# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CARISSA PERONIS, individually and as administratrix of the estate of Kendall Peronis, and MATTHEW FRITZIUS, | ) ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) |
| | )     2:16-cv-01389 |
| UNITED STATES OF AMERICA, VALLEY MEDICAL FACILITIES, INC., t/d/b/a HERITAGE VALLEY PEDIATRICS, VALLEY MEDICAL FACILITIES, INC., t/d/b/a HERITAGE VALLEY BEAVER, and HILARY JONES, M.D., | ) )     Judge Nora Barry Fischer ) ) ) ) ) ) |
| Defendants. | ) |

## **MEMORANDUM OPINION**

**I.     INTRODUCTION**

This malpractice claim arises after the tragic loss of a child who passed away just six hours after birth. Pending before the court is a motion for summary judgment (Doc. No. 86) filed by Defendant Hilary Jones, M.D. ("Dr. Jones"). Dr. Jones asserts that she is entitled to summary judgment because plaintiffs—the parents of the child and the administrators of the child's estate—have failed to offer any evidence suggesting that Dr. Jones acted negligently. Plaintiffs argue that summary judgment is not warranted because there *does* exist a genuine dispute over material facts, primarily the timing of when Dr. Jones had been notified of the child's health issues and her alleged delay in providing necessary medical treatment. For the

reasons explained below, the court finds that factual disputes in the record make summary judgment inappropriate. The motion (Doc. No. 86) will be denied.

## II. BACKGROUND

On October 12, 2014, plaintiff Carissa Peronis ("Ms. Peronis") went to Heritage Valley Beaver Hospital, in Beaver County, Pennsylvania, for the birth of her first child. Doc. No. 1 at 3, 6. She arrived at the hospital around 2:00 PM. Later in the evening, the fetal monitor showed that the baby began to experience heart rate decelerations. The child was born at approximately 5:20 AM. At delivery, the child required resuscitation, to include suctioning of meconium and administering oxygen. *Id.* at 8.

During the delivery, Dr. Kevin C. Dumpe had served as the attending physician. No pediatrician was present at that time. According to plaintiffs, after the child was born, hospital staff did not immediately notify a pediatrician about the child's health conditions, and the child was permitted to remain in the hospital room with her mother for the next two hours. *Id.* at 9. At approximately 7:25 AM, a nurse documented abnormal respiratory symptoms, and soon thereafter staff members contacted a medical resident on call at the hospital. *Id.* at 10. Shortly after 8 AM, defendant Dr. Jones examined the child, noting meconium fluid at delivery and mild respiratory distress. *Id.*

The child's health deteriorated quickly. Dr. Jones arranged for the child to be transported to another hospital. A transport team arrived sometime before 10:00 AM, but the child developed a pulmonary hemorrhage and could not sustain her heart rate. *Id.* at 11. The child died at 11:40 AM. *Id.* Dr. Jones signed the death certificate, noting the cause of death as

2

"cardiac arrest due to pulmonary hemorrhage due to pulmonary hypertension due to meconium aspiration." *Id.* at 11. A subsequent autopsy report noted the cause of death as "neonatal sepsis from E. coli and acute bronchopneumonia associated with massive aspiration of meconium." *Id.* at 11.

Plaintiffs now allege that a delay in delivery, the lack of proper treatment at delivery, and a prolonged delay in treating the child postdelivery ultimately led to the child's death. As it relates to this motion, and to Dr. Jones in particular, plaintiffs allege that Dr. Jones was called to examine the child at approximately 7:20 AM, but that Dr. Jones did not arrive to examine the child until sometime after 8 AM. Doc. No. 96 at 2. Plaintiffs allege that this delay, among other things, constitutes medical malpractice.

