# THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

CARISSA PERONIS, individually and as )
administratrix of the estate of Kendall )
Peronis, and MATTHEW FRITZIUS, )
                                )
           Plaintiffs, )
                                )
           v. )
                                )     16-cv-01389
UNITED STATES OF AMERICA, )
VALLEY MEDICAL FACILITIES, INC., )     Judge Nora Barry Fischer
t/d/b/a HERITAGE VALLEY )
PEDIATRICS, VALLEY MEDICAL )
FACILITIES, INC., t/d/b/a HERITAGE )
VALLEY BEAVER, and HILARY JONES, )
M.D., )
                                )
          Defendants. )

## MEMORANDUM

AND NOW, this 9th day of September, 2019, the Court writes to confirm its oral order on

September 4, 2019 (Docket No. 202) denying the Motion for Directed Verdict filed pursuant to

FED. R. CIV. P. 50 by Defendant Valley Medical Facilities, Inc. t/d/b/a Heritage Valley Beaver

("Heritage Valley Beaver") (Docket No. [196]). The Court previously considered said motion, the

brief in support thereof (Docket No. 197), and heard oral argument on September 4, 2019.

A motion pursuant to Federal Rule of Civil Procedure 50(a) may be made at any time

before the case is submitted to the jury. *Ponzini v. Primecare Med., Inc.*, 269 F. Supp. 3d 444, 498

(M.D. Pa. 2017) (quoting FED. R. CIV. P. 50(a)(2)). If a party has been fully heard on an issue

during a jury trial and the court finds that a reasonable jury would not have a legally sufficient

evidentiary basis to find for the party on that issue, the court *may* (a) resolve the issue against the

party; and (b) grant judgment as a matter of law against the party on a claim or defense that under

the controlling law, can be maintained or defeated only with a favorable finding on that issue. *Id.* (quoting FED. R. CIV. P. 50(a)(2)).

When deciding a Rule 50(a) motion, the court must view the evidence in the light most favorable to the non-moving party, giving the non-moving party the benefit of every fair and reasonable inference. *Galena v. Leone*, 638 F.3d 186, 196 (3d Cir. 2011) (citing *Beck v. City of Pittsburgh,* 89 F.3d 966, 971 (3d Cir. 1996)). The motion should be granted only if the evidence is not sufficient for a jury reasonably to find liability. *Id.* To this end, the court must "refrain from weighing the evidence, determining the credibility of witnesses, or substituting its own version of the facts for that of the jury." *Eshelman v. Agere Sys., Inc.*, 554 F.3d 426, 433 (3d Cir. 2009) (quoting *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 300 (3d Cir. 2007)).

In this case, the moving defendant, Heritage Valley Beaver, argued that the trial record could not support a finding of corporate negligence because the plaintiffs had not provided expert testimony demonstrating that the hospital deviated from the standard of care. (Docket No. 197 at 10). For the reasons that follow and for those stated on the record, this Court disagrees. Contrary to Heritage Valley Beaver's assertion, this Court found that there is expert testimony of record from which a reasonable jury could determine: (1) whether the hospital's policies comported with the standard of care and (2) whether those policies were or were not followed.[1]

---

[1]      Heritage Valley Beaver argues that its motion for a directed verdict must be granted as to the issue of corporate negligence because the question of whether it breached

> the standard of care for timely notifying a pediatrician in connection with the delivery and birth of any infant with an E. Coli infection and possible aspiration of fluid. . . is a question based upon medical expertise and is not one suited for a lay jury to decide without expert guidance.

(Docket No. 197 at 10). While Heritage Valley Beaver confines its arguments to whether or not it breached its duty to formulate, adopt, and enforce adequate rules and policies to ensure quality care for its patients, Plaintiffs 'claim for professional negligence is not so narrow. (Docket No. 1 ¶ 126). Indeed, the allegations as pled in Counts VII and VIII of the Complaint are much broader than the promulgation of policies or the adherence to those policies. (*Id.* at ¶¶ 125-33)

"Corporate negligence is a doctrine under which the hospital is liable if it fails to uphold the proper standard of care owed [to] the patient, which is to ensure the patient's *safety and well-being* while at the hospital." *Welsh v. Bulger*, 698 A.2d 581, 585 (Pa. 1997) (quoting *Thompson v. Nason Hosp.*, 591 A.2d 703, 707 (Pa. 1991)) (emphasis added). "This theory of liability creates a nondelegable duty which the hospital owes directly to a patient." *Id.* (quoting *Thompson*, 591 A.2d at 707). Here, we have two patients, Carissa Peronis and Kendall Peronis.

