<pre>
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2

      CARISSA PERONIS, et al.,
 3                    Plaintiffs
        vs.
 4                                      Civil Action No.
      UNITED STATES OF AMERICA, et      16-1389
 5    al.,
                      Defendants.
 6
                              - - -
 7

         Transcript from proceedings on August 26, 2019, United
 8    States District Court, Pittsburgh, PA,
      before Judge Nora Barry Fischer.
 9

10    APPEARANCES:

11      For the Plaintiffs:    Harry S. Cohen & Associates, P.C.
                               Douglas L. Price, Esquire
12                             Two Chatham Center
                               Suite 985
13                             Pittsburgh, Pennsylvania 15219

14

        For the Defendant     U.S. Attorney's Office
15      USA:                   Michael Colville, Esquire
                               Philip P. O'Connor, Jr., Esquire
16                             U.S. Courthouse
                               700 Grant Street
17                             Pittsburgh, Pennsylvania 15219

18      For the Hospital      Weber Gallagher Simpson Stapleton
        Defendants and        Fires & Newby
19      Dr. Jones             Paula A. Koczan, Esquire
                              603 Stanwix Street
20                            Suite 1450
                              Pittsburgh, Pennsylvania 15222
21

        Court Reporter:       Barbara Metz Leo, RMR, CRR
22                            700 Grant Street
                              Suite 6260
23                            Pittsburgh, Pennsylvania 15219

24

         Proceedings recorded by mechanical stenography;
25    transcript produced by computer-aided transcription.
</pre>

1          THE COURT:  Everyone may be seated.  Thank you,

2     Mr. Galovich, for escorting our jurors.

3          At this time, will you administer the oath?

4     (Jury duly sworn.)

5          THE CLERK:  Please be seated.

6          THE COURT:  Thank you, Mr. Galovich.

7          Mr. Galovich, do you have notebooks and pencils for

8     these folks?  Can you pass those out?  As you can see, I keep

9     Mr. Galovich pretty busy.

10          So let the record reflect Mr. Galovich is giving each

11     of our jurors little notepads and pencils or pens which they

12     may choose to use or not.  It's totally up to them.

13          THE CLERK:  Your Honor, the joint exhibit binders are

14     to the left there.

15          THE COURT:  We'll hold off on those for a minute.  So

16     just like being in school, like the first day of school in

17     many jurisdictions here in the Western District today.  A

18     couple of things you'll note.  If you look to the side of your

19     chair, you have a little desk you can pull up.  You might have

20     remembered those from high school days particularly, and it

21     would be helpful to me and Mr. Galovich if you indicate on the

22     top of your juror notebook just your juror name and your

23     number, and those note you'll be using if you want to take

24     notes throughout these proceedings and I'll give you some

25     further instructions about those as well.

1        So once you have all indicated your juror name and

2   number on your notebooks, the court will then provide you with

3   my preliminary instructions as it relates to this case.

4        All set?  Now that you have been sworn, I have the

5   following preliminary instructions for your guidance as jurors

6   in this case.  As an initial matter, from this point on, I

7   will refer to Carissa Peronis and Matthew Fritzius as

8   plaintiffs.  I may refer to each of the defendants

9   individually or collectively as defendants.

10        Additionally, when I say hospital defendants, I am

11   referring to both Valley Medical Facilities Incorporated,

12   trading and doing business as Heritage Valley Pediatrics and

13   Valley Medical Facilities, Inc., trading and doing business as

14   Heritage Valley Beaver.

15        Finally, although the United States is a named

16   defendant in this matter, its involvement is by means of

17   Dr. Kevin Dumpe.  So when you hear the name Dr. Dumpe, think

18   United States of America.

19        Now, I want to begin by describing for you how this

20   trial will be conducted and explain what we will be doing, and

21   by "we," I mean, the lawyers for the parties, you, the members

22   of the jury, and I as the judge.

23        The parties will present evidence regarding the

24   plaintiffs' medical malpractice claim against the defendants.

25   The parties will also present evidence regarding the

1    plaintiffs' request for damages against the defendants.

2           At the end of the trial, I will give you more

3    detailed instructions on how you are to go about reaching your

4    decision, but for now, I simply want to explain how the trial

5    generally will proceed.

6           The trial will proceed in the following manner:

7    First, the attorney for plaintiffs will make an opening

8    statement.  Thereafter, the attorney for the United States of

9    America and/or the attorney for both Dr. Hilary Jones and the

10   hospital defendants may choose to make an opening statement.

11   The defendants may also reserve their right to open until

12   after the plaintiffs have put on their evidence.

13          What is said in the opening statements is not

14   evidence, but it is simply an outline to help you understand

15   what each party expects the evidence to show.

16          After opening statements, each party is given an

17   opportunity to present its evidence.  Plaintiffs go first

18   because they have the burden of proof.  The plaintiffs'

19   evidence will consist of the testimony of witnesses as well as

20   exhibits, then the defendants' attorneys will have the

21   opportunity to present evidence on each defendant's behalf.

22   Evidence in rebuttal may also be introduced by any party.

23          After all the evidence has been presented, the

24   attorneys will present to you their closing arguments to

25   summarize and interpret the evidence in a way that is helpful

5

1      to their client's positions.

2              As with opening statements, closing arguments are not

3      evidence.  Once the closing arguments are completed, I will

4      then instruct you on the law.  After that, you will retire to

5      the jury room to deliberate on your verdict in this case.

6              Your deliberations will be secret.  You will never

7      have to explain your verdict to anyone.

8              Now that I have described the trial itself, let me

9      explain the jobs that you as the jury and I as the judge are

10     to perform during this trial.

11             I will decide which rules of law apply to this case.

12     As jurors, you will hear the evidence, decide what the facts

13     are and then apply those facts to the law that I give to you.

14     You and only you will be the judges of the facts.  You will

15     have to decide what happened.  I play no part in judging the

16     facts.  You should not take anything I may say or do during

17     this trial as indicating what I think of the evidence or what

18     your verdict should be.

19             My role is to be the judge of the law.  I make

20     whatever legal decisions have to be made during the course of

21     the trial, and I will explain to you the legal principles that

22     must guide you in rendering your verdict.  You must follow the

23     law whether you agree with it or not.

24             The evidence from which you are to find the facts

25     consists of the following:

1           Number one, the testimony of the witnesses.

2           Number two, documents and other things received as

3      exhibits.

4           Number three, any facts that are stipulated, that is,

5      formally agreed to by the parties.

6           And number four, any facts that are judiciously

7      noticed.  Those are facts you must accept as true even without

8      any other evidence.

9           The following things are not evidence:

10           Number one, statements, arguments and questions of

11      the lawyers for the parties in this case, objections by the

12      lawyers, any testimony I tell you to disregard, and anything

13      you may see or hear about this case outside of this courtroom.

14           You must make your decision based only on the

15      evidence that you see and hear in court.  Do not let rumors,

16      suspicions or anything else that you may see or hear outside

17      of court influence your decision in any way.

18           You should use your common sense in weighing the

19      evidence.  Consider it in light of your everyday experience

20      with people and events and give it whatever weight you believe

21      it deserves.  If your experience tells you that certain

22      evidence reasonably leads to a conclusion, you are free to

23      reach that conclusion.

24           There are rules that control what can be received

25      into evidence.  When a lawyer asks a question or offers an

1   exhibit into evidence and a lawyer on the other side thinks

2   that it is not permitted by the rules of evidence, then that

3   lawyer may object.  This simply means that the lawyer is

4   requesting that I make a decision on a particular rule of

5   evidence.  You should not be influenced by the fact that an

6   objection is made.  Objections to questions are not evidence.

7   Lawyers have an obligation to their clients to make objections

8   when they believe that evidence being offered is improper

9   under the rules of evidence.

10          You should not be influenced by the objection or by

11  the court's ruling on it.  If the objection is sustained,

12  ignore the question.  If it is overruled, treat that answer

13  like any other.  If you are instructed that some item of

14  evidence is received for a limited purpose only, you must

15  follow that instruction.

