1

1             IN THE UNITED STATES DISTRICT COURT
           FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2

3     CARISSA PERONIS, et al.,
                      Plaintiffs
         vs.
4                                     Civil Action No.
      UNITED STATES OF AMERICA, et    16-1389
5     al.,
                      Defendants.
6
                              - - -
7

8        Transcript from proceedings on August 27, 2019, United
      States District Court, Pittsburgh, PA,
      before Judge Nora Barry Fischer.
9

10    APPEARANCES:

11      For the Plaintiffs:    Harry S. Cohen & Associates, P.C.
                               Douglas L. Price, Esquire
12                             Two Chatham Center
                               Suite 985
13                             Pittsburgh, Pennsylvania 15219

14
        For the Defendant     U.S. Attorney's Office
15      USA:                   Michael Colville, Esquire
                               Philip P. O'Connor, Jr., Esquire
16                             U.S. Courthouse
                               700 Grant Street
17                             Pittsburgh, Pennsylvania 15219

18      For the Hospital      Weber Gallagher Simpson Stapleton
        Defendants and        Fires & Newby
19      Dr. Jones             Paula A. Koczan, Esquire
                              603 Stanwix Street
20                            Suite 1450
                              Pittsburgh, Pennsylvania 15222
21
        Court Reporter:       Barbara Metz Leo, RMR, CRR
22                            700 Grant Street
                              Suite 6260
23                            Pittsburgh, Pennsylvania 15219

24
         Proceedings recorded by mechanical stenography;
25    transcript produced by computer-aided transcription.

1              THE COURT:  Good morning, everyone.

2              I understand we are still waiting for one of our

3    jurors.  I also understand Ms. Koczan has a request for

4    sequestration of the expert.  I agree.

5              So, Dr. Zamore, while these openings are going on,

6    you'll have to sit outside or in an attorney conference room.

7              Anything else we need to address?

8              MS. KOCZAN:  Not that I know, Your Honor.

9              THE COURT:  All we need is our jurors.

10             MR. COLVILLE:  Actually, Your Honor, while you have

11   open time, Dr. Dumpe would like to -- Dr. Dumpe, during his

12   examination, would like to be able to give an illustration or

13   demonstration of what the meconium in this case looked like

14   and the different varieties of how it visualizes and how

15   texturally it appears.

16             He has some Gatorade bottles which he believes will

17   be able to show that, and if we can demonstrate that to the

18   jury during his examination, that is what we are requesting.

19             THE COURT:  Mr. Price?

20             MR. PRICE:  Your Honor, if I may have some time to

21   think about it.

22             THE COURT:  Well, you have some time to think about

23   it, because we'll have two openings and then we'll have our

24   midmorning break.

25             Do you have these Gatorade bottles with you?

1          MR. COLVILLE:  We do, Your Honor.

2          THE COURT:  Okay.  Have you shown them to Mr. Price?

3     It's always beneficial to do that.  Let's pull them out.  We

4     can all take a look at the Gatorade bottles.

5          MR. COLVILLE:  Doctor, why don't you explain how you

6     would demonstrate this?

7          DR. DUMPE:  I was going to demonstrate the degrees of

8     meconium that we see from normal fluid all the way up to thick

9     meconium and the varieties in between.

10          MR. PRICE:  My initial reaction is that I would

11     object because this has nothing to do with the issue in this

12     case, and that is particulate matter in the meconium fluid.  I

13     know there's different colors, but the issue in this case is

14     whether or not there was any particulate matter in the

15     meconium.

16          So, while that may be able to help explain some of

17     the different colors, we're still leaving out one of the

18     essential issues in the case, and that is what is in the

19     meconium.

20          THE COURT:  Well, that's a question that you and/or

21     Mr. Colville can ask.  Having read Dr. Dumpe's deposition, I

22     know he made reference to the meconium looking like Gatorade.

23     He did not have the spectrum of colors in his deposition as

24     he's indicating here today, so if he wants to use it as a

25     demonstrative, he can use it.

4

1          MR. COLVILLE:  Thank you, Your Honor.

2          THE COURT:  Anything else?

3          Mr. Colville, you'll be up next to open since you are

4     first on the caption.

5          MR. COLVILLE:  Yes.

6        (Jury present.)

7          THE COURT:  Good morning, ladies and gentlemen of the

8     jury.  I trust your travels this morning weren't too

9     burdensome despite the rain and traffic and everybody going

10    back to school.

11         Mr. Colville is now prepared to address you in his

12    opening statement.  Just as you did yesterday, please give

13    Mr. Colville your kind attention throughout his opening

14    remarks.

15         MR. COLVILLE:  May it please the court, ladies and

16    gentlemen of the jury, counsel?

17         My name is Michael Colville.  I'm an assistant U.S.

18    attorney for the Western District of Pennsylvania, and today I

19    represent the United States of America.  Seated at the table

20    next to me is Phil O'Connor.  He's also an assistant U.S.

21    attorney.  He'll be helping me in this case.  Seated next to

22    Phil is Dr. Dumpe.  Dr. Dumpe is the physician who delivered

23    Kendall on October 13.

24         Let me say a little bit about my client, the

25    United States.  Throughout the United States, there are areas,

1    mostly rural, where they are underserved by medical

2    professionals, places.  They are usually rural, economically

3    depressed.  It's difficult to get nurses or physicians to work

4    there.

5        The federal government developed a program to fund

6    clinics like Primary Health Network in Beaver.  It was at

7    Primary Health Network that Kendall was delivered and where

8    Carissa received her prenatal care, the delivery and the

9    labor.  Dr. Dumpe was a physician who worked there, and it's

10   his connection with that federally funded clinic that makes

11   this a case against the United States.  So, to the extent

12   there's any confusion as to why the United States is here,

13   that is why.

14       The plaintiffs in this case are making essentially

15   two claims.  They are saying Dr. Dumpe was negligent because

16   he failed to deliver Baby Kendall earlier than the delivery

17   occurred, and they are saying that Dr. Dumpe was negligent

18   because he didn't have a pediatrician present at the delivery,

19   at the time of delivery.

20       These claims are not supported by the medicine and

21   are belied by the facts.

22       The government has a pretty straightforward defense

23   in this case.  The evidence will show a couple things.  The

24   first thing is meconium did not cause the death in this case.

25   Meconium is a red herring in this case.  It's a shiny object

1    to distract you.  It's being used as a boogeyman.  There was

2    meconium present, but it didn't cause the death.

3         Baby Kendall died because she had an E. coli

4    infection.  She became septic.  The infection got into her

5    blood and she was a newborn and couldn't fight back.  That is

6    why she died.  There were no symptoms of this infection

7    throughout her prenatal care, through the labor and delivery

8    and for a couple -- an hour, hour and a half after the baby

9    had been delivered.  No symptoms.  Asymptomatic.  You'll hear

10   that.

11        Dr. Dumpe was not negligent in this case because he

12   provided appropriate medical care.  He complied with all the

13   hospital policies and he managed the meconium that was present

14   appropriately.  Dr. Dumpe will tell you about why he did what

15   he did, and experts who will be called by the United States,

16   and our co-defendants will explain that further.

17        Again, Baby Kendall was asymptomatic, no symptoms.

18   That's a theme you are going to hear from the defense.  There

19   was no reason for an early delivery.  There was no reason for

20   a pediatrician to be present.  If a pediatrician had been

21   called, nothing different would have been done.  Everything

22   that was done by Dr. Dumpe and the nurses who were there

23   attending to Carissa and to Baby Kendall at the delivery would

24   have done the exact same thing, because the baby didn't have

25   symptoms to do anything for.  It had meconium, but it was

1    being managed according to hospital policy and according to
2    good medicine.

3         You'll hear from Dr. Dumpe.  He's going to be called.
4    He's going to be called by the plaintiffs.  They are
5    presenting their case first so they get to call him if they
6    want, and they are going to.  You'll soon learn when you hear
7    from Dr. Dumpe he was fully licensed and he was a board
8    certified OB/GYN.  He had been practicing for 30 years, and
9    during those 30 years, he has delivered thousands of babies,
10   both vaginally and through C-Section.  He is experienced.
11   He's well trained and he knew what he was doing, and he did it
12   on October 13.

13        In short, you'll learn he took care of Carissa.  He
14   used the appropriate medical technology and he provided
15   superior care.  Dr. Dumpe will explain meconium to you.  He
16   will explain how it presents, what it looks like, what it
17   means when you see it, why it occurs and how you deal with it
18   if you have to deal with it.  All of that will be explained by
19   him and other treating medical staff from Heritage Valley.

20        In this case, you have the medical record, a copy of
21   them.  There is one record that I will make note of and I'm
22   sure others will, and it's the delivery assessment.  It's
23   Exhibit 6 page 10, I believe.  This is called the delivery
24   assessment.  It's a page out of the medical record, and it's a
25   page that is created shortly after the baby is delivered.

1          Once the baby is delivered by Dr. Dumpe, he hands the

2   baby over to the nursing staff and they do a thing that's

3   called an Apgar test.  It's up in this corner.  The Apgar test

4   assesses basically the health of the baby.  Let me get out of

5   your way.

6          It looks at the heart rate, respiration, muscle tone,

7   reflex, skin color and it gives a total.  For each of those

8   elements, the baby is scored zero, one or two.  So the best

9   score you can get is a ten or the worst is a zero.  In this

10  case, the baby is tested one minute and five minutes.  In this

11  case, Baby Kendall received six in the first minute and she

12  improved to an eight on the second, five minutes.  This is

13  completely normal.  This is what happens.

14         Usually the first score is worse than the second, but

15  it's the second one you look for.  In this case, hospital

16  policy said that if you have a seven or above, you are

17  basically considered a healthy baby, and you are permitted to

18  be left with the family instead of being taken to a nursery to

19  bond with the mother and father, and that's what happened in

20  this case.

21         Again, this is the first assessment, one of the first

22  things that's done.  Also on this document, you'll note thin

23  green meconium was noted.  During the opening, it was implied

24  that Dr. Dumpe or the hospital was walking away or trying to

25  distance themselves from this meconium.  It wasn't.  It was

1    noted immediately.  It was described accurately, and to the

2    extent that Mr. Price planted in your mind about something

3    thick or sticky, it being congestive and clogging and causing

4    the baby to drown, we're talking thin green meconium.

5            You'll note that there's no reference to

6    particulates.  You are going to hear about particulate and

7    nonparticulates.  Particulates means it's thicker,

8    essentially.  Nonparticulate it doesn't.  Dr. Dumpe will

9    explain this in his examination, but you need to see that,

10    right out of the bat, within minutes of the baby being

11    delivered, that's noted and it's thin and it's green.

12            Finally, this section, this square block, it's

13    one-third of the bottom of the page.  This is the delivery

14    assessment where they describe all the elements, appearance,

15    skin, head, neck, lungs, heart, abdomen.  You'll see up here

16    that if there is an abnormality, it's -- you are supposed to

17    put an X and describe what it is there.  If there are no

18    abnormalities, you put a zero, which is here and a line drawn

19    through.

20            If you can scroll down a little further on that,

21    please.  You see the signature here?  That's Nurse Hendershot.

22    Nurse Hendershot was the labor and delivery nurse who was

23    there with Dr. Dumpe.  She is the one who did this assessment.

24    You'll learn Nurse Hendershot is more than 30 years

25    experienced as a nurse.  Thirty of her years have been a labor

1    and delivery nurse.  She knows what she is doing.  She did

2    this assessment.  That's her signature.  She found no

3    abnormalities.

4         I don't want to get too deep into it, but if you look

5    at the middle section here, all the way down to the bottom

6    there, please, things have changed.  This note, that's

7    Dr. Jones's signature at 8:30.  You can see here there's

8    abnormalities.  Between the time the baby was born at 5:20,

9    when this note was signed off at 8:30, symptoms began.

10        The E. coli infection began to take and show itself.

11   Up until this time, it hadn't.  You are going to hear the

12   symptoms of respiratory distress.  Symptoms of respiratory

13   distress are grunting, G, flaring, the F, R, retracting.  They

14   are present at 8:30.  There's actually a document you'll

15   probably see at 7:25, once the baby was back in the nursery,

16   that shows there was granting, flaring and retracting.

17        But the point is between 5:20 and then, there were no

18   symptoms.  There were no symptoms or indication prior to the

19   baby being born that this baby had an infection, any

20   infection, let alone E. coli, and there weren't any symptoms

21   when it was delivered, up until about 7:25.

22        By that time, Dr. Dumpe had already delivered the

23   baby.  He delivered the baby at 5:20 and handed the baby over

24   to Nurse Hendershot and the nursing staff and the hospital

25   took care of that baby.

1       This document is essentially a summary of our

2  defense.  At 5:20, Baby Kendall was healthy, appeared healthy.

3  Had no symptoms, looked, acted, it was healthy.  Things

4  changed once the E. coli infection took over.

5       This document shows that at 5:20, there was no reason

6  that that baby should have been delivered earlier.  It was a

7  healthy baby when it came out.  This document shows the

8  pediatrician wasn't needed.  It was a healthy baby when it

9  came out.  This baby didn't have any symptoms at 5:20.  Didn't

10  have any grunting, flaring or retracting.  Baby didn't need

11  resuscitated.

12       In fact, one last note here is this little square box

13  here.  This is a nursery note that indicates what happened at

14  7:00.  7:00 in the morning, the baby was taken -- on or about

15  7:00 in the morning, baby was taken to the nursery, and there,

16  vitals were taken, temperature, pulse, respiration.

17  Temperature was 99.  Pulse was 132.  Respiration was 44.

18  These are normal.  These are normal vitals.

19       So as I say, this document is a snapshot of a summary

20  of our defense.  We're going to call an expert by the name of

21  Dr. Harold Wiesenfeld.  He's a prominent respected OB/GYN.  He

22  works at Magee-Womens Hospital, and he's going to tell you

23  what I just told you that Dr. Dumpe did everything he should

24  have done, that this baby did not need to be delivered

25  earlier, and the pediatrician was not needed, nor would a

1    pediatrician have done it any differently than what was done

2    at 5:20 on October 13.

3            He will tell you that the plaintiff's emphasis on the

4    meconium is misplaced and misleading also.  Dr. Dumpe managed

5    the meconium appropriately.  Dr. Wiesenfeld will tell you

6    meconium during birth is not uncommon.  One in five babies

7    have it.  It can present differently, but in this case, the

8    way it presented, Dr. Dumpe acted appropriately.

9            Again, meconium isn't the cause of death.  E. coli

10    sepsis is.  And there's no doubt that Baby Kendall was

11    infected with E. Coli infection.  It got into her bloodstream

12    and she couldn't fight the infection.

13            Unfortunately, that hour to hour and a half window,

14    it didn't give a clue that something should be done.  There

15    were no symptoms, but the experts are going to say, even if

16    there were symptoms, and there weren't, but even if there were

17    symptoms, the E. coli in this case was going to cause the

18    death regardless.  It's that viral.  It's that deadly.

19            Kendall's death is sad.  It is tragic.  However, as

20    you listen to the evidence in this case, reserve your

21    judgment, if you will.  You are going to hear a lot of

22    information.  Don't jump to a conclusion.  Evaluate the

23    evidence and consider the evidence -- or, consider the

24    arguments I've made just now as you hear the evidence, the

25    lack of signs or symptoms, the diligence and professionalism

1    of Dr. Dumpe throughout and the actions and observations of

2    trained and seasoned nurses who all took care of Baby Kendall

3    in this case.

4        Also listen to the evidence concerning the meconium.

5    It's important.  Again, it's a red herring, but listen to it.

6    Listen to Dr. Dumpe describe how it presented and what needed

7    to be done.

8        And then finally, keep in the back of your mind if

9    not in the front of your mind the details I've given you here

10   today.  Earlier delivery was not medically indicated, a

11   pediatrician was not necessary to be present and neither of

12   these things would have changed the outcome.

13       I thank you in advance for your service as a jury

14   here, and I look forward to talking to you again in the trial.

15   Thank you.

16       THE COURT:  Thank you, Mr. Colville.  At this time,

17   we'll hear from Ms. Koczan.  Ms. Koczan will likewise provide

18   her opening statement, and once again, ladies and gentlemen of

19   the jury, I ask for your kind attention.  Ms. Koczan, you may

20   proceed.

21       MS. KOCZAN:  Thank you, Your Honor.  Your Honor,

22   counsel, ladies and gentlemen of the jury.  We met yesterday,

23   but again, I'm Paula Koczan.  I have the privilege of

24   representing Valley Medical Facilities, Incorporated, which is

25   the entity that operates the hospital known as Heritage Valley

1    Beaver, Dr. Hilary Jones who you met yesterday who is seated

2    with me at counsel table and her practice, which is known as

3    Heritage Valley Pediatrics.

4         Now, for those of you who are not familiar with

5    Heritage Valley Beaver, it's a community-based hospital that

6    is located in Beaver, Beaver County, Pennsylvania.  Dr. Jones

7    is a pediatrician who has been practicing in the Beaver County

8    area since 1997.  She is board certified in pediatrics.  She

9    provides care to pediatric patients basically of all ages, but

10   one of the things that she does and has been asked to do is to

11   work in the nursery, so she covers the nursery, and it's in

12   that context that she was involved in this case.

13        As you heard yesterday and from Mr. Colville, this

14   case involves the birth and unfortunate and tragic death of

15   Kendall Peronis which was caused by a virulent and aggressive

16   infection known as E. coli, and we're going to talk a little

17   bit later about what that is.

18        Her birth and death occurred on October 13 of 2014.

19   We're here today, for the rest of this week and likely most of

20   next week because the plaintiffs claim that Kendall's death

21   resulted from some negligence you heard on behalf of Dr. Dumpe

22   and also on behalf of the hospital, the nurses and as a result

23   of Dr. Jones.  That's the claim in this case.

24        You are going to be hearing expert testimony that

25   will outline in detail exactly what the claims are, but I want

1    to go through them with you very shortly here so that you can

2    understand.  So the first claim here -- the first issue that

3    you are going to have to resolve, and can we put them up one

4    at a time?

5         Okay.  The first issue, and this is a claim by the

6    plaintiffs, and the issue that you are going to have to

7    address is were the Heritage Valley Beaver labor and delivery

8    room nurses negligent for failing to advocate for notifying a

9    pediatrician to be present at Kendall's delivery.

10         Essentially what plaintiffs are claiming is that the

11   nurses should have advocated with Dr. Dumpe, hey, get a

12   pediatrician in there.  The evidence will establish, as you've

13   already seen from the document that Mr. Colville showed you, a

14   pediatrician was not indicated nor necessary nor would

15   anything different have been done.  There was nothing for the

16   pediatrician to do.  This baby was a healthy baby and in good

17   shape.

18         The next issue in this case, were the Heritage Valley

19   labor and delivery room nurses negligent for not immediately

20   notifying the nursery nurses or a pediatrician following

21   Kendall's birth, given the need for a vacuum extraction in the

22   presence of meconium.

23         The claim is, and you are going to hear this from

24   plaintiffs' expert that even though a pediatrician wasn't

25   present at birth, immediately after, the nurses should have

1    called one.  They should have called the nursery nurses.  They

2    should have gotten a pediatrician in there.  Again, the

3    evidence will establish that that wasn't necessary.  The

4    nursery nurses would have done nothing different than

5    Ms. Hendershot did.  There was nothing to treat at that point,

6    and a pediatrician was not necessary.

7            The third claim, and this is rather interesting, this

8    is the claim against Dr. Jones.  I think you recall hearing

9    yesterday when Mr. Price did his opening that the plaintiffs

10   have no criticisms whatsoever of anything that Dr. Jones did.

11   They told you yesterday that Dr. Jones did everything that she

12   could to help this child, and she did.

13           The only reason, the sole reason why Dr. Jones is in

14   this case and is sitting in this courtroom is that there is a

15   note from a nursing supervisor made after the fact that states

16   she was called at 7:20.  You are going to be hearing evidence

17   that that just simply isn't true.  First and foremost, the

18   symptoms that began developing did not occur until 7:25, so

19   there would have been no reason to call her at 7:20.

20           The nurse who was there, Nurse McCrory, will tell you

21   she didn't call Dr. Jones.  She called Dr. Heiple who is the

22   resident there.  That's the procedure there.

23           Dr. Heiple will tell you he didn't call Dr. Jones.

24   Dr. Jones will tell you she wasn't called.  She came in at

25   8:00, at her normal time, and that's when she became aware.

1   So there is no evidence.

2        In addition, there's one other piece.  We're going to

3   show you some phone records, paging records and phone records

4   that conclusively establish Dr. Jones was not called before

5   she arrived at 8:00.

6        The next claim here is plaintiffs allege that, had

7   Kendall been delivered earlier, had treatment -- had a

8   pediatrician been there, had they done things earlier,

9   administered antibiotics earlier, that she would be alive and

10  well today.  Unfortunately, that is not the case, and the

11  evidence will establish that.

12       The evidence you are going to hear is this was a

13  virulent, aggressive infection, and earlier treatment would

14  have made no difference, so those are the issues that you are

15  going to be having to decide when you go back to deliberate at

16  the end of this case.

17       So one of the things that you are going to be asked

18  to decide is whether these health care providers were or were

19  not negligent, and it's important to understand what that term

20  means, because as lay folks, we use that term differently than

21  what it means legally.

22       So let me just go through that with you one minute,

23  and the judge will give you instructions at the end, but

24  essentially what negligence means in a legal sense is that

25  there is a duty, and there's no question in this case these

1    were health care providers.  They owed the plaintiff a duty

2    and Kendall a duty.  The next portion of that is breach of

3    duty.  That's the second element, and this is where we part

4    company with plaintiffs.

5        Breach of duty means that the doctors or health care

6    providers either did something that they should not have done

7    or failed to do something that they should have done.  In

8    other words, they breached the duty.  This is where we part

9    company.  It is our position that there was no evidence of a

10   breach of duty here.

11       The third element is causation, and the fourth

12   element is harm.  If you put it all together, it's a breach of

13   duty that causes harm.  That's what negligence means in a

14   legal sense.

15       So who has to prove this?  The burden of proof in

16   this case rests solely with the plaintiffs.  Dr. Jones,

17   Dr. Dumpe, the hospital, they don't have to put any witnesses

18   on, but we will and we will have factual witnesses and expert

19   witnesses, and the burden of proof is, as you heard yesterday,

20   the preponderance of the evidence, slightly tipping the scales

21   in favor of plaintiffs, if you believe that, or if the scales

22   are equal, it has to be for the defendants.  If they tip

23   slightly for the defendants, the verdict must be for the

24   defendants.

25       So let's talk about some of the terminology that

we've heard, and you've heard this before, and I hope not to be repetitive, but what is meconium.  Meconium is the baby's very first stool, the first bowel movement, so to speak, that the baby has.

Unlike other bowel movements, meconium is composed of materials that the baby ingests while they are in the womb. It's something called intestinal epithelial cells, the lining of the intestines; lanugo, I believe is the way you pronounce it, that's kind of the fine hair that some babies have when they are first born; mucus; amniotic fluid; bile and water. The important thing to keep in mind is meconium is sterile. There's no bacteria or viruses or anything in meconium.  It's sterile.

Meconium aspiration happens when a newborn breathes in a mixture of meconium and amniotic fluid.  We heard yesterday about treatment for meconium.  Physicians don't simply treat a baby because they have had meconium aspiration. There's no reason to do that.  The only reason that they would treat a baby in the event that there was a problem with meconium is if the baby had respiratory distress.  That would be why, but in this particular case, the issue here wasn't the meconium.  It was the fact that she had this E. coli sepsis.

One of the other terms that you are going to be hearing about is something called transition.  You are going to hear about, after a baby is born, that they go through a

1    transition period.  What does that mean?  If we can go back

2    for a minute.  That just simply refers to the change that the

3    fetus must make to move from reliance on the mother's heart

4    and lungs and thermal systems to be able to breathe on their

5    own and sufficiently oxygenate themselves.

6           The doctors will tell you that that sometimes takes a

7    while.  It can take a couple of hours, and during that time

8    period, there are occasions where a baby may have some

9    difficulties, may have some respiratory issues, that type of

10   thing.

11          Let's go to the next one.  Pneumonia.  In this case,

12   the evidence that you are going to hear is that Kendall had a

13   bronchopneumonia that was caused by the E. coli sepsis.  So

14   what is pneumonia?  It's simply a lung infection that affects

15   the air sacs, something called the alveoli which is down at

16   the bottom of your lungs and interferes with the delivery of

17   oxygen.  If we go to the next slide, this gives you some

18   picture of what it would look like.

19          On the left-hand side, you see what are considered

20   the normal alveoli.  In there, that would be air.  In a

21   patient that has pneumonia, it becomes fluid-filled so they

22   can't exchange oxygen and breathe.

23          Let's go to the next one.  E. coli.  This is the

24   formal name and I'm not going to mispronounce that.  I'll let

25   the doctors do that, but it's simply known as E. coli, and

1    what it is is a gram negative bacteria that is commonly found

2    in the gut, in our intestines.  Most of us may have E. coli in

3    there, and as adults and whatnot, we can balance it, but it

4    can cause infection in adults and it certainly can cause

5    infection in neonates, and when it causes infection in

6    neonates, it's often fatal, and that's what happened in this

7    particular case.

8         What happened here?  Let's go through that, and Jodi,

9    will I be able to click?  Let's look at the events here.  So

10   at 2:00, Carissa, who is 19 years old, arrives at Heritage

11   Valley at the labor and delivery unit, and she is there to

12   rule out labor.  She had her water break earlier in the day.

13   I believe the records will indicate it's somewhere around

14   10:00 a.m., and she came to the hospital, and there was a

15   concern was she in labor, and so when she gets to the

16   hospital, the very first thing they do is they place her on

17   the fetal heart monitor.  It's called a TOCO monitor.

18        It's a belt that goes across the woman's abdomen and

19   it monitors contractions and heartbeat and that type of thing,

20   and they do a test called an AmniSure.  That is a test that

21   tests for amniotic fluid and it confirmed that indeed her

22   water had broken, and the monitor showed that indeed she was

23   in labor, so at around 2:45, Dr. Dumpe was called.

24        The nurse who was caring for Carissa at that time is

25   Nurse Judy Ash, and you are going to hear from her later in

1    the trial.  Judy receives orders from Dr. Dumpe to admit her
2    to the hospital, and that fetal monitoring continues and the
3    monitor looks good.
4        At 4:04, Dr. Dumpe calls in for a report.  He's told
5    by Nurse Ash that Carissa is comfortable, and at this point,
6    she is dilated three centimeters.
7        At 5:15, Dr. Dumpe is in.  He's reviewing the chart.
8    He's looking at the tracings.  Everything looks good at that
9    point.
10       At 5:24, they begin the epidural, the obstetrical
11   anesthesia for Carissa.
12       At 6:30, Dr. Dumpe is back.  He examines her again,
13   three centimeters, and at that point, he determines that her
14   forebag, another part of the bag of water, has not yet been
15   broken, so he goes in and he ruptures that, and at that time,
16   he sees some light green-colored fluid, and you heard about
17   that yesterday, some meconium-tinged fluid.
18       At 8:20, Nurse Hendershot, who I believe you are
19   going to be hearing from later this afternoon, she is the
20   nurse who comes on at 7:00 p.m., and she remains with Carissa
21   until Kendall is born at around 5:20 the next morning.  She
22   conducts a vaginal exam and she finds that Carissa's labor has
23   progressed.  She is now about five centimeters, and she notes
24   there is thin meconium.
25       At 9:15, Dr. Dumpe is given verbal report letting him

1    know what is going on with Carissa.  Things are going well.

2            11:25, he's given a report again.

3            At 1:00 a.m., Nurse Hendershot performs another

4    vaginal exam.  At this point, she is eight centimeters along.

5            At 2:55 a.m., another vaginal exam is done and she is

6    nine centimeters, so her labor is progressing.  All the time,

7    all of this, they are doing that monitoring that I talked with

8    you about before, and the strips look good.  It doesn't look

9    like there's anything going on here that is in any way

10   worrisome.

11           At 3:35 a.m., Carissa is fully dilated.  She is ten

12   centimeters and she is instructed to begin pushing.

13           Let's go to the next slide.  At 4:00 a.m., she is

14   pushing.  At 5:20 a.m., Kendall is delivered by Dr. Dumpe, and

15   he has to use a vacuum extractor.  And for those of you who

16   are not familiar with it, it's a device that's put on the

17   baby's head to help pull the baby out, and the reason why that

18   was necessary here is that Carissa had been in labor for a

19   while, she was exhausted and wasn't able to push the baby

20   down, so that was why that was done.

21           You heard something about a shoulder dystocia

22   yesterday.  This child did not have a shoulder dystocia.

23   Dr. Dumpe took preventive measures to prevent that from

24   happening so she did not have a shoulder dystocia.

25           He notes at that time that there was moderate, and he

1    described it as nonparticulate -- and that's really

2    important -- nonparticulate meconium that was noted at the

3    time of birth, and at that point, she is -- Kendall is bulb

4    suctioned prior to the time she starts breathing to get

5    whatever might be there out of her lungs, and she is assessed

6    by the nurses, and you heard before the Apgars were six at

7    one, eight at five.  She is given some oxygen and suction.

8            If we can stop here now and put up the first document

9    there.  We're going to come back to this in just a minute, but

10   I want to put up the very first document.

11           Yesterday, you were shown some policies, and if you

12   can just highlight this section up here first for me.  This is

13   the policy that you were shown yesterday by Mr. Price.  This

14   is a policy entitled, "Maternal Distress Or Nonreassuring

15   Fetal Status in Labor and Delivery, Protocol to Correct."

16           If you would scroll down -- before you do that, look

17   right in here.  It said what the policy requires is the

18   registered nurse will notify the physician when signs of

19   maternal distress or nonreassuring fetal status are identified

20   and initiate nursing interventions as indicated to monitor or

21   eliminate the distress.

22           Then if you look down here, one of the definitions is

23   meconium-stained amniotic fluid.  Flip to the next page.  If

24   you highlight this section here, what the policy says is you

25   prepare for distressed newborn, you get this equipment

1    available and you notify the pediatrician as per the policy.

2    This is not the policy that requires notification, and the

3    policy, which you were not shown, if we can put that up, it's

4    2.21, and if we highlight that top section, here is the

5    policy, "Notification of pediatrician/nursery for expected

6    delivery of potentially high risk infant."

7         It says, "The pediatrician will be notified when the

8    delivery of a high risk infant is imminent and the

9    pediatricians's presence at the delivery is required as

10   determined by the attending obstetrician."  It's the

11   obstetrician who makes that determination.  The pediatrician

12   will be notified either by the obstetrician or the labor and

13   delivery registered nurse, and the labor and delivery

14   registered nurse will also notify the nursing staff of an

15   anticipated delivery in these situations.

16        Now, if you go down below here, if you scroll down,

17   here is the indication for that, for notification.  Amniotic

18   fluid containing particulate meconium.  This was not

19   particulate meconium.

20        Let's go to the next document.  Keep flipping.  This

21   is Dr. Dumpe's operative record, and I'd like to highlight, it

22   is about midway down, beginning with "Moderate."  This line

23   here.  If you can just pull that out.  "Moderate

24   nonparticulate meconium fluid was noted at the time of

25   delivery."  So this was not particulate fluid.

1           Let's go to the next document, and this is that labor

2      record that Mr. Colville showed you, and this is a very

3      important document here, and if we can highlight this section

4      here, which you were shown before, this is the Apgar scoring.

5      I don't know if any of you are familiar with that term, but

6      when a baby is born, the very first thing is that the nurses

7      assign Apgars.  That gives you some indication of how the baby

8      is doing.

9           In this particular case, at one minute, her heart

10     rate was two, which is normal.  That's what you want.  Her

11     respirations were one, muscle tone was one, reflex was one,

12     skin color was one, so that's a six.  But at five minutes,

13     things have improved, and she was up to two for heart rate,

14     two for respiration, one for muscle tone, two for reflex, one

15     for skin color, and she is eight.  Eight is a normal Apgar

16     score.  That's a good Apgar score.  That indicates a good,

17     healthy baby.

18          Let's go to this section now, and again, you were

19     shown that before, but I want to highlight that.  This is

20     Nurse Hendershot's initial assessment.  This would be the same

21     assessment that a nurse would do.  It is totally normal.

22     There is nothing there to indicate that there's any problem,

23     so there is no reason to call a pediatrician.  There is no

24     reason to call the nursery nurses.  The nursery nurses are

25     going to do the same thing that Nurse Hendershot did.  We have

1    a normal, healthy baby at this point.

2         We go to the next document.  This document is just

3    kind of an enlarged form of what you saw in the Apgars.  This

4    is actually Nurse Hendershot's assessment of what she saw at

5    that time, so she did a complete assessment at that time and

6    found a healthy baby.

7         Let's go back then to the timeline, and we'll go

8    through this quickly.  So I think we stopped at 5:20, at the

9    time of Kendall's birth.  So after Kendall was born, the

10   procedure and the policy at Heritage Valley is they want the

11   moms and the babies and the dads to bond, so the procedure

12   there is that the baby is given to mom.  Mom actually stays in

13   the delivery room.

14        This is kind of a labor and delivery suite where mom

15   stays at least immediately afterwards and Kendall was there

16   with her, and during that time, you heard from Mr. Price that

17   Kendall was -- the various family members were visiting.

18   There were quite a few people in and out, and they were

19   passing Kendall around, and Kendall was crying, and yesterday

20   I heard some indication that that was a bad thing.  That's not

21   a bad thing.

22        The nursery nurses and the pediatricians will tell

23   you they want those babies to cry, and a baby who is crying

24   vigorously is a healthy baby, and the reason why is the more

25   they cry, the more they open those alveoli that we talked

1    about.  They breathe.  They start oxygenating.  That is a

2    really very good thing.

3            So the fact that she was crying is not a bad thing.

4    It's a good thing.  It shows a healthy baby.  Babies who are

5    not healthy, they whimper.  They can't cry because they don't

6    have the ability to do so, but crying is a good thing.

7            So Nurse Hendershot is in every 15 minutes.  We heard

8    yesterday that no nurse came in.  That's simply not true.  A

9    nurse documentation in the record that we'll show you that

10   every 15 minutes, she came in to check on Carissa.  She did an

11   assessment on Carissa.  While she was there, she saw the baby.

12   Did she do a full assessment?  No.  She looked at the baby.

13   If there had been any issue, she would have done something

14   about it.  She is going to tell you that.

15           Between 6:50 and 7:00 a.m., Kendall is taken to the

16   nursery by Nurse Hendershot.  She is placed on a warmer bed.

17   She is received by a nurse by the name of Barbara Hackney.

18   Barb will testify a little bit later.  She'll tell you that

19   she took Kendall's vital signs, which you were shown before.

20   They were perfectly normal.  She administered medications, the

21   initial medications that the baby needs which are eyedrops and

22   a medication called Aquamephyton.  That's an injection.

23           Because it was at the change of shift at that time,

24   she was going to allow Jamie McCrory, the next nurse, to do

25   the full assessment.

1          So these are the vital signs at 7:00, which you saw

2    before.  At 7:05, Nurse Hackney is giving a report to

3    Nurse McCrory.  At 7:25, Nurse McCrory, while they are giving

4    a report, they give the report right there in the nursery so

5    the nurses can see the babies, Nurse McCrory looks over and

6    notes that Kendall looks a little dusky to her.  Doesn't look

7    quite right at that time.  She notes some other things, so she

8    immediately gets up.

9          She goes over to Kendall, and one of the things she

10   does is she places a pulse ox.  I don't know if any of you

11   have seen it.  It's a little device that goes on the finger,

12   and it measures the oxygen saturation.  She puts that on

13   Kendall, and she notes that her oxygen saturation is lower.

14   It's 81 percent.

15         So she immediately places, with Nurse Hackney's help,

16   Kendall under the oxy hood to deliver some oxygen to her.  At

17   7:30, the pulse ox comes up.  It's 94 percent.  It had been 81

18   before.  She is on 61 percent oxygen, and at 7:25, she also

19   calls the resident, Dr. Heiple.  He is the resident who is on

20   call for the pediatric service, and the policy there is that

21   you call the resident, not the attending, first.  The resident

22   will call the attending when they feel it's necessary.

23         I point these times out because, if you recall, the

24   reason why Dr. Jones is in here is she is allegedly called at

25   7:20.  There's nothing going on at 7:20, so there would be no

1    reason to call her.  It doesn't make any sense.

2         Dr. Heiple -- let's go back there for a minute.

3    Dr. Heiple, you heard yesterday, in his deposition testified

4    that he thought that he got there somewhere around 8:00 p.m.

5    I believe he is mistaken.  We'll show you why a little bit

6    later.

7         In any event, you are going to hear testimony that he

8    was called.  He came down.  He was at grand rounds when he was

9    called.  He did not doodle.  He immediately got up, he left,

10   he came down, so he's called at 7:25.  Doesn't make any sense

11   that he wouldn't arrive until 8:00.  He's one floor above.  He

12   has to come down one floor.

13        Anyway, he comes in.  He assesses Kendall.  He hears

14   clear lungs, good entry.  He thinks at that point that she is

15   looking okay.  Remember she is under the oxygen hood.  Her

16   oxygenation has come up at that point.  He didn't call

17   Dr. Jones because he knew she would be in at 8:00.  She was on

18   her way in.  She gets there at 8:00 just about every day, and

19   he knew she was coming in, and at that point, Kendall was

20   stable.

