1

```
 1              IN THE UNITED STATES DISTRICT COURT
           FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2

      CARISSA PERONIS, et al.,
 3                   Plaintiffs
        vs.
 4                                      Civil Action No.
      UNITED STATES OF AMERICA, et      16-1389
 5    al.,
                     Defendants.
 6
                              - - -
 7

         Transcript from proceedings on August 28, 2019, United
 8    States District Court, Pittsburgh, PA,
      before Judge Nora Barry Fischer.
 9

10    APPEARANCES:

11      For the Plaintiffs:     Harry S. Cohen & Associates, P.C.
                                Douglas L. Price, Esquire
12                              Two Chatham Center
                                Suite 985
13                              Pittsburgh, Pennsylvania 15219

14
        For the Defendant      U.S. Attorney's Office
15      USA:                   Michael Colville, Esquire
                               Philip P. O'Connor, Jr., Esquire
16                             U.S. Courthouse
                               700 Grant Street
17                             Pittsburgh, Pennsylvania 15219

18      For the Hospital       Weber Gallagher Simpson Stapleton
        Defendants and         Fires & Newby
19      Dr. Jones              Paula A. Koczan, Esquire
                               603 Stanwix Street
20                             Suite 1450
                               Pittsburgh, Pennsylvania 15222
21
        Court Reporter:        Barbara Metz Leo, RMR, CRR
22                             700 Grant Street
                               Suite 6260
23                             Pittsburgh, Pennsylvania 15219

24
         Proceedings recorded by mechanical stenography;
25    transcript produced by computer-aided transcription.
```

1         THE COURT:  Morning, everyone.  You'll recall at the

2    end of yesterday's proceedings, Mr. Galovich was talking to

3    the jurors and the jurors expressed some confusion about note

4    taking and the like.  I think we've just been joined by -- I'm

5    not sure whom.

6         MR. PRICE:  That's Carissa's grandfather.

7         THE COURT:  Potential witness?

8         MR. PRICE:  No.  Just a driver.

9         THE COURT:  And?

10        MR. PRICE:  Dr. Shore.

11        THE COURT:  I think Dr. Shore need not be here.

12   Thank you, Mr. Galovich.  Some of the jurors expressed some

13   confusion about the court's instructions vis-a-vis note

14   taking, and as I indicated yesterday, I would be prepared to

15   reinstruct the jurors as to what they may do or not do

16   vis-a-vis note taking by reiterating what was previously said.

17        I've also been thinking about their other comments to

18   Mr. Galovich, i.e., a number of them have questions, so

19   apparently either they have questions about what you said in

20   opening or they have questions about what some of the

21   witnesses had to say.

22        Now, I'm aware there's another trial going on here in

23   court, and Judge Ranjan is permitting the jurors to ask

24   questions at the conclusion of each witness's testimony, and

25   the way he is doing that is he gave them an instruction, and

1    at the conclusion of each witness' testimony, he is permitting

2    them to write in his chambers on a Post-It note and put down a

3    question.

4         The question is then submitted to the court and he

5    makes a determination what, if any, of the questions are read,

6    instructing the jurors that to the extent he does not use a

7    question, it's because of the fact that their question may be

8    eliciting information that's already been ruled or deemed

9    inadmissible for the case.

10        So the court is wondering, given the jurors', in my

11   words, persistence in talking to Mr. Galovich, whether we

12   should or should not be employing such a procedure.

13        So one thought I had overnight was that when

14   Mr. Galovich goes back once they are all there and I think

15   they are just about all there, that he, number one, inquire of

16   them, do their questions relate to witness testimony or do

17   they relate to their duties as jurors, and perhaps get them

18   before they come back out here to write down on a piece of

19   paper without reference to their name or juror number what

20   these questions are and then we can deal with these questions.

21        So I'm looking to counsel to see if they have any

22   comment about this.  Now, interestingly, we recently had a

23   case go to verdict in a different chambers, and there, the

24   jurors had a number of questions as well and some of those

25   questions went to, for example, were there attempts to settle

1    the case.

2         Well, obviously the court can't comment on such a

3    question, so who knows what's on their minds?

4         Mr. Price, what's your view vis-a-vis having these

5    jurors submit questions?

6         MR. PRICE:  Never been asked, but why not?  We do it

7    after they deliberate.  If they want to ask questions, they

8    can ask questions by paper.  It would be, I guess, interesting

9    to find out what they are thinking now, so I don't have really

10   a problem with it.

11        THE COURT:  Mr. Colville?  The jury really is not

12   within your purview, let's put it that way.

13        MR. COLVILLE:  I'm not sure what to say, Your Honor.

14   They are not -- they shouldn't be, yet we're trying the case.

15        THE COURT:  You are trying the case to me, too.  I'm

16   the ultimate fact-finder vis-a-vis the U.S.  I understand

17   that.

18        MR. COLVILLE:  The questions that are asked, I don't

19   know.  What if they asked questions that only Dr. Zamore might

20   be able to answer.  That time has come and gone for me to

21   clean up or follow up with questions.

22        THE COURT:  Understood.

23        MR. COLVILLE:  But I don't understand yet what the

24   confusion is, so it may very well be it's a nonissue.

25        THE COURT:  It may well be.

1          Ms. Koczan?

2          MS. KOCZAN:  Your Honor, I would like to know what

3    the confusion is first before I offer any comment.  I've never

4    done this before.  I'm not adverse to it, but again, I don't

5    know what the questions are, and it is somewhat concerning

6    because there have been witnesses on and off that we couldn't

7    answer questions about.

8          THE COURT:  Right.  Well, I've been trying cases here

9    for the last 12 and a half years.  This court has not been

10   confronted with this issue.  There are pros and cons to having

11   jurors asking questions.  I've read the literature on same.

12   I've not employed it to this point in time, but this early in

13   the proceedings, given the fact that these folks seem to have

14   some queries and that they feel comfortable enough, if you

15   will, to press them on Mr. Galovich, I thought that, number

16   one, we should bring it to your attention; and number two,

17   consider what we might want to do with that.

18          So I think what I'm going to do is have Mr. Galovich

19   go back since all the jurors are back there, number one, and

20   I'm going to ask him to ask the jurors generally, outside of

21   their concern or issue relative to note taking, what is the

22   nature of their questions.

23          If they relate to the proceedings, I'm going to ask

24   Mr. Galovich to have them write them down on a piece of paper

25   without indication of which juror or juror number is involved.

1    Then he'll bring those out and then we'll address whether we

2    do or don't answer those questions at this stage and how we

3    might proceed further.

4            The other thing that I would call to your attention

5    is this:  Yesterday, there were some folks in the galley as

6    well as at counsel table who were reacting to testimony.

7    That's totally inappropriate in this courtroom.  There was

8    particularly a woman with a flowery sweater on who

9    demonstratively reacted several times through the proceedings.

10   She was in and out of the courtroom.  That's not only a

11   distraction, but it's totally inappropriate in this chambers

12   or in this courtroom or anywhere else.

13           And I would also caution the parties and any other

14   witnesses that, you know, this is a sober affair, one.

15           Two, it's not appropriate to react to testimony in

16   any way, shape or form.  Everybody understand that?

17           Whoever that woman was, she was a brunette with a

18   sweater who was in and out of here yesterday and seated behind

19   Ms. Wolf most of the time.  If she appears here today,

20   Mr. Galovich is going to take her aside and we're going to

21   admonish her.

22           MS. KOCZAN:  I'm not sure who that is.

23           THE COURT:  Neither am I, because these people do

24   come and go, but she seemed to have some affiliation to the

25   defense team, you know.  Whether she is a paralegal, a

1    secretary, another attorney or a hospital employee, it's hard

2    for me to divine.

3           Mr. Galovich, if you'll go back and talk to our

4    jurors at this time.

5           Mr. Price, we know Dr. Shore is here.  Have you and

6    Ms. Koczan worked out the schedule for the rest of the day?

7           MR. PRICE:  Yes, Your Honor.  Dr. Shore will be first

8    to testify.  Nurse McCrory will be next.  We have a witness

9    Tyler Janectic, who, because of work obligations, will have to

10   testify before lunch so he's on his way and he will probably

11   be testifying probably after the break.  His testimony should

12   not be more than 10 or 15 minutes.  He's a factual witness.

13   After that, I'll call Dr. Bradley Heiple who is the resident

14   doctor.

15          Following that, I will be calling Matthew in the

16   afternoon, depending upon how far we go with Dr. Heiple and

17   with Nurse McCrory, so my plan is to call Matthew Fritzius,

18   and then I have arranged for Dr. Kenkel, who was scheduled for

19   tomorrow, I moved him up to today since we are moving faster

20   so we can get the day filled, so he's going to be here at 3:00

21   and he should take us to the end of the day.

22          THE COURT:  Thank you.  Anything else for the court's

23   attention?  I see Ms. Loftus has just arrived.

24          MR. PRICE:  Your Honor, one of the other issues --

25   the only other issue I mentioned was that I do have the five

1    original photographs which are already in the joint exhibits.

2    How does the court want me to handle introducing the actual

3    originals?  I plan to simply supplement the record and say

4    that I have the originals which I would like to, at the end of

5    my case, publish to the jury so --

6         THE COURT:  Mr. Price, finish what you were going to

7    say despite what Mr. Galovich is doing.

8         MR. PRICE:  I would publish that to the jury

9    following the close of my case so they could actually see

10    them, and they would be, I guess, attached to the joint

11    exhibit trial binder for -- but I only have one copy of the

12    original photograph.

13         THE COURT:  Understood.  Okay.  Any objection to

14    those "original" photographs going back to the jury?

15         MS. KOCZAN:  Your Honor, may I see them?

16         THE COURT:  Yes.

17         Mr. Price, share those with Ms. Koczan as well as

18    Mr. Colville.

19         MS. KOCZAN:  I'm fine.

20         THE COURT:  She has no objection.  Mr. Colville?

21         MR. COLVILLE:  No objection.

22         THE COURT:  So, as you indicated, Mr. Price, number

23    one, I think you can simply move them into admission.  There's

24    no objection, one.

25         Number two, they can be passed to the jurors and then

1    gathered up, and then in addition, each of these jurors when

2    they go out will have the binders, and in addition, they'll

3    have any singleton exhibits that have been admitted.

4         So if you want those pictures to go back to the jury

5    room, they can go back to the jury room as far as I'm

6    concerned.

7         MR. PRICE:  Finally, have the Gatorade bottles been

8    taken?  We are no longer using them.

9         MR. COLVILLE:  We have pictures.

10        THE COURT:  And the picture was provided to

11   Mr. Galovich, correct?

12        MR. COLVILLE:  Correct.

13        THE COURT:  Mr. Galovich, you came in and you were

14   signaling something to me.

15        THE CLERK:  I gave them five minutes.  I said would

16   run back in a few minutes.

17        THE COURT:  Thank you.

18        THE CLERK:  I told them not to discuss their

19   questions with one another in that respect.

20        MR. COLVILLE:  Your Honor, while we have this time,

21   looking forward scheduling-wise, Doug, what do we think

22   witness-wise?

23        MR. PRICE:  Tomorrow morning, I have Dr. Karotkin.

24   After that, I have Kylee Fritzius, she is a factual witness,

25   would not take that long.  Then I'm going to be calling

1  Carissa and I will be done.  I might be done by noon.

2          MR. COLVILLE:  What about Dr. Min?

3          MR. PRICE:  I'm sorry, Dr. Min will be tomorrow

4  morning, too.  I don't expect him to be very long.  I mean, of

5  course, defense might have a lot of questions, but then I

6  would be done by midafternoon tomorrow.

7          THE COURT:  Okay.  Thank you.  Then we might have a

8  Rule 50 motion and argument?

9          MS. KOCZAN:  Correct.

10          THE COURT:  The court will be prepared to rule.

11          MS. KOCZAN:  Your Honor, do you want my motion today

12  then?

13          THE COURT:  Well, I would like your motion and brief

14  if you have one.

15          MS. KOCZAN:  I do.

16          THE COURT:  The sooner I get it, the better.  Was it

17  filed on the docket?

18          MS. KOCZAN:  Not yet.  I'll have someone bring it up

19  today.

20          THE COURT:  Okay.

21          MS. KOCZAN:  Then, Your Honor, in terms of my

22  witnesses, as I indicated at the start of the trial, I have

23  all of my witnesses because of what we believed to be no court

24  on Friday earlier, I have all of my experts scheduled for the

25  4th, which would be that Wednesday.  I have Nurse Hackney,

1    Nurse Ash that we can put on on Tuesday or Friday, whichever

2    you prefer, and then my other experts, I'm going to try to

3    have them all here on that Wednesday so we can just go in

4    order.

5            I'm trying to see if I can get one of them on the

6    3rd, but they had all arranged for the 4th or 5th thinking

7    that we were not going to be in session on Friday.

8            THE CLERK:  Your Honor, they said they have no

9    questions.

10           THE COURT:  Okay.  Well, then that's good.

11           MR. COLVILLE:  From the government's end, Your Honor,

12   we'll have Dr. Wiesenfeld here first thing Tuesday morning.

13   That will be our only witness.

14       (Jury present.)

15           THE COURT:  Good morning, ladies and gentlemen of the

16   jury.  I trust that you had smooth travels coming in today,

17   once again, despite the rain.

18           At the end of yesterday's proceedings, Mr. Galovich

19   advised me that some or all of you wanted the court to revisit

20   with you my instructions vis-a-vis note taking, and as you'll

21   recall, I told all of you note taking is certainly permitted

22   but it's not required, and you can either take your notes on

23   the little pads that you have or you can take them actually on

24   those exhibits, because those exhibits are for your use, and

25   as you heard, all of the paper, all of the exhibits that are

1    contained in those binders is now a part of the trial.  They

2    are all admitted into evidence, and you've seen certain of

3    these documents actually blown up and put up on the screen,

4    but everything there that's before you is also for your

5    consideration.

6            So in any event, each of you can take notes, but no

7    one is required to take notes.  I also instructed you to be

8    brief.  Don't try to summarize all of the testimony.  Notes

9    are for the purpose of refreshing memory.  You may have noted,

10   just like you, I take notes, and sometimes witnesses talk too

11   fast, sometimes you don't capture everything, but you need to

12   put down what you think will jolt your memory once you start

13   deliberating.

14           They're particularly helpful when dealing with

15   measurements, times, distances, identities and relationships,

16   but overuse of note taking can be distracting, because you

17   must determine the credibility of the witness, so it's up to

18   you to observe the demeanor and appearance of each person on

19   the witness stand.  Note taking must not distract you from

20   that task.

21           If you wish, to make a note, you need not sacrifice

22   the opportunity to make important observations.  You may make

23   your note after you have made an observation.  So in a

24   nutshell, what that's saying is that it's up to you to take a

25   look at the witness, watch the witness come up to the witness

1    stand, watch the witness when the witness is on the stand and

2    make your determinations using your own background, experience

3    and common sense, is this person credible or not.

4          Thirdly, don't use your notes or any other juror's

5    notes as authority to persuade fellow jurors.  This is going

6    to come in more at the end of the trial because, in your

7    deliberations, you should give no more or no less weight to

8    the views of a fellow juror just because that juror did or

9    didn't take notes.

10         As I mentioned earlier, your notes are not official

11   transcripts.  They are not evidence.  They aren't a complete

12   outline of the proceedings.  At most, they are a list of

13   highlights of the trial.  They are valuable, if at all, only

14   as a way to refresh your memory, as I indicated a minute ago.

15         Your memory is what you should be relying on when it

16   comes time to deliberate and render your verdict in this case.

17   You, therefore, are not to use your notes as authority to

18   persuade fellow jurors of what the evidence was during the

19   trial.  Notes are not to be used in place of the evidence.

20   "The evidence" meaning the testimony and meaning all those

21   exhibits in your respective juror binders, and by the way,

22   there may be some singleton exhibits that come in during the

23   trial as well besides what's in those binders.

24         Last, but not least, I also instructed you that you

25   can't take your notes away from the court, and maybe you might

14

1    be tempted to take that binder home at night and study it,

2    but, no, you can't do that.

3         At the end of every break and each day, you leave

4    your notes, as you know.  Mr. Galovich gathers them up.  He

5    has a big -- looks like a shopping cart that he borrows from

6    the clerk's office.  He puts everything in that and he

7    literally locks that in our exhibit closet overnight, and

8    every morning when he comes in, he gets it all out.  He wheels

9    it to right outside this door and then he brings it in so that

10   you have the benefit of those binders as well as your notes.

11        As I also told you, when the trial is all over, it's

12   his job to take all of those notes back from you, and we

13   literally destroy them, so whatever confidential notes that

14   you put on the steno pad or in your exhibits, those are

15   destroyed because, as I told you, your deliberations are

16   secret.

17        So to that end, neither I, my law clerks,

18   Mr. Galovich or anybody else is going to go through all of

19   that to see what you were thinking as the case went through

20   the trial, so we don't do that here at all.  So I hope that

21   that clarifies the instructions on note taking for anybody who

22   had a pause or a concern about that, and I understand

23   otherwise, you had an opportunity to think whether you had any

24   other questions that you might want to pose, and at this point

25   in time, I understand that you don't have any questions that

1    you might want to pose.

2            So I think we are ready to start, and to that end,

3    Mr. Price has already alerted us to his next witness who will

4    be Dr. Shore, and if you will bring in Dr. Shore, Mr. Price.

5            THE CLERK:  Sir, will you please step forward?

6    Please state and spell your name for the record.

7            THE WITNESS:  Steven with a V, L. Shore, S-H-O-R-E,

8    M.D.

9        (Witness sworn.)

10            THE COURT:  Dr. Shore, watch your step getting up on

11    the witness stand.  It's a little uneven there.  Once you are

12    situated there, I have a short limiting instruction and

13    Mr. Price may start.  You may be seated.  There's water there

14    in case you need it.

15            As you were instructed yesterday, and let me remind

16    you, you are now about to hear testimony containing opinions

17    from Dr. Steven Shore.  Dr. Shore is also a physician.  He'll

18    be offering opinions because of his knowledge, skill,

19    experience, training or education in the field of pediatrics

20    and pediatric infectious disease and the reasons for his

21    opinions.

22            In weighing Dr. Shore's opinion testimony, you can

23    consider his qualifications, the reason for his opinions and

24    the reliability of the information supporting those opinions

25    as well as the other factors that I will ultimately discuss in

1    my final instructions for weighing the testimony of witnesses.

2         The opinion of Dr. Shore should receive whatever

3    weight and credit, if any, you think appropriate given all the

4    other evidence in this case.  You may disregard his opinions

5    entirely if you decide they are not based on sufficient

6    knowledge, skill, experience, training or education.  You can

7    also disregard his opinions if you conclude that the reasons

8    given in support of the opinions are not sound, if you

9    conclude that the opinions are not supported by the facts

10   shown by the evidence or if you think that the opinions are

11   outweighed by other evidence.

12        In deciding whether to accept or rely upon the

13   opinions of Dr. Shore, you can also consider any bias that he

14   may have, including any bias that may arise from evidence that

15   Dr. Shore has been or will be paid for reviewing this case and

16   testimony in this case.  So with that limiting instruction,

17   Mr. Price is ready to begin his examination.

18        MR. PRICE:  Thank you, Your Honor.

19        STEVEN SHORE, M.D., a witness herein, having been

20   first duly sworn, was examined and testified as follows:

21                     DIRECT EXAMINATION

22   BY MR. PRICE:

23   Q.  Dr. Shore, can you tell us what type of doctor, what type

24   of medicine do you practice?

25   A.  I'm trained both as a general pediatrician and I'm also

1  trained as a specialist in pediatric infectious diseases and

2  immunology.

3  Q.  Can you explain or tell us a little bit about pediatric

4  infectious disease is and immunology is.  What does that

5  involve?

6  A.  That involves generally looking at children and infants,

7  teenagers with unusual infections, with unusually severe

8  infections, and trying to find out how best to treat them as

9  well as diagnose them.  The major thing is to treat, but the

10  diagnosis comes, that's well, but it's better to be able to

11  help people.

12      The immunology part is to look and see if there's

13  something wrong with certain kinds of children who suffer

14  unusual infections or frequent infections, again to see if

15  there's something we can do to reverse that trend.

16  Q.  I know we can all hear you, but if you need to, you can

17  adjust the microphone to make it more comfortable.

18  A.  Okay.

19  Q.  Now, I have to ask you about your qualifications so the

20  jury understands your expertise and I'll go through it.  You

21  did -- you graduated from the University of Pennsylvania in

22  1963 and went on to medical school in 1967 and you graduated

23  from Johns Hopkins?

24  A.  Right.  I went to Johns Hopkins in 1963, graduated in '67.

25  Q.  Then you did an internship in pediatrics in 1966 through

1   '67 at Children's Hospital in Boston and a residency there for

2   the next year?

3   A.  Right.  The reason there is that overlap is I accelerated

4   when I went through Johns Hopkins.  I did it in three years,

5   and my senior year as a medical student, I was actually an

6   intern at Boston Children's.

7   Q.  And then you did a fellowship at Emory University in

8   Atlanta?

9   A.  That's correct.

10  Q.  And then, I notice you worked for the government as a

11  medical officer for the Center of Disease Control Biophysical

12  Separation Unit and then the viral immunology branch of the

13  virology division in charge of cellular immunology?

14  A.  Right.  That was from 1968 to 1981.  HIV broke out in

15  1983, and had I known that was coming on, I suspect I couldn't

16  have left CDC, but that was still two years away.  It's just

17  interesting how these things turn out in your life.

18  Q.  You have faculty appointments where you have been a

19  clinical assistant professor in pediatrics at Emory and your

20  clinical associate professor in pediatrics at -- or clinical

21  professor of pediatrics in Emory since 2001?

22  A.  That's correct.

23  Q.  And what's involved in that work?

24  A.  Clinical staff means you are not paid for your work.  You

25  do it because it's the right thing to do.  You see patients

1    along with people at different levels of training, and that

2    could include anything from nurse practitioners, physician's

3    assistants, fellows, residents, what have you, and there's

4    also a lot of informal teaching that goes on in medicine,

5    especially in infectious disease since we literally want to

6    teach our colleagues in other disciplines how to take care of

7    like infectious disease complications in surgery so the right

8    thing is done so the complications are kept to a minimum.

9    Q.  And you work with kids, you know, pediatrics and

10   infectious diseases in kids, and you work with doctors,

11   residents, fellows, nurse practitioners in treating,

12   evaluating and trying to diagnose those conditions?

13   A.  That's correct.

14   Q.  And I know you are on staff at a few hospitals, North Side

15   Atlanta in Atlanta, North Side Hospital in Atlanta, there's a

16   Scottish Rite Children's Hospital.  You also, since 1981, have

17   been in private practice, and you are board certified in

18   pediatrics and pediatrics infectious disease?

19   A.  I was board certified in P&ID, infectious disease until

20   Christmas of 2015, when they changed the rules and, quite

21   frankly, being about 73 or 74, with the change in rules, I

22   just did not sit for my recertification.  I'm happy to take an

23   exam, which was the way we used to do it and prove my

24   credibility that way.

25   Q.  So you were certified.  You just let it lapse sort of?

1    A.   Right.   I took the first boards that were given in 1994

2    and then recertified by examination in 2001 and 2008, so I

3    would have been board certified through December 2015.

4    Q.   And in your work, whenever you were working for the

5    government, I know there were a whole bunch of journals and

6    book chapters that you published, and I'm not going to go

7    through them all, but I noticed that a lot of them

8    concentrated in pediatric infectious disease and the use of

9    antibiotics.

10   A.   Yes.   A lot of them dealt -- a lot of my original research

11   work was on herpes simplex virus which causes cold sores and

12   also causes, by the way, neonatal sepsis.   We actually

13   published a couple articles recently on how to use certain

14   kind of blood tests to diagnose that.

15          In addition, I co-authored a number of textbook

16   chapters on invasive infections with different bacteria,

17   especially when they lead to infections of bones and joints.

18   Q.   Now, I guess the jury would like to understand your

19   current practice.   Do you treat kids every day or what do you

20   do in medicine now as a doctor?

21   A.   I'm a bit of a workaholic.   I don't have off days.   I have

22   days where I work a little less.   I see kids literally every

23   day when I'm in town which is most of the time, and I'm --

24   half of my time, I'm in my pediatric office and the other

25   halftime, I'm at the hospital seeing patients both at Scottish

1    Rite and at North Side Hospital.

2    Q.  Are you called in to consult on patients such as Kendall

3    Peronis in a case like this?

4    A.  Yes.

5    Q.  And do you teach doctors about cases where you come in

6    about an infectious disease in a baby, a newborn?

7    A.  Right.  We try to decide if the antibiotics are right.

8    We're not generally there when the event, such as happened in

9    Kendall's case, but we then come in afterwards, and they want

10   to know whether they are giving the right antibiotics, the

11   right dose of antibiotics, whether the infection has settled

12   somewhere else, the duration of therapy and what other

13   diagnostic studies to do, so for example, the infection might

14   not happen again or happen what we call a relapse.

15   Q.  It's more of a neonatologist specialty or pediatrician

16   that deals with the first resuscitation, that might be called

17   to the delivery room.  You deal more with we got an infection.

18   How do we deal with it?

19   A.  Right.  In the old days, in the 1980s, we would

20   resuscitate our own babies.  We did everything.  We attended

21   C-Sections in the middle of the night and the like.

22       Things have gotten a little more organized in a place like

23   North Side which has the largest NICU and nursery in the

24   United States actually.  So we have people from our NICU or a

25   neonatologist attend deliveries.  Now, not every hospital has

1    that kind of intensive NICU.

2    Q.  Today, you are here testifying as a medical expert in the

3    case, and as part of your work you do outside of medicine, you

4    come in and you provide expert testimony?

5    A.  I do.

6    Q.  About how long have you been doing that?

7    A.  Since approximately 1983, so about 35, 36 years.

8    Q.  And how often do you look at a case such as this?

9    A.  I get about three cases a month usually in the mail with a

10   preceding phone call from a lawyer.

11   Q.  And about how many times do you testify, like in a year?

12   A.  By deposition, meaning, people take down my opinions at a

13   deposition, it's about eight times, nine times a year in terms

14   of deposition giving.

15   Q.  How about times in court like this?

16   A.  It averages at least, over the last 20 years, about twice

17   a year.

18   Q.  Have you ever testified for our firm before?

19   A.  Not to my knowledge.

20   Q.  And you still carry on an active practice, seeing patients

21   and treating every day along with this work?

22   A.  Sure.

23        MR. PRICE:  That's all the questions I have, and I

24   would offer Dr. Shore as an expert in pediatric infectious

25   diseases and would offer for cross-examination.

1           THE COURT:  Cross-examination, Mr. Colville?

2               CROSS-EXAMINATION EN VOIR DIRE

3   BY MR. COLVILLE:

4   Q.  Good morning, Doctor.  My name is Michael Colville.  I

5   work for the U.S. Attorney's Office and I represent the

6   United States in this case.

7   A.  Yes.

8   Q.  Doctor, you are here as an expert in the area of

9   pediatrics and pediatric infection; is that correct?

10  A.  Correct.

11  Q.  You are not here as an expert in the field of obstetrics;

12  is that correct?

13  A.  Correct.

14  Q.  That's the specialty of Dr. Dumpe.  Are you aware of that?

15  A.  Yes.

16  Q.  Is it safe to say that you do not manage the care, labor

17  and delivery of newborns in your practice?

18  A.  That's correct.

19  Q.  You are not here to offer an opinion as to whether or not

20  Dr. Dumpe met the standard of care as an obstetrical

21  specialist; is that correct?

22  A.  Right.  I've not been asked to do that.

23  Q.  From the materials that were provided to me from your

24  counsel, you were just mentioning how much you testify as an

25  expert or as a reviewer.  You testify a lot.  Is that an

1    accurate assessment?

2    A.  I think that's fair, yes.

3    Q.  From the document I received, it looks like, in the past

4    four years, you've identified 46 cases where you have

5    testified; is that right?

6    A.  I think that's a Rule 99 I submitted, yes, sir.

7    Q.  That testimony would be in depositions, arbitrations and

8    trials, correct?

9    A.  Correct.

10   Q.  I assume you prep for these depositions, arbitrations and

11   trials as well; is that right?

12   A.  Sure.

13   Q.  Does this interfere with your clinical practice at all?

14   A.  No.

15   Q.  It doesn't?

16   A.  No.

17   Q.  So you do this when?

18   A.  When I'm off, at night, weekends and the like.  Patients

19   come first.  This is obviously a secondary activity.

20   Q.  What percentage of expert testimony is your income derived

21   from?

22   A.  I would say right now, a total of about 40 percent.

23   Q.  So it's nearly half of your income is derived from

24   testifying like you are today?

25   A.  Yeah.  It's getting closer every year.

1    Q.   Now, the past four years, you've testified 46 times.

2    We've established that.

3    A.   Yes.

4    Q.   That's an average of 11 per year; is that correct?

5    A.   I guess -- well, it was four and a half years.  I would

6    say it's about ten per year, yes.

7    Q.   Now, the testimony you are giving isn't in Atlanta where

8    you live presently, right?

9    A.   Right.

10   Q.   Some is?

11   A.   Some is in Atlanta.

12   Q.   Most of it is not?

13   A.   Most of it is not in Atlanta.  Most of it is not in

14   Georgia.

15   Q.   99 percent of it is elsewhere in the country; is that

16   right?

17   A.   Well, if you mean by Atlanta, I would say about 98

18   percent.  I have two defense cases I'm now working on in

19   Atlanta.

20   Q.   The list you gave me of the 46 that you identified, 46

21   times you've testified in the past four years, 17 are in --

22   well, there's a handful that were in Georgia?

23   A.   Right.

24   Q.   The remainder were in other states across the country?

25   A.   True.

1    Q.  Have you ever lived in this community?

2    A.  No, I've never lived in Pittsburgh.  I'm from

3    Philadelphia, but that's the other side of the state.

4    Q.  Have you ever practiced medicine in this community?

5    A.  No, I haven't.

6    Q.  Is this the first time you have been to Pittsburgh?

7    A.  No.

8    Q.  When have you been to Pittsburgh previously?

9    A.  I think I had a case here 20 or 25 years ago.

10   Q.  Now, on the list, it looks like you've traveled, through

11   the 46 times, to about 17 states; is that right?

12   A.  I never codified it that way, but that sounds reasonable.

13   Q.  Your list indicates you testified in Michigan, Maryland,

14   Alabama, Missouri, North Carolina, Kansas, Florida, Tennessee,

15   Georgia, Kentucky, Hawaii twice, Illinois a couple of times,

16   South Carolina, Pennsylvania, Virginia, New Jersey, Louisiana.

17   A.  Yes.  Those were largely by deposition rather than trial,

18   yes.

19   Q.  Did I miss any states?

20   A.  I wouldn't know.  I can't keep track of them.

21   Q.  But a lot of those states were duplicative.  You've

22   visited many states often?

23   A.  I only go to trial twice a year.  Some of the depositions

24   are in my office, so I don't travel nearly that much.

25   Q.  Of the 46 times that you've identified as testifying, only

1    six of them have you testified for the defense; is that

2    correct?

3    A.  In that list, that's correct.

4    Q.  Well, this is the most current list you have, correct?

5    A.  Right.  It doesn't have the last year's testimony.

6    Q.  But of the list you supplied us in this case, knowing that

7    you were going to be testifying here today?

8    A.  Yes.

9    Q.  Of the 46 times you have testified, you've only testified

10   for the defense on six occasions?

11   A.  I'd say that's about right.

12   Q.  So all the others have been for the plaintiff?

13   A.  Correct.

14   Q.  Does that affect your decision making process in any case?

15   A.  No.  I don't get to choose which cases are sent to me.

16   Actually, the first five years I testified, they were all

17   defense before a plaintiff's lawyer asked me if I would take

18   any plaintiff's cases.  Since that time, I've gotten mostly

19   plaintiff cases in the mail.

20   Q.  So you accept every case you receive?

21   A.  I look at them, yes.  I don't accept them.  In terms of

22   half the cases, I will probably find don't have merit.

23   Q.  So it just happens in this case, of the 46, 40 of them you

24   accepted they were for the plaintiff only?

25   A.  I think six, yes.

28

1              MR. COLVILLE:  Thank you.

2              THE COURT:  Ms. Koczan, cross?

3              MS.KOCZAN:  Yes, thank you.

4                    CROSS-EXAMINATION EN VOIR DIRE

5    BY MS. KOCZAN:

6    Q.  Just a few follow-up questions, Doctor.  You told us you

7    are a clinical professor of pediatrics, correct?

8    A.  Yes.

9    Q.  You are not on a tenure track?

10   A.  No.  I'm in private practice.

11   Q.  And you are not currently board certified in pediatric

12   infectious diseases, correct?

13   A.  That's true.

14   Q.  In looking at your curriculum vitae, I saw where you

15   listed your organizations.  There are a number of

16   organizations for practitioners in pediatric infectious

17   disease, correct?

18   A.  There's actually only one society.

19   Q.  Well, there is the American -- first and foremost, the

20   American Academy of Pediatrics is more pediatrics, correct?

21   A.  It's all pediatrics.

22   Q.  You are not a member of that, are you?

23   A.  No, that's not true.  I've been a fellow since 1973.

24   Q.  Not on your curriculum vitae though?

25   A.  It is.  I think it says board certified in 1973 and fellow

1    since 1974.  If so, that's an error.

2    Q.  You are not a member of the Infectious Disease Society of

3    America, are you?

4    A.  I am not a member of the IDS.

5    Q.  You are not a member of the Pediatric Infectious Disease

6    Society, correct?

7    A.  I was for 15 years and stopped paying dues.

8    Q.  In terms of your infectious disease work, looking at your

9    curriculum vitae, I didn't see that you are a hospital

10   epidemiologist; would that be true?  You don't hold that

11   position?

12   A.  Right.  While I was at CDC, the program I was in was

13   called the laboratory division, and I was not in the academic

14   intelligence service.

15   Q.  Currently, at any of the hospitals you practice at, you

16   are not the hospital epidemiologist; is that correct?

17   A.  That's correct.  One of my partners is.

18   Q.  Looking at the various articles that you wrote, I didn't

19   see any on there that were particularly pertinent or that

20   dealt with E. coli infection; would that be correct?

21   A.  That would be generally true.

22   Q.  So it doesn't appear that you've ever written on the

23   subject specifically E. coli infection.  Do you do any

24   research, Doctor?

25   A.  Not anymore.  I did extensive research for 13 years.

1    Q.  And you had never researched on E. coli infections either;

2    would that be correct?

3    A.  That's true.

4    Q.  In terms of your testifying while Mr. Colville was asking

5    you questions, I added up the numbers, and it looks like that

6    you have reviewed, over the course of your career, about 1,200

7    or more cases.  Does that sound accurate, reviewed?

8    A.  No.

9    Q.  You said you did 36 -- 35 years at 36 a year?

10   A.  No.  I didn't say that.  That misstates my testimony.

11   That's more recently.  When I started, I was only getting five

12   to eight cases a year.

13   Q.  Okay.

14   A.  And the number of cases, I would say, I've given by

15   deposition -- one of the lawyers counted 225 depositions in

16   March, so I would be up to about 230, 236, and I routinely do

17   not give depositions that go to trial, about half the cases,

18   so I would say 500.

19   Q.  You've reviewed 500 cases; is that correct?

20   A.  About 500.

21   Q.  Mr. Colville had asked you some questions about the states

22   that you testified in.  I've actually done some research and

23   found some information that you've actually testified in 29

24   states.

25   A.  I think I've testified in more than that actually.

1    Q.  You think more than 29 states?

2    A.  Probably.

3    Q.  So both he and I are missing a couple of states?

4    A.  I think so.

5    Q.  So you have literally testified sea to shining sea; would

6    that be true?  Coast to coast?

7    A.  I've gone beyond the coast.  I've testified in an Alaska

8    case.  One, perhaps two, Hawaii cases.  To my knowledge, never

9    in California.  Once in Washington.

10          MS. KOCZAN:  Thank you, Doctor.  Those are all the

11   questions I have.

12          THE COURT:  Mr. Price, anything further on

13   qualifications?

14          MR. PRICE:  No.

15          THE COURT:  Well, the court now accepts the

16   plaintiffs' proffer.  Dr. Shore will be testifying as an

17   expert in this case, particularly in the fields of pediatrics

18   and pediatric infectious disease.

19          Go ahead, Mr. Price.

20          MR. PRICE:  Thank you, Your Honor.

21                DIRECT EXAMINATION (Resumed.)

22   BY MR. PRICE:

23   Q.  Dr. Shore, this came up yesterday, too, and I know that

24   the government brought up this question.  So you've never

25   practiced here in Pittsburgh or Beaver County.

1       From your understanding of the standard of care in

2   medicine, is it a local standard of care that is limited to

3   Beaver County, or is the standard of care you testified

4   nationwide?

5   A.   It's nationwide.  There's a few states that have some

6   peculiar regional qualifications like North Carolina and to a

7   lesser degree Tennessee, but a great number of states say

8   there's a national standard of care and there is one.

9   Q.   That's what you are going to be testifying to today here?

10  A.   Yes.

11  Q.   I'm going to ask you about a few rules the jury has seen.

12  I just want to make sure if you agree with them.  First rule,

13  if a baby is at risk, a pediatrician must be present at

14  delivery.  Do you agree with that?

15  A.   Yes.  If a baby is at risk, either a pediatrician or a

16  neonatal specialist such as a NICU nurse or a NICU that is

17  neonatal intensive care unit respiratory therapist.

18  Q.   Second rule, a hospital must take all precautions to

19  minimize risks to its patients.  Do you agree with that?

20  A.   Absolutely.

21  Q.   And the final rule, the earlier you treat something, the

22  better the outcome?

