1

```
1                IN THE UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2

3      CARISSA PERONIS, et al.,
                     Plaintiffs
         vs.
4                                          Civil Action No.
       UNITED STATES OF AMERICA, et        16-1389
5      al.,
                     Defendants.
6
                               -  -  -
7

8         Transcript from proceedings on August 29, 2019, United
       States District Court, Pittsburgh, PA,
       before Judge Nora Barry Fischer.
9

10     APPEARANCES:

11       For the Plaintiffs:     Harry S. Cohen & Associates, P.C.
                                 Douglas L. Price, Esquire
12                               Two Chatham Center
                                 Suite 985
13                               Pittsburgh, Pennsylvania 15219

14

         For the Defendant       U.S. Attorney's Office
15       USA:                     Michael Colville, Esquire
                                  Philip P. O'Connor, Jr., Esquire
16                                U.S. Courthouse
                                  700 Grant Street
17                                Pittsburgh, Pennsylvania 15219

18       For the Hospital        Weber Gallagher Simpson Stapleton
         Defendants and          Fires & Newby
19       Dr. Jones               Paula A. Koczan, Esquire
                                  603 Stanwix Street
20                                Suite 1450
                                  Pittsburgh, Pennsylvania 15222
21

         Court Reporter:         Barbara Metz Leo, RMR, CRR
22                               700 Grant Street
                                 Suite 6260
23                               Pittsburgh, Pennsylvania 15219

24

25         Proceedings recorded by mechanical stenography;
       transcript produced by computer-aided transcription.
```

1          THE COURT:  Good morning, everyone.  Are we set to

2     proceed?  Is Dr. Karotkin here?

3          MR. PRICE:  Yes, Your Honor.

4          THE COURT:  Any issues vis-a-vis Dr. Karotkin?  No?

5     Good.  Mr. Colville, the jurors are complaining they can't

6     hear you.

7     (Jury present.)

8          THE COURT:  Good morning, ladies and gentlemen of the

9     jury.  I trust you had safe travels in.  It's a pretty morning

10    to be driving.  The court has asked Mr. Colville to speak up

11    and perhaps a little more clearly so everyone hears what he

12    has to say.  Mr. Price tells me he's ready to proceed with his

13    next witness.

14          As I told you yesterday, Dr. Karotkin is going to

15    testify at this time, so we'll hear more from Mr. Fritzius

16    later, but Dr. Karotkin is here and ready to go.  Mr. Price?

17          THE CLERK:  Sir, will you please step forward?

18    Please state and spell your name for the record.

19          THE WITNESS:  My name is Edward Karotkin,

20    K-A-R-O-T-K-I-N.

21    (Witness sworn.)

22          THE COURT:  Thank you, Mr. Galovich.  Dr. Karotkin,

23    watch your step getting up here.  It's a little uneven.  I see

24    you brought some papers with you.  You may be seated.

25          Ladies and gentlemen of the jury, you are about to

1    hear the testimony containing opinions from Dr. Edward

2    Karotkin.  Dr. Karotkin is another physician.  He'll be

3    offering opinions because of his knowledge, skill, experience,

4    training or education in the field of neonatology and the

5    reasons for his opinions.

6          In weighing this opinion testimony, you may consider

7    not only his qualifications, the reasons for his opinions, the

8    reliability of any information supporting those opinions as

9    well as the factors that I'll discuss with you in my final

10   instructions for weighing testimony of all witnesses.

11         The opinions of Dr. Karotkin should receive whatever

12   weight and credit, if any, you think appropriate given all the

13   other evidence you have heard or seen in this case.

14         You may disregard these opinions entirely if you

15   decide that they are not based on sufficient knowledge, skill,

16   experience, training or education.  You can also disregard his

17   opinions if you conclude that the reasons given in support of

18   these opinions are not sound, if you conclude that the

19   opinions are not supported by the facts shown by the evidence

20   or if you think that the opinions are outweighed by other

21   evidence in this case.

22         Once again, in deciding whether to accept or rely

23   upon these opinions, you can consider any bias that the doctor

24   may have, including any bias that may arise from evidence that

25   Dr. Karotkin has been or will be paid for reviewing this case

4

1    and/or testifying or from evidence that he testifies

2    regularly.  With that instruction, Mr. Price, you may proceed.

3              MR. PRICE:  Thank you, Your Honor.

4              EDWARD KAROTKIN, M.D., a witness herein, having been

5    first duly sworn, was examined and testified as follows:

6                        DIRECT EXAMINATION

7    BY MR. PRICE:

8    Q.  Dr. Karotkin, can you please tell us your business address

9    where you work?

10   A.  My business address is the Children's Hospital of the

11   King's Daughters, 601 Children's Lane, Norfolk, Virginia.

12   Q.  And you are a pediatrician?

13   A.  That is correct.  I'm a pediatrician and a neonatologist,

14   board certified in both specialties.

15   Q.  I think we all know what a pediatrician is, but can you

16   tell us what a neonatologist is?

17   A.  Sure.  A neonatologist is a board certified pediatrician

18   who goes on to obtain additional training in taking care of

19   sick and premature infants and also counseling mothers who may

20   be in the process of delivering a compromised infant.

21   Q.  Of course, I have to ask you about your educational

22   background, pursuant to court rules.  You graduated with your

23   college degree at Union College in 1965?

24   A.  That is correct.

25   Q.  And then you went on to a master's program in microbiology

1    at the University of Denver?

2    A.  I did.

3    Q.  You received your M.D. degree from the Bowman Gray School

4    of Medicine in Winston Salem, North Carolina in 1971?

5    A.  That is correct.

6    Q.  You did a pediatric internship and residency at

7    Mount Sinai Hospital in New York?

8    A.  Yes.

9    Q.  And then a neonatology clinic and research fellow at

10   Providence Lying-In Hospital Brown Medical School in

11   Providence, Rhode Island?

12   A.  That is correct.

13   Q.  I see then you went on to work -- yeah, you were in the

14   Army?

15   A.  That is correct.

16   Q.  What did you do in the Army?

17   A.  I was a pediatrician neonatologist in the Army.  I served

18   two years at Fort Jackson in Columbia, South Carolina as part

19   of a military obligation I had because of what was called back

20   then the Berry Plan, where doctors had an opportunity to sign

21   up to serve in one of the branches of the military during the

22   Vietnam War, which I elected to do.

23   Q.  Now, after that, you came out, and I notice you had some

24   faculty academic appointments that you were teaching?

25   A.  That is correct.

1    Q.  And I notice in 1978, you first started teaching as an

2    assistant professor of pediatrics at the Eastern Virginia

3    Medical School?

4    A.  That is correct.

5    Q.  Since 1991, you have been a professor of pediatrics there?

6    A.  Correct.

7    Q.  Can you tell us what does a professor of pediatrics do at

8    a medical school?

9    A.  Sure.  In my role as a professor of pediatrics, in

10   addition to teaching pediatric residents, OB residents,

11   medical students, nurse practitioners, nurses, I take care of

12   patients.  So in my role as a faculty member and as a

13   professor of pediatrics, in addition to seeing patients on a

14   regular basis, making rounds, and typically on those rounds,

15   there are medical students, residents, young physicians and

16   nurses in training, a lot of the teaching occurs at the

17   bedside.

18        And in addition to that, there are also lectures that I

19   participate in.  Currently, I'm teaching third year medical

20   students a course on physical diagnosis, management of the

21   newborn infant, recognizing abnormalities in the newborn

22   infant and how to resuscitate and things like that.

23   Q.  In this case, we've learned that Heritage Valley Beaver

24   had a resident doctor, Dr. Bradley Heiple, who was going

25   through his services and he was on a pediatric service on

1    October 13, 2014.  Dr. Jones was the pediatrician that day.

2        Would that be sort of your role as a Dr. Jones, teaching,

3    watching over the shoulder of the residents?

4    A.  To some degree, yes.  I think, unlike Dr. Jones, our

5    practice is really a hospital-based practice, so our office is

6    adjacent to the neonatal intensive care nursery and the

7    delivery room at Sentara Hospital.  Unlike Dr. Jones, I don't

8    see patients in an outpatient office.

9        All of our patients are in the nursery either at the --

10   the normal nursery or the high risk nursery at King's

11   Daughters which are right next to each other.

12   Q.  I know the jury has heard a little bit about it.  Can you

13   tell the difference between levels of nurseries?

14   A.  Sure.  There's some variation from state to state, but

15   roughly speaking, we think in terms of level three and level

16   four nurseries as the highest level of care provided to a

17   baby.  These are nurseries where the sickest of the sick

18   babies are taken care of.

19       In those facilities, there are, in addition to

20   neonatologists, there are pediatric cardiologists, pediatric

21   surgeons, pediatric radiologists, cardiac surgery, sometimes

22   even heart transplant surgery versus the lower level of care,

23   which would be regarded as a level one hospital where normal

24   newborn term babies are taken care of without any

25   complications, and then in between there are level two and two

1   plus or three minus where babies of varying degrees of

2   sickness can be taken care of.

3        So for example, a level two nursery might be one that's

4   defined as one that could take care of a child getting a

5   little bit of oxygen for a short period of time, and then if

6   it persists, then the child would be transferred to a higher

7   level of care.

8   Q.  What was your understanding with regard to Heritage Valley

9   Beaver's nursery?

10  A.  I would think it would probably be a level one or maybe

11  slightly a level two.

12  Q.  And the West Penn Hospital where the transport was going

13  to be made to, is that the NICU type level care?

14  A.  Yes.  I think that would be regarded as a level three or

15  four intensive care nursery.  I don't know how they do it in

16  Pennsylvania, because some states vary in those designations,

17  but I think it's fair to say Penn would be a level three or

18  four.

19  Q.  How big is the NICU you work at?

20  A.  Our neonatal intensive care nursery at Children's Hospital

21  of the King's Daughters has about 60 beds, and it's adjacent

22  to another nursery right down the corridor at the community

23  teaching hospital which has an additional 50 or 60 beds, what

24  we would call level two patients and normal newborn infants,

25  so although they are two different buildings, it's really, for

1    all intents and purposes, we cover both units and it's the

2    same for us.

3    Q.  You also carry on a private practice?

4    A.  I do not really have a private practice, no.  I work for

5    the medical school and for the department of pediatrics, which

6    is under the umbrella of the children's specialty group.

7    Q.  Okay.  I note on your resume that you are a member in

8    various societies and professional organizations, like the

9    fetus and newborn committee, the Virginia Perinatal

10   Association, the AMA, won honors and awards, a faculty award,

11   president of the student medical society, things of that

12   nature?

13   A.  That's correct.

14   Q.  And you also are on the hospital committees, patient care

15   committee, NICU committee, mortality review committee, things

16   like that, correct?

17   A.  I have been on those committees.  I don't currently serve

18   on those committees, but during the course of my career, I

19   have served on those committees.

20   Q.  And then I note, throughout the rest of the resume, you

21   published articles and abstracts and given lectures on a

22   variety of topics, some of them which are pertinent here.

23   Like you gave a lecture on surfactant, which is the drug that

24   was given to Kendall.

25   A.  That is correct.

1    Q.  And then also neonatal respiratory distress, things of

2    that nature, correct?

3    A.  That is correct.

4    Q.  You treat patients on a daily basis?

5    A.  I do.  Our schedule is a little bit different than perhaps

6    a regular pediatrician.  We have 12 or 14 neonatologists in my

7    department and we work typically a month at a time, being on

8    call, seeing patients.  And then the other time would be

9    involved in teaching or research, administrative duties, so I

10   can't say that every day of the year, 365 days a year I see

11   patients on a regular basis.

12   Q.  Do you treat patients such as Kendall Peronis?

13   A.  Very frequently we do, yes, because we are the referral

14   area for eastern Virginia and North Carolina, so we tend to

15   see mothers and patients with similar conditions very often.

16   Q.  You teach doctors about cases like Kendall?

17   A.  I do.

18   Q.  Of course, part of your -- you are here as a medical-legal

19   expert?

20   A.  That is correct.

21   Q.  How long have you been doing that?

22   A.  I think the first time I was asked by our hospital

23   attorney to review a case was probably in the early 1980s.

24   Q.  Has it been steady since or has it been increasing or

25   decreasing?  How much have you testified?

1    A.  I would say since that time, it's been increasing.  It's

2    probably leveled off in the last five or seven, eight years,

3    something like that.

4    Q.  How often do you review a case like this?

5    A.  Again, specifically a case with these characteristics?

6    Q.  Well, just with regard --

7    A.  In general cases?

8    Q.  Right.

9    A.  Again, it varies.  I think currently, there are probably

10   16 or 18 open cases that I have on my desk.

11   Q.  And one of the questions that's going to be asked is have

12   you ever practiced here in Beaver County?

13   A.  I have not.

14   Q.  Is the standard of care of medicine different in Beaver

15   County than it is in Norfolk, Virginia, or is it a national

16   standard?

17   A.  Well, I don't know if you could refer to it as a national

18   standard, per se.  My understanding of the standard of care is

19   what a reasonable physician would do in a similar circumstance

20   regardless of where you are.

21        MR. PRICE:  I would offer Dr. Karotkin as an expert

22   in pediatric and neonatology and offer for cross-examination.

23        THE COURT:  Cross-examination, Mr. Colville?

24        MR. COLVILLE:  No questions.

25        THE COURT:  Ms. Koczan, any questions?

1      MS. KOCZAN:  Your Honor, I will reserve until I do my

2  cross.

3      THE COURT:  All right.  So at this time, the court

4  accepts Dr. Karotkin in the fields of pediatrics and

5  neonatology.  You may proceed.

6  BY MR. PRICE:

7  Q.  Doctor, I'm going to show you a few -- these are the

8  safety rules we have been talking about.  I just want to see

9  if you agree with it.  If a baby is at risk, a pediatrician

10 must be present at delivery.

11      Do you agree with that?

12 A.  I would agree with that, yes.

13 Q.  A hospital must take all precautions to minimize risks to

14 its patients.

15      Do you agree with that?

16 A.  I would agree with that, yes.

17 Q.  And the earlier you treat something, the better the

18 outcome?

19 A.  I would say in general, that's true, yes.

20 Q.  Now, you are here to talk about the standard of care, so

21 you defined it.  Have you had a chance to review the records

22 and some of the depositions in this case?

23 A.  I have, yes.

24 Q.  Now, let's talk about the -- you are here as a

25 pediatrician and the scope of your expert testimony is limited

1    to what happened -- it's not with regard to what happened at

2    the delivery.  It's what happened once Kendall was delivered.

3    A.  That is correct.

4    Q.  So what should have been done to Kendall after she was

5    delivered?

6    A.  In my opinion, I think that this was a delivery that

7    should have had a pediatrician in attendance because of the

8    moderate to high risk nature of the mother's circumstances.

9       There was meconium described after the membranes were

10   ruptured.  There was an operative delivery using a vacuum

11   extractor.  There was some concern for shoulder dystocia and

12   there was also some delay in getting the baby delivered.

13   Q.  I put up here, you know, a few of those what you've talked

14   about.  So first, the fetal strips.  Now, from your -- you

15   didn't review the fetal strips, but you have an understanding

16   of what they showed?

17   A.  I do.

18   Q.  And from your understanding of the fetal strips and the

19   category, what did that tell you with regard to a baby that's

20   going to be delivered?

21   A.  Well, again, in my interpretation of the strips, I did not

22   feel that they were entirely reassuring.  Again, I'm not an

23   obstetrician.  I'm not an expert at reviewing strips.  I don't

24   think necessarily the strips indicated that the mother had to

25   be delivered emergently, but there was some concern based on

1    the two plus category of those strips and some of the variable

2    decelerations and abnormalities in the fetal heart rate

3    tracing.

4    Q.  Next is the arrest of descent.

5    A.  In my view, an arrest of descent means the baby is not

6    coming down the birth canal as quickly or expeditiously as you

7    might expect, so there's some delay in the first and second

8    stages of delivery.

9    Q.  What is the risk to a baby if there's an arrest of

10   descent?

11   A.  The babies can get hung up.  They can get asphyxiated in

12   utero.  A cord could drop between the baby's head and the

13   birth canal.

14   Q.  Why should a pediatrician be around in a case like that?

15   A.  Again, in those situations in particular because of the

16   description of meconium being present, a pediatrician eyes can

17   be in a very good position to assess the condition of the baby

18   after birth.

19   Q.  And then you mentioned an operative delivery.  What's an

20   operative delivery?

21   A.  Again, broadly speaking, an operative delivery would

22   include even a cesarean section.  I think in this context, it

23   is defined by the use of either forceps or, in this situation,

24   a vacuum extractor which imposes some degree of risk to the

25   baby.

1        I know in our institution, I think in many institutions,

2   if there is the potential or the expected use of either

3   forceps or vacuum, a pediatrician is called to attend those

4   deliveries routinely.

5   Q.  What's the purpose behind that?

6   A.  Again, because there's some potential for traumatic injury

7   to the baby with the use of forceps or a vacuum extractor.

8   There's potential for bruising and bleeding into the scalp of

9   the baby, and I think a pediatrician would be in a very good

10  position to make that assessment if needed.

11  Q.  And we talked a lot about meconium.  The testimony from

12  the doctors and nurses is that it was light and it turned into

13  moderate at the time of delivery.

14       Is that any requirement to have a pediatrician available

15  at delivery?

16  A.  Again, at our institution, I think at most institutions,

17  delivering patients around the country, the presence of

18  meconium in the amniotic fluid is an indication for having a

19  pediatrician in the delivery room to evaluate the baby, to

20  suction meconium, to continue to evaluate the baby over time

21  in the event that there's meconium aspiration.

22       It is also, in addition to the potential for getting

23  meconium into the airway, it's -- meconium in the amniotic

24  fluid can be a sign of fetal distress, so there may be other

25  circumstances that may be operative, not only the mechanical

1    presence of meconium in the airway, it may be a sign of

2    asphyxia, could be a sign of infection, could be a sign of

3    cord around the neck, so it's a red flag, so to speak.

4    Q.  Well, I know you haven't been here, but the testimony is,

5    and I know you've read the depositions, the nurse who

6    evaluated -- the nurses who evaluated Kendall were very

7    experienced.  They were certified in neonatal resuscitation.

8        Isn't that good enough?

9    A.  In my opinion, it's not.  I mean, I have a lot of respect

10   for the nurse who was in there, but I don't think there's

11   anything like the experience of a trained board certified

12   pediatrician to evaluate a baby.

13       One of the things that I have learned in my career is to

14   listen to the parents.  I never ignore the concerns of parents

15   when it comes to the condition of their baby, and it's my

16   understanding that this family was very concerned about the

17   condition of this baby for the first minutes and hours of

18   life, and I think had a pediatrician been there or had I been

19   there, I think I would have paid close attention to that and

20   would have evaluated this baby a lot more closely than had

21   been.

22   Q.  I put up this just to say pediatrician.  Of course you use

23   your stethoscope, examine the baby, but you also just

24   mentioned watch the baby.

25   A.  Yeah.  Again, I think in this circumstance, given the

1    circumstances of the prenatal course, the meconium-stained

2    fluid, the fetal monitor tracing, the Apgars were not

3    terrible, they weren't spectacular, but there was meconium

4    present, I think this is the kind of baby that either should

5    have been monitored much more closely in the mother's room

6    with evaluations by either a pediatrician or a nurse to listen

7    to the baby, to observe the baby, to do a pulse oximetry even,

8    or alternatively, to admit the baby directly to the nursery

9    for much closer observation and continuous pulse oximetry

10   monitoring and vital signs.

11   Q.  Dr. Dumpe mentioned, he said sometimes, just to make sure

12   you are all right, you give the baby to a nursery, have it

13   checked out and you might be overcautious, but at least you

14   are getting the baby checked out.

15       Is that what you are talking about?

16   A.  Yeah, I think that's certainly reasonable.

17   Q.  But that didn't happen in this case?

18   A.  Right.  Again, that's a procedure which is oftentimes

19   followed where babies are, from the delivery room even if

20   mothers are interested in bonding and skin to skin, we remove

21   the babies for a period of ten or 15 minutes, check vital

22   signs, listen, and then they can go back, assuming that all

23   the vital signs are normal and the saturations are normal.

24   Q.  You are not saying that a pediatrician should have hung

25   around the room for an hour and a half, are you?

1    A.  Not necessarily, no.

2    Q.  Does a pediatrician give instructions to nurses about what

3    to look for, things of that nature?

4    A.  Yes.

5    Q.  While these nurses are going to say they were in the room

6    and they saw the baby, is that enough?

7    A.  I don't think it's enough, and my reading of the record, I

8    did not see any documentation from the nursing staff.  I know

9    there was testimony in some of the depositions that the nurses

10    went in the room every 15 minutes to evaluate, but I got the

11    sense they were evaluating the mother more than the baby, and

12    I did not see any notes that specifically documented, for

13    example, saturations of the baby or the clinical condition of

14    the baby.

15    Q.  Typically, are there evaluations of babies after birth?

16    A.  There should be, particularly in a situation like this.  I

17    think this is the type of delivery that would have called for

18    frequent every 15 minutes or so evaluations by a nurse.

19    Q.  And then we know that the family has a disagreement about

20    what the baby was doing over that hour and a half crying, you

21    know, loud, vigorous, whatever we get to, but I want to

22    concentrate on the notes.  The next note where there's an

23    abnormality noted is at 7:25, the pulse ox is 81 percent.  I

24    know that's not normal.

25    A.  It is not normal.

1    Q.  And I know that there was an issue with regard to putting

2    an oxy hood on, things of that nature?

3    A.  Yeah.  I'm not sure it was an issue, but certainly I think

4    the nurse did the right thing by recognizing that a saturation

5    of 81 was not appropriate and I think she acted appropriately

6    by putting the baby in some oxygen.

7    Q.  Now, if you could put up tab 6 document 47.  I'm sorry.  I

8    have the wrong one.  It is page 30.  Okay.

9        The jury has seen this, and I know that you are here to

10   talk about this note, and this is the note where a nursing

11   supervisor stated that at 7:20, she notified Dr. Jones about

12   the delivery.  Did you see that?

13   A.  I had seen that in the records, yes.

14   Q.  Let me ask you about that.  I want you to assume that a

15   supervisor contacted Dr. Jones at 7:20 about this baby.  Did

16   you see any orders, any notes, anything in the record to show

17   that Dr. Jones did anything at 7:20?

18   A.  I did not.

19   Q.  Was the first time that you saw Dr. Jones have any notes

20   or record in this case around 8:20, an hour later?

21   A.  That is correct.

22   Q.  Let me ask you this:  If Dr. Jones was called at 7:20 and

23   just didn't respond or didn't call anybody, would you consider

24   that to be a breach in the standard of care?

25   A.  Again, it would, had she been called.  I think in most

1    institutions, there's the requirement that you should respond

2    or you must respond within 30 minutes of getting a call, so I

3    think had she been called at 7:20, she should have been in the

4    hospital by ten of 8:00 that morning to evaluate, if not

5    sooner if possible, but no later than ten of 8:00.

6    Q.  And the other issue would then be if she was called at

7    7:20 and didn't respond, since you consider that a breach in

8    the standard of care, was there any, you know, causal effect,

9    would there be any increased risk to the baby as a result of

10   Dr. Jones not coming if she was called at 7:20?

11   A.  You know, again, I think you mentioned earlier that the

12   earlier you can begin treatment, the better, so I think that

13   certainly the start of treatment at ten of 8:00 or 8:00 is

14   better than starting treatment or evaluating a baby at 8:30 or

15   9:00 or 9:40.

16   Q.  So let's switch gears back to 7:25.  You saw the nurse put

17   the oxy hood on and then a resident was called at some point.

18   A.  According to my reading of the record, Nurse McCrory

19   called the resident shortly after 7:25, and the resident came

20   up to the nursery around 7:35 or five or ten minutes later.

21   Q.  I'll represent to you that that's disputed because he

22   testified that he didn't get a call until 8:00, but

23   nevertheless, did you review his examination?

24   A.  I did.

25   Q.  And what did you find with regard to his examination?

21

1    A.  Well, I thought it was -- again, I'm not being so critical

2    of him.  I thought it was a cursory examination.  I think the

3    nurse expressed her concern to him and he decided -- he

4    thought that this baby probably needed a further workup but he

5    recognized that Dr. Jones was coming in and he thought it was

6    okay to wait a few minutes until Dr. Jones was expected at

7    8:00.

8    Q.  Was that acceptable simply just to wait in the case of

9    Kendall Peronis?

10   A.  Strictly speaking, no.  I think a resident who was

11   rotating through the nursery would have the prerogative and

12   would have the common sense to order a CBC, order a blood

13   culture, initiate antibiotics pending the arrival of the

14   attending pediatrician.

15   Q.  Now, Dr. Jones and testimony from some of the nurses and

16   the records show that her first orders were around 8:20, and I

17   want to ask you generally, I know you reviewed all the medical

18   records and I know the jury has heard all about this, so I

19   don't want to rehash and go over every record, but can you

20   summarize Kendall's care after Dr. Jones started charting it?

21   A.  I can briefly.  I think Dr. Jones evaluated the patient

22   shortly after she arrived at 8:00 in the morning.  I think,

23   quite appropriately, recognized that the baby was in distress

24   and made arrangements to have her transferred to Penn Hospital

25   emergently.

1    I think she recognized the need to get a blood culture,

2    CBC, order an x-ray, continue oxygen therapy at that time, and

3    then went out to talk to the parents I think probably 8:30,

4    quarter to 9:00, something like that.  When she came back in

5    the nursery, I think she recognized things were getting worse,

6    the baby was getting worse, and I think, quite appropriately,

7    decided to intubate the baby and provide mechanical

8    ventilation.  I have no criticism of Dr. Jones' handling the

9    patient once she arrived in the nursery.

10   Q.  And she ordered the ampicillin and gentamicin which are

11   the standard antibiotics?

12   A.  These are considered standard.  We refer to them as broad

13   spectrum antibiotics.  They are the antibiotics which are most

14   likely to treat the common germs that cause infections in

15   newborn infants, both gram positive and gram negative

16   organisms.

17   Q.  From your review of the records, when did Kendall get her

18   first dose of gentamicin?

19   A.  The first dose, according to my reading of the records,

20   was at 9:50 in the morning.  I think they were ordered

21   earlier, but they did not actually get started administered to

22   the IV until 9:50.

23   Q.  And then the transport team arrived, and the care was

24   shared or taken over by the transport team and you saw what

25   they did?

1    A.  I did.

2    Q.  And I guess, just to back up, with regard to your opinions

3    here, you don't have any criticism of Dr. Jones' care in this

4    case once she arrived at 8:20 and started issuing orders, do

5    you?

6    A.  I do not, no.  I think she did a great job.

7    Q.  The only issue for you is whether or not this 7:20 note

8    was -- she was actually called or not?

9    A.  That's correct.  I can't comment on that.  I don't know

10   what actually happened.

11   Q.  But if she was called and she didn't respond, that would

12   be a breach in the standard of care?

13   A.  If she didn't get the message, I suppose she could have

14   gotten called and the phone was broken or the pager was

15   broken, but had she been notified and had recognized that she

16   needed to be there, I think that would be the breach of the

17   standard of care.

18   Q.  Now, let me ask you this:  I'm going to go back to the

19   time of delivery.  Based upon the time of delivery and the

20   risk factors, do you have an opinion with a reasonable degree

21   of medical certainty as to whether Dr. Dumpe deviated from the

22   standard of care?

23   A.  I think --

24        MR. COLVILLE:  I object, Your Honor.  He's not here

25   to testify in the area of OB/GYN.

1          MR. PRICE:  This is about calling a pediatrician to

2    attend the deliver.

3          MR. COLVILLE:  It's the same objection, Your Honor.

4          THE COURT:  Sidebar.

5       (At sidebar.)

6          THE COURT:  Let's hear your objection.

7          MR. COLVILLE:  He's asking for an expert opinion from

8    a neonatologist as to whether or not --

9          THE COURT:  No.  A pediatrician and neonatologist,

10   correct?

11         MR. COLVILLE:  Correct.

12         THE COURT:  He's already made the statement on the

13   record his opinion is that, in deliveries that may be

14   problematic, there should be a pediatrician present, correct?

15         MR. COLVILLE:  He did.

16         THE COURT:  Okay.  Mr. Price?

17         MR. PRICE:  Yes.  Following up on that opinion, the

18   person who would be responsible, according to the hospital

19   policies and the nurses in this case, said that it's

20   Dr. Dumpe.  That's why the question is being asked, if

21   Dr. Dumpe would be the one responsible.  The same question

22   will be asked of the nurses.

23         THE COURT:  Responsible for what?

24         MR. PRICE:  Contacting a pediatrician.

25         THE COURT:  Well, yes.  Under their hospital policy,

1    he's given discretion.

2              MR. PRICE:  I don't think --

3              MR. COLVILLE:  And the doctor also acknowledged that

4    he has not read the entire medical record.  It's not clear

5    whether he read the policy at all.

6              THE COURT:  Maybe we need to get back up and maybe we

7    need a few more foundational questions.

8              MR. COLVILLE:  In particular, whether or not he's

9    read any of the labor medical records as well.

10             THE COURT:  Labor medical records, the policies,

11   whether he's familiar with the American Academy of Pediatric

12   standard, the ACOG standard, the team building standard that

13   both of these professions share.  Let's find out about that.

14        (In open court.)

15             THE COURT:  Ladies and gentlemen of the jury, that

16   question is being withdrawn.  Mr. Price is going to back up a

17   little bit and ask some additional questions of the witness.

18   BY MR. PRICE:

19   Q.  Sure.  Doctor, let me ask you a little bit about with

20   regard to your understanding about labor and delivery,

21   especially in this case.  Were you able to review the delivery

22   record?

23   A.  I was.

24   Q.  Did you review all of the -- you said you reviewed fetal

25   strips or not?

1    A.  I really just looked at them very quickly.  Again, I don't

2    hold myself out as an expert in reading strips, so I would

3    hate to render an opinion as to the type of strip.

4    Q.  Were you able to review the depositions of Dr. Dumpe and

5    of Nurse Hendershot?

6    A.  I did.

7    Q.  And from that, did you get an understanding with regard to

8    what happened during the delivery?

9    A.  I did.

10   Q.  Tell us a little bit about your experience with regard to

11   attending deliveries and taking care of newborns at delivery?

12   A.  Okay.  We have a policy in the hospitals where I practice

13   that if there is a high risk delivery, and those would be

14   defined as deliveries under 34 weeks gestation, if it's a term

15   delivery where there's meconium-stained fluid when the

16   membrane is ruptured or if there's an anticipated delivery of

17   a depressed baby, a pediatrician is called to attend that

18   delivery primarily to assess the baby and to institute any

19   kind of emergency measures that might be required, such as

20   intubation, suctioning the airway for meconium, chest

21   compressions, whatever else that might be needed immediately

22   in the delivery room.

23   Q.  As part of your education and training, are you also

24   familiar with the American Academy of Pediatrics and their

25   guidelines with regard to pediatricians attending deliveries?

1    A.   I am.

2    Q.   Do they have certain guidelines with regard to certain

3    risk factors and when pediatricians should attend?

4    A.   I believe they do, yes.

5    Q.   From your knowledge of that, do any of those guidelines

6    and what the risk factors for a baby and having a pediatrician

7    attend a delivery, do any of them apply here?

8    A.   I believe they do, yes.

9    Q.   Can you tell us which ones?

10   A.   I think the ones that would apply here would be a baby

11   that has evidence of meconium-stained amniotic fluid, in

12   particular, certainly if there's the anticipation of a

13   delivery by forceps and/or vacuum extractor, and my

14   recollection in reading the American Academy and the American

15   College of Obstetrics and Gynecology recommendations, and the

16   guidelines for perinatal care, I think those would be

17   indications for having a pediatrician in the delivery room.

18   Q.   In this case, I know we've all seen some policies.  Did

19   you have a chance to review the policies with regard to

20   notification of a pediatrician and delivery of a nonreassuring

21   fetus?

22   A.   I did.

23   Q.   And from your review of those policies, were you able to

24   glean what the hospital policies would be with regard to

25   notifying a pediatrician to attend the delivery?

1    A.   According to my reading of the policies, meconium-stained

2    amniotic fluid was an indication for notifying a pediatrician.

3    Q.   And do you remember there's another policy where it talks

4    about meconium with particulate matter?

5    A.   I saw that, yes.

6    Q.   Do you, from your review of the policies, do you agree

7    that the only time that a pediatrician should be called to a

8    delivery is if the amniotic fluid -- I'm sorry, the meconium

9    fluid has particulate matter in it?

10   A.   That's what the policy says.  I'm not so sure I would

11   agree with it.  In fact, I don't agree with it.  I think any

12   time there's meconium in the amniotic fluid, whether it's

13   particulate or not, I think a pediatrician should be there.

14        Our institution does not distinguish between particulate

15   meconium, thick meconium, but if it's there, that would be the

16   indication for having a pediatrician there.

17             MR. PRICE:  Your Honor, based upon that -- well, the

18   next question is.

19   Q.   Based upon your education, training and understanding of

20   the policies and procedures, do you have an opinion with a

21   reasonable degree of medical certainty as to whether or not

22   Dr. Dumpe deviated from the standard of care?

23   A.   Well, again, I think he did in the sense that either he or

24   the nurses had an obligation to call a pediatrician to be in

25   attendance at that delivery to evaluate the baby.

1    Q.  And that's what -- so you also agree that the nurses too

2    breached -- deviated from the standard of care?

3    A.  Well, again, I think in many institutions, that call to

4    the pediatrician is made either by the obstetrician or by the

5    nurses involved in the delivery, so I would think it's

6    probably a shared responsibility.

7    Q.  Do you have an opinion as to whether or not the deviations

8    of Dr. Dumpe and the nurses increased the risk of harm to

9    Kendall?

10   A.  I don't think there's any question that it did increase

11   the risk to Kendall, because nobody was there qualified to

12   evaluate Kendall in the minutes and hours after her birth.

13   Q.  Do you have an opinion as to whether or not, if Kendall

14   were evaluated earlier, there would have been any

15   interventions for her?

16   A.  Based on my understanding of the concern the family

17   exhibited for her distress and her discomfort and her

18   respiratory status, I think in all likelihood, had a

19   pediatrician been in the delivery room and evaluated Kendall

20   in the minutes after birth, I think, more likely than not, the

21   workup that was done that was initiated at 8:30 would more

22   likely have been done after delivery probably closer to 5:30

23   or quarter to 6:00 in the morning.

24   Q.  Do you have an opinion as to whether those deviations

25   increased the risk of harm to Kendall?

1   A.  I think they did increase the risk of harm.

2   Q.  Did she lose a chance of survival?

3   A.  She did, because it really delayed the onset of initiating

4   antibiotics and transferring her to a higher level of care.

5   Q.  Now, we talked about the nurses after delivery.  I want to

6   continue on with regard to the nursing from 5:30 to 7:00 that

7   morning.  Do you have an opinion as to whether or not those

8   nurses deviated from the standard of care?

9   A.  Well, again, as I read the records, I did not see any

10  evidence that a nurse was documenting the condition of the

11  baby from 5:20 in the morning until really 7:25 once the baby

12  was admitted to the nursery.

