```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2

      CARISSA PERONIS, et al.,
 3                    Plaintiffs
         vs.
 4                                       Civil Action No.
      UNITED STATES OF AMERICA, et       16-1389
 5    al.,
                      Defendants.
 6
                                - - -
 7

         Transcript from proceedings on August 30, 2019, United
 8    States District Court, Pittsburgh, PA,
      before Judge Nora Barry Fischer.
 9

10    APPEARANCES:

11      For the Plaintiffs:     Harry S. Cohen & Associates, P.C.
                                Douglas L. Price, Esquire
12                              Two Chatham Center
                                Suite 985
13                              Pittsburgh, Pennsylvania 15219

14
        For the Defendant       U.S. Attorney's Office
15      USA:                    Michael Colville, Esquire
                                Philip P. O'Connor, Jr., Esquire
16                              U.S. Courthouse
                                700 Grant Street
17                              Pittsburgh, Pennsylvania 15219

18      For the Hospital        Weber Gallagher Simpson Stapleton
        Defendants and          Fires & Newby
19      Dr. Jones              Paula A. Koczan, Esquire
                                603 Stanwix Street
20                              Suite 1450
                                Pittsburgh, Pennsylvania 15222
21
        Court Reporter:         Barbara Metz Leo, RMR, CRR
22                              700 Grant Street
                                Suite 6260
23                              Pittsburgh, Pennsylvania 15219

24
         Proceedings recorded by mechanical stenography;
25    transcript produced by computer-aided transcription.
```

1          THE COURT:  As the court indicated yesterday, after I

2    heard argument on the motion for directed verdict filed by

3    Dr. Jones pursuant to Rule 50, the court wanted the

4    opportunity over the evening to read her notes to this point

5    as well as the rough draft transcript of Dr. Karotkin's

6    testimony.

7          The court also revisited the exhibits, all of which

8    have been entered into the record, and based on the court's

9    understanding of the law, the motion is denied and here's my

10   reasons:

11         A motion pursuant to Federal Rule of Civil Procedure

12   50(a) may be made at any time before the case is submitted to

13   the jury, so says Ponzini, P-O-N-Z-I-N-I, versus Primecare

14   Medical Incorporated, 269 F. Supp. 3rd 444, Middle District

15   2017, quoting Federal Rule of Civil Procedure 50(a)(2).  "If a

16   party has been fully heard on an issue during a jury trial and

17   the court finds that a reasonable jury would not have a

18   legally sufficient evidentiary basis to find for the party on

19   that issue, the court may, A, resolve the issue against the

20   party, and B, grant judgment as a matter of law against the

21   party on a claim or defense that under the controlling law can

22   be maintained or defeated only with a favorable finding on

23   that issue."

24         I think it's important that the rule contains the

25   word may, which affords the court some discretion.  When

deciding a Rule 50(a) motion, the court must, as I said yesterday, view the evidence in the light most favorable to the nonmoving party, giving the nonmoving party the benefit of every fair and reasonable inference.  So says Galena versus Leone, 638 F.3d 186 Third Circuit 2011 citing Beck versus City of Pittsburgh 89 F.3d 966, a 1996 decision.

The motion should be granted only if the evidence is not sufficient for a jury reasonably to find viability.  To this end, the court must, "Refrain from weighing the evidence determining the credibility of witnesses or substituting its own version of the facts for that of the jury."

So says Eshelman, E-S-H-E-L-M-A-N, versus Agere, A-G-E-R-E, Systems Incorporated, 554 F.3d, 426 Third Circuit 2009, also quoting an earlier Third Circuit decision Marra, M-A-R-R-A, versus Philadelphia Housing Authority, a 2007 Third Circuit decision.

Now, plaintiffs Carissa Peronis individually and as administratrix of the estate of Kendall Peronis along with Matthew Fritzius filed a complaint for professional negligence against Dr. Jones among others on September 8, 2019.

Paragraph 103 of that complaint sets forth a number of allegations relating to issues of Dr. Jones' alleged delay in attending to and treating Kendall Peronis.  In that same vein, plaintiffs' counsel, in response to the motion for directed verdict, argues that a question of fact remains as to

1    whether or not Dr. Jones received and promptly responded to a

2    notification from Heritage Valley Beaver about Kendall

3    Peronis.

4         Plaintiffs' counsel particularly relies on Joint

5    Exhibit No. 6, medical records from Heritage Valley Beaver in

6    which it is recorded that, "Dr. Jones," and I'm going to put

7    this in brackets, "[was notified at 7:20]."

8         Additionally, the incident report in Joint Exhibit 15

9    implies that Dr. Jones was in fact called prior to 7:20.  See

10   Joint Exhibit 15 at 1.  Specifically it reads, "While in the

11   nursery, infant started having respiratory distress.

12   Residents notified, along with Dr. Jones, regarding infant in

13   nursery with respiratory distress.  At 7:20, oxy hood and lab

14   work along with IV placement completed."

15        Thus there are medical records that are part of the

16   joint exhibits from which a jury can reasonably find Dr. Jones

17   was notified and failed to promptly respond, if the jury finds

18   these records more persuasive than the pager and phone records

19   and the testimony of Dr. Bradley Heiple and Nurse McCrory.

20   After all, the jury is the ultimate finder-of-fact, and again,

21   I would quote to Eshelman.

22        Now, turning to Dr. Karotkin, who the court finds to

23   be well credentialed and I'd say moderate in his tone.

24   Dr. Karotkin believes that if a baby is at risk, a

25   pediatrician must be present at delivery.  His opinion that

1    this was a delivery that should have had a pediatrician in

2    attendance due to meconium, operative delivery using a vacuum

3    extractor, concern for shoulder dystocia and some delay in

4    getting the baby delivered.

5          He also noted, although not an expert and not an

6    OB/GYNE, not an expert in fetal strips, but from his knowledge

7    and experience as a board certified pediatrician and

8    neonatologist that the fetal strips weren't entirely

9    reassuring.  He had some concern based on a two plus category

10   which is consistent with prior testimony in the plaintiffs'

11   case.  He also noted the arrest of descent.

12         As a consequence, there was the potential or expected

13   use of forceps.  In his estimation, a pediatrician should be

14   called in those instances.  Relative to same, he specifically

15   noted that the use of a vacuum extractor brings the potential

16   for bruising and bleeding, and we also heard from Matthew

17   Fritzius that the baby did have some misshaping of the baby's

18   head.

19         He also pointed out that meconium can be a sign of

20   fetal distress, and to that end, in his words, this is the

21   kind of baby that either should have been monitored much more

22   closely in the mother's room with evaluations by either a

23   pediatrician or a nurse to listen to the baby, to observe the

24   baby, do a pulse oximetry, or alternatively, admit the baby

25   directly to the nursery for much closer observation.

1          He also noted vis-a-vis the call at 7:20 that there

2     was nothing in the record that Dr. Jones did until 8:20.  In

3     his words, this is a breach of duty if you don't respond.  In

4     fact, he goes on to say that generally, the requirement is you

5     respond within a half hour.

6          So if the call had been made at 7:20 and received at

7     7:20, Dr. Jones should have been at the hospital by 7:50.  In

8     his estimation starting treatment at 7:50 would have been

9     better than 8:30 or 8:40.  However, he does state that

10    Dr. Jones' treatment once she was there was fine.  He has no

11    criticism once she arrived.  In his words, she did a great job

12    once she was there.

13         He also goes on to state that in his estimation, the

14    standard of care requires a pediatrician or nurse to evaluate

15    every 15 or 20 minutes despite arguments about bonding.  He

16    further opines the delay in treatment increased the harm,

17    because, in his words, this baby was in trouble shortly after

18    birth.

19         Again, he stated had there been a pediatrician

20    present, the whole process of septic workup would have

21    happened much quicker.

22         Once again, he readily admits he doesn't know if the

23    call was or wasn't made, but that's what the documents show.

24    If he were sitting on this jury, and he's not, he would tend

25    to believe Jones, but he's not the finder-of-fact.

1          He also agrees, based on the evidence that he saw,

2     i.e., the telephone and pager records that Dr. Jones was not

3     called.  Once again, he had no criticism of Dr. Jones.

4          So although he has a number of statements very

5     favorable to Dr. Jones' treatment once she is on scene, he

6     does point out that the delay in treatment was potentially

7     causative of harm.

8          Now, the court would also note that in his opening,

9     Mr. Price did indicate to the court by way of his opening

10    statement that the plaintiffs in this case did not find fault

11    with Dr. Jones' treatment.

12         Dr. Karotkin has now testified and similarly doesn't

13    find fault, so to that degree, the court would further say

14    that these admissions or concessions by Mr. Price in his

15    opening are binding on the plaintiffs, and to that end, the

16    court would cite to a number of decisions.

17         There's actually a Supreme Court decision that goes

18    back, I think, to the turn of the 19th century, the 1820s, but

19    more recently, the court would reference Glick Versus White

20    Motor Company, 458 F.2d 1287, a Third Circuit 1972 case,

21    because there, defense counsel made certain concessions during

22    his closing argument about certain of the exhibits which the

23    court found binding.

24         The court would also cite to a later decision in

25    Pivirotto, P-I-V-I-R-O-T-T-O, versus Innovative Systems,

1  Incorporated.  This is a 1999 decision, and to that end, the

2  footnote reads, "It may be true that an attorney's clear and

3  unambiguous statements of fact made during opening and closing

4  can constitute judicial admissions."

5       The court would also note a most recent decision out

6  of the Third Circuit, Wolfington, W-O-L-F-I-N-G-T-O-N, versus

7  Reconstructive Orthopedic Associates, 2019 Westlaw 3925948.

8       So for all of those reasons, the motion is denied.

9  When the jury comes out, Mr. Price, you are going to stand up

10  and formally rest in open court.  I'll take you to sidebar.

11  We'll incorporate your prior arguments and I'll incorporate my

12  prior ruling, which has just been read into the record, and

13  then we'll proceed with the remainder of the case.

14       Now, per caption, Mr. Colville is next, but I

15  understand he's not calling any additional witnesses, unless

16  I'm wrong on that, and so we're going to hear from Ms. Koczan

17  and the hospital defendants; is that right?

18       MS. KOCZAN:  No.

19       THE COURT:  I'm sorry?

20       MS. KOCZAN:  That is not correct.  Mr. Colville is

21  calling additional witness, but he will not be here until

22  Tuesday.

23       THE COURT:  Well, I mean, he's not calling any

24  additional witnesses today.

25       MS. KOCZAN:  That is correct, Your Honor.

1          THE COURT:  So I think I'll make some kind of an

2     instruction to that effect that Dr. Wiesenfeld is going to be

3     here on Tuesday and so everybody has agreed that Ms. Koczan

4     can proceed vis-a-vis the various hospital defendants,

5     including the pediatric group, right?

6          Now, Mr. Price, I heard there was some squabbling

7     between you and Ms. Koczan.  You're accusing Ms. Koczan of

8     slow dancing her case.

9          MR. PRICE:  Yes.  I apologize if it was a squabble.

10          THE COURT:  I know you two have a history, and in

11     fact, you had a parallel case to this one in front of Judge

12     Cercone which the government settled on behalf of Dr. Lauer

13     and Ms. Koczan went to verdict and won the case.

14          Go ahead.

15          MR. PRICE:  Your Honor, I believe if you also look at

16     this case, there is reason for me to be suspicion.  I've had

17     some issues.  I don't want to go into them too deeply, but I

18     think the stipulation that was filed notes a lot of the issues

19     with regard to discovery, with regard to medical records, with

20     regard to production under the federal rules of discovery, but

21     nevertheless, I went back to the office last night and looked

22     at the schedule.  So today, we have Dr. Jones will be

23     testifying first.

24          THE COURT:  I thought we had Nurse Ash.  Isn't she

25     coming in?

1          MS. KOCZAN:  That's correct.  She is.

2          THE COURT:  So we have Ash coming in.  That was

3    indicated last night.  I read her transcript.

4          MR. PRICE:  Right.  Dr. Jones, then Nurse Ash.

5          MS. KOCZAN:  No, Nurse Ash first.

6          THE COURT:  Nurse Ash first and then I understood

7    Dr. Jones and I don't know what follows.

8          MR. PRICE:  Right.  As I mentioned with Nurse Ash,

9    the only relevant testimony she has is about the meconium.

10   Now, I know that her testimony can go on for hours about the

11   admission and about hooking her up and doing the initial

12   assessment, but that is not in contention here, so I would say

13   that's irrelevant.  The only relevant issue is -- she can talk

14   about some background, but if we spend two hours on every note

15   where she clicked, I believe that's irrelevant.

16          The only issue in contention is the meconium, and

17   that's the only issue that Nurse Ash can talk to.  I know she

18   came back the next morning and saw Carissa after the baby went

19   to the nursery, but again, I can't understand how long her

20   testimony is.

21          Then we have Dr. Jones, and I know she might be long,

22   but again, it's not -- it should not, the way this case has

23   been going, take up the whole day.  On Tuesday, we have

24   Dr. Wiesenfeld and we have Dr. Boyd and Nurse Hackney, and

25   Nurse Hackney was there from 7:00 to 7:30.

1          On Wednesday, we have two experts, Dr. Coffin and

2     Dr. Ringer.  Here's my problem is you advised us all last

3     Friday that today was going to be a full day.

4          THE COURT:  Then I told you that because of speedy

5     trial issues, I scheduled a defendant to come in here at 3:00

6     this afternoon.  I told you that.

7          I also told you that, in fairness to these jurors and

8     given the Labor Day holiday and given the fact that one or two

9     of these jurors lives a far piece from the City of Pittsburgh,

10    I was going to shut down early today.  I also told you that.

11         I also told you that even if we didn't have

12    witnesses, that we have legal issues to address, i.e. the

13    points for charge, so we're going to fill up the day as much

14    as I can, but I'm expecting we're not going to be here much

15    past 3:00 today.  That's what I'm expecting.

16         MR. PRICE:  And I would expect that this afternoon,

17    we could take care of the charge conference.

18         THE COURT:  I'm happy to do that.  That's why I'm

19    here.

20         MR. PRICE:  That leaves us with Tuesday, and again,

21    Your Honor, the way I'm looking at it, I don't see a full day.

22         THE COURT:  I don't know.  Maybe Dr. Wiesenfeld has a

23    lot to tell us.  I don't know.

24         MR. PRICE:  Here is my problem.  So Tuesday -- again,

25    I think that Mr. Colville can tell us how long he'll be.  My

1  problem is, Your Honor, as you know, this case was delayed for

2  a year to try to get a good trial date for all of us.  A lot

3  of that had to do with Ms. Koczan's schedule.

4          THE COURT:  Right.  She tries cases left and right.

5  I recall.

6          MR. PRICE:  So we get here last Friday and you tell

7  us we have Friday, and let's work the schedule.  My concern is

8  that we get to Wednesday, we have two experts.  I am not long

9  on cross-examination of experts.  I don't do that, so I don't

10  know how long we're going to be.  Are we going to close on

11  Wednesday afternoon?  Is the jury going to go out at 4:00?

12  Are we going to wait until Thursday?

13          My concern is I put my case in as quickly as I could.

14  I moved experts.  I had my clients do half their testimony on

15  one day, and there is an option under the Federal Rules for

16  getting videotape depositions done.  It's done all the time.

17  I have to do it if I'm forced to put my case in quickly.  You

18  have a chamber rule which says trial engagements must take

19  precedence over any other business.

20          THE COURT:  You would think.

21          MR. PRICE:  The only other business we have this

22  week -- I know we are preparing, but one doctor lives in

23  Philadelphia and there are planes flying across the state

24  every 45 minutes.  Another one is up in New Hampshire.  There

25  are video conference sites where we can take a deposition via

1    video conference.  We have had one week where Ms. Koczan

2    hasn't explored this issue.  She is going to benefit from her

3    delay and from just saying, hey, look, this is when I can do

4    it, when I did everything in my power to get my case in as

5    quickly and as efficiently as I could, and my problem is this

6    jury -- I don't know how attentive they are.

7            THE COURT:  I think they are very attentive.  They

8    have been taking copious notes, and I've been watching them,

9    and I've been watching their reactions to the various of the

10   witnesses.  They also seem to be a pretty copacetic group.

11   Even happier today because my deputy bought them doughnuts.

12           MR. PRICE:  My only problem is that I know from

13   talking with jurors after cases that the longer a case goes

14   on, the more they forget, and I know my job during closing is

15   to summarize things, but it hurts my case the longer things

16   drag on, and I think if she takes the deposition of one of the

17   experts, you know, it's in the can, and we know we can put it

18   in whenever, and then the other expert comes in Wednesday

19   morning and we do Wednesday closings and we're done.

20           It is an option that Ms. Koczan hasn't even

21   considered, and she is like no, I don't care, I'm just going

22   to do what I'm doing.  That's my problem is.  The rules

23   provide for it.

24           THE COURT:  Certainly the rules provide for it.  We

25   are looking though at a Labor Day holiday.  We are looking at

14

1    doctors, and I don't know how many times I've said this, but

2    doctors march to their own beat, and any time you have a

3    doctor in a case, whether it's a treater or whether it's an

4    expert, you have to work with their schedules, and that's just

5    the way of life.

6         MS. KOCZAN:  Your Honor, may I respond to all of what

7    he said?  I'd like to begin --

8         THE COURT:  We'll take a little bit, but I'm very

9    conscious it's two minutes to 9:00, so let's hold those

10   thoughts, Ms. Koczan, and I'll let you have your speech, but

11   meanwhile, I forgot one portion of my motion to dismiss

12   ruling, which I think I should also read into the record.

13        Additionally, the defendants in this case have

14   repeatedly relied upon various hospital policies as part of

15   their defense.  These policies have all been admitted into

16   record.  Two of these policies contain the signatures of

17   Dr. Jones, as chairman of the Pediatric Department Beaver, and

18   Dr. James Scibilia, as medical director of the nursing

19   department Beaver.

20        The policies with their signatures relate to the

21   administration of oxygen for newborns and notification of

22   pediatrician/nursery for expected delivery of potentially high

23   risk infant.  One of plaintiffs' experts, Dr. Edward Karotkin,

24   was critical of both of these policies and testified that they

25   negatively impacted Kendall Peronis' chance of survival.  I

1    think he was critical of the policies.  I don't know of these

2    specific ones.  Again, that's a question of fact.

3         So once again, as I have to say, viewing the evidence

4    in the light most favorable to the nonmoving party, the

5    evidence of professional negligence is not so scant from which

6    a reasonable jury could not find for plaintiffs on the issue

7    of whether Dr. Jones did or didn't breach a duty of care owed

8    to Kendall Peronis.

9         So as you can see, we worked late into the night on

10   all of these rulings, and we'll put this all in ready form so

11   we can put it on the docket along with our hearing memo.

12        Now, at this time, I'm going to give all of this to

13   Ms. Starr who is my scrivener, and to that end, you also need

14   all my handwritten notes of what Dr. Karotkin had to say.  In

15   case you can't read my handwriting, here's the rough draft

16   transcript.

17        MS. KOCZAN:  Your Honor, I've provided Mr. Price with

18   demonstrative exhibits that show the room where this happened.

19        THE COURT:  That's good.  Finally we're getting to

20   see, you know, places.  It's always good to see people,

21   places, things.  It's always good to have a timeline.  It's

22   always good to have a list of characters.  So any objection to

23   these demonstratives?

24        MR. PRICE:  Your Honor, my initial objection was I

25   was surprised, but taking a look at it, I don't have an

1    objection to it.  My only concern is that I don't know what

2    the scope and the offer of proof is going to be.  If it's just

3    simply these are pictures of the room, I'm fine with it.

4            THE COURT:  Let's hear a proffer.

5            MS. KOCZAN:  Your Honor, nurse -- there was testimony

6    yesterday from Mr. Fritzius about the size of this room, how

7    you could fit three beds, this, that and the other.  Nurse Ash

8    is going to talk about -- and also not being able, like a

9    nurse looking in, not being able to see over to the baby, and

10   these photographs clearly show what you can and cannot see,

11   the size of the room, et cetera, so she is going to talk about

12   all that.

13           THE COURT:  Okay.  Anything further on that front?

14           MR. PRICE:  Yes.  I don't have a problem with her

15   testifying about the size of the room, but I have a problem

16   with her testifying about looking at the room and seeing a

17   baby.  She didn't do that.  She doesn't know where this baby

18   was.  She wasn't the nurse on duty at the time, so she is

19   going to try to establish a fact that she can't establish.

20           MS. KOCZAN:  And, Your Honor, the room is set up such

21   that the bassinet or the warmer is in the same location all

22   the time.  It's not any different, and the picture very

23   clearly shows it.

24           THE COURT:  She can say all of that, but she can't

25   say, you know, what was or wasn't in Maria Hendershot or the

1    unnamed nurse at the nursing station's view was.  We all

2    realize it was change of shift.  We all realize that it had

3    been a long night.  We all realize that Maria Hendershot was

4    winding up and people were coming on and the like, but she is

5    not going to speculate as to what this nurse could or couldn't

6    see.

7          MS. KOCZAN:  All she is going to say is when you open

8    the door, the warmer would have been in front of you.  That's

9    it.  That's the location.

10          THE COURT:  Okay.

11          MS. KOCZAN:  She is not going to say what Maria could

12    or couldn't see.

13          THE COURT:  She shouldn't because who knows what

14    exactly Maria was or wasn't doing.

15          Mr. Galovich, before you log those in, it would be

16    nice if I could look at those pictures.

17          MS. KOCZAN:  Your Honor, they are front and back, but

18    it's the same photo.  I don't know why they copied that way.

19          THE COURT:  These aren't part of the joint exhibit

20    binder?

21          MS. KOCZAN:  No, they are not.  They are just

22    demonstrative.

23          THE COURT:  Number one, who took these pictures?

24    Number two, do they depict the facility as it was at the time

25    of this birth which is now five years ago, almost five years

1    ago?

2              MS. KOCZAN:  Judy Ash took the pictures.

3              THE COURT:  Why?

4              MS. KOCZAN:  Because I asked her to.  And she will

5    testify that she took the pictures and, yes, this is

6    exactly -- this is the room Kendall was -- not Kendall,

7    Carissa and Kendall, and this is what it looked like back

8    then.

9              THE COURT:  Okay.  Now, are you going to project

10   these or are you going to pass them?

11             MS. KOCZAN:  No.  I'm projecting them.  And we can

12   pass them too, Your Honor, if you permit that, but --

13             THE COURT:  I already permitted the original baby

14   pictures to be passed.  Things on the screen are not as clear.

15   For example, these pictures of the baby are not as clear on

16   the screen as they are in this fashion.  Okay.

17             So, Mr. Galovich, the court has now had an

18   opportunity to review Valley/Jones demonstrative exhibits

19   which is a series of, altogether, six photographs and the

20   court has heard the proffer.  I don't see anything

21   objectionable in the proffer so I think we are finally ready

22   to go.

23             MS. KOCZAN:  This is another extra copy.

24             THE COURT:  An extra copy.

25             MS. KOCZAN:  Right.  In the event you want to -- that

1    we can pass them.

2              THE COURT:  Then Mr. Galovich will do the passing.

3              MR. PRICE:  Your Honor, one quick issue, before I

4    close, I wanted to introduce as Plaintiffs' Exhibits 1, 2 and

5    3 the actual tables from Dr. Kenkel's testimony where they

6    were projected.  I submitted them to Mr. Galovich as

7    demonstrative exhibits, but I would like to introduce them as

8    the Plaintiffs' Exhibits 1, 2 and 3.

9              THE COURT:  Any objection from the defense?  Have you

10   seen these tables?  They are part of the report.

11             MR. PRICE:  These are just copies of the report.

12             THE COURT:  They are the tables only.

13             MS. KOCZAN:  It is demonstrative.

14             MR. PRICE:  No.

15             THE COURT:  They are tables only, correct?

16             MR. PRICE:  Correct.

17             THE COURT:  Let me see them.  Are these the U.S.

18   government tables?

19             MR. PRICE:  No, no.

20             THE COURT:  These are your demonstrative exhibits.

21             MR. PRICE:  Correct.

22             MS. KOCZAN:  These are not part of the joint.

23             THE COURT:  They are not part of the joint exhibit

24   binder, one.

25             Number two, the data contained herein comes from

1    Dr. Kenkel's report.  They are not the government tables.  In

2    my estimation, Mr. Price, these are demonstrative, so to that

3    end, Mr. Galovich, I think -- do you already have a set of

4    these?

5            THE CLERK:  Yes.  I would have them in here, judge.

6            THE COURT:  They are demonstrative.  They can be used

7    in your closing argument but they are not going to go out to

8    the jury, per se.

9            MR. PRICE:  Okay.

10            THE COURT:  Anything else now?  It's 9:08.  Our

11    jurors have been here bright and early.

12            MS. KOCZAN:  Can I get Judy to bring her in?

13            THE COURT:  No, because the first thing that happens

14    is he has to rest.  Then you can go get Nurse Ash.

15    Mr. Galovich, if you'll be so kind.

16        (Jury present.)

17            THE COURT:  Good morning, ladies and gentlemen of the

18    jury.  I trust you had safe travels in on another beautiful

19    day as we head into Labor Day, and I hope Mr. Galovich didn't

20    ruin your diets by bringing you in doughnuts today, so I hope

21    you enjoyed.  I'm sure Mr. Galovich hopes you enjoyed.

22            This is one reason why when, after trials are over,

23    everyone writes me notes how much they appreciate Mr. Galovich

24    and his professionalism and how he treats our jurors.  So for

25    that, the court thanks him.

1          At this time, Mr. Price, where are you vis-a-vis the

2     plaintiffs' case?

3              MR. PRICE:  We have completed the plaintiffs' case.

4              THE COURT:  So the plaintiff is now resting, correct?

5              MR. PRICE:  Right.

6              THE COURT:  I'm going to ask counsel to come to

7     sidebar.

8          (At sidebar.)

9              THE COURT:  And at this time, the court acknowledges

10    the motion for directed verdict filed by Dr. Jones.  The court

11    incorporates yesterday's arguments, the court further

12    incorporates its earlier ruling on the record.  That motion is

13    denied, so we're going to continue with this case, and as I

14    indicated, we'll make a brief statement to the jury that,

15    although Mr. Colville is next on the caption, his next witness

16    will appear on Tuesday.  Hence, Ms. Koczan has agreed to

17    proceed.

18         (In open court.)

19             THE COURT:  Ladies and gentlemen of the jury,

20    although, as you know from having heard the caption in the

21    case, the United States is the next defendant.  The next

22    witness the United States would like to call is not available

23    until Tuesday morning, so Ms. Koczan, who represents the

24    remainder of the defendants, has agreed to proceed and she is

25    now going to be calling witnesses.

1          Ms. Koczan?

2          MS. KOCZAN:  Yes, Your Honor.  Judy Ash and I'll go

3    get her.

4          THE COURT:  All right.  Thank you.

5          Ms. Ash, please approach Mr. Galovich, my deputy, so

6    you can be sworn.

7          THE CLERK:  Please state and spell your name for the

8    record.

9          THE WITNESS:  Judith Ash, A-S-H.

10      (Witness sworn.)

11         THE COURT:  Thank you, Mr. Galovich.  Ms. Ash, once

12   you get to the witness stand.  Watch your step.  It's a little

13   uneven.  Please have a seat and arrange the microphone so you

14   are speaking into it.  It adjusts.  It can be moved back and

15   forth.  There's also water there in case you need it.

16   Ms. Koczan, you may proceed.

17         MS. KOCZAN:  Thank you, Your Honor.

18         JUDITH ASH, a witness herein, having been first duly

19   sworn, was examined and testified as follows:

20                      DIRECT EXAMINATION

21   BY MS. KOCZAN:

22   Q.  Good morning.

23   A.  Good morning.

24   Q.  Can you please state your full name for the jury?

25   A.  Judith Ann Ash.

1    Q.  And Judy, where do you live?

2    A.  In Calcutta, Ohio.

3    Q.  What is your occupation?

4    A.  I'm a registered nurse.

5    Q.  And where do you work currently?

6    A.  I work at the Beaver Medical Center Heritage Valley Beaver

7    Medical Center.

8    Q.  Were you employed by the Beaver Medical Center back in

9    2014 at the time of the events that we are going to be talking

10   about here today?

11   A.  Correct.

12   Q.  Can you tell the jury a little bit about your education,

13   where you went to high school, nursing school, et cetera?

14   A.  I graduated from Beaver Local High School in Lisbon, Ohio

15   in 1984, went on to college, quit college.

16           I worked for an attorney for eight years, went back

17   to college eight years later and finished my nursing degree in

18   1995.

19           I worked for East Liverpool City Hospital as a

20   med-surg nurse from '95 to '97.  I then went up to OB,

21   transferred to OB.  I did maternity, nursery and labor and

22   delivery until 2000.

23           I became employed at the Heritage Valley in 1999,

24   strictly labor and delivery.  I like labor and delivery.  So I

25   went to work there mainly and have worked there ever since.

1    Q.  And when you came to the labor and delivery room and

2    became employed at Heritage Valley, did you receive some sort

3    of orientation to the labor and delivery unit?

4    A.  Correct.  You get orientation.  I was labor and delivery

5    trained six months at East Liverpool City Hospital, so I came

6    there with that on my -- since '97, so I had two years labor

7    room experience, so I had I do believe between six and eight

8    weeks of training.

9    Q.  Did that training include the interpretation of fetal

10   monitoring strips?

11   A.  Correct.

12   Q.  Did the training include neonatal resuscitation?

13   A.  Correct.

14   Q.  As part of that training and part of your job

15   responsibility there, are you required to be -- is it NRP

16   certified?

17   A.  Correct.

18   Q.  And can you tell the jury what is that certification?

19   A.  You have to take a neonatal resuscitation class where you

20   have to go through classes and hours of lectures and stuff

21   where they teach you the correct responsibilities where then

22   you take tests to make sure that you still are able to perform

23   your job.

24   Q.  And as part of that orientation, did you also have to

25   learn the policies and procedures of the labor and delivery

1   suite?

2   A.  Correct.

3   Q.  Now, the jury has heard that some of the maternity nurses

4   work labor and delivery, nursery and also in the postpartum

5   unit.  Are you one of those, or are you at one area?

6   A.  No.  If you are hired now at the hospital, you have to

7   work all three areas, maternity, nursery and labor room.  I

8   was hired in before they did that.  Strictly they had all

9   three places they could work.  I do have to work labor and

10  delivery, and then I have to go to maternity like once a month

11  and if there's call-offs or if the help is needed.

12  Q.  When you say maternity, what are you talking about?

13  A.  That's following the delivery, they go then to postpartum

14  that takes care of them.  After we recover them following

15  delivery, then they go to postpartum until discharge.

16  Q.  We heard some testimony from plaintiffs yesterday about

17  Carissa going to the recovery room.  Is there actually a

18  recovery room, or is that a labor room?

19  A.  You recover in the room you deliver in.

20  Q.  Where you go next is the maternity?

21  A.  Maternity postpartum.

22  Q.  Or what I call postpartum; is that correct?

23  A.  Correct.

24  Q.  Can you give the jury some idea of what your

25  responsibilities are as a labor and delivery nurse taking care

1    of patients such as Carissa?

2    A.   When the patient comes in, we determine if they are in

3    labor or whatever their complaints can be.  Every patient is

4    different.  We determine if they are in labor, and if they are

5    not in labor, we call the doctor and get orders, and then we

6    admit them and start an IV, do blood work and follow their

7    labor progress throughout their labor.

8    Q.   Okay.  When you say follow their labor progress, what do

9    you mean by that?  What do you do?

10   A.   Every patient is different of what my duties can entail.

11   From changing -- depending on the fetal heart tones, you have

12   to change positions, increase IV fluids, put a tube on them.

13   They can change periodically through the case depending on

14   what the case might entail.

15   Q.   As part of your responsibilities, are you responsible for

16   monitoring the fetal heart tones and fetal heart monitor?

17   A.   I'm responsible for monitoring the mother and the baby.

18   Q.   And as part of that -- we saw some tracings before.  Is

19   that part of what your responsibility is to review those

20   tracings?

21   A.   Correct.

22   Q.   To note changes, alert the physician, that type of thing?

23   A.   Yeah.  We have continuous monitoring systems throughout

24   wherever.  You always have to have someone.  If you have to

25   use the facilities or take a break, whatever, there has -- we

1    usually say watch my strip, and if something goes on, somebody
2    is there watching it.
3    Q.  And in addition to watching the strip and monitoring that,
4    what do you do for the patient?  What are your
5    responsibilities as far as monitoring the patient, being the
6    mother at that point?
7    A.  You want to always monitor her vital signs.  You want to
8    make sure she is comfortable, that she has what she wants.
9    This is the best time of their life.  They are having a baby.
10       You want to do whatever you can to make sure this is a
11   good time for them, so you want to make sure she is
12   comfortable.  You want to make sure -- unfortunately, I can't
13   offer a lot, ice chips and popsicles, that's about it, but you
14   try to do whatever you can to make sure that they are at their
15   best and they are comfortable, so you want to make sure that
16   their pain choices, make sure you facilitate that and help
17   them through the process the best you can.
18   Q.  And once the labor has progressed such that it's time to
19   push, are you there with them at that point too?
20   A.  Correct.
21   Q.  What do you do at that stage?
22   A.  Then you instruct them on the pushing, set them up for the
23   pushing, and you can push with the patient, which can take
24   from no time to a lot of time.
25   Q.  And you say you push with the patient, what does that

1    mean?

