```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2

        CARISSA PERONIS, et al.,
 3                      Plaintiffs
          vs.
 4                                         Civil Action No.
        UNITED STATES OF AMERICA, et      16-1389
 5      al.,
                        Defendants.
 6
                                 -  -  -
 7

           Transcript from proceedings on September 3, 2019, United
 8      States District Court, Pittsburgh, PA,
        before Judge Nora Barry Fischer.
 9

10      APPEARANCES:

11        For the Plaintiffs:    Harry S. Cohen & Associates, P.C.
                                 Douglas L. Price, Esquire
12                               Two Chatham Center
                                 Suite 985
13                               Pittsburgh, Pennsylvania 15219

14
          For the Defendant     U.S. Attorney's Office
15        USA:                   Michael Colville, Esquire
                                 Philip P. O'Connor, Jr., Esquire
16                               U.S. Courthouse
                                 700 Grant Street
17                               Pittsburgh, Pennsylvania 15219

18        For the Hospital      Weber Gallagher Simpson Stapleton
          Defendants and        Fires & Newby
19        Dr. Jones             Paula A. Koczan, Esquire
                                 603 Stanwix Street
20                               Suite 1450
                                 Pittsburgh, Pennsylvania 15222
21
          Court Reporter:       Barbara Metz Leo, RMR, CRR
22                               700 Grant Street
                                 Suite 6260
23                               Pittsburgh, Pennsylvania 15219

24
           Proceedings recorded by mechanical stenography;
25      transcript produced by computer-aided transcription.
```

1           THE COURT:  This is the time and place for

2    proceedings in regard to Carissa Peronis, et al., versus

3    United States of America, et al., civil action 2016-1389.

4           Mr. Price has advised my deputy that, number one,

5    he's requesting particulars about the offers of proof as to

6    both Nurse Kincade and Dr. Dumpe to the extent that the

7    hospital defendants intend to call Dr. Dumpe back to the

8    stand.

9           In addition, Mr. Price would like to bring a motion

10   in limine vis-a-vis Dr. Wiesenfeld.  Now, as everyone will

11   recall, motions in limine were due a long time ago, number

12   one.  Number two, the court had oral argument and the court

13   entered orders vis-a-vis all of the outstanding motions in

14   limine.

15          In addition, the record will reflect that

16   Dr. Wiesenfeld's report dated March 26, 2018 was filed on the

17   docket on September 18, 2018.

18          In addition, his supplement dated September 3, 2018

19   was likewise filed on the docket, docket No. 122-1 on

20   September 18, 2018.

21          In addition, at the request of plaintiff's counsel,

22   and likewise overdue, Mr. Colville provided Dr. Wiesenfeld's

23   schedule of rates.  His curriculum vitae has been previously

24   provided.

25          In addition, Mr. Colville supplied a listing of cases

1    between 2015 and 2019 wherein Dr. Wiesenfeld was either

2    deposed or gave testimony.

3        Moreover, Dr. Wiesenfeld is a local physician

4    currently on staff at Magee-Womens Hospital, part of the

5    University of Pittsburgh Medical Center, and his further bio

6    is easily obtained by looking at that site.

7        So first, let's deal with the offers of proof as to

8    Kincade and Dr. Dumpe.  Ms. Koczan?

9        MS. KOCZAN:  Yes, Your Honor.  As to Janet Kincade,

10   she was the nursing supervisor who was on duty on the morning

11   of October 13 of 2014.  It is her note that we have been

12   looking at for the past week, wherein she documented that

13   Dr. Jones was called at 7:20 a.m.  She is going to testify as

14   to her attendance at these events and the reason why she made

15   the note, the information that was provided to her, et cetera.

16       THE COURT:  Mr. Price, what is the objection?  What's

17   your concern?

18       MR. PRICE:  Your Honor, I apologize for not bringing

19   this up in more detail on Friday, but I guess my concern is

20   that since Ms. Koczan said this is going to be the basis of a

21   Rule 50 motion, I would like to know exactly what Nurse

22   Kincade is going to say about these documents in question with

23   regard to her notifying Dr. Jones.  Is she going to say I was

24   mistaken?  Incorrect?  I don't know.

25       MS. KOCZAN:  Your Honor, she is going to say she did

1    not notify Dr. Jones and she will explain why that

2    documentation is there, what information she was provided,

3    what assumptions she made.

4            MR. PRICE:  Am I allowed to find out what that is,

5    what assumptions these are, where she obtained this

6    information?

7            THE COURT:  Go ahead.

8            MS. KOCZAN:  Certainly.  What she is going to testify

9    to is that she was there that morning when she got there and

10   observed the situation.  She asked if a doctor had been

11   called.  She was told that one had.  She then asked who was on

12   duty, who was the pediatrician on call.  She was told

13   Dr. Jones.  She made an assumption, but she did not call

14   Dr. Jones, nor was she advised that anyone had called

15   Dr. Jones.

16           THE COURT:  I think that's pretty detailed and that

17   satisfies the inquiry vis-à-vis Nurse Kincade.  Now, vis-à-vis

18   Dr. Dumpe, what is your intent in calling him back,

19   Ms. Koczan?

20           MS. KOCZAN:  Yes, sir.  I believe it was

21   Dr. Karotkin's testimony last week, there was a discussion

22   about the Heritage Valley policies and procedures, and there

23   was testimony to the effect that, in his institution, the

24   policies and procedures were based upon various guidelines

25   from, I believe, the American Academy of Pediatrics, ACOG, et

1    cetera, and that his institution's policies and procedures

2    differed from Heritage Valley's and the implication that

3    somehow Heritage Valley's policies were deficient or didn't

4    comply.

5         And he also testified that he didn't agree with

6    Heritage Valley's, although I do not believe that he

7    necessarily deviated from.  Regardless, Dr. Dumpe is going to

8    talk about the basis for the Heritage Valley procedures, where

9    they came from and what they were based upon, which includes

10   those various materials.  That is the basis of the testimony

11   that I intend to elicit from him today.

12        THE COURT:  Mr. Price?

13        MR. PRICE:  Your Honor, no problem with that as long

14   as it's limited to the policies.

15        In addition, I did speak with Mr. Colville, and he

16   said that whenever he cross-examines or directs Dr. Dumpe,

17   that it's going to be limited to what he did after the

18   delivery.  I don't have a problem with that either.

19        THE COURT:  That satisfies those inquiries.  Now,

20   what about your late motion in limine vis-à-vis

21   Dr. Wiesenfeld?

22        MR. PRICE:  Thank you, Your Honor.  This weekend, I

23   was going over my notes from the trial, and I noticed that in

24   the USA's opening, Mr. Colville said that Dr. Wiesenfeld is

25   going to be called and he is going to state that if a

1   pediatrician would have been called, he wouldn't have done

2   anything if he got there earlier.

3           So I apologize for not making an earlier motion.  I

4   just noticed it over the weekend looking at my notes from the

5   trial.  I spoke with Mr. Colville this morning, and he says he

6   does not intend to ask Dr. Wiesenfeld any questions about a

7   pediatric standard of care, so in essence, we have resolved

8   that issue.

9           The only other issue I would have is that

10  Dr. Wiesenfeld also says nothing about the standard of care

11  for the nurses, and as this court points out, that probably

12  should have been part of a motion in limine filed early on.

13          However, I apologize just for my thinking on this

14  trial, it didn't come to me mind until I read

15  Dr. Wiesenfeld's -- I'm sorry, I read the opening notes, so I

16  just want to ensure that Ms. Koczan doesn't try to backdoor in

17  any type of pediatric or nursing standard of care when

18  Dr. Wiesenfeld doesn't talk about it.

19          THE COURT:  Ms. Koczan?

20          MS. KOCZAN:  Your Honor, I'm going to have to hear

21  what the testimony is, but it was not my intention to use

22  Dr. Wiesenfeld as my expert.  I have my own expert who is

23  going to be testifying tomorrow who will address those issues,

24  but again I have to hear what he has to say.

25          THE COURT:  All right.  Anything else then for the

1   court's attention?

2           MR. PRICE:  No.

3           THE COURT:  And for those who were not glued to their

4   CM ECF, the defendant Valley Medical Facilities at 8:45 filed

5   their motion for directed verdict under Rule 50.  Mr. Price,

6   do you want my deputy to print out a copy for you?

7           MR. PRICE:  Thank you, Your Honor.  That would be

8   nice.

9           THE COURT:  Mr. Colville, would you appreciate one?

10           MR. COLVILLE:  Please.

11           THE COURT:  Mr. Galovich, if you'll be so kind.

12           THE CLERK:  Sure.

13           THE COURT:  Let the record reflect that counsel have

14   all been provided hard copy of the defendant's motion.

15           MR. PRICE:  Your Honor?

16           THE COURT:  Yes, sir.

17           MR. PRICE:  This brief and motion is as to the

18   corporate negligence claims.  I thought there was going to be

19   something with regard to Dr. Jones.

20           MS. KOCZAN:  Your Honor, after Janet Kincade's

21   testimony, testifies today, I would renew my Rule 50 motion,

22   but I think we need to hear the testimony first.

23           THE COURT:  Correct.

24       (Jury present.)

25           THE COURT:  Welcome back, ladies and gentlemen of the

1    jury.  I trust you had a nice Labor Day holiday.  I understand

2    that Mr. Colville is ready to proceed.  As we had indicated

3    last week, we are going to hear now from Dr. Wiesenfeld who is

4    appearing as an expert witness on behalf of Dr. Dumpe, and to

5    accommodate his schedule and the hospital's schedule where he

6    works, the court is permitting him to testify now.  Then I

7    understand we're going to be hearing from some additional

8    witnesses with the help of Ms. Koczan.

9           Doctor, if you'll approach Mr. Galovich to be sworn.

10          THE CLERK:  Please state and spell your name for the

11   record.

12          THE WITNESS:  Harold Charles Wiesenfeld.

13   H-A-R-O-L-D, C-H-A-R-L-E-S, W-I-E-S-E-N-F-E-L-D.

14     (Witness sworn.)

15          THE COURT:  Doctor, watch your step as you get up.

16   It's a little bit uneven.  Once you are there, arrange the

17   microphone so you are speaking into it.  There's water in case

18   you need it.  From time to time, your attention may be called

19   to the screen next to you.

20          Before we proceed with the testimony of

21   Dr. Wiesenfeld, ladies and gentlemen, as I've done previously

22   vis-à-vis our expert witnesses, the court once again has a

23   limiting instruction for each of you.

24          You'll now hear testimony concerning opinions from

25   Dr. Harold Wiesenfeld, a physician who will offer opinions

1    because of his knowledge, skill, experience, training or

2    education in the fields of obstetrics and gynecology and the

3    reasons for his opinion.

4            In weighing Dr. Wiesenfeld's opinion testimony, you

5    may consider his qualifications, the reasons for his opinions

6    and the reliability of the information supporting those

7    opinions, as well as the other factors I'll discuss in my

8    final instructions as to weighing the testimony of witnesses.

9            The opinion of Dr. Wiesenfeld should receive whatever

10   weight and credit, if any, you think appropriate given all the

11   the other evidence in this case.  You may disregard his

12   opinions entirely if you decide that they are not based on

13   sufficient knowledge, skill, experience, training or

14   education.  You may also disregard the opinions if you

15   conclude that the reasons given in support of the opinions are

16   not sound if you conclude the opinions are not supported by

17   the facts shown by the evidence or if you think that the

18   opinions are outweighed by other evidence in this case.

19           In deciding whether to accept or rely upon the

20   opinions of Dr. Wiesenfeld, you can also consider any bias

21   that he may have including any bias that may arise from

22   evidence that he has been or will be paid for reviewing this

23   case and/or evidence that Dr. Wiesenfeld testifies regularly

24   and makes a portion of his income from testifying in court.

25           So with that limiting instruction, Mr. Colville is

10

1    ready to proceed.

2            MR. COLVILLE:  May it please the court?  Ladies and

3    gentlemen of the jury.

4            HAROLD WIESENFELD, M.D., a witness herein, having

5    been first duly sworn, was examined and testified as follows:

6                        DIRECT EXAMINATION

7    BY MR. COLVILLE:

8    Q.  Dr. Wiesenfeld, good morning.

9    A.  Good morning.

10   Q.  Are you a physician licensed to practice medicine in

11   Pennsylvania?

12   A.  Yes, I am.

13   Q.  Doctor, you currently practice medicine at Magee Hospital;

14   is that correct?

15   A.  Yes, that's correct.

16   Q.  Do you specialize in any particular type of medicine

17   there?

18   A.  I specialize in obstetrics and gynecology and have a

19   subspecialty interest in reproductive infectious diseases.

20   Q.  Can you comment generally on your subspecialty of

21   reproductive infectious diseases for the jury, please?

22   A.  Sure.  Reproductive infectious diseases is a subspecialty

23   interest focusing on infectious diseases to the reproductive

24   tract of women, either in gynecology or in obstetrics.

25   Q.  I notice in your CV, you've written articles and published

1    on sexually transmitted diseases specifically?

2    A.  Most of my research portfolio involves research in STDs

3    and how STDs can cause infertility in women.  My clinical

4    practice is not only with -- not only practicing obstetrics

5    and gynecology, doing labor and delivery and gynecologic care,

6    I also do consultation for other physicians who request my

7    opinion in the situation of any kind of complicated infections

8    in women.

9    Q.  Explain in a little bit more detail what a consultation is

10   and how that would apply in this situation involving an

11   infectious disease?

12   A.  So if a woman who is pregnant or nonpregnant has a

13   complicated infection of the reproductive tract, vagina,

14   cervix, uterus, any of the pelvic structures, physicians might

15   ask my opinion on how to manage that case.

16       In addition, I'm also the head of the infection control

17   committee at Magee-Womens Hospital where I oversee kind of the

18   overall care with regard to infection prevention in the

19   hospital and among our patients who are receiving care there.

20   Q.  Would you please explain for the court and jury your

21   educational training that you went to to become a physician?

22   A.  Sure.  I went to medical school at McGill University in

23   Montreal, Canada, after which I did an internship at

24   St. Mary's Hospital in Montreal.

25       Following internship, I entered into a residency program

1    at McGill University in Montreal where I did obstetrics and

2    gynecology.  After I graduated from the obstetrics and

3    gynecology residency, I came to Pittsburgh where I did a two

4    year kind of fellowship training period under the former

5    chairman of Magee who was a world's expert in reproductive

6    infections in women.

7    Q.  Where are you from originally?

8    A.  Montreal, Canada.

9    Q.  You moved to Pittsburgh in 1992?

10    A.  That's correct.

11    Q.  You did so to start the fellowship at Magee?

12    A.  Correct.  To get additional training.

13    Q.  Have you been here ever since?

14    A.  Yes.

15    Q.  What positions do you hold at Magee or have you held?

16    A.  So right now, my title is professor of obstetrics and

17    gynecology and reproductive sciences as well as an adjunct

18    professor appointment in the department of medicine.

19        I'm also the vice chair for gynecology for the UPMC OB-GYN

20    kind of consortium.

21        I'm also head of infection control committee, as I

22    mentioned to you earlier, and I also am the director of the

23    division of reproductive infectious diseases and its

24    fellowship director.  We have a fellowship where we train

25    OB-GYNs to become experts in reproductive infections.

1    Q.  Most of those are academic appointments?

2    A.  The ones I described are academic.

3    Q.  What does the professor of the department of OB-GYN

4    reproductive services do?

5    A.  Many.  There are several of us, and that's an academic

6    title that is achieved after a certain amount of years and

7    certain amount of -- after your credentials have merited being

8    appointed as a professor.  So I started off as assistant

9    professor, then became associate professor, then full

10    professor.

11    Q.  As part of your academic duties, I presume you teach

12    medical students issues involving OB-GYN and reproductive

13    infectious disease?

14    A.  I teach learners of a variety of different levels, medical

15    students, residents, fellows, sometimes some nurses or allied

16    health personnel, depending on the circumstances.

17    Q.  Are you a member of any professional or scientific

18    societies?

19    A.  Yes.  I'm a member of the Infectious Disease Society For

20    Obstetrics and Gynecology.  I'm a member of the Infectious

21    Disease Society for America, and I'm also a member of the

22    American Congress of Obstetrics and Gynecology.

23    Q.  In addition to your involvement with these societies and

24    your academic appointments, do you provide any clinical

25    services in the field of OB-GYN?

1    A.   Yes, I do.  I do general obstetrics and gynecology.  I

2    have an office practice within the faculty practice at

3    Magee-Womens Hospital where I see patients approximately two

4    to two and a half days a week depending on the week and

5    depending on the circumstances.

6        Those patients include both kind of normal obstetrics and

7    gynecology patients, prenatal care as well as annual exams,

8    consultations again for complicated or challenging infectious

9    diseases and other gynecologic issues.

10   Q.   Do you deliver babies?

11   A.   I do deliver babies.  I deliver within my small practice.

12   I have three other partners.  We deliver our own patients

13   during the daytime, and at night and on weekends, we are in a

14   call pool, and I participate in that call pool where I, for

15   two day -- two times a month, I'm in-house in Magee-Womens

16   Hospital for the entire shift delivering not only patients

17   from my practice but patients from other practices as well as

18   patients from the Magee outpatient clinic.

19   Q.   How long has that been your clinical practice?

20   A.   I've delivered babies ever since I pretty much started at

21   Magee-Womens Hospital as a faculty member after my training,

22   since about 1995 or so, and been delivering babies ever since,

23   and over the last, I guess, six or seven years, we have had

24   this model where we have inpatient -- we have obstetricians

25   who are in-house in the labor suite for all of the deliveries.

1    Q.  For the past ten years, approximately how many babies do

2    you deliver annually?

3    A.  I've never actually counted it specifically, but I would

4    ballpark between 100 and 150 babies per year.

5    Q.  Does the deliveries include C-Sections as well as vaginal

6    deliveries?

7    A.  Yes.

8    Q.  In your practice, do you manage and provide prenatal care?

9    A.  Yes.

10   Q.  In your practice, do you manage the labor and delivery of

11   newborns?

12   A.  Labor of pregnant patients and delivery of newborns, yes.

13   Q.  As part of your clinical practice or academic practice, do

14   you train or teach medical students, residents or fellows at

15   UPMC or Magee?

16   A.  Yes.

17   Q.  Explain for the jury what that all involves, what your

18   participation or teaching involves?

19   A.  So sometimes it's small group discussions where we get a

20   group of medical students together and we lead them through

21   problems or principles in cases.  Many times, it's direct

22   patient care and interacting with the trainee right at the

23   patient level where the trainee is at our side and we're

24   talking through issues.

25        Other times, it's during regular conferences, in a labor

1    suite or the gynecology service where we talk about patients,

2    depending on the subject or the schedule, we talk about

3    patients, talk about principles, talk about diseases.

4              MR. COLVILLE:  Your Honor, at this time, I would like

5    to offer Dr. Weisenfeld as an expert in the area of -- in the

6    medical field of OB-GYN and reproductive infectious disease.

7              THE COURT:  Any voir dire of this witness,

8    Ms. Koczan?

9              MS. KOCZAN:  None, Your Honor.

10             THE COURT:  Mr. Price?

11             MR. PRICE:  Just a couple questions.

12                   CROSS-EXAMINATION EN VOIR DIRE

13   BY MR. PRICE:

14   Q.  Doctor, you provided us with a list of the trials and

15   depositions that you've participated in, right?

16   A.  I believe over the last --

17   Q.  Five years?

18   A.  Five years.  Four or five years, yes.

19   Q.  And in addition to trials and depositions, do you also --

20   like, are you sometimes consulted by attorneys to write

21   reports on cases, and those cases might never get to a

22   deposition or trial?

23   A.  I've been asked to review cases by other attorneys that

24   might not have gotten to deposition or trial, that's correct.

25   Q.  Can you tell us, on average, about how many cases you

1    review?  Because it's called like you are doing expert work.

2    About how many cases a year do you review doing expert work?

3    A.  I don't have an exact figure, but I think I would estimate

4    around anywhere from five to eight per year if I count from

5    the beginning of when I started to do expert work.

6    Q.  And when was that?

7    A.  I believe it's 2006.

8    Q.  And sometimes doctors, when they list their cases, they

9    break it up into whether or not they work for a plaintiff's

10    firm or whether they work for a defense firm.  Can you tell us

11    the breakdown for your work?  The percentage for plaintiffs;

12    percentage for defendants?

13    A.  Again, it's an approximation, but I would say about ten

14    percent for the plaintiff and about 90 percent for the

15    defense.

16    Q.  And the defense is the doctors, the hospitals, the role

17    you are playing here today.  You are testifying on behalf of

18    the defendants, correct?

19    A.  Correct.

20    Q.  So 90 percent of the time, that's what you are doing?

21    A.  Ballpark, but not exclusively.

22            MR. PRICE:  That's all I have, Your Honor.

23            THE COURT:  Mr. Colville, anything further on

24    qualifications?

25            MR. COLVILLE:  No, Your Honor.

1          THE COURT:  Doctor, have you previously testified on

2     behalf of the United States?

3          THE WITNESS:  Yes, I have.

4          THE COURT:  And was it also an OB-GYN case?

5          THE WITNESS:  Yes.

6          THE COURT:  Was that here in the western district or

7     somewhere else?

8          THE WITNESS:  To my recollection, one was here in

9     Pittsburgh and one was in Tucson, Arizona.

10         THE COURT:  Does the court's questioning engender any

11    further questions?  Mr. Price?  Mr. Colville?

12         MR. PRICE:  No.

13         MR. COLVILLE:  No.

14         THE COURT:  The court now accepts Dr. Wiesenfeld as

15    an expert in the fields of obstetrics and gynecology and

16    reproductive infectious disease.  Mr. Colville, you may

17    proceed.

18                   DIRECT EXAMINATION (Resumed.)

19    BY MR. COLVILLE:

20    Q.  Doctor, in this case, did I ask you to review the medical

21    records to provide me an opinion of Dr. Dumpe's care and

22    treatment of Carissa Peronis and Kendall Peronis?

23    A.  Yes, you did.

24    Q.  Did you in fact review those records?

25    A.  Yes, I did.

1    Q.  Did you review the medical records related to Carissa, in

2    particular, the labor and delivery and records?

3    A.  Yes.

4    Q.  Did you review the fetal heart monitor strips in this

5    case?

6    A.  Yes, I did.

7    Q.  Did you read the operative report?

8    A.  Yes, I did.

9    Q.  Did you review the discharge summary from Carissa's

10    record?

11    A.  Yes, I did.

12    Q.  Did you also review Kendall's medical record?

13    A.  Yes, I did.

14    Q.  In particular, did you review the delivery assessment in

15    this case?

16    A.  Yes.

17    Q.  And did you review hospital policies?

18    A.  Yes.

19    Q.  And in particular, did you review 2.4 and 2.21?

20    A.  Yes, I did.

21    Q.  Did you review the depositions of the plaintiffs?

22    A.  Yes, I did.

23    Q.  Did you review the deposition of Dr. Dumpe and the

24    physicians and nursing staff at Heritage Valley?

25    A.  Yes.

1    Q.  Did you review the expert reports that had been provided
2    by plaintiffs' experts?
3    A.  Yes, I have.
4    Q.  Based upon your review of these materials, did you form an
5    opinion and provide a written report of your opinions?
6    A.  Yes, I have.
7    Q.  Based on your experience and review of the materials we
8    just mentioned, do you believe Dr. Dumpe met the standard of
9    care in this case?
10   A.  Yes, I do.
11   Q.  Let me pull up Exhibit 2, please, page 3.  This is -- up
12   on the board is a copy of the operative report.  You reviewed
13   this report?
14   A.  Yes, I did.
15   Q.  This report was prepared by Dr. Dumpe and describes all
16   the procedures that he was involved with during the delivery
17   of Kendall Peronis; is that right?
18   A.  I believe so, yes.
19   Q.  Based upon the description of all the procedures that were
20   employed by Dr. Dumpe during the delivery, do you believe
21   there was need for a pediatrician to be present at time of
22   delivery?
23   A.  No, I don't believe there was a need for a pediatrician
24   there.
25   Q.  In this case, Dr. Dumpe indicates that there was medium

1  nonparticulate meconium present during the labor.  Are you

2  aware of that?

3  A.  Yes.

4  Q.  Did you see that in the medical records?

5  A.  Yes, I have.

6  Q.  Regarding meconium in this case or presence of meconium

7  during labor, do you have an opinion as to whether or not a

8  pediatrician was needed to be present at the time of delivery?

9  A.  Yes, I have an opinion.

10  Q.  What is that opinion?

11  A.  The presence of meconium does not mandate the presence of

12  a physician at the time of delivery of an infant.

13  Q.  You indicated that you reviewed the fetal strips in this

14  case; is that right?

15  A.  Yes, I have.

16  Q.  Are you trained to read fetal strips?

17  A.  Yes.  That's what an obstetrician does.

18  Q.  Are you experienced in reading fetal strips?

19  A.  Yes.

20  Q.  Based upon the review of the fetal strips, did you review

21  the entire fetal strips in the case, beginning to end?

22  A.  Yes.

23  Q.  Based upon your review of the fetal strips, do you believe

24  that a pediatrician was needed to be present at time of

25  delivery in this case?

1   A.  No.  The fetal strips were very reassuring and not a sign

2   of any kind of concern for resuscitation, so a pediatrician

3   was not required, based on my review of the strips.

4   Q.  There's mention in the operative report regarding the

5   McRoberts Maneuver which relates to shoulder dystocia.  Did

6   you see that?

7   A.  Yes.

8   Q.  Was there anything in the operative report related to this

9   issue of the McRoberts Maneuver, shoulder dystocia, which

10  leads you to believe that a pediatrician should have been

11  present at the time of delivery?

12  A.  No.

13  Q.  Do you believe there's anything Dr. Dumpe should have done

14  differently than what was done on the day Kendall Peronis was

15  delivered?

16  A.  No.

17  Q.  Based upon your review of the medical records, were there

18  any signs or symptoms of an infection during Carissa's

19  prenatal care?

20  A.  During labor and delivery, there were no signs of

21  infection.

22  Q.  Based upon your review of the medical records, were there

23  any signs or symptoms of respiratory distress during the labor

24  and delivery of Kendall?

25  A.  Not that I could see, no.

1    Q.  Were there any signs or symptoms of an infection or

2    respiratory distress once the baby was delivered and in the

3    delivery suite?

4    A.  Other than some routine requirement for suctioning for

5    breathing, which is very common after birth, there was no

6    other evidence of respiratory distress.

7    Q.  The plaintiffs' experts -- let me ask you to assume that

8    the plaintiffs' experts have all said that the pediatrician

9    should have been present during the delivery because meconium

10   was present, there were nonreassuring fetal strips, there was

11   an operative delivery using the vacuum and there were issues

12   related to shoulder dystocia.

13        If you assume that is -- they are the facts and the

14   premise which they make that opinion, do you agree with those

15   opinions?

16   A.  No.

17   Q.  Let me ask you about the shoulder dystocia first.  First

18   of all, what is shoulder dystocia?

19   A.  Shoulder dystocia is potentially a very serious condition

20   where the head of the baby comes out of the vaginal canal

21   during vaginal delivery but the shoulder gets impacted on the

22   pubic bone.

23        At that point, there's occlusion of the umbilical cord

24   which then stops blood flow to the baby, and without quick

25   maneuvers to relieve the shoulder dystocia, the baby is

1    deprived of oxygen for a period of time.  Not only does that

2    deprivation of oxygen cause concern for baby's health, but

3    also maneuvers to disimpact the shoulder can cause fetal harm

4    and injury.

5    Q.  In this case, based upon your review of the medical

6    records, is there any evidence there was shoulder dystocia

7    present in this case?

8    A.  Based on the documentation, there's no evidence that there

9    was shoulder dystocia.

10    Q.  What is the McRoberts Maneuver?

11    A.  McRoberts Maneuver is when we take the women's thighs and

12    legs and flex them very abruptly towards the chest area.  This

13    opens up the birth canal a little bit and makes it a little

14    bit easier for the baby's shoulders to pass through the birth

15    canal.

16    Q.  In the op report, Dr. Dumpe indicates that the McRoberts

17    Maneuver was used prophylactically.  Did you see that?

18    A.  Yes.

19    Q.  Is that another way to avoid shoulder dystocia?

20    A.  Yes.

21    Q.  Regardless of whether he used it prophylactically or

22    otherwise, at time of delivery, were there any adverse

23    consequences at all related to any issue involving shoulder

24    dystocia?

25    A.  Not that I could see.

1    Q.  Consequently, would a pediatrician have been needed at

2    that time to deal with anything having to do with shoulder

3    dystocia?

4    A.  No, not a pediatrician.

5    Q.  Plaintiffs' experts, some of which read the strips, some

6    of which didn't, both were critical of the strips, saying they

7    were nonreassuring in this case.  I'm going to have you assume

8    those facts.

9        Does that match your review and interpretation of the

10   strips in this case?

11   A.  Absolutely not.

12   Q.  Would you please generally describe what you saw when you

13   read the strips in this case?

14   A.  Sure.  The fetal strips, just as a step backwards, kind of

15   indicate how well the baby is getting oxygen, how well the

16   baby is doing in the mother's womb during that period of time,

17   and in this period of time with the fetal strips is during

18   labor and delivery, and overall, the -- in its entirety, the

19   interpretation of those strips was that this was a

20   well-oxygenated baby, a baby doing well in the mother's womb,

21   without any concern of any difficulty transitioning once the

22   baby was born.  This was a normal fetal heart rate strip in

23   labor.

24   Q.  Now, what the plaintiffs' experts discussed when they were

25   talking about the strips were the issue that there were --

1    they generally described category one, two and three.  Are you

2    familiar with the categorization?

3    A.  Yes.

4    Q.  Would you briefly describe what the categories mean?

5    A.  So kind of the easiest way to think about it is category

6    one is essentially a completely normal fetal heart rate strip

7    in terms of the base heart rate of the baby and the absence of

8    concerning features.

9        The fetal -- category three tracing is one where immediate

10    attention and resuscitative measures in utero trying to

11    correct those findings, giving oxygen and other kind of

12    maneuvers, are required to relieve that category three tracing

13    in order to allow delivery and labor to continue.

14        Category two is kind of in between those two in an

15    extreme, so to speak.  Category two is a category that most of

16    the time is absolutely normal, and most babies do have

17    category two tracings during the normal labor and delivery

18    process.  There are some features of category two that, when

19    present, would require more attention or some maneuvers, and

20    there are many features of category two that we just observe

21    and keep a close eye on without doing any additional

22    interventions.

23    Q.  In this case, were there category twos?

24    A.  Yes.

25    Q.  Did any of the category twos that you reviewed and

1    interpreted require any intervention?

2    A.   All of the category two episodes are periods -- when the

3    heart was category two were still reassuring and did not

4    require any interventions.

5    Q.   Discuss a little bit that word you just used, "reassuring"

6    because the plaintiffs -- couple of the plaintiffs' experts

7    indicated that they believe the strips -- again, one expert

8    didn't read them, the other one did, but they both described

9    them as not reassuring.

10        What's the difference between reassuring and not

11   reassuring?

12   A.   Reassuring used to be the term we used before we talked

13   about categories.  Categories were developed in an effort to

14   kind of standardize the interpretation so we could communicate

15   between providers, between physician's caregivers as to what

16   the fetal status is.

