1               IN THE UNITED STATES DISTRICT COURT
             FOR THE WESTERN DISTRICT OF PENNSYLVANIA

2

3     CARISSA PERONIS, et al.,
                Plaintiffs
      vs.

4                           Civil Action No.
     UNITED STATES OF AMERICA, et   16-1389

5     al.,
                Defendants.

6

                       - - -

7

      Transcript from proceedings on September 4, 2019, United

8    States District Court, Pittsburgh, PA,
    before Judge Nora Barry Fischer.

9

10   APPEARANCES:

11   For the Plaintiffs:    Harry S. Cohen & Associates, P.C.
                     Douglas L. Price, Esquire

12                   Two Chatham Center
                     Suite 985

13                   Pittsburgh, Pennsylvania 15219

14

     For the Defendant      U.S. Attorney's Office

15   USA:                  Michael Colville, Esquire
                     Philip P. O'Connor, Jr., Esquire

16                   U.S. Courthouse
                     700 Grant Street

17                   Pittsburgh, Pennsylvania 15219

18   For the Hospital       Weber Gallagher Simpson Stapleton
     Defendants and        Fires & Newby

19   Dr. Jones            Paula A. Koczan, Esquire
                     603 Stanwix Street

20                   Suite 1450
                     Pittsburgh, Pennsylvania 15222

21

     Court Reporter:        Barbara Metz Leo, RMR, CRR

22                   700 Grant Street
                     Suite 6260

23                   Pittsburgh, Pennsylvania 15219

24

      Proceedings recorded by mechanical stenography;

25   transcript produced by computer-aided transcription.

1          THE COURT:  Good morning, everyone.  We left off last

2     evening with proceedings in this matter styled Carissa Peronis

3     versus United States of America et al. with the argument

4     vis-a-vis Dr. Jones.  The court has made its ruling.  That's

5     confirmed in writing and it should be on the docket shortly.

6          In addition, the court had suggested to hospital

7     counsel that she take a look at the proposed instructions.  We

8     received an e-mail last night pointing out a factual error in

9     regard to the employer of Dr. Jones.  We had previously seen

10    that vis-a-vis the verdict slip and corrected it.  We

11    apologize that it was not done vis-a-vis the instructions.

12    Ms. Starr should have made that correction by this time.

13         Now, in addition, Ms. Koczan points out that she has

14    another issue vis-a-vis damages.  Do you want to outline your

15    position for the court?

16         MS. KOCZAN:  Your Honor, it's really with regard to

17    the irrelevant considerations charge, and what my issue with

18    that is is that that charge is not factually accurate.

19         THE COURT:  As you know, we prepared it in advance

20    based on everything that was submitted to the court.  I didn't

21    know what you were or weren't going to put on in terms of this

22    case at that time.  That's why it's called a discussion draft,

23    so I need you to reference page and line what you want

24    deleted, and then we're going to hear from the attorney for

25    the plaintiffs as to what his position is, whether these

1    matters are or aren't irrelevant.

2         MS. KOCZAN:  Your Honor, what I'm objecting to is,

3    and I perhaps should have been clearer.  I'm objecting to the

4    entire charge because the charge basically says that there is

5    really no impact on the physician, you know, financially or

6    otherwise.  I know that that is a charge that is routinely

7    given.  It's an approved charge, but I need to take an

8    exception to it for the record, because factually, it is not

9    correct.  There are many ramifications to physicians as a

10   result of medical negligence cases, verdicts, et cetera, so

11   factually, the charge is not correct and I just --

12        THE COURT:  But to that end, we have had no evidence.

13   We have had no evidence about the database.  We have had no

14   evidence about the insurance policy, if any.  We have had no

15   evidence about self-insured retention.  We have had no

16   evidence vis-a-vis reputation, although reading depositions,

17   apparently there was some indication that family members

18   and/or friends had concerns, let's say, about Dr. Dumpe and/or

19   Dr. Lauer.

20        The court is well aware by judicial notice that

21   Dr. Dumpe's partner, Dr. Lauer, was previously sued for a

22   shoulder dystocia which the government chose to settle.  You

23   went to verdict.  The hospital won, so to that end, you know,

24   there's no evidence in the record unless you want to put it

25   on.

4

1          MS. KOCZAN:  The only reason I'm making -- made the

2    comment is I just would like an exception to that.  I'm not

3    objecting to the court giving the instruction, because I know

4    it is one that is commonly given, but I do need to take an

5    exception to it.  That was all I was pointing out.

6          THE COURT:  Mr. Price, what's your view on this?

7          MR. PRICE:  I believe it's a proper charge.

8          THE COURT:  It's a standard charge, and so far, the

9    Pennsylvania Supreme Court has not thought to disabuse trial

10   courts of using that charge.

11         MS. KOCZAN:  Your Honor, I wholeheartedly agree.  I'm

12   just pointing it out because, as I indicated, it is not

13   factually correct, so I need to take exception, but I'm not

14   opposing you giving the charge.  It's just that I need to put

15   an exception on the record, because it's not factually

16   correct.

17         THE COURT:  I guess your position is noted.

18   Mr. Price yesterday was very concerned about the court's

19   questioning about the bacterial vaginosis that was described

20   and prescribed in the prenatal care of the plaintiff, and I

21   understand that he's talked to Mr. Colville, and he and

22   Mr. Colville are agreeing that that particular issue should

23   not be addressed by this jury, and I thought you were going to

24   give me some language.  Did you send an e-mail to Ms. Starr on

25   that front?

1          MR. PRICE:  I apologize, Your Honor.  I have a draft.

2          THE COURT:  If you have a draft, what I want you to

3     do at a break is talk to Mr. Colville and to Ms. Koczan and if

4     you all agree on it, then we'll insert it in the appropriate

5     place as to that charge.

6          Now, at this point, is there anything else anybody

7     wants to bring to my attention vis-a-vis the charge?  At least

8     twice Mr. Price said he had no issues with the charge.

9     Ms. Koczan, nothing further?

10          MS. KOCZAN:  No, other than what I've included in

11     that e-mail, I'm fine.

12          THE COURT:  Mr. Colville takes no position.  So as I

13     told Ms. Starr last night when we were working on this, I'm

14     going to read through the charge again, and based on what I'm

15     doing vis-a-vis the Rule 50 on the corporate negligence side,

16     you know, I may make some additional changes there.

17          Now, outside of that, anything else legal or

18     administrative you want to bring to my attention before we

19     hear these next two experts?

20          MR. PRICE:  Nothing.

21          MS. KOCZAN:  Nothing.

22          MR. COLVILLE:  No, Your Honor.

23          THE COURT:  Mr. Galovich, is everybody here?

24          THE CLERK:  No, ma'am, not yet.

25          THE COURT:  We had one gal who was here bright and

1    early reading a book every morning, so we still need a juror

2    or two.

3                MS. KOCZAN:  Can I go out and see if my experts are

4    here?

5                THE COURT:  That's a good idea.

6                MS. KOCZAN:  I don't know if they are physically here

7    yet, but they should be.

8                THE COURT:  Who's going to be number one?  Coffin or

9    Ringer.

10               MS. KOCZAN:  I'm going to put Dr. Coffin on first.

11    She has an earlier flight.

12               THE COURT:  I'll do my limiting charge vis-a-vis her

13    when she gets in here.

14               MS. KOCZAN:  As soon as we get done with her,

15    Dr. Ringer I believe is out there and we'll put him on

16    immediately afterwards.

17               THE COURT:  And then you'll rest.

18               MS. KOCZAN:  And then I will rest, correct.

19               THE COURT:  Mr. Colville, you need to still rest at

20    some point.

21               MR. COLVILLE:  Yes, Your Honor.

22               THE COURT:  And have you decided, Mr. Price, if you

23    are going to do any rebuttal or not?

24               MR. PRICE:  No rebuttal.

25               THE COURT:  Okay.  So Ms. Koczan, do you want to

1    check the hallways for your witness?

2         MS. KOCZAN:  Yes, I'm going to look to see if they

3    are out there.

4         MR. PRICE:  Your Honor, may we run to the restroom

5    real quick?

6         THE COURT:  Yes, I think now would be an appropriate

7    time.  As soon as the jurors are all assembled, we'll start.

8       (Recess taken.)

9       (Jury present.)

10         THE COURT:  Morning, ladies and gentlemen of the

11    jury.  I understand that Ms. Koczan's witnesses are both here

12    and ready to testify.  She is first going to be calling

13    Dr. Susan Coffin.

14         Dr. Coffin, if you'll approach Mr. Galovich, my

15    deputy, to be sworn.

16         THE CLERK:  Please state and spell your name for the

17    record.

18         THE WITNESS:  Susan Coffin, C-O-F-F-I-N.

19       (Witness sworn.)

20         THE COURT:  Thank you, Doctor.  When you get over to

21    the steps, watch your step.  It's a little uneven.  Once you

22    are situated, please arrange the microphone so you are

23    speaking into it.  It moves towards you.  It can also go up

24    and down.

25         In addition, in case you need it, there's water

1    there.  You'll notice there's a monitor next to you.  You may

2    be asked to look at that monitor from time to time.

3        Now, ladies and gentlemen of the jury, as I just told

4    you a moment ago, you are going to be hearing the testimony

5    containing opinions from Dr. Susan Coffin, a physician who

6    will offer her opinions because of her knowledge, skill,

7    experience, training or education in the field of pediatric

8    neonatal care and infectious disease and the reason for her

9    opinions.

10       In weighing her opinion testimony, you may consider

11   all of her qualifications, the reasons for her opinions, the

12   reliability of the information that supports those opinions,

13   as well as any other factors I'll discuss with you in my final

14   instructions when I instruct you on how to weigh the testimony

15   of witnesses.

16       The opinion of Dr. Coffin should receive whatever

17   weight and credit, if any, you think appropriate given all the

18   other evidence in this case.  You may disregard the opinions

19   entirely if you decide that Dr. Coffin's opinions are not

20   based on sufficient knowledge, skill, experience, training or

21   education.  You can also disregard her opinions if you

22   conclude that the reasons given in support are not sound, if

23   you conclude that the opinions are not supported by the facts

24   shown by the evidence or if you think the opinions are

25   outweighed by other evidence in this case.

1          Once again, in deciding whether to accept or rely

2    upon these opinions, you can consider any bias Dr. Coffin may

3    have, including any bias that may arise from the fact that

4    Dr. Coffin has been or will be paid for reviewing this case

5    and testifying in this case.

6          In addition, you may hear evidence that Dr. Coffin

7    testifies regularly and makes a portion of her income from

8    testifying in court.  You can also consider that.  With that,

9    Ms. Koczan, you may proceed.

10         MS. KOCZAN:  Thank you, Your Honor.

11         SUSAN COFFIN, M.D., a witness herein, having been

12   first duly sworn, was examined and testified as follows:

13                        DIRECT EXAMINATION

14   BY MS. KOCZAN:

15   Q.  Good morning, Doctor.  Can you please introduce yourself

16   to the jury?

17   A.  My name is Dr. Susan Coffin.  I'm a pediatric infectious

18   disease specialist, and I work at Children's Hospital of

19   Philadelphia.

20   Q.  And is Children's Hospital of Philadelphia still one of

21   either the top or one of the top children's hospitals --

22   A.  One of the top.  Not the top.

23   Q.  -- in the country.  What is your current academic

24   position?

25   A.  I'm a professor of pediatrics at the University of

1    Pennsylvania School of Medicine.

2    Q.  And I assume because you practice in that area, you live

3    in Philadelphia?

4    A.  I live in Philadelphia proper, yes.

5    Q.  Can you tell the jury about your education?  Start with

6    undergraduate and bring us up through medical school.

7    A.  Sure.  I went to Williams College in western Massachusetts

8    for my undergrad.  I then went straight to medical school at

9    the University of Vermont.  I did my pediatric residency

10   training for a few years in Baltimore at Johns Hopkins

11   Hospital, and then moved up to Philadelphia where I started an

12   infectious disease fellowship, and once that was completed, I

13   began working at that hospital as a faculty member in

14   pediatric infectious diseases.

15   Q.  We've heard from another pediatric infectious disease

16   expert, but I would like you to very briefly explain to the

17   jury what do you do as a pediatric infectious disease

18   physician?

19   A.  The practice of pediatric infectious diseases is a bit

20   different than what you might think of as the general practice

21   of pediatrics.  General pediatricians are great infectious

22   disease doctors.  That's most of the reasons why people go to

23   see their pediatrician with their child if it's not for a

24   checkup.

25       So a pediatric infectious disease doctor like myself

1    spends most of their time in a hospital taking care of

2    children with severe enough infections that they require

3    hospitalization, so the bulk of my work is seeing children who

4    are hospitalized with infections.  Not outpatients.

5    Q.  And in addition to your medical degree, I also see from

6    looking at your curriculum vitae, you have a master's in

7    public health.  Can you explain to the jury what that is and

8    why you have that degree?

9    A.  Sure.  A master's in public health is a one or two year

10   course that people often take after they have completed some

11   part of their health or medical training, whether it's nursing

12   or physicians, and it provides an interesting complement to

13   the clinical training, in that it gives you a perspective

14   beyond just an individual patient but at a population level,

15   and I've always been interested in population health and such.

16   Q.  Are you board certified?

17   A.  I am.

18   Q.  What areas of medicine are you board certified in?

19   A.  Pediatric infectious diseases.

20   Q.  And can you tell the jury a little bit about your practice

21   since you completed both your medical training, internship,

22   residency and the master's in public health?

23   A.  Currently, I spend my time split between a couple of

24   different activities.  I take care of patients who are

25   hospitalized at Children's Hospital of Philadelphia.  In that

1    context, I'm often teaching medical students, residents and

2    fellows, which are people getting prepared to be independent

3    pediatric infectious disease doctors.

4        I also do research, clinical research and help oversee

5    some of the programs of our division, such as the training

6    program for the fellows and some of the administrative

7    functions of our division.

8    Q.  In terms of your clinical practice, actually seeing and

9    treating patients, how frequently do you do that?  Is that an

10   everyday thing?

11   A.  It constitutes about 20 percent of my time, somewhere

12   between six, eight, ten weeks a year, depending on what the

13   year looks like from the rest of the group of doctors I work

14   with.

15   Q.  And you described teaching responsibilities and who you

16   teach.  What is it that you are teaching them?  Is it limited

17   to infectious disease type things?

18   A.  Yes.  Yes.  It's virtually all infectious diseases, other

19   than career mentoring that I do for junior faculty members,

20   coaching them how to build a career in medical school.

21   Q.  You talked about research.  What sort of research do you

22   engage in?

23   A.  My research now is focused on clinical research in disease

24   prevention largely, prevention of infectious diseases, and my

25   specific area of interest is preventing hospital or health

1    care associated infections and addressing antibiotic

2    resistance.

3    Q.  Doctor, in looking at your CV, I also see that you are an

4    epidemiologist, and in fact, I think you are the associate

5    hospital epidemiologist at CHOP; is that correct?

6    A.  Yes.

7    Q.  Can you tell the jury what that position is and what you

8    do in that position?

9    A.  Sure.  So if you have been admitted to a hospital, you may

10   be aware that there's a function going on behind the scenes at

11   the hospital to try and keep a patient safe from acquiring an

12   infection while they are in the hospital for some other

13   reason.  You know, if you go in needing a broken bone to be

14   fixed, you don't want to come out with an infection.

15       So the function of a hospital epidemiologist is to provide

16   the work that ensures everybody is cleaning their hands, that

17   the instruments used in surgery are sterile and things like

18   that.

19   Q.  I also note from your curriculum vitae that you are the

20   clinical director of infectious diseases at Children's

21   Hospital of Philadelphia.  What responsibilities do you have

22   in that role?

23   A.  Largely it's addressing all of the design and delivery of

24   our clinical care at our division.  Our hospital is now quite

25   large, and so we actually have three different groups of

1    pediatric infectious disease doctors working simultaneously,

2    and trying to keep the ebb and flow of all of the work across

3    those groups is one of my major functions in that role.

4    Q.  I also see that you are the associate fellowship program

5    director at CHOP.  What responsibilities do you have in that

6    job?

7    A.  To train in infectious diseases, there's actually some

8    fairly strict criteria that you have to meet in order to be

9    established to be competent and work independently, so it's my

10   role overseeing the formal education, like classroom-type

11   education and lectures that our trainees get, as well as their

12   ability to deliver good care and think in a clinical setting

13   as we go around the hospital seeing patients.

14   Q.  Finally, I also see that you are the associate chief of

15   the division of infectious diseases at CHOP.  What

16   responsibilities do you have in that position?

17   A.  Again, these are positions that get wrapped up together.

18   All of these are part of, I think, being the associate chief.

19        In addition, there are issues surrounding the support of

20   the nurses that we work with in our infectious disease

21   practice and things to do with making sure that the junior

22   faculty who are working to get research funding are succeeding

23   and just coaching the entire group.

24   Q.  You've mentioned being on staff at Children's Hospital of

25   Philadelphia.  Are you on staff at any other hospitals?

1    A.  I do have staff privileges at the hospital at the

2    University of Pennsylvania.  The work of our neonatology group

3    at Children's Hospital of Philadelphia is also conducted at

4    the hospital at University of Pennsylvania, so I have

5    privileges there to go and see a baby in their NICU, their

6    neonatal intensive care unit.

7    Q.  Are you a member of various professional societies and

8    organizations in the field of infectious disease?

9    A.  I am.

10   Q.  Can you tell the jury about just one or two of them?

11   A.  I am a member of the Pediatric Infectious Disease Society

12   of America -- these don't have very creative titles -- the

13   Infectious Disease Society of America and the Society For

14   Health Care Epidemiology of America, so all groups of

15   similarly-minded physicians, nurses, other folks.

16   Q.  During the course of your career, have you been the

17   recipient of various honors and awards?

18   A.  I have won several awards.

19   Q.  Again, if you can tell the jury about one or two of them?

20   A.  I guess the award I'm most proud of is an award I won for

21   monitoring trainees from the Society of Health Care

22   Epidemiology, so that was given to me for supporting their

23   development.

24   Q.  We talked before about researching, and you've indicated

25   that you do conduct research, and I believe you've already

1   told us the types of things that you research; is that

2   correct?

3   A.  Right.

4   Q.  Is that something you have been doing throughout the

5   course of your career?

6   A.  It has.  I started doing research as a fellow myself, so

7   for 20 plus years.

8   Q.  Do you also lecture both nationally and internationally?

9   A.  I do.

10  Q.  And again, without going into great detail, if you would

11  tell the jury about a couple of the lectures or presentations

12  that you've given that may be pertinent to what we're going to

13  be talking about here today?

14  A.  One area that I've been recently doing a moderate amount

15  of work in is neonatal sepsis, so infections in neonates,

16  particularly in resource limited countries, so I've done a bit

17  of work in Sub-Saharan Africa, and that's been a good number

18  of the recent talks I've given is focused on some of the work

19  we've done in that setting.

20  Q.  Do you also write, author articles, books, book chapters,

21  that type of thing, and again, could you tell the jury just

22  generally how many of those publications have you authored,

23  how many book chapters, and are any of them pertinent to what

24  we are talking about today?

25  A.  So I don't know the numbers.  I know it's over 100

1   articles in what I refer to as peer reviewed journals, so

2   those are journals where other researchers read and make sure

3   it's accepted for publication.

4       I've written ten plus book chapters, several focused on

5   neonatal infections and some review articles which are kind of

6   like short book chapters often published in journals.

7   Q.  Over the course of your career, how many patients have you

8   seen and treated with just broadly the term neonatal sepsis?

9   A.  Many.  I don't know what the number is.  I would say that

10  each time I'm in the hospital taking care of patients ten

11  times a year, there are a couple that I take care of over the

12  course of that week, and so I think it would be, you know,

13  ten, 20 a year children, babies that have infections like

14  this.

15  Q.  What about babies with E. coli sepsis like we have been

16  talking about here in this case?  How frequently do you see

17  and treat those types of patients?

18  A.  Specifically with E. coli, not as frequently as all cases

19  of neonatal sepsis.  E. coli is not the most common cause of

20  neonatal sepsis, but it is amongst the more common causes.

21  Q.  And are you ever asked to see babies who have had meconium

22  noted either during labor or delivery?

23  A.  I am.

24  Q.  And under what circumstances might you be asked to see

25  those babies?

A.  Well, typically, meconium is part of their history.  It's

not a driver of the infection that I'm usually asked to

comment on, so it becomes part of the story, the background

story of the baby.  It's not typically front and center in my

work as an infectious disease doctor.

Q.  And that was my next question.  Now, does the presence of

meconium or even meconium aspiration necessarily lead to the

development of an infection for which you would be consulted?

A.  No.  You may have heard this before, but meconium is

sterile, and so even if it is aspirated into the lungs, it

doesn't bring germs or bacteria with it.

Q.  And, Doctor, over the course of your career, have you been

asked to review medical-legal matters like we are here today

about?

A.  Yes, I have.

Q.  How long have you been doing that?

A.  I think I probably did my first review maybe 15 years ago.

Q.  And how frequently do you get asked to do that?

A.  Currently, not infrequently.  Once a month.

Q.  And can you give us some idea of how many of the cases

that you get asked to review are for plaintiffs, people

bringing the lawsuits, versus the defendant, the people being

sued?

A.  Sure.  I guess maybe I should clarify a little.  I'm asked

to do it maybe once a month.  I typically only do two to three

1    a year.  Trying to not overwhelm all of my other work.

2        I have done some reviews for plaintiffs.  I don't think

3    it's the majority of my work that I've done for medical-legal.

4            MS. KOCZAN:  At this stage, I would offer Dr. Coffin

5    as an expert in pediatric infectious diseases.

6            THE COURT:  Okay.  Mr. Colville, any cross?

7            MR. COLVILLE:  No.

8            THE COURT:  Mr. Price?

9            MR. PRICE:  I'll reserve.

10            THE COURT:  So given what we've heard, the court now

11   accepts Dr. Coffin as an expert and specialist in the field of

12   pediatric infectious disease.  You may proceed, Ms. Koczan.

13            MS. KOCZAN:  Thank you.

14   BY MS. KOCZAN:

15   Q.  Doctor, were you asked by my office to review certain

16   records and materials in this case?

17   A.  I was.

18   Q.  And did you review the following?  I'm just going to give

19   you the list rather than have you try to recall.  The

20   complaint that started this lawsuit?

21   A.  Yes.

22   Q.  Dr. Dumpe's office records for Ms. Peronis?

23   A.  Yes.

24   Q.  Ms. Peronis's Heritage Valley records for labor and

25   delivery?

1    A.  Yes.

2    Q.  Kendall Peronis's Heritage Valley records?  The LifeFlight

3    records --

4    A.  Yes.

5    Q.  -- from West Penn Hospital.  Have you had a chance to look

6    at the autopsy report as well?