Plaintiffs filed their claim on September 8, 2016. Defendants included Kevin Dumpe, the attending physician who specializes in obstetrics; Hilary Jones, the treating pediatrician who specializes in pediatrics; Valley Medical Facilities, Inc. t/d/b/a Heritage Valley Pediatrics; Valley Medical Facilities, Inc. t/d/b/a Heritage Valley Beaver; Primary Health Network – Beaver Falls Primary Care ("Primary Care"), a federally qualified healthcare center; and the United States.[1] Plaintiffs bring professional liability claims against the individual physicians, along with vicarious liability claims against the healthcare entities that employed these physicians. The United States is a party based on its affiliation with Primary Care and Dr. Dumpe.

---

[1] Dr. Kevin Dumpe and Primary Health Network-Beaver Falls Primary Care have since been removed as defendants in this suit, in favor of the United States. Doc. No. 7.

3

**III.     LEGAL STANDARD**

Summary judgment is appropriate when the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A genuine dispute of material fact is one that could affect the outcome of litigation. *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 643 (3d Cir. 2015) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *N.A.A.C.P. v. North Hudson Reg'l Fire & Rescue*, 665 F.3d 464, 475 (3d Cir. 2011) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The initial burden is on the moving party to adduce evidence illustrating a lack of genuine, triable issues. *Hugh v. Butler Cnty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).  Once the moving party satisfies its burden, the non-moving party must present sufficient evidence of a genuine issue in rebuttal. *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (citing *Matsushita Elec. Indus. Co.*, 475 U.S. at 587). When considering the parties' arguments, the court is required to view all facts and draw all inferences in the light most favorable to the non-moving party.  *Id.* (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).  The benefit of the doubt will be given to allegations of the non-moving party when in conflict with the moving party's claims.  *Bialko v. Quaker Oats Co.*, 434 F. App'x 139, 141 n.4 (3d Cir. 2011) (citing *Valhal Corp. v. Sullivan Assocs.*, 44 F.3d 195, 200 (3d Cir. 1995)).

Nonetheless, a well-supported motion for summary judgment will not be defeated where the non-moving party merely reasserts factual allegations contained in the pleadings. *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010) (citing *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989)). The non-moving party must resort to affidavits, deposition testimony, admissions, and/or interrogatories to demonstrate the existence of a genuine issue. *Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 773 (3d Cir. 2013) (citing *Celotex Corp.*, 477 U.S. at 324).

## IV. DISCUSSION

The issues involved in this motion have been litigated extensively. The court held oral argument on July 20, 2018, and again on September 17, 2018. Dr. Jones submitted the motion at issue (Doc. No. 86) on May 15, 2018, a brief in support of the motion (Doc. No. 87), along with two supporting briefs (Doc. Nos. 102, 111). Plaintiffs filed a response (Doc. No. 96), along with two subsequent responsive briefs (Doc. Nos. 105, 114).

Based on the motion and arguments of counsel, the issues to decide are as follows:

- First, what is the relevant law given that this case is before the federal judiciary under the Federal Tort Claims Act (FTCA)?
- Second, should plaintiffs be permitted to supplement their expert reports, in view of arguments raised by Dr. Jones?
- And third, should the court grant Dr. Jones's motion for summary judgment?

Each of these issues will be discussed in turn.

### A. The Federal Tort Claims Act and governing state law

The FTCA permits suits against the United States for tort liability. Subject to certain exceptions, the FTCA provides that the United States is liable for the tortious actions of its employees, more specifically,

> for money damages, . . . for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. 1346(b)(1) (West 2013). To that end, "A plaintiff may recover against the United States only to the extent that recovery would be permitted under the substantive tort law of the state where the complained of conduct took place." *Weber v. United States*, 991 F. Supp. 694, 696 (D.N.J. 1998) (citing *Ciccarone v. United States*, 486 F.2d 253, 257 (3d Cir. 1973)); *see also Santos ex rel. Beato v. United States*, 559 F.3d 189, 193 (3d Cir. 2009). Based on its text and interpretive case law, the FTCA does not itself create a substantive cause of action against the United States. Instead, the act simply provides a procedural remedy "by which substantive state law could be applied against the federal government." *Weber*, 991 F. Supp. at 696.