To establish a prima facie case of corporate negligence, the plaintiffs must establish each of the following elements:

"1. the hospital deviated from the standard of care;

2. the hospital had actual or constructive notice of the defects or procedures that created the harm; and

3. the hospital's act or omission was a substantial factor in bringing about the harm."

*Kennedy v. Butler Memorial Hosp.*, 901 A.2d 1042, 1045 (Pa. Super. Ct. 2006); *see Sensenich v. Morcos*, 205 A.3d 375, 383 (Pa. Super. Ct. 2019). A hospital owes the following duties to a patient:

(1) a duty to use reasonable care in the maintenance of safe and adequate facilities and equipment; (2) a duty to select and retain only competent physicians; (3) a duty to oversee all persons who practice medicine within its walls as to patient care; and (4) a duty to formulate, adopt and enforce adequate rules and policies to ensure quality care for the patients.

*Welsh*, 698 A.2d at 585 (quoting *Thompson.*, 591 A.2d at 707).

It is well established that a hospital staff member or employee has a duty to recognize and report abnormalities in the treatment and condition of its patients. . . . . If the attending physician fails to act after being informed of such abnormalities, it is then incumbent upon the hospital staff member or employee to so advise the hospital authorities so that appropriate action might be taken. . . . When there is a failure to report changes in a patient's condition and/or to question a physician's order which is not in accord with standard medical practice and the patient is injured as a result, the hospital will be liable for such negligence.

*Thompson*, 591 A.2d at 703 (internal citations and quotations omitted); *see Ponzini v. PrimeCare Med., Inc.*, 269 F. Supp. 3d 444, 587-88 (M.D. Pa. 2017).

As noted, Heritage Valley Beaver argued that there is insufficient expert testimony of record to prove that it violated the appropriate standard of care. (Docket No. 197 at 10). Concerning the type of evidence necessary to prove a corporate negligence claim, "unless a hospital's negligence is obvious, a plaintiff must produce expert testimony to establish that the hospital deviated from an accepted standard of care and that the deviation was a substantial factor in causing the harm to the plaintiff." *Welsh*, 698 A.2d at 585. However, experts in Pennsylvania are not required to use "magic words" when rendering their opinions. *Welsh*, 698 A.2d at 586-87.

Contrary to Heritage Valley Beaver's contention, four experts, Dr. Leonard Zamore, Dr. Steven Shore, Dr. Edward Karotkin, and Dr. Steven Ringer, testified that in the event the jury found certain facts to be true, the hospital's policies and procedures violated the applicable standard of care. Each of these experts is well-qualified, Dr. Zamore in the field of obstetrics and gynecology; Dr. Shore in the field of pediatrics and pediatric infectious disease; Dr. Karotkin in the field of neonatology; and Dr. Ringer also in the field of neonatology. Said another way, these experts suggest that when the factual record is read in the light most favorable to the Plaintiffs, as the Court must, there is evidence from which a reasonable jury could find corporate negligence.

First, Dr. Zamore concluded that Dr. Kevin Dumpe deviated from the standard of care by not calling for a pediatrician to be present for Kendall's delivery.[2] According to Dr. Zamore, Dr. Dumpe should have called for a pediatrician because Kendall was clearly "at risk" given the

---

[2]    Certainly, Dr. Dumpe testified to the contrary. He spoke at length about the continuum of risk and that it was within his discretion to determine whether a pediatrician should be called. He admitted that if the risk was high enough and he needed a pediatrician there, he would have called for one or for a pediatrician designee to be present.
        He also explained that Heritage Valley Beaver Policy 2.21, which gave him the discretion to determine when to call a pediatrician, would not have been passed in its present form without his input as the head nurse of the maternal child health unit "bounces ideas off him."

presence of meconium and severe Category II tracings, her shoulder dystocia, and the use of an obstetrical operative maneuver. He also explained that it was his practice and his hospital's policy that once a baby was delivered, that the baby be handed over to a labor nurse or a pediatrician (if the baby is at risk) for examination.