16          Additionally, it may be necessary for me to talk with

17  the lawyers out of your hearing by having a bench conference,

18  also known as a sidebar.  During this time, you will hear

19  white noise and, indeed, there is a white noise maker here in

20  this courtroom and it plays the white noise literally right

21  over your head, and you'll hear this noise and you'll

22  understand that you can't hear beyond where you are sitting.

23          These conferences are necessary for me to fulfill my

24  responsibility, which is to ensure that evidence is presented

25  to you correctly under the law.

1          I may not always grant an attorney's request for a

2     conference.  Do not consider my granting or denying a request

3     for a conference as any indication of my opinion of the case

4     or of what your verdict should be.

5          So if the court decides that there will be a sidebar,

6     the court will convene over here.  The attorneys will join me

7     with the court reporter, and above your head, you'll hear

8     white noise as played by Mr. Galovich.

9          Also certain testimony or other evidence may be

10    ordered stricken from the record and you will be instructed to

11    disregard this evidence.  Do not consider any testimony or

12    other evidence that is stricken or excluded.  Do not speculate

13    about what a witness might have said or what an exhibit might

14    have shown.

15         Now, turning to the evidence.  There are two types of

16    evidence that you may use in reaching your verdict.  One type

17    of evidence is called direct evidence.  An example of direct

18    evidence is when a witness testifies about something that the

19    witness knows through his or her own senses, something the

20    witness has seen, felt, touched, heard or did.

21         For example, if a witness testified that he saw it

22    raining outside and you believed him, that would be direct

23    evidence that it was raining.  Another form of direct evidence

24    is an exhibit where the fact to be proved is in existence or

25    current condition.

1              The other type of evidence is circumstantial

2    evidence.  Circumstantial evidence is proof of one or more

3    facts from which you can find another fact.  For example, if

4    someone walked into this courtroom wearing a raincoat covered

5    with drops of water and carrying a wet umbrella, that would be

6    circumstantial evidence from which you can conclude that it

7    was raining.  You would not have to find that it was raining,

8    but you could.

9              You should consider both kinds of evidence that are

10   presented to you.  The law makes no distinction as to the

11   weight to be given to either direct or circumstantial

12   evidence.  You are to decide how much weight to give any

13   evidence.

14             In deciding what the facts are, you may have to

15   decide what testimony you believe and what testimony you do

16   not believe.  You are the sole judges of the credibility of

17   the witnesses.  Credibility means whether a witness is worthy

18   of belief.  You may believe everything a witness says or only

19   part of it or none of it.  In deciding what to believe, you

20   may consider a number of factors including the following:

21             Number one, the opportunity and ability of the

22   witness to see or hear or know the things the witness

23   testifies to.

24             Number two, the quality of the witness's

25   understanding and memory.

1              Number three, the witness's manner while testifying.

2              Number four, whether the witness has an interest in

3    the outcome of the case or any motive, bias or prejudice.

4              Number five, whether the witness is contradicted by

5    anything the witness said or wrote before the trial or by

6    other evidence.

7              Number six, how reasonable the witness's testimony is

8    when considered in the light of other evidence that you

9    believe.

10             And number seven, any other factors that bear on

11   believability.

12             You do not have to believe something is true simply

13   because more witnesses said it's true than said it is not

14   true.  You may find that the testimony of a smaller number of

15   witnesses about an event is more believable than the testimony

16   of a larger number.  What is more important is how believable

17   the witnesses were and how much weight you think their

18   testimony deserves.

19             If you wish, as I indicated, you may take notes

20   during the presentation of evidence, the summations of

21   attorneys at the conclusion of evidence and during my

22   instructions to you on the law.  My deputy, Mr. Galovich, has

23   already provided you with pens or pencils and paper.

24   Remember, as I indicated, your notes are for your own personal

25   use.  They are not to be given or read to anyone else.

1          As you see and as you've seen earlier today when we

2    went through the jury selection process, we have a court

3    reporter here and she will be transcribing the testimony

4    during the course of this trial, but you should not assume

5    that the transcripts will be available for your review during

6    deliberations, nor should you consider notes that your fellow

7    jurors may take as a kind of written transcript.  Instead, as

8    you listen to the testimony, keep in mind that you will be

9    relying on your recollections of what that testimony was

10   during your deliberations.

11         Now, here are some specific points to keep in mind

12   about note taking:

13         Number one, note taking is permitted but it's not

14   required.  Each of you may take notes.  No one is required to

15   take notes.

16         Number two, be brief.  Do not try to summarize all of

17   the testimony.  Notes are for the purpose of refreshing

18   memory.  They are particularly helpful when dealing with

19   measurements, times, distances, identities and relationships.

20   Overuse of note taking can be distracting.  You must determine

21   the credibility of witnesses, so you must observe the demeanor

22   and appearance of each witness on the witness stand.

23         Note taking must not distract you from that task.  If

24   you wish to make a note, you need not sacrifice the

25   opportunity to make important observations.  You may make your

1    note after you have made an observation.

2         Number three, do not use your notes or any other

3    juror notes as authority to persuade fellow jurors.  In your

4    deliberations, give no more or no less weight to the views of

5    a fellow juror just because that juror did or did not take

6    notes.  As I mentioned earlier, your notes are not official

7    transcripts.  They are not evidence and they are by no means a

8    complete outline of the proceedings or a list of the

9    highlights in the trial.

10        They are valuable, if at all, only as a way to

11   refresh your memory.  Your memory is what you should be

12   relying on when it comes time to deliberate and render your

13   verdict in this case.

14        You, therefore, are not to use your notes as

15   authority to persuade fellow jurors of what the evidence was

16   during the trial.  Notes are not to be used in place of the

17   evidence.

18        Number four, do not take your notes away from court.

19   I repeat, at the end of each break and each day, please leave

20   your notes on your chair in the courtroom.  At the conclusion

21   of the day, after you have used your notes in deliberations, a

22   court officer will collect and destroy them to protect the

23   secrecy of your deliberations, and at the conclusion of every

24   day, Mr. Galovich will gather up your notebooks and he will

25   literally lock them in our exhibit closet overnight and they

1   will be passed out to you first thing when we resume in the

2   morning.

3          As I mentioned, at the conclusion of the case, after

4   you've used your notes, they will all be turned in to

5   Mr. Galovich, and again, one of his jobs is to destroy them.

6          As I mentioned, exhibits which have been admitted

7   also constitute evidence which must be considered by you in

8   reaching a verdict.  You will take your juror notepads, the

9   exhibit binders that you'll be getting and any additional

10  exhibits that come into evidence separately with you to the

11  jury room at the conclusion of this case so you can consider

12  them as well as the testimony you heard and any stipulations

13  in your deliberations.

14         Next, I will explain the burdens of proof placed on

15  the parties in this case.  As you know, this is a civil case.

16  Plaintiffs are the parties who brought this lawsuit.  The

17  United States of America, the hospital defendants and

18  Dr. Jones are the parties against whom the lawsuit was filed.

19         Plaintiffs have the burden of proving their case by

20  what is called the preponderance of the evidence.  That means

21  plaintiffs have to prove, in light of all the evidence, that

22  what they claim is more likely so than not so.  To say it

23  differently, if you were to put all the evidence favorable to

24  the plaintiffs on one side of the scale and you put all of the

25  evidence on another scale as it pertains to the defendant, the

1    plaintiffs would have to make the scale tip ever so slightly

2    in their favor.

3            If plaintiffs failed to meet this burden, the verdict

4    must be for the particular defendant or defendants.  If you

5    find, after considering all the evidence, that a claim or fact

6    is more likely so than not so, then the claim or fact has been

7    proven by a preponderance of the evidence.

8            In determining whether any fact has been proven by a

9    preponderance of the evidence in the case, you may, unless

10   otherwise instructed, consider the testimony of all witnesses

11   regardless of who may have called them and all exhibits

12   received in evidence regardless of who may have produced them.

13           On certain issues called affirmative defenses, the

14   particular defendant asserting the defense has the burden of

15   proving the elements of the defense by a preponderance of the

16   evidence.  I will instruct you on the facts that will be

17   necessary for you to find on any affirmative defense.  An

18   affirmative defense is proven if you find, after considering

19   all of the evidence in the case, that the defendant asserting

20   the defense succeeded in proving that the required facts are

21   more likely so than not so.