21        So we go to the next slide.  And this is at 8:00 a.m.

22   Dr. Jones comes in, and at that time, there is again a change.

23   She is -- Kendall is on 64 percent oxygen.  Her sats are

24   around 94, 95, but she is grunting, she is flaring.  Dr. Jones

25   listen to her lungs.  She hears some coarse breath sounds.

1    Her heart was regular, her perfusion was good, but because of

2    her oxygen requirements, Dr. Jones decides it's in Kendall's

3    best interest to be transferred up to West Penn Hospital.

4    They have a NICU up there.  This is not a NICU.  This is a

5    regular nursery.  So they transfer.  They make arrangements.

6          At 8:20, Dr. Jones is already making arrangements to

7    get her up to West Penn.  She gives orders for a variety of

8    things, chest x-ray, blood cultures, CBC, cap gases.  She

9    orders an IV be inserted.  She orders antibiotics, because at

10   this point, there's evidence of respiratory distress, and

11   Dr. Jones will tell you when you see that, you think of

12   infection.  That's the first thing you think of in a baby of

13   this age.  She immediately starts all of that.

14         At 8:30, Kendall's pulse ox is 92 on oxygen.

15   Respiratory rate is 38.  They give her that ampicillin, one of

16   the antibiotics.

17         At 8:45, pulse ox is 89.  They confirm that the

18   transfer people are en route.  They are going to be flying

19   from West Penn Hospital down to Beaver.

20         8:52, they do a chest x-ray.  Confirms she does have

21   pneumonia.

22         At 9:00 a.m., pulse ox is 91 percent.  Her

23   respiratory rate is 36.  Go through that.

24         At 9:05, the labs come back and they show us

25   something interesting.  What they show us here is that she has

three percent neutrophils and 95 percent lymphocytes, and the
doctors will explain in better detail than I'm about to what
that means.  Essentially that means that she had an aggressive
infection that had basically used up all of her cells to
fight, and what that tells us is that this infection had been
going on for some period of time.  Again, not manifested, but
had been preexisting.

Between 9:30 and 9:40, Kendall's oxygen requirements
are increasing.  Dr. Jones makes the decision to intubate her,
meaning taking a tube and putting it down her throat to help
her breathe, and they are giving her IV fluids to help her.

At 9:45, the West Penn transport team arrives.
Dr. Leneri, Dr. Giovannia Leneri is a name you heard during
jury selection.  He's the attending neonatologist.  At that
point, once the transport team arrives, they take over and
they are giving directions and ordering medications, although
Dr. Jones and the nurses at Beaver are working with them.

From 9:45 until about 11:40, the resuscitation
efforts continue.  You heard yesterday they gave antibiotics.
They gave something called epinephrine and surfactant, nitrous
oxide, versed, IV fluids.  They did everything they could to
save her life.  Unfortunately, they were not able to do so,
and at 11:40, Dr. Leneri called the code.

At that point in time, the nurses, the doctors don't
know why this had happened.  They are speculating, but they

don't know.  Two days later, cultures that were taken while Kendall was in the hospital come back, and they reveal that she had an E. coli infection and that that was the cause of her death.

So as is required in this case, we have also asked a couple of experts to take a look at this case and come to court here and give you testimony with regard to their opinions about what happened.

The first one that you are going to hear from and not necessarily in this order is Dr. Susan Coffin.  She is a pediatric infectious disease experts from the Children's Hospital of Philadelphia.  She is a professor of pediatrics out there.  Her qualifications are there, and what she is going to tell you is that Kendall died from an E. coli infection that had been in existence prior to her birth, and that nothing, no antibiotics, nothing else could have saved her.

The next expert that you are going to hear from is Dr. Theona Boyd, and Dr. Boyd is a pediatric and perinatal pathologist from Boston Children's Hospital, Brigham and Women's.  It's affiliated with Harvard.  She is a professor there at Harvard, associate professor of pathology at Harvard Medical School, and she is on staff at these various hospitals.

She took a look at the autopsy slides, and she is

1    going to tell you conclusively that Kendall died of an E. coli

2    sepsis.  That is what caused her death and that it was a

3    virulent and aggressive organism that had been in existence

4    for at least a day before this all happened.

5         And the final expert that we're going to bring in is

6    Dr. Steven Ringer, and Dr. Ringer is a pediatrician

7    neonatologist.  He is currently at Dartmouth which is where he

8    practices, but he's also an associate professor in pediatrics

9    both at Dartmouth and at Harvard Medical School, and he's the

10   section chief of neonatology at Dartmouth.

11        What he's going to tell you is that there was no need

12   to call a pediatrician.  There wasn't anything that the

13   pediatrician could or should have done because there were no

14   signs or symptoms at the time of delivery, that earlier

15   intervention would not have made any difference in this case,

16   and he'll explain to you why that's the situation.

17        So you are not going to be hearing from these experts

18   and some of the other experts for Dr. Jones and Heritage

19   Valley until much later in this case, probably next week.

20        I would ask that you keep an open mind.  Don't begin

21   to decide this case until you heard from each and every one of

22   them.  Things change during the trial.  You may think one way

23   at the beginning of the trial, and by the end, you are

24   someplace completely different, so please keep an open mind.

25   This is a tragic case.  No one disputes that.

1           What happened to Kendall was devastating to Matt and

2    Carissa and also to the health care providers.  This was

3    terrible.  This was not the result that anyone wanted.

4    Everyone wanted a healthy baby.  Unfortunately, because of the

5    infection, that did not occur.  The fact that we are here

6    defending this case is not in any way meant to belittle or

7    demean anything that they went through.  That's not why we are

8    here.

9           We are here defending this case because Dr. Jones,

10   Dr. Dumpe and the nurses, they didn't cause this.  The E. coli

11   infection caused this.  The judge told you yesterday that you

12   don't and shouldn't be researching, Googling, doing any of

13   that stuff.  Everything that you need to decide this case, you

14   are going to be getting here in the courtroom.  There are

15   going to be many witnesses who come in that will explain this

16   all to you, and at the end, I think you'll agree with me you

17   don't need to do anything.  You are going to get it all here.

18          So people will say I'm not a medical person.  Why was

19   I chosen?  Well, you were chosen because of your own good

20   common sense, and that's all you really need to decide this

21   case, your own good common sense.

22          At the end of this case, probably sometime next week,

23   I'm going to have one additional opportunity to come and

24   address you in the closing argument, and at that time, I'm

25   going to ask that you render a verdict in favor of Dr. Jones

1    and the Valley Medical Centers, Heritage Valley Beaver and

2    Heritage Valley Pediatrics.

3            Thank you very much.

4            THE COURT:  Thank you, Ms. Koczan.

5            At this time, I think we should have a joint motion

6    on behalf of all of the parties.  I understand there are a

7    number of records you would like to move into evidence.

8            Mr. Price?

9            MR. PRICE:  Yes, Your Honor.

10           The parties before trial got together and have

11   designated a joint trial exhibit binder, and in the joint

12   exhibit binder, there are 53 different exhibits, and we have

13   provided the court with enough copies that are tabbed which

14   contain all the medical records, photographs and exhibits that

15   will be used during trial, and we will move to introduce them.

16           THE COURT:  Given the nature of the motion, it being

17   joined, hearing no objection, all of the exhibits contained in

18   the joint exhibit binder will be admitted.

19           Previously, my deputy was provided a list of those

20   exhibits and so he's logged them in.  At this time,

21   Mr. Galovich and Ms. Starr, will you distribute the binders to

22   our jurors?

23           Thank you, Mr. Galovich, for distributing those

24   binders, and I think you did what we did yesterday and

25   instructed the jurors that you should put your name and juror

1    number on your binder.  Those binders are there for your use.

2              As I indicated yesterday, it's up to you if you do or

3    don't want to take notes.  From past experience, I know that

4    jurors often like to take their notes sometimes on the

5    individual exhibits themselves.  That's certainly your

6    prerogative.  Once, again, whatever notes you place on those

7    exhibits in the exhibit binder will remain private and

8    confidential only to you.

9              So with that, I think we are ready at this time,

10   Mr. Price, to hear our first witness.

11             MR. PRICE:  Dr. Zamore is outside.

12             THE COURT:  Doctor, if you'll approach my deputy to

13   be sworn.

14             THE CLERK:  Please state and spell your name for the

15   record?

16             THE WITNESS:  Leonard Zamore, Z-A-M-O-R-E.

17       (Witness sworn.)

18             THE COURT:  Thank you, Mr. Galovich.  Dr. Zamore,

19   watch your step.  It's a little bit uneven there.

20             Now, I note, Doctor, you don't come to the stand with

21   any documents.  Mr. Price, are you going to be calling the

22   doctor's attention to any of the exhibits?  Is there a

23   separate binder for witnesses or no?

24             MR. PRICE:  Everything that I will show him, I will

25   put on the big screen.

1           THE COURT:  You may so proceed, but before you do

2    proceed, let me give the jurors this limiting instruction.

3    Ladies and gentlemen of the jury, the rules of evidence

4    ordinarily do not permit witnesses to state their own opinions

5    about important questions in a trial, but there are exceptions

6    to these rules like in the case of expert witness testimony.

7           You'll now hear the testimony containing opinions

8    from Dr. Leonard Zamore, a physician who will offer opinions

9    because of his knowledge, skill, experience, training or

10   education in the fields of obstetrics and gynecology and the

11   reasons for his opinions.

12          In weighing Dr. Zamore's opinion testimony, you may

13   consider his qualifications, the reasons for his opinions and

14   the reliability of the information supporting those opinions

15   as well as any other factors that I ultimately discuss with

16   you in my final instructions for your weighing the testimony

17   of individual witnesses.

18          The opinions of Dr. Zamore should receive whatever

19   credit and weight, if any, you think appropriate given all of

20   the other evidence in the case.  You may disregard his

21   opinions entirely if you decide that they are not based on

22   sufficient knowledge, skill, experience, training or

23   education.

24          You may also disregard his opinions if you conclude

25   that the reasons given in support of the opinions are not

1    sound, if you conclude that the opinions are not supported by

2    the facts shown by the evidence or if you think the opinions

3    are outweighed by other evidence.

4          In deciding whether to accept or rely upon the

5    opinions of Dr. Zamore, you can also consider any bias that

6    Dr. Zamore may have, including any bias that may arise from

7    any type of evidence that Dr. Zamore has been or will be paid

8    for reviewing this case and testifying.

9          Let me also tell you this:  That prior to the start

10   of this trial, the attorneys also agreed on a further limiting

11   instruction as it relates to Dr. Zamore.  To that end, as I

12   indicated, Dr. Zamore is an obstetrician.  He has been

13   retained by plaintiffs to testify on their behalf.  As I just

14   told you and as you heard in the opening statements, expert

15   testimony is necessary in this type of case to establish the

16   standard of care for doctors in their respective medical

17   fields.

18         Now, the testimony of Dr. Zamore, as the court

19   understands it, will be limited to his criticism of Dr. Dumpe

20   who is also an obstetrician and has the same qualifications

21   and specialty of medicine.

22         Dr. Jones, as you heard, is a pediatrician, and I am

23   instructing you that the testimony to be offered by Dr. Zamore

24   is not directed against Dr. Jones, so with that, Mr. Price,

25   you may proceed.

1          LEONARD H. ZAMORE, M.D., a witness herein, having

2     been first duly sworn, was examined and testified as follows:

3                          DIRECT EXAMINATION

4     BY MR. PRICE:

5     Q.  Dr. Zamore, could you please tell us what do you do for a

6     living?

7     A.  Obstetrician gynecologist.

8     Q.  And I'm sure the jury knows but can you tell the jury what

9     does an obstetrician gynecologist do?

10    A.  We take care of women in all respects from gynecologic

11    care to obstetrical care.

12    Q.  And that includes delivering babies?

13    A.  Delivering babies, yes.

14    Q.  Before we get into your opinions in this case, I have to

15    establish your qualifications so we're going to have to talk

16    about your education and your professional experience.  I'll

17    go through it.

18         Let's see, back to you, you obtained your bachelor of arts

19    from the University of Rochester in 1961, correct?

20    A.  Correct.

21    Q.  Medical degree, State University of New York in 1964 and

22    then an internship and residency in obstetrics and gynecology

23    at Yale New Haven Hospital from 1965 to 1968?

24    A.  Correct.

25    Q.  And then you were the chief resident instructor of

41

1    obstetrics and gynecology at Yale from '68 to '69, and you

2    went into the Army where you were a major at Fort Carson in

3    Colorado Springs from 1969 through 1971?

4    A.  Correct.

5    Q.  You were in private practice for the next -- oh, from 1970

6    through 2013?

7    A.  Correct.

8    Q.  And what did you do in private practice?

9    A.  Delivered babies, took care of women, did surgery.  Any

10   requirements that a woman needed for their care.

11   Q.  From 2013 until now, you are a clinician at the Yale

12   Medical Group Department of Obstetrics and Gynecology at Yale

13   New Haven Hospital at Yale University in New Haven,

14   Connecticut, correct?

15   A.  Correct.  Associate professor.

16   Q.  Can you tell us what you do there?

17   A.  Teach residents, deliver babies and do surgery.

18   Q.  There's a couple other -- let me ask you about that.  You

19   deliver babies on a weekly basis?  A monthly basis?  How

20   often?

21   A.  Weekly or monthly depending upon when they go into labor.

22   Q.  Do you also instruct and help residents and doctors who

23   are learning how to become obstetricians how to deliver

24   babies?

25   A.  My appointment at Yale is to teach residents, and I spend

1    three full days with them in the clinic and on the labor floor

2    teaching them, delivering babies and gynecologic care, yes.

3    Q.   In addition, do you also work with the nursing staff who

4    help in this process?

5    A.   Absolutely.

6    Q.   Okay.  Just a couple other issues with regard to

7    qualifications.  You are a fellow in the American College of

8    Obstetrics and Gynecology since the '70s?

9    A.   Yes.

10   Q.   You are certified in various diagnostic procedures and you

11   taught at Yale New Haven Hospital and associate clinical

12   professor at Yale, served on many boards and committees such

13   as the medical quality assurance committee, the department of

14   public health for the State of Connecticut, chairman of the

15   medical staff, board meetings for the women's surgical center,

16   chairman of the morbidity and mortality conference at the

17   women's surgical center at Yale New Haven Hospital.

18        Can you tell us what you do on boards like this?

19   A.   We evaluate cases and we get cases presented to us that

20   have had issues and we try to discuss them and figure out how

21   better to take care of the patient.

22   Q.   And that's -- there's a committee of quality improvement

23   and the executive committee at the department of obstetrics.

24   Same type of thing?

25   A.   Same type of thing.

1    Q.  You give lectures and seminars at Yale?

2    A.  Yes, I do.

3    Q.  And I mentioned you have a full-time practice and you

4    teach residents.  Besides that, you are here as an expert

5    witness.

6        Have you started -- have you reviewed cases before?

7    A.  Yes, I have.

8    Q.  Can you tell us just about how long you have been

9    reviewing cases in a medical-legal sense?

10   A.  Probably for the last ten or 15 years.

11   Q.  Have you reviewed cases for our office before?

12   A.  Yes, I have.

13   Q.  Have you ever testified?

14   A.  I believe I was at a trial for your firm at one previous

15   time, yes.

16   Q.  And you've written reports on other cases for our office?

17   A.  Yes, I have.

18       MR. PRICE:  At this time, Your Honor, I would move to

19   introduce Dr. Zamore as an expert in obstetrics and gynecology

20   and offer for cross-examination on qualifications.

21       THE COURT:  Any cross-examination, Mr. Colville?

22       MR. COLVILLE:  Just for clarification, Your Honor.

23               CROSS-EXAMINATION EN VOIR DIRE

24   BY MR. COLVILLE:

25   Q.  Doctor, do I understand you have been practicing medicine

44

1    for the past 50 years?

2    A.  Excuse me?

3    Q.  You have been practicing medicine for the last 50 years;

4    is that correct?

5    A.  Yes.

6    Q.  You started doing your expert reports, you said, ten to 15

7    years ago?

8    A.  Approximately.

9    Q.  You testified in that case that you referenced.  Do you

10   remember the Arbutiski case?

11   A.  Yes.

12   Q.  Do you recall testifying in that case that you began your

13   expert testimony about eight years ago?

14   A.  I believe it was about eight, yes.

15   Q.  You testified in that same case that you provided 100

16   percent of your expert testimony for plaintiffs only; is that

17   correct?

18   A.  That's not true, no.  I do about 30 percent for defense.

19   Q.  But that's what you testified to in that case?

20   A.  Well, since then.

21   Q.  Since --

22   A.  I've taken many defense cases, yes.

23   Q.  Your testimony -- I'm looking at a transcript dated

24   October 31st, 2018.  That's when you testified in that case;

25   is that correct?

1    A.  I guess if that's what you say, but I do defense cases,

2    yes.

3    Q.  But in that case on that date, you testified that you

4    testified for plaintiffs only 100 percent, correct?

5    A.  If that's what you say, yes.

6    Q.  But now you are saying it's different?

7    A.  Well, I do defense cases.  I'm saying that, yes.

8    Q.  You have been affiliated with Yale University for the past

9    20 or 30 years; is that right?

10   A.  Since 1964.

11   Q.  Are you a professor?

12   A.  Associate professor.

13   Q.  Are you on a tenure track?

14   A.  No.

15   Q.  Why not?

16   A.  Because I'm on the clinical track.

17   Q.  Have you ever authored peer reviewed publications?

18   A.  No.

19   Q.  When was the last time you delivered a baby?

20   A.  About three months ago.

21   Q.  Was it a vaginal delivery?

22   A.  Vaginal delivery.

23   Q.  What percent of your work is vaginal versus C-Section?

24   A.  I would say probably 50/50.

25   Q.  How many cases this past year did you manage a labor

1   delivery to a vaginal delivery?

2   A.   I've assisted with residents, I have, but I have not

3   personally delivered except for that one case, yes.

4   Q.   One case in the past year you managed a vaginal delivery?

5   A.   Personally, that's correct.

6   Q.   How about the year before that?

7   A.   Maybe two or three.

8   Q.   And the year before that?

9   A.   Maybe five or six.

10  Q.   In the past ten years, how many cases have you managed

11  through labor and delivery to a vaginal delivery?

12  A.   With residents or by myself?

13  Q.   No.  With you.

14  A.   Maybe ten or 12.

15  Q.   How often do you testify as an expert?

16  A.   How often do I what?

17  Q.   Testify as an expert.

18  A.   This would be the second or third trial.

19  Q.   This year?

20  A.   No.  Forever.  I think I've been only at three trials.

21  Q.   Have you given deposition testimony?

22  A.   Yes, I have.

23  Q.   How many times have you done that?

24  A.   I would say I did about six or seven depositions.

25  Q.   How many reports have you written?

1    A.  Oh, probably about 20.

2    Q.  Where do you live?

3    A.  New Haven, Connecticut.

4    Q.  Have you ever lived in this community?

5    A.  No.

6    Q.  Have you ever practiced medicine in this community?

7    A.  No.

8    Q.  Is this your first time in Pittsburgh?

9    A.  No.  I was here at a trial.

10            MR. COLVILLE:  That's all I have, Your Honor.  Thank

11   you.

12            THE COURT:  Ms. Koczan, any questions of this

13   witness?

14            MS. KOCZAN:  Yes, Your Honor.  I have a few.

15                 CROSS-EXAMINATION EN VOIR DIRE

16   BY MS. KOCZAN:

17   Q.  Dr. Zamore, before you came to court to testify here this

18   morning, Mr. Price had provided us with a copy of your

19   curriculum vitae.

20            MS. KOCZAN:  Your Honor, may I approach to show it to

21   him?

22            THE COURT:  Certainly.

23   Q.  I want to show you the curriculum vitae and ask you if

24   that is a current and complete curriculum vitae that

25   adequately provides us with information regarding your

1    training and experience?

2    A.  Yes.

3    Q.  Is there any education, training, positions, writings that

4    you have had that are not contained within that document?

5    A.  No.

6    Q.  Thank you.  Now, Doctor, would it be true that your main

7    interests in your practice really focus on gynecology and not

8    obstetrics?

9    A.  I do obstetrics, but my main focus was gynecology, yes.

10   Q.  In fact, as you might expect, I did some research on you,

11   and I found on the Yale website some information about you,

12   and it indicates in there that you have been doing a lot of

13   resident teaching in advanced operative surgical techniques

14   including operative hysteroscopy, laparoscopy, bladder

15   suspension, vaginal graft placements.

16       Those are all gynecological procedures, correct?

17   A.  Correct.  They are gynecological, that's correct.

18   Q.  And I note on your CV that you have some certifications in

19   something called colposcopy, hysteroscopy, gyne laser surgery.

20       Again, these are all gynecological procedures, not

21   obstetrics?

22   A.  Correct.

23   Q.  That you have certification in euro gynecology, again,

24   something called sling procedures.  Gynecological procedures,

25   not obstetrics procedures?  Vaginal suspension, graft

1    procedures.  Again, gyne procedures, not obstetrical?

2    A.  These are all procedures that I do and teach, yes.

3    Q.  None of that, none of your main interests has anything to

4    do with what we're talking about here today.  This was an

5    obstetrical delivery.

6    A.  I delivered probably thousands and thousands of babies

7    over the 50 years.  Obstetrics is part of my practice, even

8    though I have done all the gynecologic issues that you

9    discussed, yes.

10   Q.  And on your curriculum vitae, there are three papers that

11   we already established were not peer reviewed, but again they

12   have nothing to do with labor and delivery.  They are gyne

13   papers, correct?

14   A.  Yes.

15   Q.  Your professorship is a clinical professorship?

16   A.  That is correct.

17   Q.  Not an academic one?

18   A.  Correct.

19   Q.  Have you delivered babies where meconium has been present?

20   A.  Hundreds.

21   Q.  And is that something that you see frequently?

22   A.  I probably see it maybe 20 percent, ten to 20 percent of

23   the time that I deliver babies, yes.

24   Q.  Have you ever delivered a baby who had E. coli sepsis?

25   A.  Yes.

1    Q.  And when was the last time that occurred?

2    A.  Probably five years ago.

3    Q.  And, Doctor, you are coming to court here today, you are

4    not doing that gratis.  You are getting paid for your

5    testimony, correct?

6    A.  Correct.

7            MS. KOCZAN:  Thank you.  That's all I have.

8            THE COURT:  Anything further, Mr. Price, by way of

9    qualifications?

10           MR. PRICE:  I'm sorry?

11           THE COURT:  Anything further by way of qualifications

12   given the cross-examination?

13           MR. PRICE:  Yes, just a couple follow-up.

14                 REDIRECT EXAMINATION EN VOIR DIRE

15   BY MR. PRICE:

16   Q.  Can you explain to the jury just what is this clinical

17   associate professorship?

18   A.  It's a teaching position where I teach residents how to

19   deliver babies, how to manage obstetrics, how to read fetal

20   monitor strips, how to do gynecology, how to do surgery.  It's

21   mainly how Yale residents learn to do their profession, and

22   that's my job.

23   Q.  So are you the doctor that watches over the shoulder of

24   the residents who were delivering the baby?

25   A.  Absolutely.  I have to do that every time.  Residents are

1   not allowed to be alone.  That's correct.

2   Q.  So can you tell us, while you may not have delivered, you

3   know, delivered a baby yourself in a few months, how many

4   resident deliveries have you supervised over the last couple

5   months?

6   A.  Numerous residents in reading fetal monitor strips, in

7   taking care of labor patients.  I'm on the delivery floor.  I

8   can't even count.

9           MR. PRICE:  That's all the other questions I have on

10  qualifications, Your Honor.

11          THE COURT:  Anything further, Mr. Colville?

12          MR. COLVILLE:  No, Your Honor.

13          THE COURT:  Ms. Koczan?

14          MS. KOCZAN:  Nothing, Your Honor.

15          THE COURT:  Okay.  Dr. Zamore has been tendered as an

16  expert in the fields of OB, obstetrics and gynecology.  The

17  court accepts him as such witness.

18          Mr. Price, you may proceed.

19                  DIRECT EXAMINATION (Resumed.)

20  BY MR. PRICE:

21  Q.  Dr. Zamore, I'm going to ask you some questions.  If you

22  could pull up the PowerPoint first.  I put a safety rule up

23  here.  If a baby is at risk, a pediatrician must be present at

24  delivery.  Do you agree with that?

25  A.  100 percent.

1    Q.   Can you tell us why?

2    A.   Pediatrician is the physician that can care for the baby.

3    The obstetrician, who I would be would be the one that

4    delivers the baby and actually in the delivery room, the way

5    it works is I do the obstetrical part, I deliver the baby, I

6    take care of the mother.  I hand off the baby to the labor

7    nurse or to the pediatrician.

8             If the baby is at risk, I am sure to call a

9    pediatrician into the labor room and hand the baby off to the

10   pediatrician where the baby would get specific care from an

11   expert.

12   Q.   In your opinion, would any obstetrician disagree with that

13   rule?

14   A.   I don't believe any obstetrician would disagree with that.

15   Q.   You were asked in this case to review some records and

16   provide your opinion with regard to whether or not there was a

17   deviation from the standard of care in this case; is that

18   correct?

19   A.   Correct.

20   Q.   Now, first, I brought it up in the opening yesterday, but

21   can you define for us what does standard of care mean so the

22   jury can understand your testimony?

23   A.   You want a doctor to practice medicine so that it would be

24   consistent with what good care would be in the community and

25   throughout the country.  Standard of care is pretty constant.

1    It's pretty much the same, but under those circumstances, you

2    would want a doctor to practice medicine under a specific good

3    care advocating the patient.

4    Q.  Mr. Colville asked you whether or not you have ever

5    practiced medicine in the State of Pennsylvania or in this

6    community.  Is the standard of care any different in Beaver

7    than it is up at Yale?

8    A.  Standard of care throughout the entire country is the

9    same.  Doctors should practice the same way, careful care,

10    advocate for the patient.

11    Q.  Now, in this case, you had a chance to review Carissa's

12    prenatal record, her delivery records, the fetal strips, the

13    autopsy and death certificate.

14    A.  Correct.

15    Q.  Have you also had a chance to review some deposition

16    transcripts and hospital policies?

17    A.  Correct.

18    Q.  Now, before we talk about all of the substance of your

19    opinions, I'd like to just ask you to summarize your

20    understanding of the facts about the labor and delivery for

21    Carissa and Kendall.

22    A.  She had a fairly benign prenatal course.  In other words,

23    the nine months prior to her going into labor were pretty

24    normal.  She didn't have any complications.  She had a

25    nonstress test, which is a test that we do where we evaluate

1    the baby one month prior to delivery on a fetal monitor strip.

2        And just to explain what a fetal monitor strip is, we

3    actually put an electrode on the mother's belly and we can

4    monitor the baby's heart rate and contraction rate, and in so

5    doing, we are able to determine whether the baby is in stress

6    or not in stress, is healthy or is in jeopardy.

7        She had a test one month prior to her delivery, her due

8    date, and it was perfectly normal.  So my evaluation of her

9    prenatal course was benign and perfectly normal prenatal

10    course with no complications, normal blood work, and then as I

11    just stated, she had a fetal monitor strip one month prior to

12    her expected delivery when she went into delivery, and that

13    was absolutely normal.

14        So what we had was a normal woman with a normal

15    pregnancy who comes into the hospital on her due date, and she

16    has early contractions and she has leaking fluid or her

17    membranes had been leaking amniotic fluid.

18        She was then evaluated in the hospital by her doctor

19    and was found to be in early labor on her due date with

20    leaking membranes and it was appropriate and it was

21    appropriately done that she should be induced or that her

22    labor should be helped along so that infection would not

23    develop and that the baby would be delivered appropriately,

24    and I think this was an appropriate movement.

25        The doctor ruptured her membranes on admission, about

two hours or three hours after admission, and noted that the

amniotic fluid or the sac that the baby was swimming in the

uterus was tinged with meconium.  What meconium is -- go

ahead.  I'm sorry.

Q.  That's what I was going to ask you.  If you could explain

to us what meconium is.

A.  Meconium is kind of a greenish, brownish discharge that a

baby produces from its bowel.  Usually, that happens under

stressful situations.  So if the baby is in any way stressed

either by lack of oxygen or for other reasons, it actually

what we call poops into the amniotic fluid, and the fluid goes

from a clear liquid like water into a liquid that is filled

with particulate matter, green and blackish.  We call that

meconium.

        So the fluid is tinged green or tinged brown, and it

could be thick or thin.  The thicker the meconium, the more

serious it is, and the thinner the meconium, the less serious

it is, but he did notice on rupturing membranes that there was

meconium.

        When you see meconium on ruptured membranes, it

should be a red flag.  The red flag means you have to be

careful and watch there's something going on that's not 100

percent normal, that when you see meconium, that there's a

possibility that this baby was under some kind of stress prior

to the membranes being ruptured and that we need to monitor

1    this baby carefully and to be sure that the labor goes

2    appropriately and that the baby doesn't have some kind of

3    problem during the labor that would require an early delivery

4    like a cesarean section.

5    Q.  Let me stop you there for one second.  With regard to

6    meconium, you mentioned there are different colors of

7    meconium.

8    A.  It goes from green to dark brown to black depending upon

9    the quality and the quantity of meconium.

10   Q.  In the darker meconium, is there usually more particulate

11   matter present?

12   A.  That's the issue, because the particulate matter in the

13   meconium which is actually produced in the fetal gut, it's

14   like stool, like the baby is pooping in its sac of fluid.  If

15   that's absorbed by the baby, because the baby is breathing in

16   utero, if that's absorbed by the baby as it breathes in utero,

17   it can get caught in the baby's lungs and prevent the baby

18   from breathing when the baby is born, because the lungs

19   require oxygen to be transported from the alveoli, which is

20   the little capsules in the lung where blood is brought

21   together with oxygen, and so the baby gets oxygenated, but if

22   these little capsules get blocked with meconium or with these

23   little capsules, particulate matter, then the baby can't get

24   oxygen when it's born, and we call that meconium aspiration,

25   and these babies are quite ill and require special care.

1      They may even succumb from the disease because of

2    respiratory distress, so meconium is a serious issue and

3    requires observation and care, special observation and care.

4    Q.  Can you determine if there is particulate matter in

5    meconium just based upon the color of the meconium?

6    A.  No.  I mean, meconium is an issue where, again, as I

7    stated, the baby is actually pooping from its gut into the

8    fluid, and in order to determine whether there's particulate

9    matter in meconium, you would really have to look under a

10   microscope because it could look clear, but there may be

11   particulate matter in that fluid that you are not seeing with

12   the naked eye.

13       So I think observation is not the way to know whether or

14   not there's particulate matter in meconium, and so that you

15   must treat it all with care and take special care of the baby

16   and monitor the baby very carefully with the potential that

17   there is particulate matter, but you cannot make that

18   diagnosis on observation.  That would be a microscopic

19   examination, and sometimes even after delivery.

20       In this case, for example, the baby succumbed and had an

21   autopsy, and at autopsy, the diagnosis was meconium

22   aspiration, so that this baby did, on autopsy, have a

23   diagnosis of meconium having entered her lungs and prevented

24   her from breathing and may have been a very reasonable cause

25   for her succumbing and dying.

58

1    Q.  And just a final question.  Can there be particulate

2    matter in light green meconium fluid?

3    A.  Absolutely.  There's no way of visualizing meconium and

4    knowing whether there's particulate matter in it.  As I said,

5    it's a microscopic examination.

6    Q.  Now, after the meconium was found after the artificial

7    rupture of membranes, for the next basically nine hours, she

8    continued labor until pushing.  From your review of the

9    records, how was her labor after that?

10   A.  So as I suggested to you, that when you see meconium, it

11   doesn't necessarily mean that there's a major issue and you

12   don't need to deliver the baby, but you need to observe the

13   delivery, the labor.  And you need to monitor the baby and the

14   mother with a fetal monitor strip.

15       Now, fetal monitoring has been around for 30 years.

16   Actually, it was developed at Yale where I was a resident and

17   I helped in the development of fetal monitoring at Yale with

18   Dr. Ed Hon, 30, 35, 40 years ago, and now every single baby

19   born in America in every hospital that has the ability to do

20   it, every baby is monitored with a fetal monitor where we

21   monitor the heart rate and the contraction rate of the baby

22   and we can see whether or not there is distress, whether the

23   baby is under stress and whether the baby is getting enough

24   oxygen.

25           We need to watch this, and especially if you have

1     meconium on rupturing of the membranes, we want to be on

2     guard.

3          And I have a little anecdote.  On my door of my house

4     in French, I have a little sign that says "chien on guard,"

5     which in French means guard dog.  Actually, it's a Cavalier

6     King Charles puppy.  She probably would lick you to death, but

7     I put it there so nobody is going to rob my house, chien on

8     guard.

9          Well, it's the same thing in obstetrics.  When you

10    have meconium, it should be doctor on guard.  In other words,

11    be careful, watch, monitor carefully, be aware that there may

12    be a possibility this is not a normal situation, so doctor on

13    guard with meconium.  This labor -- did you want me to go into

14    the labor?

15    Q.  Yes, but before we do, just because the jury has in front

16    of them the medical records, I would like to pull up one fetal

17    strip so you can at least explain to the jury what they are

18    looking at.  It's at tab 4, and why don't we pull up like page

19    56?

20         So this is a fetal strip, and I don't want you to go

21    through this in great detail because I know, in your opinion,

22    you are summarizing your review of the fetal strips, but I

23    think that, just so the jury understands what you are talking

24    about, can you explain what is seen on the fetal strip?

25    A.  Okay.  You have three lines that you are looking at.

1    Let's start at the bottom line with the humps.  Those are

2    contractions.  Every time you see that rise and fall, she is

3    having a contraction.

4         It's important to monitor that in labor because we

5    have to remember a baby only gets oxygen between contractions.

6    When the woman is having a contraction, the baby, the placenta

7    shuts off and the baby doesn't get oxygen and the baby only

8    gets oxygen between contractions.  So we want to be sure, we

9    want to monitor this labor and be sure that she is not

10   contracting too frequently and that there's a good rest period

11   between contractions so that we know the baby is getting

12   enough oxygen, and this happens to be a perfectly normal

13   strip.

14        The mother is having contractions every two minutes.

15   I know you can't see that, but each of those are one minute

16   intervals, so this woman is having a contraction every two

17   minutes, which is appropriate, and there's a good rest period

18   between contractions so this baby is getting well oxygenated.

19   That's important for us to see.

20        So in monitoring, doing a fetal monitor strip, we

21   monitor contractions.  The next line up you see is the

22   maternal pulse rate.  We want to monitor the mother, and we

23   want to be sure that her pulse is okay, that she is not

24   getting hypertensive, elevated blood pressure, or hypotensive,

25   because remember that the mother's blood pressure is extremely

61

1    important, because she is pumping blood through the placenta,

2    which is giving the baby oxygen, so we want to monitor the

3    mother and that's the second line.  That's perfectly normal.

4         I can't read it from here, but I think it's running

5    about 80 or something.  I can't see the number.  I have it

6    here.  It's a perfectly normal maternal blood pressure screen.

7         The one on top is the baby, and we -- that's the

8    baby's heart rate and the normal heart rate is somewhere

9    between 110 beats per minute and 160 beats per minute.  If we

10   see the baby is out of range from 110 to 160, then we start

11   getting concerned.

12        For example, if the heart rate would drop to 90 or to

13   80, I would be very concerned depending on how long it stayed

14   down or if the heart rate went all the way up above 160, we

15   call that tachycardia.  I would worry that the baby may have a

16   reason for having an elevated heart rate like infection or

17   some other disease.

18        We also want to monitor the, what we call the

19   variability, so we all have nerves.  We have sympathetic and

20   parasympathetic nerves that allow us to remain the way we are.

21   The baby is the same way.  We want to see on the top line, we

22   want to see the baby's heart rate move up and down.  We call

23   that good variability, that she has good nervous system, her

24   nervous system is intact.

25        When we see that the variability or the heart rate is

1    not between five and 25 beats per minute, we start getting

2    concerned that the baby's nervous system is not getting enough

3    oxygen and the baby -- we call that hypoxia.

4         That term is called variability, and in this case,

5    the variability is fairly minimal, but it's still there.  We

6    call that minimal variability.  That's the most important

7    thing in looking at a fetal heart rate monitor.  We want to be

8    sure the baby's heart rate is going up and down and its

9    nervous system is intact, that the sympathetic and

10   parasympathetic nervous system is working and that the baby is

11   getting enough oxygen.

12        As soon as we see that the heart rate does not have

13   good variability, where it's like a flat line, we worry that

14   the baby is what we call hypoxic or not getting oxygen and we

15   start getting concerned.

16   Q.  Now, I know that there's a lot more to learn about fetal

17   strips, and we're not going to go deep into that, but just how

18   about an understanding of a reassuring or nonreassuring?  What

19   does that mean in obstetrics?

20   A.  So, if you recall when I discussed her prenatal course, I

21   said that she had a nonstress test one month prior to her

22   going into labor which was normal.  We call that reassuring.

23   That's a reassuring test.

24        That means that the baby is fine, that we're not worried

25   about hypoxia or low oxygen and we're not worried about the

1   baby.  A nonreassuring test would show me that, A, maybe the

2   variability of the heart rate is not between five and 25,

3   maybe it's only three beats per minute, we would be concerned,

4   or maybe I was seeing a drop in the heart rate, below the

5   normal rate of 110, maybe it was dropping to 80 or 90, or

6   maybe I would see that she is contracting too frequently and

7   she is not getting a rest period between contractions.  We

8   would call that nonreassuring.