23  A.   Yes.  That would be true except for some very advanced

24  cancers and things like that.

25  Q.   And the earlier you treat something, the better the

1    outcome is in most particular to your testimony here today?

2    A.  Right.  It would be very true for infections.

3    Q.  Now, I'm going to move along to the medical definitions,

4    and I know the jury has heard a lot about this, but I just

5    have to make sure they understand where you are coming from.

6        Meconium, what do you look for when meconium is present

7    during labor?

8    A.  What's typically done is you look to see what the meconium

9    is like, whether it's thick or thin.  We will usually -- we

10   have to clear the baby's mouth and upper airway with

11   suctioning and the like, and we look, if we think there's a

12   chance that the baby is in any kind of distress or the baby

13   may have swallowed some of the meconium, this can cause

14   obstruction to the airway or even infection in the lungs, and

15   so what one does is you look down with a laryngoscope, which

16   is a curved blade, and you look to see whether the meconium

17   has traveled beneath the vocal cords.

18   Q.  Can you tell us what is meconium aspiration syndrome?

19   A.  In this case, a baby is generally in distress in utero for

20   some reason either being deprived of oxygen or suffering from

21   an infectious process or some traumatic event, and the baby

22   puts out meconium into the amniotic fluid.  In other words, it

23   has an involuntary bowel movement, and then in the process of

24   having stress, the baby can take a gulp in and inhale some of

25   this material which may or may not get as far as the lungs.

1    Q.  Another medical issue is E. coli infection.  Can you tell

2    us what is an E. coli infection?

3    A.  Well, first, let's say what E. coli is.  E. coli is the

4    dominant aerobic organism in the bowel.  We all have it in our

5    bowels.  Pretty much all women have E. coli in their vaginas.

6    So E. Coli has the ability to move to different places, and it

7    can move up and get into the placental plate and into the

8    amniotic fluid and cause infection that way.  It's a -- it's

9    called a gram negative rod.  It's the second leading cause of

10    neonatal sepsis.

11    Q.  And what is sepsis?

12    A.  So sepsis is when a baby generally has a fever or low

13    temperature, a baby has an immunologic response to it in terms

14    of its white count and certain parameters such as C-reactive

15    protein, and most importantly, generally a germ can be

16    isolated from the bloodstream on blood culture.

17    Q.  Another term we heard just briefly, can you tell us

18    bronchopneumonia, what is bronchopneumonia?

19    A.  Pneumonia is considered an infection or at least an

20    inflammation of the lungs, and broncho means the pattern is

21    uneven, scattered around the different bronchial tubes, which

22    are the big air pipes that go to the different parts of the

23    lungs.  Rather than seeing one complete area involved, which

24    we call consolidation, bronchopneumonia is a more uneven

25    pattern usually across both lungs.

1    Q.  The cause of bronchopneumonia can be an irritation in the

2    lungs?

3    A.  Irritation of the lungs, infection of the lungs.  It could

4    be either.

5    Q.  Here's a new slide that I made for you, and the jury

6    hasn't seen this one yet so it's something new.  So could you

7    show or tell us what we're looking at here, and I know that

8    from talking with you, there's at least one correction or one

9    point you want to make with regard to the right-sided infant.

10   If you tell us what we're seeing first on the left side?

11   A.  On the left is a normal situation where baby does not have

12   any meconium inhaled.  Actually, it shows -- it does show

13   actually a little aspiration here in the very beginning.  This

14   is normal where there's no meconium that the baby has inhaled.

15       These are the little air sacs where the blood goes right

16   by the air sacs.  Oxygen is taken in and carbon dioxide is

17   taken out by the interaction of the air sacs with the blood

18   vessels.  So you want those open.  Okay.  That's the normal

19   situation.

20           So oxygen is exchanged across the alveolar -- these

21   sacs are called alveoli.  These are the alveolar walls.  The

22   capillaries take it up and that's how we breathe.  We breathe

23   in oxygen and breathe out carbon dioxide through these sacs,

24   and the blood vessels either discharge carbon dioxide or take

25   up oxygen, and then the lungs will look like this except, in

36

1    this case, a baby has inhaled some meconium.  Right there,

2    there's not a lot, and it's mostly in the upper airway.

3    Q.  Let me just ask you about that.  Are there a lot of births

4    where a baby can just take meconium into the throat area and

5    not deep into the lungs?

6    A.  Right.  That's why I mentioned that sometimes we look down

7    via a laryngoscope into the vocal cord area and see if there's

8    material there and also to see if we can suction material out

9    from below the vocal cord so the baby won't breathe that in.

10   Q.  Let's go to the right side of that picture.  Can you

11   explain to us what we're seeing there?

12   A.  So here what happened when the actual meconium gets into

13   the lungs, the air sacs will fill up with meconium, and

14   sometimes meconium actually carries with it or through

15   secretions a germ, so either the germ or the meconium can be

16   in there and the meconium blocks the oxygen uptake into the

17   capillaries and also blocks the letting go of the $CO_2$ that

18   comes out of the lungs, so you can get a deficit in the amount

19   of oxygen in your blood vessels and a buildup of carbon

20   dioxide in your vessels, which are not very good.

21       The other thing that can happen is the meconium gets into

22   the airways.  Where this thing needs a little corrected, it

23   makes the lungs look small.  Actually what happens is the

24   meconium gets into the airway, and oxygen and nitrogen, part

25   of what we breathe, gets in, but it can't get back out when

1    the baby exhales, much like a ball valve works, so the baby's

2    lungs actually blow up a little bit and the like, so it's

3    detrimental for that meconium to be in the small airways, and

4    it's detrimental for the meconium to be in the alveolar sacs

5    where the oxygen exchange occurs.

6    Q.  So just to make sure I understand, whenever we breathe in

7    oxygen, we take it into our lungs and it goes to the bottom of

8    our lungs through alveoli?

9    A.  Not actually the bottom.  It's all over the lung, but it's

10   the edge of the lung.  It's the fine parts of the lung that

11   you can see on microscopic cross-section.

12   Q.  And those fine parts of the lung is where the blood

13   exchanges oxygen, takes the oxygen?

14   A.  Correct.  It goes across the alveolar wall and into the

15   small capillary.

16   Q.  Those same walls accept the carbon dioxide to get rid of

17   it out of our body?

18   A.  Exactly.  We need both to go on.  So one is called

19   oxygenation, that's getting in the oxygen, and the other is

20   called ventilation.  That is getting off the carbon dioxide.

21   Q.  If there's meconium there or a block there, that impedes

22   that oxygenation ventilation process?

23   A.  Exactly.  Both processes.  Oxygenation goes down, which

24   would be measured by the blood oxygen, and blood CO2 goes up,

25   which is a function of the diminished ventilation.

1    Q.  And whenever you have, I guess, increased carbon dioxide

2    in your bloodstream, what does that do to you?

3    A.  That makes your blood go acid, which is detrimental to the

4    body.

5    Q.  And I know you say detrimental, but what can happen to you

6    if you have too much carbon dioxide?

7    A.  Too much carbon dioxide makes the brain go to sleep.  It

8    causes what we call narcosis.

9    Q.  Next, I want to ask you about this.  I put them side by

10   side here.  I want to ask you.  Can you tell us the

11   relationship between meconium and a condition like

12   bronchopneumonia?

13   A.  If you inhale enough meconium, it will look just like

14   bronchopneumonia.  You won't be able to tell bronchopneumonia

15   from meconium from bronchopneumonia from a germ E. coli, and

16   in fact, as I think occurred in this case, both happened.

17   Q.  Can you have -- I mean, can meconium ingestion cause

18   bronchopneumonia?

19   A.  Yes.

20   Q.  I know I showed this, and again, you agree the earlier you

21   treat these conditions, the better?

22   A.  Absolutely.

23   Q.  Okay.  Now, I asked you to review some material in this

24   case and you had a chance to review the medical records and

25   depositions and hospital policies?

1    A.   I had everything there.  I don't recall being sent

2    hospital policies.

3    Q.   Yes.  I don't know if I did.  We're going to talk about

4    the facts of the case and your concentration really occurs at

5    the time of delivery.  So this baby was born by vacuum

6    extraction at 5:20 a.m. 2014 on October 13.  Do you recall

7    that?

8    A.   Yes.

9    Q.   What do you remember about review of the records for that?

10   A.   That the baby was born by vacuum extraction.  The baby

11   weighed about four kilograms, I think about eight and a half

12   pounds.  The baby had reasonably good Apgars.  They weren't

13   perfect.

14        The first Apgar, which is a measure of the baby's

15   vitality, basically its oxygenation, was a six, which is

16   slightly depressed.

17        The second Apgar -- the first is done at one.  The

18   second one is done at five.  The one at five was okay.  It was

19   eight, so the baby had a suspicious first Apgar but a normal

20   second Apgar.

21   Q.   What about the amniotic fluid?

22   A.   The amniotic fluid was found to be stained with meconium,

23   and the baby itself was actually stained with meconium, so

24   that meconium had been in the amniotic fluid long enough to

25   turn the color of the baby's skin.

1    Q.  You noticed the -- and the jury has seen the Apgar score

2    and the assessment in the first ten minutes.  Did you notice

3    from your review of the records any assessment of the baby

4    from 5:30 until 7:00 in the morning?

5    A.  No, I did not.

6    Q.  Now, at 7:25, we've all seen the record, 81 percent

7    oxygen.  Did you see that?

8    A.  Right.  That was the pulse oximetry, so that's the

9    saturation of the oxygen measured by that little pink thing

10   they put on the baby's toe probably.  For us, it would be a

11   finger.

12   Q.  81 percent, is that a normal oxygenation rate?

13   A.  No.  It's low.  You would want it to be at least upper

14   80s, maybe 89.  90s would be better.

15   Q.  After that, did you review the records with regard to what

16   happened next?

17   A.  There is allegedly -- well, the baby was placed in oxygen.

18   The nurse, I believe, at 7:20, testified that she found the

19   baby in some distress and put the baby in an oxygen hood so

20   the baby could get more oxygen.

21          It is then stated, and it's unclear, that the

22   pediatrician was called, although the pediatrician herself

23   said she did not get a call at about that time.

24   Q.  Was there any -- do you see in your review of the records

25   any other doctors, anybody, any residents examining the baby?

1    A.  Yes.  According to the resident's testimony, he saw the

2    baby at about 8:00, after which he had been attending a

3    lecture.  I imagine on some pediatric topic.

4    Q.  And did you see the care that he gave to the child or his

5    assessment?

6    A.  I think he agreed with the oxy hood and preferred to wait

7    until the pediatrician, Dr. Jones, arrived.

8    Q.  And can you tell us at 7:25, whenever the nurse was

9    examining this child, how was this child besides the oxygen

10   rate?  Did she make any notes with regard to how the baby was

11   handling things?

12   A.  Yes.  The baby was using accessory muscles.  Normally you

13   can't see breathing very well.  This baby was retracting, so

14   you could see the part above her trachea -- the part above the

15   sternum, excuse me, pulling in.  You could see the ribs going,

16   and there was retractions, probably seesaw respirations where

17   you could see the stomach moving in and out.  We call it

18   seesaw.

19   Q.  If a baby is wrapped up, could you easily see whether or

20   not there's retractions of breathing?

21   A.  No.

22   Q.  You can't?

23   A.  It would be difficult unless it came below this part here

24   (indicating) which is called the suprasternal notch, but it is

25   usually covered, you probably wouldn't see it.

1   Q.  If she was covered, you probably wouldn't see it?

2   A.  Probably would not see it.

3   Q.  Dr. Jones showed up at 8:15, and can you tell us what was

4   her assessment of Kendall whenever she got there?

5   A.  She was alarmed.  The baby looked sick.  She ordered

6   laboratory tests to be done.  She ordered a capillary blood

7   gas, which is a finger prick, to look at the baby's level of

8   oxygen and carbon dioxide.  She ordered a chest x-ray and she

9   ordered a blood culture.  I don't think right at that moment

10  she ordered antibiotics, but she may have.

11  Q.  If you could pull up tab 6, Page 19, and these are the

12  blood count records from Kendall, and I know that you have

13  made some reference in your report to them and if you could

14  just --

15  A.  Okay.  The parts of the complete blood count which gives

16  lots of information, it gives information on whether the baby

17  is anemic.  That's the hemoglobin and hematocrit.

18      It shows you how many white blood cells are there and what

19  kind of white cells are there.  Those are the cells that

20  defend your body against infection and it also shows things

21  like the platelet count.  Platelets are little bits of a

22  larger cell called a megakaryocyte.  These carry clotting

23  factors and keep us from bleeding to death.

24      So what this shows is the white count actually is slightly

25  low.  This is for age.  In a newborn, the white count, the low

1    white count is 9,000 and the upper limits of normal is 30.

2    The baby's white count is slightly depressed.  The hemoglobin

3    and the hematocrit, you can take my word for it, are normal,

4    and the platelet count at 180,000 is normal.

5    Q.  And from your review of these records, can you tell us

6    what do these show you with regard to the condition of Kendall

7    at 9:00 in the morning?

8    A.  Okay.  So to more fully explain that, we need the

9    differential.

10   Q.  It might be above that.

11   A.  I think it's right there.  Is that a three there?

12   Q.  Yes.

13   A.  So the number there is segmented neutrophils.  These are

14   the gobbler cells.  These are the cells that eat bacteria.

15   When you have a bacterial infection, you need a lot of them.

16   We like to have at least 1,500 or something like that total.

17         This baby -- so the number of neutrophils should have

18   been at least 60 to 70 percent, 55 to 70 percent.  It's only

19   three percent.

20         When you multiply the number of the segmented

21   neutrophils times the white count, you come up with 250

22   gobbler cells per unit of blood, which is very low and leaves

23   the baby almost defenseless against infection.  It makes the

24   chances of survival go down.

25   Q.  Okay.  So that tells you how the baby's own body and blood

1   system is able to fight off infections?

2   A.   It means it's been trying to fight it for some time.

3   Perhaps 12 to 24 hours before the baby came out of the womb

4   and got delivered.

5   Q.   Okay.  Anything else from the differential or the blood

6   test results?

7   A.   So we go on to the previous page, the one that had the

8   platelet count, it may be in there somewhere.  There they are.

9   Those are normal.  So what happens when you get an

10  overwhelming bloodstream infection, generally speaking, first

11  the white blood count goes down, then the neutrophils go down,

12  and worst of all, the platelets go down which leads to a

13  process of bleeding in different organs called DIC,

14  disseminated intravascular coagulation.  It usually takes

15  longer for that to come.

16       So I would say this was a developing -- it was a

17  developing infection.  It was getting on to the severe side.

18  It was not to the point where the baby was going to bleed to

19  death from the low platelets.  So let's say a well-established

20  infection but with a saveable baby but with concern for

21  survival because of the low white count and differential.

22  Q.   Okay.  If we could pull up tab 6, page 22, and that is a

23  copy of the chest x-ray that was taken of Kendall at 8:52 in

24  the morning.  And again, I know that I don't understand all

25  this, so can you tell us what does that show you?

1   A.  Sure.  So normally, when you look at the lungs, the lung

2   fields look mostly gray, and there's some wisps of white which

3   indicate blood vessels and bronchial tubes.

4           Here there is additional white material at the right

5   base which is the base of the right lung.  There's an area of

6   consolidation which means either pneumonia or a process we

7   call atelectasis, where the lung can't re-expand such as the

8   meconium got caught there.  It also has a small right-sided

9   effusion.  That would be unusual for meconium but would not be

10  uncommon for pneumonia like E. coli.

11          Then they also noted right apical consolidation.

12  Apical means the top of the lungs, the apex.  There's

13  consolidation noted there and then there are air bronchograms

14  at the right medial base.  Again, that suggested there's

15  something going along the bronchial tubes that's consolidated

16  that makes the bronchial tubes stand out.  Those are called

17  air bronchograms.

18          Then there are other, what we call, infiltrates or

19  densities in the perihilar area.  That's where the main

20  bronchial tubes come off, but it spares the lung peripherally

21  on the left, so basically what they're agreeing it says it

22  looks like a meconium aspiration or neonatal pneumonia, you

23  can't tell them apart, and it's uneven, affecting a little

24  more the right lung than the left.

25  Q.  So at least with regard to this time from the x-ray, the

1    radiologist, whenever he's looking at it, he sees something in

2    the lungs.  It's just that on the film, he can't tell if it's

3    pneumonia or meconium?

4    A.  That's correct.  It will look pretty much identical.

5    Q.  And the only way that you can really tell would be through

6    an autopsy?

7    A.  Well, the blood count gives you a hint that there's

8    infection because meconium aspiration is not going to lower

9    your white count and your neutrophil count, so I would say

10   sepsis is definitely present.

11       Whether or not there's meconium present or not, you would

12   have to probably wait until autopsy to know that for sure.

13   Q.  The next x-ray is taken at tab 6, page 23, and this one

14   was taken an hour and a half later, and this is whenever they

15   put an endotracheal tube down Kendall's throat into her lungs,

16   and the findings were done to make sure that it was properly

17   placed, but they also noticed some other things.

18   A.  Right.  So now there's more white areas.  This is called

19   an extensive consolidation.  This means that airways have

20   collapsed, and the lung is not getting ventilated as well.  It

21   could also mean there's more pneumonia building up that looks

22   like fluid inside the lung tissues.  It has a patchy

23   heterogeneous appearance.  Again, there are air bronchograms

24   which we had discussed before.

25            So now it says there's an extensive neonatal

47

1    involvement.  It could be related to meconium aspiration, but

2    it could be an extensive pneumonia as well.  You can't tell

3    them apart.

4    Q.  You had a chance to take a look at the care that Dr. Jones

5    and the transport team provided to Kendall, and I would ask if

6    you could summarize what they did and what Kendall's condition

7    was over the next hours that she was under their care?

8    A.  Right.  So the thing has really got bad.  Dr. Jones came

9    back at around 9:15, I believe, and said the baby had

10   deteriorated in the oxygen hood.

11          She then took a look at the baby.  She repeated some

12   of the gases, which showed more carbon dioxide buildup and

13   less oxygen, and she was unable, I think, using 100 percent

14   oxygen to ventilate the baby properly and give it enough

15   oxygen.  So she decided, slightly before the transport team

16   from West Penn came, to intubate the baby.  The baby at that

17   point was getting very sick.

18          I don't think at that time the baby was hypotensive,

19   meaning having low blood pressure, because I noticed that no

20   blood pressure medicines were started, but the baby's lungs

21   were clearly deteriorating and the baby was losing the ability

22   both to bring in oxygen and send out carbon dioxide.

23   Q.  Did they provide medications and did they try to help this

24   condition in any way?

25   A.  Yes.  They tried intubating.  They gave the baby an agent

1    called nitrous oxide -- nitric oxide, which tends to make

2    blood vessels in the lungs dilate.  Pardon me, but it's a

3    little bit like Viagra which does the same thing.  We actually

4    use that in the NICU.

5         It's to make the blood vessels wider so there would

6    be less likely that the baby won't take up oxygen and carbon

7    dioxide and less likely that the baby will bleed into the

8    lungs as it subsequently did.

9         They also adjusted pressures and tried to ventilate

10   the baby the best they could and to start antibiotics as well.

11   Q.  And I mentioned a drug called surfactant.  Was that used?

12   Can you tell the jury what that was?

13   A.  Yes.  Surfactant is something that makes a balloon easier

14   to blow up basically.  When you blow up a balloon, initially

15   it takes a lot of pressure to get it going.  There's some

16   physical principle.  If you were to have surfactant in there,

17   your little bit of puff would get the balloon open quickly.

18   That's surfactant.

19   Q.  And then did you see the medical records with regard to

20   whenever her heart rate dropped, and the last hour, what they

21   did for her?

22   A.  Right.  Her heart rate dropped below 100.  This was about,

23   I think 10:50, 10:55.  They started chest compressions and

24   then gave her blood pressure medications and the like and they

25   kept giving her -- I think you all know what CPR is.  They did

1   CPR on her for, I think, 45 minutes and they could not revive
2   her.
3   Q.  Did you also have a chance to review the autopsy report in
4   this case?
5   A.  I did.
6   Q.  And what did that -- what information did that provide you
7   about Kendall in this case?
8   A.  Well, like the blood that grew out E. coli subsequently, a
9   culture of the lung also grew out the same organism, E. coli,
10  so the cause of death was felt to be septicemia and E. coli
11  and pneumonia from the E. coli which occurred together.
12      The lung tissues seemed to show areas of pneumonia with
13  inflammatory cells which could indicate just bacterial
14  pneumonia, but at least my reading of it was there was
15  definitely some meconium to a moderate amount of meconium in
16  the lungs.
17      So I think the pathologist concluded that the baby both
18  had a neonatal pneumonia infection and also had meconium
19  aspiration.
20  Q.  Can you tell us what the relationship -- how did the
21  meconium affect the E. coli and the bronchopneumonia?
22  A.  Okay.  So that's a very good question.  Mechanically, what
23  probably happened, and we have the white count to show that
24  somehow during labor in the previous 12 to 24 hours, E. coli
25  gained access to the baby either through the amniotic fluid or

1    through some small tear in the amnion and caused an infection

2    that got into the baby.  The baby then did well for a while

3    but then made a gasp and delivered some meconium into the

4    amniotic fluid which the baby then inhaled.

5    Q.  And how did the fact that the baby has now ingested the

6    meconium fluid, does that affect the baby's ability to deal

7    with or fight off an infection?

8    A.  It's like adding, you know, the effect of one atom bomb to

9    another atom bomb.  You've got two basically potentially fatal

10   syndromes going on at the same time.

11   Q.  Now, as a result of your review of the records and

12   examination of the studies and the tests and reports, did you

13   come to an opinion in this case?

14   A.  I did.

15   Q.  And I'm going to ask you about your opinions.  You just

16   talked about the fact that you believe it's highly likely that

17   the baby became septic during labor and delivery which led to

18   the meconium aspiration?

19   A.  Right.  I think the infection came first, and that was the

20   stressor that made the baby put out meconium into the amniotic

21   fluid and then inhale it.

22   Q.  Then you talked about the septic process.  Can you

23   explain, is there anymore you want to add with regard to you

24   said a low A and C count, septicemia, depressive bone marrow.

25      Can you tell us a little bit more about your opinions

1    there?

2    A.  Right.  So the baby then goes into septic shock and what's

3    called multiorgan failure, where different organs, because

4    they are not getting adequate oxygen, stop doing their work,

5    organs like the liver, kidney, especially the brain so the

6    baby losses consciousness.

7            This is all going on to interrupt the process you

8    have to get antibiotics in as quickly as possible to stop that

9    and also support the baby's circulation and things of that

10   sort.

11   Q.  Again, this is getting deep into the medicine, but you

12   noted that the normal platelet count and the CBC, did that

13   suggest anything with regard to the septic process?

14   A.  The septic process would have been ongoing at the point

15   that the white count and differential were measured which was

16   about four hours after the baby was born.  The white count and

17   the differential would undoubtedly have been better had it

18   been measured, let's say, in the first 30 to 45 minutes of

19   life.

20   Q.  The baby came out and we've heard that the baby had normal

21   Apgars.  Does that give you any insight into this infection

22   and how it was progressing?

23   A.  At that point, the baby was what we call compensating for

24   it.  The baby had a slightly low first Apgar but a good second

25   Apgar, so you would say, well, this is almost normal.  The

1    baby's color was good because the Apgar has -- part of it is a

2    score for color so the baby looked, at least at delivery,

3    relatively good.

4    Q.  Do you believe this baby was sick at birth?

5    A.  The baby was sick, but it would take a little more time

6    for it to be evident over the next hour or two just how sick

7    this baby was.

8    Q.  In your opinion, could Kendall have recovered with prompt

9    medical care in the first several hours of her life?

10   A.  Yes.

11   Q.  Do you believe that a pediatrician should have attended

12   this delivery?

13   A.  Either a pediatrician or in our hospital someone from the

14   neonatal intensive care unit.

15   Q.  Why?

16   A.  Because you not only have to evaluate the baby, but you

17   have -- some professional has to be there who knows how to

18   plan for the subsequent care which may involve NICU-type care,

19   transfer to another hospital, intubation.  The earlier you do

20   things for a baby like this, the better the outcome.

21   Q.  Do you believe that whatever chance Kendall had of

22   surviving, the chance was lost by not having a pediatrician

23   attend the delivery?

24   A.  I think that was a major contributing factor.

25   Q.  Do you also believe whatever chance Kendall had of

1    surviving, that chance was lost by not having a pediatrician

2    notified about the baby and the respiratory distress

3    immediately?

4    A.  Yes.

5    Q.  Would that have allowed more time for what?

6    A.  For the evaluation of the baby first, for the blood work

7    to be done and more time for the antibiotics, in this case

8    ampicillin and gentamicin to have been given, to support the

9    lungs while they were going down.

10   Q.  From your review of the records and the culture that grew,

11   were any of the antibiotics that would have been prescribed

12   for Kendall, were they sensitive to this E. coli bacteria?

13   A.  Well, it's the reverse.  The bacteria would be sensitive

14   to the antibiotic.  50 percent of E. coli are not sensitive to

15   ampicillin which is one of our go-to drugs in the newborn, and

16   they are all pretty much sensitive to gentamicin, so the baby

17   would have responded to gentamicin had it been given promptly.

18   Q.  And would the more time, the administration of gentamicin

19   and other appropriate interventions given Kendall more of a

20   chance to survive?

21   A.  Yes.

22   Q.  What about the facts that the neonatal team didn't arrive

23   until 9:45 a.m., about four and a half hours after delivery?

24   Do you think there was any lost chance or any lost time

25   because of the delay in getting them there?

1    A.   Definitely.

2    Q.   How is that?

3    A.   Again, earlier treatment supported the lungs, giving the

4    antibiotics and just knowing what to do in that situation.

5    Having been a primary care pediatrician, what this baby

6    presented with strikes terror in the hearts of pediatricians.

7    We don't see it very often.  Newborn sepsis like this in a

8    term baby only occurs in like one in a thousand babies on

9    average.  It's not something we face often and it's not

10   something we want to face.

11        Also, the doctor had another sick baby at the time, so she

12   really had quite a morning.

13   Q.   Right.  And we're going to hear from her about that, but

14   there were two babies she was dealing with that were going to

15   get LifeFlighted that day.

16        E. coli infections, are they treatable or can you deal

17   with them in a newborn?

18   A.   Yes.  E. coli is one of the more dangerous germs you can

19   get from what's called early onset sepsis.  The other one is

20   called group B strep.  E. coli is more dangerous, but the

21   majority of babies with early onset E. coli septicemia

22   survive.

23   Q.   You said majority.  How often -- I know one of the

24   defenses in this case is that this E. coli infection has a

25   high mortality rate.

55

1    A.   It does compared to other infecting agents, but the latest

2    data I saw was about six to ten percent of all early term

3    white babies infected with this agent, so six to ten percent

4    of the reported cases, died.   The rest survived.

5    Q.   It's been suggested that there wasn't a massive aspiration

6    of meconium and meconium played no role in Kendall's death.

7    Do you agree with that?

8    A.   I do not, but you just have to treat both of them.   I

9    don't think it makes a material difference either way.

10   Q.   Do you believe that this disease process could not have

11   been reversed by earlier administration of antibiotics?

12   A.   I don't believe that.

13   Q.   Well, there were no risk factors or clinical symptoms

14   present during labor.   Do you agree with that?

15   A.   My understanding is prior to that, there were -- there was

16   meconium in the amniotic fluid and that constitutes a risk

17   factor.

18   Q.   Again, if a pediatrician was present, do you believe that

19   a pediatrician would have been able to at least recognize or

20   at least been attuned to any type of respiratory issues?

21   A.   Yes.   I think you would say, if this baby turns a hair,

22   you give me a call and we'll start a process.   Some places

23   have protocols to handle this type of respiratory distress.

24   Do X, Y and Z.   I didn't see any protocols, but a pediatrician

25   called to a delivery at 5:20 a.m. is going to say please call

1    me if anything happens.  They give a list of things to watch

2    for, chief of which is respiratory distress.

3    Q.  Was there any watching of this baby over the next hour and

4    a half?

5    A.  None that I could find in the records.  I think the baby

6    was bonding with mom.

7    Q.  Have the opinions that you've expressed here today been

8    expressed to a reasonable degree of medical certainty?

9    A.  Yes, sir.

10            MR. PRICE:  That's all the questions I have, Your

11   Honor.

12            THE COURT:  Okay.  Cross-examination, Mr. Colville.

13                        CROSS-EXAMINATION

14   BY MR. COLVILLE:

15   Q.  Maybe we'll begin where you began.

16            MR. COLVILLE:  Doug, can I get the demonstration of

17   the two lungs in the first question to the doctor.

18            MR. PRICE:  Yes.

19   Q.  Before we go there, one of the last questions, you were

20   asked about symptoms and signs.  Dr. Zamore who testified on

21   behalf of plaintiff as the OB expert in this case, he

22   testified yesterday and he testified that there were no signs

23   or symptoms of an infection during the prenatal course of

24   Carissa.  Do you agree with that?

25   A.  I didn't see any evidence in anything I was sent that

1    there was a sign of infection during the prenatal course.

2    Q.  He also testified that there was no sign or symptoms of an

3    infection, any infection during the labor and delivery.  Do

4    you agree with that statement?

5    A.  Yes.

6    Q.  He also testified that the delivery assessment which

7    documented the birth and the condition of the baby once

8    delivered also indicated no signs or symptoms of an infection.

9    Do you agree with that?

10   A.  The Apgar six is a little suspicious, but that would be a

11   very soft sign and not particularly predictive.

12   Q.  You essentially agree there was no sign or symptom of

13   infection at that point?

14   A.  Based on the testimony and the records at the time of

15   delivery, yes.

16   Q.  So when that baby was handed off to the nursing staff to

17   perform the Apgar testing and do the assessment, nobody

18   standing there would have expected or should have been

19   expected to think that the baby had an E. coli infection at

20   that point based upon its presentation; is that correct?

21   A.  Either E. coli infection or meconium aspiration at that

22   point.

23   Q.  There was no reason to believe that or to anticipate it?

24   A.  It would be possible with the passing of meconium that

25   that could happen, but most times when babies pass meconium

1    and they are term babies, they don't get meconium aspiration

2    syndrome.

3    Q.  There was no symptom or sign there was a problem at that

4    point either, was there?

5    A.  Correct.

6    Q.  Which leads us to this demonstration.  You indicated the

7    baby on the left which indicates a normal condition; is that

8    right?  Is that right?

9    A.  At the bottom left, yes, because above, it shows the baby

10   has some meconium in the airway.

11   Q.  That's the point.  I mean, it's not uncommon for a baby

12   that is delivered vaginally to have some meconium in it; is

13   that right?  There's thick and there's thin; is that right?

14   A.  That's correct.

15   Q.  Now, this one on the left -- this one on the left

16   exemplifies more likely thin meconium as opposed to thick; is

17   that right?

18   A.  I don't think it really states.  I couldn't interpret that

19   as whether it's on its way down into the alveoli or not.  I

20   can't comment on that via the illustration.

21   Q.  Well, if you look to the one on the right, which is the

22   fetal distress version, on the bottom, it specifically

23   references thick meconium, right?

24   A.  Right.  It shows the alveolar sacs involved.  This one

25   does not suggest that the alveolar sacs are involved.

1   Q.  The fetal distress on the right is indicative of thick

2   meconium?

3   A.  Correct.

4   Q.  In contrast to the one on the left which does not have

5   thick meconium?

6   A.  Right.

7   Q.  The one on the left that does not have thick meconium is a

8   normal delivery, even in the presence of some meconium; is

9   that correct?

10  A.  At least at that point, if the meconium was just to stay

11  there, the lungs look like that, yes, that would be correct.

12  Q.  Now, in this case, are you assuming that the meconium that

13  was found was thick meconium?

14  A.  I'm not assuming that.

15  Q.  You would agree that thin meconium is something that you

16  wouldn't necessarily need or require to have a pediatrician

17  present during the delivery to attend to?

18  A.  I don't think it's predictive one way or the other.  I

19  think just the presence of meconium is considered an

20  abnormality, and it's a fearsome abnormality if the baby is

21  premature.

22  Q.  This is something an obstetrician is trained to identify,

23  to assess and to act upon; is that correct?

24  A.  That's his job, yes, sir.

25  Q.  You are not here in that capacity to testify as an expert

1    as an obstetrician?

2    A.  That's correct.

3    Q.  In this case, did you review the deposition testimony of

4    Dr. Dumpe?

5    A.  I do not think I was given that to review.

6    Q.  You didn't review the doctor who delivered this baby's

7    deposition?

8    A.  I don't think I was sent that.  It's not in my records.

9    Q.  Did you request it?

10   A.  This was quite a number of years ago.  I don't recall.

11   Q.  Wouldn't you want to know what the doctor said about his

12   thought process in a case?

13   A.  I would like to know.

14   Q.  Did you ask for it?

15   A.  As I said, I don't remember.

16   Q.  Is it your practice to ask for it?

17   A.  Sometimes.  Sometimes if I'm only asked to look at

18   causation after the baby is born, it's more or less irrelevant

19   from what I'm doing.  I'm not being asked to see whether the

20   obstetrician had done anything wrong.  Just what the course of

21   the baby was and when would intervention have made a

22   difference.

23   Q.  What the meconium actually looked like, what it really

24   looked like at the time, what happened in this case is an

25   important fact, don't you think?

1    A.  It's a factor.

2    Q.  There's two people who were there who saw it, Dr. Dumpe

3    and Nurse Hendershot.

4            MR. PRICE:  Objection.

5    Q.  Did you read that deposition?

6            THE COURT:  Sustained.

7            MR. PRICE:  Objection.

8            MR. COLVILLE:  I'll withdraw the question.

9            THE COURT:  Slow down a little bit.  One person at a

10   time.  You question.  You answer.  Let him get to the question

11   mark.  Let him get to the period.

12   Q.  It's important to know what the meconium looked like in

13   this case, correct?

14   A.  I would like to know, yes.

15   Q.  Now, we know that Dr. Dumpe was there when the prebag was

16   broken, right?

17   A.  Yes.

18   Q.  And he saw it, right?

19   A.  Yes.

20   Q.  He described it, right?

21   A.  That's my understanding.  Yeah, because you would look at

22   it and you would describe it as thick or thin.

23   Q.  You would expect that a doctor like him who is being

24   deposed would be asked questions about it, right?

25   A.  Of course.

1    Q.  But you didn't take -- you didn't think it was important

2    enough to review that deposition transcript prior to

3    testifying or prior to preparing your report in this case?

4    A.  It wasn't what I was asked to do.

5    Q.  Did you review Nurse Hendershot's deposition?

6    A.  That was not given to me either.

7    Q.  Did you ask for it?

8    A.  No.

9    Q.  Do you know that she was present during the labor and

10   delivery?

11   A.  I do know that.

12   Q.  Do you know that she documented what the meconium looked

13   like?

14   A.  I would think she would.

15   Q.  Wouldn't it have been an important thing to review her

16   deposition to form an opinion in this case?

17   A.  Not really.  The E. coli, I think, is the dominant part of

18   what killed this baby, so it didn't seem to be relevant.  If

19   you don't take care of the E. coli and you have a massive

20   infection with E. coli, you are dead.

21       The meconium is really not the most important thing.  It's

22   important as an indicator of possible distress, but I think

23   the most important thing is the overwhelming infection.

24   Q.  We agree on that.  We agree that the E. coli is the

25   problem here.  That's what killed the baby.  Do you agree with

63

1    that?

2    A.  I think most of the killing came from the E. coli and the

3    septicemia.  Yes, sir.

4    Q.  Bring up Exhibit 6, page 10.  This is the delivery

5    assessment that we were talking about earlier, with the Apgar

6    scores.  Right here, the meconium that was present was

7    indicated as thin meconium.

8        Would you agree that thin meconium is better?  It's better

9    to have thin meconium than thick meconium?

10   A.  Yes.

11   Q.  That thick meconium is what you've described as a massive

12   aspiration of meconium?

13   A.  Right.  You could aspirate thin or thick, but thick would

14   do more damage because of its viscosity, its thickness.

15   Q.  In this case, meconium is described as thin, right?

16   A.  Correct.

17   Q.  And you've reviewed the labor records in this case?

18   A.  I was not given the labor records to review.

19   Q.  What records were you given?

20   A.  I was given the post natal records, starting about here.

21   Q.  You don't know how the meconium -- how it presented during

22   labor or how it was described during the labor?

23   A.  I know it was described as thin.

24   Q.  Only from this document?

25   A.  That seems to be an adequate document to say thin.

1    Q.  I agree.

2    A.  Okay.

3    Q.  Did you see any medical records that indicated whether or

4    not the meconium was particulate?

5    A.  No.

6    Q.  Do you know if it was particulate or not?

7    A.  No.

8    Q.  Is that an important factor that you would want to know in

9    deciding what type of meconium was present?

10   A.  Not really, in the context that this baby had an

11   overwhelming infection.

12   Q.  Is that because -- I guess that's the point.  You are more

13   concerned about the E. coli in this case than you are the

14   meconium?

15   A.  One reason I'm a witness here is because it's an

16   infection, sure.

17   Q.  Based upon the findings of this -- well, this document,

18   the delivery assessment is a snapshot of the baby's health

19   once it's been delivered; is that right?

20   A.  Correct.

21   Q.  You've indicated the Apgars of six and eight.  Eight is a

22   normal finding; is that right?

23   A.  Right.

24   Q.  In this case, you also indicated you didn't see the

25   hospital policies in this case?

1    A.  No, I did not.

2    Q.  You didn't see any of them?

3    A.  That's correct.

4    Q.  One of the hospital policies allows babies to be left in

5    the room with the mother and father to bond if an Apgar score

6    is seven or above.  Does that make sense to you?  Does that

7    sound normal?