13  Q.  So did the fact that there are no records and nothing for

14  you to see the condition of Kendall, do you believe that was a

15  breach in the standard of care?

16  A.  I do believe it was.  I think in this circumstance, the

17  standard of care required a nurse or a physician to be

18  evaluating a baby like Kendall periodically, every 15 or 20

19  minutes.

20  Q.  And again, did the delay in treating Kendall increase the

21  risk of harm to her?

22  A.  I believe it did, yes.

23  Q.  And finally, with regard to when Kendall was in the

24  nursery at 7:25 and then Dr. Jones, according to her

25  testimony, the order, she came at 8:20, do you believe there

31

1     was a delay in care for Kendall at that point?

2     A.  Well, again --

3                MS. KOCZAN:  Objection, this is beyond the scope of

4     the report.  It doesn't --

5                THE COURT:  Sidebar.

6          (At sidebar.)

7                THE COURT:  Ms. Koczan?  We shouldn't get into big

8     details about your objections in front of this jury.  As you

9     know, the report itself is not going to go to the jury, so

10    it's inappropriate in federal court to make these types of

11    speaking objections.  I've given you all a little bit of

12    latitude, but from here on in, I'm going to watch it.  What's

13    your objection?

14               MS. KOCZAN:  That it's beyond the scope of the

15    report.

16               THE COURT:  Specifically?

17               MS. KOCZAN:  Specifically --

18               THE COURT:  Let's look at the report document 77-1.

19    Good thing it's filed of record.  Go ahead.

20               MS. KOCZAN:  I'm looking at the paragraph at the end

21    of page 2.  As I understand the criticisms based upon the

22    report is the delay was getting the pediatrician there, not

23    that Dr. Jones somehow delayed in ordering antibiotics or

24    administering antibiotics.

25               THE COURT:  It sounded like the pharmacy delayed.  Go

1    ahead.

2          MS. KOCZAN:  That is the basis of my objection, and

3    it sounds like he's attempting to criticize her for that, and

4    it doesn't say anything in here about the pharmacy delaying or

5    anything of the sort, and that's the basis of my objection.

6    That's not contained within this report.

7          THE COURT:  Let's go back and read the question.

8      (Record read.)

9          THE COURT:  What's your argument?

10          MR. PRICE:  My argument is this is not speaking as to

11    Dr. Jones or the pharmacy.  We are speaking about the nurses

12    from 7:25, the communication issue with Dr. Heiple and then

13    Dr. Jones getting there at 8:20.  Did that communication

14    breakdown increase the risk of harm to Kendall, and I think

15    that's the whole issue that Dr. Karotkin talked about with

16    regard to earlier assessment, and he notes in the second page

17    all of the times of when events happened, so he's commenting

18    upon the times and when events happened.

19          THE COURT:  So perhaps you need to rephrase your

20    question.

21          MR. PRICE:  I mean, the only thing I could see wrong

22    with my question was maybe at the end I mentioned Dr. Jones at

23    8:20, but I can rephrase it.

24          THE COURT:  Well, I think that's why Ms. Koczan is

25    here.  She is concerned about any kind of criticism of

1    Dr. Jones, but the witness has opined, in my opinion, if this

2    child had been delivered earlier, she would have had an

3    opportunity to avoid the massive inhalation of infected

4    amniotic fluid and meconium.  Even without an earlier

5    delivery, a pediatrician should have been called if the

6    child's respiratory difficulties had been assessed at or

7    shortly after delivery.  An earlier assessment by a

8    pediatrician would have prompted earlier antibiotic treatment

9    and quicker transfer.  Earlier treatment and transfer would

10   have provided this infant with a chance of survival.  The

11   delay in delivery and in assessing this child after delivery

12   increased the likelihood of her death.

13          Then he goes on in his report of September 14, 2018

14   document 120-1, if in the alternative, Dr. Jones was called

15   and notified of the infant's respiratory distress at 7:20 a.m.

16   but did not take action or arrive at the nursery until about

17   an hour later, this was a breach of the accepted standard of

18   care.

19          Now, he's already talked to some degree about this.

20   He's already also talked about the fact that in his

21   estimation, once she got involved, what she did was

22   appropriate.

23          You are trying to talk about the fact that there was

24   a lack of communication, that Dr. Heiple didn't recognize the

25   risk and/or the nurses didn't recognize the risk and that they

1    didn't move fast enough, right?

2          MR. PRICE:  That's what he's already testified about,

3    the cursory examination of Dr. Heiple.

4          THE COURT:  Right.  He has talked about that, yes.

5    Dr. Heiple referred to it as the case.  I recall that

6    specifically, so to that end, I don't believe that this line

7    of questioning is beyond what this man has already said, one,

8    and two, this report.

9          Secondly, here in federal district court, as I've

10   already written in this case and in other cases, the purpose

11   of a report under Rule 26 is to put counsel on notice.

12   Counsel here all chose not to depose these experts prior to

13   trial, so you can rephrase your question.

14      (In open court.)

15          THE COURT:  Ladies and gentlemen of the jury,

16   Mr. Price is going to rephrase his question.  That last

17   question is withdrawn.

18   BY MR. PRICE:

19   Q.  Doctor, I just want to clarify the timing from 7:25 until

20   8:20 when Dr. Jones arrived.  Okay?

21   A.  Okay.

22   Q.  So in that time period before Dr. Jones arrived, do you

23   believe that there was a delay in caring for Kendall?

24   A.  I do believe there was a delay, yes.

25   Q.  And do you believe there was any issues with regard to the

1  communication amongst the nurses and residents and doctors?

2  A.  I believe there was, yes.

3  Q.  Now, do you believe that that -- those issues rise to the

4  level of a deviation in the standard of care?

5  A.  I do.

6  Q.  And why?

7  A.  Well, in my experience, babies like Kendall don't just

8  suddenly appear well for several hours and all of a sudden, at

9  7:25, have a spell where they crash and, within a matter of an

10  hour or two, die.

11       I think, to my understanding, this baby was in trouble

12  shortly after birth.  I don't think it was recognized, and I

13  think finally, once the baby got into the nursery admitted

14  shortly after 7:00 or around 7:00 in the morning and then at

15  7:25, a Nurse McCrory evaluated the baby, I think it was

16  recognized that the saturations are were low, she had grunting

17  respirations, but as I piece the story together in listening

18  to the report of the family, it sounds to me like this baby

19  was in distress hours before the baby eventually got into the

20  nursery.

21  Q.  And then to follow up on the 7:25 to 8:20 time frame, do

22  you believe that the deviation in the standard of care of

23  addressing Kendall's issues medical care increase the risk of

24  harm to her?

25  A.  Again, I do, because I feel that had there been a

1    pediatrician in the delivery room or seeing Kendall shortly

2    after delivery, the whole process of the septic workup and

3    transfer would have happened much quicker, antibiotics would

4    have been given earlier and it would have increased her chance

5    for survival.

6    Q.  And one of those antibiotics that was given, gentamicin,

7    would have been sensitive to E. coli?

8    A.  Gentamicin is typically a drug which is used to treat gram

9    negative organisms which E. coli is, and according to the

10   sensitivities that were reported at the hospital, the E. coli

11   that grew out of Kendall was sensitive to the gentamicin.

12   Q.  And finally, have the opinions you expressed today been to

13   a reasonable degree of medical certain?

14   A.  They have.

15          MR. PRICE:  That's all I have.

16          THE COURT:  Cross-examination, Mr. Colville.

17                    CROSS-EXAMINATION

18   BY MR. COLVILLE:

19   Q.  Morning, Doctor.

20   A.  Morning.

21   Q.  My name is Michael Colville, and I represent the

22   United States in this case.  You testified today just moments

23   ago about a lot of OB procedures that were accomplished in

24   this case.  Do you agree with that?

25   A.  I did.

1  Q.  You began or at least the court instructed the jury and I

2  think you agreed that you are not an expert in OB/GYN issues?

3  A.  That's correct.  I have a lot of familiarity, but I'm

4  certainly not trained as an obstetrician or board certified as

5  an obstetrician.

6  Q.  You do not manage labor and delivery of newborns?

7  A.  I do not.

8  Q.  You do not manage the labor and delivery of newborns when

9  meconium is present?

10  A.  I do not.

11  Q.  You do not manage the labor and delivery where suctioning

12  is used to delivery the baby?

13  A.  I do not manage the delivery, no.

14  Q.  You do not manage the labor and delivery in the reading of

15  the fetal monitor strips?

16  A.  That is correct.

17  Q.  You have testified you are not an expert in any of these

18  issues?

19  A.  That is correct.

20  Q.  Yet you did provide opinions on all those issues in the

21  past half hour?

22  A.  I did.

23  Q.  But admittedly, you are not an expert in that area?

24  A.  Well, again, I have a lot of familiarity, but strictly

25  speaking, I'm not board certified as an obstetrician, nor am I

1    qualified to interpret fetal monitor tracing.  I do have some

2    familiarity and that's all I was testifying to.

3    Q.  Would you agree that Dr. Dumpe, the OB-GYN who did deliver

4    Kendall in this case, has 30 more years of experience than you

5    do in the management and delivery of newborns?

6    A.  No question about that.

7    Q.  He is the expert in that regard in this case, correct?

8    A.  I would think so.

9    Q.  A number of the risks that you identified, fetal heart

10   rate monitors, the suctioning, the meconium, did any of the

11   risk associated with those issues arise at the delivery?

12   A.  Well, the baby did need suctioning and did require some

13   oxygen, but again, they were relatively minimal as far as the

14   risk.

15   Q.  But the risk that you feared or why you say a pediatrician

16   should have been called to be present to attend to should they

17   be there didn't manifest themselves, did they?

18   A.  Again, I don't think the pediatrician would have needed to

19   do anything in the immediate period after delivery.  I do

20   think that, in the minutes after delivery, that's when a

21   pediatrician would have been most helpful to assess the baby's

22   clinical condition, and again, from the reports of the family,

23   the baby's grunting and irritability and excessive crying, I

24   think that's where the pediatrician's role would have been

25   most important.

1    Q.   You believe a pediatrician should have been there because

2    the family indicated that the baby was grunting?

3    A.   Well, no question about that, but again, all I'm saying is

4    that the indications for the delivery -- I mean, the risk

5    factors for the delivery would typically indicate that a

6    pediatrician be called to attend that delivery.  Oftentimes

7    we're not needed, but we're still called to attend the

8    delivery based on the risk factors.  It's great if we don't

9    have to do anything.

10   Q.   In this case, the delivery assessment indicated nothing

11   needed to be done at that time?

12   A.   That's very minimal kinds of interventions with oxygen and

13   suctioning, yes.

14   Q.   The delivery assessment indicated the baby was evaluated

15   as being a healthy baby?

16   A.   Initially it was, yes, in the first few minutes of life,

17   yes.

18   Q.   There's no indications of that change between 5:20 and

19   7:25 except for complaints by the family saying that there was

20   grunting?

21   A.   And there was no documentation that I could find from the

22   nurses that stated that the baby was in good condition.

23   Q.   I just want to make sure we are clear on something.  The

24   delivery assessment -- let's pull up Exhibit 6, page 10.  This

25   is the delivery assessment in front of you.

40

1       Do you see it, Doctor?

2    A.  I do.

3    Q.  This was the assessment that was done at 5:20 by

4    Nurse Hendershot.

5    A.  I understand that.

6    Q.  And do you recall in her deposition, Nurse Hendershot

7    indicated she was an experienced nurse of 30 years in labor

8    and delivery?

9    A.  I remember that very well, yes.

10   Q.  Do you also recall Dr. Dumpe having the same or similar

11   experience in delivering babies?

12   A.  I do.

13   Q.  The assessment that was done by Nurse Hendershot following

14   the delivery indicated Apgars of six and eight, correct?

15   A.  They did.

16   Q.  And eight is a normal finding?

17   A.  It's a great finding.

18   Q.  It's so great that hospital policy allows for a baby

19   that's delivered with Apgars of eight to remain in the

20   delivery room with the family to bond with mom and dad,

21   correct?

22   A.  I understand that.

23   Q.  And that's how this baby was assessed.  That's how that

24   baby appeared, correct?

25   A.  At that particular point in time, yes.

1    Q.  And in the same report, there is mention of thin green

2    meconium.

3        Do you see that?

4    A.  I do.

5    Q.  And you indicated that you have reviewed the medical

6    record in this case?

7    A.  I have.

8    Q.  What parts?  Did you review the entire medical record?

9    A.  I think I reviewed pretty much every part of the medical

10   record that I was provided, yes.

11   Q.  Well, I'm not sure that answers my question exactly.  Are

12   there any parts you think were missing?

13   A.  Not that I know of.

14   Q.  So you would have had all of the labor and for the baby

15   and the mother?

16   A.  As far as I know, I have it all, yes.

17   Q.  Was there any part of the medical record that you saw that

18   indicated there was meconium that was particulate?

19   A.  I did not see any mention that it was particulate.  There

20   was a note in the chart that said that there was a moderate

21   amount of meconium, and I couldn't see who wrote that.

22   Q.  I will tell you that that notation was in Dr. Dumpe's

23   operative report, and he indicated it was moderate green

24   meconium nonparticulate.

25   A.  Okay.

1   Q.  But again, it was nonparticulate?

2   A.  It was not particulate.

3   Q.  And the remainder of the medical record is consistent in

4   that it indicates the meconium was thin, lime green for the

5   most part.  Do you agree with that?

6   A.  My understanding of that is true, yes.

7   Q.  And you did review the policies here in this case?

8   A.  I did.

9   Q.  And you did acknowledge that the policy indicated that --

10  let's pull that policy up.  14, please.  This is the hospital

11  policy which dictates when an OB/GYN is to call a pediatrician

12  to the delivery for expected delivery of potentially high risk

13  infants.

14  A.  Correct.

15  Q.  In this, it indicates the pediatrician will be notified

16  when the -- it's to be determined by the attending obstetrical

17  physician?

18  A.  That's correct.  That's what it says in the policy.

19  Q.  The policy says the OB delivering the baby has the

20  discretion, the responsibility but the discretion to determine

21  when there is a high risk potential presented at the delivery?

22  A.  That's what the policy says, yes.  I'm not sure I agree

23  with the policy, but that's what the policy says.

24  Q.  That's the policy of this hospital?

25  A.  Correct.

1    Q.  And you disagree with it because the hospital you work at

2    has a different policy?

3    A.  And I think most hospitals have a different policy, yes.

4    Q.  Just because there are different policies doesn't mean the

5    policy is wrong.  You may just disagree with it and think it

6    should be a different policy.

7    A.  Correct.

8    Q.  He could still meet the standard of care and be different

9    from the policy you practice at your hospital, correct?

10   A.  I guess that's possible.

11   Q.  In this case, this policy meets the standard of care.  You

12   just happen to disagree with it?

13   A.  Again, if you look down farther, it does say

14   meconium-stained amniotic fluid.

15   Q.  We'll get there.  You would agree you can have a standard

16   that differs from yours but still meet the standard of care?

17   A.  I don't know if that's true.  I guess -- I always thought

18   the standard of care would be what a reasonable person would

19   do in a similar circumstance in a similar hospital.

20   Q.  In this hospital, the doctors have formulated this, have

21   agreed this is what the reasonable OB would do in deciding

22   when to call a pediatrician when presented with risk in a

23   delivery, correct?

24   A.  That's what they decided in this hospital, yes.

25   Q.  Now, let's go back to the -- the suspected fetal

1    compromise or the risk.  The one that is involved here is B,
2    amniotic fluid containing particulate meconium, correct?
3    A.  I see that, yes.
4    Q.  This hospital has decided that the reasonable OB, when
5    confronted with amniotic fluid with particulate meconium,
6    should call a pediatrician, correct?
7    A.  Correct.
8    Q.  And particulate meconium is quite different than
9    nonparticulate meconium, is it not?
10    A.  Well, in its description, it is.  I'm not so sure it makes
11    a difference clinically, but if you look at it, it looks
12    different than nonparticulate.
13    Q.  In this hospital, which is a different hospital than
14    yours, you indicated yours is a level three or four; is that
15    correct?
16    A.  I practice at levels ones and twos as well.
17    Q.  In this level one, they've identified that the reasonable
18    OB servicing a labor and delivery is required to call a
19    pediatrician only where particulate meconium is --
20    A.  I understand that.
21    Q.  You would agree with that?
22    A.  I don't agree with it, but I understand it's their policy,
23    yes.
24    Q.  And in this case, there was no particulate meconium noted
25    in the medical records being present?

1    A.   That is correct.  Now, you didn't show me the other policy

2    about calling a pediatrician.

3    Q.   Which one?

4    A.   Well, there's a policy here called maternal distress and

5    nonreassuring fetal status in labor and delivery.

6    Q.   That's 2.4?

7    A.   Yes.

8    Q.   Let's go to that.  That's 13.  Scroll down.  It's on page

9    3.  So you are right.  This is the policy that says here's

10   when you need to call a pediatrician, and it identifies -- I'm

11   sorry.  6 right up above.

12   A.   Also on the first page it does say nonreassuring fetal

13   status may include but not limited to meconium-stained

14   amniotic fluid.

15   Q.   Right.  Go to paragraph 6 here.  It tells you what to do.

16   It's basically saying when you have meconium that you fear is

17   going to be a risk, and the risk with meconium is that the

18   baby might need to be resuscitated or perhaps have respiratory

19   distress?

20   A.   There are multiple risks, but that's certainly an

21   important one is that the meconium can get down into the

22   airway and block the airway, but it's also, as I indicated

23   before, a red flag of other risk factors such as infection or

24   fetal distress in utero.

25   Q.   In this case, the delivery assessment identified none of

46

1    those symptoms as being present?

2    A.   That is correct.

3    Q.   So all of the concerns we are worried about, the factors

4    for -- the reason for preparing for this ended up not being

5    evident at the delivery?

6    A.   At delivery, but certainly in the hours after delivery,

7    they were there.

8    Q.   But as to when meconium-stained amniotic fluid, just that

9    generic description of it, is present, you wanted to point to

10   this policy and this policy under paragraph A says how to

11   prepare.  You get the ET tube and meconium aspirator which, in

12   this case, wasn't used and wasn't necessary, right?

13   A.   That's correct.

14   Q.   And then you get emergency equipment, right?  And in this

15   case, it wasn't needed nor used because it was not an

16   emergency at the delivery, right?

17   A.   That's correct.

18   Q.   At least concerning meconium as it related to respiratory

19   distress, and for that matter, symptoms of an infection,

20   right?

21   A.   Correct.

22   Q.   And then the third one is pediatrician notified per

23   policy.  Well, all that tells us is to go back to the first

24   policy we just spoke about, right?

25   A.   Yes.

1    Q.  And that policy only requires a pediatrician to be present

2    when there's particulate meconium?

3    A.  And again --

4    Q.  Is that correct?

5    A.  That's correct, but again, I don't agree with that policy,

6    and you are asking me for a standard of care.

7    Q.  That's fine.

8    A.  I'm not trying to be argumentative.  I'm trying to clarify.

9              THE COURT:  Once again, you get to the question mark.

10   Let the witness get to the period.  Let the witness explain.

11   Q.  You've indicated hospital policies can differ and still be

12   within the standard of care; is that correct?

13   A.  They could.

14   Q.  Would you agree that this hospital provides the minimal

15   standard of care?

16   A.  Well, again, I would disagree, in the sense that they

17   don't advocate for having a pediatrician in attendance at a

18   delivery where there are at least four or five risk factors.

19   Q.  That doesn't mean it doesn't meet the standard of care.

20   You just disagree and you think a pediatrician should be

21   present?

22   A.  Well, it doesn't meet the standard of care that I think I

23   would impose on a hospital delivering patients.

24   Q.  But it's what the reasonable doctor would, not just one

25   doctor.  It's across the board what is agreed to as reasonable

48

1    care.

2    A.  Well, again, I think -- again, I'm not trying to be

3    argumentive.  I'm trying to explain my position.  I think if

4    you ask the vast majority of the pediatricians or

5    neonatologists if a pediatrician should be in attendance where

6    there is a delivery anticipated with meconium-stained fluid,

7    vacuum extraction, delayed descent, some question of

8    abnormalities of the fetal heart rate, I think most of them

9    would agree that a pediatrician should be present at that

10   delivery to evaluate the patient, whether they need to or not.

11   Q.  All those risks that you have identified as why you think

12   a pediatrician should have been there, none of them manifested

13   themselves in this case?

14   A.  No.  I understand that, but all I'm trying to make the

15   point is that had a pediatrician been there, then that

16   pediatrician would have been in a position to evaluate Kendall

17   in the hours after delivery.

18       I agree.  Probably the pediatrician would not have had to

19   do anything in the delivery room, but she would have been

20   there to assess the risk factors and to monitor her in the

21   minutes and hours after her birth and give some orders to the

22   nurses as far as observation, pulse oximetry, things of that

23   nature.

24   Q.  So once the baby was delivered -- once the baby was

25   delivered by Dr. Dumpe, you would agree the baby was healthy

1    at that point and did not need a pediatrician, any

2    intervention by a pediatrician?

3    A.  I think, yes, you are right.

4    Q.  Nor by any hospital staff?

5    A.  Correct.

6    Q.  When that baby was handed off, Dr. Dumpe had finished his

7    job there and now was returning to take care of Carissa.  Do

8    you agree with that?

9    A.  I agree with that.

10   Q.  It's clear from the records that the hospital staff, from

11   the moment they received the baby, continued to monitor that

12   baby's progress for the time that she was in the delivery

13   room; is that not right?

14   A.  I did not see very adequate documentation that they

15   monitored the baby very well during that period from 5:20

16   until 7:00 when she was moved to the nursery.

17   Q.  You would agree there are records that document

18   Nurse Hendershot going into the delivery room every 15

19   minutes?

20   A.  There were those records, but I was under the impression

21   she was looking more at the mother than actually assessing the

22   baby, and as far as I know, she did not document in the

23   medical record that she assessed the baby either by pulse

24   oximetry or vital signs during that period of time.

25   Q.  She would have heard the baby; is that correct?

1    A.  I assume she would have.  I don't know.

2    Q.  The statements by the family are that the baby was crying?

3    A.  I think there are more than the baby was crying.  The baby

4    was grunting and having some other signs of respiratory

5    distress.

6    Q.  And something that somebody in the room could have heard,

7    correct?

8    A.  Correct.

9    Q.  And you have a nurse going in there every 15 minutes who,

10   in her deposition and her testimony before yours, testified

11   that she did not hear any grunting.

12           MR. PRICE:  Objection, assuming facts.

13           THE COURT:  Sustained.

14   Q.  In the deposition -- did you read the deposition?

15   A.  I did.

16   Q.  Did she indicate in her deposition that she did not hear

17   grunting?

18   A.  She did not say she heard it.

19   Q.  And in the delivery assessment, there were no symptoms of

20   grunting, flaring and retracting either?

21   A.  They were not documented in the medical record, no.

22   Q.  And when it was documented, it wasn't documented until

23   7:25; is that right?

24   A.  That's correct.

25   Q.  Now, there was an entry before 7:25.  Do you agree with

1    that?

2    A.  Which one are you referring to?

3    Q.  The one at 7:00.

4    A.  Yes.

5    Q.  On that entry, there's no indication of grunting or any

6    symptom that would signify respiratory distress or any problem

7    associated with E. coli; is that correct?

8    A.  That's correct.

9    Q.  In fact, the nurse who wrote that entry, Nurse Hackney,

10   did you read her deposition?

11   A.  I did.

12   Q.  She testified there was no problem with the baby at that

13   point; is that right?

14   A.  She did.

15   Q.  And do you consider that in your opinion here today?

16   A.  I do consider it, and I also consider the observations of

17   the family members who, according to my understanding, felt

18   that the baby was not right for that period of time after

19   delivery until 7:00, that in addition to being described as

20   crying, they said she was irritable and that she had grunting

21   and retractions.  To me, that's very important.

22   Q.  But that conflicts with the trained medical staff's

23   opinion and observations and notations; do you agree?

24   A.  It does conflict, but again, I tend to believe and to

25   evaluate a parent's concern.

1    Q.  But you have discounted the trained professionals in this

2    case, their observations and what they heard and saw?

3    A.  Well, again, I didn't see much in the way of documentation

4    every 15 minutes in the medical record from Nurse Hendershot

5    where there was a recording of vital signs, that there was any

6    pulse oximetry readings, any blood pressure readings.  I think

7    it was all verbal that everything was okay.

8    Q.  The time that you are referring to, the time between 5:20

9    and around 7:00 when the baby was taken to the nursery, that's

10   where the baby is bonding with the parents, right?

11   A.  Correct.

12   Q.  I mean, the idea is to let the baby bond, not to be

13   monitoring every 15 minutes, particularly in light of the

14   delivery assessment which you've described as demonstrating a

15   healthy baby at 5:20 or thereabouts?

16   A.  Again, I would disagree with that.  I think certainly it's

17   important to bond.  There's no reason why you can't listen and

18   look while a baby is bonding, particularly given some of the

19   risk factors in that pregnancy.  That's just my opinion.

20       I think that this baby deserved much closer observation

21   and assessment, particularly based on the parents' concern.  I

22   think eventually one of the family members had to go out of

23   the room and call for some help.

24   Q.  Well, again, back to that delivery assessment.

25   Plaintiffs' experts have testified before you, Dr. Zamore and

53

1    Dr. Shore, both testified that there were no symptoms or signs

2    of any infection during the prenatal course of Carissa's or

3    the labor and delivery through the delivery.  Would you agree

4    with that?

5    A.  I understand that, yes.

6    Q.  And they, like you, indicated there would have been no

7    reason to prescribe antibiotics after the delivery because

8    there were no signs or symptoms.

9    A.  Now, again, there may have been an indication for starting

10   antibiotics at 6:00 or 6:30, had the baby been evaluated by a

11   qualified pediatrician.

12   Q.  But that's nearly an hour after Dr. Dumpe had delivered a

13   healthy baby; is that right?

14   A.  That's correct.

15            MR. COLVILLE:  That's all I have.  Thank you.

16            THE COURT:  Ms. Koczan?

17                          CROSS-EXAMINATION

18   BY MS. KOCZAN:

19   Q.  Good morning, Doctor.

20   A.  Good morning.

21   Q.  I want to backtrack just for a few moments and talk with

22   you about some of your testifying activities.  You have been

23   doing this, I think you told us when Mr. Price was questioning

24   you, since 1980; is that correct?

25   A.  I think that's probably the first time I was asked by an

1    attorney to look at a case, yes.

2    Q.   And in a typical year -- let's talk about the past five

3    years.  How many cases do you review or have ongoing in a

4    typical year?

5    A.   Again, it's hard to give you an exact number.  I think

6    maybe the best way of answering that is when I was asked that

7    question a few years ago, I went back to my records to see how

8    many cases I had reviewed in 35 years or 38 years, and it was

9    about a little over 250.

10   Q.   250 cases over this time?

11   A.   Over 40 years, yeah.

12   Q.   Doctor, you currently have, you said 16 to 18 open cases

13   sitting on your desk?

14   A.   Something like that, yes.

15   Q.   And this isn't the first case that you've reviewed for

16   Mr. Price's law firm, is it?

17   A.   I don't believe it is.  I think I have reviewed another

18   case or two.

19   Q.   And I did some research on your testifying, and the

20   information that I have indicates that you've testified in

21   about 29 of the 50 states.  Does that sound accurate?

22   A.   It's certainly possible.  I'm not so sure I went to

23   deposition or trial there, but probably there are cases from

24   all over the country, yes.

25   Q.   And you don't do this for free.  You charge plaintiff's

1  attorney to testify?

2  A.  I do.

3  Q.  You have been doing that in all the cases you have done

4  over the years; is that correct?

5  A.  I do.

6  Q.  What percentage of your income would be derived from this

7  medical-legal work?

8  A.  I would say about ten or 15 percent of my income.

9  Q.  Prior to writing the report that you authored in this

10  case, were you provided with a copy of either Dr. Zamore's

11  report or Dr. Shore's report?

12  A.  I don't believe I was.  I can't be sure, but I don't

13  recall being provided with that report.

14  Q.  And, Doctor, the reason why I ask is that the verbiage

15  that you used in your report is strangely similar to that that

16  Dr. Shore used, and I just wondered if you had seen that or

17  coordinated with him?

18  A.  I had not.

19  Q.  You were shown up here some safety rules, and I want to

20  ask you about that.  Is there a book out there that has these

21  safety rules in them someplace?

22  A.  I'm not sure I recall what safety rules you are referring

23  to.  I think they were very generalized safety rules.  There

24  are publications.  There's a publication called "Perinatal

25  Guidelines," and it comes out every couple of years, and I

1    think in that book, it does mention policies and procedures

2    that hospitals should use if they are delivering babies, with

3    regard to who attends the delivery, how many nurses per

4    patient, things like that, so I suspect in that book, there

5    are recommendations for this kind of information, yes.

6    Q.  Do you know whether that's where Mr. Price got those

7    rules?

8    A.  I don't know.

9    Q.  One of the things that you said when you were asked about

10    one of the rules, and I think it was the third one, the sooner

11    you start or provide treatment, start antibiotics, the better.

12    You said that in most circumstances, but not all

13    circumstances, correct?  There are circumstances where you can

14    start treatment right away and it makes no difference,

15    correct?

16    A.  It's certainly possible, yes, but I think I qualified that

17    answer with a remark that in general, yes, the earlier, the

18    better.

19    Q.  Now, the first criticism that you've made here that I

20    would like to discuss with you, and you've just discussed that

21    in some length with Mr. Colville and I'm trying not to be

22    repetitive, is that a pediatrician should have been present at

23    delivery, and I think the words you used, and I'm going to

24    read this so I make sure I state it correctly, that even

25    without an earlier delivery, a pediatrician should have been

1    called if the child's respiratory difficulties had been

2    assessed at or shortly after delivery.  That is what you wrote

3    in your report, correct?

4    A.  I think I did, yes.

5    Q.  Exactly what respiratory difficulties were you referring

6    to at the time of delivery?

7    A.  I was referring to the information that was provided to me

8    by the attorney regarding what the family was concerned about,

9    and it was my understanding that shortly after birth, once the

10   baby was bonding with the mother, that the family was

11   concerned about crying, grunting, respirations and substernal

12   retractions, that they were very concerned that the baby was

13   not acting right.

14   Q.  Now, I want to understand when you think that happened.

15   Do you think that happened at the time of delivery or

16   subsequent?

17   A.  Based on the record, it certainly appeared from the record

18   that the baby, shortly after birth, looked fine, so my

19   conclusion would be that it happened in the several minutes,

20   maybe 20 minutes, half hour after the baby was born.

21   Q.  Because if we look at the delivery room record which the

22   jury has seen numerous times -- we'll just put it up one more

23   time, it's 1115.  Would you agree with me that there is no

24   indication, based upon the documentation of a trained medical

25   professional, that there was any difficulties, this child was

1    having any respiratory difficulties, correct?

2    A.  I would agree to that, and again, I just want to make the

3    point that, in my experience, what tends to happen in

4    situations like this is just what happened in Kendall's

5    situation.  These babies who have an overwhelming infection

6    look pretty good in the first few minutes, ten, 15, 20 minutes

7    of life, and then within the first hour or so begin to have

8    grunting respirations, have desaturations.

9        And what I teach the residents and my students is that in

10   a term baby, when a baby presents like that, you must be

11   thinking in terms of, number one, infection first, and this

12   baby needs an immediate, what we call septic workup, a blood

13   culture, CBC, lumbar puncture and antibiotics.  That's the

14   only point I'm making.

15   Q.  My question was, in this delivery room record, this is a

16   record from a trained nurse with 32 years of experience,

17   neonatal resuscitation certified, there's no document there of

18   any respiratory difficulties, correct?

19   A.  Again, that's in the immediate newborn period.

20   Q.  That's all I'm talking about now is the immediate period.

21   A.  Okay.

22   Q.  Now, you made some comments about the family.  Do you know

23   whether any of these family members have any training in the

24   medical field?

25   A.  I suspect they don't.

1    Q.  Now, this child's five minute Apgar was eight, and I think
2    I heard you say before that that was great?
3    A.  That's fine, yes.
4    Q.  That's a great Apgar, and that Apgar indicates a good
5    baby, correct?
6    A.  At that particular point in time, yes.
7    Q.  And she got on that Apgar a two for respiratory.  She
8    wouldn't have a two for respiratory if she was having
9    respiratory distress; would that be correct?
10   A.  No.  Again, she would not, but again, in this particular
11   type of clinical setting, the respiratory distress occurs
12   within minutes or hours after birth.
13   Q.  Now, do you know how long she was -- the nurses and
14   Dr. Dumpe were in that labor and delivery room with her after
15   birth?
16   A.  I do not know specifically, no.
17   Q.  Now, also in that delivery room documentation there, there
18   is no documentation of the nursing staff noting any grunting.
19   Would you agree with that?
20   A.  I would agree with that.  Again, that was immediately
21   after birth, that's correct.
22   Q.  There is no documentation there of them noting any
23   flaring, correct?
24   A.  At that particular time, that's correct.
25   Q.  And there's no documentation there of them noting any

1    retractions, correct?

2    A.  That is correct, at that particular point in time, yes.

3    Q.  And I think you already told us that, had a pediatrician

4    been called in the labor room, saw this patient, there

5    wouldn't be anything that the pediatrician would do at that

6    time?  There was no resuscitation required or anything like

7    that at that time?

8    A.  Aside from some suctioning and provision of some blow-by

9    oxygen, that's correct.

10   Q.  There would be no reason to give antibiotics at that time,

11   correct?  There was no indication of any problem?

12   A.  At that particular point in time, that's correct.

13   Q.  You would agree with what Dr. Shore told us yesterday

14   that, if a pediatrician had been called, there would have been

15   nothing for the pediatrician to do?

16   A.  I think that's fair to say, yes.

17   Q.  Doctor, are there a fairly significant amount of newborns

18   who have meconium at the time of birth?

19   A.  Again, I'm not sure what you mean by "significant."  It's

20   not rare and certainly probably, you know, five or ten percent

21   of babies have some degree of meconium passage at the time of

22   birth.

23   Q.  Would you agree that meconium is sterile?

24   A.  Not always, but by and large, it is.

25   Q.  Doctor, you commented about seeing no notes of a nursing

1    assessment for this infant from 5:20 until, I thought you said

2    7:25, but --

3    A.  About 7:00, I should say.

4    Q.  You are right.  7:00 there.  You've looked at Carissa's

5    notes, correct, the notes from Nurse Hendershot about her

6    coming in to see Carissa every 15 minutes?

7    A.  I have.

8    Q.  So according to those notes and according to -- I want you

9    to assume she testified here that that's indeed what she did,

10   there was a trained professional in the room with mom, with

11   Kendall every 15 minutes, correct?

12   A.  I guess what I was testifying to is that I understand that

13   testimony of hers, but I did not see any hard evidence that

14   vital signs were taken on the baby or there was any physical

15   assessment of that baby every 15 minutes, such as a heart

16   rate, respiratory rate or pulse oximetry.

17   Q.  Doctor, if a baby is grunting, that is certainly something

18   that a trained professional with 30 some years of experience,

19   neonatal resuscitation trained certified would be able to

20   hear, correct?