2    A.  You instruct them on how to push with the patient, to have

3    them -- help assist them with the pushing of the baby out.

4    Q.  Is it primarily instructions?

5    A.  Yes.  It's instructions and making sure, and depending on

6    how the baby is and the position of the baby coming down,

7    sometimes we will have to change positions.  There's a lot of

8    different ways we can do that.  It can go on for hours.

9    Q.  When the baby is actually being delivered, what is your

10   responsibility at that point?

11   A.  Assisting in any way, any assistance that might be needed

12   for a delivery, being there to assist the doctor.

13   Q.  And then once the baby is actually delivered, what is it

14   you are required to do?

15   A.  To take care of the baby.

16   Q.  And what does that include?

17   A.  Then you are drying it off, you are making sure the

18   respirations are okay, the muscle tone is okay, the

19   respirations are okay and you just assess the baby.

20   Q.  And then after the baby is assessed and the baby is

21   stabile, what responsibilities do you have with regard to the

22   mom at that point?

23   A.  You want to check her fundus, you want to check the

24   bleeding, you want to make sure IV access, you have to change

25   her medications that she gets after delivery.  So we have to

1    change medications on her and give her medications, and if she
2    is bleeding, it depends.  Every situation is different.
3    Q.  And is it unusual that you will start being the initial
4    nurse and then someone takes over for you and actually the
5    baby may be delivered on somebody else's shift?  Is that at
6    all unusual?
7    A.  No, that's not unusual at all.
8    Q.  So what you've described is what all the labor and
9    delivery room nurses do; is that correct?
10   A.  Usually, yes.
11   Q.  And in terms of checking the mom after delivery, what is
12   the requirement?  How frequently do you have to check them?
13   A.  Every 15 minutes following delivery.
14   Q.  For how long?
15   A.  For an hour.  Then it's a half hour times two.  Then every
16   hour times four.
17   Q.  And that's the policy and procedure at Heritage Valley; is
18   that correct?
19   A.  Correct, yes.
20   Q.  What I'd like to do now is -- before I go further though,
21   after you've done that and mom is stable and has been
22   recovered, do you transition them to the postpartum unit?
23   A.  Correct.
24   Q.  How do you do that?
25   A.  Via wheelchair.  Is that what you mean?

1    Q.  Just wheel them down the hall?

2    A.  Just wheel them down the hall.

3    Q.  With regard to the baby, at what time do they have to be

4    transitioned into the nursery?

5    A.  Are you talking about at that time in 2014?

6    Q.  In 2014, that's what I'm talking about.

7    A.  Within two hours, the nursery likes to have the baby to

8    give the erythromycin, the antibiotic ointment and the vitamin

9    K blood clotting factor shot, and then we transfer to the

10   nursery.

11   Q.  I want to talk about your care of Carissa Peronis.  First

12   and foremost, do you remember Carissa?

13   A.  I probably couldn't pick her out in the crowd, no.

14   Q.  She is sitting back there (indicating).

15   A.  Yes, okay.  I recognize.  She was a very sweet, nice girl,

16   cute, very.

17            THE COURT:  Let the record reflect that Ms. Koczan

18   has pointed to Ms. Peronis who is seated in the galley.

19   A.  I would agree.  If she wouldn't have said that, but now

20   I'm looking at her, she is still a cute girl.

21   Q.  How did you first become involved in Carissa's care on

22   October 12 of 2014?

23   A.  She came in -- as I do recall, she came in with complaints

24   of ruptured membranes and mild labor.

25   Q.  I have a document I'm going to show.  It's document No.

1    918.  I believe this is your first note.  If we can just look

2    at that.  You've got the screen in front of you.

3        Is that your first note for when, if we can scroll down,

4    when Carissa first came in?

5    A.  Yes.

6    Q.  What shift were you working that day?

7    A.  7:00A to 7:00P.

8    Q.  Were you the nurse, according to this, who admitted her to

9    the labor and delivery room?

10   A.  Correct.

11   Q.  And before we go any further, I want to ask you and show

12   you some pictures.  We have marked and we'll put this up on

13   the screen, this is Dr. Jones and Valley Medical room No. 1.

14       Let me just ask you this:  First and foremost, where did

15   this picture come from?

16   A.  It's labor room 6.

17   Q.  Excuse me.  I have it marked here as room 1 for

18   demonstrative purposes for the court.

19   A.  It is labor room 6.

20   Q.  Is this the labor room Carissa was in?

21   A.  Yes.

22   Q.  Where did this picture come from?

23   A.  I took it.

24   Q.  And can you explain to the jury what it is that you are

25   seeing here?

1    A.  I apologize because I had a patient yesterday, so it was

2    right after she had got out of the room, I took it.  That's a

3    laboring bed.  Beside the laboring bed is our monitor that

4    monitors the patient and the fetal heart tones.

5    Q.  The monitor, you are talking about on the left to the left

6    of the bed there?

7    A.  Yes.

8    Q.  That's the fetal heart monitor that we have been hearing

9    about?

10   A.  Yeah, that's below.

11   Q.  And is this room as it's depicted in this photograph

12   exactly the same as it was back in 2014?

13   A.  Yes.  It's the same as it's been since I came in 1999.

14        THE COURT:  I'm sorry.  Keep your voice up.

15        THE WITNESS:  It's the same as since I've been there

16   since 1999.  That room has not changed.

17        THE COURT:  Thank you.

18   Q.  So if you could just again explain.  To the left, we see

19   the door and where does that door lead?

20   A.  That leads out to the main nurse station.

21   Q.  And room number 6, labor room No. 6, where is it in

22   conjunction to the nurses' station?

23   A.  You make -- I'm horrible about yardage.  As soon as you

24   walk out the door, the nurses' station is right next to it.

25   Q.  Right in front of it?

1    A.  Right.  It's close.

2    Q.  So I see on the bottom of that bed, there appears to be --

3    is that stirrups, for lack of a better word?

4    A.  Yes.

5    Q.  So when mom begins to push --

6    A.  You lower the bottom of the bed.  You raise her legs up

7    and put them up in the stirrups.  There will be handles on

8    each side of the bed that come up for her to grab on to push

9    with.

10   Q.  I think we can see those on the bottom on the left there;

11   is that correct?

12   A.  I don't know if you can see it or not, because they tuck

13   underneath the bed because they flip down and flip up.

14   Q.  I want to show you another picture here, and this is room

15   2 -- again, this is labor room 6.  I have it marked as room 2.

16   If you can explain what this picture depicts.

17   A.  That just shows the chair for any member of the family to

18   stay in and the cupboards for our supplies, and then you can

19   see the restroom in the far left corner.

20   Q.  Up there on the corner, that's the restroom up there?

21   A.  Correct.

22   Q.  And then let's take a look at the next one that you took,

23   and this is -- we've labeled it for demonstrative purposes as

24   room document 3, but again this is room 6 of the labor and

25   delivery, correct?

1    A.  Correct.

2    Q.  So is this the view that you would have walking through

3    the door into the room?

4    A.  Correct, because the bed is on the left and the isolette

5    is on the right, yes.

6    Q.  Is that isolette always in that position?

7    A.  Yeah, always.

8    Q.  So if you were to walk in the room, the isolette would be

9    kind of directly in front of you?

10   A.  Correct.

11   Q.  And then mom would be over there to the left?

12   A.  To the left.

13   Q.  The chair there?

14   A.  Right.

15   Q.  These rooms don't look particularly large.  Do you know

16   what the dimensions are?

17   A.  I don't know off the top of my head, no.

18   Q.  So was this then the room that Carissa was admitted to --

19   A.  Yes.

20   Q.  -- back on October 12 of 2014?

21   A.  Yes.

22   Q.  Now, going back to your initial notes from that day, and

23   let's put that back up, 918, and if you can just explain to us

24   what you did initially, and we'll move through this pretty

25   quickly.

1  A.  Okay.  That just shows -- explains her pain assessment.

2  She is leaking.  She went to the bathroom.  She complains of

3  pain.  She rates it a seven.  She is having contractions.

4  Q.  Did you obtain an initial set of vitals on Carissa?

5  A.  Correct.

6  Q.  Document 890.  And is this the initial vital signs you

7  obtained?

8  A.  Correct.

9  Q.  And what was her temperature that day?

10  A.  98.4.

11  Q.  Is that considered to be normal?

12  A.  Yes.

13  Q.  Every other vital within normal range at that point?

14  A.  Everything.

15  Q.  And when you first get her into the room, what is it that

16  you do for her?

17  A.  I hook her -- I explain the fetal monitoring system to her

18  and hook her up on the monitor.

19  Q.  And at some point after she was admitted, did you also do

20  a test to make a determination as to whether her water had

21  actually broken?

22  A.  Correct.  I did an AmniSure.

23  Q.  We heard about that before, the AmniSure test.  How is

24  that performed?

25  A.  I stick a Q-tip into her vagina and I swirl it for a

1    minute, and then I swirl it in a test tube for a minute, and I

2    put a test strip in and let it sit for ten minutes.  If it

3    comes up two lines, it's positive.  If it comes up one line,

4    it's negative.

5    Q.  We've heard some testimony yesterday that you didn't know

6    how to use the AmniSure and had to read directions.  Do you

7    have any recollection of that being the case?

8              MR. PRICE:  Objection, Your Honor.

9              THE COURT:  Sustained.

10   A.  Can I answer it?

11             THE COURT:  No.  Ms. Koczan can rephrase the

12   question.

13   Q.  Do you have any recollection of, back in your time that

14   you were caring with Carissa and in Carissa's case, of having

15   any difficulty performing that AmniSure?

16   A.  I don't.  I might have had to read the instructions

17   because that was maybe a new test at the time to perform along

18   with the Nitrazine that we also use to -- that's supposed to

19   be more accurate.  Maybe I had to see how long I had to swirl

20   it, because if you don't use it every day, then you would have

21   to see how long it had to sit in before the test could be run,

22   but it wasn't a hard test to perform to not be able to do.

23             THE COURT:  For the benefit of the court reporter,

24   can you spell Nitrazine?

25             THE WITNESS:  You are asking a person who can't

1    spell.

2              MS. KOCZAN:  N-I-T-R-A-Z-I-N-E.

3              THE COURT:  Thank you.

4    Q.  After you got Carissa in there, put her on the fetal

5    monitoring strip, do you have any recollection of there being

6    any issues with the fetal monitoring strip?

7    A.  No.

8    Q.  Anything concerning on the fetal monitoring strip?

9    A.  No.

10   Q.  And let's go to your next note then and that's 918.  And

11   this one is at 1425, and again, let's just look at that fetal

12   monitoring strip section there down below.

13          Can you tell the jury, under that, it says fetal heart

14   rate.  It's 130.  Is that unusual?

15   A.  No.

16   Q.  What is the normal fetal heart rate?

17   A.  Anywhere between 110 and 160.

18   Q.  And I think that's right below there, it talks about that?

19   A.  Correct.

20   Q.  And below there, you mention that some of the things that

21   you saw there were accelerations.  What are they?

22   A.  That shows fetal well-being, and acceleration is 15 beats

23   by 15.  The baseline of the fetal heart tones, which I have as

24   130.  If you have accelerations, the heart rate will raise 15

25   beats above 130 for 15 seconds and then come back down to

1    baseline.

2    Q.  I see you did -- did you do a vaginal exam at that point?

3    A.  Correct.

4    Q.  And how far dilated was she at that point?

5    A.  Three centimeters.

6    Q.  And it says that she is 80 percent cervically effaced.

7    What does that mean?

8    A.  Effacement.  Effacement is of the cervix.  The cervix

9    starts out thick, and as they are laboring, it thins, and

10   usually it will thin first and then open.

11   Q.  You mentioned before that she was leaking.  Do you have

12   any recollection of the color of what was leaking at that

13   point?

14   A.  No.

15   Q.  And is there any document there at that point about that?

16   A.  The color, no.

17   Q.  At this point, is Dr. Dumpe in there?

18   A.  No.

19   Q.  Have you called him yet?

20   A.  Probably not.  I'm running the test to determine.  Not

21   until I have an answer whether she is or not.  I don't need

22   him there until I determine whether she is ruptured or not.

23   Q.  At this point in time, was the AmniSure done yet or not?

24   A.  I'm not sure where I noted the AmniSure was done at.  Was

25   it up above?

1    Q.  Put 918 up.  I think it may be there.

2    A.  Once I do it, it takes ten minutes to do.

3    Q.  We looked at 919.  Let's look at 920.  It may be on that

4    page.  If you want to scroll down through that.

5    A.  I had the spontaneous ruptured membrane status so I must

6    have done AmniSure to determine that she was.

7    Q.  And you say here that the fluid testing was positive.  I

8    see the AmniSure right there.

9    A.  Correct.  There you go.  There's the lot number and

10   everything, and it was positive.  That's where it says.

11   Q.  At this point in time, have you determined that she is in

12   labor or not?

13   A.  Well, I'm probably still watching her cervix to see if her

14   cervix changes, and that's how you determine if they are in

15   labor or not, or if they rupture membranes, then we would keep

16   them.

17   Q.  If we scroll down a little further and go to 921, keep

18   scrolling, and I see here that as part of that note, you have

19   some documentation that you called Dr. Dumpe with report and

20   orders received to admit.

21       If you would explain to the jury what's that about.

22   A.  Like I said, if she comes in to labor or rupture

23   membranes, it's our job to figure out if she is in labor or if

24   her membranes are ruptured, and we call a doctor with the

25   report of what's going on, fetal heart tones, what they look

1    like and what I discovered, and then apparently he's giving me

2    the orders to go ahead and admit.

3    Q.  And let's go to your next note there, which is 922.  If we

4    can go through that, scroll down through that.  I see a note

5    here at 1515 which would be what 5:15?

6    A.  3:15.

7    Q.  I got my military time wrong there.  Again, fetal heart

8    tones, were they within the normal range at that point?

9    A.  Correct.

10   Q.  Everything looked okay?

11   A.  Correct.

12   Q.  And if we could go to 923 and 3:26, anything unusual going

13   on then?

14   A.  I'm sorry.  It's hard for me to read.  No.  Everything

15   looks good.

16   Q.  Everything looks good?

17   A.  Yes.

18           THE COURT:  Once again, keep your voice up a little

19   bit.

20           THE WITNESS:  I apologize.

21           THE COURT:  I know you are reading and looking but we

22   have eight very interested people over there that need to hear

23   what you say.

24           THE WITNESS:  I apologize.  I'll try.

25   Q.  At that point, there's a note here now from 1604 which

1    would be 4:04; is that correct?

2    A.  Correct.

3    Q.  And at that point, again, fetal heart tones were 135?

4    A.  Right.

5    Q.  Again, is that within the normal range?

6    A.  Correct.

7    Q.  And let's go to 924, which is your next note.  I think

8    this is a continuation.

9    A.  Yes.  Accelerations, the baby is still accelerating.  I

10   did the vag exam, she is still 3 and 80.

11   Q.  What does that tell us at that point?

12   A.  Her cervix hasn't changed, so she isn't changing her

13   cervix, but she is ruptured by the AmniSure that shows us that

14   it's ruptured, and she is uncomfortable.

15   Q.  Let's scroll down a little bit further.  There's a note

16   here of you contacting Dr. Dumpe.  What was the purpose of

17   that contact at that point?

18   A.  Dr. Dumpe called in and notified the patient -- I guess

19   she was comfortable.  I rated her pain.  I have five.  Okay.

20   Comfortable with contractions not needing an epidural yet, but

21   he says he'll come in if I need him before.

22   Q.  Let's scroll to the next page which is 925.  If you can

23   explain to the jury what's going on at that point?

24   A.  Heart tones look good, normal range, contractions,

25   everything looks the same.  Still having accelerations 15 by

1   15.

2   Q.  Those accelerations are a good thing; is that correct?

3   A.  Correct, a good thing.

4   Q.  Let's go to the next note then, which is -- this is the

5   5:15 note?

6   A.  No.  4:45.

7   Q.  6:45, I'm looking at the 5:15.

8   A.  You highlighted the wrong one.

9   Q.  If you tell us what's going on at that time.  Anything

10  changing at that point?

11  A.  Contractions two to four minutes apart, lasting 50 to 60

12  seconds and they palpate moderate.

13  Q.  What does that all mean?

14  A.  That you palpate her contractions to see the intensity.

15  Q.  So you are actually helping her abdomen?

16  A.  Correct.  You do that periodically, not consistently,

17  because if she is changing cervix or if she is staying, it's

18  not like I'm rolling her out anymore, so the need to palpate

19  every single contraction is not needed.  We are keeping her.

20  We're not sending her home.

21  Q.  Let's look at the next one.  I see one here from 1750.

22  You mention that a fluid bolus is given.  What is the purpose

23  of that?

24  A.  I do believe for the epidural.  Dr. Dumpe at nurses'

25  station re -- now that the doctor is there, I'm able to call

1    and get her epidural because she was uncomfortable enough.

2    Q.  And the epidural is what?  The OB anesthetic that women

3    get?

4    A.  Correct.

5    Q.  And is this when the epidural then was started?

6    A.  At 1724, the -- you always give a patient a fluid bolus

7    because the epidural can drop their blood pressure, so you

8    increase the body fluids to compensate for that decrease in

9    blood pressure, and I told her, yeah, she is setting up and

10   she has continuous blood pressure readings every five minutes

11   and she is instructed not to get out of bed.

12   Q.  Let's look at the next couple of notes.  The next one here

13   is from 1740.  Is this just documentation of you continuing to

14   monitor the fetal heart tones?

15   A.  Correct.

16   Q.  And her?

17   A.  Correct.

18   Q.  Let's go to the next one.  This is 1745, and what's going

19   on at that time?

20   A.  The epidural infusion is going at a rate of 12, so the

21   pump has been started, and it just talks about her degree of

22   block with the epidural, that she is able to move her knees

23   and flex at the feet.  And she has -- she is numb to like the

24   lower rib cage.  She is awake, alert and there's no -- no

25   necessary action needed.

1    Q.  So up to this point in time, this brings us up to 6:00.

2    Is there anything unusual going on with either Carissa or the

3    baby by way of the fetal monitoring strips?

4    A.  Nothing.

5    Q.  Let's look at the 6:00 note and if you can tell us what's

6    going on at that time?

7    A.  Everything is still -- still looks the same.  Baby looks

8    good.  135 with accelerations 15 by 15.  Just complaints of

9    pain or discomfort, and the alleviating factor, she did get an

10   epidural.  It's just saying, with that pain, she got an

11   epidural.

12   Q.  Let's look at the 1830 note.  This is 6:00 p.m.  Again,

13   the first part of this note deals with the fetal heart

14   monitor; is that correct?

15   A.  The TOCO, again, and the contractions.

16   Q.  The TOCO, that is the fetal heart monitor?

17   A.  The TOCO measures contractions, and the fetal monitor

18   is -- the external fetal monitor measures -- it's an

19   ultrasound.  It picks up the heart rate.

20   Q.  So let's go to the next page, which would be 930.  Tell us

21   what's going on there in terms of the baby's heart rate.

22   A.  135, normal heart rate, accelerations 15 by 15.  I did a

23   vag exam.

24   Q.  We see Dr. Dumpe is in, or did you do the vag exam?

25   A.  He did it.

1    Q.  Dr. Dumpe?

2    A.  Yes, Dr. Dumpe.

3    Q.  And how far along was she at that point?

4    A.  She remained three CMs, 90 percent effaced, minus one

5    station.

6    Q.  Had she progressed at that point?

7    A.  She thinned out a little.  It's still my assessment.

8    Q.  Under vaginal bleeding, you have bloody show.  What does

9    that mean?

10   A.  When the cervix either thins or dilates, it can bleed and

11   it sheds off blood.

12   Q.  So that's what was going on at that time?

13   A.  Yes.  It usually shows progress, yes, as long as it's not

14   a lot of bleeding.  That's all normal.

15   Q.  Then the next thing below that, I see AROM of forebag,

16   artificial rupture of membranes forebag?

17   A.  Correct.

18   Q.  We heard that her water had broken before and now there's

19   the artificial rupture of membranes of the forebag.  What is

20   the difference there?

21   A.  Sometimes people can have a high leak and they can leak

22   amniotic fluid and it can test positive when we run our test,

23   but then later on, they'll have a forebag that will be there

24   still.  It's another -- there's another amniotic sac that's

25   there, so they might be leaking high up and it's not the

1  full -- how people say they have a gush of fluid and all this

2  fluid comes out.  Sometimes it's a high leak and they trickle

3  a little bit, but it's not like the big gush, but then this

4  big forebag will form.  We call it a forebag and he broke

5  that.

6  Q.  Let's go to the next note then.  I want to ask you about

7  that.  This is at 6:30; is that correct?

8  A.  Correct.

9  Q.  Why don't you read to the jury what your note is and

10  explain that.

11  A.  Dr. Dumpe called and notified, a sterile vag exam, forebag

12  felt, Dr. Dumpe at bedside to break the forebag so vag exam

13  three plus ruptured light green-colored fluid.

14  Q.  I want to ask you about that.  The light green-colored

15  fluid, what is that?  What was that?

16  A.  You just describe what you see when he breaks the water.

17  Just fluid that came out that was colored light green.

18  Q.  Okay.  And the jury has seen before Dr. Dumpe had a series

19  of bottles one with clear fluid, light green, darker green, et

20  cetera, and the second one was Gatorade, a light green.

21      Can you give us some idea of what you mean by light green?

22          MR. PRICE:  Objection, Your Honor.  If we're going to

23  talk about --

24          THE COURT:  We should use the demonstrative.

25          MS. KOCZAN:  I'll be happy to use that.

1              THE COURT:  Picture is worth a thousand words.

2              MS. KOCZAN:  There it is.

3              THE COURT:  This was a demonstrative that was used

4       previously, so your attention is being called to it, Ms. Ash.

5       Q.  Looking at those bottles of Gatorade and then something

6       else at the end there, what was the fluid at this time?  What

7       did it look like?

8       A.  Like the second one in, that yellowish green looking.

9       Q.  That's what it looked like at the time?

10      A.  Correct.

11      Q.  We can put that down then.  So that light green fluid,

12      where did it leak?  Was it on to the pad?

13      A.  I usually put a towel -- when they are going to break the

14      water, I put a towel underneath.  There's a big green Chucks

15      that's there.  It's a green thick pad underneath to catch any

16      fluid or anything that leaks out of the patient.  I put a

17      towel usually right underneath the patient which is easier to

18      change a towel than the big green, and once they get an

19      epidural, to have them raise up to change, it is harder, so I

20      usually put a towel right under it, and whenever they do

21      rupture, it's easier to see the fluids that would come out.

22      Q.  During the course of your career, have you seen meconium

23      fluid?

24      A.  Yes.

25      Q.  Have you seen clear meconium fluid?

1    A.  Clear?

2    Q.  Yes.

3    A.  Clear, I mean, like --

4    Q.  Thin meconium fluid?

5    A.  Thin, yes.

6    Q.  And we've heard some different terms here, thin, moderate,

7    heavy.  How would you describe this?

8    A.  It was thin.

9    Q.  And what's the difference between thin and moderate?

10   A.  Moderate has more particulate in it.  It has more of the

11   forming of the stool.  It's a thicker consistency.

12   Q.  And can you tell the difference between thin or when

13   there's particulate in there?

14   A.  Yes.

15   Q.  You can see that?

16   A.  Yes.

17   Q.  You don't have to put that under a microscope to see?

18   A.  Not that I've ever had to, no.

19   Q.  This was thin?

20   A.  Correct.

21   Q.  Now, let's go to your next note, which I believe is 931.

22   Go to the next one, 932.  I believe this is -- would this be

23   your last note.  Actually Nurse Hendershot took over at that

24   point; is that correct?

25   A.  Correct.

1   Q.  So that one that we looked at would have been your last

2   note; is that accurate?

3   A.  Correct.

4   Q.  At any time while you were there with Carissa that day,

5   was there anything abnormal on the fetal monitoring strip?

6   A.  Absolutely not.

7   Q.  Was there anything abnormal in terms of Carissa's -- your

8   examination of Carissa?

9   A.  No.

10   Q.  Or her vital signs?

11   A.  No.

12   Q.  Now, Maria came on at 7:00 p.m.  Were you the one who

13   assigned Maria to take care of Carissa?

14   A.  Yes.

15   Q.  And why did you do that?

16   A.  Because she was a sweet girl.  That's a dream when you

17   come in and get a sweet couple.  They were a sweet couple.  I

18   liked them.  Everything was picture perfect with her strip.

19      Maria is an awesome nurse, and I thought what better way.

20   I love Maria, so I gave her her.  I mean, unfortunately -- you

21   love when people give you nice patients like that.

22   Q.  And after you left that day, did you hear anything about

23   Carissa or the baby after that?

24   A.  I came in the next morning.  I was scheduled the next

25   morning.

1    Q.  When you came in, did you hear that the baby had been

2    delivered?

3    A.  Yes.

4    Q.  At that point, was there anything going on with the baby?

5    A.  At that point, no.

6    Q.  And did you at some point during the day receive

7    information about what happened with the baby?

8    A.  I heard that it was being transferred.

9    Q.  Did you later hear what happened to the baby?

10   A.  I had walked over to the nursery to just check on the baby

11   to see how the baby was doing, yeah.  That's when the code was

12   happening.

13   Q.  And were you surprised to see what was going on?

14   A.  I've never seen anything like that in my whole career,

15   never.

16            MS. KOCZAN:  Thank you.  Those are all the questions

17   I have.

18            THE COURT:  Cross-examination, Mr. Colville.

19                      CROSS-EXAMINATION

20   BY MR. COLVILLE:

21   Q.  Morning.

22   A.  Good morning.

23   Q.  My name is Michael Colville.  I represent the

24   United States in this case.  I just want to follow up on the

25   testimony you just gave.  With regard to the description of

1    the fluid, description of light green, did you see any

2    particulate?

3    A.  No, none.  Any time there's any -- you describe it on

4    there and I just had colored.  It was fluid.  That's all that

5    came out.  There was nothing but the fluid, green fluid that

6    came out.

7    Q.  Is that how you and all the nurses would describe

8    meconium-stained amniotic fluid by -- that is nonparticulate

9    as thin?

10          MR. PRICE:  Objection, Your Honor.

11          THE COURT:  Sustained.

12   Q.  How do you describe meconium-stained amniotic fluid?

13   A.  You just describe what you see, the color, the thin,

14   thick, moderate, whatever you see.  All I seen was fluid, the

15   light green fluid.

16   Q.  If there had been particulate that you saw on that morning

17   or that day, would you have indicated it in the record?

18   A.  Correct.

19   Q.  It was not indicated in the record?

20   A.  I did not.

21   Q.  Have you seen the record, the entire labor record in this

22   case?

23   A.  I've seen -- yeah, gone over it, yes.

24   Q.  Have you seen any part of the record where the meconium

25   that's been described has been described as containing

1  particulate in it?

2          MR. PRICE:  Objection, Your Honor.

3  A.  No.

4          MR. PRICE:  Is she here to interpret the medical

5  record and other nurses' notes?

6          THE COURT:  No.  She can only speak to what she did

7  and the notes that she wrote.

8  Q.  You indicate the fetal strips were normal throughout your

9  time there?

10  A.  Perfect.

11  Q.  Reassuring?

12  A.  Very reassuring.

13  Q.  You are familiar with how to read these records?

14  A.  Very.

15  Q.  You're trained to do this?

16  A.  Trained.

17  Q.  Was there anything that caused you to be concerned about a

18  problem based upon your reading of the fetal strips?

19  A.  There was no concerns.

20  Q.  The vitals that you took throughout the day, anything of

21  concern with regard to the vitals?

22  A.  Nothing.

23  Q.  Were there any vitals that were not normal?

24  A.  None.

25  Q.  Were there any signs or symptoms of an infection during

53

1    your coverage of this?

2    A.  None.

3              MR. COLVILLE:  Thank you.

4              THE COURT:  Mr. Price?

5                        CROSS-EXAMINATION

6    BY MR. PRICE:

7    Q.  Good morning, Nurse Ash.  We met two years ago, right,

8    when we took your deposition, right?

9    A.  You are the one who took it.

10   Q.  Yeah, I'm the one.  Excuse me.  I don't want to go through

11   all the records.  I want to talk more about memory.  Today is

12   August 30.

13       Can you tell us, in the month of August, how many babies

14   were you -- you know, did you help deliver?

15   A.  Off the top of my head?

16   Q.  Yes.

17   A.  Three yesterday.  Monday, two.  It varies from day to day,

18   so probably a lot.

19   Q.  You have to perform a lot of work with labor and delivery

20   and a lot of things go on, correct?

21   A.  Correct.

22   Q.  And you mentioned that some patients you might remember;

23   some patients you might not?

24   A.  Right.

25   Q.  Carissa was a patient, you mentioned a sweet girl, but you

1    couldn't pick her out of a crowd?

2    A.   It's been since 2014.  I wouldn't promise you.  There's a

3    lot of cute girls out there, sir.

4    Q.   Right.   To a certain extent, being a nurse, you get into

5    routines, correct?

6    A.   Correct.

7    Q.   And routines are good because routines keep us on track.

8    Like every day, we have a routine of backing out of our

9    garage.  We don't have to think about that.  We just do it,

10   right?

11   A.   Correct.

12   Q.   And a lot of nursing, you do a lot of the same things

13   over.  You make sure the electronic medical record is

14   complete, correct?

15   A.   Correct.

16   Q.   All of the notes that we saw, all of the records that you

17   kept from 2:00 until 7:00, those were your routine, correct?

18   A.   Correct.

19   Q.   And as you said, you don't -- I know you just testified

20   for a half hour about everything that happened that day, but

21   you don't remember what happened that day, right?

22   A.   Specifics, no.

23   Q.   The good thing about the records is, they can tell you

24   what you did and that could show you routine, but as to

25   whether or not Carissa said, hey, look, I need some ice chips,

1   or, hey, look, you know, my boyfriend is coming in, you might

2   not remember those specifics, correct?

3   A.  Correct.

4   Q.  And you wouldn't remember if there were, like, family

5   coming in or how many people were in the room at a certain

6   time, right?

7   A.  Well, they are only allowed two visitors at a time.  They

8   can rotate in and out.

9   Q.  But you might not remember if it was a mother or

10  grandmother.  You just know people are in the room?

11  A.  Correct.

12  Q.  You don't keep notes of who comes and goes.  It's just

13  people can come into the room, correct?

14  A.  I don't know, because I -- I thought I saw grandparents in

15  there.  I just saw that, but other than that, I don't

16  remember.

17  Q.  Right.  Like there are some little things that you know

18  every day.  You have to take -- like Nurse Hendershot was the

19  nurse who took care of Carissa throughout her labor and then

20  even after delivery, correct?

21  A.  Correct.

22  Q.  And if we could pull up that photograph number 1 they just

23  took, this picture of the room, and you come into these rooms

24  and you go out of the rooms, and you don't note every time you

25  are in or out or who's in there or not, correct?

1    A.  Correct.

2    Q.  Now, Nurse Hendershot, when she is done with the delivery,

3    she is still responsible for Carissa and Kendall, correct?

4    A.  Correct.

5    Q.  That's what happens.  After a delivery, after you finish a

6    delivery, you are still taking care of mom and you are also

7    taking care of the baby, correct?

8    A.  Correct.

9    Q.  And you make notes with regard to the mom and you make

10   notes with regard to the baby, right?

11   A.  Depending on, yeah, that everything is stable.

12   Q.  Right.  I know you can chart in the mother's note with

13   regard to how the mother is doing.  Can you chart in the

14   baby's chart as to how the baby is doing?

15   A.  At that time, no.  We chart on the fetal assessment, yes.

16   Q.  On the fetal assessment, you can?

17   A.  Well, on our Apgars and everything else that we perform

18   and do, yes.

19   Q.  For the next hour or so, if the baby is still in the room,

20   can you make notations concerning your assessment of the baby?

21   A.  We don't make notations.  We do assess the baby when we go

22   in though.

23   Q.  If you had an assessment of the baby and there was

24   something of concern, there was some note you wanted to make,

25   just assess the baby, could you record that in the baby's

57

1    record?

2    A.  No, but if there was any distress at all, the baby would

3    have been taken to the nursery.

4    Q.  And that's what Dr. Dumpe mentioned.  I just want to see

5    if this is the procedure for you as a nurse.

6         Whenever you have a baby, sometimes a baby might have a

7    little bit of, I don't know, little bit of a difficult

8    transition into life.  Sometimes you have the baby and you

9    just say to the mom, hey, look, we're just going to run the

10   baby up to the nursery and do a full assessment just to make

11   sure, right?

12   A.  I don't know what you are referring to.  If there was

13   distress or something that warranted that?

14   Q.  Just something that concerned you a little bit.

15   A.  We can do that, yes.

16   Q.  You have done that in the years you have been there at

17   Heritage Valley Beaver.  If there's something -- that's what

18   the nursery is there for?

19   A.  Correct.

20   Q.  So the reason why I want to bring up all of these issues,

21   like, for example, do you remember out of these babies that

22   you helped deliver, do you remember taking them to the

23   nursery?

24   A.  Correct.

25   Q.  Do you remember everyone who came with you to the nursery

1    this week?

2    A.  Yes, just the fathers.

3    Q.  And do you remember if any grandparents or anybody else

4    came with you?

5    A.  Never.

6    Q.  How about a few years back?  Do you remember what happened

7    a few years back with taking babies to the nursery?