17        But when we use the term category with reassuring

18   features, we mean that the baby is doing well and there's

19   nothing that needs to be done acutely to correct any of these

20   findings.

21   Q.   And is the fear of an unreassuring strip, the baby might

22   be delivered with respiratory distress?

23   A.   Or some kind of need, either low oxygen levels or need for

24   resuscitation.

25   Q.   In this case, did any of those adverse indicators show

1    themselves at the time of delivery?

2    A.  No.  There were no indications during the fetal heart rate

3    monitoring, nor were there any indications at delivery.

4    Q.  Was the baby born healthy when it was delivered?

5    A.  Yes.

6    Q.  Does that correspond with your interpretation that these

7    strips were reassuring?

8    A.  This baby's condition at birth was exactly as would have

9    been predicted by interpretation of the fetal strips.

10    Q.  Now, I provided you with a copy of Dr. Zamore's expert

11    report, correct?

12    A.  Yes, you have.

13    Q.  In that report, he indicated that, based upon the fetal

14    strips, that he believed the baby should have been delivered

15    sooner?

16    A.  That's his opinion.

17    Q.  Do you agree with that opinion?

18    A.  Absolutely not.

19    Q.  I will tell you to assume the fact that when I asked him

20    about that, he indicated he changed his mind on that issue,

21    that he was no longer suggesting that the baby should have

22    been delivered earlier.

23        I want you to provide me with what your opinion is, based

24    upon the fetal monitoring strips, was there any reason that

25    Baby Kendall should have been delivered earlier than she was?

1    A.  No, absolutely not.

2    Q.  Is there any -- were there any indications based upon the

3    fetal monitoring strips that a pediatrician should have been

4    present at the time of delivery?

5    A.  No.

6    Q.  Plaintiffs' experts make mention of the vacuum delivery.

7    First of all, do you do vacuum deliveries as part of your

8    clinical practice?

9    A.  Yes, I do.

10   Q.  Is it a common procedure?

11   A.  Fairly common in terms of the operative delivery through

12   the vagina, yes.

13   Q.  What, if any, precautions should an OB delivering a baby

14   take in the presence of a need for using vacuum extraction?

15   A.  Well, you want to assess the position of the baby's head,

16   which way the baby is positioned and how you put the cup on

17   the baby's head, and you monitor for progress as you apply

18   suction in the right amount to effectuate delivery.  If

19   there's ongoing progress, then you can allow the delivery to

20   continue through the operative vacuum.

21   Q.  In this case, is there evidence in the medical record that

22   the vacuum was used improperly?

23   A.  No.

24   Q.  Was it used properly in this case based on your review of

25   the record?

1  A.  Based upon my review, yes.

2  Q.  Does a pediatrician -- when a vacuum is going to be used

3  by an OB during a delivery, does a pediatrician need to be

4  present at delivery?

5  A.  We need somebody who can do neonatal evaluation and

6  resuscitation but not a pediatrician.

7  Q.  In this case, did we have such a person present at the

8  delivery?

9  A.  Yes.

10  Q.  Who was that?

11  A.  That was Nurse Hendershot.

12  Q.  So a nurse certified in neonatal resuscitation meets the

13  standard of care?

14  A.  Correct.

15  Q.  What is the adverse indication of why you might need

16  either a nurse or a pediatrician to be present when you are

17  vacuuming?

18  A.  Well, you are doing something to effectuate delivery.

19  Babies might have a difficult transition as a result of it.

20  There may be a hematoma that develops and you want to assess

21  the baby and make sure the baby is doing well.

22      Often, we're using vacuum because the fetal status is not

23  reassuring.  This was not the case.  The reason why the vacuum

24  was used in this case was because of maternal exhaustion and

25  there hasn't been any progress.

1       Often we're also using operative delivery, either forceps

2   or vacuum, because there's a concern of the tracing.  Again,

3   there wasn't in this case.  As a uniform approach, we want to

4   have somebody who can assess the baby right after birth after

5   a vacuum or after forceps.

6   Q.  Aside from the exhaustion in this case, there were no

7   complications that were related in any way to the use of the

8   vacuum extraction?

9   A.  Correct.

10  Q.  Do you have an opinion as to whether or not a physician

11  needed to be present in this case regarding the use of the

12  vacuum extraction?

13  A.  There was no need for a pediatrician.

14  Q.  Finally, they make mention of the meconium, the presence

15  of meconium.  Have you delivered babies with meconium present?

16  A.  Sure.  It's very common.

17  Q.  How often do you see meconium in the babies that you

18  deliver?

19  A.  The literature basically says about one in five babies are

20  born in the setting of meconium, so it's very common.

21  Q.  When meconium is present, what precautions do you make or

22  take?

23  A.  So the standards have changed since I entered practice,

24  and right now, the standard is, again, to have somebody

25  present who can assess the newborn and do initial steps of

32

1    newborn resuscitation should there be concerns, and if the

2    baby is having difficulty, then some suctioning is advised.

3    Q.  So in this case, again, Nurse Hendershot was there and has

4    testified that she was certified in neonatal resuscitation.

5         Does her presence at the delivery in this case where

6    meconium was present, does that meet the standard of care?

7    A.  Yes, it does.

8    Q.  And just to be clear, the standard of care does not

9    require a pediatrician to be present, only that somebody who

10   is certified in neonatal resuscitation?

11   A.  That's correct.

12   Q.  Once a baby is born, as it was in this case, in the

13   presence of meconium but is deemed to be stable as indicated

14   by the delivery assessment -- let me step back.

15        Do you agree that the delivery assessment medical record

16   in this case indicates that Baby Kendall was stable when she

17   was delivered?

18   A.  Yes, it does.

19   Q.  Do you believe that that document demonstrates that Baby

20   Kendall was born healthy?

21   A.  Yes.  The five minute Apgar was eight.  Things were

22   looking very normal.

23   Q.  In a baby such as Kendall in this case that is stable and

24   healthy but had meconium present, what do you do as an OB

25   after that baby is delivered with the baby?

A.  You bring the baby to the table, the isolette, the area
where babies are assessed.  The baby is generally dried.  The
nursing team, whoever is responsible for assessment of the
baby, will then do initial steps, tactile stimulation, et
cetera, that are normally done in routine deliveries and
assess the baby.

     If the baby is having trouble breathing, then maneuvers
are done like suction to try to aspirate out that meconium.

Q.  In this case, all that was done; is that right?

A.  Correct.

Q.  And the delivery assessment indicates the baby was
healthy?

A.  Correct.

Q.  What is the OB's role at that point?

A.  The OB does have an initial responsibility for the baby as
part of the team, but once the baby has been stabilized, the
obstetricians's role is generally done.

Q.  In this case, was it appropriate for the baby to stay in
the delivery room and bond with mom and dad?

A.  All indicators say it was totally appropriate.

Q.  Was allowing the baby to stay with mom and dad within the
standard of care?

A.  Yes, to bond.

Q.  Did Dr. Dumpe meet the standard of care as it relates to
his management of the meconium in this case?

1    A.  Yes, he did.

2    Q.  Doctor, would you have done anything differently in the

3    delivery of Kendall than what was done by Dr. Dumpe?

4    A.  No.

5    Q.  You mentioned the delivery assessment.  Let's pull up

6    Exhibit 6, page 10.  This is the delivery assessment we just

7    discussed.  All the plaintiffs' experts agreed and testified

8    that this document documents the birth of a healthy baby.

9        Do you agree with that opinion?

10   A.  Yes, I do.

11   Q.  Each of the plaintiffs' experts also agreed that, in the

12   absence of any signs or symptoms of an infection or

13   respiratory distress, that they would not have prescribed

14   antibiotics to this baby.

15       Do you agree with that statement?

16           MR. PRICE:  Objection, Your Honor.

17           THE COURT:  Sustained.

18   Q.  Plaintiffs' experts testified that, in light of the

19   healthy assessment and the lack of signs or symptoms with

20   regard to an infection, they would not have prescribed

21   antibiotics.  Do you agree with that?

22           MR. PRICE:  Same objection, Your Honor.

23           THE COURT:  Sustained.

24   A.  Yes, I do.

25           MR. PRICE:  Move to strike.

1          THE COURT:  Granted.

2     Q.  Was there any need to prescribe antibiotics to this baby?

3          MR. PRICE:  Objection, Your Honor.

4          THE COURT:  Sidebar.

5      (At sidebar.)

6          THE COURT:  Mr. Price, your objection?

7          MR. PRICE:  This is why I brought the motion in

8     limine this morning.  He's definitely testifying as to a

9     pediatrician's standard of care.

10          MR. COLVILLE:  Okay.  Your Honor, I didn't see that.

11     What I will do is ask -- ask what Dr. Zamore testified to.  My

12     recollection of Dr. Zamore's testimony was that he agreed that

13     the delivery assessment showed a healthy baby being born and

14     that based upon that assessment, antibiotics should not

15     have -- would not be required to be prescribed.  I believe the

16     other expert said the same thing.

17          I don't think I was mischaracterizing that, but if

18     that goes beyond and allows pediatrician expertise to come in,

19     I'll pull back and limit it to Dr. Zamore.

20          THE COURT:  I think that's the way to go.

21          MR. PRICE:  Yes.  My only objection is that

22     Dr. Zamore's report was probably more detailed than

23     Dr. Wiesenfeld, so I don't believe that Dr. Wiesenfeld should

24     be able to simply expand upon it whenever he doesn't -- he

25     wasn't here for the testimony and the representations are

1    getting a little bit broad, so I guess that's my problem.

2            MR. COLVILLE:  I'll be happy to say, Your Honor --

3    ask him to assume that Dr. Zamore testified to this.  Does he

4    agree with that.

5            THE COURT:  Yes.  You need to do that.

6            MR. COLVILLE:  Okay.

7        (In open court.)

8    BY MR. COLVILLE:

9    Q.  Can we pull up the exhibit again?  Dr. Wiesenfeld, I'm

10   going to narrow my question as it relates to this document.

11       This is the delivery assessment, and Dr. Zamore testified

12   that he believed this document, this medical record documented

13   that Baby Kendall was born healthy.

14       I want you to assume that I then asked him the question

15   that, based upon this delivery assessment, whether or not he

16   believed antibiotics should have been prescribed to this baby.

17   He indicated that no, he did not believe that to be needed.

18       Do you agree with that opinion?

19   A.  I agree with that opinion.

20   Q.  In this case, was there any reason to have a pediatrician

21   present at the delivery?

22   A.  Not that I could find.

23   Q.  Did the standard of care require a pediatrician to be

24   present at the delivery in this case?

25   A.  No, it did not.

1    Q.  Was the standard of care met by Dr. Dumpe?

2    A.  Yes, the standard of care was met.

3    Q.  Did the standard of care require Dr. Dumpe to deliver this

4    baby earlier than it was delivered?

5    A.  No.

6    Q.  Did anything Dr. Dumpe do or did not do in this case

7    increase the risk of harm to Baby Kendall?

8              MR. PRICE:  Objection, Your Honor.  This is beyond

9    the scope.

10             THE COURT:  Sidebar.

11        (At sidebar.)

12             THE COURT:  Mr. Price?

13             MR. PRICE:  There are no causation opinions in this

14   report, and Dr. Zamore didn't give any causation opinions

15   either, so now we're getting beyond the scope.

16             THE COURT:  Mr. Colville?

17             MR. COLVILLE:  If Dr. Zamore didn't give any

18   causation opinions, how does that meet the burden of proof?

19             THE COURT:  It might be fodder for a motion.

20             MR. COLVILLE:  I'll withdraw the question.

21             THE COURT:  Okay.

22        (In open court.)

23             THE COURT:  That question is being withdrawn, ladies

24   and gentlemen.  Go ahead, Mr. Colville.

25   BY MR. COLVILLE:

1    Q.  Dr. Weisenfeld, are all the opinions you expressed here

2    expressed within a reasonable degree of medical certainty?

3    A.  Yes, they are.

4            THE COURT:  Thank you, Mr. Colville.  Ms. Koczan, any

5    questions for this witness?

6            MS. KOCZAN:  I have no questions.

7            THE COURT:  Mr. Price?

8                        CROSS-EXAMINATION

9    BY MR. PRICE:

10   Q.  Morning again, Doctor.

11   A.  Morning, sir.

12   Q.  I just wanted to follow up first with regard to this issue

13   about the delivery, the operative delivery.  Can you pull up

14   tab 3, page 3?  I'm sorry, tab 2.

15       This is Dr. Dumpe's operative note, and here, if you could

16   just highlight this part right there.  I guess here is my

17   confusion, because if you could follow along with my pointer

18   here, I'm going to go towards the middle.  He mentioned first

19   the meconium fluid, moderate nonparticulate meconium fluid.

20       Then he said due to the expected tight fit of the

21   shoulders, the shoulders were delivered by the aid of a

22   prophylactic McRoberts Maneuver without difficulty.

23       You saw that, right?

24   A.  Yes, I did.

25   Q.  Now, just from my understanding that typically whenever

1    somebody does a McRoberts Maneuver it's usually done whenever

2    a shoulder dystocia is encountered.

3    A.   That's usually the case.

4    Q.   And if somebody does encounter a shoulder dystocia, just

5    to understand, if a shoulder dystocia happens, a pediatrician

6    must be present, correct?

7    A.   Someone -- not necessarily a pediatrician, but somebody

8    who could do neonatal evaluation and resuscitation.

9    Q.   But in case of a shoulder dystocia, I understand somebody

10   must be able to evaluate them, but isn't it policy that a

11   pediatrician is to at least be called and told that there's

12   shoulder dystocia, so that the pediatrician can decide whether

13   or not the pediatrician wants to come or she wants to

14   designate somebody?

15   A.   No, not -- I'm not aware of any policy that would mandate

16   a pediatrician be advised or called for that.

17   Q.   Okay.  But at least if there is a shoulder dystocia, that

18   would require -- I know you say not a pediatrician, but

19   somebody to evaluate for a neonatal potential resuscitation,

20   correct?

21   A.   Correct.

22   Q.   Now, if we go back -- before we do, let me also

23   understand.  I'm going to go deep into your practice of

24   medicine.

25        From what I understand about the practice of medicine

that, whenever a procedure is performed, I know it might not

be you, but your office has to code it.  You know what coding

is?

A.  Correct, yes.

Q.  And coding is the process of whenever a patient gets a

bill, it says, I, Dr. So-and-So, performed these procedures

and they're coded, correct?

A.  Doesn't necessarily reflect the accuracy of what happened.

Coding is done by people who are trained to look through the

chart and look for words.  They are not decision makers or

physicians or anyone who can actually interpret exactly what

goes on, so the coding is not always accurately reflective of

what actually happened.

Q.  Sure.  But for each code that's on a bill, you get paid,

correct?

A.  Well, in obstetrics, and I'm not in the finance

department, but my understanding is that obstetrics is a

bundled payment, so you get paid for the entire labor and

delivery unit of care.  Not for whatever you do within that

care.

Q.  Okay.  But you, as a doctor or your office, you have to

have somebody go through the coding to make sure that whenever

you submit a bill for payment, that you are charging based

upon the procedures that you performed and based upon the

activity and the medical procedures that you did, correct?

1    A.   In my office, and I believe what is pretty common practice

2    is the physicians themselves actually document and bill and do

3    the level of billing.  It's not somebody else in the back end

4    who goes in and reads the chart and submits the bill based on

5    an itemized list of procedures.

6    Q.   Right.  That's because you want to make sure that whenever

7    you are billing that you are billing for the proper

8    procedures.  You are not adding on a few things or getting

9    extra procedures in the bill of a patient, correct?

10   A.   When I bill, I bill for what I do.

11   Q.   So we go to the previous page.  This is the coding summary

12   for Carissa's care, and right down here, it says Dr. Dumpe was

13   the provider and he billed for a shoulder dystocia delivery,

14   ante partum condition, correct?

15   A.   I don't know if that's an actual -- something that he

16   billed for.  That very well might be somebody in the medical

17   records department who combed through the chart, saw the word

18   shoulder dystocia somewhere and put it in as a list of items

19   or what have you.

20   Q.   We just looked at the operative report and we didn't see

21   the word shoulder dystocia, correct?

22   A.   We looked at the operative -- it doesn't say it occurred.

23   It said that he prophylactically did.  He anticipated a

24   shoulder dystocia.  It doesn't say it occurred.

25   Q.   I don't know.  Let's go back to the previous page.  He

1    said:  Due to expected tight fit of shoulders, the shoulders

2    were delivered with a prophylactic McRoberts.

3        I don't see shoulder dystocia in this operative report, do

4    you?

5    A.  Right.  Because there was no shoulder dystocia.

6    Q.  But he billed for it?

7    A.  I don't know if he billed for it or the hospital coded it

8    because they saw it somewhere in the chart.

9    Q.  I'm telling you Dr. Dumpe -- you can assume that Dr. Dumpe

10   came up here and says that there wasn't a shoulder dystocia.

11   A.  That there was not?

12   Q.  Correct.

13   A.  Correct.

14   Q.  But you saw that coding summary, so somebody billed for a

15   shoulder dystocia, correct?

16   A.  Could have been somebody, again, a clerk or somebody in

17   the medical records office.  It's not necessarily a provider.

18   Q.  Okay.  We'll leave it at that.  Can you pull up the

19   PowerPoint now?

20       Here's just what I wanted to go through with regard to --

21   this is what our expert testified.  I note Mr. Colville said

22   my expert said all of the strips were nonreassuring.  They

23   never said that.  They said there were parts of it that they

24   called a category two strip.  You would agree with that?

25   A.  I would agree parts were category two.

1    Q.  Parts of that mean nonreassuring.  The whole thing wasn't

2    reassuring.  Just parts of it?

3    A.  I didn't see much evidence of nonreassuring.

4    Q.  This arrest of the descent is another thing, that the baby

5    took a while to get down and they had to do an operative

6    delivery.  Do you agree with that?

7    A.  Yes.  There was an arrest, and he, for 30 minutes or so

8    according to the documentation, he did a vacuum delivery,

9    correct.

10   Q.  And then there was meconium at birth, and these were some

11   of the risk factors that my experts said, hey, you know, in a

12   situation like this, a pediatrician should be present to

13   evaluate the baby.  But you disagree with that, right?

14   A.  I disagree with it, and most of the standards would not

15   say -- would not be consistent with your expert's opinions.

16   Q.  That's your opinion.  We are here to give opinions.

17   A.  And that's written in guidance documents.

18   Q.  But there's no guidance documents which talk about a case

19   like this where you have category two, arrested descent,

20   operative delivery, meconium.  Maybe a shoulder dystocia.  Who

21   knows?

22        You are just talking general guidelines, right?

23   A.  Each one of those would -- some of them would require the

24   presence of somebody skilled in the neonatal resuscitation.

25   Not a pediatrician.

1    Q.  Now, again, in a case of an operative delivery, the reason

2    you might want to have a pediatrician present especially with

3    vacuum extraction is because whenever you are pulling with the

4    suction on the baby's head, you can -- I don't want -- you can

5    do damage to a baby's head, correct?

6    A.  There is a risk of that, correct.

7    Q.  And the risks varied.  It varies between just simply

8    getting the cone head type of suction, correct?

9    A.  I'm sorry?

10   Q.  You have heard and we talked about the description of a

11   baby comes out with a cone head?

12   A.  Yes.

13   Q.  And that can happen with the vacuum extractor?

14   A.  Yes.

15   Q.  And that might not be a risk to the baby, correct?

16   A.  Correct.

17   Q.  There might be like sometimes with these, whenever the

18   vacuum pops off, a baby can get a cut on its scalp, correct?

19   A.  That can happen.

20   Q.  And that's what happened in this case.  This is a picture

21   of Kendall, and I'm just -- you can see up in the top corner,

22   there's a little bit of blood.  We have other pictures, and

23   the other thing that can happen is the baby, because of the

24   vacuum extractor and because of pulling, can have a subdural

25   hematoma, correct?

1    A.  Yes.

2    Q.  And those are conditions for which you would want to have

3    a pediatrician evaluate a baby, correct?

4    A.  At some point, yes.

5    Q.  Now, you will agree with this, that if there's meconium --

6    if there's particulate matter in the meconium, you call a

7    pediatrician, correct?

8    A.  No.

9    Q.  You don't agree with that?

10   A.  No, I don't.

11   Q.  You don't even agree with the hospital policies from

12   Heritage Valley?

13   A.  The hospital policies are beyond what is the standard.

14   There's no mandate about particulate matter.  All of the

15   reference for neonatal resuscitation are just meconium.

16   Q.  Okay.

17   A.  Regardless of particulate or not.

18   Q.  So from your understanding of hospital policies, the issue

19   of when a pediatrician is called to a delivery has nothing to

20   do with whether the meconium has particulate matter in it or

21   nonparticulate matter?

22   A.  Heritage Valley's criteria was particulate meconium,

23   particulate matter meconium, but that's above and beyond.

24   That's not what we typically require.  It's the presence of

25   meconium where you want somebody there to be present to

1    evaluate the baby.

2    Q.  So the standard policy about meconium, having a

3    pediatrician present, isn't as particular as having

4    particulate matter in it?  Bad way to put a question.

5    A.  Yeah, that's a bad way.  I'm having trouble following that

6    one.

7    Q.  Sure.  I'm sorry.  Most policies say that if there's

8    meconium present, then a pediatrician attends the delivery?

9    A.  Incorrect.  Most policies that I'm aware of have somebody

10   available and present to perform neonatal evaluation and

11   resuscitation.  Doesn't mandate a pediatrician.

12   Q.  Okay.

13   A.  Those are the standards that are seen in the American

14   Heart Association's guidance, those are seen in ACOG's

15   guidance that somebody skilled in neonatal resuscitation

16   should be present.  Does not mandate a physician.

17   Q.  Okay.  Regardless of who is there to evaluate a baby, the

18   requirement is that if there's meconium, somebody must be

19   there to evaluate the baby for meconium, correct?

20   A.  Correct.

21   Q.  Now, we've seen in this case, this is a picture.  I know

22   you are not familiar with it, but I'll explain it to you.

23       These are bottles of Gatorade as well as a bottle of

24   vegetable juice that Dr. Dumpe brought in, and he brought them

25   in as sort of a demonstration about the different types of

1    amniotic fluid that can be experienced during a delivery.

2        I'll explain them to you.  On the far right and this is

3    Government Exhibit 2, on the far right, the bottle shows clear

4    amniotic fluid.  The second one in from the right is a little

5    bit green, and then the third one from the right is darker

6    green and the fourth one on the left side, Dr. Dumpe described

7    as that's the bad stuff.  That's the stuff that has

8    particulate matter in it.  That's thick meconium.  That's the

9    kind that you need a pediatrician present.  Okay?

10   A.  According to Heritage Valley's policy, that particulate

11   meconium, but again, the standards are if there's meconium,

12   you have somebody present.  Not necessarily a pediatrician.

13   Q.  Sure.  Now, Nurse Hendershot said that whenever she was

14   present, she was the delivery nurse, that she only saw the

15   first green bottle, the lighter green bottle during delivery.

16   Okay?

17   A.  Okay.

18   Q.  Dr. Dumpe said, hey, if you look at my operative note, you

19   saw I said moderate nonparticulate meconium and he described

20   it as the second green bottle, okay?

21   A.  Okay.

22   Q.  Then, do you remember reading the deposition transcript of

23   Nurse McCrory.  She was the nursery nurse.

24   A.  Right.  That morning.

25   Q.  Right.  And she testified, she came here and testified

48

1    too, and she testified that whenever she saw that Kendall

2    needed respiratory help, that first thing she did was suction

3    her out.  Do you remember reading that?

4    A.  Yes, I believe so.

5    Q.  And she said that she got a lot of junk out.  Do you

6    remember her saying that at her deposition?

7    A.  I don't remember that specifically, but that's possible.

8    Sure.  I'll take that.

9    Q.  I'll represent to you that's what she said at her

10   deposition.  She also said that here, that she got a lot of

11   junk out.

12   A.  Okay.

13   Q.  Whenever I asked her, I said what type of junk, she

14   pointed to the fourth bottle.

15           MR. COLVILLE:  Your Honor, I'm going to object.

16           MS. KOCZAN:  I join in that objection.

17           THE COURT:  Sidebar.

18       (At sidebar.)

19           THE COURT:  Mr. Colville, your objection?

20           MR. COLVILLE:  My objection is that that

21   mischaracterizes the testimony of Nurse McCrory.

22   Nurse McCrory did not say the junk was represented by the

23   fourth.  What Nurse McCrory said was the color of it was

24   somewhere between the fourth and third bottle.  This is the

25   second time this mischaracterization, I should say, has been

49

1    brought up.

2            MS. KOCZAN:  Your Honor, I have a similar

3    recollection, so I would join in that objection.

4            THE COURT:  Okay.  Mr. Price?

5            MR. PRICE:  I have a totally different recollection.

6    I was the one asking her the questions, and I asked her to

7    point to the bottle and she pointed to the one on the far

8    right, and I believe that I had her confirm that, and I said

9    so you are saying the bottle on the -- I'm sorry.  Not right.

10   On the far left, and she agreed.

11           And I have asked this question before, and the only

12   objection I got was that it wasn't as to the fact that

13   Nurse McCrory pointed to the bottle on the left.  The

14   objection was that Nurse McCrory never described it as having

15   particulate matter, so my question specifically did not say

16   that when Nurse McCrory described it that she described it

17   with particulate matter.

18           So my recollection is different from defense counsel

19   as well as their previous objections didn't contest

20   Nurse McCrory's characterization of the junk being the fourth

21   bottle.

22           MR. COLVILLE:  Your Honor, let me just add that I did

23   voice an objection, and the court may recall that when I did,

24   the court admonished me and said the jury had its own opinion,

25   and I did not need to indicate what the opinion of

1    Nurse McCrory was at that time.

2            THE COURT:  Right.  What I said was the jury's

3    recollection and/or the court's recollection will control.

4            MR. COLVILLE:  Agreed.

5            THE COURT:  Right?

6            MR. COLVILLE:  Agreed.

7            THE COURT:  Anything further?  So once again, I

8    think, Mr. Price, I think you can indicate that Nurse McCrory

9    pointed out one of the bottles, but again, it's going to be

10   the jury's recollection and my recollection which of the

11   bottles, if any, she actually pointed to.

12           MS. KOCZAN:  Your Honor, if I may add one thing.  I'm

13   not feeling all that well.  After this witness is over, can I

14   have a five minute break to go to the restroom?

15           THE COURT:  Certainly.

16         (In open court.)

17           THE COURT:  Ladies and gentlemen of the jury, you may

18   recall that this issue, if you will, came up previously, and I

19   think at that time, I suggested to all of you it's your

20   recollection that controls vis-a-vis what Nurse McCrory had to

21   say, one, and two, which if any of the bottles that she

22   pointed to.  Okay, so Mr. Price is going to continue his

23   questioning.

24   BY MR. PRICE:

25   Q.  Again, the jury's recollection as to what Nurse McCrory

1    stated which bottle reflected the junk that she brought out

2    will carry the day.  But with that characterization as well as

3    you read the autopsy report, correct?

4    A.  Yes.

5    Q.  And Dr. Min in his autopsy found a massive aspiration of

6    meconium, correct?

7    A.  That's what is listed in his autopsy report.

8    Q.  And if he noted that, the meconium that was aspirated in

9    Kendall's lungs would have -- she would have gotten -- during

10   the time in utero and the time of birth, she would have

11   aspirated that, correct?

12   A.  That's when it would have gone in, yes.

13   Q.  And there would be no other place that she would have

14   gotten meconium than other than in utero at the time of birth

15   by aspirating it, correct?

16   A.  Correct.

17          MR. PRICE:  That's all the questions I have, Your

18   Honor.

19          THE COURT:  Okay.  Ladies and gentlemen of the jury,

20   we actually got started a little bit early with our court

21   reporter, the court addressing some legal matters, so Ms. Leo

22   has been working hard for already an hour and a half or more

23   so we're going to take our morning break right now and we'll

24   resume on the record at 10:15.

25          Kindly leave your notebooks as well as your pads and

1    binders all on your chair.  Once again, you know not to talk

2    yet about the case, not to do any research and/or communicate.

3    Mr. Galovich, if you'll escort our jurors.

4            (Jury excused.)

5            THE COURT:  Doctor, you may step down.  During this

6    break, you shouldn't talk about your testimony with any of the

7    folks that are here.  If you need to use the restroom, they

8    are at either end of the halls.  Okay.  We'll start again at

9    10:15.

10            (Recess taken.)

11            (Jury present.)

12            THE COURT:  Mr. Price, you indicated you had no

13    additional questions.  Mr. Colville, some redirect?

14                        REDIRECT EXAMINATION

15    BY MR. COLVILLE:

16    Q.  Dr. Wiesenfeld, I just want to clear up some of the

17    discussion about the shoulder dystocia.  If we can pull up

18    Exhibit 2, page 3, please, the shoulder dystocia or the

19    McRoberts Maneuver references.

20        I just want to make sure the record was clear that in the

21    operative report, there is no indication by Dr. Dumpe or, for

22    that matter, anywhere else in the medical record that there

23    was a shoulder dystocia in this case; is that correct?

24    A.  That's correct.  I didn't see any evidence of a shoulder

25    dystocia occurring.

1    Q.  And to that end, there are no complications from a

2    shoulder dystocia that are identified in the operative report

3    or anywhere else in the medical record; is that right?

4    A.  Correct.

5    Q.  And you previously mentioned it, but the use of the word

6    prophylactic McRoberts Maneuver, do I understand that the

7    reason that says that is it's an indication that this maneuver

8    was done to avoid a shoulder dystocia?

9    A.  Right.  Prophylactic is a kind of preemptive method or

10   maneuver.

11   Q.  It would be like taking malaria pills before you go to a

12   foreign country where you might get malaria?

13   A.  Correct.

14   Q.  By taking the medication, you avoid the issue?

15   A.  Correct.

16   Q.  So by doing this maneuver, you avoid shoulder dystocia?

17   A.  Correct.

18   Q.  Again, your testimony is based upon this prophylactic

19   maneuver, there was no reason to have a pediatrician present

20   at the time of delivery?

21   A.  Correct.  Even if there were a shoulder dystocia, there

22   was no requirement for a pediatrician to be there.

23   Q.  If we can pull up the picture of bottles again, Government

24   Exhibit 2.  Quick reference to this.  Again, this was a

25   demonstrative exhibit used to show the difference between the

1    left bottle being that of particulate versus all the three --
2    the remaining three on the right as being nonparticulate.  You
3    can take that down.

4        My only question is, based upon your testimony and your
5    questioning by Mr. Price, it's my understanding that what you
6    are saying is that, regardless of whether it was the one on
7    the left or the three on the right, particulate or
8    nonparticulate, the standard doesn't require a pediatrician be
9    present.  Only that somebody who is certified in resuscitation
10   be present at delivery; is that correct?
11   A.   That's correct.  That's the standard.
12   Q.   In this case, Nurse Hendershot was certified in neonatal
13   resuscitation; is that right?
14   A.   Yes.
15   Q.   I want you to assume also that it came out during
16   Dr. Dumpe's testimony that he too is certified in neonatal
17   resuscitation.  Does the fact that there were two people
18   present in that delivery room who were both certified in
19   neonatal resuscitation, does that meet the standard of care in
20   this case?
21   A.   Yes.
22           MR. COLVILLE:  Thank you.
23           THE COURT:  Thank you, Mr. Colville.  Ms. Koczan, any
24   questioning at this time?
25           MS. KOCZAN:  Yes, just a few.