7    A.  Yes.

8    Q.  The depositions of -- there's a list:  Carissa Peronis,

9    Matthew Fritzius, Jamie McCrory, Katherine Gantz, Barbara

10   Hackney, Judith Ash, Maria Hendershot, Dr. Heiple, Dr. Jones,

11   Dr. Dumpe, Dr. Min.  Have you seen all of that?

12   A.  I believe I have.  I haven't committed to memory the list

13   of names.

14   Q.  Have you also had an opportunity to review the plaintiffs'

15   experts' reports, and that being the report of Dr. Zamore, the

16   report of Dr. Shore and the report of Dr. Karotkin?

17   A.  Yes, I have.

18   Q.  Now, based upon your review of the medical records,

19   depositions in this case, can you tell the jury what this case

20   is about from a pediatric infectious disease perspective?

21   A.  From my perspective, the case really highlights just how

22   rapid and devastating a bacterial infection can be in a

23   newborn, and that particularly at the moment of birth, how

24   challenging it is to differentiate signs of infection from the

25   normal physiologic changes that have to happen to have a baby

1    flip their functioning from being attached to the mom's

2    placenta to being out in the world.

3    Q.  And based upon your review of the medical records and

4    other materials, did you, first and foremost, form an opinion

5    as to what caused Kendall Peronis' death?

6    A.  I think she had an overwhelming infection with E. coli,

7    escherichia coli bacteria.

8    Q.  Did you form an opinion as to whether meconium had any

9    causative effect on leading to her death?

10    A.  From my understanding, while the meconium was present,

11    there were many, many indications that overwhelming infection

12    is what resulted in her deterioration and death.

13    Q.  Did you also form an opinion as to when this E. coli

14    infection started?

15    A.  I do think that this is a situation in which Kendall

16    actually acquired the infection before she was delivered,

17    before she was born, and knowing exactly when before she was

18    born, I can't hazard a guess, but I think she was born with

19    the bacteria in her lungs.

20    Q.  Why do you believe that she was born with the bacteria in

21    her lungs?

22    A.  In thinking about the very, very short timeline between

23    her birth and when she became so obviously critically ill,

24    there just isn't time to introduce a couple of bacteria, have

25    them grow to such a large amount that they would trigger this

1    kind of response where her lungs couldn't oxygenate, the rest

2    of her body, the blood pressure couldn't stay up where it

3    needed to.

4    Q.  Did you also form an opinion as to when, in Kendall's

5    course, the infection first began manifesting itself?  In

6    other words, when she first developed symptoms and when?

7    A.  You know, I think the first symptoms, in reviewing the

8    record, that I saw with the descriptions of her having what's

9    called nasal flaring and intercostal retraction, signs that

10   she was working harder to breathe, and then when she was

11   checked in the nursery shortly thereafter, she is found to

12   have quite low concentrations of oxygen in her blood.

13   Q.  And do you also have an opinion as to whether earlier

14   administration of antibiotics would have reversed this

15   process, this overwhelming infection, or made any difference

16   whatsoever in the outcome in this case?

17   A.  Sadly, I don't think they would have.  The tempo of

18   this -- very, very rapid tempo carries with it a sense of

19   inevitability that the bacteria had the upper hand and that

20   the immune response that they were triggering was causing

21   extensive inflammation and damage.

22   Q.  I want to talk a little bit, before we talk about Kendall

23   and what happened to her, about infections in general, since

24   that's your area.

25        How do infections in neonates develop?  What would the

1    mechanism be for the development of infections?

2    A.   Probably the most common way for a baby to develop an

3    infection is to be exposed to a bacteria in the process of

4    being born or once out in the outside world.

5         As probably most people are aware, a baby is built to be

6    sterile.  There's no germs inside the uterus if things are

7    working correctly.  There are a few babies, and I think this

8    is the situation for Kendall, where infection can develop even

9    though the baby is still in the uterus, and I suspect that's

10   how Kendall got infected.

11        She was a less common version of how a baby gets infected

12   which is the bacteria living in the mother's vaginal tract

13   climbs up, attaches to the -- not the placenta, but the sac

14   that contains the fluid that the baby is in and then can

15   actually go into that sac and, in the warm dark environment,

16   grow.

17   Q.   We've heard the term ascending infection.  Is that what

18   you just described?

19   A.   Right, right.  I think it has to do with, you know, if you

20   think of somebody standing up, it starts down in the groin

21   area and goes up to the uterus.

22   Q.   How do babies like Kendall fight this infection?  What is

23   the body's response to this?  What happens?

24   A.   When bacteria are introduced into a compartment of the

25   body where they don't belong, a cascade of immunologic

1    responses happen.  The human cells that are encountering the

2    bacteria are getting damaged.  They release chemicals that

3    essentially signal we're being damaged and recruit new blood

4    cells essentially, infection-fighting cells to come to that

5    location, and those infection-fighting cells can pull in more

6    infection-fighting cells and can themselves release different

7    toxins and chemicals designed to kill the bacteria.

8         Unfortunately, some of these cells that are designed to

9    kill bacteria also release toxins that can cause local damage

10   of the human tissue too, and I think it's that kind of

11   interplay between an immune response that helps get rid of

12   bacteria can also hurt the patient, and in this case, Kendall.

13   Q.  We've heard some terminology here and I just want to very

14   briefly go over this.  We've heard the term white blood cells.

15   What are white blood cells?  What are their function?

16   A.  So there are three different types of cells that float

17   around in the blood, platelets and red blood cells and then

18   white blood cells.  White blood cells are what I like to think

19   of as infection-fighting cells.  They come in different

20   flavors of white cells, but they each -- each of these

21   different flavors have a specific set of activities designed

22   to respond to an invasion due to a virus, a bacteria, a

23   fungus.

24   Q.  What would be the normal range of white blood cells for a

25   newborn like Kendall?

1    A.   The normal range is typically felt to be between 5 and 15,

2    although in a baby who has just been born, because of the

3    stress of birth, can drift northwards up to 20 or 22,000.

4    Q.   We've also heard the term differential.  What is the

5    differential and what are the components of that?

6    A.   Sure.  I kind of just described there being different

7    flavors of white blood cells.  Those, in medical terminology,

8    are counted as differential types of cells, and so a

9    differential tells you we've got, you know, out of 100 white

10   blood cells, we have 50 that are of this flavor, let's say,

11   polymorphonuclear cells.  I don't know if we need to get that

12   specific, and this many are due to a different type of white

13   blood cell and so on like that.

14   Q.   We've heard the term neutrophils.  What are neutrophils

15   and what are their purpose?

16   A.   Neutrophils, the longer name of which is

17   polymorphonuclear, they are the key infection-fighting cell

18   that rushes -- are typically the first infection-fighting cell

19   that goes into an area where there's a bacterial infection,

20   and they contain little granules that can be released and kill

21   bacteria that they encounter.  They can engulf bacteria, and

22   inside them, they can kill bacteria too.

23   Q.   We also heard the term lymphocytes, what are they and what

24   are their function?

25   A.   Lymphocytes are the main cell in the body that makes

1    antibodies, and antibodies are proteins that float around

2    independent of cells, but that have the capacity to attach to

3    specific types of viruses or bacteria, and so lymphocytes are

4    typically like the second line of infection-fighting cell that

5    comes to a site of infection.

6    Q.  We've heard a couple other terms that I would just like

7    you to define and we'll move on.  We've heard the term

8    bacteremia.  What is that?

9    A.  Bacteremia refers to the presence of bacteria in the

10   bloodstream of a person.

11   Q.  And in this particular case, we've heard that blood

12   cultures came back showing E. coli.  Would that be bacteremia?

13   A.  Yes, yes.

14   Q.  And then finally, we've heard the term sepsis.  What does

15   it mean to be septic or have sepsis?

16   A.  So sepsis is a clinical picture that means that the body

17   is having a big physiologic response to some sort of an

18   insult, and typically it's an infection.  Blood pressure can

19   be low.  Heart rate can be high.  Breathing can be high.

20   Fever can be present.  Those are typically four components,

21   not all have to be present, but those are the kind of classic

22   four components of sepsis.

23   Q.  Sepsis caused by E. coli, is there a particular pattern

24   that you see with an E. coli sepsis?

25   A.  E. coli sepsis, when it's recognized, is typically

1    extreme.  E. coli is a fairly serious bacteria and eventually

2    triggers all of those manifestations.

3    Q.  And is there a typical course with E. coli sepsis or

4    sepsis generally?  Is it a situation where, you know, it just

5    gradually onsets, or is it something that can happen rapidly?

6    How does it work?

7    A.  Sepsis often emerges in a very dramatic fashion,

8    particularly in children who have the ability not to

9    demonstrate their ill until they become very ill, so it's

10    something where you can go from zero to 100 really quickly in

11    terms of progressing through seeming well to being quite sick.

12        E. coli is definitely one of the bacteria that has that

13    characteristic of triggering a very fast version.  It grows

14    rapidly and once the immune system has kicked in and triggered

15    a big physiologic response, dropping blood pressure, raising

16    heart rate, it's hard to stop that.

17    Q.  And we've also heard a couple of other terms.

18    Bronchopneumonia.

19    A.  Bronchopneumonia.  Bronchopneumonia is a term that simply

20    refers to a bacteria in the airspaces of the lungs and gets in

21    the way of gas exchange, and the function of the lungs is to

22    take in oxygen and give off carbon dioxide.

23    Q.  Is that one of the things you can see with an E. coli

24    sepsis?  It sets up residence in the lungs?

25    A.  It's a classic component of E. coli sepsis in the neonate

1    such as what Kendall had.

2    Q.  With regard to E. coli sepsis, what is the mortality rate

3    of neonates who acquire an E. coli sepsis?

4    A.  There is debate in the literature about what the precise

5    number is probably because we are constantly trying to do

6    better.  It ranges between --

7            MR. PRICE:  Objection.

8            THE COURT:  Sustained.  Sidebar.

9        (At sidebar.)

10            THE COURT:  Mr. Price, your further objection?

11            MR. PRICE:  I object to hearsay because I have not

12    been provided any literature and I cannot cross-examine any

13    literature with this witness if she is citing literature.

14            MS. KOCZAN:  Your Honor, I can rephrase the question

15    to ask about her experience with it.

16            THE COURT:  I think that's what we should do.

17            MS. KOCZAN:  I will do that.

18        (In open court.)

19            THE COURT:  Ladies and gentlemen, Ms. Koczan is going

20    to rephrase her question.

21    BY MS. KOCZAN:

22    Q.  Doctor, without citing the literature, can you tell us

23    what your experience has been with the mortality rate with

24    E. coli sepsis?

25    A.  E. coli sepsis is typically very serious.  I can't

1  actually remember specific cases and give you a precise

2  proportion of the number of children I cared for that lived

3  and died.  I've taken care of children who had both

4  experiences after having E. coli sepsis.

5  Q.  What I'd like to do now is focus on what happened to

6  Kendall Peronis back in October of 2014.  The jury has already

7  heard that Kendall was born at about 5:20 a.m. and was

8  assessed immediately after birth by Nurse Hendershot.

9      I want to put this document up.  The jury has seen this a

10 bunch of times.  Let's put it up again.  It's 1115 and if we

11 can highlight the Apgar section up on the top, and I just want

12 to ask you about these Apgar scores.

13     What do these Apgar scores tell us about Kendall's

14 condition at the time of birth?

15 A.  At the time of birth right at one minute, she had a fair

16 respiratory effort which earned her a score of one instead of

17 two which would be vigorous -- typically vigorous really

18 crying.

19     She was felt to have fair muscle tone, meaning she was

20 probably active but not with really strong kicks and such.

21     Her reflex, which is a response to being stimulated, was

22 okay but not quite as dramatic.

23     And her skin color, when you get a one, it means your

24 fingers and toes haven't pinked up yet.  You get a two when

25 they pink up.

1    Q.  And then at five minutes, what was her score?

2    A.  So there, her heart rate is in the appropriate range.  Her

3    respiratory effort is deemed to be good so she is vigorously

4    crying.  She still seems perhaps, if you are trying to

5    interpret the numbers, perhaps a teeny bit, I don't know,

6    floppy.  She has vigorous reflexes though, meaning when she is

7    stimulated, she responds well, and then she still probably has

8    the duskiness of her fingers and toes.

9    Q.  Does an Apgar score of eight indicate a healthy baby?

10   A.  Typically, yes.

11   Q.  In addition to receiving the Apgar scores and being

12   assessed that way, Nurse Hendershot also did a neonatal

13   assessment, and if we can look at the bottom left-hand side

14   there, and if you can take a look at that.

15       Anything abnormal about that assessment?

16   A.  It's interesting.  Now that I'm looking at it and looking

17   at the code, the X seems to indicate an abnormality.

18   Q.  And we're just looking at the one on the left.

19   A.  Okay.  So no.  It looks like that everything looked good.

20   Just having made note of the baby's gender and didn't do a

21   detailed exam of the baby's bottom.

22   Q.  Is there any indication based upon the Apgar scores or

23   this initial assessment that there was any reason to suspect

24   that this baby might have an infection at this point?

25   A.  No.

1  Q.  Was there any reason to order antibiotics at this point?

2  A.  No.

3  Q.  Was there any need for this baby, based upon those Apgar

4  scores and that assessment, not to be permitted to remain in

5  the room with mom and go through the bonding process?

6  A.  None that I see, no.

7  Q.  I would like you to assume that Nurse Hendershot, the

8  nurse who did the initial assessment, has testified that per

9  her documentation from 6:00 to 7:00 a.m., she was in to assess

10  mom, Kendall was with mom, and during those examinations, she

11  would have observed Kendall and did not observe anything

12  unusual.

13      Given the fact that we know that Kendall already had an

14  infection at that point, would the absence of any symptoms

15  during that time frame be unusual in any way?

16  A.  Unfortunately not.  Babies and children in general have an

17  amazing ability to compensate, meaning that they can tolerate

18  a moderate amount of illness, even severe illness, without

19  demonstrating it.  We're not so lucky as adults.

20  Q.  We heard from the parents that when Kendall was in the

21  room with them, she was crying continuously.  First and

22  foremost, is crying a bad thing?

23  A.  For a newborn, it's actually part of the necessary work to

24  transition yourself into being able to live outside in the

25  world of air.  It's part of what opens up your lungs and such

1  is the way I think about it.  Crying vigorously is what gets

2  you two points on the respiratory score on that Apgar system

3  we just looked at.  So crying, in and of itself, is not a bad

4  thing.

5  Q.  And in terms of we've heard some testimony that the

6  parents observed certain things.  If a baby was grunting, is

7  that something that a trained medical professional would be

8  able to hear?

9  A.  Yes.

10  Q.  If a baby was flaring, is that something that a trained

11  medical personnel would be able to note?

12  A.  Nasal flaring?

13  Q.  Yes.

14  A.  Yes, it is.

15  Q.  When we talk about nasal flaring, what exactly are we

16  talking about?

17  A.  It's literally just the outer margins of your nostrils go

18  out and it's an effort just to suck in more air.

19  Q.  And we've heard about retractions.  Is that something that

20  a trained medical professional would know what it was and be

21  able to recognize it?

22  A.  Yes, yes.

23  Q.  Was there any evidence in any of the records that you saw

24  before 7:25 a.m. that Kendall was having any of those?

25  A.  I didn't see any notations to that effect.

1    Q.   Problems.  The jury heard yesterday from the nursery

2    nurse, Barb Hackney, that sometime before 7:00 a.m., somewhere

3    between 6:50 and 7:00, Nurse Hendershot brought Kendall over

4    to the nursery and that Nurse Hackney took a set of vital

5    signs.  I'd like to put those up and just ask you about that.

6    That's 1165, if we can put those on the screen.

7        These are the initial set of vital signs that

8    Nurse Hackney took at 7:00 a.m. when Kendall arrived in the

9    nursery but were documented by Nurse McCrory.  My question is

10   simply this:  Are these normal vital signs?

11   A.   They are.

12   Q.   Did these vital signs indicate that there should be at

13   that stage any suspicion of infection or respiratory distress

14   or what we know occurred later on?

15   A.   No.

16   Q.   In addition to those vital signs, Nurse Hackney also

17   testified that she did not observe anything abnormal, no

18   respiratory distress, grunting, flaring, retractions, when

19   Kendall was brought over.

20       Again, same question.  Would that be unusual given the

21   nature of this particular infection?

22   A.   No.

23   Q.   Now, based upon your review of the records, when was the

24   very first time that there was any evidence whatsoever that

25   Kendall was having issues that might be related to an

1   infection?  And if we can put up document 1167, that may help,

2   and just highlight this page here.  Down below there, the 7:25

3   a.m. note.

4   A.  So here is documentation that I think a trained

5   neonatology nurse or physician would recognize as being

6   concerning with the grunting, flaring and retracting and

7   appears to be in pain.

8   Q.  There's another page here.  If we could put that up too.

9   That would be 1172.  This is a further part of that note.  If

10  you can put that side by side and highlight.  I think it's the

11  bottom of that page there.  Keep going, I believe.  It's below

12  that.

13        There's a note there that says the doctor was --

14  Dr. Heiple was called, I believe.  Is that 1172?  That's it,

15  at the bottom there.

16        This is a further part of that same 7:25 a.m. note, and as

17  we've talked before, is it unusual that now, about two

18  hours -- a little over two hours has passed before there were

19  any signs or symptoms that might indicate infection, given

20  what we know later happened?

21  A.  No.  The baby, in the first hours, is undergoing a

22  physiologic switch from being able to get all they need from

23  the mother's placenta into living independently, and what I

24  suspect is that as that physiologic switch was happening, the

25  stress of the infection was slowly emerging.

1    Q.  I would like you to assume that Dr. Heiple, who was the

2    resident who was called here, testified in here, in the

3    courtroom, that he was called by Nurse McCrory, went up to the

4    nursery to assess the baby shortly after he was called, and

5    when he arrived, the baby's O2 saturation had increased from

6    that 81 percent that we saw originally up to 94 percent and

7    that she looked okay.

8        I would further like you to assume that Dr. Jones has

9    testified that when she arrived around 8:00, she was concerned

10   because the baby's O2 requirement had increased and there were

11   some respiratory symptoms.

12       Again, is this course that the doctors described, what

13   Dr. Heiple saw, and there's some dispute as to what time it

14   was, 7:45, you know, before 8:00, somewhere thereabout, is

15   this course though consistent with what you have seen in

16   babies with E. coli sepsis infection?

17   A.  By -- I don't know if I'm allowed to ask a question, but

18   do you mean like a rapid course?  Like it moving quite quickly

19   and changing quite quickly?

20   Q.  Yes.

21   A.  Yes, that is typical, and as I said, the baby is

22   undergoing a physiologic switch from being in utero to being

23   out in the world, and all of a sudden, as the body's systems

24   begin to take over for living out in the world, they are

25   encountering a lot of inflammation in the lungs presumably and

36

1    saying like, whoa, this is not something that's easy to deal

2    with.

3    Q.  And again, I'd like you to assume that Dr. Jones has

4    testified, as she documented in her record, that when she got

5    in, she immediately decided that this baby needed to be

6    transferred to West Penn Hospital and then she ordered labs,

7    cap gases, an IV, antibiotics, including ampicillin and

8    gentamicin.

9        Are those all appropriate actions?

10   A.  Yes.

11   Q.  One of the things that she did order was some lab work,

12   and I want to ask you about that, and if we can put up 1140

13   and 1141, if we can put that side by side.  This is some of

14   the lab work that she ordered which included the differential.

15       If you can explain to the jury what this is and what this

16   tells us about the duration and extent of this infection.

17   A.  So actually, for me what's most helpful is to look over on

18   the right-hand side in the middle.  Does this work?  Right

19   there (indicating).

20       The white blood cell count of 8.3, so that's in the

21   relatively normal range, although it does indicate low, but

22   8.3 is normal white blood cell count in my mind, and then the

23   differential, if we could go over to the other page now, right

24   here (indicating), and so what this shows is that there is

25   three percent neutrophils, which is low, and then a very high

1    lymphocyte count, which is relatively high likely because

2    there's not very many neutrophils to fill in their normal

3    complement.

4    Q.  What does the low neutrophils tell you about the

5    infection, how long it had been going on, how far it

6    progressed?

7    A.  This is not a normal pattern, and in a normal pattern, you

8    would see maybe equal numbers of neutrophils or equal

9    percentages of neutrophils and lymphocytes, so something has

10   been going on to drive those neutrophils down to this level

11   from 30, 40 percent down to three percent.

12   Q.  One of the things that Dr. Jones ordered was the

13   antibiotics, the ampicillin and gentamicin.  First and

14   foremost, were those appropriate antibiotics choices?

15   A.  Those are the classic antibiotics to be given for a just

16   born baby who may be having an undiagnosed infection.

17   Q.  We have heard some testimony that those antibiotics, the

18   ampicillin didn't get started until sometime 9:00 or shortly

19   thereafter, and then the gentamicin was hung around 9:50 after

20   the ampicillin had infused.

21       Do you have any issue with the timing of the

22   administration of those antibiotics?

23           MR. PRICE:  Objection, Your Honor.

24           THE COURT:  Sidebar.

25       (At sidebar.)

1          THE COURT:  Mr. Price?

2          MR. PRICE:  Nowhere does she comment that the late

3     gentamicin is an acceptable dose.  I mean, I don't know what

4     she is going to say.

5          MS. KOCZAN:  Your Honor, she offers the opinion that

6     the earlier administration of antibiotics would not have made

7     any difference in this case.  I'm going to have her explain

8     that and that's why I asked the question the way I did, but

9     she clearly offered the opinion that it would not have made

10    any difference in the outcome.

11         MR. PRICE:  Early but not later.

12         MS. KOCZAN:  What's that?

13         MR. PRICE:  I understand the earlier, with which she

14    already testified to at the time of birth, but my point is

15    here now she is talking about the later administration of it.

16         MS. KOCZAN:  No.  She talks in her report globally

17    that earlier administration of antibiotics would not have made

18    any difference.  She clearly states that.  And, Your Honor,

19    it's in the last paragraph -- I guess next to the last

20    paragraph of her report at the bottom.

21         THE COURT:  So document 122-1 page 2 of 34, "It's

22    also my opinion to a reasonable degree of medical certainty

23    that infection was established prior to Kendall's birth and

24    that the disease process would not have been reversed by

25    earlier administration of antibiotics."

1        MR. PRICE:  I understand that.  That's my point is

2   she talked about earlier administration of antibiotics at the

3   time of birth and she hasn't made any comment about earlier

4   administration at 9:50.

5        MS. KOCZAN:  She talks globally about it.  That's

6   what that says.