Jurisdiction in this case is thus proper against the federal government and its agents under the FTCA. Jurisdiction is likewise proper against the remaining defendants based on supplemental jurisdiction. *See* 28 U.S.C. § 1367. Either way, this court must apply Pennsylvania substantive law, and plaintiffs must satisfy such state law requirements to potentially recover damages. *See, e.g.*, *Liggon-Redding v. Estate of Sugarman*, 659 F.3d 258, 263 (3d Cir. 2011) (holding that a certificate of merit pursuant to Pa. R. Civ. P. 1042.3 is substantive law that must be

applied in malpractice cases when a federal court exercises diversity or supplemental jurisdiction); *Baumgardner v. Ebbert*, 535 F. App'x 72, 77 (3d Cir. 2013) ("The FTCA requires a court to apply the tort laws of the state in which the alleged tort arose.").

### 1. Pennsylvania medical malpractice claims

Pennsylvania law broadly defines medical malpractice as the "unwarranted departure from generally accepted standards of medical practice resulting in injury to a patient, including all liability-producing conduct arising from the rendition of professional medical services." *Toogood v. Rogal*, 824 A.2d 1140, 1145 (Pa. 2003). The elements necessary to establish a *prima facie* case closely mirror those necessary to establish other negligence claims: "(1) the physician owed a duty to the patient; (2) the physician breached the duty; (3) the breach was the proximate cause of the harm suffered; and (4) the damages suffered were a direct result of the harm." *Brown v. Hahnemann Univ. Hosp.*, 20 F. Supp. 3d 538, 542 (E.D. Pa. 2014) (citing *Hightower–Warren v. Silk*, 698 A.2d 52, 54 (Pa. 1997)); *see also Toogood*, 824 A.2d at 1145.

Almost all medical malpractice cases require expert testimony. "Because the negligence of a physician encompasses matters not within the ordinary knowledge and experience of laypersons a medical malpractice plaintiff must present expert testimony to establish the applicable standard of care, the deviation from that standard, causation and the extent of the injury." *Toogood* , 824 A.2d 1140, 1145 (2003); *see generally* 3 Summ. Pa. Jur. 2d Torts § 37:65 (2d ed.). Assuming a *prima facie* case is shown, "the standard of care and the defendant's satisfaction of that standard are questions of fact to be submitted to a jury." *K.H. ex rel. H.S. v. Kumar*, 122 A.3d 1080, 1094 (Pa. Super. Ct. 2015).

## 2. Expert testimony standards under Pennsylvania law

Expert testimony must be stated to a "reasonable degree of medical certainty." *Mitzelfelt v. Kamrin*, 584 A.2d 888, 892 (Pa. 1990). In certain cases, establishing proximate cause may be difficult, such as in cases where physicians fail to timely diagnose a disease. In those instances, physicians may still be liable when it can be shown by a preponderance of evidence that the acts or omissions of the physician were a "substantial factor in bringing about the harm." *Id.*; *see also Maresca v. Mancall*, No. CIV.A. 01-5355, 2004 WL 1058148, at *3 (E.D. Pa. May 11, 2004), *aff'd*, 135 F. App'x 529 (3d Cir. 2005); *Billman v. Saylor*, 761 A.2 d 1208, 1211–12 (Pa. Super. Ct. 2000); *Eaddy v. Hamaty*, 694 A.2d 639, 642 (Pa. Super. Ct. 1997).