Similarly, Dr. Zamore testified to the proper chain of command in a delivery room. To that end, he stressed that nurses and physicians had a duty to advocate for their patients. Consequently, if a doctor fails to act, a nurse must intervene. Indeed, this is well-established in Pennsylvania, because nurses do occasionally need to "blow the whistle." *See Thompson v. Nason Hosp.*, 591 A.2d 703, 709 (Pa. 1991). A jury could find that Heritage Valley Beaver failed to adhere to this policy. To that end, Nurse Maria Hendershot, who was in the delivery room during Kendall's birth, testified that whether a pediatrician was necessary was solely Dr. Dumpe's call and "not hers."

Dr. Shore likewise testified that when a baby is at risk, a pediatrician or neonatal specialist like a Newborn Intensive Care Unit nurse must be present not only to evaluate the baby but also to plan for the neonate's subsequent care. He explained that meconium in the amniotic fluid was an "abnormality" and could even be "fearsome" in a premature baby.[3] Consequently, he expressly disagreed with Heritage Valley Beaver's Policy 2.21 relating to the presence of a pediatrician for a high-risk infant and emphasized that there are hospitals that require a pediatrician to be present whenever there is *any* meconium present in the in-utero process. Furthermore, he opined that regardless of the presence of meconium, a pediatrician should have been called because Kendall had a small pleural effusion, which may have been the root cause of her irritability (that or her sepsis). Finally, he stressed that the earlier a pediatrician treated Kendall the better.

---

[3]      Kendall, however, was a term baby.

In the same vein, Dr. Karotkin testified that Heritage Valley Beaver failed to meet the applicable standard of care. First, like Drs. Zamore and Shore, he opined that a pediatrician should have been present for Kendall's delivery. He explained that a pediatrician was necessary due to the moderate to high risk nature of the mother's circumstances, the presence of meconium after the membranes were ruptured, the use of a vacuum extractor, the concern for shoulder dystocia, and the delay in delivering the baby. It was his opinion that there is nothing like the experience of a board-certified pediatrician to evaluate and monitor a baby. Furthermore, he opined that either a nurse or an obstetrician had the authority to call a pediatrician.

Second, Dr. Karotkin determined that Policy 2.21 fell below the standard of care given the presence of the five aforementioned risk factors. In fact, he supposed, that a majority of pediatricians and neonatologists would agree that a pediatrician should have been present at Kendall's delivery. At the very least, Kendall should have been monitored more closely by either a pediatrician or a nurse while she was in her mother's room.

Third, he concluded that the hospital breached its duty by failing to call a pediatrician when Kendall's parents expressed concerns about the baby crying and grunting. Fourth, he explained that most institutions require a physician to respond within thirty minutes of being called and if Dr. Jones failed to do so, that was a breach in the standard of care. Fifth, he provided that the lack of recording by the nurses was a breach of care in its own right.

Finally, Dr. Ringer, on cross-examination, when asked to consider that there were Category II+ tracings, an arrest of descent, an operative delivery, the presence of meconium, and shoulder dystocia, he was equivocal in his response as to whether a pediatrician was needed. Specifically, he testified that having a pediatrician present would not have been unreasonable but may not have been necessary.

In summation, jurors, as the judges of credibility and fact, could weigh these experts' opinions along with the other evidence of record and return a verdict in Plaintiffs' favor on the corporate negligence claim. *See Eshelman*, 554 F.3d at 433. Said another way, there is testimony from which a reasonable jury could find that Heritage Valley Beaver's policies either fell below the standard of care or were consistent with the standard of care but not enforced. *See Galena*, 638 F.3d at 196. Accordingly, the Court denied the instant motion.

/s/ Nora Barry Fischer
Nora Barry Fischer
Senior United States District Judge