22           You may have heard of the term "proof beyond a

23   reasonable doubt."  That is a stricter standard of proof and

24   it applies only to criminal cases.  It does not apply in civil

25   cases such as this one, so you should put it out of your mind.

1    As you heard as we began our jury selection, this is a civil

2    case in which the plaintiffs have asserted a claim against the

3    defendants.

4         In this case, plaintiffs claim that Dr. Dumpe,

5    Dr. Jones and the employees of the hospital defendants were

6    medically negligent during and following the birth of their

7    child, Kendall Peronis.  Defendants deny these claims.  I will

8    give you detailed instructions on the law at the end of the

9    case as I indicated to you, and those instructions will

10    control your deliberations and your ultimate decision.

11         But in order to help you follow the evidence, I will

12    now give you a brief summary of what plaintiffs must prove to

13    make their case.

14         Number one, that Dr. Dumpe, Dr. Jones and/or the

15    employees of the hospital defendants were negligent.

16         Number two, that Dr. Dumpe, Dr. Jones and/or the

17    employees of the hospital defendants' negligent conduct was a

18    factual cause in bringing about the harm to Kendall Peronis.

19         And number three, the extent of damages caused by

20    Dr. Dumpe, Dr. Jones and/or the employees of the hospital

21    defendants by their negligence.

22         Just to reiterate, I will provide you with much more

23    detailed instructions on the law to be applied at the end of

24    this trial, so at this moment, please consider this

25    description of the case as a background from which you can

1    start to consider the evidence.

2         Prior to the commencement of this trial, the parties

3    agreed upon a stipulation of certain facts.  That stipulation

4    binds the parties.  Their agreement on the facts in the

5    stipulation makes these facts uncontested.  The facts as

6    agreed upon are as follows:

7         Number one, that the medical records of Carissa

8    Peronis and Kendall Peronis are authentic.

9         Number two, that at all times relevant to this case,

10   all the nurses and all the resident doctors were employees of

11   Valley Medical Facilities, Incorporated, trading and doing

12   business as Heritage Valley Beaver.

13        That at all times relevant to this case, Dr. Hilary

14   Jones was an employee of Valley Medical Facilities,

15   Incorporated, trading and doing business as Heritage Valley

16   Pediatrics.

17        Now, a few words about your conduct as jurors.

18   First, I instruct you that during the trial, until you have

19   heard all of the evidence and retired to the jury room to

20   deliberate, you are not to discuss this case with anyone.  Not

21   even amongst yourselves.  If anyone should try to talk to you

22   about the case, including a fellow juror, bring it to my

23   attention promptly.  There are good reasons for this ban on

24   discussions.  The most important being the need for you to

25   keep an open mind throughout the presentation of evidence.

1          I know that many of you use cell phones, smartphones

2    and other portable electronic devices, even laptops, notebooks

3    and other computers, both portable and fixed, as well as other

4    tools of technology to access the Internet and to communicate

5    with others.

6          Here, you must not talk to anyone about this case or

7    use these tools to communicate electronically with anyone

8    about the case.  This includes both your family and your

9    friends.  You may not communicate orally with anyone about the

10   case on your cell phone, smartphone or portable or fixed

11   computer or device of any kind, nor can you use these devices

12   to communicate electronically by messages or postings of any

13   kind, and that would include e-mail, instant messaging, text

14   messages, text or instant messaging services or through any

15   kind of blog, website, Internet chat room or by way of any

16   other social networking website or service, including

17   Facebook, Twitter, LinkedIn or YouTube.

18         If any lawyer, party or witness does not speak to you

19   when you pass in the hall or ride the elevator or the like,

20   remember it's because they are not supposed to talk with you

21   either.  That is why you are asked to wear your juror tags.

22   It shows that you are someone who is not to be approached in

23   any way.

24         Second, do not read or listen to anything related to

25   this case that's not admitted into evidence.  By that, I mean,

1   if there's a newspaper article or a radio or TV report

2   relating to this case, do not read that article or watch or

3   listen to that report.  In addition, do not try to do any

4   independent research or investigation on your own on matters

5   relating to the case or this type of case.  Do not do any

6   research on the Internet, for example.  Rather, you are to

7   decide this case upon the evidence presented at trial.

8           In other words, you should not consult dictionaries

9   or reference materials, search the Internet, look at websites,

10   blogs or use any other electronic tools to obtain information

11   about this case or to help you decide the case.

12           Please do not try to find out information from any

13   source outside the confines of this courtroom.  Again, do not

14   reach any conclusion on the claims or defenses until all the

15   evidence is in.  Keep an open mind until you start your

16   deliberations at the end of this case.

17           If any member of the jury has a friend or family

18   member who becomes in attendance at this public trial, that

19   visitor must first register with my clerk because special

20   rules will govern their attendance.  You may not discuss any

21   aspect of this trial with the visitor, nor may you permit the

22   visitor to discuss it with you.

23           In arriving at a verdict in this case, under your

24   oath as jurors, you must not permit sympathy, prejudice or

25   emotion to influence you.  You must put aside any personal

feelings you may have about the parties or the attorneys in
this case.  You should be guided solely by the evidence
presented during the trial without regard to the consequences
of your decision.

You are to perform your duties without bias for or
prejudice against any party.  To that end, you should consider
and decide this case as an action between persons of equal
standing in the community and equal worth.

The plaintiffs and the defendants are entitled to the
same fair trial at your hands.  All persons, all entities
stand equal before the law and are to be dealt with as equals
in a court of justice.

I caution you to use these instructions and
definitions only for the purpose of understanding the evidence
and not to make a determination of the outcome before all of
the evidence is presented.  The instructions given to you at
the end of the presentation of all the evidence will further
detail the law and clarify how you should apply the law to the
facts as I noted.

You must not engage in any activity or be exposed to
any information that might unfairly affect the outcome of this
case.  Any juror who violates these restrictions, I've
explained to you, jeopardizes the fairness of these
proceedings and a mistrial could result that would require the
entire trial process to start over.

1          As you can imagine, a mistrial is a tremendous

2     expense and inconvenience to the parties, the court, as well

3     as the taxpayers.  If any juror is exposed to any outside

4     information or has any difficulty whatsoever in following

5     these instructions, please advise the court immediately.

6          If any juror becomes aware that one of your fellow

7     jurors has done something that violates these instructions,

8     you are obligated to report that to the court as well.  If

9     anyone tries to contact you about the case either directly or

10    indirectly or sends you any information about the case, please

11    report that promptly.

12         These restrictions must remain in effect throughout

13    this trial.  Once the trial is over, you may resume your

14    normal activities.  At that point, you'll be free to read or

15    research anything you wish.  You'll be able to speak or choose

16    not to speak about the trial to anyone you wish.

17         The only limitation is that you must wait until after

18    the verdict, when you have been discharged from your jury

19    service.

20         Please do not ask the courtroom staff any questions

21    during the course of this trial and do not discuss anything

22    with them except for personal matters relating directly to

23    your service as a juror such as transportation problems or the

24    need for supplies in the jury room.

25         I don't even want you to discuss this case, as I

1    noted, amongst yourselves until such time as you've heard all

2    of the evidence, the closing arguments of the attorneys and

3    the final charge on the law as the court will give it to you

4    at the conclusion of the evidence and the closing arguments.

5         Once again, if anyone should approach you about this

6    case outside of the courtroom, you should advise that person

7    that you are a juror and you are not permitted to discuss the

8    matter.  If that person presses you about the case, then

9    please report it to the court through my staff, Mr. Galovich

10   or Ms. Starr.

11        Now, at this time, Mr. Galovich will administer a

12   second oath.

13      (Jury duly sworn.)

14        THE COURT:  Thank you, Mr. Galovich.

15        Now, as noted, from time to time, I will also be

16   giving you some limiting instructions.  When I do that, I will

17   explain the reason for giving those limiting instructions at

18   the time when they are used.  I will also give you final jury

19   instructions, as I noted, once the lawyers are done presenting

20   their evidence and having given closing arguments to you.