9       What we do in obstetrics, we have three categories that we

10  categorize fetal monitor strips to make it easy.  Category one

11  would be a perfectly normal fetal monitor strip, where the

12  baby is doing fine, where the obstetrician and nurse can look

13  at it and say let's proceed with labor.  We don't need to do

14  anything.  We don't need to give her oxygen or turn her to the

15  side or give her fluids, she is doing just fine and let her do

16  her thing.

17      Then we have a category two, which is an intermediate

18  zone, and I'm just going to leave that for a second and go to

19  a category three.  Category three is a danger zone.  When we

20  see category three, that means get that baby out.  That means

21  the baby is hypoxic or in a stressful situation or contracting

22  too frequently and not getting enough oxygen.  The baby is in

23  jeopardy.  Do an immediate cesarean section.  So a category

24  three is a very serious condition and we work immediately to

25  get that baby out of the uterus.

1          Category two is an intermediate zone.  We don't need

2    to get the baby out, but as I said to you before with my sign

3    on the door, you know, doctor on guard.  Watch carefully if

4    you are a category two tracing.  Watch, be sure that it's not

5    going to a three because if it goes to a three, you want to

6    get that baby out.

7          If it goes back to a one, great.  Let the mother

8    labor.  That's just fine, but whenever we have a category two

9    tracing or an intermediate zone tracing, we want to be on

10   guard.  We want to be there.  We want to watch carefully.  We

11   want to be ready to do something whenever necessary, like give

12   the mother oxygen, give her fluid or turn her to her side.

13         There are all kinds of nursing maneuvers that can be

14   done when you have a category two to try to convert it into a

15   category one to make it normal or if it doesn't work, at least

16   to observe it and be sure it doesn't go to a three, because if

17   it goes to a three, we need to deliver.

18   Q.  In this case, you have had a chance to review all of the

19   strips for hours.  Can you tell us, from your review of the

20   strips, what did they show you with regard to the status, the

21   category, if you will, of Kendall and Carissa's labor?

22   A.  So the initial part of this labor was a category one and

23   everything was just fine.  I looked at the strips and I was

24   not in any way concerned.

25         Towards the latter part of the last two hours or two and a

1    half hours of this labor, it was a serious category two, and I

2    would have been very concerned because I was seeing drops in

3    the heart rate.  I was seeing depressions in the heart rate.

4    I was seeing decrease in the variability, and I would say,

5    Lenny, on guard.  Watch this woman because there's an issue

6    here.  There's something wrong.  There's something happening.

7    Not a need to do a cesarean section.  Not a need to rush in,

8    but to start doing maneuvers like give the mother oxygen, turn

9    to her side, maybe give her fluid, but watch the monitor very

10   carefully that it doesn't go to a three.

11       It never went to a three, but it was a serious category

12   two so it was on the edge.

13   Q.  Now, let's talk about the delivery.  If you could pull up

14   tab two, page 3 and this is the operative report about the

15   delivery by Dr. Dumpe.  If you would highlight from findings

16   down to here.

17       THE COURT:  Let's do this.  We should take our

18   midmorning break before we get deep into the operative report,

19   and with that, as I've told our ladies and gentlemen of the

20   jury, just leave all of your materials on the chair.  You

21   already know my instructions.

22           You are not supposed to talk about anything, research

23   anything, et cetera, and keep your minds open.  Let's all rise

24   for our jurors, and we'll break until 11:00.

25       (Jury excused.)

1           THE COURT:  Doctor, you may step down.  Over this

2    break, you shouldn't talk about this testimony since you have

3    already been sworn.  While we take this quick break, one point

4    I have for Mr. Colville, his demonstrative Exhibit No. 1 for

5    his opening which Mr. Galovich needs to log in vis-a-vis

6    Heritage/Jones opening statement, what I was provided and what

7    I saw do not mesh.  Did you have a hard copy in terms of your

8    demonstrative?  If not, perhaps one could be made, and then it

9    will be labeled Hospital Defendant/Jones Opening Statement

10   Demo Exhibit No. 1.

11           MS. KOCZAN:  Your Honor, did you want this or what I

12   showed like in the middle?

13           THE COURT:  Exactly, because the timeline that you

14   went through in great detail is not in this packet.

15           MS. KOCZAN:  It is in the exhibit binder, Your Honor.

16           THE COURT:  Okay.

17           MS. KOCZAN:  But I do have an extra copy if you would

18   like it.

19           THE COURT:  For purposes of the record and exhibits,

20   and as I advised all counsel, if this case goes up on appeal

21   in the Third Circuit, they need to see what was actually shown

22   to the jury and the judge, and so it's very important that we

23   document these things, and similarly, Mr. Colville and

24   Mr. O'Connor, I hope you have your cell phone available so you

25   can take some pictures of the Gatorade bottles whenever we get

67

1    to that.

2              MR. PRICE:  Your Honor, as a point for clarification,

3    yes, Ms. Koczan is correct.  At Exhibit 52 in the joint

4    exhibit binder is the timeline, and my timeline was Joint

5    Exhibit 23, so I did not give you with my PowerPoint the

6    timeline either because it was in the joint exhibits.  I could

7    do that if you like.

8              THE COURT:  We can make a copy.  In terms of your

9    timeline, it's Joint Exhibit No. 23.  So, Mr. Galovich, you

10   are just going to annex that to what you already have from

11   yesterday and then Ms. Koczan.

12             MS. KOCZAN:  Mine is also in there.  It is Joint

13   Exhibit No. 52, but I do have an additional copy.

14             THE COURT:  If you have an additional one, that will

15   save Mr. Galovich a copy.  So 52 goes with Ms. Koczan's and

16   then you need to make a copy of the other to fit with

17   Mr. Price's from yesterday.

18             Let's take our break.  We'll start again at 11:00.

19      (Recess taken.)

20             THE COURT:  Doctor, you may resume the stand.

21             Now, Mr. Price, you may continue.  You and Dr. Zamore

22   were about to address delivery.

23             MR. PRICE:  Sure.

24   BY MR. PRICE:

25   Q.  Doctor, here is the operative report, and first thing I

68

1    would like to note is, at delivery, the eight pound, seven

2    ounces.  First, was that a big baby?

3    A.  It certainly is a big baby for a woman that weighed 99

4    pounds and was five feet tall.  I mean, I think that kind of

5    indicated a prenatal course that she was a small stature

6    woman, five feet, weighed 99 pounds.  An eight and a half

7    pound baby is quite large for a small woman.

8    Q.  Is there any risks or anything like that with regard to a

9    woman Carissa's size with an eight pound, seven ounce baby in

10   delivery?

11   A.  Actually, there is.  You have to be careful that you are

12   not going to get into a situation where the baby is going to

13   be obstructed at delivery, where a shoulder is going to get

14   caught underneath the synthesis pubis, so the baby cannot be

15   delivered normally and needs special maneuvers to get the baby

16   out.

17   Q.  Okay.  So, let's take a look at what exactly happened

18   during this delivery.  And if we note, due to increasing

19   maternal fatigue and the arrest of descent, a vacuum extractor

20   was placed atraumatically.

21       Can you tell us what does that mean?

22   A.  A vacuum extractor is a form of aid to allow us to help

23   deliver the baby when the mother is exhausted and can't push

24   the baby out.

25           It's like a little vacuum cup that you put on the

1    baby's scalp, and then negative pressure is applied and the

2    baby is pulled out with the vacuum as an aid with

3    contractions.

4           So with the mother pushing, that little cup is on the

5    baby's scalp, as you can see.  The obstetrician is then

6    pulling outwardly on the cup, aiding in the descent of the

7    baby's head.  This is a form of what we call an operative

8    obstetrical procedure.

9           Years ago, we used to use forceps.  Now we use

10   vacuums because it's less traumatic.  Forceps are metal

11   objects and they can injure the baby much more severely than a

12   vacuum, but a vacuum is still considered an operative

13   obstetrical procedure.  It's not a normal procedure.  It's not

14   where a mother pushes the baby out on her own but requires an

15   aid to help her.

16   Q.  Are there any different concerns that arise from a birth

17   where it is termed to be an operative delivery?

18   A.  Whenever you have an operative delivery, it is standard of

19   care that the obstetrician, prior to performing the operative

20   delivery, i.e., prior to doing a vacuum extraction or a

21   forceps delivery, that the obstetrician call a pediatrician

22   into the labor room in case there's a problem and the baby

23   needs resuscitation or the baby has an issue.

24       This is standard of care prior to any obstetrical

25   operative maneuver.  A pediatrician should be notified and

1    called into the labor room prior to the delivery.

2         Now, if it's an emergency and things happen quickly,

3    then the nurses must call the pediatrician, but this is

4    standard of care to have a pediatrician in the labor room at

5    any operative delivery.

6    Q.  We are back to the medical record.  Gentle traction was

7    applied over the next six to eight contractions, and the

8    vertex was delivered atraumatically by the aid of the vacuum

9    extractor.  The perineum had tightened to the point of

10   laceration.  It was incised.  An episiotomy was extended.  So

11   can you tell us what is an episiotomy?

12   A.  An episiotomy is a little cut that's made on the perineum,

13   the bottom part of the vagina, to give the baby more room to

14   come out.  It's only soft tissue that sometimes obstructs the

15   baby from descending out of the pelvis.  So in order to allow

16   more room, the soft tissue is incised.  That's called an

17   episiotomy.  It enlarges the opening of the soft tissue and

18   allows the baby to come out more easily.

19        This is obviously sewn up after the baby is

20   delivered, and it's a very common procedure.

21   Q.  Then doctor notes moderate nonparticulate meconium fluid

22   was noted at the time of the delivery of the vertex.

23        First, what is the vertex?

24   A.  The vertex is the head of the baby, the scalp, and

25   obviously, if meconium is noted with particulate material,

1    there needs to be concern that the baby is not ingesting it at

2    birth when the baby takes its first breath, that it doesn't

3    inhale, so to speak, when the baby takes its first breath, and

4    if there's meconium in the fluid and in the baby's mouth, that

5    it doesn't go into the lungs and cause a problem.

6    Q.  Now, just to clear up one thing.  We noted at 6:30 p.m. on

7    October 12 whenever Dr. Dumpe ruptured the membranes, that

8    meconium was present?

9    A.  Correct.

10   Q.  And we note at the time of delivery that meconium was

11   present.  From your review of the notes, were there also

12   notations throughout the night that meconium was present?

13   A.  Yes.  I think the nurses noted that, yes.

14   Q.  Can you explain the significance of that?

15   A.  Well, it means that, in some way, the baby is being

16   stressed, and remember I said to you that meconium is usually

17   produced during stressful situations, and one of the stressful

18   situations that we worry about is low oxygen level, hypoxia,

19   we call it, and this was also noted, as I said to you, by the

20   category two tracing that we picked up on the fetal monitor

21   strip so we knew that we had meconium.  We knew we had a

22   category two going to almost a three but not quite fetal

23   monitor strip, so we were concerned that this baby was in a

24   stressful situation and was probably hypoxic, and so if at

25   birth, there's meconium, we want to be sure that the baby

1    doesn't inhale the meconium and block its alveoli and get into

2    the lungs and prevent it from getting oxygen.

3    Q.  We'll continue.  Due to the expected tight fit of the

4    shoulders, oropharynx and nasopharynx were not bulb suctioned

5    until the anterior shoulder was delivered, but the shoulders

6    were delivered by the aid of a prophylactic McRoberts Maneuver

7    without difficulty.

8          Now, first to explain, in deliveries, sometimes do

9    shoulders get caught?

10   A.  When you have an -- I think we preempted this in our

11   discussion just a minute ago -- a small woman with a small,

12   bony pelvis and a large baby, the baby is going to have a hard

13   time coming through the birth canal.

14         Remember that a woman's pelvic bones don't stretch.

15   They don't move.  They are what they are, and so that if this

16   baby is a large baby and she has a small pelvis, it's going to

17   be difficult for her to deliver that, and sometimes the

18   shoulder gets caught underneath the synthesis pubis.  We call

19   that a shoulder dystocia.

20         Now, it is standard of care -- again, I bring that

21   up.  It is standard of care that whenever a shoulder dystocia

22   is recognized or whenever the shoulder is caught underneath

23   the synthesis pubis, in other words, you deliver the baby's

24   head and you can't deliver the rest of the body because the

25   shoulder is impinged under the synthesis, we call that a

1    shoulder dystocia.

2           Whenever a shoulder dystocia is recognized, it is the

3    obstetrician's absolute need to say in the labor room we have

4    a shoulder dystocia, get me a pediatrician.  This is a

5    difficult delivery.  It may cause problems with the baby, both

6    in respiration and other areas.  A pediatrician must be called

7    into the room whenever you have a shoulder dystocia.

8           So we have two issues here.  Issue one, we had a

9    vacuum extraction.  A pediatrician should have been called at

10   that time, standard of care.  Issue two, we now have an

11   impacted shoulder underneath the synthesis, shoulder dystocia

12   should be called, a pediatrician should be notified, the

13   second reason a pediatrician should be in the room.

14          And the third reason the pediatrician should be in

15   the room is because we have had meconium throughout the entire

16   labor and we don't know whether there's particulate matter in

17   that meconium or not because we don't have a microscopic view

18   of it.

19          We just know the fluid was tinged with meconium and

20   we need to be on guard for it.  So we have three reasons for

21   the pediatrician to be called into the labor room, and there's

22   a fourth reason, and that is that we had a category two

23   tracing.  We had a tracing that was not absolutely normal, a

24   tracing that we were concerned about that perhaps this baby is

25   getting hypoxic or low oxygen, so we need to be aware of that,

1    and we want to have an expert in the labor room to take care

2    of this baby on delivery if for some reason the baby is having

3    a problem.

4    Q.  Now, Doctor, I know you weren't in the room at the time,

5    but in the defendant's opening statement, they said that this

6    was actually not a shoulder dystocia.

7         So let me ask you this:  From your review of that

8    sentence, the tight fit of the shoulders as well as the fact

9    that the McRoberts Maneuver was performed, does that lead you

10   to any conclusion and why?

11   A.  Well, normally, when a baby is delivered, the mother

12   pushes the baby out and that's not an issue.  If the shoulder

13   gets impacted underneath the synthesis, which obviously this

14   baby had its shoulder impacted under the synthesis, there's a

15   maneuver which obstetricians use which is the correct maneuver

16   which was used correctly in this case where you raise the

17   mother's legs up in the air and you widen the pelvis by doing

18   so and give the baby more room to come out.  We call that a

19   McRoberts Maneuver, but that's done when the shoulder is

20   impacted underneath the synthesis.  It's not done routinely

21   when there is a normal routine procedure.  That's indicative

22   of shoulder dystocia.

23        Once, again, when McRoberts is done and a shoulder

24   dystocia is called, a pediatrician should be brought into the

25   room.

1    Q.  If we go down a little bit more at the bottom, we can show

2    a little bit more of the -- after McRoberts.  After the baby

3    was delivered, the nose and the mouth was aggressively bulb

4    suctioned, aggressively bulb suctioned prior to any neonatal

5    response.

6        Can you tell us what that means?

7    A.  I think that's appropriate.  What you want to do when you

8    have meconium and you worry about particulate matter in the

9    meconium and you don't want that to get into the baby's lungs,

10   so you have a little suction bulb, and you suction out the

11   nose and the oropharynx.  You want to get all that meconium

12   out so the baby doesn't ingest it or bring it into its trachea

13   or into its lungs when it takes its first breath.

14   Q.  Dr. Dumpe continued.  The remainder of the infant was

15   delivered without difficulty and again the oropharynx and

16   nasopharynx were again bulb suctioned?

17   A.  Correct.

18   Q.  That is to get, if there's any more meconium or fluid in

19   the nose and mouth, to get it out?

20   A.  You want to get it out.  You don't want the baby to

21   breathe it into its lungs.

22   Q.  Now, at that point, the cord is clipped and cut and the

23   baby is taken over to the warmer?

24   A.  Correct.

25   Q.  At that point, does the doctor participate in any of the

1    resuscitation?

2    A.  You know, the doctor has two patients throughout the

3    entire labor, the baby and the mother.  In labor, we're

4    following both, as I showed you on the fetal monitor strip.

5    We're monitoring the baby's heart rate, the mother's heart

6    rate, the mother's condition, the baby's condition, and then

7    the baby is born.

8        Once the baby is born, the doctor hands the baby off to

9    the nurse and puts the baby in the warmer and then it's their

10   responsibility to care for the baby.

11       Remember that the doctor now has the mother to care for,

12   especially she had an episiotomy, she has to have the placenta

13   delivered, she is bleeding.  He has to sew up the episiotomy,

14   so the obstetrician's care now is maternal.

15       Now the care goes to the pediatrician or to the nurse who

16   cares for the baby and not the obstetrician.  The obstetrician

17   now is focused on the mother and the nurses are now focused on

18   the baby, and if there's a pediatrician in the room, it's the

19   pediatrician caring for the baby but not the obstetrician.

20   Q.  Now, this last safety rule, a hospital must take all

21   precautions to minimize risks to its patients.  Do you agree

22   with that?

23   A.  100 percent.

24   Q.  And why?

25   A.  Well, I mean, the hospital has to advocate for the

1    patient.  The patient is there being cared for.  It needs

2    somebody that wants to care for her take care of her, be sure

3    that she is properly mentored to and cared for.  It's the

4    hospital's responsibility.  Absolutely.

5    Q.  You had a chance -- you had a chance to review the

6    policies in this case too?

7    A.  Yes.

8    Q.  Rather than pull them up and go through them, can you tell

9    us from your summary of the policies in this case, did you

10   believe that the doctors and nurses had any duty to act?

11   A.  The doctor has, as I explained to you before, the standard

12   of care for a doctor whenever you have an operative delivery

13   is to call a pediatrician into the labor room.  The standard

14   of care for the doctor whenever you are doing a shoulder

15   dystocia or you have an impacted baby is to call a

16   pediatrician in the room.

17       The standard of care in this case would have been with a

18   severe two tracing which was not normal where the baby was

19   probably slightly hypoxic or low oxygen level and the mother

20   had meconium with perhaps particulate material in it that

21   could cause baby damage would be -- the standard of care would

22   have been to call a pediatrician into the room.

23       Now, if the doctor doesn't do it, there is a chain of

24   command for the nurses.  Every hospital has a chain of

25   command.  The doctor doesn't always have to do the right

1    thing.  The doctor may be involved in other issues or may not

2    even be thinking about it.  So if the nurses in the room see

3    these issues occurring that I just mentioned to you, it's

4    their responsibility to call a doctor, a pediatrician into the

5    room or go up their chain of command to get their charge nurse

6    and tell them that they have an issue that they believe a

7    pediatrician should be in the room, and then the charge nurse

8    would call the pediatrician into the room.

9        There is a chain of command that nurses have.  It is their

10   responsibility to care for and advocate for the patient.  Not

11   only is it the obstetrician's need to advocate for the

12   patient, but it's the nurse's responsibility as well and it's

13   a separate responsibility.

14       So if the nurses see that the doctor is either

15   inappropriate, mindless or not thinking about it because he's

16   involved in other things, it's their responsibility to be sure

17   a pediatrician is called into the room.

18   Q.  Doctor, just to sort of conclude, based upon the facts and

19   all of your testimony, do you have an opinion with a

20   reasonable degree of medical certainty as to whether Dr. Dumpe

21   deviated from the standard of care?

22   A.  He deviated from the standard of care by not calling a

23   pediatrician into the labor room when he had an operative

24   delivery, an operative obstetrical delivery, a shoulder

25   dystocia, a severe category two tracing with meconium, yes, he

1    did.

2    Q.  And also, from your review of the facts and evidence in

3    this case, do you have an opinion within a reasonable degree

4    of medical certainty whether the nurses at Heritage Valley

5    Beaver Medical Center deviated from the standard of care?

6    A.  The same issue.  As I said, the nurses have an individual

7    separate responsibility to advocate for the patient.  It's the

8    nurse's responsibility to do -- go up the chain of command, to

9    call a pediatrician, even if the obstetrician doesn't, or to

10   call their charge nurse and to get the charge nurse to call

11   the pediatrician in.

12         Whether or not the obstetrician does it, it's the

13   standard of care for the nurses to advocate for the patient.

14   Q.  Finally, have all the opinions you have given here today

15   all been expressed within a reasonable degree of medical

16   certainty?

17   A.  Yes.

18         MR. PRICE:  Your Honor, I have no further questions

19   at this time for Dr. Zamore.  I do have copies of the slides

20   for counsel and the court.

21         THE COURT:  Let the record reflect Mr. Price is

22   providing both Mr. Colville as well as Ms. Koczan with a copy

23   of the slides that were used in examining Dr. Zamore.

24         Mr. Galovich, you should retain these as Plaintiff

25   Demonstrative Exhibit Dr. Zamore 1.  They are not being

1    admitted, but you need to make note of them.

2             Mr. Colville, are you ready for cross-examination?

3             MR. COLVILLE:  Yes.

4                         CROSS-EXAMINATION

5    BY MR. COLVILLE:

6    Q.  Good afternoon, Dr. Zamore.  Doctor, are you suggesting it

7    was negligent for Dr. Dumpe not to deliver the baby earlier?

8    A.  I am not suggesting that in any way.

9    Q.  But that's what you --

10   A.  No, I did not.  I said that I thought there was a category

11   two tracing needs to be observed and watched carefully.  I did

12   not in any way say this baby should have been delivered

13   earlier.

14   Q.  Not in your report?

15   A.  I reviewed it and I changed my opinion on that.

16   Q.  Did you change your report?

17   A.  I don't know whether I changed my report, but I changed my

18   opinion.

19   Q.  What do you mean?

20   A.  I reserved the right to change my opinion on the report.

21   I don't think that she should have been delivered earlier, no.

22   Q.  My question is, your original report, you opine that it

23   was negligent for Dr. Dumpe not to deliver the baby sooner; is

24   that correct?

25   A.  I may have opined that, yes.

1    Q.  And that report is dated January 1st, 2018, correct?

2    A.  Correct.

3    Q.  There is no other report where you have changed that

4    opinion except for you telling us right now that you have

5    changed your opinion?

6    A.  I think at the end of the report I said I reserve the

7    right to change my opinion.

8    Q.  And you didn't change it?

9    A.  Well, I have changed my opinion.

10   Q.  You didn't memorialize it, did you?

11   A.  No, I didn't memorialize it.

12   Q.  You didn't put me on notice as to what the reasons why you

13   changed your opinion are; is that correct?

14   A.  I don't think the baby should have been delivered sooner.

15   Q.  You've not given Dr. Dumpe the courtesy of explaining why

16   now your opinion has changed either, have you?

17   A.  I do not think the baby should have been delivered sooner.

18   Q.  Why would you not document that?

19   A.  Excuse me?

20   Q.  Why would you not document your change of opinion?

21   A.  I wasn't asked to make another document.

22   Q.  So would you concede you were wrong the first time in your

23   first report?

24   A.  No.  I reconsidered.  I reviewed it again.  I reviewed the

25   chart again and I reviewed the fetal monitor strip, and I felt

82

1    it wasn't a category three.  It was a severe category two.

2    That's how I changed my opinion.

3    Q.  My question was were you wrong the first time?

4    A.  I don't know whether I was wrong.  I changed my opinion.

5    Q.  Why would you change a correct opinion?

6    A.  Because I reviewed the tracing a second time and I

7    reviewed it and felt that perhaps it was okay to continue with

8    the labor, yes.

9    Q.  But just not continue with your opinion?

10   A.  I don't know what you are saying.

11   Q.  The same fact -- you reviewed the same facts the first

12   time and second time.  You have two opinions on the same

13   facts?

14   A.  You are going around in circles for me.  Because I'm

15   saying to you at the end of the report, I said I reserve the

16   right to change my opinion.  I have changed my opinion.  It

17   isn't in writing, but I'm telling you I've changed my opinion.

18   Q.  So what if you change your opinion tomorrow about

19   everything you said today?  Will there be a report or will we

20   know about that?

21   A.  I'm telling you now.

22   Q.  As I understand your testimony, Carissa had no signs or

23   symptoms during her prenatal care that there was any infection

24   or possibility of an infection such as E. coli; is that

25   correct?

1    A.  That's correct.

2    Q.  Is the same true for during the delivery, the labor and

3    delivery?

4    A.  There was no --

5    Q.  There were no signs or symptoms of an infection.

6    A.  She had a low grade temperature, I think at mid 90s, it

7    was 99, and at 2:30, I think it was 100.2, which is not above

8    the level that we consider infectious.

9    Q.  A symptom of infection is a fever, correct?

10   A.  She did not have a fever that we were concerned about.

11   Q.  She had an elevated temperature, correct?

12   A.  But not to the point we were concerned about infection.

13   Q.  Exactly.  So she didn't have that symptom?

14   A.  Correct.

15   Q.  So Dr. Dumpe, who is taking care of or managing the labor

16   and delivery, doesn't have before him a patient who is

17   exhibiting symptoms of an infection?

18   A.  Correct.

19   Q.  And at the delivery, the same applies.  The baby came out,

20   and there weren't symptoms that were consistent with

21   respiratory distress or an infection; is that correct?

22   A.  Wrong.

23   Q.  What symptoms?

24   A.  There were symptoms of respiratory distress but not

25   infection.

1    Q.  The baby wasn't noted to be grunting, was she?

2    A.  The baby was grunting.  The baby was pale.  The baby was

3    flaccid, yes.

4    Q.  Where are you getting this information from?

5    A.  It was all in the chart.

6    Q.  What chart?

7    A.  The record.

8    Q.  Who gave that information?

9    A.  When the baby went to the nursery, the nurse indicated

10    that the baby was flaccid, was taking deep breaths, was having

11    trouble breathing.  The nurse in the nursery was very

12    concerned and called the pediatrician.

13    Q.  That was at 7:25?

14    A.  Excuse me?

15    Q.  That was at 7:25, right?

16    A.  7:25.

17    Q.  7:25 a.m. is when the first note of a symptom of

18    respiratory distress appears.  Would you agree with that?

19    A.  Is that in the nursery?  You are giving me times and

20    I'm --

21    Q.  When was the baby in the nursery; do you know?

22    A.  The baby went to the nursery approximately two hours after

23    delivery.

24    Q.  Okay.  I'm talking about the two hours between going to

25    the nursery and delivery.

1   A.  The parents, in their deposition, the parents and the

2   family in their deposition stated clearly that the baby was

3   grunting and having trouble breathing.  That was in their

4   deposition.

5   Q.  Which family member?

6   A.  The mother and the father and somebody else, but I don't

7   remember who the third person was, but it was the mother and

8   father that definitely said the baby was having trouble

9   breathing.

10  Q.  Where were they medically trained?

11  A.  Excuse me?

12  Q.  Were those individuals --

13  A.  They are parents and they were holding their baby, and it

14  was having trouble breathing.  You don't have to be medically

15  trained to know when your child is having trouble breathing.

16  Q.  Was this the first child each of them had?

17  A.  Are you telling me that a parent --

18  Q.  Doctor, I'm asking you a question.  Was this their first

19  child?

20  A.  Yes.

21  Q.  This is their first experience holding their newborn in a

22  delivery room; is that correct?

23  A.  This is their first experience --

24  Q.  Doctor, is that correct?

25  A.  Correct.

1    Q.  Now, the people who were medically trained, what did they

2    have to say about the symptoms the baby was exhibiting?

3    A.  If you'll let me answer that.  According to the

4    depositions that I've read, the nurses really didn't even

5    enter the room for two hours after the baby was born, and the

6    mother and father were holding the baby in the labor room with

7    a baby having difficulty breathing.

8    Q.  Was there a delivery room assessment done?

9    A.  According to the mother and father in the deposition,

10   nothing was done.

11   Q.  Did you read the medical record and see the document

12   delivery assessment?

13   A.  The medical record says that a nurse came in several

14   times, every 15 minutes and the baby was fine, but the mother

15   and father said they never saw the nurse.

16   Q.  Have you ever seen a document in the medical record

17   identified as a delivery assessment; yes or no?

18   A.  Yes.

19   Q.  Who prepared that record?

20   A.  Who prepares it?  The nurse who put a note in the record.

21   Q.  What nurse, do you know?

22   A.  Fitzsimmons.  I don't know exactly which nurse it was.

23   Q.  Who is Nurse Fitzsimmons?

24   A.  I don't know the name of the nurse.

25   Q.  It's Nurse Hendershot.

1    A.  Nurse Hendershot.

2    Q.  She was in labor and delivery, correct?

3    A.  Yes, if you say so.

4    Q.  Do you know so?

5    A.  Yes.  That was the nurse, yes.

6    Q.  Let's pull up Exhibit 6, page 10.  This document is a

7    document that is created immediately after the baby is

8    delivered; is that correct?

9    A.  I'm assuming it's created directly after.  I have no idea

10   about that.  You are saying that.  Sometimes these things are

11   done later on.

12   Q.  But that was in the depositions you read.

13   Nurse Hendershot said that?

14   A.  You are saying this was created directly after the

15   delivery.  I have no record of that.  I'm saying it was

16   created of the delivery.  I don't know if it was created

17   directly after the delivery.

18   Q.  Isn't that what the witnesses said in the depositions,

19   that this was created immediately after the baby is delivered?

20   A.  Okay.  Go ahead.

21   Q.  You read the depositions, right?

22   A.  Yes.

23   Q.  Now, this one is signed by Nurse Hendershot.  I'll

24   indicate that that is her signature and she testified under

25   oath that it was, correct?

Case 2:16-cv-01389-NBF    Document 214    Filed 10/07/19    Page 88 of 257

88

A.  Okay.  Yes.

Q.  Now, this document itself is prepared to document the
health of the baby immediately after being born; is that
right?

A.  Yes.

Q.  And I started this whole questioning of whether or not
there were symptoms of respiratory distress after delivery,
and you started talking about when the baby was in the nursery
room.  I want to talk about while the baby is still in the
delivery room during this assessment at 5:20.

A.  As soon as the baby was born -- can I finish?  As soon as
the baby was born, the mouth was bulb suctioned, the
nasopharynx was bulb suctioned and then deep tracheal suction
was then accomplished by the nurse.

Q.  Let me stop you here.  The bulb suction, that was done
before the baby took its first breath; is that correct?

A.  It was done both times.

Q.  I'm talking about the bulb suction.  The baby's head comes
out and it is being compressed by the mother's body; is that
correct?  It's not able to contract and expand its lungs to
breathe; am I right about that?

A.  Right.

Q.  The doctor at that point, what he does is he suctions
everything in the mouth and nose that he can get with a bulb
suction; is that right?

1    A.  Wrong.  This did not happen then.

2    Q.  When did that happen?

3    A.  After the baby was totally delivered.

4    Q.  So you believe that the baby had begun to breathe before

5    it was bulb suctioned by Dr. Dumpe?

6    A.  I did not say that.  I said the baby was not suctioned

7    until it was totally delivered and before it took its first

8    breath, but not when the head was delivered.  It was

9    specifically noted by Dr. Dumpe in the op note that he did not

10   suction the baby when the head was delivered, but rather when

11   the entire baby was delivered prior to its first breath.

12   Q.  Was there suctioning before the first breath?  That's all

13   I want to know.

14   A.  You are asking me a whole different question.

15   Q.  Was there suctioning before the first breath?

16   A.  Yes.

17   Q.  Who did it?

18   A.  Dr. Dumpe.

19   Q.  And there was subsequent suctioning once the baby was out

20   and in the hands of the nursing staff; is that correct?

21   A.  They did bulb suctioning again, and then they did deep

22   tracheal suctioning.

23   Q.  Okay.  So the baby is born, there's suctioning, and then

24   this assessment takes place.  My question is:  At 5:20,

25   between 5:20 and 7:00, what symptoms were there documented in

1   the medical record that the baby was in respiratory distress?

2   A.  Nothing documented in the record.  Just in the

3   depositions.

4   Q.  This record itself, which is the document that is to

5   assess the health of the baby at birth, says no abnormalities

6   whatsoever; is that correct?

7   A.  Correct.

8   Q.  It indicates an Apgar of six at one minute and eight at

9   five minutes, correct?

10  A.  Correct.

11  Q.  That is a normal Apgar score.  That is a healthy baby,

12  correct?

13  A.  Correct.

14  Q.  You don't have healthy babies -- you don't have babies who

15  aren't healthy that have these Apgar scores, correct?

16  A.  Correct.

17  Q.  This box here, which is a nursery note, when this baby was

18  delivered in the nursery at 7:00, thereabouts, it was

19  documented at 7:00, that vitals were taken of this baby.  Do

20  you recall that?

21  A.  Yeah.

22  Q.  And the vitals here indicate the temperature was 99, pulse

23  132, res 44.  These are normal findings, are they not?

24  A.  This is on admission of the newborn to the nursery?

25  Q.  Correct.

1    A.  The nurse was very concerned.

2    Q.  At 7:00, she was not.

3    A.  7:20, she was.

4    Q.  The nurse who took this baby in at 7:00 is a different

5    nurse than the one at 7:25.  Do you know that?

6    A.  Yes.

7    Q.  This nurse wasn't concerned, was she?

8    A.  No.

9    Q.  In fact, she said in her deposition that at 7:25, when the

10   other nurse did come and say the baby is breathing hard, she

11   said, well that's different.  Do you remember that?

12   A.  Yes.

13   Q.  Because when she had the baby, when she took these vitals,

14   she said the baby was healthy, correct?

15   A.  She did.

16   Q.  She said there were no symptoms?

17   A.  She did.

18   Q.  There were no problems?

19   A.  She did.  That's correct.

20   Q.  So between 5:20 and 7:00, we've got a baby who has no

21   symptoms whatsoever of an infection or respiratory distress,

22   correct?

23   A.  According to the depositions of the parents, that's not

24   true.  We have controversy.

25   Q.  If you ignore the parents' statements -- let's put it this

1  way.  The medical record does not document it?

2  A.  Correct.

3  Q.  Now, the person who drafted this document and got all this

4  information and put it together was Nurse Hendershot; is that

5  right?

6  A.  Yes.

7  Q.  Do you know anything about her experience?

8  A.  She is an experienced nurse.

9  Q.  How experienced?

10  A.  30 years.

11  Q.  30 years in what?  Labor and delivery?

12  A.  Labor and delivery.

13  Q.  So she has been doing this for 30 years?

14  A.  Right.

15  Q.  And you are taking the word of Carissa and Matthew over

16  her as to whether or not the baby had symptoms of an infection

17  or respiratory distress at 5:20 when this assessment was done?

18  Is that what you are doing?

19  A.  Can I answer that question?

20  Q.  I'm asking you to.

21  A.  I think a parent knows when its child is having trouble.

22  Despite what the nurse wrote, these parents felt this baby was

23  having a hard time breathing and was very distressed.  They

24  said that a nurse did not come into the room.

25  Q.  They are two different things.  You are saying that they

1    went and complained to Nurse Hendershot and she did nothing;

2    is that right?

3    A.  You know --

4    Q.  Is that right?

5    A.  Repeat the question.

6    Q.  You are saying that they have testified that they told

7    Nurse Hendershot that there was a problem with the baby?

8    A.  Yes.

9    Q.  And that problem that they may have voiced is completely

10   opposite to what she found during her assessment; is that

11   right?

12   A.  Correct.

13   Q.  And she made no record or did nothing in response to this

14   alleged verbal complaint by the parents, right?

15   A.  She did nothing, correct.

16   Q.  Now, you say that -- Matthew and Carissa claim that even

17   though these complaints were made to Nurse Hendershot that the

18   nurse never came back in or out, right?

19   A.  That is correct.

20   Q.  But that's contradicted by the medical record, isn't it?

21   A.  That is correct.

22   Q.  So you are ignoring the medical record that documents that

23   Nurse Hendershot came in every 15 minutes to look in at

24   Carissa; is that right?  You are discounting that?

25   A.  I'm discounting that according to what the parents said,

1    yes.

2    Q.  So you are willing to say that Nurse Hendershot forged a

3    medical record?

4            MR. PRICE:  Objection, Your Honor.

5            THE COURT:  Sustained.  It's getting a little

6    argumentative, Mr. Colville.

7    Q.  You are saying she didn't come in.  Let me ask you this:

8    Where do you think Nurse Hendershot got the vitals that are in

9    the medical record for that every 15 minutes?

10   A.  I have no idea, but I do know that this baby turned out to

11   have a very serious respiratory problem.

12           MR. PRICE:  Objection, Your Honor.  I have to clarify

13   something in Mr. Colville's question.  I don't believe there

14   were any vitals.  He said every 15 minutes of the baby.

15           MR. COLVILLE:  I'm sorry.  I misspoke.  Of Carissa.

16           THE COURT:  Rephrase your question.

17   Q.  Do you think Nurse Hendershot was making Carissa's vitals

18   up?

19   A.  Do I feel that on a personal level or -- I feel that the

20   parents are probably correct, yes, and I think that whatever

21   was put in the record was just put in the record.

22   Q.  Have you ever met Nurse Hendershot?

23   A.  No.

24   Q.  But you are making a judgment that she made this up

25   without ever meeting her?

1    A.  Well, I am making a judgment because I know the result of

2    this baby was severe respiratory distress and that's what the

3    baby died from and so this just doesn't happen.  There's a

4    progression, and I believe that the progression starts in A

5    and goes to Z, and this baby at birth must have had

6    respiratory distress, and then it became a calamity.

7    Q.  That respiratory distress began sometime around 7:25 when

8    it was documented in the medical record?