8    A.  As a guideline, yes.  There are always exceptions to

9    guidelines, but yes.

10   Q.  In this case, the baby was an eight.  In your opinion, it

11   was a normal, healthy baby, and it's appropriate to give to

12   the parents for bonding?

13   A.  Yes.

14   Q.  Now, also on this document, there's a delivery assessment

15   that goes through basically head to toe whether or not there's

16   any abnormalities presented at the time of birth.

17       Do you see that?

18   A.  Yes.

19   Q.  You would have reviewed that prior to testifying here

20   today?

21   A.  Yes.

22   Q.  And there were no abnormalities found; is that right?

23   A.  Correct.

24   Q.  There were no -- an abnormality would be a symptom of

25   respiratory distress?

1    A.   That would be considered an abnormality, yes, sir.

2    Q.   If a baby was grunting, you would expect it to be noted in

3    this portion of the document, right?

4    A.   Absolutely.

5    Q.   And it was not?

6    A.   Yes.

7    Q.   In fact, there were no abnormalities?  There were no

8    symptoms of respiratory distress noted?

9    A.   Correct.

10   Q.   At this point, if -- let me pull back on this entire

11   document.  Dr. Zamore, when I asked him about whether there

12   was symptoms, like I did with you, you indicated there were no

13   symptoms up through this assessment.  I asked him, I said is

14   this the snapshot of a healthy baby.  He said yes.

15        Do you agree with that?

16   A.   Yes.

17   Q.   So at this point, what would a pediatrician have done if a

18   pediatrician had been called when there are no symptoms of an

19   infection or any symptoms of meconium aspiration?

20   A.   What you would do, if the pediatrician was called and

21   there was a concern because of the meconium, you would say to

22   watch for signs of meconium aspiration syndrome, not

23   infection.  That's what you would do.

24   Q.   But in this case, there are no signs of that at all, are

25   there?

1    A.   If the pediatrician was called because the risk was

2    increased and meconium was found, then that would be the

3    reason to ask a pediatrician or a higher level person, NICU

4    person.  Then you would say please call me if the baby

5    develops any respiratory issues.

6    Q.   But the decision as to whether meconium poses a risk is

7    not on the pediatrician under hospital policy.  Are you aware

8    of that?

9    A.   No, but I'm not sure I would agree with that policy.

10   Q.   But in this case, the obstetrician who was there when the

11   meconium was presented and the nurse who was there when it

12   presented, did not believe it posed a risk sufficient enough

13   to call a pediatrician because it was thin.  That's what the

14   testimony is in this case.

15   A.   Okay.

16   Q.   Does that make sense to you?

17   A.   It's one way to look at it, yes.  There are hospitals that

18   require people to be there for any meconium in the in utero

19   process.

20   Q.   In this case, the obstetrician at issue was Dr. Dumpe and

21   he has over 30 years of experience dealing with babies during

22   deliveries who present with meconium.

23   A.   I'll accept that.

24   Q.   And you do not have that experience.

25   A.   I'm not an obstetrician, yes, sir.

1    Q.  At this point, which is 5:20 to 6:00, this assessment that

2    was completed, a pediatrician would not have been expected to

3    prescribe antibiotics for anything?

4    A.  Right.  Yes.  Well, the timing on this, it would depend

5    when completed, but at this point, yes, you would not

6    prescribe antibiotics.

7    Q.  You don't prescribe medicine for a baby who doesn't

8    present with symptoms; is that right?

9    A.  As a rule.

10   Q.  When is the first symptom of respiratory distress in this

11   case documented in the medical record?

12   A.  It's not documented until the note of 7:20 by

13   Nurse McCrory.

14   Q.  But that's the first documented note that the baby was

15   having a symptom?

16   A.  That's the first documented note.

17   Q.  And that documented note indicates that the baby was

18   grunting?

19   A.  Correct.

20   Q.  So between 7:25, which is the time, and 5:20, there was no

21   documentation of any symptoms that a pediatrician would have

22   acted upon; is that correct?

23   A.  As I recall, there's no documentation of anything.

24   Q.  And certainly by the time this document is drafted and

25   prepared, Dr. Dumpe is out of the picture, he's done, he

1    delivered the baby, and the baby is healthy?

2    A.  True.

3    Q.  Did you review any deposition transcripts in this case?

4    A.  Yes.  There are three or four.  There were the -- I think

5    there were two nurses who looked at the baby, reviewed the one

6    from the resident and the one from Dr. Jones, who is the

7    pediatrician.

8    Q.  So you did not review the deposition of Dr. Min?

9    A.  No, I did not.  I read some comments about his thoughts

10    about what he found, but I did not actually read his

11    deposition.

12    Q.  Why would you prepare a report and not gather all the

13    facts?

14    A.  From the standpoint of the E. coli and the meconium, it

15    didn't seem to be important.  There was enough data there to

16    come to a conclusion, and I don't ask for materials which I

17    don't need, and it also runs up the cost of the investigation

18    and the like, so I wouldn't.

19    Q.  Do you do this in all your cases?

20    A.  If I need a deposition to form an opinion, I will ask for

21    one if it's withheld.  Sometimes I'm given many more

22    depositions than I even need to do, but I'll read them.

23    Q.  How would you know what depositions are even out there?

24    A.  I can usually infer that from the records.  I would have

25    assumed there would be Dr. Dumpe's deposition and something

1    from the nurse who was there.  I mean, that's fairly easy to

2    figure out.

3    Q.  But the nurse that was there is a nurse by the name of

4    Nurse Hendershot.

5    A.  Yes.

6    Q.  And part of what you've opined on here today is what

7    happened between 5:20 and 7:25, right?

8    A.  I certainly thought about it, yes.

9    Q.  And Nurse Hendershot was the nurse who was attending to

10   Carissa during that time, right?

11   A.  Yes.

12   Q.  So she would have had access to the room, to the mother

13   and to the baby during that period of time, right?

14   A.  True.

15   Q.  And you didn't want -- you didn't feel the need to get

16   that deposition to find out what she witnessed, saw, why she

17   did what she did or why she didn't do what she didn't do?

18   A.  There was nothing in the record to show that she saw the

19   baby.

20   Q.  Well, aren't there a number of visits by her that are

21   documented getting the mom's vitals?

22   A.  The mom's vitals?

23   Q.  Correct.

24   A.  Yes, probably.

25   Q.  Are you aware that the room that the mom was in is where

1    the baby was delivered?

2    A.  Yes.  I've been told that.

3    Q.  Are you aware that the baby was bonding in that same room

4    for the period of time between 5:20 and 7:25?

5    A.  I believe that's why the baby and the mom were together,

6    yes, sir.

7    Q.  If Nurse Hendershot came in every 15 minutes to see the

8    mom, she would have had to have seen the baby?

9         MR. PRICE:  Objection.

10   A.  Not necessarily.

11        THE COURT:  Sustained.  Speculative.

12   A.  It would depend on how the baby was clothed or dressed.

13   If the baby wears a wrap and is bundled, a lot of times you

14   will not see retractions because the blanket comes up usually

15   close to the neck.

16   Q.  Okay.  That might be something that would be discussed in

17   a deposition about her visits in and out, wouldn't it?

18   A.  True.

19   Q.  You chose not to investigate that or find out what was

20   going on?

21   A.  I don't keep track of all the depositions I'm given.

22   Q.  But you knew that deposition was out there or would have

23   been out there?  You inferred it, I assume?

24   A.  I knew it probably would have been out there, yes, sir.

25        MR. COLVILLE:  I think that's all I have.  Thank you,

1    Your Honor.

2          THE COURT:  Well, ladies and gentlemen of the jury,

3    we're going to take our midmorning break at this time.  As

4    with all the other recesses, you leave your pad and exhibit

5    binder there on your chair, and once again, you are not going

6    to talk about the case, not going to do any research, not

7    going to communicate with anyone about the case.  So let's

8    take our morning break and we'll get back here at about ten to

9    11:00 and we'll hear some more from Dr. Shore.

10          Mr. Galovich, if you'll escort our jurors.

11     (Jury excused.)

12          THE COURT:  Doctor, you may step down.  During this

13    break, you should not talk about your testimony with any of

14    the attorneys, including Mr. Price.  If you need to use the

15    restroom, they are on either end of the hall.

16          THE WITNESS:  Thank you, Your Honor.

17          THE COURT:  Mr. Price, I see one of your witnesses

18    has arrived.  Is this the gentleman that needs to get to work?

19    Are you going to call him out of order?  What are you going to

20    do?

21          MR. PRICE:  Yes, I will probably call him right after

22    Dr. Shore is complete.

23          THE COURT:  Okay.  You anticipate he'll be out of

24    here in time?

25          MR. PRICE:  Yes.

1          THE COURT:  You don't need to call him out of order?

2          MR. PRICE:  No.

3          THE COURT:  Because Ms. Koczan still has cross.  I'm

4     presuming you might have some redirect.

5          MR. PRICE:  Yeah, but --

6          THE COURT:  You might want to ask him when must he

7     leave the courthouse.

8          MR. PRICE:  I know.  And he has to be back at work by

9     2:00.  But it's out in Beaver.

10         THE COURT:  All right.

11         MR. PRICE:  If she is going to be an hour on cross.

12         MS. KOCZAN:  I don't know how long I'm going to be.

13    I don't think an hour.

14         THE COURT:  Could be long.  In any event, if it's

15    determined that you need to call him out of order so that he

16    can make his work assignment, then you'll signal that, and as

17    I reminded you all yesterday, I do have a meeting with

18    probation that starts at noon and is going to go until about

19    1:15, so we are breaking from noon until 1:15.

20         THE CLERK:  Brian screen mailed me.  Ms. McCrory --

21    somebody from the U.S. attorney's called up.  He had her sit

22    in the hallway.

23         THE COURT:  Nurse McCrory was floating around.  Shaun

24    Sweeney from your office apparently brought her up.  They were

25    back at the door peeping in.  You may want to go find her.

74

1    She is somewhere in the courthouse.

2          MS. KOCZAN:  She is one of the nurses.

3          THE COURT:  I understand, but as I said, she was

4    wandering around the courthouse.  She got herself to the U.S.

5    Attorney's Office, so to that end, Shaun Sweeney, who is

6    another AUSA, saw fit to bring her up here.  They were both

7    peeping in the back door and they left.  Where she is right

8    now, I don't know.

9          MS. KOCZAN:  I'll find her.

10          THE COURT:  I would think you might want to do that.

11      (Recess taken.)

12          THE COURT:  Ms. Koczan, you may examine.

13          MS. KOCZAN:  Thank you, Your Honor.

14                        CROSS-EXAMINATION

15    BY MS. KOCZAN:

16    Q.  Morning, Dr. Shore.

17    A.  Good morning.

18    Q.  I'd like to start where Mr. Colville left off.  I think

19    you had talked about that time period up to when the baby was

20    in the room bonding, correct?

21          THE COURT:  Ms. Koczan, the jurors are indicating

22    that the jurors cannot hear you.

23          MS. KOCZAN:  I can go over there.

24    Q.  Dr. Shore, I'd like to pick up where Mr. Colville left

25    off.  I think when you finished speaking with him, we were up

1    to or you were up to the point of talking about what happened

2    when the baby remained in the delivery room with mom, correct?

3    A.  Yes.

4    Q.  You've already told us that you have not read

5    Nurse Hendershot's deposition, correct?

6    A.  Correct.

7    Q.  And you don't know what she had to say about her

8    observations of the baby while she was in to examine Carissa,

9    correct?

10   A.  Right.

11   Q.  You were not here yesterday when Nurse Hendershot

12   testified, so you don't know what she had to say about that

13   either?

14   A.  Correct.

15   Q.  Are you aware that there are medical records that indicate

16   that she was in the room evaluating Carissa every 15 minutes?

17   A.  Carissa being the mom?

18   Q.  Carissa being the mother.

19   A.  I'm not aware of that, but I'm being made aware of it now.

20   Q.  You didn't see those medical records?

21   A.  No.

22   Q.  They weren't important for you to look at?

23   A.  Not for what I was asked to do.

24   Q.  But you were asked to evaluate the entire case, correct?

25   A.  No.

1    Q.  You weren't asked to evaluate the entire case in order to

2    give your opinions here?

3    A.  That's not how it was put to me.

4    Q.  Okay.  So anyway, let's talk about Nurse Hendershot then.

5    She testified yesterday and I'm going to ask you to assume

6    that she testified yesterday per her notes that she was in

7    that room every 15 minutes, and while she was in that room

8    every 15 minutes, she observed this child, looked at this

9    child and did not see any evidence of respiratory distress.

10   I'd like you to assume that she testified to that.

11   A.  Okay.

12   Q.  Now, you told us earlier that, well, if the baby is

13   wrapped up, you might not be able to see retractions, correct?

14   A.  Correct.

15   Q.  But if a baby is grunting, that's something that you can

16   see because that's not wrapped up, correct?

17   A.  Well, it's something you can hear.

18   Q.  That was my other point.  You can hear it and you can

19   perhaps see movement; is that correct?

20   A.  I don't think you can see movement, but you could hear it

21   if the baby was wrapped.

22   Q.  And Nurse Hendershot testified yesterday she didn't

23   observe any of that.  I want you to assume that.

24   A.  Okay.

25   Q.  Also, if the baby is flaring, that's not something that

1    would be covered up either, would it?

2    A.  That's true, but flaring is not that easy to see actually.

3    Q.  Well, Nurse Hendershot had been a nurse for 30 some years.

4    Would you assume that she had seen flaring before and might

5    know what it looked like?

6    A.  Probably, but I don't know that she looked for it.  You

7    can look at something and not see it.

8    Q.  Well, she was there to look and observe and to see things,

9    correct?  That's the purpose of her being there?

10   A.  Right, but I think she is a perinatal nurse, correct?  She

11   is the mom's nurse, correct?

12   Q.  No.  She is the nurse that was tasked with doing the

13   initial assessment.  It's her documentation that you have been

14   looking at.

15   A.  I understand.

16   Q.  Are you aware of that?

17   A.  Does she work in the nursery or the step up unit?  They

18   must have an area there.  She works only in labor and

19   delivery.

20   Q.  Doctor, are you aware that she is neonatal resuscitation

21   trained?

22   A.  I'm not.

23   Q.  Are you neonatal resuscitation trained?

24   A.  No.

25   Q.  But she is?

1    A.   Okay.

2    Q.   And that is something that, during the training, they

3    would be taught to look for, correct?

4    A.   I would think so.

5    Q.   Now, you talked about no documentation there, but

6    according to Nurse Hendershot, there was nothing going on

7    during that time frame, and if there was something going on,

8    it would have been documented, and she would have been done --

9    she would have done something about it.  I'd like you to

10   assume that she's testified to that.

11   A.   Okay.

12   Q.   Now, she takes the baby to the nursery at around 6:50,

13   7:00 a.m.  Are you aware of that?

14   A.   I was aware that the baby arrived in the nursery at about

15   7:00.

16   Q.   Have you seen the vital signs that were done in the

17   nursery at 7:00?

18   A.   I think so, yes.

19   Q.   Are you aware that those are normal vital signs?

20   A.   Yes.

21   Q.   Are you aware that when the baby got to the nursery, in

22   addition to having its vital signs taken, she was also given

23   eye drops and some Aquamephyton?

24   A.   Yes.

25   Q.   So again, the nurse is with the baby and has an

1    opportunity to observe the baby?

2    A.  Yes.

3    Q.  Have you seen Nurse Barb Hackney's deposition?  Did you

4    read that one?

5    A.  I was not given that one.

6    Q.  Nurse Hackney is the nurse who accepted the baby.  You

7    have no idea what she had to say about this baby at that time,

8    do you?

9    A.  No.  What I recall is the nurse who took over at 7:20 said

10   she was passed that baby by Nurse McCrory.

11   Q.  Just so we are clear, you never read her deposition so you

12   have no idea what she said about the condition of the baby?

13   A.  That's correct.

14   Q.  I'd like you to assume that she had testified during her

15   deposition that that baby was fine when she saw the baby.

16   That is at 7:00 a.m.

17   A.  Okay.

18   Q.  So we have experienced nurses who are observing this baby

19   and there is no indication of anything amiss until 7:25?

20          MR. PRICE:  Objection.  The question is assuming fact

21   as long as she puts it in a question.

22          THE COURT:  Right.  You need to restate it as a

23   hypothetical.

24          MS. KOCZAN:  Certainly.

25   Q.  Doctor, I'd like you to assume that Nurse Hendershot has

1    testified and Nurse Hackney has testified that there was

2    nothing going on 7:00, 5:20 to 7:00, 7:00, nothing going on.

3    I'd like you to assume that as a fact.  So based upon those

4    assumptions, can we agree that the very first time anything

5    was noted was at 7:25 a.m.?

6    A.  That's when I first noted something in the record, yes,

7    ma'am.

8    Q.  You said before when you were asked questions that it was

9    at 7:20.  Are you aware that that is incorrect, it was

10    actually 7:25?

11    A.  Well, I'm going by memory.  I would say five minutes.

12    Okay.  I'll grant you if that's what it says.

13    Q.  The reason why I'm asking you that is you made some

14    comment about Dr. Jones being called at 7:20.  If there was

15    nothing going on at 7:20 and it didn't happen until 7:25,

16    would you agree that it would make no sense for Dr. Jones to

17    be called at 7:20?

18    A.  Sure.

19    Q.  Now, the testimony of the nurses is that from 5:20 to

20    7:00, this baby was crying vigorously.  Are you aware of that?

21    A.  It wasn't in the records that I saw, but I'm assuming

22    that's what they testified to.

23    Q.  Are you aware that the family also talked about the baby

24    crying?

25    A.  I don't know what the family said, but I'm assuming what

1    you are stating is correct.

2    Q.  A baby crying is a good thing, correct?

3    A.  Generally speaking, yes.

4    Q.  Now, when Nurse McCrory noted that there was an issue, and

5    do you know what the issue was?  Do you remember seeing that?

6    A.  The issue clearly, based on her charting, was respiratory

7    distress.

8    Q.  Are you aware that that is, in fact, not true that the

9    issue that she saw initially was that she thought the baby

10   appeared somewhat dusky?  Were you aware of that?

11              MR. PRICE:  Objection, Your Honor.

12   A.  No, but that would make it even more concerning.

13   Q.  And when she saw that the baby was dusky, she immediately

14   got up, she put a pulse oximeter on the baby.  Were you aware

15   of that fact?

16   A.  Sure.

17   Q.  And certainly those actions were appropriate, weren't

18   they?

19   A.  Sure.

20   Q.  And it was appropriate for Nurse McCrory to place this

21   baby under the oxy hood?

22   A.  Yes.

23   Q.  And, Doctor, we had heard the term transitioning before.

24   Babies that are transitioning, they can often show signs and

25   symptoms of perhaps respiratory difficulties during the

1  transition period.  Would that be true?

2  A.  Right.

3  Q.  And one of the things that can happen is they can drop

4  their O2 saturation as part of that transitioning?

5  A.  Generally speaking, they don't drop their saturation.

6  They may grunt a little bit or something like that, and they

7  have this thing called transient tachypnea, but generally

8  speaking, they are not hypoxic.  They are just tachypnea.

9  Q.  When the oxygen was placed on this baby, her pulse ox came

10 up to 91, correct?

11 A.  Right, from about 81.

12 Q.  I think it was actually 94.  I misspoke there.  Now, in

13 addition to putting the baby under the oxy hood, checking her

14 pulse ox again, Jamie McCrory also called Dr. Heiple.  Were

15 you aware of that?

16 A.  No, I was not aware of that.

17 Q.  You weren't aware --

18 A.  Oh, she called -- I was thinking of Dr. Jones.  No.  Jamie

19 called Dr. Heiple, yes.

20 Q.  And have you seen her testimony regarding how soon he was

21 there?

22 A.  Yes.

23 Q.  And what did she say about that?

24 A.  He got there around 8:00, well, according to his testimony

25 as well, because he had been attending a lecture.

1    Q.  Doctor, have you seen Jamie's testimony with regard to

2    that?

3    A.  Yes.  I think there was a contradiction there that he was

4    there a little earlier than that.

5    Q.  So Jamie thought he came earlier than 8:00, correct?

6    A.  That's what she said.

7    Q.  And in terms of what he did, he immediately assessed this

8    baby, correct?

9    A.  Yes.

10   Q.  And at that point, her oxygen level was increased?

11   A.  Correct.

12   Q.  And he at that point decided to keep therapy going --

13   A.  Yes.

14   Q.  -- what was provided and he was going to wait Dr. Jones

15   coming in because he knew she would be there shortly, correct?

16   A.  That was his decision, yes.

17   Q.  Now, you said something earlier that Dr. Jones didn't get

18   there until 8:15.  I think that was your testimony.

19   A.  Correct.

20   Q.  Are you aware that she was actually there around 8:00?

21        MR. PRICE:  Objection, Your Honor.

22   A.  I saw no evidence of that.

23        MR. PRICE:  Objection.  This is testimony that hasn't

24   been placed in this record.  I don't know where she is

25   testifying from.

84

1          MS. KOCZAN:  I'm not testifying from anything.

2     There's a record.

3     Q.  Have you seen Dr. Jones --

4          THE COURT:  First off, reference the document and the

5     exhibit number.

6          MS. KOCZAN:  It is the death summary that we have

7     seen before, and it is under Peronis 3 and it's page No. 8

8     there and I can put the document up.  It's 1113, if you would

9     put that up there.

10    Q.  And if we can highlight that first section and look here.

11    This is in the note.  "Upon my arrival in the nursery at

12    8:00 a.m."

13         Were you aware of that?  Had you ever seen this note

14    before?

15    A.  I really don't recall.  I probably did see the note,

16    but --

17    Q.  Don't remember seeing it?

18    A.  I remember her saying 8:15.

19    Q.  Excuse me?

20    A.  I remember her saying 8:15.

21    Q.  But you didn't look at this note where she clearly

22    documents at the time this happened that she was there at 8:00

23    a.m.?

24    A.  She is saying that retrospectively.  I don't know which is

25    correct.  She is writing this note after the fact and she may

1    not have been looking at the clock.

2    Q.  Now, Doctor, when she got there, she immediately began

3    arranging transfer of this baby, correct?

4    A.  Right.

5    Q.  Do you know why she wanted to transfer the baby?

6    A.  I don't think they have a level three NICU and she sensed

7    the baby was in danger.

8    Q.  Are you aware that she didn't want to transfer this baby

9    because of the baby's oxygen requirements?

10   A.  That would be another way of saying the same thing, sure.

11   Q.  Doctor, you have talked about your care of infants who

12   have sepsis.  You've seen babies with E. coli sepsis; is that

13   correct?

14   A.  I have.

15   Q.  And is it generally the situation with babies with E. coli

16   sepsis that they compensate for a period of time and then, for

17   lack of better word, drop off a cliff?

18   A.  That happens fairly frequently.  All babies try to

19   compensate.  They want to live.

20   Q.  And they compensate until they've exhausted their reserve?

21   A.  Okay.  I would agree with that.

22   Q.  And the blood work that was done in this case that was put

23   up on the screen earlier indicates that this baby had used

24   just about all of her neutrophils to fight infection, correct?

25   A.  Yes.

1    Q.  When the neutrophils are essentially gone, that's when the

2    symptoms developed and she rapidly declined?

3    A.  Not necessarily.  Sometimes there are symptoms and then

4    the numbers go down.  There's no one-to-one correlation.

5    Q.  In this case, she pretty much exhausted all of her

6    neutrophils?

7    A.  At that time, yes, ma'am.

8    Q.  When she exhausts all the neutrophils, she doesn't have

9    the ability to fight infection, correct?

10   A.  Not entirely, but she has considerably less.  Babies are

11   born with other things.  Newborns also have an immune

12   incompetence in various areas of their immune system.  So

13   unfortunately, they are set up for it, and they also main line

14   their germs, because they inhaled the germs into their lungs

15   and into their bloodstream, so they are at high risk.

16   Q.  Doctor, we don't have any disagreement.  You agree this

17   baby died of E. coli sepsis, correct?

18   A.  I do.

19   Q.  You would also agree that the sepsis had been there for

20   some period of time?

21   A.  Bacteremia was there probably first and then the sepsis

22   was there probably second.

23   Q.  So this baby was able to compensate up until 7:25 a.m.,

24   correct?

25   A.  Well, I know that's in contention as to whether the baby

87

1    was having problems before that.  According to the notes, the

2    baby was able to compensate until 7:20 or 7:25.

3    Q.  And you indicated before that a pediatrician, had they

4    been at delivery with a perfectly normal baby at that time,

5    would have just said watch the baby, monitor the baby,

6    correct?

7    A.  That's correct.

8    Q.  And in fact, that's what they did.  They watched the baby,

9    they monitored the baby.  Jamie McCrory monitored the baby and

10   picked up there was something going on at 7:25 a.m., correct?

11            MR. PRICE:  Objection, Your Honor.  Again, she is

12   assuming facts that aren't in evidence.

13            THE COURT:  Right.

14   A.  That's what is documented in the records.

15   Q.  When Dr. Jones got there, you are aware, are you not, that

16   she ordered a variety of things?

17   A.  Yes.

18   Q.  She ordered CBC.  She ordered a chest x-ray.  She ordered

19   the antibiotics, correct?

20   A.  Yes, and a blood culture and a chest x-ray.

21   Q.  Blood cultures, all that?

22   A.  Capillary blood gases.

23   Q.  Do you know what time the first antibiotic was given?

24   A.  According to my records, the ampicillin was not given

25   until about 9:45, and according to the other records I read,

88

1   it was very difficult to find out when the gentamicin was

2   given, I think, because the baby was further decompensating.

3   Q.  Doctor, let me put up the record for the ampicillin.  This

4   is in the baby's record and this is in Peronis 3.  It's page

5   228 and it is document No. 1333, and if we can highlight the

6   section where it talks about the ampicillin, which is about

7   midway down the page.

8       That's the ampicillin that was given, and do you see what

9   the time was on that?

10  A.  So that would say 8:35 basically.

11  Q.  Okay.  We can put that down.

12      So the ampicillin was given.  Dr. Jones intubates the baby

13  when she sees respiratory distress, and at that point, that's

14  probably around, what?  9:40 a.m.?  Do you recall that being

15  the situation?

16  A.  9:40 to 9:50.

17  Q.  And the West Penn team arrives at 8:45 -- excuse me --

18  9:45.

19  A.  Right.  I know there was a five-minute gap between when

20  she intubated and when the West Penn team arrived.

21  Q.  I want to ask you one other thing about your testimony.

22  You made some comment that this wasn't so advanced that

23  something could not have been done because of the platelet

24  count and there was no evidence of bleeding, correct?

25  A.  That would be one indication.  There's always something

1    you can do, but that would be one indication that at least the

2    situation wasn't hopeless.

3    Q.  Doctor, are you aware that during the resuscitation

4    effort, there, in fact, was bleeding?

5    A.  Yes.

6    Q.  She had a pulmonary hemorrhage, didn't she?

7    A.  She did.

8    Q.  When antibiotics are given, particularly for an E. coli

9    infection, is it the situation that the antibiotics cause the

10   E. coli to release toxins?

11   A.  They can, yes.  There's endotoxin, and they can release

12   some of that into the bloodstream.

13   Q.  That would make the baby sicker at least initially; would

14   that be true?

15   A.  That's if the antibiotic was directed at the E. coli.

16   Q.  And the medications that were given were directed at the

17   E. coli, correct?  That was the reason why they were given?

18   A.  Directed, but the ampicillin would have been totally

19   ineffective.

20   Q.  The gentamicin -- and you said the ampicillin would be

21   totally ineffective why?

22   A.  Because the organism was resistant not just in the blood

23   culture but in the lung culture.

24   Q.  But it was certainly appropriate to give the ampicillin,

25   correct?

1    A.  Sure.

2    Q.  And antibiotics don't work instantly, do they?

3    A.  No, they don't.

4    Q.  They take some time to work?

5    A.  Sure.

6    Q.  Doctor, are you aware that another pediatric infectious

7    disease expert has looked at this case?

8    A.  I'm certain one has.  That's usually how the system works.

9    Q.  Have you seen Dr. Susan Coffin's report?

10   A.  No, I have not.

11   Q.  Do you know who Dr. Coffin is?

12   A.  No, I don't.

13   Q.  Would it surprise you if I told you that Dr. Coffin has a

14   very different opinion about this case than you do?

15   A.  Yes.  She testified on the other side.  That would hardly

16   surprise me.

17   Q.  Would you agree that, during the course of your career,

18   there have been distinguished colleagues who have had

19   different opinions about a case than you?

20   A.  Of course.

21   Q.  And in the -- what did you say -- 500 cases that you

22   reviewed, there was someone on the other side who disagreed

23   with your opinion, correct?

24   A.  The half that I would have given depositions or trial,

25   yes.

91

1                MS. KOCZAN:  Thank you.  That's all I have.

2                THE COURT:  Mr. Price, any additional questions?

3                MR. PRICE:  Just a few.

4                          REDIRECT EXAMINATION

5     BY MR. PRICE:

6     Q.  Doctor, I know that you were asked a lot about assuming

7     facts.  If there is testimony that this baby was crying for an

8     hour and a half in a way that shocked the parents and that

9     they did not feel that it was normal crying and that the baby

10    was in pain, would that be any indication to you that a

11    pediatrician should have been monitoring this baby?

12    A.  Yes.

13    Q.  And does that follow up on what you testified that, after

14    delivery, you believe that a pediatrician should have

15    evaluated this baby?

16    A.  Yes.

17    Q.  And that if there is testimony that the baby was having

18    crying spells, was in pain, those were the types of things

19    that, if a pediatrician were monitoring the baby, would be

20    picked up?

21    A.  Yes.  That kind of crying could be called irritability and

22    could indicate sepsis or lung pain.  Baby had a small pleural

23    effusion that hurts the baby, makes the baby hurt when

24    breathing.  Babies could have meningitis and they could have

25    it this early, and that could cause profound irritability.

1  Q.  I know you were retained in this case to look at the case

2  from an infectious disease point of view, correct?

3  A.  Correct.

4  Q.  And you are not here to talk about whether or not

5  Dr. Dumpe delivered this baby correctly or anything of that

6  nature?

7  A.  Correct.

8  Q.  And I know that you were asked how many depositions you

9  reviewed and all of that.  I know that you reviewed some of

10  the information from this Nurse Hackney.  She was the one at

11  shift change at 7:00.  Do you remember that?

12  A.  I don't remember reviewing that.  I remember

13  Nurse McCrory.  I don't remember Nurse Hackney.

14  Q.  And I know that the questions you were asked to assume

15  with regard to how Nurse McCrory and Nurse Hackney saw this

16  child, that it was -- the only issue that was brought up was

17  that it had an 81 pulse ox, but in your review of the notes,

18  did you also note that Kendall was grunting, flaring, there

19  were notes she was in pain, gasping for breath, things of that

20  nature?

21  A.  Yes.

22  Q.  Does that all lead to a diagnosis of respiratory distress?

23  A.  Of course.

24  Q.  One final question.  I know you talked about the fact that

25  this child died from E. coli, and that is an atom bomb, as you

93

1    mentioned, and there was another one with meconium.

2         If either of those were separated, for example, if

3    she just had an E. coli infection or she just had meconium, in

4    your opinion, would she have had a fighting chance in this

5    case?

6    A.  Sure.

7    Q.  So the fact that she had an E. coli infection, she would

8    have had a fighting chance, but with the meconium on top of

9    that, it decreased?  She lost the chance?

10   A.  She lost some chance because of the meconium, yes.  I

11   think they would be additive.

12         MR. PRICE:  That's all I have, Your Honor.  Thanks.

13         THE COURT:  Mr. Colville, any additional questioning?

14         MR. COLVILLE:  No questions.

15         THE COURT:  Ms. Koczan, any additional questions?

16         MS. KOCZAN:  No questions.

17         THE COURT:  Thank you, Doctor, for your appearance

18   here today.  May the doctor be excused?

19         MR. PRICE:  Yes.

20         THE COURT:  Doctor, you may step down.  You may also

21   be excused.

22       (Witness excused.)

23         THE COURT:  Mr. Price?

24         MR. PRICE:  Pursuant to the court's request.  I have

25   PowerPoint copies of what I showed Dr. Shore.

1        THE COURT:  That will be another plaintiff

2    demonstrative, Mr. Galovich, for your records.

3        Now, Mr. Price, are you ready to call your next

4    witness?

5        MR. PRICE:  Yes.  We will call Tyler Janectic.

6        THE COURT:  Mr. Janectic, if you'll approach

7    Mr. Galovich to be sworn.

8        THE CLERK:  Please state and spell your name for the

9    record.

10       THE WITNESS:  Tyler Janectic, J-A-N-E-C-T-I-C.

11       THE COURT:  Thank you, Mr. Janectic.  Watch your step

12   getting up.  You may proceed.

13       MR. PRICE:  Thank you.

14       TYLER JANECTIC, a witness herein, having been first

15   duly sworn, was examined and testified as follows:

16                    DIRECT EXAMINATION

17   BY MR. PRICE:

18   Q.  Tyler, could you please tell us again your name and where

19   do you live?

20   A.  My name is Tyler Janectic.  I live in New Brighton, PA.

21   Q.  And are you related to Matthew Fritzius?

22   A.  Yes.  He's my cousin.

23   Q.  Are you friends with him?

24   A.  Yes.

25   Q.  I know some cousins might not be, but do you hang out with

1    him?

2    A.  Yes.

3    Q.  What about Carissa?  Do you know Carissa?

4    A.  Yes.

5    Q.  Can you tell us a little bit about how you guys all got

6    together -- let's talk before Kendall.  Would you guys hang

7    out socially?  Did you go to school together?  What was your

8    relationship?

9    A.  We would hang out.  I would go to their house, watch

10   movies, watch sports, just socially.

11   Q.  Were you friends with them while they were dating?

12   A.  Yes.

13   Q.  And did you know that -- how did you find out that Carissa

14   got pregnant?

15   A.  Matthew told me.

16   Q.  And was it happy times?  Sad time for them?  How did they

17   take the pregnancy?

18   A.  Happy.

19   Q.  Now, did you follow the pregnancy?  Were you friends with

20   them while Carissa was pregnant?

21   A.  Yes.

22   Q.  Tell us about that.  What do you remember?  Anything?

23   A.  What specifically?  I guess I don't know.

24   Q.  Sure.  I mean, were they -- did they share the pregnancy

25   with people?  Were they quiet about it?

1    A.  I believe they were quiet at first and then they told

2    everybody.

3    Q.  Were they, in your -- when you saw them, were they hopeful

4    about the pregnancy or were they concerned?

5    A.  Like most normal people when they have children, they are

6    a little scared, but they were mostly happy.

7    Q.  Now, I'm going to jump ahead to October 12 of 2014, and

8    did you find out that Carissa was in the hospital?

9    A.  Yes.

10   Q.  How did you find out?

11   A.  I received a phone call.  I can't remember exactly from

12   who, but it was someone in my family.

13   Q.  And do you remember what was the discussion topic?

14   A.  It was just Carissa is in labor.  She is at the hospital.

15   I went right up.

16   Q.  Do you remember about what time you arrived at the

17   hospital?

18   A.  Somewhere between 10:00 and 11:00 p.m.

19   Q.  Do you remember whenever you got there, were there other

20   family members at the hospital?

21   A.  Yes.

22   Q.  Do you remember who?

23   A.  Carissa's sister's Nicolette, her mother, her grandmother,

24   my cousin Kylee and my Aunt Monica.

25   Q.  Were you all in the labor and delivery room with Carissa?

1    A.  No.  We were in the waiting room.

2    Q.  Did you have, at any time before Kendall was born, have a

3    chance to go into the labor and delivery room?

4    A.  I don't believe so, no.

5    Q.  Do you know if anybody, like did Matt come out and talk to

6    you at all?

7    A.  Yes.

8    Q.  Did he tell you anything about how the labor process was

9    going?

10   A.  No.

11   Q.  At any point, did any other family members, to your

12   knowledge, go into the labor and delivery room?

13   A.  Not that I'm aware of, but it is possible.

14   Q.  Now, Kendall was born around 5:20 in the morning.  Do you

15   remember that?

16   A.  Her being born?

17   Q.  Yes.  Do you remember being told?

18   A.  Yes.

19   Q.  Where were you?

20   A.  In the waiting room.

21   Q.  And do you remember who came out?

22   A.  I do not recall.

23   Q.  Do you remember about how long it was after Kendall was

24   born that you were told that she was born?

25   A.  Maybe like 15, 20 minutes or so.

1    Q.  Do you remember seeing any of the doctors or nurses after

2    the delivery?

3    A.  No.

4    Q.  At some point, were you allowed to go into the room?

5    A.  Yes.

6    Q.  And whenever you went in, what did you see?

7    A.  Family just hanging out.  I believe Christine was holding

8    the baby whenever I got there.

9    Q.  I'm going to show you some pictures we have and ask you to

10   identify some of the people in the pictures.  If you could

11   first pull up Exhibit 36 and can you tell us who is shown in

12   Exhibit 36?

13   A.  That's Matthew and Kendall.

14   Q.  And did you see Matthew holding Kendall at all?

15   A.  When I first got there?

16   Q.  Yes.

17   A.  Not when I first got there, no.

18   Q.  It was Christine that was holding --

19   A.  Yes.

20   Q.  If we could pull up Exhibit 41.  Is that Christine?  Is

21   that the grandmother?

22   A.  Yes.

23   Q.  Did you see her holding --

24   A.  I'm sorry.  I thought Christine was her mother's name.

25   Q.  Dana?

1    A.  Yes, Dana.  I'm sorry.

2    Q.  Okay.  Then we will pull up Exhibit 42, and Exhibit 42,

3    Dana is on the right?

4    A.  Yes.

5    Q.  And who is that holding the baby?

6    A.  That's Kylee.

7    Q.  Do you know who Kylee is?

8    A.  She is Matthew's sister.

9    Q.  Okay.  Whenever you went in, do you remember was Kylee in

10   the room?