21   A.  You would hope so.

22   Q.  They would know what that was, wouldn't they?

23   A.  They should.

24   Q.  If this baby was flaring, that was something that a

25   trained neonatal certified resuscitation nurse would be able

62

1    to note?

2    A.  You would hope so, yes.

3    Q.  And if this baby was having any sort of respiratory

4    difficulty, you would certainly expect a trained nurse with 30

5    years of experience to be able to identify that, correct?

6    A.  Again, I would hope so, but again, in my experience, I

7    don't discount what parents and family members tell me.  Just

8    something I've learned over the years in practice that

9    oftentimes, they are good observers, and if they have a

10   complaint or a concern, I take it seriously.

11   Q.  You talked about someone being sent out to get the nurse.

12   That someone who was sent out to get the nurse testified

13   yesterday here in the courtroom, Tyler Janectic.

14   A.  I understand.

15   Q.  Are you aware that Tyler -- have you seen his deposition?

16   A.  I have not.

17   Q.  You never saw Tyler's deposition?

18   A.  I don't believe I have.

19   Q.  I would like you to assume that Tyler testified both in

20   his deposition and here in the courtroom that the reason why

21   he was asked to go out to get a nurse was not because the baby

22   was grunting or respiratory difficulty, because she was

23   crying?

24   A.  I would assume that.  I would assume that, yes.

25   Q.  So when the nurse was summoned, it wasn't for grunting or

1    retracting or anything.  It was for excessive crying.  Okay?

2    A.  Okay.

3    Q.  Let me ask you this:  Is crying, a baby crying after birth

4    a good thing?

5    A.  Again, I guess it would depend on the degree of crying.

6    Yes, we like to see babies cry in the delivery room and after

7    birth.  Whether it persists and whether it's a sign of

8    distress, then I would think it could be considered abnormal,

9    but as a general rule, crying is good, yes.

10   Q.  It's a good thing because it helps the baby open up the

11   lungs, breathe, get oxygen down to those alveoli, expand those

12   alveoli, all of that?

13   A.  As a general rule, yes.

14   Q.  And, Doctor, you are aware that at somewhere between 6:50

15   and 7:00, Nurse Hendershot took the baby over to the nursery,

16   correct?

17   A.  I am aware of that.

18   Q.  Again, there certainly would be eyes on the baby at that

19   time, correct?

20   A.  At 7:00, yes.

21   Q.  Between 6:50 and 7:00?

22   A.  Yes.

23   Q.  There is no documentation in the chart of any issue

24   between 6:50 and 7:00 a.m. when Nurse Hendershot is taking the

25   baby.

1    A.  I did not see any written documentation one way or the

2    other.

3    Q.  At 7:00, the baby has her vital signs taken, and you've

4    seen those, haven't you?

5    A.  I have.

6    Q.  And those vital signs are normal, aren't they?

7    A.  They were normal.

8    Q.  And at that point, she is received in the nursery by

9    Nurse Hackney, and you said you read her deposition, correct?

10   A.  I did.

11   Q.  You would agree that Nurse Hackney testified that she

12   didn't notice any abnormalities with the baby at that time?

13   A.  I saw that, yes.

14   Q.  Are you also aware that Nurse Hackney is an experienced RN

15   in the nursery?

16   A.  I'm aware of that, yes.

17   Q.  And so if there was grunting or flaring or retraction at

18   that time, that would be something that you would expect a

19   trained nurse like Nurse Hackney also to be able to recognize,

20   correct?

21   A.  You would hope she would, yes.

22   Q.  And in addition to taking her vital signs, Nurse Hackney

23   also put some eye drops in, direct?

24   A.  Erythromycin, correct.

25   Q.  I think she gave her vitamin K or Aquamephyton?

1    A.  That's correct.

2    Q.  In order to do that, she would have to physically be

3    holding, observing the baby, correct?

4    A.  She would be, yes.

5    Q.  If there was any respiratory difficulty at that point,

6    that would certainly be something that she would have been

7    able to see; is that accurate?

8    A.  You would hope she would.

9    Q.  The very first time we see anything in the record from

10   trained professionals is at 7:25 a.m., correct?

11   A.  That is correct.

12   Q.  And that is Nurse McCrory?

13   A.  McCrory, yes.

14   Q.  I want to ask you about that.  Are you aware of the

15   circumstances under which Nurse McCrory noted this?

16   A.  I think in general, I think she was coming on duty at

17   7:00, and she was assigned this patient, and during her

18   assessment, I think she determined that the baby looked pale,

19   and I think looked a little cyanotic.  It prompted her to

20   start some oxygen.

21   Q.  That's not exactly correct.  Nurse McCrory testified that

22   while she was getting the report on this baby, she happened to

23   look over, not while she was doing her assessment.  Were you

24   not aware of that?

25   A.  You jogged my memory.  I understand that.

1    Q.  Now, I want to go back to some things that you said about

2    Dr. Jones.  You were basing your opinion about what she should

3    have done based upon a nurse -- a note from a supervisor that

4    says at 7:20, she was called, correct?

5    A.  I'm not sure I did.  I mean, I think -- I don't know

6    whether she was called or she wasn't called.

7    Q.  That's my whole point.

8    A.  Exactly.

9    Q.  That note says at 7:20.  You would agree with me that in

10   this record at 7:20, there's no documentation of anything

11   going on, correct?

12   A.  That's correct.  At 7:25, there was, but certainly at

13   7:20 --

14   Q.  7:20, nothing was going on?

15   A.  Right.

16   Q.  And there would be -- if nothing is going on at 7:20,

17   there would be no reason why anybody would be reaching out to

18   the pediatrician to come in to see this child if nothing is

19   going on, correct?

20   A.  Yeah.  I have no idea what that note refers to.  All I'm

21   saying is I read the record, and it said that Dr. Jones was

22   notified.  I'm not so sure whether she was or wasn't.  I would

23   tend to believe Dr. Jones that she wasn't notified and that

24   she came in at her regular time, 8:00 in the morning.

25   Q.  Okay.  That's my point.  Let's go through that.  You are

1    aware that Nurse McCrory -- you saw her deposition.  In her

2    deposition, she said she didn't call Dr. Jones, correct?

3    A.  That is correct.  She called the resident.

4    Q.  She called Dr. Heiple.  And you've read Dr. Heiple's

5    deposition, correct?

6    A.  I have.

7    Q.  And in his deposition, he said that he didn't call

8    Dr. Jones.  He waited for her to come in.

9    A.  He knew she was coming in, and he deferred to her judgment

10    when it came to what to do.

11    Q.  Doctor, were you also provided with copies of Dr. Jones'

12    pager records and phone records?  Did you see any of that?

13    A.  I was not, no.

14    Q.  You never saw that.  I would like to put that up.  This is

15    in tab 49 of the binder, and it's an exhibit that has been

16    introduced, and I want to show you and the jury this document.

17        These are Dr. Jones' pager records from that morning that

18    came from the hospital, and let's just take a look at that.

19    The first one, if we can just highlight the first one.  This

20    pager record looks like it is from 8:01 a.m. and it's a page

21    to Dr. Jones from a Dr. Shumway, so that wouldn't be the

22    nurse, the supervisor.  The time isn't right, 8:01, correct?

23    A.  Correct.

24    Q.  Below that, we're looking at another one.  Again, this

25    same date, and it says 12:48 a.m., 12:56 a.m.  This baby

68

wasn't even born yet at 12:56 or 12:48.  That wouldn't be a
call to Dr. Jones about this child?

A.  That is correct.

Q.  If you look at the next one, at the bottom which goes on
to the top of the next page, this is a pager to her at 12:38,
12:44 a.m., and again that couldn't be about this baby.  It's
talking about a patient with a fever of 102 complaining of
neck pain.  That couldn't be Kendall Peronis, correct?

A.  That's correct.

Q.  The next one is actually the day before, October 12 at
9:19 p.m.  That couldn't be her, correct?

A.  That's correct.

Q.  And then the next one which starts at the bottom of that
page and goes into the next page is at 8:04 p.m. on Monday,
October 13, and of course, that couldn't have been a call to
her because that's after the baby has passed, and then if we
go to the next page here, if we go to 1357.  This is October
14, so that's the day after.  The next one down is on October
13 at 9:21 p.m.  That's after the fact, so that couldn't have
been about this baby.

     And then we go to the one in the right-hand corner, if we
can highlight that.  That is October 13 at 8:18 p.m.  That
couldn't have been about this baby, and if we go to the one
below that, it is October 13, again at 8:10, 8:15 p.m. about a
patient in a car accident.  That couldn't be about this baby

1  either, correct?

2  A.  That's correct.

3  Q.  So these pager records indicate that Dr. Jones wasn't

4  called at 7:20.  Certainly wasn't paged, correct?

5  A.  I think it's great.  I think that solves the problem,

6  doesn't it?

7  Q.  So Dr. Jones, would you agree with me, wasn't called at

8  7:20?

9  A.  It certainly appears she wasn't.  Again, just to make the

10  point, I have no criticism of Dr. Jones at all.  I think she

11  did, given the circumstances, she did a great job managing

12  this patient.

13         THE COURT:  If I may interject a limiting

14  instruction.  Ladies and gentlemen of the jury, you would

15  note, as these particular documents have been shown to you

16  repeatedly, there is the word in handwriting "Redacted."  Per

17  rulings of the court and per patient privacy, those portions

18  of the record have been redacted or obliterated.  You are not

19  to concern yourself with what may or may not have been in

20  those areas where the word "Redacted" appears.  Go ahead.

21  BY MS. KOCZAN:

22  Q.  Doctor, I want to show you one other record.  This is

23  Dr. Jones' telephone records, and I'd like you to assume that

24  Dr. Jones has -- will testify that the only way the hospital

25  could get in touch with her was either a pager, which we've

1    just seen, or her cell phone which we're going to see.  Let's

2    put up those cell phone records and that's 1360.

3        And I know this is difficult to read.  This again is in

4    that tab 49, and if we could highlight in the middle there

5    where it starts with 12-13.  Is there some way to pull that

6    out?  You would agree with me that there is no documentation

7    of any telephone call to Dr. Jones at 7:20 a.m. in that

8    record?

9    A.  There does not appear to be.

10   Q.  So you would agree that based upon the telephone and pager

11   records, Dr. Jones was not called at 7:20 a.m.?

12   A.  It certainly appears that's correct, yes.

13   Q.  And in further support of that, we have the testimony from

14   Nurse McCrory, Dr. Heiple and Dr. Jones herself, correct?

15   A.  That is correct.

16   Q.  And I think you've already told us a couple of times you

17   have no criticism of Dr. Jones.  She did a great job, didn't

18   she?

19   A.  That is correct.

20   Q.  So I want to go back now and talk about what happened

21   after 7:25.  So at 7:25, we've seen the documentation of what

22   Nurse McCrory saw and what she did, and you would agree with

23   me that her actions were totally appropriate?

24   A.  I would agree to that, yes.

25   Q.  She immediately did the pulse ox, correct?

1    A.  Correct.

2    Q.  She immediately placed the baby under the oxy hood?

3    A.  That's correct.

4    Q.  That's all appropriate action?

5    A.  It is.

6    Q.  And she, per the protocol, immediately called Dr. Heiple?

7    A.  She did.

8    Q.  And in terms of when Dr. Heiple came, I know, as Mr. Price

9    pointed out, there seems to be some confusion about when he

10   came, but he did show up and evaluate the child, correct?

11   A.  I think in a very reasonable amount of time, five or ten

12   minutes.

13   Q.  That's reasonable.  He got there when he should have?

14   A.  When he should have, yes.

15   Q.  And have you also seen documentation of when Dr. Jones

16   arrived?

17   A.  You know, I think I've seen it.  I don't recall.  I know

18   she was there shortly after 8:00 in the morning.

19   Q.  Have you seen her final summary?

20   A.  I have seen it, yes.

21   Q.  And it says in that summary, you would agree, that she was

22   there at 8:00?

23   A.  Yes.

24   Q.  So I want to go back and talk about Dr. Heiple for a

25   minute.  Dr. Heiple, and you've read his deposition, correct?

1    A.    Yes.

2    Q.    You weren't here for his testimony yesterday?

3    A.    I was not.

4    Q.    Has any of that been shared with you?

5    A.    No.

6    Q.    Let me ask you to assume certain things that he testified

7    to.  I would like you to assume that Dr. Heiple testified that

8    when he got in to see the baby, the baby had been under the

9    oxy hood and her O2 saturation had come up to 94.  I'd like

10   you to assume that.

11       And you've seen the record, correct, that at 7:30, the

12   pulse ox was 94?

13   A.    Was better.

14   Q.    The pulse ox at that time when he sees her is at 94.  He

15   does an evaluation of her at that time and he does not hear

16   much of anything concerning going on in her lungs at that

17   point.  He does a physical examination at that point.  Doesn't

18   see anything that is particularly concerning for immediate

19   action at that point, and his plan is I know Dr. Jones is

20   going to be walking through the door any minute now.  I'm

21   going to wait.  I think we're going to need further care, but

22   I'm going to wait and have her assess the baby.

23       You are aware of that?

24   A.    I'm aware of that, yes.

25   Q.    At 8:00, she is there?

1    A.   Yes.

2    Q.   So at 8:00, she begins her assessment, correct?

3    A.   She does.

4    Q.   And you don't have any issues whatsoever with her

5    assessment, correct?

6    A.   I do not.

7    Q.   She did a great job?

8    A.   I believe she did.

9    Q.   And at 8:00, she starts giving orders, correct?

10   A.   Yes.

11   Q.   And we see in the chart that the orders weren't entered

12   into the chart until about 8:32 by Dr. Heiple, correct?

13   A.   That's correct.  I was going to say 8:20.  I think orders

14   were given at about 8:21, but they weren't entered until after

15   8:30.

16   Q.   Do you know for a fact they were given at 8:20?  Could

17   they have been given earlier?

18        MR. PRICE:  Objection.  Assuming facts not in

19   evidence.

20        THE COURT:  Sustained.  The objection is sustained.

21   Q.   Doctor, my question here is do you know the time that

22   Dr. Jones verbalized this is what I would like you to do?

23   A.   I don't specifically know the time.  I mean, the best I'm

24   going at is from the medical record, and it looked like to me

25   they were entered into -- that the medicines were ordered at

74

1    around 8:30 in the morning, give or take a few minutes,

2    whether it was 8:28 or 8:32, I don't know, but it certainly

3    was shortly after Dr. Jones did her assessment.

4    Q.  Let me ask you about that.  Doctor, in your hospital, do

5    you give verbal orders?

6    A.  We're not supposed to, but we do give them.

7    Q.  And just so we understand what the verbal order is, you

8    will tell a nurse do this for this patient, correct?

9    A.  Correct.

10   Q.  And then you will go and put an order in the chart to that

11   effect?

12   A.  Correct.

13   Q.  And that happens all the time?

14   A.  It doesn't happen all the time, but it happens frequently,

15   yes.  They don't like us to do it anymore.  We're supposed to

16   enter it into the electronic medical record.

17   Q.  So, Doctor, my question to you is this:  If there is

18   testimony that Dr. Jones, when she came in, gave orders, I

19   would like you to do this, but that they were not put into the

20   chart until later, would you have an issue with that?

21   A.  I would not.

22   Q.  We know from the medical record that part of Dr. Jones'

23   order was an IV, correct?

24   A.  It was.

25   Q.  And did you see the documentation that the IV was placed

1    at 8:20?

2         MR. PRICE:  Objection.

3    A.  I did not see that.

4         THE COURT:  Sustained.

5    A.  I thought I made a note of when I saw the IV put in.

6         THE COURT:  Do you want to take a minute and look at

7    your notes, Doctor?

8    A.  I don't think I wrote down when the IV was placed.

9    Q.  We have a note here from Nurse Paff.

10   A.  I do have it.  IV placed at 8:20.  I'm sorry.

11   Q.  Even before the order was placed, because we've indicated

12   not until 8:30, it was being carried out.  It was in at 8:20?

13   A.  Correct.

14   Q.  And I want to ask you some other questions about that.

15   Dr. Jones, I'm going to ask you to assume that she will

16   testify that when she came in, she started giving orders for

17   things she wanted, and one of the things she wanted was this

18   ampicillin?

19   A.  Was ampicillin, yes.

20   Q.  Have you seen the record that indicated what time the

21   ampicillin was?

22   A.  I did.

23   Q.  That was around 8:34?

24   A.  I think it was ordered at 8:31.  I have it was started at

25   9:40.

1    Q.  I think you are referring to the gentamicin.

2    A.  I think, according to my reading of the record, the

3    gentamicin was started at 9:50.

4    Q.  Let me go back and ask you a question, Doctor.  In terms

5    of getting medications to the unit, when the doctor orders,

6    they have to come from pharmacy, correct?

7    A.  In some hospitals, they do.  In some hospitals now,

8    there's a Pyxis system.

9    Q.  Do you know what was in use back then?

10   A.  I do not know.

11   Q.  But if it has to come from pharmacy, it takes some time to

12   get it up from the pharmacy?

13   A.  I understand that.

14   Q.  Nurse McCrory, I believe, yesterday testified about the

15   timing of when the ampicillin was hung.  My question is this:

16   When you hang this antibiotic, you have one IV which is what

17   was here.  You hang the first antibiotic, you let that infuse,

18   and then you hang the second one, correct?

19   A.  Correct.

20   Q.  You don't do them both at the same time through the same

21   IV?

22   A.  Typically not.

23   Q.  You can't do that, can you?

24   A.  You shouldn't.

25   Q.  At this point, they only had, according to the

1    documentation, one IV, correct?

2    A.  That's correct.

3    Q.  And you don't have any issue with the fact that Dr. Jones

4    immediately began arranging for transfer of this baby?

5    A.  Not at all.

6    Q.  That was a totally appropriate thing?

7    A.  Absolutely.

8    Q.  And every action thereafter by Dr. Jones and the nursing

9    staff in terms of the resuscitation, all of that, you don't

10   have any issue with any of that?

11   A.  I have no issue with that.

12   Q.  Give me one minute, Doctor, and I believe I'm nearly done.

13   Doctor, you've taken care of babies before with E. coli

14   sepsis; would that be true?

15   A.  I have.

16   Q.  You would agree that this baby died of E. coli sepsis?

17   A.  I believe the baby did, yes.  I think that was the primary

18   diagnosis, yes.

19   Q.  And would you also agree that while E. coli is the second

20   most common neonatal infection, second only to group B sepsis,

21   it is the number one cause of infant mortality?

22   A.  I'm not exactly familiar with those statistics in 2014,

23   but it does not sound unreasonable.

24   Q.  Would you agree with me that E. coli is a virulent and

25   aggressive infection?

78

1    A.  It certainly can be.

2    Q.  And the blood work in this case, have you looked at that

3    at all?

4    A.  I have.

5    Q.  Would you agree that the blood work primarily the

6    differential indicated that this baby had used, and this is

7    early, as I think the first blood work was drawn somewhere

8    around --

9    A.  9:00.

10   Q.  Came back at 9:00, but somewhere around 8:50.  She only

11   had three neutrophils?

12   A.  I saw that, yeah.

13   Q.  This baby had already used all of her neutrophils, pretty

14   much all of them?

15   A.  Certainly an indication of an overwhelming infection, yes.

16   Q.  And would you also agree with me that this infection had

17   been in progress for some period of time; is that correct?

18   A.  Probably, yes.

19   Q.  And sometimes with these newborns, the situation is they

20   get an infection, they can compensate for a certain period of

21   time and then they just don't have the reserve to do it

22   anymore?

23   A.  I think that's certainly a possibility.

24        MS. KOCZAN:  Thank you, Doctor.  I have no further

25   questions.

1              THE COURT:  All right.  Ladies and gentlemen of the

2     jury, it's time for our midmorning break, so let's take our

3     break now from 10:45 until 11:00, and we'll continue.

4              While we are on break, once again, you'll leave your

5     pads and binders there on your chairs.  Once again, you are

6     not to discuss the case, communicate about the case or

7     research about the case while you are on break.  Mr. Galovich

8     will escort you.  Everybody should stand.

9         (Jury excused.)

10             THE COURT:  Doctor is going to step down.  As all the

11    other people, he's not going to be talking about his testimony

12    with anyone.

13             I would also note Dr. Min appeared previously.

14    Mr. Galovich escorted him, and he's in one of the attorney

15    conference rooms.

16        (Recess taken.)

17        (Jury present.)

18             THE COURT:  Mr. Price, redirect?

19                         REDIRECT EXAMINATION

20    BY MR. PRICE:

21    Q.  Doctor, just one real issue.  So you saw in the records

22    that at the time of birth, Nurse Hendershot did deep

23    suctioning of Kendall's lungs, correct?

24    A.  Correct.

25    Q.  And she testified that when she did deep suctioning, she

1    drew out some meconium fluid, correct?

2    A.  She did.

3    Q.  And she described, in her manner, what it was, correct?

4    A.  I believe she did, yes.

5    Q.  Now, for the hour and a half after that, as you mentioned,

6    the family's testimony is there was a lot of crying and it was

7    vigorous crying and wailing and things of that nature?

8    A.  I understand that, yes.

9    Q.  Now, are there different types of cries?  Are there good

10   cries and bad cries?

11   A.  I would say so, yes.

12   Q.  Sometimes, are you crying to try to pull things out of

13   your lungs?  To get air into your lungs?

14   A.  You could be, certainly, yes.

15   Q.  You weren't here yesterday, but I want you to assume this,

16   that Nurse McCrory testified that at 7:25 when she found that

17   Kendall's pulse ox was 81 percent, her decision was to put an

18   oxy hood on, correct?

19   A.  That is correct.

20   Q.  Here's what I want you to assume because you didn't hear

21   this testimony, but before she put the oxy hood on, she

22   suctioned Kendall's throat?

23   A.  I remember that, yes.

24   Q.  She said that whenever she did, she got a lot of junk out

25   of the throat?

1  A.  I recall that in her deposition, yes.

2  Q.  She testified yesterday that whenever she looked into the

3  suctioning tube, that it was thick, dark green particulate

4  meconium.  Now --

5          MS. KOCZAN:  Objection, Your Honor.  I do not believe

6  that's correct testimony.  She did not use the word

7  "particulate."

8          MR. PRICE:  Your Honor, if my memory serves me

9  correctly, Dr. Dumpe described this last Gatorade bottle as

10  thick, dark particulate.

11          THE COURT:  And she made a comparison to the bottle,

12  that's correct.  She pointed at that particular bottle.

13          MR. COLVILLE:  No, she didn't, Your Honor.

14          MR. PRICE:  Yes, she did.

15          MR. COLVILLE:  Your Honor, I believe what the

16  testimony was, she indicated there were four bottles.

17          THE COURT:  I realize there were four bottles.

18          MR. COLVILLE:  My recollection was she said --

19          THE COURT:  The jury has its recollection too.

20  BY MR. PRICE:

21  Q.  Would a baby who is crying and wailing, in addition to

22  crying, be pulling things out of its throat possibly into its

23  lungs -- or out of its lungs, into its throat?

24  A.  It could be certainly.  It could also be pulling the

25  meconium deeper into the airway causing more problem.

1    Q.  After Dr. Jones started making orders at 8:20, did the

2    care for Kendall, from your review of the record, did it

3    change a lot?

4    A.  It certainly did.  I mean, she was getting sicker and

5    sicker by the minute.  I think the care was appropriate, but

6    certainly Kendall was getting worse and worse.

7             MR. PRICE:  That's all I have, Your Honor.

8             THE COURT:  Mr. Colville, any additional questions?

9    Ms. Koczan?

10             MR. COLVILLE:  No questions.

11             THE COURT:  Doctor, the court has a few follow-up

12    questions.  The court as well as counsel had the benefit of

13    your entire curricula vitae.  Reviewing same, it appears that

14    over the course of your career, you have written on the issue

15    of ventilation and/or resuscitation of newborns on various

16    occasions.

17             THE WITNESS:  I have given many lectures to that

18    effect, and also Dr. Goldsmith and I published a textbook on

19    "Assisted Ventilation of the Neonate," and in that book, there

20    are chapters that deal with resuscitation of newborns and the

21    management of newborns in the delivery room, yes.

22             THE COURT:  In addition and looking at your curricula

23    vitae or resume, it appears that you've also presented grand

24    rounds or lectures to physicians and other medical care

25    professionals on surfactant.

1          THE WITNESS:  I have, yes.

2          THE COURT:  And it also appears that you have also

3    guest lectured and/or spoken at various meetings, including

4    international meetings on respiratory failure in infants.

5          THE WITNESS:  I have.

6          THE COURT:  Now, you also said that you disagreed

7    with the policies of Heritage Valley, correct?

8          THE WITNESS:  I did say that, yes.

9          THE COURT:  And to that end, the hospital where you

10   work, does it have different policies?

11         THE WITNESS:  It does have a different policy, yes.

12   Virtually every hospital I work at, even in the level ones and

13   level two hospitals, has a policy that states that if there is

14   meconium present in the amniotic fluid when the membranes are

15   ruptured, that a pediatrician should be in the delivery room.

16         THE COURT:  And at your hospitals where you work, how

17   are those policies put together?

18         THE WITNESS:  Earlier in my career, I participated in

19   writing some of those policies, and they were typically

20   written by the neonatologist, nurses, both in labor and

21   delivery and the NICU, as well as obstetricians.

22         THE COURT:  What kind of sources or resources go into

23   writing these policies?  What do the doctors and nurses who

24   write these policies rely on?

25         THE WITNESS:  Well, I think there are publications

1    that are produced by our various professional groups like the

2    American Academy of Pediatrics and the American College of

3    Obstetrics and Gynecologists periodically come out with

4    statements or -- I forget what they call them -- guidelines

5    which would indicate what should be done and what is the

6    appropriate policy to be in place in the nursery, and there

7    are also a few textbooks such as the "Guidelines For Perinatal

8    Care," which is published every several years, and there's the

9    neonatal resuscitation program, the NRP, which may address

10   these issues as well.

11            THE COURT:  Thank you.  Now, you indicated that you

12   have had some experience with E. coli sepsis.

13            THE WITNESS:  I have.

14            THE COURT:  What's your understanding of the genesis

15   of E. coli sepsis?

16            THE WITNESS:  My understanding is that it is an

17   organism that is typically found in the genital urinary tract

18   of women, and that in certain circumstances, the organism

19   ascends up into the amniotic fluid into the uterus, that the

20   babies can become infected when they swallow or inhale the

21   amniotic fluid that contains the E. coli, and oftentimes, the

22   organism is disseminated through the lungs and into the

23   bloodstream.

24            THE COURT:  Now, what kind of circumstances have to

25   exist?  You used the word "circumstances."

1          THE WITNESS:  They vary, but oftentimes there is a

2     history in the prenatal course or in the mother just prior to

3     delivery of a urinary tract infection, of a circumstance which

4     we refer to as chorioamnionitis, where there is maternal

5     fever, there's maternal abdominal pain, there may be cramping,

6     there may be the onset of premature labor, and organisms may

7     be recovered from the amniotic fluid in those circumstances.

8          THE COURT:  Thank you for that additional

9     information.  The court appreciates it.

10          Mr. Price, does the court's additional questioning

11     cause you to have any additional questions?

12          MR. PRICE:  No, Your Honor.

13          THE COURT:  Mr. Colville?

14          MR. COLVILLE:  No.

15          THE COURT:  Ms. Koczan?

16          MS. KOCZAN:  No.

17          THE COURT:  Then, Doctor, thank you for your

18     testimony.  You may step down.  May the doctor also be

19     excused?

20          MR. PRICE:  Yes.

21        (Witness excused.)

22          THE COURT:  Doctor, you may be excused.  Safe

23     travels.

24          MR. PRICE:  Again, for the court, I have the

25     PowerPoints that we used during Dr. Karotkin's testimony.

1          THE COURT:  Your next witness, Mr. Price?

2          MR. PRICE:  We would call Dr. Tae Min.

3          THE CLERK:  Sir, please step forward.  Please state

4    and spell your name for the record.

5          THE WITNESS:  Last name is Min, M-I-N, first name is

6    T-A-E with the middle initial of C.

7       (Witness sworn.)

8          THE COURT:  Dr. Min, watch your steps as you get to

9    the witness stand.  It's a little bit uneven.  Once you are

10   seated, arrange yourself so you are speaking into the

11   microphone.  There's water there in case you need it.  Thank

12   you, sir.  Mr. Price, you may proceed.

13          TAE C. MIN, M.D., a witness herein, having been first

14   duly sworn, was examined and testified as follows:

15                        DIRECT EXAMINATION

16   BY MR. PRICE:

17   Q.  Morning, Dr. Min.

18   A.  Morning.

19   Q.  You are here as a witness because you are the pathologist

20   who performed the autopsy on Kendall Peronis, correct?

21   A.  Correct.

22          MR. PRICE:  Can we put up tab 70, the autopsy report?

23   Page 1.

24   Q.  And this is a copy of your autopsy report on Kendall

25   Peronis, correct?

1    A.  Correct.

2    Q.  And in your autopsy report, the final anatomic diagnoses

3    were, number one, neonatal septicemia, correct?

4    A.  Correct.

5    Q.  Number two, acute bronchopneumonia, correct?

6    A.  Yes.

7    Q.  And number three, massive aspiration of meconium, correct?

8    A.  Yes.

9             THE COURT:  Doctor, just a little caution.  You have

10   a tendency to speak softly and I barely heard your yes.  I'm

11   guessing these fine people here who are our jury may not have

12   heard you, so you either need to get closer to the microphone

13   or speak a little louder.

14   Q.  And that was your opinion and your final anatomic

15   diagnosis of what happened to Kendall on October 13, 2014,

16   correct?

17   A.  Correct.

18   Q.  Now, I just wanted to follow up with regard to a few

19   things about this report.  From what I understand -- you can

20   take that down.

21        From what I understand, with regard to preparing your

22   autopsy report, obviously, you have to get some information

23   about the patient before doing an autopsy, correct?

24   A.  Correct.

25   Q.  And in this case, the information that you got was the

1    medical record, correct?

2    A.  Correct.

3    Q.  Now, here is a copy of the certificate of death, correct?

4    I'll represent to you that's the certificate of death.

5    A.  Correct.

6    Q.  And you would have access to this in preparation for the

7    autopsy, correct?

8    A.  Correct, but I did not get this death certificate before I

9    did the autopsy.

10   Q.  Okay.  So this death certificate signed by Dr. Jones

11   listing the causes of death, you say you did not have access

12   to?

13   A.  I did not.

14   Q.  So --

15   A.  I have access, but I did not see.

16   Q.  Can you explain that to me?

17   A.  Before I did the autopsy, I reviewed the chart, but I did

18   not see this death certificate.

19   Q.  Okay.  And these death certificates are filled out by the

20   doctors who were treating the patient before death, correct?

21   A.  Correct.

22   Q.  And as we can see under the cause of death, it says,

23   "Enter the chain of events that directly caused the death,"

24   correct?

25   A.  Correct.

1    Q.  And Dr. Jones signed that, and she noted that the first

2    cause was meconium aspiration, and it says, "Approximate

3    interval onset to death was 5:20 in the morning," correct?

4    A.  On the record, correct.

5    Q.  And 5:20 was the time that Kendall was born, correct?

6    A.  Correct.

7    Q.  Now, you had access to the rest of the medical record for

8    Kendall in order to prepare your autopsy report, correct?

9    A.  I reviewed it, yes.

10   Q.  Now, I also wanted to ask you that you did not talk to any

11   doctors in order to prepare your full report, correct?

12   A.  I don't remember talking with any doctor.

13   Q.  Just for refreshing your recollection, can we pull up the

14   deposition transcript, page 8.  And do you remember a few

15   years ago in 2017, we met, and I asked you some questions

16   about the autopsy?

17   A.  Yes.

18   Q.  And this is a copy of the deposition transcript, and if we

19   just go down here all the way down, 17 all the way down, and I

20   asked you, "Did you interview doctors to prepare your clinical

21   summary," and you said "No."

22       Then I asked you, "In this case, did you talk to any

23   doctors in order to prepare your clinical summary," and you

24   said, "I did not."

25       And then I asked you, "Did you talk to any doctors in

1    order to prepare your full report," and you said, "To prepare

2    my report," and I said "Yes," and you said, "No, I did not."

3        Do you remember that?

4    A.  Yeah, I remember that.

5    Q.  So just so the jury understands, to prepare the autopsy,

6    you didn't talk to any doctors at all, correct?

7    A.  Correct.

8    Q.  And to prepare the autopsy, you relied upon the medical

9    chart, correct?

10   A.  To prepare it, yes.

11   Q.  Now, if we could go back to the PowerPoint, and your

12   diagnosis of the aspiration of meconium that Kendall had was

13   how you termed massive, correct?

14   A.  Correct.  On the report, yes.

15   Q.  Now, do you know -- you have testified that you believe

16   that you got the word massive out of the medical record,

17   correct?

18   A.  That's what I thought.

19   Q.  My point is, do you know anywhere in this medical record

20   for Kendall that any doctor wrote down that Kendall had a

21   massive aspiration of meconium?

22   A.  Aspiration of meconium, yes.  Massive, I'm not sure.

23   Q.  I will represent to you that all of the defendants'

24   position in this case is that there was no massive aspiration

25   of meconium, that it was thin or moderate at most, and that is

1    all that is in the medical record.

2        So would you agree with me that when you found massive

3    aspiration of meconium, that was your description after

4    examining Kendall's lungs?

5    A.  That information was more from the clinical information

6    rather than autopsy information.

7    Q.  Right.  Just so -- I want the jury to understand this.

8    You are saying that the term massive aspiration of meconium is

9    a clinical diagnosis.  That's what you are saying now?

10   A.  Yes.

11   Q.  And what I'm asking you is -- and we've established that

12   you didn't talk to any doctors before writing massive

13   aspiration of meconium in the autopsy report, correct?

14   A.  Correct.

15   Q.  So the only place that you are saying that you could have

16   gotten the term massive aspiration of meconium would be from

17   the medical record, correct?

18   A.  Correct.

19   Q.  And what I'm representing to you is that nowhere in

20   Kendall's medical record does it say massive aspiration of

21   meconium.  Okay?

22   A.  Yes.

23   Q.  So wouldn't it be true that the term massive aspiration of

24   meconium would be a pathological diagnosis that you made

25   independently after reviewing Kendall's lungs post-mortem?

1    A.  Not as the pathologic diagnosis, but part of my diagnosis,

2    autopsy diagnosis, which can include clinical impression,

3    clinical diagnosis, and I am not quite clear if it was not in

4    the -- from the chart.  I don't know where that come from for

5    sure.

6    Q.  So if it's not told to you by a doctor and if it's not in

7    the chart, where else could it come from except for your

8    conclusion after performing the autopsy?

9    A.  Only other possibility I can think is I talked to

10   physician, which I couldn't remember when I made the

11   deposition.

12   Q.  Well, you remember, I showed you your deposition

13   transcript, and you took an oath whenever you talked to me in

14   2017, correct?

15   A.  Correct.

16   Q.  And at that time, you told me you didn't talk to any

17   doctors before doing this autopsy report, correct?