8    A.  Since -- that hasn't changed since 1999.  I mean, usually

9    only -- there's only one person that can go to the nursery

10   with you.

11   Q.  Okay.  I'll just ask you this:  Have you ever heard of a

12   memory called like a flash bulb memory?

13   A.  Referring to what?

14   Q.  In your life, there's certain events that really matter to

15   you and you really remember events, right?

16   A.  Uh-huh.

17          THE COURT:  You are saying yes.

18          THE WITNESS:  Yes, I'm sorry.

19   Q.  For example, if you get taken to a nice restaurant, you

20   can remember the meal, you can remember what you had, you can

21   remember the waiters, you can remember the atmosphere.  And

22   it's a very special occasion for you, correct?

23   A.  Correct.

24   Q.  But you would agree with me, to the waiter, it was a

25   Friday night, you were the couple that came in at 7:00, and he

1    took a look at the receipt, it said, yeah, you had the fillet

2    and he had the salmon, right?

3    A.  Correct.

4    Q.  He might not remember what you were wearing or how many

5    times you went to the ladies' room or anything like that,

6    right?

7    A.  Correct.

8    Q.  And in this case, I don't want to say it's the same thing,

9    but I'm just reading, if this is correct from your deposition,

10   I said:  I guess what I'm getting at is, like, you know, you

11   just came from a delivery and I'm sure over the last couple of

12   years, you have had a lot more deliveries, and I'm not saying

13   that each one is just like the other, but is there something

14   about your care of Carissa that sticks out in your head?

15        And you said:  Not anything.  Correct?

16   A.  Correct.

17   Q.  And that's what my point is, is that sometimes you might

18   not remember events, but a family who gives birth to their

19   first child would remember everything that happened, correct?

20   A.  But that's what I said.  We try to make it special.  We do

21   everything we can, yes.

22   Q.  And it's special to them for their first time that they

23   are having a child, correct?

24   A.  Correct.

25   Q.  And events that, you know -- I don't want to get too

1    personal, but do you have children?

2    A.  One.

3    Q.  And do you remember your birth and do you remember what

4    happened?

5    A.  Unfortunately.

6    Q.  Maybe not?

7    A.  Unfortunately.

8    Q.  You attend a lot.  We'll leave it at that.  This picture

9    of the room of the nursery -- I'm sorry, of the labor room, if

10   you took that bed and moved it over a little bit more towards

11   the bathroom, it looks to me, from eyeballing it, you can put

12   two more of the hospital beds in there?

13   A.  We can't.  It's -- we transferred a patient to a maternity

14   bed from that bed to let them stay, and it's hard to put

15   another bed in there, no.  We very rarely do that.  We'll move

16   one bed out before we would move another bed in.

17   Q.  I know.  I'm not saying you would do it, you would try to

18   cram three beds in there, but my point is, if you move that

19   hospital bed over to the wall, it looks to be about three feet

20   from the wall, correct?  At least three feet from the wall on

21   the right.  We are looking at the right of the picture.

22   A.  I mean, I guess.

23   Q.  If you push that over -- I mean, how wide is a hospital

24   bed?

25   A.  How wide is it?  I don't know the dimensions off the top

1    of my head, but they are bigger beds, but I don't understand

2    your point.

3    Q.  My point is that yesterday, whenever the father, Matt, was

4    asked about how big this room, he said if you pushed the bed

5    all the way over to the wall, you could probably fit two more

6    beds in there.  Do you think you could do that?

7    A.  I didn't know if you wanted us in there like if we had to

8    take care of patients.

9    Q.  No.

10    A.  Yeah, I don't know.  I mean, probably would be able to fit

11    them, because we have rolled in a maternity bed and

12    transferred a patient over it to transfer them out of there.

13    Q.  And there's still room left in the room?

14    A.  That we can walk around.

15    Q.  Okay.  Were you asked to take any pictures with the door

16    open?

17    A.  No.

18    Q.  So I know you said the nurses' station is right outside

19    there, but if the door were open, we could see that?

20    A.  You can see that.

21    Q.  Nurse Hackney is coming on Monday so maybe she'll take a

22    picture, who knows, or Tuesday.

23         At that nurses' station, your job is to make sure that the

24    electronic -- that's not your job.  Part of your job is to

25    make sure that the electronic medical record is complete,

62

1    correct?

2    A.  Correct.

3    Q.  And part of that is -- each of those blocks are clicks.

4    You have to click in each box.  You have to pull things down

5    and answer whatever the fetal heart rate is, things like that,

6    correct?

7    A.  Correct.

8            MR. PRICE:  That's all I have.

9            THE COURT:  Ms. Koczan, any follow-up?

10                      REDIRECT EXAMINATION

11   BY MS. KOCZAN:

12   Q.  Just one question.  Have you ever been involved in a

13   situation like this where there was a fetal death?

14   A.  No.

15   Q.  Is this something that was unusual in the unit?

16   A.  I never seen this happen.  With how it was the day I took

17   care of her, I would have never dreamed this would happen.

18   Q.  And you said this is unusual.  You've never seen this

19   happen the entire time?

20   A.  Never.  If a baby is sick, the fetal heart tones don't

21   look as beautiful as they were for me.

22   Q.  And is that something that would make this situation stand

23   out in your mind?

24   A.  Yeah.  I do remember.  I mean, yes, it does.

25   Q.  And would this -- again, you've never seen it.  Have you

1    heard of it happening other than in this situation?

2    A.  No.

3    Q.  So this is something that would stand out in people's mind

4    because it was an unusual situation; is that correct?

5    A.  Yes.

6              MS. KOCZAN:  Thank you.  That's all.

7              THE COURT:  Mr. Colville, anything else.

8                        RECROSS-EXAMINATION

9    BY MR. COLVILLE:

10   Q.  What do you mean when you say the fetal heart tones were

11   beautiful?

12   A.  Meaning they had the 15 by 15 accelerations for me while I

13   was there from 2:00 to 7:00, which shows fetal well-being,

14   when people come in for nonstress tests to test fetal heart

15   tracings.  There was no concerns with me during the whole time

16   I traced this child.

17             MR. COLVILLE:  Thank you.

18             THE COURT:  Mr. Price, anything additional?

19                        RECROSS-EXAMINATION

20   BY MR. PRICE:

21   Q.  The only -- I understand that this was a very traumatic

22   event for Heritage Valley, but as to the events that happened

23   during your shift, you didn't understand anything about this

24   baby's death.  It wasn't until the next day, correct?

25   A.  It would be nothing that would make me believe this would

1   ever happen.  It was shocking the next day, yes.

2   Q.  The next day.

3          MR. PRICE:  Thanks.

4          THE COURT:  Ms. Ash, I have a few follow-up

5   questions.  I try to take good notes, but I think you said you

6   check on the mom after delivery every 15 minutes in the first

7   hour; is that right?

8          THE WITNESS:  Correct.

9          THE COURT:  And then in the second hour, it's every

10  half hour; is that right?

11         THE WITNESS:  Correct.

12         THE COURT:  By the third hour, you are checking once

13  an hour?

14         THE WITNESS:  By the third hour, they are usually

15  over on maternity.  We have to watch them for at least an

16  hour.  Don't get me wrong, if there's some problems, if they

17  are bleeding or their vital signs, something that warranted

18  more checks, then we check more frequently.

19         THE COURT:  So --

20         THE WITNESS:  But for a normal delivery.

21         THE COURT:  By hour three, if mom has gone over to

22  maternity, somebody else takes over; is that right?

23         THE WITNESS:  Correct.

24         THE COURT:  Now, how many labor rooms are there

25  altogether at Heritage Valley back in 2014?

1          THE WITNESS:  We have labor room 1, 2, 3, 4, 5, 6, 7,

2     seven laboring rooms.

3          THE COURT:  When Carissa came, were they all occupied

4     that night or no?

5          THE WITNESS:  I don't recall that.

6          THE COURT:  Now, how do you keep your notes?  Do you

7     walk around with an iPad and take notes, or do you go back to

8     the nurses' station, or do you write on a piece of paper and

9     transfer?  What do you do?

10          THE WITNESS:  The fetal monitoring strip that comes

11     out.

12          THE COURT:  You write on it.

13          THE WITNESS:  I can write on it, if -- when he came

14     in and checked her and ruptured that forebag, I wrote on the

15     strip.

16          THE COURT:  All of these notes we have been looking

17     at on the big screen, how do you enter that data?

18          THE WITNESS:  That's on the computer.

19          THE COURT:  Where is that computer?

20          THE WITNESS:  At the nurses' station or at the desk,

21     at the bedside, but usually, that one isn't always working.

22          THE COURT:  Vis-a-vis Carissa, do you recall whether

23     you were back out at the nurses' station or were you trying to

24     use the one at the bedside that doesn't always work?

25          THE WITNESS:  I was back probably at the nurses'

66

1    station.  I don't remember which.  If I can throw in like a

2    universal precaution when they are getting a time-out, I'll

3    try to do that at bedside because I'm right there, but a lot

4    of times, that computer doesn't work.

5         THE COURT:  Different nurses do different things.  I

6    mean, we heard testimony, for example, that Nurse Hendershot

7    writes notes on her pant leg.  You are smiling at that.

8         THE WITNESS:  I've done that.

9         THE COURT:  You've done that too.  Sometimes too,

10   nurses write on their hands, right?

11        THE WITNESS:  Some do, but I wash my hands too much

12   to do that.

13        THE COURT:  You wash your hands too much to do that.

14   Okay.  Now, vis-a-vis Nurse Hendershot, she would have to do

15   the same thing to enter data?  She would have to go back to

16   the nurses' station; is that right?

17        THE WITNESS:  Correct.

18        THE COURT:  Now, you said that you called Dr. Dumpe.

19   Do you have his telephone number handy?

20        THE WITNESS:  Uh-huh.

21        THE COURT:  You are saying yes?

22        THE WITNESS:  Yes.

23        THE COURT:  Where is the telephone number kept?

24        THE WITNESS:  At the nurses' station, we have all the

25   doctors' phone numbers.

1          THE COURT:  How about all the pediatricians?

2          THE WITNESS:  We have them too.

3          THE COURT:  Now, when did you come in the next

4     morning?  7:00 again?

5          THE WITNESS:  7:00A.

6          THE COURT:  And so you would have been heading up to

7     your normal station, right?

8          THE WITNESS:  Yeah, back in labor and delivery, yes.

9          THE COURT:  You heard the baby was being transferred

10    and you went up to the nursery, right?

11         THE WITNESS:  That was, yes, around 10:00.  I think

12    we had two babies we were transferring that day.

13         THE COURT:  And you said that when you got up there,

14    you saw the code was going on; is that right?

15         THE WITNESS:  Correct.

16         THE COURT:  Do you have any recollection who was

17    involved with the code?

18         THE WITNESS:  Dr. Jones was there and I'm not going

19    to name names because I'm not sure.  I think Peggy Underwood.

20    I recognized her.  She is another nurse, but other than that,

21    I could not tell you.

22         THE COURT:  After the fact, did you ever talk to

23    Dr. Jones about Kendall?

24         THE WITNESS:  No.

25         THE COURT:  Did you ever talk to Peggy Underwood

1    about Kendall?

2              THE WITNESS:  No.

3              THE COURT:  These photographs you took, that was at

4    the direction of Ms. Koczan; is that right?

5              THE WITNESS:  Correct.

6              THE COURT:  When you took those photographs, you took

7    them of the room where Carissa was?

8              THE WITNESS:  Correct.

9              THE COURT:  And does that room look the same today as

10   it did back in 2014?

11             THE WITNESS:  Yes.

12             THE COURT:  Does the court's additional questions

13   cause any additional questions, Ms. Koczan?

14             MS. KOCZAN:  Yes, Your Honor.

15                       REDIRECT EXAMINATION

16   BY MS. KOCZAN:

17   Q.  In response to the court's questions, you had indicated

18   that you keep your notes -- you write things on the strip; is

19   that correct?

20   A.  I try to.  During an epidural, people write down what time

21   the time-out was and what time different things go on.  If --

22   I did make a note on my pant leg yesterday so I do do that

23   also.

24   Q.  Let's put up 1004 which is one of your strips, and would

25   this be an example of the notes that you are writing on the

1  strip?

2  A.  Correct.

3  Q.  And what have you written on this particular strip?

4  A.  That I did an AmniSure at that time and then I did a

5  sterile vaginal exam.

6  Q.  Let's put up 1006.  Would this be another example of you

7  documenting on the strip?

8  A.  Yes.  I called Dr. Dumpe, yes.

9  Q.  And let's put up another one.  There are several here, but

10  we'll put up one more 1022.  This again, is this more of your

11  documentation?

12  A.  Epidural catheter placed, yes.

13  Q.  Down at the end, there's something else?

14  A.  Because she is sitting up and we place her to her back.

15  She is placed supine, yes.

16  Q.  Is this an example of some of the notes you keep as you

17  are going through this?

18  A.  Correct.

19  Q.  I wanted to go back.  One other question you were asked

20  about your documentation.  When you are the nurse who is --

21  who has been present for the delivery, monitoring the mother,

22  making your notes every 15 minutes for the first hour, if you

23  would notice anything with the baby, if you observed the baby

24  and noticed anything, would you make a note at that point?

25  A.  You would make a note, and you would transfer to the

1  nursery, yes.

2  Q.  If you as a nurse noted anything abnormal or unusual about

3  the baby, you would do two things.  You would make a note and

4  you would take the baby to the nursery?

5  A.  Yes, nursery notified and baby transferred to the nursery.

6  Q.  Is that the procedure, the policy at Heritage Valley that

7  that's what you are to do?

8  A.  Correct.

9  Q.  Other than that, observing something unusual, are you

10  required to make any documentation about the baby during that

11  first two hour period?

12  A.  No.

13          MS. KOCZAN:  Thank you.  That's all.

14          THE COURT:  Mr. Colville, anything further?

15          MR. COLVILLE:  No, Your Honor.

16          THE COURT:  Mr. Price?

17          MR. PRICE:  No.

18          THE COURT:  Ms. Ash, just a couple questions.  Now

19  that you recognize Ms. Peronis here, do you have any

20  recollection of any discussions that you might have had with

21  her during her labor?

22          THE WITNESS:  I don't, no.

23          THE COURT:  And can you describe for me generally

24  what happens at change of shift?

25          THE WITNESS:  We give a report to the oncoming nurse.

1          THE COURT:  And about what time does that start?

2          THE WITNESS:  At 7:00P or 7:00A, whatever time the

3    shift is ending.

4          THE COURT:  So what does a report entail?

5          THE WITNESS:  You give the age, the gravida, the

6    para, the gestation.  Gravida and para is how many

7    pregnancies, how many deliveries, how much weeks gestation

8    from her EDC, her estimated due date is her gestational age,

9    so how far along she is, then the progress of she came in.

10   You just tell them your report of the day.  She came in,

11   ruptured membranes and AmniSure was positive.  She has an

12   epidural.  She was positive and we kept her.  She is three

13   centimeters.  You tell them dilatation and anything you can

14   report on, what IV bag is up, what fluids are running.

15         THE COURT:  And you know, without recalling this

16   specific day, but in general, how long does it take you to

17   give a report?

18         THE WITNESS:  Moments.  I mean, it's minutes.  You

19   usually have all the information in front of you.

20         THE COURT:  And once you give the report, the person

21   receiving it can ask questions, right?

22         THE WITNESS:  Correct.

23         THE COURT:  Now, on this particular day, there were

24   not one but two babies who were having problems, right?

25         THE WITNESS:  That was the next morning, Monday.

72

1            THE COURT:  That was the next morning.  So to that

2     end -- let's strike that.

3            So by the way, when do you generally get in?

4            THE WITNESS:  6:45, 6:40.

5            THE COURT:  Does report start right then, or does the

6     report start at 7:00?

7            THE WITNESS:  7:00.

8            THE COURT:  So report is what?  About five minutes or

9     so?

10           THE WITNESS:  Correct.

11           THE COURT:  Thank you.  Ms. Koczan.

12           MS. KOCZAN:  I do have follow-up on that.

13                    REDIRECT EXAMINATION

14    BY MS. KOCZAN:

15    Q.  The report you were talking with the judge about, is that

16    the report in the labor area?

17    A.  Correct.

18    Q.  Not in the nursery?

19    A.  Correct.

20    Q.  In the nursery, would there be more patients, more babies?

21    A.  Correct.

22    Q.  Would you have to give report on each one of those babies?

23    A.  I don't work at the nursery.

24    Q.  You wouldn't know what they do?

25    A.  No.

73

1          MS. KOCZAN:  Thank you.

2          THE COURT:  Anything further?  Mr. Colville now has a

3     question.

                    RECROSS-EXAMINATION

5     BY MR. COLVILLE:

6     Q.  When you are working in the labor and delivery, are you

7     assigned to more than one patient?

8     A.  If they are laboring patients, no.  It's one to one.

9     Q.  So on this day, when you were with Carissa, you were

10    solely dedicated to her?

11    A.  One to one, yes.

12    Q.  When Nurse Hendershot came in to replace you, she would

13    have been one to one with Carissa as well?

14    A.  Yes, one to one.

15          THE COURT:  Ms. Ash, you may step down.  I don't

16    think Ms. Ash is subject to recall.  Ms. Ash, you may step

17    down.  Thank you for your appearance here today.

18        (Witness excused.)

19          THE COURT:  Ms. Koczan, you had indicated that in

20    addition to displaying the photos that you did, that you were

21    going to pass the photos to the jurors.  Do you want to do

22    that at this point?

23          MS. KOCZAN:  Certainly.

24          THE COURT:  Mr. Galovich will assist.  He has his own

25    set.  Let the record reflect that Mr. Galovich will be passing

1    the photographs that Nurse Ash took altogether.  So as you did

2    with the baby photographs, you should review it and then pass

3    it on.

4            Let the record reflect that each of our jurors has

5    had an opportunity to review the entire stack of photographs

6    that depict the labor room.  At this time, it's just about

7    10:25.

8            Ladies and gentlemen of the jury, without you, we got

9    started here this morning for some legal matters.  I'm sure

10   Ms. Leo needs a break.  I need a break, so we're going to take

11   our break now and get back together at quarter to 11:00.

12           Once again, let me give you the recess instruction.

13   Once again, you are not to discuss this case yet.  You are not

14   to talk to family members and friends about it, communicate

15   about it with anybody here that you might see, anybody that

16   might want to reach out to you by telephone or otherwise

17   today.

18           Once again, I don't know if there's any news coverage

19   about this case.  To the extent there is, you would have to

20   ignore it, and you can't do any research either directly or

21   indirectly or by way of the Internet.  Continue to keep your

22   open minds.  Enjoy your break.  We'll get started again at

23   10:45.

24           (Jury excused.)

25           (Recess taken.)

1           MR. COLVILLE:  Your Honor --

2           THE COURT:  I heard.  We're going to hear from

3    Dr. Jones.

4        (Jury present.)

5           THE COURT:  Thank you, Mr. Galovich.  Ladies and

6    gentlemen, I trust you had a good break.  The court did.  I

7    understand Ms. Koczan is ready to call her next witness,

8    Dr. Jones.

9           MS. KOCZAN:  That's correct, Your Honor.

10           THE CLERK:  Please state and spell your name for the

11    record.

12           THE WITNESS:  Hilary Jones H-I-L-A-R-Y, J-O-N-E-S.

13        (Witness sworn.)

14           THE COURT:  Dr. Jones, you've heard me repeatedly say

15    watch the step.  Despite maintenance's efforts, it's not

16    entirely even.  Once you are situated, please arrange the

17    microphone so you are speaking into it.  Thank you.

18           Ms. Koczan, you may proceed.

19           MS. KOCZAN:  Thank you, Your Honor.

20           HILARY JONES, M.D., a witness herein, having been

21    first duly sworn, was examined and testified as follows:

22                          DIRECT EXAMINATION

23    BY MS. KOCZAN:

24    Q.  Doctor, can you please state your full name for the jury?

25    A.  Hilary Sara Miller Jones.

1    Q.  And, Dr. Jones, what is your occupation?

2    A.  I'm a pediatrician.

3    Q.  Are you licensed to practice medicine here in

4    Pennsylvania?

5    A.  Yes.

6    Q.  Are you licensed in any other states?

7    A.  Yes, Ohio.

8    Q.  And where do you currently live?

9    A.  In Beaver, Pennsylvania.

10   Q.  And how long have you lived there?

11   A.  Since -- I've lived in Beaver County since 1994.  In my

12   current house since 1998.

13   Q.  Are you married?

14   A.  Yes.

15   Q.  Do you have any children?

16   A.  Yes.  I have two daughters.

17   Q.  And how old are they?

18   A.  15 and 18.

19   Q.  And what do they do?  Are they in school?

20   A.  My oldest one just started college this week.  My younger

21   one is a sophomore in high school.

22   Q.  Would you tell the jury about your education, starting

23   with your undergrad bringing us up through medical school?

24   A.  I attended West Virginia Wesleyan undergraduate.  I

25   majored in biology with a minor in chemistry.  I graduated in

1    1990 with a BS in biology.  Then I attended West Virginia

2    University Medical School and graduated in 1994 with my M.D.

3    Q.  After completing medical school, did you go on for

4    additional training?

5    A.  Yes.

6    Q.  Can you tell the jury about that?

7    A.  I did a three year pediatric residency at Todd Children's

8    Hospital in Youngstown, Ohio.

9    Q.  Let me stop you there and ask you to explain to the jury.

10   They've already heard some of this, but the field of

11   pediatrics, what is it?  What sort of patients do you see,

12   conditions do you treat, et cetera?

13   A.  We see patients from birth up until 18 to 21 years old

14   usually.  It depends when we cut off the age.  We treat well

15   babies, we treat sick children, we treat chronic illnesses,

16   preventive care, immunizations.  I treat -- I do inpatient and

17   outpatients.  I treat them while they are in the hospital.  I

18   treat newborns in the nursery.  I don't know what else.

19   Q.  And since you completed that, you said that was what?

20   Internship and residency in pediatrics?

21   A.  They don't do internships anymore.  You just do residency.

22   Q.  You completed that in what year?

23   A.  1997.

24   Q.  After you completed that residency in 1997, what did you

25   do next?

1    A.   I joined the practice that I'm currently in in Beaver,

2    Pennsylvania.

3    Q.   And what is the name of that practice?

4    A.   It's -- the name now is Heritage Valley Pediatrics.

5    Q.   What was the name when you joined?

6    A.   I don't know.  They changed several times.  They had just

7    been acquired by the hospital when I joined the practice.  It

8    was Tristate Pediatrics and I think they had something like

9    Children's Hospital Alliance of Beaver at one point.

10   Q.   So the name has changed?

11   A.   Yes.

12   Q.   But now Heritage Valley Pediatrics?

13   A.   Heritage Valley Pediatrics.

14   Q.   I want to talk about the time period in 2014.  In addition

15   to yourself in 2014, who were the other members of the group?

16   A.   In 2014, we've always had a lot of pediatricians.  I mean,

17   you want me to name everybody?

18   Q.   Yes.

19   A.   I'll go in order from the ones who have been longest.

20   Dr. Haddad, Dr. Liljestrand was still there, Dr. Scibilia,

21   Dr. Cahill, and then I was next in line, Dr. Deacon,

22   Dr. Wisler, I think Dr. Amerigo Ceccarelli was part of our

23   group then, Dr. Barbara Negrini, Dr. Alpa Arora, Dr. Sarah

24   Bahr and then we had several physician assistants and possibly

25   nurse practitioner then.  I'm not sure.

1  Q.  Does this practice have more than one office?

2  A.  Yes.

3  Q.  Can you tell the jury where the offices are located?

4  A.  We have an office in Sewickley.  We have an office in

5  Hopewell.  The main office in Beaver.  We have an office in

6  Chippewa and we have an office in Calcutta, Ohio.

7  Q.  What offices do you go to?

8  A.  I'm generally in Calcutta, Ohio, Beaver and Chippewa.

9  Occasionally I'll go to Hopewell.

10  Q.  You've told us already that in addition to seeing

11  pediatric patients in the office, you also see them in the

12  hospital?

13  A.  Yes.

14  Q.  And how does that work?  Are there certain days you are in

15  the office, certain days you are in the hospital?

16  A.  We rotate through.  Generally when we are in the hospital,

17  it's our call weekend.  So we'll start at 8:00 a.m. Saturday,

18  work in the office.  We see the patients in the hospital, work

19  in the office Saturday, Sunday.  We take all the calls, Sunday

20  morning.  We see patients in the hospital and take all the

21  calls into Monday, and then starting Monday, we go to the

22  hospital in the morning and then start office hours at 1:00

23  p.m.

24  Q.  We've heard in this case that your involvement is rounding

25  in the nursery.  Do all of your partners round in the nursery

1    or just certain?

2    A.  Not all of them.  Just certain ones do.  It depends on --

3    I think I know Dr. Haddad doesn't go to the hospital anymore.

4    At the time, I think pretty much everybody did a week in the

5    hospital.  The PAs don't.

6    Q.  When you talk about doing a week in the hospital, are we

7    talking about the nursery?

8    A.  Yes.  Well, we see patients that are in the nursery, and

9    if we have any pediatric patients that have been admitted to

10    the floor, we see them as well.

11    Q.  And can you tell the jury what your responsibilities are

12    with regard to the nursery?

13    A.  In the nursery, I come in every morning and see the well

14    newborns.  We always have newborns in there.  The census is

15    always that we have at least somebody there.  We see the well

16    newborns and examine them, write our notes, talk to the moms.

17    If we are discharging somebody, we give them instructions on

18    discharging, and then if there's any other babies that are in

19    there that need other care, we take care of them, and then

20    after I'm done with the nursery, if there's any inpatients,

21    I'll round on the patients on the floor.

22    Q.  Those inpatients would be pediatric patients?

23    A.  Yes, only pediatrics.

24    Q.  Do you have a typical hour every day that you come to the

25    hospital to see patients in the nursery?

1   A.  Yes, because I have to teach the residents as well.  I'm

2   limited to the time that I can teach the residents and round,

3   and I like to get there right around 8:00 so that I can start

4   rounding and we can see the patients together and then see the

5   pediatric patients, and then if there's time left over, I can

6   lecture to them or teach them something or if they have

7   questions, I can answer them.

8   Q.  Was that your practice back in 2014?  To get to the

9   nursery at 8:00 a.m.?

10  A.  Yes.

11  Q.  And was that typically what you did every day without

12  deviation?

13  A.  Yes.

14  Q.  Are there also occasions in which you would get call to

15  attend a delivery?

16  A.  Yes.

17  Q.  Under what circumstances might you get call to attend a

18  delivery?

19  A.  It would vary.  If the obstetrician wanted the

20  pediatrician there for whatever reason, they just call us and

21  say we need you for a delivery and we go in and attend the

22  delivery.

23  Q.  Do you get called every time there's meconium present?

24  A.  No.

25  Q.  And do you get called every time there's a vacuum

1  extraction?

2  A.  No.

3  Q.  Do you get called when there's a prophylactic McRoberts

4  Maneuver performed on a patient?

5  A.  No.

6  Q.  Does Heritage Valley have policies and procedures -- I

7  believe Dr. Dumpe has talked about that and the nurses -- that

8  dictate when they call; is that correct?

9  A.  Yes.

10  Q.  Moving back to what we were talking about before, do you

11  have any other responsibilities either in the hospital or in

12  the practice that we haven't discussed yet?

13  A.  I don't think so.

14  Q.  Are you board certified?

15  A.  Yes.

16  Q.  And in what areas are you board certified?

17  A.  Pediatrics.

18  Q.  And what did you have to do to get board certified?

19  A.  When I first took the test back in 1997, we had to travel

20  and sit for a test that lasted eight hours one day and eight

21  hours the next day, and then every seven years, I believe, we

22  have to recertify, where we have to go to a testing center and

23  sit down and take a computerized test.

24  Q.  And have you passed that certification test each time you

25  take it?

1  A.  Yes.

2  Q.  Are your hospital privileges at Heritage Valley Beaver?

3  A.  Yes, and Sewickley.

4  Q.  That was my next question.  Is there any other place that

5  you go to?

6  A.  No.

7  Q.  Have you, in the past or presently, held various positions

8  at Heritage Valley Beaver?

9  A.  Yes.

10  Q.  What sort of positions have you held?

11  A.  The chairman of the department of pediatrics.  It's just a

12  rotating position.  They have to have a pediatrician who will

13  take the position of chairman of the department.  We just

14  attend meetings and sign documents.

15  Q.  And during the course of your practice, have you been the

16  recipient of various honors or awards?

17  A.  During my practice, I've had several honors and awards

18  when I was in medical school.

19  Q.  Can you tell the jury about a couple of those?

20  A.  In medical school, you get -- we don't get grades.  We get

21  pass/fail/marginal pass/honors.  If you get over 97 percent in

22  class, you are awarded an honors.  I believe I got honors in

23  psychiatry, clinical medicine, pediatrics, and then my fourth

24  year, I was awarded the -- they gave an award for the most

25  outstanding pediatric medical student, and I received that my

84

1    fourth year.

2    Q.  What made you decide to go into pediatrics?

3    A.  A couple of things.  Number one, I enjoyed it.  I was good

4    at it.  I like taking care of the kids.  It's challenging in

5    that you have to figure out what's going on with a patient

6    that a lot of times can't tell you what's wrong, but kids

7    are -- they are innocent and when they are sick, they are

8    sick, and it's just rewarding to take care of them.

9    Q.  Before we start talking about your care in this particular

10   case, I wanted to speak about some of the medical conditions

11   that the jury has been hearing about.  First and foremost,

12   we've heard a lot about meconium, but from your perspective

13   what is meconium?

14   A.  Meconium is the baby's first bowel movement.  In utero,

15   the baby is swallowing amniotic fluid, and the lining of the

16   intestine sheds, bile is produced, and all of this stuff

17   gathers in the intestines and into the colon, and that

18   essentially forms a substance that they excrete as their first

19   bowel movement.

20   Q.  That is the meconium; is that correct?

21   A.  Yes.

22   Q.  And what causes meconium to be present in amniotic fluid?

23   A.  If the baby has a bowel movement, it will be present in

24   the amniotic fluid.

25   Q.  And under what circumstances might that happen?

85

1    A.   It can happen -- anything that could potentially cause

2    some stress to the baby, they might have a little bit of

3    meconium that passes or sometimes larger amounts.

4    Q.   And meconium, is that -- is it full of bacteria?

5    A.   No.

6    Q.   Like adult stool would be?

7    A.   No.  It's sterile.  The whole environment the baby is in,

8    the amniotic sac is very protected.  It protects the baby, and

9    there's no bacteria for the baby to ingest.  There's no

10   bacteria in the baby's gut, which is another reason that

11   babies -- immune defenses are not developed, and so there's no

12   bacteria in the gut yet.

13   Q.   Okay.  And the fact that a baby may pass meconium into the

14   amniotic fluid and that show up at the time of delivery, given

15   the fact that it's sterile, is every baby that passes

16   meconium, are they at risk for infection?

17   A.   Not necessarily, no.

18   Q.   And why is that?

19   A.   Well, the meconium is sterile, like I said.  It's not

20   going to introduce bacteria into their lungs, not the meconium

21   itself.  Meconium, if it gets into the lungs, can cause

22   different issues, but not because of a bacterial infection it

23   introduces.

24   Q.   I'm going to ask you some more questions about this in a

25   minute.  Let me ask you this:  From the pediatric perspective,

1    are you aware of the various categories of meconium?

2    A.  Yes.

3    Q.  Thin, what does thin meconium mean?

4    A.  Essentially that it's staining the fluid, the fluid is

5    still clear.  There's just a little bit of coloration to it.

6    Q.  The term moderate that we've heard, moderate meconium,

7    what does that mean?

8    A.  It's a little bit more colored.

9    Q.  Heavy meconium, what --

10   A.  Well, heavy or thick?

11   Q.  Thick.

12   A.  Thick meconium is -- it's thick.  It's like -- we always

13   described it as pea soup, and I've been to deliveries where

14   the baby comes out and it's like they are swimming in pea

15   soup, and it's very apparent.

16   Q.  And we've heard this term particulate and nonparticulate.

17   What does that mean?

18   A.  Well, the particulate is just that you can see the

19   consistency.  It's very thick.  Like I said, it's like a

20   consistency of pea soup, and that's the best way I can

21   describe it because that's what it looks like.

22   Q.  And thin or moderate meconium, are these things

23   concerning?

24   A.  I mean, not as much as if you had a baby that was in the

25   thick meconium.  I mean, there's always some concern.  You

1    don't want them to ingest a whole bunch of it.  Not ingest.

2    They swallow all of this stuff, but inhale.

3    Q.  And is the presence of meconium during the labor, is that

4    something that's unusual?

5    A.  It happens fairly frequently.  I believe -- I don't know

6    the numbers myself.  I believe one in five is what we had

7    said, but I mean, it happens relatively frequently.

8    Q.  So one in five deliveries, there's meconium there?

9    A.  I believe that was the number that we had heard.

10   Q.  So when there's meconium present, what sort of problems

11   can that cause for a newborn?  We're just talking about

12   meconium.

13   A.  Just the meconium?

14   Q.  Right.

15   A.  If they inhale it and it gets into the lungs, it can cause

16   some issues with the gas exchange in their lungs.  In

17   meconium -- do you want me to talk about actually aspiration

18   of meconium?

19   Q.  Yes.

20   A.  Aspiration of meconium, it causes problems in three

21   different ways.  The first way is that if it gets in there, it

22   can cause what's called a chemical pneumonitis.