<div align="center">RECROSS-EXAMINATION</div>

BY MS. KOCZAN:

Q.   Morning, Doctor.  I want to follow up on a couple of

comments you made about the policies and procedures at

Heritage Valley.  When Mr. Colville began questioning you

today, he asked you whether you had an opportunity to review

those policies, and I believe your answer was in the

affirmative that you did; is that correct?

A.   Correct.

Q.   And in reviewing those policies, did you become aware that

those policies were prefaced on the American Academy of

Pediatrics and the ACOG guidelines?

A.   Those are some of the references in those policies.

Q.   Okay.  You've now -- or, you had a chance to review those

policies.  Do those policies, and let's start with the policy

that requires a pediatrician to be present, which is 2.21, and

if we could put that up on the screen.  This is that policy

2.21.

     Does that policy comport with the standard of care as

required by ACOG, the American Heart Association and the

American Academy of Pediatrics?

A.   Well, again, in terms of the particulate, the presence of

particulate matter, those guidance documents don't

differentiate between particulate or not, and those guidance

documents, when they refer to meconium in the amniotic fluid,

1    refer to somebody who is -- personnel who are trained in the

2    neonatal resuscitation, so this might have gone a little

3    beyond that.

4    Q.  I want to make sure that the jury understands what you are

5    saying.  The standard of care simply requires that someone

6    trained in neonatal resuscitation be present, and that would

7    have been met by both Nurse Hendershot being present and

8    Dr. Dumpe; is that correct?

9    A.  Correct.

10   Q.  This policy, however, goes above and beyond the

11   requirements and includes having a pediatrician present if

12   there is particulate matter; is that correct?

13   A.  That's what's indicated in that policy.

14   Q.  So just so I'm clear on your testimony, the Heritage

15   Valley policy actually exceeds the standard of care by that

16   requirement?

17   A.  It's beyond the standard of care, correct.

18   Q.  So in terms of the policies themselves, they are

19   completely compliant and over and above what is required; is

20   that correct?

21   A.  Again, I looked at it particularly with regard to

22   meconium, not the other components of that, like abruption,

23   et cetera, but they are consistent with the standard of care.

24        MS. KOCZAN:  Thank you.  Those are all the questions

25   I have.

1        THE COURT:  Mr. Price, any additional questions for

2    this witness?

3        MR. PRICE:  Sure.

4                      RECROSS-EXAMINATION

5    BY MR. PRICE:

6    Q.  I hate to follow up on what Mr. Colville said.  If you

7    have a shoulder dystocia, the first move that a doctor orders

8    to the nursing staff to try to relieve a shoulder dystocia is

9    to do the McRoberts Maneuver, correct?

10   A.  That's not correct.  It's one of the initial maneuvers.

11   There's not necessarily an early hierarchy, but it's one of

12   the early maneuvers that we do as part of the team to relieve

13   a shoulder dystocia.

14   Q.  Right.  That's what -- so in obstetrics, if you are

15   sitting around with a bunch of colleagues and said I had a

16   delivery where I had to do a McRoberts Maneuver, more likely

17   than not, your colleagues are going to say you had a shoulder

18   dystocia, right?

19   A.  I don't know if that's true.  I don't know more likely or

20   not.  We don't sit around and chat about the McRoberts

21   Maneuver in the lounge.

22   Q.  Most doctors, whenever you hear the McRoberts Maneuver,

23   it's associated with a shoulder dystocia, correct?

24   A.  It is a maneuver to relieve shoulder dystocia.

25   Q.  Now, the only other thing I'm going to deal with these

1    policies, if you can pull up Exhibit 14 page 2.  This is -- we
2    could talk about this, highlight all this.  I know we're
3    dancing around this, but I wanted to get clear.  So this is
4    the policy about notifying the pediatrician.
5        And the procedure says that the pediatrician or his/her
6    physician designee will attend the delivery when time of
7    notification permits.  Let's stop there.
8        From my understanding of how this policy works, if a
9    pediatrician must be notified, you are to notify the
10   pediatrician.  You can't just assume that, hey, we have
11   somebody here who is a neonatal resuscitation nurse.  That
12   satisfies the role of a pediatrician, correct?
13   A.  Actually first off, which policy is this from?  Can you
14   remind me, please?
15   Q.  Sure, 2.21, the notification of a pediatrician.
16   A.  Again, your question specifically is?  I'm sorry.
17   Q.  Sure.  That the presumption of the policy is that when a
18   pediatrician must be notified, you must notify the
19   pediatrician.  The pediatrician can get a call and say, okay,
20   this is all the delivery is about.  I will allow my designee,
21   a nurse who is certified in neonatal resuscitation, to handle
22   this delivery, correct?
23   A.  That's the way the policy -- I would interpret that.
24   Q.  Right.  So the first thing that has to be done though is
25   you got to notify the pediatrician because the pediatrician is

1    the one who makes the call.  It's not the obstetrician.  It's

2    not the neonatal nurse.  The pediatrician is the one who says,

3    hey, either I should be there or I can designate somebody to

4    be there, right?

5    A.  According to this policy.

6    Q.  Correct.  Thank you.

7            THE COURT:  Anything further, counsel?

8                        REDIRECT EXAMINATION

9    BY MR. COLVILLE:

10   Q.  Pull that back up, please.  Go to page 4, please, under

11   the policy.  It's the obstetrician's discretion as to whether

12   or not a pediatrician needs to be called under this policy; is

13   that right?

14   A.  That's true.  It's determined by the obstetrical

15   physician.

16   Q.  According to the policy, the predicate is whether or not

17   there was particulate meconium present?

18   A.  Correct, particulate meconium.

19   Q.  In this case, was there anything in the medical record

20   that you reviewed to indicate that any of the meconium that

21   was observed by anybody, documented medical record, had

22   particulate meconium in it?

23   A.  There are multiple references to meconium.  None of them

24   have the word particulate as describing the meconium.

25   Q.  According to you, regardless whether it's particulate or

1    not, you don't need a pediatrician.  What you need is somebody

2    who is certified in neonatal resuscitation.  Pediatrician or

3    otherwise, correct?

4    A.  That's correct, sir.

5            MR. COLVILLE:  Thank you.

6            THE COURT:  Ms. Koczan?

7            MS. KOCZAN:  Just one additional question.

8                        RECROSS-EXAMINATION

9    BY MR. COLVILLE:

10   Q.  If you could put up Dr. Dumpe's report up again and

11   highlight the section where he talks about the meconium there.

12   It's in the middle, I believe.

13       Does Dr. Dumpe in fact clearly document that there was

14   nonparticulate meconium present?

15   A.  That's clear to me, yes, nonparticulate.

16           MS. KOCZAN:  Thank you.  That's all.

17           THE COURT:  Doctor, I have a few questions.  You

18   previously indicated not only by testimony but by your report

19   and we've heard that Kendall Peronis died from neonatal

20   E. coli sepsis, and to that end, you previously wrote this

21   could not have been anticipated during the antepartum,

22   intrapartum or early postpartum care.  What do you mean by

23   that?

24           THE WITNESS:  That there were no signs that this baby

25   was going to suffer from E. coli sepsis infection during the

1    antepartum care, so the prenatal care, during the labor

2    process or in the early immediately postpartum transition up

3    until about -- up until actually the baby started to show

4    respiratory issues in the regular nursery about two hours or

5    so after delivery.

6              THE COURT:  Okay.  Now, how does E. coli sepsis

7    develop?

8              THE WITNESS:  So E. coli is a bacteria characterized

9    as gram negative.  That's the kind of general class of those

10   type of bacteria.  They are very commonly found on human skin.

11   Nearly every human probably has E. coli somewhere in their

12   body.  It's commonly found in the vagina, and in the field of

13   obstetrics as infection ascends from the vagina through the

14   cervix into the womb.  Typically bacteria from the vaginal

15   canal can access the womb during labor and delivery.

16             So the short answer to your question is it's often

17   found in the vagina in healthy individuals.

18             THE COURT:  Thank you.  Now, as you may know, all of

19   the medical records in this case have been introduced into

20   evidence, and to that end, there's an earlier note in this

21   case on September 18, I think it is, 2013, where Ms. Peronis

22   had been diagnosed with a bacterial vaginosis.  In fact, you

23   wrote about that in your report of March 26, 2018, correct?

24             THE WITNESS:  I believe there's a line about that as

25   part of her antenatal history.

62

1          THE COURT:  Would that have had any connection

2     vis-à-vis the development of the E. coli sepsis?

3          THE WITNESS:  So bacterial vaginosis is actually the

4     most common cause of vaginal infections in reproductive age

5     women.  It actually exceeds the incidence of yeast infections,

6     and bacterial vaginosis is an alteration of the vaginal flora

7     in the vagina.

8          It's again extremely common depending on the clinical

9     scenario.  The population, anywhere from ten percent to 30 or

10    40 percent of women may have bacterial vaginosis.  It does

11    put -- it has been associated with infection in the womb, but

12    it is so common that we don't screen for it, and this likely

13    did not have any role in the development of E. coli sepsis in

14    the newborn.

15         THE COURT:  Okay.  In fact, the records show she was

16    given a drug, I think it's metronidazole.

17         THE WITNESS:  Correct.  That's the standard treatment

18    for bacterial vaginosis.

19         THE COURT:  What kind of drug is that?

20         THE WITNESS:  It's an antibiotic.  It can be given

21    intravenously, orally or vaginally.  Typically it's given

22    orally or vaginally for bacterial vaginosis.  It focuses on

23    anaerobic bacteria present in bacterial vaginosis, which are

24    the group of bacteria that are very predominant in bacterial

25    vaginosis.

1          THE COURT:  Now, if she went out and got that

2    medication as prescribed, would that vaginosis have resolved

3    itself prior to the delivery on October 12/13.

4          THE WITNESS:  Probably, although bacterial vaginosis

5    often tends to occur.

6          THE COURT:  Now, Ms. Peronis had an episiotomy at the

7    time of delivery.  Now, would that episiotomy have had any

8    impact on the development of the E. coli sepsis?

9          THE WITNESS:  No.

10          THE COURT:  Would the use of a vacuum have had any

11    impact on the development of E. coli sepsis?

12          THE WITNESS:  No, Your Honor.

13          THE COURT:  Now, given the nature of your practice,

14    you have previously seen episodes of E. coli sepsis?

15          THE WITNESS:  So in pregnant women.  We see E. coli

16    sepsis in nonpregnant women as well and we, in the

17    circumstances around my job at Magee, have unfortunately

18    babies who suffer from E. coli sepsis.

19          THE COURT:  Thank you.  Now, does the court's

20    additional questions cause any counsel to have questions?

21          MR. COLVILLE:  No, Your Honor.

22          THE COURT:  Ms. Koczan?

23          MS. KOCZAN:  Just one, Your Honor.

24          MR. PRICE:  Objection, Your Honor.  Can we approach

25    real quick?

1          THE COURT:  Certainly.

2      (At sidebar.)

3          THE COURT:  Mr. Price?

4      MR. PRICE:  Your Honor, I understand your role here

5  is with regard to determining the liability of the

6  United States, and I know that within Dr. Wiesenfeld's report,

7  he talked about bacterial vaginosis.

8          THE COURT:  It's also in the records.

9      MR. PRICE:  And I made a motion in limine to preclude

10 any discussion about that before this jury which was granted

11 by this court.  I understand that you can ask questions about

12 this issue to the doctor.

13          However, I feel that this issue should not have been

14 brought up in front of the jury and now is, and my concern is

15 that if Ms. Koczan or anybody else goes into this issue when

16 no expert has linked bacterial vaginosis or anything else to

17 the E. coli infection, that I am in trouble.

18          THE COURT:  Well, to that end, I think this witness

19 has already said he didn't link it.  Ms. Koczan, what would

20 you intend to inquire of the witness?

21      MS. KOCZAN:  Nothing about bacterial vaginosis.  I

22 want to ask him a question about the E. coli and signs and

23 symptoms and when they first develop.  Nothing about bacterial

24 vaginosis.

25          THE COURT:  Any objection to her asking about E. coli

1    sepsis, its signs and symptoms since we've heard he's had

2    experience with E. coli sepsis in his own practice.

3         MR. PRICE:  My objection is that these questions

4    could have been asked earlier, and I understand that the court

5    opened it up, but it's already been inquired into.

6    Mr. Colville raised it on direct and now we're just repeating.

7    This is cumulative evidence.

8         THE COURT:  How is it not cumulative, Ms. Koczan?

9         MS. KOCZAN:  Your Honor, the questions that you asked

10   basically opened the door to that, and I just want to ask some

11   additional -- one or two additional questions about that,

12   given the comments that he has just made with regard to the

13   E. coli, because Mr. Colville didn't really ask him a lot of

14   questions about E. coli.  You did, and I just want to follow

15   up on that.

16        THE COURT:  And he was called as an OB-GYN and

17   specialist in reproductive infectious disease, and so you

18   might have thought we would have had a little bit more

19   tutelage on that front.  Your objection is preserved.  Keep it

20   short.

21        (In open court.)

22                         RECROSS-EXAMINATION

23   BY MS. KOCZAN:

24   Q.  Doctor, just a few questions in follow up to some of the

25   questions you were asked by the court.  You have reviewed this

1    record, correct?

2    A.  Yes.

3    Q.  Did you see anything at the time of delivery that

4    indicated that there potentially could be an E. coli

5    infection?

6    A.  No.

7    Q.  Was there any reason then at the time of delivery for this

8    baby to have gone to the nursery directly as opposed to

9    bonding with the parents?

10   A.  No.  I don't see any reason why that baby would have been

11   transferred immediately to the nursery.

12   Q.  Based upon your review of the record, was there any

13   indication that an infection was, for lack of a better word,

14   brewing or manifesting before 7:25 in the morning?

15   A.  No.

16           MS. KOCZAN:  Thank you.  That's all.

17           THE COURT:  Anything further, Mr. Price?

18           MR. PRICE:  No, Your Honor.

19           THE COURT:  At this point, Doctor, I think you can

20   step down, and I trust the doctor is being excused.  Thank you

21   for your appearance here today.

22       (Witness excused.)

23           THE COURT:  At this point in time, I understand,

24   Mr. Colville, you are not going to be calling any additional

25   witnesses, at least at the moment, but Ms. Koczan is going to

1    continue with the hospital defendants' case, correct?

2              MR. COLVILLE:  Yes.

3              THE COURT:  Okay.  Ms. Koczan, who is your next

4    witness?

5              MS. KOCZAN:  Janet Kincade, and I'll go get her.

6              THE CLERK:  Please step forward, miss.

7              THE COURT:  Ms. Kincade, if you'll approach to be

8    sworn.

9              THE CLERK:  Please state and spell your name for the

10   record.

11             THE WITNESS:  Janet Kincade, J-A-N-E-T,

12   K-I-N-C-A-D-E.

13        (Witness sworn.)

14             THE COURT:  Ms. Kincade, right over here.  Watch your

15   step heading up into the witness box.  It's a little uneven.

16   Once you are there, you may be seated.  You'll speak into the

17   microphone.  It moves towards you.  It can also be moved up

18   and down.  If you need to have it, there's water in case you

19   need it.

20             Also, from time to time, one or more of the attorneys

21   could call your attention to the screen next to you.

22   Ms. Koczan, you may proceed.

23             MS. KOCZAN:  Thank you, Your Honor.

24             JANET KINCADE, a witness herein, having been first

25   duly sworn, was examined and testified as follows:

1                     DIRECT EXAMINATION

2     BY MS. KOCZAN:

3     Q.  Good morning.  Can you please introduce yourself to the

4     jury?

5     A.  My name is Janet Kincade.

6     Q.  And, Janet, where do you currently reside?

7     A.  Gilbert, Arizona.

8     Q.  What is your occupation?

9     A.  I'm a registered nurse.

10    Q.  Can you tell the jury a little bit about where you grew up

11    and then your education?

12    A.  I grew up in Holbrook, Arizona, graduated there, then I

13    moved down to Pennsylvania.

14    Q.  What year was that?

15    A.  I moved here between '93 and '94.

16    Q.  What did you do next?

17    A.  I went to nursing school in -- I graduated in 2006.

18    Q.  What nursing school did you go to?

19    A.  Community College of Beaver County.

20    Q.  After graduating from nursing school in 2006, did you

21    become employed as a registered nurse?

22    A.  Yes.

23    Q.  Can you tell the jury where you became employed?

24    A.  I started out on a cardiac telemetry floor.

25    Q.  What institution?

1    A.   At Heritage Valley.

2    Q.   You said cardiac telemetry floor?

3    A.   Uh-huh.

4    Q.   Is that a floor where they monitor people's cardiac

5    rhythm?

6    A.   Yes.

7    Q.   How long did you stay on that unit?

8    A.   I was on that unit for about a year and a half.

9    Q.   And what was next?

10   A.   Pediatrics.

11   Q.   Was that at Heritage Valley?

12   A.   Heritage Valley also.

13   Q.   And how long were you on the pediatric unit at Heritage

14   Valley?

15   A.   I was on the pediatric unit for about two years, but half

16   of that year, we were cross-trained into maternity.

17   Q.   And were you cross-trained into maternity at that time?

18   A.   Yes.

19   Q.   When you talk about maternity, are we talking about what I

20   have referred to as the postpartum unit as opposed to labor

21   and delivery or the nursery?

22   A.   Yes.

23   Q.   So that is where the moms go after they have delivered to

24   recover; is that correct?

25   A.   Yeah.

1  Q.  Is that also the unit where moms keep the babies, and they

2  are sometimes in the rooms with the moms?

3  A.  Yes.

4  Q.  So you would have learned to care for the babies at that

5  point; is that correct?

6  A.  Yes.

7  Q.  How long were you on the pediatric and then cross trained

8  with maternity?

9  A.  I cross-trained for probably about six months.

10  Q.  And what was after that?

11  A.  I moved back to Arizona.

12  Q.  And can you tell the jury what year was it that you moved

13  back to Arizona?

14  A.  I want to say -- oh, my gosh.  I can't even remember.

15  2012 maybe.

16  Q.  And why the moves from and to Arizona?

17  A.  My husband's job.  He was transferred.

18  Q.  And did you work in Arizona?

19  A.  I did.

20  Q.  Can you tell the jury what you did there?

21  A.  I worked at a small hospital there, working emergency room

22  and general population.

23  Q.  At some point, did you then come back again to western

24  Pennsylvania?

25  A.  I did.

1    Q.  What year was that?

2    A.  I think that was 2012.

3    Q.  When you came back to western Pennsylvania, did you again

4    become employed by Heritage Valley Beaver?

5    A.  I did.

6    Q.  And in what capacity were you employed at that time?

7    A.  A supervisor.

8    Q.  And can you tell the jury what units you were the

9    supervisor for?

10   A.  In the beginning, it was pediatrics, maternity, nursery

11   and labor and delivery and then our pediatrics department

12   dissolved and they didn't have it anymore, so it was just

13   maternity, nursery and labor and delivery.

14   Q.  How long were you the supervisor for the units that you've

15   just discussed?

16   A.  About three and a half years, I'm thinking.

17   Q.  Can you tell the jury a little bit about your

18   responsibility as the supervisor for that unit?  What would

19   you do on a day-to-day basis?

20   A.  Mostly, it was census, making sure that we had enough

21   nurses to work.  Dealt with call-offs, evaluations, education,

22   things like that, but mostly it was the flow of the unit.

23   Q.  When you say "flow of the unit," what do you mean by that?

24   A.  Making sure we had enough nurses working on maternity for

25   all the babies born in the middle of the night and things like

1    that.

2    Q.  Would you, as the supervisor, also be called if there were

3    emergency situations going on in a particular unit?

4    A.  Yes.

5    Q.  And would you be called to render assistance to get

6    equipment, that type of thing?

7    A.  Yes.

8    Q.  In October of 2014, at the time of the events that we have

9    been talking about here, were you working on a full or

10   part-time basis?

11   A.  Part-time.

12   Q.  And how many days a week were you working?

13   A.  Two.

14   Q.  Were you working on October 13 of 2014?

15   A.  I was.

16   Q.  And what shift would you have been working that day?

17   A.  I was daylight that shift.

18   Q.  And for you, is daylight 7:00 to 3:00 or was it 7:00 to

19   7:00?

20   A.  7:00 to 7:00.

21   Q.  Do you have a recollection as you sit here today of that

22   day?

23   A.  Yes.

24   Q.  Why is that?

25   A.  We had a busy day that day, and there was two babies that

1    was in the nursery.  One was high risk, and then one that was

2    having a little bit of difficult time breathing.

3    Q.  Do you have a recollection of Kendall Peronis' situation

4    that day?

5    A.  Yes.

6    Q.  Is that for the same reason that you've just articulated?

7    A.  Yes.

8    Q.  Can you tell the jury what you recall happening that

9    brought you to the nursery that day and brought attention to

10   Kendall Peronis?

11   A.  I was orienting another nurse for the supervisor position.

12   Q.  Was that Peggy Brooks?

13   A.  That was Peggy Brooks, and we were in the office, and we

14   were working on paperwork and I was explaining to her

15   everything that you do on a daily basis for the hospital, and

16   I knew that we had a baby that -- I can't remember

17   specifically, but had some type of disfigurement to the chest

18   and was high risk and was going to be shipped out, so we went

19   back to look at that baby.

20        Once we went back to look at that baby, I noticed that the

21   other baby was underneath an oxy hood, so at that time, I had

22   asked what was wrong.

23   Q.  So prior to going -- the events that you've just talked

24   about, you were in the nursery, correct?

25   A.  Yes.

74

1    Q.  Prior to going to the nursery that day, had you heard
2    Kendall had been born at around 5:20 a.m.?
3    A.  I had called at 5:00 in the morning, and they said there
4    was a mom laboring, so I knew that in my census, that I was
5    going to have a couplet ready.
6    Q.  When you went to the nursery that day, you've told us that
7    there was a baby on the warmer; is that correct?
8    A.  Yes.
9    Q.  And was that Kendall Peronis?
10   A.  Yes.
11   Q.  And do you have a recollection of what nurses might have
12   been in attendance that day with Kendall?  Who was there?
13   A.  Barb Hackney, I think, worked the night shift, and Jamie
14   McCrory worked day shift.
15   Q.  And when you saw the baby on the warmer, did you have any
16   conversation with either Jamie or Barb about what she was
17   doing there, what was going on?
18   A.  I did, because the baby actually had an oxygen hood on
19   because it was having a little bit of problems breathing, so I
20   asked what was going on with the baby, and they explained the
21   baby -- they thought maybe the baby was transitional.
22       Then I asked if a physician was notified.  They said yes,
23   the physician was notified.  I asked, okay, what time.  They
24   said 7:20.  I said who is on for pediatrics today.  And they
25   said Dr. Jones, so that's who I thought was on.

1    Q.  Let me just stop you and ask you some questions about what

2    you just said.

3         You asked them if a physician had been notified; is that

4    correct?

5    A.  Yes.

6    Q.  When you asked that question, did anyone say who they had

7    notified?

8    A.  No.

9    Q.  Did they just simply say yes, a physician --

10             MR. PRICE:  Objection.  Can we not lead?

11             THE COURT:  Sustained.  Open the questions up a

12   little bit, Ms. Koczan.

13             MS. KOCZAN:   Okay.

14   Q.  Did you ask who they had notified?

15   A.  No.

16   Q.  Did they ever say who they had notified?

17   A.  No.

18   Q.  When you asked that question, their response was simply --

19   was there response simply, yes, that they had notified a

20   physician?

21   A.  Yes, and then I asked what time.

22   Q.  Then you asked what time, is that correct, and they told

23   you what, around 7:20?

24   A.  Around 7:20.

25   Q.  At that time, did you know anything about who they called?

1    A.  No.

2    Q.  Did you ask who they called?

3    A.  No.

4    Q.  You have told us that you asked who the pediatrician on

5    call that day was?

6    A.  Yes.

7         MR. PRICE:  Objection, Your Honor.  This is all

8    leading.

9         THE COURT:  Sustained.

10   Q.  Did you ask who the pediatrician on call was that day?

11   A.  I did.

12   Q.  And who did they tell you?

13   A.  Dr. Jones.

14   Q.  Did you then make an assumption that it was Dr. Jones who

15   had been called?

16        MR. PRICE:  Objection, Your Honor.

17        THE COURT:  Sustained.

18   Q.  Did you have any thoughts or opinions about who had been

19   called?

20   A.  I assumed that it was Dr. Jones because she was the one

21   that was on call.

22   Q.  Did you know one way or the other for a fact that it had

23   been Dr. Jones?

24   A.  No.

25   Q.  Let me ask you this question:  Did you ever call

1    Dr. Jones?

2    A.  I did not.

3    Q.  Did you observe anybody else calling Dr. Jones at that

4    time?

5    A.  I did not.

6    Q.  After that initial conversation about had a pediatrician

7    been called and what you've told us already, what happened

8    next?

9    A.  From what I recall, the baby deteriorated and they started

10   working more on the baby.

11   Q.  Do you have any recollection of seeing or speaking with

12   the resident Dr. Heiple that morning?

13   A.  I don't remember seeing him or speaking with him, but I

14   know that he was there at some point because of the orders

15   that were written.

16   Q.  Okay.  Do you recall Dr. Jones coming in that morning?

17   A.  Yes.

18   Q.  And can you tell the jury what it is that you recall about

19   her arrival, and let's start with the time?  Do you remember

20   what time she got there?

21   A.  I do not remember what time she got there.

22   Q.  Do you recall the circumstances of her arrival?

23   A.  No.

24   Q.  You just -- is it that you --

25   A.  I expected her to be there.

1    Q.  And do you recall hearing any conversations that Dr. Jones

2    had with either the resident or the nursing staff when she

3    arrived?

4    A.  No.

5    Q.  Do you recall Dr. Jones making arrangements for Kendall to

6    be transferred?

7    A.  Yes.

8    Q.  Can you tell the jury what you can recall about that?

9    A.  Just that she was on the phone making arrangements and

10   getting an accepting doctor.

11   Q.  Did you stay for the entire time that Dr. Jones, Jamie and

12   the West Penn team were working on Kendall?

13   A.  For the most part, yes.

14   Q.  And what were you doing during that time frame?

15   A.  At that time frame, I was taking care of the other high

16   risk infant that was in the room so that everybody else could

17   focus on the other baby.

18   Q.  And in terms of the focus on the other baby, do you have

19   any recollection of what they were doing for the baby?

20   A.  Yes, I could see what they were doing.

21   Q.  Can you tell the jury what you recall observing?

22   A.  I think they intubated.  They were doing chest

23   compressions, things like that.  Lifesaving procedures.

24   Q.  We have seen a code sheet, and if we could put that up.  I

25   believe that's 1116.  Not a code sheet but some documentation

1    of the events.  Does this sheet contain any of your

2    handwriting?

3    A.  No.

4    Q.  If we scroll down a little bit further, I see that you are

5    identified as the recorder on that.  What does that mean?

6    A.  Usually it's the person that fills the paperwork out.

7    Q.  But you said that this is not your handwriting there?

8    A.  No.

9    Q.  There's also a couple of other folks identified, one of

10   which is Peggy Brooks.  Can you see that right above yours?

11   A.  My writing is up on this top part right here where it says

12   "West Penn at 9:45 and x-ray at 9:50."

13   Q.  Let's scroll up here.  Where is your handwriting?

14   A.  In the side where it says, "Transport West Penn at 9:45."

15   That's my handwriting and "X-Ray at 9:50."  Not that one.

16   Q.  On the right-hand side there?

17   A.  And x-ray called.

18   Q.  That is your handwriting?

19   A.  Yes.

20   Q.  After the code was called, do you have any recollection of

21   there being any discussions with Dr. Jones or anyone else

22   about what they thought had happened that day?

23   A.  I did not.

24   Q.  And were you in any way involved in making arrangements

25   for Kendall's autopsy or any of that type of thing?

1    A.  No.

2    Q.  After that day, do you have any recollection of hearing

3    anything further about what had happened to Kendall?

4    A.  Well, yes.  No.  I heard that it was a possibility for an

5    aspiration meconium, but that's what I had heard.

6    Q.  Was that that day?

7    A.  That was like the day, the next day, yes.

8    Q.  Did you ever hear after the fact that the blood cultures

9    and tissue cultures in fact revealed an E. coli sepsis?

10   A.  No.

11        MR. PRICE:  Objection, Your Honor.

12        THE COURT:  Sustained.

13   Q.  After the code that day, did you prepare an event note?

14   A.  Yes, I did.

15   Q.  Let's take a look at that.  That's 1135 and 1136.  And I

16   would like to -- let's talk about this one first.  Is this

17   your note?

18   A.  Yes.

19   Q.  You have here documented here, "Infant born at 10-12-14 at

20   5:20."  Was it actually 10-13-14?

21   A.  I guess.

22   Q.  It says here, "While in nursery, infant started having

23   respiratory distress."

24        Where did you get that information?

25   A.  From what they had told me.

1    Q.  "They" being what Jamie McCrory and Barb Hackney?

2    A.  Yes.

3    Q.  "Residents notified along with Dr. Jones."  And again, do

4    you have any knowledge of anyone calling Dr. Jones that day

5    before she arrived?

6    A.  No.  Just from how I questioned the nurses.

7    Q.  And that question was what?  Whether a doctor had been

8    called?

9    A.  Who was on.  Who was on call.

10   Q.  Who was on call?

11   A.  After I asked if a doctor was notified.

12   Q.  And then I think the rest of it simply documents what

13   you've already talked about; is that correct?

14   A.  Yes.

15   Q.  Let's also look up above it, in the middle there on the

16   left-hand side, and again scroll down a little bit.  Keep

17   scrolling down.  Let's go to the next document.  This one is

18   1135.  This is a second one here.  And if we can focus in the

19   middle of that where it says "Physician notified."  If we

20   scroll up a little bit higher so we can see that.

21       You have documented Dr. Jones notified at 7:20 a.m.; is

22   that correct?

23   A.  Yes.

24   Q.  And just so we're clear on this, you never called

25   Dr. Jones?

82

1    A.  No.

2    Q.  Even though it's documented.  You did not observe anybody

3    else calling Dr. Jones?

4    A.  No.

5    Q.  Is that correct?  And is that documented there because you

6    made an assumption that it was Dr. Jones rather than the

7    resident that was called?

8             MR. PRICE:  Objection.

9             THE COURT:  Sustained, leading.

10   Q.  Why did you document Dr. Jones at 7:20?

11   A.  Because when I talked to the nurses, I was under that

12   assumption, that because Dr. Jones was the one that was on

13   call for the day, there for the day, that she was notified

14   when I asked if you called the physician.

15   Q.  But did you know one way or the other whether she had or

16   had not been?

17   A.  No.

18   Q.  Let's look at the rest of that documentation then again.

19   If we can leave that up.  There's some other documentation

20   about some other folks that were notified, and you identified

21   yourself and Peggy Brooks were notified at 7:20, and is that

22   when you were in the nursery that day?  Is that why that

23   documentation appears there?