7        THE COURT:  It's very generic.  It's very broad, and

8   as I've told you repeatedly, you all had the opportunity to

9   depose these experts prior to going to trial.  You all chose

10  not to do that.

11       (In open court.)

12       MS. KOCZAN:  Could you please read that question

13  back?  Never mind.  I remember it.

14  Q.  My question was this:  We've heard testimony and looked at

15  some records that indicate that the ampicillin was not hung

16  until sometime 9:00 or a little afterwards and that the

17  gentamicin was not hung until after the ampicillin had infused

18  somewhere around 9:50 a.m.

19       Do you have any issue with the timing of the

20  administration of the antibiotics under these circumstances?

21  A.  Typically, we want to get antibiotics into a patient

22  within one hour after they have been ordered.  That is a

23  national target, and so I don't know what time precisely the

24  orders were written, but that sounds as though it is, you

25  know, close, if not within that range.

1    Q.  The antibiotic order was actually written by Dr. Heiple at

2    around 8:32.  Now, let me ask you this:  This baby had one IV.

3    Can you run these simultaneously, or do you have to let the

4    one go in and then the other?

5    A.  I don't know about amp and gent being compatible, meaning

6    they could be simultaneously infused.  There often is a rate

7    limiting step, in terms of the caliber of the baby's vein,

8    like how much you can pump in how quickly, so that often is

9    what the rate limiting step is, like how much you can get in

10   there, how quickly.

11   Q.  Can you explain just briefly to the jury without going

12   into any great detail what this baby's course was after the

13   initial evaluation by Dr. Jones and then when she came back

14   after talking with the parents about transfer?  Just generally

15   what happened after that?

16   A.  The baby rapidly, rapidly deteriorated, having rapid

17   escalation in the amount of oxygen that the baby was

18   requiring, and even with maximal oxygen, was not getting

19   enough into her bloodstream.

20       Her metabolism became more and more out of whack, and

21   that's something you can see if you look at what the PH of her

22   blood was over time.  It should be 7.4, and at one point, it

23   was 7, and then it was below 7, all of which are very

24   concerning.

25   Q.  Let me put a document up and this may help too for the

1     jury to follow along.  It's 1120 and 1121, if you can put that

2     side by side.

3          That is Dr. Jones' summary of the events, if you need to

4     refer to that.  I didn't mean to interrupt you, if you can

5     continue.

6     A.  So in addition to deteriorating metabolism, deteriorating

7     respiratory support, requiring more and more oxygen, the baby

8     ultimately needs to be intubated to provide, in addition to

9     more oxygen pressure which is what you get with intubation and

10    using a mechanical ventilator to push the air more -- more air

11    into the baby's lungs, the baby, I believe is given a dose of

12    something called surfactant, which is typically present in

13    babies who are born at term but can -- but helps a baby

14    breathe if they are born preterm.  Sometimes it's done in a

15    baby like this whose lungs just aren't working in the off

16    chance that that will help them.

17    Q.  One of the other things that we saw given was something

18    called nitrous oxide.  What is that and why is that given?

19    A.  Nitric oxide is a gas, but it's a drug given as a gas

20    mixed in with the oxygen that's being delivered, and it has

21    this unique effect of causing the blood vessels that go

22    through the lung tissue to dilate, and the reason that's

23    helpful in a case like Kendall's is there's a lot of signals

24    in her respiratory course that her blood vessels in her lungs

25    are all clamped down, back like they would have been before

1    she was born, and that's part of the reason why the oxygen

2    isn't getting into her bloodstream.

3    Q.  And if you could continue, in terms of her course, what

4    happened as it progressed?

5    A.  There were many efforts to reverse these things.  Giving

6    the nitrous oxide and the surfactant were important efforts to

7    try and address the deteriorating lung function.

8         She is given what are called boluses of normal saline, so

9    a quick infusion of a large volume of fluid to expand her

10   blood volume in the setting of having low blood pressure.  She

11   is given some bicarbonate, which is like bicarbonate soda used

12   to correct the low pH in her blood.

13        So those are the major interventions that were undertaken

14   until she got very, very sick.

15   Q.  One of the things that we saw too is that during the

16   course of this resuscitation, there was some pulmonary

17   hemorrhaging.

18        What is that and what is the significance?  Why does that

19   happen?

20   A.  Pulmonary hemorrhage means that there has been leakage of

21   blood from the blood vessels that sit at the base of the air

22   sacs of the lung into the lung, and it's been in a sufficient

23   amount that it's coming bubbling up, and in this case was

24   visible, I think, in her endotracheal tube.

25        It's a concerning sign.  It means that the blood vessels

1    aren't able to keep the blood where they belong separate from

2    the tissue.  This is something that happens with very advanced

3    sepsis.  It's a very concerning sign.

4    Q.  In terms of the entire course, you know, what occurred

5    during the resuscitation, in your opinion, is that consistent

6    with an overwhelming E. coli sepsis?

7    A.  It is, yes.

8    Q.  And in terms of the actual mechanism of how she died, what

9    did happen?  What were the physiological changes that

10    ultimately led to her death?

11    A.  I think, you know, a variety of things that you can see

12    from this are that she -- her heart is being driven to beat

13    faster and faster because her blood pressure was low, because

14    it's being stimulated by the infection and the inflammation

15    that the infection is causing.

16        Her lungs are kind of shutting down.  At first, they are

17    not accepting oxygen, and then they start being unable to keep

18    separate the gas from the blood with the pulmonary hemorrhage,

19    and then the tissues of her body aren't getting the oxygenated

20    blood they need and that's why her pH is falling low, all of

21    which are very concerning signs of bad sepsis.

22    Q.  It has been suggested and testified here in the courtroom

23    by plaintiffs' experts that if she had an earlier

24    administration of antibiotics, it would have changed the

25    course.  Do you agree with that?

1    A.  Unfortunately, I don't.

2    Q.  Can you tell the jury why?

3    A.  I think this process was very well established at the

4    point it was recognized, and there's a very short period of

5    time between that and when the baby was born, and I think that

6    this is the kind of picture that you can't reverse when the

7    physiology of the body is so out of whack.  It's not just

8    about killing bacteria.  The bacteria stimulated a whole

9    cascade of physiologic changes in the body, and killing of

10   bacteria won't reverse those.

11   Q.  And just more to explore that a little bit further.  There

12   has been some suggestion that, you know, if Dr. Heiple would

13   have ordered antibiotics right away, that somehow this would

14   have been different.

15       Do you agree with that, and keep in mind Dr. Heiple was

16   there somewhere between maybe 7:45, 8:00, something like that?

17   Would that have changed anything?

18   A.  At that point, if I'm remembering the timeline correctly,

19   Kendall was already having really profound issues getting

20   oxygen into her system, and that we saw because she needed

21   such a high concentration of oxygen, and to me, that's, even

22   though it's just a concentration of oxygen in the blood,

23   that's a big signal that things are seriously out of whack in

24   terms of her lung function.

25   Q.  So just in terms of the response to that question, would

1    it have made any difference at that stage?

2    A.  I don't think so.

3    Q.  Let's assume the antibiotics were started at 8:00.  Would

4    it have made any difference at that time?

5    A.  No.

6    Q.  8:30, would it have made any difference at that time?

7    A.  No.

8    Q.  9:00, 9:50?

9    A.  No.

10   Q.  In terms of this entire picture that we've discussed here

11   today, is this typical of what you see with an E. coli

12   infection in terms of the timing of these symptoms, the

13   rapidity of the deterioration and ultimate death?  Is this the

14   typical course?

15   A.  This is definitely, you know, a severe case of E. coli

16   sepsis, but it is a typical case.  It's shocking how rapidly

17   this progresses.

18   Q.  Just to conclude, we've heard all this about, you know,

19   the faster you get antibiotics in, the better it is, that type

20   of thing.  I think we would all generally agree with that.

21       In this case, would that have been the situation?

22   A.  The goal of getting antibiotics in quickly to treat an

23   infection really has to do with getting them in before bad

24   secondary complications develop.  I don't see that window of

25   time in Kendall's story.  I think we see signals that Kendall

46

1    was having big physiologic reactions to this infection, but

2    that they weren't manifest in ways that the people caring for

3    her could see.

4    Q.  Have all the opinions that you've rendered here today been

5    rendered with a reasonable degree of medical certainty?

6    A.  Yes.

7              MS. KOCZAN:  Thank you.  Those are all the questions

8    I have.

9              THE COURT:  Mr. Colville, any questions of this

10   witness?

11             MR. COLVILLE:  No questions.

12             THE COURT:  Mr. Price?

13             MR. PRICE:  Sure.

14                          CROSS-EXAMINATION

15   BY MR. PRICE:

16   Q.  Dr. Coffin, I'll start out with, you mentioned that part

17   of your work like you are doing here today is medical-legal

18   work, and you said that you do a percentage of your cases for

19   patients, for plaintiffs.  Can you tell me what percentage

20   that is?

21   A.  I haven't calculated it.  In the past year, I can think of

22   two specific cases that I've reviewed.

23   Q.  Just so the jury understands, reviewing is different than

24   actually coming to court and testifying?

25   A.  Right.

1    Q.  Did you actually come to court and testify for either of

2    those patients or the plaintiffs?

3    A.  No.

4    Q.  I thought it was the policy of the Children's Hospital of

5    Philadelphia to not allow the doctors to write reports for

6    patients, that they could only -- you could only testify on

7    behalf of defendant hospitals and physicians.

8    A.  I'm not aware of that policy.

9    Q.  Okay.  Can you tell -- I know that we have your documents

10   that you've given us about your testimonial history.  Over the

11   last five years, how many cases have you testified on behalf

12   of the plaintiff or the patient?

13   A.  Zero.

14   Q.  Do you remember the last time you did?

15   A.  I never have done that.  I've only testified once before

16   in court.

17   Q.  Now, it has been the plaintiffs' position in this case

18   that Kendall suffered respiratory distress due to a massive

19   aspiration of meconium.  Do you understand that?

20   A.  Do I understand, yes.

21   Q.  If you could bring up M01.  This is just an exhibit which

22   we used with one of our experts, and I'll explain it to you.

23   On the left-hand side is a baby that has inhaled a little bit

24   of meconium but it doesn't get all the way down into the

25   alveoli.  I hate that word.

48

1    A.  Air sacs.

2    Q.  Thank you.  Air sacs.  On the right-hand side, the baby

3    has ingested a lot of meconium so it's gotten all the way down

4    to the bottom air sacs.  The only thing I will correct for you

5    is our expert said that my drawing of the lungs was too small

6    because the lungs would actually expand.

7        The reason why I'm asking you about this is he explained

8    that, in a situation where you have meconium all the way down

9    into the bottom of the air sacs, that it's sort of like a bell

10   valve.  In fact, Dr. Jones testified to this in the sense that

11   air will come in.  It will go into the body but getting it

12   back out is difficult.

13       Do you understand that to be the same?

14   A.  I'm not a neonatologist, but yeah, I think that is one of

15   the ways that meconium aspiration can cause damage.

16   Q.  And if you had problems like that, from your

17   understanding, the body then in a baby would become acidotic?

18   A.  Uh-huh.

19   Q.  You have to say yes for the court reporter.

20   A.  Yes.  Sorry.

21   Q.  And acidosis is something that the pH is off balance and

22   the baby's organs can start being affected, things of that

23   nature, correct?

24   A.  That's correct.

25   Q.  Now, if a baby becomes acidotic, that throws, on top of

1  things, that the baby has to battle to stay oxygenated,

2  correct?

3  A.  Correct.

4  Q.  So in a situation like this exhibit on the right-hand

5  side, if a baby has meconium deep in its lungs, every breath

6  it takes, it's fighting to get more oxygen into its system,

7  correct?

8  A.  I think that's possible.  I think it depends on how much

9  and how many of the air sacs would be involved, but --

10  Q.  Right.  Exactly.  That's for debate.  You know, the

11  pathologist said it was massive.  The defense expert says it's

12  not.  We'll leave that for the jury's decision, but my point

13  is that if you have a condition like on the right-hand side

14  where the lower air sacs are filled with meconium, that would

15  hinder a baby's ability to fight off other conditions,

16  correct?

17  A.  Well, it certainly hinders gas exchange.

18  Q.  Right.  And you need good gas exchange to help fight off

19  any type of infection too, correct?

20  A.  Correct.

21  Q.  So while the cause of death in this case was E. coli

22  sepsis, as you know from the pathologist's report, he said it

23  was associated with a massive aspiration of meconium, correct?

24  A.  Right.

25  Q.  So you would agree with me that if this baby didn't have

1   the massive aspiration of meconium, the only issue would be

2   whether the baby could have fought off the infection, correct?

3   A.  I guess so, yeah.

4   Q.  Because having both conditions, the baby was trying to

5   fight to breathe as well as fight an infection, correct?

6   A.  Well, because the infection was in the lungs, there was

7   perhaps two things going on in the lungs simultaneously.

8   Q.  Right.  And so the longer that this condition went on, the

9   tougher it was for Kendall to fight, correct?

10  A.  Certainly things progressed, and that's the sad story.

11  Things did progress.

12  Q.  Right.  That's the whole issue about the progression.  I

13  know that you said the infection had the upper hand, but you

14  didn't mention the meconium in that statement, and I guess the

15  infection had the upper hand, but with the meconium, it had a

16  really good head start, a lot of --

17  A.  I don't know the extent, if any, the meconium played in

18  the -- in changing the features that I see of progressive

19  infection.

20  Q.  Okay.  Yeah.  I understand your point that the meconium

21  wasn't the infected material as much as the meconium was in

22  the bottom of the lungs and that meconium is what Kendall was

23  fighting her air exchange, the acidosis, and that all hinders

24  her ability to fight an infection, correct?

25  A.  While meconium alone might cause some of those things, I

51

1    think that the infection played a really big part in her

2    struggling to get the oxygen she needed for her deteriorating

3    pH, her rising heart rate.  I see those as signs of

4    progressive infection.

5    Q.  Okay.  But would you disagree if an expert had come in

6    here and said that having massive aspiration of meconium with

7    meconium in the bottom air sacs would cause acidosis, your pH

8    to go into an acidotic state and that you would have organ

9    failure and organ problems as a result of that?

10   A.  Certainly babies can have devastating illness, total body

11   illness as meconium aspiration.

12   Q.  I know you heard one set of facts and I want you to assume

13   a little bit different set of facts.  I want you to assume

14   that no nurse came into the baby's room from 5:30 to 7:00 in

15   the morning.  I want you to assume that there are no notes

16   about the baby's condition from 5:30 to 7:00, and I want you

17   to assume that when the baby got to the nursery at shift

18   change, Nurse McCrory looked over at Kendall and said she is

19   breathing fast.

20       Within 15 minutes, they found the oxygen level was 81,

21   grunting, flaring and retracting, appears to be in pain, nasal

22   flaring, substernal retractions, respiratory is labored,

23   abdominal muscle use, subcostal retractions, the breath sounds

24   were coarse, anterior and posterior, she had a dusky

25   appearance and they had to put her on an oxy hood at 64

1    percent oxygen.

2        So since you are here as an expert, what can you tell me

3    about Kendall's condition for the two hours previous?

4    A.  With what you've just described, you don't have

5    information.

6    Q.  That's the whole point in this case, that you can't tell

7    me here while you are sitting there what Kendall's pulse ox

8    was at 5:30, 5:45, 6:00, 6:15, 6:30, 6:45, 7:00 or 7:15,

9    correct?

10   A.  Correct.

11   Q.  Now, with regard to antibiotic administration, you are not

12   suggesting that Kendall was so sick that even if a doctor had

13   recognized signs of some type of respiratory distress at 5:30

14   or 6:00, that they wouldn't try antibiotics, would you?

15   A.  If you are asking if Kendall was recognized to be -- have

16   a high likelihood of being infected?

17   Q.  Yes.

18   A.  Would they have started antibiotics?

19   Q.  Yes.

20   A.  Yes, they would have.

21   Q.  So if a pediatrician had been in Kendall's room and

22   noticed that Kendall had some type of respiratory distress,

23   you would agree that the initial workup is giving oxygen and

24   working up for a neonatal sepsis, which is giving antibiotics,

25   correct?

1    A.   Right.

2    Q.   And you would agree that if a pediatrician saw Kendall at

3    5:30, 6:00 and recognized those symptoms, that she would have

4    gotten the antibiotics earlier, correct?

5    A.   If they were present, correct.

6    Q.   And you would agree that if Kendall got antibiotics

7    earlier before she started showing the 81 percent, that there

8    was a chance that the antibiotics would have an effect on the

9    E. coli infection, correct?

10   A.   Correct.

11   Q.   So earlier recognition of this infection, an earlier

12   administration of antibiotics would have given Kendall a

13   chance to survive, correct?

14   A.   I don't know the size of the chance, but what appears to

15   have been present when she is first assessed in that nursery

16   appears to be very longstanding.  I mean, she had barely any

17   neutrophils at that point.  She had a low pH.  She had low

18   oxygen.  It seems as though this must have been going on

19   probably since before she was born.

20   Q.   Understood.  But my question was specific with regard to

21   recognizing respiratory distress and treating it before 7:20,

22   and you are saying it might be a small chance, but there was a

23   chance, correct?

24   A.   Correct.

25   Q.   Dr. Jones described the scene in the nursery -- I'll

54

1    represent this to you.  This is what her testimony was, that

2    when she walked into the nursery, she said that it was a

3    crisis.  Okay.

4    A.  Okay.

5    Q.  Now, you would agree with me that it's always better to

6    treat a patient before it turns into a crisis, correct?

7    A.  Correct.

8    Q.  And in fact, that's what your testimony was, that a workup

9    of Kendall before she showed these really bad signs at 7:25,

10   would have been preferred, correct?

11   A.  Yes.

12   Q.  Now, I know that you were asked a question with regard to

13   the timing of the gentamicin, and you were given one set of

14   facts.

15       Dr. Jones has said that she came in to the nursery at 8:00

16   in the morning.  She said that at 8:00 in the morning, she

17   gave verbal orders for the blood gases, for chest x-ray and

18   for antibiotics.  I want you to assume 8:00 is when she made

19   that order.

20   A.  Uh-huh.

21   Q.  You testified that typically antibiotics should be given

22   within one hour of an order?

23   A.  Correct.

24   Q.  So if these antibiotics took one hour and 50 minutes after

25   that verbal order, you would say that that was a delay?

1  A.  Yes.

2          MR. PRICE:  That's all the questions I have, Your

3  Honor.

4          THE COURT:  Ms. Koczan, any redirect?

5          MS. KOCZAN:  Yes, I do.

6                  REDIRECT EXAMINATION

7  BY MS. KOCZAN:

8  Q.  Doctor, I'd like to begin by going back and asking you

9  about the acidosis that was noted.  Mr. Price was asking you

10  questions about was that associated with the meconium.

11      What do you believe caused the acidosis that was noted

12  during the course of the resuscitation efforts?

13  A.  I think it was overwhelming infection.

14  Q.  And you were asked a number of questions about if this had

15  happened at 5:00 or 6:00, whatever, based upon your review of

16  the records, is there any indication here in the records, and

17  let's start with 5:00, 5:20, when this child was born, is

18  there any indication that there was anything going on for

19  which a workup should have been initiated?

20  A.  No.  I didn't see anything that should have triggered a

21  workup in what I reviewed.

22  Q.  Is there anything that you saw in the records that

23  indicated that an administration of antibiotics should have

24  occurred sometime around the time that this child was born?

25  A.  No.

1    Q.  Now, we talked before about Nurse Hendershot's testimony,

2    that she went in, that she observed this baby and did not

3    notice anything.  Nurse Hendershot, I'd like you to assume, is

4    a nurse with 30 years of experience and is neonatal

5    resuscitation trained.

6        Would you expect a nurse with that degree of experience

7    and that training to be able to recognize signs and symptoms

8    of respiratory distress?

9    A.  Indeed.

10   Q.  And I'd like you to assume that Nurse Hendershot has

11   testified that had she noticed any of that, she would have

12   done a couple of things.  Number one, she would have brought

13   the child to the nursery, and number two, there would be some

14   documentation.

15       Did any of that occur in this case?

16   A.  I didn't see any.

17   Q.  We went over before Nurse Hackney seeing the baby at 7:00,

18   taking vital signs.  Again, is there any indication at 7:00

19   that there was anything going on that should have triggered an

20   investigation or the administration of antibiotics?

21   A.  No, not at that time.

22   Q.  Based upon the records you reviewed, was the very first

23   time that anything was going on that indicated that something

24   was going on such that antibiotics might be indicated, was

25   that around 7:25?

1    A.  I would probably need to look at it precisely, but I think

2    that's when we began to see the changes documented, with the

3    baby having retractions and flaring and such.

4    Q.  So was there any reason to suspect infection, begin

5    antibiotics before they were in fact given in this particular

6    case?

7    A.  No.

8    Q.  I want to go back and ask you again, in terms of the

9    administration of those antibiotics, you were asked questions

10   about, well, if they weren't given until an hour and 50, was

11   that a delay.  If indeed there was a delay, did that make any

12   difference in this case, given what we know here?

13   A.  No, I don't think so.

14   Q.  And why is that?

15   A.  I think at the point that this baby moved into the NICU

16   that the die had been cast.  The multiple organ systems were

17   exhibiting kind of the secondary complications with high heart

18   rate, low blood pressure, inability to get oxygen into the

19   blood.

20   Q.  You were also asked a chance, even a small chance.  Given

21   the picture that we see as documented in this chart and has

22   been testified to by the medical professionals, was there any

23   chance for Kendall, given this infection?

24   A.  I honestly don't know for sure.  This is a devastating

25   infection and it progressed so rapidly.  Unfortunately,

1    there's a tempo of inevitability.  Things are getting worse

2    and worse and worse.

3    Q.  So given that progression, would the outcome have been any

4    different here?

5    A.  I don't think so.

6    Q.  And again, is that an opinion you hold with a reasonable

7    degree of medical certainty?

8    A.  Yes.

9         MS. KOCZAN:  Thank you.

10         THE COURT:  Mr. Colville, at this time any questions?

11         MR. COLVILLE:  No questions.

12         THE COURT:  Mr. Price, anything further of this

13    witness?

14         MR. PRICE:  Sure.

15                    RECROSS-EXAMINATION

16    BY MR. PRICE:

17    Q.  I'm not going to go over and have you assume one set of

18    facts and have a question.  The jury has heard all this and

19    they can make a decision based upon you believe this nurse or

20    you believe the parents, what was going on in the room.  But I

21    guess I wanted to ask one other question with regard to

22    Nurse Hendershot.

23         You saw all those Apgar scores.  When Kendall was born,

24    you say that it was a normal healthy baby, right?