Finally, when considering the requisite degree of medical certainty, expert testimony should be viewed in its entirety. *See, e.g.*, *Eaddy*, 694 A.2d at 642 ("[A]n expert need not testify with absolute certainty or rule out all possible causes of a condition…[n]or do we require an expert to testify in precisely the language used to enunciate the legal standard.") (collecting cases); *see also McCann v. Amy Joy Donut Shops, A Div. of Am. Snacks, Inc.*, 472 A.2d 1149, 1151 (Pa. Super. Ct. 1984). The same is true when a court reviews an expert's report in the context of summary judgment. *See Rauch v. Mike-Mayer*, 783 A.2d 815 (Pa. Super. Ct. 2001). In other words, an expert report need not contain "magic words." *Welsh v. Bulger*, 698 A.2d 581, 585-86 (Pa. 1997). Rather, Pennsylvania courts look at the substance of the evidence presented to determine if there is an adequate expert opinion to make out a *prima facie* case of medical malpractice against the defendant. *Rauch*, 783 A.2d at 826 (finding that, when reviewing an expert report, there is no need to rely on "formulaic incantation of identification and fault attribution," if the "clear import of the report implicates the named physician defendants.").

B.  **Sufficiency of the expert reports**

With this legal background in mind, the court turns to Dr. Jones's arguments.  Dr. Jones argues that summary judgment is warranted because none of plaintiffs' experts opine in their reports that Dr. Jones's conduct fell below the standard of care.  Doc. No. 87 ("[N]one of the experts that plaintiffs identified have provided a report which is in any way critical of Dr. Hilary Jones, or the care she rendered to [the child].").  Dr. Jones further argues that plaintiffs should not be permitted to supplement or amend their expert reports because:

(1) the court has already set deadlines for disclosure of expert reports;

(2) plaintiffs' experts are not privy to new information that was not previously available at the time they drafted their initial reports;

(3) any proposed modifications to those reports would constitute additional expert opinions, as opposed to mere clarification of existing opinions; and

(4) Dr. Jones would incur prejudice after having to litigate a summary judgment motion based on deficient expert reports.  Doc. No. 111 at 17.

1.  **Contents of plaintiffs' expert reports**

Plaintiffs intend to call three medical experts at trial:  Dr. Edward H. Karotkin (neonatology), Dr. Leonard Zamore (obstretics/gynecology), and Dr. Steven Lewis Shore (pediatrics/pediatric infectious diseases).  Doc. No. 77 at 9, 10.  Each expert produced a report.  Those reports are attached to plaintiffs' pretrial statement.  *Id.*

Beginning with Dr. Karotkin, his report does not name any physician by name.  Doc. No. 77-1. Nonetheless, Dr. Karotkin provides a detailed summary of events and ultimately opines the following:

> [I]f this child had been delivered earlier she would have had an opportunity to avoid the massive inhalation of infected amniotic fluid and meconium. Even without an earlier delivery, a pediatrician should have been called if the child's respiratory difficulties had been assessed at or shortly after delivery. An earlier assessment by a pediatrician would have prompted earlier antibiotic treatment and quicker transfer. Earlier treatment and transfer [to another hospital] would have provided this infant with a chance of survival. The delay in delivery and in assessing this child after delivery increased the likelihood of her death.

Doc. No. 77-1 at 2.

Dr. Zamore's report likewise provides a detailed account of events and discusses alleged deviations in the standard of care. According to Dr. Zamore, delivery should have been accomplished several hours earlier, and Dr. Dumpe should have had a pediatrician present at delivery. Doc. No. 77-2 at 2. Dr. Zamore is further critical of the nurses and all other healthcare providers in "failing to advocate" for a pediatrician to be present at delivery, and in failing to provide a full assessment of the infant's condition at or shortly after delivery. *Id.* Put simply, Dr. Zamore believes that "the fact that a pediatrician was not present or called at this delivery was contrary to good medical practice and hospital policy." *Id.*

Finally, Dr. Shore claims in his report that "[t]here is confusion as to when the pediatrician was called." Doc. No. 77-3 at 1. According to Dr. Shore, the child was brought into the nursery around 7:00 AM, but was not assessed until about 7:25 AM, when it was noted that the child had respiratory distress and hypoxemia. *Id.* Dr. Shore goes on to reference medical records suggesting that a pediatrician was called when the baby was found in respiratory distress (around 7:20 AM). *Id.* Dr. Shore further states:

> [T]he resident testified that the call [to Dr. Jones] came in after 0800. He [the medical resident] then went to the nursery, did a cursory exam and told the nurse to wait for the general pediatrician on call, Dr. Hilary Jones, to show for her

>rounds. Dr. Jones did not arrive to examine the baby until after 0815, about 3 hours after birth.