21        Now, with that, the court is prepared to hear opening

22   statements.  Are counsel likewise prepared?

23        MR. PRICE:  Our technology people are right outside

24   but we're ready.

25        THE COURT:  So can we get our technology people here?

1    Thank you, Mr. Galovich.  Mr. Price, are you ready to proceed,

2    sir?  We always have to have a pause for technology.

3         MR. PRICE:  May it please the court?

4         THE COURT:  It may.

5         MR. PRICE:  Counsel.  On October 13, 2014 at 5:20

6    a.m. at Heritage Valley Hospital in Beaver County, an eight

7    pound seven ounce girl was born.  The doctors and nurses

8    declared the baby to be a very healthy baby at birth, very

9    normal.  Yet six hours later, on October 13, 2014 at 11:40

10   a.m., that little baby was declared dead.

11        Ladies and gentlemen, I think we are going to unseal

12   and discover what happened or didn't happen in the hours

13   leading up to the birth, the six hours of life and in the

14   years after.  I suspect that you will see the inner workings

15   of the health care system and how they cared for and in

16   instances didn't care for the lives in our community.

17   Together we will see how they handled this life in this

18   system, and we will call them to the stand for you to

19   discover.

20        Now, what brought us here today are safety rules.

21   Safety rules are what protect us.  Doctors learn these in

22   medical school.  Nurses learn them in training and hospitals

23   issue policies covering them.  The safety rules can help lead

24   you to a decision if they are enforced.

25        Now, the safety rules in this case is, number one, if

1    a baby is at risk, a pediatrician must be present at delivery.

2          Second safety rule is a hospital must take all

3    precautions to minimize risks to its patients.

4          And the third safety rule is the earlier you treat

5    something, the better the outcome.

6          So this is a case, of course, as you heard, it's a

7    medical negligence case, and I don't believe that most of you

8    have a lot of medical training, so you are going to hear a lot

9    of medical terms over this next week to two weeks and I'm

10   going to give you a little bit of a flavor of some of the

11   terms that you are going to hear to give you an idea how to

12   process some of the information.

13         Of course, you are going to hear from witnesses on

14   the stand who are going to go into more depth, but this will

15   give you a little bit of a road map.  So before I get into the

16   facts, I thought maybe I should tell you a little bit about

17   the medicine so you could learn how to apply those facts with

18   the medicine.

19         Now, in a normal labor, there is a normal amniotic

20   sac, and the normal amniotic sac has clear fluid and the baby

21   swims around and it gets nutrients through the amniotic fluid.

22         There's another case of what is called meconium.

23   Meconium is basically the baby's first bowel movement, and

24   meconium is green or brown and it can be sticky, and what

25   happens is, if a baby is in utero and has a little bit of

1    distress, they have a reaction.  They expel this meconium, and

2    the meconium then is inside the amniotic fluid.

3            And up on top, you can see a normal amniotic fluid,

4    and the bottom a baby is swimming in this meconium which is in

5    the amniotic fluid.

6            Now, the problem is if this is not treated, the baby

7    can have what you will hear is called meconium aspiration

8    syndrome, and that's when a baby breathes in the meconium, and

9    if the meconium is thick or if it is sticky, it will then go

10   down the baby's throat into the lungs, and if it gets into the

11   bottom of the lungs and deep and if it's thick, that can lead

12   to problems which we'll hear about.

13           You are also going to hear about in this case an

14   infection, E. coli infection.  Most of us have heard about

15   E. coli, and it's an infection, and the doctors will explain

16   to you how the baby can get an E. coli infection, and you are

17   also going to hear about bronchopneumonia, and

18   bronchopneumonia is a pneumonia in the bronchial tubes, and

19   it's basically a reaction to some type of, you could say,

20   matter.  Something irritates the lungs and you have a

21   reaction, you have bronchopneumonia, and you are going to hear

22   about that in this case.

23           So what to do?  You have these conditions and you are

24   going to hear a little bit about the medicine and you are

25   going to hear from the doctors who come to the stand, but what

1    do you do about these conditions?  Well, there are certain

2    things you can do.

3            If, at birth, if the baby has a lot of meconium, you

4    have a bulb and the nurses take the bulb and the doctors use

5    the bulb and they suction it out of the nose and the mouth.

6            However, if it's a little bit deeper, if it's deeper

7    into the lungs and it's been there for a while and the baby

8    has been ingesting it, you can use a deeper suction and get

9    down deeper into the lungs.  There are tests that can be run

10   to see if the meconium or bronchopneumonia affect the baby.

11           Number one is the stethoscope.  You can listen for

12   sounds.  Do you hear coarseness?  Do you hear clearness?  Do

13   you hear any wet lungs?  What do you hear inside the lungs?

14           You can also take blood gases.  You can take a little

15   bit of blood from the baby and what you can do when you test

16   that is you can see is the baby being oxygenated.  Is the air

17   that's coming through the lungs getting into the bloodstream?

18   Is it getting back out, the carbon dioxide, or is it causing

19   problems in the bloodstream, and you can also take chest

20   x-rays.

21           Are there treatments for this?  Yes.  You are going

22   to hear that, for certain infections, antibiotics.  What you

23   are seeing up here are pills.  They don't give pills to a

24   baby.  They give them IVs.  You are going to hear about that.

25           You can also give medications, and the medication in

1    the middle is a pretty wonderful drug called surfactant.  It

2    helps baby's lungs that are just maturing continue to

3    oxygenate if they are having trouble.

4            And finally intubation.  Intubation is you put a tube

5    down and you breathe for the baby because the baby is

6    struggling to breathe, but the point is:  The earlier you

7    treat, the better.

8            With regard to this meconium aspiration, if you don't

9    treat meconium aspiration, it can lead to a condition called

10   respiratory distress.  The problem with respiratory distress

11   in a baby is that if you don't treat respiratory distress, it

12   can lead to death.

13           Now, what happened?  What about the facts of this

14   case?  We're back in 2014 at the hospital Heritage Valley

15   Beaver.  It's a local hospital out in Beaver County.  They

16   deliver babies there, and they have a nursery and the nursery

17   is a -- there's a couple different levels.  It's a lower level

18   nursery.  They don't have what is called a NICU, a neonatal

19   intensive care unit.  If there's a problem, usually they have

20   the baby flown or driven to Pittsburgh to deal there.  It's a

21   nice hospital where they deliver babies and they take care of

22   babies that don't have a lot of problems.

23           I'm going to get into the timeline of this case, and

24   let me orient you a little bit to this graphic, as we're going

25   to go through it.  We're back in October 12, 2014.  That was

1    the due date.  That was actually the date that the baby

2    reached 40 weeks and was to be delivered, or they hope it

3    reaches 40 weeks.  So October 12, 2014 is the due date, and

4    that morning, Carissa goes into a little bit -- she has some

5    feelings and she leaks a little bit of amniotic fluid.  She

6    calls up her doctor, and they said you can go to the hospital.

7         She reports around 2:00 in the afternoon, and they

8    say, okay, look, we'll admit you.  We'll see how you are

9    doing, and they continue to monitor her, and at that time,

10   Dr. Dumpe is the obstetrician, and Dr. Dumpe is the doctor who

11   is on call.  Carissa had chosen a practice.  October 12 was a

12   Sunday.  So Dr. Dumpe, for this practice, was on call the

13   whole weekend.  He had started on Friday at 5:00, and he

14   worked all the way until Monday at 7:00 a.m.

15        Now, as you heard the first slide, the baby was born

16   at 5:20 on Sunday, so he was working that whole weekend.

17   Around 6:30 that night, Dr. Dumpe comes in on that Sunday

18   night, and Carissa's amniotic sac -- they call it a forebag,

19   you'll hear different names -- it hadn't completely ruptured.

20   It was still intact, and Dr. Dumpe comes in, and this happens

21   all the time, he breaks it.  There's a little tool.  You can

22   break the amniotic sac, and the reason why you do that is to

23   progress labor.

24        So when he does that -- it's called an artificial

25   rupture of membranes, AROM.  When he does that, out comes all

this meconium.  Now, they see this meconium, and one of the
big disputes in the case and the reason why you are here is to
see what type of meconium this was.