9    A.  Correct.

10    Q.  That's two hours after the birth; is that right?

11    A.  Well, at autopsy, this baby had meconium in its lungs and

12    so this must have been way before.

13    Q.  I'm looking at your report and you finished your report

14    beginning where we -- ending where we started.  You finished

15    this report by saying these opinions have been provided within

16    a reasonable degree of medical certainty.  There is nothing in

17    your report that indicates that you reserve the right to amend

18    or change your opinion.

19    A.  I think in my first report, there was probably.

20    Q.  This is your first and only report I've been given.

21    A.  I have two reports.

22            MR. COLVILLE:  Doug, is there a second report?

23            MR. PRICE:  No, there isn't a second report.

24    A.  There was an original one and then there was a second one.

25            MR. PRICE:  I believe he's referring to the

1    certificate of merit.

2            MR. COLVILLE:  That's all I have, Your Honor.

3            THE COURT:  Ms. Koczan, you may proceed.

4            MS. KOCZAN:  Thank you, Your Honor.

5            THE COURT:  Ladies and gentlemen of the jury, I think

6    that last exchange requires the court to provide a limiting

7    instruction.  There was a brief interchange between counsel

8    and the doctor about a certificate of merit.

9            Just so that you understand, in order to bring a

10   professional negligence case here in the Commonwealth of

11   Pennsylvania, there's a requirement that you have an expert

12   review the matter before you bring the lawsuit, and to that

13   end, there's a piece of paper put together called a

14   certificate of merit, so that's what may have occurred here.

15   That Mr. Price and/or Dr. Zamore put together a certificate of

16   merit, then there was a report prepared for today's

17   proceedings.

18           Now you may proceed.

19           MS. KOCZAN:  Thank you, Your Honor.

20                        CROSS-EXAMINATION

21   BY MS. KOCZAN:

22   Q.  I want to just pick up on the last series of questions.

23   You were asked about where in your report you documented that,

24   and just so the jury is clear, the report that was provided to

25   counsel was your last report, correct?

1    A.  Correct.

2    Q.  That is the one that was dated January 1 of 2018, correct?

3    A.  Correct.

4    Q.  You put that you reserve the right in the certificate of

5    merit, but you would agree there's nothing in this report that

6    was provided to counsel that says that you reserve the right

7    to change your opinion, correct?

8    A.  Correct.

9    Q.  I want to talk with you about some other things you said

10   in your report.  In your report, you said that there was

11   nothing in the labor record to say if the amniotic fluid was

12   thick or thin.  Have you seen Nurse Ash's note?

13   A.  Yes.

14   Q.  Let's put that up.  It's 931, and if we can highlight the

15   section there where she documents the -- right up there, the

16   top section there.  She describes it as light green-colored

17   fluid, correct?

18   A.  Correct.

19   Q.  And you are also aware that Dr. Dumpe has testified that

20   when he came in that what he observed, it was thin meconium,

21   correct?

22   A.  Correct.

23   Q.  And not only did Dr. Dumpe testify to that and Nurse Ash

24   put it in her report, there's also other documentation in the

25   chart, and if we put up 935, this is Nurse Hendershot's note

98

1    from 20:20.  That would be about 8:20 p.m.

2         If we highlight that second section there, right

3    below that, again, there's documentation, actually below that

4    toward the middle, you can see it says thin meconium, correct?

5    A.  I think I went into this very clearly that observing

6    meconium in no way tells you whether or not there's

7    particulate matter within the meconium.

8    Q.  Doctor, that wasn't my question.  My question was with

9    regard to what you said in your report, you said that there

10   was no documentation in there that described it, and I'm

11   pointing out that, in fact, there was documentation there that

12   was described.  Thin meconium, correct?

13        MR. PRICE:  Objection, Your Honor.  I believe that

14   Ms. Koczan is taking the report out of context.

15        THE COURT:  Let's take a look at the report and

16   exactly what are we looking at?

17        MS. KOCZAN:  I'm looking at the second full paragraph

18   and it reads:  At 6:30 p.m. on October 12, 2014, Dr. Dumpe

19   examined her, ruptured her prebag of waters and noted that her

20   amniotic fluid was meconium.  There was no labor record

21   recorded at this time to indicate whether the amniotic fluid

22   was thick or thin.

23        MR. PRICE:  I believe the operative word was

24   "recorded at this time," which would have been --

25        THE COURT:  Correct.  That's the language there.

1           MR. PRICE:  She is showing records from later times.

2           THE COURT:  Understood.

3   BY MS. KOCZAN:

4   Q.  Doctor, you would agree though that there is documentation

5   in the labor record that talks about it being thin meconium?

6   That's my only point.

7   A.  Correct.

8   Q.  Okay.  Now, you've talked about a shoulder dystocia.  Are

9   you aware -- did you read Dr. Dumpe's deposition?

10  A.  Yes.

11  Q.  And are you aware that he has testified that he basically

12  prevented a shoulder dystocia by doing the McRoberts Maneuver

13  prophylactically?

14  A.  The only reason for doing a McRoberts is when you

15  anticipate or have a shoulder dystocia and that should be

16  called out.  That's standard of care.  When you think you are

17  going to be have a shoulder impacted, you call out shoulder

18  dystocia, and you get a pediatrician in the room.

19  Q.  Are you aware though that Dr. Dumpe has testified that

20  there wasn't a shoulder dystocia, that his maneuver prevented

21  it from occurring?

22  A.  You don't normally do a McRoberts Maneuver unless you have

23  a shoulder dystocia.

24  Q.  Did you see his operative note where he says prophylactic?

25  A.  I saw that.

1    Q.  And the episiotomy, that was done because the perineum was

2    stretching, correct?

3    A.  That was appropriate.

4    Q.  You don't disagree?

5    A.  I don't disagree.

6    Q.  That was an appropriate thing to do?

7    A.  Absolutely.

8    Q.  Now, in terms of the hospital policy, you talked with us

9    about that and you are of the belief that the hospital policy

10   required the obstetrician to be present.  Is that what you are

11   saying?

12   A.  Say that again.  You said if the obstetrician to be

13   present?

14   Q.  Excuse me.  Pediatrician to be present.

15   A.  When you have -- when there's jeopardy, a possible

16   jeopardy of the fetus, the hospital policy is to have a

17   pediatrician in the labor room, yes.

18   Q.  And, Doctor, you have seen the hospital policy 2.21 which

19   I put up for the jury before, I'm not going to put it back up,

20   that says that a pediatrician would be called if there was

21   particulate meconium, correct?

22   A.  If there's any way that there's jeopardy of the baby and

23   meconium, yes.

24   Q.  Particulate meconium is what it says, doesn't it?

25   A.  Yes.

1    Q.  And you would agree that Dr. Dumpe very clearly described

2    in that operative note that had been put up there that the

3    meconium that he saw was nonparticulate?

4    A.  But you cannot define meconium by looking at it.  It's a

5    microscopic examination.  Particulate matter would be noted

6    under the microscope, and again, at autopsy, we found

7    particulate matter in the baby's lungs.

8    Q.  And did they describe it as particulate matter or simply

9    meconium?

10   A.  They described it as meconium aspiration, which means

11   particulate matter blocking all the alveoli of the baby's

12   lungs.  That was in the autopsy.

13   Q.  And that's your opinion about what it shows; is that

14   correct?

15   A.  Yes, correct.

16   Q.  Now, I'm not going to go back through Nurse Hendershot's

17   assessment because the jury has already heard that, but you

18   would agree, as you did before, it was a completely normal

19   assessment?

20   A.  Correct.

21   Q.  There was no document of grunting -- documentation of

22   grunting?  There's no documentation of respiratory distress,

23   correct?

24   A.  No documentation, no.

25   Q.  And in the fact that the baby wasn't in distress at that

1    time, the nursery nurses, had they been called, would not have

2    done anything different than Nurse Hendershot, correct?

3    A.  That I don't know because the parents described the baby

4    as being in distress.

5    Q.  They described the baby as being distressed in the

6    delivery room?

7    A.  In the labor room.

8    Q.  The labor room is the same as the delivery room.  Are you

9    aware of that?

10   A.  That is correct.  The mother said the baby was having

11   difficulty breathing and was stressed in the labor room.

12   Q.  There is no documentation to support that?

13   A.  There is no documentation, no.

14   Q.  So according to the record that you saw there, that is the

15   only record that we have of the delivery, there was no need

16   for resuscitation at that point, because it was a normal

17   delivery and a normal baby based upon Nurse Hendershot's

18   evaluation, correct?

19   A.  No.  It was not a normal delivery.  It was a vacuum, an

20   operative delivery with a shoulder dystocia with a category

21   two tracing and meconium.  It was not a normal delivery.

22   Q.  It was a normal assessment, correct?

23   A.  Say that again.

24   Q.  The evaluation of the infant revealed a normal assessment,

25   correct?

1   A.  Correct.

2   Q.  So in terms of Nurse Hendershot and what she did in terms

3   of calling the pediatrician or the nursery, she had a baby who

4   had an Apgar of eight which is normal and shows a good baby,

5   correct?

6   A.  Correct.

7   Q.  And she had a completely normal assessment?

8   A.  It was her responsibility to have called a pediatrician

9   into the labor room when the vacuum extractor was going to be

10  used and when a shoulder dystocia was called.

11  Q.  Doctor, that wasn't my question.  My question was she had

12  an Apgar of eight, which is normal.  She had a completely

13  normal assessment, correct?

14  A.  Correct.

15  Q.  So in terms of resuscitation at that point, there was

16  nothing to resuscitate because it was normal?

17  A.  They did deep tracheal suctioning which is not a normal

18  procedure.

19  Q.  Doctor, that wasn't my question.  My question was:  These

20  were completely normal assessments, correct?

21  A.  I think the nurse in the delivery room did deep tracheal

22  suctioning of the baby in the labor room at birth, so they did

23  a maneuver that's not a standard maneuver.  You don't do deep

24  tracheal suction on a normal delivery.  You do it when you are

25  concerned.

1    Q.  After that was done, the baby was completely normal,

2    correct?

3    A.  After that was done, the baby was fine.

4    Q.  Do you know anything about Nurse Hendershot's background

5    beyond what you and Mr. Colville just described?

6    A.  No, I don't.

7    Q.  Are you aware that she is NRP certified?

8    A.  I think she stated that.

9    Q.  And are you -- would you agree that this NRP certification

10   is something that was developed by the American Academy of

11   Pediatrics?  Do you know one way or the other?

12   A.  I don't know one way or the other.

13   Q.  If I told you that it was developed by the American

14   Academy of Pediatrics, would that surprise you?

15   A.  Anything would surprise me.

16   Q.  Doctor, are you aware that this certification is the same

17   certification that a pediatrician takes?

18           MR. PRICE:  Objection, Your Honor.  At this point, I

19   believe Ms. Koczan is testifying.

20           MS. KOCZAN:  I'm just asking the question.

21   A.  She is not a pediatrician.  She is not trained like a

22   pediatrician.  She may have training in what she did and

23   that's understood, but a pediatrician is an expert, somebody

24   who does it all the time.  That's their specialty.  That's who

25   should have been in the labor room.

1    Q.  Doctor, that's nice, but that wasn't my question.  My

2    question was:  Are you aware that this is the same

3    certification -- this NRP is the same certification that the

4    pediatricians take?

5    A.  I'm not aware of it.  I do not know that.

6    Q.  I want to move now to the last group of comments that you

7    made about Nurse Hendershot and the evaluation of Carissa

8    after that.  Have you seen the records?

9    A.  Excuse me?

10   Q.  Have you seen Nurse Hendershot's documentation?

11   A.  If it's in the record, I probably reviewed it.  I mean, I

12   don't know what you are asking me.

13   Q.  Let me get it out for you and show it to you.  I want to

14   ask you some questions about it.  You are aware that

15   Nurse Hendershot documented in the record that after this baby

16   was delivered while Carissa was still in the labor and

17   delivery room that she was in to evaluate her every 15

18   minutes.  Are you aware of that?

19   A.  Yes.

20            MR. PRICE:  Objection, Your Honor.  Could she define

21   who "her" is?

22            THE COURT:  Yes, let's be clear.

23   Q.  Nurse Hendershot was in to evaluate Carissa every 15

24   minutes?

25   A.  That's in the record, yes.

1    Q.  You are not going to disagree that there is documentation

2    in the record by Nurse Hendershot every 15 minutes?

3    A.  No, I'm not.

4    Q.  There is some at 6:00, 6:15, 6:30, 6:45 and 7:00 a.m.

5    correct?

6    A.  Correct.

7    Q.  Despite that documentation, your opinion, based upon what

8    you heard from the plaintiffs in their depositions, was that

9    that never happened?

10   A.  Correct.

11   Q.  Doctor, as a pediatric -- excuse me.  As a maternal labor

12   and delivery room nurse, nurses certainly understand and are

13   trained to evaluate when a patient or when a baby is in

14   distress.  Would you agree with that?

15   A.  Yes.

16   Q.  So if Nurse Hendershot saw that, that was certainly

17   something that she would be able to recognize, correct?

18   A.  Yes.

19   Q.  Especially with 32 years of experience, she certainly

20   would know that?

21   A.  Yes.

22   Q.  You would agree that there's no documentation in this

23   record of any observations by Nurse Hendershot or anyone else

24   prior to 7:25 that there was any grunting or respiratory

25   distress?

1    A.  I point out that the baby had deep tracheal suction which

2    is not a normal maneuver.  They must have been concerned that

3    the baby was aspirating -- was about to aspirate meconium.

4    Q.  My question was:  There's no documentation about any

5    grunting or respiratory distress where anyone wrote baby is

6    grunting, baby is in respiratory distress?  There's no such

7    documentation, correct?

8    A.  No documentation.

9    Q.  And a baby, after it is born, crying is a good thing,

10   isn't it?

11   A.  Yes.

12   Q.  You want the baby to cry?

13   A.  Yes.

14   Q.  That shows that a baby is vigorous and is in good shape?

15   A.  Crying, not grunting, yes.

16   Q.  And, Doctor, have you seen Tyler Janectic's deposition

17   transcript?

18   A.  No.

19   Q.  He is the person who was asked to go out and notify the

20   nurses and asked them to come in.  Do you know what he said

21   about why he was asked to go out there?

22   A.  No.

23   Q.  Would it surprise you if I told you that he was asked to

24   go out there because the baby was crying vigorously?

25   A.  I don't -- if you say so.  I don't know.

1    Q.  Just finally, have you read Nurse Hackney's deposition?

2    A.  Yes.

3    Q.  Are you aware that she said that when the baby was brought

4    to her in the nursery at 7:00 a.m., that she did not notice

5    any problems with the baby?

6    A.  That's correct.

7    Q.  And that the distress did not occur until 7:25 a.m. when

8    Nurse McCrory noted it?

9    A.  Correct.

10   Q.  One more thing.  You repeatedly referred to the nursery

11   here as a NICU?

12   A.  It's not a NICU, I understand.

13   Q.  You understand you are wrong when you say that?

14   A.  I understand.

15          MS. KOCZAN:  Thank you.  That's all I have.

16          THE COURT:  Any redirect examination, Mr. Price?

17          MR. PRICE:  Real quick.

18                      REDIRECT EXAMINATION

19   BY MR. PRICE:

20   Q.  You just heard all about Nurse Hendershot and her

21   certifications and her length of experience.  If she gets all

22   the certifications in the world, is that the same as a

23   pediatrician?

24   A.  No.

25   Q.  Why not?

1    A.  No, it's not.  That's the point I'm trying to make.  You

2    want an expert in the room, which is a pediatrician.  You want

3    somebody who does this all the time and whose skill is at the

4    pinnacle of the need, and that would be a baby in distress

5    with respiratory distress.

6    Q.  Finally, you were asked all about Nurse Hendershot's

7    documentations every 15 minutes about Carissa.  From your

8    review of the records, did you see any documentation of how

9    Kendall was doing from 5:30 in the morning until 7:00 in the

10   morning?

11   A.  No.

12          MR. PRICE:  That's all the questions I have, Your

13   Honor.

14          THE COURT:  Anything further, Mr. Colville?

15                      RECROSS-EXAMINATION

16   BY MR. COLVILLE:

17   Q.  Do you know if Dr. Dumpe is certified in resuscitation?

18   A.  I do not know that, no.

19   Q.  And resuscitation wasn't necessary in this case anyhow,

20   correct?

21   A.  Deep tracheal suction was, which was extremely important.

22   Q.  And after that, no abnormal findings, right?

23   A.  From what I'm aware of.

24          MS. KOCZAN:  I have nothing further.

25          THE COURT:  Nothing further.  All right.  I think

1    this is a good time for our lunch recess, so ladies and

2    gentlemen of the jury, if you will just leave your binders as

3    well as your notebooks there on your chair.  Mr. Galovich will

4    take care of those for you.

5        Over this lunch break, just like any other recess,

6    you are to follow the golden rules of not talking about the

7    case, not talking to anyone else about the case, not

8    researching about the case.

9        If by chance there's any kind of news coverage about

10   this case, you are going to avoid it.  Otherwise, you are

11   going to have a nice lunch hour.  We'll resume back here at

12   1:15.  Does that work for everybody?  Let's all rise for our

13   jury.

14       (Jury excused.)

15       THE COURT:  Dr. Zamore, you may step down.  I trust

16   Dr. Zamore may be excused, correct?

17       MR. PRICE:  Yes.

18       THE COURT:  He's not subject to recall.  Dr. Zamore,

19   you may also be excused.  Safe travels.

20       Mr. Price, when we start again at 1:15, who will be

21   your next witness?

22       MR. PRICE:  Dr. Dumpe.

23       THE COURT:  So we'll start with Dr. Dumpe at 1:15.

24       (Luncheon recess taken 12:01 p.m. -1:12 p.m.)

25       (Jury present.)

1          THE COURT:  I trust you had a nice lunch break.
2     Mr. Price, call your next witness.
3          MR. PRICE:  Plaintiffs call Dr. Kevin Dumpe.
4          THE COURT:  Dr. Dumpe, approach Mr. Galovich to be
5     sworn.
6          THE CLERK:  Please state and spell your name for the
7     record.
8          THE WITNESS:  Kevin C. Dumpe, D-U-M-P-E.
9       (Witness sworn.)
10          KEVIN C. DUMPE, M.D., a witness herein, having been
11     first duly sworn, was examined and testified as follows:
12                         DIRECT EXAMINATION
13     BY MR. PRICE:
14     Q.  Good afternoon, Dr. Dumpe.  I have to ask you a few
15     preliminary questions so we can establish some facts with
16     regard to your relationship to this case.  Back in 2014, you
17     were an obstetrician at a practice where Carissa Peronis was
18     getting prenatal care?
19     A.  Yes.
20     Q.  And during her prenatal care, you and your partners would
21     see her at the office?
22     A.  Yes.
23     Q.  And as is typical in an obstetric practice, you shift
24     doctors so you might see her one week and your partner might
25     see her another week?

1    A.   True.

2    Q.   During Carissa's prenatal period, you saw her on occasion

3    in the office?

4    A.   Yes.

5    Q.   And during that time, you didn't notice any abnormalities

6    or anything really wrong with her prenatal pregnancy?

7    A.   Nothing at all.

8    Q.   And these visits were all in your office?

9    A.   Yes.

10   Q.   And just to establish the fact so it's not -- you are

11   employed by a company called Primary Health Network?

12   A.   Correct.  If I could back up.  We did see her one time

13   that Mr. Zamore testified to for a nonstress test in the

14   hospital when she thought she was in labor.  Everything else

15   was in our office.

16   Q.   So your employer is Primary Health Network, and that's a

17   federally funded clinic funded by the United States of

18   America?

19   A.   Yes.

20   Q.   Now, on October 12, 2014, you were the obstetrician on

21   call for your practice?

22   A.   Yes.

23   Q.   And you were on call for the whole weekend, correct?

24   A.   Correct.

25   Q.   Because October 12 was a Sunday, so your shift started

1    Friday at 5:00 and would end Monday at 7:00 a.m.?

2    A.  Correct.

3    Q.  And as is typical, while you might be on call, there might

4    not be a patient of yours in the hospital, so you might be at

5    home for the whole weekend or you might be at the hospital the

6    whole weekend?

7    A.  That's correct.

8    Q.  So it really wasn't until Sunday whenever Carissa started

9    having labor that you were -- you came to the hospital?

10   A.  That's true, but I believe the labor room record shows I

11   did another delivery late that evening, 11:00, 12:00 o'clock

12   that evening.  Believe me, I don't remember that.  I would

13   have been there for that and it was documented I was there per

14   the record shortly after Carissa got there.

15   Q.  Right.  So your first real interaction with Carissa -- I

16   mean, of course the nurses advised you she had come in and

17   admitted her, but your first real interaction with her was

18   whenever -- around 6:30, you broke the amniotic sac?

19   A.  The first time I had personal interaction with her, yes.

20   Q.  And at that point, it's called artificial rupture of

21   membrane; is that correct?

22   A.  Correct.

23   Q.  And during that procedure, whenever you broke the sac, you

24   noticed that meconium had come out of the amniotic sac,

25   correct?

1    A.  Yes.

2    Q.  And I know that we've spoken and you described it as a

3    light green-colored fluid?

4    A.  Yes.

5    Q.  Now, did you do any other examination than just a visual

6    examination of it?

7    A.  No.  Of the meconium fluid?

8    Q.  Correct.

9    A.  We do a digital exam of her cervix, but of the meconium

10   fluid, it was a direct gross visual examination.

11   Q.  And meconium is the baby's first bowel movement, correct?

12   A.  Yes.

13   Q.  And from your understanding, is that in response to some

14   type of stress or something the baby is undergoing in utero?

15   A.  I'm not sure anybody knows the answer to that.  It's an

16   autonomic response.  The baby had to go from some stimulus,

17   whether this was -- and it's hypothesized that maybe the baby

18   is stressed at a time and that's what provokes that.  That's

19   somewhat theory.  We don't know what happens in utero to cause

20   that.  We have a lot of babies that we know otherwise were

21   perfectly normal that have meconium so they don't look

22   stressed.  They have no evidence of stress, but they do have

23   meconium.

24   Q.  And meconium happens between ten to 20 percent of births?

25   A.  I think the literature says 20 percent, and in my

1    experience, if I had not read that literature and was

2    guessing, I would come up with about the same number as, I

3    guess, Dr. Zamore did too.

4    Q.  Most of the time, meconium is not of a large concern, but

5    if the meconium has particulate matter in it, then that is

6    more concerning, correct?

7    A.  Correct.

8    Q.  If the meconium has particulate matter in it, at that

9    point, you are to call a pediatrician to attend the delivery,

10   correct?

11   A.  Yes.

12   Q.  And the reason is is that aspiration of meconium with

13   particulate matter can worsen into something like meconium

14   aspiration syndrome, correct?

15   A.  Can.  Usually does not, but can, yes.

16   Q.  But that's the concern and that's what you are worried

17   about?

18   A.  Yes.  That's why we take preventive measures because it

19   can.

20   Q.  And it's really the respiratory distress because of the

21   meconium and the particulate matter going deep into the lungs.

22   That's the biggest concern for a baby, correct?

23   A.  Yes.  I believe, as already has been testified, it causes

24   an irritation called a pneumonitis which makes it a little

25   harder for the baby to breathe and exchange oxygen.  That's

1    what we are concerned about.

2    Q.  I know you and I talked before in a deposition and that's

3    what you had described for me pneumonitis is an irritation of

4    the lungs, correct?

5    A.  Correct.

6    Q.  And so if there is some type of debris or particulate

7    matter that gets down into the lungs, not only is there a

8    potential blockage of the alveoli which allows oxygen to go

9    back and forth, that's one concern, but the other concern is

10   that it can irritate the lungs and cause what you call

11   pneumonitis, which is sort of an inflammation of the lungs?

12   A.  Yeah.  A minute ago, we called it an irritation.  The

13   inflammation is a better term.  Causing the response.

14   Q.  That's the same thing with us.  If we aspirate -- as

15   adults, if we get something deep in our lungs, that can cause

16   a problem because we're only supposed to have air in there.

17   If there's dust or something in there, it can cause problems?

18   A.  Yes.  I think it's noteworthy that when anesthesia talks

19   to adult people about that aspiration possibility before

20   surgery, they instruct them not to eat anything except

21   liquids, except clear liquids, meaning only eat nonparticulate

22   stuff before you come in, so therefore, they have the same

23   concern, and their concern is reserved to particulate matter.

24   Q.  Exactly.  That's what, whenever you are looking at

25   meconium and particulate matter, that's your big concern that

1    it could get deep and cause problems and cause pneumonitis,

2    right?

3    A.  Yes.

4    Q.  I know you have seen this and I just wanted to see whether

5    or not, if a baby is at risk, a pediatrician must be present

6    at delivery.  Do you agree with that?

7    A.  Not entirely, no, because there are gradations of risk.

8    So far, testimony has seemed to imply that risk is a plus or

9    minus thing.  It's either there or not there.  Risk is a

10   tremendously broad continuum from very minimal risk to very

11   significant risk, and it depends on where in that continuum

12   you say I think a pediatrician has to be here because the risk

13   is high enough to mandate or make a pediatrician's presence

14   beneficial.

15   Q.  Okay.  The next slide is, as you had seen in the opening,

16   it's a picture of a baby that ingests meconium, and it shows

17   how a baby can get meconium into the lungs, and I know you've

18   seen this and I know this isn't -- it's just a drawing, but

19   the principle behind it, do you agree with it?

20   A.  Yes, although I've never seen meconium look as bad as your

21   picture.  That really overemphasizes the particulate nature of

22   possible meconium.  Other than that, yes, I agree with the

23   mechanics of the picture.

24   Q.  Sure.  One of the issues is, you know, an infection.

25   Would you agree that if you have an infection that if you have

1    particulate matter meconium in your lungs, that it would make

2    it more difficult for you to fight that infection?

3    A.  I don't know.

4    Q.  So you don't know if there is infection on top of a

5    massive aspiration of meconium whether or not a baby would be

6    able to fight off an infection any easier?

7    A.  It's a pediatric question.  I really don't know the answer

8    to that.

9    Q.  So just take an infection.  If you had an infection

10   without meconium, do you think a baby would have an easier

11   time fighting off an infection without meconium?

12   A.  Again, I don't know.

13   Q.  Okay.  Next I just have some slides here.  Do you agree

14   with this?  If there is thick meconium, you are to call a

15   pediatrician?

16   A.  If you are equating thick with particulate meconium, yes,

17   and it usually is equated.

18   Q.  How about this one?  If you have massive aspiration of

19   meconium, you are to have a pediatrician at delivery?

20   A.  We don't know if the baby has massive aspiration until

21   well after delivery.

22   Q.  But if you knew that this baby had a massive -- you are

23   saying so that you don't know what gets into the baby's lungs

24   until after delivery?

25   A.  We can make a guesstimate on the risk based on the quality

1    of the meconium we've seen during labor and delivery, but what

2    has actually happened and what the consequences of that are

3    going to be to the baby, we can only assess the risk based on

4    the quality of meconium we've seen, but after the fact, we

5    have seen babies with meconium almost as thick as is in your

6    cartoon and we are really worried about the baby, and the baby

7    is born and is perfectly healthy and never has a problem.

8        So the correlation between the thick stuff and disease is

9    not that good, but we rarely see bad disease with the very

10   thin stuff.

11   Q.  But that's what I guess Dr. Zamore was talking a little

12   bit about was that sometimes you can have particulate matter

13   in thin meconium and sometimes you can have nonparticulate

14   matter in thick meconium, correct?

15   A.  Not correct.  I can't tell you how much I disagreed with

16   that statement he made.

17   Q.  But do you agree that you can have particulate matter in

18   thin meconium?

19   A.  I will -- let me explain that.  I can tell you that there

20   is microscopic particulate matter in normal amniotic fluid.

21   We periodically have reason to look at amniotic fluid under

22   the microscope usually to ascertain whether it is amniotic

23   fluid and whether a woman has ruptured membranes.  There is a

24   test we do where we plate out and dry amniotic fluid and look

25   at it under a microscope.  We are looking for a particular

1    pattern that is not pertinent to this case, but in addition to

2    that pattern, we always see epithelial cells and things that

3    people might say that's microscopic particles.  That is a

4    normal part of normal clear non-meconium-stained fluid.

5        So that's not reserved to thin meconium.  Even normal

6    amniotic fluid has microscopic particulate material, but I can

7    also tell you every bit of literature that guides our clinical

8    management of patients is based on the gross visual obvious

9    particulate matter in meconium, so I would have liked to ask

10   Dr. Zamore whether he actually does a microscopic exam on

11   every thin meconium to ascertain whether there's particulate.

12   I can tell you the answer is no.

13   Q.  I don't think that's what he was driving at.  What I think

14   was his point, from the way I took it, was that whenever you

15   have meconium, that you can have particulate matter in all

16   kinds of different meconium.

17   A.  You can, but it will be visually apparent if that's true.

18   You can have a very light-colored meconium, but if you look at

19   it, as we always do, you can actually see, in addition to the

20   light color, there's also particulate matter in it.  You can

21   see that, and the way we do that is as the woman is still

22   leaking amniotic fluid during labor, we always tuck a white

23   towel, a very clean, sterile white towel underneath her bottom

24   end so anything that leaks out goes on that white towel and

25   therefore we can see its color, whether it's blood, mucus,

1   whether it's amniotic fluid, whether it's green, it's clear

2   and whether there is particulate matter in it.  That is very

3   obvious at that time visually.  Not microscopically.

4   Q.  Sometimes whenever you have those pads underneath mothers,

5   sometimes the nurses will come in and change those pads,

6   correct?

7   A.  Quite frequently.

8   Q.  In fact, they do it a lot in front of the family, correct?

9   A.  Yes.

10  Q.  Like in front of Matt, they might have changed the pads,

11  correct?

12  A.  Let me correct that.  They do it when the family is in the

13  room.  The family rarely watches what's going on.

14  Q.  Sometimes they do, right?

15  A.  They could.

16  Q.  Sometimes they see --

17  A.  We don't prevent them from doing that.  It's socially

18  awkward to do that.

19  Q.  It may be socially awkward, but sometimes the family does

20  see whether or not the meconium that's coming out is green or

21  brown or has consistency to it, correct?

22  A.  Correct, but it takes a little bit of skill, a little bit

23  of experience to differentiate things like a fleck of blood

24  from a piece of brown/green meconium.

25  Q.  That all being said, and I agree they are not doctors, but

1    I guess what I'm driving at is if they say this is what

2    they've seen, you are taking Nurse Hendershot's word and

3    disregarding what the family would say about what they saw,

4    correct?

5    A.  Concerning the presence of meconium?

6    Q.  Yes.

7    A.  Absolutely.  Absolutely.

8    Q.  We also know in this case that on autopsy, Dr. Min found

9    massive aspiration of meconium in the lungs, correct?

10   A.  Correct.

11   Q.  So this isn't a theory that we're going he said/she said.

12   We know that is a fact that Kendall had a massive aspiration

13   of meconium while she was in utero, correct?

14   A.  No.  Not correct.

15   Q.  Okay.  Where did the meconium come from that was in her

16   lungs?

17   A.  We are going to contend it wasn't there.  I know -- I

18   agree 100 percent that it says that in the autopsy report.

19   Q.  Leave it at that because that's the official record at

20   this point, correct?

21   A.  Yes, but let it be known that we are going to contest

22   that.

23   Q.  As I said in my opening yesterday, you don't believe that

24   massive aspiration of meconium occurred, correct?

25   A.  Correct.

1    Q.  And that's what your defense is based upon.  You are going

2    to try to talk about how Dr. Min changed his testimony,

3    correct?

4    A.  He didn't change his report.  My understanding is he is

5    changing his testimony, yes.

6    Q.  If we could put up Exhibit 13, which is the policy.  I

7    wanted to talk to you a little about these policies.  I know

8    the jury has seen them.  The only reason why I want to talk a

9    little bit about it is, so of course this is for a

10   nonreassuring fetus.  The registered nurse will notify the

11   physician when signs of maternal distress or nonreassuring

12   fetal status are identified and initiate nursing interventions

13   as indicated to modify or eliminate the distress, correct?

14   A.  Correct.

15   Q.  And if we continue down a little bit, nonreassuring status

16   for a fetus may include, and number one is meconium-stained

17   amniotic fluid, correct?

18   A.  It says that, yes.

19   Q.  And if we can go to the next page, I think page 3, and

20   here is we've seen this and meconium-stained, you prepare for

21   a distressed newborn, correct?

22   A.  Correct.

23   Q.  I guess that's sort of instructive because it's not like

24   whenever you have amniotic-stained fluid, to a certain extent,

25   this policy assumes that that baby could be distressed upon

1    birth just by having amniotic-stained fluid, correct?

2    A.   That's assuming you've already identified the baby is at

3    risk as per this policy.  If that's the case, yeah.  If we've

4    identified such a baby at risk, we will do what this policy

5    says, which is take a step or two toward further staffing,

6    making sure other equipment is available that could

7    potentially be necessary for resuscitation.

8    Q.   And then notify pediatrician per policy?

9    A.   Correct.

10   Q.   And if we could go back under that, I think it's down to

11   page 5, this policy, you signed off on.  You are one of the

12   people who made this policy?

13   A.   Yes.

14   Q.   And agreed to it?

15   A.   Yes.

16   Q.   If we can go next to Exhibit 14, which is the next policy

17   2.21, and notification of pediatrician.  The pediatrician will

18   be notified when the delivery of a high risk infant is

19   imminent and the pediatrician's presence at the delivery is

20   required as determined by the attending obstetrical physician,

21   correct?

22   A.   Correct.  That's what it says, yes.

23   Q.   If we can scroll down a little bit more.  The scope is

24   expected delivery of any potentially high risk infant, and

25   amniotic fluid containing particulate meconium, correct?

1    A.   Yes.   Looks like we followed the policy exactly.

2    Q.   Now, if we could continue down.   Let's see, it's on -- go

3    back up to the top.   This notification of the pediatrician,

4    that is a notification of a pediatrician or his or her

5    designee, correct?

6    A.   For this policy, this is -- if you notice, it's per my

7    discretion of the obstetrician.   We are talking about the risk

8    continuum we were talking about before.   Depending how high on

9    that risk depends on whether I think we need a pediatrician

10   there.

11       The reason my discretion is added to this policy is

12   because that's the recognition that there is such a continuum,

13   that there's very low risk situations where we do not need a

14   pediatrician.

15   Q.   Go to page 2 of the policy under procedure.   The

16   pediatrician and/or his physician designee will attend the

17   delivery when time of notification permits or he or she will

18   examine the infant as soon as possible after delivery,

19   correct?

20   A.   Correct.

21   Q.   Now, that doesn't mean a labor and delivery nurse, does

22   it?

23   A.   Depends on what the risk assessment is.

24   Q.   Well, the point about this policy is that it's the

25   pediatrician who gets to make the call who examines the child,

1    correct?

2    A.  No.

3    Q.  Doesn't that say the pediatrician will attend the delivery

4    when notification permits and he or she will examine the

5    infant?

6    A.  That's at the end of the policy.  At the beginning of the

7    policy, it says it is per my discretion whether that person

8    actually has to be there or not.

9    Q.  My point is that if you are to call a pediatrician to

10   attend a delivery, that if, under any policy a pediatrician is

11   to attend the delivery, it is to be a call to a pediatrician,

12   correct?

13   A.  If I discern that the risk is high enough, yes.

14   Q.  And that does not allow you to say, hey, rather than a

15   pediatrician take care of this child, I will just allow the

16   labor and delivery resuscitation nurses to take care of this

17   baby, correct?

18   A.  I hate to be redundant, but as long as the risk is high

19   enough and I need a pediatrician there, I want a pediatrician

20   there, I think the policy speaks to the fact that should there

21   be a case where this happens quickly, and the pediatrician

22   can't get there and the pediatrician calls up a resident and

23   says could you get there until I get there, that's a

24   pediatrician's designee at that time, but your question is

25   correct that if I want a pediatrician there, I want a

1    pediatrician there, but that is assuming that I've assessed

2    the risk is high enough to have a pediatrician there and

3    that's what the policy allows me to do, and that's because the

4    recognition there is such a continuum and the recognition that

5    we are pretty good at knowing where the baby is on that

6    continuum.

7    Q.  But I mean, not to reiterate or to stress the point, but

8    if a pediatrician -- if a pediatrician wants to designate the

9    labor and delivery nurse, he or she can do so, correct?  It's

10   not for you to make that call.

11   A.  The pediatrician will never know about this unless I make

12   the decision that the pediatrician should be called.

13   Q.  Once the pediatrician is called, it is his or her decision

14   as to who is to examine this baby, correct?

15   A.  They could do that.  In my 30 years, I've never known them

16   to do that.  When I say I'd like you here, pediatrician, they

17   don't say from what you are saying, let me get my designee.

18   I've never seen that happen, because they know when we are

19   calling them, we already made the assessment that there's

20   reason for them being there.

21   Q.  Exactly.  That's my point.  Whenever a baby is at risk or

22   there's a problem with the baby that requires a pediatrician,

23   that pediatrician comes to the delivery as fast as he or she

24   can?

25   A.  If I've called them, yes, they do.

1    Q.  Let's move on back to the PowerPoint.  We talked about the

2    delivery.  Now, again, I know this wasn't -- I think you said

3    it wasn't an uncomplicated delivery?

4    A.  Correct.

5    Q.  So it wasn't -- you are not saying that it was easy, but

6    there were some complications?