11   A.  Yes.

12   Q.  And was she holding the baby?

13   A.  Yes.

14   Q.  Now, did you at any time get to hold Kendall?

15   A.  I was too scared to so I didn't.

16   Q.  I guess, do you have any children of your own?

17   A.  No.

18   Q.  Okay.  Was this the first baby of a friend of yours that

19   you had seen?

20   A.  Yes.

21   Q.  Now, tell us a little bit about -- so you come in and you

22   see Kendall being held by some family members.  What was your

23   observations of Kendall?

24   A.  She was just crying.

25   Q.  Now, I know that babies cry.  We've heard that in this

1    case, but can you describe for us, whenever you heard her

2    crying, how would you describe the crying?

3    A.  I would describe it as more of a wailing, like it didn't

4    sound pleasant.  I've heard babies cry before but not like

5    that.

6    Q.  Did you talk to anybody about that?

7    A.  Matthew was concerned and he asked me to go get the nurse.

8    Q.  Whenever this came up, how did Matthew bring up to you the

9    fact that he was concerned?

10    A.  Just I'm really concerned, like she is crying really bad.

11    She hasn't stopped.  Can you please go get a nurse?  I went to

12    grab her.  She poked her head in the room.  Just said that's

13    normal.  That's fine.  Just spend time with her.

14    Q.  So just let me back up and get a little bit more of the

15    details.  So you are in the room and Matthew asks you to go

16    find a nurse?

17    A.  Yes.

18    Q.  Then did you go out into the hallway or did you --

19    A.  Yes, into the hallway.

20    Q.  Do you remember how far you had to go to find a nurse?

21    A.  Not far.

22    Q.  Do you have any recollection of what the nurse looked

23    like?

24    A.  I do not.

25    Q.  I will -- if you could pull up Exhibit 17.  This is

1    Nurse Hendershot.  Does she look familiar to you?

2    A.  Vaguely.

3    Q.  Do you know if this was the nurse who you went out to talk

4    to?

5    A.  I can't say 100 percent certainty.

6    Q.  So whenever -- can you put the other picture back up?

7    Whenever -- this nurse that you talked to, what did you say to

8    her?

9    A.  I just said my cousin feels like there's something wrong

10   with the baby.  She is crying.  Can you come check on her?

11   Q.  What did she say in response?

12   A.  She got up.  She came in.  She didn't actually come in the

13   room.  She kind of like poked her head in, listened, heard the

14   baby cry and said that's normal, just spend time with her.

15   Q.  Did you see the nurse come in and hold the baby or touch

16   the baby?

17   A.  No.

18   Q.  Could you tell us about how far away was the door to where

19   the baby was?

20   A.  I would say from me to you maybe.

21   Q.  Do you remember whether or not -- let me back up.

22       How long were you in the room with Matt, Carissa and the

23   baby?

24   A.  About 30 minutes or so.

25   Q.  And if 5:30 was around the time that they started coming

1   in until 7:00, do you remember what time frame that 30 minutes

2   was?  Was it closer to 7:00?  Was it closer to 5:30?

3   A.  Somewhere between 6:15 and 6:30ish.  I believe I got home

4   around 7:00.

5   Q.  During the time that you were in there, do you remember

6   any nurse coming into the room?

7   A.  No.

8   Q.  Do you remember any nurse coming in and examining Carissa?

9   A.  No.

10  Q.  Do you remember any nurse putting their hands on Carissa

11  and checking her belly or anything of that nature?

12  A.  No.

13  Q.  Did you see any doctor come into the room while you were

14  there?

15  A.  No, I did not.

16  Q.  Besides that one time that you went out to get a nurse, do

17  you remember, did anybody else try to go out and get a nurse?

18  A.  Not to my knowledge, no.

19  Q.  Whenever that happened and the nurse said what she said,

20  what was the conversation between you and Matthew?

21  A.  We just kind of accepted it for what it was.

22  Q.  Did Matthew say anything further?

23  A.  Not to me, no.

24  Q.  Do you remember was Carissa saying anything during this

25  time?

1    A.  She was kind of in and out of it.  She wasn't really there

2    when I was in the room.

3    Q.  She was sort of sleeping, tired?

4    A.  Yeah.

5    Q.  Did you see Matt take Kendall to the nursery?

6    A.  I left just before that.

7    Q.  Was there anybody else in the room whenever you left

8    besides Matthew and Carissa and Kendall?

9    A.  Taylor Moore and I believe Kylee was there, too.

10   Q.  After you left the hospital, you went home, correct?

11   A.  Correct.

12   Q.  What was the next thing you were told?

13   A.  I fell asleep.  I woke up to a phone call from his sister

14   Kylee, and she said we need to get to the hospital.  There's

15   something wrong.

16   Q.  What did you do?

17   A.  I got up, went and picked her up and we went to the

18   hospital.

19   Q.  Were you present whenever the doctors and nurses came in

20   to tell you about what happened to Kendall?

21   A.  No.

22   Q.  Did you have a chance to talk to Carissa and Matt after

23   that?

24   A.  Very, very briefly.

25   Q.  How were they?

1    A.  Not well.

2    Q.  I know that you have had a chance to see them after this.

3    Did you have a chance to talk to Matt about Kendall's passing?

4    A.  A little bit, yes.

5    Q.  How is he doing?

6    A.  Not well.

7    Q.  Can you tell us why?  Can you describe for us what you

8    mean by that?

9    A.  I have grown up with Matt.  I've watched him my whole

10   life.  He's been very outgoing, a very caring person, and this

11   whole thing has just devastated him.  He's not the same.  He's

12   closed off.  He's distant.  He's just not himself.

13   Q.  What about Carissa?  Have you seen her since?

14   A.  Little bit, yes.

15   Q.  Have you had a chance to talk to her about how this --

16   A.  Not a whole lot, no.

17            MR. PRICE:  That's all the questions I have, Your

18   Honor.

19            THE COURT:  Cross-examination, Mr. Colville.

20                         CROSS-EXAMINATION

21   BY MR. COLVILLE:

22   Q.  Morning, Mr. Janectic.  My name is Mike Colville.  I

23   represent the United States in this case.  Just a few

24   follow-up questions.

25        So you arrived at the delivery room around 6:15; is that

1  right?

2  A.  Somewhere between there and 6:30.

3  Q.  So it was about an hour after the baby was delivered in

4  this case?

5  A.  Yes.

6  Q.  Was this the first time you had been to a delivery suite?

7  A.  Yes.

8  Q.  First time you have been to a hospital to see a newborn

9  baby?

10  A.  Yes.

11  Q.  Do you have any children yourself?

12  A.  I do not, no.

13  Q.  Have you ever heard what a baby sounds like an hour after

14  it's been born?

15  A.  No.

16  Q.  So this was the first time?

17  A.  Yes.

18  Q.  Were you nervous?

19  A.  No.

20  Q.  Can we put Exhibit 42 up?  When you arrived, who all was

21  in the room, if you remember?

22  A.  When I got there -- you mean who came with me in the room?

23  Q.  When you get to the delivery room, who was in the room and

24  who was with you?

25  A.  Matthew, Carissa, Dana, Kylee and I went in with Taylor

1    Moore.

2    Q.  What was happening?

3    A.  We were just -- everybody was hanging out holding Kendall.

4    Q.  Were they passing the baby around?

5    A.  Yes.

6    Q.  Were they still taking pictures?

7    A.  I don't recall.

8    Q.  This picture here, this Exhibit 42, on the right, who is

9    that?  That's Dana?

10   A.  Dana, yes.

11   Q.  Who is holding the baby?

12   A.  That is Kylee.

13   Q.  Now, during the hour that you were present from -- 6:15 to

14   6:30, did you observe any pictures being taken?

15   A.  No.

16   Q.  Did you observe people holding the baby like in this

17   picture?

18   A.  Yes.

19   Q.  Were they smiling like they are in this picture?

20   A.  Yes.

21   Q.  When Matthew -- if you are only there 15 minutes, how soon

22   after you arrived did Matthew come to you and say can you go

23   out and get a nurse?

24        MR. PRICE:  Objection.  He testified he was there for

25   at least a half hour.

1          MR. COLVILLE:  I'm sorry.  I wrote 6:15 to 6:30.

2   Q.  You arrived between 6:15 and 6:30?

3          THE COURT:  Correct.  That's when he arrived.

4   Q.  For the half hour you were there, after arriving at 6:15

5   or 6:30, how soon after you arrived did Matthew come to you

6   and say please see a nurse?

7   A.  About 20 minutes in.

8   Q.  The people in the room were still holding the baby and

9   passing it around?

10  A.  Yes.

11  Q.  They were still smiling?

12  A.  Yes.

13  Q.  And the specific -- not complaint, but what Matthew had

14  come to you to go relay to the nurse was about the crying?

15  A.  Yes.

16  Q.  He didn't tell you to please go tell the nurse that the

17  baby is grunting; is that right?

18  A.  No.

19  Q.  Now, you mentioned that the sound you heard the baby make

20  was different than crying.  It was wailing, right?

21  A.  Yes.

22  Q.  We've established you've never heard what a newborn baby

23  sounds like, right?

24  A.  Not at the present time, no.

25  Q.  But the nurse who you went and reached out to who came in

1    told you that the crying she heard was normal?

2    A.  Correct.

3    Q.  Now, you were asked about whether or not nurses came in

4    and out of the room while you were there for that half hour.

5    You said you don't remember.  I want to clarify.

6        Are you saying you don't remember it happening or you are

7    saying it didn't happen?

8    A.  I'm saying no, it didn't happen.

9    Q.  So no nurse, at least for the half hour you were there?

10   A.  At least for the half hour I was there, yes.

11   Q.  There's no doubt in your mind that you were in the room

12   for more than 15 minutes at any given time?

13       Let me ask you this:  Were you in the room for the whole

14   half hour?

15   A.  Yes.

16   Q.  Did not leave?

17   A.  I did not leave.

18               MR. COLVILLE:  Thank you.

19               THE COURT:  Ms. Koczan, cross-examination?

20               MS. KOCZAN:  Thank you, Your Honor.

21                         CROSS-EXAMINATION

22   BY MS. KOCZAN:

23   Q.  Tyler, is the situation that what you observed when you

24   were in the room was simply Kendall crying or, as you put it,

25   wailing?

A.  Yes.

Q.  And when Matt asked you to go get the nurse, the reason he asked you to get the nurse because of crying, correct?

A.  Yes.

          MS. KOCZAN:  That's all I have.  Thank you.  I do have one more.

Q.  You said that the nurse was standing the distance from you and Mr. Price?

A.  I would say maybe a little bit further back, yes.

Q.  Further back than that.  Do you know how large those labor and delivery rooms are?  Do you know the dimensions of the room?

A.  I have no idea.

          MS. KOCZAN:  Thank you.  That's all.

          THE COURT:  Mr. Price, any other questions for this witness?

          MR. PRICE:  No, Your Honor.

          THE COURT:  The court just has one or two questions.

          Could you just tell us a little bit about your educational background and where you currently work, sir?

          THE WITNESS:  I work in the Super 8 in Beaver Falls and I graduated from high school.  It's my highest level of education.

          THE COURT:  Thank you.  I understand you have to get to work this afternoon, right?

1          THE WITNESS:  Yes.

2          THE COURT:  Any other questions of this witness?  May

3     he step down and be excused?

4          MR. PRICE:  Yes.

5          THE COURT:  Thank you, Mr. Janectic, for your

6     appearance here today.  Watch your step getting down.

7        (Witness excused.)

8          THE COURT:  Mr. Price, would you like to start with

9     another witness?

10          MR. PRICE:  Yes.  At this point, Nurse Jamie McCrory.

11          THE COURT:  Nurse McCrory is going to come in.

12          MS. KOCZAN:  Should I go get her?

13          THE COURT:  Yes, I think so.  She is being called.

14          THE CLERK:  Please step forward, miss.  Please state

15     and spell your name for the record.

16          THE WITNESS:  Jamie McCrory, J-A-M-I-E,

17     M-c-C-R-O-R-Y.

18        (Witness sworn.)

19          THE COURT:  Nurse McCrory, watch your step as you get

20     up.  It's a little uneven.  You may proceed.

21          MR. PRICE:  Thank you, Your Honor.

22          JAMIE MCCRORY, a witness herein, having been first

23     duly sworn, was examined and testified as follows:

24                      DIRECT EXAMINATION

25     BY MR. PRICE:

1    Q.  Nurse McCrory, first, could you tell us your full name and

2    where you work?

3    A.  My name is Jamie McCrory.  I work at Heritage Valley

4    Beaver Hospital.  I am a labor and delivery, maternity and

5    nursery nurse or maternal child health nurse.

6    Q.  If you could move up or put that a little bit closer so

7    the jury can hear you.  Thanks.

8         So you work as a nursery nurse and labor and delivery

9    nurse?

10   A.  Yes.

11   Q.  And obviously you went to school for that?

12   A.  Yes.

13   Q.  Where did you go to school?

14   A.  I went to Heritage Valley Health Systems Sewickley School

15   of Nursing and I graduated with my nursing degree from

16   Sewickley Valley Hospital, Heritage Valley Health System

17   School of Nursing, and then I went on for my bachelor's in

18   nursing from Penn State.

19   Q.  You have been working at Heritage Valley Beaver for how

20   long?

21   A.  I've been working at Heritage Valley Health System since

22   2009, and I've been working as a registered nurse since 2011.

23   Q.  And do you continue to work at Heritage Valley Beaver

24   until today?

25   A.  Yes, I do.

1   Q.  And do you still work in the labor and delivery and the

2   nursery?

3   A.  Yes, that is correct, I do.

4   Q.  And from what I understand, you come into work every day,

5   and depending upon how the staffing is, you could be assigned

6   to labor and delivery or nursery?

7   A.  Yes.

8   Q.  It just happened to be that on October 13, 2014, you were

9   assigned to the nursery?

10  A.  That is correct, yes.

11  Q.  And your shift started around 7:00 that morning?

12  A.  7:00 a.m., yes.

13  Q.  And whenever you come on to a shift as is normal, you get

14  a report from the nurse who was coming off shift?

15  A.  Yes.

16  Q.  And that nurse who was coming off shift was Barb Hackney?

17  A.  Yes.

18  Q.  She would give you a rundown on all of the babies who were

19  in the unit?

20  A.  Yes.

21  Q.  And what she told you was that it was a busy morning,

22  there were about eight to ten babies who were on the unit,

23  correct?

24  A.  I do not recall the number of babies that were on the unit

25  that day, no, I do not.

1    Q.   You remember it being a busy day?

2    A.   It was a busy day, yes.

3    Q.   And I know that we have this issue with Kendall, and that

4    at 7:25, things started happening, and we're going to talk

5    about that, but from what I understand, there was also another

6    baby in the nursery who had some serious conditions?

7    A.   Yes.

8    Q.   And, of course, I don't want to get too deep into that

9    baby's history, but can you describe for us how serious of a

10   condition that baby was in?

11   A.   The other case or the other baby's condition was more of a

12   physical condition that doctor had to assess as well as all

13   the other babies they assess in the day, so it was a serious

14   condition that I do not recall the specifics, but it also

15   required a transfer that day to a Pittsburgh hospital.

16   Q.   And that baby was going to be LifeFlighted to Children's

17   Hospital?

18   A.   That is correct, yes.

19   Q.   And ultimately, Kendall was planned to be LifeFlighted to

20   West Penn Hospital?

21   A.   Yes, that is correct.

22   Q.   Now, you were the only nurse assigned to the nursery that

23   morning, correct?

24   A.   Yes, that is correct.

25   Q.   And from what you remember, whenever you were getting

1    report from Nurse Hackney, that the father of the baby came

2    into the nursery with Kendall?

3    A.  The father of the baby was already in the nursery at the

4    infant warmer or the radiant warmer.  He was already in the

5    nursery at the warming station.

6    Q.  Okay.  Now, just to give the jury a little understanding,

7    when a baby comes into the nursery, they are to get a full

8    assessment, correct?

9    A.  That is correct, yes.

10   Q.  Now, the only thing was that when Barb was -- she checked

11   the baby in, she was going off shift, so she asked you to do

12   the complete assessment on Kendall, correct?

13   A.  Yes.

14   Q.  She might have taken a set of vitals and put some eye

15   drops in and given a shot, but she didn't assess the baby,

16   correct?

17   A.  She did not chart a baby assessment.

18   Q.  That was what you did and your notes reflect that it

19   happened at 7:25?

20   A.  Yes.

21   Q.  I know your notes reflect that it happened at 7:25, but

22   could it have happened a few minutes earlier at 7:20?

23   A.  There's always marginal room for error, yes.  It could

24   have happened give or take five or ten minutes before.

25   Q.  That 7:20, 7:25, I know, is an issue in this case, but it

1    was around 7:20, 7:25 when you were doing your assessment and

2    getting ready to see how Kendall was?

3    A.  Yes.

4    Q.  Now, whenever you are given report by Barb, you noticed

5    that when you were told about Kendall, she looked a little

6    dusky to you?

7    A.  Yes.

8    Q.  Can you describe for the jury, to a nurse, what does

9    "dusky" mean?

10   A.  Dusky means a little pale in color, not your normal warm,

11   pink, not the normal color we see on the majority of the

12   babies that we assess in the nursery.

13   Q.  And that to you, I mean, it perked up your ears as a nurse

14   and you were concerned at that point, correct?

15   A.  Yes.

16   Q.  And at that point, what you did was you did a pulse ox.

17   Is that what it's called?

18   A.  Yes.

19   Q.  Can you explain to the jury how you did that for Kendall?

20   A.  I put a pulse ox on the hand or the foot, and pulse ox is

21   just measuring the oxygen-carrying capacity.  Typically, we

22   like to put it on the right hand, and her pulse ox was reading

23   in the 80s at that time.

24   Q.  Now, I'm going to show you some of the documents.  I know

25   you've seen these, but I just want the jury to understand what

1    you were doing.  If we can start on tab 6, page 60, and we

2    start here at 7:25.

3        So these are your first notes with regard to Kendall and

4    her respiratory rate, correct?

5    A.  Yes.

6    Q.  Now, again, just to step back for a moment.  When this

7    happened along with the other baby you had and along with what

8    all happened with Kendall and her resuscitation, calling for

9    LifeFlight, it was a very busy morning for you?

10   A.  It was a very busy day in the nursery, yes.

11   Q.  And sometimes whenever you are working as a nurse,

12   obviously your first concern is to take care of the patient?

13   A.  Yes.

14   Q.  And you have some notepads where you might be able to jot

15   down things about the baby or some vitals or things of that

16   nature, right?

17   A.  Yes.

18   Q.  And it isn't until everything is done, everything is -- I

19   don't want to say calmed down, but at some point when you get

20   a break where you might chart?

21   A.  Yes.

22   Q.  So while we see the vital signs and this stuff being done

23   at 7:25 a.m., it may have been a few minutes earlier; it may

24   have been a few minutes later, correct?

25   A.  Yes.

1    Q.  And in fact, these notes that you made, it wasn't until

2    almost 12 hours later at 19:56 that you actually put this into

3    the computer, correct?

4    A.  Yes.

5    Q.  So you have a busy day and you have some notes with you

6    and you are finishing your shift and you have to complete your

7    paperwork, so if there's some discrepancy in the time, it

8    might be because it's been 12 hours?

9    A.  And it's an emotionally draining day and because it was 12

10   hours, yes.

11   Q.  And if we are off by a minute or two, you are not trying

12   to -- you are just trying to do your charting and trying to

13   recreate from your notes as best as you could what time things

14   happened?

15   A.  Yes.

16   Q.  So but you'll agree that this all happened around 7:20,

17   7:25 in the morning?

18   A.  Yes.

19   Q.  Soon after your shift started?

20   A.  Yes.

21   Q.  Now, if we could go to the next page, page 62 of tab 6.

22   This is continued vital signs right here.  This is where you

23   are taking a look at Kendall and you note that she is

24   grunting, flaring and retracting, correct?

25   A.  Yes.

1    Q.  And I know we've heard the GFR and if you hear the term

2    "GFR," it's grunting, flaring and retracting.  You also note

3    that she appears to be in pain, correct?

4    A.  Yes.

5    Q.  And then if we could go to page 65, and again, I know

6    these are electronic medical charts and we are jumping around

7    a little bit but if we could pull that out and here you have

8    nasal flaring, grunting and then you have substernal

9    retractions.

10        Can you describe for the jury what that means?

11   A.  When a baby is working hard to breathe, they use different

12   muscles a normal breathing person would not be using whenever

13   they are working hard to breathe.  They are deeper breaths and

14   it's just -- it's just an indicator that something is wrong

15   respiratorily.

16   Q.  And you also noted that her breathing was labored and she

17   was using her abdominal muscles to breathe; is that correct?

18   A.  Yes.

19   Q.  Now, I know that this might be difficult, but could you, I

20   guess, sort of demonstrate for the jury the difference between

21   normal breathing and breathing which is nasal flaring,

22   grunting, have substernal retractions, abdominal muscle use.

23   What do you see and how is that different from normal

24   breathing?

25   A.  It would be the equivalent of you breathing normal versus

1    choking on something, gasping for air, things of that nature.

2    I would say that difference in breath of somebody just

3    normally gradually breathing versus a baby that is struggling

4    to breathe.

5    Q.  From what I -- is this the type of thing where a baby is

6    going like this (indicating) and you can see it, not feel it,

7    but you can see a baby struggling to breathe?

8    A.  Yes.

9    Q.  That's what you saw?

10   A.  Not at 7:25, but because of my charting, things got

11   generalized, and the work of the way that things were -- the

12   way that the workup went with the baby and the way that my

13   charting at the end of the day, it was more of a

14   generalized -- it was more of a general description as to how

15   things progressed because she was not and I can't take back

16   what I charted, she was not grunting, flaring and retracting

17   when I put the pulse ox on the baby, so the timeline is tough.

18   Q.  I understand that, and I understand that some of your

19   charting was done 12 hours later.

20   A.  Yes.

21   Q.  But you'll agree with me that with regard to all of the

22   nasal flaring, grunting, substernal retractions, labored

23   breathing, you put into the time frame the time slot of 7:25

24   in the morning, correct?

25   A.  Yes, and it was a very distressful time for me, as was for

1  most people that worked that day, yes.

2  Q.  I understand.  And to a certain extent we are trying to

3  recreate what happened that morning, but you could have chosen

4  to put simply the oxygen level at 7:25, grunting, flaring and

5  retracting at 7:35, something at 7:45, if you wanted to,

6  correct?

7  A.  Yes, I could have.

8  Q.  So all of these notes that you put in were put in for the

9  7:25 time slot?

10  A.  That is correct, yes.

11  Q.  And then also we note here the nailbeds, they were dusky,

12  correct?

13  A.  Yes.

14  Q.  And I'm sorry.  There's something else on this, if you

15  could back out of that.  Is that page 65?  Maybe it's page 67.

16  There it is.  Right there.

17       Here, we have breath sounds were coarse, both anterior and

18  posterior.  So I assume that means that you are listening with

19  a stethoscope?

20  A.  Yes.

21  Q.  And you listened to the front and the back, and whenever

22  you did that, you could hear coarseness in the lungs?

23  A.  Yes.

24  Q.  If we could continue down on that page.  It might be the

25  next page.  Sorry.  Keep going.  Maybe at the top of page 67.

1   At some point then, you contacted the resident, correct?

2   A.  Yes.

3   Q.  Now, from your recollection, whenever this assessment was

4   all going by, Matt was still in the room in the nursery

5   watching?

6   A.  Yes.

7   Q.  And whenever you said that you remembered that at some

8   point Matt was there whenever the resident came down and

9   talked to him?

10  A.  Yes.

11  Q.  And you also remember that Matt was there whenever

12  Dr. Jones made the orders for the CBC, blood cultures, chest

13  x-rays, things like that?

14  A.  Yes.

15  Q.  Now, if we go to tab 6, page 30.  So this top part here,

16  this is another medical record which talks a little bit about

17  just the practices at Heritage Valley Beaver.  This is a note

18  by your supervisor, correct?

19  A.  Supervisor at the time, yes.

20  Q.  So whenever you put a baby in an oxy hood, that is an

21  abnormal -- that's a level of care that you have to make sure

22  that supervisors know about, correct?

23  A.  Yes, typically.

24  Q.  So your supervisor, you notified.  It says manager

25  supervisor notified at 7:20 in the morning, correct?

1    A.  This is not my documentation.

2    Q.  I know.  I know.  That's what I'm asking you.

3        This document says that manager supervisor Peg Brooks was

4    notified at 7:20, correct?

5    A.  That's somebody else's charting though.

6    Q.  I know.  I'm asking you if that's what this document says?

7    A.  It says that, yes.

8    Q.  It also says that Janet Kincade was notified at 7:20,

9    correct?

10   A.  Janet Kincade is the supervisor.

11   Q.  That's the point about all this is that if you put a baby

12   in an oxy hood, you have to alert a supervisor?

13   A.  I act first and then call later.

14   Q.  Right.  Yeah.  You put the baby in the oxy hood and you

15   alert your supervisor, this baby is in an oxy hood, it needs

16   oxygen.  I need more help here, correct?

17   A.  Yes.

18   Q.  That was the whole purpose, because once you know that a

19   baby is going into an oxy hood, the level of care has just

20   jumped up, correct?

21   A.  It depends.

22   Q.  Well, what it depends upon is the level of oxygen you are

23   giving to the baby, correct?

24   A.  Potentially, yes.

25   Q.  And that's why there's policies that if you have to give a

1    certain amount of oxygen to a baby, you better alert

2    pediatricians, doctors and supervisors?

3    A.  Doctors primarily and then supervisors.

4    Q.  Right.  And the doctor that you notified was doctor --

5    A.  Dr. Heiple, resident.

6    Q.  Right.  There is a note here on tab 6, page 30 that

7    Dr. Jones was also notified at 7:20.  You see that?

8    A.  I do see that.

9    Q.  Do you have any recollection of talking to your

10   supervisors about what was happening in the nursery on the

11   morning of October 13?

12   A.  I know that they were informed that I needed some

13   assistance in the nursery.  I notified the resident that I

14   would need some assistance.

15   Q.  Did you have a chance to talk to your supervisors about

16   what was going on in the nursery that morning?

17   A.  Yes.

18   Q.  During any of your conversations with your supervisors,

19   did they tell you that they had talked with Dr. Jones about

20   the case?

21   A.  The supervisors?

22   Q.  Yes.

23   A.  No.

24   Q.  Do you know whether or not Dr. Jones was contacted by the

25   supervisors at 7:20 in the morning?

1    A.   No.

2    Q.   You don't know that?

3    A.   I know they weren't.  I know they didn't contact Dr. Jones

4    at 7:20 in the morning.

5    Q.   That's based upon Dr. Jones' testimony?

6    A.   That's based upon my experience of the day.

7    Q.   We're going to talk about that, but what I'm asking you is

8    specifically you have no knowledge as to whether or not your

9    supervisor has contacted Dr. Jones at 7:20?

10   A.   Directly via phone, no, I do not.

11               MR. PRICE:  Your Honor?

12               THE COURT:  Is this a good time to take a break,

13   Mr. Price?

14               MR. PRICE:  Yes.

15               THE COURT:  As you can see, ladies and gentlemen of

16   the jury, it's just about five to 12:00 so we are going to

17   take our lunch break.

18               Let me remind you of the instructions that I give you

19   at every recess.  Once again, you are not to discuss this case

20   with anyone, including fellow jurors, anybody who might be

21   involved in the trial, seated here in the courtroom, any of

22   the parties, witnesses, anyone else who seems to be affiliated

23   with this case, either when you are coming or going.

24               Once again, you are not to look for any kind of news

25   coverage, if there is any, about this case, nor are you to do

1    any independent research either through the Internet or by

2    calling somebody asking questions and the like.  You are only

3    to consider what you hear in this courtroom, what you see in

4    this courtroom and then ultimately my final instructions to

5    you.

6           So once again, you are going to keep open minds,

7    leave behind your binders and notebooks.  Mr. Galovich will

8    escort you out.  I have a meeting over the lunch hour with

9    people from probation, so I expect we'll get started again

10   here at 1:15 again with Nurse McCrory.

11          If everyone would please stand.

12       (Jury excused.)

13          THE COURT:  Nurse McCrory, you may step down.

14   Certainly you may go get some lunch.  You've taken the oath.

15   It would not be appropriate for you to discuss your testimony

16   with anybody here, understood?

17          THE WITNESS:  Yes, Your Honor.

18       (Luncheon recess taken 11:59 a.m.-1:19 p.m.)

19       (Jury present.)

20          THE COURT:  Thank you, ladies and gentlemen of the

21   jury.  I trust you had a nice lunch.  The weather has broken

22   and hopefully you got out a little bit.  As you can see,

23   Ms. McCrory has already resumed the stand.  Let's continue

24   examination, Mr. Price.

25   BY MR. PRICE:

1    Q.  Nurse McCrory, we had taken a break when we were talking

2    about 7:25 in the morning when you were calling the resident.

3    A.  Yes.

4    Q.  And from what I recollect, although 7:25 is when the pulse

5    ox was low and your notes are about the baby being in pain,

6    grunting, flaring.  It would have taken you a few minutes to

7    determine things and then to contact the resident, correct?

8    A.  Yes.

9    Q.  Okay.  So if you could pull up tab 6, page 47, and -- I'm

10   sorry, not tab 6, page 47.  Tab 6 page 67, and this part down

11   here, and pull it down.

12       Here is your note residents contacted.  What does RT mean?

13   A.  Related to.

14   Q.  I'm sorry?

15   A.  Related to.

16   Q.  Related to infant's dusky appearance and GFR, which is the

17   grunting, flaring and retracting.

18   A.  Yes.

19   Q.  Pulse ox and oxy hood in place, correct?

20   A.  Yes.

21   Q.  If you take that down for a second.  Just so we all see,

22   that's at 7:25 in the morning.  That's still at the 7:25 in

23   the morning assessment time, correct?

24   A.  Yes.

25   Q.  Now, I want to talk a little bit about you were putting

1    this oxy hood on Kendall.  Now obviously, before you put an

2    oxy hood or oxygen on a patient, you have to make sure that

3    the patient's airway is clear, correct?

4    A.  Yes.

5    Q.  And you did that with Kendall, correct?

6    A.  Yes.

7    Q.  And whenever you did that with Kendall, the first thing

8    you have to do is look in the back of the throat and down to

9    make sure that the pathway -- airway is clear, correct?

10   A.  Yes.

11   Q.  And whenever you, at 7:25, 7:30 were looking down

12   Kendall's throat, you noticed that there was meconium staining

13   on the back of her tongue, correct?

14   A.  Yes.

15   Q.  It wasn't on the front of her tongue, it was on the back

16   of her tongue, back in the back of her throat, correct?

17   A.  Yes.

18   Q.  And after seeing that, obviously you were concerned that

19   now we are two hours after birth and she has meconium

20   staining, so you want to make sure that the airway is clear,

21   correct?

22   A.  Yes.

23   Q.  And part of what you then have to do is suction, correct?

24   A.  Yes.

25   Q.  Because you want to make sure there's nothing obstructing

1    it, right?

2    A.  Yes.

3    Q.  And you did suction, correct?

4    A.  Yes.

5    Q.  And whenever you suctioned, as you said, you got a lot of

6    junk out, correct?

7    A.  Yes.

8    Q.  Now, if you could pull up the Gatorade picture, and this

9    is a picture of just some Gatorade bottle.  I know this is a

10   very bad picture.  Hopefully, it's better on the little

11   monitors, but as you can see, on the right-hand side is a

12   clear bottle, the next one is lime green, the next one is a

13   little bit darker green, the final one is almost like a

14   vegetable juice.

15       So the junk that you got out, was it darker or lighter?

16   A.  I would say none of the above.  It's its own consistency.

17   It's hard to explain.  It's a darker substance than the blue

18   clear one or the clear clear one.

19   Q.  On the scale going from right to left, you are putting it

20   more closer to the one on the left?

21   A.  Yes.

22   Q.  You can take that down.  You did some deep suctioning and

23   you showed in the tube that there was some meconium in there

24   and you told Dr. Heiple, "I got a lot of junk out," correct?

25   A.  Yes.

1    Q.  Now, you then had the oxy hood on -- let me take a break.

2        Dr. Heiple was not there whenever you put the oxy hood on,

3    correct?

4    A.  Correct.

5    Q.  He came in sometime later?

6    A.  Yes.

7    Q.  But you still had the suction tube with the meconium in it

8    and you still had it there so that you could show it to

9    Dr. Heiple, correct?

10   A.  Yes.

11   Q.  So he saw the amount of meconium in the tube which you

12   were concerned about and called a lot of junk?

13   A.  Yes.

14   Q.  Now, after that -- you believe that Dr. Heiple came down

15   within about five or ten minutes from your call, correct?

16   A.  Yes.

17   Q.  And that would place it to be at about 7:40, 7:45 at the

18   latest?

19   A.  7:35, 7:40, yeah, something of that nature.  Within ten

20   minutes of my phone call placement, yes.

21   Q.  Now, obviously, we're going to have Dr. Heiple testify in

22   a little bit, but he disputes that.  You know that?

23   A.  I do not know.

24   Q.  He says that it wasn't until 8:00 that you called?

25   A.  It's been five years since this case, so it's very hard to

1    remember specifics, but I know that I placed a phone call to

2    the resident immediately after I got baby stable on the warmer

3    bed.  Priority is patient.

4    Q.  Okay.  I know it's been some years, but it was a few years

5    back that we took all of your depositions and asked you about

6    this, correct?

7    A.  Yes.

8    Q.  And you dispute Dr. Heiple's testimony that it wasn't

9    until 8:00 that you called, correct?

10   A.  The timeline is very difficult for me to remember or

11   recall.

12   Q.  Nevertheless, it wasn't until sometime after 8:00 that

13   Dr. Jones arrived, correct?

14   A.  Yes.

15   Q.  And whenever you remember Dr. Jones coming in, it wasn't

16   a -- how do I want to put it?  She was ticked?

17   A.  Yes.

18   Q.  And I'm going to play the clip from your deposition where

19   you describe when she comes in just so the jury can see how

20   you described her coming into the nursery that morning.  Okay?

21   A.  Yes.

22          MR. PRICE:  If you could play the clip.

23          MS. KOCZAN:  Your Honor, I'm not sure what the

24   purpose of that is.  He can ask her questions about that.  I'm

25   not sure why we have to show.

131

1      THE COURT:  Certainly, you can ask questions about

2  it.

3      MR. PRICE:  I just want to ask her if this is her

4  reaction because her reaction might be different and seems to

5  be different today.

6      THE COURT:  I'll let it go.

7      (Video playing.)

8  BY MR. PRICE:

9  Q.  So Dr. Jones was upset about not knowing about this baby

10 earlier?

11 A.  Yes.

12 Q.  Now, again, as to when she comes in to the nursery, I know

13 there's a record that says that she came in at 8:00, but do

14 you have any notation as to when she came in to the nursery?

15 A.  I have notation of when the IV was started on the baby at

16 8:20 a.m.

17 Q.  And that would take an order from a doctor?

18 A.  That would take an order from a resident or a doctor, yes.

19 Q.  And if you could pull up that tab 6, page 47, and these

20 are the -- if we could -- this part down here (indicating).

21     These would be the orders that would be given for the

22 medication and the chest x-rays and the ampicillin and blood

23 gas, correct?

24 A.  Yes.

25 Q.  It was requested by the resident, Bradley Heiple, correct?

1    A.  Yes.

2    Q.  And he didn't time that until 8:32 in the morning,

3    correct?

4    A.  Yes.  A lot of times, we act first and orders get placed

5    after.

6    Q.  Okay.

7    A.  Or we ask a resident, while we are collecting samples, we

8    ask a resident to put the orders in for us so we can label and

9    send it to the lab as soon as we can.

10   Q.  Sure.  And that was at least an hour and five minutes

11   after you first noted that the blood oxygen level was 81

12   percent, correct?

13   A.  Yes.

14           MR. PRICE:  That's all the questions I have, Your

15   Honor.

16           THE COURT:  Thank you, Mr. Price.

17           Mr. Colville?

18                       CROSS-EXAMINATION

19   BY MR. COLVILLE:

20   Q.  Just a couple quick questions.  With regard to the

21   suctioning that you did, you mentioned that you pulled up a

22   lot of junk.  Is that exactly what you told Dr. Heiple?

23   A.  That was my deposition.  I discussed with Dr. Heiple that

24   I pulled out -- that I deep suctioned, and there was a lot

25   of -- there was meconium in the suction catheter.

1    Q.  Could some of the substances also have been mucus and

2    secretions?

3    A.  Yes.  Multiple times, there are mucus secretions,

4    meconium.  There can be multiple different things that come

5    out.

6    Q.  Could it also have been blood from the pulmonary

7    hemorrhage we know occurred?

8    A.  I don't know.  I don't know the consistency of what was in

9    there.  I'm sorry.

10           MR. PRICE:  I would just like to object in the sense

11   that the pulmonary hemorrhage wasn't diagnosed for several

12   more hours, and he was assuming that was happening at 7:30 in

13   the morning.

14           THE COURT:  Why don't we pose it as a hypothetical?

15   Q.  Hypothetically, would that account for it?

16   A.  It could have, yes.

17   Q.  Would mucus and secretions also make the substance darker?

18   A.  Yes.

19           MR. COLVILLE:  Thank you.

20           THE COURT:  Ms. Koczan?

21                        CROSS-EXAMINATION

22   BY MS. KOCZAN:

23   Q.  Good afternoon.

24   A.  Good afternoon.

25   Q.  I would like to go back to the time you came on shift that

1    day, which I understand was around 7:00, 7:05.  Would that be

2    correct?