18   A.  That I remembered, I didn't talk to anybody.

19   Q.  Right.  Now you may have, correct?

20   A.  I may have.  Of course I cannot find where that come from,

21   because there should be some reason somewhere I got that as a

22   clinical diagnosis.

23   Q.  The only intervening factor between your autopsy report

24   where you put massive aspiration of meconium and your

25   testimony here today where you are saying maybe it was a

1    clinical diagnosis was that you had a meeting with Dr. Dumpe,

2    correct?

3    A.  Not when I prepared that report, I didn't talk to

4    Dr. Dumpe.

5    Q.  Right.  And at the time that you prepared the report, just

6    so we understand, you stuck with, you were confident, you

7    filed your autopsy report, it was filed in Kendall's medical

8    record, and it said massive aspiration of meconium, correct?

9    A.  I wrote it down as a report, correct, but I don't know

10   where it come from exactly.

11   Q.  Okay.  But my point is is that medical record was in

12   Kendall's file, correct?

13   A.  Correct.

14   Q.  And it stayed, and to this day, that medical report is

15   still in Kendall's file, correct?

16   A.  Correct.

17   Q.  And it still says that she died -- one of the diagnoses is

18   massive aspiration of meconium, correct?

19   A.  That is not as a cause of death.  That is a parallel

20   finding or associated findings on my report.

21   Q.  Right.  It contributed to her death?

22   A.  Associated with as a parallel finding.  I don't know how

23   much it contributed to.

24   Q.  Right.

25   A.  On my report, yeah.

94

1    Q.  She had an E. coli infection, but you'll agree with me

2    that the massive aspiration of meconium, in your term, was

3    associated with her death, correct?

4    A.  Aspiration of meconium?

5    Q.  Yes.

6    A.  Yeah.

7    Q.  Yes.  So it is very important to have a correct medical

8    record, correct?

9    A.  Correct.

10   Q.  And your medical record continues to state that Kendall

11   died of E. coli with associated massive aspiration of

12   meconium, correct?

13   A.  E. coli pneumonia with E. coli septicemia.

14   Q.  Associated with massive aspiration of meconium?

15   A.  Associated with aspiration of meconium as an associated

16   finding.  Not caused by.

17   Q.  But it was massive?

18   A.  Massive is a clinical impression I got, but I cannot

19   document that.

20   Q.  I don't want to keep dancing around this, but you are

21   saying it's a clinical diagnosis from someplace where you

22   can't find where it's documented, correct?

23   A.  Correct.

24   Q.  And my point is that we are so far -- in preparation of

25   the deposition that I took, you met with Attorney Koczan,

1    correct?

2    A.  Correct.

3    Q.  And Ms. Koczan represents Heritage Valley Hospital,

4    correct?

5    A.  Correct.

6    Q.  And you didn't work for Heritage Valley Hospital, did you?

7    You were your own employer?

8    A.  My own employer, but I am partly associated with the

9    hospital.

10   Q.  You did all of the pathology reports, but you were not an

11   employee of the hospital?

12   A.  Not an employee of the hospital, no.

13   Q.  So you met with -- you weren't a hospital employee,

14   correct?

15   A.  Correct.

16   Q.  But you met with the hospital attorneys before your

17   deposition, correct?

18   A.  I just got a notice to make a deposition.

19   Q.  And you met with Ms. Koczan in your office, correct?

20   A.  Correct.

21   Q.  And you actually sat down and reviewed the slides with

22   her, correct?

23   A.  Correct.

24   Q.  And you talked to her about the medical record, correct?

25   A.  Correct.

1    Q.  And you were not shown any medical record, any clinical

2    summary where the word massive aspiration of meconium was ever

3    revealed, were you?

4    A.  Aspiration -- meconium aspiration is there, but I did not

5    find massive.

6    Q.  That's just what I want to be clear.  So the records show

7    aspiration of meconium, but it's only in your autopsy report

8    where the word massive shows up, correct?

9    A.  Correct.

10   Q.  Now, when you also met with Attorney Koczan, did you ever

11   have any authorization to do so?

12   A.  Authorization?

13   Q.  Yes.

14   A.  No.

15   Q.  You know that I represent the family.  I represent the

16   estate of Kendall Peronis, correct?

17   A.  Correct.

18   Q.  And you understand under the law --

19          MS. KOCZAN:  Your Honor, may we approach?

20          THE COURT:  Let's have a sidebar.

21      (At sidebar.)

22          THE COURT:  Ms. Koczan?

23          MS. KOCZAN:  I believe that this is an inappropriate

24   line of questioning.  Dr. Min was the hospital's pathologist,

25   and I believe it was totally appropriate for me to meet with

1    him to prepare for the deposition that I was requested to

2    provide him with, and I think that this line of testimony is

3    inappropriate here.

4        MR. PRICE:  Your Honor, there was no employment

5    relationship between Dr. Min and the hospital.  I don't

6    understand the basis for Dr. Min to be meeting with a hospital

7    attorney without the proper authorization.  I thought that

8    under HIPAA, only if I gave an authorization could he speak to

9    anybody about it.  Even though he is the sole pathologist for

10   the hospital, he wasn't employed.

11       MS. KOCZAN:  But he was a representative of the

12   hospital that Mr. Price requested that I provide.  He is the

13   hospital's pathologist, and I believe it was totally

14   appropriate, but regardless, that is not an issue in this

15   case, and I'm not sure why we are bringing it up at this

16   point.

17       MR. PRICE:  Your Honor, it's a huge issue in this

18   case, because I believe that this whole clinical summary issue

19   about where massive came from is cooked up.

20       THE COURT:  Okay.  Well, couple of things.  Number

21   one, Mr. Price, I think you would have been better served by

22   bringing this as a motion in limine, number one.  Number two,

23   the court does not have in front of it whatever his

24   organization is, i.e., is he an Inc., is he an LLC, is he a

25   sole proprietor, nor do I have the contract with the hospital.

1          Moreover, I don't have the law vis-a-vis HIPAA.  Now,

2     I do think it's appropriate for you to ask any and all of

3     these witnesses who all they met with prior to their

4     testimony.  It's clear to me that the entire defense team is

5     coordinating, so I'm going to let you stop here, but I think

6     there's a potential argument there.

7          (In open court.)

8     Q.  Dr. Min, one final follow-up on that.  I know that you met

9     with Ms. Koczan, correct?

10    A.  Correct.

11    Q.  Do you recall if you met with anybody else besides

12    Ms. Koczan?

13    A.  When?

14    Q.  When you met with Ms. Koczan, before your deposition.

15    A.  I just met with Ms. Koczan.

16    Q.  Was Dr. Dumpe in the room too?

17    A.  No.

18    Q.  Was the attorney for the United States of America in the

19    room too?

20    A.  No.

21    Q.  Was there anybody else from your staff there too?

22    A.  My assistant later came.

23    Q.  Now, I'm sorry.  I'm getting lost in my notes.  If we

24    could pull up page 13 of Dr. Min's deposition, and what I want

25    to ask you is, now Dr. Dumpe came down to ask you to review

1    the pathology slides on Kendall Peronis, correct?

2    A.  Review the case, correct.

3    Q.  And you told him, okay, at your request, I will review the

4    slides again, correct?

5    A.  Correct.

6    Q.  And whenever you reviewed the slides, at first, you

7    actually concurred or you agreed with your original findings,

8    correct?

9    A.  With the E. coli septicemia and E. coli pneumonia.

10    Q.  And you concurred that the slides showed the septicemia,

11    bronchopneumonia and the massive aspiration of meconium?

12    A.  I will not concur the massive aspiration of meconium on

13    microscopic examination.

14    Q.  Let's read your deposition.  "When Dr. Dumpe came to ask

15    me about the autopsy findings, okay," and you said, "And it

16    was, and I don't quite remember the case well, I told him I

17    will review.  I have to review the slides."

18        And then I said, "Well, tell me about that.  What

19    happened?"

20        And you said, "When I reviewed the slides, actually I

21    concurred with the findings, what I have written down."

22        Correct?

23    A.  I concurred with the findings as a cause of death.

24    Q.  That's what you have written down?

25    A.  Written down as a cause of death.

1  Q.  Right.  And the autopsy report mentions septicemia,

2  bronchopneumonia and massive aspiration of meconium, correct?

3  A.  Correct.

4          MR. COLVILLE:  Object to -- it's mischaracterizing

5  the autopsy report itself.

6          MS. KOCZAN:  I would join in that objection.

7          THE COURT:  Let's rephrase the question then.

8  Mr. Price, we need to rephrase the question.

9          MR. PRICE:  Sure.  If we can go back to Exhibit 7,

10  page 1 and if we could go to microscopic description.

11  Q.  Now, this is what you were reviewing because you were

12  reviewing the microscopic slides, correct?

13  A.  Correct.

14  Q.  And you said that after your first review with Dr. Dumpe,

15  you concurred with your findings that are on this page,

16  correct?

17  A.  I concurred with the diagnosis, the cause of death.

18  Q.  You told me -- do you remember what I just read you?

19  "When I reviewed the slides, actually I concurred with the

20  findings," and the findings would be the microscopic slide --

21  microscopic findings from the slide, correct?

22  A.  Correct.

23  Q.  And the findings show:  Sections of the lungs show almost

24  all of the alveoli are filled with meconium or inflammatory

25  cells, correct?

1    A.   Correct.

2    Q.   Mostly neutrophils indicating acute bronchopneumonia

3    associated with aspirated meconium, correct?

4    A.   Correct.

5    Q.   And then you have noted under your final anatomic

6    diagnosis, massive aspiration of meconium, correct?

7    A.   Correct.

8    Q.   Now, Dr. Dumpe, whenever he came to see you, he wasn't

9    asking you to review the issue about E. coli or

10   bronchopneumonia, was he?

11   A.   He was asking me about I can see pathologically massive

12   aspiration of meconium.

13   Q.   And that was the only issue that he asked you to review,

14   correct?

15   A.   Correct.  When I reviewed the case, I reviewed the whole

16   case.

17   Q.   But his inquiry of you was solely related to the meconium,

18   correct?

19   A.   Massive aspiration of meconium.

20   Q.   Whenever you -- just so the jury understands, whenever you

21   looked at the slides of the lung tissues of Kendall, what you

22   could see in the lungs is what you termed to be debris,

23   correct?

24   A.   Correct, and inflammatory cells.

25   Q.   And debris and inflammatory cells, that could be meconium.

1    It could be bronchopneumonia.  You found aspiration of

2    meconium, correct?

3    A.  I could not prove it microscopically because there was so

4    much inflammation.

5    Q.  At any point since 2014 in any type of case, have you ever

6    amended or changed a report?

7    A.  This case?

8    Q.  Any case.

9    A.  In surgical pathology, I did.

10   Q.  Yes.  You sometimes correct your autopsy reports, correct?

11   A.  Correct.

12   Q.  In this case, you haven't, correct?

13   A.  Correct.

14   Q.  I know that Dr. Dumpe said that, hey, this case is a legal

15   case, but that didn't -- if you wanted to correct your report,

16   there would be no reason stopping you from correcting your

17   report, correct?

18   A.  It is hospital policy any case is in litigation, we are

19   not allowed to change any word or anything.

20   Q.  Okay.  And when did you learn this?

21   A.  Learn what?

22   Q.  That you can't change a report.

23   A.  That's been a fact the whole time.  In the surgical

24   pathology, any kind of report, we cannot -- in a case that's

25   in litigation, we cannot change anything.

1    Q.  And if you could pull up page 23 of Dr. Min's deposition,

2    and we'll just go to the bottom part on to page 24.

3        So I just want to understand.  So you think now that

4    because the case is litigation, you can't amend your report,

5    correct?

6    A.  Correct.

7    Q.  You remember when I took your deposition, the reason why I

8    took your deposition was because the case was in litigation,

9    correct?

10   A.  Correct.

11   Q.  And I asked you at that time why haven't you amended your

12   report?  You said why?  I don't know.  Which would presume

13   that if you wanted to, you could have, right?

14   A.  I said that in the deposition I wasn't -- I didn't remind

15   myself of the policy we had.

16   Q.  If we could go to page 41 of your deposition, line 8

17   through 12 and again, I asked you:  Did both of you talk --

18   that would be -- both of you would be you and Dr. Dumpe.  Did

19   either of you talk about filing an amended report.  You said

20   we did not.  I said are you going to file an amended report.

21   You said I probably will, I suspect, yes.

22       And you haven't, correct?

23   A.  Correct.

24           MR. PRICE:  That's all the questions I have, Your

25   Honor.

1           THE COURT:  Mr. Colville.

2                      CROSS-EXAMINATION

3    BY MR. COLVILLE:

4    Q.  Good morning, Dr. Min.  My name is Michael Colville.  I

5    represent the United States.  So the record is clear, the

6    first time I met you and the only time I met you was at the

7    deposition; is that correct?

8    A.  Correct.

9    Q.  I never met you with Ms. Koczan or anybody else; is that

10   right?

11   A.  No.

12   Q.  As I understand the chronology of this, you get the case

13   referred to you, Baby Kendall's case and you pull the medical

14   record to review it prior to doing your autopsy; is that

15   right?

16   A.  Correct.

17   Q.  You did not speak with any of the treating physicians in

18   this case?

19   A.  Before autopsy, no.

20   Q.  And this issue -- well, you conduct the autopsy, right?

21   A.  Correct.

22   Q.  And then you prepared this report and the report is

23   Exhibit 7, please.  In the report, items 1, 2 and 3 are what

24   you found; is that correct?

25   A.  Yes.  Number 3 is more --

1    Q.  I'm going to get to number 3.  This is the one we have an

2    issue with, massive aspiration of meconium.  At some point

3    subsequent to the autopsy, it's my understanding, based upon

4    your deposition and the testimony of Dr. Dumpe, that he didn't

5    believe that could possibly be the case because of what he

6    said he saw during the delivery and labor of Kendall.

7         Did he come and explain that to you at some point

8    subsequent to the autopsy?

9    A.  He came to me to be certain there was a massive aspiration

10   of meconium.

11   Q.  First things first.  Dr. Dumpe didn't come to you and say

12   please change this.  He didn't ask you to do anything other

13   than review the slides again?

14   A.  Yes.

15   Q.  And he asked you to do that because he had questions

16   himself.  He didn't believe it was possible that there was a

17   massive aspiration of meconium.  Do you agree with that?

18   A.  Yes.

19              THE COURT:  Keep your voice up.

20              THE WITNESS:  Yes.  Sorry.

21   Q.  It's my understanding that, subsequent to this

22   conversation you had with Dr. Dumpe, that you went back and

23   you did look at the slides again, correct?

24   A.  Yes.

25   Q.  And you did think about what you did in leading up to the

1    autopsy report that was prepared; is that correct?

2    A.  Yes.

3    Q.  And at some point, you came to believe that the use of the

4    word massive in your report was a mistake; is that correct?

5    A.  Yes.

6    Q.  It shouldn't have been there because there's nowhere in

7    the clinical record, that's the medical record, where massive

8    is used, correct?

9    A.  Correct.

10   Q.  So we start with this autopsy report has a mistake in it.

11            MR. PRICE:  Objection, Your Honor.  There's no

12   evidence that there was a mistake in this autopsy report.

13            THE COURT:  He just said that massive was a mistake.

14   Go ahead.

15            MR. PRICE:  I missed that.

16   Q.  As you think about this, you realize that the mistake has

17   been made that the report notes a massive aspiration and

18   there's no clinical record of it.  You then look at the

19   slides; is that right?

20   A.  Yes.

21   Q.  When you looked at the slides, you did not find massive

22   aspiration of meconium; is that right?

23   A.  Yes.

24   Q.  Can you pull up --

25            THE COURT:  This is on the second review.

1          MR. COLVILLE:  Yes, Your Honor.

2    Q.  So we are clear -- well, in your first review of the

3    slides, did you find massive aspiration of meconium, or was

4    the massive aspiration of meconium based upon your clinical

5    record alone?

6    A.  It was clinical record alone.

7    Q.  I guess that's a point worth making.  The use of the words

8    "massive aspiration of meconium" on the autopsy report comes

9    solely from your clinical review of the records?

10   A.  My clinical impression of the record.

11   Q.  And that clinical impression is mistaken to the extent

12   that the word massive is included in the aspiration of

13   meconium?

14   A.  Correct, the term massive.

15   Q.  And it's the second review of the slides where you have

16   determined that you cannot determine from those slides that

17   there was a massive aspiration of meconium; is that correct?

18   A.  Correct.

19   Q.  Can we pull up Min depo page 14, line 10 down to here.

20   During your deposition, you were asked:  Did you go on to

21   review the pathology slides, and you've indicated yes, you

22   had.  The question:  From your review, did you find there was

23   massive aspiration of meconium.  Your answer was no.

24        Do you stand by that testimony today?

25   A.  Correct.

1  Q.  Let's go back to Exhibit 7.  This is the original autopsy

2  report.  It's the only autopsy report, correct?

3  A.  Yes.

4  Q.  As to the cause of death, you indicated acute respiratory

5  failure due to neonatal E. coli sepsis and acute

6  bronchopneumonia; is that right?

7  A.  Yes.

8  Q.  Do you stand by that statement today?

9  A.  Yes.

10  Q.  You do not include as a cause of death massive aspiration

11  of meconium or aspiration of meconium as a cause of death; is

12  that correct?

13  A.  Yes.

14  Q.  And you stand by that today?

15  A.  Yes.

16          MR. COLVILLE:  Thank you.  That's all I have.

17          THE COURT:  Ms. Koczan?

18                      CROSS-EXAMINATION

19  BY MS. KOCZAN:

20  Q.  Dr. Min, just a few questions.  You were asked about the

21  meconium, and in particular about the language in the

22  microscopic description that we just had up on the board, and

23  I think I heard you say that you couldn't tell what was there.

24  Is that what you said?

25  A.  Yes.

1   Q.  Can you explain that to the jury?  What did you mean by

2   that?

3   A.  In the lung tissue examination.

4   Q.  Right, in the lung tissue.

5   A.  I did not see microscopically which I can tell or I can

6   recognize as meconium in the lung tissue.  Partly because most

7   of the lung airspaces were filled with inflammatory cells and

8   with debris, so I could not recognize any aspirated meconium

9   or amniotic fluid if it was aspirated.

10  Q.  I want to ask you about that.  You said that sections of

11  the lung showed -- you said are filled with either meconium or

12  inflammatory cells and I want to ask you about the

13  inflammatory cells.  What are inflammatory cells?

14  A.  Inflammatory cells is generally the body's response to --

15  most commonly due to infection.

16  Q.  And you say that it is mostly neutrophils, and is that the

17  component of the white blood cells that fights infection?

18  A.  Yes.

19  Q.  So when we saw in the laboratory data that she only had

20  three neutrophils left, are we talking about the same thing,

21  these neutrophils?

22  A.  Neutrophils.

23  Q.  And neutrophils are sent out from the body to fight

24  infection, correct?

25  A.  Correct.

1    Q.  And you found that the cause of the infection that you

2    identified as her cause of death was E. coli sepsis, correct?

3    A.  Correct, and E. coli pneumonia.

4    Q.  And E. coli pneumonia.  Can you explain the difference to

5    us?

6    A.  E. coli pneumonia means the infection of the lung and

7    acute means the time of the infection interval infection.

8    Sepsis means the organism got into the bloodstream.  That's

9    what we call sepsis, so in this case, pneumonia and sepsis go

10   together hand in hand so pneumonia probably caused the sepsis.

11   Q.  The pneumonia caused the sepsis.  And could you tell from

12   looking at the tissue slides that you prepared how long this

13   process had been in place?

14   A.  Because of many, many neutrophils filling airspaces, even

15   though there are few mononuclear cells, usually neutrophils

16   means very acute phase and it can start from four, five hours

17   to start coming out, but usually day or two have that many

18   inflammatory neutrophils in the alveoli of the lung.

19   Q.  So if I understood what you are telling me, with the

20   amount of neutrophils, this is a process that had been in

21   place for a day or two; is that what you are saying?

22   A.  A day or two.

23   Q.  In terms of the cause of death, that was because of the

24   E. coli sepsis, not because of aspiration of meconium; is that

25   correct?

1    A.  On the basis of my pathology slide, pathologic findings,

2    yes, that's the cause of death.

3    Q.  You also were asked some questions about whether you

4    talked to anybody beforehand, and I think you said in your

5    deposition that you don't remember speaking with anybody ahead

6    of time.

7        I would like you to assume that Dr. Jones has testified

8    that she recalls having a conversation with you sometime

9    before the autopsy was finished.  Do you have any recollection

10   of that?

11   A.  In deposition, I did not remember and I wasn't sure, so I

12   remember I asked my assistant whether he can remember, and he

13   remembered Dr. Jones was down before the complete -- before to

14   file the complete report.

15              MS. KOCZAN:  Thank you.  That's all I have.

16              THE COURT:  Mr. Price, anything further?

17              MR. PRICE:  Yes.

18                        REDIRECT EXAMINATION

19   BY MR. PRICE:

20   Q.  So now, what we just heard is, even though you told me you

21   didn't talk to any doctors, what you are saying now is

22   Dr. Jones came down and talked to your associate and told your

23   associate that this baby had massive aspiration of meconium

24   and that's why you put it in your report?

25   A.  What I said was Dr. Jones was down, and when I asked my

1    assistant, because when I was doing the deposition, I truly

2    did not remember I talked with anybody, and as I talked to my

3    assistant who was there in autopsy, and he told me Dr. Jones

4    was down in my office, just around the time of the autopsy.

5            THE COURT:  Just around the time of autopsy?

6            THE WITNESS:  I'm not exactly sure.  The day I did or

7    the day after.

8            THE COURT:  Do you remember the date of the autopsy?

9            THE WITNESS:  I think on the record it was October

10   14.

11           THE COURT:  October 14.

12   BY MR. PRICE:

13   Q.  If I understand this now, after the deposition where you

14   told me you didn't speak with any doctors, you talked with

15   your assistant, and they said, oh, Dr. Jones came down and

16   told us it was massive aspiration of meconium and --

17   A.  I didn't say that Dr. Jones said massive aspiration of

18   meconium.  I just barely remember, after he reminded me

19   Dr. Jones was down there.  I could not quite remember exact

20   conversation I had, what she told me.

21   Q.  We'll move on to page 32 of your deposition.  At the very

22   bottom, there was a question that I wanted to talk to you

23   about where I asked you, I said, "How often did doctors come

24   down like Dr. Dumpe did in this case and say to you can you

25   please review the slides?"

113

1      And your answer was, rather curious, "Dr. Dumpe asked me

2   to clear out the autopsy findings."

3      Do you remember that?

4   A.  Yes.

5   Q.  So he asked you to clear out all of the autopsy findings?

6   A.  Clear out, what I meant by was to make it clear about what

7   I write down as autopsy findings.  Not removing any sentence

8   or change any autopsy report.

9            MR. PRICE:  Nothing further.

10           THE COURT:  Any additional questions, Mr. Colville?

11           MR. COLVILLE:  No.

12           THE COURT:  Ms. Koczan?

13           MS. KOCZAN:  None.

14           THE COURT:  Doctor, I have a few questions.  I don't

15   think we heard anything about your educational background and

16   training.  Do you want to tell us about that?

17           THE WITNESS:  Yes, Your Honor.  I was born in Seoul,

18   South Korea.  I graduated medical school in Korea, 1968.  I

19   came here 1968, here July 1st for one year.

20           THE COURT:  I'm sorry?

21           THE WITNESS:  Came here in 1968, in Pittsburgh.  I

22   trained one year at an internship in the West Penn Hospital,

23   and after that, I have four years of clinical and anatomical

24   pathology training.

25           THE COURT:  Where did you do that?

1              THE WITNESS:  At West Penn Hospital.

2              THE COURT:  Still at West Penn.  Go ahead.

3              THE WITNESS:  And then I have a three months of

4     hematology oncology fellowship at West Penn Hospital.

5              THE COURT:  Hematology, oncology fellowship.  That

6     was at West Penn.  Then what?  Anything further?

7              THE WITNESS:  After that, I came to Beaver County as

8     a pathologist.

9              THE COURT:  Okay.  Did you go to work right away for

10    Heritage Valley or what?

11             THE WITNESS:  Yes.

12             THE COURT:  So you are board certified as a

13    pathologist and you have been?

14             THE WITNESS:  Yes, Your Honor.  Since 1985.

15             THE COURT:  We were told that you are now retired; is

16    that right?

17             THE WITNESS:  I'm retired right now.

18             THE COURT:  You are retired.  When did you retire?

19             THE WITNESS:  As of end of July.

20             THE COURT:  This past year?

21             THE WITNESS:  Yes, Your Honor.

22             THE COURT:  Congratulations.

23             THE WITNESS:  Thank you.

24             THE COURT:  Now, it was a little bit unclear to me.

25    Are you actually employed by Heritage Valley, or do you have

1    your own practice?

2           THE WITNESS:  I had our own practice as an

3    independent contractor with the Heritage Valley.

4           THE COURT:  So you had an independent contractor

5    relationship with Heritage Valley?

6           THE WITNESS:  Correct.

7           THE COURT:  So you agreed to provide them pathology

8    services, right?

9           THE WITNESS:  Yes.

10          THE COURT:  But you had your own separate business?

11          THE WITNESS:  Yes.

12          THE COURT:  Now, you've mentioned this assistant a

13   couple of times.  Who is that?

14          THE WITNESS:  It was pathologist assistant, like

15   physician's assistant who assist when I'm doing autopsy.  He

16   helps out and he take the sections from the organ to take

17   sections or remove any organs when I ask to remove under my

18   guidance.

19          THE COURT:  Who was that person?

20          THE WITNESS:  Tim Mensevich.  He's still an employee

21   of the Heritage Valley.

22          THE COURT:  So he's still an employee?

23          THE WITNESS:  Yes.

24          THE COURT:  Of your business or of the hospital?

25          THE WITNESS:  Partly our group as well as employee of

1    the hospital.

2            THE COURT:  Okay.  Now, before coming here for your

3    testimony today, did you talk to him about this case?

4            THE WITNESS:  Only time I talked to him about it when

5    I had meeting with Ms. Koczan.

6            THE COURT:  The meeting with Ms. Koczan to prepare

7    for your deposition, right?

8            THE WITNESS:  That was after the deposition.

9            THE COURT:  After the deposition.  So you had a

10   meeting with Ms. Koczan before the deposition.  Then you had

11   another meeting with her after the deposition.

12           THE WITNESS:  I didn't have any length meeting with

13   Ms. Koczan.  I got rather notified the preparation for the

14   deposition, and after deposition, before this testimony, I had

15   meeting with Ms. Koczan.

16           THE COURT:  Okay.  Now, besides Ms. Koczan, was

17   hospital attorney there too?

18           THE WITNESS:  No.

19           THE COURT:  Now, you told us the date of the autopsy

20   was October 14, right.

21           THE WITNESS:  October 14.

22           THE COURT:  And did anybody particularly request the

23   autopsy, or under state law, did you have to do an autopsy

24   because the baby died?

25           THE WITNESS:  It was because of the family requested.

1          THE COURT:  The family requested it.  Okay.  Now,

2     when we saw your report at the bottom of your report, there's

3     a big D/T, that means dictated and transcribed, right?

4          THE WITNESS:  Right.

5          THE COURT:  The date on that that I made a note of

6     was October 27, right?

7          THE WITNESS:  Yes.

8          THE COURT:  Now, does the court's additional

9     questions have any impact on counsel?  Do you want to ask any

10    additional questions?

11                         REDIRECT EXAMINATION

12    BY MR. PRICE:

13    Q.  Did you meet with Ms. Koczan to prepare for your testimony

14    here today?

15    A.  Yesterday, I met her associate.

16         THE COURT:  Mr. Colville, anything else?

17         MR. COLVILLE:  No.

18         THE COURT:  Ms. Koczan, anything else?

19         MS. KOCZAN:  Nothing.

20         THE COURT:  One other thing, since you are retired,

21    are you being paid for your appearance here today?

22         THE WITNESS:  I don't expect to.

23         THE COURT:  You don't expect.  It would be nice but

24    you don't expect it; is that right?

25         THE WITNESS:  Right.

1          THE COURT:  Thank you, Dr. Min, for your appearance

2     today coming out of retirement to rejoin us.  Does Dr. Min

3     need to be recalled?

4          MR. PRICE:  No, Your Honor.

5       (Witness excused.)

6          THE COURT:  Ladies and gentlemen of the jury, we've

7     reached the magic lunch hour.  Once again, I'll give you the

8     instruction.  You are not to discuss this case with anyone

9     including fellow jurors, people involved in the trial and the

10    like, nor can you talk to any friends and relatives about your

11    experiences here.

12         Similarly, you are not to do any research about the

13    case either directly, indirectly or on the Internet.  Once

14    again, I don't know if there is or isn't news coverage on this

15    case.  You should avoid that as it might have an impact on you

16    and what you think about this case because your job is to keep

17    your mind open.  We still haven't heard all the evidence in

18    this case, and certainly, you haven't heard closing arguments

19    nor have you heard the court's instructions.

20         Enjoy your lunch.  Once again, I have a meeting over

21    the lunch hour.  This time it's about pro ses.  Those are

22    people who don't have money to hire lawyers.  The court will

23    be engaged in that meeting from right now until about 1:15 or

24    so.  Let's all try to be back and ready to go at 1:20.

25       (Jury excused.)

1          (Luncheon recess taken 12:04 p.m.-1:28 p.m.)

2          THE COURT:  Thank you, ladies and gentlemen of the

3      jury.  Sorry I was a bit delayed.  As I indicated to you over

4      the lunch hour, I had a meeting with a number of my colleagues

5      and our clerk of court over pro se litigation and funding of

6      same.  It went a little bit over, and I had a couple of other

7      matters to attend to.

8          Mr. Price, your next witness.

9          MR. PRICE:  Before that, Your Honor, just a

10     housekeeping matter, the PowerPoint slides from Dr. Min's

11     testimony.

12         THE COURT:  Thank you.

13         MR. PRICE:  We will call Kylee Fritzius.  She is

14     outside.  I'll go get her.

15         THE CLERK:  Please step forward, miss.

16         THE COURT:  You must approach my deputy to be sworn.

17         THE CLERK:  Please state and spell your name for the

18     record.

19         THE WITNESS:  Kylee Fritzius, K-Y-L-E-E, Fritzius,

20     F-r-i-t-z-i-u-s.

21         (Witness sworn.)

22         THE COURT:  Watch your step getting up there.  It's a

23     little uneven.  Once you are seated, if you'll arrange the

24     microphone so you are speaking into it.  Mr. Price, you may

25     proceed.

1        KYLEE FRITZIUS, a witness herein, having been first

2    duly sworn, was examined and testified as follows:

3                    DIRECT EXAMINATION

4    BY MR. PRICE:

5    Q.  Good afternoon, Kylee.  Can you please tell us your full

6    name and where do you live?

7    A.  Kylee Fritzius, and I live in New Brighton, Beaver County.

8    Q.  And can you pull that up a little closer to your mouth,

9    move your chair in just a little bit?  Can you tell us your

10    relationship to Matt and Carissa?

11    A.  Yes.  Matthew is my little brother, and Carissa has been a

12    friend for many years.

13    Q.  Now, tell us a little bit about yourself.  Did you

14    graduate from high school?

15    A.  I am a high school graduate.  I also have a 4.0 GPA from

16    DCI Career.  It's a degree for medical assisting.  I'm the

17    mother of a nine-year-old and a ten-month-old, nine-year-old

18    girl and ten-month-old boy.  I've worked at Saga Hibachi

19    Steakhouse for the last eight years.

20    Q.  Great.  That little bit of background, so you yourself

21    have had children before.  Well, you had one before Kendall

22    was born and one after?

23    A.  No.  I had two before Kendall.  My son passed away.

24    Q.  Now, you had a son in the neonatal intensive care at West

25    Penn for some time?

1    A.  Six months, correct.

2    Q.  You were familiar with caring for children and the

3    birthing process and things of that nature?

4    A.  Yes.

5    Q.  During that time, I know it's a struggle for you, did

6    Matthew and Carissa help you out at all?

7    A.  Nearly every day they transported me.  My son's father

8    worked in the city.  I didn't have a license, so Matt and

9    Carissa would take me to visit Cyrus.

10   Q.  I want to now go back to 2014.  Obviously you found out

11   Carissa was pregnant?

12   A.  Yes.

13   Q.  How did you find out?

14   A.  She told me.

15   Q.  Did you guys talk about that?

16   A.  All the time, yes.  We're going to be sisters.

17   Q.  Did she have any -- I mean, how was she after being

18   pregnant?  Was she happy?  Sad?

19   A.  She was very excited.  They were both excited.  They were

20   both happy.  They were getting an apartment together when they

21   found out she was pregnant.  She was very healthy and Matt

22   took good care of her.

23   Q.  Did you go to any of the prenatal visits with her?

24   A.  No.

25   Q.  Do you remember any problems that she talked to you about

1  during the pregnancy?

2  A.  No.

3  Q.  So let's jump head to October 12.  Did you find out

4  Carissa was in the hospital?

5  A.  Yes.

6  Q.  How did you find out?

7  A.  She called to tell me she was in labor.

8  Q.  And did you go to the hospital on October 12?

9  A.  Yes.

10  Q.  Do you remember about what time you got there?

11  A.  1:00 or 2:00 in the afternoon.

12  Q.  Do you remember where you went?  Did you go into the room?

13  A.  I first got to see her in the room hooked up to monitors,

14  and the remainder of the time, I was in the waiting room.

15  Q.  Who else was in the waiting room with you?

16  A.  There was my mother, Carissa's family, her mother, her

17  yiayia, her grandma, her little brother Hunter, Matthew, my

18  cousin Tyler, a friend of hers is Taylor, there was Lindsay

19  Dietz, April Bradley.  Towards the end of the night, her

20  stepbrother Buck and his girlfriend Jess.

21  Q.  I assume these people would come in and come out?

22  A.  Come and go, yes.

23  Q.  Did you leave or did you stick around?

24  A.  I stayed until Kendall was born, yes.

25  Q.  Were you allowed back into the room at any time while

1    Carissa was pushing?

2    A.  Not while pushing, no.

3    Q.  So let's talk about after Kendall is born.  You are in the

4    waiting room?

5    A.  Correct.

6    Q.  Did somebody come out and tell you?

7    A.  No.  I was not in the waiting room.  I was outside the

8    waiting room in a hallway where I could hear what was going on

9    in the room.  I was in the hallway of the delivery department.

10   Q.  What do you remember about that?

11   A.  A lot of heart wrenching screams for a long time.  I told

12   her grandmother yiayia more than once to go back and check on

13   her because it just didn't sound right.  It was about two

14   hours of screams.

15   Q.  She delivered an eight pound seven ounce baby?

16   A.  Yes.

17   Q.  And were you able to go into the delivery room after the

18   delivery?

19   A.  Yes.

20   Q.  And do you remember who was in the delivery room when you

21   went in?

22   A.  Her mother had already been in there along with my brother

23   Matthew.  Before me, they allowed her grandmother yiayia to

24   come back, and they allowed me, Lindsay, Tyler, April, Taylor

25   and Hunter, Buck and Jess all to go into the room at the same

1    time.