23   Q.  What does that mean?

24   A.  Pneumonitis is irritation of the airways.  It's like if

25   you inhaled something that was noxious and your airways get

1    irritated, and that's one of the things that it can cause.

2        The second thing, if it's thick and particulate, it can

3    cause what's called like -- the best way to describe it is a

4    ball valve mechanism, where the airway is blocked with this

5    thick, sticky substance.  When the baby inhales, air goes in.

6    The airway is dilated, and then when they try to exhale, they

7    can't get the air out, and the problem that that creates is

8    not so much with the air exchange.  They get the air in.  They

9    can't get the air out, but air keeps going in.  It's like

10   blowing up a balloon, and eventually, they develop what's

11   called a pneumothorax, where the lung essentially pops, and

12   that can cause all kinds of issues.

13   Q.  Anything else?

14   A.  It can result in what's called pulmonary hypertension.

15   There are a lot of physiologic changes that go on whenever a

16   baby is first born.  They don't need their lungs in utero, so

17   the blood vessels are clamped down very tightly, and the

18   pressure in the blood vessels is high because they don't need

19   a lot of blood going to their lungs because they are not

20   exchanging gas in the lungs in utero while they are in the

21   mother.

22       When they are born, there's a whole bunch of changes that

23   happen, chemical changes that causes blood vessels to dilate.

24   Lots of blood goes to the lungs.  They start breathing.  Gas

25   exchanges, and they transition into the environment outside

1    where they need their lungs because they no longer have the

2    placenta.

3        And sometimes, any kind of inflammation and irritation

4    causes blood vessels to clamp down, and it's called pulmonary

5    hypertension where those blood vessels get tight again and the

6    gas exchange doesn't occur as well.

7    Q.  I'm going to stop you there and ask you about treatment.

8    The first thing that you talked about is it can cause an

9    irritation, and I think you used the word pneumonitis?

10   A.  Pneumonitis.

11   Q.  Do you have to do anything about that?

12   A.  It depends.  If it causes symptoms, then we treat the

13   symptoms.  We don't treat meconium aspiration unless there's

14   actual symptoms.

15   Q.  The mere fact that a child has meconium in their amniotic

16   fluid, are you telling us that you don't just treat that?

17   A.  No.  Only if they develop symptoms from it.

18   Q.  The fact that meconium is present, does that put them at

19   higher risk of developing an infection?

20   A.  It can cause -- they can develop pneumonia later on simply

21   because if there's a lot of meconium in there, sometimes

22   within a couple of days, it can act as essentially a substrate

23   for bacteria to start taking hold and give them a pneumonia.

24   Q.  You said later on?

25   A.  Yeah.  Usually it's within a few days.

1    Q.  Few days after delivery?

2    A.  Yes.

3    Q.  And one of the other terms that I believe we've heard

4    about, I think some of the experts that have taken the stand

5    have talked about, the term is ascending infection.

6        What does that mean?

7    A.  An ascending infection is one that actually ascends into

8    the uterus.  Like I said, the amniotic sac is a protective

9    membrane that's there to protect the baby from this

10   environment that's outside in the outside world.

11       Ascending infections, generally the urinary tract in women

12   has a lot of bacteria in it and that bacteria can move upwards

13   into the -- through the cervix into the uterus, and if there's

14   a disruption in the amniotic sac for any reason, then it can

15   get in and potentially infect the baby.  Viruses can as well.

16   Q.  And in this particular case, we know, the jurors already

17   heard that this baby had an E. coli sepsis?

18   A.  Yes.

19   Q.  Was that the mechanism of how that infection got there?

20   Ascending infection?

21   A.  Yes.  I mean, yes.

22   Q.  We've heard the term transitioning.  I think you started

23   to explain that.  What does that term mean?

24   A.  Transitioning, it's just a complex process.  Like I was

25   saying, when babies are in utero, they are in this nice, warm,

1    liquid environment.  They don't need their lungs.  The

2    placenta provides all of the nutrients and oxygen, carries

3    away the waste and carbon dioxide that the body produces, and

4    there are a whole bunch of different -- fetal circulation is

5    very different from the circulation that newborns and adults

6    have.  There are blood vessels that are needed in utero that

7    aren't needed.  There are holes through the chambers of the

8    heart that are needed in utero and are not needed outside.

9        And again, the blood supply to the lungs is very minimal

10   in utero because really the only reason for blood to go to the

11   lungs is to actually supply the lung tissue to feed the lung

12   tissue.  They don't need to exchange gases in the lungs in

13   utero.

14       We were explaining transition, so transition actually can

15   start before they are born.  The labor induces a bunch of

16   chemicals to be released that cause a whole bunch of changes.

17   The fetal lung tissue, there's fluid in the lungs that's

18   supposed to be there.  It's secreted by the alveoli in the

19   lungs.  Some of it is amniotic fluid.  Not all of it.  A lot

20   of it is secreted by the lung itself.

21       And prior to birth, there's surges of different chemicals

22   called catecholamines that cause changes in the air sacs to

23   start the resorption of the fetal lung fluid to prepare the

24   baby for breathing once they deliver, and these blood vessels

25   close and pressures change, once they are born and they take

1    the first breath, the pressures change in the lungs, the blood

2    vessels dilate, vessels close.

3        The pressure between the chambers of the heart changes and

4    blood starts flowing in other directions because it needs to

5    go in other directions.  Instead of bypassing the lungs, it

6    needs to go to the lungs now.

7    Q.  So that is the transition process?

8    A.  Yes.

9    Q.  How long can it take for a newborn to actually go through

10   the process?

11   A.  Well, there's pulmonary transition and circulatory

12   transition.  The pulmonary transition can take hours to a day

13   or two.  The circulatory transition can take up to six weeks.

14   Q.  And are there various -- I'm going to use the word --

15   issues, signs, symptoms, issues a newborn might have as part

16   of that transition process?

17   A.  Generally, in newborns, we talk a lot about pulse

18   oximetry.  The amount of oxygen in the fetal blood is actually

19   pretty low.  You or I have our pulse ox in the high 90s

20   usually.  Babies in utero, their pulse ox is usually in the

21   50s, and during labor, it can drop as low as the 30s.  It just

22   depends.

23       Once they are born, we expect them to have specific levels

24   of oxygenation at certain periods of time, and we usually go

25   between -- at a minute, we want them to be 60 to 65 percent

1    saturated.  At two minutes, 70 to 75 -- or 65 to 70 and 75 --

2    from one, two, three, four, five, and at ten minutes, the

3    oxygen saturation, we want it over 85 percent.

4    Q.  And when babies are transitioning, can they have

5    respiratory issues?

6    A.  Yes, they can.

7    Q.  And what sort of respiratory issues would a baby have

8    during transition?

9    A.  Sometimes just breathing a little bit faster or needing a

10   little bit of supplemental oxygen.  Some babies are slow to

11   transition, and they can require a little bit of supplemental

12   oxygen for up to a couple of hours after birth.

13   Q.  And in addition to transitioning, are there other problems

14   that can cause respiratory issues in newborns?

15   A.  Yes.

16   Q.  What would they be?

17   A.  Respirations in newborns, there's something called

18   respiratory distress syndrome, and that particularly deals

19   with the lungs being immature.  They weren't quite ready.

20       There's a substance called surfactant that's produced in

21   the last few weeks of pregnancy, and the surfactant coats the

22   insides of the alveoli and allows them to stay expanded once

23   they expand.  They have been clamped down for months, and this

24   substance essentially holds them open once the baby starts

25   breathing.

1     If they are immature, the lungs aren't ready, they weren't

2     quite ready to be born, sometimes they'll develop what's

3     called respiratory distress syndrome.  It's primarily a lack

4     of surfactant, and that can cause them to breathe a little bit

5     fast, to have the flaring, the grunting, a little bit of an

6     oxygen requirement, and this sometimes resolves quickly on its

7     own, and sometimes they need a lot of support.

8     Q.  I want to stop you and ask you about those terms you just

9     used.  Flaring.  What is that?  What does that mean?

10    A.  Nasal flaring is a movement.  When you breathe, normally

11    you just -- air goes in and out of your nose, and it doesn't

12    move.  If you are working to breathe, you can see that it's a

13    movement that the nostrils will kind of flare outwards and

14    relax back inwards when they are breathing.

15    Q.  We were shown a still photograph there yesterday, and I

16    believe one of the witnesses, I think it was Kylee, pointed

17    and said, yes, that's flaring.

18        Can you see flaring on a still photo?

19    A.  It's a movement.  You can't see it in a still picture.

20    Q.  It's something you have to observe in terms of movement?

21    A.  It's a movement.

22    Q.  The next thing you mentioned, grunting?

23    A.  Yes.

24    Q.  What is that?

25    A.  Grunting creates what we call peep or positive and

1   expiratory pressure.  Like I said, the alveoli, they have been

2   expanded, and when the baby takes its first breath, they

3   expand and you want to keep them expanded because it's easier

4   to breathe.  The air goes in and out.

5       If there's surfactant there, coating that area, they stay

6   expanded fairly well.  If there's no surfactant there or their

7   lung compliance or the lungs are stiffer, then if they are

8   more difficult to keep expanding, the baby will inhale, and

9   every time they exhale, the alveoli clamp down, and they have

10  to inhale a lot harder to get them to expand.  What they'll do

11  is they'll create this peep by grunting.  Can I demonstrate

12  it?

13  Q.  Yes.

14  A.  When you see a baby grunting, they are like

15  (demonstrating) because they are actually holding their lungs

16  open.  When they are grunting like that, it helps expand the

17  alveoli and keep it open.

18          THE COURT:  Just let the record reflect that the

19  doctor imitated for the jurors what grunting is.  Go ahead.

20  Q.  And this grunting, is this something that you as a

21  pediatrician can hear?

22  A.  Yes.

23  Q.  A nurse would be able to hear?

24  A.  Yes.

25  Q.  That's something pretty obvious?

1    A.  Yes.

2    Q.  And we heard another term here, and I don't know if you

3    used it before, but retraction.  What does that mean?

4    A.  Retraction, there are different types of retractions.

5    Normally when you breathe, your diaphragm does the work.  Your

6    diaphragm is a muscle that you don't have to think about

7    moving, and it just moves up and down and helps expand your

8    lungs and then it relaxes and the air goes out.

9        Accessory muscles are muscles that you can use in addition

10   to your diaphragm to breathe.  When you are having trouble

11   breathing or there's -- you need to work harder to breathe,

12   you'll use these accessory muscles.  The ones in between your

13   ribs are called intercostal muscles, and you'll have

14   intercostal retractions.

15       I usually describe to parents when I say what to look for,

16   if it looks like the baby is -- every time they breathe, you

17   see their ribs and their ribs seem to be sucking in every time

18   they breathe, those are called intercostal retractions.

19       You have substernal retractions under here (indicating).

20   Q.  You are pointing to your sternum?

21   A.  Yes, bottom of your rib cage.  They will breathe and use

22   those abdominal muscles and that will sink in.

23       And suprasternal retractions which are not as frequent in

24   babies, but you'll see suprasternal retractions when they are

25   really, really working.  This area right here (indicating),

1    the suprasternal notch at the top of your sternum will

2    actually suck in when you are breathing.

3              THE COURT:  Again, the witness is pointing to the

4    sternum and also demonstrating.  Go ahead.

5    Q.  And, Doctor, we had -- we were talking about respiratory

6    issues and that's how we got on that discussion.  Can

7    infection cause respiratory issues?

8    A.  Yes.

9    Q.  And can infection also cause pneumonia?

10   A.  Yes.

11   Q.  And I think we showed in the opening, but I'd like to put

12   them back up and have you explain this.  1364.  This is in the

13   joint binders also.  I think 1365 also.  Will this help you

14   illustrate what pneumonia is?

15   A.  Yeah.  Yes.

16   Q.  Can you explain what pneumonia is, and I have another

17   drawing too.  I think that was maybe 1363.  This one might be

18   easier.  1362 maybe.  Here's one with the baby.  Is this

19   better?  Which one would you like?

20   A.  This is fine.  I mean, pneumonia -- there's different

21   types of pneumonia.  When you think -- usually when you think

22   of children or adults that have pneumonia, it's because

23   they've had a cold or something that's caused a disruption in

24   their defenses of their airways, and we all have bacteria

25   everywhere.  There's bacteria in your airways.  There's

1    bacteria in your bronchial tubes, and our body takes care of

2    it, but sometimes the defenses are broken down, and one or two

3    of those bacteria will take hold and start dividing and cause

4    pneumonia in a section of the lung.

5        Specifically with neonatal pneumonia, that's usually a

6    more diffuse process.  For some reason, the bacteria get,

7    through this vertical transmission, will get into the airways

8    and they are everywhere and it takes hold and infects a lot

9    more of the tissue.  It's not so much a consolidation as much

10   as a diffuse process.

11   Q.  And you've seen the autopsy report and whatnot.  Is that

12   what was described there?

13   A.  Yes.

14   Q.  Let's go to -- if we go to the next in the series there.

15   I think that was maybe 1363.  Does this help at all to explain

16   how it works or what happens?

17   A.  Yes.  I mean, the bacteria in the alveoli cause

18   inflammation, irritation.  The body's immune system wants to

19   fight it off.  It goes to that area and starts trying to kill

20   the bacteria.

21       In the process, it causes a lot of damage to the tissues

22   in the area as well.  It releases chemicals.  It releases

23   fluids, makes cells leaky so fluid builds up, and when that

24   happens, the gas exchange is compromised, because the

25   alveoli -- there's not as much air in there and the cell walls

1    can't exchange the gas the way they are supposed to.

2    Q.   Now, we have heard about some of the laboratory work that

3    was done here.  We'll talk about that a little bit later, but

4    I just want to talk about the concept.  We've heard about

5    white blood cells and we've heard about a differential which

6    include things like neutrophils, lymphocytes, that type of

7    thing.

8        Can you briefly explain to the jury what that all is about

9    and what that tells us and what happens in infection?

10   A.   We get the CBC to give us a clue as to whether or not

11   there is infection, to look at other things as well that can

12   be causing the respiratory distress.  The white blood cell

13   count, the number of red cells in there, the hemoglobin level

14   that's in there, are they anemic, are they polycythemic, too

15   many red cells, and we look at the platelets as well, because

16   they can be an indication of inflammation as well in

17   laboratory response.

18       The white blood cells are what we primarily look at to

19   decide whether or not there's infection, and they could be

20   either very, very high or very low in a newborn that would

21   make you think there's infection.

22       The differential is, they take a sample of the blood, a

23   smear of the blood on a slide and they put a stain on it, and

24   they look at it under a microscope, and they take a field and

25   they count how many of each cell is in that field, so we can

1    get a percentage of how many neutrophils are there,

2    lymphocytes, monocytes, eosinophils, basophils, immature

3    cells.  Give us a clue as to what's going on.

4    Q.  We heard here in this case that when the laboratory work

5    that you ordered came back that she only had -- Kendall only

6    had three neutrophils?

7    A.  She had three percent neutrophils.

8    Q.  What does that mean?  First of all, tell me what is a

9    neutrophil?

10   A.  Neutrophils are the main infection fighting cells in the

11   blood.  Those are the ones that really work to destroy

12   bacteria and infection, and you want the ANC or the absolute

13   neutrophil count, which is we take the number, we look at the

14   number of white blood cells reported on the CBC and we take

15   the percentage of neutrophils that are there and figure out

16   what the ANC is using those numbers, and ideally you want it

17   over 500.  Anybody should be over 500.

18        If you drop below 500, your ability to fight infection is

19   severely compromised.

20   Q.  And in this particular case, with the three percent

21   neutrophils, what would that ANC come out to be?

22   A.  I would have to see the numbers.

23   Q.  Is it around 2 something?

24   A.  I don't remember what her white count was.

25   Q.  We'll look at it.  One of the other things that we saw in

1    that differential and with Kendall's case, there were 95

2    percent lymphocytes.  First of all, tell us what a lymphocyte

3    is?

4    A.  Lymphocytes are another white blood cell that help fight

5    infection, but primarily lymphocytes, we usually see more of

6    dural viral infections.  They are better at fighting viral

7    infections.

8    Q.  You mentioned something else.  Eosinophils, is it?

9    A.  Eosinophils.

10   Q.  What are they?

11   A.  Eosinophils are just another group of cells.  Usually they

12   are responsible for causing your allergies and hay fever.

13   Q.  Any other pertinent cells in the differential?

14   A.  The cell that I was looking at was the neutrophils and any

15   immature cells.  The presence of immature cells indicates that

16   the body is really trying to produce more white cells to fight

17   infection.

18   Q.  And we've talked about pneumonia generally.  Let's talk

19   now about E. coli.  First and foremost, what is E. coli?

20   A.  E. coli is a gram negative rod.  It's a bacterium that is

21   present in -- mostly in the GI tract.  It can be in the

22   genital urinary tract.  Everybody has it in their GI tract.

23   Q.  And what is -- we'll start with E. coli pneumonia.  What

24   is E. coli pneumonia?

25   A.  It's pneumonia that's caused by E. coli bacterium.

1    Q.   In terms of the characteristics of this pneumonia, is this

2    a virulent or aggressive, or is it not virulent?

3    A.   It's very virulent and very aggressive.

4    Q.   And what is the significance of that?

5    A.   The significance of E. coli -- neonatal sepsis, neonatal

6    pneumonia are usually caused by -- the majority of them are

7    caused by an organism called group B strep.  Group B strep is

8    in the genitourinary tract of a lot of people.  Most of the

9    cases, neonatal sepsis are due to group B strep.

10       The next organism that we see percentagewise is E. coli,

11   but it's like the majority of them are group B strep, and a

12   smaller number are E. coli and other organisms.  The E. coli

13   is a gram negative rod.

14       Gram negative infections are fairly serious.  Do you want

15   me to go into that?

16   Q.   Yes, if you could.

17   A.   Treating a gram negative rod -- any kind of gram negative

18   bacteria -- gram positive and gram negative is a distinction

19   we identify the bacteria by looking at it with a specific

20   stain called a gram stain.  It takes up the stain or doesn't

21   take up the stain.  It just indicates the type of cell wall

22   that the bacterium has.

23       When you have a gram negative infection and you start

24   treating it, the cell wall breaks down and releases something

25   called endotoxin, and the endotoxin causes an inflammatory

1    response in the body that can overwhelm the body.

2        It causes chemicals like tumor necrosis factor to be

3    released, and essentially what your body is trying to do to

4    protect you is actually hurting you as well.  There's

5    regulatory systems that keep it from -- when you have

6    infection, there are systems in the body that say, okay, this

7    is enough.  It's helping, but we can't get too much of this,

8    and we need to let the body heal a little bit.

9        In a gram negative infection, these systems go haywire,

10   and the inflammatory response creates a cascade of chemical

11   release and inflammation that can create all kinds of problems

12   and destroy organs and be extremely serious.  It can lead to a

13   condition called DIC, which stands for disseminated

14   intravascular coagulation.  That is very difficult to treat.

15   Requires a lot of supportive care and frequently results in

16   death.

17   Q.  And the E. coli infections in the neonatal population,

18   what is the percentage of mortality in that area?

19   A.  From what I have read in the articles and journals,

20   E. coli sepsis, in and of itself, just looking at E. coli

21   sepsis and spectrum of newborns, that generally 41.7 percent

22   of babies that develop an E. coli neonatal sepsis will die.

23   Q.  We've also heard -- we saw these safety rules that

24   Mr. Price has put up there, and one of them was the sooner you

25   treat with antibiotics, the better.

1        Do you generally agree with that?

2  A.  You want to treat as soon as you notice the symptoms, yes.

3  As soon as you are suspecting that there's infection, you want

4  to start treating.

5  Q.  Okay.  Is it with all of these infections that the sooner

6  you get the antibiotics on, the better it's going to be, or

7  are there some infections where it doesn't make any

8  difference?

9  A.  It depends on how advanced the infection is.  The

10  antibiotics take time to work.  They are not going to work

11  right away.  You want to get the antibiotics in, and as I

12  said, part of the problem with treating gram negative

13  infections is that when we treat and the antibiotic comes in

14  and causes fissures in the cell wall, it releases this

15  endotoxin and creates this cascade of problems that you may

16  end up having to deal with.

17  Q.  So in E. coli sepsis, are there circumstances where it

18  doesn't make any difference when you give the antibiotics if

19  the infection is advanced enough?

20        MR. PRICE:  Objection, Your Honor.  She is leading.

21        THE COURT:  Agreed.  Your witness.  Open up the

22  question.

23        MS. KOCZAN:  I will rephrase.

24  Q.  Doctor, are there circumstances with E. coli infection

25  that that isn't the situation, that the earlier you treat, the

1    better?

2    A.  There's circumstances with any infection that once you

3    notice the symptoms and start treating, if it's past the point

4    where it's going to help, it's not going to make a difference.

5    Q.  One other topic and we're going to move on to your care of

6    Kendall, and we've heard a lot about Apgars.  I know different

7    people have explained those.  I would like you, from the

8    pediatric perspective, to talk about that and I'm going to use

9    Kendall's as an example here.

10         If we can put up 1115 which is the delivery note and

11   highlight that top section.  Would you, first and foremost,

12   explain what is an Apgar?  What does that stand for?

13   A.  Apgars are a score that we give the babies that kind of

14   give us a snapshot of their well-being at a minute of life, at

15   five minutes of life, and then if we need to, at ten minutes

16   of life.

17   Q.  What is it that you are assessing as part of the Apgar

18   scores?

19   A.  These five things that you see.  The heart rate, we want

20   the heart rate to be -- in order to get a two, the heart rate

21   has to be over 100.  We don't want the heart rate below 80.

22   If it's below -- if it's between 80 and 100, they get a one.

23   If it's below 80, they get a zero.

24   Q.  You said you want it over 100?

25   A.  Yes.

1    Q.  For a neonate, brand new baby like this, what is the range

2    that you want the heart rate to be in?

3    A.  Anything over 100, and generally, I've seen babies have

4    heart rates of 160 to 170, but generally a baby's heart rate

5    is between 140 and 160.

6    Q.  So is the range then 100 to 160, 170?

7    A.  Anything over 100 is good, but when you get up into the

8    180s, you are talking about tachycardia or too fast of a

9    heartbeat.

10   Q.  So you told us that in order to get a two, it has to be

11   above 100?

12   A.  Has to be over 100.

13   Q.  The second category, respirations?

14   A.  Respirations.

15   Q.  Tell us about that.

16   A.  Baby is born and they are not breathing, they get a zero.

17   If they are not making any effort to breathe, they get a zero.

18   If they are breathing, they get a one.  If they are crying,

19   they get a two.

20   Q.  That's the difference then?

21   A.  Yes.

22   Q.  Next is muscle tone.

23   A.  Yeah.  The tone we want babies usually have -- you want

24   their extremities flexed and them to have good tone.  If they

25   are just laying there flat, their arms are extended and legs

1    are extended, that's a zero.  If they are brought in a little

2    bit, then they get a one, and if they are up like this

3    (indicating) and their knees are bent and their hips are

4    flexed, they get a two.

5    Q.  The next category is reflex.  What is that?

6    A.  That's essentially just how they respond to stimuli.  If

7    you are drying them off and agitating them, do they respond to

8    that stimuli?  If they don't respond at all, they get a zero.

9    If they are moving around a little bit, they get a one, and if

10   they are really not liking what you are doing, they get a two.

11   Q.  The next one is skin color.

12   A.  Skin color, if they are blue, they get a zero.  If they

13   are pink but have blue hands and feet and blue around their

14   mouth which is called acrocyanosis, they get a one, and if

15   they are completely pink, they get a two.

16   Q.  Is it unusual for a newborn to have that acrocyanosis?

17   A.  No.  It's very common.

18   Q.  Is that something that could persist?

19   A.  Days or weeks.

20   Q.  Days or weeks?  Is that what you said?

21   A.  Days or weeks.

22   Q.  Let's look at the total scores then.  This baby here at

23   one minute got a six.  What does that tell us?

24   A.  Essentially it means she was vigorous but not -- it's not

25   perfect but it's okay, and generally we want it to be over

1    seven and so -- she wasn't crying yet, which I mean, her

2    tone -- I wasn't there.  From the pictures that I've seen, I

3    may have given her tone a two.

4    Q.  In the pictures that we've seen here in the courtroom --

5              MR. PRICE:  Objection, Your Honor.  Now, they are

6    treating my photographs when they weren't there.  I don't

7    believe -- I think it's improper for them to speculate.

8              THE COURT:  I think that the doctor has rendered an

9    opinion based on the photograph that she saw that she might

10   have given it a two.  I don't see any problem with that,

11   Mr. Price.  Go ahead.  All these photographs are in evidence.

12   Q.  You were talking about the photographs the jury has seen

13   and that are in these books, correct?

14   A.  Uh-huh.  Yes.

15   Q.  And at the five minute mark, the baby was up to an eight.

16   First of all, tell us, is an eight a good thing?

17   A.  Yes.

18   Q.  Is that a normal, healthy baby?

19   A.  Yes.

20   Q.  What does that tell us that she's got a score of eight?

21   A.  That she is vigorous, she is breathing, her heart rate is

22   good and it's -- like I said, it's a snapshot of how well they

23   are doing at that moment in time.  And five minutes, having an

24   Apgar of eight, that's a perfectly normal Apgar.

25   Q.  While we are on this, let's take a look at this

1    assessment.  I'm going to ask you some questions about that

2    too.  At the bottom kind of the left-hand side,

3    Nurse Hendershot has testified about this, but this is the

4    baby's assessment that is done in the nursery.  If you could

5    just walk us through and tell us what are we looking at at

6    these various things and what does it mean.

7        Under general appearance, what is it you are looking at?

8    A.  Just what does the baby look like.  Does it have any

9    genetic defects, is there anything, just glancing at the baby,

10   that looks abnormal.

11   Q.  This one was marked as norm, correct?

12   A.  Yes.

13   Q.  The next thing under there is skin?

14   A.  If they have any lesions, any birth marks, any open

15   wounds, bruising, things like that.

16   Q.  Head and neck?

17   A.  We look at the fontanelle which are the openings in the

18   front of the skull.

19   Q.  Is that what we refer to as the soft spot?

20   A.  The soft spot, yes.  Whether there's molding.  When babies

21   are born vaginally, their heads -- the bones of their skull

22   are in several different pieces, and the reason for that is so

23   their head can change shape when they come out of the birth

24   canal.  Some babies have pretty pointy heads when they come

25   out.

1    Q.  I've heard them referred to as cone heads.

2    A.  Yes.  We assess whether there's any edema.  Being born,

3    it's rough, and it can cause swelling on their scalp as well,

4    so we'll mark that down as well.

5    Q.  Eyes?

6    A.  Whether the eyes are present, whether they are in the

7    correct place.

8    Q.  The ENT?

9    A.  We look at the ears to make sure they are in the right

10   place on the head, they are not low set, high set, that they

11   are there, that they are open.  We look at the nose, whether

12   the nostrils are patent or open, and check their pallet to

13   make sure they don't have a cleft pallet.

14   Q.  The thorax?

15   A.  The symmetry of the chest, make sure --

16   Q.  It's equal?

17   A.  Equal, yes.

18   Q.  Lungs?

19   A.  How their lungs sound.

20   Q.  And what are you doing that with?  A stethoscope?

21   A.  Listen with a stethoscope, yes.

22   Q.  Heart?

23   A.  Just that the heart is beating regularly, there aren't any

24   murmurs or abnormal sounds.

25   Q.  Abdomen?

1   A.  That the abdomen is well developed, that there isn't any

2   opening, that the umbilical cord -- the umbilical stump is

3   developed normally, and we feel for their liver and kidneys

4   and spleen, any masses it might have in their belly.

5   Q.  Under genitalia?

6   A.  Whether they are male or female.  On the boys, we make

7   sure the testicles are descended, that there's not any

8   ambiguous genitalia where you can't tell if it's a boy or

9   girl.

10  Q.  Trunk and spine?

11  A.  Just essentially the spinal column looks developed and

12  it's not open in any places or have any dimples at the bottom.

13  Q.  Extremities, what are you looking at?

14  A.  If they have ten fingers and toes and everything looks

15  like it's proportionate.  With extremities as well, I include

16  the hips.  We make sure the hips aren't dislocated.

17      Reflexes, just how they respond to noxious stimuli.  We

18  are irritating them, essentially picking them up and

19  undressing them is irritating to them.

20  Q.  And the last one is the anus.

21  A.  That it's patent, because some babies are born without the

22  anal opening being patent.

23  Q.  I know this is the nursery assessment.  Is this the first

24  assessment you would do when you first see a baby?

25  A.  Yes.

1    Q.  And this was all marked as normal?

2    A.  Yes.

3    Q.  What does that tell us looking at those Apgars and looking

4    at this?  What does that tell us about the condition of this

5    baby?

6    A.  That after birth, she looked good.

7    Q.  We've heard some testimony from Dr. Shore and Dr. Karotkin

8    yesterday that, with this assessment, had a pediatrician been

9    called, there would have been nothing to do.  Would you agree

10   with that?

11   A.  I agree.  I wouldn't have done anything.

12   Q.  And would you have made -- this assessment, would that

13   require a baby to go to the nursery?

14   A.  No.

15   Q.  Would you have made any recommendations at that point?

16   A.  No, nothing out of the ordinary, no.

17   Q.  And the ordinary is what?

18   A.  We have standard orders of what to look for.  The nurses

19   will -- if the baby has anything abnormal on their exam on any

20   kind of assessment, if there's a problem, then they will take

21   the baby to the nursery.  The nursery nurses decide whether or

22   not they think something needs to be done.

23   Q.  If you had been called to attend the delivery with this

24   assessment, would you have started any antibiotics?  Including

25   the fact that there was meconium, would there be any need to

1    start antibiotics?

2    A.  No.

3    Q.  I'd like to move on now at this point and start talking

4    about your treatment of Kendall, and on October 13 of 2014,

5    were you covering the newborn nursery that day?

6    A.  Yes.

7    Q.  At any time prior to you arriving at the hospital that

8    day, did you receive a call regarding Kendall Peronis?

9    A.  No, I did not.

10   Q.  And we have seen a document that was authored by Janet

11   Kincade.  First and foremost, do you know who she is?

12   A.  I don't really remember her.  She was a nursing supervisor

13   at the time.

14   Q.  There's an indication in her note that you were called at

15   7:20 and I want to start with this.  Did Janet Kincade call

16   you at 7:20?

17   A.  No, she did not.

18   Q.  Did anybody call you at 7:20?

19   A.  No, nobody called me.

20   Q.  Are you sure of that?

21   A.  I am positive.

22   Q.  That morning, did you receive a telephone call from Jamie

23   McCrory?

24   A.  I did not.

25   Q.  Did you receive a telephone call from Bradley Heiple?

1    A.   I did not.

2    Q.   We saw these yesterday, but I'd like to put up your pager

3    records, and before I do that, I wanted to ask you this

4    question:  If the nursing staff, and that would include

5    supervisors, nurses or even Dr. Heiple, needs to get ahold of

6    you back in October of 2014, what are the mechanisms to do so?

7    A.   They can either call my cell phone directly or they can

8    use our Cortext paging system, which they call our paging

9    company, they type in something that sends a text.  We use the

10   Cortext because of HIPAA.  It's secure and it will send a

11   notification to my phone, the app on my phone, that tells me

12   that there's a call, and they get notifications as to whether

13   or not I read that, and if we haven't read it within five

14   minutes, they will send it again.

15   Q.   And you said it's either the pager system that you just

16   described; is that correct?

17   A.   Yes.

18   Q.   Or your cell phone?

19   A.   Yes.

20   Q.   Do they have a home phone number for you?

21   A.   I don't even have a home phone.

22   Q.   So the only way they could get in touch with you?

23   A.   My cell phone.

24   Q.   And the pager?

25   A.   And my Cortext pager.

1    Q.  Let's take a look at those.  We saw those yesterday, but

2    I'd like to put them up again.  1355 is the first one.  I want

3    to go through these with you.

4        If we can just highlight the first one over there.  The

5    judge noted yesterday the redactions.  That would include

6    patient name.  That was taken out for HIPAA purposes, correct?

7    A.  Yes.

8    Q.  And whoever called.  So let's take a look at that first

9    one.  Let's see the time on that.  The time on that would be

10   at 8:01 a.m. on the 13th which would be the day of Kendall's

11   birth?

12   A.  Yes.

13   Q.  This is --

14   A.  Dr. Shumway from the ER.

15   Q.  Calling you?

16   A.  Yes.

17   Q.  Does this have anything to do with Kendall?

18   A.  No.

19   Q.  The time is 8:01, so that wouldn't be a call that was

20   referenced by Janet Kincade; is that correct?

21   A.  No.

22   Q.  Let's look at the next one.  Can you tell the jury what

23   time that one is from?

24   A.  That one was at 12:48 a.m.

25   Q.  Obviously that's not about this baby?

1    A.  No.  That was a parent calling with a question.

2    Q.  The baby or son had a fever for the past couple of days,

3    calling now, due to has not been draining.  That's clearly not

4    Kendall.

5    A.  No.

6    Q.  Let's go to the next one.  We can look at the time there.

7    That's what?

8    A.  That was at 12:38 a.m.

9    Q.  Let's go to the top of the next page, top of that page.

10   Again, in terms of the time, that would be before Kendall was

11   even born, correct?