24   A.  Yeah.  She was with me.  I was orienting her.

25   Q.  There is a question in this case about when Dr. Jones was

1    first made aware of this entire situation.

2        Do you have any knowledge whatsoever that she became aware

3    of the situation before she walked into the hospital or walked

4    into the nursery at 8:00 that morning?

5            MR. PRICE:  Objection, Your Honor.

6            THE COURT:  Overruled.

7    A.  I was under the assumption that she was called and that

8    she was going to be coming in.

9    Q.  And that was your assumption though?

10   A.  Yes.

11   Q.  That was not based upon anything that anyone told you,

12   anything that you personally did?

13   A.  No.

14   Q.  Or anything that anybody -- or anything that you observed;

15   is that correct?

16   A.  Correct.

17   Q.  So if Dr. Jones has pager records and cell phone records

18   that indicate that she was not called, would you have any

19   reason to disbelieve that?

20           MR. PRICE:  Objection, Your Honor.

21           THE COURT:  Overruled.

22   A.  No.  I would believe it.

23           MS. KOCZAN:  Thank you.  That's all I have.

24           THE COURT:  Mr. Colville, any questions of this

25   witness?

1           MR. COLVILLE:  No, Your Honor.

2           THE COURT:  Mr. Price?

3                       CROSS-EXAMINATION

4    BY MR. PRICE:

5    Q.  Good morning, Nurse Kincade.

6    A.  Good morning.

7    Q.  I wanted to follow up on a little bit of your background.

8    You mentioned, as we know, you were here in October of 2014,

9    but obviously you left town again?

10   A.  Yes.

11   Q.  When did you leave?

12   A.  In 2015.

13   Q.  What month of 2015?

14   A.  I want to say maybe August.

15   Q.  So you were here for almost a year after Kendall's

16   passing?

17   A.  Uh-huh.

18           THE COURT:  You are saying yes?

19           THE WITNESS:  Yes.

20   Q.  Since then, I mean, you moved back to Arizona?

21   A.  Yes.

22   Q.  Have you been back up to work in Heritage Valley since

23   then?

24   A.  No.

25   Q.  We did not meet until today.  We didn't do any pretrial

1    depositions in this case, correct?

2    A.  Correct.

3    Q.  So you have never -- you weren't asked to sit down and to

4    talk about the notes and about what you did any time before

5    today, correct?

6    A.  Correct.

7    Q.  So we are almost five years after the time of recording,

8    correct?

9    A.  Correct.

10   Q.  And just so I understand, after October 13, 2014, you

11   didn't have any further conversations with anybody about the

12   case?  Didn't talk to Dr. Jones?  Didn't talk to Dr. Dumpe?

13   Didn't talk to any of the other nurses about Kendall, correct?

14   A.  Correct.

15   Q.  So your testimony here is based upon your recollection

16   from almost five years ago, correct?

17   A.  Correct.

18   Q.  Now, when were you notified that your testimony might be

19   required in this case?

20   A.  On Thursday.

21   Q.  And were you notified by Ms. Koczan?

22   A.  Yes.

23   Q.  So she called you and she asked you to come up and testify

24   in this case?

25   A.  Yes.

1    Q.  And when did you fly up?

2    A.  On yesterday, I guess.

3    Q.  On Labor Day?

4    A.  Yeah, the night.

5    Q.  Phoenix?  Tucson?

6    A.  Phoenix.

7    Q.  What time did you come in yesterday?

8    A.  Well, it was technically the night before at 1:00 a.m. I

9    left and I got here about 10:30.

10   Q.  So you flew the red eye on Sunday night?

11   A.  Yes.

12   Q.  Came in, so you were here all day yesterday?

13   A.  Yes.

14   Q.  And where were you staying?

15   A.  In a hotel.

16   Q.  Which one?

17   A.  The Hampton Inn.

18   Q.  Where is that located?

19   A.  That's by the Beaver Valley Mall in Monaca.

20   Q.  And when are you flying back?

21   A.  I am flying back on Friday.

22   Q.  And are all of the expenses that you are going to incur

23   here, are they all going to be covered -- they are not coming

24   out of your own pocket, correct?

25   A.  No, they are not coming out of my own pocket.

1  Q.  In addition to all of your expenses, are you being paid

2  any money to come here to -- here's some money for your

3  testimony?

4  A.  No.

5  Q.  You had a chance to meet with counsel to discuss your

6  testimony yesterday, correct?

7  A.  We discussed it, yes.

8  Q.  Now, yesterday was the first time that you saw any records

9  or notes about Kendall since October 13, 2014, correct?

10  A.  I didn't see any.  All I did was hear when I was talking

11  to her on the phone.  We didn't meet person to person.

12  Q.  Okay.  So these were all telephone calls that you and your

13  counsel had about the records, and you hadn't seen any of

14  them, correct?

15  A.  Correct.

16  Q.  Now, if you can pull up the PowerPoint.  I'm going to show

17  you a couple things.  First, we saw this record.  Now, this

18  record is a medical record, correct?

19  A.  Yes.

20  Q.  And you, as the nursing supervisor, were tangentially

21  involved in Kendall's care, correct?

22  A.  Yes.

23  Q.  And as the nursing supervisor, you were the one that was

24  responsible for making sure that staffing and who was all

25  there and if any of the nurses had a little bit of extra

1    trouble or there were some problems, you could step in to

2    help, correct?

3    A.  Yes.

4    Q.  So you filled out this medical record in Kendall's file on

5    October 13, 2014, and you put that Dr. Jones was notified at

6    7:20, correct?

7    A.  Yes.

8    Q.  And you didn't put down on there I think, I assume, maybe

9    Dr. Jones was notified.  You put down Dr. Jones notified at

10   7:20, correct?

11   A.  Correct.

12   Q.  And from what I think you told us is that you didn't hear

13   anybody talking about calling Dr. Jones or whether or not they

14   had called Dr. Jones before you, correct?

15   A.  Correct.

16   Q.  So your first recording in Kendall's chart is that

17   Dr. Jones was notified, correct?

18   A.  Correct.

19   Q.  So as you could see, I think you would agree with me,

20   anybody who looks at that would make it seem like, since you

21   recorded this note, you notified Dr. Jones at 7:20, correct?

22   A.  No.  I wouldn't think that, that I was the one that

23   personally notified the doctor.

24   Q.  You don't read it that way.  You can read it differently,

25   but you are the one who wrote the note.  You say Dr. Jones

1  notified at 7:20, correct?

2  A.  Yes.  That's what I believed.

3  Q.  Now, let me get into the next part about this.  Now, you

4  know Nurse Jamie McCrory, correct?

5  A.  Yes.

6  Q.  Whenever you got into the nursery at 7:20 that morning,

7  you saw how Kendall was doing and you talked to Nurse McCrory

8  about how she was caring for Kendall, correct?

9  A.  Yes.

10  Q.  And Nurse McCrory has testified, well, Kendall's oxygen

11  level was abnormal at 81 percent.  Do you remember that?

12  A.  Uh-huh.

13          THE COURT:  You are saying yes?

14          THE WITNESS:  Yes.

15  Q.  She was grunting, flaring and retracting.  Do you remember

16  that?

17  A.  Yes.

18  Q.  That Kendall appears to be in pain.  Do you remember that?

19  A.  No, I don't remember that statement.

20  Q.  That she had nasal flaring, grunting and substernal

21  retractions?

22  A.  At that time, I didn't notice that either.

23  Q.  But these are all notes, I'll tell you, that Jamie McCrory

24  noted at 7:25, so I'm just quoting from the record.  I know

25  you haven't seen it and I'll represent to you she was here

1    last week and this is what she testified to.

2              MS. KOCZAN:  Objection, Your Honor.

3              THE COURT:  Sidebar.

4         (At sidebar.)

5              THE COURT:  Ms. Koczan?

6              MS. KOCZAN:  Your Honor, my objection is that this

7    witness was not present to hear Jamie's testimony, and the

8    representation is being made that Jamie said that all of these

9    things occurred at that time which is not what Jamie said, and

10   I don't want this witness misled in that regard because she

11   wasn't here to see it or hear it, so I want to make sure the

12   record reflects what Jamie actually did say.

13             THE COURT:  Mr. Price?

14             MR. PRICE:  This trial has been about people

15   representing testimony and about what people said, and why all

16   of a sudden I'm getting called on it, I don't know.

17             THE COURT:  True.  I think this may be a -- how shall

18   I say -- a timeline style objection, because although

19   Ms. McCrory did testify to a lot of findings that she made,

20   she didn't pinpoint all of them at 7:20 or 7:25 and the like,

21   one.

22             Number two, it's true all through this trial, unlike

23   other trials I've been in, we haven't had experts sitting in

24   the back of the room to watch other experts.  We haven't had

25   witnesses sitting in the back of the room to watch others, and

1    I don't know that we've had a formal motion to sequester, so I

2    think that the objection can be met by you rephrasing it as a

3    hypothetical question, but to that end, I don't think that she

4    was as precise as you might have wanted her to be, Mr. Price,

5    as to 7:20, 7:25 and the like.  Certainly she found a lot of

6    issues with the baby and she was attempting to address all

7    those issues.  Understood?  Okay.

8        (In open court.)

9            THE COURT:  Mr. Price is going to rephrase his

10   question.

11   BY MR. PRICE:

12   Q.  Here's what I will -- I know you haven't seen the medical

13   record, but at 7:25, Jamie McCrory made a medical record, and

14   I'll represent to you that all of these facts were in the

15   medical record for Jamie McCrory when she recorded at 7:25 in

16   the morning.  Okay?

17   A.  Uh-huh.

18   Q.  We went through all of these.  She noted respiratory is

19   labored, abdominal muscle use, subcostal retractions, breath

20   sounds coarse anterior/posterior, infant's dusky appearance

21   and pulse ox and oxy hood in place.

22       And just so the jury could see, this is the type of thing

23   that an oxy hood is --

24   A.  Yes.

25   Q.  -- whenever you put an oxy hood on, and she also noted the

1    oxygen level was 64 percent.  Now, here's my question:  As a

2    nurse in the nursery, when you have a patient who has all of

3    these conditions, isn't it true that this is what you do?

4    A.  Yes.

5    Q.  And your next note is an incident report and this was --

6    you know what an incident report is, correct?

7    A.  Yes.

8    Q.  Can you explain to the jury what an incident report is?

9    A.  It's a summary of what was going on at the time.

10   Q.  Why are incident reports filled out?

11   A.  Actually, I don't really know.  Just for record.

12   Q.  Are they filled out in every case?

13   A.  Just when something has gone on.

14   Q.  When something has gone wrong?  And this is a case where

15   something has gone wrong?

16   A.  It's -- it's something that's gone on that's out of the

17   ordinary for a normal everyday day task that we have.  So if

18   it's something that's out of the ordinary and we need to fill

19   something like that out.

20   Q.  And your job as the nursing supervisor is to fill out

21   incident reports and be as detailed as possible so that

22   whenever these incident reports are given to administration,

23   that they can review the incidents to determine if anything

24   needs to be changed or anything needs to be addressed,

25   correct?

1    A.  Correct.

2    Q.  And when you filled out this note, you mentioned that the

3    residents were notified along with Dr. Jones regarding infant

4    in nursery with respiratory distress, correct?

5    A.  Correct.

6    Q.  So you noted that, first, the residents had been notified,

7    and then you also noted that Dr. Jones was notified, correct?

8    A.  Correct.

9    Q.  Now, I know you weren't here for Dr. Jones' testimony, but

10   what I will tell you is that she says I was never notified.

11   Assuming that, your note is in contradiction to that, correct?

12   A.  Correct.

13   Q.  And that is part of your job as supervisor.  Whenever a

14   nurse like Nurse McCrory is deep into a condition and she

15   needs help, that you are there to lend a little backup, to

16   make sure that doctors, residents, whoever come in to help the

17   situation as best as you can, correct?

18   A.  Correct, and that's why I said, as soon as I came in, was

19   the physician notified.  As soon as I came in, to make sure

20   there was a physician notified.  I was told yes, and the time

21   that they told me was 7:20, and then I asked, well, who was on

22   for the day and they said Dr. Jones, so yes, I assumed that it

23   was Dr. Jones, but I made sure that there was a physician

24   notified.

25   Q.  First, let me ask you who was notified at 7:20?  What

1    doctor?

2    A.  I was under the assumption it was Dr. Jones.  Apparently

3    it was a resident.

4    Q.  Here's what I'll tell you too:  The evidence has shown

5    that at 7:20, no resident was notified.

6    A.  Okay.  That's just what they told me.

7    Q.  Who is "they"?

8    A.  It was either Barb Hackney or Jamie.

9    Q.  But when you came in at 7:00, 7:20, you were under the

10   impression that Dr. Jones or a doctor had been notified?

11   A.  Yes.

12   Q.  And then you were there for the rest of the morning.  Now,

13   I know that you don't remember anything about really the event

14   because you were dealing with the other child, correct?

15   A.  Correct.

16   Q.  And you don't recall seeing any resident doctor come in to

17   the -- you don't even recall Dr. Heiple coming into the

18   nursery, correct?

19   A.  No, not at this time.  I don't remember.  He could have

20   been in and out and I just didn't see him.

21   Q.  And you have no idea what time Dr. Jones got there?

22   A.  No.

23   Q.  But the important thing is that, in a situation like Jamie

24   McCrory was in, that a doctor be notified, correct?

25   A.  Correct.

95

1          MR. PRICE:  That's all the questions I have, Your

2    Honor.

3          THE COURT:  Ms. Koczan, follow-up?

4                    REDIRECT EXAMINATION

5    BY MS. KOCZAN:

6    Q.  Janet, was it the policy of the Heritage Valley that when

7    a situation like this occurred that the nurses were supposed

8    to call the resident first before the attending physician?

9          MR. PRICE:  Objection, Your Honor.  Leading.

10         THE COURT:  Sustained.

11   Q.  Are you familiar with the Heritage Valley policy?

12   A.  I don't really remember the policies as much because I

13   haven't worked there in quite a while.

14   Q.  Can we put up document 1172?  And if we can highlight that

15   section where it says physician communication at the bottom.

16   Can you see that?

17       I will represent to you that this is Jamie's note which

18   was timed at 7:25 a.m., and does that note document, under

19   physician communication, physician communication detail,

20   "Residents contact related to infant's dusky appearance, GFR,

21   pulse ox and oxy hood in place"; is that correct?

22   A.  Yes.

23   Q.  And does that in fact document that somewhere around 7:25,

24   Jamie McCrory called the resident Dr. Heiple?

25   A.  Yes.

1    Q.  Just to conclude, you did not call Dr. Jones, you are not

2    aware of anyone else calling Dr. Jones.  Is it the situation

3    that you made an assumption in this case?

4    A.  Yes.

5            MR. PRICE:  Objection, Your Honor.

6            MS. KOCZAN:  Thank you.  That's all.

7            THE COURT:  Sustained.  That question is stricken, as

8    is the answer.  Mr. Colville, any questions of this witness?

9            MR. COLVILLE:  No, Your Honor.

10           THE COURT:  Mr. Price, anything else?

11           MR. PRICE:  No.

12           THE COURT:  Ms. Kincade, I think I have one question.

13   You said that you called in at 5:00.  I guess you called in

14   from home?

15           THE WITNESS:  Yes.

16           THE COURT:  Do you remember who you talked to?

17           THE WITNESS:  I talked to -- I don't remember

18   specifically who it was.  I talked to Barb Hackney in the

19   nursery.  Labor and delivery, I don't really remember because

20   it's multiple nurses on that side, and maternity, it's

21   multiple nurses on that side.

22           THE COURT:  And when you called in at 5:00, you were

23   basically told that there was a mom laboring; is that it?

24           THE WITNESS:  Yes.

25           THE COURT:  Were you told anything else?

97

1          THE WITNESS:  No.

2          THE COURT:  Does the court's additional questions

3     cause either counsel to have questions?  Ms. Koczan?

4     Mr. Price?

5          MS. KOCZAN:  No.

6          MR. PRICE:  No.

7          THE COURT:  Ms. Kincade, you may step down.  Thank

8     you for your appearance here today.  I'm presuming you can be

9     excused.  She is not subject to recall?

10         MS. KOCZAN:  That's correct.

11       (Witness excused.)

12         THE COURT:  Ms. Koczan, do you have another witness

13    you want to call at this time?

14         MS. KOCZAN:  I do, Barb Hackney.  She is outside.

15    I'll go get her.

16         THE CLERK:  Please step forward, miss.

17         THE COURT:  Ms. Hackney, if you'll approach

18    Mr. Galovich to be sworn.

19         THE CLERK:  Please state and spell your name for the

20    record.

21         THE WITNESS:  Barbara Hackney, B-A-R-B-A-R-A,

22    Hackney, H-A-C-K-N-E-Y.

23       (Witness sworn.)

24         THE COURT:  Ms. Hackney, watch when you step over

25    here, the step is not entirely even.  Once you are there, if

1    you'll arrange yourself with the microphone so you are

2    speaking into it.  And there's water just in case you need it.

3    You may also be asked to look at the screen from time to time.

4    Ms. Koczan, you may proceed.

5              MS. KOCZAN:  Thank you, Your Honor.

6              BARBARA HACKNEY, a witness herein, having been first

7    duly sworn, was examined and testified as follows:

8                        DIRECT EXAMINATION

9    BY MS. KOCZAN:

10   Q.  Good morning.

11   A.  Good morning.

12   Q.  Can you please introduce yourself to the jury?

13   A.  My name is Barbara Hackney.

14   Q.  And, Barb, what area of town do you live in?

15   A.  I live in New Sewickley out behind Cranberry.

16   Q.  And what is your occupation?

17   A.  I'm a registered nurse.

18   Q.  Can you tell the jury about your education, beginning with

19   high school and bringing us up through nursing school?

20   A.  I graduated from Beaver Falls High School in 1979, and

21   then I went on to attend college at Edinboro State College,

22   and I graduated from there in 1983 with my BSN.

23   Q.  And BSN means bachelor of science in nursing; is that

24   correct?

25   A.  Correct.

1    Q.  After you graduated with your BSN, did you begin to work

2    as a nurse?

3    A.  I did.  I first started out in Dubois.  I was looking for

4    a full-time job.  I went out there, worked for five days and

5    decided that that was just not what I wanted to do, and The

6    Medical Center had offered me a part-time job, so I came home

7    and started there.

8    Q.  And when you were offer -- when you talk about The Medical

9    Center, we're talking about Heritage Valley Beaver; is that

10   correct?

11   A.  That is correct.  It used to be called The Medical Center.

12   Q.  And when you were offered a part-time job at what is now

13   known as Heritage Valley Beaver, where were you working?  What

14   unit?

15   A.  I first started on the eye, ear, nose and throat unit, and

16   I worked there probably about six weeks or so.  There was a

17   full-time job that came open.  They told us we were allowed to

18   bid on them, so I bid on a full-time job, and I went up and

19   worked on the drug and alcohol unit.

20   Q.  How long were you on that unit?

21   A.  From then until February of 1988.

22   Q.  And what happened in February of 1988?

23   A.  I applied for a position down in maternity, and I received

24   the position, and I went down there and worked, and that's

25   where I worked until I no longer worked there.

1    Q.  And when did you leave Heritage Valley Beaver?

2    A.  March of 2015.

3    Q.  And where are you employed now?

4    A.  I am now employed with Heritage Hospice out of

5    New Kensington.

6    Q.  Is Heritage Hospice in any way related to Heritage Valley?

7    A.  It is not tied to Heritage Valley in any way.

8    Q.  And are you a hospice nurse now.  Is that what you do?

9    A.  Yes, I am a hospice nurse.  I'm an RN case manager.

10   Q.  Let's go back to your time in the maternity department,

11   and again, when did you start there?  What was the date of --

12   A.  Sometime in February of 1988, I started there.

13   Q.  And when you say maternity department, are we talking

14   about all three units that we've heard about, which is labor

15   and delivery, nursery and the postpartum unit, or were you

16   specifically in one of those?

17   A.  When I first started there, they were -- all three were

18   separate, and I was hired to work in postpartum, so that is

19   where I worked was in postpartum with the moms.

20   Q.  As part of working in postpartum, did you also work with

21   the babies?

22   A.  After a while, and I can't remember how long I was working

23   there, they started doing what was known as mother baby

24   nursing, and it was becoming very popular, where the babies

25   spent more time with the moms, and we were trained in doing a

1    normal newborn assessment on the babies and the moms, and we

2    would take care of the moms and babies during the day while

3    they were on the floor.

4    Q.  At some point, did you also begin working in the nursery

5    taking care of the babies?

6    A.  At some point, they started cross training us.  They said

7    that we had to work two of the three units, and I chose to do

8    the nursery instead of labor and delivery, and I was trained

9    to work back in the nursery.

10   Q.  Can you tell the jury a little bit about the training that

11   you got to work in the nursery?  What did it consist of?

12   A.  It was working alongside another nurse who was proficient

13   in the nursery and educating me on what was the protocols and

14   what was the way of doing things to care for the newborn.

15   Q.  As part of that training, did you learn to perform a

16   newborn assessment?

17   A.  Yes.

18   Q.  And would you have also learned how to identify and assess

19   a baby that might have respiratory difficulties?

20   A.  Yes, absolutely.

21   Q.  And was that training, did it also include what to do in

22   the event that there were respiratory difficulties?

23   A.  Yes.  There was a protocol for that.  You'll have to

24   excuse me.  I do not remember.  It has been several years

25   since I've worked there.

1    Q.  So once you became trained in the nursery, in addition to

2    the maternity ward, can you give the jury some estimate of

3    what time -- what percentage of your time was in the nursery

4    versus the postpartum unit?

5    A.  Our schedules ran for four weeks and they would mark on

6    the schedule what days you were to spend in the nursery, and

7    it was usually, for a four week period, you would get three or

8    four days in the nursery to work back there.

9    Q.  And how long was that?  When did you begin in the nursery

10   and how long would you have done it that way?

11   A.  I don't know.  I cannot remember at this time.

12   Q.  This series of events that we are talking about occurred

13   in 2014.  Obviously it was sometime before that?

14   A.  Yes, it was sometime before that, but I don't know when it

15   started.

16   Q.  Would it have been years before that?

17   A.  My best recollection is it would have been a couple years

18   before that.

19   Q.  When you worked in the nursery, what were your

20   responsibilities?

21   A.  The responsibilities were to care for any of the babies

22   that were back there.  They would all be assigned to other

23   nurses unless they were a high risk baby, in which that would

24   be mine or a new admission would be mine as it came into the

25   nursery.

1    Q.  Let me stop you and ask you to explain that.  You said

2    they were all assigned to other nurses.  What did you mean by

3    that?

4    A.  As a mother/baby couplet, they were assigned to the nurses

5    on the floor, and if mom wanted to rest or mom had to go for a

6    test or whatever, they would come back to the nursery, and I

7    would observe and maintain their care until mom returned.

8    Q.  You also said that there were situations in which you

9    would be taking care of the baby when they were first admitted

10    to the nursery; is that correct?

11    A.  Yes.  If you were the nursery nurse and babies came over

12    from labor and delivery, you would receive them.

13    Q.  Can you explain that process to the jury?  What did that

14    entail?

15    A.  You'll have to excuse me, because again, it's been a long

16    time, but -- I can't be specific, but in general, we would

17    receive report from the labor room nurse, and we would do

18    vital signs.  We would give them medications.  We would assess

19    the baby from head to toe, every nook, every cranny.  We would

20    listen to lungs and bowels.  Everything.  You would just check

21    the baby from head to toe to note anything that was abnormal.

22    Q.  You also told us that there was a third circumstance in

23    which you would take care of babies.  I think the term you

24    used was high risk babies.

25    A.  Yeah, they were back in the nursery.  They were the ones

1    that were staying because they were maybe on oxygen, maybe

2    they were being observed for other reasons.  Sometimes moms

3    would go home and babies would be -- would have to remain.

4    They were not discharged, and those would be the ones that I

5    would take care of.

6    Q.  Was there a typical number of babies that you would be

7    responsible for in the nursery on any given day?

8    A.  I have a vague recollection of like six was the most we

9    were allowed to take, but I'm not -- I would have to go back

10   and look at what was happening at the time.

11   Q.  We've heard a lot about different types of nursing.  What

12   type of nursery was the nursery at Heritage Valley in terms of

13   was it level one, level two, level three, level four, what?

14   A.  The level one nursery is where the newborns would go, and

15   the level two nursery is where the newborns would go if they

16   were struggling or needed extra care or observation.

17   Q.  Now, I want to move and ask you some questions about your

18   responsibilities on the maternity ward.  We've talked about

19   the nursery.  What did you do when you were the nurse on the

20   maternity ward?

21   A.  Took care of the moms and the babies together.  You would

22   just make sure that the babies were being fed.  You would

23   provide education to mom as she was preparing to take the baby

24   home, trying to help her get ready to do that.

25   Q.  And if you were taking care of babies on the maternity

1    ward along with mom, would you be doing the same sort of

2    things that you had done in the nursery, assessing the baby,

3    watching the baby, that type of thing?

4    A.  Yes.

5    Q.  Is that accurate?

6    A.  Yes.

7    Q.  Now, I'd like to switch gears and talk a little bit about

8    Kendall Peronis and the events that occurred on October 13 of

9    2014.  First and foremost, do you have a recollection of that

10   day?

11   A.  Very vague.

12   Q.  Can you tell the jury what it is that you can recall about

13   that day?

14   A.  I remember receiving the baby in the nursery right at

15   change of shift.

16   Q.  Do you remember that the baby that you received was indeed

17   Kendall Peronis?

18   A.  When I reviewed the records, that's what it said, yes.

19   Q.  What shift were you working that day?

20   A.  I worked 12 hours, so I worked 7:00 p.m. to 7:00 a.m.

21   Q.  So would it be the situation that you would have started

22   at 7:00 p.m. on the 12th?

23   A.  Correct.

24   Q.  And you were working until 7:00 a.m. on the 13th; is that

25   accurate?

A.  Right.  Well, I worked until 7:30 because they always do
that overlap, so there's report and there's adequate staffing
for the change.

Q.  And do you have any recollection of how many babies were
actually in the nursery that night and into that morning?

A.  At the time when I gave report is that what you are asking
about?

Q.  That's right.

A.  Kendall was there and there was another baby that was
there on another warmer bed.

Q.  We've heard about another baby being present that had some
sort of surgical issue that needed to be transferred.  Is that
the one that you are referring to?

A.  Yes.  That baby was stable at that time.

Q.  Do you recall what time it was that Kendall arrived in the
nursery that day?

A.  I cannot specifically say exactly what time the baby came,
but it was very close to 7:00, because had it been sooner, I
would have done the full assessment and assessed the baby.

Q.  Do you have a recollection of who brought Kendall to the
nursery that day, which nurse?

A.  Maria Hendershot.

Q.  And did you know Maria?

A.  Oh, yes.  Maria took care of me when I had my babies.

Q.  So had you known Maria for some period of time then?

1    A.  Yes, I have.

2    Q.  Do you have any recollection as you sit here today about

3    getting report from Maria about Kendall?

4    A.  I am 100 percent sure that I got report because that is

5    what we do when you take a baby to a new place, you always

6    give report to the person you are handing the baby off to.

7    Per se, I cannot remember exactly what was said.

8    Q.  Not recalling exactly what was said, was there a routine

9    that existed between the nurses at Heritage Valley about the

10   type of information that would be or was required to be

11   provided to a nurse picking up a baby in the nursery?

12   A.  Yes.  When they would bring them over, they would -- they

13   had the delivery record with them and they would let us know

14   the Apgar scores.  They would let us know if there was

15   anything unusual that happened during labor and delivery,

16   anything that could -- that was out of the norm.

17   Q.  Do you have any recollection of hearing that there had

18   been any issues with Kendall before she arrived in the nursery

19   that day?

20   A.  No, I do not recollect any information that she was having

21   any issues.  Usually, if the baby is having issues, they bring

22   them directly to the nursery.  They do not get to stay with

23   their moms.

24   Q.  And did you have an understanding that Kendall had stayed

25   with her mom for some period of time?

1   A.  Yes.  I knew that she had been born and that she was still

2   over there.  I was just waiting for them to call and let me

3   know that they were going to bring her to the nursery.

4   Q.  How was it that you knew that she had been born and she

5   was staying over there?

6   A.  We have computer systems at Heritage Valley, and there was

7   a census computer that was up all the time, and on that

8   computer would be a list of every baby that was admitted to

9   the nursery, and when the new babies were born, they would

10  just flip in and they would show up on that computer screen,

11  and that's how I knew that that baby had been born.

12  Q.  When Maria brought Kendall over to you, do you have a

13  recollection of whether dad was present with Maria?

14  A.  I do remember dad was present.

15  Q.  Would dad have been permitted to bring Kendall over all by

16  himself?

17  A.  Absolutely not.

18  Q.  Can you tell the jury why?

19  A.  Because it is hospital policy and protocol for the baby to

20  be handed off RN to RN, and dads are not allowed to carry the

21  babies in the hospital because of safety factors.  You know,

22  what if somebody spilled something on the floor?  What if

23  there's a bump?  You know how sometimes floors, the linoleum

24  is not even and all that, so we just never permitted it as a

25  safety precaution, always to have the babies in the bassinets.

1    Q.  When Maria brought Kendall over and gave you report, you

2    said that she would typically provide information about when

3    she was delivered, her condition at delivery, that type of

4    thing.

5        Do you have any recollection of hearing anything that

6    morning about the fact that there had been meconium present at

7    the time of delivery?

8    A.  I personally do not remember, but when I reviewed the

9    records, it was on the delivery record, and that is definitely

10   a red flag that would be communicated to -- I don't mean a red

11   flag, but that is definitely something that's not normal.

12   It's not with every pregnancy, every delivery, so they would

13   make sure that they would mention it.

14   Q.  I think you previously indicated that part of what Maria

15   would convey to you would be the Apgar scores; is that

16   correct?

17   A.  Correct.

18   Q.  And would the typical report also include the initial

19   neonatal assessment?

20   A.  I don't remember.

21   Q.  Do you have any recollection as you sit here today about

22   what Kendall looked like when she was brought to the nursery

23   that day?

24   A.  I do know that she was brought over and placed on the

25   warmer bed in just -- it has warmer lamps, lights on it, so

1    she would have been placed on that with just a diaper on so

2    you could see everything, and I'm pretty sure I took a set of

3    vitals, but they are not documented in the chart, and I had

4    the dad sign consent for treatment for the baby.

5    Q.   Let me stop you there, because I'm going to take you

6    through that.  You said that she was brought over and placed

7    on the warmer bed; is that correct?

8    A.   Correct.

9    Q.   Was anything unusual?

10   A.   Not that I could see right away, because I would have

11   immediately started caring for the baby if there was something

12   that needed to be taken care of.

13   Q.   Do you have any recollection as you sit here today of

14   noticing any respiratory distress when Kendall was brought

15   over?

16   A.   I do not -- I do not remember there being any respiratory

17   distress, but I can tell you this much.  If that baby was

18   having any respiratory issues, I would have never walked away

19   from the warmer bed.  I would have stayed there by the warmer

20   bed and took care of that baby.  I just -- you just don't walk

21   away from a baby that's struggling or having trouble

22   breathing.