25    A.  Right.

1  Q.  But at the same time, she has this massive infection going

2  on that you say could not have been addressed, correct?

3  A.  Correct.

4  Q.  And from part of what you say with regard to this

5  infection, you say that it was so far advanced that nothing

6  could be done, yet this baby has normal Apgar scores, correct?

7  A.  Correct.

8  Q.  Now, part of this infection would be that the lungs itself

9  would be filling up with fluid and things and just having

10  infection in the lungs, correct?

11  A.  Yes, but at the same time, in the first hours of life, the

12  baby is expelling the fluid that was in the lungs from their

13  life in utero.

14  Q.  I guess my question is that what we are looking at is,

15  unfortunately, we had nurses who were examining this child and

16  gave normal Apgars and gave normal respirations to a baby that

17  you are telling the jury had an overwhelming infection at the

18  time of its birth?

19  A.  Right.

20  Q.  And you were just asked some questions with regard to

21  whether or not earlier antibiotic use could have affected this

22  case and I wrote down your answer.  You said I don't know for

23  sure.  Previously you said that there was no way.

24  A.  I apologize if I used the phrase no way.  I think, for me,

25  it's impossible to say with 100 percent certainty.  I don't

1    think this baby had a chance.  I really don't.  I wish it was

2    otherwise.  I really don't.  I'm trying to express myself as

3    clearly as possible, but that's what my opinion is.  I don't

4    think this baby had a chance.

5    Q.  And that's based upon the assumptions in the record that

6    Ms. Koczan pointed out to you.  But based upon the assumptions

7    of the records that I gave you, if you believe what I told you

8    about the baby's condition for the two hours before it got to

9    the nursery, you don't know for sure whether or not there was

10   a chance lost, correct?

11   A.  We don't know what would have happened.

12   Q.  Right.  And that's sort of the problem here, because we

13   don't know what the baby's condition was for two hours, right?

14   A.  No.  All we can do is look at what the baby's condition

15   was when it's been charted.

16   Q.  Right.  And there's no charting from 5:30 until 7:00,

17   correct?

18   A.  I would want to, like, eyeball it completely, but I don't

19   think so.

20          MR. PRICE:  That's all the questions I have, Your

21   Honor.

22          THE COURT:  No further questions for Ms. Koczan or

23   Mr. Colville, correct?

24          MR. COLVILLE:  No.

25          THE COURT:  They are indicating no.  Doctor, you may

61

1    step down.  I trust the doctor can also be excused at this

2    time.  Dr. Coffin, thank you for your appearance and safe

3    travels home.

4         (Witness excused.)

5              THE COURT:  Ladies and gentlemen of the jury, we're

6    going to take our midmorning break at this time.  We have been

7    working prior to you all entering, and so to that end, we're

8    going to break until quarter to 11:00.  I understand we'll

9    next be hearing from Dr. Ringer.

10             Once again, leave your pads and your binders with

11   exhibits on your chair.  Don't communicate.  You don't

12   research.  You don't talk yet.  Enjoy your break.  We'll see

13   you back here at quarter to 11:00.

14        (Jury excused.)

15        (Recess taken.)

16        (Jury present.)

17             THE COURT:  Doctor, you are going to come up here.

18   Ladies and gentlemen, as I indicated, Dr. Ringer is our next

19   witness.  Mr. Galovich, please administer the oath.

20             THE CLERK:  Please state and spell your name for the

21   record.

22             THE WITNESS:  Steven Allen Ringer, R-I-N-G-E-R.

23        (Witness sworn.)

24             THE COURT:  Thank you, Mr. Galovich.

25             Dr. Ringer, watch your step as you climb into the

1    witness box.  It's a little uneven there.  Once you are

2    situated, you can change the microphone so you are speaking

3    into it.  It slides.  It can go up and down as well.  There's

4    also water there in case you need it.

5              THE WITNESS:  That I do.

6              THE COURT:  It appears you have been given a binder

7    or you have a screen there.  I'm not sure what that is.

8              THE WITNESS:  Screen.

9              THE COURT:  Ladies and gentlemen, as I've given this

10   limiting instruction before, one more time, you are now going

11   to hear testimony concerning opinions from Dr. Steven Ringer,

12   who is a physician.  He'll offer his opinions because of his

13   knowledge, skill, experience, training and education in the

14   field of neonatology as well as the reasons for his opinions.

15        Once again, in weighing this opinion testimony, you

16   can consider all of his qualifications, the reasons for his

17   opinions and the reliability of the information supporting

18   those opinions as well as any other factors I'll ultimately

19   discuss with you in my final instructions about how you should

20   weigh testimony of witnesses.

21        The opinion of Dr. Ringer should receive whatever

22   weight and credit, if any, you think appropriate given all of

23   the evidence in this case.  You can also disregard his

24   opinions entirely if you decide that they are not based on

25   sufficient knowledge, skill, experience, training or

1    education.

2         You can also disregard his opinions if you conclude

3    that the reasons given in support of his opinions aren't

4    sound, or if you conclude that the opinions are not supported

5    by the facts shown by the evidence or if you think that the

6    opinions are outweighed by other evidence in this case.

7         Once again, in deciding whether to accept or rely

8    upon these opinions of Dr. Ringer, you can consider any bias

9    that he may have, including any bias that can arise from

10   evidence that Dr. Ringer has been or will be paid for

11   reviewing this case and testifying as well as any other

12   evidence that Dr. Ringer testifies regularly and makes any

13   portion of his income from testifying in court.

14        Ms. Koczan, you may proceed.

15        MS. KOCZAN:  Thank you, Your Honor.

16        STEVEN RINGER, M.D.  a witness herein, having been

17   first duly sworn, was examined and testified as follows:

18                     DIRECT EXAMINATION

19   BY MS. KOCZAN:

20   Q.  Good morning, Doctor.

21   A.  Good morning.

22   Q.  Can you please introduce yourself to the jury?

23   A.  Sure.  My name is Steven Ringer.  How much more should I

24   say?

25   Q.  What is your occupation?

1    A.  I'm a neonatologist.

2    Q.  And are you licensed to practice medicine?

3    A.  I am.

4    Q.  Is that in what states?

5    A.  In New Hampshire and Massachusetts.

6    Q.  Can you tell the jury what your current academic positions

7    are?

8    A.  Sure.  I'm a professor of pediatrics at the Geisinger

9    School of Medicine at Dartmouth.

10   Q.  In addition to that position, do you also hold an

11   appointment at Harvard?

12   A.  Not anymore.  I did.

13   Q.  Did you previously?

14   A.  Yes, I did.

15   Q.  Where do you reside?

16   A.  I reside in Hanover, New Hampshire.

17   Q.  Would you tell the jury about your education?  Start with

18   undergraduate, bring us up through your internship and your

19   fellowship.

20   A.  Sure.  My undergraduate degree was at Brandeis University

21   just outside of Boston, and then I went from there to Case

22   Western Reserve University where I received my M.D. degree and

23   my Ph.D. degree.  My Ph.D. was in biochemistry.  I finished

24   those in 1982, and I stayed in -- that's in Cleveland.  I

25   stayed in Cleveland at Rainbow Babies and Children's Cleveland

1    Metropolitan General Hospital for my residency in pediatrics,

2    finishing that in 1985.

3        I then went back to Boston to what was then called the

4    joint program in neonatology at Harvard Medical School which

5    was a program in neonatology that involved Brigham and Women's

6    Hospital, what was then the Beth Israel Hospital, and the

7    Children's Hospital in Boston, and I finished that in 1988.

8    Q.  You mentioned that that was -- I think you were

9    neonatology; is that correct?

10   A.  Yes.

11   Q.  I've also heard perinatal medicine.  Is that the same

12   thing?

13   A.  Yeah.  Well, so yeah, our board certification is called

14   neonatal perinatal medicine, and perinatal care meaning care

15   around birth, is a field that we share with obstetricians and

16   there are some specialists in obstetrics called

17   perinatologists.

18       Basically the division is we're coming at it from the side

19   of the baby.  They are coming at it from the side of the

20   mother, and obviously, the two are interlinked, so we both are

21   involved to some extent in the middle, if you will.

22   Q.  In terms of neonatology, what does that field encompass?

23   We heard about pediatrics and pediatric infectious disease.

24   What is neonatology?

25   A.  Well, the classic definition of a neonate is a baby up to

1    28 days of age, but what modern neonatology means is that we

2    care for babies sometimes before birth, during the process of

3    birth, and if they require hospitalization, immediately after

4    birth.  We care for them during that immediate hospitalization

5    that sometimes can last several months, so it's basically the

6    care of newborns specifically.

7    Q.  And, Doctor, in addition to what you've already described

8    in terms of your education, I also saw that you had some

9    further educational experiences.  Looking at your curriculum

10   vitae, I saw that you were a scholar in medical education,

11   curriculum planning and you also took a fellowship in medical

12   ethics.

13        Would you briefly explain to the jury what that's all

14   about?

15   A.  Sure.  The first one was a program that was offered to

16   people who had a specific interest in the teaching part of our

17   role as medical school faculty, so it was an intensive program

18   or actually I think a couple of intensive programs focused on

19   learning about education and how we could better train young

20   physicians and medical students.

21        The second one is because I've always had a strong

22   interest in medical ethics and have been very involved in it

23   within the hospitals, and that was a program that's offered

24   where you get additional, more formal training in that field.

25   Q.  And were all of those programs conducted and that training

67

1    occurred at Harvard Medical School?

2    A.  Yeah, they were.

3    Q.  Can you tell the jury what you have been doing since you

4    completed your fellowship?

5    A.  Sure.  After completing my fellowship, I took on a role

6    as -- I think at that point, it was called associate medical

7    director of the neonatal intensive care unit at Brigham and

8    Women's, which very quickly, over a short period of time,

9    evolved to be director of that unit.  So I have always had a

10   role, sort of an administrative organizational role, but

11   primarily, I've been taking care of newborns in the nurseries

12   and neonatal intensive care unit as well as being involved in

13   some research and teaching medical students, residents and

14   fellows.

15   Q.  I understand that your current practice is at Dartmouth;

16   is that correct?  What are your roles and responsibilities

17   there?

18   A.  Yeah.  Similar roles.  The position at Brigham and Women's

19   evolved to what was called the chief of neonatology or

20   division chief of neonatology, and then I made the decision to

21   move to Dartmouth about four years ago, where I am the chief

22   of neonatology, and the other things are very similar.

23       I'm caring for patients in the neonatal intensive care

24   unit and the nurseries as well as teaching residents, medical

25   students and fellows.

1    Q.  Are you board certified?

2    A.  I am.

3    Q.  And in what areas are you board certified?

4    A.  In pediatrics and in neonatal, perinatal medicine.

5    Q.  I think we've heard a number of doctors talk about board

6    certification.  I'm not sure we actually defined what that

7    means?  What does it mean to be board certified?

8    A.  Well, it means that you've taken specific training in an

9    area and then have passed specific qualifying examinations in

10   that area, and when I was first board certified, the process

11   was you took those exams and you were sort of good for life in

12   terms of your certification unless you did something bad, I

13   guess.

14       And subsequently, they've added, I think it's every ten

15   years, recertifications for people which involve another

16   examination, and when that program first came in, they offered

17   this voluntary, I think it was called maintenance of

18   certification examination, which I took, but the requirement

19   is, you know, I'm grandfathered in.

20   Q.  You don't have to take the recertification every year?

21   A.  Right.

22   Q.  What hospitals are you currently on staff at?

23   A.  Right now, I'm on staff at Dartmouth-Hitchcock Medical

24   Center and at Catholic Medical Center which is in Manchester,

25   New Hampshire.

1    Q.  You talked before about being the chief of neonatology at

2    the Children's Hospital at Dartmouth?

3    A.  Yes.

4    Q.  What sort of responsibilities do you have in that

5    position?

6    A.  Well, it's basically responsibility for the care of

7    newborns in the hospital, and in our particular instance, that

8    really extends out to providing advice and support and

9    guidance for hospitals across the region, and then

10   facilitating the careers of my faculty members of my division

11   as well as sort of the ongoing administration of the neonatal

12   units.

13   Q.  Are you a member of various professional societies and

14   organizations in the field of neonatology and perinatal

15   medicine?

16   A.  Yeah.  There's no real specific organization for just

17   neonatology, but I'm a member of the American Academy of

18   Pediatrics, which serves that role.

19   Q.  During the course of your career, have you been the

20   recipient of various honors and awards?

21   A.  Yes.

22   Q.  And can you tell the jury about a few of those?

23   A.  God, yeah.  Some of them long ago, but teaching awards, I

24   think primarily and various other local and regional

25   recognitions for providing, I guess, a good care.

1    Q.  During the course of your practice, have you been invited

2    to give lectures both nationally and internationally?

3    A.  Yes.

4    Q.  And can you tell the jury whether any of those national or

5    international lectures or presentations dealt with any of the

6    subjects we're going to be talking about here today?

7    A.  I don't think so specifically.  It's possible that in some

8    of the teaching sessions, some of the issues related to this

9    case came up.

10   Q.  Do you also write?

11   A.  Yes.

12   Q.  Have you authored various publications?

13   A.  Yes.

14   Q.  Can you give the jury some idea of how many publications

15   you have been the author of?

16   A.  I think I've been the author or co-author of -- I forget

17   really, but I think somewhere around 45 or 50.  It sort of

18   depends on which things get counted, including original

19   articles in the medical literature, book chapters and

20   educational materials.

21   Q.  Do any of those have to do with the subjects we're talking

22   about here today?

23   A.  Not directly or specifically.

24   Q.  And do you conduct research?

25   A.  Yes, I do, a little bit less now since I moved to

1    Dartmouth, but yes.

2    Q.  And what has the research generally been about?

3    A.  Well, it's been involved with a lot of -- well, there have

4    been several things, but a lot of it is focused on care of

5    premature newborns.  Some on issues of global health or health

6    in developing countries, and those have been probably the

7    primary.

8    Q.  During the course of your practice, and I look back, and

9    it looks like you have been practicing for about what?  31

10   years?  Does that sound accurate?

11   A.  I guess so, yeah.

12   Q.  During the course of that 31 years, have you seen and

13   treated babies that had meconium noted at birth?

14   A.  Oh, yes.

15   Q.  And can you give the jury some estimate of how many that

16   you have seen babies like that?

17   A.  Well, meconium at birth is not at all uncommon, so I mean,

18   I would guess thousands probably.

19   Q.  And you said that it's not uncommon.  How frequently does

20   that happen?

21   A.  Well, around term, so generally thought of as somewhere

22   between 38 and 42 weeks of gestation, somewhere between 12 and

23   15 percent of newborns will have -- will pass meconium in the

24   process of birth.

25   Q.  Have you also seen and treated babies who have had

1  meconium aspiration?

2  A.  Yes.

3  Q.  Meconium in the lungs.  Again, is that something rare or

4  unusual?

5  A.  It's less frequent than it used to be, but it is not

6  unusual.

7  Q.  And what about babies with neonatal sepsis?  Have you had

8  the opportunity during your 31 years to care for babies with

9  just generally neonatal sepsis?

10  A.  Yes.

11  Q.  And is that something that you see frequently?

12  A.  Yeah.  I mean, again, it depends on how you define

13  frequently, but it's a well-known problem, much less common in

14  the United States than elsewhere in the world, but still

15  occurs, you know.  We see several cases a year.

16  Q.  And what about E. coli sepsis in particular?  Have you had

17  the opportunity to see and treat babies who have had that

18  condition?

19  A.  Oh, yes, I have.

20  Q.  And can you give the jury some idea of how many of those

21  types of patients you have treated over the years?

22  A.  Well, probably over, you know, all the years I've been

23  practicing, at least dozens, if not more than that.

24  Q.  And during the course of your career, have you been asked

25  to review medical-legal cases like this one?

1   A.  Yes.

2   Q.  And when did you first start doing that?

3   A.  I think sometime around 1992 or something like that.

4   Q.  And can you give the jury some idea of how many of those

5   cases you've reviewed over the course of your career?

6   A.  It would be a complete guess.  I try to limit the number

7   of cases that I accept for review, so I typically don't accept

8   more than a maximum of ten or 12 a year, and certainly in the

9   first several years, it was far fewer than that, so probably a

10  few hundred, but I don't know.

11  Q.  In terms of coming to court to testify, how many times

12  have you done that?

13  A.  I think maybe 25, plus or minus.

14  Q.  And in terms of your review of cases, is it primarily for

15  one side or the other?  Plaintiffs versus defendants?

16  A.  Not by any design, but I think earlier in my career, it

17  seemed to be that I got more requests from plaintiff's

18  attorneys, and now I seem to get more requests from defense

19  attorneys, but I still review cases for either plaintiffs or

20  defendants.

21          MS. KOCZAN:  At this stage, I would offer Dr. Ringer

22  as an expert in the fields of neonatal and perinatal medicine.

23          THE COURT:  Mr. Colville, any questions?

24          MR. COLVILLE:  No.

25          THE COURT:  Mr. Price?

1          MR. PRICE:  I'll reserve.

2          THE COURT:  At this point, the court accepts

3     Dr. Ringer as an expert in the fields of neonatal medicine and

4     perinatal medicine.  His being board certified in both

5     pediatrics and neonatal/perinatal medicine.

6     BY MS. KOCZAN:

7     Q.  Doctor, were you asked by me to review various medical

8     records and other materials in this case?

9     A.  I was.

10    Q.  And as I've been doing, I'm just going to read you a list

11    rather than have you try to remember everything that I sent

12    you.

13    A.  Thank you.

14    Q.  Did you have a chance to look at the complaint that

15    started this action?

16    A.  Yes.

17    Q.  Did you look at Carissa Peronis's Heritage Valley medical

18    records?

19    A.  I did.

20    Q.  Kendall's medical records?

21    A.  Yes.

22    Q.  The West Penn Hospital LifeFlight record?  Did you take a

23    look at those too?

24    A.  Yes, I did.

25    Q.  Did you also have a chance to read the depositions that

1    were taken in this case, including those of Carissa Peronis,

2    Matthew Fritzius, Jamie McCrory, Chelsey Paff, Katherine

3    Gantz, Barbara Hackney, Judith Ash, Maria Hendershot,

4    Dr. Heiple, Dr. Jones, Dr. Dumpe, Kylee Fritzius,

5    Dr. Goldstein and Dr. Min?

6    A.  Yes.

7    Q.  Have you also had a chance to take a look at the expert

8    reports, not only those of plaintiffs' experts, which were

9    Dr. Zamore, Dr. Shore and Dr. Karotkin, but did you also have

10   a chance to see Dr. Boyd's report?

11   A.  I did.

12   Q.  And Dr. Coffin's report?

13   A.  Yes.

14   Q.  Have you also had a chance to look at the Heritage Valley

15   policies and procedures that are issued in this case, that

16   being the 2.4 and the 2.21 policy?

17   A.  I'll trust you on the numbers, but I think those are the

18   ones I looked at, yes.

19   Q.  Based upon your review of all of those materials, from a

20   perinatal neonatology perspective, can you tell the jury what

21   you believe this case to be about?

22   A.  Well, this is a case about a term newborn with E. coli

23   sepsis that progressed rapidly after birth and unfortunately

24   led to her death.

25   Q.  And based upon your review of those records, did you form

1    certain opinions about the care that was provided here?

2    A.  I did.

3    Q.  And the first opinion that I want to ask you about was

4    with regard to attendance by a pediatrician at the time of

5    birth.  Let me just ask you this question:  Did you form an

6    opinion as to whether either Dr. Dumpe or the nursing staff

7    were required or should have called a pediatrician to attend

8    Kendall's delivery, given the fact that there was meconium

9    that had been noted during labor, that there was a use of a

10   vacuum extractor and that Dr. Dumpe did a prophylactic

11   performance of the McRoberts Maneuver?

12   A.  I did.

13   Q.  What was your opinion?

14   A.  My opinion was that, at least from looking at the

15   policies, they weren't required to summon a pediatrician.

16   Q.  And even if they weren't required to summon a

17   pediatrician, under the -- given those chains of events, would

18   it have been appropriate or was it necessary?

19   A.  I don't think it was necessary.  That decision is

20   typically at the discretion of obstetricians and/or obstetric

21   caregivers, so I don't think it would have been inappropriate

22   for them to do it, but I don't think that, under those

23   circumstances, it would have been necessary or usual for that

24   to happen.

25   Q.  The mere fact that meconium was present, does that require

1    a pediatrician to be present?

2    A.  Well, that's a great -- that's been a great debate in

3    neonatology, but it doesn't require a pediatrician.  I think

4    the requirement is that actually for all deliveries that there

5    should be someone there who is capable of initiating

6    resuscitation that a newborn needs, and with meconium, if

7    there's someone there who has skills in intubation, in 2014,

8    that was recommended.

9    Q.  And, Doctor, if someone is neonatal resuscitation trained,

10   would that be an appropriate person to have present at

11   delivery?

12   A.  Yes.  I mean, the neonatal resuscitation program or NRP is

13   an educational program designed to ensure that caregivers are

14   trained, and if they've completed the course and maintained

15   their engagement, then they are perfectly adequate.  I think

16   it varies from hospital to hospital as to what their exact

17   style is, but, you know, who gets invited to different births,

18   but having NRP -- I'll use the term certified even though NRP

19   hates that term.  People who completed NRP training is the

20   standard.

21   Q.  Okay.  And in this case, are you aware that Maria

22   Hendershot, the delivery nurse, was NRP trained?

23   A.  Yes.

24   Q.  As was Dr. Dumpe?

25   A.  That's correct.

78

1    Q.  Would that meet the appropriate standard to have those

2    types of --

3    A.  I believe so, yes.

4    Q.  Based upon this child's condition at delivery, and we'll

5    take a look at the records later, but do you have an opinion

6    as to whether the administration of antibiotics would be

7    necessary at that time?

8    A.  I do.

9    Q.  And what is that opinion?

10   A.  It wouldn't have been.

11   Q.  If a pediatrician had been called, in your opinion, would

12   there have been anything for the pediatrician to do at the

13   time of Kendall's delivery given her condition and the

14   assessments done at that point?

15   A.  No, not more than the usual things that were done.

16   Q.  Now, given Kendall's condition at the time of birth, the

17   Apgar scores and the assessment, do you have an opinion as to

18   whether it was appropriate for the staff to allow Kendall to

19   stay with her mom and dad and bond at that time as opposed to

20   going to the nursery or anything else?

21   A.  I do.

22   Q.  What is your opinion on that?

23   A.  My opinion was that it was entirely appropriate.

24   Q.  And we've heard lots of testimony about lack of

25   documentation regarding Kendall's condition from 5:20 until

1    she was brought to the nursery at 7:00 a.m., that there were

2    no additional assessments done.