*Id.* Dr. Shore opines that, although the child had been very sick at birth, the baby could have recovered with prompt and appropriate medical care, particularly earlier care by a pediatrician. *Id.* at 2. "The more timely administration of an effective antibiotic and intervention with NICU-level care may well have saved this baby's life." *Id.* at 3.

What is clear from these reports is that plaintiffs' medical experts believe, to a reasonable degree of medical certainty, that quicker medical intervention—particularly earlier care by a pediatrician— would have increased the child's chance of survival. What is less clear is Dr. Jones's alleged violation of the standard of care because none of plaintiffs' experts explicitly implicate her by name.

### 2. Plaintiffs' position regarding the expert reports

In response to the motion for summary judgment, plaintiffs contend that Dr. Karotkin's and Dr. Shore's expert reports establish a *prima facie* case of medical malpractice against Dr. Jones. To support this argument, plaintiffs reference the hospital records wherein a nurse documents the child's respiratory distress. In those records, a nurse writes that Dr. Jones was notified at 7:20 AM. Doc. No. 96-2 at 1. Plaintiffs then reference Dr. Shore's report that discusses the confusion as to when the pediatrician was called and that Dr. Jones did not ultimately examine the baby until 8:15 AM. Doc. No. 77-3 at 1. Plaintiffs claim that, if Dr. Jones was called at 7:20 AM, but did not arrive until after 8:15 AM, such a delay would constitute a deviation from the standard of care. Furthermore, plaintiffs claim that causation is established

11

because Dr. Shore and Dr. Karotkin opined that earlier medical assessment and care by a pediatrician would have provided the child with an increased chance of survival.

During oral argument on July 20, 2018, plaintiffs argued that their expert reports need not contain magic words and that their reports are sufficient. Nonetheless, plaintiffs also suggested supplementing or clarifying their expert reports if the court deemed it necessary. On September 17, 2018, plaintiffs filed a supplement to Dr. Karotkin's expert report. That supplement now explicitly states that it would constitute a deviation from the accepted standard of care if Dr. Jones was notified of the child's respiratory distress at 7:20 AM, but did not act or arrive at the nursery until about an hour later. Doc. No. 120-1 at 1.

### 3. Law related to supplemental filing of expert reports

Before considering the sufficiency of the expert reports, the court must first determine whether it will consider the supplemental filing. This decision implicates several rules of procedure, to include Rules 26, 37, and 56. First, an expert witness is required to provide an expert report. Fed. R. Civ. P. 26(a)(2)(B). That report must contain, among other things, a complete statement of all opinions of the expert witness. *Id.* Expert reports are designed to eliminate unfair surprise to the opposing party and to conserve resources. *See, e.g.*, *Reed v. Binder*, 165 F.R.D. 424, 429 (D.N.J. 1996) (citing *Sylla–Sawdon v. Uniroyal Goodrich Tire Co.*, 47 F.3d 277, 284 (8th Cir. 1995), *cert. denied*, 516 U.S. 822 (1995)). "The test of a report is whether it was sufficiently complete, detailed and in compliance with the Rules so that surprise is eliminated, unnecessary depositions are avoided, and costs are reduced." *Reed*, 165 F.R.D. at 429.