The question is:  Was it thin meconium?  Was it thick
meconium?  Did it have particulate matter in it?  Was it
massive?  Did this baby have a lot of aspiration of it?  So he
ruptures it and meconium is seen.

At 7:00 that night, a nurse Maria Hendershot comes on
to her shift as a labor and delivery nurse.  Now, she is a
nurse who's going to help with labor and delivery.  Her shift
was from 7:00 p.m. on Sunday night until 7:00 a.m. Monday
morning, a 12 hour shift, and again, the birth occurred at
5:20 so she is on for the remainder of this labor.  She is
present.

And what she notes is she cares for Carissa, and she
sees throughout this time that there's meconium and she has
some notes where she notes meconium.  She calls it thin.  You
are going to hear other testimony about what it looked like,
how green and how brown it was and other factors about the
meconium.

And that continued all the way through into the
morning hours at 3:40 in the morning.  Now, at 3:40 in the
morning, Carissa began pushing, and that's pushing for
delivery.  Now, here's the thing is at this point, they are
preparing for delivery.  She is in the final stage.  Most

deliveries occur once you start pushing within two hours, so the hospital has policies about what happens, and here's a policy that they have.

It says if you have a baby who has, if you see on the left side, meconium-stained amniotic fluid, that means that a baby could be in a nonreassuring fetal status. What that means is if a baby is nonreassuring, that's not a good sign. It's a cautious sign. There are things that, if a baby is nonreassuring -- obviously we want to be reassuring -- but if something is nonreassuring, it's something they have to look out for and watch out for, and the first thing on their list is meconium-stained amniotic fluid, which we have in this case.

So the policy continues. If you have meconium-stained amniotic fluid, you prepare for a distressed newborn. You know that this baby, when it comes out, can be distressed, so you have to prepare for that, and one of the things that you do is you notify the pediatrician per their policy.

Now, in this case, the meconium continued, but no pediatrician was called. It's 5:00. Another nurse comes on to help with the delivery. She is just a delivery nurse. Katherine Gantz. Most hospitals, one nurse can take care of it, but it's better to have two, because one nurse is taking care of the mother and delivery and helping the doctor and

1    another nurse is ready for the baby once the baby is born.

2    That's what Nurse Gantz's job was, so she was waiting next to

3    the isolette watching the delivery, so she is there too.

4            At 5:20 in the morning is when the birth occurs.

5    Now, this wasn't a tough birth.  It wasn't a complicated

6    birth, but there were some complications because, for example,

7    whenever Carissa was pushing, the baby didn't come all the way

8    down the birth canal, so Dr. Dumpe took out a vacuum extractor

9    and he put a vacuum on the baby's head and he pulled the baby

10   down the birth canal for the last couple centimeters.

11           Unfortunately, when the baby came down there, the

12   baby's shoulder got stuck behind the mother's pubic bone, and

13   the doctor had to do maneuvers and get the baby out.  Whenever

14   he pulled the baby out, he noted that there was meconium

15   inside the mouth, and he took his bulb and he suctioned it

16   out.  He then cut the cord and handed the baby off to the

17   nurse.

18           He cut the cord when the plan had been for the father

19   to cut the cord, so he was quick.  Let's get this baby over to

20   the isolette, and they get the baby over to the isolette, and

21   over on the isolette Nurse Gantz and Nurse Hendershot start

22   taking care of this baby.  No pediatrician is there.  They

23   start doing an assessment of the baby.

24           When they do an assessment of the baby, at first this

25   baby is not breathing as well as it should.  So they suction

1    more.  They pull out some oxygen, and they wave some whiffs of

2    oxygen in the mouth, and they take the tube and they put it

3    down deeper into the trachea to pull more meconium out, and

4    this whole time they are pulling meconium out and

5    Nurse Hendershot listens to the lungs and she hears that the

6    lungs are moist.  Still no pediatrician is called.

7            After ten minutes, we have pictures.  Father took

8    pictures of what was happening to the baby at the isolette, so

9    you are going to see some of that and see what the baby was,

10   and the baby, according to the parents, was covered in

11   meconium, and we have pictures that you'll see up here, and I

12   have the original photographs which we're going to introduce

13   to you, so you can see how the meconium was stuck all over the

14   baby, all over Kendall, and the meconium was down in the lungs

15   of Kendall.

16           The one thing about meconium is, once the baby is

17   born, the baby doesn't -- can't ingest anymore meconium.  It's

18   only something in the amniotic sac.  So after 5:20, the baby

19   isn't ingesting anymore meconium, but the question is where is

20   all the meconium that the baby ingested?  Is it all gone?  Has

21   it all been cleared out, or is it still in the baby's lungs?

22   Because if it is and if it's massive, if it's causing

23   problems, a pediatrician must be there to evaluate.

24           Well, at 5:30, they finished the evaluation.  Only

25   takes about ten minutes or so to do this evaluation of the

1    baby and they declare the baby to be healthy.  They say

2    there's no respiratory problems.  They wrap the baby up, put a

3    hat on and give the baby to the parents, and you are going to

4    see pictures, because, of course, it's a happy, joyous

5    occasion.  Not only was the grandmother in there but friends

6    and family came in.  There were a lot of pictures taken, and

7    we're going to show you some of the pictures, but for the next

8    hour and a half, the baby is with the family, but this baby is

9    crying and this baby is crying very loud, and this baby, to

10    the family, looks like it's in pain, and this baby just

11    continues to cry and can't be consoled.

12        So after the pictures are taken, they hit the button

13    and try to get the nurse to come in and no nurse comes in, and

14    they hit the button several times, and finally Matt tells his

15    cousin can you go out and get a nurse to check on the baby.

16        Now, we don't know if it was Nurse Hendershot or

17    another nurse, but the nurse comes to the doorway and looks in

18    and says what's going on, and they say this baby keeps crying

19    and just won't stop, and the nurse says all babies do that,

20    just bond with it and then leaves.

21        There's no evaluation of this baby.  There's no

22    checkup to see how this baby is doing, and in fact, the

23    testimony will be from the family that no nurse came in from

24    5:30 until 7:00.  Now, there are nurses' notes that say they

25    were in there, that they were examining Carissa, but the

1    family will tell you they didn't see anyone come in.  So it's

2    an issue that you are going to have to decide as well as there

3    are no notes from 5:30 until 7:00 about how Kendall was doing.

4    Nobody examined the baby again.

5           So at 7:00, Nurse Jamie McCrory is in the nursery.

6    She comes on shift at 7:00 in the morning, and she is getting

7    ready to go on her shift and there's another nurse who briefly

8    accepts Kendall at 7:05.  She looks at her, puts eye drops in

9    and says to Nurse McCrory you have to do the full assessment.

10   This is typical since Nurse McCrory is on shift.  Whenever a

11   baby comes in the nursery, you have to do a full assessment.

12          So it's around 7:00.  No pediatrician still has seen

13   this baby, and at 7:20, something happens.  Now, at 7:20,

14   there is a note that says that Dr. Jones was called about

15   Kendall.  Now, Dr. Jones denies that.  She says she wasn't

16   called.  Again, this is a reason why you are here, but we'll

17   show you the medical record.  She says she wasn't called, and

18   again, no pediatrician sees Kendall.

19          Now, at 7:25, there is this note and this is probably

20   what set everything off, but Nurse McCrory does a pulse oxygen

21   level on Kendall and finds out her pulse is 81.  Now, most of

22   us sitting here are in the high 90s.  We should be -- 100 is

23   perfect if you are a runner, but anything below 90 is

24   abnormal.  And 81, for a two hour old baby, is bad, so

25   Nurse McCrory, she decides I have to do something else.  She

1    takes out her stethoscope and she listens and she hears

2    coarseness in the lungs.

3            She looks at this baby and she sees something and she

4    writes it down, the initials GFR.  That's going to be

5    important in this case because what that means is grunting,

6    flaring and retracting.  This baby is struggling to breathe

7    and she knows it.  She also knows that this baby is using its

8    abdomen, trying to use its muscles to breathe, and she knows

9    that this baby is in trouble and what she does is she puts on

10   an oxy hood.  It's a hood that goes over the isolette, and she

11   pumps oxygen so this baby can get some breath.