7    A.  If I could backtrack a little bit.  It was uncomplicated,

8    but only because there were difficulties we had to manage, and

9    since we managed them well, it became a relatively

10    uncomplicated delivery after the fact.

11    Q.  And that was first the meconium, the vacuum assisted

12    delivery, I know you disagree that it was a shoulder dystocia.

13    A.  Yeah.

14    Q.  And an episiotomy and then the McRoberts Maneuver.

15    A.  Yeah.

16    Q.  And at birth, there was -- you did both bulb suctioning of

17    the nose and mouth and then the nurses did the deep

18    suctioning, correct?

19    A.  I don't know about the deep suctioning.  I would have been

20    otherwise occupied.  Other than that, everything you said is

21    true.

22    Q.  So at this point, once the baby is delivered, your focus

23    is on Carissa and not really what the nurses are doing?

24    A.  Yeah, yes.

25    Q.  Whenever you delivered Kendall and you bulb suctioned her,

1    did you bulb suction her to remove meconium from her nose and

2    her throat?

3    A.  I do that routinely on all deliveries.  In this case, it

4    had the added benefit of removing any thin meconium that might

5    be in her nose or throat.

6    Q.  I don't want to go over what the nurses found at that

7    point with regard to their assessment, because you were -- I

8    mean, they were over your shoulder and they are taking care of

9    the baby?

10   A.  Yes.

11   Q.  However, if you recall -- I guess in preparation of trial,

12   did you read your deposition?

13   A.  Yes.

14   Q.  And just so the jury knows that under the court rules,

15   before we come to trial, we are allowed to sit down and talk

16   about the facts and find out what you recall about that,

17   correct?

18   A.  Correct.

19   Q.  And do you remember telling me that it was your

20   recollection, and I know you said it might have been faulty,

21   but you said that it was your recollection that Kendall had

22   some breathing problems after birth, correct?

23   A.  I did say that, yes.

24   Q.  And you thought your memory was that after a couple

25   minutes, they thought the baby was breathing a little harder

1    and they thought that they should take it to the nursery,

2    correct?

3    A.  Yes.  Yes, that was in my deposition.

4    Q.  Right.  Then you added in your deposition that babies have

5    a transitional condition sometimes where they breathe a little

6    faster and the nurses take the baby to the nursery as a safety

7    measure, correct?

8    A.  Correct.  Can we back up a second?  In my deposition,

9    you're right.  I said this might be a faulty memory.  I think

10   I said that about three times in my deposition, because this

11   was a very vague and even at the time of the deposition, I

12   thought may be highly inaccurate.

13   Q.  That's fine.  That's not what I'm asking, because you are

14   right.  I don't think there's anybody that's going to come and

15   say that they took the baby in ten minutes, but it was more

16   insightful as to what you said that they take the babies to

17   the nursery as a safety measure.  If those babies, in the next

18   ten minutes, turn around and do great, fine.  No mistake made.

19   If the baby is going to have increasing difficulties, now they

20   have that baby in a place where they can take care of that.

21       And I guess that's the point, isn't it, that if you have a

22   little bit of concern, it's better to get the baby into the

23   nursery where they can evaluate it and take care of it rather

24   than keep the baby in the labor and delivery room, correct?

25   A.  That's a big -- that's an if.  If.  If we assess the baby

1    has those difficulties, yes, it should be in the nursery.  The

2    testimony I've heard from people that know better than I do

3    was that there was no such difficulty.

4    Q.  And then you went on, and say, the baby is breathing a

5    little harder, say hi to your baby, give your baby a kiss,

6    we're going to take her over to the nursery and evaluate her.

7         Again, those are measures that are done for the protection

8    to reduce risk for a baby who might have problems, correct?

9    A.  For a baby who does have problems.  Not routinely.

10   Q.  But even might.  I mean, if you were a nursery nurse or a

11   doctor and you saw a baby might have problems, you would

12   rather err on the side of caution and get the baby to a

13   nursery where a full assessment could be done, correct?

14   A.  No, because that includes -- you just described every

15   baby.  Every baby that might have problems, that's every baby,

16   and we don't want to rip babies away from mom and dad to take

17   it over to the nursery just in case something bad might happen

18   to that baby.  That is not standard practice in our hospital

19   or anywhere.

20        The bonding that goes on between mom and dad and baby is

21   important.  We want to promote that especially in babies who

22   are ascertained as healthy as this one was.

23   Q.  I don't disagree about that, but this baby, and I know

24   everyone is saying this baby is healthy, even though defense

25   says this baby was infected and nothing can could be done for

1   it, but what my point is is that you had a baby here who not

2   only needed bulb suctioning but was respiratorily slow one

3   minute and then had to have tracheal suctioning, and at that

4   point, what would the harm be to take that baby to the nursery

5   for a full assessment?

6   A.  The risk is taking a healthy baby from mom and dad who

7   would love to bond with that baby, and remember that the bulb

8   suctioning I did is routine.  I told you I do that with every

9   delivery.

10  Q.  Wouldn't you agree that in this case, that if Kendall had

11  gone to the nursery if there was a chance that a full

12  assessment, they might have picked up on other respiratory

13  issues, and that if they did, there was a chance that a

14  pediatrician could have been called and there was a chance

15  that Kendall could have been cured?

16  A.  You are talking about 5:20 a.m.?

17  Q.  Yes.

18  A.  No, I don't agree with that.

19  Q.  Okay.  Now, I want to get into this whole issue about the

20  autopsy.  So after you finished up with Carissa, your job -- I

21  don't want to say it was done, but your job was done, so you

22  left and they took care of the baby after that?

23  A.  Essentially, yes.

24  Q.  Later, you heard that Kendall had passed, correct?

25  A.  Yes.  24 hours later, I heard that.

1    Q.  And that is obviously and I'm not trying to -- it's got to

2    be heart wrenching for you too as a care provider as well as

3    other doctors.  Nobody wants this.  The whole question is what

4    was done and the standard of care, so obviously you wanted to

5    find out what happened, correct?

6    A.  Yes.

7    Q.  At that point, the death certificate that was signed by

8    Dr. Jones said meconium aspiration, correct?

9    A.  I didn't know that at the time, but after the fact, yes,

10   that's true.

11   Q.  And then it was in about 48 hours, you heard about the

12   fact that the cultures grew E. coli?

13   A.  Yes.

14   Q.  And at some point, did you get the autopsy report and

15   review the autopsy report?

16   A.  I would have automatically got a copy of that in my office

17   because it becomes part of Carissa's chart and I'm sure I

18   looked at it.  I remember my response being a little bit taken

19   aback because we knew what the baby died of.  The baby died of

20   E. coli sepsis and that was on the autopsy report.

21       That additional comment that is on that autopsy report

22   about meconium absolutely took me aback.  As a matter of fact,

23   I looked at that and I looked and said that cannot be true.

24   Q.  Now, after that, after you saw that and you saw that that

25   can't be true, you had a meeting, it was a meeting with you,

1    Dr. Jones, Carissa, Matt and her mother, correct?

2    A.  Yes.  I don't remember her mother being there.

3    Q.  At that point, you sat down with them to talk about what

4    happened to Kendall, correct?

5    A.  Yes.

6    Q.  And you had the autopsy report and you knew everything,

7    correct?

8    A.  I don't remember whether we had a full autopsy report.

9    Sometimes that takes a long time to come back, but we did have

10   the culture results.

11   Q.  And did you know about the fact that Dr. Min had said this

12   was a massive aspiration of meconium?

13   A.  I don't know the timing of that.  I can't remember the

14   exact timing of that meeting.  Again, a vague memory was it

15   might have been a week or ten days or two weeks later once we

16   had all the information back, and those autopsy reports

17   sometimes take a very long time to come back, so I don't know

18   whether we had the autopsy report in hand, but we did have

19   those cultures.

20   Q.  And then you met with the family and talked with them.  I

21   won't get into too much detail, but it didn't go well, right?

22   A.  It went well for 99 percent of the meeting.

23   Q.  And after that, you let -- then I assume you got the

24   autopsy report and you reviewed it?

25   A.  Yes.

1    Q.  And at that point, you saw on the autopsy report that it

2    said that Kendall had a massive aspiration of meconium,

3    correct?

4    A.  Correct.

5    Q.  And at that point, which would have been within a month of

6    the birth, you had that knowledge that Dr. Min had said this

7    baby had a massive aspiration of meconium, correct?

8    A.  Correct.

9    Q.  And at that point, you didn't do anything about that,

10   correct?

11   A.  Correct.

12   Q.  And it wasn't until this lawsuit was filed that you went

13   back to revisit that, correct?

14   A.  Yes.

15   Q.  And I think that you said, well, once a lawsuit is filed,

16   you can't just brush that thing off anymore, right?

17   A.  Correct.

18   Q.  So let's talk about what you did to talk about this

19   massive aspiration of meconium.  And you'll agree that you

20   went down and probably in 2017 sometime, we don't know exactly

21   when, but you went down to visit Dr. Min, the pathologist,

22   correct?

23   A.  I believe I saw him in the hallway.

24   Q.  And at that point, did you ask him to review the file?

25   A.  I asked him to look at the slides again.

1    Q.  And did he?

2    A.  Yes.

3    Q.  And then did he report back to you?

4    A.  I asked him what did you find.  I had specific questions

5    for him.  The question was because the report said massive

6    aspiration of meconium and I knew that could not be the case

7    clinically, could not be the case, I asked him can you

8    really -- can you see that, because one possibility was that

9    he was describing something that he was assuming and not

10   seeing, and so I asked him that question and I asked him can

11   you quantify meconium.  If you can see it, can you quantify

12   it.  I said could you look at the slides again and answer

13   those questions for me.

14   Q.  And he reviewed the slides, and he said, after I review

15   the slides, I agree with my initial assessment, correct?

16   A.  No.

17   Q.  Can we play Dr. Min TM008A?  I'm going to play for you

18   from Dr. Min's deposition where I asked him about his initial

19   assessment after he reviewed the pathology slides.

20       (Video recording played.)

21           MR. PRICE:  Then, can you play TM012A?

22       (Video recording played.)

23   BY MR. PRICE:

24   Q.  I will repeat that because I know Dr. Min's accent is a

25   little bit, but he said when I reviewed the slides, actually I

1    concurred with the findings, what I had written down.  So
2    whenever he reviewed the slides at first, he concurred.  He
3    agreed with what he put on the autopsy report, correct?
4    A.  That's what he said in his deposition.  That is not what
5    he said to me.
6    Q.  Okay.
7    A.  Could I clarify what he said to me?
8    Q.  Maybe later.  You are saying that he has changed his
9    report?  You are saying that he changed his report from --
10   that it's no longer massive aspiration of meconium?
11   A.  He did not change his report ever.
12   Q.  So I was correct that the official report is still the
13   official report?
14   A.  Correct.  Do you remember him answering why he didn't
15   change his report?
16   Q.  I'm going to let him answer that question.  Here's what I
17   want to ask you:  It is your suggestion that the reason why
18   massive aspiration of meconium was placed on the autopsy
19   report was that is a clinical diagnosis, correct?
20   A.  That is the explanation Dr. Min gave to me as to why it
21   was there, yes.
22   Q.  You are saying that Dr. Min reviewed the medical records
23   in this case before doing his autopsy report, and in the
24   medical records, he saw where it said massive aspiration of
25   meconium, and that's what he put on his autopsy report?

1    A.  I don't know where he got the term or the information, but

2    he did know that that was the clinical -- that was the

3    clinical diagnosis, and as was brought up in testimony here

4    that the death certificate said that because that's the only

5    information we had then, and when Dr. Jones was doing a

6    resuscitation, she didn't know about culture results.  All she

7    knew was there was some meconium present.  She did not know

8    the amount.  She assumed it was massive meconium that was

9    causing her bad baby that she was trying to resuscitate.  That

10   ended up being in the clinical record, and Dr. Min just kind

11   of translated it into his report from clinical knowledge, not

12   from microscopic examination.

13   Q.  This is important because the word massive is important,

14   correct?

15   A.  Correct.

16   Q.  What I will do right now is I'm going to -- let me ask you

17   this first:  From your review of Carissa and Kendall's medical

18   record, did you ever see the word massive as -- the words

19   massive aspiration of meconium in any record besides the

20   autopsy report?

21   A.  No, because I had -- the only record I had at that time

22   was Carissa's.  I didn't review the baby's autopsy report or

23   baby's clinical record.  There was no reason for me to do

24   that.

25       All of a sudden, that term came up in the autopsy report

1    so, yes, that was the first time I saw it.

2    Q.  So let me just note tab 2.  We're going to start at page

3    3, and this is your operative report, correct?

4    A.  Yes.

5    Q.  And you describe it as moderate nonparticulate meconium

6    fluid, correct?

7    A.  Correct.

8    Q.  And that's the only description that you have in your

9    record about the meconium fluid, correct?

10   A.  No.

11   Q.  If we go to page 59 of tab 2, and right there, thin

12   meconium, correct?

13   A.  Correct.

14   Q.  No massive aspiration of meconium, correct?

15   A.  Correct.

16   Q.  Page 61, tab 2, it just says meconium is present, correct?

17   A.  Yes.

18   Q.  Tab 2 page 138, this describes the forebag and it just

19   says light green color fluid, correct?

20   A.  Synonymous with thin.

21   Q.  And there is no mention about massive aspiration of

22   meconium, correct?

23   A.  Correct.

24   Q.  Page 142 of tab 2.  Thin meconium, correct?

25   A.  Yes.

140

1    Q.  If we go to tab 6, page 3, and this is one of the death

2    certificates.  If you could just highlight here.  Dr. Jones

3    just termed it as meconium aspiration, correct?

4    A.  Yes.

5    Q.  She never used the word massive aspiration of meconium,

6    did she?

7    A.  Not in this document, no.

8    Q.  Page 8 of tab 6.  And this is Dr. Jones' discharge summary

9    report, and she notes meconium was present in the amniotic

10    fluid at delivery and baby was stained with meconium, correct?

11    A.  Correct.

12    Q.  We saw the delivery note where they called it thin

13    meconium.  If you go to tab 6, page 12, and this is her

14    handwritten progress note, and she simply writes that the

15    assessment is meconium aspiration, correct?

16    A.  Yes.

17    Q.  She did not assess this baby as having a massive meconium

18    aspiration, did she?

19    A.  She did not.

20    Q.  Page 22 of tab 6.  These are the x-rays that were taken of

21    Kendall and this whole block.  Findings most consistent with

22    meconium aspiration and/or neonatal pneumonia.

23        Nowhere in there does it say massive meconium aspiration,

24    correct?

25    A.  Correct.

1   Q.  Next page 23 of tab 6.  Again, findings suggestive of
2   extensive neonatal and could be related to meconium
3   aspiration, correct?
4   A.  Correct.
5   Q.  Does not say in this clinical record massive meconium
6   aspiration?
7   A.  Apparently not.
8   Q.  Page 24 of tab 6.  This is another x-ray taken 11:35,
9   bilateral consolidation which may represent neonatal pneumonia
10  versus meconium aspiration.
11      Do you see that?
12  A.  I see that.
13  Q.  Doesn't say massive meconium aspiration, does it?
14  A.  No, it doesn't.
15  Q.  And there are a few more just references to -- let's go to
16  page 91 of tab 6, and this is a note that is drawn up by the
17  nurses, and if you could highlight right down here about
18  characteristics of the labor after delivery, and one of the
19  boxes that can be checked is moderate/heavy meconium staining
20  of the amniotic fluid and it wasn't checked, correct?
21  A.  Correct.
22  Q.  So there is no record in this Kendall or Carissa that I
23  could find where the word massive aspiration of meconium was
24  used, but you are telling us that Dr. Min got this from a
25  clinical file, correct?

1    A.  No, I did not say that.

2    Q.  You are saying that Dr. Jones told him that?

3    A.  I don't know.  I don't know where he got it.  Maybe it was

4    an assumption.  If you look back on the record a few minutes

5    ago, I said I have no idea where he got that, but he said it

6    was a clinical diagnosis, not a pathological diagnosis.  I

7    don't know where he got it.  Obviously not from the record, as

8    you pointed out.

9    Q.  If he didn't get it from the record and if he did this

10   autopsy and if his initial finding was massive aspiration of

11   meconium, wouldn't you assume that that was the finding that

12   he made upon autopsy and reviewing the pathology slides?

13   A.  Based on a report, yes, but I also knew that that could

14   not be true.

15   Q.  Because if it is true, then there's problems in this case

16   for you, correct?

17   A.  No, that's not my reason.  It's because the clinical

18   presentation was that that does not happen in the clinical

19   presentation that we had with Carissa's labor and delivery.

20   Q.  Now, I know that we talked about -- or you just mentioned

21   that Dr. Min did not change his official report, correct?

22   A.  Correct.

23   Q.  But you know medical records can be changed, amended,

24   supplemented, corrected, correct?

25   A.  Can be, but are not.

1  Q.  Have you never in your whole practice ever amended a

2  medical report?

3  A.  Not for legal purposes, no.

4  Q.  Well, that's my point.  Is this whole massive aspiration

5  of meconium going away just for legal purposes?

6  A.  No.  I'm telling you he's afraid to change his record

7  because we have been taught over and over again from the first

8  day of medical school on that.  Once there's a legal issue in

9  a case, the last thing you ever want to do ever is go back and

10  change the medical record.  That looks like you are trying to

11  cover your rear-end and we are told never to do that.

12      Dr. Min was told never to do that and, therefore, once he

13  knows there's legal issues here, he would be absolutely

14  frightened, as would I be, to go back and change the medical

15  record.  We were taught that that is anathema.  That is

16  something you never, ever do.

17  Q.  I don't know who taught you that, but whoever taught you

18  that is a bad teacher, because the point is that you have a

19  wrong finding on a medical record, it has to be changed.

20      For example, right now, this medical record is sitting in

21  the files in Heritage Valley Beaver which says that Carissa

22  died -- Kendall died of massive aspiration of meconium,

23  correct?

24  A.  No.  It says she died of neonatal E. coli sepsis.

25  Q.  Associated with massive aspiration of meconium, correct?

1    A.   Associated with.

2    Q.   Right.

3    A.   Not as a result of.

4    Q.   Okay.  In other words, there was a lot of -- there was a

5    massive aspiration of meconium and that did not help this

6    little girl fight off infection, correct?

7    A.   Only according to the written report, but I know that is

8    not true.

9    Q.   But here's the thing is that it's not true only in this

10   courtroom, correct?

11   A.   No.   It's the absolute truth.

12   Q.   No.   The absolute truth is what is written in an autopsy

13   report in Heritage Valley Beaver in their files, correct?

14   A.   No, sir.  That's the way lawyers look at things.  Truth is

15   truth, and the only two people that know the degree of

16   meconium present at this delivery are two people, myself and

17   Nurse Hendershot.  We are the only people who visualized the

18   degree of meconium, and we know she knows from 30 years of

19   experience, I know from 37 years of experience that what

20   showed up as the supposed associated cause of death is

21   absolutely and could not be true.

22   Q.   Okay.  So just when Dr. Min originally wrote the major

23   bronchial trees are mostly clear, however the smaller

24   bronchial trees contain some aspirated material most likely

25   meconium, you are saying that he, in his autopsy report, is

1    incorrect because you didn't see it?

2    A.  No.  I know this is incorrect and I know I didn't see it.

3    Therefore, those two are inconsistent with each other.  Why

4    this showed up, I know from my discussions with Dr. Min is he

5    saw, as is indicated on this highlighted area here, that he

6    saw aspirated debris.  Because of what he knew from clinical

7    knowledge of this case, he assumed that that was meconium.  He

8    will tell you -- I'm not sure I can testify for him.  I can

9    testify what he said to me is that he saw debris.  That could

10   be inflammation, which we know was going on in this baby's

11   lungs, and it could be meconium, but he said it is just

12   debris.

13   Q.  But the point is is that on October 14, 2017, two days

14   after this baby's death, he writes a report where he says the

15   bronchial trees contain some aspirated material, most likely

16   meconium, and that was his conclusion two days after Kendall's

17   death, correct?

18   A.  Yes.

19              MR. PRICE:  That's all the questions I have, Your

20   Honor.

21              THE COURT:  Cross-examination, Mr. Colville?

22                        CROSS-EXAMINATION

23   BY MR. COLVILLE:

24   Q.  Let me pick up where you finished and we'll go back to

25   some of your credentials.  Why do you believe there was not a

1    massive aspiration of meconium?

2    A.  Because there was not massive meconium to aspirate.

3    Q.  Explain how you know that.

4    A.  There was not enough meconium at delivery to cause the

5    type of reaction in the lungs that they are contending

6    happened based on what I know to be an erroneous pathology

7    report.

8    Q.  What do you base that upon?  Your experience?  Books?

9    A.  Well, yes, but also I teach our residents how to do this

10   assessment, and if you'll allow me, I did bring a

11   demonstration with me.

12       These are obviously Gatorade bottles purchased off the

13   shelf.  This one is filled with water and it's filled with

14   water for a reason.  That's what normal amniotic fluid looks

15   like.  If you look at this microscopically, normal amniotic

16   fluid, you will see microscopic particulate matter in there,

17   which our last expert claimed was somehow pathologic.

18   Q.  Is amniotic fluid this clear?

19   A.  It commonly has a little bit of a straw-tinged color to

20   it, but it's only tinged.  It's almost that color.

21   Q.  Okay.

22   A.  Once you get light meconium -- I can tell you this is what

23   Carissa's fluid looks likes -- you get a situation like this

24   (indicating).  You get this light green color, and if you hold

25   this up to the light, you can see right through it.  It's

1    transparent.  That's the definition of nonparticulate.

2        When you look at this, you cannot see any particles in it.

3    It is those particles that cause the pneumonitis, that cause

4    the problem in a newborn baby.  Therefore, we are not as

5    worried about what exactly the color is as to whether or not

6    there is particulate matter in it.

7        And I'd like you to look at this one, because this is the

8    color that I would describe as light, thin, nonparticulate

9    meconium.  This is what Carissa's fluid would have looked like

10   (indicating).

11           MR. COLVILLE:  Before you go any further, for the

12   record, Your Honor, we have a photograph of the bottles that

13   Dr. Dumpe is going through illustrated on the scanner.  Will

14   we label this as an exhibit number?

15           THE COURT:  You should, yes.  So you have used a

16   portion of the hospital record as a demonstrative exhibit

17   similar to this.  I think this should be Government

18   Demonstrative 2.

19           MR. COLVILLE:  We'll call this Government

20   Demonstrative 2 and, for the record, the first bottle that was

21   discussed is the bottle on the far right and is a clear bottle

22   where you can see a good portion of the letter G.

23           The second bottle that was just discussed is the one

24   to its left, and it has the nutritional facts facing towards

25   us.

1  BY MR. COLVILLE:

2  Q.  Doctor, you were saying this is the color of --

3  A.  That is what we considered light, thin, nonparticulate

4  meconium which is the documentation through most of the

5  medical record.  The only word that differs from that is, on

6  my delivery note, it says moderate, which means that they may

7  have been trending toward a little deeper green color, but

8  again, I documented nonparticulate, which again means, if you

9  hold this up to the light, there were no particles that could

10  damage a baby's lungs in it, so this might be somewhere

11  between that last bottle and this one is what we saw at the

12  time of delivery.  Again, very non-worrisome.  Does not put

13  the baby at risk for aspiration syndrome.

14  Q.  It's obviously a different color, so you know there's a

15  difference in color?

16  A.  Yes.

17  Q.  But as it relates to particulates or its viscosity, is

18  there a difference?

19  A.  No.

20  Q.  Was there a difference on October 13?

21  A.  No, which is why I make it a habit to document

22  nonparticulate to explain why I manage the labor and delivery

23  as I am, including not calling a pediatrician, because it's

24  not necessary, because there is not particulate meconium to

25  worry about.

1    Q.  And again, for the record, this last bottle that was

2    discussed is the third from the right, the darker green

3    version.

4    A.  Let me show you what we do worry about.  This would be

5    thick meconium, particulate meconium.  This is a Green Farms

6    very healthy product that I picked up, but this is a very good

7    demonstration of what particulate meconium looks like.  It's

8    darker green, but more importantly, it is opaque.  It looks

9    like pea soup.  This is thick particulate meconium.

10        In here, even though I can't see -- I can't see spots in

11   here.  I can see that I can't see through it.  Therefore, it's

12   the particles that are making it opaque, and it is those same

13   particles that cause damage to baby's lungs.  There was

14   nothing like this present anywhere in this delivery.

15        This is the type of meconium that Dr. Min was describing

16   in his pathology -- wrongly describing in his pathology

17   report, and the only thing that was ever present through this

18   whole labor process was bottle number two.  That's why I knew

19   from moment one that Dr. Min's pathology report had to be in

20   error.

21   Q.  Is this version of the meconium the only meconium that

22   could cause massive meconium aspiration?

23   A.  Yes.

24   Q.  Can any of the three other bottles be versions of meconium

25   that would be described as massive aspiration?

1  A.  If you look at standards on how you manage these things,

2  the implication is no, because you are not supposed to worry

3  too much about them, and in my own experience, like I said,

4  I've seen people -- I've seen babies born through amniotic

5  fluid that looked like bottle number four that did perfectly

6  well and the pediatricians will tell you the same thing.

7      It doesn't necessarily mean you are going to have that

8  syndrome, but those are the people that are at risk, and those

9  are the babies for whom I would definitely call a pediatrician

10 to be in attendance for delivery.

11 Q.  Do you call a pediatrician for any of the first three

12 bottles?

13 A.  No.

14 Q.  Why not?

15 A.  Because there is hardly ever a problem with those babies

16 as far as respiratory situations go, as is demonstrated with

17 the birth of this baby.

18 Q.  I guess that's the question.  The argument is you should

19 have called a pediatrician here because meconium was present

20 in the amniotic fluid?

21 A.  Yeah.

22 Q.  Is the purpose for calling the pediatrician to be there in

23 case there is respiratory distress or resuscitation needs to

24 occur?

25 A.  Yes.

1  Q.  So in this case, there was meconium present?

2  A.  Yes.

3  Q.  You've described the second and possibly the third version

4  which is the see-through colored water version.  That didn't

5  result in a need for resuscitation or any respiratory distress

6  symptoms?

7  A.  We predicted it wouldn't and it didn't.

8  Q.  In the lighter versions of that meconium amniotic fluid,

9  you are not denying that there are particulates in it.  It's

10  just particulates that don't -- it's microscopic?

11  A.  Yes, but as I said, even normal amniotic fluid has that.

12  Q.  And that's where maybe I didn't understand what Dr. Zamore

13  was talking about.  The microscopic versus you need -- you

14  can't just look at it and tell.  Did you understand what he

15  was discussing there?

16  A.  No.  I have no idea what he was talking about.  I have

17  been doing this for 37 years.  I read the literature.  I keep

18  up with the literature because I have to teach residents.  I

19  have to know current day information.

20      Believe me, this type of management of meconium, I need to

21  know this, because this is 20 percent of deliveries we are

22  dealing with.  I have to know up-to-date information.  I

23  queried our pediatric colleagues and said anywhere in your

24  literature is there anything about microscopic particulate

25  meconium.  They said no, and it's not in our literature.  I've

1   never known of an obstetrician to practice based on the

2   possibility of microscopic particulate meconium.  I don't know

3   what he was mentioning.  There is no such thing.

4   Q.  If a baby had massive aspiration meconium, would the baby

5   have presented as though it did at 5:20 in your hands?

6   A.  More a pediatric question, but I can tell we do know how

7   the baby is responding in the first minute or so after

8   delivery because the baby is in our hands, and if you have a

9   baby that has massive meconium aspiration, they tend to have

10  trouble taking their first breath.

11  Q.  What did you see when the baby came out?  What did you

12  think about the baby when it was delivered?

13  A.  We had some difficulties to manage, as has been pointed

14  out.  In retrospect, I hate to say this because it sounds

15  prideful, we did a very good job.  We handled all those

16  problems well, and therefore, delivered a baby that looked

17  perfectly healthy.  We know it was infected at the time.  We

18  know it had a destiny that was tragic, but at the moment, it

19  was entirely healthy.

20  Q.  Did you know that at the time of delivery?

21  A.  The infection, no, absolutely not.  That was 48 hours

22  later.  But upon delivery, even that six Apgar, that's not a

23  perfect Apgar, but we know why that baby had a six Apgar.  I

24  created the six Apgar because I wanted to delay its first

25  breath so that I could aspirate the little bit of very light

1    meconium and the normal secretions.  I do this with every

2    delivery.

3        Before the baby's shoulder is delivered, I suctioned out

4    the baby's nose and mouth and did it again after delivery

5    because of the presence of the mild meconium.  I did something

6    above and beyond what is required to do.  I suctioned out the

7    baby's nose and mouth.

8        Current neonatal resuscitation program tells you you don't

9    have to do that.  There's no benefit to that.  There's no harm

10   in doing it, but there's no benefit, and because I delayed

11   that first respiration to make sure I could suction -- by the

12   way, the baby's first respiration is commonly taken when we

13   stimulate the baby.  Sometimes those babies are born kind of a

14   little lethargic, and you've heard of spanking babies.  We

15   don't spank babies, but we do take a cloth to dry the baby

16   off, and in doing so, depending on how vigorous the baby is,

17   we use that as a stimulant to make the baby cry.

18       I would do that from the first second in a lot of

19   deliveries, but to go above and beyond standard of care, I

20   suctioned out the baby's nose and mouth and delayed its first

21   cry until I could do that.  Therefore, that may take ten or 15

22   seconds, that may depress the Apgar score by a point or so.

23       Remember that respirations in the first minute, there was

24   a one instead of a two.  Probably my fault, because I was

25   going above and beyond the standard of care to try to handle

1  the meconium that was possibly in this baby's airway even

2  though it was minimal and probably clinically insignificant.

3  Q.  Once the baby was delivered, was there anything about the

4  presentation that you thought you needed to call a

5  pediatrician at that point?

6  A.  No, not at all.  If there was any thought before delivery,

7  and there wasn't, there was even less thought after delivery

8  because we had a normal newborn in our hands.

9  Q.  Let me get some housekeeping done.  You are licensed to

10  practice medicine in Pennsylvania; is that correct?

11  A.  Yes.

12  Q.  Do you specialize in any particular --

13  A.  Obstetrics and gynecology.

14  Q.  And are you board certified?

15  A.  Yes.

16  Q.  How long have you been board certified?

17  A.  Since my graduation from residency, which was 1986 or so.

18  Q.  Can you explain for the jury your professional training?

19  You went to become an OB-GYN?

20  A.  After undergraduate graduation, I went to medical school

21  at Hahnemann University, which you might have seen in the news

22  recently got shut down because of financial reasons.  That's

23  in Philadelphia.

24      I then spent four years as an OB/GYN resident at Western

25  Pennsylvania Hospital locally in Pittsburgh.  At my fourth

1    year, I was selected as the chief resident.

2        I then spent four years in the United States Air Force

3    doing obstetrics and gynecology for them.  Just like our last

4    expert, I was a major when I separated.

5        I then moved to Beaver to accept a position of director of

6    OB/GYN training as well as running a concurrent private

7    practice and I've been doing that ever since.

8    Q.  Explain what you do with the training portion?

9    A.  We have residents in our program.  They are family

10   medicine residents.  Not like Dr. Zamore who has OB-GYN

11   residents.

12   Q.  This is Heritage Valley?

13   A.  Heritage Valley Beaver.

14   Q.  When did you start doing this?

15   A.  1990.

16   Q.  What is the title exactly?

17   A.  Director of OB-GYN training.

18   Q.  Explain exactly what you do.

19   A.  Family medicine residents are trained in a wide variety,

20   almost an infinite variety of medicine.  They have to know a

21   little bit about everything, including their training is

22   obstetrics and gynecology.  In that section of their training,

23   I am the person who directs that training.

24       We have six residents per year.  It's a three year

25   program, so 18 residents I have under my wing, and my job is

1    to, just like Dr. Zamore intimated, is it to train those

2    residents in the general practice of obstetrics and

3    gynecology.

4        These are not surgically trained residents.  These are

5    family medicine residents.  Whereas Dr. Zamore was teaching

6    them minimally invasive surgical techniques, I don't teach

7    that to our residents, but in the type of case under

8    consideration today, vaginal delivery, normal labor and

9    delivery, management of common complications in labor and

10   delivery, that is what I do every day.

11   Q.   Do you teach about meconium?

12   A.   Absolutely.

13   Q.   Do you teach about the fetal heart monitors?

14   A.   Yes.

15   Q.   How to read them?

16   A.   Yes.

17   Q.   And you are employed at Primary Health Network?

18   A.   Yes.

19   Q.   How long have you been employed there?

20   A.   Since 2005.

21   Q.   And what are your duties there?

22   A.   We have a private practice there.  Dr. James Lauer and

23   myself have a joint private practice.  We have limited our

24   practice to a one doctor volume practice, but there are two of

25   us there, because when one of us is there taking care of that

1    practice, the other one is fulfilling the duties in teaching

2    and at the Heritage Valley Beaver and taking care of inpatient

3    duties.

4    Q.  You obviously have privileges at Heritage Valley?

5    A.  Yes.

6    Q.  Do you have privileges anywhere else?

7    A.  No.

8    Q.  How long have you been in private practice?

9    A.  Private practice or general OB/GYN?

10   Q.  General.

11   A.  I would say since the end of my medical school in 1982

12   which, if my math is right, makes 37 years.

13   Q.  Have you published any professional journals?

14   A.  No.

15   Q.  You were asked about Primary Health Network.  It is a

16   federally funded clinic?

17   A.  It is a federally qualified health care center, yes.

18   Q.  You were not employed by Heritage Valley; is that correct?

19   A.  That's correct.  They have a contract with Primary Health

20   Network for OB/GYN teaching, and at the moment since 1990,

21   that is me and my partner.

22   Q.  Do you hold any -- do you hold any positions on the

23   committees at Heritage Valley?

24   A.  Yes, just because I'm the chairman of the department

25   there.

1    Q.   Chairman of which department?

2    A.   OB/GYN department.

3    Q.   How long is that term?

4    A.   The term is two years.  There's nine of us in the

5    department.  That usually, by tradition, rotates amongst the

6    nine of us.  They have re-elected me to that position for the

7    fourth straight term now because I guess they think I'm doing

8    a good job, but because of that, I sit on the medical

9    executive committee which is a committee -- that is the

10   highest medical committee at the hospital.  It is composed of

11   all the department chairs.

12   Q.   That may lead into the policy issues.  Your name is on

13   these policies that we have been putting up on the screen

14   here.  What was your involvement with -- to the extent you

15   signed any of the policies, the two we've looked at, 2.4 and

16   2.21, you are on both of those as a signatory?

17   A.   Yes.

18   Q.   Does that mean you had input into this, or is that

19   something run through the department?

20   A.   I couldn't have put my signature on there without my input

21   because I'm chairman of the department.  They are looking for

22   the signatures of the department chairman.  That definitely

23   means you've reviewed them.  In those particular policies, I

24   am actually very friendly with the head nurse of the maternal

25   child health unit and she puts these together.  She actually

1    puts them down on paper, but she bounces things off of me

2    almost on a daily basis.

3    Q.  Just so we are clear, the policies that we've gone through

4    is Exhibit 14 and 13 of the joint exhibit list.  They were

5    both in effect at the time of the birth; is that correct?

6    A.  Yes.

7    Q.  And they are both in effect today?

8    A.  Yes.

9    Q.  Do you agree with the policies?

10   A.  Yes.

11   Q.  Have you complied with these policies?

12   A.  Yes.

13   Q.  Have you complied with these policies as it relates to

14   this case in particular?

15   A.  Absolutely, yes.

16   Q.  Is there any deviation whatsoever from these policies that

17   you believe occurred on your watch?

18   A.  No.  The policy says per my discretion after evaluating

19   the risk, I determine whether a pediatrician is necessary.

20   One of those things can be thick particulate meconium which

21   was not present in this case, and by the way, if you wonder

22   whether that determination was accurate or proper, I hate to

23   use the term, but the proof is in the pudding.  We got a

24   healthy baby out of this.

25        You might be saying we got a dead baby out of this.

1    Tragedy, but I delivered a healthy baby that happened to be

2    infected that died days later, but the proof in the delivery

3    of a healthy newborn baby shows that the determinations I made

4    whether or not to call a pediatrician were correct.

5    Q.  And your reference to the continuum of risk, if you could

6    describe for the jury what are the risks that apply to this

7    case and where in the continuum did you find the baby back in

8    October of 2014?

9    A.  Looking at individual risks, looking at the meconium risk

10   because of the particular color and consistency of that

11   meconium, if we're on a one to ten scale, which by the way we

12   don't use that, it was a one.  On the --

13   Q.  Fetal heart rate monitor.  There was discussion about the

14   category two.

15   A.  The fetal heart rate monitor, there was a lot of category

16   two tracing, as Dr. Zamore described category two tracings for

17   you, but you'll notice every time he mentioned that, he said

18   the proper management of that is to heighten your awareness a

19   little bit and wait and see what happens from there.  It's

20   what we call expectant management.  See what happens.  Does it

21   go downhill or uphill from there?  We did that a lot with this

22   labor.

23   Q.  Were you aware of these category twos at the time?

24   A.  Yes.

25   Q.  Were you monitoring the monitoring of the baby and the

1    mom?