3    A.  Yes.

4    Q.  When you came on shift, did you receive report from Barb

5    Hackney?

6    A.  Yes.

7    Q.  And I think you've already told us that you don't recall

8    the number of babies that had been born that night?

9    A.  Not specific number of babies that were in the nursery.

10   Q.  You would have, however many there were, received report

11   on all of those babies; is that correct?

12   A.  Every single baby, but also each baby had a nurse assigned

13   to it on maternity because they are coupling.  Mom and baby

14   are given a nurse on maternity floor 2, but in the event when

15   a pediatrician is on their way in, all the babies come to the

16   nursery for assessment.

17   Q.  And at the time that you got there, was it the situation

18   that there were only two babies in the nursery, Kendall and

19   that other baby?

20   A.  There may have been, because I do not recall a few other

21   babies in the nursery, but Kendall was one on the warmer bed

22   on the left side in the nursery.

23   Q.  We've heard about this other baby, and I don't want to go

24   into any detail about what was wrong with the baby, but was

25   that baby stable at that time?

1    A.  Stable, yes, but needed transferred.

2    Q.  Right.  But there wasn't any active treatment being

3    provided at that time for that baby that you had to provide?

4    A.  A second nurse, that would have been the maternity nurse,

5    had brought the baby back to the nursery, and so there was

6    other nurses on at the time assessing the baby, and there's a

7    lot going on during change of shift in the morning especially

8    when pediatricians are on their way into the hospital for

9    assessment.

10   Q.  And in terms of pediatricians on their way into the

11   hospital, you worked in the nursery before; is that correct?

12   A.  Yes.

13   Q.  And you were familiar with Dr. Jones?

14   A.  Yes.

15   Q.  And were you familiar with her routine?

16   A.  Yes.

17   Q.  And was it her routine to be there generally at 8:00 every

18   day?

19   A.  Dr. Jones is a very punctual person.

20   Q.  And she was there at 8:00 every day?

21   A.  For the most part, or sometimes earlier.  She is

22   definitely one that is very punctual.

23   Q.  When you got report from Barb Hackney, do you have any

24   recollection of Barb indicating to you that there had been any

25   issue with Kendall up to that point?

A.  No.

Q.  And did Barb tell you or were you aware that Barb had done vital signs on Kendall already?

A.  She had informed me that she did a set of vital signs on the baby and that she gave the baby a vitamin K shot and erythromycin eye drops in the eyes.  It's a standard procedure we give to all babies unless parents refuse it.

Q.  When she gave you report on Kendall, did she also give you a history?  By that I mean, did she tell you the time she was born?

A.  Yes.

Q.  Did she give you any information about what had happened in the delivery room?

A.  Background, we have a sheet, a delivery note sheet we used to use because everything is evolving and ever changing, so I apologize in regard of charting aspects because there's so many things that we don't do now that we did then, but there was a paper chart that we used that showed the Apgars, the weight, the time of delivery, any complications that may have arose from report from the labor and delivery nurse and then passed to the nursery nurse.

Q.  Do you have any recollection -- let me just stop there for a second.

    Were you aware that there was meconium-stained fluid noted at the time of delivery?

1  A.  Yes.  There was notation that there was meconium, thin
2  meconium present, and I mean, there's multiple different
3  things that we record and places that we record them on.
4  Q.  Do you have any recollection of hearing in the report from
5  Barb Hackney that there had been any issues with Kendall up to
6  that point?
7  A.  No.
8  Q.  So Barb begins to give you report on all of these nursery
9  patients, and as I understand it, you correct me if I am
10 wrong, that as you are getting report, you are actually in the
11 nursery; is that correct?
12 A.  Yes.
13 Q.  And you can visualize the babies that are in the nursery?
14 A.  Yes.
15 Q.  Is it the situation that while you were getting report,
16 you looked up and you noticed what you've already described
17 with regard to Kendall looking dusky?
18 A.  Yes.  She had a weird color to her.  She didn't look right
19 to me.  So my instinct -- my nursing instinct was just to
20 check her out.
21 Q.  Okay.  When you looked up and you noted that, was there
22 any discussion between you and Barb?
23 A.  Yes.  Barb asked me if I needed any help because I did the
24 pulse ox.  I said she looks dusky to me.  Let me put a pulse
25 ox on.  She didn't seem too concerned and when we saw the

1   pulse ox was low, she said, well, let me help you -- it takes

2   a few, you know, movements to get things that you need for

3   oxygen for -- to put an oxy hood on.

4   Q.  Do you remember there being any discussion with Barb about

5   whether that had been present -- "that" being the duskiness --

6   present before that moment in time?

7   A.  No.  She had said -- it was just concerning to her that

8   the pulse ox was low.

9   Q.  And after you noticed that, you got up and you put the

10  pulse ox on, correct?

11  A.  Yes.

12  Q.  And after you put the pulse ox on, that is when you

13  notified what, your supervisor?

14  A.  Supervisor, yes.

15  Q.  I want to ask you some questions about that.  We've seen

16  this note from the supervisor.  This is Janet Kincade.

17  A.  Uh-huh.

18  Q.  Before we talk about the note, let me ask you this:  Did

19  you call Dr. Jones that morning?

20  A.  No.

21  Q.  Did you see Janet Kincade calling Dr. Jones that morning?

22  A.  No.

23  Q.  Did Janet Kincade ever tell you that she called Dr. Jones

24  that morning?

25  A.  No.

1    Q.  Did Barb Hackney ever tell you that she called Dr. Jones

2    that morning?

3    A.  No.

4    Q.  Did you observe Barb Hackney calling Dr. Jones that

5    morning?

6    A.  No.

7    Q.  And when you called Dr. Heiple, I think you've told us,

8    you did that why?  Why him?

9    A.  Chain of command.  You contact the resident on to come lay

10   eyes on the baby to assess the baby and to inform the

11   supervisors so they know what's going on.

12   Q.  So your protocol was not to call Dr. Jones but to call

13   Dr. Heiple and what's what you did?

14   A.  Yes.

15   Q.  I want to ask you some questions about the call to

16   Dr. Heiple.  You were asked questions about what time it was.

17   You've documented there at 7:25?

18   A.  Yes.

19   Q.  And you've told us it could be 7:25.  It could have been a

20   couple minutes before or a couple minutes after; is that

21   correct?

22   A.  Yes.

23   Q.  You don't think it would be any later than that; would

24   that be accurate?

25   A.  Typically no, no.

1    Q.   In terms of Dr. Heiple's response, do you have any

2    recollection of how long it took from the time you called him

3    until he showed up in the nursery?

4    A.   I would say approximately ten minutes.

5    Q.   So that puts us somewhere, if you called at 7:25, he's

6    there somewhere around 7:35, maybe 7:40; is that correct?

7    A.   Yes.  Yes.

8    Q.   And when Dr. Heiple got there, what did he do?

9    A.   He assessed the patient.  He assessed the infant and then

10   talked to the dad and explained to me that Dr. Jones was on

11   her way in, because that's the reason why all babies are

12   coming to the nursery at the time, and then I explained to

13   him, you know, he observed the baby on the warmer bed.  He

14   observed that the pulse ox was now up to 92, the 90s where we

15   like it to be, and I said to him it's probably something

16   transitional.

17   Q.   What do you mean by that?

18   A.   Transitional.  Some babies need a little bit of oxygen.

19   It's not uncommon for babies to need oxygen after delivery.

20   It's not uncommon for babies to have respiratory issues after

21   delivery.

22          So transitional, sometimes babies have respiratory

23   issues that they need a little bit of O2 or a little

24   observation, closer observation and things resolve.  So

25   transitional is just from in utero to actually taking real

1    breaths, so transitional is layman terms as I can put it for

2    anybody who has a question about it.

3    Q.  Was there a discussion between the two of you about

4    whether this could be transition?

5    A.  I did say I'm not sure if it's transitional or not.  I

6    just wanted to make sure you were aware and inform you and

7    wasn't sure if there was anything else you wanted me to do.

8    Q.  What was his response?

9    A.  He again assessed the baby, talked to the dad and let me

10    know that Dr. Jones was on her way in so she was in route

11    driving.

12    Q.  And I want to go back for a minute and ask you, you were

13    shown a copy of your note and in particular that portion of

14    your note which documented coarse breath sounds.

15        Was that coarse breath sounds before or after you

16    suctioned?

17    A.  I do not recall.  It's been a very long time, but I will

18    say my assessment on the baby initially was that the baby was

19    dusky.  I put a pulse ox on.  We took action.  I did vitals.

20    All the other vitals were relatively stable.  Coarse breath

21    sounds are very common after delivery, too.

22    Q.  Why is that?

23    A.  Because babies' lungs are very wet until they start taking

24    their first breath then the moisture absorbs and the breathing

25    begins to circulate differently than in utero.

1    Q.   One of the other things that I thought was pointed out on

2    that note was the baby's nailbeds being dusky.   Is that

3    unusual with a baby of this age?

4    A.   Acrocyanosis is very common.   Acrocyanosis is the purpling

5    of the hands and feet, but also, it was 12 hours after, I

6    charted, so there's a lot that -- emotionally, everything.

7    There's a lot of time expanding between.

8        Acrocyanosis is purpling of the hands and feet and that's

9    very common in most newborns, but dusky also can be because,

10   as the day progressed, she obviously ceased to breathe, so

11   it's very hard to summarize something from a 12-hour status

12   after being an extremely draining and traumatic day.

13   Q.   I wanted to go back to something you said earlier about

14   that.   You've told us that the first thing that you noticed

15   was that Kendall was dusky, correct?

16   A.   Yes.

17   Q.   It's because of that that you got up, went in, put the

18   pulse ox on, put her under the oxy hood and that the grunting,

19   flaring and retracting was something that occurred later in

20   the progression; is that correct?

21   A.   Yes, and until we stressed her when we started doing our

22   labs, that's when the real grunting, flaring and retracting

23   happened.

24       It's difficult to summarize every single thing I did and

25   every single moment I did it and every single thing that I

1    observed, but it transitioned from a slightly dusky baby to a

2    baby in respiratory distress.

3    Q.  And this transition, was this over a period of time?

4    A.  Yes.

5    Q.  And did that transition occur over the period of time up

6    to the time that Dr. Jones got there?

7    A.  No.  The baby was not in respiratory distress.  I mean,

8    there's many degrees of respiratory distress.  The baby was

9    observed as being dusky, and the situation was rectified by

10   putting the oxy hood on.

11       It did not progress to anything worse until after we

12   started doing the orders from Dr. Jones because we stressed

13   the baby by, again, doing lab draws and trying to start an IV

14   which makes the baby want to cry, so that's when things got --

15   things started to get worse.

16   Q.  So just so I understand, in terms of the timing, I want to

17   make sure we are absolutely clear on this, 7:25, it's just the

18   duskiness that you noted?

19   A.  Yes.

20   Q.  You put her under the oxy hood.  Does she pink up at that

21   point?

22   A.  Yes.

23   Q.  So she is -- her color is better at that point?

24   A.  Her color is better and her oxygen saturation is in the

25   90s.

1  Q.  And I think we saw before, but let's see if we can pull

2  this up, 1165, and this is Jamie's vital sign note, and if we

3  can pull up the section -- I think it's the second section

4  here.  Go down further, the third section.  7:30.  The pulse

5  ox at that point is 94 percent; is that correct?

6  A.  Yes.

7  Q.  And at 94 percent, is she at that point pink?

8  A.  Yes.

9  Q.  Is she at that point, from your recollection, grunting,

10  flaring and retracting?

11  A.  No.

12  Q.  So when Dr. Heiple comes in -- and you said you thought it

13  was about ten minutes later; is that correct?

14  A.  Yes.

15  Q.  Was she pink at that time?

16  A.  She is under the oxy hood still having oxygen being

17  provided for her, supplemental oxygen.  Underneath the oxy

18  hood, she was stable.

19  Q.  So when he saw her, she was -- your recollection was that

20  she was stable at that point?

21  A.  Yes.

22  Q.  And at that point, she was not grunting, flaring and

23  retracting; is that correct?

24  A.  No.

25  Q.  So when Dr. Heiple had finished his examination, spoke

1    with Matt, she was stable; is that accurate?

2    A.  Yes.

3    Q.  Is it accurate that she remained stable up through the

4    time that Dr. Jones came in, according to her note, at 8:00

5    a.m.?

6    A.  Yes.

7    Q.  You told us that at that point, Dr. Jones evaluated her;

8    is that correct?

9    A.  Yes.

10   Q.  What did Dr. Jones do?

11   A.  She ordered a workup on her.

12   Q.  Do you recall what the workup included?

13   A.  Chest x-rays, CBC, blood culture, I believe cap gases.

14   Q.  What are, for the jury, what are cap gases?

15   A.  Just to see oxygen levels, carbon dioxide levels, see if

16   the baby has anything for like an acid based balance, if you

17   will.  There's a balance that your body needs to be, so if you

18   have too much carbon dioxide or too much of one thing, the

19   balance is off, and it will be reflected in the baby's cap

20   gas.

21   Q.  So when Dr. Jones got there, did she immediately go to

22   Kendall?

23   A.  She assessed Kendall, yes.

24   Q.  Did she do anything with that other baby at that point?

25   A.  Yes.

1  Q.  Did she assess that baby as well?

2  A.  Yes.

3  Q.  And after she assessed the baby, what did she do in terms

4  of -- in addition to those orders, did she at that point begin

5  making arrangements to transfer the child?

6  A.  Yes.

7  Q.  And did she tell you why she wanted to transfer Kendall at

8  that point?

9  A.  I do not recall timeline, but I know that there was labs

10  that were returned and that she was already making progress

11  towards shipping both the babies that were in the nursery at

12  that time.

13  Q.  You were asked questions about Dr. Jones' reaction when

14  she came in.  She was upset that she had not been called,

15  correct?

16  A.  Yes.

17  Q.  She wanted to know why she hadn't been called?

18  A.  Yes.

19  Q.  And Dr. Heiple's response was?

20  A.  You were already on your way in.

21  Q.  And do you know how he knew that, other than the fact that

22  she was always there at 8:00?

23  A.  The residents are always contacted, the majority of the

24  time, contacted by the pediatrician because they round

25  together, that they are on their way in to gather the babies

1    to have their morning assessments prepared for debriefing that

2    they do every morning.

3    Q.  Do you know if that's what happened here?  Was there some

4    other way he knew she was on her way in?

5    A.  I do not know.

6    Q.  Now, in addition to the laboratory studies that you

7    mentioned that she ordered, she also ordered that an IV be put

8    in; is that correct?

9    A.  Yes.

10   Q.  And the purpose of that IV was to give the antibiotics.

11   Did she order the antibiotics right away, too?

12   A.  Yes.

13   Q.  And you've told us that the IV was put in at around 8:20

14   that morning?

15   A.  Yes.

16   Q.  And did you put that in or did someone else put it in?

17   A.  When you draw labs on a baby, it is a joint effort.  You

18   need more than the one set of hands, two sets of hands,

19   sometimes you need three and four because babies are

20   resistant, and babies are small, and sometimes their veins --

21   their veins are not developed as our veins are.

22       So you need a couple sets of hands to do peripheral sticks

23   and to find a vein that we can start an IV on, so you need

24   extra sets of hands.

25   Q.  So the IV was inserted at 8:20.  We've already seen a note

1    that indicates the ampicillin, one of the antibiotics that

2    Dr. Jones was -- had ordered, was started around, looks like,

3    8:34, 8:35.  Does that sound accurate?

4    A.  Yes.  Once an IV is in, once a septic workup is ordered,

5    it's kind of a standard -- it is a standard procedure that we

6    do blood culture, do a CBC, start an IV, get antibiotics and

7    IV fluids going.

8    Q.  And you do it in that order?

9    A.  Yes.

10   Q.  And the reason why you do it in that order is that you --

11   your blood culture will not be accurate if you've already

12   started the antibiotics; is that correct?

13   A.  Yes, that is correct.

14   Q.  So you have to get the blood culture first so you get an

15   accurate read on the blood culture about what organism might

16   be growing; is that correct?

17   A.  Yes.

18   Q.  And it's after that you get those blood cultures that you

19   can then start the antibiotics?

20   A.  After you draw the blood culture, yes.

21   Q.  Now, the entire time that -- from 7:25, Dr. Heiple comes

22   down until Dr. Jones gets there around 8:00, Dr. Heiple is

23   there the entire time, correct?

24   A.  Yes.

25   Q.  You are there the entire time?

1    A.   Yes.

2    Q.   You are both watching, monitoring this baby, correct?

3    A.   I never left the nursery.

4    Q.   And when Dr. Jones got there, other than the time that she

5    went to talk to the parents about transferring this child, was

6    she there the entire time too?

7    A.   Yes.

8    Q.   Now, at some point, she leaves the nursery to go talk with

9    the parents.  Did you go with her for that?

10   A.   No.

11   Q.   Do you believe Dr. Heiple went with her, or did anyone go?

12   A.   There may have been a supervisor.  There may have been

13   another nurse, maternity nurse on.  Chelsey Paff was taking

14   care of the patient, the patient's mother.

15   Q.   Carissa?

16   A.   Carissa, sorry.  So she may have been present, but I never

17   left the nursery.

18   Q.   You've told us before about the progression.  You told us

19   that things didn't, grunting, flaring and retracting, until

20   after you started interacting with the baby, taking blood

21   work, starting the IV, that type of thing.

22        Can you tell the jury what you recall after that?  The IV

23   has now been in.  What happened after that?  You've applied

24   the antibiotics.  What's next?

25   A.   Results are back.  Dr. Jones reads the results of the cap

1    gases.  Also -- she is also coming back from receiving -- I'm

2    sorry.  I don't know the exact timeline and the exact specific

3    way that things went down, but once the cap gas results were

4    back and Dr. Jones came back to the nursery and once we were

5    doing an invasive procedure, stressing the baby, the baby's

6    color and pulse ox -- the oxygen demand was increasing.

7        Dr. Jones immediately came in and said we need to intubate

8    this kid now because she saw that it was not looking the way

9    it looked when she first saw it on the warmer bed with the

10   pulse ox in the 90s.

11   Q.  I'm going to put up a couple copies of your notes.  This

12   is page 1116.  I think these are -- this is the handwritten

13   note there, some of your documentation.  Is this your

14   documentation or is this somebody else's?

15   A.  This is a combined documentation.  Whenever we do an

16   infant transfer, it's a group effort, and a lot of this

17   information, I was trying to gather for West Penn, so whenever

18   their transfer team came, they had an idea of what was going

19   on and the timeline that things were given, so it is not

20   gospel, but it is the best of my ability in the moment of

21   trying to organize for West Penn's transfer.

22   Q.  Okay.  So you have documented here it looks like around --

23   correct me if I'm reading this incorrectly -- 8:30 is a chest

24   x-ray was done?

25   A.  I can't say that that's a specific time that the chest

1    x-ray was done, but in the event of getting labs drawn and an

2    IV started at 8:20, the chest x-ray was also in.

3        We called them to let them know before the order even goes

4    in that we need them to come down, because we can't take the

5    baby to them because of security purposes, so we let them know

6    we have an order coming in.  If you don't get it, we need this

7    x-ray before you even get the order.  They are aware and they

8    are in route.

9    Q.  We saw some chest x-rays that were timed earlier.  I

10    shouldn't say "timed earlier."  We saw some x-rays with

11    various times on them.  You have under 9:00, CBC, cap gas, IV

12    started, blood culture, but we know that happened earlier; is

13    that correct?

14    A.  Yes.  That column where it says procedure, meds, results,

15    comments, it was my order of what we were doing.  They don't

16    fall with the times.  Those are more so for vital signs when I

17    have that written down.

18        On the other where it says status, that is just for vital

19    signs that were collected throughout the time and what the

20    pulse was.

21        So the timing of when the chest x-ray, CBC, the cap gas,

22    the IV, that is a general timeline that I put around the 8:30

23    time because that's when the orders were received for us to

24    start things and we got the ball rolling around 8:00.  We got

25    her IVs.  It takes a long time to start a baby's IV, and

1    sometimes we are unsuccessful to start IVs.  Not for any

2    reason other than some babies are very difficult to get IV

3    starts on.

4    Q.  In terms of Dr. Jones intubating the child, I've seen

5    several different things.  I see a 9:40, I see a 9:50.  In her

6    notes, she said 9:40.  Again, do you know what time exactly

7    that occurred?

8    A.  I do not recall.  Again, I was hands-on on the warmer bed

9    with that baby.  I never ever left her side for anything but

10   collecting things that the doctors needed.

11   Q.  Was that baby intubated before the West Penn team got

12   there?

13   A.  Yes.

14   Q.  After the West Penn team got there, did they then take

15   over the resuscitation of the baby?

16   A.  Yes.  There is a doctor.  I don't know the doctor's name.

17   Q.  Is it Leneri?

18   A.  It could be, yes, I'm sorry.  But the West Penn team is in

19   charge of the transfer out.  We're in charge of stabilizing

20   the baby until the team gets there, and it was a joint effort

21   to attempt to stabilize and keep Kendall stabilized, and

22   unfortunately, she never got stable enough to be transferred.

23   Q.  I'm not going to ask you to go through that.  The

24   records -- are you okay?

25   A.  Yeah, I'm good.

1    Q.  The records reflect that they got there around 9:45 and

2    that the code was eventually called at 11:40.  Is that

3    consistent with what you can recall?

4    A.  Yes.

5    Q.  And from your reaction, I assume this was really traumatic

6    for you?

7    A.  It was a traumatic day for everybody.

8    Q.  This isn't something that normally happens in the nursery,

9    does it?

10   A.  No, not typically.

11   Q.  The entire time that this baby was being resuscitated from

12   the time that they got there, the West Penn team at 9:45,

13   until the code was called, was Dr. Jones there with you the

14   entire time?

15   A.  Yes.

16   Q.  And you were --

17   A.  From the moment she intubated until the baby was ceased to

18   breathe.

19   Q.  After the baby passed, did you go with Dr. Jones to talk

20   with the family?

21   A.  Dr. Jones did on her own.  I took time to console them

22   when I had a moment to just send my apologies and wish that I

23   could take things back or do something different that would,

24   you know, that their baby would still be here.  I just wanted

25   to console them.

1    Q.  And that was my next question.  Did you speak with Matt

2    and Carissa?

3    A.  Yes.

4    Q.  Was it that day or was it the next day?

5    A.  That day.  I don't believe I worked the next day.  I

6    honestly do not recall, but I just wanted them to know that my

7    heart was with them.

8    Q.  And in terms of Dr. Jones, did you ever have a

9    conversation with her after this all happened about what

10   happened?

11   A.  We would debrief a little bit.  I would see her in the

12   mornings for rounding when I was in the nursery and discuss,

13   you know, cause.  What questions -- we had a lot of questions

14   and, you know, it was very difficult to handle that

15   emotionally, professionally, so there were conversations in

16   passing and professionally with Dr. Jones.

17   Q.  The reason why I ask the question, that day, when this was

18   all happening, was it the situation that there was -- that you

19   were aware of some explanation, or was it we don't know what

20   happened?

21   A.  There was a we don't know what happened question mark and

22   just waiting for results to come back to explain.

23   Q.  And did you learn at some point after that day that the

24   blood cultures and the tissue cultures came back showing that

25   this child had an E. coli sepsis?

1    A.  Yes.

2    Q.  And had you ever seen a baby with E. coli sepsis like this

3    before?

4    A.  No.

5              MS. KOCZAN:  Thank you.

6              THE COURT:  Mr. Price, any additional questioning of

7    this witness?

8              MR. PRICE:  Just a few.

9                    REDIRECT EXAMINATION

10   BY MR. PRICE:

11   Q.  Just to follow up on this.  When you were talking about

12   this transitional breathing and the coarseness in the chest,

13   you knew why Kendall had coarseness in her chest, correct?

14   A.  I observed coarseness in the chest and I deep suctioned

15   and there was meconium present.  Coarseness in the chest

16   doesn't always mean meconium.  I've heard coarseness in chests

17   of many patients that don't have meconium.  There's multiple

18   reasons that coarseness could be the reason.

19   Q.  But you suctioned out a lot of junk.  It was in a tube and

20   it was meconium, correct?

21   A.  I deep suctioned meconium out of Kendall, yes.

22   Q.  Did you show that tube -- I know you showed it to

23   Dr. Heiple.  Did you show what was in that tube to Dr. Jones?

24   A.  Yes.

25   Q.  Let me ask you this, and I know this is very difficult, so

1    Kendall didn't survive.  I know you were dealing with another

2    baby who had a lot of other issues, too.

3        Did that baby survive, the baby that was in the nursery

4    that morning?

5    A.  Is that important to this case?

6    Q.  Yes, it could be, because we are talking about an

7    emotional issue, and if the hospital lost two babies in one

8    day, that could be very emotional.

9    A.  Okay.  I just didn't know that was important.  From my --

10   I don't have anything factual on paper.  I have hearsay that,

11   yes, the baby survived its transfer.

12            MR. PRICE:  Thank you.

13            THE COURT:  Mr. Colville, anything?

14            MR. COLVILLE:  No.

15            THE COURT:  Ms. Koczan, any additional questions?

16            MS. KOCZAN:  Just one additional question.

17                        RECROSS-EXAMINATION

18   BY MS. KOCZAN:

19   Q.  In terms of what you suctioned out, you talked about you

20   saw meconium.  There was mucus in there, too?

21   A.  I'm sure there's mucus.  I don't know the actual content.

22   I know what meconium looks like.  I know what mucus looks

23   like.  I'm sure there's meconium in there.  I'm sure there's

24   mucus in there, but there's also many babies that have lived

25   after meconium has been suctioned out of their lungs, so

1    that's very important to understand that it's not just -- it's

2    not just meconium.  There is a lot of other complications,

3    that that baby was very sick.

4    Q.  And that was, you learned later, because of the E. coli

5    sepsis?

6    A.  Yes.

7              MS. KOCZAN:  Thank you.  Your Honor, may she step

8    down?

9              THE COURT:  I think I have one question.

10             Nurse McCrory, I think that you advised Mr. Price

11   that you were there when Dr. Heiple was talking to dad, Matt;

12   is that right?

13             THE WITNESS:  Yes.

14             THE COURT:  Were you part of that conversation?

15             THE WITNESS:  I was.

16             THE COURT:  Do you recall what they were talking

17   about?

18             THE WITNESS:  I was present for the conversation, but

19   I do not recall what Dr. Heiple said to Matt.  I can tell you

20   what I said to Matt myself because when we had to do lab draws

21   on Kendall, initial introduction with Matt, met him, I always

22   want to know the baby's name.  I write it down.  It's

23   something in me as a nurse, and I explained to him that it

24   could be something transitional, and transitional, again, is a

25   big word if you are not in the medical field as to what that

1    is, and said baby might just be having a hard time

2    transitioning from being inside mom to the outside.  We're

3    going to do some lab draws, and I'm going to have you step out

4    unless you have any other questions, because I don't want --

5    parents get a little upset and worked up if they stay present

6    for when you are poking or prodding a baby, and they are

7    getting stressed out.

8            So he had questions in regard to the baby's head.  I

9    explained to him that's normal, coming out of a vaginal

10   delivery, first-time mom.  Those are normal things, and

11   usually the babies' heads, within the first two, three days of

12   life, go back to normal.  So he had questions.

13           Dr. Heiple discussed -- talked to him, and the dad

14   had left, so I do not know specifics of what Dr. Heiple said

15   to Matt, but I know my conversation with Matt.

16           THE COURT:  Okay.  Thank you.  The court has no

17   further questions.

18           Does that questioning prompt any additional

19   questions?

20           MR. PRICE:  Yes, Your Honor.

21           Matt, can you stand up for a second?

22                          REDIRECT EXAMINATION

23   BY MR. PRICE:

24   Q.  I want to make sure that everything you said was said to

25   this gentleman (indicating)?

1    A.  Yes.

2         THE COURT:  You are indicating, Mr. Price, to Matthew

3    Fritzius?

4         MR. PRICE:  Yes.

5    Q.  You had that whole conversation with him?

6    A.  Yes, I did.

7         THE COURT:  Anything further then?

8         Nurse McCrory, thank you for your appearance here

9    today.  You may step down, and I think everybody has signaled

10   you are also excused.

11        THE WITNESS:  Thank you, Your Honor.

12        THE COURT:  We appreciate you being here.

13      (Witness excused.)

14        THE COURT:  Mr. Price, your next witness.

15        MR. PRICE:  Dr. Bradley Heiple.

16        THE CLERK:  Sir, will you step forward, please?

17        THE COURT:  Dr. Heiple, please approach my deputy to

18   be sworn.

19        THE CLERK:  Please state and spell your name for the

20   record.

21        THE WITNESS:  Bradley Heiple, B-R-A-D-L-E-Y, last

22   name H-E-I-P-L-E.

23      (Witness sworn.)

24        THE COURT:  Thank you, Doctor.  Watch your step.

25   Arrange yourself.  Make sure you are speaking into the

1    microphone so everyone can hear you.

2         BRADLEY HEIPLE, M.D.  a witness herein, having been

3    first duly sworn, was examined and testified as follows:

4                        DIRECT EXAMINATION

5    BY MR. PRICE:

6    Q.  Dr. Heiple, good afternoon.  Could you please tell us your

7    full name and what do you do for a living?

8    A.  Sure.  My name is Bradley Heiple, Dr. Bradley Heiple.  I

9    work currently as a family practice physician with Heritage

10   Valley at an outpatient only practice near Robinson Township

11   right now.

12   Q.  And just so the jury understands family practice, what

13   does that involve?

14   A.  Sure.  Family practice is a nonsurgical specialty of

15   medicine that encompasses care of individuals all the way from

16   birth all the way to end of life issues, so it's pretty much

17   full scope nonsurgical medical practice.

18   Q.  So you could take care of babies, adults and senior

19   citizens?

20   A.  Correct.

21   Q.  And you work at one of the satellite offices, so it's sort

22   of like an urgent care, not really, or do you see patients on

23   a continuing basis?

24   A.  Continuing basis.  There's continuity of care.  It's your

25   basic general practice that you would go to for primary care,

1    ankle, physicals, things like that.

2    Q.  We're going to go back five years back to 2014, and can

3    you tell us back in 2014 what were you doing?

4    A.  Sure.  So I was in my residency.  I was in my second year

5    of residency actually at Heritage Valley where I work now.

6    They have a family practice residency training program there,

7    and I was a senior resident, so second of three years of

8    training, and at the time we are talking about, I was on a

9    pediatrics rotation as one of the specialties we focus on

10    throughout our training.

11    Q.  Let's go back a little bit more so the jury understands.

12    Where did you graduate from college?

13    A.  Undergraduate, I went to Grove City College.  Graduated in

14    2009, degree in molecular biology.  Then I did my medical

15    school at Lake Erie College of Osteopathic Medicine from 2009

16    to 2013.

17    Q.  And from what I understand, of course, being a doctor of

18    osteopathic medicine, you have to do a residency?

19    A.  Yes.

20    Q.  That's what, through Heritage Valley Beaver, they would

21    allow you to come in and be a resident at that hospital?

22    A.  That's correct.

23    Q.  Now, tell the jury a little bit more about residency so

24    they understand it, and I understand that in July -- I'm

25    sorry, October of 2014, you were on a month-long residency in

1    a specific type of medicine?

2    A.  Right.

3    Q.  So that would be pediatrics?

4    A.  That's correct.

5    Q.  And then the month before, do you know, were you in a

6    different practice?

7    A.  I don't remember where I was in the month before.  We

8    would rotate through various specialties about every four

9    weeks in the residency, being pediatrics, inpatient adult

10   medicine, obstetrics and gynecology and a few other electives,

11   outpatient medicine.  I can't remember what I had at that

12   point.  I know at that point I was on pediatrics though.

13   Q.  In osteopathic medicine, did you study any specific

14   pediatric medicine besides the general pediatrics?  Did you

15   have any specialty in pediatrics through your teaching or your

16   school of osteopathic medicine?

17   A.  Yeah.  We did a pediatrics rotation in medical school.  I

18   believe a couple.  I can't remember exactly how many I had,

19   and then in family medicine, as I chose to become a family

20   practitioner when I was in residency, because you will

21   occasionally see kids in your practice, they did have, I

22   believe it was four months of dedicated pediatric rotation

23   throughout training.

24   Q.  And would that four months be at one time or was that four

25   months over your entire residency?

1    A.  It was spread out over the three years.  There were two

2    first year when you are an intern or first year resident and

3    you have one in second year and one in third year of

4    residency.

5    Q.  In October of 2014, you were in your second year of

6    residency?

7    A.  That's correct.

8    Q.  So this would have been, in essence, the third month,

9    third rotation that you had in pediatrics?

10   A.  That's correct.

11   Q.  So let's get to October 13, 2014.  It's a Monday morning,

12   correct?

13   A.  Correct.

14   Q.  And I'm going to -- there's a little PowerPoint I have, so

15   it's 7:25 in the morning, and Nurse McCrory notes an oxygen

16   level of 81.  She records grunting, flaring and retracting.

17   The baby appears to be in pain, nasal flaring, grunting,

18   substernal retractions, respiratory is labored, breath sounds

19   coarse and she contacts a resident, correct?

20   A.  That's correct.

21   Q.  Now, here's where we get to a little bit of a dispute,

22   correct?

23   A.  Sure.

24   Q.  And that is that you believe that you were not contacted

25   until 8:00, correct?

1    A.   During my deposition, I did say that I thought it was at

2    the end of our lecture hour, we had discussions about that,

3    that ended around 8:00.  That was my recollection at the time.

4    Just a mental snapshot I had.

5         Bear in mind, the deposition was a couple years after so

6    the timing of it could be a little bit foggy.  I know it was

7    during the lecture hour whenever I received the call.

8         Again, when I testified, my recollection was that it was

9    at the end of the lecture hour which would have been around

10   8:00 on most days but there is a chance that it may have been

11   earlier.

12   Q.   Just so the jury understands what you said in your

13   deposition, I copied it out and you said, "Starting from the

14   beginning, so we got called around 8:00.  I just remember we

15   were leaving our lecture hour which ended at 8, and I got a

16   call on my pager from the nursery just saying, hey, we have

17   this baby that was born earlier this morning.  You know, we

18   were doing our assessment, and her oxygen levels were down,

19   and I believe it was in the 80s."

20        Do you remember saying that?

21   A.   I do.

22   Q.   And then, so you told me in your deposition, it was a few

23   minutes later, you and your intern -- you had an intern

24   working with you, correct?

25   A.   Correct.

1    Q.  You went down to assess the baby, and whenever -- you were

2    told the oxygen saturations were in the low 80s, mid to low

3    80s, correct?

4    A.  Correct.

5    Q.  You listened to the lungs and you heard they were clear;

6    is that correct?

7    A.  Correct.

8    Q.  You believed this was some type of transitional routine

9    syndrome?

10   A.  Correct.

11   Q.  She was on oxygen and it came up to the mid 90s and you

12   made the decision to wait for Dr. Jones to come in, correct?

13   A.  Correct.

14   Q.  You did not deem the situation with Kendall to be critical

15   or deteriorating, correct?

16   A.  Correct.

17   Q.  Now, so we are at a few minutes after 8:00, and then I

18   asked you when did Dr. Jones come in.  I said after your

19   examination, how long was it until Dr. Jones showed up.  You

20   said I would say no more than 15 to 20 minutes; is that

21   correct?

22   A.  Yes, I was saying that.

23   Q.  So you believe that it was around 8:20 that she showed up?

24   A.  I believe that it was 15 to 20 minutes after I received

25   the call and did the assessments and waited with the baby, and

1    then she came around that time frame.

2        Again, had the call come in at 8:00, then, yes, I would

3    say 8:15 to 8:20, but again, like I said, there is -- you

4    know, I may have not remembered correctly what time I was

5    called just because it had been so long, but I do remember it

6    was probably in the neighborhood of 15 minutes or so from the

7    time I received the call that she came in.

8    Q.  I'm trying to establish the time of the call.  If you

9    could take that out.  We're going to play this clip from your

10   deposition to see if this refreshes your recollection.  Could

11   you play BH009.

12       (Video playing.)

13           MR. PRICE:  Then if we could play BH010.

14       (Video playing.)

15   BY MR. PRICE:

16   Q.  So back in 2017 when I took your deposition, you were

17   doubly clear that it was after 8:00 that you got down to see

18   Kendall, correct?

19   A.  At that point, yes.

20   Q.  Could we go back to the PowerPoint?  Then Dr. Jones came

21   in and this is what she found, that the baby was grunting,

22   flaring and retracting, coarse breath sounds, working to

23   breathe, respiratory was labored with the abdominal muscle use

24   and subcostal retractions, correct?

25   A.  Correct.

1    Q.  She immediately ordered a chest x-ray, CBC, cap blood

2    gases, IV started and called for a transport, correct?

3    A.  Correct.

4    Q.  I walked in that morning.  They told me I had a sick baby,

5    and I said why didn't you call me.  They said we knew you were

6    going to be here any minute, correct?

7    A.  Correct.

8    Q.  So after your examination, you just thought she's going to

9    be coming in.  Just wait and see what happens, right?

10   A.  At the time when I assessed the patient, the oxygen levels

11   and vital signs were within normal limits.  She had responded

12   well at that point to supplemental oxygen.

13       This is a situation we had seen with previous patients

14   that I was familiar with, and oftentimes, I would, you know,

15   give a period of observation before making the call to, you

16   know, assess whether or not we needed to pursue further workup

17   or not.