2    Q.  Do you remember was Dr. Dumpe or any of the nurses,

3    anybody else in the room at the time that you got to go back?

4    A.  I watched Dr. Dumpe leave the delivery room right after

5    she had had Kendall, because I was watching through the door,

6    and I watched Dr. Dumpe leave and exit through the back door

7    of the hallway, and while I was in there, there were no

8    nurses, no.

9    Q.  Okay.  If you could pull up Exhibit 36.  Can you describe

10   this picture?

11   A.  That's my brother.  He's obviously excited to see his

12   daughter.

13   Q.  Do you remember seeing Matthew hold Kendall?

14   A.  Yes.

15   Q.  And how was Kendall when Matthew was holding her?

16   A.  Very distraught.  She was in a lot of stress.  You can

17   tell her face.  She flares her nose.  Her eyebrows are

18   squints.  She would whine and cry a lot.  I kept telling him,

19   Matt, there's something wrong.  This isn't a hunger type of

20   cry.

21   Q.  Let's go to the next picture.  See if it's -- 37, please.

22   I know it's basically the same picture.  He's got a different

23   expression.  Let's try 38.  And do you remember taking those

24   pictures?

25   A.  Yes.

1    Q.  And do you remember who else was in the room whenever

2    those pictures were being taken?

3    A.  Yes.  Her mother, her grandma Bonnie, yiayia, Matthew,

4    Lindsay and April and Hunter.

5    Q.  Do you remember what the conversation was that was going

6    on in the room whenever you were in there?

7    A.  The conversation?

8    Q.  Like about the baby.

9    A.  Yes.  Well, when I first come in, he let me know that she

10   had inhaled something.  That's all he told me.  He didn't

11   specify what.  He said there was no complications.  I asked

12   Carissa if she was okay.  She spoke to me.  She said, Kylee,

13   I'm never doing this again.  She was really tired.  She said

14   let me see her.  Matt handed her to me.  She was crying.  I

15   was trying to sooth her.  I placed Kendall near my neck to

16   give her a little warmth.  She seemed to be cold and fidgety

17   and she wouldn't stop crying.

18   Q.  Let's pull up Exhibit 42.  Who is that a picture of?

19   A.  That is me and Kendall.

20   Q.  And can you describe how Kendall was whenever you got to

21   see her?

22   A.  She was very, very stressed.  She was screaming.  Not a

23   hunger cry.  I'm a breastfeeding mother.  I know a hunger cry

24   when I hear one.  That was more so of a pain cry.  I wasn't

25   comfortable with everybody passing her around.  You can tell

1    my smile is completely fake.  I don't really want to be taking

2    this picture right now.  She is not okay.

3    Q.  How about Exhibit 43?

4    A.  That's me holding Kendall, and that's another she is

5    grimacing her face, flaring her nostrils.

6    Q.  Did you notice was Kendall, I mean, all cleaned up

7    whenever you got her?

8    A.  She was not.  The picture doesn't really do justice unless

9    they have anymore in different UV lights, I would say.  I

10   remember her hat.  I remember seeing scrapes on her head,

11   little bit of blood and tinge around the ears, like a green on

12   that yellow cap, and it also being around the neck of her --

13   the blanket was tinged darker colors and her ears and in her

14   nostrils and she was covered in other, like, grayish gritty.

15   Q.  Now, let's go to Exhibit 44.  That's another close-up

16   picture.

17   A.  Yes.  Her lips are bluish, and that's when I said

18   something to Matt.

19   Q.  Were you able to, whenever you were holding Kendall, were

20   you able to console her?

21   A.  No.

22   Q.  Because I know Matthew said for a little bit whenever he

23   held her --

24   A.  Yeah.  When he held her for a minute, she seemed to calm

25   down, but then she started screaming again.

1    Q.  Did you see whether or not Carissa was able to hold
2    Kendall?
3    A.  While I was in there, it was just me and Matt that were
4    holding her.
5    Q.  And this was, I know that -- let me ask you this:  Do you
6    know about how long you were in the room?
7    A.  Yeah.  I would say roughly 30 minutes.
8    Q.  Now, we know that Kendall was born at 5:20, and around
9    5:30, they gave the baby to you guys and then she left close
10   to 7:00, so in that hour and a half, what section of 30
11   minutes were you in?
12   A.  I went back out to the waiting area after I had seen
13   Kendall to wait for Lindsey to take me home but she wanted to
14   hold her first.  I wanted to step out, give them all time, so
15   I was in there right after for about 30 minutes, and in that
16   time, only her mother, Tyler, me and Matt held her.
17   Q.  Now, I know that you've already talked about this, but was
18   she crying?  Did she stop?
19   A.  No, she never stopped crying.
20   Q.  Did you notice anything about how she was breathing?
21   A.  Yes.  I could tell that she was struggling to exhale, like
22   she would have a grunt after each exhale.  She would grunt a
23   little bit, and when she was screaming, it would sound as
24   if -- like a wet cough.  I could hear when she was in between
25   breaths like a gurgling as if something were to be stuck in

1   her throat.

2       Sometimes when my kid eats, she gets a wet throat after

3   food and her voice changes after she eats, so I know that

4   something had to be blocking her esophagus, and I let Matt

5   know something is wrong.  I want you to get a nurse.  He went

6   out, and I said where is she.  He said the nurse said the baby

7   is fine.  We just have to get to know her.

8   Q.  Besides that, at any time did you see -- I mean, a nurse

9   did not come into the room, correct?

10  A.  Right.

11  Q.  Matt took the baby out to a nurse?

12  A.  No.  I held her when Matt went to get the nurse.  When he

13  didn't return with a nurse, I gave him back the baby and I

14  left.

15  Q.  At any time, did you see a nurse come into the room?

16  A.  No.

17  Q.  At any time, did you see a nurse come and like do any

18  examination of Carissa?

19  A.  No.

20  Q.  What was Carissa doing during the time that you were in

21  there?

22  A.  Watching all of us.  I mean, she was in and out of it, but

23  she was awake.  She was there watching us.  I spoke to her.

24  She joked about it being painful and never wanting to do it

25  again.

1    Q.  Did you see a nurse come in and do any type of examination

2    of Carissa's uterus or anything like that?

3    A.  No.

4    Q.  At any time, did you see any nurse come in to check on

5    Kendall?

6    A.  No.

7    Q.  Besides telling Matt to get a nurse, did you hear anybody

8    else talk about getting a nurse?

9    A.  Yes, her mother.  After a nurse had come, Matt said she

10   just needs to bond with us.  I gave her back to Matt.  She

11   still continued to cry.  Her mother went out to see if they

12   could get a nurse.  I let yiayia know she shouldn't be

13   screaming like this, and I got to an uncomfortable point where

14   I didn't want to be in there.

15   Q.  Did you leave?

16   A.  I left the delivery room, yes.

17   Q.  Were you in the room whenever Tyler Janectic was in the

18   room?

19   A.  Yes.

20   Q.  And because Tyler said he was there closer to 7:00.

21   A.  Yes.  I've gone back.  Like, I left, and I saw Kendall

22   twice, yes.

23   Q.  You saw him twice, so you came back in?

24   A.  Yes.

25   Q.  When did you come back in?

1    A.  I'm not really sure.  Me and Lindsay left a little after

2    7:00, but I went to ask her if she could take me home because

3    my boyfriend was coming up to see Carissa.  His name is

4    Christopher Cleckly.  He was also there, but he wanted to stay

5    for a little bit, so I asked Lindsay to take me home.

6    Q.  Whenever you were in there, you were with -- you were in

7    there with Tyler, did you ever see him go out to try to get a

8    nurse or anything like that?

9    A.  Matt asked him to get a nurse, yes.

10   Q.  Did you see any nurse come in after that?

11   A.  No.

12   Q.  After you left, you left with Taylor?

13   A.  Lindsay Tyler.

14   Q.  I'm sorry.  Lindsay and Tyler.

15   A.  No.  Lindsay Tyler.  That is her last name.

16   Q.  I apologize.  There's Tyler and Taylor.  I've been getting

17   confused.  At any point -- whenever you left, was it Matt and

18   Carissa still in the room?

19   A.  Yes.

20   Q.  And they were just with Kendall?

21   A.  Yes.

22   Q.  I know that you, after that, went home?

23   A.  I went to a friend's, yes.

24   Q.  And it was a long night, and what did you do after that?

25   A.  I went right to sleep, and I woke up to my mother calling

1    me to tell me to return to the hospital, that something might

2    be wrong with Kendall.

3    Q.  And whenever you got back there, what do you remember

4    next?

5    A.  That she -- I called Tyler to see if he could pick me up

6    to take me up to the hospital, and then my mother beeped back

7    in on the phone.  I told him to hold on.  She said you need to

8    come up now.  Kendall is dead.

9        I switched back over.  Told Tyler.  He was about ten

10   minutes away.  He was there in like five minutes.  I got in

11   the car.  We rushed up to the hospital.  It was a different

12   waiting area.  It was like a recovery side of the hospital

13   that we were in now, and I went in, you know, very upset,

14   because we had already, all night, had suspicions from her

15   pushing to Kendall nonstop crying all night long suspecting

16   something is wrong, and now she is gone.

17       So I went in and I yelled at her grandmother.  I said

18   yiayia, I told you something was wrong.  You need to do

19   something about this right now.  She said there's nothing

20   anybody could do.  I was told to lower my voice or I would

21   have to leave, so I sat down with family.

22   Q.  Did you talk to Matt and Carissa that day?

23   A.  That day, no.

24   Q.  I want to move off into the days and weeks after that.

25   Can you tell us a little bit about are you still friends with

1  Carissa?

2  A.  Yes.

3  Q.  Are you still friends with Matthew?

4  A.  Yes.

5  Q.  Did you hang out with them -- you hung out with them

6  before the delivery, while she was pregnant, right?

7  A.  Correct.

8  Q.  Can you tell us about what you saw about them after

9  Kendall's passing?

10 A.  A lot of pain.  It broke them.  It's not easy for Matt to

11 speak on it to me, only because he's seen me lose my child, so

12 it was more so we can look at each other and just know.  We

13 don't have to say anything.  He knows my pain.  I know his

14 pain, but from the mother aspect, I could tell that it was too

15 much to watch her go through for him.

16     Like, he has a good heart and he already seen it with me.

17 He couldn't watch it with Carissa, so it did, it broke their

18 relationship.  I wouldn't say she became obsessive with it,

19 but she was stuck in the hurt for a really long time.  He is

20 somebody who tries to stay positive and move past things.

21     You can't change what happened, but a mother loses a child

22 wants to grieve, so she did that for a while.  I stayed by her

23 side because I understood the pain and what it's like to go

24 through and how it is to be left after that as well in

25 situations like that or even just having a baby tend to make

1    or break a relationship.  It broke it.

2    Q.  Okay.

3              MR. PRICE:  That's all the questions I have, Your

4    Honor.

5              THE COURT:  Cross-examination, Mr. Colville?

6                      CROSS-EXAMINATION

7    BY MR. COLVILLE:

8    Q.  Good afternoon, Ms. Fritzius.  My name is Michael

9    Colville, and I represent the United States in this case.

10   Just a couple questions to clear up what you just testified

11   to.

12   A.  Okay.

13   Q.  Do I take it you were in the room two separate occasions;

14   is that correct?

15   A.  Correct.

16   Q.  First occasion was shortly after the baby was delivered?

17   A.  Correct.

18   Q.  You weren't there when the delivery occurred?

19   A.  Correct.

20   Q.  Were you there immediately after the baby had been taken

21   care of by the nursing staff there?

22   A.  Yes.

23   Q.  So the nursing staff had done their assessment shortly

24   before you came in; is that right?

25   A.  Correct.

1    Q.  So they weighed the baby and done Apgar scores and

2    swaddled the baby --

3    A.  Correct.

4    Q.  -- in the blanket.  How soon after that do you think you

5    came in?  Couple minutes?

6    A.  Apgars are done like one minute, five minute.  I would say

7    within ten minutes, after about ten minutes, I was in there,

8    yes.

9    Q.  When you came in, who had the baby in their hands?

10   A.  Matthew.

11   Q.  So had the baby been given to the mother already at that

12   point?

13   A.  Not that I seen, no.

14   Q.  Were the nurses still in the room?

15   A.  No.

16   Q.  So there were no nurses at all?

17   A.  No nurses.

18   Q.  So it was just the family and the baby?

19   A.  All family, all friends.

20   Q.  Now, you mentioned at some point that while you were in

21   that room that first time, you were there when Dr. Dumpe left?

22   A.  No, no.  I wasn't in the room when Dr. Dumpe left.  I was

23   in the hallway of the delivery room, and that's how I knew the

24   baby had been born.  Dr. Dumpe was done.  I watched him exit

25   the back hallway pushing the cart of bloody things.

1  Q.  Okay.  So Dr. Dumpe -- so you -- are you aware that

2  Dr. Dumpe had to take care of Carissa after she gave birth?

3  A.  No.  To my knowledge, he left right after birth.

4  Q.  So you believe that what she did was she delivered the

5  baby, gave it to the nurses, and the nurses did what they had

6  to do, handed the baby over to the family, and while that was

7  being done, Dr. Dumpe left the room and had no involvement

8  whatsoever with Carissa?

9  A.  To my knowledge, yes.

10  Q.  So I take it you believe that he left within a couple

11  minutes of the baby being delivered?

12  A.  Yes.

13  Q.  You indicated the baby was crying the whole time you were

14  there.  Are you saying for that first time you were there, the

15  first 30 minutes?

16  A.  Yeah.  When I was in the room, but I also left.  It is

17  sectioned off by doors, but I could still hear her crying.

18  Q.  I want to focus on the first 30 minutes while you were

19  there.

20  A.  Yes.  She cried the entire time.

21  Q.  I thought in your deposition, you and Matt were the ones

22  passing the baby back and forth, right?

23  A.  Yes.

24  Q.  And the baby was crying when you were holding her?

25  A.  Yes.

1    Q.  But when you gave the baby to Matt, the baby stopped

2    crying?

3    A.  For a second.  Maybe a minute or two.

4    Q.  That's not what you said in your deposition though.  You

5    didn't quantify or qualify it.  You said the -- the only time

6    the baby would not cry is when Matt held the baby.  Do you

7    remember that?

8    A.  I do not remember saying that.

9    Q.  During that first 30 minute period when you were there,

10   were there any nurses when you walked in at all?

11   A.  No, sir.

12   Q.  And there were no nurses for the 30 minutes you stayed

13   that first time?

14   A.  Correct.

15   Q.  And as I understood your testimony, there were a lot of

16   people in the room at that point?

17   A.  Correct.

18   Q.  Is it ten or 12 people?

19   A.  All family and friends, yes.

20   Q.  And pretty exciting time, I take it?  Everybody was --

21   A.  Yes.

22   Q.  Everybody was excited.  Everybody is talking to everybody?

23   A.  About getting a nurse.

24   Q.  Were you talking about the baby at all?  Were you talking

25   to Carissa?  Were you talking to Matt?

1   A.  Yes.

2   Q.  Were you talking to them about the baby?

3   A.  Yes.

4   Q.  Were you talking about the pain or the happiness?

5   A.  Yes.

6   Q.  Or the joy?

7   A.  The pain that she was in, yes.

8   Q.  And that whole time, the baby was being passed around as

9   well, correct?

10  A.  Yes.

11  Q.  During that time the baby was crying a lot, you indicated

12  it was loud?

13  A.  Yes.

14  Q.  It was sort of a chaotic scene, right?

15  A.  No.  It was not very chaotic.  We weren't passing her

16  around.  I held her for a good, like, five, ten minutes before

17  I would give her back to Matt.  It was me and Matthew that

18  were holding her where I'm trying to figure out if something

19  is wrong or I'm trying to console her.  I'm, like, here, you

20  take her.  Maybe you can do it.  I let him know don't let

21  everybody start grabbing on her when she's a newborn.

22      I was confused as to why there were so many people in

23  there.  I've never seen that happen.  I was just like, here,

24  let's just focus on trying to calm her down.

25  Q.  There were also people taking pictures at the same time?

1   A.   Yes.

2   Q.   Selfies, pictures of each other, with and without the

3   baby?

4   A.   Correct.

5   Q.   Smiling?

6   A.   Yeah.

7   Q.   Looking at the baby?  And when you were asked about

8   whether you saw -- are you saying there was no nurse or you

9   didn't see one or notice one during that 30 minute period you

10  were there?

11  A.   I know twice, we requested a nurse and she did not come to

12  the room.

13  Q.   Aside from requesting a nurse, I'm saying --

14  A.   No nurse came in to check Carissa, to check Kendall, to do

15  anything in the room at all while I was there.

16  Q.   The reason I ask is there are medical records that we've

17  gone through in this case, and there are records which

18  document vitals, temperature, blood pressure and such were

19  taken of Carissa every 15 minutes, and then there were also

20  records that showed that the nursing staff, one of the nurses

21  that was there, Nurse Hackney during the delivery who would

22  come in every 15 minutes and check on Carissa and move her

23  bed, give her ice, feel her abdomen.

24       Your testimony conflicts with that.  I want to make sure

25  none of that type of stuff happened and you may have just been

1    distracted by what was going on in that room.

2    A.  Yes.  I stayed in one corner by the bed with Carissa and

3    the baby, so I know while I was in there, there was no nurse

4    in there.

5    Q.  Now, when was the second time?

6    A.  Pretty close to 7:00 a.m.

7    Q.  Pardon me for interrupting.  The baby is born at 5:20.

8    A.  Uh-huh.

9          THE COURT:  You are saying yes.

10          THE WITNESS:  Yes.

11          THE COURT:  I need to make a record.

12    Q.  You come in shortly thereafter, and you stayed for about

13    30 minutes, so between 6:10 and 6:15, you leave?

14    A.  Correct.

15    Q.  How long are you gone from the room?

16    A.  About 45 minutes.

17    Q.  So that takes us to like 7:00?

18    A.  Correct, but I wasn't gone from the room.  I was in the

19    hallway of the room.  I was letting everybody else in there.

20    Q.  I understand.  But there's a reason I'm asking.  You say

21    there was a second time you were in the room?

22    A.  Yes.

23    Q.  So you would have -- you believe you came back in the room

24    at 7:00?

25    A.  Yes.

1    Q.  Who was in the room at 7:00?

2    A.  Everybody.  Her grandmother, her yiayia, her grandma

3    Bonnie, my brother, her two brothers, one is a stepbrother,

4    Jessica Rosenburg, April Bradley, Lindsay Dietz, my cousin

5    Tyler, Taylor, no nurses, Carissa, Matt and Kendall, and I had

6    asked Lindsay if she was able to take me home, because my

7    boyfriend was on his way to pick me up, but he wanted to spend

8    time with them.

9         So I was like, okay, I'll see if Lindsay will take me back

10   to New Brighton.  I brought Christopher to the room to see

11   Carissa and my brother.  I asked Lindsay if she was leaving.

12   Q.  How big is this room?

13   A.  It's a big room.

14   Q.  Is there one bed in it?

15   A.  One bed.

16   Q.  One bathroom?

17   A.  One bathroom.

18   Q.  Is there a couch or chair?

19   A.  Yes.  There was a chair.  There was also the place where

20   they placed a newborn baby.

21   Q.  Was there a television?

22   A.  Yes.

23   Q.  There was about -- was it the same 12 people that were in

24   the room, give or take, the first time you were in that were

25   still there the second time?

1    A.  Yes.

2    Q.  Were those people still talking with each other,

3    interacting with Carissa and Matt?

4    A.  At this point, her mother was being concerned, yes.

5    Q.  Were they taking pictures still?  Selfies?

6    A.  No.

7    Q.  Were they still passing the baby around to hold and take

8    pictures with?

9    A.  No.  I went in, and I just asked Lindsay if she was ready

10   to go.  She had the baby at the time.  She gave her to

11   Carissa's mother and said that we will come back later.

12   Q.  Now, I thought you testified earlier that during that

13   second time is when Tyler Janectic was in the room; is that

14   right?

15   A.  Tyler was in there the whole time, yes.

16   Q.  For the second time you were in.  Isn't this when he went

17   out to the nurses' station to talk to somebody to ask for a

18   nurse to come in?

19   A.  That's when I went in.  I wasn't in there when Matthew

20   asked him to get a nurse.  I was in the hallway when he came

21   to get a nurse, so I saw him come out of the room to ask for

22   one.

23   Q.  You were going in as he was coming out, or you happened to

24   be in the hallway?

25   A.  I was in the hall when he went out.

1   Q.  When was that relative to when he went in following that?

2   A.  A little before 7:00.

3   Q.  And did you hear Matthew ask Tyler to go get a nurse?

4   A.  No.

5   Q.  Tyler told you that he was going to get a nurse because

6   Matt --

7   A.  No.  He didn't tell me anything.  When he came out, I

8   didn't know why he was coming out.  I just went in to ask for

9   a ride home, and then he came back and let Matt know that a

10  nurse said that nothing was going to -- I didn't know why

11  Tyler was sent out there.

12  Q.  Tyler testified yesterday that Matthew asked him to go out

13  to the nurse to get a nurse to come in because the baby was

14  crying.  Is that your understanding of why he went out?

15  A.  Yes.

16          MR. COLVILLE:  That's all I have.  Thank you.

17          THE COURT:  Ms. Koczan?

18                      CROSS-EXAMINATION

19  BY MS. KOCZAN:

20  Q.  Good afternoon.  Just a couple of questions.

21  A.  Okay.

22  Q.  Kylee, you are, and I think you've already told us that

23  you are Matthew's sister?

24  A.  Correct.

25  Q.  And you are Carissa's friend?

1    A.   Correct.

2    Q.   And in fact, you are Carissa's best friend, right?

3    A.   One of them, yes.

4    Q.   You were her best friend?

5    A.   Yes.

6    Q.   And in terms of your education and background, you told us

7    that you are a high school graduate, correct?

8    A.   Correct.

9    Q.   And at the time this was going on, did you have any

10   education beyond that?

11   A.   Yes.  I got certified as a medical assistant in 2011 from

12   DCI Career Institute where I did a four week extern with a

13   plastic surgeon Beverly Carl, and I went on for three years as

14   a supervisor in a nursing home.

15   Q.   And you are not trained though as an LPN, correct?

16   A.   Correct.

17   Q.   And you are not trained as an RN, correct?

18   A.   Correct.

19   Q.   And you have never worked in a maternity ward, correct?

20   A.   Never worked, no.

21   Q.   And never worked in a nursery before?

22   A.   I lived in one for six months but never worked.

23   Q.   And were not trained as a maternity nurse, correct?

24   A.   Correct.

25            MS. KOCZAN:  Thank you.  That's all.

1           THE COURT:  Mr. Price, any additional questions of

2      this witness?

3           MR. PRICE:  No, Your Honor.

4           THE COURT:  Now, Ms. Fritzius, I have a few

5      questions.  Unfortunately we don't have any pictures of this

6      labor and delivery suite, so what you've described is a fairly

7      large room with a bed in it, a couch in it, was there a place

8      for Matt to sleep overnight if he wanted to do that.

9           THE WITNESS:  I remember a chair.  I don't remember a

10     couch.

11          THE COURT:  A chair.  And there was a TV in there.

12          THE WITNESS:  This is the delivery room.  It's not

13     the recovery aspect, yes.

14          THE COURT:  Now, where was this room vis-a-vis the

15     nurses' station, if you know?

16          THE WITNESS:  Pretty much directly across.  If you

17     walked out, the nurses' station was visible, yes.

18          THE COURT:  When you came and went as you described,

19     did you see any nurses at the nursing station?

20          THE WITNESS:  At the station, yes.

21          THE COURT:  What were they doing?

22          THE WITNESS:  On the computer or just sitting there

23     talking.

24          THE COURT:  Now, while you were there, was the baby

25     always wrapped up in that swaddling?

1          THE WITNESS:  While I was there, yes.

2          THE COURT:  Anybody take that swaddling off at any

3    time while you were there?

4          THE WITNESS:  No, not while I was there.

5          THE COURT:  Does the court's questioning cause either

6    attorney to have any additional questions?

7          MR. PRICE:  No, Your Honor.

8          MR. COLVILLE:  No, Your Honor.

9          MS. KOCZAN:  No.

10          THE COURT:  Thank you, Ms. Fritzius, for your

11    appearance here today.  You may step down.  I trust she can

12    also be excused; is that right?

13          MR. PRICE:  Yes.

14      (Witness excused.)

15          THE COURT:  Mr. Price, your next witness.

16          MR. PRICE:  Recall Matthew Fritzius.

17          THE COURT:  Mr. Fritzius, if you'll approach.  You

18    were sworn yesterday, but Mr. Galovich, if you'll readminister

19    the oath.

20      (Witness sworn.)

21          MATTHEW FRITZIUS, a witness herein, having been first

22    duly sworn, was examined and testified as follows:

23                        DIRECT EXAMINATION

24    BY MR. PRICE:

25    Q.  Yesterday, we left off just as you two were starting the

1    labor progress, and we showed the picture of you two in -- why

2    don't we put up Exhibit 28 just to refresh the recollection of

3    where we left off?  And this is the selfie picture that

4    Carissa took.  You guys are in the labor and delivery room,

5    right?

6    A.  Yes.

7    Q.  Okay.  Now, tell us a little bit about this time from

8    October 12 into the 13.  Do you remember -- let's go to -- you

9    get admitted in the afternoon.  What do you remember about

10   Carissa's progress of labor that afternoon?

11   A.  As far as the progress of labor goes, to my understanding,

12   everything was going fine.  There were no concerns.

13   Q.  Okay.  And do you remember seeing Dr. Dumpe come in?

14   A.  Yes.  There was a few times he came in.  There was one or

15   two times I had to step out of the room because they have to

16   do some sort of evaluation on her, things of that nature, but

17   yes, I do remember Dr. Dumpe coming in the room.

18   Q.  Now, we talked about and everybody knows at 6:30, around

19   there, that Carissa's membranes were ruptured.  Do you

20   remember were you in the room when that happened?

21   A.  I can't say I was exactly in the room for it, but I

22   remember being there after most definitely because the nurse

23   was showing me some of the fluids that had been, you know,

24   involved with the process of that.

25   Q.  Can you describe for us what that looked like or what did

1    you see?

2    A.    It's been the green fluid that we have been talking about

3    the entire time.

4    Q.    And how did she show it to you?

5    A.    It was on, like, a white -- just a white towel or like a

6    white sheet that was under Carissa.  I can't really recall.

7    Q.    What does she do with that?

8    A.    She just threw it away.

9    Q.    Now, at that time, did you know anything about this word

10    meconium?

11    A.    At the time, she said the word, but I had not one clue

12    what it meant.  I was waiting for my daughter to get here.

13    Q.    And I know that you talked about what color it looked

14    like, but can you describe what you saw on the sheet?

15    A.    Yeah.  It was just like -- it was like a greenish brown

16    mix.  Like really like a big nasty booger that you didn't

17    want, like if you had a real bad hocker and you was trying to

18    get it out.  It was like this thick green brown mix.  That's

19    the best way I can describe it.

20    Q.    That's very descriptive.  After -- did you see that

21    continue?

22    A.    Throughout the night, yes, I did see that continue.

23    Q.    Now, you saw while you were here that Dr. Dumpe had

24    brought up different color things of Gatorade?

25    A.    Yes.

1  Q.  Were you able to see any of the discharge on the sheets?

2  A.  Yes, I was.

3  Q.  And from the colors of the Gatorade, were you able to

4  determine what -- was there any color to this discharge?

5  A.  With those beautiful examples, yes, it would be the

6  darkest one to my left.

7          THE COURT:  You are looking at and you are pointing

8  to what is the government demonstrative exhibit.

9          MR. PRICE:  Yes, the Gatorade exhibit.

10          THE COURT:  Government 2.

11          MR. PRICE:  Yes.

12  Q.  Did you have any discussions with anybody?  Did anybody

13  talk to you about that, what you were seeing?

14  A.  As far as discussions go, I know Nurse Hendershot was very

15  interactive with me throughout the entire night.  She was

16  really engaged with me, you know, to keep me aware of what's

17  going on, but as far as information goes, like the entire

18  night, I was just really excited for my daughter to get here,

19  so I was just, you know, anxious for that to happen.

20  Q.  Do you remember, were there any other opportunities -- not

21  opportunities but any other times after 6:30 into the early

22  morning hours before Carissa started pushing that you saw

23  anymore of these towels, napkins being removed?

24  A.  Yes.  They had come in on more than one occasion to just

25  come down and, like, check on her to see how she is

1    producing -- progressing, I guess, and they would just wipe it

2    down.

3    Q.  Was this the type of thing during labor a woman is lying

4    on a pad?

5    A.  Yes.

6    Q.  And then the nurse would come in, lift up the cover and

7    remove the pad and put another one in?

8    A.  Yes.

9    Q.  The type of thing Carissa would have to roll back and

10   forth on because it was underneath her?

11   A.  Yes.

12   Q.  Now, do you remember -- I know you said you mentioned you

13   remembered Nurse Hendershot.  What do you remember about her?

14   A.  I think I mentioned some of it yesterday.  Like I said,

15   she was very interactive with us.  She was very supportive of

16   the entire process.  She would take notes on her pant leg,

17   which I thought was a little odd, but I guess that's what

18   happens in hospitals.  That's what they do.

19       Like I said yesterday, she told me to remind her every 15

20   minutes about checking up on this and checking up on certain

21   monitors and things of that nature.

22   Q.  Now, we're getting to the point where it's early morning,

23   3:40 in the morning.  She starts pushing.  Do you remember

24   starting into that process?

25   A.  Yes, I do.

1    Q.   What do you remember about it?

2    A.   I just remember being ready, being like really anxious,

3    excited because this is going to happen, but little did I know

4    that this process could take over an hour and a half.

5    Q.   Who was in the room with you during this pushing process?

6    A.   Dana was with me the entire time and Dr. Dumpe was there.

7    I believe, like, when she started pushing, I believe Dr. Dumpe

8    was involved.  I don't know exactly when he came in, but

9    majority was Nurse Hendershot and another nurse.

10   Q.   And Dana, just for the jury, that's Carissa's mom?

11   A.   Carissa's mother Dana, yes.

12   Q.   You are there.  Were you on one side of Carissa or where

13   were you standing or sitting or what were you doing?

14   A.   I was pacing all over the room.  I was in every inch of

15   that room at the time.

16   Q.   And you've just heard Kylee talk about the room.  Can you

17   describe the room for us?  What did it look like?

18   A.   I mean, just your basic delivery room.  It was a

19   decent-sized room.  It's not like it was meant for one bed and

20   one chair and one warming bed.  You could probably fit at

21   least three hospital beds in there, no problem.

22   Q.   Was there a TV and couch or anything?

23   A.   Yes, there was a TV.  There was extra room for a bathroom.

24   There was a sink.

25   Q.   Okay.  Now, let's get to the point of delivery.  Delivery

1    is happening.  What are you doing?

2    A.  I definitely remember being to the left of Dr. Dumpe as he

3    had I believe what I've just learned is to be the vacuum

4    extractor.  I can definitely remember that process and looking

5    over to want to see this process.

6        I've been told about it my entire life.  This is a

7    beautiful thing to witness, so I wanted to see, and in the

8    process of that, what I now know is meconium, that green color

9    that we have been talking about, I seen plenty of that in the

10   process of him putting the extractor on Kendall's head to pull

11   her out.

12   Q.  Whenever you saw -- let me ask you this:  Did you and

13   doctor have any discussions?  Did you have any talks about

14   what would happen at the time of birth?

15   A.  I can't really recall what would happen at the time of

16   birth.  I know we definitely organized for me to cut the cord,

17   but that was originated months in advance to be like, hey,

18   when this day comes, do you want to cut the cord.  I'm like,

19   yes, I want to cut the cord.  No question.

20   Q.  Whenever it comes time for delivery, do you remember

21   seeing Kendall being born?

22   A.  Yes, I definitely remember that.

23   Q.  Do you remember, and you were here when Dr. Dumpe was

24   talking about the delivery.  What do you remember about the

25   delivery?

1    A.  I definitely remember there being a holdup.  Just kind of

2    the energy in the room wasn't as exciting as it was the entire

3    night leading up to, and I can't say exactly how long it took,

4    but there was just a little bit of time, you know, from when

5    she was crowning and she was coming out of the womb that I

6    believe he mentioned she wasn't breathing so he had to do

7    certain things to get her out safely.

8    Q.  Do you remember -- I know that you don't have any medical

9    training.  Do you know what he was doing?  Did you see any

10   maneuvers, anything like that?

11   A.  To my recollection, I can't remember exactly what he did.

12   Q.  Do you remember him calling out for anything, for extra

13   equipment, anything like that?

14   A.  The vacuum extractor.  That's the one thing I do remember

15   him calling out for.

16   Q.  Now, Nurse Hendershot was she helping with the delivery?

17   A.  Yes.  She was in the room the entire time.

18   Q.  Was she next to Carissa holding a leg?  What was she

19   doing?

20   A.  She was back and forth too.  She was helping, you know,

21   whatever he needed help with.  She would assist him, but she

22   was also very supportive with Carissa, letting her know to

23   breathe and things like that.

24   Q.  How about Dana?  What was Dana doing?

25   A.  I can't recall exactly.  I would imagine she was crying as

1    the mother that she is.  She was definitely crying at some

2    point, but she was probably just observing like I was.

3    Q.  Now, whenever the delivery happens, what do you remember

4    about seeing Kendall being born?

5    A.  I instantly remember when she fully came out, Dr. Dumpe

6    cutting the cord, and obviously that confused me, because I

7    don't see any complications.  I don't know what's really going

8    on.  I'm unaware, and I see him cut the cord, and he instantly

9    wants to get her over to the warming bed, and looking over,

10   I'm a little scared at this point, because I don't know what's

11   going on, but I see her body kind of limp, and they wanted to

12   talk about just getting her to breathe, so they would start to

13   rub her feet.

14       I recall patting on the back, but I guess that's something

15   they mentioned they do not do, and rubbing her feet, and I

16   remember them wiping her down with a towel trying to get her

17   to take some breaths.

18   Q.  Do you remember whenever she was delivered, did you see

19   anymore meconium?

20   A.  Yes.  It was all over the sheet that Carissa was on.  It

21   was on my daughter.  I seen her covered in it, but you know,

22   by the time that they started to wipe her down and everything,

23   it was just a very faint green-like stain on her.

24   Q.  Now, I'm going to show you a couple of the pictures.

25   Exhibit 29 first.  And now, these are pictures of Kendall that

1  you took?

2  A.  It could have been me or her mother.  I mean, Dana, not

3  Carissa.

4  Q.  This is Kendall.  Where is she?

5  A.  She is at the warming bed at this point.

6  Q.  And were you able to talk to or touch Kendall or what was

7  going on at this time?

8  A.  At the time, no.  The nurses, they were doing a lot of

9  work with what I believe is called a bulb suction.  I'm not

10 quite sure, and they were sticking it inside of her and they

11 were getting out all this green mucus-looking stuff, and they

12 just kept going in and out, in and out, and they were dumping

13 it all in the trash, and they just kept going at it.

14 Q.  If you take a look in the top right corner of the picture,

15 is that the type of bulb suction you are talking about?