12   A.  Yes.

13   Q.  The description?

14   A.  That was a patient, a parent calling with a question.

15   Q.  Let's go to the next one.  This one occurred the day

16   before, so this couldn't be a call about Kendall?

17   A.  As you can see at the bottom, it says when the text was

18   sent and when it was read.  Those are the read receipts I was

19   talking about, so if we didn't check it, it pops up on the

20   computer we didn't see it or check it.

21   Q.  Let's go to the next one that starts on the bottom of that

22   page and goes to the next page.  What time is this one?

23   A.  That one was October 12, which was the day before.

24   Q.  Kendall wasn't even born yet?

25   A.  No.

1    Q.  That's from a Dr. Cahill?

2    A.  Yes.  He's in our office.

3    Q.  Let's go to the next page of records then.  Let's take a

4    look at that.  This is from the day after?

5    A.  Correct.

6    Q.  So this wouldn't have been about Kendall?

7    A.  No.

8    Q.  Let's go down to the next one, and this is October 13, but

9    this would have been at 9:21 p.m.?

10   A.  Yes.

11   Q.  It's about a child having stomach pains, so this isn't

12   Kendall?

13   A.  No.

14   Q.  Let's go to the next one.  This is at October 30 at 9:11

15   p.m.  Let's look at the content of that, and again, first of

16   all, the time isn't right and this is about a child with

17   headaches and an ear problem.

18   A.  Yes, that's another parent calling.

19   Q.  Let's go to the next one.  This is October 13, again, 8:10

20   p.m.  That would be long after and it's about a baby or child

21   that was in a car accident.  That would not be Kendall?

22   A.  Yes, 15-year-old.

23   Q.  Just so the jury is clear, you requested copies of your

24   paging records, correct?

25   A.  Yes.

1    Q.  This is what you were given?

2    A.  Yes.

3    Q.  These are the complete paging records for those days?

4    A.  Yes.

5    Q.  Now, let's look at the cell phone records, and again, can

6    you tell us how those -- go to the first page, which is 1358.

7    This is the letter from Verizon verifying, is that correct,

8    that they have given you a complete copy of the cell phone

9    records for that day?

10   A.  Yes.

11   Q.  Let's take a look at the cell phone records, and if we

12   could just highlight those portions that talk about the 13th,

13   because that's all we really need to look at.

14       On the 13th, it looks like the first phone call, at least

15   that is recorded, is 12:40 a.m., 12:52 a.m., 11:52 a.m.

16   Kendall wasn't even born yet, correct?

17   A.  Correct.

18   Q.  So they couldn't be about her?

19   A.  Can you make that bigger so I can see?

20   Q.  Do you want more of the side of it?  Is that what you are

21   looking for?

22   A.  Yeah.  I have old eyes.

23   Q.  So we have one we looked at 12:40 a.m., 12:52, 11:52.  The

24   next one after that isn't until 1:03 p.m.  So there is nothing

25   on here about a call after 5:20 which is the time she was

1    born?

2    A.  Correct.

3    Q.  Up through 1:03 p.m., correct?

4    A.  Correct.

5    Q.  And other than these two records, is there any other way

6    that you could have been called that day?

7    A.  No.

8    Q.  Let's put those down.

9         MS. KOCZAN:  Your Honor, we're going to move on from

10   there.  Might this be a good time to take a break?

11        THE COURT:  This might be a good time to take our

12   lunch break.  Ladies and gentlemen of the jury, we're going to

13   take our lunch recess.  Once again, leave your notepads as

14   well as your exhibit binders there on the chair.  Mr. Galovich

15   will collect them.

16        As you've just heard not too long ago, you are not to

17   talk about the case yet amongst yourselves, not communicate

18   with anyone else about the case, not do any research, not look

19   for any news accounts.  Again, continue to keep an open mind

20   as we go through these proceedings.  There are other witnesses

21   we have to hear from and possibly other exhibits, and as you

22   know, you haven't had the final instructions in the case nor

23   the attorneys' closing arguments.  With that, let's take our

24   lunch break and be back at 1:15.

25        (Jury excused.)

1          THE COURT:  Doctor, you may step down.  You've

2   already taken the oath as indicated.  You shouldn't really be

3   talking about your testimony over this lunch break.  You can

4   talk about the Steelers loss, your daughter, sending one off

5   to college.  You can check in with your husband.  You can

6   check in with your office.  You can do all those kind of good

7   things but not talk about the substance of your testimony not

8   only with your attorney but the attorneys for the government

9   and/or Dr. Dumpe.  We'll see you all back here to start again

10  at 1:15.

11       (Luncheon recess taken 11:58 a.m. -1:14 p.m.).

12       (Jury present.)

13          THE COURT:  Ladies and gentlemen, I trust you enjoyed

14  your lunch break.  Ms. Koczan is ready to go.  Dr. Jones has

15  already resumed the stand.

16          MS. KOCZAN:  Your Honor, may I begin?

17          THE COURT:  Yes.

18  BY MS. KOCZAN:

19  Q.  Dr. Jones, before we took our lunch break, we were talking

20  about the pager records and whatnot.  And again, I don't mean

21  to be repetitive, I want to make sure I asked you.  Pager

22  records, cell phone, that would have been the only way to get

23  you?

24  A.  Yes.

25  Q.  There would be no other way for somebody to contact you?

1    A.  No.

2    Q.  So when was the first time you heard anything about

3    Kendall Peronis?

4    A.  When I walked into the nursery.

5    Q.  What time was that?

6    A.  8:00.

7    Q.  And when you -- again, is that your normal time of

8    arriving every day?

9    A.  Yes.

10    Q.  Can you tell us what happened?  You walked into the

11    nursery.  What do you see?  What do you find?

12    A.  I walked in and there were two warmer beds with babies on

13    them.  The resident was there and Nurse McCrory, and they were

14    directing me toward Kendall, and I said, well, we have this

15    baby over here that's on O2 and working a little bit to

16    breathe, and we have this other baby over here, and at the

17    time I don't recall if any of the other newborns were in

18    there, but after that, it was just those two babies.

19    Q.  Okay.  We're not going to talk about the other baby, any

20    detailed terms of the baby's condition, but was that baby

21    stable at that moment?

22    A.  Yes.

23    Q.  You've heard Jamie McCrory testify.  You were in the

24    courtroom when she testified about what she said.  Is that

25    your recollection?

1    A.  Yes.

2    Q.  And why was that your reaction?

3    A.  Why was that my reaction?  That she talked about?

4    Q.  Yes.

5    A.  Because I hadn't been called.  I walked in thinking that I

6    was just going to see some babies and we were going to do

7    rounds and talk to the moms and go and sit down and talk, and

8    I walked in to a whole lot of other stuff going on.

9    Q.  Were you mad at the resident for not calling you?

10   A.  I was frustrated, because he knows that he can call me any

11   time and I just said why -- I remember saying why didn't you

12   call me.  He said I knew you were going to be here.

13   Q.  And to you, was that a reasonable explanation?

14   A.  At the time, yeah.  I mean, it really didn't make that

15   much difference at that point, because I was driving in

16   anyway.

17   Q.  Even if he had called you when he got there, and the jury

18   has heard there's some discrepancies about what time, but

19   let's assume he was there at 7:45 and he called you, how long

20   would it have taken you to get in there?

21   A.  I was on my way at that point.  I was already driving.

22   Q.  And how far do you live from the hospital?

23   A.  It's about 15 to 20 minutes door to door.

24   Q.  And had he called you -- you were present also when he

25   testified about his findings.  Had he called you and told you

1    that, what would you have done?

2    A.  If he had called and told me what he found, I would have

3    said, all right, I'm almost there.

4    Q.  So if you could pick up.  You've walked in, you see this

5    baby.  Tell me about the -- tell the jury about the

6    conversation with Dr. Heiple.  What did he tell you at that

7    time?

8    A.  He just essentially said we have this baby over here.  She

9    is on some oxygen.  She had a little bit of meconium at

10   delivery.  She is breathing a little bit fast, and I want you

11   to take a look at her, and he presented the other baby to me

12   as well.

13   Q.  As he's presenting these babies to you, are you evaluating

14   the baby?

15   A.  Yes.

16   Q.  Was there any conversation with Nurse McCrory at that

17   time, or was it primarily with Dr. Heiple?

18   A.  She essentially told me the same thing.  She was standing

19   there, and she said, you know, this baby is here, and I do

20   remember she held up the suction catheter and said, here, I

21   got this junk out of her, and she is on, I think it was 60

22   some percent O2, but her stats were about 94 percent at the

23   time.  She just presented the basic history and told me what

24   was going on with her.

25   Q.  I want to stop you and ask you about -- I think you

1    said -- I think I heard this, I got this junk out.  Is that

2    what she said?

3    A.  Yes.

4    Q.  What did it look like?

5    A.  It was tinged mucus.  It was green-tinged mucus.

6    Q.  And any other information either from Dr. Heiple or from

7    Nurse McCrory at that time?

8    A.  No.  They just gave me a basic rundown what was going on

9    with the babies.

10   Q.  And this is at 8:00 a.m.; is that correct?

11   A.  Yes.  At that point, shortly thereafter.

12   Q.  So after you get the rundown on Kendall and this other

13   baby, what do you do next?

14   A.  I said -- I looked at Kendall.  I listened to her and I

15   walked over and looked at the other baby, assessed the other

16   baby, and I said neither one of these can stay.  And --

17   Q.  Why was that?

18   A.  Well, the one baby was clearly a surgical problem and that

19   was going to need to be addressed, and Kendall, I didn't -- I

20   don't keep babies that are on more than 40 percent oxygen and

21   she was on 60.  I think 64 is the number that sticks out in my

22   head, 64 percent oxygen to keep her saturations into the 90s,

23   and I like -- I don't keep them if they are that high simply

24   because I would rather transfer a stable baby that may get

25   better than keep a baby and end up trying to transfer an

1    unstable baby if she gets worse.

2    Q.  Now, you said stable.  At that point, was Kendall stable?

3    A.  She was having a little bit of trouble breathing and she

4    was on a relatively high amount of oxygen, but she didn't look

5    that bad when I got in there.

6    Q.  The way you are testifying, and I just want to make this

7    clear, you have a recollection?

8    A.  Yes.

9    Q.  Do you have a clear recollection?

10   A.  Yes.

11   Q.  So tell us about the rest of your evaluation of Kendall.

12   You told us you listened to her heart, her lungs.  What else?

13   A.  I listened to her heart, lungs.  I looked at how much

14   oxygen she was on, how much she was working to breathe, and we

15   checked for their perfusion, look at their skin, how well they

16   are perfusing, that's important.  We press on their skin and

17   see how quickly -- when you press on somebody's skin, it gets

18   pale, and we let go to see how long it takes for it to refill.

19   Q.  And we've heard about grunting, flaring and retracting.

20   When you got there at 8:00, was Kendall doing any of that?

21   A.  She was retracting a little bit, and from my recollection,

22   I felt she was breathing -- she was working to breathe, but

23   she was not grunting at that point.

24   Q.  And was she flaring at all at that point?

25   A.  I don't recall that she was flaring.

1    Q.  You said she was just working to breathe?

2    A.  Yeah, she seemed like she was working to breathe.

3    Q.  And after you did your evaluation, you said -- you've told

4    us that you immediately made up your mind that neither that

5    other baby or Kendall could stay?

6    A.  Yes.

7    Q.  So what happened next?

8    A.  I told the resident, I said I want everything done, which

9    they know the CBC, the blood culture, I get cap gases, so that

10   I can get an idea of how effectively the baby is breathing.

11   Q.  What are cap gases?

12   A.  There are three types.  You can get arterial, you can get

13   venous, or you can do capillary.  It's easy on the newborns to

14   get the capillary.  You just have to do the heel stick and

15   draw it up in a little pipette tube, and you can't really

16   assess the oxygen level, but I have the pulse ox for that, but

17   you can look at their pH, which gives me an idea of how the

18   acid based balance in the baby and the carbon dioxide and

19   bicarb levels.

20        The $CO_2$ is what I'm really looking at to see how

21   effectively the baby is breathing, because if the baby is

22   breathing effectively, the $CO_2$ will be around 40.  In some

23   newborns, it's up to 50 and I'm okay with it being around 50

24   in a fairly large term newborn, because they have the

25   musculature to actually breathe effectively.  They don't get

1    tired as easily as smaller, premature babies do.

2    Q.  So about what time was it that you told the resident I

3    want everything?

4    A.  It had to have been shortly after 8:00.  I mean, it was as

5    soon as I assessed her.  I said go ahead and get everything

6    and the chest x-ray as well.

7    Q.  At that time, did you also order an IV?

8    A.  Yes.

9    Q.  And did you also order antibiotics at that time?

10    A.  Yes.

11    Q.  And was your order a verbal order?

12    A.  Yes.

13    Q.  So you verbally told them to do that?

14    A.  Yes.

15    Q.  And is that unusual?

16    A.  In a crisis situation where we are -- I say crisis.  In a

17    situation like that where you want things done right now, I

18    would give the verbal order.  I say do this, do this, do this,

19    and then at some point, we have to put it in the computer so

20    the lab has the labels and all the things that need to be

21    sent, but at that point, I just want them to get the stuff

22    going, get the IV and get the blood drawn.

23         Some of the stuff can be done through a heel stick and

24    some of it need -- the blood culture has to come from an

25    actual vein.  They have to draw the blood culture a specific

1   way, and it has to be done in a sterile manner so that we

2   don't get skin bacteria on there that mess up the labs, that

3   give you a contaminant, and you need to get the blood culture

4   in order to start the antibiotics and get the IV in.

5       Sometimes it's very difficult to get IVs in these babies.

6   They got hers relatively quickly.

7   Q.  The jury has seen some documentation that the IV went in

8   at about 8:20 a.m.  Does that sound about right?

9   A.  Yes.

10  Q.  We've seen documentation about blood work.  We'll look at

11  that in a little bit.  Just so I understand and the jury

12  understands the timing, 8:00 you come in.  You do your

13  assessment.  You give orders, and orders are within what time

14  frame?  8:00 to what?

15  A.  That I gave the orders?

16  Q.  Yes.

17  A.  Or they were carried out?

18  Q.  Let's talk about you did your assessment.  How long does

19  it take you to do the assessment and give the orders?

20  A.  Five, ten minutes.  Not long.

21  Q.  So we're talking about anywhere from 8:05 to 8:10 is when

22  you would have given the orders?

23  A.  Yes.

24  Q.  And so you give the orders.  What happens next?

25  A.  They start carrying out the orders, and I went over

1    into -- we have a little dictation room where our telephones

2    are and I called West Penn Hospital.  We have a good

3    relationship with West Penn.  The neonatologists there know me

4    and we can call directly and say, hey, I have this baby.  This

5    is what's going on.  I need you to come get them.

6        And I presented both babies to them knowing that the other

7    one was most likely going to have to go to Children's because

8    we use West Penn and Magee for premature babies, respiratory

9    problems, feeding problems, blood sugar problems, but

10   Children's Hospital, if they have a cardiac issue or surgical

11   problem, they'll go to Children's.

12   Q.   And do you recall who you spoke with?

13   A.   Dr. Leneri, L-e-n-e-r-i.

14   Q.   We've heard the name Giovannia Leneri.  Is that the

15   doctor?

16   A.   Yes.

17   Q.   Was Dr. Leneri willing to accept Kendall in transport?

18   A.   Yes.  They are very good at that.  They say, fine, we'll

19   come get them.

20   Q.   So can you give the jury some estimate what time that was

21   that you called?

22   A.   It was probably between 8:15 and 8:20.

23   Q.   I think we've seen some documentation from Nurse McCrory

24   when she testified that it was around 8:20 that you were

25   making arrangements for transfer.

1    A.  Yes.

2    Q.  Does that sound accurate?

3    A.  Yes.

4    Q.  So you make the arrangements for transfer, and you are

5    still in the nursery at that time; is that accurate?

6    A.  Yes.

7    Q.  You can see Kendall?

8    A.  Yes.

9    Q.  So what happens after you make the arrangements for

10   transfer?

11   A.  I had the residents -- whenever we transfer, we have to

12   get consent.  So I don't think anybody had talked to the

13   parents at that point, so I told the residents to get my

14   consent forms, and we walked down to the room, down the hall

15   to the maternity area, and I spoke with Carissa and Matt

16   first, and I just essentially told them your baby is having a

17   little bit of trouble breathing.  She is on more oxygen than I

18   would like to see her on.  It's something that would be better

19   handled downtown, so I'm going to send your baby downtown.

20   Q.  And we saw it yesterday, but let's put this up, 1177.  Is

21   this the consent form that you had the parents sign?

22   A.  Yes.

23   Q.  If you can scroll to the bottom there.  And that's

24   Carissa, and then it looks like you signed it after that?

25   A.  Yes, and a lot of times -- I can't say whether this was

1    the case or not, but a lot of times, I'll have mom sign and

2    take them back down to the nursery and sign, because I had two

3    consents I had to do and just sign them both at the same time.

4    Q.  And when you went to see the parents, did anyone go with

5    you?

6    A.  I believe Dr. Heiple went with me.  I don't know if any of

7    the nurses went with me.  Usually, if I'm going to talk to a

8    mom whose baby is in distress, I'll talk to the nurses'

9    station in maternity and I'll say who's taking care of whoever

10   and have them come with me, simply because they already have a

11   relationship with mom and are taking care of her.

12   Q.  And when you had this conversation with mom and -- mom and

13   dad both, correct?

14   A.  Yes.  I believe -- there were usually a lot of people in

15   the room, more than just Carissa and Matt.  I think there were

16   more people in the room than just Carissa and Matt at that

17   point.

18   Q.  Is it the situation that you believe Dr. Heiple was there

19   also?

20   A.  Yes.

21   Q.  And did Dr. Heiple say anything or did he leave all the

22   talking to you?

23   A.  No.  They just follow me.

24   Q.  We've heard testimony yesterday from Matt that the very

25   first encounter with you, that you seemed to be out of your

1    element, I think was the terminology, and if I've misstated,

2    the jury's recollection is what counts, out of your element or

3    broke down at that time.  Was that the situation?

4    A.  Not that I recall.  I mean, I was trying to express that

5    this was a problem that we needed to take care of.  I have had

6    parents that would have refused transfer, and I've had to

7    convince them that their baby needs to be transferred, but no.

8    Q.  And you didn't have to convince these parents?

9    A.  No.

10   Q.  They were willing to --

11   A.  Yes, they did right away.

12   Q.  -- sign the consent?

13   A.  Yes.

14   Q.  So in terms of the antibiotics, you ordered the

15   antibiotics.  Tell us what did you order?

16   A.  Ampicillin and gentamicin.

17   Q.  Let's start with the ampicillin.  Why did you order the

18   ampicillin?

19   A.  Neonatal sepsis is treated with -- the standard is just

20   give them ampicillin and gentamicin.  Ampicillin covers gram

21   positive organisms such as the group B strep.  Gentamicin

22   covers the gram negative organisms such as E. coli and a

23   couple other ones that we think about when we're treating for

24   sepsis.

25           We give them two antibiotics because we don't know

1  what we are treating and we have to cover a broad spectrum of

2  bacteria that we possibly could be covering.

3  Q.  I neglected to ask you, once you had evaluated Kendall

4  that morning, what was your impression?  What did you think

5  was going on at that point?

6  A.  At that point, I -- we start thinking -- you always have

7  what we call a differential diagnosis in your head.  You just

8  run through.  She is clearly in respiratory distress.  Is it

9  because she has infections?  Is it because of the meconium?

10 Is it because she just has respiratory distress?  Could it be

11 transitional?  Could it just be TTN?  TTN stands for transient

12 tachypnea of the newborn.  It's a condition that some newborns

13 have where they just breathe fast.  Sometimes they need a

14 little bit of oxygen, and sometimes they don't need oxygen,

15 but they are just breathing fast for a day to I've seen it

16 last for five days.

17    But those are things you think about with a newborn, but

18 we always treat as if it's an infection, because that's the

19 first thing that we need to do because that needs to be

20 treated, so you always work them up as if it's infection.

21    Another thing too, we have a chest x-ray to get an idea of

22 what their lungs look like and make sure they don't have a

23 pneumothorax or something like that.

24 Q.  Was there -- was infection -- you have talked about the

25 term differential diagnosis.

1    A.  Yes.

2    Q.  We hear doctors talk about what was high on their list of

3    differential and what was down.  Was the infection number one

4    on your differential diagnosis?

5    A.  Infection is going to be -- I tend to think of the things

6    that are worse, the worst things down to the more treatable,

7    less serious things, so like I said, infection is always going

8    to be at the top of the list, which is why we treat all of

9    these babies as if they are infected.

10   Q.  And you told us the two antibiotics that you chose, and

11   we've seen some records here that indicate that Kendall got

12   her first ampicillin at around 8:34, 8:35.  Let me ask you

13   about that.

14            MR. PRICE:  Objection.

15            THE COURT:  I'm sorry?

16            MR. PRICE:  Objection.

17            THE COURT:  Basis?

18            MR. PRICE:  That's an incorrect fact.

19            THE COURT:  Fact not stated in the record.  Perhaps

20   you need to rephrase the question.

21   Q.  Dr. Jones, do you know what time Kendall got her first

22   antibiotic?

23   A.  I would have to look at the record.

24   Q.  We'll pull that up in a minute.  When you order the

25   antibiotics, are they right there on the floor, or do they

1    have to come up from the pharmacy?

2    A.  No.  They have to come up from the pharmacy.  They have to

3    be calculated based on the baby's weight, and we put the order

4    in or call the pharmacy.  Usually, when we have something like

5    this, we'll put the order in and call the pharmacy and say,

6    hey, we need this stuff.

7    Q.  And then does the pharmacy send it up?

8    A.  Yes.  They send it by the bullet tubes.

9    Q.  The tube system?

10   A.  Yes.

11   Q.  And Kendall had one IV?

12   A.  I believe she had one.

13   Q.  Can you run the ampicillin and gentamicin at the same

14   time?

15   A.  No.

16   Q.  So explain to the jury how that works.

17   A.  You have to run antibiotics over a certain length of time

18   because they are what we call hypertonic.  There's a lot of --

19   the solute level is very high in them and it can be damaging

20   to the blood vessels if you run it too fast or push it

21   through.  It has to be mixed a certain way into a certain

22   volume and it has to be infused over a specific amount of

23   time.

24       Usually they hook a pump up that infuses that volume over

25   a certain amount of time and pushes it into the vein just so

1    that the vein doesn't get sclerosed and you'll either blow the

2    IV or lose the vein altogether, and then you don't have your

3    IV anymore.

4    Q.  Ampicillin, what is the time frame you run that over?

5    A.  The ampicillin has to go in over 30 minutes.

6    Q.  Okay.  So it would be 30 minutes from whatever time they

7    timed it, 30 minutes to infuse that into the --

8    A.  Yes.

9    Q.  After that, are you able to give the gentamicin?

10   A.  Yes.

11   Q.  Now, you talked about ordering some laboratory work.

12   Let's just take a look at that.  That's 1140 and 41.  And if

13   you can just explain to us what this is and what information

14   is provided to you?

15   A.  The bedside glucose, a lot of times these babies have

16   blood sugar issues.  That's another thing we have to watch

17   carefully, because their respiratory symptoms could be because

18   their blood sugar is low, so we always check blood sugars on

19   them.  Hers was 115, which is -- it's marked as high, but we

20   want it over 40/60 so that's fine.  I'm okay with it being

21   115.

22   Q.  Okay.  So what is the next thing?

23   A.  This is the differential which I didn't get back.  That

24   takes a while because they have to stain the slide and look at

25   it under the microscope.  That's the one that shows the three

1    percent segmented neutrophils and 95 percent lymphocytes.  She

2    only had one monocyte.

3        This atypical lymphocyte that you see and the nucleated

4    red blood cells are the immature cells that we tend to see in

5    higher amounts when the bone marrow is working overtime to try

6    to push out more blood cells to fight infection.

7    Q.  So what does this lab work tell us?  What did that tell

8    you that day about Kendall?

9    A.  That day, I didn't care about this, because at that point,

10   this wasn't back yet and I was treating my patient.  I ordered

11   the labs, and some of the quicker ones will give me a clue as

12   to what's going on, but I'm going to treat my patient based on

13   what I see right then and there.

14   Q.  So one of the other things -- let's go to the second page

15   of that, too.  If you can just explain what's on there and

16   what that tells us.

17   A.  That's just more of the -- that's just a different way.

18   This is the computer generated -- the machine generated

19   differential.  The machine generates a differential and gives

20   it to the lab, but the other one you saw was actually them

21   staining the slide and looking at it under the microscope.

22   Somebody actually looks and it and counts cells with a little

23   clicker.

24   Q.  We saw at the bottom the white blood cell was count was

25   8.3.  What does that tell us?

1    A.  She had 8. -- 8,300 white blood cells per unit.

2    Q.  Does that give you any information?

3    A.  It's a little bit low for a newborn, yes.

4    Q.  And one of the other things you did -- let's put up 1127.

5    I think this was the initial chest x-ray.  Is this the first

6    one?

7    A.  Yes.

8    Q.  Can you explain to the jury what this chest x-ray, what

9    the findings were and what they meant?

10   A.  It was read -- you want me to read the findings?  The

11   heart looks fine.  That's another thing.  The respiratory

12   issues could be cardiac as well.  That's why we listen to

13   their chest.  I didn't hear any murmurs or anything.

14        When we get the chest x-ray, that also gives us an idea if

15   the heart is big, if the heart is misshapen, it will give us a

16   clue as to whether there's an underlying cardiac issue.

17            The heart did not appear enlarged.  Pulmonary

18   vascularity is difficult to evaluate given the background.

19   Pulmonary parenchymal opacities, meaning that the lungs were

20   so whited out it was difficult to see the blood vessels that

21   were there.

22   Q.  What would cause the lungs to be so whited out that it was

23   difficult to see --

24   A.  The pneumonia.

25   Q.  Go on.

1    A.   There's a right basilar consolidation, which meant, as I

2    was saying consolidation is when there's a specific area of

3    the lung that is infected and sometimes the consolidation can

4    look the same -- something called atelectasis can look the

5    same as consolidation on an x-ray.

6              X-rays are a snapshot in time.  They are like reading

7    shadows.  You say it could be this or could be this and put

8    together your assessment based on the clinical picture of

9    what's going on with the patient.

10             So when the alveoli kind of don't inflate really

11   well, they can cause atelectasis which can look like

12   consolidation or it could just be atelectasis.

13             Then there's a probable small right-sided pleural

14   effusion.  Pleural effusion is just fluid that's outside the

15   lung but inside the membrane that surrounds the lung, and

16   that's more of an inflammatory response to the irritation

17   that's in there from the infection.

18             And then again right-sided apical consolidation, same

19   as what was in the right base, and air bronchograms.  The air

20   bronchograms just kind of -- the lung tissue is so apparent as

21   opposed to the dark area where the air is going through the

22   bronchi that you can see them very clearly on the x-ray.

23             Air bronchograms at the medial right base suggest

24   right medial basilar consolidation.  Again, there are ropey

25   bilateral perihilar and peribronchial densities.

1    Q.  What does that mean?

2    A.  It means that that area of the lungs are whited out more.

3    Q.  And then the radiologist says there's no evidence of

4    pneumothorax?

5    A.  Correct.

6    Q.  What does that mean and what is significant about that?

7    A.  The pneumothorax, like I said, we look for, especially in

8    cases of meconium aspiration, that that ball valve effect has

9    essentially popped the lung, and you see air outside of the

10   lung and the lung can't inflate against that air.

11        It creates a -- there's a potential space, meaning

12   it's a space that's there but isn't there when everything is

13   functioning properly, and when the alveoli essentially pop and

14   develop a leak, the air goes into that section of the lung and

15   the lung itself deflates, and it's very difficult to inflate

16   against that pressure of the air that's in there, and every

17   time they take a breath, it gets bigger and bigger, but that

18   wasn't there.

19        THE COURT:  Once, again, the witness is

20   demonstrating.  Go ahead.

21   Q.  What is the significance -- the jury has heard about

22   meconium.  What is the significance of the fact that there was

23   no pneumothorax?

24   A.  The significance of that is that the lungs were well --

25   that there was no pneumothorax.  It's important because that's

1    something that needs to be treated.

2    Q.  So let's go down to the impression.  If you would explain

3    that to the jury.

4    A.  Overall consolation of the findings -- I think that's

5    supposed to be constellation of the findings, but that says

6    consolation of findings most equivalent with meconium

7    aspiration and/or neonatal pneumonia in the proper clinical

8    setting.

9    Q.  At this point in time, when you got the results of this

10   chest x-ray back, what were you thinking was going on at that

11   point?

12   A.  That this was either pneumonia or that there was meconium,

13   and he noted the small right pleural effusion.

14   Q.  And we've heard testimony here that after you went out and

15   talked to the parents, got the parents' consent to transfer,

16   you came back to the nursery, correct?

17   A.  Yes.  I walked across the hall to tell the other parents

18   that I was sending their baby as well, and I actually felt

19   badly because they had more questions and I cut them off.  I

20   said, look, just sign this, please.  I will be back to talk to

21   you and left and went back to the nursery.

22   Q.  And you did that why?

23   A.  Because I wanted to get back to the nursery.

24   Q.  For Kendall?

25   A.  Yes.

1    Q.  So you come back to the nursery.  What happens at that

2    point?

3    A.  I walk back in, and the nursery, it's all glass.  Even

4    when you walk in through the doors, there's glass in the

5    hallway and there's glass on the left as you walk in.  I

6    looked over, and I think at the time too, Jamie had said to me

7    she is on a little bit more oxygen, and I walked back in and

8    took a look at her.

9        At this point, she was working really hard to breathe and

10   she was on a lot more oxygen, and saturations had dropped, and

11   I think she had put her up to almost 100 percent O2 and I

12   didn't like the color of her skin.  She was what we call

13   mottling, which means that she is not perfusing her skin very

14   well.

15       I remember saying to her are any of the labs back yet and

16   they weren't, and I then asked how far West Penn was away,

17   where the helicopter was or did they give us an ETA, and I

18   think they were trying to figure that out, and at that point,

19   I said you know what, never mind.  Just give me the intubation

20   tray.  I'm going to tube her.

21   Q.  And we know that the West Penn team, based upon the

22   records, arrived at 9:45.  And there's documentation in the

23   records that we'll look at in a minute that you intubated her

24   somewhere around 9:40?

25   A.  It was right before the West Penn team got there.

1    Sometimes we'll end up calling West Penn back saying, hey,

2    this baby looks like this now.  What do you want me to do?

3    They'll say don't intubate or don't do this, but I didn't even

4    bother.  I wasn't going to not tube her.

5    Q.  And the term intubate or tube, what does that mean?

6    A.  That I put an endotracheal tube into her trachea so we

7    could better oxygenate her.  What we do beforehand, we have

8    what's called an Ambu bag, it's a bag with a mask that we can

9    put over the baby's nose and mouth, and we can actually force

10   air into the lungs so the baby is not actually having to use

11   her muscles and her body to move air in and out.

12       And when you get to the point where you are having to bag

13   the baby, you have to put a tube down.  You can bag a baby for

14   a long time if you have trouble getting a tube down, but the

15   best thing to do is get the tube down so you can adequately

16   oxygenate the baby.

17   Q.  Up through this period of time, have you personally

18   suctioned this baby at all?

19   A.  Have I?

20   Q.  Suctioned her.

21   A.  Suctioned her?

22   Q.  Yes.

23   A.  I don't think I suctioned her until I was doing the

24   intubation.

25   Q.  So let's talk about that.  Did the suctioning occur prior

1    to the intubation or after the intubation?

2    A.   That I suctioned her?  It was during, because they have a

3    lot of secretions and bubbles, and it makes it very difficult

4    to see, because I take the laryngoscope, which is a metal

5    handle with a blade on the end.  It's shaped like the letter L

6    and has a light on it, and we put it into the baby's mouth and

7    use it to pull the tongue forward and get the trachea in a

8    position where we can actually see it so we can put the tube

9    in, because if we were to stick the tube into the baby, it

10   will go into the esophagus every time because the trachea is

11   too far forward, so we have to move the anatomy so we can see

12   it and put the tube through the vocal cords into the trachea.

13   Q.   Tell the jury what you saw when you looked down there.

14   A.   She had a lot of secretions that were just bubbly and

15   mucusy.

16   Q.   Did you see any meconium at that time?

17   A.   No, not -- no, I didn't see any meconium then.  I remember

18   because I had to suction all of those bubbles and mucus out of

19   the way so I could see the trachea and vocal cords.

20   Q.   Are you then able to intubate her to get that tube in on

21   the first attempt?

22   A.   Yes.

23   Q.   And after you gets the tube in, do you have to suction

24   more?

25   A.   No.  I put the tube in and then we put a sensor on it that

1    has a little purple film, so when we bag, it defects carbon

2    dioxide.  So when we push the air in, when the baby actually

3    exhales and we let go, it goes through that sensor and turns

4    yellow, and when it turns yellow, you know that you have a

5    tube in the right place, so that, you know, that you are not

6    bagging her esophagus accidently, because it's difficult to do

7    sometimes, but we do that to confirm tube placement, that the

8    tube is actually in the trachea.