23   Q.   And do you have any recollection of hearing Kendall

24   grunting at all?

25   A.   No, because that would let me know that the baby was

1    having trouble.

2    Q.  What about flaring or retraction?  Do you have any

3    recollection of that occurring?

4    A.  I have no recollection of any of that.

5    Q.  Do you remember seeing anything unusual about her color

6    when Maria brought her over?

7    A.  Again, had there been anything unusual with her color, I

8    would have never left the bedside.

9    Q.  I want to show you one of the documents here.  If you

10   could put up 1119, and just ask you a question about this.

11   Can you explain to the jury what this document is?  I see both

12   yours and Maria's handwriting on this.  What is this?

13   A.  Yes.  This is -- I saw the title at the bottom.  It's the

14   newborn -- it's for the security and to make sure that the

15   baby and the mom's bands match, and before the baby even

16   leaves mom's side, they put bands on the baby with numbers

17   that mom's numbers and baby's numbers match, and we are always

18   supposed to check those numbers when we are handing the baby

19   to mom to make sure it's the right baby, right mom.

20   Q.  The fact that Maria's handwriting on there -- or,

21   signature and yours, what does that indicate?  Does that

22   indicate that Maria is now transferring the baby to you?

23   A.  Yes.  That means that I received the baby in the nursery

24   and I checked the bands and I found them to be matching.

25   Q.  I'd like to put up another document, that is 1115, and

1    just highlight that on the right side about not quite halfway

2    down.  You mentioned to the jury before that you have a

3    recollection of taking vitals but not actually recording them;

4    is that correct?

5    A.  Correct.

6    Q.  There is a set of vital signs taken at 7:00 a.m., and I

7    would like you to assume that Jamie McCrory has testified that

8    you took the vitals but she actually recorded them.  Do you

9    have any reason to disagree with that?

10   A.  No, I do not, because that is usually the standard that we

11   do when the babies come at change of shift, because if you

12   take a quick set of vital signs, it will tell you a lot about

13   the baby.

14   Q.  Let's take a look at these vitals.  Can you tell the jury

15   what they are?

16   A.  The temperature looks like it was 99.6.

17   Q.  Is that unusual or abnormal?

18   A.  No.  The baby was probably being held by mom and stuff and

19   the temperature was up enough.  Baby could have been bathed at

20   that time, but again, because of change of shift and stuff, I

21   like to watch the babies for a little bit before I would do

22   something, you know, to bathe them.

23   Q.  Let's look at the next vital sign which I believe was the

24   pulse.  What was that?

25   A.  That's the baby's apical and it was 132.

1    Q.  Is that in any way unusual?

2    A.  No, it is not.

3    Q.  What is the normal pulse rate for a newborn infant like

4    this?

5    A.  Between 120 and 160.

6    Q.  And then we look at the respiratory rate, which is what?

7    A.  44.

8    Q.  Again, is that in any way unusual?

9    A.  No.  Usually, you expect to see a baby between 40 and 60.

10   Q.  Taken as a whole, is there anything abnormal about the

11   vital signs that were taken by you and documented there?

12   A.  No.

13   Q.  We see underneath there where it says RN signature and it

14   has your name and Jamie's name.  Is that your handwriting

15   there?

16   A.  It is not.

17   Q.  Is it Jamie's handwriting, if you know?

18   A.  I can't say for sure, but I would assume that it was

19   Jamie's because she slashed and put her name afterwards.

20   Q.  There's another document here that I'd like you to take a

21   look at.  That's 1165.  And if you can highlight that first

22   section there.

23       This is documentation by Jamie of these 7:00 a.m. vital

24   signs, which again, I would like you to assume that Jamie

25   testified that you took them but she wrote them.

1    Again, can you just tell us what this is, and is there

2    anything abnormal there?

3    A.  No.  It states the same thing that was on the other paper

4    that you showed.

5    Q.  So if you had taken vital signs and they were in any way

6    abnormal, what would you have done?

7    A.  I would have immediately stayed with the baby and

8    continued with the full assessment.

9    Q.  Now, after you took these vital signs, did you do anything

10   in addition for the baby at that time?

11   A.  I gave the baby -- there is a shot and some eye ointment

12   that needs to be given within two hours of the baby's birth,

13   and I went ahead after doing the vital signs and I gave the

14   baby the shot of Aquamephyton and I did the erythromycin eye

15   ointment.

16   Q.  Let me stop you there and put up some documents.  The

17   first one is 1333.  If you can highlight the section there

18   that talks about -- that documents --

19   A.  It's the bottom two.

20   Q.  If you can highlight the entire section there.  Down below

21   there where it says erythromycin, ophthalmic ointment, that

22   section and the one below.  Just that section for right now.

23       Barb, can you explain to the jury what this is?

24   A.  This is a medication record that records any medication

25   that's given to the infant, so that anybody following after me

1    will know exactly what was given to the baby.

2    Q.  And is this documentation of that eye ointment that you

3    just testified giving to Kendall that morning?

4    A.  Yes, it is.

5    Q.  And you have documented that at, I believe it says 7:01

6    a.m.?

7    A.  Yes.

8    Q.  So you -- is it the situation that you give the medication

9    and then you document it?

10   A.  Yes.

11   Q.  So you would have given the medication --

12   A.  I believe you have to scan the medication to even give it

13   to the baby, so that would have been the time that it was

14   done.

15   Q.  Let's look now at 1334 and we're looking for the

16   Aquamephyton there, if you can highlight that.

17   A.  It was on the other page.

18   Q.  Was it on 1333 also?  I'm having trouble seeing.  That is

19   the gentamicin.  It's not that.  Let's go above that.

20   A.  It's above the erythromycin.

21   Q.  There it is.

22   A.  That's it.

23   Q.  What is this medication?

24   A.  It's vitamin K.

25   Q.  Why is it that you are giving them medication?

1    A.  That is a standard they give to all infants on admission

2    to the nursery.  It helps with blood clotting.

3    Q.  And again, is that documentation that you were the one

4    that gave the medication that morning?

5    A.  Yes, it is.

6    Q.  And that is also documented what, at 7:01 a.m.?

7    A.  Correct.

8    Q.  While you were getting vital signs and giving these

9    medications, did you notice anything unusual about Kendall?

10   A.  I do not remember, but if there would have been something,

11   I would have immediately reacted.

12   Q.  And is there any indication in this chart that there was

13   anything unusual at that time to which you reacted?

14   A.  No.

15   Q.  Now, you've already told us that you did not conduct the

16   initial nursery assessment; is that correct?

17   A.  That's correct.

18   Q.  And that you did not do it because of the change of shift?

19   A.  Correct.

20   Q.  Other than this documentation and that other note that we

21   saw, did you make any sort of note on Kendall that morning?

22   A.  I started the standard of care and the plan of care on the

23   baby.

24   Q.  I think we will look at that document.  Is that just the

25   care plan?

1    A.   The care plan and the standard orders for all newborns

2    that come over that they are all the same.  It's a standing

3    order that we do as long as they are coming to the newborn

4    nursery.

5    Q.   Now, after you did these -- took Kendall's vital signs

6    that we've seen and you gave the medications, what would you

7    have done next?  Would you have started report?

8    A.   I would have started report.  I did have -- the dad was

9    there, and I had him sign consent for treatment for the baby,

10   and then I went over and I gave report to Jamie.

11   Q.   You said you had him sign the consent for treatment.  Is

12   that treatment in the nursery in the event that she needed

13   anything?

14   A.   It was just the standard hospital, when you are admitted

15   to the hospital, they have you sign consent for treatment.  It

16   was that general consent that you were -- that I had signed.

17   Q.   That morning, in addition to giving report on Kendall, did

18   you have other babies that you had to give report on?

19   A.   I did, but I do not remember how many.

20   Q.   Would one of the other babies have been that baby who had

21   that surgical issue?

22   A.   Yes.

23   Q.   Would you also be giving report on those babies who may be

24   not in the nursery but were out with mom and had been born?

25   A.   Yes, but we had a board that we kept, and almost

1    everything was written on there so that it was just basically

2    a brief going over just to highlight anything that was

3    abnormal, out of the norm, anything that needed told to the

4    physician when they were coming in, things like that.

5    Q.  Up through the time that you began giving report to Jamie

6    that morning, if you had noticed anything unusual about

7    Kendall, what would you have done?

8    A.  I would have immediately went over and done the assessment

9    and I would have called the doctor if that was necessary.

10   Q.  Do you remember giving a report to Jamie that morning?

11   A.  I just remember doing it because we do it always at the

12   end of our shift.

13   Q.  Do you have a recollection of -- before I ask this, let me

14   ask you this question:  When you give report, are you right in

15   the nursery?

16   A.  We are sitting right outside the nursery.  The nursery is

17   all windows and you can see directly into the nursery, so you

18   can monitor any of the babies.  You are never -- they are

19   never out of sight.  They ever always within view.

20   Q.  Do you have a recollection of while you were giving report

21   to Jamie, Jamie noticing something about Kendall?

22   A.  Yes.

23   Q.  Can you tell the jury what it is that you recall?

24   A.  She said something was going on.  I can't remember the

25   exact words.  I cannot do it verbatim.  She just made note

1    that something was going on with the baby, and I remember

2    saying that's new.

3    Q.  Why did you say that's new?

4    A.  Because that baby was not having that issue when I was

5    over there at the bedside.

6    Q.  At the time that Jamie made that statement, I'd like you

7    to assume that she has testified that what she saw was that

8    the baby appeared dusky to her.

9        Do you have any recollection of Kendall appearing dusky

10   before Jamie made that statement?

11   A.  No, I do not.

12   Q.  Jamie has also testified that when she noticed that, she

13   immediately got up, went over and put a pulse ox on Kendall.

14   Do you have a recollection of that occurring?

15   A.  I do not remember.  I know that Jamie got up immediately

16   and went into the nursery.  What she did after that, I don't

17   know.  I was following after her so that I could give her any

18   assistance that she needed.

19   Q.  When you say "following after her," do you mean physically

20   walking right in after her?

21   A.  Physically walking in the nursery right after her.

22   Q.  Do you have any recollection of observing Kendall at that

23   time, what she looked like?

24   A.  I do not have any recollection.  I do not remember.

25   Q.  Jamie has testified that she put on a pulse ox, I'd like

1    you to assume that, and that it was 81 percent and as a

2    result, the baby was put under an oxy hood.  Do you have any

3    recollection of any of that?

4    A.  I know that I was there and Jamie was at the bedside and I

5    was running to get whatever she asked me for, whatever she

6    needed.  If she asked me for an oxy hood, I went and got an

7    oxy hood for her.  Whatever she needed to care for that baby,

8    I was going to get so she did not have to leave the bedside.

9    Q.  How long did you stay there assisting Jamie?

10   A.  My shift ended at 7:30.  I remember my manager Donna

11   coming in and there was a supervisor there, and I remember

12   asking them if they wanted me to stay, and I was told no.  I

13   was told to go home, that I was not needed.

14   Q.  While you were there, do you have any recollection of

15   Jamie calling the resident, Dr. Heiple?

16   A.  I do not.

17   Q.  There's been an issue in this case about Dr. Jones and

18   whether she was called.  Did you ever call Dr. Jones?

19   A.  I did not.

20   Q.  Did you ever hear Jamie or anybody else calling Dr. Jones?

21   A.  I did not.  I don't know.  I mean, where I was standing, I

22   do not remember anybody calling Dr. Jones.

23   Q.  You've told us that at the time that you left, the

24   supervisors were there?

25   A.  Correct.

1    Q.  Was one of the supervisors Janet Kincade?

2    A.  I don't remember.

3    Q.  You left at what?  Was it around 7:30?

4    A.  I would have to check my timecard to see for sure, but I

5    think that I was out on time because we were not allowed

6    overtime without approval, so I would have punched out on

7    time.

8    Q.  At the time that you left, is there anything else that you

9    recall going on with Kendall that we haven't yet spoken about?

10   A.  Not that I -- I don't remember.

11   Q.  Was dad still there, or had he already left?

12   A.  To my best recollection, I think dad was -- remained in

13   the nursery with the baby.

14   Q.  You said you went home.  At any time that day, and that

15   would be after 7:00 a.m. on the 14th, did you hear anything

16   else about Kendall?

17   A.  After working the night shift, I went home and went to

18   bed.  When I got up, I called in and talked to the supervisor.

19   I was inquiring about the babies.

20   Q.  And the babies being what, the other baby?

21   A.  The other baby and Kendall.

22   Q.  What did you learn at that time?

23   A.  That Kendall had passed.

24   Q.  And when you learned that, were you surprised?

25   A.  To my best recollection, I was shocked.

1    Q.  Why was that?

2    A.  Nobody likes to lose a baby.  All the babies are like your

3    babies, and you just try to take care of them and do the best

4    you can, and it just hurts.

5    Q.  Did you see anything that morning while Kendall was there,

6    again, before Jamie first made the comment, that indicated

7    that there was any issue with Kendall?

8    A.  No.

9    Q.  And did you ever hear anything more about what happened to

10   Kendall?

11   A.  At some point, and I don't remember how or whatever, but I

12   remember learning that they said that the baby had been septic

13   in utero.

14   Q.  Did you hear the term E. coli at all?

15   A.  No.

16   Q.  Had you ever taken care of a baby before Kendall who had

17   an E. coli infection?

18   A.  I don't remember.

19       MS. KOCZAN:  Thank you.  Those are all the questions

20   I have.

21       THE COURT:  Thank you, Ms. Koczan.  It's just about

22   noon, so we'll take our lunch recess at this time.  Once

23   again, ladies and gentlemen of the jury, if you'll leave your

24   exhibit binders and notes there on your chair.

25       As I had previously instructed you, don't speak with

1   anyone coming or going, still do not speak amongst yourselves

2   about your impressions of this case.  There's still more

3   evidence to hear as well as the attorneys' closing arguments

4   and my instructions.

5          Once again, I don't know if there is or isn't any

6   news coverage.  To that extent, we ask you not to review any

7   news coverage, whether it might be in print form or on the

8   Internet or over the radio or TV.

9          Let me remind you again, the only information you are

10  to consider is everything you see and hear in this courtroom

11  and ultimately the attorneys' closing arguments and the

12  court's instructions and of course your fellow jurors' views.

13         Continue to keep open minds and enjoy your lunch.

14  We'll resume here on the record with Ms. Hackney at about

15  1:15.  Mr. Galovich, if you'll escort our jurors.

16     (Jury excused.)

17         THE COURT:  Thank you, Ms. Hackney.  You may step

18  down.  Since you have taken the oath, it would not be

19  appropriate to talk about your testimony with any of the folks

20  that are present, but you are going to come back in and we'll

21  start again at 1:15.  The other attorneys may have some

22  questions for you.  We'll start again at 1:15.

23         I'm presuming once we are concluded with Ms. Hackney

24  that we might have you, Ms. Koczan, recalling Dr. Dumpe.

25  Isn't that the plan?

1          MS. KOCZAN:  Your Honor, I have Dr. Boyd first.  She

2     hopefully is out in the hall.

3          THE COURT:  Somebody did try to open the door.  I

4     don't know if it was she or somebody else, but somebody was at

5     the door and then disappeared.

6          MS. KOCZAN:  I believe she should have arrived by

7     now.  I want to put her on first so I can get her out of here,

8     and I'll have Dr. Dumpe which will be very short.

9          THE COURT:  Very good.  We'll have Dr. Boyd after

10    Nurse Hackney, right?

11         MS. KOCZAN:  Your Honor, just so you are aware, other

12    than Dr. Boyd and Dr. Dumpe, I don't have any other witnesses

13    today.  The other two will be first thing tomorrow and will go

14    on one right after each other.

15         THE COURT:  We understand each other.  All right.

16       (Luncheon recess 12:03 p.m.-1:14 p.m.)

17         THE COURT:  I think Ms. Hackney is going to come to

18    the stand.  Before she does, having this debate about the

19    bottles, the Gatorade bottles, and so over the lunch hour, I

20    read through my notes and I also read through what Ms. McCrory

21    had to say, and to that end, she said "I would say none of the

22    above.  It's its own consistency.  It's hard to explain.  It's

23    a darker substance than the blue clear one or the clear one.

24         On the scale going from right to left, you are

25    putting it more closer to the one on the left?

1            Yes.

2            Then later on when she was asked a question, would

3    mucus and secretions also make the substance darker, her

4    answer was yes.

5            Now, thank you, Ms. Hackney, for rejoining me up

6    here, and I understand we're going to hear some more from you

7    as the jurors are brought in.  Mr. Galovich will go get our

8    jurors.

9        (Jury present.)

10            THE COURT:  Ladies and gentlemen, I trust you enjoyed

11    your lunch.  Still pretty nice outside if you got a chance to

12    go outside.  Ms. Hackney has already resumed the stand.

13    Ms. Koczan has completed her initial round of questions.

14    Mr. Colville, do you have anything to add?

15            MR. COLVILLE:  No, Your Honor.

16            THE COURT:  Mr. Price, cross?

17                        CROSS-EXAMINATION

18    BY MR. PRICE:

19    Q.  Good afternoon.

20    A.  Good afternoon.

21    Q.  Do you remember we met?

22    A.  Yes, I do.

23    Q.  Okay.  So I'm just going to follow up on a couple of the

24    questions that you answered for Ms. Koczan, but before I ask

25    you that, did you have a chance to review your deposition

1    transcript before you came here today?

2    A.  Yes, I did.

3    Q.  Okay.  So Ms. Koczan, one of the issues that she asked you

4    about was the issue about when Kendall -- it was discovered

5    that Kendall had some problems.  Do you remember that?  Do you

6    remember the questions?

7    A.  I remember the questions, yes.

8    Q.  And I wrote down, correct me if I am wrong, but the

9    question was Jamie said something and you said I can't recall

10   what she said; is that correct?

11   A.  Just from what -- from the deposition, it said that she

12   said that the baby was dusky.

13   Q.  Okay.  So whose deposition are you referring to?

14   A.  Mine.

15   Q.  Your deposition.  You said that whenever Jamie noticed

16   that there was something going on with Kendall, that you said

17   in your deposition that Jamie said that baby is dusky?

18   A.  Yes, I believe that's what it said.

19   Q.  Okay.  I'm going to pull up your deposition, so let's take

20   a look at it.  We can start on page 18 and we'll highlight --

21   let me get the date.  Do you remember your deposition on

22   September 12, 2017?

23   A.  Yes.

24   Q.  Okay.

25   A.  It says there --

1    Q.  Hold on one second.  I have a question for you.  I'll get

2    there.

3        So the question was:  "Okay.  But you mentioned that

4    before you left, they were working on her?"

5        Your answer was, "I was giving report, and as I finished

6    report, Jamie looked up and said she is breathing hard."

7        And I said, "Well, that's new because she wasn't when she

8    came over."

9        I said, "Okay.  So what did Jamie say in response?"

10       You said, "Jamie got up and went in the nursery."

11       Next question, "And then what did they do?"

12       You said, "I don't understand what you're asking."

13       I said, "Sure.  What did you see them do?"

14       You said, "I don't understand what you are asking."

15       I said, "Sure.  You went -- you said that Jamie said she

16   is breathing hard.  What did you do?"

17       You said, "We went in and assessed the baby."

18       Isn't it correct that it was actually Jamie who said she

19   is breathing hard, which is what prompted an investigation

20   into what was going on with Kendall?

21   A.  Yes.

22   Q.  It wasn't some dusky -- mention of the baby being dusky,

23   was it?

24   A.  According to the deposition, no, it was not.

25   Q.  You'll agree in your deposition, I asked you this a couple

1    times, right?

2    A.  I don't remember.

3    Q.  In your deposition, do you ever mention the word or did

4    you ever mention that Jamie said that the first thing that

5    prompted her question about Kendall was that Kendall was

6    dusky?

7    A.  I honestly don't remember.  I thought that's what it said

8    in the deposition, but I was mistaken.

9    Q.  Let's go to page 44, line 12 and we'll start there and

10   we'll highlight on to page 45, line 5.

11       "You mentioned that it was Jamie who said that the baby

12   was having trouble breathing?"

13       Your answer, "We were given report."

14       I said, "Explain."

15       You said, "And she looked up through the glass and said,

16   'That baby is having trouble breathing.'"

17       My next question was, "So if I understand then, you and

18   Jamie were outside the nursery."

19       Your answer, "At the desk with a clear view of the infant

20   on the warmer."

21       Next question, "Okay.  And while you are giving report on

22   all the babies that are in the nursery, she looks up and sees

23   that Kendall is having trouble breathing?"

24       Your answer "Correct."

25       And your response was, "She wasn't having it whenever I

1    was watching her. 'That's new,' I said."

2        Do you remember that?

3    A.   I do remember that.

4    Q.   And this is what you told me in September of 2017, and

5    just so I understand, you no longer work for Heritage Valley

6    Beaver, correct?

7    A.   I do not.

8    Q.   And you haven't worked there since 2015?

9    A.   Correct.

10   Q.   And before your testimony here today, did you meet with

11   anybody?

12   A.   I met with Attorney Koczan.

13   Q.   And at any point, did she talk to you about -- scratch

14   that.

15       Let me ask you the next question, and this has to do with

16   dads coming into the nursery, and do you remember you said,

17   dads aren't allowed to carry the babies into the nursery?

18   A.   No, they are not.

19   Q.   And you said it's never allowed, correct?

20   A.   Correct.

21   Q.   Okay.  If we could pull up your deposition at page 21,

22   line 16 through 22, line 5.  I just wanted to refresh your

23   recollection with regard to this.

24       I said, "So if I understand this, you're in the nursery,

25   and at some point Maria Hendershot delivers Kendall to the

nursery on her bassinet?"

You said, "I don't remember.  That is the policy on how they are delivered --

I said, "Okay."

You said -- "to the nursery."

Question, "Right.  You don't recall if dad was carrying Kendall in along with Maria?"

You said, "Dad never -- we never let the dads carry the babies, so no."

I said, "Never?"

Your answer was, "Not if we catch them," right?

A.  Correct.

Q.  So "not if we catch them" implies that sometimes you catch them carrying the babies, correct?

A.  Correct.

         MR. PRICE:  That's all the questions I have.

         THE COURT:  Ms. Koczan, anything further of this witness?

         MS. KOCZAN:  No, Your Honor.

         THE COURT:  Mr. Colville, at this point, do you have any questions?

         MR. COLVILLE:  No, Your Honor.

         THE COURT:  Nurse Hackney, I may have one question. I think you referenced a manager named Donna.  Who was that?

         THE WITNESS:  Donna Kingston.

1          THE COURT:  You called her a manager; is that right?

2          THE WITNESS:  She was in charge of the whole maternal

3    child health unit, yes.

4          THE COURT:  Was she actually involved in Kendall's

5    care too?

6          THE WITNESS:  She came into the nursery prior to my

7    leaving, and I don't know what happened after that.

8          THE COURT:  When you say prior to your leaving, you

9    mean leaving for the day?

10          THE WITNESS:  Correct.  I had asked her if she wanted

11   me to stay, and she told me to, no, go ahead and go home.

12          THE COURT:  Okay.  That's all the questions the court

13   has.  Does the court's questioning cause any additional

14   questions, Ms. Koczan?

15          MS. KOCZAN:  No, Your Honor.

16          THE COURT:  Mr. Colville?

17          MR. COLVILLE:  No, Your Honor.

18          THE COURT:  Mr. Price?

19          MR. PRICE:  No.

20          THE COURT:  You may step down.  Thank you for your

21   appearance here today.  Safe travels home.  I trust

22   Ms. Hackney is excused.  She is not going to be recalled?

23      (Witness excused.)

24          THE COURT:  Ms. Koczan, I think you told us you have

25   another witness yet to call.

1          MS. KOCZAN:  Yes, Dr. Boyd.  She is out in the hall.

2     I'll go get her.

3          THE COURT:  B-O-Y-D.  Dr. Boyd, if you'll approach my

4     deputy to be sworn.

5          THE CLERK:  Please state and spell your name for the

6     record.

7          THE WITNESS:  Theonia Kamman Boyd, T-H-E-O-N-I-A,

8     K-A-M-M-A-N, B-O-Y-D.

9       (Witness sworn.)

10         THE COURT:  Thank you, Mr. Galovich.  Doctor, when

11    you get over here to the witness stand, just watch your step.

12    It's a little bit uneven.  Once you are situated, you may be

13    seated.  Arrange the microphone so you are speaking into it.

14    It can be pulled closer to you.  It can go up and down.

15    There's water in case you need it.  There's also a projector

16    next to you and you might be asked to look at it.

17         I do note that you bring to the stand what appears to

18    the court to be possibly your report as well as slides.

19         Now, as with the other expert witnesses, ladies and

20    gentlemen of the jury, you'll hear testimony containing

21    opinions from Dr. Theonia Boyd, a physician who will offer

22    opinions because of her knowledge, skill, experience, training

23    or education in the field of pathology and the reasons for her

24    opinions.

25         In weighing her opinion testimony, you may consider

1    her qualifications, the reasons for her opinions and the

2    reliability of the information supporting those opinions as

3    well as any other factors I will discuss with you in my final

4    instructions as to weighing the testimony of witnesses.

5        The opinion of Dr. Boyd should receive whatever

6    weight and whatever credit, if any, you think appropriate

7    given all the other evidence in this case.  You may disregard

8    her opinions entirely if you decide that they are not based on

9    sufficient knowledge, skill, experience, training or

10   education.

11       You can also disregard her opinions if you conclude

12   that the reasons given in support of those opinions are not

13   sound if you conclude that the opinions are not supported by

14   the facts shown by the evidence or if you think that the

15   opinions are outweighed by other evidence.

16       In deciding whether to accept or rely upon these

17   opinions of Dr. Boyd, you may also consider any bias that she

18   may have, including any bias that may arise from evidence that

19   Dr. Boyd has been or will be paid for reviewing this case and

20   testifying or from any other evidence that Dr. Boyd regularly

21   testifies and/or makes a portion of her income from testifying

22   in court.  So with that limiting instruction, Ms. Koczan is

23   ready to proceed.

24       THEONIA BOYD, M.D., a witness herein, having been

25   first duly sworn, was examined and testified as follows:

1                          DIRECT EXAMINATION

2    BY MS. KOCZAN:

3    Q.  Doctor, can you please introduce yourself to the jury?

4    A.  Yes.  My name is Theonia Boyd.

5    Q.  And can you tell them what your occupation is?

6    A.  I am a medical physician, so I'm an M.D., but my

7    occupation is as a pathologist, and my subspecialty

8    certification is in the field of pediatric pathology.

9    Q.  And can you tell the jury what your current academic

10   position is, what it is and where it is?

11   A.  Yes.  I am an associate professor of pathology at Harvard

12   Medical School.  My primary place of employment is Boston

13   Children's Hospital which is one of Harvard's teaching

14   hospitals and it is its Children's Hospital.

15       I am also part-time faculty in one of the adult hospitals

16   also affiliated with Harvard Brigham and Women's Hospital.

17   Q.  Where do you reside presently?

18   A.  In the suburbs of Boston.

19   Q.  Can you tell the jury about your education, beginning with

20   undergraduate and bringing us up through medical school?

21   A.  I was an undergraduate at Johns Hopkins University in

22   Baltimore, Maryland.  I was a medical student at the

23   University of Utah School of Medicine in Salt Lake City, Utah.

24   Q.  After you completed medical school, did you then go into

25   an internship or residency?

1    A.  Yes.  My residency was in the field of pathology, and that

2    encompassed both internship and residency.

3    Q.  I noted from looking at your curriculum vitae that the

4    specific residency was something called anatomic and clinical

5    pathology.  Can you explain to the jury what that is?

6    A.  Yes.  Anatomic pathology is the area of pathology where we

7    as physicians overseeing other personnel receive specimens

8    from living patients into the laboratory such as a skin biopsy

9    or a kidney removed for a kidney tumor.  Those specimens are

10   then examined with a naked eye, we call that gross

11   examination, and then sampled.  Those tissue samples are

12   placed on glass slides which then allows us to view those

13   samples through the microscope.  Anatomic pathologists also do

14   autopsies on hospital patients who die.

15       The clinical arm of pathology are the physicians who run

16   large hospital laboratories such as the blood bank or

17   microbiology, other areas like that.  They don't look at

18   tissue samples, per se.

19   Q.  And after you completed that residency program, did you go

20   on to do a fellowship?

21   A.  I did.

22   Q.  What was that the area of your fellowship?

23   A.  My fellowship training was in pediatric pathology, and

24   pediatric pathology also encompasses the field that is more

25   narrowly broken down into perinatal pathology which is

1    basically the pathology of pregnancy so includes disorders

2    that are related to pregnancy from the time of conception up

3    through live or still birth and early -- the early neonatal

4    period and also maternal or obstetric disorders that occur as

5    a result of pregnancy.

6        And so the field, while it's called pediatric pathology,

7    encompasses that arena plus what is standardly considered

8    pediatric pathology which is the study of diseases related to

9    humans from live birth up through young adulthood.

10   Q.  After you completed the pediatric and perinatal pathology

11   fellowship, what was next?  Did you begin practicing at that

12   point?

13   A.  Yes.  That was the culmination of my training, and I then

14   took my first academic position in pathology.

15   Q.  Where was that?

16   A.  I was affiliated with Tufts University School of Medicine

17   which is based in Boston.  However, I was at a teaching

18   hospital in western Massachusetts called Baystate Medical

19   Center in Springfield, Massachusetts.

20   Q.  Was your practice at Tufts, was it again pediatric and

21   perinatal pathology?

22   A.  It was -- at that point in my career, that was half of my

23   practice.  The other half was more general adult pathology.

24   Q.  And how long were you at Tufts?

25   A.  Nine years.

1    Q.  And after Tufts, what was next?

2    A.  I went back on to faculty at Boston Children's Hospital

3    where I completed my training in 2004 and have been there

4    since.

5    Q.  And can you explain to the jury your current practice at

6    Boston Children's?  What is it that you do?

7    A.  Because hospitals that are affiliated with academic

8    medical centers are teaching hospitals, any time I'm

9    performing clinical service, so evaluating tissues or

10   performing an autopsy, it's always in the context of teaching

11   younger doctors, medical students, doctors who are almost

12   finished with their training in specialty fields more related

13   to mine, and so when I say clinical service, there's always

14   teaching that accompanies that on a daily basis, and that is

15   typically in academic centers somewhere between half of a

16   calendar year to two-thirds.

17        At Boston Children's Hospital, I'm on service, that is,

18   receiving materials from patients or performing autopsies,

19   about 26 weeks a year.  I do that same sort of practice at

20   Brigham and Women's Hospital an additional ten to 12 weeks a

21   year.

22   Q.  As part of your practice, do you perform neonatal and

23   pediatric autopsies?

24   A.  I do.

25   Q.  And have you, as part of your practice, had the

1    opportunity to receive tissue and evaluate tissue with infants

2    who have had various forms of sepsis?

3    A.  I have.

4    Q.  And did that include E. coli sepsis?

5    A.  Yes.

6    Q.  I want to move from there.  You told us that part of what

7    you did and ongoing is teaching, correct?