3        Is that the typical course in these circumstances?

4    A.  Yes.  In my experience, that's a typical course in the

5    first hour or so after birth when you are trying to facilitate

6    interaction between what, by all indications, appears to be a

7    healthy baby and her parents.

8    Q.  Did you also form an opinion as to whether there was any

9    evidence in this medical record or based upon the testimony of

10   the medical professionals that there was anything going on

11   with Kendall prior to 7:25 a.m. when she was assessed in the

12   nursery?

13   A.  I did.

14   Q.  What was your opinion?

15   A.  I couldn't find any indication of a problem during that

16   time period.

17   Q.  Did you also form an opinion as to whether the actions of

18   the resident, Dr. Heiple, were appropriate in keeping with the

19   standard of care?

20   A.  Yes.

21   Q.  And what was your opinion with regard to that?

22   A.  My opinion is that they looked to be appropriate.  He was

23   called and evaluated the baby in short order.  I think all of

24   that was appropriate.

25   Q.  What about Dr. Jones and her actions?  We've heard some

1    testimony in this case from the plaintiffs' experts that they

2    have no criticisms of what Dr. Jones did once she arrived,

3    that they thought she did a great job.  Do you agree with

4    that?

5    A.  I do.

6    Q.  Do you also have an opinion as to what caused Kendall's

7    death?

8    A.  Yes.

9    Q.  What is that opinion?

10   A.  E. coli sepsis.

11   Q.  And do you have an opinion as to whether earlier

12   treatment, including the administrations of antibiotics, would

13   have made any difference in Kendall's outcome, given that

14   E. coli sepsis?

15   A.  I do.

16   Q.  What is your opinion?

17   A.  In my opinion, earlier administration would not have

18   changed the outcome in this case.

19   Q.  And can you tell the jury why you hold that opinion?

20   A.  Well, I think for a couple of reasons.  I mean -- and I

21   suppose it all depends on what "earlier" means.  I think,

22   first of all, there's evidence that the infection had been

23   developing for a long period of time, I mean, before labor and

24   delivery or at least the last several hours, and so in an

25   infection that has progressed to that point, it's unlikely, in

81

1    my opinion, that a difference of an hour in antibiotic

2    administration or a couple of hours would have made a

3    difference, and I see no indication for administering

4    antibiotics or thinking about administering antibiotics

5    earlier than that, so that's -- I think I've answered your

6    question.

7    Q.   I think you have.  What I want to do now is switch gears

8    for just a minute and talk about neonatal sepsis and

9    particularly E. coli sepsis.  You said you have experience

10   with that.

11        Can you tell the jury generally, and they've heard what it

12   is, can you tell the jury generally what the course is with

13   neonatal sepsis caused by E. coli?  What happens?  The general

14   course.

15   A.   Sure.  To the best of our knowledge, I mean, E. coli is a

16   common bacteria.  We all carry it in our bodies, and most of

17   the time, as I think we would probably all understand, it's a

18   friend of ours, you know.  It's doing its job while we are

19   doing ours, but it can, in certain circumstances, cause

20   infection.

21        Characteristically, I mean, neonatal sepsis in a general

22   sense is characteristically a severe disease that has often a

23   fairly rapid presentation and onset, and among the pathogens

24   that can cause neonatal sepsis and infection, E. coli and

25   other gram negative bacteria tend to be the worst.

1        So the clinical course can be somewhat variable, but it's

2    not unusual for babies to appear generally well up to a

3    certain point and then rapidly decompensate and for the

4    disease to progress in a very severe fashion thereafter.

5        Part of that is due to the infection itself.  Part of that

6    is due to the body attempting to fight the infection, and as

7    the bacteria are destroyed, they release powerful compounds

8    that cause an inflammatory or sepsis-type response that is

9    often devastating for the body, results in shock, organ

10   failure, et cetera.

11       In the neonate, the disease can spread rapidly throughout

12   the body and affect essentially all of the major organs.

13   Typically infection that begins right around or the time of

14   birth, for whatever reason, it usually spares the brain and

15   central nervous system, but anything is possible, but liver

16   failure, cardiac failure, bronchopneumonia with respiratory

17   failure are all components of the disease.

18   Q.  In this particular case, we've heard testimony and

19   evidence that this baby, when she was first born, was healthy,

20   Apgar score of eight, normal assessment, comes to the nursery

21   at 7:00.  Has normal vital signs at 7:00, and then at 7:25,

22   things begin.

23       Is that kind of the typical course?

24   A.  Unfortunately, that's a course that commonly occurs within

25   the babies that get this disease and, you know, where a baby

1    who was well, well-appearing 30 or 45 minutes earlier, starts

2    to show symptoms and rapidly progresses from there.

3    Q.  We've had discussion with other physicians, and I think I

4    had asked the question is it the situation that the baby

5    compensates for a certain period of time and then essentially

6    falls off a cliff?  Is that what happens?

7    A.  Yeah.  I think that's, in essence, what happens.  I mean,

8    particularly with this bacteria and the release of various

9    chemical compounds from the bacteria themselves as well as the

10   tissues in the body that are fighting the infection.

11       You can develop a situation where the patient is in what's

12   called warm shock, so their blood vessels are becoming more

13   dilated because of these chemical compounds, and initially,

14   when they are able to compensate for that and maintain their

15   blood pressure, sometimes patients actually look extra good.

16   Sometimes people will comment that they actually look pinker

17   than the next baby down, but as that process continues, they

18   reach a level where they are unable to support their blood

19   pressure, perfuse their organs and basically everything falls

20   apart.

21   Q.  I'd like to talk now about Kendall's care, and the jury

22   has been over this.  I don't mean to be boring, and we'll move

23   through this quickly.  We've seen the initial Apgar scores.

24   I'm going to put that up again here so you have reference.

25   It's 1115.  And up in the corner there, without going through

1    them and discussing them, these are the five minute Apgar

2    scores.  Is that a good Apgar score?

3    A.  Yes, it is.

4    Q.  Does that indicate a healthy baby?

5    A.  Yes.

6    Q.  Before we talk a little bit more about that, let me ask

7    you this question:  During the course of Kendall's delivery,

8    Dr. Dumpe ended up using a vacuum extractor because of

9    maternal exhaustion.  Is that unusual?

10   A.  I don't think it's unusual.

11   Q.  Does that require a pediatrician to be present?

12   A.  I think, again, it's at the discretion of the obstetrician

13   in terms of what they think is going on and how much effort is

14   going to be required.

15   Q.  We've heard that Dr. Dumpe did the McRoberts Maneuver to

16   prophylactically prevent shoulder dystocia.  Does that require

17   a pediatrician to be present?

18   A.  I don't think so.  I mean, I'm not an obstetrician so I'm

19   not sure I can fully comment on it, but I mean, shoulder

20   dystocia is a bad thing, and that would require a pediatrician

21   to be present.

22   Q.  If it occurred?

23   A.  Lack of shoulder dystocia wouldn't.

24   Q.  In this case, from your review of the record, was there a

25   shoulder dystocia?

1    A.  No, not that I could find.

2    Q.  So putting those altogether, this baby during delivery had

3    meconium, vacuum extractor, the prophylactic maneuver to

4    prevent a shoulder dystocia, was there any reason that a

5    pediatrician should have been present at that time?

6    A.  I don't see any reason why it was necessarily required,

7    you know, and again, I think it would be at the discretion of

8    the obstetrician.

9    Q.  And in terms of what happened afterwards when the baby was

10    born and the Apgars were assigned, that eight, that's a

11    healthy baby; is that correct?

12    A.  Yeah.  To me, that indicates the baby appears to be

13    transitioning well and to be in the normal range.

14    Q.  And if we look at the bottom left-hand corner of that,

15    this is Nurse Hendershot's assessment.  Again, anything

16    abnormal there that would require the attendance of a

17    pediatrician?

18    A.  No.  Nothing is indicated as abnormal.  The only notation

19    is that she, I guess, didn't look at the anus, but that's not

20    abnormal.

21    Q.  In terms then of the picture at this point in time, this

22    is 5:20 at the time of delivery, first and foremost, is there

23    any reason that a pediatrician should have been called by the

24    nursing staff at that time?

25    A.  No.

86

1    Q.   Is there any reason at 5:20, based upon this assessment,

2    that this baby needed to immediately be sent over to the

3    nursery?

4    A.   No, not in my opinion.

5    Q.   Is there any reason at 5:20, based upon this assessment,

6    that she shouldn't be allowed to go -- to stay in the delivery

7    room with mom and dad and bond?

8    A.   I could see no reason for that.

9    Q.   Now, we have heard some testimony about earlier

10   administration of antibiotics.  Given this picture here, is

11   there any reason to give antibiotics at that time?

12   A.   No.  They are -- certainly not given this picture or the

13   known data that was available at the delivery.

14   Q.   Is there any reason at this point, given her condition, to

15   suspect that she was going to go on and have this overwhelming

16   E. coli sepsis?

17   A.   Unfortunately, there isn't.

18   Q.   And again, is that consistent with what you see with

19   babies who have this type of infection?

20   A.   Yes.

21   Q.   I would like you to assume that Nurse Hendershot has

22   testified here that, per her documentation and chart -- have

23   you had a chance to see her notes of her evaluation of

24   Carissa?

25   A.   Yes.

1    Q.  That she was in to assess Carissa every 15 minutes, and

2    during the assessment process, although not doing a full

3    assessment like was done here, she would have observed the

4    baby, and had anything unusual been occurring, she would have

5    taken the baby to the nursery or she would have alerted a

6    pediatrician, that type of thing.

7        Is that the normal protocol?  Is that what generally

8    happens?

9    A.  Yeah.  I tell you that's entirely the standard approach,

10   so nothing unusual about that.

11   Q.  And would you expect a nurse who is NPR --

12   A.  NRP.

13   Q.  -- NRP certified, has 31 years of experience, to be able

14   to recognize if there were abnormalities?

15   A.  Yes.

16   Q.  And if a baby is grunting, flaring and retracting, is that

17   something that a nurse trained like that would be able to

18   recognize?

19   A.  She should be.

20   Q.  Now, we know that this baby was brought to the nursery

21   sometime between 6:50 and 7:00 a.m.  What I want to ask you

22   about is the vital signs.  Let's put those up there, and I

23   believe that was 1165.  If we can just highlight that top

24   section.  The jury has seen this before, but these are the

25   vital signs that were taken at 7:00 a.m.

1      Is there anything at all abnormal with these vital signs?

2    A.  No, not that I can see.

3    Q.  And are these vital signs consistent at that time with a

4    healthy baby with no evidence of infection going on?

5    A.  Yes, they are.

6    Q.  There has been some suggestion here that, had vital signs

7    been taken or an assessment been done at 6:00 or 6:15 or 6:30

8    or 6:45, any of those times, that somehow something would have

9    been noticed here that would have been abnormal that could

10   have been acted on.

11     Given the fact that the vital signs at 7:00 were normal,

12   does that make any sense?

13   A.  It doesn't to me.  I mean, since we know what subsequently

14   happened, this is a progressive disease, so it's hard for me

15   to imagine that vital signs would be abnormal and then normal.

16   I would expect, if they were abnormal earlier, that they would

17   continue to be abnormal or get worse.

18   Q.  These vital signs that were taken were perfectly normal,

19   correct?

20   A.  Yeah.  I mean, there's nothing in them that would raise a

21   concern.

22   Q.  We've also heard testimony in this case that prior to the

23   baby being brought to the nursery that the baby was crying,

24   and I think some of the testimony was she was inconsolable,

25   she was crying, that type of thing.

1        Is that a sign of infection?

2   A.  I mean, not typically.  I mean, it's hard to know exactly

3   what that means.  I mean, many babies will cry in the initial

4   period after birth, but crying, in and of itself -- I mean,

5   it's more typical for a baby with infection to be less active,

6   but again, that's highly variable, so I don't know, in and of

7   itself, what can be made of that report.

8   Q.  So based upon these vital signs and your testimony that if

9   they are normal at 7:00, they were probably normal at 6:00,

10  6:15, 6:30, 6:45, up through this time, is there any reason to

11  suspect that there's infection for which further intervention

12  should have been done?

13  A.  I don't see any.

14  Q.  Now, we know from the record, and the jury has seen this

15  numerous times now, that at around 7:25, 7:20, 7:25, Jamie

16  McCrory noted that this baby was dusky, and there's some

17  question about what else she noted, whether there were

18  breathing difficulties or whatever.

19       Based upon your review of the record, is that the very

20  first time that you see anything that would indicate that

21  there might be something going on here?

22  A.  Yes.  From the record, that's the first time.

23  Q.  And let's put up Jamie's note, and that's 1167 and then

24  put 1172.  We looked at this before side by side.  What I want

25  to ask you about is the signs and symptoms at this time.  Can

1    you just generally talk about what they were?

2         MR. PRICE:  Your Honor, may I object?

3         THE COURT:  Sidebar.

4    (At sidebar.)

5         THE COURT:  Mr. Price?

6         MR. PRICE:  Your Honor, these are literally the same

7    questions that were asked of the first expert.  Under Rule

8    403, you have a discretion to limit testimony based upon

9    cumulative evidence, undue delay and a waste of the jury's

10   time, and while Ms. Koczan has the right to bore this jury to

11   death, I think that at some point, cumulative evidence has to

12   be stopped and real questions of different experts have to be

13   asked.

14        THE COURT:  Ms. Koczan?

15        MS. KOCZAN:  Your Honor, I just wanted him to talk

16   about what he saw and what the evidence was and I'm going to

17   be asking him opinions about that.  He's entitled to give his

18   opinions about that, but he has to be able to articulate what

19   it was.

20        THE COURT:  He has to be able to provide a foundation

21   what in the record is important to him, but there's a lot of

22   cumulative testimony, and I can see it's wearing on this jury.

23        MS. KOCZAN:  I'll move it along.

24   (In open court.)

25   Q.  Doctor, you have had a chance to look at those records.

1    We put them up.  You saw what the signs and symptoms were at

2    that time?

3    A.  Yeah.  Let me just orient myself.  So this is her note at

4    7:25.

5    Q.  7:25 a.m.

6    A.  And I think several things are abnormal there.  I think,

7    first of all, there's the place where the marker is that notes

8    that the baby is grunting, flaring and retracting, so has an

9    abnormal respiratory pattern, and quite typically in newborns,

10   those are -- some subset of those three phenomenon is what you

11   see.

12       Grunting, which is just what it sounds like, expiring

13   against sort of a closed glottis, so that type of noise

14   (demonstrating), flaring, which is nasal flaring which

15   newborns do ostensibly to try to increase airflow, and

16   retractions are just that the muscles between and around the

17   ribs are pulling in, whereas normally, when they expand

18   outward, and all three of which indicate some difficulty in

19   breathing.

20   Q.  Now, we know the jury has already seen and heard that when

21   Jamie went in and assessed Kendall, she put a pulse ox on,

22   that it was 81 percent and she placed the baby under an oxy

23   hood.  Were those all appropriate interventions?

24   A.  Yes, they were.

25   Q.  And in addition to that, she also called the resident,

1    Dr. Heiple.  Was that an appropriate intervention?

2    A.  Yes.

3    Q.  And the jury has already heard Dr. Heiple testify about

4    what he did when he came in and what his assessment was.  I

5    don't want to go over that again, but his actions -- and I

6    wanted to ask you about this.  I'd like you to assume that he

7    testified that, when he assessed the baby, her O2 sat was now

8    up to 94 percent, that she was looking okay at that moment and

9    that he did not call Dr. Jones at that point because he knew

10   that she would be in very shortly and she would be assessing

11   the baby.

12       In your opinion, were his actions at that time

13   appropriate?

14   A.  Yes.

15   Q.  Did they in any way deviate from the standard of care?

16   A.  Not that I can see.  I mean, I think particularly, since

17   he specifically knew that the physician was en route, so I

18   mean, I don't know how it would have changed things to notify

19   her a few minutes earlier.  She was already on her way there,

20   and that sounds like something fairly standard.

21   Q.  And at that point, was it also reasonable for him to allow

22   her to assess the baby and make determinations about

23   additional interventions?

24   A.  Yeah, because, I mean, she arrived shortly thereafter,

25   yes.

1    Q.  And, Doctor, at that moment in time, do you have an

2    opinion as to whether Dr. Heiple should have ordered

3    antibiotics or anything like that at that point?

4    A.  I think he would have typically waited for the attending

5    physician, knowing that it was going to be a few minutes

6    difference.

7    Q.  I would like you to further assume that when Dr. Jones got

8    there, she ordered, and you saw her deposition, she ordered a

9    variety of things, including antibiotics.  Again, were her

10   actions appropriate?

11   A.  They sure look appropriate to me.

12   Q.  And was it appropriate for her to have ordered the

13   transfer of this baby under the circumstances?

14   A.  Yes.

15   Q.  Now, we've heard a lot about the antibiotic

16   administration.  I want to ask you some questions about that.

17   There has been testimony in this case that the orders were

18   entered by Dr. Heiple at 8:30 although Dr. Jones had

19   previously been given -- had given a verbal order earlier than

20   that, and that the antibiotics, first and foremost, were

21   ampicillin and gentamicin.

22       Let me begin by asking you this:  Were those appropriate

23   antibiotics to order under the circumstances?

24   A.  Yes, they were completely correct.

25   Q.  And why are those the appropriate antibiotics?

1    A.  Well, again, as I sort of alluded to earlier, there are a

2    number of organisms that are the more common causes of sepsis

3    in the newborn, so worrying about infection immediately after

4    birth in the United States, we typically worry about a group B

5    strep, E. coli and, to some extent, listeriosis, which is a

6    less common bacteria, and so we start with the empiric

7    cocktail of ampicillin and gentamicin, because it generally is

8    effective against those three organisms as well as many

9    others, but it's primarily to treat those three or if one of

10   them turns out to be present.

11   Q.  And in the hospital setting such as this, when you order

12   an antibiotic, is it immediately available for you to give

13   generally?

14   A.  No.

15   Q.  Why is that?

16   A.  Well, that used to be the practice.  I mean, fairly

17   quickly available, in that antibiotics were stored on the

18   floor, and depending on the hospital, nurses would draw them

19   up, but I think -- I'm sure actually that the standard

20   practice in hospitals across the United States is that the

21   antibiotics are made up by the pharmacy in the appropriate

22   dose because of appropriate concerns about safety of drawing

23   up the antibiotics, measuring the correct dose, ensuring that

24   they're placed in syringes in the proper way, et cetera, so

25   all of that unfortunately takes some time to get the

1    antibiotics from the pharmacy, and in my experience, it's

2    typically on the order of an hour to an hour and a half

3    sometimes before antibiotics are given.

4    Q.  In this case, we know that the ampicillin was administered

5    sometime after 9:00 a.m.  In your opinion, was that timing in

6    any way inappropriate?

7    A.  No.  I think that's pretty standard.

8    Q.  And we've also heard that they did not administer the

9    ampicillin and gentamicin at the same time.  Again, is that in

10   any way unusual?

11   A.  No.  I think that's the only way you can do it.  I think

12   you can't give them both, and you would have to ask a

13   pharmacist exactly why this is a bad idea or the nurse, in

14   terms of flow rates on pumps and things like that, so they are

15   always given sequentially.

16       In my experience, for whatever reason, most commonly the

17   ampicillin is given first.

18   Q.  Why is that?

19   A.  Well, I think the bugs that you are most worried about are

20   usually sensitive to ampicillin, and that would be group B

21   strep, and virtually all or most of community acquired

22   E. coli, but like I say, you have to give both and you have to

23   give them sequentially.

24   Q.  And, Doctor, the ampicillin, is that something that the

25   nurse can just inject immediately, or does it have to infuse

1    via IV over a period of time?

2    A.   Yeah.  It has to infuse.

3    Q.   And typically, how long does that have to take?

4    A.   I think ampicillin goes in over 30 to 45 minutes.

5    Q.   So if this ampicillin was hung somewhere shortly after

6    9:00, it would have been like 9:30, 9:40 before you could

7    start the next one?

8    A.   That's what I would expect.

9    Q.   If it was 9:10, it would have been 9:50, something like

10   that?

11   A.   Yeah.

12   Q.   Then gentamicin would have been hung.  Again, is that

13   appropriate that it was hung somewhere around 9:50 in this

14   case?

15   A.   Yes, to follow the ampicillin.

16   Q.   There has been some suggestion that because the gentamicin

17   wasn't hung until 9:50, it was somehow delayed and a deviation

18   from the standard of care.  Do you agree with that?

19   A.   No, for basically the same reason.  I mean, they are both

20   important.  They have to be given sequentially, so you have to

21   give one, then the other.

22   Q.   And we've seen some lab work in this case.  I'm not going

23   to put it up, but one of the things we saw was the neutrophil

24   count was three percent.

25        What does that tell you about the extent and duration of

1    this infection?

2    A.  Well, to me, it says the infection is clearly already well

3    established and likely had been going on for several hours to

4    some extent, if not longer, and that at least at that point,

5    it suggests that the baby's ability to mount a response to the

6    infection was failing.

7    Q.  And I'm not going to ask you to go through the

8    resuscitation.  I think the many other doctors that have

9    testified have talked about that, but was or were the events

10   that occurred during the resuscitation again consistent with

11   the clinical course of an overwhelming E. coli sepsis?

12   A.  Yeah, and I mean, I think not only were the actions

13   appropriate, but they considered even somewhat outlying

14   possibilities, including whether the administration of

15   surfactant might improve the baby's pulmonary status, because

16   the infection can interfere with the function of surfactant,

17   and then initiating inhaled nitric oxide because of concern

18   about persistent pulmonary hypertension, so it appears that

19   everything that was possible was done, at a minimum.

20   Q.  And, Doctor, there has been a major issue in this case

21   about whether earlier administration of antibiotics would have

22   made any difference.  In your opinion, if they had given

23   antibiotics at 6:30, would it have made any difference here?

24   A.  Well, no, I don't think so.  I mean, I pause because I

25   can't think of any indication to give them then, but I think

98

1  at that point, the infection was already developing.  It's

2  hard to say that there's any likelihood that that much of a

3  difference in the antibiotics would have made a difference.

4  Q.  We've heard questions about, well, we don't know what was

5  happening at 6:30 because there was no documentation, but does

6  that 7:00 a.m. vital signs give you some clue as to what was

7  going on?

8  A.  Well, it does, you know, for the reasons that I think I

9  already mentioned.  This is a progressive disease.  It gets

10  worse, and so if the vitals were normal at 7:00 a.m., it's

11  hard for me to imagine that they would have been overly

12  abnormal at 6:30.

13  Q.  Prior to the events of 7:25 a.m., was there any reason to

14  give antibiotics or to consider it?