An expert witness also has a duty to supplement or correct his disclosure. Fed. R. Civ. P. 26(e)(1), (2). Such changes must ordinarily be disclosed by the time the party's pretrial

disclosures are due. *Id.* Notably, Rule 26 "does not give parties the right to freely supplement, especially after court-imposed deadlines." *McDaniel v. Kidde Residential & Commercial*, No. 2:12-CV-1439, 2015 WL 6736811, at *1 (W.D. Pa. Nov. 3, 2015) (citations omitted). "Courts distinguish true supplementation (e.g., correcting inadvertent errors or omissions) from gamesmanship, and have therefore repeatedly rejected attempts to avert summary judgment by supplementing an expert report with a new and improved expert report." *Id.* (citations and quotation marks omitted); *accord Kremsky v. Kremsky*, 2017 WL 4467180, at *4 (E.D. Pa. Feb. 22, 2017).

Violations of Rule 26 requirements can result in sanctions under Rule 37. As this court has addressed in the past, Rule 37 provides the court with discretion to impose a variety of potential sanctions. *See McDaniel v. Kidde Residential & Commercial*, No. 2:12-CV-1439, 2015 WL 6736811, at *2 n.1 (W.D. Pa. Nov. 3, 2015). One such sanction is to disregard the supplemental report and exclude those opinions contained therein from trial. *See id.*; *see also Sowell v. Butcher & Singer, Inc.*, 926 F.2d 289, 302 (3d Cir. 1991). Another potential sanction is to shift the costs of expert depositions. *See Reed v. Binder*, 165 F.R.D. 424, 429 (D.N.J. 1996).

Prior to excluding evidence under Rule 37, the court should consider the following four factors: "(1) the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified; (2) the ability of that party to cure the prejudice; (3) the extent to which allowing the evidence in trial would disrupt the orderly and efficient trial of the case or of other cases in the court; and (4) bad faith or willfulness in failing to comply with the district court's order." *McDaniel*, 2015 WL 6736811, at *2 (citations omitted).

Finally, this court must be mindful of Rule 56. The 1963 advisory committee notes to Rule 56 explain that "[t]he very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." To that end, if a party fails to properly support an assertion of fact or to properly address the opposing party's assertion of fact at the summary judgment stage, Rule 56 (e) gives the court discretion to permit that party "an opportunity to properly support or address that fact." Fed. R. Civ. P. 56(e)(1). The 2010 advisory committee notes to Rule 56(e) further state that this approach is usually "the court's preferred first step." *See also Liebling v. Novartis Pharm. Corp.*, No. CV1110263MMMMRWX, 2014 WL 12584383, at *3 (C.D. Cal. Mar. 6, 2014) ("[G]enerally courts should afford a party an opportunity to support her facts and address her opponent's facts under rule 56(e)(1).").

As mentioned, invoking Rule 56(e)(1) is a matter of this court's discretion. In reviewing case law, it appears other courts have declined to afford this opportunity in cases of bad faith or in protracted litigation where further opportunity to address summary judgment arguments would lead to even further delay in the litigation process. *See, e.g., Rahman v. Taylor*, No. CIV. 10-0367, 2013 WL 1192352, at *4 (D.N.J. Mar. 21, 2013); *Hayes v. Am. Int'l Grp.*, No. CIV.A. 09-2874, 2014 WL 3746813, at *34 (E.D. Pa. July 29, 2014).

### 4. Analysis regarding the supplemental filing

After carefully considering the parties' arguments, the court finds in its discretion that permitting the supplemental filing is warranted. As discussed above, the purpose of summary judgment is to truly assess whether there is a genuine need for trial. And, under Rule 56(e), it is ordinarily the preferred first step to allow a party to properly support or address the fact at

issue. In this case, the confusion over when Dr. Jones was called had already been outlined in the expert reports. The issue thus boils down to whether any of plaintiffs' experts would agree that an alleged hour or so delay on the part of Dr. Jones in responding to the child's respiratory distress would constitute a breach of the standard of care. Plaintiffs answer that in the affirmative with a one-sentence supplement to Dr. Karotkin's expert report.