12           And then what she does is she calls her supervisor

13   and then she says, well, I have to call a resident doctor

14   because that's the next step that they take.  If they are not

15   calling the pediatrician, they call a resident doctor, and she

16   calls Dr. Bradley Heiple, and Dr. Heiple is going to be here

17   and he's going to testify.  He disputes what Nurse McCrory

18   says.

19           Nurse McCrory says she calls around 7:35.  He said I

20   didn't get a call until 8:00.  I know I didn't get a call

21   until 8:00 because I was in a lecture, and whenever I left the

22   lecture, my phone rang, and whenever my phone rang, I was told

23   to come down to check on a baby so I came down with an intern.

24   We walked down, got down there a little after 8:00, 8:05, and

25   Dr. Heiple says he checked on this baby.

1    Here's the thing about Dr. Heiple.  As he comes in,

2    he listens.  Nurse McCrory hears coarseness.  She hears the

3    grunting, flaring and retracting.  Dr. Heiple finds a normal

4    baby, so he decides, well -- they look.  It's 8:00.  We know

5    Dr. Jones.  It's Monday morning.  She starts her shift around

6    8:00.  She'll come in, so we'll just wait until Dr. Jones

7    comes in.

8    Dr. Jones comes in at 8:15, and this is when

9    Dr. Jones sees what's going on, and she is not in a good mood

10    because she knows there's a baby that has another problem and

11    there's Kendall, and she has two babies.  This one is going to

12    be transported to Children's Hospital, and this one, Kendall,

13    is going to be transported to West Penn.

14    Dr. Jones listens to this baby and she hears the

15    grunting, flaring and retracting.  She hears coarseness in the

16    lungs.  She hears or sees this baby struggling to breathe and

17    she knows she has got to do something.  So where Dr. Heiple's

18    examination, all of a sudden, this baby got better for 25

19    minutes is for you to decide.

20    Nevertheless, at that point, Dr. Jones does

21    everything she can.  She calls for a transport to West Penn.

22    She orders blood gases.  She orders capillary gases.  She

23    orders x-rays and, like I said, she calls for the transport

24    team, and what she is doing then is trying everything to help

25    this baby.

1          West Penn Hospital team arrives around 9:45.  About

2     an hour later, they come with their equipment.  Some of it is

3     that drug called surfactant.  They give that to the baby.  The

4     baby is intubated.  Unfortunately the blood gases show this

5     baby is becoming worse.  It's becoming hypoxic.  It's not

6     exchanging its air properly through its lungs, and

7     unfortunately at 10:50, her heart rate has problems.

8          They do chest compressions.  They work on her for

9     almost an hour, but it becomes inevitable, and at 11:40,

10    Kendall is pronounced dead.

11         Now, if that were the end of the story, there

12    wouldn't be anymore to talk about, but of course there is.  So

13    what happens the next day is they have an autopsy done, the

14    hospital, and Dr. Min is the pathologist, and he does the

15    autopsy, and what he finds is this baby had massive aspiration

16    of meconium, and he filed his autopsy report, and in his

17    autopsy report he said, yes, this baby had an infection.

18    E. coli.  This baby had bronchopneumonia, but underlying all

19    that was this massive aspiration of meconium, and this

20    meconium, unfortunately, was very deep in the lungs, into

21    the -- I'm going to get the word wrong -- the alveoli.

22         It's the bottom part of the lung, and it was

23    basically crusted with it.  It was encased in it, and the baby

24    couldn't exchange the oxygen, so he writes this autopsy, and

25    as I mentioned earlier, it's your job to see what happened in

1    the years after too, because he files his report.

2            A few weeks later, Dr. Dumpe, Dr. Jones and the

3    family get together, and they meet and they say to the family

4    unfortunately your daughter died of an E. coli infection, and

5    they say, well, there was meconium too, but that -- they just

6    leave it at that.

7            Parents still wondering, curious, and then they file

8    a lawsuit, and in this lawsuit, which was filed on September

9    8, 2016, the complaint is filed, and there are allegations.

10   There's several allegations, but one of the allegations

11   against Dr. Dumpe is that he didn't address the massive

12   aspiration of meconium.

13           So what he does is he goes back to the pathologist

14   and he says, hey, this can't be right.  If this is massive

15   aspiration of meconium, it can't be, because if so, I have to

16   call the pediatrician in the delivery, so it can't be a

17   massive aspiration.  This has got to be thin meconium.

18           Now, Dr. Min is then deposed in this case, and you

19   are going to hear from Dr. Min, and at first he said:  When

20   Dr. Dumpe came to me, I agreed with my first report.  I agreed

21   with my report.  Everything I had in there was right.

22           But Dr. Dumpe said we've got to review this.  Are you

23   sure it wasn't a clinical diagnosis?  And Dr. Min tells me in

24   his deposition:  Well, maybe it wasn't massive aspiration of

25   meconium.

1          And I say to Dr. Min:  Okay.  Are you going to change

2     your autopsy report?

3          He said he might.  I don't know.

4          Here's what I'll tell you.  As of today, this is the

5     official autopsy report for Kendall Peronis.  Massive

6     aspiration of meconium.  You are going to hear about what

7     happened with these conversations and what happened with

8     Dr. Dumpe and what happened with Dr. Min, and the defendants

9     are going to walk this back.  They are going to try to tell

10    you that that is not massive aspiration of meconium, that that

11    is not on that report, but that is the official word.

12         Now, the judge just told you a little bit about

13    burden of proof and about the law, and I am not going to go

14    into this too deep because you are going to hear about it, but

15    I have to tell you a little bit about it because you have to

16    understand from my perspective, whenever I present the case to

17    you from the facts and the evidence whether or not I'm

18    presenting my case and, you know, I've met my burden of proof.

19         So the burden of proof, as you can see, the judge

20    mentioned the scales.  Criminal case beyond a reasonable

21    doubt.  Civil case is preponderance of the evidence.  If my

22    evidence is a little bit more, I reached the burden of proof.

23         Now, negligence is also another legal term you are

24    going to hear about.  What is negligence?  I know it's a

25    difficult term, but basically, were the doctors and nurses

1    careful or were they careless.  That's what it comes down to.

2    You are going to hear a lot about standard of care.  What is

3    this mythical, magical standard of care?  Every doctor that

4    comes up on the stand is going to talk about it.  Basically it

5    is, is it good medical care.  Are the doctors doing right?

6           Now, the last thing is causation.  I have to talk

7    about this because it's a little bit of a difficult concept,

8    legal concept.  You throw a baseball through a window, it's a

9    direct cause and effect.  Throw the baseball, it breaks the

10   window.  In cases like this, the cause isn't as easily

11   described, because, for example, it's how long can the

12   meconium have stayed there before they treated it?  Was there

13   a chance that, if Dr. Jones got there at 5:20 in the morning,

14   that something could have been done?

15          We can't go back in time and predict that 100 percent

16   certainty, so the question is was the chance lost, and that's

17   what causation is, and we'll talk about that more through the

18   experts, but these are just legal concepts.

19          Now, how do we prove our case?  We have experts.

20   Since it's a medical case, we all have to have experts.

21   Tomorrow morning, you are going to hear from Dr. Zamore.  He's

22   an obstetrician.  He delivers babies.  He works at Yale.  He's

23   a professor at Yale, and he's going to talk about what you do

24   in a situation where you have meconium at birth and what the

25   nurses are supposed to do at delivery.

1          On Wednesday, you are going to hear from Dr. Steven

2     Shore.  He's a pediatrician who has a specialty in infectious

3     diseases.  He works at Emory in Atlanta.  He's on staff at

4     several hospitals and he's board certified in this, and he's

5     going to tell you about what happens to the lungs, meconium,

6     E. coli, how you fight it, the antibiotics, gentamicin, things

7     of that nature.

8          And then you are going to hear from Dr. Karotkin.

9     He's a pediatrician and neonatologist.  A neonatologist is a

10    doctor who takes care of a baby right after birth.  He's a

11    professor in Norfolk, Virginia, medical director and a

12    pediatrician, and he's going to talk to you about what do

13    pediatricians do, how do they care for babies like this.