2    A.   Well, Carissa labored overnight.  I can tell you I saw the

3    tracing several times, as was documented in the timeline, at

4    least up until I think at 11:45 p.m. was the last time they

5    said Dr. Dumpe was in the room, and I had the capability --

6    our on call room, the call room I would sleep in, and I could

7    almost guarantee between the delivery of that baby at midnight

8    and being awoken for Carissa's delivery at 5:00, I was

9    probably sleeping in a call room that was probably as far away

10   from Carissa as those exit doors are away from me now.  Very

11   close by.

12       Right outside the door of that call room is a fetal

13   monitor where all the fetal strips are broadcast to that area.

14   Periodically, I would be updated by Nurse Hendershot as to

15   what the strip looked like.  Maria, I have consummate trust in

16   Maria.  Maria and I have worked together for 30 years, and I

17   have other nurses that I've worked with for 30 years that I

18   don't trust.  It's not just her 30 years that makes her

19   trustworthy.  It's her competence.

20       When Maria describes a heart rate tracing to me, I either

21   will say what you are describing is normal and never look at

22   the monitor strip, or if what she is describing sounds a

23   little bit suspicious, and Maria and I have discussed this

24   over 30 years, I will step out of the call room and look at

25   the monitor strip and say what does this look like.  Do I

1    think this is worrisome or not?

2        If Maria says we need you here, this is a category three

3    tracing, I don't look at the strip, I run because I know Maria

4    knows what she is talking about.  I trust her.

5    Q.  Was there any categories threes on this strip?

6    A.  No.  Dr. Zamore said that.  I agree.  The only monitor

7    strip that makes you say maybe we should get this baby

8    delivered now on a more emergent bases, meaning by cesarean

9    delivery is a category three tracing.  There is none in this

10   strip.  Dr. Zamore testified there was none, and I certainly

11   agree with that.

12   Q.  Is it common for there to be category twos in labor?

13   A.  Yes.  Category two tracings, if you read the literature,

14   they say on the average, every baby spends about 22 percent of

15   its time in category two, with a normal labor and delivery.

16   It may have been more in this case.  We saw a lot of category

17   two tracings.

18   Q.  Was there any category two tracing in this case that

19   didn't revert back to a category one?

20   A.  No.  It would periodically go back to category one.  A lot

21   of things that cause worrisome category two tracings or a

22   category three tracing have to do with the placenta, which is

23   the source of nourishment and oxygen to this baby not working

24   well.  It's a sick placenta, and if you see that, they don't

25   heal during labor and delivery.  If they are sick, they don't

1    get better.  So if you see a category two tracing resolved to

2    a category one tracing, that tells you that previous category

3    two tracing was not due to a truly sick placenta.

4        Other things that cause category twos are things as simple

5    the baby going to sleep.  We go to sleep.  Our heart rate

6    becomes very stable.  We like to see baby's heart rates be

7    jiggly.  Ours are like that right now.  Mine probably beating

8    a little faster than yours.  Our heart rates do that.  They go

9    up and down.  If we are sleeping and not dreaming, that's what

10   our heart rate might do, nice and flat.

11       Sometimes you see that in a baby.  That's a category two

12   tracing, but it's extremely benign.  The baby is sleeping.

13   The baby is allowed to sleep.  You will see that result when

14   the baby wakes up.  That's what we saw periodically in this

15   heart rate tracing.  It never went to a category three.

16   Q.  When you consider the fetal heart rate monitor results or

17   the strips in that continuum of risk, where do you place it?

18   A.  Again, if a ten point scale, maybe I would put this one up

19   to a two.

20   Q.  The next item that Dr. Zamore focused on was the

21   suctioning of the baby at the very end towards delivery.  Can

22   you explain what was going on there?

23   A.  I can tell you what I did.  I can't tell you why he said

24   what he said, because he immediately contradicted my delivery

25   note.  Here's what happened.

1    Q.  Let me ask you what do you understand him to have said.

2    Why is it wrong?

3    A.  He was trying to say that I never suctioned that baby out

4    until the baby was completely delivered.  My delivery note

5    says exactly the opposite, and my pattern and my habit and my

6    routine is to do it differently, and I documented that I did

7    the delivery.

8        There was three other things going on with Carissa.  One

9    was the fact that she wasn't delivering vaginally.  She was

10   getting fatigued.  She couldn't push that baby out anymore.

11   The fetal heart tones were sometimes category two although

12   around the time of delivery, they were very nice.  What was

13   the question again?

14   Q.  The suction.  You disagree with Dr. Zamore how he

15   characterized it?

16   A.  Because I had a thought that maybe there was potentially

17   what we call a shoulder dystocia.  Dr. Zamore described the

18   shoulders getting stuck.  That is a bad, bad complication.

19       Obstetricians live in fear of that complication.  Babies

20   can be injured due to that complication.  I knew that Carissa

21   had a larger than average baby, and I knew she had pushed a

22   long time without delivering that baby and she was giving good

23   pushing effort.  It wasn't because she was being wimpy.  She

24   was tiring out.  She didn't have anymore energy and the baby

25   wasn't coming out.

1    That in itself makes you up your thinking about maybe this
2    baby is going to get stuck and maybe we have to think about a
3    shoulder dystocia, but if you are asking that one to ten risk
4    assessment, we are up to three or four on this shoulder
5    dystocia issue.
6        So therefore, my risk -- remember my risk on the meconium
7    was a one.  In grading the potential complications, the
8    shoulder dystocia took precedence.  So therefore, I wanted to
9    make sure that the baby's shoulder dystocia was resolved
10   before I managed the baby's airway.
11       When you are delivering a baby, once the head delivers, we
12   grab the baby's head.  We try to get them anterior, the
13   forward-most shoulder delivered first.  Once that shoulder
14   delivers, you are not going to have a shoulder dystocia.  You
15   resolved that.
16       Once I delivered that anterior shoulder -- and I did that
17   using a prophylactic McRoberts Maneuver.  It's a very simple
18   maneuver.  You position the mother's legs a little bit
19   different in order to expedite delivery.  It's very benign.
20   It hurts nobody and it may help.  I do that on most of my
21   deliveries.  Our labor and delivery nurses know that we should
22   have two nurses in there for all of Dr. Dumpe's deliveries
23   because he so routinely does the McRoberts Maneuver which
24   takes a nurse on each leg.
25       Once I knew that potentially very serious problem was not

1    going to be an issue, before I delivered the rest of the baby,

2    I suctioned out the baby's nose and mouth.  That's documented

3    on my delivery note.

4        Then I delivered the other shoulder, the rest of the baby,

5    and I bulb suctioned the nose and mouth going above the

6    standard of care for meconium management, and having known

7    that I resolved this very potentially bad problem, but I did

8    it prophylactically.  I did aggressive preventive measures so

9    we did not have a problem with shoulder dystocia.

10        Dr. Zamore said you wouldn't do a McRoberts Maneuver

11    unless you had a shoulder dystocia.  That is wrong.  I do a

12    McRoberts Maneuver all the time.  Why not do a simple

13    preventive measure instead of waiting until you have a baby's

14    shoulder stuck and trying to resolve it?

15    Q.  That's not just something limited to this case.  You do

16    that in all your cases?

17    A.  A lot of them.  If you have a mom who this is their fourth

18    baby and a six pound baby coming out, I don't do a McRoberts

19    Maneuver.  That baby is going to deliver very easily.

20    Q.  Dr. Zamore made some comment about the size of Carissa and

21    the size of the baby.  Do you have any comment on that?

22    A.  Yeah.  Dr. Zamore said that with her light weight, short

23    stature and a potentially large baby, that that was a risk

24    factor and it was.  It was.

25        What Dr. Zamore should have told you is that on the first

1    prenatal visit when we were doing our pelvic exams and our

2    tests and cultures, one thing we do is called a clinical

3    pelvimetry.  We assess the diameter of the woman's pelvis to

4    see if she has adequate room to deliver a normal size baby,

5    and what we found out, and any obstetrician that's practiced

6    for any length of time will tell you, the size of the woman

7    does not correlate to the size of the pelvis.

8        We have -- some of the smallest pelvises I've found are in

9    some enormous women, and vice versa, and Carissa's pelvimetry

10   showed her to have a perfectly normal pelvis.  She had a large

11   normal baby.  Eight-seven is a pretty good sized baby, but

12   that's sort of in the large normal range, but because we knew

13   that baby was not small, we took again some preventive

14   measures to prevent the shoulder dystocia, including I did an

15   episiotomy.

16       I tell our residents I never want to see I had a shoulder

17   dystocia and be proud of the fact you delivered her without an

18   episiotomy.  Those two things don't go together.  If you are

19   risking a shoulder dystocia, make sure you have all the room

20   you can to not damage the baby on delivery, including

21   episiotomy, and that's why that was done.

22   Q.  What does it say the baby was delivered vaginally as it

23   relates to the size of the baby versus size of mother?

24   A.  I can tell you I hope Carissa doesn't have any bigger

25   babies in the future, because I had to use the vacuum

1    extractor to deliver the baby.  That means she needed extra

2    help.  That was a combination of her fatigue, which was real,

3    and the size of the baby, which was real, but she had -- if

4    you look at the report, she had advanced that baby to what we

5    call a plus three station.

6        If you have been involved in a delivery, there is a time

7    where you can see the baby's head starting to protrude.  It's

8    called crowning.  When it starts to do that, that's plus three

9    station.  That's how low this baby was.

10       Therefore, you could very safely apply an instrument like

11   a vacuum extractor, very quickly and easily, and my thought

12   was most of the issue was her fatigue.  That's what I could

13   help her with with that vacuum extractor.

14       If there's a true problem with a fetal size and pelvic

15   size, you can get yourself into trouble with that vacuum

16   extractor by creating a shoulder dystocia.  But I thought my

17   judgment at the time was that the bigger issue was her

18   fatigue, not the size of the baby, and in retrospect after

19   seeing that it resolved with the interventions that I

20   employed, that was true.  She could deliver this baby

21   vaginally, and therefore, we saved her the risks and the

22   trauma and the recuperation of what other people might say you

23   shouldn't put the vacuum extractor.  You should do a cesarean

24   section.

25       There's -- we would have upped her risk dramatically, and

1    by the way, that would have done nothing for the outcome for

2    Kendall.

3    Q.  I covered some of this with Dr. Zamore as it relates to

4    symptoms and signs of any infection.  Are you aware of any

5    signs or symptoms of infection prenatally with Carissa?

6    A.  Before labor and delivery?

7    Q.  Right.

8    A.  No.

9    Q.  How about during labor and delivery?

10   A.  Well, even before, and the question is where did E. coli

11   come from?  A lot of women -- some women who end up having

12   that diagnosis had a bladder infection, had a kidney infection

13   that was E. coli, and just theoretically, maybe that's where

14   it came from.  Nobody knows the answer to that question where

15   it comes from.

16       To my recollection, she has none of that during her

17   prenatal course.  In labor and delivery, there are fairly

18   classic signs of infection.  Fever, she didn't have that.  By

19   the way, the slight elevations in temperature that they

20   mentioned, imagine being in labor, my temperature goes up that

21   high when I play basketball because you are just exerting

22   yourself.  In labor, you are exerting yourself, your

23   temperature goes up a little bit.  That's almost universal

24   that there's a bump in temperature.  As Dr. Zamore said, there

25   is no fever at all in this situation.

1    You get fetal tachycardia.  That's an increase in the

2   baby's heart rate.  Dr. Zamore mentioned that the normal heart

3   rate is from 110 to 160 beats per minute.  The issue with

4   Kendall is her baseline heart rate was 150 beats per minute.

5   It doesn't take a whole lot of acceleration to get above that

6   normal level of 160.  That gap that he described 110 to 160

7   beats per minute is what we call the 95 percent confidence

8   interval.  95 percent of normal kids will be in that normal

9   range.  Five percent of kids live above or below that and are

10  perfectly normal kids.

11   In Kendall's case, the fact that this creeped above 160

12  beats per minute a few times, and it does if you look on the

13  strip, that is expected when your baseline is at 150 beats per

14  minute which is in the normal range.

15   You also -- the fluid that is leaking out during labor and

16  delivery can become very foul smelling if there's an

17  infection.  There was no sign of that whatsoever.  The other

18  thing that can happen is uterine tenderness.  You can't

19  ascertain that once you have an epidural in place.  You can't

20  feel her belly and determine whether her uterus is tender or

21  not.  You lose that sign when you put an epidural in place.

22   Mom's heart rate too high is another issue.  Those are the

23  general things you look for for fever in labor, and again, we

24  were seeing none of those.

25  Q.  Again, looking back to those risks that we talked about on

1   the continuum, I wanted to follow up and say for any of those
2   risks, the meconium, the suctioning, the moving of the baby so
3   there was no shoulder dystocia, did any of them, in your
4   opinion, require you to reach out to a pediatrician and say I
5   need you to be here because something might happen?
6   A.  I appreciate that question, because Dr. Zamore suggested
7   that because I did a vacuum extraction, a pediatrician should
8   be there.  The assessment of the adequacy of Carissa's pelvis
9   and the health of the baby that we are about to deliver are
10  two separate evaluations.
11      I knew I was going to deliver a baby with a tight fit, but
12  I could tell by the fetal heart rate pattern that we were
13  about to deliver a healthy baby through a tight fit, and
14  therefore, that's why the pediatrician is there to take care
15  of a potentially unhealthy baby, and I knew we weren't going
16  to get that.
17  Q.  You were asked by Mr. Price, if something might happen,
18  shouldn't you have somebody there.  Do the policies in your
19  practice, do you call a pediatrician on what might happen or
20  what symptoms tell you are likely to happen?
21  A.  Yeah, the latter.  As I mentioned, when I answered
22  Mr. Price's question, we don't do things about what might
23  happen.  Every labor patient would be a ten out of ten in all
24  those categories if you used that philosophy, because
25  something might happen in every labor and delivery, and

1    believe me, our specialty is one of those that has been

2    described as hours of boredom punctuated by moments of sheer

3    terror.  All of those things can happen all of a sudden, but

4    there are those hours of boredom where you can make good solid

5    assessments as to what is the risk evaluation here, and we had

6    that opportunity with Carissa, and the evaluation was that she

7    was not at high enough risk in any category to call a

8    pediatrician.

9    Q.  I don't have any other questions.  I was talking to my

10   co-counsel.  He indicated that you may have misspoke.  You

11   said you delivered the baby and it died a day later.  When you

12   were talking about Kendall, the baby died six hours later.

13   A.  No.  I said I learned about it a day later.

14   Q.  We misheard.  Thank you.

15   A.  I was on call until 7:00 or 7:30 that morning.  She

16   delivered at 5:20, I believe.  So two hours later when the

17   baby was still perfectly healthy, I was off duty, and believe

18   me I left the hospital.  Like you said, I had been on duty

19   since evening of Friday, and I get Monday off if I do the

20   weekend on call.  Monday, I don't know what I did, but I

21   probably recreated somehow and came back to make rounds the

22   next day thinking I'm going to say congratulations to Carissa,

23   glad everything went well, and I find out things didn't go

24   well at all and that her baby died, and I wasn't there to

25   learn that until the next morning.

1    Q.  Once you deliver the baby in this case, you would have

2    sewn Carissa back up, where do you go?  What do you do after

3    that?

4    A.  I have paperwork to do.  Carissa had -- another thing I

5    had to manage, by the way, she bled a little extra after

6    delivery, and we managed that, so that might have taken an

7    extra minute or two.  Her episiotomy was not only a

8    episiotomy.  It was a large episiotomy.  I had to do quite a

9    bit of repair.  That would take on the average of ten to 15

10   minutes.  Then I had paperwork to do which probably took ten

11   more minutes.

12   Q.  Who then -- once you pull the baby out and hand the baby

13   to the nursing staff to do the Apgar and delivery assessment,

14   does the nursing staff then take care of the management of

15   that baby from that point forward?

16   A.  Yes.

17   Q.  If there are issues that arise, say, while there's

18   something in the delivery room, not this case but some other

19   cases, would you be called back in, or do they call a

20   pediatrician at that point?

21   A.  Depends on who the problem is with.  If it's mom, it's me.

22   If it's the baby, it would be the pediatrician.  As was

23   mentioned before, I am neonatal resuscitation certified as

24   well, but I hardly ever get to use those skills, because,

25   first of all, the nurses are so good at it.

1      Dr. Zamore said a neonatal resuscitation trained nurse is

2   not the same as a pediatrician, I agree with that, with their

3   breadth of training, but with their initial evaluation of a

4   newborn, it is equivalent.  Neonatal resuscitation is training

5   specifically for that first half hour of life and that's the

6   training that pediatricians have too.

7      They don't know a whole lot more about the first half hour

8   than the nurses do.  In that brief window, they are almost a

9   pediatrician, although Dr. Zamore's comment is entirely

10  correct.  Their broader training is not that of a

11  pediatrician, but the reason I'm certified is every once in a

12  while, if I'm done with the mom and they are still

13  resuscitating a newborn and they need an extra pair of hands,

14  it's good to have somebody that's resuscitation trained and

15  step over there and be an extra pair of hands.  That might be

16  me.

17  Q.  If you would have called a pediatrician in this case, 4:30

18  in the morning, pediatrician was there, in your experience,

19  what would the pediatrician have to have done there once the

20  baby is delivered?

21  A.  I can tell you exactly what they would have done.  This is

22  not an unusual situation.  We call a pediatrician because of

23  our ascertaining of risk factors is such that a pediatrician

24  should be there in one of those categories we talked about.

25      If we ascertained a pediatrician should be there and it

turns out that potential complication we are anticipating did
not happen, that is what happens most of the time.  The
pediatrician comes in.  They look at the baby.  The nurses are
doing the initial resuscitation.  The pediatrician does this
(indicating), turns around and leaves, because they say I
didn't need to be there.  They don't argue about that.  They
are not mad about that.  They are more than happy to come in
and attend these deliveries, so it's not -- I don't risk their
wrath by calling.  That's not why I don't call a pediatrician,
but when they walk in the door and have to walk back out the
door and do absolutely nothing, they are happy.  They have a
healthy baby, and that's what would have happened in this
delivery.

          THE COURT:  Before we have Dr. Dumpe questioned by
Ms. Koczan, I think we should take our afternoon break, so at
this time, ladies and gentlemen, we're going to break.  We'll
resume at five to 3:00.  Once again, continue to keep open
minds.  No talking.  No research about this case.
Mr. Galovich, if you'll escort our jurors.

          (Jury excused.)

          THE COURT:  Doctor, you may step down.  During this
break since you are under oath and not completed your
examination, it would not be appropriate to discuss your
testimony with anyone.

          MR. COLVILLE:  Your Honor, do I need to move this

1    into evidence or is it, by its very nature, demonstrative?

2         THE COURT:  It's demonstrative.  It's already been

3    noted.  Mr. Galovich will take it.

4         (Recess taken.)

5         (Jury present.)

6         THE COURT:  Doctor, you may take the stand.

7    Ms. Koczan, any questions of the doctor?

8         MS. KOCZAN:  Yes, Your Honor.

9                        CROSS-EXAMINATION

10   BY MS. KOCZAN:

11   Q.  Good afternoon, Dr. Dumpe.  I'm going to go back for just

12   a few moments here and talk about before the delivery.  We

13   heard here about there being category two, and I think you

14   said just a few moments ago that it went back to a category

15   one; is that correct?

16   A.  Periodically it did, yes.

17   Q.  Before the delivery, right before the delivery, was she a

18   category one?

19   A.  Yes.

20   Q.  Based upon what you saw on the strips, and this is

21   throughout the labor up through the time of delivery, under

22   the hospital policies and good medical practice, was there any

23   reason to call a pediatrician because of what you saw on those

24   strips?

25   A.  No.

1   Q.  Was there any reason for the nurses to advocate with you

2   that you should call a pediatrician?

3   A.  No.  The nurses sometimes make the error of alerting me to

4   strips that aren't that worrisome.  They are taught to err on

5   the side of caution so they do, and when reviewing this, they

6   may have told me about a few minor abnormalities on the strip

7   because they have to.  They are obligated to report them to

8   me, but never was there any part of the strip that I would

9   have said, gee, you should have notified me and you didn't.

10  Q.  Was there anything, and this is again up through delivery,

11  on the strip that would have required them, them personally,

12  Maria or Katherine Gantz, the other nurse that was in there,

13  to pick up the phone and call a pediatrician?

14  A.  No, and I'm friendly enough with those nurses that they

15  would not hesitate, if they thought I was making a mistake and

16  I said no pediatrician and they thought there should be one,

17  there would be no hesitancy on any of their parts to say I

18  think we should.  As soon as they say that, I would have

19  called a pediatrician.  Again, erring on the side of caution.

20  They would not be hesitant to do that and they never did.

21  Q.  Now, I want to switch gears for a minute and ask you about

22  the meconium.  The meconium that you saw when you broke

23  Carissa's water somewhere around 6:30 p.m., the meconium that

24  was reported to you thereafter, and this is again up through

25  the time of delivery, not yet delivery, is the fact that there

1    was meconium present, what you have described, would that

2    meconium, with that being present, would that require a

3    pediatrician to be present under the hospital policy?

4    A.  No.

5    Q.  And would it be, as Dr. Zamore said, good medical practice

6    to have a pediatrician there because of the meconium that you

7    observed?

8    A.  No.

9    Q.  And was there any reason for the nursing staff to advocate

10   with you to call a pediatrician because of the meconium that

11   you saw?

12   A.  No.

13   Q.  Was there any reason for the nursing staff themselves to

14   call a pediatrician because of meconium?

15   A.  No.

16   Q.  So there wasn't because of the strips and there wasn't

17   because of the meconium, correct?

18   A.  Correct.

19   Q.  And those are the only two things that were present before

20   the delivery, correct?

21   A.  Yes.

22   Q.  Now, let's switch gears and talk about the delivery.

23   During the delivery, it became apparent to you that Carissa

24   was fatiguing, correct?

25   A.  Yes.

1    Q.   And you would --

2    A.   Actually, that's usually a notification from the nurses.

3    Maria Hendershot would be at her bedside minute by minute

4    coaching her through the pushing process.  It's usually the

5    nurse's ascertainment that progress is not happening and

6    mother is progressively fatiguing.

7        It's usually their clinical judgment that those two things

8    are happening, and I usually don't question that either

9    because they are very good at that, but what I might do, which

10   I believe I did in Carissa's case is let's try this for 30

11   more minutes or maybe I put the option to Carissa and she said

12   could I try this for 30 more minutes.  I don't know which

13   happened, but I think the documentation was that I then

14   allowed 30 more minutes to see if she would deliver before I

15   decided to help her out with the vacuum extractor.

16   Q.   First and foremost, is a vacuum extraction, is that

17   considered an operation?

18   A.   It's considered an operative vaginal delivery, as

19   Dr. Zamore said.  Yes, it's in that category.

20   Q.   And the fact that you had to do the vacuum extraction,

21   under the hospital policy, does that require you to call a

22   pediatrician?

23   A.   No.

24   Q.   Does that require the nurses to call a pediatrician?

25   A.   No.

1    Q.  The fact that a vacuum extraction was done, does that

2    require the nurses to advocate with you to call a

3    pediatrician?

4    A.  No.

5    Q.  Or after the fact, after the vacuum extraction is done,

6    does that require them to call a pediatrician?

7    A.  No.

8    Q.  Why is that?

9    A.  There's nothing for the pediatrician to do.  If a baby has

10   a true shoulder dystocia, for instance, those babies can be

11   somewhat compromised if it takes us too long to get the baby

12   out, but that didn't happen.  I didn't expect that was going

13   to happen.  It didn't happen.  I planned on doing preventive

14   measures.  I did.  They worked.

15       Other than that, there's -- for any other complication we

16   are talking about, there would be nothing for the pediatrician

17   to do.  Again, they would give me that universal sign of why

18   am I here.  I'll see you.  I'm glad we have a healthy baby.

19   Have a good day.

20   Q.  The next issue that Dr. Zamore talked about was this

21   shoulder dystocia that wasn't, correct?

22   A.  Yes.

23   Q.  There was no shoulder dystocia?

24   A.  Correct.

25   Q.  The fact that you prophylactically did a McRoberts

1    Maneuver to prevent a shoulder dystocia, does that require a

2    pediatrician to be called by you?

3    A.  No.

4    Q.  Does it require the nurses to call a pediatrician?

5    A.  No.

6    Q.  Should they advocate with you to call a pediatrician?

7    A.  No.

8    Q.  What about after the fact, after it's all over and done

9    with and you delivered the baby without a shoulder dystocia,

10   would the fact that you did the prophylactic McRoberts

11   Maneuver, would that require them to call the pediatrician?

12   A.  No.

13   Q.  Once you delivered the baby, and just to go back and sum

14   that all up, the meconium didn't require a pediatrician to be

15   called; the fact that there were those category two, category

16   one tracings didn't require a pediatrician to be called by

17   either you or the nurses; the fact that you did a vacuum

18   extraction -- and we didn't include episiotomy.  The

19   episiotomy wouldn't require a pediatrician either; is that

20   correct?

21   A.  Correct.

22   Q.  And the fact that you prevented a shoulder dystocia, none

23   of that would require you to call a pediatrician; is that

24   correct?

25   A.  That's correct.

1    Q.  And is that because there wouldn't be anything for the

2    pediatrician to do?

3    A.  Yes.

4    Q.  Now, after the baby is born -- you've testified that after

5    Kendall was born, she was handed over to the nurses, correct?

6    A.  Correct.

7    Q.  And they began doing their assessment.  And although you

8    weren't involved in the assessment, did you generally know

9    what was going on with this baby?

10   A.  I don't know.  That far retrospect, I don't know.

11   Q.  Is it something that the nurses will generally tell you?

12   For example, if there was a problem with the baby, is that

13   something that they would generally tell you?

14   A.  No, not necessarily, because they know they're every bit

15   as qualified to resuscitate a baby as I am.  If they needed my

16   help in doing so, yes, they would probably grab me or grab a

17   third nurse to help them if they needed extra hands, but

18   commonly, routinely, if I'm doing something with mom and I

19   look over and they seem to be hovering over the baby a little

20   bit more than they should, which is not in this case, it's

21   just a general discussion, I may ask them how is the baby

22   doing, knowing that the mom would like to know that.

23       So sometimes in their resuscitation, one thing they

24   sometimes forget is keeping mom up to date, and maybe I remind

25   them of that, but that's really the only involvement I have.

1  Q.  Do you have any recollection of doing that in this case?

2  A.  No.

3  Q.  Do you have any recollection of hearing from Maria

4  Hendershot or Katherine Gantz before you left the delivery

5  room that day that there had been any issue with this child?

6  A.  I had that faulty recollection that maybe might have been

7  taken out of there during the delivery process, but I was

8  probably mixing her up with some other delivery.  That's not a

9  rare thing.  We don't hesitate to do that, but apparently I

10  have a faulty recollection that was done, because everybody

11  else is testifying that knows more than I do that they did not

12  do that.

13  Q.  You've seen the record and the record doesn't support your

14  faulty recollection; is that correct?

15  A.  Correct.

16  Q.  The baby is born.  We've seen, it's been put up on the

17  screen several times that the baby had an Apgar of six at one

18  minute and eight at five minutes.  Is that a healthy baby?

19  A.  Yes.

20  Q.  You have been in the courtroom and you saw Maria's initial

21  evaluation?

22  A.  Yes.

23  Q.  Is that a healthy baby?

24  A.  Yes.

25  Q.  Is there anything that a pediatrician would have added

1    with an Apgar of eight and that normal assessment?

2    A.  Not at that time, no.

3    Q.  Was there any reason for the nursing staff to call the

4    nursery or call a pediatrician at that point?

5    A.  Based on what I see from the documentation, no.

6    Q.  Was there any reason for them to bring the baby down to

7    the nursery at that point as opposed to allowing it to bond?

8    A.  No, I didn't see any evidence that would be the case.

9    Q.  This bonding, we've heard a little bit about that.  Why is

10   that done?

11   A.  The pediatric community seems to think that's extremely

12   important.  There are actually physical benefits to the baby.

13   I can't detail them.  I'm not a pediatrician.  And to tell you

14   the truth, I have my doubts as to whether that's true, but is

15   it a nice thing?  100 percent of people in this room would say

16   yes.  To have mom have the baby in mom's arms, put them in

17   dad's arm, let the rest of the family come in.  That is a

18   joyous time, absolutely joyous time, and we're not animals.

19   We're not like little ducklings that imprint on our mothers,

20   but there is something about mom taking that baby, holding a

21   baby and breastfeeding immediately and those type of things.

22   I think there's a tremendous emotional benefit even if there's

23   no physical benefit.

24   Q.  That is the policy and procedure at Heritage Valley to

25   allow the moms to bond with the baby?

1    A.   Absolutely.

2            MS. KOCZAN:  Thank you.  That's all.

3            THE COURT:  Any additional examination, Mr. Price?

4            MR. PRICE:  Yes, just a few little things.

5                       REDIRECT EXAMINATION

6    BY MR. PRICE:

7    Q.   So this bottle clear never applied, correct?

8    A.   Correct.

9    Q.   So this one is out.  This bottle is the next colored?

10   A.   Yes.

11   Q.   And this is what it started with, correct?

12   A.   Yes.

13   Q.   But it changed so that's out, right?

14   A.   Yeah.

15   Q.   At the time of delivery, it was this color, correct?

16   A.   There's a continuum there as well.  I'm not telling you

17   this color versus that color but somewhere maybe in between

18   the two.

19   Q.   Okay.  You are saying it's not this color?

20   A.   No, never.

21   Q.   And you just told us that you have a faulty recollection

22   about what happened to Kendall five minutes after birth,

23   correct?

24   A.   Correct.

25   Q.   But you are saying that there is no way you have any

1    faulty recollection as to the consistency of the meconium,

2    correct?

3    A.  Correct, because I documented it.

4         MR. PRICE:  That's all I have.

5    A.  At the time of the event, I documented it.  And I'm

6    wondering why.  I would ask the question why -- what

7    motivation do I have to undergrade the meconium?  If the

8    meconium is thick, there's no reason for me to not tell you

9    that, not to tell everybody that.  I want the baby to have the

10   best care possible, so I'm wondering if people are saying

11   maybe you undergraded this.  There's no motivation for me to

12   do that.

13       This is prospective charting.  This is not something I

14   look back on the record and say, gee, this is going to court.

15   Maybe I should change this.  Never.  This is something that

16   happened before the fact.  I have no motivation to lie about

17   that.

18         THE COURT:  Mr. Colville, anything further?

19         MR. COLVILLE:  No.

20         THE COURT:  Ms. Koczan?

21         MS. KOCZAN:  Nothing.

22         THE COURT:  Doctor, you may step down.  Mr. Price,

23   your next witness.

24         MR. PRICE:  Nurse Maria Hendershot.  For some

25   housekeeping, the PowerPoints for Dr. Dumpe's testimony.

1          THE COURT:  This is another plaintiff demonstrative,

2     Mr. Galovich.

3          THE CLERK:  Yes, Your Honor.  Please step forward,

4     miss.

5          THE COURT:  You have to approach my deputy to be

6     sworn.

7          THE CLERK:  Please state and spell your name for the

8     record.

9          THE WITNESS:  It's Maria Hendershot.

10         THE CLERK:  Spell, please.

11         THE WITNESS:  M-A-R-I-A, H-E-N-D-E-R-S-H-O-T.

12       (Witness sworn.)

13         MARIA HENDERSHOT, a witness herein, having been first

14    duly sworn, was examined and testified as follows:

15                        DIRECT EXAMINATION

16    BY MR. PRICE:

17    Q.  Good afternoon, Nurse Hendershot.  How are you?

18    A.  Good afternoon.

19    Q.  Can you please state your full name and your business

20    address?

21    A.  My full name is Maria Annette Hendershot, and you said my

22    address?

23    Q.  Business address, where you work.

24    A.  I work at Heritage Valley Beaver.  Do you need the address

25    for that?

188

1    Q.  No.  That's good enough.

2         MS. KOCZAN:  Maria, can you pull the microphone a

3    little closer.

4    Q.  You have been a labor and delivery nurse at the time of

5    this delivery for about 30 years?

6    A.  That's correct, sir.

7    Q.  And most of the work that you did was at Heritage Valley

8    Beaver?

9    A.  All of it, yes, sir.

10   Q.  Now, we are here to talk about your shift and your shift

11   was from 7:00 p.m. on October 12 through 7:00 a.m. on October

12   13, correct?

13   A.  That's correct, sir.

14   Q.  You were the labor and delivery nurse who took care of

15   Carissa for the final hours of her labor through delivery and

16   afterwards?

17   A.  Yes, sir.

18   Q.  Okay.  You can see in front of the court reporter there

19   are Gatorade bottles and some other bottles.

20        Do you see that?

21   A.  Yes, sir, I see those.

22   Q.  These were used by Dr. Dumpe, and I just wanted to get

23   your confirmation of things.  Whenever you are taking care of

24   Carissa, you were present whenever -- you weren't present

25   whenever Dr. Dumpe ruptured the membranes?

1    A.  No, sir.

2    Q.  You didn't come on shift until a little later?

3    A.  That's correct, sir.

4    Q.  At that point, you documented that she had thin meconium?

5    A.  Correct.

6    Q.  And would you agree the thin meconium was about the color

7    of this --

8    A.  Yes, sir.

9    Q.  -- Gatorade bottle which is the second one on the

10   government exhibit of the Gatorade bottles.  Now, you took

11   care of Carissa from 7:00 p.m. all the way through, we'll take

12   until the 3:40 in the morning that she was pushing, correct?

13   A.  Yes, sir.

14   Q.  Now, were you caring for other mothers at that time?

15   A.  No, sir.  We only do one labor room patient at a time.

16   Q.  Do you help if there are other nurses or other mothers

17   that need help?  Would you, in the middle of caring for

18   Carissa, have to run in for another delivery?

19   A.  Sometimes we have to, yes, sir.  Very rarely though.

20   Q.  Dr. Dumpe mentioned that there was another delivery he did

21   on October 12 around 11:00.  Do you have any recollection as

22   to whether you participated in that?

23   A.  I don't think I did, sir, no.

24   Q.  Did you see the meconium change color as the labor

25   progressed?

1    A.  No, sir.  It stayed a thin meconium the entire time, yes.

2    Q.  At the time of delivery, did it change?

3    A.  No, sir.

4    Q.  So it's your testimony that at the time of delivery, the

5    color is the same lime green bottle that it started out with?

6    A.  Yes, sir.

7    Q.  And again, for purposes of the record, that is the second

8    bottle in from the left on the government's exhibit.

9        Just to confirm, at the time of delivery, you are saying

10   that you didn't see any type of darker green meconium fluid?

11   A.  No, sir.

12   Q.  Now, Kendall was a larger baby at eight pounds, seven

13   ounces?

14   A.  Yes, sir.

15   Q.  And Carissa had a little bit of difficulty through pushing

16   and there was the need for the vacuum extractor?

17   A.  Yes, sir, there was.

18   Q.  And were you present whenever Dr. Dumpe delivered the baby

19   and suctioned the baby's mouth?

20   A.  Yes, sir, I was.

21   Q.  And do you remember Dr. Dumpe suctioning any meconium out

22   of her mouth?

23   A.  I do not remember that.

24   Q.  The baby -- did you go over to the isolette, or did you

25   stay with Dr. Dumpe and the mom?

1    A.  I was at the isolette with another RN that I work with,

2    and Dr. Dumpe did bring Kendall to the isolette directly after

3    delivery and then we went ahead and did what we needed to do

4    to take care of her.

5    Q.  And part of your assessment of Kendall was her breathing

6    and how she was adapting to life, correct?

7    A.  Yes, sir.

8    Q.  I'm going to show you, if we can pull up Exhibit 29, and

9    this is a picture of Kendall in the isolette after birth,

10   correct?

11   A.  Yes, sir.

12   Q.  Now, here's what I'm going to do.  I showed these to the

13   attorneys for the defendants.  I actually have the actual

14   pictures here.

15   A.  I'm allowed to look at -- this is what I'm seeing here?

16   Q.  It's the same picture.  The pixilated -- so take a look at

17   the actual picture, because the picture on the screen can be a

18   little pixilated, so what I'm going to do is I'm going to ask

19   that this picture be included with the actual exhibits so the

20   jury can see the picture.

21        I only have three of them here, but this is a picture of

22   Kendall after birth, correct?

23   A.  Yes, sir.

24   Q.  And she is on the isolette, and what you can see is that

25   she has -- her cord is cut and it's on the -- it's clamped,

1    correct?

2    A.  Correct.

3    Q.  Now, the first thing that I noticed was that cord looks

4    very green?

5    A.  Yes, sir.

6    Q.  And that's normal?

7    A.  That's very normal for a thin meconium, yes, sir.

8    Q.  For what?

9    A.  For the meconium, yes.

10   Q.  So Kendall had -- she had meconium staining?

11   A.  Correct.

12   Q.  And she was basically in, I don't want to say a meconium

13   bath.  That's not a good way to put it, but she was in the

14   amniotic sac and she had meconium for hours, and it was still

15   in the sac coming out as labor was progressing?

16   A.  Yes, sir.

17   Q.  So through the night, you were changing her pads, and you

18   were, as meconium would leak out, you would change the pads,

19   correct?

20   A.  Yes, sir.

21   Q.  And at certain points in the night, do you remember

22   whether Matt was there and whether or not he saw what was on

23   the pads or anything like that?

24   A.  I don't remember that.  I'm sorry.

25   Q.  So if Matt was there and he remembers what it was, would

1    you rely on his memory?