18       Based on working with Dr. Jones in the past, as this had

19   not been the first day I worked with her, I knew kind of when

20   she would come in.  I believe the pediatricians have office

21   hours after they round in the hospital.  I knew the basic time

22   frame she would be in, so my thought was let's watch the

23   patient for a few minutes here, see if she comes in, and sure

24   enough, she did come in shortly thereafter.

25       Obviously, had things begun to deteriorate rapidly, I

1    would have called her or if she had not showed up in a timely

2    fashion, I would have called her.

3    Q.  You decided to wait and watch, even after Nurse McCrory

4    showed you a suction tube filled with dark thick green

5    meconium, correct?

6              MS. KOCZAN:  Objection to the form of that.

7              MR. COLVILLE:  Objection.

8    A.  I don't remember saying that.

9              THE COURT:  Sustained.

10   Q.  You don't remember that Nurse McCrory showed you a suction

11   tube with meconium in it?

12   A.  I do not recall.

13   Q.  Would that have been important to your assessment of

14   Kendall to know whether or not, before an oxy hood was placed

15   on her, whether or not she was suctioned?

16   A.  Any kind of information that would have happened during

17   the birth or the labor or after would have been important.  I

18   just don't recall getting that piece of information or seeing

19   that piece of equipment.

20   Q.  So if a baby, before an oxy hood is put on and suctioned

21   meconium out that is dark green, that would be concerning to

22   you, correct?

23   A.  It would be a relevant piece of information.

24   Q.  And something like that would be concerning as to whether

25   or not this type of respiratory issue was transitional or not?

1    A.  Potentially.

2    Q.  And potentially, a pediatrician would want to know that

3    immediately, correct?

4    A.  Absolutely.  Any information would be helpful in these

5    types of situations.

6    Q.  And your assessment though was everything was normal with

7    Kendall, correct?

8    A.  From a vital signs standpoint and the basic exam, the head

9    to toe assessment I did, I didn't see anything that was

10   critical at the time that would deem --

11   Q.  You actually listened to her lungs, too?

12   A.  I did.

13   Q.  Whenever you listened to her lungs, everything was fine?

14   A.  Sounded clear to me, yes.

15   Q.  Just so we understand, an hour and a half later, there's

16   an x-ray that's done -- not even an hour and a half later, a

17   half an hour later, this x-ray is done, and it shows that

18   there's meconium aspiration and/or neonatal pneumonia,

19   correct?

20   A.  Correct.

21   Q.  And you didn't hear any of that?

22   A.  I did not hear anything, no.

23   Q.  So at 7:25 when Nurse McCrory does an examination, she

24   notes that -- everything with Kendall.  There are a whole

25   bunch of abnormalities with her breathing, with her

1    respirations, coarse sounds, correct?

2    A.  Correct.

3    Q.  You come in, it's either 7:35 according to Nurse McCrory

4    or 8:05, according to you, and it's a normal exam, correct?

5    A.  Yes.

6    Q.  And then 20 minutes later, Dr. Jones does her examination,

7    and what she finds is that -- she finds the same things, the

8    same abnormal findings that Nurse McCrory found, correct?

9    A.  Correct.

10   Q.  Now, it wasn't until 8:32 that the orders for blood gas

11   and the chest x-ray and the blood count were ordered, correct?

12   A.  Correct.

13   Q.  So that was at least an hour from the time that

14   Nurse McCrory said that she called you, correct?

15   A.  Correct.

16   Q.  Do you agree with this safety rule:  A hospital must take

17   all precautions to minimize risks to its patients?

18   A.  Absolutely.

19   Q.  Do you also agree with this safety rule:  That the earlier

20   you treat something, the better the outcome?

21   A.  Absolutely.

22          MR. PRICE:  That's all the questions I have.

23          THE COURT:  Mr. Colville?

24          MR. COLVILLE:  No questions.

25          THE COURT:  Ms. Koczan?

                        CROSS-EXAMINATION

1   BY MS. KOCZAN:

2   Q.  Good afternoon, Doctor.  I want to go back for a moment or

3   two to ask you some background questions.  I know you were

4   asked about where you went to medical school.  When did you

5   begin your residency at Heritage Valley?

6   A.  So we started in July of 2013, so shortly after I

7   graduated from medical school.

8   Q.  And you told us that up through that time -- "that time"

9   being October of 2014 -- you had done two pediatric rotations;

10  is that correct?

11  A.  That's correct.

12  Q.  And during those pediatric rotations, correct me if I am

13  wrong, I'm assuming you would have seen newborns?

14  A.  Absolutely.

15  Q.  And during those pediatric rotations, is it the situation

16  that one of your responsibilities every day on the rotation is

17  to go through the nursery, evaluate babies?

18  A.  Correct.

19  Q.  Newly born babies?

20  A.  Correct.

21  Q.  So you had seen babies who had issues with transitions

22  before; is that correct?

23  A.  That's correct.

24  Q.  Had you seen babies who had infections before?

1    A.  Yes.

2    Q.  So your evaluation of Kendall that morning wasn't the

3    first one you had ever done; is that correct?

4    A.  That's correct.

5    Q.  Can you give the jury some estimate of how many babies

6    routinely would be in the nursery on a normal day?

7    A.  Sure.  It did vary pretty widely.  I'd say, on average,

8    usually there were anywhere from maybe six to eight newborns

9    at that time on the service at any given time, and those would

10   turn over usually every two to three days.  They would be

11   discharged, and there were enough deliveries that it usually

12   maintained five or six babies you would be seeing.  Sometimes

13   more; sometimes less on a given day.

14   Q.  When you were on your rotations, is it Monday through

15   Friday, or is it seven days a week?

16   A.  For the pediatric duties, it was Monday through Friday,

17   and then the interns and the senior would take turns rounding

18   over the weekends on Saturday and Sunday.

19   Q.  And the first two rotations, they were each four weeks

20   long?

21   A.  That's correct.

22   Q.  So you had had eight weeks of pediatrics, and then this

23   was your --

24   A.  This would be the third.

25   Q.  The third rotation, so do you know how far along you were

1    in that rotation at that point?

2    A.  I honestly don't remember what week it was of the

3    rotation.  I don't think it was the first one, but I can't be

4    sure.  I would have to look back at the schedule.

5    Q.  You've told us that you were with Dr. Jones before?

6    A.  That's correct.

7    Q.  And you knew what her routine was; is that correct?

8    A.  That's correct.

9    Q.  And what was her routine about getting to the hospital?

10   A.  Usually, if I remember correctly, as it's been a while

11   now, she would usually get there around 8:00.  She was usually

12   there right around when lecture would be over, and she would

13   usually either be down there or just getting there around that

14   time.

15   Q.  And that was something that you had observed her doing?

16   A.  In the past.

17   Q.  First two rotations and then this rotation?

18   A.  Yeah, correct.

19   Q.  And was there any other way for you to determine if she

20   was on her way in other than simply knowing that it was her

21   practice at 8:00?

22   A.  Yeah.  They actually -- at Heritage Valley, they have like

23   a parking board.  It's just an app on a computer you can click

24   and see, based on whoever swiped into the lot, when certain

25   doctors are in-house or when they left.

1    So it was a nice way to know on that rotation and other

2    rotations when your attending physician or your supervising

3    physician was in the house.  It was just a nice way to be able

4    to tell what time they were there, when they were there so you

5    can be prepared when they got there.

6    Q.  Do you have a recollection on this day if you accessed

7    that to know that Dr. Jones was in the house and on her way?

8    A.  I believe I did have it up, just because I knew obviously

9    the situation she would want to know about, and I wanted to

10   make sure she was there, and like I said before, had she not

11   arrived within a few minutes, I definitely would have called

12   her at that point.

13   Q.  So I want to go back now and talk a little bit about what

14   happened at various times.  The jury has already heard that,

15   according to Jamie's documentation, that around 7:25, she

16   noted that the baby was dusky, got up, put a pulse ox, oxy

17   hood.  When she called you, did she tell you all of that?

18   A.  I only really recall hearing about the oxygen saturations.

19   I don't remember the exact nature of the conversation though.

20   That could have been said.  I don't have a recollection of

21   that though.

22   Q.  You were shown a copy of Jamie's note from 7:25?

23   A.  Correct.

24   Q.  She just testified a little while ago in the courtroom.

25   You were not present?

1    A.  Correct.

2    Q.  You don't know what she had to say --

3    A.  That's correct.

4    Q.  -- about what was in the note and when those things

5    occurred?

6    A.  That's correct.

7    Q.  I'd like you to assume that Jamie has testified that at

8    7:25, what she initially noted was that the baby was dusky,

9    and it wasn't until after they began interacting with her, and

10   by that I mean, you know, sticking her to get blood work, the

11   IV, that type of thing, that she began grunting, flaring and

12   retracting.

13   A.  Correct.

14   Q.  If that was her testimony, would that be consistent with

15   what you saw when you came in?

16   A.  The grunting, flaring and retracting?

17   Q.  No.  That there was no grunting, flaring and retracting at

18   the time when you came in?

19   A.  Right.  When I assessed the patient, I do not recall

20   seeing any retractions or grunting or flaring or anything like

21   that.

22   Q.  So you get the call.  You've told us that you were -- I

23   thought you said grand rounds; is that correct?

24   A.  Yes.  It was something like that, a lecture hour that

25   happened every day.

1  Q.  And the lecture started at what time?

2  A.  7:00.

3  Q.  And did it always end at 8:00?

4  A.  No.  It would frequently end earlier.  Sometimes it would

5  go over.

6  Q.  And as you sit here today, do you have any recollection

7  what time this lecture on that day ended?

8  A.  I couldn't tell you that.

9  Q.  And did you know back in 2017 when you were deposed, what

10  time the lecture ended on that particular day?

11  A.  I did not.

12  Q.  So we're clear, you get the telephone call.  What do you

13  do?

14  A.  So we immediately proceeded to the nursery.  I had gotten

15  these calls before obviously, so we knew it was something that

16  needed to be looked at right away, so we picked up and went

17  right down.

18  Q.  Where was this lecture in the hospital?

19  A.  The lecture was on the second floor.

20  Q.  Where is the nursery in comparison to the lecture?

21  A.  Nursery is on basement level, so it was two floors up and

22  just down the hallway.

23  Q.  There are elevators at Heritage Valley?

24  A.  We did.

25  Q.  Did you take the elevator down?

1    A.  No.  We ran down the steps.

2    Q.  You ran down the steps because you were in a hurry and

3    wanted to get down there?

4    A.  Correct.

5    Q.  So you ran down the steps.  Can you give the jury some

6    estimate of how long from the time the jury called -- excuse

7    me.  I'm saying "jury" too much.  From the time Jamie called

8    you until the time you got down to that nursery?

9    A.  Probably wouldn't have taken more than one and a half or

10   two minutes to get down there.  Not a very long walk.

11   Q.  So you come to the nursery and you told -- you said before

12   "we."  It was you and another, was it an intern?

13   A.  Correct.  It was a first year resident that I was working

14   with at the time.

15   Q.  Who was that?

16   A.  Dr. Alyssa McKenna.

17   Q.  And so you and Dr. McKenna come into the nursery.  Do you

18   go immediately to Kendall?

19   A.  Yes, correct.

20   Q.  Do you have a conversation with Jamie at all about what's

21   been going on since the time you got the call until the time

22   you see Kendall?

23   A.  I think she was talking to me throughout this, kind of

24   filling me in.  Again, I don't remember the exact nature of

25   what was going on.  I was more concerned at that point of

1    getting the patient, assessing the patient and seeing what was

2    going on from my own eyes, from my own vantage point.

3    Q.  At the time you got there, were you aware, based upon what

4    Jamie told you, that when she put the pulse ox on initially,

5    somewhere around 7:25, that the pulse ox was 81?

6    A.  Yes.  I do remember that was part of the conversation on

7    the phone.  I do remember that piece of information.

8    Q.  By the time that you got there, had the second pulse ox

9    check already been done?

10   A.  Yes.  She was actually on a continuous monitor so we were

11   able to see heart rate and oxygen levels in the blood at that

12   point live, and at that point, I believe it was in the mid

13   90s.  94, I want to say.

14   Q.  There's documentation in this chart by Jamie that at 7:30,

15   the pulse ox was 94 percent?

16   A.  Okay.

17   Q.  Do you have any reason to dispute that?

18   A.  I don't.

19   Q.  So you come in and can you tell the jury what did you do?

20   You have this conversation with Jamie.  Are you with Kendall

21   at that point?

22   A.  Yes.  We were standing by the warmer where she was.

23   Q.  Can you tell the jury what you did?

24   A.  Yes.  We just did a basic head to toe assessment.

25   Q.  Let me stop you there and ask you to explain, because you

1    may know what a basic head to toe assessment is, we may not.

2    Can you explain that?

3    A.   Absolutely.  First of all, just observing the patient,

4    looking at color, looking at muscle tone.

5    Q.   Let me stop you.  Looking at color, what was her color at

6    that point?

7    A.   I believe she was pink at that point.  I don't remember

8    seeing a lot of cyanosis, which is a blue discoloration or any

9    discoloration or paleness or anything like that.

10   Q.   If there had been blueness in her finger nails, I think

11   Jamie termed that as acrocyanosis, would that have been

12   unusual?

13   A.   Not necessarily.  That's a very common thing you see in

14   newborns that are transitioning from inside the womb to

15   breathing air.  You see a little bit of blue discoloration

16   usually in the hands and feet.  That usually resolves within a

17   day or so.

18   Q.   So you took a look at her color?

19   A.   Correct.

20   Q.   What was next?

21   A.   Looking at tone, muscle tone.  She was laying flat on the

22   bed.  She was moving her extremities, so that's always a

23   reassuring sign as well.

24   Q.   Why is that?

25   A.   Well, if a baby is sick or going through some sort of

1    infection or some sort of systemic illness, usually they

2    become a lot more limp.  They lose muscle tone.  That's one of

3    the first things you see that changes.

4    Q.  And she had good muscle tone at that time?

5    A.  At that time, she did.

6    Q.  So what was next in your assessment?

7    A.  Then I did listen to the heart and lungs with my

8    stethoscope.  Of note, it can be difficult to examine a baby's

9    breathing and cardiovascular exam just because of some of the

10   fluid and things like that in the throat.  We hear a lot of

11   other accessory sounds, but I didn't hear anything that was

12   particularly concerning at that time.

13          MR. PRICE:  Your Honor, I'm going to object at this

14   point with the caveat I want to ensure that Dr. Heiple is

15   testifying solely from his memory about all of this.

16          THE WITNESS:  Yes.

17          THE COURT:  Go ahead, Mr. Price.

18          MR. PRICE:  Because I will ask him where the notes

19   are, but I just want to make sure that he is testifying from

20   memory at this point.

21          THE WITNESS:  Yes.

22          THE COURT:  Go ahead, Ms. Koczan.

23   BY MS. KOCZAN:

24   Q.  Doctor, you were telling us about -- let me ask you this:

25   At the time you got there, had Jamie already suctioned

1  Kendall?

2  A.  I don't know at that point.

3  Q.  If she had already suctioned her, would that explain why

4  perhaps she heard coarse breath sounds and you didn't?

5          MR. PRICE:  Objection, Your Honor.  That's pure

6  speculation.

7  Q.  From a medical perspective.

8          THE COURT:  Sustained.

9  Q.  Doctor, if a patient is suctioned, what effect does that

10  have?

11  A.  Sometimes you can remove some of the like mucus-esque

12  secretions and some of the things you have from just being

13  born out of the air canal and help you breathe a little bit

14  better that way, especially out of the nasal passages.

15  Q.  Was the word you used mucus-esque?

16  A.  Mucus-esque, mucoid secretions.

17  Q.  Are those what are responsible for coarse breath sounds?

18  A.  They can be.

19  Q.  So you don't know one way or the other whether Jamie had

20  already suctioned her by the time you got done?

21  A.  I do not know.

22  Q.  When you listened to her lungs, you said it sounded okay?

23  A.  From my perspective, I remember I didn't hear anything

24  that really concerned me at that point.

25  Q.  Okay.  The next thing you said you listened to her heart?

1    A.  Correct.

2    Q.  Do you remember anything unusual there?

3    A.  Nothing unusual there, and I was looking at the heart rate

4    on the monitor, and I believe it was in the 140s.

5    Q.  You talked about this monitor.  What is displayed on the

6    monitor?  Is it an EKG tracing or just a number?

7    A.  It's a number with a waveform that you see.  They have one

8    lead on the chest so it keeps track of that and it keeps track

9    of oxygen levels with the probe that's on there, on their

10   extremities.

11   Q.  And the number with the waveform, that would be her heart

12   rate; is that correct?

13   A.  Correct.

14   Q.  And there's -- is there another waveform for the pulse ox?

15   A.  Yeah.

16   Q.  And there's a waveform, and is there also a corresponding

17   number with that?

18   A.  There's a number with that, correct.

19   Q.  So is it the situation that once that device is on, you

20   can continuously see from second to second what's going on?

21   A.  Correct.

22   Q.  So you looked at that.  What was next in your assessment?

23   A.  Those were the big things.  I just wanted to do a basic

24   assessment, kind of what we talked about there, and then

25   observe how she did over the next couple of minutes with the

1    oxygen to see what the numbers were doing, if they were

2    trending in a worrisome direction.  Those were the biggest

3    things I did at that point.

4    Q.  After you did that assessment, what were your thoughts at

5    that point about what was going on?

6    A.  At that point, the next step in the process is to kind of

7    assess what are the possibilities.  Is this something life

8    threatening?  Is this something, like we talked about, a

9    transitional syndrome that you see in a lot of kids and just

10   kind of go through that diagnostic process?

11       At the point, based on what I had seen and based on the

12   numbers, as they were in the reassuring range at that time, I

13   deemed that this could very well be a transitional syndrome

14   which we had dealt with before, and I thought, because the

15   numbers weren't deteriorating at that point and going down

16   into a more worrisome range, that I was okay watching for a

17   few minutes at least until Dr. Jones came up, and we would

18   discuss it at that point.

19   Q.  At that point, you told us you believe you accessed -- was

20   it on an iPad or something?  How would you access like knowing

21   she had checked into the parking lot?

22   A.  Correct, into the doctor's lot.  It probably was on my

23   iPad.  They issued us iPads, and we were able to access the

24   electronic medical record that way.

25   Q.  And you could access that doctor's parking lot information

1  too?

2  A.  Correct.

3  Q.  So do you believe that you would have known at that point

4  that she had already checked in and was on her way?

5  A.  Correct.  Correct.

6  Q.  So did you talk -- do you have a recollection of talking

7  with Matt, the baby's dad?

8  A.  Personally, no, I do not.

9  Q.  Jamie testified that she recalls you talking to Matt.

10  Would you have any reason to dispute that?

11  A.  I don't have any reason to dispute it.  I don't remember

12  the conversation though.

13  Q.  So what happened next?

14  A.  So Dr. Jones did arrive in fairly short order.  I think we

15  said 15 to 20 minutes.  That sounds about right, and then she

16  did her assessment and made the decisions from there.

17      At that point, I became more of a helper, so to speak.  I

18  kind of sat in the background.  I didn't want to get in the

19  way and let things happen as they happened.

20  Q.  When Dr. Jones came in, was she -- did she say anything

21  about being contacted or not being contacted?

22  A.  Yeah.  We actually did -- she actually asked me why she

23  hadn't been contacted at that point.  I basically told her

24  what I told you.  I knew she was coming in within a few

25  minutes, and she was -- and I did tell her that had she not

1    been there in a timely fashion, I still would have given her a

2    call.

3    Q.  I want to explore that a little bit more.  When you had

4    that conversation with her, she told you -- she asked you why

5    wasn't I called.  Is that what she said?

6    A.  That's correct.

7    Q.  So are you aware, based upon the conversation you had,

8    that she had not received any calls before arriving; is that

9    accurate?

10   A.  That's correct.

11   Q.  That's why she was asking you the question?

12   A.  That's correct.

13   Q.  And after she got there, did the two of you then work

14   together?

15   A.  Again, I was more in the background at that point.  I

16   mean, I was helping her out with some of the computer things

17   we had to do and things of that nature, but I let her do her

18   assessment and make her judgments at that point.

19   Q.  When she got there, by the time she got there, had there

20   been a change in the baby's condition?

21   A.  I don't remember if the numbers had declined at that point

22   or if the oxygen levels had dropped.  I don't think they had,

23   but I couldn't tell you with certainty at this point.

24   Q.  You were letting her take over at that point; is that

25   correct?

1    A.  Correct.

2    Q.  So whatever was going on, we should ask her and she could

3    tell us?

4    A.  Correct.

5    Q.  We've seen orders that have your name on it but were

6    entered by Dr. Alyssa McKenna.

7    A.  Correct.

8    Q.  Those were Dr. Jones' orders; is that correct?

9    A.  That's correct.

10    Q.  And they are timed, I believe, for 8:32.  The timing of

11    that, is that when you actually -- when Alyssa actually sat

12    down to the computer and typed them in?

13    A.  I presume.  I'm not sure exactly how the computer system

14    works in terms of timing, but I presume that's when they were

15    actually entered into the system.

16    Q.  When Dr. Jones got there and finished her assessment, did

17    she immediately give orders?

18    A.  Yes.

19    Q.  And then the orders were entered at some point later; is

20    that correct?

21    A.  Correct.  I don't remember there being a big delay in

22    terms of when we decided to start all this treatment and when

23    the orders went in, but it was all in the same -- essentially

24    the same time frame.

25    Q.  So the orders go in.  We know they are sometime around

1    8:32, but there was an IV inserted around 8:20.  So in order

2    for that to happen, would the nurse already have had to have

3    an order, verbal order --

4    A.  Probably a verbal order.

5    Q.  -- to start an IV?

6    A.  Correct.

7    Q.  We know from looking at the records that the ampicillin

8    was hung around -- somewhere around 8:34, 8:35, so there would

9    have to be an order for that in order to get it from the

10   pharmacy up to the unit to give it to Kendall?

11   A.  That's correct.

12   Q.  Is it the situation that you give verbal orders, the

13   nurses start acting on it, and then you put them in the

14   computer so they are covered?

15   A.  Yes, that's how the process would go, often just to save

16   time.

17   Q.  And Jamie called you --

18   A.  Correct.

19   Q.  -- at 7:25 or thereabout.  Why did she call you as opposed

20   to Dr. Jones?

21   A.  Part of our duties as resident or in training physicians

22   throughout the pediatric residency and some of the other

23   programs or some of the other rotations were to field the

24   calls on the floor since we were the ones in the hospital.

25       The pediatricians and some of the other specialists would

1    often be at their office hours.  It would be a nice way to get

2    the information to the doctor to move it up the chain of

3    command.  It was actually very commonplace for nurses to call

4    us first whenever something would happen in the hospital.

5    Q.  We've heard testimony and we saw in the opening, I think

6    in my opening time when Dr. Jones at some point went and spoke

7    with the family about transferring Kendall up to Pittsburgh.

8       Were you with her when she went to speak with them?

9    A.  I was.

10   Q.  Do you remember anything about that conversation?

11   A.  I don't recall specifics.  I remember we just went down

12   and her basic spiel at that point is we are going to transfer

13   the baby for precautionary reasons.  We think there might be a

14   chance that this could decline, so we just want to get her on

15   to a tertiary care center where she can get a higher level of

16   care at that point, if needed.

17   Q.  From your recollection, did the parents agree to that?

18   A.  I believe so, yes.

19   Q.  After you talked with the parents, did you then go back to

20   the nursery?

21   A.  We did.

22   Q.  And did you then stay up until the time the transport team

23   came?

24   A.  Yes, yes.

25   Q.  And can you tell the jury generally what was going on

1    during that time frame, from the time you get back from

2    talking with the parents up until around and we've seen 9:45,

3    is when the transport team arrived, just generally -- we don't

4    have to go minute by minute -- but generally what was going

5    on?

6    A.  Mainly observing the patient, watching for any subtle

7    changes or any critical changes that would necessitate more

8    urgent action, number one.

9       Number two, I think we were doing some of the computer

10   work, and I think Dr. Jones was doing some documentation at

11   that point, just some more clerical stuff while we waited, and

12   I know Alyssa and I were in the nursery at that point just

13   keeping an eye on things while we waited for them to show up.

14   Q.  Dr. Jones was, wherever she was, she was in the nursery

15   too, correct?

16   A.  That's correct.

17   Q.  You didn't make a note that day?

18   A.  I did not.

19   Q.  Why is that?

20   A.  Normally, I would have.  It was more of a timing issue

21   than anything else.  So from the time I got the call to the

22   time I went down to assess the patient and then when Dr. Jones

23   came in to take over, there wasn't a lot of time to run out

24   and actually write a note.

25      I would have, had the timing worked out a little

1    differently, but at the time -- by the time she got there, the

2    orders had already been placed.  We made the decision to

3    transfer, and at that point, she just did the documentation,

4    so I figured while she was documenting, it was a better use of

5    my time to stay with the patient as opposed to writing my own

6    note.

7    Q.  Okay.  Did there come a point in time where Dr. Jones felt

8    that this child needed to be intubated?

9    A.  Yes.

10   Q.  And were you there for the intubation?

11   A.  I was.

12   Q.  And did you in any way participate in that, or did she do

13   that?

14   A.  She did that mostly on her own.  I think I maybe stood

15   next to her and handed her things she needed.  At that point,

16   with the situation as critical as it was, I stayed out of the

17   way and let her handle it.

18   Q.  Once the West Penn team arrived, did you then continue to

19   participate in the care, or did you leave at that point?

20   A.  At that point actually, there were -- Dr. Jones was there

21   taking care of -- the transport team was also helping her, and

22   there were some things on the floor that needed to be done, so

23   we both agreed that the transport team is here, why don't you

24   go to the floor and take care of anything else that needed to

25   be done, and at that point, it was the last interaction I had

1    with that particular case.

2    Q.  And did you hear at any time that afternoon about what

3    happened?

4    A.  Yeah.  Dr. Jones called me after lunchtime sometime just

5    to tell me that the patient had passed.  I didn't really get

6    any specifics on how it transpired or what transpired or any

7    discussion on what may have happened.  It was more just a

8    notification since I had been involved in the morning with it.

9    Q.  Did you get the impression from talking to Dr. Jones at

10   that time that she knew what had happened?

11   A.  I did not at that point, no.

12   Q.  You didn't get any impression as to whether she knew what

13   had happened?

14   A.  No.  We didn't really get into it.  It was more just an

15   FYI, this is what happened.

16   Q.  At some point after that, did you learn what happened,

17   what had caused this baby's death?

18   A.  I did.  I don't remember.  It was a while after, and I

19   don't remember the exact interaction I had.  I believe it was

20   from Dr. Jones, but I think it was in passing.  Maybe even

21   several months down the line, I just asked, hey, do you know

22   what happened with that, and at that point, she told me the

23   official diagnosis, but that was the extent of the discussion

24   at that point.

25   Q.  Did you understand that the official diagnosis was that

1  she had an E. coli sepsis?

2            MR. PRICE:  I have to object, Your Honor.  She is

3  just leading.  She is just putting words --

4            THE COURT:  There is a lot of leading going on.

5  Q.  Did you ever learn what the official diagnosis was?

6  A.  Yeah, I did.

7  Q.  What were you told?

8  A.  I was told it was E. coli sepsis at that point.

9            MS. KOCZAN:  Thank you.  That's all I have.

10            THE COURT:  Any additional questions, Mr. Price?

11            MR. PRICE:  Yes.

12                      REDIRECT EXAMINATION

13  BY MR. PRICE:

14  Q.  Dr. Heiple, I just want this jury to understand.  You just

15  testified all about your whole examination and your whole

16  assessment of Kendall, and there's not one note in that

17  binder, which are all the medical records, where you

18  documented any of this, correct?

19  A.  That's correct.

20  Q.  Now, you have a very specific recollection about looking

21  in the nose, hearing the heart, doing all of that on your

22  assessment of Kendall, correct?

23  A.  That's correct.

24  Q.  Now, here is my problem.  You remember whenever we first

25  met, it was a couple years ago, and whenever you came into the

1    conference room at the hospital, I was there.  There was a

2    court reporter there.

3    A.   Right.

4    Q.   And your attorney was there, correct?

5    A.   Correct.

6    Q.   And before we started this question-answer session called

7    a deposition, you raised your hand and you said I agree to

8    tell the truth, correct?

9    A.   Correct.

10   Q.   And then whenever you came in here today, you raised your

11   hand and you said I'm going to take the same oath, correct?

12   A.   Correct.

13   Q.   Now, if you could pull up page 8 of Dr. Heiple's

14   deposition, because these are the words that you told me, and

15   if you could just blow up this paragraph here.

16       And I already said this to you, but starting from the

17   beginning, so we got called around 8:00, I just remember we

18   were leaving our lecture hour, which ended at 8:00, and I got

19   a call on my pager from the nursery just saying, hey, we have

20   this baby.

21       Now, that's what you told me in 2017, and today, what you

22   just told your counsel was that the lecture, you think, ended

23   early?

24   A.   I don't think I said that it ended early.  I said it could

25   have.  I mean, at the time that -- if I may, at the time that

1    I gave the deposition, that was my recollection.  Outside of

2    this context, if you asked me what time are you called, I

3    probably would have said the same thing today.

4    Q.  Here's my point.  My point is there has to be some reason

5    why you have a motivation to change the time when you were so

6    certain that it's 8:00 on the -- at the lecture hour.

7         MS. KOCZAN:  Objection to the form of the question.

8         THE COURT:  Sustained.

9    Q.  Now, you also understand that with regard to -- you can

10   take that down.

11        I already played for you the clips.  Just so I understand,

12   to be clear, to make sure the record is clear, before 8:00

13   a.m., you did not have any participation in Kendall's care; is

14   that correct?

15   A.  That's what I said, correct.

16   Q.  You are saying today, that might not be correct?

17   A.  Well, that was my best recollection at the time.  I wasn't

18   trying to intentionally mislead, but again, the deposition was

19   two and a half years down the line.  20 minutes here, 20

20   minutes there.  I couldn't say for sure.

21   Q.  And now we are another two years down the line, and now

22   you have a recollection -- you have a better recollection of

23   this time two years after the deposition?

24   A.  I wouldn't say that.  I just think, again, there's room

25   for error in terms of the exact time that I received the call.

1   Q.  You were asked the question about what did Dr. Jones say

2   whenever she came in and if you talked.  I'm going to play you

3   the clip from Jamie McCrory's deposition, JM067.

4       (Video played.)

5   BY MR. PRICE:

6   Q.  Does that refresh your recollection as to what Dr. Jones

7   had to say?

8   A.  Potentially.  It went something along those lines.  I

9   don't know the exact wording.

10  Q.  So when she said why wasn't I called about these, do you

11  remember her being that adamant about it?

12  A.  I remember she wasn't happy about it.

13              MR. PRICE:  That's all the questions I have.

14              THE COURT:  Mr. Colville, anything at this time?

15              MR. COLVILLE:  Just one question.

16                        RECROSS-EXAMINATION

17  BY MR. COLVILLE:

18  Q.  Dr. Heiple, have you reviewed the medical record at any

19  time subsequent?

20  A.  I have.

21  Q.  The medical record makes reference to meconium and the

22  references to the meconium, it has been described as thin to

23  moderate, green colored liquid, nonparticulate?

24  A.  Okay.

25  Q.  My question of you is:  Beginning with your involvement

1    when you came down to the nursery through the time you left to

2    go on to the floor, did you see or hear anything that

3    contradicts that description?

4    A.  I didn't see anything to the contrary.  To be honest, I

5    don't remember hearing a lot or anything about meconium

6    throughout it.  I may not just be remembering.

7                MR. COLVILLE:  Thank you.

8                THE COURT:  Ms. Koczan, anything else?

9                MS. KOCZAN:  One question.

10                        RECROSS-EXAMINATION

11    BY MS. KOCZAN:

12    Q.  You talked about your assessment that day, and you've

13    given us some detail about that.  Why is it that you remember

14    this?

15    A.  And it was a particularly unique, and obviously not in a

16    good way, case that tends to stick out in your memory.

17                MS. KOCZAN:  Thank you.

18                THE COURT:  Doctor, I have a couple of questions.

19                You had indicated that when you were called from the

20    lecture hall, you and Ms. -- now Dr. McKenna both went to the

21    nursery, right?

22                THE WITNESS:  That's correct.

23                THE COURT:  And you did the assessment; is that

24    correct?

25                THE WITNESS:  That's correct.

1          THE COURT:  And as you did the assessment, was she

2    participatory to the assessment?

3          THE WITNESS:  I think she was just standing next to

4    me.

5          THE COURT:  Did you have any discussion as to what

6    your findings were?

7          THE WITNESS:  Not with her, no.

8          THE COURT:  Do you recall her saying anything about

9    the baby?

10          THE WITNESS:  I don't recall, no.

11          THE COURT:  Vis-a-vis this residency program, you

12    would have spent -- altogether, this would have been into part

13    three month of your pediatric rotation, right?

14          THE WITNESS:  That's correct.

15          THE COURT:  And as a family practice resident, would

16    you also rotate in OB?

17          THE WITNESS:  That's correct.

18          THE COURT:  And did you do that at Heritage Valley,

19    too?

20          THE WITNESS:  I did.

21          THE COURT:  When you did those rotations at Heritage

22    Valley, did you also interact with Dr. Dumpe?

23          THE WITNESS:  I did.

24          THE COURT:  And his partner, Dr. Lauer?

25          THE WITNESS:  Correct.

1          THE COURT:  You are currently employed by Heritage

2    Valley, right?

3          THE WITNESS:  That's correct.

4          THE COURT:  Any other questions?

5          MS. KOCZAN:  Nothing, Your Honor.

6          MR. PRICE:  No, Your Honor.

7          THE COURT:  Then, Doctor, you may step down.  Thank

8    you for your appearance here today.

9          Is the doctor excused?  Is he going to be called

10   again?

11         MS. KOCZAN:  Not from my perspective.

12     (Witness excused.)

13         THE COURT:  It's time for our afternoon break, ladies

14   and gentlemen of the jury, so let's take one.  It's just about

15   five to 3:00 so we'll resume on the record at about 3:10.

16         I bet you could quote to me my recess instructions,

17   but bottom line, you can leave your binders behind, your

18   notebooks behind.  Mr. Galovich will escort you and we'll

19   start again at 3:10.

20     (Jury excused.)

21     (Recess taken.)

22     (Jury present.)

23         THE COURT:  Mr. Price, your next witness.

24         MR. PRICE:  Your Honor, just for some housekeeping

25   matters, I have the PowerPoints from Dr. Heiple's testimony.

1      THE COURT:  Thank you.  Mr. Galovich, as you know,

2  you'll mark that as a demonstrative for the plaintiff.

3      MR. PRICE:  The next witness will be Dr. James

4  Kenkel.

5      THE CLERK:  Sir, please step forward.  Please state

6  and spell your name for the record.

7      THE WITNESS:  My name is James L. Kenkel,

8  K-E-N-K-E-L.

9    (Witness sworn.)

10     THE COURT:  Thank you, Mr. Galovich.  Dr. Kenkel,

11 watch your step getting up there.  It's a little bit uneven.

12 I see you brought your briefcase with you and a book.  Now,

13 before you get started, Mr. Price, as with the other experts,

14 the court has a limiting instruction.

15     Ladies and gentlemen of the jury, you are now going

16 to be hearing testimony from Dr. James Kenkel and included

17 among that testimony will be opinions.  Dr. Kenkel is a

18 professor of economics at the University of Pittsburgh.  He'll

19 offer his opinions because of his knowledge, skill,

20 experience, training and/or education in the field of

21 economics and the reasons for these opinions.

22     Once again, in weighing his opinion testimony, you

23 may consider not only his qualifications, the reasons for his

24 opinions as well as the reliability of the information

25 supporting those opinions and any other factors I'll

1    ultimately discuss with you in my final instructions for you

2    to weigh the testimony of individual witnesses.

3        The opinions of Dr. Kenkel should receive whatever

4    weight and credit, if any, you think appropriate given all the

5    other evidence in this case.  You may disregard his opinions

6    entirely if you decide they are not based on sufficient

7    knowledge, skill, experience, training or education.

8        You can also disregard his opinions if you conclude

9    that the reasons given in support of these opinions are not

10   sound, if you conclude the opinions are not supported by the

11   facts shown by the evidence or if you think the opinions are

12   outweighed by other evidence.

13       In deciding whether you do or don't accept the

14   opinions of Dr. Kenkel, you can consider any bias that he

15   might have, including bias that could arise from evidence that

16   he has been or will be paid for reviewing this case.

17       With that, Mr. Price will begin his examination.

18       JAMES L. KENKEL, PH.D., a witness herein, having been

19   first duly sworn, was examined and testified as follows:

20                        DIRECT EXAMINATION

21   BY MR. PRICE:

22   Q.  Can you please state your full name?

23   A.  My name is James L. Kenkel, K-E-N-K-E-L.

24   Q.  And what is your address?

25   A.  I live at 807 Academy Place in Mt. Lebanon, Pennsylvania.

1    Q.   And can you tell us what is your current occupation?

2    A.   For 49 years, I was a professor in the economics and

3    statistics departments at the University of Pittsburgh, and

4    last August, I retired after 49 years.  So now, basically the

5    employment that I do is I do some consulting work such as what

6    I'm doing today.

7    Q.   Part of -- as I explained to the jury, having experts

8    testify, we have to know about your educational background and

9    your qualifications, so let's talk about your educational

10   background.

11       Can you tell us where did you go to school, college, all

12   that stuff?

13   A.   I have a bachelor's degree in mathematics from Xavier

14   University in Cincinnati, Ohio, in 1966; a master's degree in

15   economics from Purdue University in Lafayette, Indiana, in

16   1968; and a Ph.D. in economics from Purdue University in 1969;

17   and I had additional training at Princeton University,

18   Princeton, New Jersey in 1971.

19   Q.   And employment-wise, you just mentioned that you used to

20   be a full-time faculty member in the economics department at

21   the University of Pittsburgh and that was since when?