16 A.  Yes.

17 Q.  Now, if we could go to the next picture, 30, and this is

18 another picture of Kendall on the -- there seems to be at

19 least a couple hands there working on Kendall.  Do you

20 remember the doctors or nurses?  Do you remember who was

21 working on Kendall?

22 A.  I'm certain Nurse Hendershot now, but who was with her, I

23 do not know.

24 Q.  Because we can see at least four hands there.  Do you

25 remember Dr. Dumpe going over at all to work on Kendall?

1    A.   That's a negative.  Dr. Dumpe did what he had to do.  I

2    know he had to like stitch up Carissa after.  I'm not quite

3    sure exactly how long that took, but I knew that he was over

4    there working on Carissa for a majority of the time while the

5    nurses were working on Kendall.

6    Q.   Did you hear any conversations between Dr. Dumpe and the

7    nurses about what was going on with Kendall?

8    A.   The only thing that I remember, because I can't say -- the

9    one thing I do remember is that when she came out, that she

10   was having trouble breathing, and they had to get all of that

11   established.  That's really the only thing I heard them call

12   out.

13   Q.   And did he -- at any time, did you hear him call out to

14   have a pediatrician come to the room?  Anything like that?

15   A.   No.

16   Q.   The next picture, 31, please.  Again, this was either you

17   or your mother-in-law taking the pictures?

18   A.   Yes.

19   Q.   And I'm sorry to show you these pictures, but this is

20   evidence and we have to establish.  Are you all right?

21   A.   Yeah, I'm all right.

22   Q.   The next one, 31 or 32.  That's a picture of Kendall being

23   held up by the nurses?

24   A.   Yes.

25   Q.   And 33, now she has a diaper on, and she is still in the

1    warmer?

2    A.   Yes.

3    Q.   Do you remember -- I mean, there's some tubes up here, and

4    if we go to the next one, 35, 34.  Yeah.  They are using a

5    tube and the tube is in Kendall's mouth.

6         Do you remember them doing any suction on her?

7    A.   Yes.  I can remember that.

8    Q.   What do you remember about that?

9    A.   I just remember, you know, like from my perspective, I'm

10   thinking about what that would even feel like to have

11   something just get shoved down your throat, but at the same

12   time, I was also scared because I did see more -- like that

13   tube was filled up with like a green mucus-looking thing.

14             MR. PRICE:  You can take those down now.

15   Q.   Now, do you remember any of the conversations that the

16   nurses were having while taking care of Kendall in the warmer?

17   A.   I don't remember any of the conversations that the nurses

18   were having.  I just remember, you know, them doing everything

19   we just saw, and pretty much at that point, we seen the

20   picture of the nurse holding her up.  That was, you know,

21   pretty much like here's your baby, you know.  I think I took

22   that picture, and you know, them informing me that she was 21

23   inches, eight pounds, seven ounces.

24   Q.   And if we could take a look at Exhibit 36.  Of course this

25   is a picture of you holding her.

1    A.   Yeah.

2    Q.   How was Kendall?

3    A.   I mean, as far as I can recall -- obviously, I've never

4    been in a delivery room before.  I have no medical experience,

5    but I can hold my daughter, and I can look at my daughter, and

6    I just felt that she was just not okay.

7    Q.   Are you all right?

8    A.   Yeah, I'm okay.

9    Q.   Can we go to the next picture?  37 and 38, and I take it,

10   at this point, I mean, you are obviously holding your

11   daughter.  How did you feel?

12   A.   I mean, as far as this picture goes, the picture before,

13   you can see a little bit of concern in my face, but this one

14   right here, I was told that everything is fine and, you know,

15   here's your baby.

16   Q.   How long did you hold her?

17   A.   I feel like I never got to put her down, but I can't

18   exactly say.

19   Q.   Did you give Kendall to Carissa?

20   A.   Yes.

21   Q.   And for some reason, I forgot to mark the number down.

22   Exhibit 35.  And was this the picture of Carissa and Kendall?

23   A.   Yes.

24   Q.   Did you give Carissa -- Kendall to Carissa?

25   A.   Yes, I did.

1    Q.  Can you tell us how was Carissa after the birth?

2    A.  As you can tell, I mean, she was definitely awake for, you

3    know, a majority of it, but we knew that she was very tired

4    because of, you know, all that time, you know, being in a

5    hospital room and, you know, pushing, exerting all that

6    energy, so she was very, very tired, like I said.

7    Q.  Did she get to hold Kendall for long?

8    A.  She didn't get to hold Kendall for long.  I know in this

9    picture, this is probably about the time where the family came

10   in, and like Kylee had just said previously, there was a lot

11   of people in the room, so I would imagine that the bed is

12   surrounded by people right now.

13   Q.  And do you remember whether or not Carissa was able to --

14   was she able to hold her for minutes or hour or how long?

15   A.  Yeah.  She didn't get to hold her for very long.  Like I

16   said, she was exhausted.  She did get to spend that little bit

17   of time with her, but it was -- to my knowledge, it was like

18   I'll take her for now and we can all hold her.

19   Q.  From what you remember, was Kendall crying whenever

20   Carissa was holding her?

21   A.  I can honestly remember, and this is not a made up thought

22   in my mind, there was two seconds I know she did not cry and

23   that was when Carissa was holding her.  She held her, and in

24   that moment, she was silent, but then she went right back to

25   everything that she was doing previously.

1    Q.  Now, did you take Kendall back?

2    A.  Yes, I did.

3    Q.  And did you tell us how Kendall was after that?

4    A.  Her situation was the same.  I mean, nothing had changed.

5    What you guys just heard previously from Kylee, we were all

6    concerned.  We all wanted nurses to come in.  We all wanted

7    her to get checked on, because something just did not seem

8    right about the way that she was reacting.

9    Q.  I'm going to show you photograph 39.  This is Carissa's

10   mom?

11   A.  Yes.

12   Q.  And I assume that you took this picture?

13   A.  Yes, I did.

14   Q.  And when was this after the birth?

15   A.  Couldn't have been much longer after the birth.  At this

16   point, she is swaddled up.  At max 15 minutes, max.

17   Q.  Tell us a little bit about the atmosphere in the room.

18   You said a lot of people came in.

19   A.  Yeah.  I know the timing seems to be a little bit

20   confusing about when everybody came in and when everybody came

21   out.  Just know for a fact that everybody came in at one time.

22   As far as when they came in and the time they came in and how

23   long they were in there, it's very hard to point out, but

24   everybody did come in at one time at this point.

25   Q.  And then picture 40, Exhibit 40.  And then --

1    A.  That is her yiayia.

2    Q.  I'm sorry?

3    A.  Yiayia.  It's a grandmother.

4    Q.  In Greek?

5    A.  Yes.

6    Q.  And she got to hold her.  Do you know did you talk to

7    yiayia about what was going on or the birthing process?

8    A.  At this point, everybody had gotten a chance to hold her.

9    Everybody had gotten a chance to converse and talk about it.

10   We were all bringing up the fact that we thought that

11   something more needed to be done, but like what's been

12   recalled already, we went outside.  We asked for nurses to

13   come in, but we were told to just bond, and that's all we got

14   from it, but the conversations that I had were pretty much

15   just with me and my cousin Tyler, because he's literally

16   watched me grow up, so I was just with him the majority of the

17   time.

18   Q.  Picture 41, please, Exhibit 41.  That's just a picture of

19   yiayia kissing her?

20   A.  Yes.

21   Q.  And then Exhibit 42 and we saw that.  That's your sister?

22   A.  Yes.

23   Q.  And 43, that's a close-up, and 44.  These would all be

24   pictures.  You can take that down.  These would be pictures

25   taken by you or Carissa's mom?

1    A.  Yes.

2    Q.  Now, let me just ask you this:  I know that for an hour

3    and a half, it's a long time to have the baby in the room, do

4    you remember any nurses coming in to the room at any time?

5    A.  I do not remember any nurses coming in at all.

6    Q.  Do you remember any nurse coming in to examine Carissa?

7    A.  I do not remember any nurse coming in at all.

8    Q.  Do you remember any nurse coming to check on her uterus,

9    anything like that or give her ice chips, anything like that?

10    A.  I do not remember that at all.

11    Q.  Are you saying that you don't remember or it didn't

12    happen?

13    A.  It did not happen.

14    Q.  As Kylee said it was getting close to 7:00, people started

15    to leave, and I know you took Kendall down to the nursery.

16    Can you tell us what happened?

17        Let me ask you this:  Let's step back for a second.  At

18    some point, did you talk to Tyler about going out to get a

19    nurse?

20    A.  Yes, I did.  At this point, and like I said earlier, a lot

21    of people were in the room and then people were in and out of

22    the room, so from what was said slightly earlier, you know,

23    with Kylee and the times, that can easily be confused on the

24    times, but I know around this time, it had to have been around

25    6:40, and the people in this room now are me, Tyler, Taylor

1    and Carissa, because we were the last four in the room, and

2    Taylor was getting ready to leave because she was getting

3    tired, and I was still holding Kendall at this point, and I

4    asked my cousin Tyler, I said, Tyler, can you go out there and

5    can you get a nurse to come in and check on Kendall.  I don't

6    think she is doing well, and I wanted them to get that bulb

7    suction again, and I wanted to see if they could get more out,

8    because just holding her and looking down at her, I knew there

9    needed -- something needed to be done, and then he went out,

10   and forgive Tyler, but Tyler just went out and said, hey, my

11   cousin wants you to check on the baby because she keeps

12   crying.

13        Tyler has been in solitude the majority of his life.  This

14   is the first time he's experienced anything like this, and

15   it's tragic for him just as it is for me.  For him to go in

16   the hallway and for him to bring up that she was just crying,

17   that is not what I told him.  I said that I wanted them to

18   come and check on her.

19        And the nurse, all she did was -- she didn't even come

20   into the room.  She poked her head into the room, and she said

21   she just needs to bond with the family.  That is it and she

22   walked out.

23   Q.  After that, did Tyler and Taylor leave?

24   A.  Yes.  They had left at this time.  It's got to be closer

25   to 7:00, probably like 10 to 7:00, and at this point, I had

1    been up for like 24, 20 some hours, and I was just ready to

2    get her to the nursery, so I stepped out into the hallway and

3    I had asked one of the nurses, I don't believe it was even

4    Nurse Hendershot, but one of the nurses I had asked, I said is

5    it okay if she goes to the nursery now, and she said, yeah,

6    that's fine.

7        I said is it okay if I walk her down.  She said it's not a

8    problem.  Just follow me, so I followed her to the nursery.

9    Q.  You heard testimony here, of course, from Nurse Hendershot

10   that said that you followed her and she said that's hospital

11   policy.  Why should we believe your testimony that you took

12   your daughter to the nursery?

13   A.  Just like I said before, Nurse Hendershot was very, very

14   respective of me and Carissa the entire night.  She was

15   engaged.  She was friendly.  She was trying to make it a good

16   time for us, so when it came down to all that happening and me

17   holding her, I simply asked is it okay if I walk her down to

18   the nursery, and she said it's not a problem.  Just follow me.

19       That simple.  I can remember walking her all the way down,

20   and I remember setting her inside the nursery bed myself.

21   Q.  We'll pull up tab 6 page 73, and this is a consent form,

22   and we'll just highlight this bottom part, and this is a

23   nursery consent form, and the only reason why I'm bringing

24   this up, is this your signature up here?

25   A.  Yes.

1    Q.  And then it's signed by a nurse Barb Hackney.  Do you

2    remember Nurse Hackney?

3    A.  Slightly, but like we've already discussed earlier, it was

4    the end of shift so people were coming and people were going.

5    Q.  And then the signature time here is 7:05 in the morning.

6    Does that recollect with your time when you got to the

7    nursery?

8    A.  Yes.

9    Q.  The next question is how long did you stay in the nursery?

10   A.  I was not in the nursery very long at all.  I remember

11   dropping Kendall off in the nursery.  I kissed her on her

12   forehead.  I told her that I love her and she would be with me

13   and mommy pretty soon.

14   Q.  You heard yesterday Nurse McCrory was here, and she said

15   you were in there for a very long time, that she did the whole

16   examination while you were there and that the resident

17   Dr. Bradley Heiple came and talked to you and explained to you

18   what was going on.

19       Do you remember any of that?

20   A.  No, not at all.  I have never even seen Dr. Heiple until

21   yesterday when he was in here.  That's the first time I ever

22   saw him.

23   Q.  Now, I know, and again, I'm not trying to get on words,

24   but you said you don't remember, and I want to make sure that

25   don't remember is different than it didn't happen.

1    A.  Yeah.  That did not happen at all.  I dropped my daughter

2    off, and I walked out of the nursery, and then I went back to

3    the delivery room where Carissa was at.

4    Q.  Whenever you got back there, how was Carissa?  What was

5    going on?

6    A.  I literally walked in to her falling down.  Because she

7    was having trouble walking.  As I walked into the door, she

8    was going to restroom.  I believe a nurse was with her, but

9    she was going to the restroom and I remember her falling over.

10   Q.  And what happened then in the delivery room?

11   A.  We had helped Carissa obviously, and from there, she did

12   what she had to do, and then they got us all ready to go down

13   to the recovery room.

14   Q.  So at that time, Carissa went to the ladies' room, came

15   back to the bed, and how did she get from the delivery room to

16   a recovery room?

17   A.  That, I'm pretty sure it was a wheelchair.

18   Q.  And did you stay in the recovery room?  Let me ask you

19   this:  How far away was the delivery room to the recovery

20   room?

21   A.  Oh, man, probably like from this room right here to the

22   ladies restroom down the hall.

23   Q.  And then you get down there.  What happened in that room?

24   A.  We got to the room.  We had gotten to the room.  She had

25   gotten situated, and I remember when I was leaving the

1    nursery, the nurses telling me she is in good hands.

2    Everything is fine.  Everything is okay, and she would have

3    her with us in about 20 or 30 minutes, and we had gotten to

4    the recovery room, and by this point, I believe it had to be

5    just after 8:00, I want to say around 8:20 to 8:30, and I was

6    definitely concerned, because I dropped her off, as we seen,

7    at 7:05 and I did not hear anything about my daughter coming

8    back.

9    Q.  So what did you do?

10   A.  I decided to walk down to the nursery.

11   Q.  Are you all right?

12   A.  Yeah.

13   Q.  Can you tell us when you got down there --

14   A.  Yeah.  I walked down to the nursery just to check, you

15   know, to see what was going on, and at this point, I just seen

16   just like six or seven doctors, nurses, whatever they are, I

17   just seen them surrounded by my daughter's bed, and instantly,

18   I just had no idea what I was supposed to think because they

19   didn't look like they were having a good time.

20      Like, they are just examining a baby.  And that's when one

21   of the nurses, she put a curtain up.  She put a curtain up in

22   front of my face so I couldn't see what was happening, and

23   then I just collapsed.

24   Q.  Do you need water or anything like that?

25   A.  I'm good.

1    Q.  What did you do after that?

2    A.  I had to go back to the room and I had to try to explain

3    to Carissa why our daughter wasn't in the room yet, but by

4    this point, family had already came in the room, so I didn't

5    even say anything.  I just sat there in silence.

6    Q.  And at some point, Dr. Jones came in?

7    A.  Yes.

8    Q.  Tell us about that.

9    A.  This is the first time I had ever met Dr. Jones or even

10   seen Dr. Jones, but this is the first time she had come in the

11   room, and herself, she was a little teary-eyed because she was

12   just informing me and Carissa, and at this point, the entire

13   family was in the room, she was just giving us the status

14   about Kendall and the things that they were going to have to

15   do to try to stabilize her.

16   Q.  Were you able to go back down to the nursery at all?  Were

17   you able to see anything?

18   A.  No.

19   Q.  You stayed in the room with Carissa?

20   A.  I stayed in the room with Carissa.

21   Q.  And did Dr. Jones or a nurse or anybody come back after

22   that?

23   A.  So after she left the first time, a family member decided

24   to speak up, because at this point, I'm still silent, and a

25   family member spoke up and said let's just give them some

1    alone time, so the family all left the room, and the second

2    time that Dr. Jones had come in, I'm not sure who she was

3    with, she was asking us for permission to LifeFlight our

4    daughter.

5    Q.  How was Carissa during this time?

6    A.  Broken.

7    Q.  Do you remember Dr. Jones saying anything more?

8    A.  I just know she was -- you could tell she was out of her

9    element.  I still feel really bad, because she had to come in

10   to work for this, but she came just so broken as well trying

11   to inform us, in the most calm way possible, that she has to

12   take these measures right now.

13   Q.  Now, from what I understand, there was a third visit that

14   Dr. Jones had to make.

15   A.  The third visit was the visit of her informing us that she

16   had passed away.

17   Q.  How was that?  Who was all in the room?

18   A.  I believe me, Carissa, obviously, her yiayia might have

19   been in there, her mother and my mother, I think.

20   Q.  Besides the fact that Carissa -- I'm sorry, Kendall had

21   passed, were you told anything more about what happened?

22   A.  At this point, I wouldn't remember if I was told anything.

23   Q.  Did the family stick around, or did they give you some

24   more alone time?

25   A.  The family stayed in the waiting room that was just not

169

1    too far away from us.

2    Q.  If you could, I will bring up Exhibit 45.  This is a

3    picture unfortunately after Kendall had passed.  Can you tell

4    us about that?

5    A.  Yeah.  They had photographers that worked at the hospital,

6    I guess, prepared for situations like this, and they asked us

7    if we would like to have pictures done with our daughter after

8    she passed and we agreed.

9    Q.  Do you know how long -- was this the same day?  Was it

10   that afternoon?

11   A.  This was -- they asked us about the pictures maybe not

12   even 15 minutes after we were informed that our daughter

13   passed away.

14   Q.  Exhibit 46, please.  Do you remember this picture?

15   A.  Yes.

16   Q.  Exhibit 47.  Are you holding her feet?

17   A.  Yes.

18   Q.  And then 48.  Is that you or Carissa?

19   A.  That's my hand.

20        MR. PRICE:  You can take that down.  Thanks.

21   Q.  After that, what do you remember about being in the

22   hospital?

23   A.  Well, we stayed the night there and we were informed that

24   we would be discharged the next day.

25   Q.  At any point before you left the hospital, had anybody

1    told you what happened?

2    A.  No.

3    Q.  After that, what did you all do?

4    A.  After we left the hospital?

5    Q.  Yes.

6    A.  So we got discharged the next day.  Carissa still had a

7    lot of trouble walking so she was getting wheelchaired up from

8    the room, and I went to go get the car to pull it up in front,

9    and I sat out front waiting for her, and I helped her get into

10   the car, and instantly, you know, we got into the car and we

11   broke down, because we both knew that in the backseat was a

12   car seat, because this is obviously not the way we planned for

13   anything to go.

14       And we drove home in just dead silence, really not saying

15   anything to each other at all, and we got to the apartment,

16   and I carried her up the steps, and we walked into the

17   apartment where everything -- the gates opened at that point,

18   and looking at her crib, looking at all of her clothes and all

19   the toys and everything that we had set up, it just broke us.

20   We probably laid down for like three days straight.

21   Q.  I know at some point a few weeks later you went to the

22   hospital and had a meeting with Dr. Jones and Dr. Dumpe and

23   some nurses?

24   A.  I don't remember any nurses, but I definitely remember the

25   meeting with Dr. Dumpe and Dr. Jones.

1    Q.  Do you remember what was said or what happened there?

2    A.  I wish I could.  I know the idea for it was to just let us

3    know what happened.  I remember Dr. Dumpe just specifically

4    trying to speak on preparing for the next pregnancy and, you

5    know, whatever preventive measures that we had to take and

6    from Dr. Jones, I just remember her tearing up a little bit

7    and telling us, you know, everything that happened and why she

8    wasn't here.

9    Q.  How did you feel?  I know it's sort of a blur.  Do you

10   remember were all the questions you had, were they answered,

11   or did you still have questions?

12   A.  I think the biggest question is why isn't our daughter

13   here and there was just no solid answer for that.

14   Q.  Tell us a little bit about, after all of this, how was

15   your and Carissa's relationship?

16   A.  So like I testified yesterday, talking about we lived in

17   an apartment at the time, but we had purchased a mobile home,

18   and that's what we were going to be moving into.  So we got to

19   do that.  We moved into that place, and obviously, we had a

20   room set aside for our daughter and that room basically just

21   became a shrine, just a piece of us that we could never really

22   have, and you know, just days and days of this stress just

23   adding up on the both of us.

24       I was doing the best I could.  I really wanted to be

25   supportive, you know.  I wanted to help her through this, but

1    I needed help through it too, and I didn't know how to handle

2    myself.  I didn't know what I was supposed to do and

3    especially for her, so I don't remember exactly how long, but

4    eventually, I ended up just leaving Carissa.

5    Q.  And I know that in my opening statement, I said that there

6    were a lot of tears, there were a lot of arguments, there were

7    a lot of fights.  I might have stepped a little too far.  You

8    didn't have any physical altercations or anything like that?

9    A.  No.

10    Q.  It was just a lot of argument and a lot of tears and a lot

11    of heartbreak over the next couple of months, correct?

12    A.  Yes.

13    Q.  And how was Carissa doing during this time?

14    A.  Like a ghost.  She just wasn't really all there.  All of

15    our conversations were limited, and if we ever really talked,

16    there was just so many questions about why this happened.

17    There are nights we would go to sleep and she would just burst

18    into tears.  We literally cried ourselves to sleep so many

19    nights.  She was just really broken.

20    Q.  From what I understand, you stuck around, but then a year

21    later, you moved?

22    A.  Yes.  I had broken up with Carissa, and probably after

23    Kendall, I was probably with Carissa for at least like six

24    more months, and then we just couldn't make things work, so I

25    stayed away for a little bit, and then on October 14 or

1     October 13 of 2015 on Kendall's anniversary, I literally -- I

2     just quit my job and I went to Michigan to live with my

3     brother to just get away.

4     Q.   Did you live up there for a while and do some work?

5     A.   Yeah.  I lived up there for a little while, and I worked

6     in the restaurant that he worked at.  He was the chef and I

7     was just a server.

8     Q.   How long did you stay up in Detroit?

9     A.   It was probably just about five months.

10    Q.   You came back to town?

11    A.   Yes, I did.  The primary reason, and clearly just being a

12    young hot head at the time, I just didn't think things through

13    thoroughly, but when I moved to Michigan with my brother, he

14    also had a baby on the way and they lived in an apartment.

15    They had a little room set up for their daughter, and they had

16    a perfectly healthy baby on January 6 of 2015 -- '16 at the

17    time, I guess, yeah.  After just being there with them for a

18    few months, it was just too much for me to bear.  I couldn't

19    be around it, so I just decided to come back home.

20    Q.   Did you and Carissa talk whenever you came back?

21    A.   I tried to, but it wasn't in the most -- not in the most

22    proper way to do it, I guess.  Just because we had left on bad

23    terms, so it was really hard to see eye to eye in any

24    conversation we had after that.

25    Q.   Eventually, you two decided to -- you still remained, I

1    know, sort of friends but not really close anymore, and then

2    the issue about this lawsuit came up, and you are a plaintiff

3    in this lawsuit?

4    A.  Yes.

5    Q.  And I know that you guys aren't back together but do you

6    still see each other socially or see her around town?

7    A.  I hardly ever see Carissa around town.

8    Q.  Do you still -- I mean, I know that you are here together

9    this week.  Do you still talk?

10    A.  Yes.  We are more than civil.  We know what it takes now.

11    It's been years, but now we can have a decent conversation.

12    Q.  Do you consider yourself friends?

13    A.  I would always consider Carissa a friend to me, yes.

14    Q.  Finally, obviously I can't relate, but just tell us from

15    your perspective, now it's been a couple years, having Kendall

16    and losing Kendall, can you tell us how -- what that means to

17    you?

18    A.  Well, I know it's definitely something I think about every

19    day.  It's no emotion that I've wanted to feel.  It's not like

20    I've ever prepared myself to be at peace with losing a

21    daughter.  I know I've been at peace with it.  I've been

22    upset.  I've been hurt.  I've been broken.  I've realized that

23    I can find happiness at the same time.  My emotions have just

24    literally been all over the place since the day that we lost

25    her.

1           MR. PRICE:  That's all the questions I have, Your

2   Honor.

3           THE COURT:  Okay.  Thank you, Mr. Price.  I think

4   before we hear from counsel for the defendants by way of their

5   questions, we should take our afternoon break.  Ladies and

6   gentlemen, leave your pads as well as your binders there on

7   your chairs.  Once again, no talking, researching,

8   communicating.  Continue to keep those open minds.  We'll get

9   back together here at about 3:05.

10          (Jury excused.)

11          THE COURT:  Mr. Fritzius, you may step down.  While

12  we have this break, if you want to run to the men's room, that

13  would be perfectly okay.  Don't talk about your testimony.

14  You have been sworn.  You are still under oath.

15          Okay.  Ms. Koczan, you have something to advise the

16  court vis-a-vis tomorrow's schedule?

17          MS. KOCZAN:  Yes, Your Honor.  I will have tomorrow

18  Judy Ash.  There was a question about whether I could get her

19  in here, and I believe my office is working on it right now,

20  but I believe I will be able to get her in here tomorrow.

21          MR. PRICE:  Who?

22          MS. KOCZAN:  Judy Ash, and then we are working also

23  on trying to get one of my experts in on Tuesday, the 3rd so

24  as to fill up that day, and we're working on that.  I don't

25  have final confirmation yet.  I hope to before the end of the

1    day to see if that could be done also, and I'll have my last

2    two on Wednesday.

3              THE COURT:  Mr. Colville's witness is ready to go

4    Tuesday?

5              MR. COLVILLE:  Yes.

6              THE COURT:  He's just in Squirrel Hill.  He just has

7    to drive downtown.

8              MR. COLVILLE:  Yes.

9              THE COURT:  We'll take our break.  We'll start again

10   at 3:05.  I guess one other thing for the record.  There had

11   been some dispute vis-a-vis Mr. Fritzius's referencing the

12   term meconium.  That had been part of a motion in limine.  I

13   didn't hear any objections, one.  Two, he testified now that

14   he had actually heard the word from the nurses, so to the

15   extent necessary, for the record, we'll do an order denying

16   that motion as moot, because you advised me that Dana Contenta

17   is not going to testify.  Is that still the case?

18             MR. PRICE:  Yes.

19             THE COURT:  So since Ms. Contenta is not testifying

20   and there's no further objection vis-a-vis Mr. Fritzius and he

21   indicated where he got the knowledge of the word meconium,

22   that motion is denied as moot.  Ms. Starr will put together a

23   little order.

24        (Recess taken.)

25        (Jury present.)

1          THE COURT:  Thank you, Mr. Galovich.  Ladies and

2    gentlemen.  Cross-examination, Mr. Colville?

3          MR. COLVILLE:  I have nothing, Your Honor.

4          THE COURT:  Ms. Koczan?

5          MS. KOCZAN:  Yes, I do have some questions.

6                    CROSS-EXAMINATION

7    BY MS. KOCZAN:

8    Q.  Good afternoon.

9    A.  Hello.

10   Q.  Matt, I want to go back to the time before Kendall was

11   delivered.

12   A.  Okay.

13   Q.  Do you remember the original nurse who was there when

14   Carissa was first brought in?  Do you know what her name was?

15   A.  When she was first brought into the hospital?

16   Q.  Correct.  When she was first brought in around 2:00 in the

17   afternoon.

18   A.  No, not a clue.

19   Q.  If I said the name Judy Ash, that wouldn't mean anything

20   to you?

21   A.  Not a thing.

22   Q.  You were there though?

23   A.  I was there the entire time.

24   Q.  Do you remember a nurse being in there with Carissa,

25   coming in and checking on her, looking at the fetal monitoring

1   strips, that type of thing?

2   A.  During the labor process, yes, I do.

3   Q.  And would that be true for the earlier part of the process

4   too?

5   A.  For what?  Excuse me.

6   Q.  The earlier part of the process.  I'm talking about the

7   time frame before 7:00 p.m.  The records reflect that Carissa

8   was admitted to the hospital somewhere or got to the hospital

9   somewhere around 2:00 p.m.  I'm talking about the time frame

10  from 2:00 until about 7:00 p.m.

11  A.  Okay.  What was your question?

12  Q.  My question, first of all, you were there, correct?

13  A.  Yes.

14  Q.  And I asked you whether you remembered the nurses coming

15  in at all?

16  A.  Before 7:00, yes, I do.

17  Q.  So they were in frequently?

18  A.  From 2:00 to 7:00, yes.

19  Q.  And then at 7:00, Nurse Hendershot, we'll just call her

20  Maria, she came in, correct?

21  A.  Yes.

22  Q.  And I think you've already told the jury that Maria was

23  very attentive.

24  A.  Yes, Maria was.  She was nice.

25  Q.  Nice woman.  Very attentive?

1  A.  To us, yes.

2  Q.  Very attentive to Carissa while she was with her during

3  the labor?

4  A.  Yes.

5  Q.  And was it true that Nurse Hendershot, Maria, she was in

6  every 15 minutes, every 20 minutes to come in and check on

7  Carissa, see how she was doing?

8  A.  During the labor process, yes.

9  Q.  You were in there?

10  A.  Yes, the entire time except for one or two times.  I had

11  to step out of the room.  I wasn't in there.

12  Q.  Every time that Maria came into the room, would she be

13  explaining to you what was going on?

14  A.  Yes, she did her best.  I was young at the time.  She

15  would explain to me why she was doing certain things and this

16  was going to happen, and she would also say in 15 minutes,

17  come remind me about this to keep me on guard as well.

18  Q.  She was keeping you and Carissa up to date on what was

19  going on, explaining everything, very attentive, correct?

20  A.  Very attentive, yes.  She was very friendly to me.

21  Q.  In that situation, did that go on throughout the evening,

22  say, from 7:00 until midnight, Maria was in, say, every 15

23  minutes or so checking on Carissa, talking with you, keeping

24  you apprised of what was going on?

25  A.  It's hard to say every 15 minutes, but yes, she was in the

1    room with us doing her job, so to speak.

2    Q.  And then from the period of midnight until the time that

3    Kendall was born around 5:20, did anything change in terms of

4    Maria being in there, being attentive, engaging you, giving

5    you information, checking on Carissa?  Did that just continue?

6    A.  It wasn't until she was actually born.  All of that

7    happened, and then it seemed like their duty was pretty much

8    done when Kendall was delivered.

9    Q.  Okay.  Now, I want to talk about that.  When Kendall was

10   delivered, it was Maria and another nurse in the delivery room

11   with you?

12   A.  Yes.

13   Q.  Do you remember what the other nurse's name was?

14   A.  I do not remember, no.

15   Q.  Do you remember anything about what the other nurse looked

16   like?

17   A.  No, not a clue.

18   Q.  Do you remember having any conversation with that other

19   nurse?

20   A.  No, I do not.

21   Q.  Do you remember Maria explaining to you what they were

22   doing with Kendall at that point?

23   A.  There wasn't so much explaining to me.  They were

24   obviously just communicating together, because like we had

25   said, when she came out, there were questions and concerns.

1   They wanted to make sure that she got over there safely and

2   they were working on Kendall.

3   Q.  Did it appear to you that Maria and this other nurse, they

4   were doing their job; they were working on Kendall?

5   A.  From the shoes that I was standing in with my knowledge,

6   yes, it seemed like everything was going well, and they were

7   doing their job.

8   Q.  Then you told us that -- and I want to go back for a

9   minute.  The room that Carissa labored in was the same room

10  that Kendall was delivered in, correct?

11  A.  Yes.

12  Q.  And it was the same room that she stayed in and that she

13  being initially Carissa and then Kendall, she was in the room

14  with you all too; is that correct?

15  A.  After Kendall was born, yes, we were still in the same

16  room.

17  Q.  And can you give the jury any idea of the dimensions of

18  that room, how large a room it was?

19  A.  If I had to get specific, I would say from one wall -- we

20  could go from the edge of this probably to where Mr. Matt

21  Diaddigo is, from where he's sitting, that length, to maybe

22  this second row of where the second seats start, over there

23  (indicating).

24  Q.  I think you told us that you thought that room was large

25  enough to hold three beds, and the beds like the bed that

1    Carissa was in; is that correct?

2    A.  Yes.

3    Q.  In addition to the three beds that it was large enough to

4    hold, it was also large enough to hold, I think I heard you

5    say there was a bassinet in there?

6    A.  I'm not going to say in addition to the three beds it

7    could hold all of those things.  I just said it could probably

8    fit three beds in that room, not counting the chair, the sink

9    and the bassinet and things of that nature.  I didn't say

10   that.

11   Q.  So I thought I heard, and I may have misheard, did you say

12   there was a couch in there or there was a chair?

13   A.  There was a chair.

14   Q.  There was not a couch.  It wasn't large enough to hold a

15   couch?

16   A.  A chair.

17   Q.  After Kendall was born, you've given us a list of people

18   who were in the room.  I think I heard you say they all came

19   in at the same time; is that correct?

20   A.  Yeah, pretty much.  Obviously we just kind of weaned one

21   by one, but it was to the point that everybody that was in the

22   waiting room was just in the delivery room.

23   Q.  You gave us a list of names, and in addition to those

24   folks that you listed, it was you and Carissa also, correct?

25   A.  Yes.

1    Q.  And I think I counted between 10 and 12 folks that were in

2    there at that time; would that be accurate?

3    A.  That sounds accurate.

4    Q.  And while they were in there, other than Tyler Janectic

5    who told us that he didn't want to hold the baby, he didn't

6    know what to do with her yesterday, other than Tyler, did

7    every one of those folks get an opportunity to hold Kendall?

8    A.  Carissa's little brother probably didn't hold Kendall

9    because he was maybe like 12 at the time, so he was probably

10   the same boat as Tyler.  He didn't want to hold her because he

11   was scared.

12   Q.  So everybody else in that room, they were passing her from

13   one to the other?

14   A.  Not necessarily passing her around.  You know, she wasn't

15   like hors d'oeuvres or anything.  We all spent some time with

16   her.  We all questioned her actions at the time, and

17   eventually, yes, everybody did get to hold her.

18   Q.  You have told us at some point, this is after all those

19   folks left, you asked your cousin Tyler to go out and get a

20   nurse; is that correct?

21   A.  Yes.  Specifically I told him, I said Tyler, can you

22   please go out and get a nurse.  I think something is wrong

23   with Kendall, and I would like for them to do the bulb suction

24   again, because I felt as if there was still something inside

25   of her, and he went outside, and just being Tyler, he said,

1   hey, my cousin is concerned because the baby keeps crying.

2   Can you come in and check on her.

3   Q.  And let me ask you this.  You didn't go out with him, did

4   you?

5   A.  No, I did not.

6   Q.  You are just telling us what you heard him say yesterday;

7   is that correct?

8   A.  Yes.

9   Q.  Did you ever send anybody else out to get a nurse?

10   A.  I can't say that I sent anybody else out, because at this

11   point, I'm sending Tyler out, and at this point, it's me,

12   Tyler, Taylor and Carissa, so it was just the four of us.

13   Q.  I'm asking before that.  Before this time, this is when

14   everybody is gone and this is approaching 7:00 a.m.?