9    Q.  Were you able to confirm tube placement?

10   A.  Yes.

11   Q.  Once you got the tube in, was somebody Ambuing her?

12   A.  Probably me.

13   Q.  You were actually standing there forcing air in?

14   A.  Yes.

15   Q.  So tube is in.  What happens next?

16   A.  I order chest x-ray.  The tube was in and I actually

17   ordered -- I don't know if I have them do the bolus beforehand

18   or not.  I think I ordered the bolus before.  I had them run

19   the fluid bolus before I intubated her, because at that point,

20   we were bagging her anyway and her circulation -- I was

21   concerned about her circulation, so I had them bolus her with

22   fluids to increase her blood volume and improve her perfusion.

23   Q.  Let's put up document No. 1114 which is the second page,

24   the delivery record, the second page.  It would have been

25   1116.

1    This is -- the jury has seen this before.  Jamie talked

2    about this the other day.  It gives some times on here, chest

3    x-ray.  Jamie has testified that the times on there reflect

4    the time the vitals were taken, not necessarily what is gone

5    over there.

6    She is documented there you intubated the infant, various

7    things happen.  Is that consistent with what you recall?  Not

8    necessarily the times but the actions.

9    A.  Yes.

10   Q.  And you also made a note, correct?

11   A.  Yes.

12   Q.  I think that was the 1114, and it would be 1113 and 1114,

13   if we can put that up too.  Before we go to that, let me just

14   ask you.  You made some handwritten notes too, and I want to

15   pull those up and ask you some questions about that.  Let me

16   get those out.

17   What we have on the board right now is your final summary.

18   And if you can -- we can highlight the first page and I just

19   want to ask you some questions about that, in terms of the

20   documentation about what we discussed thus far.

21   A.  Do you want me to read it?

22   Q.  If you can generally summarize for the jury.  What is it

23   you are documenting?  Let's take the top part, because I think

24   that's where we are at right now.

25   A.  The history of what was going on.  The baby girl Peronis,

what time she was delivered, mom's information.  She was 19,

first baby, first delivery, vacuum vaginal delivery, birth

weight was eight pounds, seven ounces, 3840 grams.  Meconium

was present in the amniotic fluid at delivery.  Baby was

stained with meconium.  Apgars were six at one minute, eight

at five minutes.  Baby was brought to the nursery in mild

respiratory distress and was placed on oxygen under the hood

to maintain her saturations over 90s.

Upon my arrival in the nursery at 8:00, a.m., the baby was

on 64 percent oxy hood, maintaining sats 94 to 96 percent but

was still grunting, flaring, retracting head -- I don't know

why that says retracting head.  That's probably a typo.  I

wouldn't have dictated that.  And coarse lung sounds.

Heart was regular without murmur.  Perfusion was good.  At

that point, because of the high oxygen requirement, it was

decided that the baby should be shifted -- that should be

shipped to West Penn for further care.

I spoke with Dr. Giovannia Leneri at West Penn and

arranged for transport at that time.  Chest x-ray was

obtained.  IV access was obtained.  Blood cultures, CBC and

capillary blood gasses were obtained and sent.

Ampicillin and gentamicin were started.  I spoke with both

parents regarding the baby's condition and need for transfer

and they were in agreement.

Upon my return to the nursery at 9:00 a.m., the baby's

1    condition had deteriorated.  The pulse ox -- that should say

2    was in; that's more likely was in -- the upper 80s and oxygen

3    requirement had gone up and the baby's work of breathing had

4    increased.

5        The capillary blood gas had not returned yet.  The results

6    are not returned from the lab, but at that point, I decided

7    that I was going to go ahead and intubate the baby.

8        The West Penn team was already en route and was

9    approximately five minutes out from the hospital at that

10   point.  The baby was intubated with a 4.0 ET tube.  That's

11   just the size of the ET tube that I used, which was placed

12   without difficulty.  $CO_2$ return was confirmed and --

13   Q.  Is that the purple yellow thing?

14   A.  Yes.  And a chest x-ray was obtained for placement.  At

15   that point, the capillary blood glass is returned.

16   Q.  Everything you have talked about, is that what you have

17   documented there thus far?

18   A.  Yes.

19   Q.  Let's put up the rest of it.

20   A.  And chest x-ray is obtained.  At that point, the capillary

21   blood gas result returned and showed a pH of 7.0 and a $pCO_2$ of

22   64.

23   Q.  Tell us what that means.

24   A.  The pH we want to be ideally 7.4.  That's the ideal acid

25   based balance for all bodily functions to occur.  That shows

1    that she is tipped a little bit more towards the acidotic,

2    that's she's got more acidic in her blood than basic and she

3    is not at the level that everything works well.

4    Q.   What about the pCO2?

5    A.   The pCO2 of 64 just means that she is not exchanging gas

6    very well in her lungs for as hard as she was working.   I

7    would expect it to be lower if her lungs were working well and

8    she was exchanging gas well.

9    Q.   So what does that result are you -- what information does

10   it give you at this point?

11   A.   Well, it shows me that she's got what's called a

12   respiratory acidosis.  You have to have other, like her bicarb

13   levels and things like that, to determine if there's a

14   metabolic acidosis as well.

15        You can have metabolic reasons that throw off your acid

16   base and you can have respiratory reasons to throw off your

17   acid base balance.  Hers, the majority of it was respiratory.

18   Q.   Okay.  So if you would go on.

19   A.   The baby's perfusion was still not good at that point, and

20   I ordered a 40 milliliter bolus of normal saline.  We usually

21   give ten milliliters per kilogram.  Normal saline to be given

22   at 9:35 a.m. and another one was given at approximately 9:45.

23        So the first bolus went in likely while I was bagging the

24   baby and getting the intubation done, and then her perfusion

25   still wasn't ideal, so I gave her a second bolus that was

1    infusing as the West Penn team arrived at 9:45.

2    Q.  You go on to say --

3    A.  The ampicillin had already infused at that point, and the

4    gentamicin was started.

5    Q.  You also say that maintenance IV fluid --

6    A.  Maintenance IV fluid of D10W, which we start all of these

7    babies on.  D10 is the amount of sugar that's in the fluid and

8    the W is just water.  So we give them essentially sugar water,

9    sterile sugar water.  We don't put any electrolytes in it in

10   the newborn period.  Had been started at 12 milliliters per

11   hour.  That's calculated based on their weight as well.

12       I usually have my residents start it at 80 milligrams per

13   kilogram per day and we can go up or we can go down.  You have

14   to manage their -- you don't want to overload them with fluid,

15   but you want to give them enough to keep their blood sugar up.

16       Accuchecks, which are for the blood sugar, at this point

17   had been 130 at 9:05 a.m.  Those are done by heel stick by the

18   nurses.

19       The initial chest x-ray for tube placement showed that the

20   tube was slightly low, although we were getting very coarse

21   breath sounds at that time.

22       So when we put a tube in, we listen to both sides because

23   it's very easy to put it in too far and it goes off to the

24   right, so we are really only inflating the right lung.  So we

25   listen to make sure we hear breath sounds on both sides, which

1    I did, but on the chest x-ray, it was a little bit lower than

2    we like to see it, so we pulled back just a little bit so it's

3    an ideal spot so it inflates both lungs really well.

4        The ET tube was retracted slightly and taped.  We tape it

5    into place so it doesn't move, and another chest x-ray was

6    obtained to verify placement.  The O2 sats continued to remain

7    in the 70s, and the baby was very difficult to ventilate

8    because of the noncompliant lungs and required high pressures

9    to ventilate.  That just meant that I really had to squeeze

10   the bag hard to get the air into her lungs.

11   Q.  I want to stop you at this point because there's another

12   note that you made.  Does that summarize everything you've

13   told us up until this point?

14   A.  Yes, and a little bit further.

15   Q.  Let me just show the jury another note.  This is page

16   1117, and I think this is your handwritten note that you made

17   sometime around 9:00, and if you could just explain to the

18   jury what that is.

19   A.  That's just a note that I was jotting down.  The dictation

20   that I made obviously was after the fact.  I jotted down some

21   notes to say what I was doing, what was going on, because,

22   like, we have to have something in the chart for the West Penn

23   team to have to take with them, and they grabbed the chart and

24   make copies of it for the team to take with them, so I was

25   jotting down my findings and my plan as quickly as I could.

1    Q.  That dictated note, that would have been typed up at some

2    time later; is that correct?

3    A.  Yes.

4    Q.  So that wouldn't have been available for the West Penn

5    team?

6    A.  No.

7    Q.  So if you would just tell the jury what you put in your

8    note, and before you start, I want to ask you another

9    question.  This note is timed at 9:00 a.m., correct?

10   A.  Yes.

11   Q.  And that would have been -- was that the first time you

12   had a moment to jot a note?

13   A.  I think that I had something that was timed 8:20.  I think

14   it was the actual like the newborn assessment they do because

15   they want that filled out, too, my initial assessment and then

16   what she looked like at discharge, so I wrote that down

17   because that has to go with the chart as well.

18   Q.  So let's take a look at that one first and we'll come back

19   to that.  That's 1115.  That's the same document, and is that

20   your newborn assessment in the middle?

21   A.  Yes.

22   Q.  Can we highlight, because I think the categories we

23   wouldn't be able to see them.  This would have been the first

24   one you did --

25   A.  Yes, at 8:30.  My assessment at 8:30.

1   Q.  Your assessment is already done.  You've done all of that.

2   Now you are going to sit down and write this?

3   A.  Write it down, yes.

4   Q.  Okay.  So tell us what your assessment was at that time?

5   A.  The general appearance, the GFR means grunting, flaring

6   and retracting.  That MEE is not my handwriting.  I think the

7   resident has started to write, because their job is to

8   actually do this for us, and then I co-sign it.  I think the

9   intern or resident had started writing the note and I directed

10  them to do other things.

11      So MEE, that stands for molding.  I don't use that

12  abbreviation, but it stands for molding and edema.  That's the

13  scalp, the description of the baby's head.

14      And then eyes, ENT and thorax were insignificant at this

15  point.  The lungs were coarse.  The heart was regular without

16  murmur.

17  Q.  When you say coarse, is that breath sounds?

18  A.  Yeah, like crackly breath sounds.

19  Q.  Okay.

20  A.  Then, like I said, the rest of it was not pertinent to

21  what I was doing at that point.

22  Q.  So just so we are clear, it appears the resident started,

23  and you told them, stop, I'll do it?

24  A.  I think the resident had started writing it and then was

25  actually going to do some other things, so they never finished

1    that note.

2    Q.  Dr. Heiple testified that he didn't have a note because

3    you were doing it, was that correct?

4    A.  Right.

5    Q.  Let's go back then to the other note that we started to

6    look at.  That one was first and this one was next, and if you

7    can explain to the jury what you've documented there?

8    A.  The date and time, the HVP stands for Heritage Valley

9    Pediatrics.  Three-hour old infant born to a 19-year-old G1P1,

10   which is how many babies, how many pregnancies, delivered by

11   vacuum.

12       Do you want me to read the abbreviations and what the

13   words stand for?

14   Q.  Yes, the words.

15   A.  Vacuum vaginal with meconium.  Birth weight 8-7.  GFR

16   tachypnea.  Then the physical exam, AFOF, anterior fontanelle

17   is open and flat.

18   Q.  And what does that mean?

19   A.  That just means their soft spot is open.  Lungs, coarse;

20   heart, regular without murmur; abdomen soft; full pulses.

21   Assessment, meconium aspiration.  Plan, CBC, blood cultures,

22   CBG which is the cap gas, chest x-ray, start IV and amp and

23   gent.  Spoke with Dr. Leneri at West Penn and transfer.

24   That's my signature.

25   Q.  I want to ask you about your assessment.  At that point

1  your assessment was meconium aspiration.  Why?

2  A.  Simply because that was in the history, and I was assuming

3  that's what I was dealing with.

4  Q.  Then let's go back to that previous note and her summary

5  at the end, that document we were reading and stopped.

6      Before I go on from there, I just want you to explain to

7  the jury what you remember, and then we're going to look at

8  the note about what you document.  The West Penn team arrives.

9  What happens then?

10  A.  She was very difficult to bag, meaning ventilate with the

11  bag.  Her perfusion was not good and we could not get her

12  saturations up.  They were staying low, and at that point, we

13  had Dr. Leneri on the phone telling him step by step what was

14  going on, and he was giving us orders of what to do.

15      West Penn travels with their own medications and

16  equipment, and he suggested at that point that we give the

17  baby surfactant to try to open up the airways since her

18  compliance was so low.

19      So we gave the surfactant.  The way you do that, -- it's a

20  milky white substance.  It almost looks like skim milk.  They

21  dose it based on the baby's weight, and you have to have an

22  endotracheal tube in place to give it.  We put it into the

23  endotracheal tube.

24      We are essentially putting several milliliters of liquid

25  into the baby's lungs which sounds crazy but this is -- it's a

1    medication that -- it's a substance that should be in there

2    that we're just adding to help.

3        When we do it, we have to keep bagging, and it goes down

4    and comes back up and goes down and comes back up, and we keep

5    bagging until it doesn't come back up, which means it's been

6    dispersed within the airways.

7    Q.   Once the West Penn team came, did they take over?

8    A.   Pretty much.  I mean, I was there helping, but Dr. Leneri

9    was telling us everything that we needed to do at that point.

10   Q.   And was Jamie still there helping?

11   A.   Oh, yes.

12   Q.   And then in addition to you and Jamie, the transport team

13   was also there?

14   A.   Yes.

15   Q.   So there were a number of folks there all working?

16   A.   Yes.  There were several people there, several nurses.

17   Everybody was -- we would say we need this, we need this.

18   There were people getting things and grabbing everything we

19   needed.

20   Q.   One of the things that was said yesterday was that the

21   reason why you wanted to transport Kendall up to West Penn

22   was -- I think I heard that there wasn't the appropriate

23   equipment or you didn't have the equipment at Heritage Valley.

24   Is that the case?

25   A.   Well, we can't -- I mean, at that point, we didn't have a

1    ventilator.  We can't ventilate babies.  I transport them when
2    we are not able to manage them there.
3        If she were to get worse -- like I said, she is on 64
4    percent oxygen.  She could get better in an hour or she could
5    get a lot worse, and I'm not going to stand there and wait for
6    a baby to see if they are going to get better or worse.  If
7    they are on 64 percent oxygen, I would much rather transport a
8    sick relatively stable baby than try to stabilize the baby
9    that is getting sicker and scramble to get them stabilized so
10   we can get them out and transfer them.
11   Q.  That brings up another question.  We heard about various
12   levels of nursery.  What level nursery does Heritage Valley
13   have?
14   A.  Well, we're a level one nursery and we do have level two
15   capabilities.  We call it a high risk nursery.  We keep babies
16   that are on a little bit of oxygen, have that TTN that I was
17   talking about, have mild respiratory distress.  Sometimes if
18   the baby comes in, they are working a little bit to breathe,
19   we've done this whole sepsis workup on them, started them on
20   antibiotics, they are breathing a little bit fast but need a
21   little bit of oxygen but are not to the point where they need
22   to have what we call CPAP or intubation, we'll keep them.
23   We'll keep babies that just need antibiotics.  We'll keep
24   babies that aren't feeding really well.
25       We actually will keep babies that have to be what we call

1    NG fed, where they are not eating or they have been sick and

2    getting better but not eating well.  We have to put a tube

3    into their stomach that we put in through their nose so we can

4    inject the formula into their belly if they are not able to

5    eat well.  We'll keep them for that, because the level of care

6    they require, we can handle.  We like to keep them if --

7    because it's better for mom.

8        Mom lives in Beaver and she's delivered there.  If mom is

9    still in the hospital, and we are capable of taking care of

10   the baby, we would rather not separate mom and the baby if we

11   don't have to.

12   Q.  We've heard a term NICU.

13   A.  Yes.

14   Q.  I'm assuming that stands for neonatal intensive care unit?

15   A.  Yes.

16   Q.  Does Heritage Valley Beaver have a neonatal intensive care

17   unit?

18   A.  No.

19   Q.  Is that why you wanted her transferred to West Penn

20   because they do?

21   A.  Yes.

22   Q.  Let's pick up.  You were starting to tell us about the

23   transport team was there.  You've now given the surfactant.

24   What happens next?

25   A.  We gave the surfactant.  Her saturations were still low.

1    Her lungs were not compliant.  We were still having a lot of

2    trouble ventilating her.

3        When I say "ventilating," I mean, making her lungs work to

4    keep her oxygen saturations up.  At that point, they did have

5    nitric oxide there.

6    Q.  What is nitric oxide?

7    A.  That is a gas that's normally produced in the lungs

8    shortly after birth that actually helps dilate those pulmonary

9    blood vessels.  The blood vessels I was talking about when

10   they are in utero are very tight and have high pressure.  That

11   nitric oxide is released into those airways, and that actually

12   stimulates those blood vessels to dilate and we'll actually

13   mix that with the oxygen that we are giving the baby so that

14   we're trying to get those blood vessels to dilate to carry the

15   oxygen away from the lungs.

16   Q.  I want to stop you because I want to ask you another thing

17   that I neglected to ask you.  Before you intubated Kendall,

18   did you go talk with Matt and Carissa again?

19   A.  Not before.

20   Q.  It was after?

21   A.  Yes.  Once I had intubated her, the West Penn team was

22   there, we talked to Dr. Leneri and they do their assessments

23   and start getting their equipment out and looking at her and

24   getting her ready to go.

25       At that point, because I had put the tube down, I ran down

1    the hallway to just let them know that I had put the tube down

2    and that the team was here, and we always take the babies down

3    to see mom before we fly them out, and I ran down the hallway,

4    went into the room and I said I just want you to know I had to

5    put a tube down to help her breathe.  The team is here.  We

6    are still working on her.  We will bring her down as soon as

7    we are ready to get her out of here so you can see her.

8    Q.  So back now -- after you did that, you came back, and what

9    you have been describing about the nitric oxide, was that

10   after that?

11   A.  Yes.  It was after that.

12   Q.  Okay.  So now you've given the nitric oxide.  Did that

13   help improve the situation?

14   A.  No.

15   Q.  I didn't ask you.  The surfactant, did that help improve

16   the situation at all?

17   A.  No.

18   Q.  What did that tell you?  The --

19   A.  At that point, I was like why isn't any of this working?

20   I mean, I was like this doesn't make any sense.  None of this

21   is working.  Why can't we ventilate this baby?

22   Q.  So the nitric oxide, the surfactant.  What happens next?

23   A.  I think at that point was when the monitor suddenly showed

24   that her heart rate was very, very fast, and we looked up at

25   it, and I remember I looked at the West Penn nurse, and I said

1    that can't be right, and got my stethoscope out and listened,

2    and her heart rate had actually dropped into the 60s, at which

3    point we started chest compressions, because anything under

4    80, we have to do chest compressions on.

5    Q.   And what happened after the chest compressions?

6    A.   Well, when you start doing the chest compressions, you are

7    going to give epinephrine, which is essentially adrenaline to

8    try to stimulate their heart to beat better.  We gave her

9    epinephrine several times, and there's different ways to give

10   it, through the IV, down the ET tube.  If you don't have an IV

11   available, we put it in the endotracheal tube and bag it in

12   there.  We did both with her.

13   Q.   Here's again your notes, if that helps you at all.  I

14   think approximately 10:50 that you were just talking about,

15   heart rate on the monitor?

16   A.   Yeah.  At approximately 10:50, the heart rate on the

17   monitor was noted to suddenly rise into the 200s and

18   auscultation, that just means listening to her heart with my

19   stethoscope, showed that her heart rate had dropped into the

20   60s.  Chest compressions were started at that point and IV

21   epinephrine was given by the West Penn team times two, so we

22   gave it twice.

23       At that point, also during the ventilation, while we're

24   bagging her, blood started coming back up out of the tube.

25   Q.   What is the significance of that?

1    A.   Pulmonary hemorrhage, that for some reason, she started

2    bleeding, and we were getting bright red blood that was coming

3    up into the ET tube and going up and down.

4    Q.   We heard the term before DIC?

5    A.   Yes.

6    Q.   Is that what that was?

7    A.   It very well could have been.  DIC, disseminated

8    intravascular coagulation, again, with gram negative sepsis,

9    something that happens is that the platelets and another

10   clotting factor in the blood called fibrin start to deposit in

11   the tiny blood vessels in the body which causes clots and cuts

12   off blood flow to certain organs, which is part of the reason

13   that you end up with multisystem organ failure with DIC.

14       But the other thing that it does, because the liver is not

15   functioning properly, and your liver is responsible for

16   creating your clotting factors, there's a lot of different

17   factors that make your blood clot, and those get used up very

18   quickly when all of this clotting is going on, and then your

19   body loses its ability to even form the clots and you actually

20   start bleeding from everywhere and hemorrhaging.

21       And whether that was because of this or whether that was

22   because of just the horrible inflammation that was going on in

23   her lungs, I don't know but we were getting -- she had clearly

24   had a pulmonary hemorrhage.

25   Q.   And what you described for us, is that consistent with --

1    you told us about the E. coli being a gram negative sepsis.

2    Is that what you see with a gram negative sepsis?

3    A.   The DIC?

4    Q.   This entire pattern that we've just gone through.

5    A.   Yes.  You can, yes.

6    Q.   So you were telling us at that point there's pulmonary

7    hemorrhage.  What happens next?

8    A.   We gave the epinephrine down the ET tube, because another

9    thing that epinephrine does, it causes blood vessels to

10   constrict.  So we were trying to control the hemorrhage by

11   putting the epinephrine down the endotracheal tube and bagging

12   it in there to try to control the bleeding that was going on

13   there, at the advice of Dr. Leneri again.

14       At that point, a spontaneous heart rate in the 120s was

15   obtained, so her heart was beating on its own again in the

16   120s, but the saturations, her oxygen saturation remained in

17   the low 60s to low 70s and then began dropping again.

18       We placed a second IV in her at this point.  At that

19   point, the heart rate began to drop again, well below 60, and

20   we started doing chest compressions again.

21       We got another chest x-ray at that point to make sure we

22   weren't dealing with a pneumothorax at this point, because

23   again, a pneumothorax can cause what's called a tension

24   pneumothorax where the one side fills up with air and pushes

25   the heart off to the side and compresses it and the heart

1    can't beat effectively, and we can treat that by putting a

2    needle into the chest to let all that air out, but there was

3    no pneumothorax on that chest x-ray.

4    Q.  At some point in time, did Dr. Leneri decide to end the

5    resuscitation efforts?  Are you okay?

6    A.  Yeah.  We gave her several more doses of epi, epinephrine,

7    and kept doing the compressions for 25 minutes.  It was a long

8    time, and they were on the phone with him, and he told them

9    to -- that he wanted to talk to me, and I went over.

10        At that point, the nurses and the respiratory therapist

11   were doing the bagging and the chest compressions, and he told

12   me, he said, listen, he said, you guys have been working on

13   her for how long now.  You've done this, you've done this,

14   you've done this.  This baby cannot be saved.  She has been

15   hypoxic for how long now and her brain was going to be so

16   affected that we weren't going to be able to get anything back

17   and we couldn't continue and to stop, so I told them to stop.

18   Q.  After you told them to stop, did you then go and talk to

19   the family?

20   A.  Not right away, we stopped, and I went into the dictation

21   room and shut the door and I cried, and I pulled myself

22   together because I needed to go talk to them, and the West

23   Penn nurse was there and --

24   Q.  Let me stop you there for a second.  Had you ever had

25   anything like this happen to you before?

1    A.   No.

2    Q.   This is the first time?

3    A.   Yeah.

4    Q.   Is this the only time this has ever happened?

5    A.   Yes.

6    Q.   So you said the West Penn nurse was with you?

7    A.   The West Penn nurse was with me, and she said do you want

8    me to go talk to the parents, and I said no, I'm going to go

9    talk to the parents, and she offered to come with me.  So we

10   walked down the hallway, and at that point, I know that there

11   were more people in Matt and Carissa's room, and I don't

12   remember.

13        I think I asked them if I could talk to them, if they

14   wanted me to talk to them in front of everybody or if I wanted

15   to send people out, and I honestly don't remember if people

16   left or if they kept people in there, and I sat down on the

17   bed.  I think Jamie -- I don't think Jamie went with us.

18        I think her maternity nurse came with us as well.

19   Q.   Would that be Chelsea?

20   A.   If that was who was taking care of her.  Like I said, I

21   usually grab the nurse that's taking care of them, and I sat

22   down on the bed and I told her that Kendall had passed and

23   that we tried everything that we could, but her little body

24   couldn't take it and she was gone.

25   Q.   And I'm assuming that when you were there, you were crying

1    with them?

2    A.  Yeah.

3    Q.  At that point in time, did you know what had happened?

4    A.  No.

5    Q.  Did you have --

6    A.  No.  No.  It's like this happens, you do this.  This

7    happens, you do this.  This happens, you do this, and we were

8    do doing it, and you keep pulling things out of your box to

9    keep doing things, and pretty much, you look into the box and

10   there's nothing left in there to do, and it didn't make any

11   sense.  It did not make any sense.

12   Q.  When you said it didn't make any sense, one of the things

13   that you told us that you were thinking about before is that

14   this could have been a meconium aspiration.  What had

15   happened, the course of this, did it make any sense to you

16   thinking initially it was meconium aspiration?

17   A.  Babies don't die acutely from meconium aspiration.  I

18   mean, you can have respiratory issues, you can develop

19   pneumonia down the road, you can develop pulmonary

20   hypertension down the road, but everything just went so

21   quickly and it was just -- it was just -- I was just -- I

22   didn't know what was happening.  It didn't make any sense to

23   me.

24       In my mind and what I was doing and what I was working

25   with, nothing made sense.

1    Q.  So you've talked with Matt and Carissa; is that correct?

2    A.  Yes.

3    Q.  And we heard something yesterday about being told that she

4    didn't make it on to the helicopter.  Is that what you said?

5    A.  That's not what I said.

6    Q.  What did you say?

7    A.  What I told you.  I said we did everything.  Her little

8    body could not take it and she was just too sick.

9    Q.  At that point, do you have any conversations with anybody

10   else?  For example, any staff?  Anybody else at that point?

11   A.  At that point, I don't think anybody really said much of

12   anything.  We were all just in shock.

13   Q.  And that was on the 14th, and we've seen the time of death

14   being around 11:40 a.m.  Did you have any conversations with

15   Dr. Heiple that day?

16   A.  I don't remember if I talked to him or not.  I don't think

17   I did.

18   Q.  Did there come a time where you received -- before we get

19   there, we've heard and we've seen that an autopsy was done

20   here.  Was it done that day or was it the day after?

21   A.  I think it was -- it wasn't done that day.  It was

22   probably the day after.

23   Q.  Do you have a recollection of going to talk with Dr. Min?

24   A.  Yes.

25   Q.  Can you tell the jury about that conversation?

1    A.  Dr. Min called me and said, you know, I'm going to do this

2    autopsy on this baby.  Can you come down and give me a

3    clinical history of what happened so that I can kind of know

4    what I'm looking for here to look at.

5           MR. PRICE:  Objection, Your Honor.  At this point, I

6    believe this is all hearsay.

7           THE COURT:  Sustained.

8    Q.  I don't want you to tell the jury what was said, but if

9    you can just give the jury an understanding of what happened.

10   A.  I went to Dr. Min's office and -- his assistant was there,

11   and Dr. Min and I went over what I just went over with you,

12   essentially what happened, the history and all the

13   resuscitative efforts and all the medications and everything

14   that we did.

15   Q.  Did you tell him at that time that you thought this might

16   be a meconium aspiration?

17   A.  Well, I told him, I said, I don't know what's going on.  I

18   said the baby had meconium.  I said, if this was meconium

19   aspiration, I said I can't explain why she -- why we couldn't

20   resuscitate her.

21   Q.  Was that the only conversation you ever had with Dr. Min?

22   A.  Yes.

23   Q.  Did you at some point learn the results of the blood

24   culture you had ordered and the tissue cultures?

25   A.  The blood culture, I believe, because all of these labs go

1    to our office and somebody reads them and signs off on them,

2    even the ones for the inpatients, and I think Dr. Scibilia's

3    name -- was the admitting doctor, so it went to him, and I

4    remember he called me and he said, hey, did you know that your

5    baby's blood grew E. coli, and I said no, I didn't. He said,

6    yeah, your baby had E. coli sepsis, and it was kind of like,

7    oh, my God! That's why it wasn't going to work. That's why

8    nothing worked.

9    Q. And does the E. coli sepsis then explain the entire series

10   of events that we've talked about here today?

11   A. Yes. At that point, it made sense, that she had an

12   overwhelming E. coli sepsis, and I want to say -- it wasn't an

13   aha moment. It was, oh, my gosh, it makes sense. This is why

14   I couldn't resuscitate her.

15   Q. In terms of why that makes sense, is this what you see

16   with an overwhelming E. coli sepsis?

17            MR. PRICE: Objection, Your Honor. Leading.

18            THE COURT: Sustained.

19   Q. What do you see with an overwhelming E. coli sepsis?

20   A. Just that they're extremely sick and a lot of them -- it

21   has a very high mortality rate. A lot of them do not survive.

22   Q. And in this particular case, do you think anything would

23   have changed the course here?

24   A. Not in her case, no.

25   Q. Why is that?

1  A.  Because I think it started long before she was -- not

2  long -- it started before she was born.  She had that

3  infection and she was born and was transitioning and her

4  little body did the best it could but couldn't do any more.

5  Q.  After Kendall had passed on the 13th and the jury has seen

6  the death certificates.  You did two of them; is that correct?

7  A.  Yes.  They wanted me to fill one out immediately, and I

8  didn't even know where I was supposed to go to do it.  I had

9  to go to medical records and fill it out.

10 Q.  Had you ever done one before?

11 A.  No.

12 Q.  So we saw the first one which listed a variety of

13 different things and then there was a second one.  Why did you

14 do a second one?

15 A.  I'm not exactly sure.  They sent me a second one because

16 the diagnosis at that point had changed, because we had the

17 E. coli blood culture results and I guess the autopsy results

18 and I just remember that the funeral home called me, and they

19 actually sent a representative to the office because they were

20 trying to plan the funeral, and they didn't want to delay

21 anything so they sent somebody to my office for me to sign the

22 revised one.

23 Q.  Now that you've got the E. coli sepsis culture result

24 back, what did Kendall die of?

25 A.  She died of overwhelming E. coli sepsis and pneumonia.

1   Q.  Did meconium have anything to do with that?

2   A.  I don't know if the meconium had anything to do with that

3   or not, but she had E. coli sepsis.

4   Q.  Now, we've heard some testimony about a meeting that you

5   and Dr. Dumpe had with Carissa and Matt.  First and foremost,

6   do you remember when that occurred?

7   A.  I don't remember when it occurred, no.

8   Q.  Are we talking about weeks or less than a month?

9   A.  Honestly, I can't -- it wasn't months, but I can't tell

10  you exactly how long it was.

11  Q.  Whose idea was it to have that meeting?

12  A.  I spoke with Dr. Leneri, because I actually called him to

13  let him know what the blood culture results were and to fill

14  him in on everything that went on and why this -- we got the

15  result that we got, and when I talked to him, he said --

16  Q.  You can't say what he said.  You can talk about your

17  understanding.

18  A.  It was my understanding that in cases like this, because a

19  lot of times the parents have a lot of questions, and in order

20  to help them get closure, to talk to them and explain to them

21  what was going on and answer any questions, and especially in

22  mom's case, alleviate any guilt she might feel about anything

23  she could have done or she should have done differently.

24  Q.  Did you then have some conversation with Dr. Dumpe?

25  A.  I spoke with Dr. Dumpe and he said -- well, because he had

1  a relationship with Carissa.  I really didn't.  The only

2  contact I had with her was that day, so I suggested that he

3  call and set up the meeting.

4  Q.  And that happened?

5  A.  Yes.

6  Q.  Can you tell us what you can recall about that meeting?

7  A.  It was in Dr. Dumpe's office which was on the same level

8  as the nursery.  It was in the hospital on that level, and

9  Dr. Dumpe and I was there and the nurse supervisor, and her

10  name escapes me, there was a nurse supervisor who was there as

11  well and Carissa and Matt and then somebody's mother or aunt

12  was there.  There was one other family member, I believe.

13  Q.  Okay.  So can you tell us then what happened at this

14  meeting?

15  A.  Dr. Dumpe did most of the talking.  We just essentially

16  explained to them that your baby grew E. coli out of her

17  blood.  She had an overwhelming infection, and that that was

18  why she passed, and I remember Carissa asked something

19  about -- I don't recall exactly, but from the conversation,

20  that she was thinking that this was something that she did,

21  and I remember just reassuring her that it wasn't anything

22  that she could have done differently, that there wasn't

23  anything that she did wrong.

24      And I do remember talking to her about meconium at

25  delivery, because -- and I do remember telling her about my

1    first daughter having meconium at delivery as well, and some

2    babies do totally fine and some babies have issues with it,

3    but that the meconium -- I don't think the meconium was the

4    problem.  It was the E. coli sepsis.

5    Q.  And do you remember if Matt and Carissa had any questions

6    for you or Dr. Dumpe?

7    A.  I think they asked a couple of questions, but it was

8    overwhelming for them at that point.  I don't remember a whole

9    lot of what was going on.  I don't remember a whole lot from

10   that meeting.

11   Q.  Was it the situation that any questions that they asked,

12   either you or Dr. Dumpe made an effort to answer for them?

13   A.  I'm sorry.  Repeat that.

14   Q.  Sure.  Any questions that they asked, is it the situation

15   that you attempted to give them answers?

16   A.  Yes.

17   Q.  Same thing with Dr. Dumpe?

18   A.  Yes.

19   Q.  After that occurred, did you have any additional contact

20   with Matt and Carissa before you came to the courtroom here

21   today?