8    A.  Yes.

9    Q.  And what would you be teaching?  What subjects?

10   A.  Well, when I'm on service at Boston Children's Hospital,

11   it is typically teaching about diseases of infants through

12   young adulthood, which includes tissue samples from still

13   living children and also again performing autopsies on those

14   children or teenagers or young adults when they died.

15       I do the same thing at Brigham and Women's Hospital.  The

16   patient population that I evaluate are pregnancies that have

17   either been lost spontaneously, so miscarriages, from early

18   pregnancy up through term or the time of usual live birth, and

19   they also include neonatal autopsies, so babies who are

20   transferred to the neonatal intensive care unit and die within

21   the first several days of life.

22       Also in that arena, not just fetuses and neonates, I

23   examine placentas, so the organ that connects mom's womb to

24   the fetus and is sort of the lifeline in the womb, and as I

25   said, also some maternal or obstetric tissues when that occurs

1    such as an ectopic pregnancy.

2    Q.   In addition to your clinical practice which you've

3    described and the teaching, is there some portion of your

4    practice that is devoted to administrative type

5    responsibilities?

6    A.   There is, but I guess in order to be complete, I should

7    say that some of my teaching is done on a daily basis or much

8    of it.   However, I also do teaching in a larger context, not

9    necessarily during my daily activities which I can explain, if

10   you would like.

11        But to answer your question about administration, I am

12   currently the director of anatomic pathology at Boston

13   Children's Hospital, which means, in essence, I run daily

14   operations on the physician side of our department rather

15   than, let's say, the technical side.   The laboratory

16   technicians are overseen by other people.

17   Q.   Would you go back and tell us about the teaching?   You

18   started to tell us about that.

19   A.   Yes.   In addition to my daily teaching, I do teaching of

20   all sorts from giving conferences to physicians and trainees

21   in other departments within those two hospitals to giving

22   larger courses either nationally or internationally, and so

23   those are done some through Harvard Medical School, the larger

24   courses, and some are invited teaching courses or lectures

25   that are national and international.

1  Q.  In addition to your teaching, your administrative and your
2  clinical practice, do you also do research?
3  A.  I do.
4  Q.  And what percentage of your time is devoted to that?
5  A.  It's a proportion of my time, probably similar to my
6  administrative time.  Somewhere, depending on my workload, in
7  the range of five, ten, 15 percent.
8  Q.  Do you also write?
9  A.  I do.
10  Q.  And what percentage of your time would be devoted to
11  writing?
12  A.  For me, research and writing are similar, because I write
13  about -- I write about studies that have been done but also
14  information that generally has become accepted and to be put
15  in, let's say, a textbook, so that would be encompassed in
16  that sort of, depending on my schedule, five to 15 percent of
17  my time.
18  Q.  Doctor, over the course of your career, how many neonatal
19  pediatric autopsies have you performed?
20  A.  Hundreds.
21  Q.  And what about tissue biopsies of neonatal or pediatric
22  lung tissue?
23  A.  Probably also hundreds.
24  Q.  And over the course of your practice, have you diagnosed
25  bronchopneumonia from tissue slides?

1    A.   Many times.

2    Q.   And what about neonatal sepsis?

3    A.   Also many times.

4    Q.   And when you say "many," are we talking about hundreds or

5    thousands?

6    A.   No.  Bronchopneumonia is more common than sepsis, and so

7    that would be -- bronchopneumonia would be in probably the

8    multiple dozen times.  Sepsis is less common, so I would say

9    if bronchopneumonia is many dozens, that's probably on the

10    order of a few dozen times in my career, if we're restricting

11    my answer to neonates.

12    Q.   What about pediatric patients?  Would it be greater then?

13    A.   It would be greater than that.

14    Q.   What about E. coli sepsis?  Is that something that, over

15    the course of your practice, you have seen and made diagnosis

16    based on, not only tissue sample, but also culture results,

17    that type of thing?

18    A.   Yes.

19    Q.   How frequently have you seen that condition?

20    A.   It would be some subset of the overall sepsis.  E. coli

21    sepsis is typically restricted to the neonatal population, so

22    I would say a handful to somewhere upwards of a dozen times.

23    Q.   Is it something that you don't see very frequently?

24    A.   Correct.

25    Q.   One of the other topics that I wanted to ask you about in

1   terms of seeing this would be meconium aspiration.  Is that

2   something that you have seen during the course of your career?

3   A.  Many times.

4   Q.  And that was my next question.  How frequently?

5   A.  Many times.

6   Q.  Are you board certified?

7   A.  I am.

8   Q.  And in what areas?

9   A.  Anatomic pathology is my general board certification, and

10  my subspecialty certification is in pediatric pathology.

11  Q.  You talked about a couple of hospitals, Boston Children's

12  and did you say Brigham and Women's?

13  A.  Yes.

14  Q.  In addition to those two hospitals, are there any other

15  hospitals that you are currently on staff at?

16  A.  I have a consulting position at the Beth Israel Deaconess

17  Hospital which is yet another Harvard teaching hospital.  In

18  the past, I have also been active to various degrees at other

19  medical centers in the state of Massachusetts, such as the

20  University of Massachusetts Medical Center and Tufts

21  University School of Medicine, as I said before.

22  Q.  Do you have various responsibilities in the hospital in

23  various health care organizations, and if so, can you tell the

24  jury about a couple of those?

25  A.  Through my directorship, so this is through my

1    administrative roles, I sit on a couple of committees,

2    hospital wide committees.  One of them is our ethics

3    committee, hospital ethics committee, and that is a committee

4    that's comprised of many different health care providers, a

5    few lawyers and also community members, and we deal with

6    issues that come to our attention, because there is some sort

7    of disagreement between health care givers or health care

8    givers and families or between family members and sometimes

9    it's between family members and the patients, the children

10    themselves, and we're asked to weigh in and make

11    recommendations about how to proceed in those areas of

12    differing opinions.

13        I also sit on an institutional committee that reviews

14    hospital contracts for the Boston Children's Hospital, which

15    includes not only local but national and international payers

16    such as patients who come from other countries.

17    Q.  Are you a member of various professional associations and

18    organizations in the field of pathology?

19    A.  Yes.

20    Q.  Can you tell the jury about one or two of those?

21    A.  The Society For Pediatric Pathology, which is our

22    professional society that encompasses people who work

23    primarily in children's hospitals or people who work primarily

24    in labor and delivery areas, as I've said I do both.

25        I'm also a member of the College of American Pathologists

1    and the United States and Canadian Academy of Pathology, which

2    is not just restricted to the U.S. and Canada.  It's really an

3    international consortium of pathologists.

4    Q.  Are you also an editor for various publications?

5    A.  Yes.

6    Q.  Again, just tell the jury about one or two of those?

7    A.  Currently, my principal editorship for a journal is our

8    journal for the Society of Pediatric Pathology called

9    "Pediatric and Developmental Pathology," but I've also served

10   as a book editor on textbooks that have been published in the

11   field of pathology.

12   Q.  During the course of your career, have you been the

13   recipient of various honors and awards?

14   A.  I have.

15   Q.  Can you tell the jury about one or two of those?

16   A.  In my career, I've been awarded teaching awards several

17   times.  I've been awarded through my Society For Pediatric

18   Pathology for innovative research in the form of an oral

19   presentation at meetings.  Some of my trainees have received

20   awards, where I've been their mentor, and I've received a

21   scholarship through -- actually, there were two, through

22   Harvard University, one through the School of Public Health

23   and one through the School of Continuing Education to perform

24   advanced learning for people who are continuing to work like I

25   do and are health professionals but are learning various new

1    aspects of medicine, one being leadership.

2        It was a leadership course through the Public Health

3    School and then a fellowship course, year long course in

4    medical ethics.

5    Q.  And as part of your practice, do you routinely lecture

6    both nationally and internationally?

7    A.  I do.

8    Q.  And have any of the presentations that you've given over

9    the years have anything to do with the subjects that we're

10   going to be talking about here today?

11   A.  Yes.

12   Q.  And how frequently have you lectured on those types of

13   subjects?

14   A.  In the sense of infection that occurs in the setting of

15   pregnancy, it's been a topic of more lectures than I know, not

16   necessarily a principal topic but a topic where there are

17   common processes that occur in the setting of pregnancy, in

18   terms of infections that result -- bodily infections that

19   result from that because they are less common.  That would be

20   a less common topic in presentations.

21   Q.  And have you also authored various publications?

22   A.  Yes.

23   Q.  Can you give the jury some idea of how many?

24   A.  Probably a few dozen book chapters by now and several

25   dozen peer reviewed journal articles.

1    Q.  And again, do any of those have to do with what we're

2    going to be talking about here today?

3    A.  Yes.

4    Q.  And over the course of your career, have you been asked to

5    do what I asked you to do in this case, take a look at

6    pathology slides and offer some opinions about what it is that

7    you see on those slides?

8    A.  Yes.

9    Q.  And how long have you been doing that, where you have been

10   asked to be an expert?

11   A.  I was first asked in the year 1996, so it's been quite a

12   while.

13   Q.  How frequently do you do that, act as an expert?

14   A.  Well, I don't do it during my normal working hours.  I do

15   it nights and weekends, and I would say that, on average, I

16   get asked to review a file a week, a new case a week.  I don't

17   always take those cases, but I get asked fairly frequently.

18   Q.  Have you reviewed cases both for plaintiffs, those are the

19   individuals bringing the lawsuit, and the defendants, the

20   physicians?

21   A.  Yes.

22   Q.  Can you give the jury some idea of what the split is

23   there?

24   A.  Over the course of the decades I've been doing this, I

25   would say the reviews that I've done, so looking at medical

1    records and looking at pathology materials, has been fairly

2    equally weighted between plaintiffs and defendants.  My

3    testimony, however, has not been as equally weighted.

4    Q.  Prior to this case, have you ever reviewed a case for me

5    or my firm?

6    A.  No.

7         MS. KOCZAN:  At this stage, I would offer Dr. Boyd as

8    an expert in perinatal and pediatric pathology.

9         THE COURT:  Thank you, Ms. Koczan.  Mr. Colville, any

10   questions on qualifications?

11        MR. COLVILLE:  No, Your Honor.

12        THE COURT:  Mr. Price, any cross-examination?

13        MR. PRICE:  I'll reserve.

14        THE COURT:  So to that end, at this time, the court

15   will accept Dr. Boyd as an expert in the fields of pathology

16   as delineated by Ms. Koczan.

17   BY MS. KOCZAN:

18   Q.  Doctor, were you asked by me to review certain materials

19   and records in this case?

20   A.  Yes.

21   Q.  And did your review include the following?  I'm just going

22   to list them.  Did you see Dr. Dumpe's office records for

23   Carissa Peronis?

24   A.  Yes.

25   Q.  Did you review Carissa Peronis's Heritage Valley records

1    for her labor and delivery, including the various laboratory

2    studies?  Did you have a chance to look at all of that?

3    A.  Yes.

4    Q.  Did you also see Kendall Peronis's Heritage Valley

5    records, including laboratory studies?

6    A.  I did.

7    Q.  Did you review the autopsy report that was prepared by

8    Dr. Min?

9    A.  Yes.

10   Q.  And have you also had an opportunity to review the slides

11   made from the tissue during the -- prior to or during the

12   autopsy?

13   A.  Yes.

14   Q.  Now, based on your review of those materials, can you tell

15   the jury what this case is about from a perinatal pathology

16   perspective?

17   A.  This is a case where at the time that -- of birth, there

18   was an infection present in the uterus, the womb that had been

19   there for a minimum of days, a few days at a minimum and had

20   progressed from being restricted to just the womb, the area

21   around the baby, and had come to also infect the baby's

22   tissues and bloodstream.

23   Q.  And based upon your review of the records and other

24   materials, did you form an opinion regarding the cause of

25   Kendall Peronis' death?

1    A.   Yes.

2    Q.   What is that opinion?

3    A.   Neonatal sepsis due to E. coli.

4    Q.   And what is the basis for that opinion?

5    A.   The autopsy slides, the tissue slides, neonatal blood

6    cultures, autopsy blood cultures and my general knowledge and

7    experience of how these types of infections evolve prior to,

8    during and after pregnancy.

9    Q.   Did you also form an opinion regarding when this E. coli

10   infection started?

11   A.   Yes.

12   Q.   And what is your opinion?

13   A.   Based on the pathology materials available and the culture

14   results, the beginning of the infection was, at a minimum, a

15   few days prior to delivery and could have been as much as

16   several days.  In other words, at least a few days, perhaps up

17   to days longer than that.  Likely not a week prior to

18   delivery.

19   Q.   And did you also form an opinion as to what kind of

20   infection this is?  By that, I mean, was this an ascending

21   infection?  Was it an infection that was acquired as the baby

22   was coming through the birth canal?  What was your opinion

23   with regard to that?

24   A.   Unequivocally, this was an ascending infection that, as I

25   said, began days prior to delivery.

1    Q.   Can you define what you mean by ascending infection?

2    A.   Yes.  This is the mode of infection that occurs most

3    commonly when there is infection during pregnancy where

4    bacteria that are common on all of our bodily surfaces that

5    are present around the birth canal gain entry and move up the

6    birth canal into the womb and set up residence, if you will,

7    in the fluid that bathes the baby, the amniotic fluid.

8         Another term for ascending infection is amniotic fluid

9    infection.

10        And from that process, the organisms, the bacteria that

11   are in the amniotic fluid can gain access to the baby's body

12   including, as I said, tissues of the body and the bloodstream.

13   Q.   And we've heard of the term meconium aspiration.  Was

14   there, based on your review of the slides, was there evidence

15   of meconium aspiration here?

16   A.   Yes.

17   Q.   Did it cause Kendall's death?

18   A.   No.

19   Q.   And was there any pathological evidence of the term

20   massive meconium aspiration?

21   A.   Based on the way I use the terminology massive meconium

22   aspiration, the answer is -- simple answer is no.

23   Q.   Doctor, before we talk about your review of the tissues, I

24   wanted to ask you some general questions.  We've heard the

25   term neonatal E. coli sepsis, but from a pathological

1    perspective, can you explain to the jury what that is and how

2    it progresses?

3    A.  The type of neonatal sepsis in this case which is

4    called -- which is also called congenital sepsis, means that

5    when live birth occurs, the baby's body is already infected

6    with the bacteria.  That's what congenital means, born with

7    the process, and as I think I explained a few answers ago,

8    that's a process that begins first with bacteria that gain

9    access to the normally sterile fluid bathing the baby in the

10   womb and then had the capacity to gain entry into baby's

11   body.

12   Q.  And the E. coli, what is that?  What type of an organism?

13   What are its characteristics?

14   A.  So escherichia coli is a bacteria and there are various

15   kinds of organisms in the environment that can cause infection

16   in all of us.  Bacteria, in the setting of late pregnancy, are

17   by far the most common, is one of the bacteria that is fairly

18   common as an infecting agent in cases where there is infection

19   of the fluid around the baby and within the womb, and E. coli

20   in particular is a bacteria that's present in all of our

21   intestinal tracts.  It's part of the normal bacteria that live

22   in all of our intestines, and because of that, those bacteria

23   commonly are also present around the birth canal because of

24   the location of the birth canal and normally don't move up the

25   birth canal to gain entry, but sometimes, as in this case, do.

1    Q.  And is E. coli sepsis, is that a serious infection?

2    A.  E. coli sepsis is, in my experience and based on my

3    general understanding of the literature, one of the -- not

4    only one of the most common causes of neonatal sepsis, but it

5    is a particularly aggressive, so strong bacteria that, among

6    the babies that it infects in that early newborn period, can

7    lead to early onset death, so it's one of the stronger, more

8    aggressive bacteria among those that can be present during the

9    later stages of pregnancy.

10   Q.  And how is it that it works and ultimately causes death?

11   What is the mechanism or what does it do to the body?

12   A.  The answer to that is probably more complex than even I

13   understand, but in a general sense, when bacteria gain access,

14   in this case, to the lung, then the lung itself can set up a

15   tissue fighting response, and that's what we commonly refer to

16   as pneumonia.  That's when the infection is restricted to the

17   lung only.

18       However, when the bacteria are present in the lung and

19   with neonates, also when they swallow the amniotic fluid, so

20   swallow the bacteria in their intestines, those bacteria have

21   the ability to move from the airways and the intestinal tract

22   into blood vessels that are close by and then infect the

23   bloodstream, leading to neonatal bacteremia or congenital

24   bacteremia, sometimes also called sepsis.

25   Q.  Is there a normal cascade of events that ultimately leads

1    then to neonatal mortality or death?

2    A.  I'll answer that as a pathologist since I don't do

3    clinical care and I can address it only given my field of

4    expertise, but when cases of congenital infection are fatal,

5    they cause death, they do so by altering the baby's automatic

6    bodily ability to regulate blood pressure, and sometimes it

7    will involve heart rate and breathing and lead to, as in this

8    case, with the baby's blood pressure, the blood vessels become

9    leaky because of the infection and it leads to bleeding into

10   tissues and a low blood pressure, and that's something we call

11   septic shock or I, as a pathologist, call septic shock.

12   Q.  What is the mortality rate associated with E. coli sepsis

13   in neonates?

14            MR. PRICE:  Objection, Your Honor.  Hearsay.

15            THE COURT:  Sidebar.

16        (At sidebar.)

17            THE COURT:  Anything further by way of argument?

18   Just hearsay?

19            MR. PRICE:  No.

20            THE COURT:  Ms. Koczan?

21            MS. KOCZAN:  Your Honor, she is going to say --

22   testify with regard to her experience and what she knows, and

23   I think you will hear that she can't give an exact number, but

24   she is going to talk about her experience.

25            THE COURT:  Okay.  Let's back it up a little bit and,

1    rather than ask her generally, you know, what the mortality

2    rate is, what's been her experience in these regards when she

3    has seen these type of cases.

4            MS. KOCZAN:  Certainly.

5        (In open court.)

6            THE COURT:  Ms. Koczan is going to rephrase her

7    question.

8    Q.  What has your experience been in terms of mortality with

9    E. coli sepsis in neonates?

10    A.  As I said, when there is what I call an ascending

11    infection, also called chorioamnionitis or amniotic fluid

12    infection, E. coli is one of the more common bacteria that

13    cause that process.

14        However, when that process then moves into baby's body and

15    into the bloodstream and it can and does lead to very rapid,

16    because it's an aggressive bacterium, a very rapid death,

17    within some relatively few hours or up to a day or so

18    following the recognition of the infection, and by that, I

19    mean, as a pathologist, when I know with certainty that there

20    was that infection in a particular tissue such as the lung or

21    blood culture.

22    Q.  Doctor, what I'd like to do now is focus our attention on

23    your review of these slides and materials with regard to

24    Kendall Peronis.  Now, in order to explain your opinion, have

25    you prepared some PowerPoint slides to help the jury

1    understand your testimony and what happened in this case?

2    A.  Yes.

3    Q.  Why don't we take a look at them at this stage?

4           MS. KOCZAN:  Your Honor, may she step down?  I think

5    it would be easier for her to explain these with the laser

6    pointer and go through those.

7           THE COURT:  She may.

8           MS. KOCZAN:  If you want to come down off the stand.

9           THE COURT:  Watch your step, Doctor, as you get down.

10   Q.  If you would bring the slides with you too.

11          MS. KOCZAN:  Can we put the slides up here?

12          THE COURT:  I would rather them to be there so they

13   don't get knocked to the ground at some point.

14   Q.  Do you have the laser pointer there?

15   A.  I do.

16   Q.  So, Doctor, you have in front of you a box of -- looks to

17   be glass slides?

18   A.  Correct.

19          MS. KOCZAN:  May she lift one of them up to show the

20   jury what that looks like?

21          THE COURT:  Certainly.

22   A.  These are the samples of baby's organs that were prepared

23   at the time of autopsy, and the purple or pink or purple that

24   you see are the tissue samples themselves.  We color them with

25   inks of various colors, if you will, so we can visualize or

1    see that what those tissues look like through the microscope,

2    and it is from glass slides like this that we, as

3    pathologists, make our pathologic diagnoses based on tissue

4    samples in a particular medical context or clinical history.

5    Q.  How are those slides made?

6    A.  At the time of examining a sample, whether it's a skin

7    biopsy or, as I said, a kidney from a living patient is

8    removed because of a tumor, we examine those tissues in a

9    laboratory with our naked eyes, that's called gross

10   examination, and then we sample portions of those whatever it

11   is, tissues, to be prepared so that they end up slices of

12   tissues as glass slides.

13       And what occurs is that the tissues are put into paraffin

14   which is really like candle wax and made into rectangular

15   squares a few centimeters, a couple inches one and a half by

16   an inch wide, and very thin slices are cut from that tissue

17   paraffin or wax and put on these glass slides and then stained

18   with coloration so we can see what the disease processes are.

19       When it comes to autopsy, it's the very same process.

20   Instead of a skin biopsy or a kidney tumor, we sample organs

21   throughout the body.

22   Q.  And in that box of slides -- first of all, is that box of

23   slides all of Kendall Peronis' slides?

24   A.  Yes.

25   Q.  In there, what is in there?  What tissues are on those

1    various slides?

2    A.   There are a number of tissues.  I'm not sure I can

3    remember all of them, but from various organs such as the

4    heart, the lungs, the spleen, the liver, the intestines and

5    other tissues, the thymus, which is an organ that sits in

6    front of the windpipe and just above the heart, the kidneys,

7    the organs that live above the kidneys or reside above the

8    kidneys.

9    Q.   Why don't we go to the next slide?  Is that the slide that

10   we're going to be looking at today?

11   A.   Yes.  This image was taken with my iPhone.  I put the

12   slides on my desk on a piece of paper and I took a photograph,

13   and one thing I would like to draw to attention is that when

14   it comes to pathology, each tissue sample that comes to the

15   laboratory is labeled with a unique number so that it can be

16   recognized from any other sample that comes to the laboratory.

17       In this case, TMA means that it was an autopsy, and it's

18   the designation from this particular hospital that uses the

19   TM, the A is for autopsy.  It was the year 2014 and it was the

20   second autopsy performed in this hospital during that calendar

21   year.

22       Thereafter, each of the tissue samples that's prepared is

23   labeled with a unique number so that they can be described in

24   a report and then referred to, if need be, back to the glass

25   slide.

1          So for example, this particular tissue is block A, meaning

2     there's one specimen in the baby's body, the first tissue

3     sample.  A two would be the second organ or second tissue

4     sample, a three would be the third and so on.

5     Q.  What does it say there?  Recut?  What does that mean?

6     A.  It is very common that hospitals who have their tissue

7     samples prepared will not send those samples out to other

8     hospitals for whatever reason, but that instead they'll take

9     other thin slices through those paraffin wax blocks and make

10    additional sets of tissue samples that, for all intents and

11    purposes, are like the originals.

12    Q.  Is there anything else on this first slide that you want

13    to point out?  Anything else?

14    A.  No.

15    Q.  Let's go to the next one then.  Doctor, would you explain

16    this slide and what it is that it tells us?

17    A.  This is a diagram of a fetus or a baby in the womb, and

18    the fetus obviously is feet up and head down.  The baby is

19    within this oval shaped structure which is mom's uterus.  It's

20    like looking through the middle of the uterus.  That's mom's

21    belly button, for example, and this is her back, and even

22    though it's not shown here, there is fluid that surrounds the

23    baby, the amniotic fluid.

24         Also present in this case is a spiral-looking structure

25    which is the umbilical cord.  That's the structure that

1    attaches baby at the naval to the placenta which is the organ

2    that attaches to mom's uterus.  In this case, the tissue

3    samples are taken from the baby's body, per se.

4        Another thing that I did want to point out by virtue of

5    this diagram is when we talk about ascending infection or

6    amniotic fluid infection or chorioamnionitis, the pathway by

7    which that occurs is that, as I said, bacteria that are

8    commonly present on all of our bodies in the particular area

9    of the birth canal can travel up the birth canal and gain

10   entry into this normally sterile -- when I mean sterile, I

11   mean, normally no bacteria or other infectious organisms

12   present -- amniotic fluid.

13       And as part of normal life, fetal life before birth,

14   babies breathe in amniotic fluid and they swallow the amniotic

15   fluid.  That's normal.  Whatever is in the amniotic fluid,

16   they will also breathe in and swallow, which is, in the case

17   of ascending infection, how baby's bodies become infected when

18   it starts out with the fluid being infected.

19   Q.  Let's go to the next slide then, and again, is this just

20   another picture of --

21   A.  These are the -- it's the same image that I showed two

22   PowerPoint photos ago, but I did put black boxes around some

23   of the slides to demonstrate that, in making higher power or

24   closer up images to follow, they were taken from specific

25   slides.  I did not photograph all of the slides, but rather

1    the ones that would make specific points.  To photograph them

2    all would not have added additional information.

3    Q.  Okay.  And let's go to this next diagram, and would you

4    explain what this is and why this is pertinent to what we're

5    going to be talking about?

6    A.  This is a diagram of, as it says in the title, the upper

7    respiratory tract.  That is the airway path from our mouths

8    down our windpipes -- from our mouths down our wind pipes or

9    trachea and into the lungs proper, and the airways, which are

10   open so that we can breathe in and breathe out air, are like a

11   tree that's upside down, an upside down tree, where I think of

12   the trachea -- the mouth and the trachea as the tree trunk,

13   and then once we get into the substance of the lungs, those

14   airways branch out into innumerable, thousands and thousands

15   of small sacs that are normally filled with air.  In the case

16   of a baby in the womb, filled with amniotic fluid, which is,

17   as I think I've already mentioned, how it is that organisms or

18   bacteria such as E. coli that are present surrounding the baby

19   with the fluid can gain entry into baby's airways and at times

20   eventually into the bloodstream.

21   Q.  We've heard mention of those sacs before.  Alveoli, is

22   that what they are?

23   A.  Correct.  Alveoli.

24   Q.  Let's go to the next slide, and before you talk about

25   this, can you explain what this was and how you made it into a

1    slide?

2    A.   This is a very high power or very close-up magnification

3    of one of the slides of the lung sample that was taken, and

4    microscopes, just like telescopes, they are outfitted with

5    lenses that can allow you to look far away or very much up

6    close.  So this would have been a slide of, as I have here

7    depicted, of baby's lung that I would have taken.  I would

8    have seen exactly the same image, and there's a camera

9    attached to my microscope, so I took a microscopic image of

10   what I was looking at.

11   Q.   Were these produced because obviously you couldn't bring

12   your microscope into the courtroom here today?

13   A.   Correct.

14   Q.   And did they illustrate what it is that we're going to be

15   talking about here and the basis for your opinions?

16   A.   Yes.

17   Q.   Would you begin with this tissue and tell us what we're

18   looking at and what is significant there?

19   A.   This is one of the sections of lung.  There were several

20   taken but most of them, they demonstrated, in essence, the

21   same process.  The white spaces that you see are the alveoli

22   or air sacs, and this is one of the few areas in all of the

23   samples of lung, where I could still see the air sacs because

24   they are not completely filled with something.

25        So this was about as normal an image as I could provide to

1    serve as contrast for the following image or images that

2    demonstrate what most of the lung samples looked like.

3    Q.  So if we could go to the next slide then, and what again

4    is this lung tissue?

5    A.  Yes.  This is a higher power image of that last one, so I

6    took an area of the last field and I looked even closer to

7    demonstrate the white areas being the air sacs, and even

8    though there are some bits of material, if you will, in them,

9    I can still see the open white spaces where air or amniotic

10   fluid would have gained entry.

11   Q.  The bits of material in there, what is it?

12   A.  Well, that's really actually better demonstrated on

13   subsequent slides.  I primarily wanted to show what a more

14   normal appearing lung looks like.

15   Q.  Let's go to the next slide then.

16   A.  Here is a lower power, so farther away, image of another

17   area of lung or another section of lung which is what most of

18   those samples looked like, where it is very hard to see any

19   white spaces because there is material that's filling the air

20   sacs or the alveoli that I can't tell myself at this power.  I

21   would need to look closer to identify what is present.

22   Q.  Does this next slide do that for us?

23   A.  Yes.  This is a closer image of that last slide, and to my

24   eye, what it demonstrates is that these air sacs or alveoli,

25   which are a little irregularly shaped, you can still see some

white in the background, are packed with mostly baby's infection-fighting cells, and there are two types that are present in this case.

There are the first responders or neutrophils that come as the first response when there's a tissue, a lung response to infection, and yet there are also other cells that are not as common but -- excuse me, there are other cells that are actually as common if not more common that are kind of the second responders.

When an infection is present, initially one set of infection-fighting cells, the neutrophils, come out to fight the infection. As time goes on and the infection progresses, the second responders called lymphocytes come to try to get rid of the infectious agents.

So there's a combination of neutrophils, which I think I have a higher power slide I can show you, and lymphocytes in terms of the cells. There's other material in the lungs that I can't see quite at this image. I would need a closer view.

Q. What is the significance of the fact that there are neutrophils and lymphocytes in the lung tissue?

A. That is the definition of pneumonia. It is the lung's tissue response to infection, so it's an infection that has set up in the lungs, and the baby's body is trying to -- responding to the infection in the lung tissues proper.

Q. What does this slide tell us about the degree of pneumonia

1    or infection that was present in the baby's body?

2    A.   It isn't so much this one slide or this one image as the

3    fact that of all of the samples of lung that were taken,

4    overwhelmingly most of it looked like this.  This is a very

5    advanced pneumonia that affected all of baby's lungs, and

6    that, as I said, because of the types of infection-fighting

7    cells, not only are the first responders present but the

8    second responders are present, meaning a time has elapsed or

9    progressed between when the infection began in baby's lungs

10   and when the death occurred.

11   Q.   And does this slide and the subsequent slides then support

12   the opinion that you gave that this infection had been in

13   existence for some period of time before the baby's birth?

14   A.   This is one piece of information in multiple pieces of

15   information, but yes, this does independently support that

16   opinion.

17   Q.   One of the other things, and the jury has heard this, when

18   we looked at the laboratory studies that were done in this

19   case, earlier testimony, that the initial differential showed

20   that there was only three percent neutrophils and I think 95

21   percent lymphocytes.

22        What's the significance of that in relation to this?

23   A.   In short, baby's body sent most of its neutrophils, which

24   are normally present inside our bones, which is where they are

25   made and in our bloodstream, had sent them to the lungs to try

1    to fight the infection, so there were very few neutrophils

2    left circulating in the bloodstream.

3    Q.  And does that tell us anything about how far advanced this

4    infection was?

5    A.  In cases where there is a low neutrophil count because of

6    infection, it's always in cases of advanced infection.

7    Q.  If we go to the next slide then.  If you can tell us what

8    this is and what the significance is?

9    A.  This is an even closer view of that last image that shows

10    something that I'll talk about in a second in the circle.  An

11    airway would be wherever there's white space left, and the

12    structures that are the round structures that have a single

13    purple or black, depending on how you look at it, shade are

14    the second responders.

15        The first responders that are left in this particular

16    field, I'm not sure I even see any of them, the neutrophils,

17    although they are present in many other areas.  There would be

18    one where, instead of being round or oval, sometimes they are

19    cloverleaf shape.  Sometimes they look like two of three

20    leaves of clover.