15  A.  Not that I could see.

16  Q.  Would an earlier administration of antibiotics at any time

17  during the course, 6:00, 6:15, 6:30, 6:45, 7:00, 7:30, 8:00,

18  8:30, would that have made any differences in the outcome in

19  this case, in your opinion?

20  A.  In my opinion, it's very unlikely that it would have made

21  any difference whatsoever.

22  Q.  There has been questions posed to one of the other experts

23  about a chance.  Was there any chance?  In your opinion, based

24  upon what you saw, was there any chance for a different

25  outcome in this case, given this child's E. coli sepsis?

1    A.  Well, not given -- in my opinion, not given the way --

2    given the way that the case unfolded where there was no marker

3    that would prompt earlier evaluation and administration of

4    antibiotics, I can't see where there was an opportunity to

5    change the outcome, so no.

6    Q.  One other question I wanted to ask you about is meconium.

7    Based on your review of these records, do you believe that

8    meconium and the aspiration of meconium played any role in the

9    clinical course here?

10   A.  It's hard to say it played no role whatsoever, because we

11   know that there was some evidence of meconium being present in

12   the lungs, but meconium aspiration is usually evident by

13   respiratory distress soon after birth, so the absence of

14   respiratory distress early on would, in my opinion, argue very

15   strongly against meconium being a significant factor, if any.

16   Q.  Doctor, just one final series of questions.  There has

17   been testimony in this case about the Heritage Valley policies

18   and procedures.

19       Based upon your review of the policies and procedures, do

20   you believe that they are in keeping with the standard of care

21   for such policies and procedures?

22   A.  In my opinion, they are in keeping with the standard of

23   care.  I mean, there's -- I think different institutions do

24   things differently and that's fine, but in terms of sort of

25   the basic standard of care, I didn't see anything in these

1    policies that stood out as a deviation from that.

2    Q.  And have all the opinions that you've rendered here this

3    morning been rendered within a reasonable degree of medical

4    certainty?

5    A.  They have.

6            MS. KOCZAN:  Thank you.  That's all the questions I

7    have for you.

8            THE COURT:  Mr. Colville, any questions of this

9    witness?

10            MR. COLVILLE:  No, Your Honor.

11            THE COURT:  Mr. Price?

12            MR. PRICE:  Sure.

13                        CROSS-EXAMINATION

14    BY MR. PRICE:

15    Q.  Doctor, shoulder dystocia, you said that if a shoulder

16    dystocia occurs, a pediatrician must be present at delivery,

17    correct?

18    A.  Well, I think typically, a pediatrician or somebody would

19    be requested.  I mean, if it occurs, I mean, most hospitals

20    where babies are being born, there may not be a pediatrician

21    there so they may arrive well after the birth, but typically

22    it would be an indication to request a pediatrician.

23    Q.  Typically, in shoulder dystocia cases, a McRoberts

24    Maneuver is done, correct?

25    A.  I don't know what's typical.

1    Q.  Tab 2, page 2.  This is the coding summary, and as you'll

2    see, the last issue is shoulder dystocia that was billed for

3    this procedure.  So you would agree with me that, if Dr. Dumpe

4    billed for a procedure involving a shoulder dystocia, that a

5    pediatrician must have been present at delivery, correct?

6    A.  No.  In my experience, I don't know -- I don't think -- I

7    think he has no choice but to code it that way, but I really

8    don't know, so -- I don't know that coding -- this coding

9    indicates that there was a shoulder dystocia.  His testimony

10   is that there wasn't, so I don't think I can say anything more

11   than that.

12   Q.  Well, as a doctor, you are only allowed to bill for the

13   procedures that you perform, correct?

14   A.  Well, that's true, but oftentimes in identifying a code,

15   you have to take a code that relates to what you are doing, so

16   I mean, I don't think that there's an exact -- I'm quite sure

17   that there's not an exact correlation between billing codes

18   and what happens clinically, so that's about all I can say

19   about that.  This is a billing code.

20   Q.  We'll leave it at that.  Can you go to the PowerPoint?

21   Now, I am going to ask you a pretty long hypothetical.  This

22   delivery, you had a delivery where the fetal strips were a

23   category two plus.  Do you agree with that?

24   A.  I don't really interpret the fetal monitoring strips, but

25   I think that's how they were interpreted.

1   Q.  There was an arrest of descent and operative delivery in

2   this case, correct?

3   A.  That's right.

4   Q.  There was a shoulder dystocia and McRoberts Maneuver,

5   correct?

6   A.  Again, I don't know that there was a shoulder dystocia.  I

7   think there was a McRoberts Maneuver.

8   Q.  And there was meconium present?

9   A.  That's right.

10  Q.  With all of these risk factors, it's your opinion that a

11  pediatrician did not need to attend this delivery?

12  A.  No, I don't -- I don't know that it was necessary.  I

13  don't think it would have been unreasonable.  I don't know

14  that it's necessary.

15  Q.  And this baby needed resuscitation with both bulb suctions

16  and deep suctions, correct?

17  A.  Yes.

18  Q.  Okay.  I'm going to ask you this hypothetical, because you

19  have been called in deliveries like this before, correct?

20  A.  Sure.

21  Q.  After being called to deliveries like this, you make plans

22  of care for babies, don't you?

23  A.  Depends on the circumstances, yeah.

24  Q.  And a lot of times -- this would be a typical type of

25  order.  I want you to assume that an order is being made to

1    monitor the baby every 15 minutes, and to monitor the baby

2    would include two things:  Vital signs be taken and a pulse

3    ox.  Okay?

4    A.  If that's what the standards were in the hospital.  I

5    think it varies from hospital to hospital.

6    Q.  But you have done plans of care like this before where you

7    said, hey, nurse, just monitor every 15 minutes for vital

8    signs or a pulse ox, correct, or and a pulse ox?

9    A.  I suppose so.  I think if it's a well-appearing baby, I

10   wouldn't specify.

11   Q.  Okay.  Well, I am asking you to assume that a plan of care

12   is set up that the baby is monitored every 15 minutes which

13   includes vital signs and pulse ox, okay?

14   A.  Okay.

15   Q.  Fifteen minutes later, family is enjoying the baby, the

16   baby is crying excessively, there's grunting seen.  An exam is

17   done which shows the pulse ox is a little bit low, okay.

18   A.  Okay.  So this is a hypothetical?

19   Q.  Correct.

20   A.  Okay.

21   Q.  Thirty minutes after birth, more family are in.  They are

22   enjoying the baby, but the baby is still crying excessively.

23   At this point, grunting is noted as well as a witness says

24   flaring and the pulse ox is dropping.  Do you agree?

25   A.  Well, there's nothing for me to agree with.

1    Q.    That's my hypothetical.

2    A.    I understand what you are asking, what you are painting a

3    picture of, sure.

4    Q.    Forty-five minutes after birth, this baby is still crying.

5    The family is reporting that the baby seems to be in pain,

6    still grunting and flaring and the pulse ox is still dropping.

7    Okay?

8    A.    I guess I have no idea what "still dropping" means.

9    Q.    The pulse ox is dropping from normal.

10   A.    Progressively?

11   Q.    Progressively.

12   A.    So now it's been 45 minutes?

13   Q.    Right.

14   A.    I mean, what's it dropped to?

15   Q.    We'll find out in a minute.  At one hour, do you believe a

16   pediatrician, in a situation like that, should examine the

17   baby?

18   A.    I mean, in a hypothetical situation like that, my

19   expectation would be that, you know, a pediatrician -- some

20   pediatrician might examine the baby, or a nurse, yeah.

21   Q.    You would also believe that a pediatrician, under this

22   hypothetical examining a baby, might find signs of respiratory

23   distress, correct?

24   A.    Well, the hypothetical you've painted describes

25   respiratory distress.

1    Q.  Correct.

2    A.  So, yes.

3    Q.  And under a situation where you find a baby in respiratory

4    distress, the first thing that you do is provide supplemental

5    oxygen, and the second thing that you do is a neonatal sepsis

6    workup which includes providing antibiotics, correct?

7    A.  Not -- no.  I mean, the first thing you do is assess the

8    baby, and that would probably, if you had a pulse oximeter on

9    the baby and it was below the normal range, you would

10   typically give supplemental oxygen, but then you would make a

11   decision about what to do next.

12   Q.  Can you pull that down for one second and pull up tab 6,

13   page 60?  Now, we have seen this ad nauseam, but sometimes as

14   you are traveling through these cases, you find something new

15   and you want to point it out.

16        So if you could just do the 7:00 and the 7:25 vitals so

17   the jury can see both of them, because what we have been told

18   all along is that, hey, at 7:00, these vitals are normal.

19   That means this baby was healthy, correct?

20   A.  Yeah.  I mean, it appeared healthy, yes.

21   Q.  Tell me at 7:00, what was this baby's pulse ox?

22   A.  There was no reason to measure it.

23   Q.  No, that's not the question.  The question is at 7:00,

24   what was the baby's pulse ox?

25   A.  It wasn't measured.

1    Q.   Don't know, correct?

2    A.   (Witness nods head affirmatively.)

3    Q.   Let's take a look at the temperature at 7:00 was 99.6.  At

4    7:25, it had dropped to 99.2, so it's still the same, right?

5    A.   Essentially.

6    Q.   The temperature degrees -- well, it's just Celsius and

7    Fahrenheit.  The next one, heart rate 132 beats per minute.

8    Heart rate is 128, correct?

9    A.   Yeah.

10   Q.   Same thing basically, right?

11   A.   That's right.

12   Q.   The respiratory rate is noted at 44 beats per minute, but

13   it's not calculated here, but here is the outlier, correct?

14   A.   I'm not sure I know what you mean by the term "outlier."

15   Q.   The outlier is you have normal vitals at 7:00, you have

16   normal vitals at 7:25, and the only thing that's different is

17   the 81 percent, correct?

18   A.   Yeah, that's true.

19   Q.   So my point is is that by looking at the vitals at 7:00,

20   we have no clue whatsoever what this baby's respiratory status

21   is, do we?

22   A.   Well, no, I don't think that's correct.  I mean, the

23   respiratory rate is normal, and the baby is being looked at,

24   so there's no evidence that the baby has anything abnormal.

25   Q.   At 7:25 -- let me back up.  The reason I asked you all

1    this was, you'll agree with me that, in a case where a baby

2    has meconium in its air sacs, that the baby might not be

3    processing air as efficiently as one that doesn't have

4    meconium, correct?

5    A.  If in fact they have aspirated meconium, that might be

6    true.

7    Q.  Right.  And that could account for the reason why a pulse

8    ox is low, correct?

9    A.  It could be one of the reasons, sure.

10   Q.  Right.  And we know at 7:25 that the pulse ox was 81,

11   correct?

12   A.  That's what was recorded, yes.

13   Q.  And we have no idea what the pulse ox was for the two

14   hours before that, correct?

15   A.  Well, it wasn't measured.

16   Q.  So we don't know?

17   A.  Sure, but are you suggesting that every baby should

18   have -- that the only appropriate thing is that every baby has

19   continuous pulse oximetry monitoring from the moment of birth

20   despite looking well?  It's an interesting thought, but it not

21   only doesn't happen, but it's generally recommended against.

22   Q.  I didn't say that in my hypothetical.  I said with all of

23   the risk factors, with the fact that there was meconium

24   present, with the fact that this was a difficult operative

25   delivery, that there was an arrest of descent, that a

1    pediatrician who had come to the delivery, set out a plan of
2    care and said get vitals and a pulse ox every 15 minutes might
3    have picked up on this before two hours.  Would you agree with
4    that?
5    A.  If that's what their decision had been, sure, but I don't
6    think that would have been a routine decision in an apparently
7    healthy-appearing baby after this delivery.
8            MR. PRICE:  Your Honor, I'm sorry.  I should only be
9    about two more minutes.
10           THE COURT:  Ladies and gentlemen --
11           MR. PRICE:  I'd like to finish if that's all right
12   with the jury.
13           THE COURT:  Yes.  I was just going to ask them that.
14   Ladies and gentlemen of the jury, as you know, we're going to
15   recess early today because of the swearing in ceremony.  Would
16   you mind if we go a little bit past 12:00 to finish up this
17   witness?  Everyone is indicating they are okay.  Anybody need
18   a necessary break or anything like that?  Everybody is good to
19   go.  Mr. Price, you can continue.
20           MR. PRICE:  Thank you.  I just wanted to finish up
21   with your final answers to Ms. Koczan about antibiotic
22   administration.
23   BY MR. PRICE:
24   Q.  Under my scenario, if a pediatrician had seen this baby at
25   one hour and given antibiotics, was there a chance that this

1    baby could have been saved?

2    A.  So at one hour versus three hours?  I think it's extremely

3    unlikely.

4    Q.  I know.  You keep saying very unlikely, extremely

5    unlikely, but in your report, do you ever put that that would

6    not happen, that the baby would not have survived?  You

7    condition -- in other words, you can't exclude the

8    possibility, right?

9    A.  I don't think I can ever exclude any possibility, but

10   other than that, I would say, in my opinion, it's extremely

11   unlikely unfortunately that it would have made a difference.

12   Q.  And you said there is a chance -- or there is not a chance

13   given the way this case unfolded, and that was based upon the

14   facts that Ms. Koczan gave you, correct?

15   A.  Well, I think it's the facts that, unlike the

16   hypothetical, it's the facts in this case.

17   Q.  Well, see that's what the jury's job is.  The jury is

18   going to determine the facts of this case.

19       So you'll agree with me that, if the facts unfolded

20   differently as I mentioned, earlier administration of

21   antibiotics would have given this baby a chance at survival?

22   A.  Well, again, it's an indeterminant statement, because what

23   does "earlier" mean?  But I think if the case -- I mean, it's

24   all hypothetical.  If the case had unfolded as you presented

25   it, with the baby having evidence of significant respiratory

1    distress earlier, again, knowing that this ultimately turned

2    out to be E. coli sepsis, I would say, well, that would be

3    evidence that the disease was already more severe at 6:30 or

4    6:00 or wherever these times are in your hypothetical, and

5    frankly, I think that probably would have made the chances of

6    survival -- I mean, I don't think they could have been lower,

7    but there's no way they would have been improved if the baby

8    had been ill already at that time.

9            MR. PRICE:  No further questions.

10           THE COURT:  Ms. Koczan, any redirect?

11           MS. KOCZAN:  Just one or two, Your Honor.  That's

12    all.  I will be quick.

13                    REDIRECT EXAMINATION

14   BY MS. KOCZAN:

15   Q.  Doctor, you were given -- shown hypotheticals, pulse ox

16   dropping, this happening, that.  Is there anything in the

17   record that indicates that any of that went on?

18   A.  No.

19   Q.  Does the medical record indicate then that the very first

20   time that there was anything going on with this baby was at

21   7:25 a.m.?

22   A.  Yes, it does.

23   Q.  And just one final comment.  Earlier administration, would

24   that have made any difference in this case?

25   A.  No.

1          MS. KOCZAN:  Thank you.

2          THE COURT:  Mr. Colville, at this time?

3          MR. COLVILLE:  No, Your Honor.

4          THE COURT:  Mr. Price, anything further?

5          MR. PRICE:  No, Your Honor.

6          THE COURT:  May Dr. Ringer then step down and may he

7     be excused?

8          MS. KOCZAN:  Yes.

9          THE COURT:  He's ready to go.  Doctor, safe travels.

10    Thank you for your appearance here today.  You may step down.

11    You are also excused.

12         (Witness excused.)

13         THE COURT:  At this time, does the defendant hospital

14    group and Dr. Jones rest?

15         MS. KOCZAN:  We do, Your Honor.

16         THE COURT:  Mr. Colville, does the United States also

17    rest?

18         MR. COLVILLE:  We do, Your Honor.

19         THE COURT:  Any rebuttal, Mr. Price?

20         MR. PRICE:  No, Your Honor.

21         THE COURT:  All right.  Ladies and gentlemen, for

22    your information at this stage of the proceedings, the court

23    will have to address various legal matters with the attorneys,

24    particularly working on the charge to the jury, and I would

25    anticipate that we'll get that done this afternoon, so

1    tomorrow's schedule should be closing arguments, correct?

2            So we'll start tomorrow at 9:00 with closing

3    arguments, and then you'll hear the charge to the jury and

4    then the case will be yours.

5            Now, as I indicated previously, the court has a

6    swearing in to attend to and I have to report between 2:30 and

7    2:45 for that.  I'm expecting what we need to do with the

8    attorneys on the legal front is going to take that time after

9    a short lunch break, so I'm going to give you the rest of the

10   afternoon off.  It looks like a pretty day again.

11           I want to remind you not to discuss this case with

12   anyone, including fellow jurors, other people involved in the

13   trial, members of your family, anyone else.  Again, as you

14   leave, do not speak to any of the parties, witnesses or others

15   who have been gathered here, similarly, when you come in first

16   thing tomorrow.

17           Once again, I don't know if there is or isn't news

18   coverage about this matter.  If there is, obviously you need

19   to avoid it.  Once again, even though you've heard all of the

20   evidence that we anticipate in this case, you are not to do

21   any research or gather any information on your own.  Continue

22   to keep an open mind about what the verdict should be in this

23   case because you need to hear from the court and you also need

24   to hear from the attorneys, first the attorneys with their

25   closing arguments, then the court with its instructions and

1   how you'll fill out the verdict form.

2            Then and at that time, you'll have all the time you

3   want to debate the issues, to go through your exhibit binders

4   and ultimately first find the facts and then apply the law.

5            So with that, have a good afternoon and evening.

6   We'll see you all back here tomorrow at 9:00.  Mr. Galovich

7   will escort all of you.  Once again, leave your exhibit

8   binders as well as your notepads there on your chairs.  He'll

9   gather them up.

10       (Jury excused.)

11           THE COURT:  Everybody may be seated.  And so I would

12  suggest that we take a lunch break, and given the fact of the

13  jury being recessed, do you all think you can be back here at

14  1:15, and at that point, we'll address what I anticipate will

15  be Ms. Koczan's motion on corporate negligence and the

16  plaintiff response, and we'll also take a look at the

17  instructions so we can try to get those finalized, and then as

18  I said, we're going to wrap up between 2:30 and quarter to

19  3:00 because I have to have my robes on and be in another

20  court by quarter to 3:00.  We'll see you back here at 1:15.

21       (Luncheon recess taken 12:09 p.m.-1:19 p.m.)

22           THE COURT:  I think first we should have argument on

23  the Rule 50 motion.  Ms. Koczan?

24           MS. KOCZAN:  Yes.  Your Honor, we are bringing this

25  Rule 50 motion with regard to the corporate negligence claim

against Heritage Valley, and the basis for the motion as set

forth in our brief is that there has been no expert testimony

to establish that the hospital in any way deviated from the

standard of care, as required under the various elements of

the Thompson versus Nason Hospital case, and in this case, the

only really portion of that was -- I think it's number four

which is the hospital's policies and procedures.

Earlier, there were cases that were cited that, and I

think Your Honor had mentioned them, that said you don't have

to have an expert to give the opinion if it's within the

knowledge and understanding of the jury, but that's not the

situation here, and I think that those cases, as we set forth

in the brief, can be distinguished, both the Cangemi cases and

I think it's the McKay case is the other one, and those cases

involve things like, you know, did you need to have expert

testimony to say that it would be imperative to make sure that

you got the radiology reports to the physician, that type of

thing.  That's within the average knowledge of a juror.

This case is really very different and can be

distinguished because it isn't within the average knowledge of

a juror as to what a policy should be with regard to

pediatrician attendance at a delivery, you know, the

circumstances of that, so under those circumstances, the case

law is pretty clear that you do require expert testimony, and

to that end, there has been no expert testimony in this case

1    that the policies deviated from the accepted standard of care.

2         The expert who talked about this, I believe, was

3    primarily Dr. Karotkin or it could have been Dr. Shore, I'm

4    getting them mixed up right now, but what they basically

5    testified to was that at their hospital, they did something

6    different.  Their hospital required something different.  He

7    didn't agree with the policy, but at no time did he say that

8    the policy that Heritage Valley had deviated from the standard

9    of care, so there is absence of any testimony here that there

10   was any deviation from the standard of care, and again, that

11   would have been required -- or, that is required to go forward

12   with the corporate negligence case.

13        So under the circumstances, I do not believe that

14   there is any evidence in this case of deviation that meets the

15   requirement, and on that basis, I believe that the Rule 50

16   motion should be granted.

17             THE COURT:  Mr. Price, your response?

18             MR. PRICE:  Twofold, Your Honor.  I rely upon my

19   response to Defendant Heritage Valley Beaver's motion in

20   limine with regard to this issue to begin with, because I

21   believe that a corporate negligence claim is not limited

22   solely to policies and procedures, so I believe that there are

23   still other issues which allow this claim to survive.

24        Secondarily, as to this specific issue of policies

25   and procedures, Dr. Karotkin did testify about the policies,

1    that they were incorrect and that it did affect the care and

2    that it was a breach in the standard of care, and I note in

3    this court's memorandum order of August 30, document 195 on

4    page 5, the court specifically noted Dr. Karotkin was critical

5    of some of the hospital's policies and testified that they

6    negatively impacted Kendall's chance of survival, and I don't

7    believe that the defendants putting Dr. Dumpe on or having

8    their own experts removed this issue from the jury's

9    contention.

10          As the standard was noted in the court's previous

11    ruling as to Dr. Jones, any dispute, any contention as to

12    documents or testimony is for the jury to decide.

13          THE COURT:  Anything further, Ms. Koczan?

14          MS. KOCZAN:  Yes, Your Honor.  I'm not sure what

15    other issues there are under the corporate negligence.  I

16    don't remember hearing anything, any other issues with regard

17    to that.  It's really coming down to the policies, and what

18    Mr. Price cited was your ruling before this case even was

19    tried.  You know, there was no testimony.  It was simply what

20    was written in the report, and what was written in the report

21    isn't evidence in this courtroom; it is his testimony, and

22    while he said this is not what we do at my institution and I

23    don't agree with it, he didn't say that it deviated from the

24    standard of care, and I think that's the important distinction

25    here, and I do not believe there is any other evidence that

117

1    would support a case for corporate negligence.

2         THE COURT:  Anything else?

3         MR. PRICE:  Just to correct Ms. Koczan, I cited to

4    your memorandum order of August 30.  It was document 195 and

5    it was -- it notes, "And now this 30th day of August 2019,

6    upon consideration of the motion for directed verdict filed

7    pursuant to Federal Rule 50," so Dr. Karotkin had testified

8    and you did consider it in making that ruling.

9         MS. KOCZAN:  Your Honor, you haven't considered the

10   Rule 50 motion for corporate negligence before so I'm not sure

11   what he's referring to.