The court is mindful of Dr. Jones's concerns about the initial deficiency in the reports. The court has considered Rule 37 and Dr. Jones's position that any supplemental filings or clarifications to the expert reports should be stricken. In considering such a severe sanction, the court has reviewed the four factors specified in *McDaniel.*

Each of those factors weighs in favor of permitting the supplemental filing. First, the court finds little prejudice or surprise to Dr. Jones. While Dr. Jones asserts prejudice in having to file a summary judgment motion, that was her tactical decision. By the same token, Dr. Jones could have first conferred with plaintiffs about fault attribution, before filing any motion. After all, Dr. Jones was on notice of the issue based on the complaint. Specifically, in Count III of the complaint, plaintiffs explicitly allege that Dr. Jones was negligent "in failing to respond to notifications and messages regarding [the child's] condition in a timely and proper fashion." Doc. No. 1 ¶ 103. Similarly, Dr. Shore in his report noted the confusion about when the pediatrician was called. Doc. No. 77-3 at 1. Furthermore, all three of plaintiffs' experts opine that faster medical intervention *by a pediatrician* could have saved the child's life. Plaintiffs' theory should come to no surprise to Dr. Jones.

In addition, the court finds little prejudice because Dr. Jones did not depose any of plaintiffs' experts. When asked about this decision at oral argument, Dr. Jones's counsel

explained that no depositions were taken because "the issue… is not even close… It's clear from the reports and it's clear from plaintiffs' narrative statement what the story is they're telling us here and the story doesn't involve Dr. Jones's negligence." Doc. No. 109, Hr'g Tr. 12:5–13. The court disagrees. Plaintiffs' experts could have provided more clarity regarding fault attribution; nevertheless, when read together, all three expert reports implicate Dr. Jones. *See Rauch v. Mike-Mayer*, 783 A.2d 815, 826 –27 (2001) (reviewing expert reports *together* in their entirety to determine whether the substance presents a *prima facie* case of medical malpractice). To the extent there was some ambiguity in the expert reports, Dr. Jones had other options aside from immediately seeking summary judgment.

The court further finds little prejudice because Dr. Jones's theory of the case will not be changing in view of the one-sentence supplement to Dr. Karotkin's report. At oral argument, counsel for Dr. Jones stated: "It's our position that none of that [i.e. a delay in medical care] mattered." Doc. No. 109, Hr'g Tr. 17:21 –24. Rather, according to Dr. Jones's experts, the child suffered from fetal sepsis, and "no intervention taken by any of the physicians was going to change the outcome of this case." *Id.* at 18:4 –10. Therefore, allowing plaintiffs to clarify fault attribution and causation with a one-sentence supplement does little to change the defense theory of this case.

Turning to the second factor to consider under Rule 37—the ability of the party to cure the prejudice—the court finds that plaintiffs have already done so, to the extent there was any prejudice in the first place. Plaintiffs clarified their position through written filings and at oral argument. Plaintiffs, in no uncertain terms, have now set forth their position regarding Dr. Jones's alleged deviation in the standard of care.

16

The third factor to consider is whether allowing the evidence at trial would disrupt the orderly and efficient presentation of the case. Dr. Jones made no arguments on this point. The court likewise sees no reason why the supplemental filing would have any impact on efficiency in this case moving forward.

Finally, the court must consider bad faith. Here, the court does not find plaintiffs acted in bad faith. At all times plaintiffs have complied with this court's deadlines and rules. The supplemental filing here is best viewed as a minor clarification to the previous reports. As discussed above, courts distinguish true supplementation of expert reports—correcting minor errors and omissions—from gamesmanship. In the past, this court has excluded evidence from trial under Rule 37; in both cases bad faith was a significant factor for the sanction. *See McDaniel* 2015 WL 6736811, at *2 n. 1, and *Wonderland NurseryGoods Co. v. Thorley Indus.*, LLC, No. CIV.A. 12-196, 2014 WL 199789, at *1 (W.D. Pa. Jan. 17, 2014). These cases are distinguishable. The court based its decision in *McDaniel* on violations of the court's scheduling orders, the potential for significant delay in trial, and the supplemental filing constituting an "entirely new" theory of the case on the eve of trial. 2015 WL 6736811, at *5. Similarly, in *Wonderland*, the court excluded amended claims in a patent infringement case when plaintiffs attempted, without leave of court, to file amended claims that constituted a "wholesale change in position" on the eve of trial. 2014 WL 199789, at *6.