14         So how does this all apply to the case?  Remember

15    safety rule number one:  If a baby is at risk, a pediatrician

16    must be present at delivery.

17         Dr. Dumpe now, he was there, he saw meconium.  Said

18    it wasn't a really, really tough delivery, but there were a

19    lot of complications.  The use of a vacuum extractor, that's a

20    complicated delivery.  Shoulder dystocia, he had to do an

21    episiotomy, and no pediatrician was there to evaluate this

22    baby.

23         Do we know there was massive aspiration of meconium?

24    Yes, it's on the autopsy report, and as I mentioned, that

25    massive aspiration of meconium had to have happened before

1    this baby was born because it can't happen after, so this

2    meconium was deep in the lungs before delivery.

3            Nurse Hendershot, should she have called a

4    pediatrician?  Again, she saw the meconium.  She knows the

5    policies.  She had a child with moist lungs, and the facts and

6    the evidence will show that there was no checkup from 5:30 to

7    7:20 and a pediatrician should have been present.

8            And this is the pulse ox medical record.  You are

9    going to see this at 7:25, 81 percent for Kendall.  Safety

10   rule 2:  A hospital must take all precautions to minimize

11   risks to its patients, and the earlier you treat something,

12   the better the outcome, and the facts and the evidence -- this

13   is all about Nurse McCrory, Dr. Heiple and Dr. Jones, and

14   again, Nurse McCrory saw that this baby was bad.

15           The question is first did she call Dr. Jones at 7:20.

16   Here's the note.  Dr. Jones notified at 7:20.  If she didn't,

17   was there a delay of getting another doctor down there until

18   after 8:00.  What happened?  Was more time lost?

19           Then Dr. Heiple, again, he comes down at 8:00 and

20   says this baby is fine, but when Dr. Jones comes in at 8:20,

21   she says this baby isn't.

22           Now, as Dr. Jones -- here's what I'll tell you.  The

23   question about her care is if she was called at 7:20 and

24   didn't do something, there was a delay in care.  If she didn't

25   call somebody, if she gets a call at 7:20, and they say you

1   have a baby in distress and she just sits on it, that's a
2   problem.  However, her story is I wasn't called.  I didn't
3   arrive until 8:15, 8:20, and here's what I'll tell you is that
4   there is no criticism from us of her care once she arrives.
5   She did do everything she could to save this baby.  It's just
6   that she didn't get this baby until it was three hours old,
7   and that's the question.  At three hours earlier, if she had
8   been there, was there a chance to do something for this baby,
9   so there's going to be no criticism of Dr. Jones.  The only
10  question is was she called?  There's a note that says she was.

11          Now, causation.  The earlier you treat, the better.
12  The longer you wait, the worse the outcome.  There are some
13  defenses in this case.  Of course, number one, this was thick
14  or thin meconium, and again, you are here to judge this.  You
15  can see what the autopsy said.  The pathologist will say
16  there's debris in the lungs.  Testimony from the family.
17  There will be photographs.  Dr. Jones diagnosed meconium
18  aspiration.  The x-ray showed respiratory distress.

19          When Nurse McCrory first got there, she looked in the
20  back of Kendall's throat and still saw meconium.  Even at
21  autopsy, the next day when the doctor took Kendall for an
22  autopsy, he removed the diaper and he said meconium is noted
23  in the diaper as well as in the perianal areas, in other
24  words, in the legs and private parts, and you are going to
25  take a look at some of the pictures.  Some of them are -- it's

1   a baby just being born, just right after being born, but you

2   are going to be able to see and judge for yourself what you

3   can see in those pictures.

4        Now, their defense is this was a healthy baby at

5   birth, and again, the facts and the evidence are going to show

6   there were moist lungs, crying, the witnesses are going to say

7   no nurse came, just bond with this baby.  And these are the

8   pictures that you are going to see of Kendall for the first

9   hour and a half of her life.

10       Well, this was an overwhelming infection.  Again,

11  we're not disputing there was an infection.  The autopsy said

12  there was E. coli and bronchopneumonia.  Our point is that

13  this baby aspirated meconium and was drowning and gasping.

14  The air was being trapped.  If you can't get oxygen in, that's

15  a problem, and if you can't get the carbon dioxide out, that's

16  another problem because you can become what is called

17  acidotic.

18       We all live in a PH balanced life as much as we can.

19  If you can't do that, things start happening to our body and

20  brain and organs, and that's what happened to Kendall.  She

21  was unable to exchange and unable to fight.

22       Again, this was unpredictable and unpreventable.

23  E. coli is so unpredictable and unpreventable, there was

24  nothing that could have been done.  I agree there was no way

25  to predict an E. coli infection, but if Dr. Jones had been

1    there with her pediatric skills, could she have heard from the

2    moist lungs, and she is going to say when you hear that, you

3    presume sepsis, you presume an infection and you give

4    gentamicin which is what they gave.  Unfortunately, they gave

5    it too late, and you are going to find out the E. coli

6    bacteria was sensitive, which means it would have given an

7    effect to this E. coli.  What would have happened if it would

8    have been given three hours earlier?  The sooner you treat,

9    the better.

10            Now, this is Kendall.  This is right after she had

11    passed.  Matt and Carissa were able to spend some time with

12    her.  The hospital sent in a photographer, and you are going

13    to see a few more photographs.  This is a case about Kendall

14    and about her estate.  Under the law, a lawsuit such as this

15    is brought by her estate, and her estate is represented by an

16    administratrix who is Carissa and Matthew is with her, and

17    they are both here in this lawsuit.

18            Just to give you a little bit of understanding about

19    them, they were a grade school couple.  They met in the

20    seventh grade.  Started dating in the eighth grade and dated

21    all the way through high school, went to the prom, did all

22    that stuff, hung out and they were boyfriend and girlfriend.

23    They graduated in 2013, and they moved in together, and they

24    were living together and Carissa became pregnant and what they

25    decided was it's a journey.  Let's try it.  Let's see what

1    happens.

2         So you are going to see some pictures and you are

3    going to see what they did with their life together, about how

4    they were excited about this baby, prepared for this baby, and

5    that Matthew was there at the delivery, but then Kendall

6    passed, and you are going to hear about the effects of what

7    that has had, and you are going to hear about the struggles

8    and about how losing a baby is very difficult, not only on

9    anybody but on a young couple, 19 and 20 years old, and they

10   tried and they tried to make it work.

11        After about six months, arguing, making up, fighting,

12   trying to do something, they just said this is just not, so

13   they broke up.  Matt stuck around for a little bit.  On the

14   first anniversary, he took off to Detroit to see his brother.

15   He had to get out of town.  Came back.  They tried to get back

16   together.  They became friends; they became enemies, but they

17   are here as friends, and as they are here for Kendall, so in

18   this case on behalf of her estate, there is an award that you

19   are going to be able to make, which is the loss, and that is

20   to Carissa and Matthew, and the judge is going to instruct you

21   on what the elements of damages are in that, but that's what

22   you are going to have to consider.

23        The other part of this case is economic loss, and the

24   economic loss, the law allows a claim to be made for Kendall,

25   and what it is is basically, if Kendall were here, what would

1    she have earned over her lifetime.  We don't know what she

2    would have done, so what we have to do is we are bringing in

3    an economist, James Kenkel.  He works at Pitt.  He's going to

4    tell what an average high school graduate makes, college

5    graduate, some college, and again, this is a case about

6    Kendall and about what her life would have been like and what

7    Matthew and Carissa's life is like now.

8           Now, the final thing is, I'm finishing up here, I

9    thank you for your attention.  I thank you for participating.

10   I thank you for all of that.  It is a very, very important

11   case for Carissa and Matthew.  I know that when I'm done,

12   probably tomorrow, the defendants might get up and they'll

13   give their opening statements, and they'll say, hey, Doug only

14   told you half the story.  Again, I only have so much time I

15   can tell my story in.