2    A.  No, sir, I would not.  I mean, I know if I charted thin

3    meconium on her peri care, that's what was there, yes, because

4    it continues to come out throughout the entire labor, and when

5    I go to clean the patient, I try to do it with nobody else

6    staring, and I do throw the towel in the laundry and clean her

7    up, so there was never any thick meconium whatsoever.  It was

8    always just very thin colored fluid.

9    Q.  Okay.  And I know this picture on our screen is not that

10   good because of the lights, but taking a look at it, and I

11   know we talked about this because again I met you before.  We

12   took a deposition, right?

13   A.  Yes, sir, you did.

14   Q.  I showed you these pictures, and I don't know if I showed

15   you the actual pictures.

16   A.  No, I did not see them, sir.

17   Q.  But basically, in the folds of the legs --

18   A.  Yes, sir.

19   Q.  -- I asked you whether or not that was meconium, and you

20   said it is not?

21   A.  No.  It's not, sir.  It's vernix.

22   Q.  You think it's vernix?

23   A.  Yes, sir.

24   Q.  Vernix is a white substance that most babies have while

25   they are in utero?

1    A.  That's correct.

2    Q.  And vernix is, to give the jurors a little understanding,

3    is an oily substance that helps the baby so its skin doesn't

4    break down?

5    A.  Yes, sir.

6    Q.  However, most babies whenever they reach their due date of

7    40 weeks, most of the vernix -- if you deliver a baby at 34

8    weeks, it's going to have a lot more vernix than if you

9    deliver a baby at 40 weeks?

10   A.  That is correct.

11   Q.  In this case, we know that whenever Kendall was born, she

12   had meconium, correct?

13   A.  That is correct.

14   Q.  But I just want to understand that you are saying that,

15   whenever the jury looks at these pictures, the material that

16   is in the folds of the legs, on the knees, in the perinatal

17   area is vernix and not meconium?

18   A.  Yes.  That is correct.  That is vernix.  You'll see vernix

19   on 40 week babies also.  Sometimes just not as much.  Not

20   covered from head to toe.

21   Q.  And was Kendall covered in head to toe in vernix?

22   A.  It just looks like the lower half from this picture, and

23   you can kind of see some in the underarm.  Other than that,

24   she may have been dried at this time also.

25   Q.  But vernix is more of an oily substance?

1    A.   It's very, very normal for babies to have that at birth.

2    It's not a bad thing at all.  Very normal.

3    Q.   It's an oily white substance?

4    A.   It's like a lotion is how I describe it to my patients.

5    Q.   On the other hand, meconium with particulate matter is

6    more gritty, correct?

7    A.   Correct.

8    Q.   And it's more sticky and chunky?

9    A.   That's correct.

10   Q.   I'll show you another picture, Exhibit 31.  If we could

11   pull up Exhibit 31.  Again, this is another picture of Kendall

12   after birth, and again, just for certainty purposes, from your

13   review of this picture, you are saying that none of the

14   material that is on Kendall's right leg, left leg, eyebrows,

15   on the arms, none of that is meconium?

16   A.   No, sir.  It's vernix.

17   Q.   The last one I'll show you is Exhibit 34, if you can pull

18   that up.  Exhibit 34 is a picture of Kendall on the isolette

19   being resuscitated, correct?

20   A.   I would not call that resuscitation.  It looks like they

21   were suctioning her out a little bit, yes.

22   Q.   In the middle of the picture, I know it's tough because we

23   have pixilated pictures here, but that's your hands or

24   Nurse Gantz's hands along with the tube that is down Kendall's

25   throat?

1    A.   That's right.   The suction catheter.

2    Q.   That catheter is put down there because you heard

3    moistness in her lungs?

4    A.   Yes, sir.

5    Q.   And you heard moistness in her lungs because there was

6    meconium deep in her lungs, correct?

7    A.   I would say that most babies are born with moist lungs,

8    because when they come down through the vaginal canal, they do

9    take in a lot of mucus, so we do this for every baby, whether

10   it's meconium or not.

11   Q.   You do deep tracheal suctioning on every baby?

12   A.   Sometimes we do, if their lungs are moist, because we

13   assess them at delivery.   If they sound moist like they have

14   taken in a lot of mucus, then we will do some suctioning.

15   Q.   I just want to understand.   It's not every baby you do?

16   A.   No, sir.   It's only the babies that sound like they need

17   that.

18   Q.   Right.   But with regard to Kendall, the sole purpose for

19   doing deep tracheal suctioning was for meconium?

20   A.   That's correct.

21   Q.   Again I know this may seem obvious, but Kendall would have

22   stopped ingesting meconium after birth?

23   A.   That's correct.

24   Q.   So all the meconium that she had in her body was present

25   from what she had ingested in utero?

1  A.  Correct.

2  Q.  Now, you didn't believe that Kendall had any type of

3  massive aspiration of meconium?

4  A.  No, sir.

5  Q.  You did your assessment, I know we've all seen it, and the

6  assessment was Apgars of six and then eight in five minutes?

7  A.  That's correct.

8  Q.  Can we go to -- let me ask you this first:  You finished

9  your assessment and then wrapped the baby up and gave it to

10 the family in about ten minutes after birth?

11 A.  That could be possible, yes.

12 Q.  After that, your job was to take care of Carissa, correct?

13 A.  Yes, sir.

14 Q.  Is your job also to take care of the baby?

15 A.  Yes, sir.  My job and also the other nurse that's involved

16 in the room with me.  We do share roles there.

17 Q.  You'll agree that from 5:30, after the delivery note was

18 prepared, until Kendall gets to the nursery, there is no

19 medical record, no notation about how Kendall was doing,

20 correct?

21 A.  There's the initial assessment when the baby is born and

22 everything was very normal, and so then we do keep the babies

23 in the mom's room for up to two hours after delivery for

24 bonding and for the family to see the baby.

25 Q.  But my specific question was --

1    A.  I'm sorry.

2    Q.  You charted and you have medical records of your

3    assessment of Carissa --

4    A.  Yes, sir.

5    Q.  -- from 5:30 until 7:00?

6    A.  Yes, sir.

7    Q.  There are no records of any assessment of Kendall after

8    the initial delivery record?

9    A.  It's just the birth record, correct.

10   Q.  So the birth record, which was done within about five or

11   ten minutes after that, there is no charting from 5:30 until

12   7:00, correct?

13   A.  Yes, sir.

14   Q.  Now, one of the issues in this case is you are charting

15   after 5:30, and you understand that the family, and there's

16   going to be testimony that no nurse came in to Carissa's room

17   from 5:30 until 7:00.  Do you understand that?

18   A.  That is not correct, no, sir.

19   Q.  You deny that?

20   A.  Yes, sir.  I was there every 15 minutes assessing her,

21   yes, and making sure the baby was doing well, yes, sir.

22   Q.  Now, if I understand at this time too, unfortunately at

23   Heritage Valley Beaver, there was also a delivery of another

24   baby who was in distress?

25   A.  I do not know of that, sir.

1   Q.  Because Dr. Jones, we'll get into that a little bit later,

2   but I didn't know if you participated in that delivery or not.

3   A.  No, sir, I did not.

4   Q.  Let's talk about your charting.  So if we could turn to

5   tab 6 -- I'm sorry, tab 2 page 166.  And these are flow

6   sheets, correct?

7   A.  Yes, sir, they are.

8   Q.  And if we take a look, it's for Carissa and this starts at

9   6:00?

10  A.  Yes.

11  Q.  And you start charting, correct?

12  A.  Yes, sir.

13  Q.  So there wasn't any assessment at 5:45.  Your first

14  assessment of Carissa was at 6:00?

15  A.  Right.  The 6:00 started the recovery period.  That's when

16  Dr. Dumpe was finished with what he needed to do with Carissa,

17  yes, sir.

18  Q.  Now, you make a whole bunch of different assessments, and

19  some of these look like you have to judge whether or not --

20  you have to actually talk to Carissa that she has generally

21  purposeful motor response?

22  A.  Yes, sir.  This has a lot to do with the epidural

23  placement.  We make sure that after the epidural is

24  discontinued, that they are able to move their lower

25  extremities before they get up to the shower, so that's a lot

1    of what this is about.

2    Q.  Let me just understand generally.  Are you saying that

3    every 15 minutes, you came in and you actually put your hands

4    on Carissa?

5    A.  Yes, sir, because I do have to assess bleeding.  I have to

6    assess pain.  And I also make sure that she is -- you know,

7    the family is okay, if she has any questions, and we always

8    are checking on the baby to make sure the baby is doing well.

9    Q.  Now, if we go down a little bit further, you have here

10   that she was fully awake at 6:00?

11   A.  Yes, sir.  That's part of a checklist that we have.  It's

12   a recovery room type of record that we use on all of our

13   patients post recovery, and that's something we do check.

14   Q.  And whenever you check, are -- is this you have to go to

15   the computer and you pull up a chart and you check boxes?

16   A.  That's correct, sir.

17   Q.  So if we continue down, you noted that she was pain-free

18   and you have to ask her to find out that, correct?

19   A.  Yes, sir.

20   Q.  You keep going down.  Go to the next page, page 167, and

21   here she complained of pain, discomfort in the perineal area

22   and you applied ice?

23   A.  That's correct, sir.

24   Q.  If we keep going down, you noted where the bed was.  She

25   is not at risk for fall.  Her cardiac and peripheral is within

1    normal limits.  Keep going down.  Respiratory, next page is

2    168.  If we keep going down, you note that there is swelling

3    in the perineal area, swelling at the episiotomy site?

4    A.  Yes, sir.

5    Q.  Keep going down.  And here, the reproductive uterus,

6    uterus consistency, you note, is firm with massage?

7    A.  That's correct, sir.

8    Q.  I assume at that point you have to put your hands on her

9    and feel her --

10   A.  Yes, sir.

11   Q.  -- uterus to make sure everything is fine?

12   A.  Yes, sir.

13   Q.  And then if we continue on to the next page, 169, and this

14   is the perineal care and her care provider, so you gave some

15   care to her?

16   A.  Yes, sir.

17   Q.  Now, here's what I noted, and if we could go back to page

18   166.  Starting at 6:00, whenever you have your entry at 6:00,

19   whenever you made your note at 6:00, you entered it at 7:32,

20   correct?

21   A.  Yes.

22   Q.  And your shift ended at 7:00, so this is after your shift

23   is over, you are entering the records?

24   A.  That's correct.

25   Q.  Here's what I did.  If you continue, just keep looking at

1    this, 7:32, keep going down, go to the next page, 7:32, this

2    is all the 6:00 entry, 7:32.  We are still at 6:00, 7:32 and

3    we go to 6:00, still 7:32.  It's all entered.  Stop right

4    there.

5        I counted it, and at 7:32, you have 48 different entries

6    about how Carissa was doing?

7    A.  Yes, sir.

8    Q.  You are saying that you remembered an hour and a half

9    before 48 different entries about how Carissa was doing?

10   A.  Yes, sir.  Yes, I did.

11   Q.  And then if we continue down at 6:15, you have ten, I

12   counted them, ten entries, and you did that at 7:33, correct?

13   A.  That's correct.

14   Q.  Next page.  At 6:30, 7:39, keep going, 7:41, keep going.

15   Your 6:40 assessment, 7:41.

16   A.  6:45, yes, sir.

17   Q.  6:45 is 7:41 too.  Keep going on to page 171.  We're still

18   at 6:45, 7:41 and your final assessment at 7:00 is at 8:05.

19   That's by another nurse.  You have one entry down here at

20   7:43, correct?

21   A.  Yes, sir.

22   Q.  So all of your entries from 6:00 until 7:30 -- I'm sorry,

23   6:00 and 7:00 are 88 separate clicks, correct?

24   A.  That's correct, sir.

25   Q.  And you did those all 7:32, 7:33, 7:41 and 7:43?

1    A.   That's correct, yes.

2    Q.   We go to tab 6 page 60.  Now, this is -- if we can come

3    down a little bit to the 7:25 one right here.  This is what I

4    want to ask about.  I just want to understand what we are

5    hearing here, and that is that 5:20 when this baby was born,

6    you are saying this baby had good respirations?

7    A.   That's correct.

8    Q.   And you are saying there wasn't any problem with this baby

9    circulating air?

10   A.   No, sir.  I would have taken it to the nursery.

11   Q.   And there was no oxygen -- pulse ox done on this child,

12   correct?

13   A.   Not with me, sir, no.

14   Q.   And the assessment of the respirations was done by you

15   through stethoscope?

16   A.   At initial delivery, yes, sir.

17   Q.   And then for the next hour and a half, you say -- well,

18   the parents, friends, family will all say we had a baby who

19   was crying and just crying way too much for us.

20   A.   Actually, as a labor and delivery room nurse, we welcome

21   crying.  We know that when they are crying vigorously that

22   they are doing very well, and when I found out what happened

23   to this sweet baby, I remember that that baby was really doing

24   very well and crying and everybody on our unit agreed.

25        The nurse that came in to relieve me at 7:00 said that

1    baby is so sweet in there.  It's crying.  What a nice healthy

2    baby.  So we -- that is not respiratory distress.  Vigorous

3    crying is not respiratory distress, sir.  It's not.

4    Q.  Could vigorous -- what you call vigorous crying, but just

5    crying, could that be any type of pain or a struggle, grunting

6    flaring, trying to breathe?

7    A.  There was no grunting or flaring.  That's separate from

8    vigorous crying.

9    Q.  And this is based on your recollection?

10   A.  Yes.  This is based on me going in there every 15 minutes

11   and looking at the situation, yes, sir.

12   Q.  And there is going to be a witness who is going to come in

13   here and say that they were -- the family was so concerned

14   that they sent a cousin out to get a nurse to come in and take

15   a look at the baby.

16   A.  Okay.  I don't recall that.

17   Q.  It wasn't you?

18   A.  Not that I know of.

19   Q.  And the nurse simply said just keep bonding with the baby

20   and there was no check of the baby?

21   A.  Okay.

22   Q.  That wasn't you?

23   A.  No, and if maybe the baby was again crying very

24   vigorously, so that's what -- that's probably what the nurse

25   heard.

1    Q.  And you had mentioned this other nurse, Donna Godecker?

2    A.  That's correct.  She took over at 7:00.

3    Q.  She took over, and I think the way you described in the

4    deposition, we can play the video, she was more surprised,

5    wasn't she?

6    A.  No, sir.  She was very -- she said, wow, that baby is so

7    nice and healthy in that room.

8         I said, actually, you are going to take over for her.  I'm

9    going to take the baby to the nursery.

10        She said, wow, what a nice sound.  She was not concerned,

11   sir, no, sir.  If I felt at any point that there was any issue

12   with that baby, I would have taken it to the nursery.

13   Q.  20 minutes after this conversation, 25 minutes after this

14   conversation that this is a very healthy, vigorous, we love

15   the cry, this is a very good baby, you'll agree that a nurse

16   finally takes the pulse ox and it's 81 percent?

17   A.  I was not in the nursery, so I do not know that.

18   Q.  I'm going to represent to you that 25 minutes after 7:00,

19   Nurse McCrory took the pulse ox, and it's 81 percent.  Is that

20   normal or abnormal?

21   A.  I don't work in the nursery, so I was not there.  That is

22   not my charting, and I can't answer for her.

23   Q.  I know.  I'm not asking you to answer for her.

24   A.  That would be an abnormal pulse ox entry, yes.

25   Q.  Would that be consistent at all with a baby having a pulse

1    ox of 81 and then 25 minutes earlier having a vigorous cry?

2    A.  It could definitely change very quickly, yes, sir.  When I

3    took the baby to the nursery approximately 6:50, the baby was

4    fine, and actually the nurse that took over at 7:00 gave the

5    baby a shot, eye ointment.  If there would have been any

6    issues, they don't do the medication.

7    Q.  We're going to talk to her, so don't --

8    A.  That's fine.

9    Q.  You said you don't know anything about the nursery.

10   A.  Just I took the baby over at 6:50 in the morning.  Yes,

11   sir.

12   Q.  If we can then continue on to tab 6, page 62.  Right there

13   and right there.  So again, 25 minutes after you have a

14   vigorous healthy baby, Nurse McCrory noticed that she is

15   grunting, flaring, retracting and appears to be in pain,

16   correct?

17   A.  I didn't do the assessment at 7:00.

18   Q.  I know, but I'm asking you --

19   A.  I took the baby at 6:50.

20   Q.  Sure.

21   A.  Yes, sir.  That can happen.  Babies can go downhill very

22   quickly.

23   Q.  You are saying that all of the vigorous crying had nothing

24   to do with grunting, flaring and retracting?

25   A.  No, sir.

1    Q.   And whenever you -- apparently you are saying you took

2    Kendall over?

3    A.   That's correct.

4    Q.   When you took Kendall over, she didn't appear in pain to

5    you?

6    A.   No, sir.

7    Q.   And page 65, again, nasal flaring, grunting, substernal

8    retractions, abdominal muscle use for respiratory subcostal

9    retractions.  So she is at that point straining to breathe,

10   correct?

11   A.   According to this record, yes, sir, but I was not there.

12   Q.   I know you weren't there.  In your assessment of babies,

13   you know when babies are grunting, flaring and retracting?

14   A.   Absolutely.  If that was the case when I had the baby, she

15   would have went to the nursery, yes.

16   Q.   Just so I understand, if the baby is doing that, grunting,

17   flaring and retracting, appears to be in pain, labored

18   breathing abdominal muscles, the baby could be doing that

19   while crying, correct?

20   A.   No, sir.

21   Q.   Now, the baby could also have those conditions with a

22   massive aspiration of meconium, correct?

23   A.   I don't know, sir.

24   Q.   We know if we go to tab 6 page 22.  So this is an x-ray

25   which was taken at 8:52 a.m. of Kendall, and at that time,

1   whenever they looked at the chest, they said that, and I know

2   a lot of this is medical, but basically the impression is

3   "Overall consolation of findings most consistent with meconium

4   aspiration and/or neonatal pneumonia in the proper clinical

5   setting."

6        Do you see that?

7   A.  Yes, sir.

8   Q.  Three hours after delivery, three and a half hours after

9   delivery, an x-ray shows that she has -- her lungs are filled

10  with meconium or pneumonia, correct?

11  A.  That's what that is saying, yes, sir.

12  Q.  I want to understand that you are saying that, well, in

13  the hour and a half before that and the two hours after

14  delivery, I never had any problem with this child's

15  respirations or never knew there was anything wrong with it.

16  A.  No, sir, I did not.

17  Q.  If we could pull up the autopsy report.  If we could go to

18  the second page and if we could pull up this part.  "Meconium

19  is noted in the diaper as well as in the perianal area."

20       Even at autopsy, they found meconium in the diaper and

21  perianal area, correct?

22  A.  That was at the autopsy time, sir.

23  Q.  Yes.

24  A.  Yes.  Babies do pass thick meconium after delivery, so it

25  very well could have been that.

1    Q.  You are saying the meconium, that it passed after, and it

2    had nothing to do with the meconium that the baby was swimming

3    in?

4    A.  Exactly.  It's a different type of meconium, yes, sir.

5    Q.  Go to the next page.  And it's right here, this paragraph,

6    and the jury has all seen this, but I'll show it to you.  "The

7    smaller bronchial trees contain some aspirated material, most

8    likely meconium."

9        And the baby didn't get that after delivery, correct?

10   A.  I'm sorry.  What are you asking?

11   Q.  The baby didn't get aspirated meconium after delivery.  It

12   got it before, correct?

13   A.  I couldn't answer that question.

14   Q.  If meconium gets deep into the lungs, that happens while

15   they aspirate it, correct?

16   A.  They aspirate mucus, whether it's colored meconium or not.

17   Q.  I'm sorry?

18   A.  Babies aspirate mucus all the time during the delivery.  I

19   explained that earlier, that during the delivery, the baby

20   does suck in mucus, and this baby just had a colored thin

21   mucus and pneumonia can be caused by regular mucus.  It

22   doesn't necessarily have to be meconium colored mucus.

23   Q.  But in this case, the autopsy report showed this baby had

24   meconium in its lungs, correct?

25   A.  That's because the fluid the baby was in was meconium

1   colored thin like that, not thick.  Yes.  So I'm sorry.  Go

2   ahead.

3              MR. PRICE:  That's all the questions I have.

4              THE COURT:  Mr. Colville, any questions of this

5   witness?

6              MR. COLVILLE:  I'll defer.

7              THE COURT:  Ms. Koczan?

8              MS. KOCZAN:  Yes.  Thank you, Your Honor.

9                        CROSS-EXAMINATION

10  BY MS. KOCZAN:

11  Q.  Good afternoon.

12  A.  Good afternoon.

13  Q.  I'm going to try not to be repetitive.  I want to go back

14  and ask you some questions because the jury didn't really hear

15  too much about your background.

16      Can you tell the jury a little bit about, beginning where

17  you grew up and where you went to school?

18  A.  I grew up in a little town in Ellwood City, Pennsylvania.

19  I graduated there from high school, and then I went to nursing

20  school at St. Francis in New Castle, a three year program.

21  Q.  And after you graduated from nursing school, I'm assuming

22  you had to take boards?

23  A.  That's correct.

24  Q.  Did you pass those boards?

25  A.  Yes, I did.

1  Q.  Then did you begin working?

2  A.  Yes, I did.

3  Q.  Can you take the jury through your work experience

4  bringing us up to the present?

5  A.  Yes.  I started at Heritage Valley Beaver where I

6  presently work now in 1985, and I worked on a medical surgical

7  unit for two years, and then in 1987, I went to labor and

8  delivery and that is where I presently work.  I've been there

9  32 years.

10  Q.  And when you went to Heritage Valley initially, before you

11  began working in the labor and delivery room, I'm assuming you

12  had some sort of orientation; is that correct?

13  A.  Yes, six to eight weeks, and it depends.  I think I had

14  about eight weeks orientation into labor and delivery.

15  Q.  As part of that orientation, did you learn to read the

16  fetal monitoring strips that we have been seeing here in the

17  courtroom?

18  A.  Yes, ma'am.  Yes.  We had to take a class on that.

19  Q.  And do you continue your education with regard to that

20  over the years?

21  A.  Yes.  We do have fetal monitoring courses every few years.

22  Q.  And did you also receive training in neonatal

23  resuscitation?

24  A.  Yes, ma'am.

25  Q.  And what did that consist of?

A.   It's a course that we do take where we read a book, we
take a test, and then we also go to a four hour class, and we
learn how to take care of newborns at delivery and we are
recertified every two years.

Q.   We talked earlier and you weren't present in the courtroom
when this was discussed but something called NRP
certification.  First of all, explain what that is to the
jury?

A.   It stands for neonatal resuscitation program, and again,
we do have to be certified.  If you work in labor and delivery
and nursery and maternity, you have to be certified every two
years, and that's what we were talking about earlier.  It's a
book that you read, you take a test, and then you spend four
hours in a classroom being educated on that.

Q.   And this program, this neonatal resuscitation program, is
this something that was developed by the American Academy of
Pediatrics?

A.   I believe that is correct.

Q.   Is this the same certification test that, for example, a
physician might take?

A.   That is correct, yes, the pediatricians and the
obstetricians, yes.

Q.   They both take this class?

A.   Yes.

Q.   Over the course of the 30 some years that you have been at

1    Heritage Valley Beaver, can you give the jury some estimate of
2    how many -- we'll start with labors.  How many labors you've
3    attended?
4    A.  I mean, I really couldn't tell you a number, but it's been
5    very many, a lot, because I solely do labor and delivery.
6    Every now and then, I do go to the maternity unit so I've been
7    present for a lot of deliveries.
8    Q.  Are we talking about the hundreds and perhaps into the
9    thousands?
10   A.  Yes, I believe so, yes.
11   Q.  And I asked you about labors.  What about deliveries?  How
12   many deliveries have you been in attendance for?
13   A.  Probably just about as many as the labors, yes.
14   Q.  And when you are the labor and delivery nurse in
15   attendance at the delivery, are you the one who is required to
16   do the initial assessment, and that would include assigning
17   those Apgar scores and doing any initial physical assessment,
18   providing any care that is necessary?
19   A.  It can be me.  A lot of times, we also have a second nurse
20   in the room during the delivery.  Sometimes they will go ahead
21   and do the assessment of the baby.  Sometimes even the nursery
22   nurse will come over and help us out if we need the extra
23   help.
24   Q.  And you've told us that you've done -- my words --
25   hundreds, perhaps thousands of deliveries?

1   A.  Yes, ma'am.

2   Q.  Every time that you are there, you or whoever you are

3   working with is doing those Apgars, correct?

4   A.  That's correct.

5   Q.  You are doing those neonatal assessments?

6   A.  That's correct.

7   Q.  Would you say that you've done hundreds, if not thousands,

8   of those assessments?

9   A.  I would say, yes.

10  Q.  Over the course of your career?

11  A.  Yes.

12  Q.  This is something you know how to do?

13  A.  Yes, ma'am.

14  Q.  Would you agree that if a baby is in distress, you would

15  be able to recognize that?

16  A.  Yes, ma'am, and I would take the baby to the nursery, yes.

17  Q.  I want to stop for a minute and talk about these Apgars.

18  We've seen a lot about them and talked about them.  Why don't

19  we put up document 1115, which everyone has seen this a couple

20  of times now.  If we can just highlight that top section here.

21      Maria, I would like you to explain to the jury what is the

22  Apgars.  What is it that you are doing and how do you make

23  those assessments?

24  A.  An Apgar is mainly a tool for the nurse that is taking

25  care of the baby.  It's like a tool for us to, like, assess do

1    we need to suction the baby, do we need to give it oxygen, do

2    we need to stimulate a little more to get it to cry.  It's

3    more of an assessment type that the nurse that's taking care

4    of the baby, we use that, and then we give it at one minute

5    and five minutes, and as you can see, these look pretty

6    normal.

7    Q.  Let me ask you about that.

8    A.  Yes.

9    Q.  In terms of the heart rate, what is it that you are

10   assessing?

11   A.  You actually listen to the heart rate for at least a

12   minute.  It should be above 100.

13   Q.  If it's above 100, do they get a two then?

14   A.  That's correct.

15   Q.  If it's below 100?

16   A.  We give them a one.

17   Q.  If it was absent, it would be a zero?

18   A.  Yes, ma'am.

19   Q.  The next there is respirations.

20   A.  Yes.

21   Q.  What is it that you are doing to assign that number?

22   A.  That's the baby making an effort to breathe and also

23   crying and it got a one at one minute, because Dr. Dumpe did

24   bring the baby to the warmer directly after delivery.  We did

25   not do a whole lot of stimulating of the baby just because we

1    wanted to make sure that we went down and suctioned the baby

2    before we did a lot of crying so it didn't take in anymore

3    mucus, and that is part of the NRP program, that we do bring

4    the baby over to the warmer.  The nurse does what they need to

5    do, and once we suction the baby, we go ahead and stimulate

6    the baby to get it to cry, and as you can see, at two

7    minutes -- or five minutes, it had great respirations.

8        Actually like right below that is a box that we check that

9    states that the baby's breathing was spontaneous less than one

10   minute.  That means that even before the two minute Apgar,

11   which we don't do, that baby was crying.  That's what that

12   indicates.

13   Q.  I want to ask you about that suction.  Dr. Zamore who

14   testified earlier made a big deal that you had to do deep

15   suctioning.

16   A.  That's part of the NRP requirement for a baby, even with

17   thin meconium -- definitely with thick meconium -- but with

18   thin meconium, that was part of the NRP recommendation that

19   you don't -- you bring the baby over to the warmer.  You go

20   ahead, you do your assessment, you go ahead and suction it

21   out, and you go ahead and proceed to make the baby cry.

22   Q.  The fact that you had to suction -- and I think the words

23   he used were deep suction.  Just so we are all clear on what

24   that is, we saw in the picture that you were shown this little

25   thin tube.  Is that putting it down the baby's --

1   A.  Yes, into the throat down into the lungs and withdrawing

2   it, yes, and it's hooked up to a suction on the crib and the

3   baby.

4   Q.  Does that mean the baby is in respiratory distress?

5   A.  Not at all.  That's something we do.  We suction a lot of

6   babies after delivery to make sure that we can get their lungs

7   as clear as possible.  Sometimes you can't do it totally, but

8   you know, if you get them to cry, a lot of times the crying

9   that they do, they will bring it up on their own.  That is a

10  really, really good sign when a baby does cry.

11  Q.  So on this one, it's one because of Dr. Dumpe holding the

12  baby and not stimulating it?

13  A.  Exactly.

14  Q.  Then it was two when you suctioned?

15  A.  That's correct.

16  Q.  Just so we are clear, two is normal?

17  A.  That's correct.

18  Q.  Good?

19  A.  Yes, ma'am.

20  Q.  Healthy?

21  A.  Yes, ma'am.

22  Q.  Let's look at muscle tone.  What is it they are looking at

23  there?

24  A.  That's just like -- if I can just show you.  That's like

25  this (indicating), like the baby's tone, and a lot of times,

1    you see it just sort of be a little bit like this at delivery

2    (indicating), and eventually they'll really start to, when

3    they cry, they'll start to increase their tone.  It's muscle

4    tone is what we're assessing there.

5    Q.  Okay.  The fact that she got one at five minutes and one

6    at five minutes, does that mean there's some problem with the

7    baby?

8    A.  No.

9    Q.  Is that normal?

10    A.  It's very normal, yes.

11    Q.  The next thing there is reflex, and would you explain to

12    the jury what it is that you are testing there or assessing

13    there?

14    A.  It's the baby's response to what we do, and the one at one

15    minute was due to us not doing a whole lot of stimulation so

16    we can go ahead and get those lungs cleared out, and then the

17    two at five minutes is because we had really stimulated the

18    baby and so now the reflexes are really at two, which is a

19    good number.

20    Q.  How do you stimulate the baby?

21    A.  We do many things.  Mainly drying them off helps a lot.

22    We can flick their feet a little bit, rub their back and that,

23    a lot of times, will just get the baby to start crying.

24    Q.  Then the last category there is something called skin

25    color.  Would you explain to us, first of all, how you did it

1    and then what the one means?

2    A.  The one skin color at one minute and five minutes was

3    taken off for the circulation of the hands and feet.  In other

4    words, the rest of the body was pink.  The hands and feet are

5    the last to get circulation.  Sometimes it takes a couple

6    hours.  That's a normal newborn thing.  Their hands and feet

7    have very little vessels, so those vessels sometimes take a

8    little bit of time to open up, so very rarely do we give a two

9    for color at delivery.

10        Usually, if I can see this, preterm babies, they will have

11   pink hands and feet.  That's just another situation.  That's

12   actually very normal.

13   Q.  And we'll talk a little bit later about your assessment.

14   I just wanted to talk about the Apgars at this point.  If you

15   perform -- and we're talking about just generally here.  Not

16   about Kendall.

17        If you performed a baby's assessment, Apgars, the

18   assessment we're going to talk about later, in the delivery

19   room and it's in any way abnormal, what are you required to

20   do?

21   A.  We are required to call the nursery, and if the baby is

22   able to go to the nursery, we will go ahead and transport the

23   baby to the nursery.  If not, the nursery will call the

24   residents.  They are always in-house, who do follow the

25   pediatricians and we'll call the pediatrician.

1    Q.  If a baby is normal, Apgars of a normal assessment, what
2    is the procedure then at Heritage Valley?  What happens next?
3    A.  They usually will keep the baby in the room for the family
4    to see the baby, the parents to hold the baby.  We like for
5    them to be there like about two hours, just because I think
6    the bonding is a very, very wonderful thing for this family
7    and for the mom and the significant other.
8        And then after -- before the two hour mark, the nursery at
9    this time, because we have changed our policy since then, at
10   this time, they have to give an eye ointment and a vitamin K
11   shot to the baby within two hours after delivery, and that is
12   a state requirement.
13   Q.  During that period of time, and just so we are clear, the
14   jury understands, the room that Carissa labored in, is that
15   the same room she delivered in?
16   A.  Yes, that's correct.  That's where she recovered.
17   Q.  It's the room she stays in?
18   A.  That's correct.
19   Q.  That's where Kendall is with her?
20   A.  That's correct.
21   Q.  All the same throughout?
22   A.  Yes.
23   Q.  What are your responsibilities then after the baby is
24   delivered, you've done your Apgars, you've done your
25   assessment, you cleaned her up, you've handed her over to mom,

1    what do you, as a labor and delivery room nurse, do?

2    A.   Now we do a recovery period on the moms and we have to do

3    assessment every 15 minutes for one hour, and that includes

4    blood pressure, temperature -- I'm sorry, pulse, respirations

5    and we assess bleeding.  We assess pain, and we do that for

6    one hour.  If everything is stable, then we can lessen that to

7    about every half hour until she is able to go to the maternity

8    unit, and that's where they spend their two to three days in

9    the maternity unit.

10   Q.   What about with baby?  What is it you are required to do

11   during that time frame with the baby?

12   A.   Basically, just let the family and the mom and the father

13   bond with that baby as long as the baby is stable, and this

14   baby was doing fine.  I know that with my whole heart and soul

15   or I would have taken her to the nursery.  I have done it

16   before.  I would not hesitate to.  If I thought for one

17   instance that that baby was having issues, that baby would

18   have been in the nursery.

19   Q.   What I'd like to do now is to backtrack actually and talk

20   about your care of Carissa.  We're going to go through this

21   quickly, because earlier today, I put up a timeline that

22   showed some of what you did, so the jury has already seen it,

23   but I want you to tell us a little bit about that.

24        We heard earlier that you came on at about 7:00 p.m. that

25   day; is that correct?

1    A.  That's correct.

2    Q.  Who was the nurse that was on before you?

3    A.  Judy Ash.

4    Q.  And at the time you come on, do you receive some sort of

5    report?

6    A.  Yes, we receive a full report.

7    Q.  As you sit here today, do you remember what Judy told you?

8    A.  I only remember because when I came back to work after

9    having Carissa and found out what happened to the baby, it has

10   just been something that's always been in the back of my mind,

11   yes.

12   Q.  Can you tell the jury what you remember about hearing?

13   A.  I remember that the baby was stable on the fetal heart

14   monitor and that there was thin meconium and that she did have

15   an epidural placed.  That's for pain relief.

16   Q.  I think you've told us before when Mr. Price was

17   questioning you, but was Carissa your only patient during that

18   shift?

19   A.  That is correct.

20   Q.  And is that typical?

21   A.  That is, especially someone that's in active labor.  That

22   is our protocol, our policy, per actually the union, that we

23   do one-on-one with our labor room patients.

24   Q.  As part of your initial assessment of Carissa and ongoing

25   assessment, do you take her vital signs?

1   A.  Yes, I do, every half hour.

2   Q.  I want to put up 893.  This is one of your first vital

3   sign assessments.  If we can just highlight.  We're not going

4   to go through all of them, but if you can explain to the jury

5   what is it that you are doing?

6   A.  We do -- our temperature checks are not every half hour.

7   We only do temperature checks every two to four hours

8   depending on the situation.  Every half hour, we assess their

9   blood pressure, their pulse and oxygen level and their

10  respirations.

11  Q.  As I said, I'm not going to put those all up there and

12  have you go through them.  Do you have any recollection of any

13  time while you were taking care of Carissa that evening,

14  through the night, into the next morning before she delivered

15  there being any issue with her vital signs, her temperature,

16  anything like that?

17  A.  Not that I recall.

18  Q.  And one of the other things that we heard earlier is that

19  when mom comes to the hospital, there's a fetal monitoring

20  strip put on?

21  A.  That's correct.

22  Q.  A TOCO monitor.  Not the strip.  The strip is printing

23  out; is that correct?

24  A.  Yes.  That's okay.

25  Q.  So is that something that you are looking at?

1   A.  Continuously, yes.

2   Q.  I just want to put this up and ask you some questions

3   about it.  We're not going to go through all the strips but

4   just put up 1031, and if we can put these side by side if

5   that's possible.  Maria, can you see those?

6   A.  Yes, I can.

7   Q.  Dr. Zamore explained to us before that the lower tracing

8   is the mom's contractions; is that correct?

9   A.  That is correct.

10  Q.  And the one above that would be the mom's heart rate?

11  A.  Yes.

12  Q.  And then the top one is the baby's heart rate?

13  A.  That's correct.

14  Q.  Throughout the time that you were there monitoring

15  Carissa, were there any periods of time where you were

16  reviewing the strips that there was anything that you

17  considered abnormal or concerning?

18  A.  No.  I actually did look at the tracings recently and I

19  thought they all looked fine, yes.  There was nothing that

20  worried me at all.

21  Q.  Dr. Dumpe testified that toward the end, there were some

22  category twos, but that it went back to the one?

23  A.  Toward the pushing stages, sometimes you do see that.  I'm

24  wondering if that's what he was referring to, yes.

25  Q.  Do you remember that?

1    A.  At the end, towards the end, there was some variable

2    decelerations, and that can be very common with the pushing

3    stages, but it was not something consistent or worrisome.  I

4    see that pretty much every time towards the end of the

5    delivery.

6    Q.  What I want to go to is your documentation, which I

7    believe is 1945 is the next thing I want to put up.  This

8    is -- maybe it's 1042.  1043.  Let's put up 936.  I'm sorry.

9        We showed the jury before that throughout this labor you

10   have documentation of the meconium; is that correct?

11   A.  That's correct.

12   Q.  And you've already testified here that it was thin

13   meconium?

14   A.  That's correct.

15   Q.  And what you were seeing was this (indicating) bottle; is

16   that correct?