22   A.   After I got my Ph.D., I was hired immediately at the

23   University of Pittsburgh in September of 1969, and I was a

24   full-time faculty member there continuously until August of

25   2018.

1    Q.  That's 49 years?

2    A.  Yes, sir.

3    Q.  What were your duties as a professor at Pitt?

4    A.  Every faculty member had duties that fall into three broad

5    areas and we are all supposed to teach.  So I taught every

6    semester at both the undergraduate and the Ph.D. level.

7        We are all supposed to publish and do research, so I've

8    published a book on risk in mortgage lending.  I've published

9    a book on mathematical economics that is used in Ph.D.

10   departments.  I published several undergraduate statistics

11   books, the latest is called "Introductory Statistics For

12   Management and Economics."  That's been used at 50 to 100

13   universities across the country.

14       Along with the statistics books, there are, I think, 13

15   additional books that are teachers' manuals, student study

16   guides, computer test banks, solution manuals, all kinds of

17   things that go along with a big textbook, and I published

18   articles in lots of different economics and statistics

19   journals.

20       So we are all supposed to teach, we are all supposed to

21   publish and do research, and the third thing we are supposed

22   to do is provide various services to the department and

23   university.  Throughout the years, I've served as the director

24   of the Ph.D. program in economics.  I've served as the

25   chairman of the department of economics for more than 20

1    years.  I was on the board of directors of the Computer

2    Research Institute at Pitt, and I've served on probably 100

3    different Ph.D. dissertation committees.

4    Q.  And part of working in economics, you know, and math and

5    all, there's different societies that you can be members of,

6    and have you been a member of any of these professional

7    societies?

8    A.  I'm a member of the American Economic Association, the

9    Pennsylvania Economic Association, Mathematics Association of

10   America, the American Statistical Association.

11        What I'm doing today is testifying in a legal matter.

12   That area of economics is called forensic economics.  I'm a

13   member of the National Association of Forensic Economics.  I'm

14   a member of the -- let me see if I get it right -- American

15   Association of Economic and Financial Experts, and I'm a

16   member of the American Rehabilitation Economics Association.

17   Q.  And part of that is, in cases, you learn about

18   rehabilitation, wage loss, things of that nature, correct?

19   A.  Yes.

20   Q.  This is a pretty interesting fact I noted about you on

21   your resume that, throughout teaching, you won certain awards.

22   Can you tell us about that?

23   A.  Yes.  Well, I taught every semester to the Ph.D. students

24   at Pitt, and in the 1980s, I think it was, they decided to

25   have a teacher of the year award, and I was the first person

1    to get that award.

2         At the undergraduate level, I received a Teacher of the

3    Year Award, and in the 19 -- late 1990s, I think, I was a

4    finalist for the Most Distinguished Teaching Professor at the

5    whole university, including the Greensburg campus, the

6    Bradford campus and so on.

7    Q.   In addition to working as an economics professor, during

8    your work or during your life, did you perform any consulting

9    services for governmental agencies or national corporations?

10   A.   I have consulted with the Federal Home Loan Bank Board in

11   Washington, D.C., concerning risk in mortgage lending.

12        I've consulted with the Environmental Protection Agency

13   concerning proposed changes in pollution control laws and how

14   it affects investment and profitability in the steel industry.

15        I've consulted with the Pharmaceutical Manufacturers

16   Association of America concerning proposed changes in patent

17   laws and how it influences development of new drugs and

18   medicines.

19        Throughout the years, I've consulted with, I don't know,

20   maybe 100 national and international corporations such as Dow

21   Chemical, United States Steel, Ford, General Motors, Chrysler,

22   Hyundai, Kawasaki, many, many others.

23   Q.   Have you also taught seminar courses on how to calculate

24   economic losses in cases like this where there's an injury or

25   death?

A.  Yes.  I've done this since the early 1970s, and

eventually, I was asked to give seminars to attorneys from

Ohio, West Virginia and Pennsylvania who congregated at the

University of Pittsburgh Law School, so I gave seminars to

attorneys to show them what's involved in calculating economic

losses.

    I've been asked to give seminars before the Attorney

General's Office for the State of Pennsylvania to explain to

attorneys that represent the state what's involved.

    I've given seminars before the Pennsylvania Bar

Association, and I've discussed issues like this with numerous

law firms around, western Pennsylvania.

Q.  And when you talk about "issues like this," we're talking

about the economic loss of Kendall Peronis?

A.  Today, that's what I'm talking about, but what I was doing

is explaining to attorneys all the things that are involved.

I mean, if somebody like me gets a broken leg in a car wreck

or you get killed in a car wreck, or in this case, we're

talking about where the child dies and so on, there's

different things that are involved in different cases, and

another thing that's important is that the laws in different

states are different, so how you calculate the loss is not the

same, for example, in Ohio or West Virginia or Pennsylvania.

Q.  Right.  And approximately how many of these economic

reports have you authored and how many times, you know, and

1   where have you testified?

2   A.  I have probably written -- well, I know I've written more

3   than 5,000 economic reports.  Most of the time, cases settle,

4   so you don't have to testify in court, but I've testified more

5   than 500 times in situations like this.

6       I've testified in state and federal courts all over

7   Pennsylvania, in Ohio, in West Virginia, South Carolina,

8   North Carolina, Virginia, Maryland, Washington, D.C.,

9   New Jersey, New York, Connecticut, and I've testified in cases

10  that were venued in Arizona and Illinois, Texas, et cetera.

11  Q.  Okay.

12          MR. PRICE:  At this time, Your Honor, I offer

13  Dr. Kenkel as an expert in economics.

14          THE COURT:  Any cross-examination on his

15  qualifications, Mr. Colville?

16          MR. COLVILLE:  Just a couple questions.

17              CROSS-EXAMINATION EN VOIR DIRE

18  BY MR. COLVILLE:

19  Q.  Good afternoon, Dr. Kenkel.

20  A.  Good afternoon.

21  Q.  My name is Michael Colville.  I represent the

22  United States in this case.

23      When you were not retired, when you were actually working,

24  what percentage of the work you are doing today accounted for

25  your income at that point?

1    A.  Maybe 15, 20 percent.

2    Q.  Have you ever testified for Mr. Price's law firm before?

3    A.  Yes.

4    Q.  How many occasions?

5    A.  I would say I've testified in court, I don't know, maybe

6    five or ten times.

7    Q.  When was the last time you testified for them?

8    A.  I think two years ago.

9    Q.  Have you prepared reports on their client's behalf where

10   you didn't testify as well?

11   A.  Yes, sir.

12   Q.  How many of those types of reports?

13   A.  I would say over the years, maybe 20 or 30.

14           MR. COLVILLE:  Thank you.

15           THE COURT:  Ms. Koczan, any questions?

16           MS. KOCZAN:  None at this time.  Thank you.

17           THE COURT:  Anything further, Mr. Price, on

18   qualifications?

19           MR. PRICE:  No, Your Honor.

20           THE COURT:  And Dr. Kenkel, having been offered as an

21   expert in the field of economics and economic calculations,

22   the court accepts him as same.

23                   DIRECT EXAMINATION (Resumed.)

24   BY MR. PRICE:

25   Q.  Doctor, at my request, did you prepare an economic report

1    projecting the economic losses in this case?

2    A.  Yes.

3    Q.  First, before we get into the economic losses, why don't

4    you explain to us what is meant by an economic loss in a case

5    like this?

6    A.  Well, we can start out with suppose I was a 30-year-old

7    professor at Pitt and I got run over by a drunk driver,

8    whatever.  The question would be what is the economic loss.

9        The one thing we would do is look historically at my

10   income, and you would say what do you think his income is

11   going to be in the future, so that's lost income.

12       The next thing you do is you would say, well, if he was

13   employed at Pitt, they have a big fringe benefit package, they

14   contribute to your retirement funds, they contribute to health

15   care, dental, vision, et cetera.  That's been lost, so what's

16   the value of that.

17       So you want to look at your income stream.  You want to

18   look at potential fringe benefits.  Suppose it's a 30-year-old

19   man, I was married and had a couple kids, so I did lots of

20   things around the house.  I did grocery shopping and cleaned

21   the cars, took care of the cars, maybe blacktopped the

22   driveway and so on, so another area of economic loss in most

23   cases is the value of household services.  What are the things

24   that you used to do around the house that helped other people.

25       And then in Pennsylvania, the last thing we have to do is

1    say, out of that income that you were earning, how much of it

2    did you spend on yourself.  We subtract that out because the

3    rest of the income is then left for other family members.

4        So in this case here, we have a child that was -- died

5    basically at childbirth so we don't have an income record to

6    look at, so what we do is we go to the census and say how much

7    do women earn on the average if you have, say, a high school

8    degree, if you have, say, some college but didn't finish

9    college, or what if you have a college degree.

10       So we don't have an income record because the child was

11   never employed so we look at historical data from the census

12   that says how much do women actually work or how much they

13   actually earn based on their level of education.

14       The next thing we do is we can go to data that are

15   published by different economics firms that say, well, how

16   long do women work, so I have data that show the average or

17   the median, the middle age at retirement for women, and

18   typically, the women retire around age 62 or so on, so I have

19   data in my report from the census that shows, say, when you

20   are 25, how much do women make when they are high school

21   graduates, when they are 30, how much do they make, when they

22   are 35, how much do they make.  The same thing for college

23   graduates, et cetera.

24       Then I have data that says if you have a high school

25   degree, on the average, how long do you work?  If you have a

1    college degree, on the average, how long do you work?

2        Then I refer to data published by the Labor Department and

3    the Department of Commerce.  She is not employed.  I mean, if

4    I was injured at Pitt, you could go to Pitt and say what

5    fringe benefits did James Kenkel get and how much did it cost.

6        Well, we don't have anything like that.  So what we have

7    are data published by the government that says, on the

8    average, fringe benefits amount to about 27 percent of your

9    wage income.

10        You think of the employers' mandatory contribution to

11    Social Security and Medicare, that's 7.65 percent.  Employers

12    typically contribute to retirement funds, 401(k)s, pension

13    plans, so forth, that's three to five percent of your income.

14    Employers typically contribute to your health plan, et cetera,

15    much more than that.  The data show that on the average, the

16    fringe benefits amount to about 27 percent, so I'll make a

17    calculation of that.

18        The next area is the household services.  In this case, I

19    totally ignored it, and I think, well, my mother died at age

20    90 and my brother, my sister and I helped her around the house

21    for years and years and years.  So you would expect that this

22    child, as the child got older, would eventually be helping the

23    mother and father, but in this case, I've said I'm not going

24    to make any calculation for household services.

25        Then the last area in Pennsylvania, we are required to

make a subtraction for what's called personal maintenance

expenses.  What we have to do is look at the total income that

the person potentially could have earned and then say what do

we think that person would have spent on themselves for

certain mandatory items such as food, clothing, housing,

medical care, some reasonable recreation.

So I have referred -- I brought along a document here.

This is the consumer expenditure survey.  This is from 2002

and 3, but they stopped publishing all the data as a book, but

I brought this along to show you what we have here, and in

here, we have hundreds of different tables showing how much

money people spend on food, clothing, housing, medical care,

recreation, et cetera, based on what your income is.

Clearly, if your income is $20,000, you are going to spend

a different amount on food and housing than if your income is

$100,000.  We have data, what if you are single, what if you

are married, what if you are married and working and have a

couple kids, et cetera, so the amount you spend on yourself

varies depending on your lifestyle and your family situation.

So what I've done in this case is I treated Kendall

Peronis as a single person, which would mean that she is going

to spend the maximum amount on herself.

If you are married, if the family income is a certain

amount, some of the money is going to go and be spent on the

husband or on the wife.  Some of the money is going to be

1    spent on the kids, and the housing expenses would continue, so

2    you could say you don't need to subtract housing.  In this

3    case, I'm making a subtraction for all these things.

4    Q.  Okay.  Of course, in this case, since you are going to be

5    making projections of economic loss for Kendall from her birth

6    through her expected lifetime, correct?

7    A.  Yes.

8    Q.  And again, there are -- I know you brought a lot of books

9    with you, but there's life tables and things like that which

10   have the average.  You can take a look at if a child is born

11   today and take a look at that to determine how long that child

12   would live?

13   A.  Well, I brought along here what is called the

14   United States Life Tables.  New ones are published just about

15   every year.  In here -- this is just a portion of the big

16   document, but what we have here is data that show how long you

17   can be expected to live based on how old you are today and

18   whether you are male or female, white or nonwhite.

19       So what we have is at childbirth, a person like Kendall

20   Peronis would be expected to live for 81.4 years.  Some people

21   live longer and some people live less, but most people live a

22   heck of a long time.

23       There's also data in here that show what percentage of

24   people -- for example, I'm going to say she had the potential

25   to work to, say, age 62 or more.  What percentage of people

1    actually live to age 62.  Well, if you are a young baby girl,

2    90 percent of baby girls live to at least age 62.  83 live to

3    at least age 70.  So it's not like oh, 50 percent of kids die

4    at age seven or eight, whatever.  Most people live a heck of a

5    long time.

6        The next thing that we need is when is she going to

7    retire, so this is the part of the article that shows how old

8    the women are when they typically retire, and the data show

9    that if you start working at age 18 with a high school

10   diploma, on the average, you work about 43.9 years.  If you

11   start working at age 20 with some college, you work for about

12   43.8 years, and if you start working at age 22 with a college

13   degree, you work for about 42.7 years.

14       So I'm not making the numbers up.  I've got the documents

15   here that support all this.

16   Q.  These are all -- even though our lives are boiled down to

17   numbers, the government keeps all of these statistics about

18   what the average is for all Americans, and that's what you

19   used to calculate an economic loss?

20   A.  In this case, I based my report on white females.

21   Q.  Right.  So did you receive background information from us

22   necessary to project the economic loss for Kendall?

23   A.  Yes.  I mean, I know she died basically at childbirth so

24   she's got a life expectancy of a little over 81 years.

25       We can expect if she worked until the typical age at

retirement, based on her education, she worked, give or take a little bit, about 43 years.

I had some information about her parents. Her father Matthew was born in 1994. What I wrote in my report, he was 23 or so. I guess now, he's a little over 24. He has a life expectancy to age 78, so he's expected to live 53 or 54 additional years. He graduated from high school in 2013 and he's been working in construction at the Shell Oil Cracker Plant in Beaver, so he's employed full-time.

The mother Carissa was born also in 1994 so she would now be about age 24. As a woman, her life expectancy is slightly larger than for a man, so her current life expectancy would be about 58 additional years to about age 82. She also graduated from high school. What I wrote in my report, she was attending the Police Academy, and I've been informed that she has graduated from the Police Academy and was studying criminal justice and police technology at the Community College of Beaver County, so she also, besides the high school degree, had some college.

She has worked at various different places and she is now working in the restaurant business, but she recently told me, I think she wants to get into the police work based on her education and so on, so I have some information about the family background, but then typically in cases like this, what we do is refer to census data to ask on the average how much

1    do women make based on their level of education.

2    Q.   Just for the jury's understanding, while the parents,

3    their educational background and their educational attainment

4    and how long they are going to live is good historical data,

5    just because your parents only graduated from high school

6    doesn't mean, especially in America, that you can't go to

7    college or do something different.

8    A.   Well, I have data in my report that show what percentage

9    of people graduate from high school, and now that's way over

10   90 percent, and I have data that show what percentage of

11   people attend college.

12       Now, for example, when I was in college in 19 -- in the

13   1960s, only 11 percent were attending college.  Now it's over

14   40 percent, and every single year, the percentage has gone up.

15       Another example, I mean, my father had to drop out of high

16   school because his father had died so he had to take care of

17   my mother.  He dropped out of high school after his freshman

18   year.  I have a Ph.D.  My brother has a master's degree in

19   engineering.  My sister graduated from high school and was

20   executive secretary for executives at Procter & Gamble, so we

21   far exceeded the education levels of our parents, which is

22   really pretty common nowadays.

23       I wouldn't expect my kids to exceed my level of education

24   because I'm pretty much at the top of the pecking order, but

25   my daughter has a master's degree, my son has a college degree

in economics and has passed various stock licenses, et cetera,

like as a stockbroker, so their education levels are much

better than, say, my parents' education levels.

Q.  So after you collect all that data and you learn a little

bit about the family, you then calculate a wage loss, and can

you just explain to us -- I know in this case we have some

tables we'll show the jury in a second, but you calculated

wage loss in three different ways, correct?

A.  Yes.  I projected potential wages as a high school

graduate, potential wages with some college and potential

wages as a college graduate.

Q.  So as we put this up as to lost income, fringe benefits,

you can explain how that all works, so why don't I put up on

the screen the first page, and this will be table 1, and this

is your economic projection or net economic loss for a high

school graduate who had a work life of 43.9 years.

First, you have above your calculations a note that all

values are discounted to present value, and again, that's

another economic term.

Can you tell us what that means and why you did that?

A.  All right.  What we're doing is talking about the

projected loss in the future.  If the jury decided that the

defense was liable, you would have to set aside a certain

amount of money today so that money could be invested and it

would grow to match the future losses that I have -- I'm going

1    to project.

2        So as an example that might clear your mind and might make

3    it a little bit simpler, suppose you had a child that was in

4    the seventh or eighth grade and you said I want to set aside

5    some money today for that kid's first year in college, five

6    years from now.  How would you decide how much to set aside?

7        Well, the first thing you would do is you look at some

8    data and say how much does college education cost today?

9    That's what we're going to do in this case.  How much could

10   this girl have earned once she is 18.

11       Suppose the college education today costs $20,000, then

12   you have to say, well, let's look at historical data and

13   inflation rates and so on and see how that tuition, that cost

14   of college has increased over time, because in five years,

15   it's not going to be 20,000, it's going to be more than that.

16       So let's say it's going to be 25,000, so we say here's how

17   much it cost today.  How much is it going to cost in the

18   future?  We're going to do the same thing with the college

19   education, et cetera.

20       The next thing then is once you decided, wait a minute,

21   I'm going to need, say, $25,000 five years from now, if I put

22   money into a certificate of deposit today and got a fixed

23   interest rate, how much would I have to put into that pot

24   today.  If the interest rate is high, you wouldn't have to put

25   in so much because it's going to grow rapidly, but if the

1    interest rate is low, which interest rates are today, you are

2    going to have to put a lot of money into that pot so that it

3    can grow to $25,000.

4        So the amount that you would have to put into the pot

5    today so that it would grow to 25,000, that is called the

6    present value.  We're going to do the same thing with the

7    income.

8        So what I'm going to do, I have in my report here is how

9    much 18-year-old girls make in 2016 when they have a high

10   school degree.  Here's how much 30-year-old girls make.

11   Here's how much 40-year-old girls make and the money goes up

12   each year because you've got more experience, more seniority,

13   more knowledge, et cetera.

14       So I started her out at exactly the incomes that white

15   females were actually earning, and then I looked at government

16   data and said what do economists, what does the Congressional

17   Budget Office, what does the Social Security Administration,

18   what do blue chip investors, what do the forecasters say is

19   going to happen to inflation.

20       They typically said the inflation rate, 2.3 percent was

21   their low estimate, which is what I've used, so I've said if a

22   female could earn say $36,000 at age 35, I'd say, well, she is

23   going to be 35, 35 years in the future.  That amount is going

24   to grow at 2.3 percent per year, so it might grow to $60,000,

25   so I'm going to say, 35 years from now when the child would

1    have been age 35, she should be making like $60,000.

2        Then the question is, if you put money into the savings

3    account today and let it sit there for 35 years at current

4    interest rates, how much would you have to put in there, and

5    the answer might be something like $28,000.

6        To make it clearer, when I got hired at the University of

7    Pittsburgh 49, 50 years ago, my salary was $11,000.  Right now

8    the minimum wage is like $16,000 and the people raise the

9    minimum wage to $15 an hour, you work 40 hours a week, that's

10    $30,000 a year.  So when I say, the income that's 35,000 today

11    might be 60,000 in the future, that's really reasonable.

12    Q.  Now, I did not bring -- want to put your whole report up,

13    but can you pull up your report to show the jury a lot of

14    these different tables that you --

15    A.  Here is the data that shows, for example, in 1995, when

16    you are 18, the girl with a high school degree makes $13,999.

17    In 2016, the same girl at age 18 is making 24,278.  I've got

18    how much you make at any given age, I've got the data.  I

19    mean, I've got data at home back to 1980 but only fits to

20    1995.  Every single year, the income goes up.

21    Q.  So with all of that, the first line that you have is lost

22    income for a high school graduate for Kendall, over her

23    lifetime would earn $1,207,494.

24        Can you tell us where does that number come from?  Is that

25    what you just told us, all of that?

1    A.  What I did was I said I'll start with the actual earnings

2    of actual white females in 2016 and I'm going to increase

3    those numbers 2.3 percent every year, which is what the

4    economists projected for inflation, and then I went to the

5    Treasury Department and found out what are actual interest

6    rates.

7        If you are going to try to invest money for one year,

8    what's the interest rate?  If you are going to invest money

9    for five years, what's the interest rate?  I used the actual

10   interest rates and brought everything back to present value.

11       Think about if you worked for 40 years and made $40,000 a

12   year, that's 1.6 million.  I've got her working for 43 years

13   but in present value, it's $1,207,494.

14   Q.  Because that seems like a big number, but over a lifetime,

15   it's not as much as you think?

16   A.  I just think it's reasonable.  Whether you think it's a

17   big number or small number, it's what it is.

18   Q.  Now, lost fringe benefits, and you briefly talked about

19   that, that would be the health care, that would be the Social

20   Security, that would be the other fringe benefits, and you

21   calculated that based upon the average that employers pay

22   throughout the United States?

23   A.  Yes.  That's 27 percent.

24   Q.  That would be 27 percent of your 1.207?

25   A.  Yes.

1    Q.  That equals 326,023.  You mentioned you did not add in

2    lost household services.  For example, as you mentioned, if

3    I'm injured and I can't cut my grass, I have to pay somebody

4    or I can't do something, I have to pay somebody.  That's a

5    household service that I have to pay for.

6        There's an economic value for me not having to pay

7    somebody.  Is that a bad way of putting it?

8    A.  Well, in this case, what I'm saying is if Kendall were

9    still alive, over the rest of her lifetime, she would do lots

10   of things for her parents.  I mean, kids, you go to the store,

11   you cut the grass, you clean the windows.  When your parents

12   get old, you take care of them.

13       What I'm saying, this child over their lifetime would do

14   things for their parents, but I'm ignoring that.

15   Q.  Okay.  You have to take out what you mentioned was

16   personal maintenance, and that is the clothes, food, house,

17   rent, things of that nature, correct?

18   A.  Yes.

19   Q.  And again, this is based on governmental statistics?

20   A.  Yes, from the Consumer Expenditure Survey.

21   Q.  And that was $736,571.  So the net economic loss that you

22   projected for a high school graduate of Kendall's age at birth

23   would total $796,946?

24   A.  Yes.

25   Q.  Now, if we go to the next table, and this would be table

1    2, and in this one, you changed it a little bit, and you

2    projected that the economic loss would be for somebody who had

3    gone to a little bit of college.

4        Can you explain the difference in economic, I guess,

5    benefit to a person who just has a high school degree as

6    compared to has some college?

7    A.  Well, the data just show that people that have some

8    college, maybe it's one year, maybe it's two, maybe it's

9    three, you went to college, that shows something, number one,

10   that you want more education and it might be -- not

11   necessarily, but it might be you are better intellectually

12   than the kid that says I don't want to go to college or I'm

13   afraid to go to college, so it shows something anyway that you

14   have got some drive and ambition, but the data just show that

15   kids that have some college on the average earn more than kids

16   that don't have some college.

17   Q.  So if Kendall had some college over her work life

18   expectancy, her lost income would total $1,431,646?

19   A.  Yes.  That's in present value terms again.

20   Q.  And then you reduced it by the lost fringe benefits of

21   27.5 percent?

22   A.  I increased it by 27 percent.

23   Q.  I'm sorry, 27 percent.  For $386,544.  And then you took

24   out the personal maintenance of 744,456, and just so the jury

25   understands, that number increased also, correct?

1    A.  Yes.

2    Q.  A person with some college over their lifetime would have

3    more personal maintenance than a person just in high school?

4    A.  Well, the amount you typically spend depends partly on

5    your income.  If somebody makes $20,000, how much they can

6    spend is limited.  If you make $100,000, you can spend a heck

7    of a lot more, so typically the person that has a higher

8    income spends more than the person that has the lower income.

9    Q.  So some college work life expectancy net economic loss for

10   Kendall would be $1,073,734?

11   A.  Correct.

12   Q.  And then the last calculation you made was for table 3,

13   and this is if she -- it is if she had gone to college and was

14   a college graduate, correct?

15   A.  Yes.

16   Q.  And we'll just refer to your report while we're waiting

17   for it to come up on the screen.  So the work life for a

18   college graduate is only 42.7 years as compared to 43.94,

19   somebody in high school, correct?

20   A.  Yes.

21   Q.  And that takes into consideration that they have to go to

22   school a little bit longer, they might still work longer but

23   they have to go to school?

24   A.  Right.

25   Q.  And then their lost income for a college graduate of

1    Kendall's age would have been $2,128,633?

2    A.  That's right, yes.

3    Q.  The lost fringe benefits of $574,731, correct?

4    A.  Yes.

5    Q.  And then you take out the personal maintenance, and that's

6    $979,171 for a net economic loss for a college graduate of

7    Kendall's age of $1.724,193, correct?

8    A.  Yes.

9    Q.  And those are the calculations that you prepared for us to

10   explain the economic loss for Kendall in this case, correct?

11   A.  Yes.

12   Q.  Have the opinions you've expressed been to a reasonable

13   degree of economic certainty?

14   A.  Yes, sir.

15             MR. PRICE:  That's all the questions I have, Your

16   Honor.

17             THE COURT:  Mr. Colville, any cross-examination?

18                        CROSS-EXAMINATION

19   BY MR. COLVILLE:

20   Q.  Good afternoon.

21   A.  Hello.

22   Q.  I went to the University of Pittsburgh back in '81-'85,

23   and statistics, I remember them well.

24       The job you have is made more difficult because you don't

25   have any factual background on Kendall because she died very

1    soon after her birth to have some type of base evidence to say

2    here's what she would make looking out in the future like you

3    would have if you retired 20 years ago?

4    A.  If we had a secretary that was age 30 that had worked at

5    the same place for five years or whatever, you would say let's

6    look at that person's income and see how it's growing,

7    et cetera, and you would have more certitude on what you are

8    doing.

9    Q.  The more information you have, probably the more accurate

10   your report is going to be, at least as far as projecting into

11   the future, right?

12   A.  Yes, sir.

13   Q.  Nobody has a crystal ball to say with any real certainty

14   here's what this person is going to make from this point

15   forward, whether it's from day one or 30 years into their

16   career, right?

17   A.  Yes, sir.

18   Q.  But you would rather have someone who has 30 years' worth

19   of career and evidence and facts to base your projections

20   with?

21   A.  That's correct.

22   Q.  In this case, because you didn't have that, you are

23   relying on the statistical averages --

24   A.  That's correct.

25   Q.  -- that are in the books and the government statistics

1    that the census brings together; is that right?

2    A.  That's correct.

3    Q.  You are using life expectancy statistics, work, life and

4    education as the statistical average, right?

5    A.  Yes, sir.

6    Q.  And we can all agree that two people, three people, a

7    thousand people all born today, if we were applying the

8    statistical average that you would apply to all of them, odds

9    are they would all have different incomes, different education

10   outcomes, different work lives, correct?

11   A.  Yes, sir.

12   Q.  And if you had written a report for each one of them, they

13   would -- your report would say the same thing for each one of

14   them, right?

15   A.  That's correct.

16   Q.  Yet everybody would be different?

17   A.  That's correct.

18   Q.  And while some might be exactly spot on average, odds are

19   most of them wouldn't be, correct?

20   A.  That's correct.

21   Q.  And in that situation or that scenario, your report would

22   be either underestimating or overestimating but it wouldn't be

23   accurate as to those people who were not the statistical

24   average; is that right?

25   A.  Depends on what you mean by accurate.  It is the best

1    projection.  I would say that it's not going to be exactly

2    correct on what they actually earn.

3    Q.  Please don't take offense.  I'm not being pejorative about

4    it.  I'm trying to conceptualize what you are doing is you are

5    saying I'm going to treat everybody born today as

6    statistically average looking forward, at least as I project

7    what they are going to do income, wage, or work life, and

8    that's probably just not going to happen on a statistical

9    average for everybody born today.  Some will, but most won't.

10        Do you agree with that?

11   A.  Yes.

12   Q.  With regard to the assumptions as to whether somebody goes

13   to high school or graduates high school, graduates some

14   college or graduates college, there's a lot of factors that go

15   into it, and the same type of variability occurs if you look

16   at all the people born today.

17        Some people's parents have more money than others and can

18   afford it.  Some people have parents who both graduated

19   college and they're more likely to graduate high school and go

20   on to college.  There's thousands of other variables that

21   impact that ability.  Would you agree with that?

22   A.  To a certain extent, yes, except the data show that, I

23   mean, virtually everybody graduates from high school.  So if

24   you say are there thousands of factors that influence that, I

25   would say main factor is did you live to be age 18 or 19,

1  because more than 90 percent of white females graduate from

2  high school, and at the present time, about 40 percent or more

3  are graduating from college.

4  Q.  Nobody is disagreeing with that, but there are still ten

5  percent who don't graduate high school, right?

6  A.  Yes.

7  Q.  And your report doesn't reflect that, and I'm not

8  suggesting it should, but it just doesn't?

9  A.  That's correct.

10  Q.  If Kendall happened to be one of those persons who didn't

11  graduate high school for whatever reason, your report doesn't

12  accurately reflect that projection looking forward.  That's

13  all.

14  A.  That's correct, but I did emphasize that more than 90

15  percent do graduate from high school, so that's by far the

16  most likely scenario.

17  Q.  Again, agreed and understood.  There is a footnote in your

18  report that does indicate that whether or not somebody

19  graduates high school or wherever the educational chain that

20  person finds is influenced by what the parents have

21  accomplished in their educational pursuits; is that right?

22  A.  Yes, sir.

23  Q.  In this case, it's sort of a mixed bag.  Matthew has only

24  graduated high school, he hasn't graduated some college or

25  college at all, and Carissa graduated high school and has not

1    graduated community college yet and has the Police Academy but

2    has not completed college.

3        So to the extent you are suggesting in that footnote that

4    whether or not you graduate high school or some college or the

5    college is dependent upon the parents' educational background,

6    we don't know, and you can't predict based upon the parents

7    involved in this case where Kendall would have fallen,

8    correct?

9    A.  Well, we can predict.  We can always forecast and predict,

10   but I don't know with certainty, no.

11   Q.  Your prediction is only based upon the statistical

12   average, again assuming she is one of a thousand people that

13   are all predicted by you to meet the statistical average when

14   we know not everybody will, correct?

15   A.  Yes, sir.

16   Q.  The incomes that you assign for a high school graduate or

17   a graduate of some college or graduate of college, again, all

18   is the statistical average of income earned by those groups,

19   but you would agree that, within the group itself, high school

20   graduates, they don't all earn the same amount of income.

21   Some earn a lot; some earn a little; some are right in the

22   middle, right?

23   A.  Yes, sir.

24   Q.  So the same thing applies in this case of the scenario

25   with a thousand people, Kendall being one, assuming she would

1    have graduated high school or, for that matter, even some

2    college or college, the amount you are attributing to her as

3    earning an income is only a statistical average, but it

4    doesn't account for the possibility that she may have fallen

5    short like any other people that were born on the same date

6    and same time; is that right?

7    A.   It also doesn't take into account that instead of falling

8    short, she could have greatly exceeded the averages.

9    Q.   Understood and agreed.  In this case, one of the

10   projections is that she would have graduated college.  I don't

11   see anything in your report which accounts for the cost of

12   college.

13   A.   That's not part of the legal scenario.

14   Q.   Well, okay.

15   A.   It's not part of personal maintenance so I'm not supposed

16   to discuss that.

17   Q.   Okay.  I don't understand that.  What I understood you

18   were doing is you are saying here's all the income that would

19   have been taken in by Kendall and here's the money that would

20   go out and the number that we're giving to the jury is what's

21   left over.  You've assumed that she is going to be a single

22   woman.

23       If she is a single woman and she is getting the college

24   years, and she graduated high school and she's decided I'm

25   going to go to college, it's not going to be for free likely.

1    It's going to cost some money.  Would you agree with that?

2    A.  Yes.  It's also possible the parents are going to pay for

3    it, but it's also not part of personal maintenance.

4    Q.  But that cost has not been deducted?

5    A.  That's correct.

6    Q.  The work life expectation, you make a reference that it

7    would be continuous work life.  What does that mean?  You

8    anticipate she will work if she is a high school graduate 43.9

9    years work life and it will be continuous.

10       Do you mean there will be no breakage of that employment

11   for 43.9 years?

12   A.  In my report, I said she would work potentially to age 67,

13   and of those years, she would work about 43 of them, so

14   there's periods in between that she could be in or out of the

15   labor force.

16   Q.  I didn't understand that so I wanted to be clear.  Your

17   work life expectation doesn't account for the possibility that

18   she would choose to have a child and raise that child as

19   opposed to being in the workforce, does it?

20   A.  That would change everything though, because if she is

21   married and has a child, now she's got tremendous household

22   services which could add up hundreds of thousands of dollars,

23   also the personal maintenance -- I've subtracted over 60 to 70

24   percent for personal maintenance.

25       When a person is married and has children, the personal

1    maintenance deduction could be as low as like 15 to 20

2    percent.

3    Q.  I'm not suggesting it wouldn't change the report.  I'm

4    just saying your report doesn't account for it.  That's all.

5    A.  I did not, no.  The legal parameters that I understood is

6    you take the person the way they were kind of at the date the

7    trial.

8    Q.  I don't even know.  Women born today, what percentage of

9    those women have children?  It's pretty high, right?  It's

10   about half?  Maybe a little more than half?

11   A.  Could be.

12   Q.  So that's a statistical bullet point that could have been

13   used and could have been input here?

14   A.  No.  That's not the way the law treats people.  I mean,

15   I'm married.  Right now, you don't say, well, what if you are

16   not married.  You take the person the way they are.

17   Q.  The fringe benefits that you reference, explain to me how

18   you did the calculation.  How are you accounting --

19   A.  You look at government data that says what percentage of

20   income do firms add for fringe benefits.  First of all, you've

21   got the mandatory contribution of Social Security and

22   Medicare.

23   Q.  Let me stop you there.

24           THE COURT:  Whoa, whoa.  Let the witness get to the

25   period, Mr. Colville.  I know you are anxious to ask

1    questions.

2           Doctor, if you need to finish that last answer,

3    please do it.

4    A.  We take into account the mandatory contribution to Social

5    Security and Medicare.  We add in that almost all firms

6    contribute to pensions, retirement, 401(k), health benefits,

7    vision, dental, et cetera, and the average across the whole

8    economy is about 27 percent of income.

9    Q.  With regard to the Social Security, Medicare, wouldn't the

10   recipient, in this case Kendall, have to pay a matching

11   contribution that the employer would pay?

12   A.  Yes.

13   Q.  Did you account for that in this?

14   A.  No.  That's a tax.  Under Pennsylvania law, we never

15   discuss taxes.

16   Q.  But that wouldn't be money coming out of her -- the money

17   she earns in whatever job she had as a high school graduate,

18   some college graduate or college graduate?

19   A.  There's various expenses she would have that we don't

20   discuss because it's not part of Pennsylvania law.

21   Q.  Now, when you prepare a report, do you have a

22   predisposition depending on who is asking you to prepare the

23   report, the plaintiff's side or the defendant's side?

24   A.  No.

25   Q.  Are you more inclined to project more damages for a

1    plaintiff as opposed to a defendant?

2    A.  No.

3    Q.  Do you recall an expert report you prepared regarding an

4    individual by the name of James Margo?

5    A.  Yes.

6    Q.  In that case, you prepared two expert reports regarding

7    Mr. Margo in the same case; is that right?

8    A.  Yes.  I was given vastly different information which led

9    to completely different reports.

10   Q.  In that case, Mr. Margo was dead at the time you prepared

11   the report?

12   A.  Yes.

13   Q.  He had been in jail; is that right?

14   A.  Yes.

15   Q.  And he had been in jail years before you prepared both

16   reports; is that right?

17   A.  Yes.

18   Q.  Initially, you prepared a report for the plaintiff's firm.

19   Do you remember that?

20   A.  Yes.

21   Q.  And that report was dated December 22nd, 2007, correct?

22   A.  Yes.

23   Q.  Now, in that report, you offered an opinion that, based

24   upon a work life experience that you had projected, I'm

25   assuming based upon the same statistical averages that you are

1    doing here today, you predict a work life expectancy of 21.5

2    or 21.7 years and an economic loss was 796,000 and 1.7

3    million?

4    A.  That's based on information provided to me by the attorney

5    which turned out to be completely wrong.

6    Q.  Now, in that case --

7    A.  That projection is useless because the background

8    information was he's a high school graduate.  No.  He was

9    kicked out of high school for fighting and dealing drugs.

10           MR. COLVILLE:  Your Honor, I would move to strike as

11    nonresponsive to the question I asked.  I didn't ask a

12    question.  He's just testifying.

13           MR. PRICE:  I object, Your Honor.  He opened the door

14    and he's explaining.

15           THE COURT:  He did, yes.  Motion denied.  Explanation

16    stands.