15   A.  I mean, we're getting closer to 7:00 a.m., but at this

16   point, it's not 7:00 a.m., no.

17   Q.  Prior to that, that time, had you sent anyone else out to

18   get a nurse?

19   A.  No.  I was a little scared, you know.  I have obviously

20   never held my child before, let alone to hold her in the

21   condition that she was in.  Being in the room with Carissa's

22   parents and her grandparents and elders, I wanted to be, you

23   know, a little on edge, so I wasn't thinking like, everybody,

24   let's go out and let's do this.  I didn't send anybody out,

25   no.  I did not.

1    Q.  My question was simply did you send anybody else, and the

2    answer is, no, you did not; is that correct?

3    A.  Correct.

4    Q.  Before Tyler.  So while all these other folks are in the

5    room, is it true that nobody else went out to get a nurse?

6    A.  Somebody -- I mean I'm pretty sure, we went back and

7    forth.  I know there's a few times we had asked, somebody had

8    asked, hey, we should get a nurse every time somebody just

9    came back into the room.  I was asked to go get a nurse.  When

10   I went out, the nurses simply said they just need bonding time

11   with the family.  Plain and simple.

12   Q.  I want to ask you about and give you some names.  You tell

13   me if these are correct, the names of the folks that were in

14   there at that time, because there's quite a list.

15       There was an April Bradley?

16   A.  Yes.

17   Q.  And she is a friend of Carissa's?

18   A.  Yes.

19   Q.  She didn't go out and get a nurse, did she?

20   A.  That I recall, I don't remember.

21   Q.  There was a Lindsay Dietz, is it?

22   A.  Dietz, yes.

23   Q.  She is a friend of Carissa's?

24   A.  Yes.

25   Q.  She didn't go out and get a nurse?

1    A.  Not that I remember.

2    Q.  There was a Taylor Moore, that's another friend of

3    Carissa's?

4    A.  Yes.

5    Q.  She didn't go out and get a nurse, as far as you know?

6    A.  Not that I remember.

7    Q.  Carissa's mother was Dana?

8    A.  Carissa's mother was Dana, yes.

9    Q.  Dana didn't go out and get a nurse?

10   A.  I don't think she did, no.

11   Q.  There was Nicolette.  Is that Carissa's younger sister?

12   A.  Yes.

13   Q.  And Nicolette didn't go out and get a nurse, did she?

14   A.  Not that I remember, no.

15   Q.  Your sister Kylee, we talked about Kylee.  There was also

16   your cousin Tyler.  You talked about him.  And then there was

17   yiayia.  Is that Christine Peronis?

18   A.  Yes, that is.

19   Q.  Christine didn't go out and get a nurse either?

20   A.  She might have.

21   Q.  Did she ever tell you that she did that?

22   A.  Not that she would have to tell me.  I just know, like I

23   stated earlier, we were all raising the concerns, and between,

24   you know, the hour, hour and a half that the majority of us

25   were in there, a few of us stepped out, and we all got told

1    the same answer every time.

2    Q.  Was your mother there at some point?

3    A.  My mother was there, and she had left before the actual

4    delivery because she just has a lot of physical pain and she

5    just wanted to go home and go to sleep.

6    Q.  Did she come back after Carissa delivered Kendall?  Like

7    during that time frame from the time of delivery until around

8    7:00, was she there?

9    A.  No.  My mother didn't show up until around 10:30 when all

10   the news was just bad.

11   Q.  You've told us about walking down the hall.  Did you walk

12   down the hall with Maria?  Is that who you were with?

13   A.  She was a bit of the ways in front of me.  I can't say if

14   it was Maria.  Nurse Hendershot is who you are getting at,

15   right?

16   Q.  That's correct.

17   A.  I cannot say for certain that it was Nurse Hendershot that

18   walked me and Kendall to the nursery, but it was a nurse that

19   willingly said, yes, you guys can walk down, and she walked in

20   front of us to open the doors and to let us into the nursery.

21   Q.  When you got into the nursery, there was a nurse there,

22   Barb Hackney.  Does that name mean anything to you?

23   A.  No, it doesn't.

24   Q.  When you were walking down with whoever the nurse was,

25   Maria or whomever, did you say anything to the nurse at that

1    time, hey, look, you know, I'm concerned about Kendall.  Is

2    she okay?

3        Do you remember having any conversation at that point

4    about that?

5    A.  Yeah.  I didn't bring up the conversation because this is

6    maybe ten to 15 minutes after I asked my cousin if he could go

7    get a nurse to check on her, and like I said before, we tried

8    all night to get a nurse to come in and look, but we were just

9    told she needs bonding the entire time.

10       So as I was told to go, in my mind at this stage, I'm not

11   a parent that's, like, well, something is wrong and it needs

12   to be done.  I'm just a young man holding my child.  I'm being

13   told everything is okay and you need to be with me, so no, I

14   didn't ask her anything.

15   Q.  What about when you got to the nursery with Barbara

16   Hackney?  Did you have any conversations with Barbara Hackney

17   about what you had observed or any of the concerns that you

18   had at that point?

19   A.  I think I might have brought up the shape of her head

20   because, you know, with that vacuum extractor, she did have

21   kind of like a bean looking kind of head, but it wasn't

22   anything for me to be truly concerned about.  It was just like

23   a real quick question, and then I kissed her on the head, told

24   her I love her and I was on my way.

25   Q.  There was a nurse who came and testified yesterday, Jamie

1    McCrory.  Do you remember meeting Jamie McCrory that day?

2    A.  I remember meeting her one time and that was after

3    everything was all said and done and she was giving her

4    condolences and apologies.

5    Q.  When was that?  That was that day?

6    A.  That was that day around, I don't know, probably noon.

7    Q.  So you don't remember having any conversation with Jamie

8    McCrory; is that correct?

9    A.  I have never spoken to Jamie McCrory, no.

10   Q.  And you've already told us you have no recollection of

11   ever speaking with Dr. Heiple; is that correct?

12   A.  That is true.

13   Q.  I want to go back and talk about the visits by Dr. Jones.

14   You told us I think if I counted correctly that there were

15   three visits; is that correct?

16   A.  Correct.

17   Q.  And the first visit, I think I heard you say was when she

18   came in for -- correct me, what did she come in for the first

19   time?

20   A.  The first time she came in just to basically inform us

21   that Kendall was not in a good condition.

22   Q.  I want to ask you more about that.  Do you have a

23   recollection -- first of all, do you remember what time that

24   was?

25   A.  Do I remember what time?  Probably around 8:30ish, 8:40.

1    Q.  Okay.  And when she came in that time, was there any

2    discussion by her about the fact that she wanted to send

3    Kendall up to West Penn Hospital?

4    A.  At that time, no, but the second visit, yes.

5    Q.  So the first visit, she just came in and what?  Just

6    expressed concern?

7    A.  It wasn't so much concern.  I mean, I guess you could put

8    it that way, but she was letting us know that Kendall was not

9    in a good condition, and she was going to have to do certain

10   things to stabilize her, I guess.  I don't know all the

11   terminology.

12   Q.  And then the second visit, how much longer -- what was the

13   time frame between the first one and the second?

14   A.  Maybe -- it's really difficult to try to accumulate

15   minutes when it's been years.  I would have to say maybe a

16   half hour, 45 minutes at the very max.

17   Q.  And the second time she came in, you said that it was at

18   that point that she requested permission for you to send

19   Kendall to West Penn; is that correct?

20   A.  Yes, that is true.

21   Q.  And do you remember her giving you a consent form to sign?

22   A.  Yes, I do remember.

23   Q.  Did you sign it?

24   A.  Probably.

25   Q.  Let's put that up.  Before we put that up, do you remember

1    signing a consent form with Barb Hackney to allow Barb to go

2    ahead and give the eye drops and the Aquamephyton and that

3    type of thing?

4    A.  I already told you, I don't remember Barb Hackney, but if

5    there was a nursery nurse in there when I dropped her off in

6    the nursery, I do remember signing the consent form.

7    Q.  You think you also signed the consent form for the

8    transfer to West Penn?

9    A.  To save my daughter's life, yes, I probably did.

10    Q.  Let's put that up.  That's 1177.  And if you could

11    highlight the consent section down below the transfer consent.

12    Whose signature is that?

13    A.  Okay.  That would make sense.  That is the mother's

14    signature, not mine.

15    Q.  So that was Carissa who signed, not you.  And then you

16    told us that there was a third visit.  I want to go back to

17    the second one.  You said during that second visit that

18    Dr. Jones seemed out of her element?

19    A.  Yes.  You could tell --

20    Q.  What do you mean by that?

21    A.  You could tell she was very sad.  That's the most that

22    I'll say.

23    Q.  At that point, she was just arranging the transfer,

24    correct?

25    A.  I mean, she probably had a lot going on at that point, but

1    the communication that we had together, yes, she wanted to get
2    permission to LifeFlight Kendall.
3    Q.  And I think you said, and correct me if I am wrong, I
4    might have misheard that she looked broken as well at that
5    time?
6    A.  True, yes.
7    Q.  This is at the time she came in to arrange the transfer?
8    A.  Yes.
9    Q.  You thought this was sometime around --
10   A.  9:30.
11   Q.  Let's take a look at that again, 1177.  The time that
12   Carissa signed was 9:05?
13   A.  Yes.  25 minutes before.
14   Q.  It wasn't 9:30.  It was 9:00.  The third time is when she
15   came in to tell you that Kendall had passed, correct?
16   A.  Yes.
17   Q.  The first time that she came in, or the time that she came
18   in to talk about the transfer, was it just her or did somebody
19   else come in with her?
20   A.  I'm not sure who was with her.
21   Q.  Could there have been somebody else with her, you just
22   don't remember?
23   A.  Possibly, there could have been somebody with her.
24   Q.  And what about the second time she came in -- or excuse
25   me, the third time she came in?  Was there anybody with her at

1   that time?

2   A.  I'm pretty sure every time she came in, she had somebody

3   with her.

4   Q.  The first time she came in, was there somebody with her at

5   that time?

6   A.  I'm pretty sure every time she came in, she had somebody

7   with her.

8   Q.  I want to move ahead.  You told us about the meeting that

9   was held sometime after, and that was with Dr. Dumpe and

10  Dr. Jones, and I think you said you and Carissa, and was Dana

11  there?

12  A.  Yes.

13  Q.  And were there other folks from the hospital there?

14  A.  Not that I remember.  I specifically remember those two,

15  myself, Carissa and her mother.

16  Q.  And you told us that when you walked out of there, you had

17  received no solid answers about what happened to Kendall; is

18  that correct?

19  A.  To my recollection, the emotion that I was dealing with,

20  yes, I had no solid answers to what happened to my daughter.

21  Q.  Do you remember them telling you that the culture results

22  from the blood cultures and the tissues conclusively

23  established that Kendall had died from an E. coli sepsis

24  infection?  Do you remember that?

25  A.  I have no recollection of that.

1          MS. KOCZAN:  Thank you.  That's all I have.

2          THE COURT:  Mr. Price, any additional questions?

3          MR. PRICE:  No.

4          THE COURT:  Now, Mr. Fritzius, if you remember, when

5    Carissa was in labor, were there any other women in labor that

6    night?

7          THE WITNESS:  I mean, as far as women in labor goes,

8    I can't say for sure, but I know when I dropped Kendall off in

9    the nursery, there was probably like six or seven babies

10   there.

11         THE COURT:  When you went -- strike that.

12         When you were in the delivery suite after the baby

13   had been born, were the other delivery suites around you also

14   occupied or not?

15         THE WITNESS:  To my recollection, I don't remember.

16         THE COURT:  And how far was the nurses' station from

17   the delivery suite, if you remember?

18         THE WITNESS:  From me to Mr. Price right there.

19         THE COURT:  About halfway across the courtroom?

20         THE WITNESS:  Yeah.

21         THE COURT:  Now, did you come and go out in the

22   hallway?

23         THE WITNESS:  I mean, throughout the entire labor

24   process, yes.  I was in the delivery room.  I was in the

25   waiting room, back and forth updating the family on what goes

1   on.

2           THE COURT:  And after the baby was born and you were

3   all in that delivery suite room, did you have occasion to go

4   out in the hallway then?

5           THE WITNESS:  I'm sorry?

6           THE COURT:  Did you have occasion to go out in the

7   hallway then?

8           THE WITNESS:  You said occasion?

9           THE COURT:  Yes.  Did you have any reason to go out

10  in the hallway?

11          THE WITNESS:  Just to try to, you know, see if a

12  nurse could come in, but other than that, no.

13          THE COURT:  When you did that, what were the nurses

14  doing if you saw them?

15          THE WITNESS:  They were just on the computer, you

16  know, behind the desk, doing whatever they had to do, I guess.

17          THE COURT:  Now, in all the pictures that we saw,

18  Kendall was in swaddling.  Did you ever take her swaddling

19  off?

20          THE WITNESS:  No, I never did.

21          THE COURT:  Now, you talked about yourself needing

22  help and that Carissa needed support.  Did Carissa see any

23  kind of a doctor or therapist after the baby was born?

24          THE WITNESS:  To my knowledge, I'm not quite sure on

25  that question.

```
1              THE COURT:  Better off to ask her; is that right?
2              THE WITNESS:  Yes.
3              THE COURT:  I think that's all the questions I have
4    of you, sir, at this time.
5              Any additional questions?
6              MR. PRICE:  No, Your Honor.
7              MS. KOCZAN:  Yes.
8                        RECROSS-EXAMINATION
9    BY MS. KOCZAN:
10   Q.  Matt, you've told us that the delivery room that Carissa
11   was in and stayed in and where Kendall was was kind of across
12   the way from the nurses' station; is that correct?
13   A.  If my front door is right here (indicating), directly
14   across.
15   Q.  And while you were in there and all those other folks were
16   in there, was the door open?
17   A.  No.
18   Q.  You had the door shut?
19   A.  Yes.
20   Q.  And would people come in and out and open and shut the
21   door as they were coming in and out?
22   A.  Yes, they would.
23   Q.  That's what would happen?
24   A.  When people would come in, they would shut the door behind
25   them, yes.
```

1    Q.   When the door was open, could you see the nurses?

2    A.   If you were standing in front of the doorway, yes, you

3    could.

4    Q.   And could the nurses see you?

5    A.   If you were standing in front of the doorway, yes, they

6    would.

7              MS. KOCZAN:  Thank you.  That's all.

8              THE COURT:  Mr. Colville, nothing?

9              MR. COLVILLE:  Nothing.

10             THE COURT:  Mr. Fritzius, you may step down.

11        (Witness excused.)

12             THE COURT:  Mr. Price, your next witness.

13             MR. PRICE:  Carissa Peronis.

14             THE COURT:  Ms. Peronis, if you'll step forward.

15             THE CLERK:  Please state and spell your name for the

16   record.

17             THE WITNESS:  Carissa Peronis, P-E-R-O-N-I-S.

18        (Witness sworn.)

19             THE COURT:  Ms. Peronis, watch your step as you get

20   up there.  It's a little bit uneven.  Once you are there,

21   there's water in case you need it.  You are a pretty small

22   person.  Make sure the microphone is situated so that you are

23   speaking into it.

24

25                              - - -

```
 1

 2              CARISSA PERONIS, a witness herein, having been first

 3    duly sworn, was examined and testified as follows:

 4                          DIRECT EXAMINATION

 5    BY MR. PRICE:

 6    Q.  Carissa, can you please tell us your full name and where

 7    do you live?

 8    A.  Carissa Peronis and I'm from New Brighton.  I reside in

 9    Conway now.

10    Q.  You are the plaintiff in this matter?

11    A.  Correct.

12    Q.  You are the mother of Kendall Peronis?

13    A.  Correct.

14    Q.  And you are also the administratrix of her estate?

15    A.  Yes.

16    Q.  I'm going to show you docket 1 page 1 which is a face

17    sheet of the complaint.  If you could just highlight the top

18    part.  And this is your name as administratrix of the estate

19    of Kendall Peronis, and you and Matthew have brought this

20    lawsuit on behalf of the estate of your daughter; is that

21    correct?

22    A.  Yes.

23              MR. PRICE:  You can take that down.

24    Q.  Now, tell us a little about yourself, where were you born?

25    Where did you grow up?  Tell us a little bit about living in
```

1  Beaver County, that type of thing.  I take it from all the

2  family names I've heard, you come from a big Greek family.

3  A.  Yes, Greek and Italian.  I was born at West Penn Hospital

4  in Pittsburgh.  I grew up in New Brighton and I graduated from

5  New Brighton, graduated from Community College Police Academy

6  and I've just been working since then.

7  Q.  Now, I know I asked Matthew this, but tell us what school

8  did you go to?

9  A.  New Brighton.

10  Q.  Did you have brothers and sisters that went to school with

11  you while you were growing up?

12  A.  Not the same school district.  I was the oldest.  I did

13  have a little brother and little sister.  They went to

14  Hopewell, and then my little brother is six years younger than

15  me, so we weren't in school together.

16  Q.  And did you -- I know that at some point, you and Matthew

17  met?

18  A.  Yes.

19  Q.  Do you remember that?

20  A.  Yes.  We met in seventh grade.

21  Q.  What was the occasion?

22  A.  We had home room together.

23  Q.  And did you guys start hanging out?

24  A.  Yes, we did.

25  Q.  And I know that I asked Matthew about this, but you

1    started being exclusive?

2    A.  Yes.

3    Q.  Maybe that's an old term.  As kids, that would be the

4    early 2000s?

5    A.  Yes.

6    Q.  What do you call it whenever you are dating?

7    A.  We were boyfriend and girlfriend.

8    Q.  Okay.  What would you guys do together?

9    A.  Actually, Kylee just had her first born, a little girl, so

10   we spent a lot of time with her.  We would hang out, watch

11   movies, go to the movies, go to high school games, basketball

12   games, activities like that.

13   Q.  And during high school, did you guys stay together as a

14   couple?

15   A.  Yes.

16   Q.  During this time, were you working at all?  Did you do

17   anything besides school?

18   A.  In high school, I got my first job at the hot dog shop

19   actually, and then I started waitressing at Water's Edge.

20   Q.  And you continue to have a friendship with them and

21   continue to work there every so often?

22   A.  In high school?

23   Q.  No.  Until today at Water's Edge?

24   A.  It actually closed down.  The owner passed away so it's

25   now Mario's Dockside, so, yes, I do work there now.

1    Q.  You graduated from high school?

2    A.  Yes.

3    Q.  What year?

4    A.  2013.

5    Q.  And after that, did you have any plans after high school?

6    A.  I just wanted to go to college.  I just wasn't sure for

7    what, so I got my general studies, and then I wanted to study

8    forensics so I went to the police academy to get a jump start

9    on that.

10   Q.  And did you finish any -- get any certificate or degree or

11   anything like that from work with the police academy thing?

12   A.  Yes, I got my certificate.

13   Q.  And what does that entail?  What do you learn?  What do

14   you study for your police academy certificate?

15   A.  I learned a lot of training.  I got my MPOETC number.

16   Q.  What's that?

17   A.  My badge number to be a police officer.  This just put me

18   back, so I didn't really do much in it.

19   Q.  So it was after high school, you guys were still together?

20   A.  Yes.

21   Q.  Did you move in together?

22   A.  Yes.

23   Q.  Did you have any plans for the future, the two of you?

24   A.  Not really plans.  We were just kind of going with what

25   was thrown at us.

1     Q.   And Matt is working?

2     A.   Yes.

3     Q.   You are working?

4     A.   Yes.

5     Q.   Going to school?

6     A.   Yes.

7     Q.   And then found out you were pregnant?

8     A.   Yes.

9     Q.   Can you tell us about that?

10    A.   I found out I was pregnant and I told Matt.  We told the

11    family and then we just kind of started planning for that.

12    Q.   Were you guys excited?  Scared?  What?

13    A.   Very excited, nervous, a little scared, but I wasn't too

14    scared, because like I said, Kylee just had her daughter and

15    we were very involved with her and Kylee, so I really wasn't

16    too scared.  I was excited for them to grow up together.

17    Q.   How about Matt?

18    A.   Same.  He was very excited.

19    Q.   You guys decided to -- did you make any plans for the

20    pregnancy and after?

21    A.   Not really plans.  We just kind of -- I guess, yeah, we

22    planned.  We bought a crib.  We bought a dresser.  We started

23    buying clothes, car seat, stroller, stocked up on diapers,

24    wipies.  Yes, so I guess we did plan.

25    Q.   Did you guys -- he mentioned moving into a mobile home.

1    Were you in an apartment?

2    A.  Yeah.  We were in an apartment.  When we first graduated,

3    we were there, and then when our lease was up, we were looking

4    to move into the mobile home, which we would have moved into

5    there, I think, like a few weeks after I would have had the

6    baby.

7    Q.  I'm going to show a couple of the pictures.  I know you've

8    seen them, but Exhibit 24.  I know Matt talked about that, but

9    what's your recollection of this Pirate game?

10   A.  We just went to the Pirate game on a weekend to hang out,

11   something to do.  My pap probably had free tickets and he gave

12   us tickets to go to the game.

13   Q.  Exhibit 25, was this during while you were pregnant?

14   A.  Yes.  That was on the bridge like he mentioned.  It was

15   just first built, and that was our first time crossing it.

16   Q.  I'm sorry.  It was what?

17   A.  The bridge was just built, so we were crossing the bridge.

18   Q.  Exhibit 26?

19   A.  That was at one of my appointments with Dr. Dumpe.

20   Q.  Tell us a little bit about your prenatal visits.  Did Matt

21   go to a lot of your visits with you?

22   A.  No.  His work schedule was very tight.

23   Q.  Obviously he was at one of them.  Do you remember which

24   one he went to?

25   A.  I don't.

1   Q.  I know at some point you get an ultrasound to find out if

2   you are having a boy or girl.  Did you do that?

3   A.  Not at Dr. Dumpe's office.  I went to another office, and

4   I believe that he was there for that appointment.

5   Q.  What do you remember about this visit?

6   A.  I don't remember the visit specifically, but we look very

7   excited.

8   Q.  Were you?

9   A.  Yes.

10  Q.  Was everything all right with your pregnancy?

11  A.  Yes.

12  Q.  I mean, how did you feel?

13  A.  Definitely moody.  I ate a lot, but other than that, I was

14  just happy.

15  Q.  Do you recall whether or not, did you have any problems

16  during your pregnancy?

17  A.  I had no problems.

18  Q.  Exhibit 27.  This is the picture of you two at a party.

19  A.  Yes.  I think it was a cookout, family cookout.

20  Q.  Do you remember about when that was?

21  A.  Either late Memorial Day, 4th of July or Labor Day, one of

22  those.

23  Q.  Looking at how pregnant you are, is there any way to tell?

24  A.  Probably Labor Day.

25  Q.  So we're coming up to Labor Day weekend, so this would

1    have been five years ago?

2    A.  Right.

3    Q.  Now, do you remember any concerns that the doctors had for

4    you before delivery?

5    A.  There was no concerns.

6    Q.  And did you take any type of prenatal classes or learn

7    anything about the birthing process?  What was your -- going

8    into it, what did you think?

9    A.  They were offered, but I didn't have any interest in them.

10   Q.  Did you talk to anybody about what's involved in a birth

11   and things like that?  Did you talk to Kylee or anybody?

12   A.  Yeah, like, I was going to say I had Kylee around, so I

13   didn't really ask many questions.

14   Q.  Had you ever been to a delivery before?

15   A.  No.

16   Q.  This was your first one?

17   A.  Yeah.

18   Q.  So how were you feeling about the prospect of actually

19   delivering a baby?

20   A.  I was excited.  I couldn't wait to have her.

21   Q.  Did you have any fear or trepidation about delivery?

22   A.  No.

23   Q.  October 12, 2014, what do you remember about that day?

24   A.  I remember I dropped Matt off at work.  I went to my

25   grandparents' house.  I slept there for a little bit, and I

woke up, went to the bathroom, and that's when my mucus plug

came out, so I called my grandmother into the bathroom,

because I was very nervous, because I didn't know what was

happening.

    She said I think you need to call your doctor, so I called

Dr. Dumpe and he said -- he just basically told me I'm not in

labor yet, but we're just going to take the day and see how

it's going to go, and if you feel -- if anything changes in

the next couple of hours to call him again.

    So at that time, I called him again, and I was like I

think I'm going to go.  I'm having a little bit of cramping.

I think I need to go to the hospital, and that's when I went

to the hospital.

Q.  And whenever you got to the hospital, can you tell us what

happened when you arrived and who was with you?  Just you

and --

A.  It was just me and Matt.  I picked him up from work and I

got to the hospital.  I got down to the maternity, and I told

them that I think I'm in labor.  My mucus plug just came out,

and they told me, Oh, no.  You are too pretty to be in labor.

You would know if you were in labor, but they still admitted

me, and they hooked me up to monitors.

Q.  And do you remember any of the nurses that admitted you?

A.  Faces or names, no.  I remember, like, two names.  Faces,

definitely not.

1    Q.  So if you were asked, do you know Judith Ash?

2    A.  No.

3    Q.  How about Maria Hendershot?

4    A.  From yesterday, yes.

5    Q.  So you are in the hospital about what time on the 12th?

6    A.  I believe we got there around noonish.

7    Q.  And did they put you in a room or just keep you in

8    admitting?

9    A.  They put me in the room.

10   Q.  And was it still just you and Matt?

11   A.  Yes.

12   Q.  Do you remember any family coming in to see you during

13   this time?

14   A.  We didn't really tell anybody to come up until I

15   definitely knew what was going on.

16   Q.  And about what time was that?

17   A.  Whenever they came in and used the -- he talked about the

18   test strips yesterday.  I remember her checking to see what

19   the test strips said, so after that, she said you can call

20   your family and tell them we're going to have a baby.

21   Q.  These would be test strips to see if your amniotic fluid

22   was leaking?

23   A.  I believe so.

24   Q.  Whenever you got to the hospital, did you notice whether

25   or not, whenever your amniotic fluid was leaking, whether

1   there was any color to it?

2   A.  I believe I had a slow leakage.  Whenever she did put the

3   towel down underneath me, whenever she picked it up and Matt

4   was beside me, the garbage was right beside him.  When she

5   picked up the towel, it was kind of like in our face a little

6   bit, definitely his face, and she folded it up and threw it

7   away.  On that towel, you could definitely see a greenish

8   substance on that towel.

9   Q.  Now, I take it over the night, that happened a couple of

10  times?

11  A.  It happened the whole night.

12  Q.  Let's talk about -- so you were in the hospital the

13  afternoon of the 12th.  We know at this junction, Dr. Dumpe

14  comes in to break your water?

15  A.  Correct.

16  Q.  Had you seen him any time before that?

17  A.  I don't believe so.

18  Q.  And had you ever -- did you talk to him on the phone

19  anymore after getting to the hospital?

20  A.  No.

21  Q.  So he comes in.  Do you remember what he said, what he was

22  talking to you about?

23  A.  We were just talking about the delivery.  He said -- I was

24  worried about like having the C-Section because I didn't want

25  to have a C-Section.  That scared me.  So he was like we won't

1    do a C-Section unless it's absolutely necessary.  So he told

2    me that everything was going to be okay and I was going to

3    have the baby.  Everything looked good.

4    Q.  Do you remember him breaking the amniotic sac, the

5    forebag, whatever it's called?

6    A.  I do.  I was very afraid that was going to hurt and I was

7    surprised that it didn't hurt once he broke it.  It was just

8    very gross.

9    Q.  What do you mean, "very gross"?

10   A.  The greenish dark substances that were in there, the

11   liquid, the mucusy looking.

12   Q.  Did anybody say anything?

13   A.  No.  They thought it was normal.

14   Q.  So did you talk to anybody about it?

15   A.  No.

16   Q.  Did they go on to a pad, or did it go anywhere else?

17   A.  Yeah.  It was on the changing pad underneath me.

18   Q.  Did the nurse take that away or keep it there or what

19   happened?

20   A.  Yeah.  She cleaned it up.

21   Q.  Did you see what was on the pad?

22   A.  Yes.

23   Q.  Was it any different than the first pad that you had?

24   A.  It looked a little bit darker, but it was still gross.

25   Q.  Matt was there too at the time?

1    A.   Yes.

2    Q.   After that, you are in a bed and are not going to leave

3    until you deliver a baby, right?

4    A.   Right.

5    Q.   We could pick Exhibit 28, and you took this photo.

6    A.   Yes.

7    Q.   And any reason?

8    A.   I just wanted memories.

9    Q.   You've got your pulse ox on your finger.  Do you remember

10   anything else about what's going on at the time?

11   A.   No.  Just anxious, excited.

12   Q.   How was Matt?

13   A.   Same way.  Just excited.

14   Q.   Do you remember that at the time who was the labor nurse

15   for you?

16   A.   I do not remember any names of nurses.  I couldn't picture

17   them with faces.

18   Q.   This Nurse Hendershot you remember.  Do you remember her

19   coming on later in the night?

20   A.   I do remember her.  She was helping me a lot.

21   Q.   And tell us about that.  What do you remember about her?

22   A.   I just remember being very afraid to give birth, and her

23   just like walking me through it, coaching me and telling me

24   what to do, that sort of thing.

25   Q.   Do you remember her coming in and changing any of the pads

1    underneath you?

2    A.  I do.  I do remember.

3    Q.  What do you remember?  Did you look at the pads or could

4    you see them, or did she talk to you about it?

5    A.  Yeah.  We seen them every time that she changed them.

6    Q.  And I know that you can't give us a number, but was it

7    once an hour?  Twice every two hours?  What do you recollect?

8    A.  I just remember her coming in.  I remember after my

9    epidural, I couldn't move a lot, so I remember her flipping me

10   over, picking up my legs to move the pads, so I feel like I'd

11   say, maybe if I had to say, I'd say at least every hour.  I

12   don't remember it being sooner than that.  I don't believe

13   that much.

14   Q.  Just so the jury understands, epidural was a pain shot in

15   your back that numbs everything?

16   A.  Yes.

17   Q.  Do you remember what time you got your epidural?

18   A.  I want to say -- I remember I couldn't feel both of my

19   legs when I first got my epidural, and then by the time that I

20   had her, I had all the feeling on my right leg, and only my

21   left leg was numb, so I remember thinking that it wore off

22   because it wasn't working that well on the other side of my

23   leg.  Maybe it just didn't take.  I don't know.  I would say

24   maybe around like 2:30 or 3:00 a.m., I got that.

25   Q.  At that point, so you can't really move your legs.  Are

1    you in stirrups or are you on a bed?

2    A.  I was on a bed.

3    Q.  She would roll you and change the pads?

4    A.  Yes.

5    Q.  What would she do with those pads when she was done with

6    them?

7    A.  She would throw them away.

8    Q.  Do you know if those pads were -- were they all cloth pads

9    that would get washed, or were they -- I know there's these

10   pads that are blue on the bottom and you just crunch them up

11   and throw them in the trash?

12   A.  Don't quote me on this, but I want to say they were more

13   of a washcloth material, but I could be wrong.  I remember her

14   using a washcloth to dab me off a little bit, so I would say

15   like a cloth.

16   Q.  Whenever she did that, did you -- did anybody talk to you

17   about what was the green stuff, what was coming out?

18   A.  We asked her about it, but it was nothing that she was

19   concerned about.

20   Q.  Do you see any changes in the green, brown stuff?

21   A.  Yes.  It was definitely getting darker over the time.

22   Q.  And I know this might be a very difficult question for you

23   to ask, but did you see any consistency to it?

24   A.  That, I really didn't notice until right before I had her.

25   So in the beginning, it was more watery, where it got more

1    lumpier as the time was coming.

2    Q.  Do you remember any conversations with Dr. Dumpe about the

3    time that you are getting ready to push?

4    A.  What?

5    Q.  Did he come in and say it's time to push?  You are going

6    to deliver a baby?  Anything like that?

7    A.  I was talking to the nurse who was there, and I asked her,

8    like, how does this happen, because she was telling me to

9    push.  And she said Dr. Dumpe will be in soon.  He is

10   performing a C-Section on the patient across the hall, so once

11   he's done with that patient, he'll come in and help you

12   deliver the baby, and she said we are just going to start

13   pushing, and in my mind, I was like start pushing?  He's not

14   even in here yet.  So that kind of threw me off, because I was

15   scared that he wasn't in the room yet, and I remember her

16   saying, like, to Matt, look, you can see like there's a little

17   curl on her head.  I was like, oh, no.  Her head is down

18   there.  We have to hurry up and get this process on, so I was

19   a little bit nervous about that.

20   Q.  Do you remember Dr. Dumpe coming in?

21   A.  After he was finished, yeah, I remember him coming in.

22   Q.  Did you have any conversations with him; do you remember?

23   A.  No, I was in a lot of pain at this point.

24   Q.  So whenever you are pushing, who all is in the room at

25   that time?

1    A.  My mom and Matt.

2    Q.  And was your mom helping at all, or what was she doing?

3    A.  She kind of just, like, stood and observed a little bit.

4    She fed me ice cubes.  She was letting Matt do more of the

5    work, like, let him hold my leg and talk me through it, that

6    type of stuff.

7    Q.  Was Matt encouraging you through this process?

8    A.  Yeah, I remember telling him to be quiet, because I was

9    getting nervous.

10   Q.  To you -- I mean, I know this is the first time you were

11   delivering a baby, but the pushing, you know, was it painful?

12   Did it seem normal?  Was there anything you were concerned

13   about besides just a lot of pain and things?

14   A.  It was terrible.  I remember, like, I could not wait for

15   this baby to get out of me, and halfway in there, I was just

16   like I can't do it anymore.  This is becoming unbearable, but

17   I stuck it through and had to deliver this baby.  We were

18   there at this point.

19   Q.  And you delivered an eight pound, seven ounce baby girl?

20   A.  Yes.

21   Q.  Tell us -- I know that you are pushing and all that, but

22   what do you remember about the actual time of delivery?

23   A.  I do remember Dr. Dumpe grabbing the vacuum suction and

24   pulling her out.

25   Q.  Do you remember him talking to anybody or talking to you

1    about what he was going to do?

2    A.  If I recall, he wasn't really talking at all.  I remember

3    him pulling her out of me, and he hurried up and rushed over

4    to the --

5    Q.  Warmer?

6    A.  -- warmer.  Rushed over to the warmer after he had cut her

7    cord, and in my head, I was just confused because she wasn't

8    crying at the time that she was born.  He seemed nervous.

9         I looked over at my mom and I'm like -- like I mouthed to

10   her is she okay?  And my mom was crying, and she was like,

11   yeah, she is fine, she is fine, like, you are okay.

12        And I just remember them immediately working on the baby,

13   and then Dr. Dumpe came back over, and he was like, now, see,

14   when you have a baby, nobody pays attention to you anymore

15   jokingly, and I was like, yeah, and then he stitched me up and

16   left.

17   Q.  Now, let me take you back just a few minutes with the time

18   of delivery.  Whenever Kendall was born, did you get a chance

19   to see her when Dr. Dumpe -- not pulled her out, but once you

20   gave birth?

21   A.  Not really.

22   Q.  You heard Dr. Dumpe talk about bulb suctioning Kendall.

23   Did you see any of that go on?

24   A.  I seen some of it going on, yes, I did.

25   Q.  What do you remember about that?

1   A.  Well, I was still laying in the bed at this time, so I

2   really couldn't see much of what was going on because there

3   was nurses over there.