22   A.  No.

23            MS. KOCZAN:  Thank you.  I think those are all the

24   questions I have for you.

25            THE COURT:  Thank you, Ms. Koczan.  Mr. Colville.

1    CROSS-EXAMINATION

2    BY MR. COLVILLE:

3    Q.  Good afternoon, Doctor.  My name is Michael Colville and I

4    represent the United States in this case.

5        When you met with Carissa and Matt with Dr. Dumpe, it was

6    your opinion at that time that -- you told them that the

7    meconium was not the problem in this case.  I'm sorry.  The

8    meconium was not the problem in this case.  It was the

9    E. coli?

10   A.  Yes.  The E. coli sepsis was what killed their daughter.

11   Q.  When you were talking about the E. coli sepsis originally

12   with Ms. Koczan, you mentioned the high mortality rate.

13       One of the questions that she asked you subsequent to that

14   was would anything have changed the outcome, and I believe

15   your answer at that point was no; is that right?

16   A.  No, I don't think anything would have changed.

17   Q.  The next question was -- or one of the statements was that

18   you believe that the E. coli sepsis started or the E. coli

19   infection had started before the baby was born?

20   A.  Yes.

21   Q.  Would you having been present at the delivery, would that

22   have changed the outcome in this case?

23   A.  Not based on what needed to be done.  We don't treat -- we

24   treat based on symptoms.

25   Q.  In this case, you've reviewed the medical record; is that

1    right?

2    A.  Yes.

3    Q.  You've seen the delivery assessment?

4    A.  Yes.

5    Q.  You've seen Dr. Dumpe's operative report; is that right?

6    A.  Yes.

7    Q.  Do you believe that you should have been called at the

8    time of delivery in this case?

9    A.  I wouldn't have been -- at that point, no.  It didn't seem

10   like anything else needed to be done.  With thin meconium, the

11   resuscitative efforts are fairly minimal.

12   Q.  Were there any resuscitative --

13   A.  Other than bulb suctioning the mouth and throat, it

14   doesn't sound like they needed to do anything for her.

15   Q.  And are the nurses who did that certified in that

16   specialty?

17   A.  Yes.

18   Q.  Was Dr. Dumpe certified in that as well?

19   A.  Yes.

20   Q.  That's something you were certified to do as well?

21   A.  Yes.

22   Q.  Is that the idea of calling a pediatrician to be present

23   at the delivery in the presence of meconium so that, in your

24   case, the pediatrician could be there in case resuscitation

25   needs to occur?

1    A.  Yes, in case resuscitation needs to occur, and in the case

2    of particulate thick meconium, that the deep tracheal

3    suctioning can be done.

4    Q.  In this case, was the deep particulate meconium present?

5    A.  No.

6    Q.  Dr. Karotkin identified a number of potential concerns he

7    had or that he believed warranted you being called to be there

8    at the delivery.  You were here for that testimony; is that

9    correct?

10   A.  Yes.

11   Q.  Did any of Dr. Karotkin's concerns prove to be problematic

12   during and after the delivery?

13   A.  His concerns?

14   Q.  Were there any consequences of his concerns that showed

15   themselves after the baby was born?

16   A.  Not until she was in the nursery.

17   Q.  Were there any issues that, you as a pediatrician being

18   present, would have addressed at delivery?

19   A.  No.

20   Q.  Can we pull up Exhibit 6, page 10?  We've seen this

21   document a number of times.  This is the delivery assessment.

22   Based on the results of this delivery assessment, is it

23   accurate to say that the baby that was delivered by Dr. Dumpe

24   was a healthy baby?

25   A.  Yes.

1   Q.  In an otherwise healthy baby who has meconium present, how

2   do you manage the meconium?

3   A.  Well, depending on the degree, the quality of the

4   meconium, and again, the NRP guidelines have changed with

5   this, but at the time you suction the mouth and nose so that,

6   when that baby takes her first gasping breath, that that

7   doesn't get inhaled into the trachea and into the lungs.

8   Q.  Was that done in this case?

9   A.  Yes.

10  Q.  By Dr. Dumpe?

11  A.  Yes.  Ideally, before the baby actually comes out and is

12  stimulated, you want to suction that stuff out of their mouth

13  and throat so that when they take that first breath, there's

14  nothing that is going in there.

15  Q.  And as Dr. Dumpe's op report indicated, that's what he

16  did?

17  A.  Yes.

18  Q.  Was there subsequent suctioning as well?

19  A.  Yes.

20  Q.  If you had been there at the time, would anything else --

21  would anything differently had been done that wasn't done the

22  day Kendall was delivered?

23  A.  No, because --

24          MR. PRICE:  I'm going to have to object.  This is

25  speculation.  She wasn't there.  She can't evaluate this baby.

1          THE COURT:  Sustained.

2    Q.  Based upon the delivery assessment that you see in front

3    of you, do you believe you would have needed to do anything

4    differently that has been documented as having been done on

5    the day of the delivery?

6    A.  Well, with the Apgar of one at the one minute with the

7    respirations means she was breathing at that point, and we

8    don't do the deep tracheal suctioning and all of that when

9    they are breathing.  Once they are breathing, we oxygenate

10   them.

11   Q.  Would there be any reason to prescribe antibiotics at this

12   point?

13   A.  No.

14   Q.  Why not?

15   A.  Because she wasn't in any distress, and we don't routinely

16   treat prophylactically for the possibility of meconium

17   aspiration.

18   Q.  Do you treat in anticipation of a possible infection?

19   A.  No.

20   Q.  Without symptoms?

21   A.  No.

22   Q.  So in this case, with this delivery assessment, was there

23   any reason anyone looking at it should have been thinking that

24   there's a possibility that there's an E. coli infection in

25   play here?

1    A.  No.

2    Q.  How about any infection?

3    A.  No.

4    Q.  So if you wouldn't have prescribed antibiotics at the

5    delivery and you wouldn't have resuscitated beyond what was

6    done by Dr. Dumpe and the nursing staff, if you had been

7    called, what would you have done at that point?  Would you

8    have stayed around?

9              MR. PRICE:  Objection.  Speculation.

10             THE COURT:  Sustained.

11   Q.  What is your experience when you are called?

12   A.  Go ahead.

13   Q.  When you are called to attend a delivery such as this,

14   once there are no symptoms present, there's no need for an

15   antibiotic or resuscitation, what do you do?

16             MR. PRICE:  Objection, Your Honor.  Can we define

17   this type of delivery?

18             THE COURT:  Right.  He used the words "such as this."

19   Rephrase, Mr. Colville.

20   Q.  Delivery evidenced by this delivery assessment.  If you

21   were called to this delivery and you did not need to

22   resuscitate and you did not need to provide antibiotics, what

23   would you do as the attending pediatrician?

24   A.  If I come to a delivery and there's no -- nothing for me

25   to do, then I take a look at the baby and if it has good

1    Apgars, I would say call me if you need me and leave.

2    Q.  Would you wait then?  Once you left, would you wait here

3    for symptoms before you acted on anything?

4    A.  Wait and hear for symptoms --

5    Q.  In this case, the delivery assessment shows no symptoms to

6    act upon or to cause you to prescribe an antibiotic.

7    A.  Yeah.  I would wait.  I mean, if symptoms developed, then

8    you start antibiotics and the workup.

9    Q.  Is it fair to say you don't do anything until symptoms

10   show up?

11   A.  Yes.  We don't give anything until symptoms show up.

12   Q.  You mentioned the surfactant that was administered.  Can

13   you explain to me again how that process worked?

14   A.  It's -- I believe it comes in a bottle, and they calculate

15   the amount to give based on the baby's weight, and you have to

16   have an endotracheal tube in place to give it, and we squirt

17   is into the endotracheal tube with a syringe, small amounts at

18   a time, and force the air -- bag the baby and force it into

19   the lungs and it comes back up, and force it in again, and

20   keep doing it until it doesn't come back anymore.

21   Q.  Can you see the liquid going in and out?

22   A.  Yes.

23   Q.  You described it as milky?

24   A.  Yes.  It looks like skim milk.

25   Q.  The liquid is going down in the tube that you've intubated

1    the child with; is that right?

2    A.  Yes.

3    Q.  Go back to when you intubated to begin with.  You are

4    looking into the lungs at that point?

5    A.  I'm looking into the trachea.

6    Q.  Can you see into the lungs at all?

7    A.  Not into the lungs.

8    Q.  You can see into the trachea?

9    A.  Yes.

10   Q.  And if a baby had been aspirating meconium, would it be

11   located in the trachea?

12   A.  If there were a lot of meconium, I would see it in the

13   trachea, and you can actually see sometimes it will stain the

14   vocal cords as well.

15   Q.  When you did intubate that day and -- is it the ringer

16   scope?

17   A.  The laryngoscope.

18   Q.  When you applied that, were you able to see into the

19   trachea clearly?

20   A.  Yes.

21   Q.  Were you able to see whether or not there was any

22   meconium?

23   A.  I did not see any meconium at that point, no.

24   Q.  Did you see any meconium staining?

25   A.  No.

1  Q.  If you had, would that be an indication there was a

2  significant amount of meconium in the lungs or there was some

3  meconium in the lungs?

4  A.  It would tell me that there had been meconium at that

5  level, yes, and if it were past the cords into the trachea,

6  yes, definitely.

7  Q.  Going back to when you administered the surfactant, once

8  you put the liquid in and you say it goes up and down, and

9  that's because you are using the bag?

10 A.  Yes.

11 Q.  How long a process is that?

12 A.  It takes a couple of minutes.

13 Q.  Were you actually physically doing it at that point?

14 A.  I -- I don't believe I was bagging.  I think the West Penn

15 nurse was doing the bagging, but I was standing right there.

16 Q.  Were you present and could see?

17 A.  Yes.

18 Q.  Could you see the liquid going up and down?

19 A.  Yes.

20 Q.  During that period of time, does -- if there is meconium

21 in the lungs, does it mix with the surfactant?

22 A.  If there were a lot of it, yes.

23 Q.  Would it change -- is it your experience as it went up and

24 down, that the surfactant color would change as a result of it

25 being mixed with the meconium?

1    A.  If it were mixing with the meconium, yes.

2    Q.  Did you see any change in the color of the surfactant

3    while they were bagging in this case?

4    A.  No.  It stayed milky.

5    Q.  Dr. Karotkin described the meconium and E. coli yesterday

6    as two separate atomic bombs.  Do you agree with that?

7            MR. PRICE:  He didn't say that.

8            THE COURT:  He did say it was atomic bomb 1 and

9    atomic bomb 2.

10           MR. COLVILLE:  I thought it was.  One of plaintiffs'

11   experts described it as two atomic bombs.

12   Q.  Do you agree with that?

13   A.  Do I agree it's two atomic bombs?

14   Q.  Yes.  He equated the meconium and E. coli --

15   A.  In this case?

16   Q.  Yes, in this case.

17   A.  In this case, no.  I would say that the E. coli was an

18   atomic bomb, and the meconium was probably more like a

19   firecracker.

20   Q.  In the face of this delivery assessment, should Dr. Dumpe

21   have reached out to you?

22   A.  With this assessment?

23   Q.  Yes.

24   A.  It doesn't look like I was needed.

25   Q.  Was this a healthy baby?

1    A.  Yes.

2            MR. COLVILLE:  Thank you.

3            THE COURT:  Ladies and gentlemen of the jury, it's

4    time to take our afternoon break.  So at this point, once

5    again, if you'll leave your notebooks and your exhibit binders

6    there on your chairs and we'll take a 15 minute break.

7            I know our court reporter has worked particularly

8    hard.  We've all learned a lot of medicine this afternoon, so

9    once again, keep all of this information in your head.  Don't

10   discuss.  Don't research.  Don't communicate.  Enjoy this

11   break.  Mr. Galovich.

12       (Jury excused.)

13           THE COURT:  Doctor, you may step down.  Mr. Galovich

14   is going to check with our jurors to see if any of them have

15   any plans that are taking them out of town for this Labor Day

16   weekend and how much longer they can stay, whether it's until

17   3:00, 3:30, 4:00, 4:30.  We'll see what they have to say.

18           THE CLERK:  They said no problem staying to the

19   normal time today.  Two of them were worried is this going to

20   go beyond next week.  I said that's parameters the judge gave

21   you, because two of them the week after have prepaid

22   vacations.  That's the parameters the judge gave you.  I'll

23   remind the judge.  That's fine.

24           THE COURT:  So we can go until about 4:30 if we need

25   to today.  Since that ate up about ten minutes of your break

1    time, you can still have break until 3:10.

2            MS. KOCZAN:  Can I make a request?  Can we be done at

3    4:30?  I have an event I have to attend.

4            THE COURT:  I understand that.  I think this

5    particular juror here will want to be done at 4:30 for her

6    bus.  She did say that.  So we will conclude no matter what at

7    4:30.

8        (Recess taken.)

9        (Jury present.)

10           THE COURT:  Dr. Jones has retaken the stand.  We are

11   going to have cross-examination by Mr. Price.  We understand

12   everybody wants to wrap up today at 4:30.  Mr. Galovich had to

13   leave for a family matter, so Mr. Kravetz, who is my career

14   clerk, is taking over for him.

15                       CROSS-EXAMINATION

16   BY MR. PRICE:

17   Q.  Good afternoon, Dr. Jones.  As has been stated, plaintiffs

18   had made no allegations against you with regard to the care

19   that you gave to Carissa after 8:20 a.m.

20       Do you understand that?

21   A.  Yes.

22   Q.  And the allegation that is against you is based upon

23   medical records in the Heritage Valley Beaver medical file

24   which claim that you were called at 7:20 in the morning.

25       Do you understand that?

1    A.  Yes.

2    Q.  Now, before I get into that issue, I just wanted to talk

3    to you about a lot of the issues you talked about treating

4    Kendall and treating patients like Kendall.

5        Now, whenever you came into the hospital, you did not know

6    what was going on with regard to Kendall, so in a situation

7    like that, when you look at her, the first thing you noticed

8    was that she was in respiratory distress, correct?

9    A.  Correct.

10   Q.  And whenever you have a patient in respiratory distress,

11   you, as a doctor, don't know what is causing that respiratory

12   distress, because you mentioned it could be a variety of

13   things, correct?

14   A.  Correct.

15   Q.  And you can't say, okay, I'm just going to address one

16   thing because you might miss another thing.  So basically, you

17   have to take a global approach, correct?

18   A.  Correct.

19   Q.  And the first thing you do is you give oxygen to the baby

20   to help it breathe, right?

21   A.  To increase the oxygen saturation.

22   Q.  Right.  It's able to breathe.  You want to make sure more

23   oxygen is getting into the body.

24       The second thing you mentioned was that you suspect that

25   it's some type of infection so you give antibiotics, correct?

1    A.  Correct.

2    Q.  So in this case, and in most cases, the standard

3    antibiotics are the ampicillin and gentamicin, correct?

4    A.  Yes.

5    Q.  So if you were called at 5:30 in the morning and they

6    said, hey, we have a baby with meconium, grunting, flaring,

7    retracting, in pain, had substernal retractions, you would

8    order oxygen and antibiotics, correct?

9    A.  If they were to call me at 5:20 and say that this is the

10   case, I would likely call the resident and say did you look at

11   this baby, and I'm coming in to take a look at the baby as

12   well.

13   Q.  And after you came in, the first orders, if you saw a baby

14   like that, in that type of respiratory distress, you would

15   give oxygen and antibiotics, correct?

16   A.  In what type of respiratory distress?

17   Q.  Grunting, flaring and retracting, low pulse ox.

18   A.  Essentially the way Kendall was when I first saw her?

19   Q.  Yes.

20   A.  Yes, I would do what I did.

21   Q.  The sooner the E. coli is treated with antibiotics, the

22   better the result is, correct?

23   A.  The sooner the E. coli --

24   Q.  I just want to see if you still agree with this.  The

25   sooner you treat any neonatal sepsis, including E. coli, the

1  better?

2  A.  Yes.

3  Q.  Now, sorry to jump around here, so if I understand the

4  relationship with Kendall, while she had this E. coli neonatal

5  sepsis, that was what you had to treat, but underlying that

6  was -- what made it so difficult was the meconium aspiration.

7  That made it more difficult to resuscitate her with the

8  compliance of her lungs and the ability to ventilate her,

9  correct?

10  A.  If she had -- yes.  If she had meconium in there, it would

11  make it more difficult, yes.

12  Q.  Right, because that's what we talked about in your

13  deposition.  You said the neonatal sepsis was really what made

14  her so sick.  The meconium aspiration made it more difficult

15  to resuscitate her with the compliance of her lungs and the

16  ability to ventilate her.

17  A.  Yeah.

18  Q.  You said that?

19  A.  Yes.

20  Q.  Now, let me ask you about when you arrived.  You mentioned

21  that when you came in, there were two babies in the nursery

22  who were in bad shape.  One being Kendall and the other one

23  that had this anomaly, right?

24  A.  I wouldn't say the other one was in bad shape.  It needed

25  to be transferred and further evaluated.

1    Q.  At the time that you got to the hospital though, that

2    second baby, you said, was stable?

3    A.  Yes.

4    Q.  However, just so we understand, and again, we're not going

5    to get into the condition of the second baby, but I think you

6    said he had a birth anomaly that could potentially deteriorate

7    quickly.

8    A.  It could have underlying issues.

9    Q.  So while -- I mean, you were still concerned about that

10   baby while caring for Kendall?

11   A.  Concerned about the baby?

12   Q.  Yes.

13   A.  The state of the baby?

14   Q.  I don't know what the condition of the baby was.  I'm not

15   allowed to find that out.

16   A.  I was concerned enough to transfer the baby.

17   Q.  Okay.  Now, you come in and whenever you came in -- well,

18   let me back up again.  Again, I'm sorry I'm moving around

19   here.  It's the way things came in to my mind.

20        Ms. Koczan asked you that, when you were driving in, if

21   Dr. Heiple had called you and told you what his examination

22   revealed, you had no need to rush into the hospital.  Do you

23   remember saying that?

24             MS. KOCZAN:  Objection.  That wasn't her testimony.

25             MR. PRICE:  That was your question.

1          THE COURT:  Sustained.  I think you need to rephrase.

2          MR. PRICE:  Sure.

3     Q.  The question that was asked of you was that if you were

4     driving into the hospital and Dr. Heiple -- because the

5     residents call you sometimes, correct?

6     A.  Yes.

7     Q.  And if he told you what his examination findings were from

8     his examination findings, there would be no need for you to

9     rush in?

10         MS. KOCZAN:  Objection.  That was not her testimony.

11         THE COURT:  That's not exactly what she said.

12    Q.  Let me ask you it this way, because my concern was that if

13    you had received a call from Nurse McCrory at 7:50 stating

14    that I have a patient who has an 81 percent oxygen rate who is

15    grunting, flaring and retracting in pain with substernal

16    muscle use, abdominal muscle use to breathe, would that be

17    something that would get your concern?

18    A.  Hypothetically?  Because that's not anything that

19    happened.

20    Q.  Right.

21    A.  If they had called me and said I had this baby, I would

22    have said where is the resident, and asked the resident to

23    evaluate the baby, and let me know what he thought.

24    Q.  Okay.  Whenever Nurse McCrory put Kendall on oxygen, she

25    put her on at 64 percent, correct?

1    A.  Yes.

2    Q.  And you mentioned that you usually don't see babies with

3    more than 40 percent oxygen?

4    A.  I said I don't keep babies that are needing more than 40

5    percent oxygen to maintain their saturations.

6    Q.  Keep.  So 64 is something outside of what your nursery

7    usually uses?

8    A.  It's more than I like to keep them.

9    Q.  In a situation like that, a nurse like Nurse McCrory is

10   supposed to call her supervisor, correct?

11   A.  I don't know what their protocol is.

12   Q.  The supervisor in this case was Janet Kincade.  Do you

13   know Janet?

14   A.  No.

15   Q.  We'll pull up tab 6, page 10, and we've all seen this

16   document.  I'm sorry, not 10.  It's 11.  I'm sorry.

17       This is the -- here's what I want to concentrate on.  This

18   part down here (indicating).

19       So you are the physician, Dr. Jones, and this is in the --

20   you are taking care of the baby, correct?

21   A.  Yes.

22   Q.  And Nurse McCrory is there as well as Peggy and Janet

23   Kincade, who is the supervisor, right?

24   A.  That's what it says.

25   Q.  And the recorder, the person who was to record the time

1    and everything, is Janet Kincade, the nurse, right?

2    A.  That's what it says.

3    Q.  Let me see the whole document.  She is there during all

4    this in the nursery recording what's going on.  You don't

5    remember her?

6    A.  No, I don't.

7    Q.  If we could go back to page 10, and again, I'm sorry.

8    Whenever you were answering Ms. Koczan's questions, you said

9    that whenever you first came to the nursery and you evaluated

10   Kendall, that all you really noticed that she was maybe

11   grunting a little bit.

12   A.  That's not what I said.

13   Q.  What did you say?

14   A.  I said she was working a little bit to breathe and she was

15   on a lot of oxygen.

16   Q.  Let me get my notes.  You said that she was retracting,

17   working to breathe, but you don't recall flaring.

18   A.  I don't recall flaring.

19   Q.  But let's block out this.  Go all the way down.  That's

20   your assessment at 8:30, correct?

21   A.  Correct.

22   Q.  And whenever you put GFR, that means grunting, flaring and

23   retracting, correct?

24   A.  Correct.

25   Q.  And then if you could go to page 15, and this is the note

1     we've seen all about, but I just want the top part.  It just

2     says right here:  Upon my arrival in the nursery, but was

3     still grunting, flaring and retracting.  I know you said head

4     is wrong and coarse lung sounds.

5         So just to confirm, whenever you got there, Kendall was

6     grunting, flaring and retracting and had coarse lung sounds?

7     A.  When I got there, she was not grunting yet.  This, I

8     dictated a long time after everything was done, and I mean,

9     she started grunting, yes, shortly after that, but when I

10    first arrived in the nursery, she was not grunting.

11    Q.  But your first assessment, you noted at 8:30 that she was

12    grunting, flaring and retracting?

13    A.  At 8:30, yes.

14    Q.  If we could pull up No. 22 and I think it's No. 51.  I

15    just wanted to ask you about this.  I mean, they showed you

16    this picture about the -- let's get the word out -- alveoli

17    that's got pneumonia in it, correct?

18    A.  Yes.

19    Q.  And then on the right side is the picture you saw and it's

20    the same type of lung sac, and it could have meconium in it,

21    correct?

22    A.  On the left side?

23    Q.  Correct.

24    A.  That's the picture demonstrating the meconium in the

25    alveoli, yes.

1  Q.  And so it could basically be either meconium or pneumonia,

2  which is what the report was, correct?

3  A.  What report?

4  Q.  The autopsy report.

5  A.  That it could be.

6  Q.  There was meconium and there was some signs of pneumonia.

7  A.  On the autopsy report?

8  Q.  Right.

9  A.  Yes.

10  Q.  Exactly.  You can take that down.  If you could pull up

11  tab 8 and highlight this part.  Now, so this is the first

12  death certificate that you filled out, correct?

13  A.  Correct.

14  Q.  And it says, and we read this yesterday, enter the chain

15  of events that directly caused the death, and you said that

16  you had to go to the medical records department because you

17  had never filled one of these out before, right?

18  A.  Correct.

19  Q.  And whenever you did that, the first thing you put was

20  meconium aspiration which occurred at 5:20 a.m., correct?

21  A.  That's not the first thing.  That's the last thing.

22  Q.  I know.  I'm going timewise.  Interval onset to death.  So

23  that was actually the first thing that happened in the

24  sequence of events which led to her death, correct?

25  A.  The information that I had at that point, yes.

1  Q.  And that's because, if there was any meconium aspiration,

2  it would have occurred before she was born, correct?  You

3  can't get meconium aspiration after you are born.

4  A.  That's when you get meconium aspiration.  You don't get

5  meconium aspiration until you take your first breath.

6  Q.  Right.  At the time of birth.

7  A.  You said before she was born.

8  Q.  Right.  You breathe it in utero?

9  A.  No.  Babies don't breathe in utero.

10  Q.  I'm sorry.  I'm not using the medical terminology breathe.

11  They ingest it?

12  A.  They can swallow it.  They can get it in their mouth, but

13  babies -- in utero, babies will make some breathing movements,

14  but they are not really like breathing stuff in and out.  The

15  lungs are small.  There's fetal lung fluid in there, but they

16  are not breathing in utero.  They make some movements, and in

17  labor, chemicals are actually released that suppress those

18  breathing movements that they have.

19      Now, if a baby becomes anoxic in utero, where the oxygen

20  is severely depleted for some reason because the placenta is

21  not working or the cord is compressed, they can make some

22  gasping movements in utero.

23  Q.  You were right.  I used the wrong medical terminology.

24  I'm not a doctor.  What I meant to express is the only way

25  Kendall got meconium was in utero?

1    A.  When you say "got meconium," it was --

2    Q.  As you know, upon the autopsy, it said that meconium --

3    that Kendall had massive aspiration of meconium, correct?

4    A.  That's what the autopsy shows, yes.

5    Q.  That's what the autopsy showed.  And my point is, the only

6    way that she could have gotten that was through ingesting it

7    in utero?

8    A.  When you say "ingesting," that means swallowing.

9    Q.  Swallowing in utero.  How do you want to put it?

10   A.  If she was swallowing, it's going to go into her esophagus

11   and her stomach.

12   Q.  Okay.  Well, how do you get meconium into your lungs?

13   A.  If it's in the back of your throat or in your mouth when

14   you are born and it's not removed from your throat and your

15   mouth, then when you take that first breath, they can get it

16   into their trachea and into their lungs.

17   Q.  So when Kendall was being born, she had meconium in the

18   back of her throat and breathed and got it down deep into her

19   lungs, correct?

20       That's the only way you can have, on autopsy, a massive

21   aspiration of meconium is what you just described.  She took

22   in a whole gulp of meconium down into her lungs, correct?

23   A.  If that's what they found, she had to have inhaled some

24   meconium probably from the back of her throat.

25   Q.  Right.  Now, you also noted at 9:00 pulmonary

1  hypertension.  At 10:55, pulmonary hemorrhage and at 10:50,

2  the cardiac arrest, correct?

3  A.  Yes.

4  Q.  Now, can we go to the second page of that tab, and this is

5  the second death certificate.  I showed the top of it in the

6  opening, but I want to show the bottom part because this is

7  the one you talked about that you had to change.  They asked

8  you to fill out a second one.  This is the official one.

9     And it says enter the chain of events that directly caused

10  the death, and you left the immediate cause was meconium

11  aspiration, correct?

12  A.  That's what it says.

13  Q.  And then it says sequentially, those conditions leading to

14  the cause or it's an underlying cause was the neonatal sepsis,

15  correct?

16  A.  Yes, she had neonatal sepsis.

17  Q.  At the time you were filling it out, you still believed

18  that meconium aspiration was the immediate cause of Kendall's

19  death, correct?

20  A.  Based on the autopsy findings.

21  Q.  Right.  Now, I'm going to jump back to the time that you

22  were at the hospital.  Now, you get there and you noticed, and

23  I know the time is disputed, if it's 8:00, 8:20, like

24  Dr. Heiple says, you are there after 8:00, and you see Kendall

25  and you start issuing orders, correct?

1    A.  Yes.

2    Q.  Now, from my understanding, you gave verbal orders and

3    then the doctors would write those orders in, correct?

4    A.  Yes.

5    Q.  And from what I understand with Kendall's condition, you

6    ordered all of the orders to be stat, correct?

7    A.  They are always stat.

8    Q.  They are always stat.  If we could pull up page 47 of tab

9    6, and if we could have this part.  Now, let's see.

10       We start out with Dr. Heiple at 8:32 enters the order for

11   ampicillin, correct?

12   A.  Yes.

13   Q.  Now, he also enters an order at 8:32 for a blood gas.

14       Do you see that?

15   A.  Yes.

16   Q.  Now, below that one, I see the word "stat."

17   A.  Yes.

18   Q.  Under the ampicillin, I don't see stat.  Do you?

19   A.  No.

20   Q.  And if we continue down, the next one was the chest x-ray

21   at 8:32, and he ordered that one stat, correct?

22   A.  Yes.

23   Q.  And can we continue on to -- I don't know if it's the next

24   page.  Keep going down.  A CBC and differential at 8:32, he

25   ordered that stat, correct?

1    A.  Yes.

2    Q.  If we go on the next page, 48.  At the top, again, at

3    8:32, blood culture, he ordered that stat, correct?

4    A.  Correct.

5    Q.  Another blood culture at 8:32 by Dr. Heiple stat, and then

6    we go down to the gentamicin, and he ordered that at 8:32, but

7    again, I don't see any stat order on the gentamicin, do you?

8    A.  I don't know if they put a routine stat on the

9    medications.  They are given as soon as we get them.

10   Q.  And that was the whole discussion about this bullet tube

11   coming up and everybody getting the medications as quickly as

12   you can, correct?

13   A.  What was?

14   Q.  I mean, on direct, you talked about the drugs coming up

15   from the pharmacy through a bullet tube?

16   A.  Yes.

17   Q.  Now, if we take a look at page 25 of tab 6, and these are

18   the -- just the whole thing.  These are when the drugs were

19   given, and from what I can see, the ampicillin, it was

20   performed at 9:40.

21       Now, I know that you talked about the ampicillin being a

22   drug that has to be given over a half hour, correct?

23   A.  Yes.

24   Q.  So it may have begun at 9:10 and was finished at 9:40?

25   A.  I don't remember.  There was a note that was other than

1    this that was saying when the ampicillin was being

2    administered.

3    Q.  Right.  We're going to get to that in a minute, but I'm

4    just trying to draw the timeline again for the jury so we all

5    understand.

6        So if ampicillin takes a half hour to finish, if it was

7    performed at 9:40, it would be given at 9:10, correct?

8    A.  I'm sorry.  Say that again.

9    Q.  Sure.  If the ampicillin was finished being done at 9:40

10   and if you say it takes a half hour to give, that means it was

11   started at 9:10 a.m.?

12   A.  If that were the case, yes.

13   Q.  I'll show you my facts in a minute to confirm that because

14   it comes from your note.  And then after that was finished,

15   the gentamicin was given, correct?

16   A.  Correct.

17   Q.  And that wasn't given until 9:50, correct?

18   A.  Where are you seeing?

19   Q.  At the very bottom.

20   A.  Yes.

21   Q.  9:50.  And the reason why, I mean, that was unfortunately

22   one hour and 50 minutes before Kendall's death, correct?

23   A.  Yes.

24   Q.  And as you mentioned, I know that antibiotics take some

25   time to take effect, and probably at that point, giving

1    gentamicin would have had little to no effect on Kendall,

2    correct?

3    A.  At that point?

4    Q.  At 9:50.

5    A.  Antibiotics take hours to take effect.

6    Q.  Now, if we could -- page 8 of tab 6.  Here is where I just

7    want to confirm all these times.  Let's say right in the

8    middle, because this is from your note where you say, the West

9    Penn -- the baby's perfusion was still not that good.  A bolus

10   was given at 7:35.

11            THE COURT:  It says 9:45.  If he's following the

12   pointer, it says 9:45.  I think you said 7.

13   Q.  Follow along with my pointer here.  So the baby's

14   perfusion was still not that good.  You order another bolus to

15   be given at 9:35.  Another one is given at 9:45, just as the

16   West Penn team was arriving.

17       The ampicillin had already infused at that point, so if

18   they come at 9:45, and if you remember the last record, the

19   ampicillin was performed at 9:40, so it had just finished up.

20   Does that make sense?

21   A.  That it just finished up, yes.

22   Q.  And then you continue on.  At that point, you are

23   referring to 9:45, the gentamicin was started?

24   A.  Yes.

25   Q.  So the gentamicin, like I said, it wasn't started until

1    9:45, 9:50 in the morning, correct?

2    A.  Correct.

3    Q.  And the earlier you treat an infection, the better chance

4    you have for treating that infection, correct?

5    A.  Correct.

6    Q.  Now, if we could pull up page 30 of tab 6 and highlight

7    this area.  Now, you've seen this record, of course, and this

8    is the record that was authored by Janet Kincade, the nursing

9    supervisor.

10       And just so I understand, you don't get to be a nursing

11   supervisor unless you work for a long time, right?

12   A.  I have no idea how you get to be a nursing supervisor.

13   Q.  But nursing supervisors are the people that nurses call.

14   It's sort of up the chain of command.  They call their

15   supervisor to come in and help them out, correct?

16   A.  They do the administrative work.

17   Q.  Now, what we're saying is -- you are saying that that

18   record there, Dr. Jones notified at 7:20 is inaccurate?

19   A.  It is inaccurate.

20   Q.  So that is an inaccurate medical record?

21   A.  It is.

22   Q.  If we could go to page 10 of tab 6 -- scratch that.

23       I wanted to go to -- before we get to that tab 15, and tab

24   15, the jury hasn't seen yet, but this is an incident report,

25   and this incident report is what?  After an event like this

1   where something goes wrong in a hospital, somebody reports it

2   to administration because you have to have an after event --

3           MS. KOCZAN:  Objection to the form of the question.

4           THE COURT:  Sustained.

5   Q.  Do you know what an incident report is?

6   A.  It's a report about an incident.

7   Q.  Okay.  Why do you file incident reports?

8   A.  There could be any number of reasons to file them.

9   Q.  Can you tell us some?

10  A.  No.  I mean, I don't know when you would file incident

11  reports.  That's not my scope.