21        What I wanted to draw attention to was material -- the

22    color of it isn't well depicted on this slide, probably

23    because of the lighting, but there's stuff that is orangey

24    brown that is in the lungs, so that's what it looks like to my

25    eye through the microscope, and that is in fact meconium, so

1    there had been meconium aspiration in this case because the

2    meconium came to rest into baby's airways.

3    Q.  And those purple things, are those the lymphocytes?  Is

4    that what you are pointing out?

5    A.  Correct.

6    Q.  Let's go to the next slide then and explain to us what

7    this is and what is the significance of this?

8    A.  This is the very same image I just showed you.  In the

9    lower right-hand area is the circle that I had in the last

10   slide showing the meconium.

11       What I'm circling this time are lines, these purple lines.

12   These are the actual E. coli bacteria.  That's what bacteria

13   that are line-shaped look like through the microscope to

14   demonstrate that in fact I could find the bacteria in baby's

15   airways.

16       Now we know from blood culture, it had also gained access

17   to the blood, but they are present here, and in terms of the

18   process of advancing from being in the airways to going in the

19   bloodstream, what occurs is the bacteria moved from the

20   airspaces into these red circles that are present, anything

21   you see that's red are baby's red blood cells that are in

22   little tiny blood vessels.

23       So in the lung, baby's bacteria can move from the airways

24   and gain entry moving in this way into the baby's bloodstream,

25   and then from there circulate throughout the body.

1   Q.  Is that what happened in this particular case?  It moved

2   into the bloodstream and caused a bacteremia?

3   A.  Correct.

4   Q.  Let's go to the next slide.  If you can tell us what this

5   is and what's significant there?

6   A.  This is an organ that isn't talked about normally because,

7   in adults, it shrinks to a very small size, but in fetuses and

8   neonates, there's an organ that rests in front of the airways

9   and above the heart called the thymus.  It is an organ where,

10  if the baby is in a state of not normal well-being but taken

11  out of well-being prior to delivery, there can be changes in

12  the thymus that I can see that indicate to me or help indicate

13  how long this process in the thymus represents the baby's body

14  being taken away from a state of well-being to lead to this

15  process.

16      Now, that doesn't mean the baby was perfectly fine

17  earlier, but it means that, at least for this period of time,

18  the baby was in a state where it was not in its normal state

19  of well-being in the womb.  That's called thymic involution.

20  I think I have another slide that shows this at higher power.

21  Q.  If we can go to the next one.

22  A.  This is the very same image of the thymus looking at it

23  closer up, and all of these white spaces that are present are

24  not normally present in a newborn thymus.  These are cells

25  that are basically eating up, if you will, the background

eq

1    purple cells that have been damaged or that have responded to

2    baby's unwellness and undergone -- they break apart, in

3    essence.

4        This kind of punched-out appearance is an appearance of

5    acute thymic involution.  When I say that, I mean, a period

6    that, in the thymus alone, represents the baby being in a

7    state of unwellness for up to about a day prior to delivery.

8    This is greater than a 12 hour period but up to probably about

9    a day.  It hasn't evolved into the days process, even though

10   the infection was present longer than that, to demonstrate a

11   more advanced microscopic appearance.

12   Q.  And in terms of the significance of this, does that again

13   correlate or confirm your opinion that this was an infection

14   that had been in process for some period of time?

15   A.  In light of all of the other information, yes.

16   Q.  And does it also tell us about how advanced the infection

17   was at this time?

18   A.  Unto itself, no.

19   Q.  Let's go to the next slide then, and if you would explain

20   to us what this is and what the significance is?

21   A.  So this is a pretty far away view of another area of the

22   lung, and just to go back to what I had said earlier, the

23   spaces where I can still see airspaces are not much of what I

24   can see of the lung tissue themselves.  This was a -- this is

25   a blood vessel.

1    Most of the lung tissue proper is solid.  It's solid pink,

2    because it's filled with those infection-fighting cells, but

3    what I really wanted to demonstrate here is, in the case of

4    neonatal sepsis, babies are in the later stages of illness or

5    the infection becomes advanced, their bloodstreams become

6    leaky.  Clinically, the correlate of that, is low blood

7    pressure usually.

8        The blood escapes the blood vessels and enters into the

9    tissue.  It's like bursting a blood vessel if you get a

10   bruise.  The blood escapes into your skin, so this is bleeding

11   in the lung, also called hemorrhage, so this is lung

12   hemorrhage and was present in many tissues.  I believe I took

13   photos of just a few of them for demonstration.

14   Q.  And what is the significance of lung hemorrhage as it

15   relates to this particular infection and the process?

16   A.  It is a late stage process that precedes death.

17   Q.  We have heard testimony here from Dr. Jones and some

18   others that, during the course of the resuscitation, that

19   there was pulmonary hemorrhaging.  Is that what is being

20   depicted there?

21   A.  Yes, in part because part of where the blood escapes when

22   it escapes blood vessels is into the airspaces that should be

23   filled with air, and then those spaces then are filled with

24   blood and can be pulled up by resuscitation or suctioning

25   machine.

1    Q.  We've also heard from one of the previous physicians who

2    came in here is one of the things you see with E. coli sepsis

3    as it progresses is a condition called DIC.  Would that be

4    consistent with that?

5    A.  Well, this is also consistent with DIC.  DIC, however, is

6    a clinical diagnosis that's comprised of laboratory results,

7    but this would be a process, and septic shock and DIC often go

8    hand in hand, that would also be consistent with that

9    diagnosis.

10   Q.  Let's go to the next slide then.  And can you tell us what

11   this is and what the significance of this is?

12   A.  Yes.  This is a sample of the spleen which is an organ

13   that sits under the diaphragm, your breathing muscle that's

14   right here (indicating).  In this case, while there is blood

15   in the spleen, it doesn't ever look like pure lakes of red to

16   me.  It looks like there's bleeding into areas of the spleen,

17   and so this is another organ that demonstrated that process of

18   bleeding into the tissues or spleen hemorrhage.

19   Q.  Again, what does this tell us about how far this infection

20   has progressed?

21   A.  Given that this process occurred in multiple tissues that,

22   once again, that it was advanced unto itself and that it was

23   present in multiple tissues further supports that opinion.

24   Q.  Let's go to the next slide, and what is this?

25   A.  This is the top portion of the autopsy report that

1    contains in it the final diagnosis, so the bullet lines of

2    disease processes or what the pathologist rendered opinions on

3    as well as a summation of the cause of death as well as

4    briefly what he or she saw looking at the microscopic slides.

5    Q.  And under the cause of death, it says, "Acute respiratory

6    failure due to neonatal E. coli sepsis and acute

7    bronchopneumonia."

8        And do you agree with that statement as the cause of

9    Kendall's death?

10   A.  Yes.

11   Q.  Based upon all of those materials that we have looked at,

12   what were your conclusions about what happened in this

13   particular case?  If you need to look at your report too, you

14   can certainly do that.

15   A.  If you don't mind, since I think this is the last slide,

16   may I go back to my chair?

17   Q.  Absolutely.

18   A.  In my second paragraph, I say, "In this case, there is

19   unequivocal evidence," which means without question, "of

20   congenital sepsis associated with congenital pneumonia which

21   is in turn the cause of early neonatal death of Kendall

22   Peronis.  This is evidenced by the following," and I list

23   multiple pieces of evidence to support that, and that in the

24   looks like the third to last paragraph, last sentence, last --

25   next to the last sentence, "In this case," I'm restating the

1    same thing, "there is abundant evidence in the neonatal

2    autopsy that the series of events occurred beginning in utero

3    and culminating in early neonatal death."

4    Q.  And based upon your review of all of the materials that

5    you've shown us and the slides that you reviewed, did you form

6    an opinion as to how far along this infection had progressed

7    at the time that Kendall was born and then resulting in her

8    death?

9    A.  It had progressed as far as it could progress, because it

10   led to very rapid death following baby's delivery.

11   Q.  And is that sequence of events, rapid progression to

12   death, is that what you see with E. coli sepsis?

13   A.  When it occurs in this context, that is, the context of

14   pregnancy where the infection in baby's body and bloodstream

15   is present at the time of delivery, it is more typical than it

16   is rare, so yes.

17   Q.  And just to conclude, have all the opinions that you have

18   rendered here today been rendered with a reasonable degree of

19   medical certainty?

20   A.  They have.

21          MS. KOCZAN:  Thank you.  Those are all the questions

22   I have.

23          THE COURT:  Mr. Colville, any questions?

24          MR. COLVILLE:  No, Your Honor.

25          THE COURT:  All right.  Mr. Price?

```
 1              MR. PRICE:  I do, but may we take a break?

 2              THE COURT:  Do you need a break?

 3              MR. PRICE:  Yes, please.

 4              THE COURT:  At this point, ladies and gentlemen,

 5     we're going to take our midafternoon break.  Once again, you

 6     will leave your notepads and binders there on your chairs.

 7     Continue to keep an open mind.  No research.  No talking

 8     amongst yourselves yet about the case.  No talking with others

 9     about the case.  We'll get back together here at ten to 3:00.

10              Mr. Galovich, if you'll escort our jury.

11          (Jury excused.)

12              THE COURT:  Doctor, you may step down.  During this

13     break, since you are under oath, you should not talk about

14     your testimony with anyone.  Restrooms are on either end of

15     the hall.  The jurors have private restrooms back there.

16          (Recess taken.)

17              THE COURT:  Ms. Koczan has provided to my deputy and

18     in turn to me a set of the slides prepared by Dr. Boyd for use

19     during the course of her testimony.  I trust that you,

20     Mr. Price, particularly have a copy?

21              MR. PRICE:  Yes.

22              THE COURT:  And you, Mr. Colville?

23              MR. COLVILLE:  Yes.

24              THE COURT:  So again, this is a demonstrative

25     exhibit.  It relates to the hospital defendants.
```

1    Mr. Galovich, you'll log it in accordingly.  At this time, our

2    jurors will come out.

3        (Jury present.)

4            THE COURT:  Thank you, Mr. Galovich.  Mr. Price, are

5    you ready for cross-examination?

6            MR. PRICE:  Yes, Your Honor.

7                            CROSS-EXAMINATION

8    BY MR. PRICE:

9    Q.  Good afternoon, Dr. Boyd.  Just a couple things to clean

10   up and to set context.  So with regard to this bacterial

11   infection, from what you are saying is that by the time it

12   came for labor, that the baby had an overwhelming bacterial

13   infection?

14   A.  Could you define for me what time frame you mean by labor?

15   Q.  The day before.  I mean, you know, she came into the

16   hospital October 12, and I thought you said it was there for

17   weeks or, not weeks, days.

18   A.  So if you are using -- if you don't mind, as a

19   non-clinician, I'll say that the time that she -- mom

20   presented to the hospital on the 12th, the infection was

21   already established.

22       What occurs in these infections is that, as time goes on,

23   they become more and more advanced, and the more advanced the

24   infection itself becomes, the greater the risk of harm, or I

25   should say untoward outcome.  So the infection itself was

1    already established at the time that mom presented.  What

2    effect -- what that looked like clinically, I can't know.

3    Q.  Now, sometimes whenever a baby is in utero and has some

4    type of stressor such as an infection, it can cause the baby

5    to, like, expel meconium, correct?

6    A.  Meconium can be expelled in circumstances of stress.  It's

7    not always.  Some people believe meconium is a normal process

8    of late pregnancy.

9    Q.  But from your understanding, if a baby did, I mean, in a

10   situation like this, where you are saying the baby had an

11   infection, one of the reasons why the baby might be expelling

12   meconium is in response to the infection?

13   A.  That may be the case.

14   Q.  Okay.  And in this case, this baby, there was meconium

15   noted while this baby was -- before birth in utero, correct?

16   A.  I'm not sure what you mean by "meconium noted."  I see

17   what you are saying.  Prior to delivery when baby was still in

18   the womb, clinically there was meconium noted.  There is

19   information in the medical records to that effect, yes.

20   Q.  And you testified that whenever -- whatever is in the

21   amniotic fluid, which would include meconium, the baby will

22   breathe it in, correct?

23   A.  And swallow it, yes.

24   Q.  And that's how you can get something like this, like

25   meconium aspiration syndrome or respiratory distress, right?

1    A baby will breathe in meconium.  It goes into the lungs and

2    it will get deep down in the lungs, right?

3    A.  Well, meconium aspiration syndrome and respiratory

4    distress are clinical terms.  I can tell you that there was

5    meconium breathed into the airways which is meconium

6    aspiration.

7    Q.  So this baby had meconium aspiration?

8    A.  That is correct.

9    Q.  And I know in your direct testimony, you really didn't

10   touch on that too much.  You showed the slide, but you don't

11   believe that meconium aspiration was a major contributing

12   factor to this child's death?

13   A.  That is correct.

14   Q.  And as you mentioned -- I also was going to bring this

15   slide up, because clinically, this child, at 8:52, had

16   respiratory distress and we've all seen that.  And I just want

17   to get -- you've seen the medical records and the jury has

18   seen this.  This is the cause of death, and we've gone over

19   the chain of events, and you've seen the cause of death when

20   Dr. Jones filled out that meconium aspiration was the first

21   onset issue at 5:20 in the morning.

22       Do you see that at the very bottom?

23   A.  I do.

24   Q.  And then she goes up, as time goes by, pulmonary

25   hypertension happened at 9:00, pulmonary hemorrhage at 10:55,

1   cardiac arrest at 10:55 and the baby died at 11:40.  You saw

2   that?

3   A.  I'm sure that I saw that in my review of the records.  I

4   do see that on the screen.

5   Q.  And likewise on the final death certificate cause of

6   death, again, the immediate cause Dr. Jones listed as meconium

7   aspiration and then the underlying cause was the neonatal

8   sepsis.  Do you agree with that?

9   A.  As a pathologist -- I agree that that is what is written.

10  As a pathologist, I would disagree with the immediate cause.

11  Q.  Okay.  Now, the one thing that you stated in your

12  testimony which I found very interesting was when you said

13  that, in reviewing these images, that these images -- your

14  opinion about what is on the slides is what you see and you

15  said "to my eye."

16      And the way I took that was to your eye, you could see it

17  one way, but somebody else could see it a different way; is

18  that correct?

19  A.  That, if I recall my testimony correctly, what I intended

20  to convey when I said that was that I, as a pathologist, can

21  recognize this process.  I would not necessarily expect the

22  jury to whom I'm showing the images to recognize as I do the

23  same process.

24  Q.  But in this case, there is another pathologist, and that

25  was Dr. Min, right?

1    A.   That is the pathologist who performed the autopsy, yes.

2    Q.   And Dr. Min, his experience just -- you were able to read

3    his deposition testimony, correct?

4    A.   I believe I did at some point in the past.

5    Q.   He has been practicing at this point for about 45 years on

6    the job.  He was getting towards the end of his career, and

7    you know that whenever he reviewed the slides that he found

8    massive aspiration of meconium, correct?

9    A.   I see that that was his diagnosis, yes.

10   Q.   And you disagree with that?

11   A.   I do.

12   Q.   Dr. Min, he also did a microscopic evaluation, examination

13   of the same slides you did, correct?

14   A.   He did.

15   Q.   And whenever he did, I mean, he found meconium in the

16   diaper, but he also said whenever he examined, the major

17   bronchial trees are most clear.  However, the smaller

18   bronchial trees contain some aspirated material, and he

19   concluded it was most likely meconium, correct?

20   A.   I see that.

21   Q.   And did you also know that Dr. Min reviewed the slides a

22   second time?

23   A.   Not necessarily.

24   Q.   Okay.  About two and a half years after the birth, two and

25   a half years after his autopsy, he went back and here's what

1    he testified:

2        "When was the last time you reviewed Kendall's autopsy

3    slides?"

4        He said, "When Dr. Dumpe asked me to."

5        I said, "What happened?"

6        He said, "When I reviewed the slides, actually I concurred

7    with the findings, what I have written down."

8        So he was saying that this official autopsy report is

9    still correct, but you disagree with that?

10   A.  I disagree with his interpretation.  If his interpretation

11   remained the same, I disagree with his second opinion, which

12   he believes is the same as his initial opinion.

13   Q.  And you disagree with -- I mean, like I said, his first

14   opinion was massive aspiration of meconium.  His second review

15   had the same thing, and you disagree that there's a massive

16   aspiration of meconium?

17   A.  That is correct.

18   Q.  And I know that we talked about, you know, Dr. Min came

19   here from Korea, he's been working in Beaver County, and he

20   reviewed this without any interest in the case.  Just simply

21   it's his job as the pathologist.  You come at it from a

22   different angle, correct?

23   A.  I am not a hospital-based pathologist in this case.  I'm

24   an expert witness, so to that extent, I come at it from a

25   different angle.  My intent, however, is to accurately portray

1    the findings that I have in this case and my interpretation

2    therein based on my 30 years now of specialty training and

3    experience in pediatric and perinatal pathology.

4    Q.  In addition to that, you have provided your list of cases,

5    and the way it looks to me is you give a deposition or you

6    come to trial at least once a month for the last -- at least

7    for this, it's seven years, correct?

8    A.  I don't review my own records so I don't know what my

9    trial testimony is.  If that is what you have calculated, I

10   will accept that that's your calculation.

11   Q.  I'm just -- we'll go to -- let's go to the year that this

12   death occurred.  You testified January of 2014, February of

13   2014 three different times, April of 2014 two times, May of

14   2014, three times in June of 2014, once in July of 2014, twice

15   in August of 2014, once in September of 2014, four times in

16   October of 2014, once in November of 2014 and twice in 20 --

17   December of 2014.

18        Do you want to take a look at this?

19   A.  I will trust that what you are saying is what's

20   represented on the paper.

21   Q.  That's about the way it is every year for you.  At least

22   once or twice a month, you are somehow testifying or giving a

23   deposition in a case?

24   A.  Again, I would say that, on average, I probably give a

25   deposition a month.  In my mind, in my memory, I testify

1    anywhere from one time a year to several times a year.  I
2    don't know the exact breakdown.
3    Q.  2017 January three times, February three times, March
4    once, April once, May once, June once, July once -- no.  I'm
5    sorry.  July three times, September once, November once,
6    October twice.  It makes it about the same, right?  You are
7    doing about 15 to 20 depositions or trials a year?
8    A.  Well, I represented to you what I just said, which is my
9    general recollection, and if you are saying that, on average,
10   a deposition a month and on average one to several trials a
11   year is on average 15, I'll accept that.
12   Q.  And from what you are telling this jury is that at the
13   time that Kendall was born, her lungs were filled up with
14   infection, a massive infection, correct?
15   A.  Correct.
16   Q.  That would mean that at the time that Kendall was born,
17   when Nurse Hendershot and Nurse Gantz were evaluating her,
18   even though her lungs were filled up with an infection, there
19   was no notice of them upon examination of anything wrong with
20   her lungs, correct?
21   A.  You are asking me about clinical interpretation of
22   examination, and I am not a clinician who examines neonates,
23   so I can't speak to that.
24       I can tell you that the overwhelming pneumonia that was
25   present at death would have been, in essence, the same extent

1    as was present at the time of delivery.  That does not

2    necessarily mean that clinically it looks the same, but I

3    can't speak to the clinical events.

4                MR. PRICE:  That's all the questions I have.

5                THE COURT:  Anything on redirect?

6                MS. KOCZAN:  Yes.

7                        REDIRECT EXAMINATION

8    BY MS. KOCZAN:

9    Q.  Doctor, you were asked some questions about Dr. Min's

10   testimony in the courtroom.  I would like you to assume that

11   he testified not only in deposition but here in the courtroom

12   that the term massive aspiration was something that he took as

13   a clinical diagnosis, not necessarily a pathological

14   diagnosis.

15       If that was his testimony, would you agree with that, that

16   there is no pathological evidence of a massive meconium

17   aspiration?

18   A.  Given that I see meconium aspiration in neonates who die

19   from all kinds of causes other than meconium aspiration and

20   even other than infection, meconium, when it is present in the

21   amniotic fluid, is commonly present in the lungs at death.

22   That doesn't mean it's massive meconium aspiration.

23       I don't know what led Dr. Min to use that terminology.  If

24   you are saying that his testimony is that it was based on a

25   clinical diagnosis, I will accept that.

1    Q.  But my question is, do you see any evidence based upon the

2    slides that you reviewed that there was, quote-unquote, a

3    massive meconium aspiration?

4    A.  This was not pathologic massive meconium aspiration.

5              MS. KOCZAN:  Thank you.  That's all I have.

6              THE COURT:  Anything at this point, Mr. Colville?

7              MR. COLVILLE:  Just a follow-up on that point.

8                          RECROSS-EXAMINATION

9    BY MR. COLVILLE:

10   Q.  If you could bring up Dr. Min depo, page 14.  Good

11   afternoon, Doctor.  My name is Michael Colville.  I represent

12   the United States in this case.

13        Doctor, Mr. Price indicated in his questioning to you that

14   Dr. Min had concurred with his original reading of the slides.

15   That's how he posed the question to you, but what I will show

16   you here is page 14 of his deposition.  I think beginning on

17   line 10.

18        He indicates that he went back and looked at the slides.

19   This is the second viewing of the slides he's referencing.  He

20   was asked:  Did you go back and review the pathology slides?

21        He indicated yes, he did.

22        He was asked:  From your review of the pathology slides,

23   did you find that there was massive aspiration of meconium?

24        And he testified at that deposition and he testified here

25   just a couple days ago to the accuracy of that answer.  He

1  said no, he did not.

2      Assuming those facts that, when he went back and looked

3  and he didn't find massive meconium, would you agree with that

4  opinion?

5  A.  Given that I don't think there is pathologic evidence of

6  massive meconium aspiration, I would agree with his

7  reinterpretation.

8          MR. COLVILLE:  Thank you.

9          THE COURT:  Anything further, Mr. Price?

10          MR. PRICE:  Sure.

11                    RECROSS-EXAMINATION

12  BY MR. PRICE:

13  Q.  Now we're going down the worm hole.  You reviewed

14  everything and all the medical records, depositions.  I mean,

15  at least you testified in direct that you did, correct?

16  A.  I do not typically read depositions.  Certainly not of

17  clinicians because it's not my area of expertise.  If there is

18  a pathologist deposition, I may or may not read it depending

19  on circumstances.

20  Q.  Okay.  And you did testify that you did review the

21  clinical chart in this case?

22  A.  Correct.

23  Q.  And again, I know you weren't here for Dr. Min's

24  testimony, but we did explore this issue of where he got this

25  information about massive from the clinical chart.

1        Let me ask you this:  If it's Dr. Min's testimony that he

2   got the word massive from the clinical chart, from your review

3   of the medical record in this case, did you ever see anybody

4   refer to the meconium aspiration as massive except for Dr. Min

5   in his autopsy report?

6   A.  I don't recall one way or another.

7   Q.  Dr. Min found that although Kendall died of E. coli and

8   bronchopneumonia, it was associated with the massive

9   aspiration of meconium, correct?

10  A.  I believe that, based on what I understand, that is his

11  opinion.

12              MR. PRICE:  That's all I have.

13              THE COURT:  Anything further of this witness?

14              MS. KOCZAN:  Nothing, Your Honor.

15              MR. COLVILLE:  No, Your Honor.

16              THE COURT:  Doctor, thank you for your appearance

17  here today.  May the doctor step down?  May she be excused?

18              MS. KOCZAN:  From my perspective, yes, Your Honor.

19              THE COURT:  Doctor, you may step down.  Safe travels

20  back home.  You may be excused.

21      (Witness excused.)

22              THE COURT:  The doctor is taking with her the slides

23  that she made.

24              THE WITNESS:  Your Honor, if you don't mind, these

25  belong not to me but to the hospital.  I would prefer to leave

1    the slides with the attorney.

2            MS. KOCZAN:  I will take them.

3            THE COURT:  Do you want to tender them to Ms. Koczan.

4    Let the record reflect that they have been provided to

5    Ms. Koczan.

6            Ms. Koczan, your next witness.

7            MS. KOCZAN:  Yes, briefly Dr. Dumpe.

8            THE COURT:  Dr. Dumpe, if you'll approach

9    Mr. Galovich to be resworn.

10        (Witness sworn.)

11            KEVIN C. DUMPE, M.D., a witness herein, having been

12    first duly sworn, was examined and testified as follows:

13                         DIRECT EXAMINATION

14    BY MS. KOCZAN:

15    Q.  Good afternoon, Doctor.  I want to talk with you about the

16    policies and procedures that we've seen in this case,

17    particularly policy No. 2.40 and 2.21 and the jury has seen

18    both of those policies, and before I put them up, I just want

19    to ask you some general questions about that.

20        How are these policies and procedures put together at

21    Heritage Valley?

22    A.  The procedure is designed to be pretty robust and it has

23    been because here's the procedure.  We have a point person for

24    formation of policies.  All these nurse supervisors you have

25    been hearing about, they are overseen by a nurse manager.

1    At the time, it was Donna Kingston.  We've heard that

2    name.  She ends up being the point person for policy

3    formation.  We have to have somebody that everybody can get

4    their information to and it's the nurse manager.

5    She derives her information as to when to consider either

6    formulating a new policy or revising a policy by getting

7    multifaceted input.  For instance, the physicians, I read

8    journals.  All the other nine physicians in our department

9    read journals.  If they read something that they think starts

10   being elevated to a true standard of care, they will bring

11   that to our attention, either myself as the chairman of the

12   department or the nurse manager, and say maybe we should

13   consider either formulating a new policy or amending an old

14   one.

15   In addition to that, now, we all look at different

16   journals, so because there's approximately nine of us, there's

17   a lot of journals being read and a lot of information being

18   culled, and those are -- like I said, if an individual doctor

19   says this is actually rising to a standard of care situation,

20   maybe we should think about having a policy, they bring it to

21   our attention.  That's one avenue.

22   The nurses, they are employed in the maternal child health

23   unit, and especially the nurse supervisors and especially the

24   nurse manager are all being -- many of them are members of

25   AWON, I can't remember what the acronym stands for, but the ON

1    means obstetrical nursing.  It's their guiding body.

2        If that organization starts saying that there's

3    information that rises to that level again, they will start

4    contacting their membership and they will see that in their

5    journals.

6        The nurse manager, especially our current nurse manager,

7    but all nurse managers I've known since I've been there, have

8    also had a very close relationship to other nurse managers at

9    other hospitals, and they make it a point of specifically

10   deriving information from nurse managers at like hospitals,

11   like other community hospitals.  St. Clair Hospital is a

12   similar hospital to ours.  Butler Hospital is a similar

13   Hospital, Washington Hospital.  We also have a pretty close

14   working relationship, as you've heard, with West Penn

15   Hospital, and our nurse manager and their nurse manager have a

16   close relationship.  Sewickley, our sister hospital, has its

17   own nurse manager.

18       So that type of group also has a lot of discussions as to

19   is there anything you are doing policy-wise that we should

20   consider doing policy-wise, so wherever the information comes

21   from, and it becomes very multifaceted and very diverse where

22   that information comes from, it then comes to the nurse

23   manager and myself.

24       I'm the head physician in our department.  She is the head

25   nurse, and we put our heads together and we say what do we

1    think.  Is this truly something we should consider, again

2    either formulating or amending a policy.  If so, we have to

3    say, yes, we have to make this amendment or formulate this

4    policy.  We bring that policy to our department meeting,

5    OB-GYN department meeting.  We meet quarterly.  That's when

6    the decision is made as to should we finalize this as an

7    amendment or a new policy.

8    Q.  Can we put up 2.21?  And what I'd like to do is have you,

9    if you could, the first page of that and then the last page of

10   that, if you can put them side by side initially.  The reason

11   why I'm asking, next page, keep going to the next page.  First

12   I want the page that shows the references on it.  That's the

13   one.

14        The page on the left is the first page of this policy 2.21

15   that we've looked at, and this is the notification of

16   pediatrician nursery for expected delivery of potentially high

17   risk infants.

18        Then if we look at the last page of that document where it

19   identifies references, if you can highlight that for us, and I

20   want to ask you about this.

21        The references here that are referred to, are those the

22   documents from which these policies are derived?

23   A.  The procedure is more diverse than that, as I just

24   described, but some of these references that have been used in

25   the specific policy listed here, the reference I highlight on

1    there, the one that is most applicable to me, for instance,

2    the goals for anesthesia care, if there's a question

3    concerning anesthesia in labor and delivery, I tend to defer

4    decisions on that or at least do it jointly with the

5    anesthesia department.

6        Same thing with nursing care.  I would let the nurses take

7    the point on that.  I can be an adviser, but the one I

8    highlight is the one that is third on that list, "The

9    Guidelines For Perinatal Care."  I like that resource, and

10   every time we have a discussion about a policy, we look it up

11   in that resource, because that is specifically meant for the

12   purpose we're describing right here.  What should policies be?

13   What should standard of care be?

14       And that particular reference is a joint publication, as

15   you see up there, of the governing authority of pediatrics,

16   American Academy of Pediatrics and our governing authority,

17   American College of Obstetricians and Gynecologists.

18       When those groups gets together and say here's things we

19   think you should be looking at as far as your standards,

20   that's a powerful publication and helpful publication.

21   Therefore, the first question when the nurse manager says

22   might we look at a change in policy in this direction, my

23   first question is what do "The Guidelines of Perinatal Care"

24   say.  Does it address it and if so how?

25   Q.  We've heard some testimony of one of plaintiffs' experts

1    last week, and I believe it was Dr. Karotkin who testified

2    that the guidelines are, and I believe this is it, ACOG and

3    the American Academy of Pediatrics; is that correct?

4    A.  Yes.

5    Q.  And this particular policy was based upon those

6    guidelines; is that correct?

7    A.  Yes.

8    Q.  At least in part.  And would the information that is set

9    forth in that document, "Guidelines For Perinatal Care," would

10    that be essentially the standard of care?

11    A.  It would certainly contribute to it.  It's a big voice in

12    the standard of care.  I'm not going to point to any reference

13    and say that outlines the standard of care, but this comes as

14    close as possible to saying, yeah, these are probably the

15    rules you should be following.

16    Q.  And the policy, the Heritage Valley policy 2.21, is that

17    consistent with the standard of care?

18    A.  Absolutely.

19    Q.  And we heard from Dr. Wiesenfeld this morning that

20    indicated that the standard of care for notification of a

21    pediatrician does not require, in the presence of meconium, a

22    pediatrician to be present but instead someone who can -- is

23    trained in neonatal resuscitation.

24        Is that your understanding of the guidelines?

25    A.  Yes.  My understanding of his testimony was that even with

1    thick meconium, he said all you need is a person able to do

2    the initial steps in assessment resuscitation, and he

3    specifically said a nurse could do that.

4        So our guideline, which says if there is the presence of

5    thick meconium, we will have a pediatrician there, that's what

6    our guideline says, is actually above the standard of care.

7    Q.  Okay.  So it is going one step further.  Here's the

8    standard of care, but we're going to do something even better

9    or more.  Is that what this policy does?

10   A.  Yes.

11   Q.  Not only does this policy comply, is that correct, but it

12   goes above what is required?

13   A.  Correct.

14   Q.  I want to show you another portion of that document and

15   ask you about that.  If we can go to that page that you showed

16   before with the signatures on it and just if you can highlight

17   that top section there.  I want to ask you about this.