12        THE COURT:  All right.  Well, the court has had the

13   benefit, as you know, of the expert reports as well as the

14   curriculum vitae, but in looking at this motion for directed

15   verdict, I always think too it's important to look back at the

16   initial pleadings here, and to that end, vis-a-vis this

17   corporate negligence claim, Mr. Price has alleged that the

18   defendant, the hospital, was negligent and a number of

19   particulars.

20        I particularly call your attention to paragraph 126

21   and the subparagraphs thereunder, and to that end, one of the

22   subparagraphs speaks to, "In failing to ensure the physicians,

23   medical staff, nursing staff and/or other health care

24   providers were properly trained to recognize signs and

25   symptoms of nonreassuring fetal heart tones and/or fetal

1    distress."

2            Then in that same paragraph, it also talks about

3    "Failure to ensure that the health care providers were not

4    only properly trained but adequately staffed to take timely

5    action."

6            There's some further allegations about selection,

7    retention and employment, then it goes on to talk about

8    failing to ensure that health care providers were properly

9    trained on how to document the medical records.

10            There's also an allegation here about failing to

11   properly train, supervise and/or oversee health care providers

12   in promptly and accurately communicating a patient's status to

13   treating physicians and/or health care providers.

14            Then it also speaks to the policies and procedures at

15   subparagraphs K, L, M, and N as well as O and P, Q and

16   ultimately S, and then it also talks about delegation of

17   responsibilities.

18            So as pled, the allegations are much broader than,

19   number one, the promulgation of policies and/or two, the

20   adherence to those policies.

21            The court is also certainly mindful of what I already

22   wrote at document 187 and the cases to which I cited, and I

23   also took the time to read the cases that Ms. Koczan has

24   provided in her latest memorandum, much of which mirror what

25   I've seen previously, and to that end, the only difference I

1    see is the Macosky, M-A-C-O-S-K-Y, versus Udoshi case which

2    she spends a little bit more time on trying to factually

3    distinguish it.

4         But more recently, one of my colleagues in the middle

5    district has again looked at the issue of corporate

6    negligence, and furthermore, you know, I've also conferred

7    with my colleagues on this issue in cases where they have

8    previously addressed this issue, and I guess, in most

9    instances, the argument is heard and then the motion is simply

10   denied with a lot -- without a lot of rationale, and I guess

11   that's one way of doing things.

12        But be that as it may, this court has had the benefit

13   not only of her copious notes but also the rough draft

14   transcripts, and pertinent to my decision is the following:

15   First off, Dr. Zamore -- and by the way, you know, all of

16   these witnesses, in my estimation, were all adequately and

17   then some credentialed.  Some of them were from some of the

18   top institutions in the country.

19        I think everybody knows Boston Children's is number

20   one.  I think that Philadelphia Children's ranks up there

21   pretty high as well.  Vanderbilt was also referenced, and

22   certainly Harvard was thrown around a few times, so we had all

23   the experts with appropriate credentials and the like, but of

24   course, differing views.  That's why we have trials.

25        But in any event, Dr. Zamore initially said that if

the baby is at risk, a pediatrician has to be present.  And to that end, he said that he either hands off to the labor nurse or the pediatrician.  He also talked about advocating for the patient, that that's a duty of the physician as well as the nurse.  He spoke to a standard of care, that the pediatrician should be notified and called into the labor room.  When shoulder dystocia is recognized, get a pediatrician.

He also said that meconium throughout the entire labor is also an indication for calling a pediatrician.

He also went on to say if the doctor doesn't do it, then go up the chain of command.  That's exactly what Nason speaks to.  That's why we have that landmark decision Nason, because the nurses occasionally have to blow the whistle.

So if nurses see issues, they have a responsibility to call the pediatrician into the room.  They also have a responsibility to advocate for the patient, says Dr. Zamore.

He then went on to say that Dr. Dumpe deviated from the standard of care when there was no pediatrician in the room when he had an indication of a shoulder dystocia.  He had an operative OB delivery, he had category two tracings as well as meconium.

Now, certainly Dr. Dumpe testified to the contrary and he spoke at length about what he described as the continuum of risk, and he also referenced his discretion as an OB, and he did admit though, if the risk was high enough, he'd

even want a pediatrician there or a pediatric designee, and he then went on to say, in some instances, for some babies, he would definitely call a pediatrician.

And the purpose of that person being there would be to respond if there was any respiratory distress.  In this instance, he didn't think he had a need to call a pediatrician.  Troubling, frankly, to the court and in my estimation cavalier, when he was asked about the policies, and I'm quoting, "I couldn't put my signature on there without my input because I'm the chairman of the department.  I'm very friendly with the head nurse.  She puts these things together. She bounces these things off me."

Now, when he was called within the hospital's case, and perhaps he was nudged, to be a little bit more thoughtful in how these policies and procedures were promulgated.

He also admitted that he's called pediatricians to the delivery room and he admitted that if there were abnormal Apgars that then someone would be required to call a pediatrician to the nursery.  He talked about the baby being able and being able to be transported to the nursery.  If not to the nursery, to call residents.

Admittedly, we've heard a lot about this baby bonding, and if the baby is normal, it's appropriate to keep the baby in the room so that the baby can bond.  Once again, you know, it was interesting in reading Nurse Hendershot's

1    testimony that "It was his call," Dr. Dumpe's call, "not

2    mine," to determine whether or not a pediatrician should be

3    called.

4            And going back to Nason, I don't think it's only his

5    call, and in my estimation, she was deferential to the doctor

6    in that regard, and I don't know what that speaks to, his

7    manner in the operating room, I don't know, you know.  She is

8    a long time nurse, 30 years.  You know, he's a long time OB.

9    He has a military background.  I don't know what goes on in

10   that particular hospital, but I thought that was an

11   interesting comment that she made, "His call, not mine."  She

12   said, "I can suggest," but in this instance, she would not

13   have suggested.

14           I also took a look at the testimony of Dr. Shore.

15   Again, he said if the baby is at risk, the pediatrician must

16   be there, and he also spoke to either a pediatrician or a

17   neonatal specialist such as a NICU nurse.  In this particular

18   hospital, they don't have a NICU, right?  They have level two

19   nursery, so they don't even have a NICU.

20           And Dr. Shore said you need to have someone there to

21   evaluate the baby and plan for subsequent care.  To that end,

22   he saw the meconium in the amniotic fluid as a risk.  It's an

23   abnormality, in his words.  He also went on to say that it's

24   actually fearsome if the baby was premature.  This baby was

25   term, maybe post term, given its side.

1          He did not agree with the policy of Heritage Valley.

2     He did say there are hospitals which require people to be

3     there with meconium.  He also indicated that the baby's

4     irritability could indicate sepsis or lung pain.  He noted

5     that the baby had a small pleural effusion.  And to that end,

6     in his estimation, such a pleural effusion hurts the baby.

7     Hence, a pediatrician should have been called.

8          Jamie McCrory also said something rather curious that

9     stuck in my mind, and to that end, she said, in any event,

10    when the pediatrician is on the way, all the babies come to

11    the nursery for assessment.

12         So, I mean, a jury could consider that, in that

13    particular instance, given that statement by Nurse McCrory

14    that it was routine, if you will, that this baby ultimately

15    went down to the nursery, because everybody knew that

16    Dr. Jones, who was very punctual, was supposed to be there at

17    8:00.  Hence it was time for the pediatrician to eyeball

18    everybody.

19         Frankly, I found Dr. Heiple underwhelming, and

20    admittedly, I'm not supposed to critique somebody in terms of

21    credibility, and frankly, you know, he had very limited

22    pediatric training at that point in his career.  He's a family

23    resident.  He's not a board certified pediatrician.  I don't

24    recall if we heard anything about him knowing how to

25    resuscitate a neonate.  When he referenced the baby as a case,

1    that gave me a little further insight into his personality and

2    the way he might be out there practicing medicine.

3        Dr. Karotkin is certainly key to the plaintiffs'

4    case.  He talks both as a pediatrician and neonatologist.

5    Again, he says the delivery should have had a pediatrician in

6    attendance and he reasoned because of the moderate to high

7    risk nature of the mother's circumstances, the meconium, the

8    operative delivery, the concern for the shoulder dystocia and

9    the delay in getting the baby delivered.  It's true this lady

10   was in labor for some period of time and then she did not

11   continue to descend.  She arrested.

12       You know, interestingly, when you look at the consent

13   here, she was given an epidural.  You know, when you have an

14   epidural, that in and of itself slows things down, and we

15   never heard any discussion by the way of the consent what the

16   doctor did or didn't do with this gal.

17       But be that as it may, Dr. Karotkin went on to say

18   there's nothing like the experience of board certified

19   pediatricians.  He also went on to say that the baby should

20   have been monitored more closely with either a pediatrician or

21   a nurse listening and observing this baby.  He did indicate

22   that if you are on call, you should respond within 30 minutes.

23   That's reasonable.  He talked about the Reasonable Man

24   Standard as well.

25       He recalled the perinatal guidelines, and I thought

1    it was interesting to the extent that the hospital, Dr. Dumpe

2    or anybody else wants to make reference to those ACOG

3    standards or the perinatal standards, how easy would it have

4    been to have a slide to compare them and whether Heritage

5    Valley really does adhere or not, but we didn't see that.

6          To that end, he went on to say that the call to the

7    pediatrician could have been made either by the OB or by the

8    nurses.  He also noted that, in his estimation, the lack of

9    recording was also a breach of care, and he also found that

10    there was a delay in care, that the septic workup would have

11    been faster.

12          To that end too, he was noteworthy in his recognition

13    of the reports of the family, that the reports of the family

14    do matter.  He did go on to say that most hospitals have a

15    different policy, and despite what you said, Ms. Koczan, he

16    does say that this did not meet the standard of care in his

17    testimony.

18          So to that end, I think that, in and of itself, is

19    enough to put this case over to a jury on the corporate

20    negligence case, but it's also interesting for me to note too

21    that Dr. Ringer said he didn't think it was necessary but it

22    was certainly not unreasonable to have a pediatrician there,

23    and he also said if the hypothetical facts are ultimately true

24    and accepted, that it would have been beneficial to have

25    called a pediatrician or a nurse.

1        So, you know, whether the jury considers these

2   policies and procedures to be breached or not, whether they

3   consider that this is the standard of care or not, whether

4   they find that the hospital as an institution didn't live up

5   to its duties under Nason and its progeny, then and in that

6   event, I think it's a jury question for the jury.

7        To that end, I'm going to write a little bit about

8   all this, and I'm going to lay out the cases to which I want

9   to cite and we'll put that on the docket in due course.  Of

10  course we have other things to address.

11       So that's my ruling on corporate negligence, and you

12  know, as I said, given my time constraints, since all of a

13  sudden, we are interested in getting this case done sooner

14  rather than later, that's as far as I got, but I'll continue

15  to plumb the transcript if I need to, although I do think

16  that, based on what I've seen here, that this is sufficient to

17  take this case over to the jury.

18       Okay.  Nicole, print off what you sent me last night

19  on Waugh.  I want to add that to the record here too.  I

20  didn't finish all of my research.  There's a brand new

21  opinion -- relatively new opinion by Judge Mariani out of the

22  middle district.  It's only 129 pages long.  Of course, it

23  covers all kinds of subjects beyond corporate negligence.

24       So what's striking here to me is this language:

25  "Corporate negligence is a doctrine under which the hospital

1    is liable if it fails to uphold the proper standard of care of

2    the patient which is to ensure the patient's safety and

3    well-being while at the hospital."

4         Here we have two patients, both Carissa as well as

5    Kendall, and indeed this theory of liability creates a

6    nondelegable duty which the hospital owes directly to the

7    patient, both mom and baby.

8         You know, I'm also mindful of this language which

9    appears in the recent Mariani case, Ponzini.  "It's well

10   established that a hospital staff member/employee has a duty

11   to recognize and report abnormalities in the treatment and

12   condition of its patients.  If the attending physician fails

13   to act after being informed of such abnormalities, it's then

14   incumbent upon the hospital staff or employee to so advise the

15   hospital authorities so that appropriate action might be

16   taken.  When there is a failure to report changes in a

17   patient's condition and/or question a physician's order which

18   is not in accord with standard medical practice and the

19   patient is injured as a result, the hospital will be liable

20   for such negligence.

21        "Health care providers are deemed to have

22   constructive notice when it should have known of the patient's

23   condition or where there was an absence of supervision," again

24   Ponzini.

25        So, you know, back to whether a jury can or cannot

1    discern, you know, whether or not, number one, this policy,

2    discretionary call to the pediatrician by the OB, is or isn't

3    reasonable, I think they have a sufficient basis.  They can

4    weigh what all these doctors had to say.  They can weigh what

5    the nurses had to say.  They can weigh what Dr. Dumpe and

6    Dr. Jones had to say, and then they can make a determination

7    whether there is or isn't corporate negligence on the part of

8    Heritage Valley Beaver.

9         Okay, now, moving on to the final jury instructions,

10   over the lunch hour, I went back through the draft that was

11   circulated to all of you, and Nicole made changes, and

12   Mr. Kravetz is supposed to be proofing those changes, but in a

13   nutshell, what I did was I went through the discussion draft

14   number five that went out to you on e-mail and to which

15   Mr. Price had no objections and Ms. Koczan had an exception,

16   and we needed to correct the typographical error of for whom

17   Dr. Jones works.

18        Now, on these edits, what I normally do is I take out

19   the references to whether your proposed instruction came from

20   the PA standard or the Third Circuit and the like.  I don't

21   think the jury needs to ponder what treatises we're looking at

22   when we come up with these instructions, so those kinds of

23   things get eliminated throughout.

24        In addition, and most importantly, I think for all of

25   this, in looking at paragraph 5, I think you know we talk

1    about stipulations.  I shouldn't say paragraph 5.  I mean,

2    page 5.  In talking about stipulations, we say here that the

3    medical records of Carissa and Kendall are authentic, that at

4    all times relevant, all nurses and doctors and residents were

5    employees, blah-blah-blah, that at all times relevant to this

6    case, Dr. Hilary Jones was an employee of Heritage Valley

7    Pediatrics, but then I think we should go on to say here that

8    there's no claim against Dr. Hilary Jones for her care of

9    Kendall Peronis once she began to administer that care.  I

10   believe we should say that.

11          Additionally, per our discussion yesterday and now

12   that I have Mr. Price's e-mail wherein he writes to me,

13   "Ladies and gentlemen, when Dr. Wiesenfeld, the obstetrical

14   expert for the United States, was on the witness stand, I

15   asked him several questions about a prenatal office visit

16   wherein the doctors diagnosed Ms. Peronis with a bacterial

17   vaginosis.  If you recall Dr. Wiesenfeld's testimony, he

18   stated that the bacterial infection was not related in any way

19   to the infection that is at issue in this case.  I am

20   instructing you to give no weight or consideration to that

21   bacterial infection, as it is irrelevant to your deliberations

22   in this case."

23          So I pondered whether we should give this just as it

24   is, but I'm a little concerned that it might highlight the

25   fact that the court asked questions, and to this end, I

1    believe because I am the finder-of-fact vis-a-vis Dr. Dumpe,

2    from time to time, it was important for me to ask questions so

3    I could determine how credible he is or isn't.

4         So I rephrased this a bit and what I have here is

5    that there is no claim that the infection Carissa Peronis had

6    while carrying Kendall Peronis had any relation to the E. coli

7    sepsis infection Kendall Peronis developed.  In fact,

8    Dr. Wiesenfeld testified that the bacterial infection was not

9    related in any way to the infection at issue.

10        So that's another change that I made.

11        Also on page 6, since we had timelines, I've included

12   timelines along with other charts and summaries, and I've made

13   some transitions here so this is not incredibly boring as I

14   read it to them.

15        In addition, as I noted, I've taken out the

16   references to the various instructions.  Again, I've added a

17   couple of transitions because they have been repeatedly

18   instructed on how they are supposed to handle an expert, but

19   when I get to the part about Hilary Jones and who she works

20   for, that needed some more work, and so there, I've rewritten

21   it, "Therefore, if you find the defendant Hilary Jones or the

22   nurses and resident doctor to be liable, then you must find,

23   in the case of Dr. Jones, Heritage Valley Pediatrics and in

24   the case of the nurses and resident, Heritage Valley Beaver

25   Hospital also liable."  So that needed to be changed.  I saw a

1  couple of typos that we've corrected.

2  Relative to the damages, I think given the nature of

3  this case and given we've heard so much about Kendall, I think

4  that we should say in terms of the harm suffered by Kendall

5  Peronis, Carissa Peronis and Matthew Fritzius, I'm debating

6  that and I'll be interested to hear what you have to say on

7  that.  We only spoke to the parents initially.

8  Also, when we wrote this up, we talked about both of

9  the adult plaintiffs being administrators, they are not, and

10  so Carissa is the administratrix and he's there individually

11  so that needed to be changed.

12  I do permit the headers in terms of past loss

13  contributions, past and future noneconomic damages and the

14  like.  Again that's stylistic.  We can take that out if you

15  please.

16  So those are the changes that I've made.  Ms. Starr

17  tells me that these have now been proofed, so we are up to

18  discussion draft number six, and she is going to run and get

19  copies so all of you counsel have an opportunity to read these

20  one more time and so that Ms. Leo has a copy for her benefit

21  and Mr. Galovich will get one as court Exhibit A.

22  We also, by the way, have similar issues vis-a-vis

23  the verdict slip, and that verdict slip, I think, needs to be

24  retyped so that it reflects the relationship, if you will,

25  between Jones and Heritage Valley Pediatrics if they are going

1    to remain in the case.

2            MS. KOCZAN:  Your Honor, with regard to that, I'm not

3    sure that that needs to be done because I would stipulate that

4    if Jones was found liable, Heritage Valley Pediatrics would

5    be, so I don't think we need to do that.

6            THE COURT:  In terms of the verdict slip?

7            MS. KOCZAN:  Yes, in terms of the verdict slip.

8            THE COURT:  Well, in terms of the instructions then,

9    do we need to make any changes vis-a-vis the instructions?  So

10   should we be including that stipulation in here?

11           MS. KOCZAN:  I don't think it's necessary, but you

12   could mold the verdict based upon that.  I don't think it's

13   necessary that we have to include a stipulation that it's

14   stipulated that, you know, Jones is liable, Heritage Valley

15   Pediatrics is liable as well.  I just think, with my agreement

16   that if the jury finds Dr. Jones liable, then the verdict is

17   molded to include Heritage Valley Pediatrics, that that should

18   be sufficient.

19           THE COURT:  What do you think, Mr. Price?

20           MR. PRICE:  Typically on a verdict slip in a case

21   like this, if we can just leave it to defendant, that's fine

22   for me because I don't think -- I think if you include the

23   employer and all that stuff, it confuses the jury, but I think

24   that the jury should be told that if you find against

25   Dr. Jones, her employer will also be liable, and I know that

1    somewhere, I was just trying to find where, that is in here.

2          THE COURT:  I will do likewise.  The other thing we

3    could do is we could drop a footnote.  We've done that in

4    other verdict slips, explaining to the jury that if they find

5    Dr. Jones liable, per the stipulation or agreement among

6    counsel, then and in that event, Heritage Valley Pediatrics is

7    also liable and just drop a footnote.

8          MS. KOCZAN:  Your Honor, I'm waiting for her to bring

9    the revised copy.  My copy is in my briefcase, but there's one

10   other thing that I recall seeing the damages, and I didn't

11   include it in my e-mail.  I thought there was something in

12   there about like lost household services, this, that and the

13   other.  If I remember and I will stand corrected if he did,

14   Dr. Kenkel did not include lost household services in his

15   testimony and in the estimates that he gave.  It was just wage

16   loss, so without that testimony, I don't know that that

17   instruction is proper.

18         THE COURT:  Mr. Price, what do you have to say about

19   that?

20         MR. PRICE:  I would have to go back to the --

21         THE COURT:  Before you get there, I have found a

22   section of the charge that deals with the employment situation

23   at 19.  "In this case, it's also admitted that the nurses and

24   resident doctor were, at the time of the occurrence, acting as

25   the employees of the defendant Heritage Valley Beaver Hospital

1    known as the employer and were engaged in furthering the

2    interests, activities, affairs or business of their employer.

3    An employer is liable for the negligence of its employee

4    occurring while the latter was acting in the course and within

5    the scope of his or her employment."

6         Then it goes on, "Therefore" -- I'm sorry.  Even

7    ahead of that, we say, "In this case, it's admitted that

8    defendant Hilary Jones was acting as the agent of defendant

9    Heritage Valley, known as the principal."

10        So we cover that on page 19 of this draft number

11   five, and then we say that the principal is liable there.  We

12   say vis-a-vis the hospital.  Then we have a catchall,

13   therefore, if you find that she is liable or the nurses and

14   doctors are liable, then you have to find Heritage Valley

15   and/or Heritage Valley Beaver Hospital liable, so once we get

16   the verdict slip to look at again, we can look at that

17   language because that's where it's pertinent.

18        MS. KOCZAN:  Your Honor, with regard to Dr. Jones, it

19   should be Heritage Valley Pediatrics rather than just Heritage

20   Valley.

21        THE COURT:  Right.  I think I was curtailing myself.

22        MS. KOCZAN:  I'm looking at Dr. Kenkel's report, and

23   if you look at the report on page 19, he says value of lost

24   household services in this report.  There's no projection of

25   lost household services and he did not give any testimony or

1    projection at trial, so to the extent that that is included in

2    there in some of that verbiage, that probably needs to be

3    changed.

4         THE COURT:  So if you look at page 25, "In addition

5    to the monetary contributions decedent would have contributed

6    to her family's support, the plaintiffs are also entitled to

7    be awarded a sum that will fairly and adequately compensate

8    her family for the monetary value of the services, society and

9    comfort that she would have given to her family had she lived,

10   including such elements as work around the house, provision of

11   physical comforts and services and provision of society and

12   comfort."

13        So you are saying, if I hear you right, Ms. Koczan,

14   this should be eliminated?

15        MS. KOCZAN:  That's correct, because there was no

16   testimony about the value of lost household services, that

17   type of thing.  There's nothing in the record with regard to

18   that, so anything that deals with that, household services,

19   the value of household services should be eliminated.

20        THE COURT:  Mr. Price?

21        MR. PRICE:  I don't believe -- I agree that

22   Dr. Kenkel took out that provision in his report.  However, I

23   don't believe that this is limited solely to the economic

24   report because -- in fact, I disagree with all of that.

25        That page 25 paragraph talks about past and future of

1    noneconomic damages, so this is more of the consortium claim.

2    This is what they're allowed to be awarded for the loss of a

3    family member.  She is looking at future lost earnings which

4    would be on page 26.

5          THE COURT:  No, I think she is talking about loss of

6    services.  You know, dusting around the house, running to the

7    grocery store, feeding Fido.