Here, plaintiffs' supplemental filing is not a wholesale change in position. To the contrary, plaintiffs have maintained their overall theory since the initial filing of the complaint. It has remained plaintiffs' position that the entire medical staff at the hospital breached the standard of care by failing to timely intervene with appropriate medical care. The genesis of the

17

claim—and the opinions of plaintiffs' experts—is that earlier intervention by a pediatrician could have saved this child's life. The fact that plaintiffs' expert reports could have been more thorough with respect to fault attribution does not change plaintiffs' theory of the case. Put simply, Dr. Jones has been on notice of the claims since the beginning. There is no justification to find bad faith.

### C. Summary judgment

The court now turns to the crux of the issue — whether summary judment is appropriate. Because there is a genuine dispute as to material facts, this case must move forward to trial. The court reaches this decision based on (1) the *prima facie* case established against Dr. Jones and (2) the dispute as to the time Dr. Jones was notified of the child's condition.

As discussed above, Plaintiffs must satisfy Pennsylvania law in establishing a *prima facie* case. That includes the elements of duty, breach, causation, and damages. *See Brown v. Hahnemann Univ. Hosp.*, 20 F. Supp. 3d 538, 542 (E.D. Pa. 2014) (citing *Hightower–Warren v. Silk*, 698 A.2d 52, 54 (Pa. 1997)). Expert testimony is required to establish each element. *Toogood v. Rogal*, 824 A.2d 1140, 1145 (Pa. 2003). Here, at least one of plaintiffs' experts, Dr. Karotkin, opines that Dr. Jones departed from the accepted standard of care in failing to timely respond to the child's respiratory distress when she was notified at 7:20 AM. This expert further claims that earlier care by a pediatrician would have increased the child's chance of survival. Should the factfinder agree, damages could be awarded.

Given that a *prima facie* case has been established, the court considers whether there is a triable issue of fact. The court must look beyond the pleadings and consider whether plaintiffs,

as the nonmoving party, have pointed to evidence in the record to demonstrate the existence of a genuine issue. *See Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 773 (3d Cir. 2013). Notably, the court is required to view all facts and draw all inferences in the light most favorable to the nonmoving party. *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (further noting that "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial").

As discussed at length in this decision, the parties dispute whether nurses notified Dr. Jones at 7:20 AM. Hospital records indicate Dr. Jones received notice at that time. Doc. No. 96-2 at 1. Dr. Jones, however, denies this in her deposition: "I was not called." Doc. No. 96-3 at 2. At oral argument, plaintiffs have further summarized the dispute as follows:

> [T]here is a factual dispute between the nurse's note where she says 7:20 Dr. Jones was notified, her deposition testimony where she says it was a little after 7:20, with the resident who says he wasn't called by the nurse until around 8:00 when he was coming out of his morning lecture, and Dr. Jones who says she never got a call and didn't show up until 8:15 or 8:20.

Doc. No. 109, Hr'g Tr. at 25:14 –20. Dr. Jones barely addresses this factual dispute in her motion for summary judgment. Instead, she relies on deficiencies in the expert reports. In other words, Dr. Jones completely ignores the factual dispute regarding the time and method in which she was notified to administer care to the child.

The court is not in the position to weigh the evidence, assess witness credibility, or determine the standard of care or whether that standard was violated. This case is appropriate for determination before a jury, and summary judgment must be denied.

An appropriate order follows.

s/*Nora Barry Fischer*
Nora Barry Fischer
United States District Judge

Dated:  October 2, 2018