16          Please remember I'm trying to give you as much as I

17   can in the time that I have, but I thank you for your

18   attention, and here's what I'll tell you, at the end, what

19   this case is all about.  Was this acceptable medical care?

20   And that's why you are here.  You are here to listen to the

21   facts and to judge this case.

22          Now, on behalf of Kendall and Matt and Carissa, we

23   would ask that, after the case is over, you return a verdict

24   for them, but here's what I'll also tell you.  You are free to

25   choose.  I can't tell you what to do.  They can't tell you

1      what to do.  We are resting our case in your hands, and you

2      are free to choose what kind of verdict you want to give in

3      this case and that's all we ask.  Thank you.

4              THE COURT:  Thank you, Mr. Price, and ladies and

5      gentlemen, I also thank you for your attention throughout this

6      opening statement.  Given the fact that it's already 4:40 and

7      the court previously talked to counsel and has an estimate

8      about how long they might need for their respective opening

9      statements, I think this would be an appropriate time for us

10     to recess for the evening, and to that end, just like I told

11     you earlier when we took our lunch recess, the same kind of

12     instructions do apply.

13             So during this recess, which will be overnight, you

14     are not to discuss this case with anyone, and that includes

15     your fellow jurors, even as you walk out, any other people

16     involved in the trial, members of your family, friends or

17     anyone else.  Once again, you are not to talk with any of the

18     attorneys that are present, any of the parties that are

19     present.

20             As you can see, we have some additional people that

21     have shown up who are working the technology and also

22     observing the case, so you are not to talk with any of those

23     people.

24             If you need to talk with the court, you can reach us

25     through Mr. Galovich or Ms. Starr, and when we conclude here

1    in open court, Mr. Galovich will have some instructions for

2    you on that vein.

3         Once again, I don't know if there's any news coverage

4    of this case, and I ask you not to listen or read any kind of

5    news report, whether it be on TV, radio or on the Internet.

6    Also, you can't go out and do any research.  You already know

7    now a lot more about the case, about the terms, but it would

8    be inappropriate for you to get on the Internet and start

9    researching people, places, terms and the like.

10         Once again, the only information you are to consider

11   is what you receive here in the courtroom.  I ask each of you

12   to keep an open mind and don't make up your mind until you've

13   heard all the evidence, the attorneys' closing arguments as

14   well as the court's instructions, and then most importantly,

15   you get an opportunity to talk about what you have seen, heard

16   and learned in the jury room before you make all of your

17   decisions.

18         Now, a couple of things.  As I told you earlier,

19   you'll leave your notebooks and pens.  Mr. Galovich will pick

20   those up.  You want to make sure you have all of your personal

21   items.  I always ask my jurors to advise me when would you

22   like to start in the morning, and to that end, I know some of

23   you may be depending on buses.  Some of you might be driving

24   from a good way.  A lot of our jurors like to start at 9:00,

25   some like to start a little bit after at 9:15 and some as late

1    as 9:30.  So what works for all of you?  Have you thought

2    about that at all?  Some jurors like to be down here as early

3    as they can because they want to avoid the traffic and they

4    wish we could start as early as 8:00, but it's difficult to

5    get everything going that early, so why don't you think about

6    that, and when you go out and talk with Mr. Galovich, you can

7    let us know.

8          Similarly, leaving, most of our jurors like to work

9    as long as they can, and I've actually had jurors say they

10   wish they could go into the evening so that they could shorten

11   their time in beautiful downtown Pittsburgh, but for the court

12   reporter's sake, and it's a very tough job to be a court

13   reporter and keep that attention and type all day long, we try

14   to conclude no later than 5:00.

15         I'm also mindful that there is a certain bus

16   particularly to Butler that leaves I think around ten to 5:00,

17   so people heading that way always want to get out of here a

18   little bit early.  So again, when you all get back there, talk

19   to each other and see what works for all of you and then alert

20   Mr. Galovich, okay?  So with that, leave your things.  Let's

21   all rise for our jury.  Mr. Galovich will escort you.

22         (Jury excused.)

23         THE COURT:  Once we hear from the jurors when they

24   want to start, that would determine our start time tomorrow.

25   I would still ask counsel and the parties to be here earlier.

1    My experience in the last 12 and a half years that jurors are

2    always here early and chomping at the bit ready to go.

3            Secondly, Mr. Galovich indicated to me a couple of

4    things.  Number one, when the court is instructing and/or

5    attorneys are making their statements or a witness is being

6    questioned and the like, those in the gallery should not be

7    talking amongst themselves, because it's, number one,

8    distracting to the jurors and sometimes it can impede the

9    court reporter's job.  Thirdly, he pointed out that some may

10   be chewing gum.  Gum chewing in this court is a no-no, and as

11   I think you attorneys know, Mr. Galovich is a deputy clerk.

12   He reports to the clerk of court, and we have strict rules

13   about, you know, what can or can't be eaten in the courtroom,

14   so if you are a gum chewer, this is not the place, and you

15   don't want to be embarrassed by Mr. Galovich literally

16   bringing a piece of paper to your chin asking you to discard

17   the gum.  I do caution you on that.

18           I do recognize sometimes people have a cold or

19   allergies and they need a cough drop or something like that.

20   Also be mindful of the jurors.  If you're unwrapping candy,

21   they are not getting candy and the like.  They do get water

22   from all of us.

23           Last point from Mr. Galovich, I think all of you have

24   attorney lists.  Those need to be returned to him.  They

25   cannot be taken outside of the courtroom, so Mr. Price,

1    Ms. Koczan, Mr. Colville, your attorney list should now be

2    tendered to Ms. Starr.  In turn, she will provide them to

3    Mr. Galovich and he'll return them to the jury administrator.

4         So outside of the openings tomorrow, I think we have

5    a hint as to which of the experts is going to appear.  Per my

6    procedures, Mr. Price, do you know who else you'll be calling

7    tomorrow?

8         MR. PRICE:  First, Dr. Zamore and then Dr. Dumpe and

9    depending upon time, Nurse Hendershot.

10        THE COURT:  Okay.

11        MS. KOCZAN:  What time do you think she'll be on so I

12   can let her know what time to be here?

13        MR. PRICE:  Obviously it won't be until late

14   afternoon.

15        THE COURT:  So tomorrow, the way I would see it is

16   that we would conclude the opening statements, then we'll have

17   a joint motion for admission of the exhibits, and then you'll

18   proceed to call your witnesses.  Anything else for the court's

19   attention?  No, no, no, no.  Good.  You may leave your things

20   here in the courtroom overnight.

21        Once Mr. Galovich is done with our jurors, he will be

22   locking up and, you know, he, I can tell you, is one of the

23   first people in the courthouse, so he's here as early as 7:00

24   in the morning.  You won't have any difficulty getting into

25   this courtroom if you'd be earlier.

1          Now, I am mindful he's still instructing them and you

2     should not mingle with them as they leave.  I can also hear

3     there's a large reception going on on our third floor as you

4     leave, so if you want to pick up your things and maybe scoot

5     before the jurors come out, that might be a good idea.  Then

6     we can e-mail you what time they want to start.

7          Ms. Starr, do you want to go back and see if they

8     answered that question?

9          Ms. Starr, what is the word?

10          THE CLERK:  9:00 a.m.

11          THE COURT:  We'll see you all if you can be here no

12     later than 8:30.  Get yourself set up and organized and ready

13     to go.  As you can see, the screen is obviously up.  There are

14     also flip charts and there's a smaller screen.  Do you need

15     any of that pulled out for your presentation?

16          MR. PRICE:  I do not.

17          THE COURT:  If somebody does, let us know in advance

18     so that can be handled at a break or overnight so it's not

19     cumbersome.  Okay.  Everybody can pack up.  So far, I don't

20     see our jurors leaving.

21        (At 4:51 p.m., the proceedings were adjourned.)

22                    C E R T I F I C A T E

23          I, BARBARA METZ LEO, RMR, CRR, certify that the
      foregoing is a correct transcript from the record of
24     proceedings in the above-entitled case.

25

      _\s\ Barbara Metz Leo__                ___10/07/2019___

1    BARBARA METZ LEO, RMR, CRR              Date of Certification
     Official Court Reporter
2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25