17   A.  Yes, ma'am.

18   Q.  And you documented that several times?

19   A.  Yes, with each exam, and any time I would do any care of

20   her bottom, I would check that and assess that.

21           THE COURT:  Ms. Koczan was pointing to the

22   light-colored Gatorade bottle.  Go ahead.

23   Q.  Would you be -- rather than me saying this, was it the

24   situation that you were frequently assessing Carissa?

25   A.  I'm sorry.  What's that?

1    Q.  Frequently assessing Carissa?

2    A.  Yes.

3    Q.  How frequently would you do that generally?

4    A.  At least every half hour, and you know, I go in, I'm just

5    one of those people that I'm always in there a lot making sure

6    they are okay.  I know that Mr. Price kind of questioned me

7    about my charting.  That's because I spend as much time as I

8    can in that patient's room doing what I need to do, and then I

9    get to my charting when I can, but I'm probably in there more

10   than every half hour, but every half hour, I get a blood

11   pressure and I assess the patient, pain.  The fetal heart

12   monitor tracing is always in my sight because we have a

13   central monitoring, so I look at that continuously.

14   Q.  And at any time through Carissa's labor, was there ever a

15   period of time where you noted anything other than that green?

16   A.  No, absolutely not.

17   Q.  And that's the second bottle that I'm pointing to at this

18   stage, correct?

19   A.  Correct.

20   Q.  In your documentation, you noted that around 5:07,

21   Dr. Dumpe was gowned for delivery?

22   A.  Yes.

23   Q.  Was Carissa ready to deliver?

24   A.  Yes.

25   Q.  Based upon everything that happened up through that time

1  frame, all of your evaluations, your reviews of the strip, the

2  fact that there was that thin meconium, all of that type of

3  thing, was there any reason for you to call a pediatrician to

4  be in attendance at this delivery?

5  A.  No.  Actually, the obstetrician, Dr. Dumpe, would be the

6  one that would say I think we need to call a pediatrician.

7  That's his call, not mine.  I can suggest that, but I never

8  would have ever suggested that.  Not in this situation.

9  Q.  Can you tell the jury why?

10  A.  Because the fetal heart tones were fine, and thin meconium

11  is not part of a policy to call a pediatrician.

12  Q.  One of plaintiffs' experts, Dr. Zamore, criticized you,

13  the nurses generally, for not advocating, notifying a

14  pediatrician, and by that, I assume he meant not telling

15  Dr. Dumpe or suggesting to Dr. Dumpe that he should have a

16  pediatrician.  Did you do that in this case?

17  A.  I would not.  We did not need a pediatrician in this

18  situation.

19  Q.  Is that why you didn't advocate for one?

20  A.  Exactly, yes.  And Dr. Dumpe, who is phenomenal, would

21  have said, Maria, let's get a pediatrician.  Will you call

22  them?  So like I said, the obstetrician is the one that

23  advocates it, that says to me, you know, this is not part --

24  if it was thick meconium, our policy says to get a

25  pediatrician in here, we would have done that.

1    Q.  We've seen the policies, 2.4 and 2.21.  Did the policy

2    2.21 which is the one that talks about notification of a

3    pediatrician, does that policy, did that policy require you to

4    notify a pediatrician under these circumstances that existed

5    with Carissa?

6    A.  No.

7    Q.  This is up until the time of delivery?

8    A.  No.

9    Q.  Why is that?

10   A.  Because the meconium stayed thin and the fetal heart

11   tracings reassuring.

12   Q.  Now I'd like to talk about the time of delivery.  You did

13   touch on this somewhat with Mr. Price, but can you tell the

14   jury what your role is during the delivery, and by that, I

15   mean, where are you standing, what are you doing, all of that?

16   A.  Well, during the pushing stages, which first time moms can

17   push one to two to three to four hours, we are at the bedside

18   continuously during the pushing stages, and then during the

19   delivery, we do have another nurse present, and between myself

20   and the other nurse, we do assist Dr. Dumpe or whatever doctor

21   is there with whatever he may need, and then we do take care

22   of the baby after delivery, one or the other.  Either I do it

23   or the other nurse does it.

24   Q.  In this particular case, Dr. Dumpe ended up using a vacuum

25   extractor?

1    A.  Yes.

2    Q.  Do you recall that?

3    A.  I do from the notes, yes.

4    Q.  And in reviewing the notes, are you aware that the reason

5    why he used that was basically because of maternal exhaustion?

6    A.  Exactly.

7    Q.  She was --

8    A.  We do that an awful lot, yes.

9    Q.  The fact that he had to use a vacuum extraction, does that

10   require you to notify a pediatrician?

11   A.  Absolutely not.

12   Q.  Why is that?

13   A.  We use them a lot.  It's not part of a policy, and we

14   don't need -- we don't call a pediatrician because of that.

15   It's just not what we do.  It's not our policy.  It's not

16   needed.

17   Q.  One of the other things that occurred during the delivery

18   is that Dr. Dumpe was anticipating that there might be a

19   problem with a shoulder dystocia given the size of this baby

20   and Carissa's pelvis and that he did something that he's

21   described for us as a prophylactic McRoberts Maneuver.

22       Do you remember that being done?

23   A.  Yes.  We do that a lot for a lot of deliveries.  When the

24   baby's head is delivered, when you sense it to be a bigger

25   baby, we'll do what's called a McRoberts.  All that is is

1    taking the mom's legs, putting them back, helping the pelvis

2    to open so we can get the shoulders out.  That's what we do

3    for a lot of deliveries.

4    Q.  Do you have any recollection of there actually being a

5    shoulder dystocia in this case?

6    A.  I do not recall.

7    Q.  The fact that he prophylactically did something to prevent

8    that, does that require you to call a pediatrician?

9    A.  No, it does not.

10    Q.  And in terms of calling a pediatrician, I just wanted to

11    ask you that, let's assume there was a shoulder dystocia and

12    there was some complication.  What do you do?  Do you stop

13    everything and call the pediatrician?  How does that work?

14    A.  We would deliver the baby and if there was -- we don't

15    call a pediatrician for a shoulder dystocia unless we have

16    issues with the baby at the crib, so if the shoulder dystocia

17    happened, and I'm not saying in this case, but if it would

18    happen, we would put the baby in the crib, and if we would

19    find issues with the baby not breathing, not moving well, then

20    we would do our resuscitation, what we need to do, and then

21    one of our nurses contact the nursery.

22        They'll either come over or we'll get a resident down.  We

23    have residents there 24/7.  They come down and can look at

24    that baby, assess the baby and see what we need, but a

25    shoulder dystocia does not require a pediatrician being called

1   unless there's issues afterwards.

2   Q.  And the issues that you are talking afterward would be

3   what?  There would be some sort of neurological injury to the

4   shoulder?

5   A.  Yes.

6   Q.  Like a brachial plexus injury, that type of thing?

7   A.  Yes.

8   Q.  The other injury I thought I heard you say, if they were

9   having some other neurological --

10  A.  Basically if they don't transition well.  It's from being

11  in utero.  Being inside of mom to coming out into this world,

12  there's a huge transition for these babies, and some babies

13  are a slow start.  If that was an issue, we would take the

14  baby to the nursery and they would call a pediatrician.

15  Q.  The other thing that was done during this delivery is that

16  Dr. Dumpe did an episiotomy.  First and foremost, is that

17  anything unusual?

18  A.  That's very common.

19  Q.  Do you have to call a pediatrician because mom had an

20  episiotomy?

21  A.  No.

22  Q.  So was there anything that happened during this delivery

23  that required either you or Dr. Dumpe to call a pediatrician?

24  A.  Absolutely not, or we would have done it.  Absolutely not.

25  Q.  Now, I want to go back to that document that we looked at

1    before and that was where the Apgars were.  If we can put that

2    back up.  I want to ask you about the other portions of that

3    record, and up in the corner, we have the Apgars.  Let's look

4    at some of this other documentation.  Let's look underneath

5    the Apgars first.  Why don't you explain to us what all that

6    is?  If we can highlight that section.

7        If you can explain to us, Maria, what this section is

8    before your signature there?

9    A.  That would be something that we do after each delivery.

10   We assess, if we would need to give oxygen, if we would need

11   to suction the baby, these are areas where we check.  The big

12   thing is the spontaneous respirations, which is indicating

13   within one minute of delivery, that baby was breathing fine,

14   and we suction the baby with the bulb suction and we also did

15   the deep suctioning which we did talk about that.

16       We gave the baby whiffs of oxygen at five liters.

17   Basically we do that when we deep suction the baby to give

18   them a little extra oxygen.  It doesn't mean the baby was blue

19   or had issues.  That's something we do when we give deep

20   suctioning.

21   Q.  Do you do that before the deep suctioning or after?

22   A.  No, after.  It's basically -- whiffs mean the mask is not

23   held there and they are not constantly getting it.  We kind of

24   hold it there after we suction the baby, and they are crying,

25   so we kind of take it away because they are able to oxygenate

1  themselves after that.

2  Q.  Then you have something cords examined.  What does that

3  mean?

4  A.  That means that the cord was fine and examined, the baby's

5  umbilical cord.

6  Q.  Under resuscitation, I don't see anything.

7  A.  No.  Going through that means that we did not have to do

8  any extraordinary CPR or anything for the baby.

9  Q.  This baby didn't require any sort of resuscitation; is

10  that correct?

11  A.  No.

12  Q.  Let's move to the other section of that that would be on

13  the left-hand side.  Is any of that your documentation up

14  there?

15  A.  The only thing that would be something that I did mark is

16  under anesthesia, it would be right under description of

17  fluid, I did write epidural.  That just means that during her

18  delivery, what they used to help her with pain is her epidural

19  was in place.

20  Q.  Underneath that, you have -- there's documentation of the

21  date of delivery, the time, the type of delivery.

22  A.  That's not my writing.

23  Q.  Is that Katherine's?

24  A.  Yes, I believe so.

25  Q.  And it says vacuum assist; is that correct?

1    A.  That's correct.

2    Q.  That's the vacuum extractor?

3    A.  Presentation vertex, that means the baby was presenting

4    head down.  There was no nuchal cords and there was no true

5    knots in the cord.  That's what those other two are

6    indicating.

7    Q.  Under complications, that's blank, meaning there was no

8    complication?

9    A.  Correct.

10   Q.  Let's scroll down to the next section, and if we can just

11   highlight that, that section there, keep going, right there.

12   If you could explain to the jury what is it that you are doing

13   to complete this?

14   A.  That's just our assessment after delivery, and going down

15   it says everything was normal.  It's just saying it was a

16   female, and when you get to the part where it says anus and

17   says deferred, we don't do like a rectal temperature or

18   anything like directly after delivery, so we are not totally

19   sure that everything is intact there unless you do a rectal

20   temp, so deferred means you were able to see the anus, but you

21   didn't know if it was intact, and that's what that means.

22       It's deferred to when the pediatrician comes in the

23   morning or the nursery nurse or whoever takes the temperature

24   would determine that.

25   Q.  I want to ask you about some of these categories here.

1    The first one is general appearance.  What is it you are

2    assessing under that category?

3    A.   Just the baby's general -- if there was anything abnormal

4    in this part, then you would mark it.  So the general

5    appearance, skin, neck, everything is normal for this

6    delivery.  So that's why I put zero and went the whole way

7    down.

8    Q.   The next thing is skin, and what are you assessing there?

9    A.   The color, the skin color.

10   Q.   The fact that you have it normal, what does that tell you?

11   A.   That the baby is doing fine, yes.  The baby is oxygenating

12   and circulation is doing great, yes.

13   Q.   The next category is head and neck.  What are you

14   assessing there?

15   A.   Just making sure there's nothing abnormal with the head or

16   neck, like a cyst or anything that we would look at and say

17   that's not normally what we see at delivery.

18   Q.   Under eyes, what are you looking at there?

19   A.   Anything abnormal with the eyes.  Like if it's missing an

20   eye.  I've never seen that, but it would be something

21   abnormal.

22   Q.   ENT, which is ear, nose and throat.  What are you looking

23   at there?

24   A.   Basically if everything is normal.  When we did the

25   suctioning, we were able to get the suction catheter down

1    there, and if for some reason we couldn't, if there was an

2    obstruction, we would probably say we were unable to get the

3    catheter down, there might be something with the ear, nose and

4    throat.

5    Q.  The next is thorax.  What are you assessing?

6    A.  That's the lung area.  If we would see an abnormal look in

7    the chest.  Some babies have deformities in this area, so we

8    would look to see if the bones looked abnormal in the thoracic

9    area, which is this area (indicating).

10   Q.  The next category is lungs.  What do you do to assess the

11   lungs?

12   A.  We listen to the lungs.

13   Q.  With a stethoscope?

14   A.  That's correct.

15   Q.  If you had noted anything --

16   A.  I would have put it there, yes.  It was normal.

17   Q.  Does that tell us there was nothing unusual in the lungs?

18   A.  Yes.

19   Q.  The next is the heart.  What do you do to assess the

20   heart?

21   A.  With a stethoscope.  We make sure it's above at least 100,

22   and usually they are at 120, 140 and 150.  We listen to make

23   sure it doesn't have a murmur, regular heart rate, so we also

24   assess that.

25   Q.  The next is the abdomen.  What are you looking at there?

1    A.   Just the belly in general.  If we would see anything

2    abnormal with the umbilical cord, we would mark it there.

3    Q.   The genitalia, you've documented?

4    A.   Female.

5    Q.   Is that what you are looking for?

6    A.   Yes.

7    Q.   Trunk and spine, what are you looking for?

8    A.   That would be going to the back of the baby, just making

9    sure that the spine is intact.  There's no cyst back there.

10   Just making sure there's no sores.  Nothing abnormal in the

11   spine area.

12   Q.   The next is the extremities.  What are you doing there?

13   A.   Yes, that would be the hands, the feet, the legs.

14   Sometimes babies are born with extra digits.  Sometimes babies

15   are missing digits.  Sometimes they have club feet, something

16   like that.  That's what we're looking at in that situation.

17   Q.   The next one is reflexes.

18   A.   Right.  That's just the baby's response to everything.

19   Q.   You told us earlier that when they come out that sometime

20   they are kind of like this (indicating)?

21   A.   They'll be floppy, I guess, is the word, yes, so the

22   reflexes were normal, yes.

23   Q.   And I think you could see that in the pictures, the

24   pictures that were shown?

25   A.   Yes, you can see her like this (indicating).

1  Q.  Does that show normal reflexes?

2  A.  Yes.

3  Q.  And you've told us about the anus.  That's your signature

4  there?

5  A.  Maria Hendershot, yes, that's mine.

6  Q.  After you completed this, you've done the Apgars, you've

7  completed this, at this stage, is there any reason for you to

8  call -- we'll start with the nursery.  Is there any reason for

9  you to call the nursery at that point?

10 A.  Absolutely not, no.

11 Q.  Why not?

12 A.  Because there was nothing abnormal.

13 Q.  Is there any reason for you to call a pediatrician at that

14 point?

15 A.  No.

16 Q.  Why not?

17 A.  Because there was nothing that warranted me to call the

18 pediatrician or for the nursery to call the pediatrician.

19 Q.  You told us before that after you completed your

20 assessment, the baby is wrapped up, provided to mom; is that

21 correct?

22 A.  That's correct.

23 Q.  And do you stay in that labor and delivery room for some

24 period of time?

25 A.  Until -- like my first note was at 6:00.  I was there

1    until about 6:00, cleaned her up.  Took her epidural catheter

2    out.  Assessed her bleeding.  We give them drinks.  We give

3    them food, and then around 6:00 is when I try to -- whenever

4    Dr. Dumpe is finished and when I'm finished with my

5    assessment, around 6:00 is when I went ahead and went to the

6    desk and let the family come in.  The entire family at that

7    point is allowed in after delivery.  Friends, family, whoever

8    they choose to allow in the room.

9    Q.  In this particular case, we've heard testimony, and I

10   believe we're going to see some pictures, that there were

11   quite a few family members in this room.

12   A.  I believe so, yes.

13   Q.  They were passing Kendall around?

14   A.  Yes.

15   Q.  Do you remember seeing any of them?

16   A.  Just an awesome family, very -- a lot of support in that

17   room, yes.

18   Q.  We've seen your notes before, and I'm not going to make

19   you go back, the jury just looked at them.  Dr. Zamore earlier

20   today questioned the accuracy of those notes.  Basically

21   implied that they never happened, that they were fabricated.

22   A.  I would never chart it if it didn't happen.  Absolutely

23   not.  That's the truth, yes.  I would never, ever falsify a

24   documentation, ever.

25   Q.  In order for you to make those notes, do you have to be in

1    there?

2    A.  No, you do not.  You can take little notes.  You can

3    remember in your head.  I know they went on and on about my

4    charting and how it was delayed and late.  It happens every

5    time I work because I'm with that patient.  I'm taking care of

6    that patient, and I write little things down, like something

7    that came up that's not on my fetal monitor strip, something I

8    have to remember and I write it down, and then I go back out

9    to the desk and I do the most accurate charting I can possibly

10   do.  I would never falsify a document ever.  I would never do

11   that.

12   Q.  In order for you to have documented what you did, the

13   assessment, I'm not going to put those back up, the jury just

14   saw what it was you did, the various assessments, et cetera,

15   you have to go into that room and you have to examine?

16   A.  Yes.  You have to go in every 15 minutes or sometimes even

17   more often, the patient will put their call light on and say

18   can I have more to drink and can you clean me up, whatever it

19   may be, yes.  I need something for pain.  I need an ice pack.

20   We are there to help them whenever.  It could be every three

21   minutes if I need to go in that room.

22   Q.  You can't do that assessment from the nurses' station?

23   A.  Absolutely not.

24   Q.  Not looking at the patient; is that correct?

25   A.  No, absolutely not.

1    Q.  And when you go in to assess Carissa, we heard a lot about

2    the fact that there aren't any notes about an assessment of

3    Kendall at that point?

4    A.  Right.  We don't do that.  We do -- we take the baby

5    within the two hour mark and the nursery does their

6    assessment, what they need to do.  We do the initial, and then

7    the nursery does the following assessment.

8    Q.  Let me ask you this:  When you go in to assess Carissa, do

9    you ignore Kendall?

10   A.  Absolutely not, no.

11   Q.  What do you do?

12   A.  We look at the baby.  Again, I'm going to note again that

13   baby was crying.  It was vigorous.  It was a stable, healthy

14   baby.  I'm telling you I was in shock when I heard what

15   happened.  I just was.  I was in shock.

16   Q.  And up through the time that you took the baby to the

17   nursery, I think you've told us that was sometime around 6:50

18   a.m.?

19   A.  Yes.

20   Q.  I want to ask you about that.

21   A.  Yes.

22   Q.  The parents haven't testified yet, but I believe we're

23   going to hear some testimony about how it was Matt who took

24   the baby to the nursery and not you; is that true?

25   A.  No.  That would be totally against hospital policy.  The

1    first time that the baby does go into the nursery after

2    delivery, a nurse has to accompany the baby, but the father of

3    the baby is allowed to also go or the person that's wearing

4    the second bracelet.  It could be somebody's mother,

5    boyfriend, whatever, but we do allow another person to go into

6    the nursery with us, but it has to be a nurse, because then

7    they give report to the nursery nurse.

8    Q.  You talked about --

9    A.  Because they couldn't get through the doors anyway.  We're

10   a lockdown unit.

11   Q.  I was going to ask you about that.  You said something

12   about a bracelet.  What do you mean about that?

13   A.  When the baby is born, we have a bracelet system for

14   identification purposes.  There's a five digit number on these

15   four bracelets.  The baby gets two bracelets and the mom gets

16   a bracelet and whoever else you choose to have the second

17   bracelet.  That means the mom and the other person who has the

18   second bracelet are allowed in the nursery at any time.

19        It's identification purposes.  They also use that to

20   identify the baby when they go in and out of the room with the

21   baby.

22   Q.  Is there any doubt in your mind that it was you who took

23   the baby?

24   A.  Oh, no.  I know it was me, yes.  No doubt in my mind.

25   Q.  As you were taking the baby to the nursery, do you have

1    any recollection of seeing -- we'll start with grunting.

2    A.  No.

3    Q.  Do you have any recollection of seeing flaring?

4    A.  No.

5    Q.  Retracting?

6    A.  No.

7    Q.  Any sort of respiratory distress?

8    A.  Not at all.

9    Q.  Do you remember the baby crying?

10   A.  Yes.

11   Q.  And is that a good thing?

12   A.  That's a very good thing, yes.  Again, the nurse that took

13   over for me, she said that is such a nice cry, Maria.  I said,

14   yeah, it is.  It's not that we were, you know, making a big

15   deal about it.  It's just that I remember it because of what

16   occurred afterwards.

17   Q.  And the nurse that you gave report to, was that Barbara

18   Hackney?

19   A.  In the nursery, that's correct.

20   Q.  Do you have a recollection of what you told Barb that day?

21   A.  I take the assessment that we were looking at and I go

22   over everything with her, so I tell her about the mom, any

23   complications with her, the Apgars, she would have known about

24   the thin meconium, and basically, we tell her everything that

25   we need to tell her, the assessment of the baby.  If anything

1    was abnormal, she would know that.

2    Q.  While you are doing that, I'm assuming you are doing that

3    at bedside?

4    A.  That's correct.

5    Q.  You are standing --

6    A.  Baby would be in the crib.

7    Q.  Barb is standing by the baby.  Are you both looking at the

8    baby while you are talking?

9    A.  Yes.  We are at the isolette.

10   Q.  If there were any problem, both of you would have been

11   able to see; is that correct?

12   A.  Yes, correct.

13   Q.  At the time that you left Kendall at the nursery with

14   Barb, was there anything abnormal going on?

15   A.  Not at all.  Again, when I found out what happened, I

16   just -- really just couldn't believe it.

17   Q.  When did you find out what happened to Kendall?

18   A.  The next shift.  I left at probably around 8:00 because I

19   finished up charting.  The next time I was at work, I did find

20   that out.

21   Q.  Do you remember what it was that you heard?

22   A.  Just that the baby had passed, and it was several hours

23   after it got to the nursery and they didn't have an official

24   reason why.  I did hear later on it was E. coli sepsis that

25   unfortunately that baby died from.

1    Q.  E. coli sepsis, is that something that you had ever seen

2    before?

3    A.  I personally couldn't tell you if I've ever seen it.

4    We've seen babies septic, absolutely.  I've seen a lot of

5    babies that develop sepsis, but they are fine.  They are

6    delivered.  They are fine.

7        A lot of times, like later on, it could be a day later,

8    they are starting to show some signs, and that's when sepsis

9    can occur.  Whether it's been E. coli, I don't know.  I've

10   never had anybody say that baby three days ago had E. coli

11   sepsis.  I don't know that.  I can't recall that.

12   Q.  Thank you, Maria.  Those are all the questions I have for

13   you.

14   A.  Thank you.

15            THE COURT:  Mr. Price, any additional questions of

16   this witness?

17            MR. PRICE:  A few.

18                    REDIRECT EXAMINATION

19   BY MR. PRICE:

20   Q.  You said you know it was you who took this baby.

21   A.  Yes, it was.

22   Q.  Who was all there?  Who gave you the baby to take to the

23   nursery?

24   A.  I took the baby from the mom's room to the nursery.

25   Q.  So did you take the baby out of the mom -- whose hands?

1    A.  That, I really can't recall, but it was whoever --

2    whatever family member had the baby.  I put it in a crib that

3    we have that we wheel to the nursery.

4    Q.  Did you put the baby in the isolette?

5    A.  In the crib?  I could have or the family member could have

6    put the baby in the crib.  It's not really an isolette.  It's

7    like a little crib on wheels.

8    Q.  I understand what it is.  I'm trying to ask your

9    recollection about the events about how you got this baby to

10   take to the nursery, and I want you to be as specific as you

11   can about whenever you entered the room to take the baby to

12   the nursery.

13   A.  I would have taken --

14   Q.  Listen to my question, please.

15   A.  Sorry.

16   Q.  Who was all in the room whenever you entered to take the

17   baby to the nursery?

18   A.  I'm not sure, to be honest with you.  I know Carissa was

19   there and the father of the baby, because he did go with me to

20   the nursery.

21   Q.  Okay.  So the father of the --

22   A.  He did not take the baby to the nursery.  He went with me,

23   so I think --

24   Q.  Please let me finish my question.

25   A.  Okay.  Sure.

1    Q.  So the father of the baby went with you to the nursery?

2    A.  That's correct.

3    Q.  Was he following you?

4    A.  Yes, correct.

5    Q.  He was following you?

6    A.  Yes.

7    Q.  He was behind you?

8    A.  Beside me, behind me.

9    Q.  You said no doubt.  You know it was you, so I'm trying to

10   get your recollection of what you did.

11   A.  Yes.  He was right beside me, yes.

12   Q.  He was beside you, not behind you?

13   A.  No.

14   Q.  So beside you?

15   A.  Yes.  I mean, that's really kind of hard for me.  He was

16   right near me, sir, with the baby.

17   Q.  I mean, you are very, very confident that you know it was

18   you that took this baby to the nursery.

19   A.  Yes, it was.  It was me.

20   Q.  What I'm trying to find out is your recollection of where

21   people were, who gave you the baby, who was in the room and

22   what happened whenever you got to the nursery.  So did anybody

23   else follow you and the baby and Matt to the nursery?

24   A.  No, sir.  They wouldn't be allowed to get into the

25   nursery.

1  Q.  But I mean, they are allowed to go to the window?

2  A.  Yes, sir.  They certainly can, yes.

3  Q.  But now, at this time, was it just all on one level?

4  A.  It still is on one level, yes.

5  Q.  And did Matthew, whenever he was following you to the

6  nursery, was he talking to you?

7  A.  I couldn't remember that, sir.  I'm sorry.  I'm sure I

8  always talk to them.  Maybe we talked about how cute the baby

9  was.

10  Q.  I'm trying to get your memory, so if you don't remember,

11  say I don't remember.

12  A.  I remember going to the nursery with the baby.  I did not

13  let a family member take the baby to the nursery.  That's what

14  you are trying to say.

15  Q.  Whenever you are taking Kendall to the nursery and she is

16  in the isolette, was she crying?

17  A.  Yes, because we commented about how healthy her lungs

18  were.

19  Q.  And who is "we"?

20  A.  Me, the nurses at the nurses' station, because we go past

21  the nurses' station when we go to the nursery.

22  Q.  So you take it -- you take the isolette, and you have

23  Kendall in it.  You are walking past the nurses' station, and

24  you are saying -- you're all saying, oh, listen to the healthy

25  baby's lungs?

1    A.   Yeah.  We absolutely say that all the time.

2    Q.   Now, did the dad hear that?  Was he next to you whenever

3    you said that?

4    A.   I mean, I can't answer for him.  I'm sorry, but I'm sure

5    he did.

6    Q.   Where was he whenever you said that?

7    A.   He was right next to me.  Right next to me.  And then we

8    go into this nursery where you have to -- you know, it's a

9    lockdown, so we walk into the nursery together with the baby.

10   Q.   Let me ask you something about this lockdown.  While it is

11   a lockdown, that means that somebody without a bracelet can't

12   get in, correct?

13   A.   Correct.

14   Q.   So if Matt had a bracelet, he could get into the nursery?

15   A.   No.  He has to buzz in, and he would have had to go

16   through a locked area to buzz in.

17   Q.   But if he buzzes and he hits the buzzer, he can get in?

18   A.   Exactly, but it was me.

19   Q.   Because he's got a bracelet?

20   A.   Right, yes, but when we initially -- let me explain that.

21   When we initially take the baby to the nursery, there's always

22   a nursery or a nurse with that baby.  That is a given.  You

23   have to do that, but later on, like for instance, there's

24   times when the mom and the baby are in the maternity unit.

25   Q.   We're talking about the first time, the first trip down.

1    A.  It's always with the nurse and a significant other, if

2    they choose to go.

3    Q.  And I understand that there's a hospital policy which you

4    can't violate, and you have to take the baby from the room to

5    the nursery for his first assessment, right?

6    A.  That's correct.

7    Q.  And we're just going to leave it at it's your testimony

8    that you took the baby to the nursery and Matt did not,

9    correct?

10   A.  I took the baby to the nursery, correct, with Matt.  He

11   was with me.

12   Q.  Let me ask you two more questions.  If the meconium that

13   was present in the amniotic fluid had particulate matter in

14   it, and when this baby was delivered, you had a duty to call

15   the pediatrician to the delivery, correct?

16   A.  That's correct.

17   Q.  And if this meconium had particulate matter in it and you

18   didn't call the pediatrician, you violated the standard of

19   care?

20   A.  Actually, sir, it's the opposite, correct.  It's the

21   obstetrician that's the one that decides if the pediatrician

22   is to be called.  Not me.

23   Q.  But you also, as a nurse, have the ability to say this

24   baby needs a pediatrician, correct?

25   A.  If I felt that, I could say that to the obstetrician and

1    he would say, okay, let's call the pediatrician.

2            MR. PRICE:  That's all I have.

3            THE COURT:  Mr. Colville, you passed previously.  Do

4    you have any questions at this point?  Ms. Koczan?

5            MS. KOCZAN:  Just one or two more.

6                        RECROSS-EXAMINATION

7    BY MS. KOCZAN:

8    Q.  Maria, do you have to look under a microscope to tell if

9    it's particulate meconium?

10   A.  No.

11   Q.  Can you see that visually?

12   A.  Yes, you can.

13           MS. KOCZAN:  Thank you.

14           THE WITNESS:  You're welcome.

15           THE COURT:  May the witness step down at this point?

16   Yes.  Ms. Hendershot, you may step down.  I think your

17   testimony is concluded.  Is she subject to recall?

18           MS. KOCZAN:  She is not.

19           THE COURT:  So you are also excused as well.  At this

20   time, it's about 4:35.  It may be too late to start another

21   witness.  And so to that end, ladies and gentlemen of the

22   jury, we're going to take our evening recess.  Once again,

23   you'll leave your notebooks and your binders there on your

24   chairs.  Mr. Galovich will pick them up and lock them up in

25   the exhibit room as I advised you.

1            Just as I told you repeatedly and I'll remind you

2      again, once again, you can't talk about this case with anyone,

3      including fellow jurors, as you come and go and as you are

4      waiting for things to get started here.  Don't speak to any of

5      the parties, the witnesses or any of the other folks that

6      you've seen coming and going out of this courtroom.  Again,

7      don't have anyone come up to you and try to talk to you about

8      this case.

9            Once again, I do not know whether the news has or has

10     not picked up this case.  To the extent that there might be a

11     news report, you need to stay away from it, don't listen to

12     it.  Don't read it.

13           Once again, now you know a lot more about this case

14     but you should not feel compelled to do any kind of research

15     on your own or by talking to somebody else about the issues in

16     the case.  Continue to keep an open mind.  You still haven't

17     heard all the evidence in the case and you certainly haven't

18     heard my final instructions.

19           So with that, you are going to take your evening

20     recess.  We'll start again tomorrow at 9:00 and we look

21     forward to seeing you all back here so we can start promptly

22     at 9:00.  Let's all rise for our jurors.

23        (Jury excused.)

24           THE COURT:  Now, as a housekeeping matter, who will

25     we expect to see tomorrow?

1          MR. PRICE:  Tomorrow morning first will be Dr. Steven

2     Shore and then Nurse McCrory.

3          THE COURT:  Nurse McCrory.

4          MR. PRICE:  I have Tyler Janectic.

5          THE COURT:  Could you spell the name for the benefit

6     of the court reporter?

7          MR. PRICE:  I think it's J-A-N-E-T-I-C.  I would like

8     to take Dr. Heiple after Nurse McCrory, but there might be a

9     problem with getting him here tomorrow.

10         MS. KOCZAN:  Your Honor, Mr. Price originally told me

11    he wanted him on Thursday.  That's what I arranged with the

12    doctor.  Same thing with Dr. Min, so I'll try, but I believe

13    he had to take off from work, and I'm not sure he can

14    rearrange that schedule because he's also a physician.  I

15    don't know if he can get coverage to be here tomorrow, but he

16    will definitely be here Thursday.  That's what I made

17    arrangements with him based upon the prior request.

18         THE COURT:  If it turns out he can't appear, do you

19    have somebody else in mind?

20         MR. PRICE:  I would then like to do Dr. Min.

21         THE COURT:  Is Dr. Min available tomorrow?

22         MS. KOCZAN:  Your Honor, that was the same thing.  He

23    originally told me Thursday so that's what I have arranged.

24    I'll talk to Dr. Min.

25         THE COURT:  Dr. Min still works for the hospital?

```
1              MS. KOCZAN:  He does not.  He's retired.

2              THE COURT:  He's retired.  Does he live in this area?

3              MS. KOCZAN:  He does.

4              MR. PRICE:  I thought my e-mail said Wednesday.

5              MS. KOCZAN:  I thought you told me, because I think

6      we talked about it, Thursday.  I'll see.  If I can get them

7      here, I'll get them here.

8              THE COURT:  Who else in the event Dr. Min is playing

9      golf?

10             MR. PRICE:  I will have Matt testify.  Kylee Fritzius

11     may be able to make it in, but I thought she had a doctor's

12     appointment on Thursday.  Dana Contenta possibly too, but I

13     don't know if I'm going to be calling her at this point.  I

14     have to talk to her tonight.

15             THE COURT:  She is a question mark.

16             MR. PRICE:  Right.  Unfortunately, I thought, Your

17     Honor, that I asked for Dr. Heiple and Dr. Min to be here on

18     Wednesday.  I didn't know the court schedule because Thursday,

19     I have one expert and Dr. Kenkel and I thought I would be done

20     on Thursday.  You are being efficient.  I'm not trying to tax

21     the jury's attention so my experts aren't going to be that

22     long.  So tomorrow filling up, if I can't get these witnesses

23     in, we're going to have some problems.

24             THE COURT:  I think we should make every effort to

25     get the witnesses in.
```

1          MS. KOCZAN:  I'll do that.  As soon as I leave, I'll

2     call and see what I can do.

3          THE COURT:  By all means, and to that end, I think,

4     as counsel knows, this court has rearranged her entire

5     schedule to accommodate this trial, and that meant postponing

6     a number of criminal matters and the like.

7          In addition, as we well know, these jurors are here

8     at some sacrifice, and when we are in trial, I expect to fill

9     the day 9:00 to 5:00, and I'm sure that they expect likewise.

10    I do have a meeting with probation over lunch tomorrow.  It

11    will probably go from noon to about 1:15 so we'll have that

12    same kind of break, but I do expect that we're going to fill

13    this day.  Mr. Galovich, is there a problem?

14         THE CLERK:  I wouldn't say a problem, but juror No.

15    2, gentleman he asked me to come aside and he said during your

16    preliminary instructions, you gave instructions regarding note

17    taking, and he marked seven things in his book, and I said

18    hold on.  You shouldn't be telling me anything about the case.

19    He said it wasn't about the case.  It was about taking notes,

20    and basically his question for -- I don't know if it was for

21    the benefit of all the jurors, I didn't talk to all of them

22    about this -- is can they get a copy or direction regarding

23    your instructions reinstructing them about note taking?

24         THE COURT:  That's not a problem.  I can reinstruct

25    them in the morning.

1        THE CLERK:  I'll let him know.

2        THE COURT:  As far as note taking, we'll give them a

3   short reinstruction tomorrow.  Not a problem.

4        MR. PRICE:  If we have to fill up the day, Your

5   Honor, if I could, I would call Carissa also.  However, I

6   would ask the indulgence to call Carissa only as to the issues

7   about her pregnancy and labor and what happened then, and then

8   wait until Thursday to call her for the damage aspect of the

9   case.

10       THE COURT:  That sounds reasonable, particularly if

11  the defendants can't line up their witnesses.  We can do that.

12  I will give the jurors a limiting instruction if that's how

13  we're going to proceed.  Anything else for the good of the

14  order?  No.  All right.  Everybody have a good night.  Try to

15  get back here by 8:30 so we can start promptly at 9:00.

16       (At 4:45 p.m., the proceedings were adjourned.)

17

18

19

20

21

22

23

24

25

1                   C E R T I F I C A T E

2           I, BARBARA METZ LEO, RMR, CRR, certify that the
   foregoing is a correct transcript from the record of
3   proceedings in the above-entitled case.

4

5    _\s\ Barbara Metz Leo__              ___09/25/2019___
   BARBARA METZ LEO, RMR, CRR             Date of Certification
6   Official Court Reporter

7                      I N D E X

8   WITNESSES                                           PAGE

9   LEONARD H. ZAMORE, M.D.,

10        Direct Examination By Mr. Price               40
          Cross-Examination En Voir Dire By Mr.         43
11   Colville
          Cross-Examination En Voir Dire By Ms. Koczan  47
12        Redirect Examination En Voir Dire By Mr.      50
   Price
13        Direct Examination (Resumed.) By Mr. Price    51
          Cross-Examination By Mr. Colville             80
14        Cross-Examination By Ms. Koczan               96
          Redirect Examination By Mr. Price             108
15        Recross-Examination By Mr. Colville           109

16   KEVIN C. DUMPE, M.D.

17        Direct Examination By Mr. Price               111
          Cross-Examination By Mr. Colville             145
18        Cross-Examination By Ms. Koczan               176
          Redirect Examination By Mr. Price             185
19
   MARIA HENDERSHOT
20
          Direct Examination By Mr. Price               187
21        Cross-Examination By Ms. Koczan               210
          Recross-Examination By Ms. Koczan             251
22

23

24

25