17    Q.  You indicated --

18           MR. PRICE:  Your Honor, may he finish his answer?

19           THE COURT:  Yes, I would like him to finish the

20    answer.  I like all witnesses to finish answers.  I'm sure our

21    jurors do, too.

22    A.  I was given information that this person had worked as an

23    auto mechanic, as a roofer and as a construction worker.  Auto

24    mechanic, what we found out was between the age of 16 and 24,

25    he had worked for less than two months out of the eight years.

1    He worked filling gas tanks at a gas station.

2         Construction worker, what he did was he helped his father

3    dig some post holes to put in some fences at the family house.

4         As a roofer, he handed up some shingles to his father to

5    put some shingles on the roof.  I didn't know that.

6         I was informed that he had a career as an auto mechanic,

7    as a construction worker and as a roofer, so I went to

8    government data and said on average how much does a person

9    like that make, and at the time, that was like $30,000 a year.

10   Over 30 years that's $900,000.  That's where my number came

11   from.

12   Q.  Okay.

13   A.  A couple years later, the defense calls me and said we

14   have a case about some guy you won't believe but he got kicked

15   out of high school for dealing drugs, he stole money from his

16   grandmother to buy more drugs, he had been incarcerated year

17   after year for being a heroin dealer and he died in jail from

18   an overdose.

19        The one person told me -- the plaintiff told me that the

20   reason he was in jail was for a routine traffic stop.

21   Actually, what happened was he was violating probation.  He

22   died in jail.  I didn't know why he died in jail.  I thought

23   maybe the police beat him up or something.  He died from an

24   overdose of drugs.  When he died, how much did he earn?  Zero.

25   He never had been employed.

1    So what I did, even I said maybe he'll clean his act up

2    and work and make the minimum wage.  If you make the minimum

3    wage and we subtracted those expenses, you are down to zero,

4    so in the one case when I was given totally wrong information,

5    I said the loss is 900,000.  I didn't know he was a drug

6    dealer who constantly was in jail.  I didn't know he got

7    kicked out of high school.  I didn't know he didn't work as an

8    auto mechanic, et cetera.

9        On the other side when I was given the correct

10   information, I said that plaintiff report is basically

11   useless.  I'm just trying to honest.

12       I'm not saying, if I'm on one side, I do one thing, and if

13   I'm on the other side, I do something else.  I just go with

14   the information I'm given.

15   Q.  Just so we are clear, the two reports you prepared were in

16   the same lawsuit.  It would be as though you prepared a report

17   for Mr. Price and you prepared a report for me.

18   A.  That's exactly right.

19   Q.  Both of the reports that you prepared, you swore that they

20   were within a reasonable degree of economic certainty?

21   A.  Based on the information that I started with, that is

22   exactly right.

23            MR. COLVILLE:  That's all I have.

24            THE COURT:  Ms. Koczan, any questions of this

25   witness?

1              MS. KOCZAN:  I do not, Your Honor.

2              THE COURT:  Mr. Price, any follow-up?

3              MR. PRICE:  Just a few.

4                        REDIRECT EXAMINATION

5    BY MR. PRICE:

6    Q.  I'm not going to follow up on that because you seem to

7    have addressed that.  I did not come to you and ask you to

8    assume that Kendall was going to graduate from Harvard, go on

9    to start her own web company, compete with Google and travel

10   around the world making millions and millions of dollars for

11   appearances at the MTV awards or something like that, did I?

12   A.  No.  I was given -- what I do is I start with an

13   information form, and I say you want me to do an economic

14   report, provide this information to me, and I assume that the

15   information that is given is correct because I put most of it

16   into my report, so if you would have told me, oh, Kendall died

17   at age 24 and she had a Ph.D., I would have used that, and

18   you'd say that's not true.  She died at age zero and didn't

19   have a Ph.D.  I'd say if I didn't know that, my report would

20   be worthless.

21        I have in here all the information that I discussed, the

22   education of the parents, the names of the parents, the date

23   of birth, education background, et cetera.

24   Q.  And in this case --

25              THE COURT:  For the record, the witness is showing

1    the jury the form he uses.

2            Go ahead, Mr. Price.

3    Q.  In this case, we just simply asked you to do the median,

4    the average girl who would go to high school, college and some

5    college, correct?

6    A.  Actually, they didn't ask me that.  They said provide an

7    estimate of the economic damages, so everything else is my

8    opinion.  They didn't say assume she is going to make the

9    average of a high school graduate or whatever.  I did that.

10   They just said project the economic damages.

11   Q.  Good point.

12           MR. PRICE:  That's all the questions I have.

13           THE COURT:  Thank you, Mr. Price.

14           Anything else?  Mr. Colville?  Ms. Koczan?

15           MR. COLVILLE:  No, Your Honor.

16           THE COURT:  Doctor, you may step down.  Thank you for

17   your appearance here today.  I believe the doctor may also be

18   excused.

19       (Witness excused.)

20           THE COURT:  You did have a briefcase.  Make sure you

21   take it.

22           Mr. Price, are you prepared for another witness?

23           MR. PRICE:  First, just for purposes of the record,

24   to introduce the tables that were shown up on the screen.

25           THE COURT:  You have some additional exhibits.  Any

1    objection?  He projected the economic loss on the screen.  He

2    just provided hard copies to Mr. Galovich.  Any objection?

3            MS. KOCZAN:  Are these exhibits or are they

4    demonstratives?  Are you introducing them as exhibits?

5            MR. PRICE:  No.  I'm introducing them because they

6    are part of the record.

7            MS. KOCZAN:  I don't have any objection to it.

8            THE COURT:  Mr. Colville?

9            MR. COLVILLE:  No objection.

10           THE CLERK:  Plaintiff Kenkel demo.

11           THE COURT:  Yes.  Anything else, Mr. Price?

12           MR. PRICE:  No.  My next witness would be Matthew

13    Fritzius.  I'm just looking at 4:15.  Do you want me to start?

14           THE COURT:  Well, it's up to you.  Mr. Fritzius is

15    here.

16           MR. PRICE:  He is.

17           THE COURT:  Do any of you jurors have an engagement

18    or something this evening that you can't stay?  Anybody need

19    to leave earlier than quarter to 5:00 or so?

20           A JUROR:  Will we still make the bus?

21           THE COURT:  What time is your bus?

22           A JUROR:  I get the bus at 5:00 or ten after at the

23    latest.

24           THE COURT:  I was just talking to staying until about

25    quarter to 5:00.  Would it be better?

1           A JUROR:  I can do quarter to 5:00 so I can run out.

2           THE COURT:  Right.  We will not go any further past

3    quarter to 5:00.  Does that work for everybody?

4           So Mr. Price, do you want to start Mr. Fritzius at

5    this time or did you want to demo those pictures that we

6    talked about earlier?

7           MR. PRICE:  I'm sorry.  If I wanted to --

8           THE COURT:  Demonstrate the pictures that you entered

9    into evidence earlier.  At one point, you indicated you were

10   going to pass those to the jurors.

11          MR. PRICE:  Yes.  I'm sorry, Your Honor.  I seem to

12   have lost my notes for Matthew -- here they are.

13          Your Honor, for purposes of the record, I have

14   original photographs of Exhibits 29, 30, 31, 33 and 34.  These

15   photographs are contained within the -- in the joint exhibit

16   list, in the exhibit binder, there are blowup pictures that

17   are pixilated, and these are the actual pictures from the

18   camera, so I think they are a little clearer and they are a

19   little bit more detailed, so I ask to introduce them, the

20   originals for the jury.

21          THE COURT:  Right.  There was no objection by the

22   defendants, and given the nature of the pictures, what the

23   court normally does is have the pictures passed.  Mr. Galovich

24   will assist.

25          THE CLERK:  For clarity, Your Honor, this isn't being

1    readmitted again.

2           THE COURT:  No.  They've already been agreed upon and

3    admitted, but we did not have an opportunity to have the

4    jurors take a look at them.

5           So let the record reflect that the pictures that were

6    just referenced as exhibits are now being passed to our jurors

7    one by one.

8           It appears that all of our jurors have had an

9    opportunity to review those exhibits.  The originals have now

10   been returned to Mr. Galovich.

11          As I indicated to you earlier, Mr. Price, when the

12   jury goes out to deliberate, then they should also have the

13   opportunity to have those pictures go with them.  Mr. Galovich

14   is done taking custody and I think you already have those

15   logged in; is that correct, Mr. Galovich?

16          THE CLERK:  Well, they are not logged in separately,

17   but they are logged in as joint exhibits.  I will put them in

18   the binder.

19          THE COURT:  Thank you.  Now, it's about 4:25.  Is

20   there any other "housekeeping" before we call another witness?

21          MR. PRICE:  No, Your Honor.

22          THE COURT:  Would you like to start with

23   Mr. Fritzius?

24          MR. PRICE:  Yes.

25          THE CLERK:  Please step forward.  Please state and

1    spell your name for the record.

2         THE WITNESS:  Matthew Fritzius, F-R-I-T-Z-I-U-S.

3       (Witness sworn.)

4         THE COURT:  Mr. Fritzius, please watch your step.

5    It's a little uneven there.  Mr. Price, you may proceed.

6         MR. PRICE:  Thank you.

7         MATTHEW FRITZIUS, a witness herein, having been first

8    duly sworn, was examined and testified as follows:

9                     DIRECT EXAMINATION

10   BY MR. PRICE:

11   Q.  Matthew, you have to pull a little closer to your mouth

12   but speak into it.  Okay.

13   A.  Sound good?

14   Q.  Perfect.  Can you please tell us -- we know your name.

15   Where do you live?

16   A.  I live in Monaca in Beaver County.

17   Q.  And you are a plaintiff in this matter?

18   A.  Yes, I am.

19   Q.  And you are the father of Kendall?

20   A.  Yes, I am.

21   Q.  You have filed this lawsuit on behalf of the estate along

22   with Carissa?

23   A.  Yes.

24   Q.  Before we get into the facts of the case.  Tell us a

25   little bit about yourself.  Where were you born?

244

1    A.   I imagine I was born in Beaver County.  I don't know all

2    the details on it, but born in 1994, September 11 was my

3    birthday, and I was just born and raised in Beaver County.

4    Q.   Any brothers and sisters?

5    A.   Yes, actually.  My dad has six children total.  My mother

6    has four, so I have three brothers and two sisters.

7    Q.   And grew up in the Beaver County area?

8    A.   Yeah, born and raised.

9    Q.   And schooling, did you go to school in Beaver County?

10   A.   Yeah, I spent time in Beaver Falls, and I graduated from

11   New Brighton.

12   Q.   Now, from what I understand, at some point, you left

13   Beaver Falls and went to New Brighton?

14   A.   Yes.  I left the Beaver Falls School in like seventh

15   grade, and then I moved over to New Brighton at the end of the

16   school year over there.

17   Q.   From what I understand, at some point whenever you moved

18   over to New Brighton, you met somebody in your home room?

19   A.   Yes.  That would be Carissa.

20   Q.   Tell us a little bit about meeting Carissa.

21   A.   Well, it was -- I mean, to look back on it now, it was

22   definitely interesting.  She was very pretty to me, and I

23   thought I was quite charming, to say the least, so I would,

24   you know, I would definitely engage in conversation with her

25   and try to get to know her.

1   Q.  And did you start to get to know her?

2   A.  Yes.  It was the next year in our eighth grade year is

3   when we became official like boyfriend and girlfriend.

4   Q.  So in grade school, you are official boyfriend/girlfriend

5   and everybody in the school knows that?

6   A.  Yes.

7   Q.  Did you continue to hang out?  Too early to drive, so were

8   you dating?

9   A.  Yeah, we were dating, but luckily, New Brighton, it's like

10  a smaller town in the county, and there's a lot of things in

11  walking distance.  You know, we have a nice park, restaurants

12  and whatnot, so we spent a lot of time just out in the streets

13  with our friends playing release and things like that.

14  Q.  Did you two stay together as a couple through high school?

15  A.  Yeah.  All through high school we were together.

16  Q.  After high school -- what year did you graduate from high

17  school?

18  A.  2013 we graduated.

19  Q.  And after that, did you have any plans for your future?

20  A.  My future was just focused on work, just go straight into

21  the workforce and try to make as much money as I could.

22  Q.  Did you start working directly after school?

23  A.  Yes, directly after school.

24  Q.  What did you do?

25  A.  I started off in the shoe department.  It wasn't much.  It

1   was pretty much my first job.  I was in a restaurant for a

2   year, but then I got into this -- a company called Phoenix

3   Glass Anchor Hocking.  It was located in Monaca, PA, basic

4   labor.

5   Q.  Anchor Hocking is a bigger corporation in Beaver County?

6   A.  Yes.

7   Q.  What do they make?

8   A.  Glass products.

9   Q.  From what I understand, at the time Carissa was pregnant

10  with Kendall, you were working there?

11  A.  Yes.  By the time we had Kendall on the way, I would have

12  been there about a year and a half.

13  Q.  What did you do there?

14  A.  Basic labor.  Like they have lehrs, I don't know if you

15  guys know what lehrs are.  Just big belts that a bunch of

16  glass comes out on, and we were required to put the glass into

17  boxes, ship the boxes up, pack them up, tape them, get them

18  out where they got to go.

19  Q.  And from what I understand, it's a 24-hour operation?

20  A.  Yes, 24/7, yeah.

21  Q.  Did you have a specific shift or when would you work?

22  A.  They rotated shifts.  So we would be on 7:00 to 3:00 one

23  week, and 3:00 to 11:00 the next week and 11:00 to 7:00, so on

24  and so forth.

25  Q.  Did you work weekends?

1    A.  Yes.

2    Q.  After you graduated from high school, did you and Carissa

3    continue on as a couple?

4    A.  Yes, we did.

5    Q.  And at some point, did you and Carissa move in together?

6    A.  Yes, we did.

7    Q.  And was this before she became pregnant?

8    A.  This was well before she became pregnant.

9    Q.  Whenever you two were living together, was she working?

10   A.  Yes, she was working.

11   Q.  Where?

12   A.  It was a restaurant.  I believe at the time, it was called

13   Water's Edge.

14   Q.  And at some point, she comes and she tells you that she is

15   pregnant?

16   A.  Yes.  At this point, I was helping -- my friend worked at

17   a restaurant called Pigs 2 Peaches, a barbecue restaurant.

18   Some days I would help them out.  Just lovely people I loved

19   to work with.

20       We were closing for the night and I received a text

21   message that we need to talk, and any time you hear those

22   words, you know, the only thing lingering in the back of my

23   mind is like what did I do wrong, but I come to find out for

24   her to tell me that we had a baby girl coming on the way.

25   Q.  And how did that make you feel?

1    A.   I couldn't say baby girl.  We had a baby on the way.  We

2    didn't know at the time.

3    Q.   How did you feel about that?

4    A.   Really excited at the time.  Just super anxious because it

5    was a new turning point in my life.

6    Q.   Did you and Carissa talk -- how was she about the whole --

7    A.   Same boat as me.

8    Q.   You were pretty young?

9    A.   Yeah.  I've always got comments that I was like -- I was

10   ahead of, like, my age.  I don't know why people would like to

11   tell me that, but I've gotten it my entire life.  So for me,

12   it wasn't as much, but for her, maybe.

13   Q.   That you look maybe a little more -- I don't want to say

14   mature, but a little bit older than you are.

15   A.   I don't know about now.  I had to shave my face.  I'm not

16   used to this look at all, by the way.

17   Q.   Let me ask you about after you and Carissa talked about

18   becoming pregnant or after she became pregnant, did you make

19   any decisions with her?

20   A.   We made plenty of decisions together.  I know when we had

21   found out that we were going to have the baby, instead of

22   living in the apartment, we knew that wasn't going to be

23   something for us for the rest of our lives, so we ended up

24   looking into getting a mobile home.

25   Q.   Now, we have some other pictures that we can show to have

1    a little bit of insight into your life before Kendall came

2    along, so if you could pull up Exhibit 24, and can you explain

3    to us what this picture is of?

4    A.   That was us at a Pirate game, and what was funny about

5    that day is like we showed up super early.  I don't know why.

6    They put big red arrows and they hide them in the seats and if

7    you find a big red arrow, you get to take a picture with the

8    big parrot that they have.  I don't know if that's the right

9    term for the mascot.  It was right under our seat and we got

10   to take a picture with the big parrot.

11   Q.   And this was after high school?

12   A.   Yes.

13   Q.   You can take that picture down.

14       The next one I'll show you is Exhibit 25.  Can you tell us

15   about that picture?

16   A.   Yes.  That picture, there was -- that bridge that we were

17   on a bridge at the moment right now and it was just built so

18   it was brand new, and it's the first time that we had driven

19   on the bridge, so while we were at a red light, I thought it

20   would be cool if we captured that memory together.

21   Q.   So you weren't moving at the time the picture was taken?

22   A.   No.  The car was not moving.

23   Q.   The next one is Exhibit 26, and can you tell us what this

24   picture is of?

25   A.   From the look of my eyes, I know I was just getting off of

1    work maybe, but we were at a doctor's appointment to check up

2    on the baby to see how things are going.

3    Q.  Did you go to any of the prenatal visits?

4    A.  I went to a couple, I believe, but I didn't attend a lot

5    of them just because of my work schedule.

6    Q.  And do you remember what was happening at this visit?

7    A.  I can't quite remember exactly what was going on at this

8    visit.

9    Q.  Do you ever remember whether or not you, before delivery,

10   found out whether it was going to be a boy or girl?

11   A.  Yeah.  At one point we got to find out.  I don't remember

12   how because there was -- our shifts were so crazy.  We worked

13   16-hour shifts, 12-hour shifts, come home, go to sleep, wake

14   up, do it again.  There was a lot of information that was

15   passed my way, but I know, at one point, I definitely found

16   out what we were having.

17   Q.  So Carissa would keep you in the --

18   A.  Yes, the best she could.

19   Q.  The next exhibit we'll pull up is Exhibit 27.  This is a

20   picture.  She is obviously pregnant at that point?

21   A.  Yeah.

22   Q.  Can you tell us what was happening in this picture?

23   A.  I'm not sure what holiday we were celebrating.  Something

24   before October.  This may have been Labor Day, maybe, but

25   yeah, we were just at family's house, having a pool party and

1    we were all hanging out together.

2    Q.  Do you remember whether or not Carissa told you while she

3    was pregnant whether there were any concerns about the

4    pregnancy?

5    A.  There was never any concern that I was aware of at all.

6    Q.  Sometimes, there are prenatal classes offered where, you

7    know, mothers and fathers they'll go to learn about delivery

8    and things like that.

9        Were you and Carissa -- did you ever go to any of those?

10   A.  No, we never did.

11   Q.  Do you remember were you ever offered them and just said I

12   don't want to go, or did you ever learn about them?

13   A.  I would imagine it was offered to us, but no, we never had

14   any of those classes.

15   Q.  Let me ask you a little bit about your experience, I

16   guess, leading up to this.  Had you ever been present in a

17   labor and delivery room when a baby was being born?

18   A.  In the process of a baby being born, no, but I was in the

19   room when my niece was born, like well after she was born.  I

20   got to be there for that.

21   Q.  So you were able to go into the -- to see your niece after

22   she was born?

23   A.  Yes.

24   Q.  So the actual birthing process, you had never experienced

25   it?

1   A.  No.

2   Q.  Were you scared?

3   A.  Myself to be in there?  Was I scared?  I was definitely

4   nervous, you know, to say the least, yeah.

5   Q.  The due date was coming up in October, because the due

6   date was October 12?

7   A.  Yeah.

8   Q.  Tell us about preparations that you and Carissa were

9   making for the birth.

10  A.  Everything under the sun.  We had to get the crib, you

11  know, get the supplies, diapers, you know, prepare -- what do

12  they call those for the female?  Diaper party?  No.  Is that

13  what it's called?  I'm not quite sure, but you know planning

14  all those things, and also we were in the process of getting

15  ready to move out of the apartment into the mobile home that

16  we had purchased.

17  Q.  How about a baby shower?

18  A.  There we go.  I don't know what I was thinking.

19  Q.  I'm sure they give out diapers too.

20  A.  The majority of everything that comes is diapers, so it's

21  pretty much a big diaper party.

22  Q.  Okay.  So Sunday, October 12, 2014.  October 12, 2014 was

23  a Sunday?

24  A.  Yeah.

25  Q.  Do you remember that day?

1  A.  It's one of the hardest days for me to forget actually,

2  but yes, I remember.  We had gotten up at around 5:30 on that

3  day, 5:30 in the morning.  My shift started at 7:00, so we

4  were going through the basic routine, coffee, breakfast and

5  all this.  She drops me off at work.  I get into my shift.

6      Maybe at this point, it's probably 8:30 or 9:00.  I get a

7  text message from her and she is just stating that her water

8  broke and she called some -- called the doctor to get

9  confirmation, and she got the go ahead to go up to the

10  hospital, and then she had come to pick me up from work, and

11  we went straight up there.

12  Q.  Now, do you remember about what time you guys got to the

13  hospital?

14  A.  Probably like before 11:00, after 10:00.  It was just

15  around 10:00.

16  Q.  Did you get -- did you both -- I don't want to say get

17  admitted, but did you go into the hospital and they checked

18  you in and stuff like that?

19  A.  Yes.  Immediately.  Yes.  They were very prompt.  They got

20  us where we had to be and got us in the room.  Got her all

21  hooked up and we were ready to go.

22  Q.  Tell us a little bit about that, getting into the room,

23  getting hooked up.  What did you see?  What happened?

24  A.  Oh, my, just a whole bunch of, like, this is really going

25  to happen.  Just so anxious for this to really be here.

1    Q.  Do you remember any of the nurses who were caring for you

2    when you came into the hospital?

3    A.  Not up until Monday.  I recalled no nurses up until this

4    week.

5    Q.  You mean until Monday morning?

6    A.  No, like -- what was your question?

7    Q.  Do you remember any of the nurses?

8    A.  Now I do.

9    Q.  From seeing them here on the stand?

10   A.  From seeing them here, yes.

11   Q.  Now, besides seeing them here on the stand, I don't want

12   to say you remember their faces or remember the conversations,

13   but do you remember what happened during the October 12, while

14   you guys were admitted, into the 13th?

15       Do you remember what was happening at the hospital?

16   A.  Yeah.  A few things were going on.  You know, clearly

17   they're doing their job.  They're checking on her.  They are

18   informing me on certain things.  One nurse was pretty -- she

19   was engaged with us, to say the least.  Like she wanted to

20   communicate and to reassure us that everything was going to be

21   fine, everything is okay.

22       She knew what her job was to do, but she would -- like a

23   little test for me, she would have me, like, check in with her

24   every 15 minutes, like, what she had to do, and this was all

25   in the process of, like, the labor.  She would tell me, like,

1    hey, every 15 minutes come remind me of this.  Obviously, she

2    knows what she has to do, but it was kind of for me to be on

3    my game.

4        And I can vividly remember one nurse, like, she would take

5    notes on her pants leg, but I guess in the hospital world,

6    that's just kind of a normal thing that they do, and there was

7    one nurse who wasn't sure how to use one of these strips.  I'm

8    not sure what the strip was for, but she had to literally

9    pause for a minute and tell us I have to read the directions.

10    Give me a minute before I use this.

11        There was no red flags in my head because we are here, we

12    are here in your care, and I'm going to let that be what it

13    is, and I would much rather you read the directions.

14    Q.  If you could pull up Exhibit 28.  I know the picture is

15    tilted, but is this what you kids term a selfie?

16    A.  Yes.

17    Q.  Carissa is taking it while she is in the bed and this is

18    during her labor?

19    A.  Yes.

20            MR. PRICE:  Your Honor, if you don't mind, at this

21    point, we're going to get into a little bit more of the

22    delivery, and this might be a time to break.

23            THE COURT:  That works for the court, and as we know,

24    one of our jurors needs to catch the bus, so we're going to

25    pause here and we'll hear more from Mr. Fritzius tomorrow.  I

1    also understand we have some additional witnesses including an

2    expert tomorrow; is that correct?

3            MR. PRICE:  Yes.

4            THE COURT:  Ladies and gentlemen of the jury, as per

5    usual, you'll put your binders and notebooks on your chairs to

6    be picked up by Mr. Galovich.

7            Once again, let me remind you of the recess

8    instruction.  No talking about the case, no researching about

9    the case, no communicating about the case.  Again, if anybody

10   should approach you about this case coming in tomorrow, for

11   example, at any time, let us know that.  Continue to keep your

12   minds open.  You still haven't heard all of the evidence and

13   you haven't heard my final instructions.

14           With that, safe travels home.  It's a nice night

15   outside.  I hope you get some time to enjoy it.  Everybody

16   should stand for our jurors.

17       (Jury excused.)

18           THE COURT:  Mr. Fritzius, you may step down, please.

19   Besides Mr. Fritzius, Mr. Price, what else do you anticipate

20   tomorrow.  Still Dr. Karotkin; is that correct?

21           MR. PRICE:  Dr. Karotkin, Dr. Min, Kylee Fritzius,

22   and then Carissa.

23           THE COURT:  Now, vis-a-vis Dr. Karotkin, is he going

24   to be here first thing in the morning?  Should we interrupt

25   Mr. Fritzius and then have Dr. Karotkin?  Is that what you are

1    going to do?

2              MR. PRICE:  If you wouldn't mind, yes.

3              THE COURT:  How about Dr. Min?  Does he have to be

4    anywhere else?

5              MS. KOCZAN:  Your Honor, I was going to ask Mr. Price

6    what time he wanted him here.  He's waiting to hear from me as

7    to the exact time.

8              MR. PRICE:  I don't think I'm going to be really,

9    really long with Dr. Karotkin.  I would ask that he be here, I

10   don't know how much cross-examination, but 10:00, 10:15, so

11   right after the break, I could put him on.

12             THE COURT:  So do you think he could be downtown

13   around 10:30 or so?

14             MS. KOCZAN:  I will tell him that's when I would like

15   him.

16             THE COURT:  All right.  And as far as these other

17   folks, there's no problems with their appearing, right?

18             MR. PRICE:  Correct.

19             THE COURT:  Okay.  Well, then everybody can have a

20   good night.  We'll see you here tomorrow, unless there's

21   something else, Mr. Price?

22             MR. PRICE:  One issue, Your Honor.  It's with regard

23   to, and I spoke with Mr. Colville about this, but I wanted to

24   put it on the record.  On Tuesday, their expert Dr. Wiesenfeld

25   is to be testifying.  Dr. Wiesenfeld's report was filed.

1    However, the remainder of the 26 -- Rule 26 information

2    concerning his list of cases and compensation has not yet been

3    filed.

4              THE COURT:  He needs to get busy, so where is the

5    list of cases and compensation?

6              MR. COLVILLE:  It was an oversight, Your Honor.  I

7    reached out to the doctor this afternoon when I heard from

8    Mr. Price.  Hopefully, it's being processed to me and sent to

9    me and I can file it.

10             THE COURT:  It's a Rule 26 violation.

11             MR. PRICE:  The only other thing I would ask is that

12   it be filed because it was filed -- all of Ms. Koczan and our

13   experts' reports are filed and I think that they should all be

14   filed of record.

15             MR. COLVILLE:  I'm not sure what the purpose of

16   filing it is.

17             MR. PRICE:  I guess the purpose is since my experts

18   have disclosed all of their compensation and their lists, he

19   should too.

20             MR. COLVILLE:  I don't think that's common in federal

21   court to file the report.

22             THE COURT:  That you file them and make some of them

23   proffers.  Ms. Koczan, what did you do?  Did you file yours?

24   I think yours were filed.

25             MR. COLVILLE:  I think that's after we objected, Your

1    Honor, for having it filed to begin with.  This was a nonjury

2    case as to the United States, and the expert reports were

3    filed with the court, the finder-of-fact.

4            THE COURT:  Yes, you made that objection.  I have to

5    read them anyway, and I read them all.

6            MR. COLVILLE:  I understand, Your Honor.

7            THE COURT:  So you did file your reports of record,

8    so is this Dr. Wiesenfeld used widely?

9            MR. COLVILLE:  By us, no.

10           THE COURT:  I mean, in general.

11           MR. COLVILLE:  No, I don't think so.  I don't think

12   there's going to be much at all.

13           THE COURT:  I guess somebody could Google him, so

14   let's get Dr. Wiesenfeld's information first thing and I'll

15   take a look at it and determine if we need to have it filed or

16   not.  Okay, but we need it.

17           MR. COLVILLE:  As I said, Your Honor, as soon as I

18   heard, I texted him this morning.

19           THE COURT:  This case has been around for a while.

20   This trial has been listed for a while.  It was relisted

21   thanks to a criminal defendant, and hence, it should have been

22   produced a while ago.  Now, any other issues?

23           MR. PRICE:  No, Your Honor.

24           MS. KOCZAN:  The only other issue, and we brought

25   this up before, is with regard to next week.  Mr. Colville has

1    Dr. Wiesenfeld on Tuesday.  All of my experts were previously

2    scheduled for Wednesday.  I intend to have all three of them

3    there on Wednesday, but I can't get them there on Tuesday

4    because of the previous -- the court's previous scheduling was

5    that we were not going to have court on Friday and that's why

6    we did it that way.

7        THE COURT:  There's court and there's court.  We

8    still have a Rule 50 motion I have to have argument on,

9    correct.  I still have to make ruling on that.  We still have

10   to have a charge conference and there may be some other legal

11   issues, so be that as it may.  If they are not here until

12   then, they are not here until then.

13       MS. KOCZAN:  Your Honor, what would you like me to

14   do?  Would you like me to have my other witnesses on Friday,

15   or would you prefer to have them on Tuesday because I have two

16   more nurses that have to go on and Dr. Jones depending on what

17   you do with the Rule 50 motion, but she can testify

18   regardless.

19       THE COURT:  Okay.  First off, Mr. Price, you are

20   going to put on Dr. Karotkin, Dr. Min, Kylee, Matt has to go

21   back on and finish up, and Carissa, right?

22       MR. PRICE:  Correct, Your Honor.

23       THE COURT:  Are you going to have Carissa testify

24   both liability and damages, because at one point you said you

25   were going to split that?

1          MR. PRICE:  I'll have her testify to the whole thing.

2          THE COURT:  That sounds to me like, at a minimum,

3    we're going to fill all day tomorrow right there, because the

4    court, again, has a meeting at lunchtime.  This time, it's

5    about pro ses, and that's from noon until 1:15, so we're going

6    to take that same kind of a lunch break.

7          And then on Friday, is it your intent to call anybody

8    else, Mr. Price, or are you going to be resting?

9          MR. PRICE:  Your Honor, I intend to rest, yes.  I'm

10   resting.

11         THE COURT:  Are you?  Okay, because Ms. Koczan is

12   indicating that she is going to have at least two nurses that

13   might need to testify, right?

14         MS. KOCZAN:  Your Honor, currently, I asked them for

15   next week because when I originally scheduled, we did not

16   think we would be here on Friday, so that's why I have them

17   lined up for next week, and then I asked initially my experts,

18   two of them are going to be here on Wednesday, one on

19   Thursday.

20         I got them all moved to Wednesday hoping we can get

21   them all in and expedite things, so my question to you is do

22   you want me to see if I can get those nurses Friday or is it

23   okay to leave them on Tuesday.

24         THE COURT:  I think we'll leave them on Tuesday

25   because if we finish everybody tomorrow on the plaintiffs'

1    side and perhaps have somebody that needs to finish up, then

2    the plaintiff is going to rest, and I'm anticipating arguments

3    on the Rule 50, and I need to make a ruling, and then I'm

4    anticipating that given these "witness problems," we'll just

5    move right into a charge conference and so we get that all

6    done, so that's one way we could approach things.

7            Now, if these ladies want to come in and be done

8    before Labor Day, I would be happy to accommodate them.

9            MS. KOCZAN:  I can certainly call them.  I don't know

10    what their schedules are because I had originally told them

11    next week, but I can make a phone call.

12            THE COURT:  Sure.

13            MR. PRICE:  Your Honor, if I may.  I have squeezed

14    witnesses into every minute of this trial at least three days.

15    I am --

16            THE COURT:  Which I and the jury very much

17    appreciate.

18            MR. PRICE:  However, I know and I have tried cases

19    with defense before, and the case will drag and the case will

20    drag.  We will end early on Monday, we will have to -- and it

21    hurts me the longer --

22            THE COURT:  Monday we won't be here.  I hope we'll

23    all be at a cookout somewhere, not all together but individual

24    cookouts.  It's Labor Day.

25            MR. PRICE:  These nurses, who do you have?

1    Nurse Ash, who I'm going to ask for an offer of proof because

2    the only relevant testimony she can have is that she saw the

3    meconium fluid at the time of delivery, then she went off

4    shift at 7:00.

5         Nurse Hackney was only there for five minutes, and

6    Nurse Gantz, she was there at the time of delivery, so she

7    might have something relevant to say, but she didn't have much

8    in her deposition, so I can't see them filling up, and you've

9    told us last week that we were going to be having trial on

10   Friday.

11        THE COURT:  I did, because it was represented to me

12   by our law clerk that you were going to have all these

13   witnesses and all these experts and we need to get this case

14   done so that's what I did.

15        MR. PRICE:  I'm doing it.  I'm getting it done, but

16   now from what I'm hearing is, well, and that's -- I hate to

17   say it because this always happens to me.

18        THE COURT:  We'll see one thing after another.  So

19   first, Ms. Koczan, why don't you see if Nurses Ash, Hackney

20   and Gantz are available on Friday and see what their

21   preference is.  Are they still working for the hospital or are

22   they someplace else?

23        MS. KOCZAN:  First of all, I don't intend to call

24   Nurse Gantz because she doesn't remember anything.  That is

25   not my intention to do that.  She doesn't remember.  My

1    intention was to call Nurse Ash.

2            THE COURT:  You want to give us a proffer?

3            MS. KOCZAN:  It will be with regard to meconium and

4    what she did and what she saw.  And --

5            THE COURT:  Is she still employed by the hospital?

6            MS. KOCZAN:  She is.  And then Nurse Hackney is the

7    nurse who accepted Kendall into the nursery.  She is no longer

8    employed by the hospital.  She is employed elsewhere now, so

9    that's why, as I said, the original plan --

10           THE COURT:  She might be a little bit difficult to

11   get in, but Ash, if she is still working for the hospital,

12   should be easier to get in.

13           MS. KOCZAN:  That would be fine.  I don't anticipate

14   a problem with her because the hospital will accommodate that.

15           Nurse Hackney, obviously you have to work around her

16   schedule, and I did tell her based upon earlier

17   representations that it would be next week.  I certainly can

18   call her.  I don't know for certain whether she can be there,

19   and of course, I have Dr. Jones who I could have testify

20   either Friday or Tuesday, and then, per previous

21   representations, I have my experts for Wednesday.

22           THE COURT:  Understood.  It's not your intent to call

23   Dr. Jones in your case, Mr. Price?

24           MR. PRICE:  No.

25           THE COURT:  Anything else then that we need to

1    discuss?  Dr. Wiesenfeld needs to get his list of cases and

2    how much he's being paid up to you, Mr. Colville, ASAP.  I

3    want to see a hard copy, and I'll make a determination if it

4    needs to be filed or not.

5         We do now have a proffer for Nurse Ash.  You are

6    going to do your best to see if she might be available if we

7    need her on Friday and I understand Dr. Wiesenfeld will be

8    here first thing Tuesday, and the rest of the experts on

9    Wednesday, and the other times, as I said, we'll be filling in

10   if we need to vis-a-vis the Rule 50 motion and the charge

11   conference.

12        Of course, Mr. Colville and Mr. O'Connor don't have

13   much to offer on the points for charge unless they want to

14   weigh in on comparative negligence.  Maybe they want to do

15   that.  Anything else?

16        Have a good evening, everybody.

17        (At 4:55 p.m., the proceedings were adjourned.)

18

19

20

21

22

23

24

25

266

1                    C E R T I F I C A T E

2          I, BARBARA METZ LEO, RMR, CRR, certify that the
   foregoing is a correct transcript from the record of
3  proceedings in the above-entitled case.

4

5   _\s\ Barbara Metz Leo__              ___09/25/2019___
   BARBARA METZ LEO, RMR, CRR          Date of Certification
6  Official Court Reporter

7                    I N D E X
   WITNESSES                                          PAGE
8
   STEVEN SHORE, M.D.,
9
       Direct Examination By Mr. Price                 16
10     Cross-Examination En Voir Dire By Mr.           23
   Colville
11     Cross-Examination En Voir Dire By Ms. Koczan    28
       Direct Examination (Resumed.) By Mr. Price      31
12     Cross-Examination By Mr. Colville               56
       Cross-Examination By Ms. Koczan                 74
13     Redirect Examination By Mr. Price               91

14 TYLER JANECTIC

15     Direct Examination By Mr. Price                 94
       Cross-Examination By Mr. Colville              104
16     Cross-Examination By Ms. Koczan                108

17 JAMIE MCCRORY

18     Direct Examination By Mr. Price                110
       Cross-Examination By Mr. Colville              132
19     Cross-Examination By Ms. Koczan                133
       Redirect Examination By Mr. Price         155, 158
20     Recross-Examination By Ms. Koczan              156

21 BRADLEY HEIPLE, M.D.

22     Direct Examination By Mr. Price                160
       Cross-Examination By Ms. Koczan                171
23     Redirect Examination By Mr. Price              192
       Recross-Examination By Mr. Colville            195
24     Recross-Examination By Ms. Koczan              196

25

267

INDEX (Continued)

JAMES L. KENKEL, ph.D.,

    Direct Examination By Mr. Price                         200
    Cross-Examination En Voir Dire By Mr.                    206
Colville
    Direct Examination (Resumed.) By Mr. Price              207
    Cross-Examination By Mr. Colville                       224
    Redirect Examination By Mr. Price                       238

MATTHEW FRITZIUS

    Direct Examination By Mr. Price                         243