4   Q.  I'm sorry.  I'm talking about Dr. Dumpe, whenever he said

5   he delivered Kendall, do you remember he testified that he

6   actually used the bulb once Kendall came out.

7       Do you remember seeing anything like that?

8   A.  I don't remember any of that.  I remember him grabbing the

9   vacuum, cutting the cord and getting her over there.

10  Q.  So you are lying in bed, and Dr. Dumpe is paying attention

11  to you now and helping stitch you up, and what do you see --

12  where are you looking?  Where is Kendall?

13  A.  She is over in the warmer with the nurses.

14  Q.  Off to your left?

15  A.  She would be to my right.

16  Q.  And whenever you look over there, what do you see?

17  A.  I just see a lot of hands moving, a lot of working on her.

18  Matt and my mom were stepped to the side, so that kind of

19  concerned me as to why they weren't over there.  I kept asking

20  that.  I want to see her.  I want to get pictures, and they

21  kind of just like threw me to the side like they were more

22  concerned about what was going on with the baby at that point.

23  Q.  So that would be Matt and your mom?

24  A.  Yes.

25  Q.  Did that give you any relief?  Were you concerned?  What

1    were you thinking?

2    A.  I didn't know what to think at this point.

3    Q.  Do you remember any more conversations with Dr. Dumpe

4    while he was taking care of you?

5    A.  No.

6    Q.  Now, if we could pull up Exhibit 35.  Of course you

7    weren't over at the warmer.  Do you remember how long Kendall

8    was over at the warmer?

9    A.  I wouldn't be able to give you an exact time or minutes.

10   I just remember, once the nurses left, Matt brought her over

11   to me.

12   Q.  And in Exhibit 35, when you see a picture, that's you

13   holding her?

14   A.  Yes.

15   Q.  Can you tell us about that?

16   A.  That's actually the only picture I have of her.  That's

17   the only picture we have together while she was breathing, and

18   I was too tired to hold her so I maybe had like ten seconds

19   with her.

20   Q.  So she was a big baby and --

21          THE COURT:  Ms. Peronis, if you need Kleenex, there's

22   a little teeny box there next to you.

23          THE WITNESS:  Thank you.

24          THE COURT:  There's also water in case you need to

25   take a little break.

1    BY MR. PRICE:

2    Q.  Are you all right?

3    A.  Yeah.

4    Q.  You are tired, and she is a big baby, and you are holding

5    her?

6    A.  Yes.

7    Q.  Are you able to hold her much?

8    A.  No.  I was so tired, and I regret falling asleep, but I

9    was too tired to even hold her to even keep my eyes open.  I

10   just couldn't.

11   Q.  Do you remember taking -- looking at her at this point?

12   A.  Yeah.

13   Q.  What did you see?

14   A.  My baby, my beautiful baby that I just had.

15   Q.  I know after a few seconds, Matt took Kendall from you?

16   A.  Yes.

17   Q.  And what happened to you?  What did you do?

18   A.  I fell right to sleep.  I couldn't stay up any longer.

19   Q.  Now, we heard a lot from Matt and from Kylee that there

20   was a lot of family?

21   A.  Yes.

22   Q.  And tell us, did you fall completely asleep, or were you

23   in like a half sleep?  How were you?

24   A.  I was in and out of it for the most part.  I was trying --

25   as people came in, they were telling me congratulations.  I

1    probably got out the words thank you and fell back asleep

2    until the next person woke me up to tell me congratulations.

3    Q.  Do you remember Kylee coming in and talking to you?

4    A.  That's one person I do remember coming in and talking to

5    me.

6    Q.  Do you remember anybody -- did they bring Kendall over to

7    you, or were they just holding Kendall?

8    A.  No.  I believe -- I do remember Kylee coming over to me

9    and holding her, and I remember her telling me look at your

10   baby girl, look at your baby, and then I remember just going

11   back to sleep, and I remember my brothers and sisters being

12   there.  I remember my mom being there, and I laid back down at

13   that point.

14   Q.  Now, through this -- obviously you are in the bed and you

15   are exhausted and people are coming in.  They are trying to

16   talk to you and they are holding Kendall.  Were you able to --

17   I mean, you've heard some description about how Kendall was

18   afterwards.

19       Were you able to hear her or anything like that?

20   A.  I had no clue anything was wrong.

21   Q.  Now, at some point, I mean, do you remember -- do you hear

22   any of this crying that was going on?

23   A.  She wasn't crying when she was first born at all until --

24   I missed this part actually.  They did start to smack her

25   around a little bit to get her to start crying, but yeah, it

1    was very hard to stay asleep hearing your baby cry and not

2    knowing what was wrong, so obviously I was waking up concerned

3    as to what's wrong, why is she still crying.

4        In my head, I thought maybe she is hungry, maybe she

5    wanted a pacifier.  Matt kept mentioning that there was stuff

6    that they were suctioning out of her, but nobody did anything

7    else about it, so I was obviously concerned why that wasn't

8    still happening, so I was just really confused and wondering

9    why, what is wrong with her.

10   Q.  Now, I know that when Tyler was in there -- do you

11   remember Tyler being in there?

12   A.  I remember waking up, Matt waking me up and asking me to

13   ring the nurse's button, and I remember when I woke up, Matt,

14   Tyler and Taylor were in the room and he told me to ring the

15   nurse's button.  I rang it -- I'm not even lying when I tell

16   you this -- probably 25 or 30 times and not one nurse came to

17   this room, and Matt was like it's so bright outside.  I don't

18   want to take the baby in there.

19       The lights were off in our room.  It was late.  We had a

20   long night, and he asked Tyler to go out to the nursery to get

21   a nurse and asked for them to suction this out of her throat.

22   Q.  Do you remember -- you are lying in bed.  Where is the

23   door?

24   A.  The door is right here (indicating).  Maybe where the

25   judge is to me.

Q.  I'm sorry?

A.  Maybe where, like, the judge is to me.

Q.  When you look out the door, what were you able to see?

A.  I couldn't see anything looking out to the door.

Q.  Did you see Taylor go out -- Tyler go out?

A.  No, I did not.

Q.  What's the next thing you remember?

A.  I believe there was a curtain up, if I'm not mistaken, so I don't even remember -- I know where the door was. Obviously, I walked in the door, but I remember there being a curtain up.

Q.  Do you remember any nurse coming into your room?

A.  Yes.  Not coming in.  She opened up the door, literally enough for her head to fit in, and Matt said are you guys able to get a suction to get this out of her throat, and I remember asking the nurse, because at this point, Matt had asthma really bad, so I asked the nurse do you think she maybe has asthma and that's why she can't breathe and that's why she is sounding like this because she sounded very, I guess, hoarse a little bit, I guess I could say, if that sounds okay.

So she just sounded like groggy and hoarse and I thought maybe she had asthma, and they said no, she is fine.  Just bond with her and she left.  She never came in to check on the baby.

Q.  I'm sorry.  You said that a little quick.  She said what?

1    A.  She said just bond with her.  You guys are new parents.

2    Just bond with her and she left.

3    Q.  Do you remember after -- let me ask you about this:

4    You've heard -- you have been here for the testimony, and you

5    heard Nurse Hendershot say that she came in after 6:00 every

6    15 minutes to examine you to do things.

7        Do you remember any examination of you over that --

8    A.  I do not recall a nurse ever coming in until I woke up at

9    7:30, and no one was in the room, and I was, like, what is

10   going on.  Like, Matt wasn't there, Tyler wasn't there, the

11   baby wasn't there, so I remember pressing the nurse's button,

12   and surprisingly a nurse came in, and I remember asking her

13   where everybody was.

14       And I asked if I could see my baby because I had a little

15   bit of rest at this point and I was excited to see my

16   daughter, so I asked if she could bring her in.  She said,

17   yeah, once you get a shower and get cleaned up, we'll bring

18   you the baby.

19   Q.  What happened then?

20   A.  She picked me up out of the bed, and I remember walking as

21   far as the doorway to the bathroom, and I remember falling

22   over in front of the toilet.

23   Q.  And were you hurt?

24   A.  I passed out.  I don't remember anything until I woke up

25   in a wheelchair.

1  Q.  Do you remember who this nurse was that helped you?

2  A.  Looking at Nurse Hendershot now, I believe she was there,

3  but I do not remember the other nurse that was with her.

4  Q.  Do you remember -- obviously you weren't able to take a

5  shower.  Did they put you back into bed or what did they do?

6  A.  They put me in a wheelchair and they moved me to the next

7  room.

8  Q.  Recovery room?

9  A.  Yes.

10  Q.  And do you remember Matt coming in?

11  A.  I remember Matt coming in to the delivery room before they

12  wheeled me into the recovery room, so we walked down there

13  together.

14  Q.  You get to the recovery room.  Did he talk to you at all

15  about the nursery about what was happening?

16  A.  No.

17  Q.  Did the nurses tell you that they were going to be

18  bringing Kendall to you?

19  A.  I kept asking for her, and they told me that once I went

20  to the bathroom and ate some breakfast that they would bring

21  me to her, and I told them that I didn't want that.  I just

22  wanted to see my baby.

23  Q.  And what did they say?

24  A.  Okay.  We'll bring her down in a little bit.  We'll bring

25  her down in a little bit.  Still asking.  Not getting her at

224

1    all.

2    Q.  Matt described that at some point, he went down to the

3    nursery?

4    A.  He probably did.

5    Q.  Do you remember him coming back from the nursery?

6    A.  I do.

7    Q.  What do you remember about that?

8    A.  He didn't tell me anything.

9    Q.  Did you ask him anything?

10   A.  Yeah.  I just said where's the baby, and he said she'll be

11   down.

12   Q.  Were there any nurses in the room or anybody else

13   explaining what was going on?

14   A.  There was one nurse that was trying to get me to go to the

15   bathroom, and I couldn't go to the bathroom at all.  I

16   couldn't walk at this point, and I kept telling them I can't

17   walk.  I don't want to get up and try to go to the bathroom,

18   because the last time I did, I passed out.

19       This is my first hospital experience ever, and I just

20   passed out, so I was scared.  I was not moving from that bed

21   at this point.

22   Q.  At some point, Matt mentioned that all the people had left

23   the delivery room, and then you got moved to the recovery

24   room.  Did people start coming back to the hospital to see you

25   in the recovery room?

1    A.  Not until we called them.

2    Q.  And is there a reason why you started calling family?

3    A.  Yes.

4    Q.  What was that?

5    A.  We were told -- I did not call my family until -- I was

6    told that they were going to be putting Kendall -- they were

7    going to LifeFlight her.

8    Q.  Do you remember Dr. Jones coming in to talk to you?

9    A.  I do.

10   Q.  What do you remember about that?

11   A.  I just remember her coming in and telling me that

12   something was wrong with the baby and we have to stabilize

13   her, and once we get her stabilized, we're going to put her on

14   the helicopter, and that's when they asked me if I would sign

15   that form, and I said yes.

16   Q.  And do you remember any further visits with Dr. Jones?

17   A.  Not until she told me that my daughter didn't make it on

18   the helicopter.

19   Q.  Meaning that she didn't make the LifeFlight?

20   A.  Yes.

21   Q.  Do you remember any further -- did she come in with

22   anybody?

23   A.  I do remember in between her -- right before she said she

24   didn't make it, I do remember the hospital on the intercom,

25   they called a Code Red and a Code Blue, and Matt had just

1    walked in from the nursery, and I said do you think that's our

2    baby, and he said no, and then he ran out to the hallway.

3        So in the back of my head, I knew that something was

4    wrong, but I had no clue.  I'm just asking for my baby, and

5    there was no saying that anything was wrong at all up to this

6    point, no.

7    Q.  Did any of the nurses that were caring for you talk to you

8    about what was going on?

9    A.  No nurse talked to me until Dr. Jones did.

10   Q.  Did Dr. Jones tell you or give you any idea about what

11   happened?

12   A.  I don't believe -- at this point, I don't believe so.

13   Q.  So Dr. Jones' way of telling you your daughter passed was,

14   you know, she just didn't make the LifeFlight.  They couldn't

15   transport her?

16   A.  Correct.

17   Q.  How did that make you feel?

18   A.  Terrible.  Like, it was a nightmare.  Like, they have the

19   wrong baby.  It can't be my baby.  I just had her.  I didn't

20   get to hold her.  I spent no time with her, like it was not

21   true.  It was heartbreaking.

22   Q.  I'm not going to pull up the pictures.  You saw the

23   pictures of you and Matt and Kendall after the hospital.  What

24   do you remember about that?

25   A.  After she passed away, they came in and asked us if I

1    wanted to hold her and take pictures with her, and they asked
2    if any family members would want to hold her, and I told them
3    no, because I didn't want anybody to remember her like that,
4    and that me and Matt would just take this time and have
5    pictures, because I didn't get to spend time with her, so I
6    wanted to hold her again.
7    Q.  Did you and Matt talk about what was happening during the
8    pictures?
9    A.  We just -- no.  We were at a loss for words.
10   Q.  After they finished the pictures, did they take Kendall?
11   A.  Yeah.  They told us to say our good-byes and that they
12   would wrap her up and take her.
13   Q.  And did you stay in the hospital?  You had to recover?
14   A.  Yeah.  I was taken to the hospital.
15   Q.  How were those two days?
16   A.  They were terrible.  After they took my daughter, they
17   brought us -- they were terrible.  People are taking their
18   newborn babies home, and I'm taking a box home of grieving
19   packets.
20       They also came in and immediately asked me if I wanted to
21   donate any of her organs, and that really upset me because at
22   this point, like, I have nothing, like no.  I blamed myself
23   for a lot of it because I thought I had done something wrong
24   in this whole delivery and labor.  I had no answers.  I didn't
25   know what happened.  I had nothing.  Like, I was just lost.

1    Everything that I just had had been ripped and just gone at

2    this point.

3    Q.  You and Matt -- you were discharged on the 14th and you

4    and Matt went home.  Matt described a little bit, but can you

5    tell us what it was like going home with Matt?

6    A.  He's 100 percent correct.  It was so hard going home.  I'm

7    going home with a box, like I just mentioned, of grieving

8    packets.  I have a car seat in the backseat with no baby in

9    it.  I have a filled diaper bag with no baby.

10        I walk into my house that's completely ready for a baby,

11   and I have no baby, so I'm sitting there reliving the same

12   nightmare.  I left my house pregnant and came back with

13   nothing.  It was terrible.

14   Q.  I know a few weeks later that you, Matt, Dr. Jones,

15   Dr. Dumpe and your mom had a meeting?

16   A.  Yes.

17   Q.  Do you remember going to that?

18   A.  I do.

19   Q.  Did you get any answers?  How did that go?

20   A.  At this meeting, I believe this is where I learned about

21   the meconium.  I remember Dr. Jones telling me that Kendall

22   was so stained that in the back of her throat, all of her

23   organs were stained with this meconium, and I remember her

24   telling me that there was no way that this baby could have

25   been saved.

1    She did tell me that this had happened to her daughter, so

2    in the back of my head, I'm thinking this happens a lot, why

3    did this happen to me then.  And I was told that they didn't

4    have the proper equipment at the hospital and that my baby was

5    too sick.  She couldn't be saved.

6    Q.  Did you feel that you got your questions answered at the

7    meeting?

8    A.  No.  I didn't get any questions answered.

9    Q.  How did you respond?  I mean, was it a productive meeting?

10   Was it emotional?  How did it go?

11   A.  I felt at this point I was just -- it was just a joke to

12   them, like I felt as if they didn't care.  I kept asking them

13   questions that weren't being answered.

14       Like, Matt said they kept saying just take precautions for

15   your next pregnancy.  At this point, I can't even think about

16   stepping into a hospital ever again.  Getting to that hospital

17   and having this meeting was the hardest thing ever.

18   Definitely getting PTSD.  The anxiety was extreme.

19       I didn't even want to go there and talk to them, but I

20   felt as though I needed my answers, and I still feel like

21   nothing was resolved out of that meeting besides the fact that

22   I was told that she was so stained with meconium.

23   Q.  Now, tell us a little bit about going home after that, you

24   and Matt.

25   A.  I went home.  I wasn't able to walk for days.  I just laid

1    on my couch and didn't do anything.  I shut everybody out
2    besides Matt, and I didn't do anything.  I couldn't even go
3    back to work.
4        I mean, I quit working because I was waitressing at the
5    time.  Everybody knew I was pregnant.  I didn't want them to
6    ask about my child and have to explain to them what happened.
7    I couldn't go back to school.  Same scenario.  I didn't want
8    everybody to ask me, hey, congratulations.  How is your baby?
9    I was just like stuck at my house.  I didn't do anything.
10   Q.  What happened to your relationship with Matt over the next
11   six months?
12   A.  He probably had a lot of pressure on him because he still
13   had to go to work.  The bills still needed paid.  We were
14   moving.  We had a funeral to plan for, and I just couldn't do
15   anything.
16   Q.  At some point, did you talk to a doctor about all this?
17   A.  I talked to my PCP, but she wanted me to talk to a
18   psychiatrist, still does to this day, and I'm not -- I don't
19   want to talk to a psychiatrist.
20   Q.  Did she prescribe any type of medication or anything like
21   that for you?
22   A.  Yes.  She put me on anxiety medication and
23   anti-depressants.
24   Q.  Did you take them?
25   A.  Yes.

1   Q.  Are you still taking them or --

2   A.  Yes.

3   Q.  Tell us a little bit about you and Matt.  What happened?

4   You are no longer together?

5   A.  No.  We could not -- this was either going to make us or

6   break us, and it definitely broke us within six months of this

7   happening.

8   Q.  And where did you go?

9   A.  I stayed at the house, because, like he said, we just got

10  a house, so I was hoping that he was going to come back, and

11  he didn't.

12  Q.  And did you and Matt, I mean, over the next couple

13  years -- like I said, I described a hot and cold relationship.

14  Can you tell us about that?

15  A.  Over the last couple years?

16  Q.  Yes.

17  A.  No.  We haven't talked.

18  Q.  Whenever you did get back together -- I mean, right after

19  the breakup, did you guys continue to communicate?

20  A.  Here and there, yeah.

21  Q.  Now, you are both in this lawsuit.  Did you talk about

22  proceeding with this lawsuit together?

23  A.  I was doing it regardless of what he had to say, but he's

24  always backed me up and been on my side, because when it comes

25  down to it, we had a healthy baby, and within a few hours, our

1    child was dead, so nothing makes sense to me.

2    Q.  Since your breakup, it's been -- you know, unfortunately

3    it's been a couple years now.  From what I understand, you've

4    met another man?

5    A.  Yes, I have.

6    Q.  And you also, after that, became pregnant?

7    A.  Yes.

8    Q.  You have a child?

9    A.  I do have a one-year-old.

10   Q.  How did the pregnancy go for that?

11   A.  It was the same.  It was the same.  I had no

12   complications.  Everything was fine.

13   Q.  Tell us a little bit about how you feel having a child now

14   after having Kendall?

15   A.  I definitely don't take my child for granted.  I hate

16   leaving her.  Separation anxiety really plays a part in this.

17   I just try to do what I can for her.  I waitress a couple days

18   a week.

19       Other than that, I stay at home with her until I do the

20   outages once a year, but it's definitely been hard losing a

21   child and then having a child, because the anxiety and PTSD

22   really traumatizes you.  It's very scary.

23   Q.  Do you have any ways that you remember Kendall?

24   A.  I held her for ten seconds.

25   Q.  To this day, I mean, do you have any -- I know some people

1  have lockets or tattoos or something like that.  They remember

2  their children in different ways.

3  A.  Yeah.  I have a ring with her name on it and her

4  birthstone.  I have pictures.  I have blankets of hers.  I

5  have her hospital bracelet, her hospital hat, her blanket.

6  Yeah, I have all of her stuff still.

7          MR. PRICE:  That's all the questions I have, Your

8  Honor.

9          THE COURT:  Okay.  Thank you, Mr. Price.

10  Mr. Colville?

11          MR. COLVILLE:  No questions.

12          THE COURT:  Ms. Koczan?

13          MS. KOCZAN:  No questions.

14          THE COURT:  Ms. Peronis, I have a couple questions.

15  You had an episiotomy, correct?

16          THE WITNESS:  Yes.

17          THE COURT:  And do you know how big or long that

18  episiotomy was?

19          THE WITNESS:  I do not.

20          THE COURT:  But how long did it take to heal?

21          THE WITNESS:  I was not able to walk for probably a

22  good two weeks after I had her.

23          THE COURT:  Now, you are pretty tiny.

24          THE WITNESS:  Correct.

25          THE COURT:  And before you had Kendall, how tall were

1  you and how much did you weigh.

2          THE WITNESS:  I'm almost five foot and I was about 90

3  pounds.

4          THE COURT:  When Kendall came, how much did you

5  weigh?

6          THE WITNESS:  120.

7          THE COURT:  Now, the jurors and the court have all

8  been provided with your records, and I don't think we've heard

9  anything about this to this point, but when I go through your

10  records, it looks to me like you were in on September 27 to

11  rule out labor, right?

12          THE WITNESS:  Yes.

13          THE COURT:  And you didn't see Dr. Dumpe then, did

14  you?

15          THE WITNESS:  I did not.  Are you talking about the

16  hospital visit?

17          THE COURT:  Yes.

18          THE WITNESS:  Yes.

19          THE COURT:  You saw a different doctor, right?

20          THE WITNESS:  I don't believe seeing Dr. Dumpe, but I

21  couldn't tell you who I seen at that point.

22          THE COURT:  And the reason why you went in was you

23  thought you might be in labor on 9-27?

24          THE WITNESS:  Yes.  I believe I was having Braxton

25  Hicks.

1          THE COURT:  And then instead of Dr. Dumpe, you saw a

2     different doctor, right?

3          THE WITNESS:  Yes.

4          THE COURT:  Does the name Lauer ring any bells?

5          THE WITNESS:  I seen him one time at the office.

6          THE COURT:  Do you remember seeing him in the

7     hospital on 9-27?

8          THE WITNESS:  I don't remember seeing him

9     specifically, no.

10          THE COURT:  Do you remember being told you weren't in

11     labor and you were sent home with instructions?  Do you

12     remember that?

13          THE WITNESS:  Yes.

14          THE COURT:  Do you remember what those instructions

15     were?

16          THE WITNESS:  I don't remember the instructions.  I

17     remember one of the nurses told me to -- she was asking me a

18     lot of questions, and she said if I ask you these questions

19     now, it will eliminate whenever you come in when you do have

20     the baby, so we'll just get this out of the way now in case

21     you are in a lot of pain whenever you come in, but I don't

22     remember exactly instructions, no.

23          THE COURT:  Now, there's also reference a couple of

24     places in these records about you having a vaginal infection.

25     Do you remember that?

1           THE WITNESS:  I do not.

2           THE COURT:  Now, I think you testified that you were

3      concerned that Kendall might have asthma.  Do you have any

4      experience yourself with asthma?

5           THE WITNESS:  I don't.  But Matt has asthma very

6      badly, and I thought that maybe she would have asthma.  I

7      didn't know.  I just knew that she couldn't breathe correctly.

8           THE COURT:  By the way, who is your PCP?

9           THE WITNESS:  I go to Dr. Wesselowski at AGN.

10          THE COURT:  Does the court's additional questions

11     cause either or any counsel to have questions?

12          MR. PRICE:  No.

13          THE COURT:  No?  Ms. Peronis, you may step down.

14        (Witness excused.)

15          THE COURT:  Mr. Price, do you have any PowerPoints

16     that you want to give to Mr. Galovich?

17          MR. PRICE:  Not from -- all of the pictures that I

18     have shown are exhibits that have been marked and are part of

19     the joint exhibit list.

20          THE COURT:  Do you have any other witnesses for this

21     afternoon, sir?

22          MR. PRICE:  No.

23          THE COURT:  Well, rather than start anew, ladies and

24     gentlemen of the jury, we're going to adjourn, recess for this

25     evening, and once again, you are going to leave your notepads

1    and you're going to leave your binders.  Mr. Galovich and

2    Ms. Starr will collect them and store them away.

3         As I told you at every recess, you are not to discuss

4    this case with anyone, including fellow jurors, other people

5    involved in the trial, members of your family, friends or

6    anyone else.  You are not to speak to any of the people that

7    are here in the courtroom coming or going, and again, you are

8    not to do any kind of research.

9         Once again, I don't know if there is or is not any

10   news print of any kind about this case.  Of course, if there

11   is, you are going to avoid it.  Continue to keep an open mind.

12   Don't make up your mind until you've heard all the evidence,

13   the closing arguments and my instructions, and then you'll

14   have an opportunity to share your views with your fellow

15   jurors and make your determinations.

16        So with that, let's all rise and let our jurors

17   depart.

18      (Jury excused.)

19        THE COURT:  So we have Nurse Ash coming first thing

20   tomorrow, correct?

21        MS. KOCZAN:  Your Honor, I believe.  I haven't spoken

22   with her yet, but I'm -- I haven't confirmed, but I believe we

23   have her.  I don't know if she is first thing or Dr. Jones

24   will be first.

25        THE COURT:  To that end, Mr. Price, is Nurse Ash

1    being called by you or are we now going to be in the hospital

2    case?

3              MR. PRICE:  We'll now be in the hospital case.

4              THE COURT:  So you are going to be resting?

5              MR. PRICE:  Yes.

6              THE COURT:  We have a motion.  That motion was filed

7    earlier today.  This is the motion and brief in support of

8    directed verdict on behalf of Dr. Jones filed by Ms. Koczan

9    and her associate, Mr. Hamilton.

10             Have you had an opportunity to see this motion and

11   brief, Mr. Price?

12             MR. PRICE:  Yes, Your Honor.

13             THE COURT:  What is your position?

14             MR. PRICE:  My position is with regard to the brief,

15   not to say it was filed premature, because I understand that

16   they had to get it filed, but it did not take into any account

17   Dr. Karotkin's testimony today, and Dr. Karotkin established

18   the breach in the standard of care based upon the medical

19   record that has been admitted into evidence and that that

20   creates an issue of fact for the jury to determine, whether or

21   not the supervisor made a call to Dr. Jones at 7:20, so I

22   believe that Dr. Karotkin's testimony obviates the Rule 50

23   motion.

24             THE COURT:  Ms. Koczan, your further argument?

25             MS. KOCZAN:  Your Honor, I would say the exact

1    opposite.  Dr. Karotkin's testimony today further establishes

2    and supports the motion.  Dr. Karotkin said I don't know how

3    many times that Dr. Jones did a terrific job, and only if she

4    wasn't called, then there would be an issue, and he doesn't

5    believe that she was called.  That was his testimony.

6            Furthermore, in addition to that, we went over the

7    phone records, the pager records which conclusively

8    establishes that she was not called, so I believe that his

9    testimony today, the responses I got from him, further

10   supports my motion and, you know, there is no testimony of

11   record here that Dr. Jones did anything that deviated from the

12   standard of care, and she should not remain as a defendant in

13   this case for all the reasons set forth in my brief and my

14   motion.

15           THE COURT:  Okay.  Mr. Price?

16           MR. PRICE:  I disagree.  The medical record has

17   established that a supervisor called or made a note that she

18   called Dr. Jones at 7:20.  We do not know whether or not that

19   call was made.  The only evidence that Ms. Koczan -- it's not

20   even evidence.  She testified about these phone records.

21           However, what is missing is why don't we have

22   testimony from the supervisor.  She could have made this

23   motion moot by calling the supervisor, and the supervisor

24   could have said, hey, look, that was a mistake in the record.

25           I never called Dr. Jones, but apparently this

1    supervisor is now retired living in Arizona, so I went with

2    the record and the record says that she was called at 7:20.

3         It is a business record.  It's been admitted into

4    evidence so it is a fact.  It is not opinion.  There's a fact

5    in the record that she was called at 7:20, and Dr. Karotkin

6    said, if I'm looking at this record and if this record is

7    accepted as the truth, and if this jury wants to accept this

8    record and Dr. Jones didn't come in or didn't make a call at

9    7:20 after receiving a call, that's a delay.  That's a breach

10   in the standard of care.

11        The jury can believe otherwise, because, in hearing

12   all the other evidence, she probably did come in at 8:20, but

13   I'm looking at a record that says she was called at 7:20.

14   There's nothing in the evidence that disputes that, so I have

15   to go with what the record says.

16        MS. KOCZAN:  Your Honor, may I respond to that?

17        THE COURT:  Yes, Ms. Koczan.

18        MS. KOCZAN:  First and foremost, Dr. Jones doesn't

19   bear the burden of proving this.  That further rests with

20   Mr. Price, and there is plenty of evidence in this record.

21        We have testimony from Nurse McCrory that she didn't

22   call.  We have testimony from Dr. Heiple that he didn't call.

23   We have testimony from Nurse McCrory and Dr. Heiple both that

24   when Dr. Jones came in, she asked why she wasn't called.  We

25   have the pager records that were introduced as evidence.  We

1    have plenty of record that she was not called, and we have

2    Dr. Karotkin's testimony today.  I asked him multiple

3    occasions.  He said I don't believe she was called.

4            So I think there's plenty of evidence on which you

5    can enter the requested motion and order that.

6            THE COURT:  Let me take a few minutes and go back

7    through my notes of Dr. Karotkin.

8            MS. KOCZAN:  Your Honor, may I make one more point?

9    The other point I would make is the record establishes that

10   these events that triggered all of this did not occur until

11   7:20.  There's a note -- excuse me, until 7:25.  That note is

12   at 7:20, which makes no sense.  They wouldn't have called her

13   before.  They would have called her once the problems began,

14   and again, there is testimony that she was not called per

15   protocol.  It was Dr. Heiple who was called.  I would just add

16   that too.

17           MR. PRICE:  And if I would respond to that, I think I

18   established with Nurse McCrory could have been 7:20, could

19   have been 7:25, and that's why she called her supervisor, and

20   that's why the ball started getting rolling.

21           THE COURT:  First off, under Rule 50, the evidence at

22   this stage of the litigation has to be seen in the light most

23   favorable to the plaintiff, number one.

24           Number two, it would seem to me that the supervisor,

25   even retired in Arizona, could have provided an affidavit many

1    moons ago in support of a motion for summary judgment if this

2    was going to be the position.  We had a prior position

3    previously.

4           Thirdly, it is true that Dr. Karotkin said a lot of

5    things that are very favorable to the doctor.  I also go back

6    to testimony that's been made in this matter and Mr. Price's

7    reference to it vis-a-vis Dr. Dumpe and the time of birth, and

8    to that end, when Dr. Dumpe was deposed, he was asked:

9           For some babies, like you mentioned, that has, did

10   you say, grunting or anything like that, or did the baby have

11   some difficulty breathing?

12          And then he answered -- Dr. Dumpe answered:  Yeah.

13   They do things called grunting and retracting.

14          Question:  Right.  Was this baby grunting and

15   retracting?

16          Answer:  The baby was over there and I was over here,

17   so I think that's why they took the baby to the nursery,

18   because it was doing some of those things.  Exactly what it

19   was, I don't know.  Those are the reasons that they would say,

20   "Let's evaluate the baby in the nursery."

21          I also then take a look at this hospital record, and

22   admittedly, some of these notes are not contemporaneous, but

23   be that as it may, some of the notes don't appear at all, but

24   when I look at -- this was the initial exhibits provided to

25   the court.  What I'm looking at is Heritage Valley Beaver

1    Carissa Peronis admitted 10-13-2014, 5:00.

2            Then it starts:  Last updated 10-13-2014, 8:05, and

3    it says heart rate, more than 100 beats/minute; respiratory

4    rate, weak, irregular; muscle tone, some flexion of

5    extremities; reflex, irritability, grimace, body pink,

6    extremities blue.  One minute Apgar six.

7            Then at five, good crying, some flexion of

8    extremities, cough or sneeze, body pink, extremities blue,

9    eight.

10           Then resuscitation efforts, suction bulb syringe,

11   suction catheter.  Later on, meconium management, suction

12   method, bulb syringe, suction catheter mouth, nasopharyngeal,

13   nose.  Delivery 5:30.  Delivered spontaneously.  Remains in

14   mother's room.

15           Judith Ash provided the electronic signature

16   10-12-2014 at 15:34 and Maria Hendershot at 10-13-2014 at

17   8:05.

18           So there's some indication in this record that this

19   baby was having some problems earlier than 7:20 or 7:25 as the

20   defense continues to maintain, so it is conceivable to this

21   court that somebody, whether it was the supervisor or somebody

22   else, called and said we need a pediatrician in here, so

23   that's the facts.

24           So with that, I'm going to read through my notes of

25   Dr. Karotkin, and I'm going to read -- I'm fortunate to have a

244

1    rough draft of his testimony, and I'll read it over tonight,

2    and I'll make a final decision first thing tomorrow morning.

3            So have a good night, everybody.  By the way, we also

4    spend a lot of time on these policies, and it's most

5    interesting to the court that a lot of these policies weren't

6    signed off by the doctor until after this baby was born.

7            MS. KOCZAN:  Which doctor, Your Honor?

8            THE COURT:  Dr. Dumpe signed on 11-18-14.  Carissa

9    was born 10-13, correct?

10            In addition, another one of these policies,

11    Dr. Dumpe, 10-18-14.  Another one, Dr. Dumpe, 11-18-14.

12    Another one signed by Jim Scibilia and Dr. Jones 11-20 and

13    21-2014.  These were the hospital policies that you all

14    maintain were in effect at the time of this delivery.

15            MS. KOCZAN:  That's correct, Your Honor.

16            THE COURT:  Well, it's interesting when they got

17    signed off on.  It's also interesting how they were

18    formulated.  Okay.  Have a good night.

19        (At 4:50 p.m., the proceedings were adjourned.)

20                    C E R T I F I C A T E

21            I, BARBARA METZ LEO, RMR, CRR, certify that the
     foregoing is a correct transcript from the record of
22    proceedings in the above-entitled case.

23

24    _\s\ Barbara Metz Leo__                    09/25/2019_____
     BARBARA METZ LEO, RMR, CRR              Date of Certification
25    Official Court Reporter

```
 1                          I N D E X

 2    WITNESSES                                      PAGE

 3    EDWARD KAROTKIN, M.D.

 4         Direct Examination By Mr. Price              4
           Cross-Examination By Mr. Colville           36
 5         Cross-Examination By Ms. Koczan             53
           Redirect Examination By Mr. Price           79
 6
      TAE C. MIN, M.D.
 7
           Direct Examination By Mr. Price             86
 8         Cross-Examination By Mr. Colville          104
           Cross-Examination By Ms. Koczan            108
 9         Redirect Examination By Mr. Price     111, 117

10    KYLEE FRITZIUS

11         Direct Examination By Mr. Price            120
           Cross-Examination By Mr. Colville          133
12         Cross-Examination By Ms. Koczan            142

13    MATTHEW FRITZIUS

14         Direct Examination By Mr. Price            145
           Cross-Examination By Ms. Koczan            177
15         Recross-Examination By Ms. Koczan          196

16    CARISSA PERONIS

17         Direct Examination By Mr. Price            198

18

19

20

21

22

23

24

25
```