12  Q.  So you've never filed an incident report?

13  A.  No.

14  Q.  Then I won't explain why it happened, but these are notes

15  that again Janet Kincade wrote on the 13th, and if you could

16  just highlight the first two sentences.  Infant born at 5:20.

17  To nursery around 6:30.

18      While in nursery, infant started having respiratory

19  distress.  Residents notified, along with Dr. Jones, regarding

20  infant in nursery with respiratory distress.

21      Then it says at 7:20 oxy hood and lab work with IV

22  placement completed.  So from that record, it looks like

23  before 7:20, you were contacted?

24  A.  That's what it looks like.

25  Q.  Is that accurate?

1    A.  No.

2    Q.  Now, if we could pull up document 10, and we've seen this

3    record, the Apgars and the examination.  I don't want you to

4    pull anything out, but I just want you to agree with me, how

5    do we know that everything on this record is accurate?

6    A.  I don't know.

7    Q.  You'll agree with me there can be inaccuracies in medical

8    records?

9    A.  There can be.

10    Q.  And you'll agree with me that sometimes people's

11    descriptions of things in medical records can likewise be

12    inaccurate?

13    A.  Descriptions of -- as far as like descriptions of an exam

14    or we're talking about writing down times that things happen?

15    Q.  Right.  An examination of kids, the Apgars, there can be

16    inaccuracies, couldn't there?

17    A.  It depends on who is evaluating the patient.

18    Q.  Depending upon what nurse supervisor Janet Kincade did and

19    what she wrote, that's the reason why you are here, right?

20    A.  Because she wrote down that I was notified at 7:20.

21    Q.  Right.

22    A.  Yes.

23    Q.  Now, you mentioned that whenever you came into the -- this

24    was your word -- that it was more a crisis situation in the

25    nursery whenever you got there.

1    A.   It was a situation that required a lot of attention, yes.

2    Q.   Let me ask you this:  If you had been there to evaluate

3    Kendall at, let's say, 6:30, you would have no idea what her

4    situation was, right?  There's no way for us to tell what her

5    situation was?

6    A.   I don't know what she looked like at 6:30.

7    Q.   If you were present at birth and noticed that there was

8    some respiratory distress and if you had noticed that Kendall

9    needed to be watched a little bit more closely, and I think

10   your answer to Mr. Colville was I would take a look at the

11   baby and wait.  If you did that, and you noticed that she had

12   some respiratory distress, you would continue to follow her,

13   correct?

14   A.   Yes.

15   Q.   And if you continued to follow her, would there be a

16   chance that you would have picked up on the respiratory

17   distress earlier than when you got there at 8:20 in the

18   morning?

19   A.   It depends on when she presents with the respiratory

20   distress.

21   Q.   Is there a chance that if you were there earlier, that you

22   would have had a chance to evaluate Kendall to determine if

23   she had respiratory distress?

24   A.   I have no idea.  I don't know what she looked like.

25   Q.   Right.  The point is though that it wasn't until you came

1    in at 8:20 that Kendall was diagnosed with respiratory

2    distress, correct?

3    A.  No.  The nurse found she had some respiratory distress

4    shortly after she came to the nursery.

5    Q.  But you were the first doctor on board at 8:20?

6    A.  Not at 8:20.

7    Q.  Well, depends on the records.  Depends on who you believe,

8    because I don't know if all of your records are accurate at

9    this point, but the point is that if you were there earlier

10   and you saw that Kendall -- let's take even an hour earlier.

11       If you were there at 7:20 and you had noticed the

12   grunting, flaring and retracting, 81 percent, would you have

13   started her on oxygen and done a neonatal sepsis workup?

14   A.  I would have done what Nurse McCrory did.  She put her on

15   oxygen and we probably -- it's hard to say because I don't

16   know what she looked like.

17       When I saw her, she was working a little bit, and like I

18   said, her oxygen requirement was high.  This happens -- babies

19   do this a lot.  They'll have some respiratory distress.

20   They'll have some oxygen requirement and sometimes it's just

21   transitioning and sometimes it's worse.

22       Generally, there's a rule of thumb.  If baby is still

23   requiring supplemental oxygen two hours after delivery, then

24   we start to think is this just transitioning or is this

25   something else.

1    Q.   This wasn't transitioning?

2    A.   No, this wasn't transitioning.

3    Q.   Right.  But do you believe that, and I know that, like I

4    said, the antibiotics didn't get to her, at least the

5    gentamicin, which was sensitive to E. coli, didn't get to her

6    until 9:50 in the morning.

7         Do you believe if you had been there earlier and if you

8    had given her antibiotics earlier, that there was at least a

9    chance?

10   A.   I don't think it would have made a difference in her case.

11              MR. PRICE:   Okay.  That's all the questions I have.

12              THE COURT:   Ms. Koczan, any follow-up?

13              MS. KOCZAN:   Just a couple.

14                         REDIRECT EXAMINATION

15   BY MS. KOCZAN:

16   Q.   Doctor, you were asked some hypothetical -- not

17   hypothetical, but questions about what if at 5:20, she was

18   grunting, flaring and retracting, et cetera.

19        Is there any evidence in this chart that she was grunting,

20   flaring and retracting at 5:20?

21   A.   No.

22   Q.   Is there any evidence in this chart that there was

23   anything going on before 7:25 a.m.?

24   A.   No.

25   Q.   And even assuming, and I just want to make sure I

1  understood your last response, even assuming at 7:25, somehow

2  antibiotics got started, would that have made any difference

3  here?

4  A.  I don't think it would have.

5  Q.  Why is that?

6  A.  She had an overwhelming sepsis that had already started

7  and was already taking over.  She had used up all of her white

8  blood cells.  They were gone.  They were fighting infection,

9  and at this point, she had nothing left to fight the infection

10  with.

11        MS. KOCZAN:  Thank you.  That's all.

12        THE COURT:  Mr. Colville, anything else of this

13  witness?

14        MR. COLVILLE:  No questions.

15        THE COURT:  Doctor, I just have a couple of

16  questions.

17        Looking at one of these Heritage Valley Beaver

18  records, I think it was one of the last ones that Mr. Price

19  put up.  It's marked at the bottom Exhibit E.  At the top of

20  the page, it says the attending physician is James P.

21  Scibilia.  You previously advised us that he's one of your

22  colleagues, right?

23        THE WITNESS:  Yes.

24        THE COURT:  So to that end, if by chance, the nurse

25  called thinking James Scibilia is involved and he's really

1    not, you are the one on call, how does the message get to you?

2         THE WITNESS:  That doesn't happen like that.  The

3    reason that we have the different attendings, there's several

4    people in our group, and every week, they list a different

5    physician as the attending, but there's a specific call

6    schedule, and whoever is on call, they will call.

7         They don't look at -- Dr. Scibilia is listed as the

8    attending on a lot of babies.  They don't look at who the

9    attending is.  They see it's Heritage Valley Peeds.  They

10   don't say this is Dr. Scibilia's baby.  They say this is HVP's

11   baby, and they call whoever is on call for us.

12        THE COURT:  How does Heritage Valley Peeds alert the

13   nurses as to who is on call?

14        THE WITNESS:  I believe they have a copy of our

15   schedule and the hospital has a copy of the schedule.

16        THE COURT:  So it would be up to the nurses to have a

17   copy of that at their station, right?

18        THE WITNESS:  Either at their station or the hospital

19   operator always knows who is on call.

20        THE COURT:  Now, this call schedule, does it include

21   the office number or just the cell numbers?

22        THE WITNESS:  They have our cell numbers if they need

23   them for an emergency.  Otherwise, they call -- they either

24   call the operator and have the operator call our Cortext line

25   or they have our emergency line.  The emergency line rings to

210

1        the Cortext operator, our paging company.

2                    THE COURT:  Do you know from your experience in this

3        hospital, do the operators keep records of who they call when?

4                    THE WITNESS:  I don't know if they keep records or

5        not.

6                    THE COURT:  As far as the records that have been

7        produced on this issue, those are your records, right, your

8        pager records and your cell records?

9                    THE WITNESS:  They were our practice Cortext records.

10                   THE COURT:  So it's your practice Cortext records

11       which I was calling pager records, right?

12                   THE WITNESS:  Yes.

13                   THE COURT:  And then they are your cell records?

14                   THE WITNESS:  That was my cell phone, correct.

15                   THE COURT:  And were you asked to check in your

16       office to see if there was any record vis-a-vis calls as it

17       relates to Kendall?

18                   THE WITNESS:  Our office?

19                   THE COURT:  Right.

20                   THE WITNESS:  Our office wasn't open when she was --

21                   THE COURT:  I understand that, but sometimes

22       pediatricians have a call in number.

23                   THE WITNESS:  Yeah, our emergency line, but it would

24       have gone straight to our paging system.

25                   THE COURT:  So the emergency line goes straight to

1    the paging system?

2            THE WITNESS:  Yes.

3            THE COURT:  Now, another question I have is -- I

4    think I'll save that for somebody else.

5            Another question I have is, as you know, some

6    policies of the hospital have been entered into the record,

7    and to that end, some of these policies reflect your

8    signature.  One being administration of oxygen for newborns

9    and the other one being -- there's a second one, I think that

10   also references you, but I don't think I have it, but

11   generally, how do these policies develop?

12           THE WITNESS:  The director of the department and the

13   nursing supervisors put them together is my understanding.

14   I'm not involved in putting policies together.

15           THE COURT:  You have not been involved yourself?

16           THE WITNESS:  No.

17           THE COURT:  Even though one of these policies

18   references you as Hilary Jones, M.D., Chairman Pediatric

19   Department Beaver?

20           THE WITNESS:  Because at the time I was the chairman

21   of the department, and our duties with that are to attend the

22   pediatric department meeting and read off the minutes and

23   essentially run the meeting, and then we have to attend the

24   med exec meetings and just be present, and we have to sign

25   whatever they give us to sign as the chairman of the

1    department.

2            THE COURT:  At the time I think of this particular

3    policy I'm looking at, where you signed, Vida Kaniecki, M.D.

4    was the chairman of the pediatric department at Sewickley.

5    You were at Beaver, and James Scibilia was medical director

6    nursery department Beaver, right?

7            THE WITNESS:  Correct.  He's always the department

8    director.

9            THE COURT:  Would he be the most involved vis-a-vis

10   these policies?

11           THE WITNESS:  Yes.

12           THE COURT:  These policies are updated from time to

13   time; is that right?

14           THE WITNESS:  I believe so.

15           THE COURT:  Then they are circulated around.  Is that

16   what happens?

17           THE WITNESS:  As far as --

18           THE COURT:  Because there are a number of signatures

19   with different dates.

20           THE WITNESS:  Yeah, because the different chairs and

21   different people have to sign them.

22           THE COURT:  Okay.  So the other policy I was looking

23   for is 2.21, notification of pediatrician/nursery for expected

24   delivery of potentially high risk infant.  This one also

25   contains your signature on 11-20-14.  Do you recall that?

1              THE WITNESS:  I don't recall.  I mean --

2              THE COURT:  Be that as it may, it would be the same

3    process?

4              THE WITNESS:  Yes.

5              THE COURT:  So it would be largely Dr. Scibilia?

6              THE WITNESS:  Yes.

7              THE COURT:  And whoever this head nurse is?

8              THE WITNESS:  Yes.

9              THE COURT:  This policy notification of

10   pediatrician/nursery for expected delivery of potentially high

11   risk infant was signed off by Dr. Dumpe on 11-18-14, by you on

12   11-20-14, by Dr. Scibilia on 11-21-14, but there's a prior

13   policy that had been in effect in August of 2009, it would

14   appear.  Do you recall that?

15             THE WITNESS:  I would have to look at it.  I don't

16   know.

17             THE COURT:  Now, when these policies are handed down,

18   is there any kind of an in-service or something that alerts

19   practitioners to the fact that the policy is there and/or it's

20   been changed?

21             THE WITNESS:  If it's been changed.

22             THE COURT:  Who runs those?

23             THE WITNESS:  Runs the in-services?

24             THE COURT:  Right.

25             THE WITNESS:  They would be discussed at our

1    pediatric department meeting.

2            THE COURT:  One other question.  The residents, do

3    they sleep overnight, or do they live in the neighborhood?

4            THE WITNESS:  They stay at the hospital.

5            THE COURT:  They stay at the hospital.  They have a

6    call room?

7            THE WITNESS:  Yes.

8            THE COURT:  So Dr. Heiple would have been there

9    overnight?

10           THE WITNESS:  I don't know who was on call overnight.

11   He was on for pediatrics that day.

12           THE COURT:  He had been at the lecture.  That's what

13   he said.

14           THE WITNESS:  Yes.  They start very early.

15           THE COURT:  Now, does the court's questioning cause

16   anybody to have some additional questions?

17           MR. PRICE:  Not upon your questioning.  However, I'd

18   like to follow up on Ms. Koczan's.

19           THE COURT:  Okay.  Mr. Price, what else?

20                        RECROSS-EXAMINATION

21   BY MR. PRICE:

22   Q.  If Kendall's death was solely caused by E. coli, then why

23   do you care whether or not she had massive aspiration of

24   meconium?

25   A.  Why do I care?

1    Q.  The whole defense, why did Dr. Dumpe go down to see

2    Dr. Min except for to say this wasn't massive aspiration of

3    meconium?

4    A.  I didn't go down to see Dr. Min.

5    Q.  Pardon me?

6    A.  I don't know why you are asking why do I care.

7    Q.  Your defense, part of it, if you were called at 7:20, the

8    defense was this wasn't massive aspiration of meconium.

9        My point is, if this death was solely from E. coli,

10   whether or not she had massive aspiration of meconium, who

11   cares?  It's all E. coli.

12   A.  I'm not saying who cares.  I'm saying what killed Kendall

13   was her overwhelming E. coli sepsis.

14   Q.  That's your opinion, and my point is that also on this

15   autopsy report is massive aspiration of meconium, and the

16   defense is got to get rid of that.  My point is why?

17            MS. KOCZAN:  Objection, Your Honor.  The defense --

18            THE COURT:  Sustained.

19            MS. KOCZAN:  That's objectionable.

20            THE COURT:  You could rephrase that, Mr. Price, if

21   you want to attempt to do that.

22            MR. PRICE:  I'll try.

23   Q.  I guess basically, if you are basically saying this is

24   just a case of E. coli, whether she had little massive

25   aspiration, it wouldn't matter, right?

1    A.   If she had a little bit of meconium, if she had a lot of

2    meconium, I don't think it would have mattered.  She had

3    overwhelming E. coli sepsis.  She had pneumonia, and I believe

4    that she was going into DIC towards the end of the

5    resuscitation.

6    Q.   I know you had it very tough once you started working on

7    her, but I just don't understand why we're fighting over

8    massive aspiration of meconium if it doesn't matter?

9              MS. KOCZAN:  Objection, Your Honor.

10             MR. COLVILLE:  Objection, Your Honor.

11             THE COURT:  We'll save that for argument.

12             Ms. Koczan, anything further?

13             MS. KOCZAN:  Just one question.

14                          REDIRECT EXAMINATION

15   BY MS. KOCZAN:

16   Q.   Doctor, you were asked some questions by the court about

17   the policy 2.21, and if we could put up 434.  I think that's

18   the last page of that policy.  Up at the top there, in the --

19   where it says origination date reviewed and then revised.

20        According to this record, was the last time this policy

21   was revised was August of '09?

22   A.   Correct.

23   Q.   One other thing I wanted to ask you about this policy.  So

24   this signing off of it wasn't revising anything?

25   A.   No.

1    Q.  The last time it had been revised was August of '09.  One

2    other thing I want to show you about that and ask you about

3    that.  433, which is the page before that.

4        Underneath where it says all this, procedures, and there's

5    references I just want to ask you, could you highlight the

6    references?

7        Is this an indication that this policy was based upon

8    these various things, the ACOG practice bulletin, the American

9    Academy of Pediatric Guidelines, et cetera?

10   A.  Yes.

11           MS. KOCZAN:  Thank you.  That's all.

12           THE COURT:  Anything else, Mr. Colville?

13           MR. COLVILLE:  No.

14           THE COURT:  Mr. Price?

15           MR. PRICE:  No.

16           THE COURT:  Dr. Jones, at last you may step down, and

17   I don't know that we have another witness lined up for now; is

18   that correct?

19           MS. KOCZAN:  That is correct, Your Honor.

20           THE COURT:  And it also is 4:00.  So ladies and

21   gentlemen of the jury, as we've done repeatedly, we're going

22   to have you put your binders and pads there on your chair.

23   Instead of Mr. Galovich, you are going to have Mr. Kravetz who

24   will take custody of those and lock them up in our exhibit

25   room over the Labor Day holiday.

1        As I've told you over and over again, don't discuss

2   this case with anyone, including fellow jurors, other people

3   involved in the trial, members of your family at the cookouts

4   that you'll all be attending this weekend or anyone else.

5        Again, do not speak to the parties coming or going.

6   Do not speak to any of these other folks that have been coming

7   in watching the trial as you come or go.  You have

8   Mr. Galovich's cell phone number just in case you need it over

9   the weekend and he'll be happy to return anybody's call if by

10  chance you get sick or there's some other issue he needs to

11  know about.

12       Once again, I don't know if there is or isn't any

13  news coverage, and to that end, you should not watch or listen

14  to any news coverage that might pertain to this case.

15  Likewise, you should not do any research over this three-day

16  break, and that would include even informal research, talking

17  to a family member or friend who might be a nurse saying what

18  do you think about this, you should not do that, because the

19  only information you are to consider is the evidence you see

20  and hear in this courtroom, and then ultimately, you'll be

21  listening to the closing arguments and my instructions.

22       Continue to keep open minds.  You have been very

23  diligent this week.  You've taken in a lot of information.

24  I've seen a number of you taking copious notes and paying very

25  deep attention.  The court appreciates it, as do the litigants

1    and the parties.

2            So with that, Mr. Kravetz is going to escort you out.

3    I don't know what all your personal plans are, but if one or

4    more of you have plans that you are going to be out of town

5    and you are concerned about getting here on Tuesday morning,

6    if you would let Mr. Kravetz know that so that in case

7    somebody is coming in late, say, Monday night and they want to

8    start at 9:30 or 10:00 rather than 9:00, he's going to ask you

9    that when you go back in your room.

10           Have a good weekend and safe travels.  Enjoy the

11   holiday.

12       (Jury excused.)

13           THE COURT:  Okay.  So what will the lineup be on

14   Tuesday?

15           MS. KOCZAN:  I didn't know if Mr. Colville wanted to

16   take this.

17           THE COURT:  I know what he wants to do.  I've already

18   told these jurors that, in effect, out of courtesy,

19   Mr. Colville is letting you go ahead, and I just think, from

20   the standpoint of presentation, whatever you are going to do

21   vis-a-vis these lay witnesses, we should get done, and then I

22   know he's got the doctor coming in to testify on behalf of

23   Dr. Dumpe, and if he needs to call back Dr. Dumpe, I think

24   that works better as a block rather than in and out.

25           MR. COLVILLE:  Actually, what I was going to tell you

1    is we've decided not to do it that way.  I think Paula is

2    going to call Dr. Dumpe.

3              THE COURT:  Okay.  However you want to call it.

4              MR. COLVILLE:  Dr. Wiesenfeld will be here in the

5    morning.

6              THE COURT:  So what time do you expect him here?

7              MR. COLVILLE:  I told him to be here at 8:30, but if

8    Ms. Koczan wants to continue on, he can follow or --

9              THE COURT:  So he's made himself available all day?

10   Magee is letting him come down all day?  Take him away from

11   his gynecological research in herpes?  Go ahead.

12             MR. COLVILLE:  He's ready to go first thing in the

13   morning.

14             THE COURT:  Okay.  That would probably be preferable

15   to him so he could go back to the UPMC Mercy or Magee, right?

16             MR. COLVILLE:  Sure.

17             THE COURT:  So he should be ready to go right out of

18   box at 9:00.  How long do you anticipate he's going to be?

19             MR. COLVILLE:  No more than an hour.

20             THE COURT:  On your end.

21             MR. COLVILLE:  I'm not even sure an hour on my end.

22             THE COURT:  Then, of course, he has to be crossed.

23             Then, Ms. Koczan, who all do you still have?

24             MS. KOCZAN:  I have Barb Hackney.  I'm going to call

25   Janet Kincade.

1             THE COURT:  You got her?

2             MS. KOCZAN:  I got her.  So she is coming in.

3             THE COURT:  Live from Arizona.  She got a free trip

4    home.

5             MS. KOCZAN:  I don't know that she necessarily views

6    it that way, but she is coming.

7             THE COURT:  Well, she got a free trip home to

8    Pittsburgh courtesy of Heritage Valley.

9             MS. KOCZAN:  I have Barb, Janet and I may call

10   Dr. Dumpe and then I have my expert, Dr. Boyd.

11            THE COURT:  Right.  Mr. Kravetz, have you polled

12   everybody?

13            THE CLERK:  They are all good at 9:00.

14            THE COURT:  Tell them that's when we will start,

15   because the first doctor can be here at 9:00 ready to go.

16   That's going to be a pretty full Tuesday, right?  Then what,

17   if anything, do we have on Wednesday?

18            MS. KOCZAN:  Wednesday, I have my two final experts,

19   Dr. Coffin and Dr. Ringer, and I think I'm probably going to

20   try to have them both here at the same time, so as soon as we

21   are done with one, the other one will go on.

22            THE COURT:  Once again, the court has a meeting over

23   the lunch hour, so I'm going to be out of commission between

24   noon and 1:15, and as you know, we have to adjourn on

25   Wednesday at about 2:45 for Magistrate Judge Dodge's swearing

1    in ceremony.

2              MR. COLVILLE:  Is that Tuesday or Wednesday?

3              THE COURT:  That's Wednesday, so you were trying to

4    pack in both of your experts.  I'm not sure that's going to

5    happen.  Depends.  We're going to start at 9:00 with them and

6    then we'll go to 12:00, we'll break, 1:15 and we'll go to

7    2:45.  That's Wednesday.  And hopefully they both get done.

8    Otherwise, somebody is going to be staying overnight.

9              And then on Thursday who, if anybody else, do we

10   have?

11             MS. KOCZAN:  We don't, Your Honor, not from our

12   perspective.

13             THE COURT:  How about you, Mr. Colville?

14             MR. COLVILLE:  No.

15             THE COURT:  At this point, Mr. Price, do you

16   anticipate any rebuttal?

17             MR. PRICE:  Not at this point.

18             THE COURT:  At some point, and it's probably going to

19   be Thursday, we're going to need the charge conference.  So

20   what we might do on Thursday is do the charge conference first

21   thing in the morning and tell the jurors they can come in a

22   little bit later.  So depending on how that all goes, we might

23   be able to have closings on Thursday afternoon.

24             Now, I have an 8:30 criminal matter on Wednesday that

25   I'm going to have to attend to before I start with you all at

1    9:00 on Wednesday, and vis-a-vis the charge, you have what I

2    call a discussion draft.  You could make things move a lot

3    quicker if you start looking at that and e-mail back to Nicole

4    comments so we can start working on that.

5         Now, I guess I'm jumping the gun here.  Are we going

6    to have another Rule 50 motion?

7         MS. KOCZAN:  Yes, Your Honor.  Actually probably two

8    of them.

9         THE COURT:  So one will be vis-a-vis Dr. Jones again?

10        MS. KOCZAN:  Correct.

11        THE COURT:  And the other one is going to be on

12   corporate negligence?

13        MS. KOCZAN:  Correct.

14        THE COURT:  So we're going to have to make rulings.

15   I guess that might be Thursday morning and the charge

16   conference might be Thursday afternoon, so you might be making

17   closings Friday.

18        If you are going to bring these motions again

19   vis-a-vis Jones and if you are going to bring me a new one on

20   corporate negligence, the sooner I get it in writing the

21   better so we can work on it on our end.

22        MS. KOCZAN:  I think the corporate negligence, I

23   wanted to wait until plaintiff rested.  They've done that

24   today so I'll have that to you -- I'll try to see if I can

25   have that filed tonight, or Mike is working on that.

1          THE COURT:  I figured that.

2          MS. KOCZAN:  I'm here.  He's there.

3          THE COURT:  Mr. Hamilton, the trustee, is doing all

4    the research and writing.  As soon as you get that filed, that

5    will be helpful.  Do you anticipate a written response to the

6    corporate negligence motion or not?  Depends on what it is.

7    The corporate negligence claim is only against the hospital.

8    It's not against the pediatric group, although the pediatric

9    group is named.

10         MS. KOCZAN:  It's just against the hospital.

11         THE COURT:  I'm glad now we know what to look forward

12   to.

13         Mr. Price?

14         MR. PRICE:  I do not understand why Dr. Dumpe is

15   going to be called again as a witness.

16         THE COURT:  Well, I guess we can have a proffer.

17         MS. KOCZAN:  To talk about -- there was testimony

18   from Dr. Karotkin yesterday who talked about these policies

19   and how they are developed and whether they meet the

20   standards, and Dr. Dumpe was on the committee for this.

21         THE COURT:  He previously testified, how did he say

22   it, something about one of the nurses wrote them and they came

23   by and he looked at them and signed them.  It wasn't too in

24   depth, let's put it that way.

25         So given the court's inquiry, I'm sure you all want

1    to bolster that.  Go ahead.

2              MR. PRICE:  Why would he be allowed to be called back

3    when he already answered the questions about how the policies

4    were?  Just to rebut what my experts say?

5              MS. KOCZAN:  Your Honor, he's entitled to do that.

6              THE COURT:  Number one, he's entitled.

7              Number two, he's being called, if you will, in a

8    different guise.  He's now being called vis-a-vis the

9    corporate negligence claim against the hospital is the way I

10   see it.

11             MS. KOCZAN:  That is correct.

12             MR. PRICE:  Well --

13             MR. COLVILLE:  Your Honor, I also would like to clear

14   up the issue regarding the deposition transcript that you

15   mentioned last night, and that was what I intended to address

16   here this afternoon, and we pulled back once Paula indicated

17   she was going to move forward.

18             MR. PRICE:  We're going to have another whole

19   testimony from Dr. Dumpe.  It's got to be limited, because all

20   of a sudden, the door's open, and the problem is the jury

21   hears -- if the jury wants to hear this issue about the

22   policies to rebut Dr. Karotkin, that's fine, but this case

23   could go on forever --

24             THE COURT:  It's not going to go on forever.  You

25   should see my schedule the week of the 9th.  I must have 20

1    criminals listed.

2              MR. PRICE:  The other issue I have is I know that I

3    filed a motion against cumulative expert testimony on two of

4    the experts, but at this point now, we're getting worse

5    because Dr. Jones is a pediatrician who has testified as an

6    expert and --

7              THE COURT:  No.  She testified as a treating doctor,

8    and all of you elicited opinions.  She is allowed to give her

9    opinions vis-a-vis the treatment.

10             MR. PRICE:  I don't have a problem with that.

11             THE COURT:  She did that and then some.

12             MR. PRICE:  And I didn't say that I had a problem

13   with that.  My problem is how many times are we going to learn

14   how to score an Apgar.

15             THE COURT:  Hopefully, we're not going to learn that

16   again.

17             MR. PRICE:  How many times are we going to learn how

18   to score the assessment at 7:20?

19             THE COURT:  Once again, I think defense counsel would

20   be shrewd to take a real hard look at what they need from

21   these potential expert witnesses.

22             MR. PRICE:  I disagree with that because I think this

23   case is going to be boredom into submission for the jury.

24             THE COURT:  I don't know.  From all accounts, and I

25   watch them very carefully, I think they are very engaged with

1    this.

2          MR. PRICE:  Because I cannot envision, as

3    Mr. Colville said --

4          THE COURT:  They will also be rested up, fueled up.

5    They will have had cookouts galore this weekend.  They'll be

6    ready to go on Tuesday.

7          MR. PRICE:  If we have on Monday Dr. Wiesenfeld.

8          MS. KOCZAN:  We won't.  Monday is Labor Day.

9          MR. PRICE:  Whatever.

10         THE COURT:  Tuesday we're getting him, 9:00 in the

11    morning.

12         MR. PRICE:  Tuesday, Dr. Wiesenfeld.  He's not going

13    to be all morning unless Paula goes off for two hours which

14    she can't because it's an obstetric case, nevertheless.

15         Barb Hackney, she was there for half an hour.  Are we

16    going to really get into everything she's ever done as a nurse

17    like we did -- we spent an hour with Judith Ash on irrelevant

18    stuff which I told the court was going to happen and it

19    happened.

20         We talked about fetal strips and her heart rate all

21    afternoon when that's not an issue in this case and --

22         THE COURT:  As I heard the testimony, I think at

23    least one of your experts indicated that he -- they were all

24    hes -- might be concerned and we talked about category two and

25    possibly two plus and three vis-a-vis those strips, so I

1       didn't think what she had to say was that troublesome.

2           MR. PRICE:  My trouble is going to be when it comes

3       to Wednesday, whenever we have another pediatrician and

4       another pediatric infectious disease doctor.

5           THE COURT:  You had a pediatric infectious disease

6       doctor, and so the defendants are then entitled to rebut that.

7           MR. PRICE:  I understand, but now they have another

8       pediatrician.  We've heard everything about neutrophils.

9       We've heard --

10          THE COURT:  Right.  I'm cautioning everybody, as I've

11      watched these jurors, they are taking notes, they are paying

12      attention.  Per Mr. Galovich, they are very engaged.  They are

13      copacetic.  They are getting along well.  I think they will be

14      refreshed and renewed and ready to go on Tuesday.

15          You just heard from Mr. Kravetz, rather than start a

16      little bit later given the holiday, they want to be back here

17      at 9:00 in the morning.

18          MR. PRICE:  From my perspective, it's to get it over

19      and done with.

20          THE COURT:  Maybe, maybe not.  I go back to my CMU

21      case.  That went almost a month.  Those jurors on December 26

22      wanted to come back at 8:30 in the morning and they brought

23      their own doughnuts and they ended up providing a verdict of

24      1.2 billion, the biggest verdict this area has ever seen.

25          MR. PRICE:  To move things along, Your Honor, I have

1    read all -- your charge.  I'm fine with everything.  I have no

2    problem.

3         THE COURT:  It may have to change based on rulings

4    related to, query, is Dr. Jones going to be still in the case

5    or not, is there going to be a corporate liability claim here

6    or not.  That's one issue.

7         MR. PRICE:  My point is from everything I've read,

8    I'm fine with it.  If you have to take things out after your

9    rulings, I don't have a problem.

10        THE COURT:  I appreciate that.  That makes my job a

11   little bit easier.  Ms. Koczan and Mr. Hamilton, who does all

12   the research, they may have a different view.  We'll do

13   everything we can to expedite things.

14        As I said, I rearranged this schedule for two solid

15   weeks, and I have criminals literally chomping at the bit to

16   get in here for changes of plea, suppression hearings,

17   supervised release hearings and sentencings.  You've heard me

18   say before, and your clients should know, too, we have the

19   biggest number of criminal defendants this court has ever had.

20        I've got to do those, so that's why we have to get

21   this done.  I was supposed to have had another trial right

22   after you, Mr. Wiley, but Mr. Wiley decided -- he thought he

23   was going to plead out, but then when the government made the

24   offer, it was a little too much for Mr. Wiley.  So now he says

25   he wants a trial again.  Mr. Wiley is a little wily.  He's

230

1    reset for trial in December.

2           Anything else for the good of the order?  In terms of

3    all of your materials and the like, I don't know if you want

4    to leave them here over the weekend.  We will be locking up

5    here.  There is a cleaning team that will come through.

6    Sometimes on these long weekends, they come Friday night and

7    they are not back in here again until Tuesday night, so I

8    don't know what Goodwill, who is our clean team, are going to

9    be doing here or not.

10          There are a lot of medical records here and the like,

11   so I wouldn't just leave them every which way, given the fact

12   that there will be a clean team here.  They do not go into the

13   jury room.

14          MS. KOCZAN:  Can we leave things here?

15          THE COURT:  You can, but as I said, I would just make

16   sure everything is closed up and the like.  Once you are all

17   gone, Mr. Kravetz and Ms. Starr will lock everything up.

18   We'll see you on Tuesday.  Everybody have a good holiday

19   weekend.

20          (At 4:21 p.m., the proceedings were adjourned.)

21

22

23

24

25

231

1                    C E R T I F I C A T E

2              I, BARBARA METZ LEO, RMR, CRR, certify that the
  foregoing is a correct transcript from the record of
3  proceedings in the above-entitled case.

4

5    _\s\ Barbara Metz Leo__              09/25/2019
  BARBARA METZ LEO, RMR, CRR          Date of Certification
6  Official Court Reporter

7                        I N D E X

8  WITNESSES                                              PAGE

9  JUDITH ASH

10      Direct Examination By Ms. Koczan                   22
        Cross-Examination By Mr. Colville                  50
11      Cross-Examination By Mr. Price                     53
        Redirect Examination By Ms. Koczan       62, 68,  72
12      Recross-Examination By Mr. Colville          63,  73
        Recross-Examination By Mr. Price               63

13
  HILARY JONES, M.D.
14
        Direct Examination By Ms. Koczan                   75
15      Cross-Examination By Mr. Colville                 174
        Cross-Examination By Mr. Price                    185
16      Redirect Examination By Ms. Koczan        207,    216
        Recross-Examination By Mr. Price                  214
17

18

19

20

21

22

23

24

25