18       It has an origination date of 7 of '88 and then it has

19   dates where it was reviewed, and I just wanted to ask you what

20   this means.  We see that looks like just about every year, at

21   least 2010, '11, '12, '13 and '14, this particular policy was

22   reviewed.  What does that mean?

23   A.  Well, in past years, as you can see they are back in the

24   1980s and 1990s, it was reviewed, but infrequently.  There was

25   no departmental policy on how often we should do that, and so

1    when somebody said, gee, our policies, we haven't looked at

2    them in a while, maybe we should look at them again, that was

3    the practice.

4        We recently decided that maybe that's not good enough,

5    that we should start reviewing these yearly.  You can see the

6    dates up there since 2010, we have been -- our practice has

7    been to review these policies yearly.  I appreciate the fact

8    that we're doing that.  I think we should do that.  Believe

9    me, it seems like it's every six months because it's a long

10   process.  It's rather tedious, but it gets done, and that

11   nurse manager is the one who takes the point.

12       With all those diverse inputs I talked about, one of them

13   is her yearly review.  If she reads something and all of a

14   sudden goes maybe we're not doing that or maybe we should do

15   that differently or that's not our practice, again, that's

16   another source of input that maybe we should revise the

17   policy, so that's what it means by review.  They are read and

18   not necessarily revised, which is the next line, but reviewed.

19   Q.  Let's go to the next line revised.  What does that mean?

20   A.  That means that, during those years you see there, during

21   the review, we found reason to change something.

22   Q.  And would the reason to change something be that there was

23   some new guideline from the American Academy of Pediatrics or

24   from ACOG?

25   A.  Or maybe we found that somewhere we were within standard

1    of care, we decided to bump that up, and maybe it was our

2    practice to be above standard of care, we said let's change

3    our policy to reflect that.  It could be any of those reasons

4    it would be revised.

5    Q.  The last time that this policy was then revised would have

6    been August of 2009; is that correct?

7    A.  Correct, as of the date of the event under consideration.

8    As of 2014.

9    Q.  So just so we understand what happened here, it was last

10   revised, changes made in August of '09, but it was reviewed in

11   August of 2014 again, correct?

12   A.  Yes.

13   Q.  And then is it then circulated?

14   A.  Yeah, as you can see the names there.  If you actually

15   pull that down, you see a lot of names on there.  You'll see

16   the chair -- my name as the chair of our department, the name

17   of the Sewickley chair.  If it is a policy that affects

18   pediatrics, they get the chairs of both pediatric departments

19   on both campuses.

20       If it would be something that involves the nursery,

21   Dr. Scibilia, as you heard, has been the head of the nursery

22   for a long time.  If it's an anesthesia issue, anesthesia's

23   signature goes on there.

24       Whoever the policy involves, the authoritative person in

25   that department has to review it as well and put their

1   signature to it and so that's what you see.

2       That's why you see the dates varying there because it gets

3   circulated.  The nurse manager has it in her office and says

4   please review it and sign it.  Some people get there very

5   quickly.  Maybe I get there later because it was in someone

6   else's hands and it wasn't available when I was available to

7   sign it.

8       So over the course of time, that reviewed policy gets put

9   through the hands of all the department people and they affix

10  their signature to it on whatever date they could.

11  Q.  This was the policy that was in effect on October 14 --

12  excuse me, October 13 of 2014?

13  A.  Yes.

14  Q.  This is the policy that comports with the standard of care

15  and is in fact over and above; is that correct?

16          MR. PRICE:  Objection, Your Honor.

17          THE COURT:  Leading.

18          MR. PRICE:  Asked and answered.

19          THE COURT:  Sustained on both counts.

20  Q.  Doctor, same questions, and I'm not going to go through it

21  with 2.24.  That was another policy that we've looked at here.

22  Would the same process be utilized for that as well?

23  A.  Yes, both in formulation, review and revision.

24          MS. KOCZAN:  I think that's all I have.  Thank you

25  very much.

1           THE COURT:  Mr. Colville, any questions of Dr. Dumpe

2    at this point?

3                        CROSS-EXAMINATION

4    BY MR. COLVILLE:

5    Q.  Good afternoon, Doctor.  Just a few questions.  Could you

6    bring up Exhibit 2, page 3.  Doctor, this is your operative

7    report?

8    A.  Yes, it is.

9    Q.  It indicates that the birth occurred at 5:20?

10   A.  Well established, yes.

11   Q.  Can you go to the next page, please?  You can highlight

12   this part, please.  This indicates that you dictated this

13   report at 5:53 that same day; is that correct?

14   A.  Correct.

15   Q.  So what I'd like you to do is explain for me and the jury

16   what happens between 5:20 and 5:53?

17   A.  Delivery of the baby at 5:20.  As has been testified over

18   and over again, I brought the baby over to the warmer.  I have

19   to then deliver the placenta.  I cannot tell you how long it

20   took Carissa's placenta to deliver.  On the average, it's

21   three to five minutes.

22        And then in her case, she had a little excess bleeding, so

23   I had to take care of that, which is a very brief massage of

24   her uterus to stop that bleeding.

25   Q.  While you are doing that, the baby is at the table.  The

1    Apgar scores are being taken?

2    A.  Yes, yes.  I'm not involved in Apgar scoring.  They do

3    that so we don't bias ourselves.  We'd love to brag that we

4    deliver really good babies and we would tend to cheat in the

5    good Apgars.  Nurses don't have that motivation, so I'm taken

6    out of that process.

7        Then she had a large episiotomy that had to be put back

8    together.  That would take me ten to 15 minutes, and after

9    that point, if all was well, we get Carissa out of that weird

10   position we have her in for delivery and make sure she is

11   settled.  That's all nursing duties, because about that time,

12   I have a habit of cleaning up the room.  The nurses love the

13   fact that I help them clean up.  That takes me three minutes

14   to get the room put together.  Before the family comes in, I

15   like to make sure it's presentable for them.

16       And then at that point, I wheel that garbage out of the

17   room, and then I go to do this type of documentation.

18   Q.  Okay.  Do you have a time when that would have been when

19   you would have left the room to go do the documentation?

20   Noting that 5:53 is when the dictation was completed; is that

21   correct?

22   A.  Yeah.  This, as opposed to a lot of other documentation

23   which is people's estimates of times, this is an

24   electronically generated time.  This is the true time pretty

25   much to the second of when I did this, so she delivered at

1    5:20.  We're looking at 20 to 30 minutes of total work time

2    after that for me before I then leave the room and then

3    apparently -- I would go out of the room, and there is a small

4    handwritten note on the progress notes that we have to write a

5    very short paragraph.

6        I do that because, as I walk out of the room, people are

7    throwing numbers at me, birth weights, births times, Apgar

8    scores.  So I don't forget those, I make my short notation in

9    a short paragraph, and in addition to that, the next day when

10   the residents are making rounds on this patient, they need to

11   know what happened in brief.

12       This transcribed report does not get on the chart -- did

13   not at that time get on the chart for several days, so to

14   allow the residents to know the brief details of what went on,

15   I would do the short note, and then -- very short.  It's a two

16   minute undertaking, and then I would transcribe this note, and

17   then I would put orders in the computer for her, her

18   postpartum orders.

19       Then I would be done.  I might stop back in to say

20   congratulations, guys, I'll see you tomorrow, and then I would

21   leave the hospital.

22   Q.  Is it reasonable to say you would have been out of the

23   room going to create this document about 5:45?

24   A.  That's probably a pretty good estimate, yes.

25   Q.  When you left, the baby was in the delivery room with the

1    family at that point?

2    A.  Yes.

3    Q.  At that point, you leave the room.  Were there any signs

4    or symptoms of respiratory distress or of an infection?

5    A.  No, not at all.

6    Q.  Were you present when the baby was taken from the delivery

7    room back to the nursery by Nurse Hendershot?

8    A.  I didn't know at the time of my deposition whether I was

9    or not, but from all testimony I hear here, I wasn't even

10   close.  It was a long, long time after I left.

11   Q.  The testimony, I believe you were here, was that shortly

12   before 7:00, the baby was taken.  Were you in that room or

13   near that room near 7:00?

14   A.  No.  I was out of the hospital long before then.

15            MR. COLVILLE:  Thank you.

16            THE COURT:  Mr. Price?

17            MR. PRICE:  No questions.

18            THE COURT:  Well then, Dr. Dumpe, you may step down.

19       (Witness excused.)

20            THE COURT:  Unless Ms. Koczan, did you have anything

21   further?

22            MS. KOCZAN:  No, I didn't, Your Honor.

23            THE COURT:  So at this time, Ms. Koczan, do you have

24   any other witnesses that you want -- who you would like to

25   offer?

1          MS. KOCZAN:  Not today, Your Honor.  My next witness

2     will be first thing tomorrow morning.

3          THE COURT:  Mr. Colville, we have been back and forth

4     on your case.  Is there anything else that you would like to

5     offer at this time?

6          MR. COLVILLE:  No, Your Honor.

7          THE COURT:  Ladies and gentlemen of the jury,

8     Ms. Koczan had told us at the outset of this trial that she

9     had made arrangements to have her next two witnesses, both of

10    whom are experts, appear on Wednesday, and as a consequence,

11    that's when they are going to be coming in.

12         We had anticipated perhaps going yet another hour

13    today, but as you can see, we've wrapped up sooner rather than

14    later, so at this point in time, we're going to take our

15    evening recess, and once again, I'm going to ask you to put

16    your notebooks and binders together.  Mr. Galovich will pick

17    them up and put them in the cart and then store them overnight

18    in our exhibit room.

19         Once again, you are not to discuss this case with

20    anyone, including fellow jurors, anybody involved in this

21    trial, members of your family, friends or the like, people on

22    the bus coming and going.

23         Once again, you should not approach anyone nor permit

24    anyone to approach you coming or going here today.  At this

25    stage, again, I do not know whether there is or is not news

1    coverage about this matter.  You should certainly avoid that.

2    You should not do any research on your own or indirectly about

3    any of the issues in the case, the various witnesses that

4    you've seen and the like.

5           Continue to keep open minds and do not make up your

6    mind about the verdict, because you still haven't heard all of

7    the evidence, nor have you heard my final instructions and the

8    closing arguments, and of course, you want to hear what your

9    fellow jurors have to say.  With that, we're going to conclude

10   this evening.

11          Let me tell you about tomorrow.  We do anticipate

12   having two experts pretty much back to back.  The court is

13   going to have to adjourn tomorrow at 2:30.  Reason being we

14   have a new judge having joined our bench.  She is being sworn

15   in tomorrow.  Her ceremony starts at 3:00.  All of the judges

16   in the court have to convene for that at 2:45 with robes on.

17   It's a very formal ceremony, and as a consequence, we're going

18   to wrap up tomorrow between 2:30 and 2:45 so that I can get to

19   the place I have to get to for this formal swearing in.

20          By the way, I hear it's a very large crowd coming in

21   for this swearing in.  Hopefully that's not going to delay you

22   in leaving tomorrow, but given that, if you have plans you

23   want to make, I thought I would give you a heads-up that we

24   are going to have a shorter day tomorrow.  I do not schedule

25   these swearings in.  This is all done by my chief judge as

1    well as the judge that's involved and the dignitaries that are

2    involved, so I don't have any control over that, so I do

3    apologize, but by the same token, we're very glad to have

4    Magistrate Judge Dodge join us.

5           She's actually been working hard in the court since

6    last month informally sworn in, but tomorrow is her big day

7    where she gets officially sworn in before the court, and as I

8    said, all of the judges of our court will appear there.

9           So with that, Mr. Galovich will now escort you all.

10    Again, let's all rise for our jury.

11      (Jury excused.)

12          THE CLERK:  Do you wish Nicole to come in while I

13    escort the folks out?

14          THE COURT:  Yes.  Why don't you find her?

15    Mr. Galovich is going to get Ms. Starr to come into the

16    courtroom while he escorts the jurors from the floor.

17          Are there any administrative or other legal matters

18    that we can take up?  I know we do have pending a motion on

19    the issues of corporate negligence vis-à-vis the hospital

20    defendants, and I do also know that Ms. Koczan intends to

21    renew her motion vis-à-vis Dr. Jones and whether she should or

22    shouldn't be dismissed at this time.

23          Certainly the court could hear argument on those

24    issues, if you would like.  We also heard at the outset of

25    this case that Mr. Price was questioning how many jurors

1    should or shouldn't go out and deliberate in this case.  We

2    purposefully empaneled eight in this case because of the

3    length of the trial and the fact that the Labor Day

4    intervened.

5         To that end, we have done some preliminary research.

6    I think that you should all be aware of the rules, and

7    particularly Rule 48.  A jury must begin with at least six and

8    no more than 12 members, and each juror must participate in

9    the verdict unless excused under Rule 47(c).

10        The rule continues at (b), "Unless the parties

11   stipulate otherwise, the verdict must be unanimous and must be

12   returned by a jury of at least six members."

13        Reading the history of all of this, back in 1991, the

14   rules were amended allowing all jurors to participate in

15   rendering a verdict even if it's more than six and, as I read

16   it, less than 12.  Of course when we have a criminal jury, we

17   have 12 jurors and we usually have anywhere between two and

18   four alternates.  So what, if anything, would you like to take

19   up at this point?

20        MS. KOCZAN:  Your Honor, at this stage, I would like

21   to, because I believe we now have heard all the evidence with

22   regard to Dr. Jones and whether she was or wasn't there, so I

23   think that I would like to at this point renew my Rule 50

24   motion and ask that she be dismissed.

25        I think the corporate negligence, that is probably

best saved for tomorrow because we do have one more witness

who is going to comment on that as well and you may want to

hear that testimony before you rule on that one, but certainly

with regard to Dr. Jones, I think that that is -- you've heard

all the testimony and it is now ripe for resolution.

THE COURT:  Okay.  Mr. Price, your argument vis-à-vis

Dr. Jones?

MR. PRICE:  It's a disputed fact.  I will cite to

first this court's memorandum order of August 30, document 195

on the original Rule 50 motion.  This court notes, "To this

end, the court must 'refrain from weighing the evidence,

determining the credibility of witnesses or substituting its

own version of the facts for that of the jury,'" citing the

Eshelman case.

Additionally, the PA standard jury instructions which

I believe we all agreed to, although we haven't talked about,

talks about inconsistencies in testimony and if you read all

of that, it's for the jury.

And then finally, from my little research, Rule of

Evidence 1008, "Ordinarily the court determines whether the

proponent has fulfilled the factual conditions for admitting

other evidence of the content of a writing, recording or

photograph under Rule 1004 or 1005."

It then continues, "But in a jury trial, the jury

determines, in accordance with Rule 1004(b), any issue about

1    whether," and I believe subsection (c) applies, "other

2    evidence of content accurately reflects the content."

3         So in other words, even though they can bring in

4    Nurse Kincade to say I assume something or that it's a

5    different fact, the jury has conflicting evidence, the jury is

6    to weigh that decision.

7         THE COURT:  Anything further, Ms. Koczan?

8         MS. KOCZAN:  Yes, Your Honor.  I believe that there

9    is no more conflicting evidence here in this particular case.

10   We have had testimony from Dr. Jones who has indicated that

11   she was not called, that the first knowledge she had of this

12   was when she walked in the door at 8:00 a.m.

13        In addition to her own testimony in that regard, we

14   have also produced copies of her pager records and her

15   telephone records.  Her testimony, and it's uncontradicted, is

16   that the only mechanism by which they could contact her would

17   be either the pager records or the telephone records, and

18   those records are devoid of any contacts regarding this child

19   or at the time frame in question which was around 7:20 that

20   morning.

21        There is no telephone calls either from the pager or

22   from the cell phone record that indicate that there were any

23   calls, so there is no way she could have been notified at

24   7:20.

25        In addition to that, we have the testimony of Jamie

1    McCrory who testified that she did not call her.  Jamie

2    further testified the conversation that occurred between

3    Dr. Jones and Dr. Min when she got there, that this was

4    Dr. Jones's first notification.

5         We then have the testimony of Dr. Min who testified I

6    did not call her.  I decided that since I knew she would be

7    here at 8:00, that I knew she would be walking in the door any

8    minute now.  I saw that she had checked in by looking at the

9    system on the iPad, so I did not call her.

10         We had the testimony of Barb Hackney this morning who

11    also indicated that she did not call Dr. Jones.

12         We then had the testimony of Nurse Kincade who

13    testified that she did not call Dr. Jones, that the basis for

14    that note that she documented both in the incident report and

15    in the event note was her conversation when she came in was a

16    doctor called.  Yes.  What time?  7:20.  Then her next

17    question was who is on call or who is the pediatrician on

18    call?  Dr. Jones.  She made the assumption and therefore the

19    documentation.

20         So there is no contradicted testimony in this case

21    that Dr. Jones was ever contacted by any of these individuals.

22    They would be the people who would have called her.  I think

23    the record is very clear.  I don't think there's any question

24    of fact, and I believe that based upon those records, she is

25    entitled to -- I'm entitled to have my Rule 50 motion granted

1    and Dr. Jones dismissed from this action because that's the

2    only basis.

3            There was no testimony here, Your Honor, that any of

4    her actions after that were in any way a deviation from the

5    standard of care.  The testimony of Dr. Shore and I believe

6    Dr. Karotkin was she did a great job.

7            The only reason why she is in this case is the

8    testimony and opinion of Dr. Karotkin that if she was called

9    and didn't appear, then she would have deviated from the

10   standard of care, but I think the evidence that we have heard

11   conclusively establishes that she was not called.

12           THE COURT:  Mr. Price, anything else?

13           MR. PRICE:  The only thing that is changed for this

14   court since its previous ruling is the testimony of Nurse

15   Kincade.  I know Nurse Hackney said she never made a call, but

16   really it was Nurse Kincade who said I made some assumptions

17   in the document.  Again, the document is evidence.  Rule 1008

18   and the other rules on inconsistent testimony establish it is

19   for the jury to decide whether to believe the document or her

20   testimony.  That's their choice.

21           MS. KOCZAN:  Your Honor, if I may just respond to

22   that.  That wasn't the only thing that has changed.  Since

23   that time, since your initial ruling, Dr. Jones has testified,

24   Nurse Hackney has testified and Nurse Kincade has testified,

25   so there has been additional testimony above and beyond what

1    Mr. Price cited, so we have quite a bit of additional

2    testimony in this case.

3            THE COURT:  It is true.  We have heard additional

4    testimony, and I think as all of you counsel well know that,

5    except for Dr. Dumpe, it's the court's role here not to pass

6    on the credibility of witnesses, so whether Dr. Jones was or

7    wasn't credible, whether Nurse Hackney and/or Kincade were or

8    weren't credible, that's not for me.  That's for the eight

9    people who have been sworn to follow the court's instructions

10   once they find the facts and they deliberate amongst

11   themselves.

12           Secondly, as I've already pointed out, the standard

13   here in the circuit and the cases that support that standard

14   all are to the same effect, light most favorable to the jury.

15   Admittedly, you are all going to argue that the weight of the

16   evidence, all of these various witnesses, works in favor of

17   the doctor and ultimately a verdict in her favor.

18           On the other hand, I can anticipate Mr. Price is

19   going to argue that when you look at these documents and you

20   look at how they were recorded, particularly the one that's in

21   narrative form, there's some indication that the doctor was

22   called and vis-à-vis Nurses Hackney and Kincade, both of them

23   testified to the fact that, number one, it's been some time,

24   neither of them are currently working for the hospital.  One

25   of them specifically said she had vague recollections of

1    things, and as we also heard, at least one of them had all

2    their expenses including, if you will, a free trip from

3    Arizona paid for by the hospital, so query whether there's

4    bias or not.

5            So I think ultimately, all of this is for the jury to

6    weigh and to consider, and to that end, I certainly agree with

7    what Ms. Koczan says, and I think that Mr. Price also agrees

8    that, on this record, there's no fault being laid at Dr. Jones

9    concerning her treatment of Kendall Peronis once she appeared

10   on the scene, and in fact, you know, in toying with the fact

11   that in terms of these instructions, we should make that clear

12   to the jury.  That's no longer a claim as it might pertain to

13   Dr. Jones.

14           So bottom line, the renewed motion for judgment

15   pursuant to Rule 50 as it pertains to Dr. Jones is denied and

16   the claim about her being called and whether there was or

17   wasn't delay on her part in arriving at the hospital is still

18   something the jury can consider.

19           Now, in addition, looking at the caption in this

20   case, besides Dr. Jones, we also have not only Valley Medical

21   Facilities as Heritage Valley Pediatrics, but we also have

22   Valley Medical Facilities as Heritage Valley Beaver, and based

23   on what I've heard so far and seen so far, we've heard a lot

24   and seen documents, including policies of Valley Medical

25   Facilities, Inc. t/d/b/a Heritage Valley Beaver, but we've

1    heard barely nothing about Heritage Valley Pediatrics, so I

2    question whether that entity should remain part of this

3    caption or not.  Ms. Koczan?

4            MS. KOCZAN:  Your Honor, based upon plaintiffs' case,

5    we didn't hear anything about Heritage Valley Pediatrics and

6    there was no testimony with regard to any deviations from the

7    standard of care.  I'm assuming that the only reason why they

8    are here is a vicarious liability claim for Dr. Jones, but

9    there is no evidence that Heritage Valley Pediatrics did

10   anything wrong.

11           THE COURT:  Yes.  There's no independent corporate

12   negligence claim, for example, against them.

13           MS. KOCZAN:  That is correct.

14           THE COURT:  Mr. Price, what's your view vis-à-vis

15   Heritage Valley Pediatrics?

16           MR. PRICE:  We entered into a stipulation that they

17   were the employer of Dr. Jones so --

18           THE COURT:  The only claim is vicarious liability.

19           MR. PRICE:  Right, agency.  I usually don't really

20   care if they are on the caption with the understanding that

21   the jury understands that if they find against Dr. Jones, they

22   are finding against Heritage Valley Pediatrics, but since it's

23   a stipulated fact, it should probably stay on the caption.

24           THE COURT:  Is there anything else then that we can

25   address here this evening?  Doesn't appear so.  Mr. Price?

1          MR. PRICE:  Sure.  Just a few.  First housekeeping

2     items.  I do have the PowerPoints from Nurse Kincade and --

3     no.  The expert this morning.  What's his name?

4          THE COURT:  Dr. Wiesenfeld.

5          MR. PRICE:  Yes.  That one is for Nurse Kincade and

6     this one is for Dr. Wiesenfeld.  I do have a PowerPoint from

7     Dr. Boyd, but I took out a slide so I'm going to reprint it

8     tonight and I'll bring it in the morning.

9          The only other issue -- well, I have two issues.

10    First is with regard to scheduling, Your Honor.  I understand

11    the court's timing tomorrow.  Personally, I think that we can

12    deal with this corporate negligence Rule 50 issue now even

13    without testimony tomorrow, but if you want to wait until

14    tomorrow, that's fine.  My concern is I would really, really

15    like to get this case to the jury with closing arguments on

16    Thursday morning for a couple reasons.

17         Number one, just because of the timing that the jury

18    is here, and I understand the court has a lot of work to do in

19    the meantime, and I don't mean to tax the resources of the

20    court, but on a personal issue, my son is leaving for

21    California Friday afternoon, so at 4:00 I would like to be

22    there.

23         But the other issue is my client Matthew Fritzius, he

24    doesn't have any money coming in unless he works.  This has

25    been a struggle -- he has no money coming in and the sooner

1    that he can get back to work, the better.  He cannot -- I

2    talked to him about this.  It's not the type of job he has

3    where a foreman can say you can start a job on Thursday but

4    have Friday off, so I just think that if we can get tomorrow's

5    experts done.  I think that we still have to discuss the issue

6    of the charge.

7              As I told the court on Friday, I have no problem with

8    the charge.  Both defendants should have been able to look at

9    the charge over the weekend, so we could probably deal with

10   that right now.  Then the only other remaining issue is this

11   Rule 50 issue, so I would ask the court if that schedule would

12   work.

13             THE COURT:  Well, I don't have any idea how long

14   these two experts are going to be here tomorrow.  We are going

15   to start tomorrow at 9:00.  I can certainly start with you all

16   at 8:30.  No, I can't.  I have a criminal at 8:30 tomorrow.

17   That criminal matter though should only take about five

18   minutes, so to the extent we need any kind of arguments and

19   the like, we could do some of that outside the realm of the

20   jury.

21             Ms. Koczan, how long are these experts going to take?

22             MS. KOCZAN:  I don't think they are going to be

23   terribly long.  They may be a little bit longer than Dr. Boyd

24   but not much.  I really think we can get them all done before

25   2:30 unless there's a lot of cross-examination, which of

1   course, I can't comment on, but I don't think the direct

2   examinations are going to be terribly long.

3        THE COURT:  Now, Ms. Starr has not alerted me to any

4   edits or changes or anything of that ilk that you or

5   Mr. Hamilton have for me on the charge.  Have you had a chance

6   to look at the draft charge?

7        MS. KOCZAN:  Your Honor, I did before.  I thought I

8   had it with me.  I don't have it in front of me.  I did have a

9   couple of notes I had issue with.  I thought I had it, but I

10  do not.

11       THE COURT:  If those could be e-mailed to Ms. Starr

12  this evening.

13       MS. KOCZAN:  I could do that.

14       THE COURT:  If we could have that this evening, then

15  we could certainly get that done.

16       MS. KOCZAN:  Yes, I can look at that again this

17  evening and then just e-mail you with any comments or concerns

18  that I have.

19       THE COURT:  Then we'll put all that on the record as

20  well.

21       MS. KOCZAN:  That's fine.

22       THE COURT:  Mr. Colville back there isn't concerned

23  about anything, except comparative maybe, right, Mr. Colville?

24       MR. COLVILLE:  Yes, Your Honor.

25       THE COURT:  I won't be expecting a lot of comments

1    from Mr. Colville and/or Mr. O'Connor.  Well, all I can do is

2    all I can do, but as I said, I'm going to be in another

3    courtroom starting at 3:00 tomorrow, between 3:00 and at least

4    4:15.  It's court en banc with all of the judges and the

5    court, and hence, you know, I told the jury that we're going

6    to have to let them go.

7          As far as Thursday goes, we can also again start

8    early.  We can start at 8:30 without the jurors so that the

9    instructions are ready to go, but much depends on these two

10   witnesses, how much they have to say, how much

11   cross-examination and the like.  I can also shorten the

12   lunchtime if that helps.

13         MR. PRICE:  Yes, Your Honor.  You saw, I mean,

14   Dr. Boyd was an hour and a half.  I was ten minutes.  I'm not

15   going to do that.  Plus too, I know that Paula doesn't want to

16   pay her experts to stay over another night, so I'm sure she'll

17   want to get them done tomorrow, so I think that we can

18   definitely get them done tomorrow and I'll leave it at that.

19         THE COURT:  That's all we can do, and then like I

20   said, depending on what you give me vis-à-vis the

21   instructions, then we'll be able to move that along.

22         On the corporate negligence front, Ms. Starr wasn't

23   sitting in court because she has been going through all the

24   expert testimony and their reports flagging it for me so I can

25   read it all tonight on the corporate negligence front.  Then

1    I'll be prepared for any argument.

2            We have their motion with their briefs, so I don't

3    know if you are going to give me contrary authority or not,

4    Mr. Price, but it's up to you.

5            MR. PRICE:  I'll take a look at it tonight.  From my

6    cursory review of the motion, it looked to be similar to the

7    previous one, but I'll take a look at it a little more deep.

8            THE COURT:  They added a case or two.

9            MR. PRICE:  So I'll take a look at that.

10           THE COURT:  Anything else, Mr. Price?

11           MR. PRICE:  Just one other issue, Your Honor.  This

12   one, I guess, I don't know how to deal with.  It's the issue

13   about the bacterial vaginosis, and I know that you were

14   inquiring of Dr. Wiesenfeld to find out about the issue, but

15   it was a nonissue but the jury heard about it.

16           THE COURT:  Well, the jury, as I said at sidebar, has

17   all the records, and if the jury spends any time reading those

18   records, they are going to see that diagnosis.  They are going

19   to see that medication, and to that end, I have no problem

20   charging them as a matter of law that that's not an issue.  I

21   think he was clear that it wasn't an issue.

22           MR. PRICE:  Yes, and I would appreciate that, Your

23   Honor, and the reason is that we didn't bring it up.  We

24   didn't address it because Mr. Colville had said he's not going

25   to bring it up as an issue, and that's why we did the little

1    motion in limine.

2         I know it came out and I would, if we could say the

3    court inquired and it's not -- however you would like to do

4    it, but I would appreciate it.

5         THE COURT:  I don't have any problem with that.  Any

6    objection, Ms. Koczan?

7         MS. KOCZAN:  No.

8         THE COURT:  Mr. Colville?

9         MR. COLVILLE:  No.

10        THE COURT:  You had made an agreement it was not

11   going to be an issue?

12        MR. COLVILLE:  Correct.

13        THE COURT:  He speaks to it in his report, but he

14   doesn't say much except for the fact that it was diagnosed,

15   one, and two, that the medication was given, and that was the

16   extent of what he had to say, and so the court felt, because

17   they do have all these records and that part hasn't been

18   redacted, that that question needed to be asked.

19        But then we can put language in the final

20   instructions that that's not for their consideration in this

21   case, because he clearly testified on that front, and if you

22   want to give me some proposed language, Mr. Price, circulate

23   it to the other attorneys by e-mail, I'll be happy to look at

24   it.

25        Anything else then?  Okay.  Then we're concluded for

1    today, and once again, you can leave your things here if need

2    be.  Mr. Galovich and Ms. Starr will lock up as appropriate.

3        (At 3:59 p.m., the proceedings were adjourned.)

4                    C E R T I F I C A T E

5            I, BARBARA METZ LEO, RMR, CRR, certify that the
     foregoing is a correct transcript from the record of
6    proceedings in the above-entitled case.

7

8    __\s\ Barbara Metz Leo__                09/25/2019
     BARBARA METZ LEO, RMR, CRR            Date of Certification
9    Official Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

218

1                          I N D E X

2     WITNESSES                                        PAGE

3     HAROLD WIESENFELD, M.D.

4          Direct Examination By Mr. Colville            10
           Cross-Examination En Voir Dire By Mr. Price   16
5          Direct Examination (Resumed.) By Mr. Colville 18
           Cross-Examination By Mr. Price                38
6          Redirect Examination By Mr. Colville      52, 59
           Recross-Examination By Ms. Koczan         55, 65
7          Recross-Examination By Mr. Price              57
           Recross-Examination By Mr. Colville           60
8
      JANET KINCADE
9
           Direct Examination By Ms. Koczan              68
10         Cross-Examination By Mr. Price                84
           Redirect Examination By Ms. Koczan            95
11
      BARBARA HACKNEY
12
           Direct Examination By Ms. Koczan              98
13         Cross-Examination By Mr. Price               125

14    THEONIA BOYD, M.D.

15         Direct Examination By Ms. Koczan             134
           Cross-Examination By Mr. Price               174
16         Redirect Examination By Ms. Koczan           182
           Recross-Examination By Mr. Colville          183
17         Recross-Examination By Mr. Price             184

18    KEVIN C. DUMPE, M.D.

19         Direct Examination By Ms. Koczan             186
           Cross-Examination By Mr. Colville            196
20

21

22

23

24

25