8          MS. KOCZAN:  That's what I'm talking about.

9          MR. PRICE:  If that's what this paragraph talks about

10    on page 25, the only thing that should be eliminated is the

11    monetary value of the services that she would have given, just

12    the services like the work around the home, because provision

13    of physical comforts and services or the provision of

14    comforts, society, all of that, it's what makes up the

15    consortium claim.  I don't have a problem editing it to take

16    out services but not the whole paragraph.

17          THE COURT:  Okay.  So it would read, "In addition to

18    the monetary contributions that the decedent would have

19    contributed to her family's support, the plaintiffs are

20    entitled to be awarded a sum that will fairly and adequately

21    compensate her family for the monetary value of" -- I guess it

22    should say "her society and the comfort that she would have

23    given to her family had she lived, including such elements as

24    work around the home, provision of physical comforts and

25    services and provision of society and comfort."

1          So Ms. Koczan said that we haven't heard anything

2     about her doing work around the house or what that would be

3     projected to be and there's been no numbers attached to it, so

4     maybe it should be further edited "and the comfort she would

5     have given to her family had she lived," period.

6          MR. PRICE:  How about "had she lived, such as

7     provision of society and comfort"?

8          THE COURT:  I guess you could say that.  It's kind of

9     redundant.

10          MS. KOCZAN:  I think maybe the easiest way is at the

11     beginning of that line, "compensate her family for the

12     monetary value of the society and comfort that she would have

13     given to her family had she lived," period.

14          THE COURT:  That's what I thought.

15          MS. KOCZAN:  I think that makes most sense.

16          THE COURT:  Because otherwise, you are adding

17     provision of society and comfort a second time.  So we'll edit

18     that paragraph a little bit more.  You should all now have a

19     copy of the latest rendition that I reviewed for you.  Why

20     don't you take a few minutes and go through it and point out

21     to me any other comments or changes that you have?

22          And, Ms. Starr, where are we on the revised verdict

23     slip?

24          THE CLERK:  I have it.  They sent us a PDF so I had

25     to redo it.

1          THE COURT:  The initial complaint has a totally

2      different caption on it, saying United States of America,

3      Primary Health Network-Beaver Falls Primary Care, Valley

4      Medical Facilities, Inc. t/d/b/a Heritage Valley Pediatrics,

5      Valley Medical Facilities, Inc. t/d/b/a Heritage Valley

6      Beaver, Kevin C. Dumpe and Hilary Jones, so this verdict slip

7      is a lot different than your caption in the complaint.  Seems

8      to me it's got to parallel the complaint caption.

9          MR. PRICE:  Your Honor, I believe that we entered

10     into some stipulation after the complaint was filed to correct

11     the caption.

12         MS. KOCZAN:  We might have done that, I don't

13     remember, but I know that the original cannot be the correct

14     one because Dr. Dumpe can't be named so that can't be correct,

15     and I think the verdict slip that we have is what it was

16     corrected to, and I can't remember if it was done by

17     stipulation or whatnot, but regardless, what is in the verdict

18     slip United States of America, Valley Medical Facilities,

19     Inc., trading and doing business, et cetera and Hilary Jones

20     M.D. should be the correct caption.

21         THE COURT:  We've retyped this up, and I want you to

22     take a look at it again, because, prior to our discussion

23     about Hilary Jones and Heritage Valley Pediatrics, what I

24     thought would make sense is you would include them as one

25     defendant, defendant Hilary Jones and defendant et cetera, but

1    we also talked about possibly dropping a footnote given the

2    stipulation that Hilary Jones is an employee of Valley Medical

3    Facilities, and hence, if she is liable, so are they.

4            Do you have extra copies of this, Ms. Starr, that you

5    can give to these attorneys?

6            MS. KOCZAN:  Your Honor, she just gave us a copy.

7            THE COURT:  No.  No.  This is the verdict slip.

8            MS. KOCZAN:  I have my verdict slip.

9            THE COURT:  This has been changed a little bit, and

10   Mr. Galovich, as a representative of the clerk's office, still

11   thinks it's awkward.

12           MS. KOCZAN:  The verdict slip is awkward?

13           THE COURT:  Yes.

14           Just so the record is clear, final jury instructions,

15   discussion draft number six dated 9-4-19, Ms. Starr is -- I

16   think I said Court Exhibit A or 1, and the proposed verdict

17   slip that you have in front of you is now Court Exhibit B and

18   you need to mark those as exhibits for this proceeding.  The

19   attorneys are now reviewing this latest draft of the

20   instructions for their additional comments.

21           MS. KOCZAN:  Your Honor, may I respond on the verdict

22   slip?  I think it would be simpler to say defendant Hilary

23   Jones and Heritage Valley Pediatrics period not all the rest

24   of defendant valley trading and doing business as Heritage

25   Valley.  I think that's too much.  Just Dr. Jones and Heritage

1    Valley Pediatrics.

2         THE COURT:  What do you think about that, Mr. Price?

3         MR. PRICE:  I like your idea about dropping a

4    footnote just to say that Heritage Valley Pediatrics is

5    Dr. Jones' employer, but if you don't want to, I would rather

6    just have Dr. Hilary Jones, because the verdict is going to be

7    molded.

8         MS. KOCZAN:  That was my original comment to you.  I

9    just think it should say Hilary Jones and, Your Honor, given

10   the stipulation, you mold it, I think that's the simplest.

11   Otherwise, we're going to start confusing the jury.

12        THE COURT:  What if the jury comes back with a

13   question and wonders why is only the U.S., Heritage Valley

14   Hospital and Dr. Jones on this slip and not the pediatric

15   group?

16        MS. KOCZAN:  I think Your Honor could tell them that

17   the reason why it is is that, you know, the parties have

18   agreed that Heritage Valley Pediatrics is her employer and if

19   she is found liable, they are found liable period.  I think

20   that's pretty simple.

21        THE COURT:  I agree, but I also think it might just

22   be helpful to have it right there on the verdict slip with a

23   footnote.

24        MR. PRICE:  I would prefer that, just because if

25   they're going through all these parties on the caption, I

1    think that they -- they're going to be wondering what happened

2    to this one party and I think it would be clearer if it's

3    noted.

4            THE COURT:  Okay.  So, Ms. Starr, why don't you draft

5    up some language?  The parties through counsel have agreed

6    that, to the extent that Dr. Hilary Jones is found liable,

7    then her employer Heritage Valley Pediatrics is likewise

8    liable.  We'll just type that up and we'll stick that there

9    and you can ponder that a little bit more, but Mr. Galovich's

10   concern is more related to the second page where he doesn't

11   understand the instructions vis-a-vis the percentage of causal

12   negligence.

13           We're going to have to take out defendant Heritage

14   Valley Pediatrics on the second page too if we're going to do

15   the footnote.  Go ahead, Ms. Koczan.

16           MS. KOCZAN:  Perhaps it may be easier or a way to say

17   it, "If you found that one or more of the defendants was

18   negligent, what percentage of negligence do you attribute to

19   each," and then just list defendant United States, Heritage

20   Valley, Hilary Jones.

21           THE COURT:  I think that's simpler.  What do you

22   think, Mr. Price?

23           MR. PRICE:  Can you explain that again?

24           MS. KOCZAN:  Sure.  I think what I said was maybe

25   change it to read, "If you found that one or more of the

1    defendants was negligent, what percentage of liability do you

2    attribute to each, United States, Heritage Valley, Dr. Hilary

3    Jones."

4         MR. PRICE:  That would seem to be a little bit

5    clearer.  The only caveat that, whenever you say -- I mean,

6    you continue to use the word factual cause and causal

7    negligence.  You just said liable.  I think you are right.

8    That would probably be easier.

9         THE COURT:  So we could rewrite question 3 then to

10   that language, so Ms. Starr, can you also type that up?  Do

11   you have that retyped?

12        THE CLERK:  Yes.

13        THE COURT:  Print it out so I can go through it while

14   the attorneys are going through the draft instructions.

15        MR. PRICE:  Your Honor?

16        THE COURT:  Yes, sir.

17        MR. PRICE:  In reviewing the jury instructions, you

18   referred to the hospital defendant as defendant Heritage

19   Valley Beaver Hospital, and I was just wondering shouldn't the

20   verdict slip refer to it the same way?

21        THE COURT:  We should probably do that because that's

22   how we have it here.  Here on the verdict slip we have

23   defendant Heritage Valley Hospital period.  The caption says

24   Heritage Valley Beaver.

25        MR. PRICE:  Right.

1          THE COURT:  So whatever your preference is, if you

2     think it should be all the way through Heritage Valley Beaver

3     instead of hospital, we can do that.

4          MR. PRICE:  It's just in the jury instructions, you

5     refer to it as Heritage Valley Beaver Hospital, and I think if

6     you can put that on the verdict slip.

7          THE COURT:  That was easy enough.  So you have an

8     extraneous "and" at the top of the page and you need a "the"

9     on page 2 before verdict form.  So once you clean that up,

10    we're going to mark that Court Exhibit C and provide copies to

11    the attorneys so they can look at it again.

12         MS. KOCZAN:  You just added Beaver to number one,

13    Heritage Valley Beaver Hospital.

14         You need them in both places there.

15         THE CLERK:  Three places.

16         THE COURT:  One Beaver is not enough.

17         MS. KOCZAN:  Your Honor, looking at this more

18    carefully in number 3, it just says negligent, but the first

19    two things -- the first one is were they negligent, was there

20    factual cause.  I think there might be some confusion there,

21    so maybe we need to add just a little bit more to No. 3.

22         "If you find that one or more of the defendants was

23    negligent and that defendant's negligence was a factual cause,

24    what percent of liability do you attribute to each?"  That

25    way, it's completely clear.  Otherwise, if they answer

1    question No. 1, they may think they have to 3, and maybe they

2    didn't find factual cause, so I think we probably need just to

3    add that language.

4         THE COURT:  I agree.  I think that does make it more

5    complete and more in line with the other questions that are

6    already there, so once again, Ms. Starr, you see what it is to

7    be a law clerk in chambers rather than rotating.

8         MR. PRICE:  Rather than "If you find," how about "If

9    you found that one or more of the defendants is negligent."

10        THE COURT:  Yeah, because they would have already

11   done that.

12        MS. KOCZAN:  "And their negligence was a factual

13   cause, what percentage of liability do you attribute to each?"

14        MR. PRICE:  Except the only thing, liability, I would

15   change to be what percentage of causal negligence because

16   that's what the construction says.  It doesn't say percentage

17   of liability.

18        THE COURT:  I think we used shorthand liability but I

19   think you are right.  It should be consistent with the terms

20   of our -- they are not going to be instructed on liability.

21   They are being instructed on negligence.  So while Ms. Starr

22   does that, back to discussion draft number six.  Any other

23   changes that we need to address outside of the issues relating

24   to the damages on page -- I think it's still 25?

25        MR. PRICE:  The only thing, I know Your Honor likes

1      to be very specific in its language.  On page 7, you had

2      mentioned the issue of timelines, and it's not in the first

3      sentence.

4              THE COURT:  Right.  I saw that, so I already added

5      that because there were timelines that you all used as

6      PowerPoints, and I was looking, it's kind of wordy, chart

7      summaries, timelines or lists, and then I could say "these

8      items" instead of repeating all that.  "These items have not

9      been received in evidence and were shown to you only to

10     explain or illustrate the contents of documents,"

11     blah-blah-blah.  "These items have not been received were

12     shown to you."

13             We kept calling them demonstrative exhibits, so why

14     don't we say that, because that's what they heard me say, so

15     "These demonstrative exhibits have not been received in

16     evidence and were shown to you only to explain or illustrate

17     the content of documents, testimony, other evidence in this

18     case.  As such, they are not proof of any facts."

19             I think that reads a little bit better and is not so

20     ponderous, so we'll make those edits.  Let me find that

21     damages section here.  On page 25, we're going to just end at

22     line 13, "her family had she lived," and not include

23     "including such elements as work around the home," et cetera.

24             Any other comments?  What we'll do, because I know

25     we're kind of moving things along pretty quickly, we'll make

1    these additional edits and send them to you by e-mail and

2    you'll have another chance to read them tonight, and we'll

3    look at them one more time tomorrow at 8:30.  If there are any

4    other additions or changes, we can make them.  Generally I try

5    to have the instructions done so that when the jurors go out,

6    they have their little notebooks, they have their binders,

7    they have anything else loose that came in, like those

8    pictures of yours, and then they all take out their own set of

9    instructions, but if Ms. Starr or Mr. Galovich has to run back

10   afterwards and hand them the instructions, I don't think it

11   will be a big deal.  We have had to do that on occasion,

12   because in fairness, you are allowed to come back up to

13   sidebar and tell me if there's anything else you want to talk

14   about in terms of instructions before they're charged.

15           The feedback I get is the jurors all love having hard

16   copy of the instructions when they go back there to

17   deliberate.  They really like that.

18           Sometimes I even give them a hard copy of the

19   preliminary if there's a lot of stipulations of fact so that

20   they have all those stipulations written down.  Ms. Starr,

21   have you typed up the verdict slip again?

22           THE CLERK:  Yes.

23           MR. PRICE:  Your Honor, on a procedural issue, I've

24   forgotten, is the closing argument order any different in

25   federal court?

1          THE COURT:  No, except in criminal cases, government

2     always gets the last bite at the apple.

3          MR. PRICE:  So it will be Ms. Koczan and Mike.

4          THE COURT:  And Mr. Colville, unless he wants to

5     waive his argument.  He could send me a brief, but I think

6     he's going to close.

7          MR. COLVILLE:  I'll be brief.

8          THE COURT:  You can be as long as you want.  That's

9     up to you.  What do you all anticipate in terms of closings?

10    About 45 minutes each?

11         MR. PRICE:  Yes.

12         MS. KOCZAN:  Yes.

13         THE COURT:  Let me read this one more time.  We are

14    up to Court Exhibit D, right?  It's the latest version of the

15    verdict slip.  Okay.  So, Ms. Starr, you want to print that

16    out so they can all take a look at that one?

17         The other thing I usually do, once the case has

18    concluded, is I usually have counsel meet with Mr. Galovich so

19    he can make sure that he has a listing of all of your exhibits

20    and that there's no discrepancies.  I know much of this case

21    is joint, but you know, out of an abundance of caution, he can

22    be called out here once I've left where you would just meet

23    off the record with him and make sure that his list matches

24    what you all want to go back to the jury.

25         MR. PRICE:  Okay.  I did provide the copy of the

1    Dr. Ringer and Dr. Boyd PowerPoints for my case.  I'll leave

2    it up here.

3            THE COURT:  Thank you.  Counsel for the defendants

4    have that?

5            MR. PRICE:  Yes.

6            THE COURT:  So, Ms. Starr, here's the latest edits

7    here and this will become discussion draft 7 and become

8    another court exhibit tomorrow morning if we have to revise it

9    some more.  Any other comments vis-a-vis the instructions?

10            MR. PRICE:  No, Your Honor.

11            THE COURT:  So Nicole will make those edits we just

12    talked about vis-a-vis the timelines, et cetera.  She'll also

13    make the edit vis-a-vis the damages.  We'll send that back out

14    on e-mail so everybody has another chance to look at it

15    overnight or later this afternoon, and maybe, Ms. Starr, you

16    can screen mail Mr. Galovich so he can appear and talk to the

17    folks about exhibits and I think he needs to record those

18    Ringer exhibits.  I don't know that he's done that.

19            MR. PRICE:  Right.

20            THE COURT:  Anything else for the record at this

21    point?  Okay.  So he'll just do a staff note that he met with

22    you to go over the exhibits just to make sure that you know

23    what he has on the official court docket matches what you

24    believe has all been entered.  Shouldn't take all that long.

25            You all did get a copy of the latest version of the

1     verdict slip, Court Exhibit D.  Any other changes to it?

2             MR. PRICE:  Looks good to me.

3             MS. KOCZAN:  I don't see any others.

4             THE COURT:  Okay.  Mr. Colville is taking a pass.

5             MR. COLVILLE:  I looked at it, Your Honor.  It's

6     fine.

7             THE COURT:  I know you looked at it.  Mr. Galovich,

8     first off, Mr. Price has some Ringer demonstratives he failed

9     to give you that need to be logged in, and then out of an

10    abundance of caution, maybe you should just double-check

11    exhibits with them.

12            THE CLERK:  It's very straightforward.  It was the

13    only exhibits other than the demos were the joint exhibits.

14            THE COURT:  Well, there were those original pictures.

15            THE CLERK:  They were in the binder, judge.  I do

16    have those.

17            THE COURT:  I think the idea was that not only are

18    they going to get them in the binder, but they are going to

19    actually get those pictures.

20            THE CLERK:  Indeed.  They are right here.  I have

21    them in the binder and I have the small versions right here,

22    judge.

23            THE COURT:  I'm presuming you are going to use

24    PowerPoints and the like, right?  And the way I normally do

25    things is I give people an opportunity to set up in between in

1    case you are doing something different, you know, speaking

2    from the podium or not, and also I usually let the jurors

3    stand up and stretch or something so that they concentrate on

4    each of the closings.

5              This has been an attentive group, I'm sure you've

6    noticed.  Some of them have been, in my words, copious note

7    takers, and a few times, I think you struck an emotional chord

8    with various of the jurors and, you know, how they are

9    ultimately going to react to this case is anyone's guess, but,

10   you know, at times, there were a lot of tears in this

11   courtroom.

12             MS. KOCZAN:  Mainly from the witness stand.

13             THE COURT:  Well, no, also from some of the jurors,

14   and we had tears from the witnesses.  We had some tears from

15   some of the jurors at different times.

16             MR. PRICE:  I gave you Dr. Ringer and Dr. Boyd's

17   PowerPoints.

18             THE COURT:  The ones that he used with those two

19   witnesses, John.

20             THE CLERK:  I'll mark these on here as demos for each

21   of those doctors, because I've been marking down the days

22   that -- regarding the cross-reference where they testified and

23   I made a reference on here about those original photos you

24   just referenced as follows:  Original photos of Joint Exhibits

25   29 through 34 placed in binder for jury deliberations per

1    direction of the court on August 28, '19."

2            THE COURT:  Thank you.

3            MS. KOCZAN:  Your Honor, Mr. Colville just pointed

4    out under the Wrongful Death Act in here, there's future

5    noneconomic loss in a lump sum, and it's the same as in the

6    wrongful death.  I'm not sure that it should be in both.

7            THE COURT:  I don't think we added that language.  I

8    think that came from you attorneys.

9            MS. KOCZAN:  If you look at No. 4, the Wrongful Death

10   Act and then it's the same under the survival.

11           MR. PRICE:  Yes.

12           MS. KOCZAN:  Let me just look at the instructions.

13           THE COURT:  That's what I'm doing myself.  It seems

14   to me, if you look under The Survival Act, you would only be

15   looking at future loss of earnings in a lump sum and not the

16   next two items.  Am I right on that?  When I look at the

17   instructions, that seems to be the way it should read, but as

18   I said, this verdict slip, we got from you all.

19           MS. KOCZAN:  It's not the same for both of them and

20   you know, under the instructions, it's wrongful death, it's

21   the past loss contributions, past and future noneconomic

22   damages, and under survival, it's future loss of earnings and

23   that's it.

24           MR. PRICE:  Your Honor, that might be correct.  Just

25   for correction of the jury instructions, on page 24 at line

1      21, it's entitled "Past Loss Contributions" and I think it

2      should be "Future Loss of Contributions."

3              THE COURT:  Let's see.  24, as you have seen -- where

4      is this again, Mr. Price?  Page 24 line 21?

5              MR. PRICE:  Yes, if you take a look at the verdict

6      slip, it says they are -- the damages would cover a future

7      loss of contributions, because --

8              THE COURT:  You are right.  Under the Wrongful Death

9      Act, it should say future loss contributions.

10             MR. PRICE:  Right, because she didn't really have

11     any -- I mean, there is no past loss contributions.

12             THE COURT:  Right.

13             MR. PRICE:  My only concern is, and I have to take a

14     look at it tonight, what The Survival Act damages are.

15             MS. KOCZAN:  I'm looking at that right now.  I pulled

16     it up on my handy-dandy computer here.  Make sure I have the

17     right thing.

18             THE COURT:  Ms. Starr, on this version, it's one of

19     these italicized things that says Past Loss Contributions

20     needs to be made "Future Loss Contributions" under the

21     sentence that begins "Under The Wrongful Death Act."

22             THE CLERK:  I have it.

23             THE COURT:  This is what we'll do, because I need

24     about five minutes to get where I'm going, so we're going to

25     go off the record at this point in time.  Ms. Starr will make

1    these edits as we've talked about to this point, and then

2    she'll e-mail it to all of you unless you want to sit here and

3    work with her line by line.  It's a little cumbersome, and in

4    terms of the confusion about the verdict slip, you know, we

5    can also go back in time and pull up other verdict slips that

6    we have had involving wrongful death and survival, but what we

7    were playing off is what you had given us as a joint verdict

8    slip.

9        MS. KOCZAN:  I have a document in my office that

10   identifies all of it, so I'll look at that whenever I go back.

11       THE COURT:  If you could share that with Mr. Price

12   and go back and forth maybe with copy to Mr. Colville, that

13   will speed things up tomorrow.  And we can all go on the

14   record at 8:30.  I should be here no later than 8:15, I think,

15   tomorrow.  Maybe sooner.

16       As far as your clients go tomorrow, they don't have

17   to be here at 8:30, but they should be here by 9:00 because

18   those jurors will be ready to go.  I think they are chomping

19   at the bits to get this case.

20       MS. KOCZAN:  I'm sure they are.  It's been a long two

21   weeks for them.

22       THE COURT:  A lot to take in.  Eight experts is a lot

23   for anybody.

24       (At 2:41 p.m., the proceedings were adjourned.)

25

154

1                        C E R T I F I C A T E

2              I, BARBARA METZ LEO, RMR, CRR, certify that the
     foregoing is a correct transcript from the record of
3    proceedings in the above-entitled case.

4

5     _\s\ Barbara Metz Leo__              09/25/2019
      BARBARA METZ LEO, RMR, CRR          Date of Certification
6     Official Court Reporter

7                         I N D E X

8    WITNESSES                                            PAGE

9    SUSAN COFFIN, M.D.

10        Direct Examination By Ms. Koczan                 9
          Cross-Examination By Mr. Price                  46
11        Redirect Examination By Ms. Koczan              55
          Recross-Examination By Mr. Price                58
12
     STEVEN RINGER, M.D.
13
          Direct Examination By Ms. Koczan                63
14        Cross-Examination By Mr. Price                 100
          Redirect Examination By Ms. Koczan             110
15

16

17

18

19

20

21

22

23

24

25