1

1        IN THE UNITED STATES DISTRICT COURT
      FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2

      CARISSA PERONIS, et al.,
3                 Plaintiffs
        vs.
4                                    Civil Action No.
      UNITED STATES OF AMERICA, et    16-1389
5     al.,
                  Defendants.
6
                          - - -
7

        Transcript from proceedings on September 5, 2019, United
8     States District Court, Pittsburgh, PA,
      before Judge Nora Barry Fischer.
9

10    APPEARANCES:

11     For the Plaintiffs:    Harry S. Cohen & Associates, P.C.
                              Douglas L. Price, Esquire
12                            Two Chatham Center
                              Suite 985
13                            Pittsburgh, Pennsylvania 15219

14
       For the Defendant     U.S. Attorney's Office
15     USA:                   Michael Colville, Esquire
                              Philip P. O'Connor, Jr., Esquire
16                            U.S. Courthouse
                              700 Grant Street
17                            Pittsburgh, Pennsylvania 15219

18     For the Hospital      Weber Gallagher Simpson Stapleton
       Defendants and        Fires & Newby
19     Dr. Jones             Paula A. Koczan, Esquire
                             603 Stanwix Street
20                           Suite 1450
                             Pittsburgh, Pennsylvania 15222
21
       Court Reporter:       Barbara Metz Leo, RMR, CRR
22                           700 Grant Street
                             Suite 6260
23                           Pittsburgh, Pennsylvania 15219

24
        Proceedings recorded by mechanical stenography;
25    transcript produced by computer-aided transcription.

1              THE COURT:  Good morning, everyone.  This is the time

2       for proceedings in the case of Carissa Peronis, et al., versus

3       United States of America.  Overnight following our discussion

4       yesterday, we sent out another version of the final jury

5       instruction, discussion draft No. 7, and to that end,

6       Ms. Starr advises me that she had no additional corrections,

7       comments or the like that came from counsel.  Is that the

8       case, Mr. Price?

9              MR. PRICE:  No further comments.

10             THE COURT:  Ms. Koczan?

11             MS. KOCZAN:  Yes, no further.

12             THE COURT:  Now that we have an approved set, this

13      will be Court Exhibit -- what are we up to, Nicole.

14             THE CLERK:  E.

15             THE COURT:  This is Court Exhibit E that's been

16      approved by all counsel.

17             THE CLERK:  5.

18             THE COURT:  Also counsel should have the verdict

19      slip.  Mr. Galovich retyped it, if you will, so that the

20      questions followed.  There was an e-mail exchange concerning

21      the extent of damages vis-a-vis The Wrongful Death Act and The

22      Survival Act.  I think we have agreement; is that correct,

23      Mr. Price and Ms. Koczan?

24             MS. KOCZAN:  That is correct.

25             THE COURT:  And you have all had a chance to look at

1    the reformulated verdict slip?

2            MR. PRICE:  Yes.

3            THE COURT:  There are no changes to same, correct?

4            MR. PRICE:  Correct.

5            MS. KOCZAN:  Correct.

6            THE COURT:  So that's Court Exhibit F.

7            THE CLERK:  Your Honor, they were going originally by

8    numbers so I guess that will be 6 then.

9            THE COURT:  That's fine.  Whatever it is.  Are we

10   prepared and ready to proceed?  Anything need to be done here

11   in the courtroom before closings?

12           MS. KOCZAN:  Your Honor, I just need one minute.

13   This is then the final version of the verdict slip?

14           THE COURT:  Yes.

15           MR. PRICE:  Your Honor, since we have the time, the

16   only thing I'll do pursuant to the court's direction, I have

17   copies of my PowerPoint.

18           THE COURT:  I appreciate that.  Let the record

19   reflect that Mr. Price is providing counsel and the court with

20   copies of his PowerPoint which will be demonstrative to his

21   closing argument.

22           MS. KOCZAN:  Your Honor, while I have a PowerPoint,

23   it doesn't include any medical records or anything.  It's just

24   my verbiage.  That's it.  It is just my argument.  That's all.

25           THE COURT:  Okay.  Mr. Galovich, all of our jurors

4

1    here?

2            THE CLERK:  No, Your Honor, not yet.

3            THE COURT:  Ms. Koczan, back to what your PowerPoint

4    says, what do you have?  Bullets?

5            MS. KOCZAN:  No, it's my argument.  It's just on

6    paper, so it's not -- there's nothing like what is in here.

7    I'm not showing documents or pictures or anything like that.

8    It's just my argument.

9            THE COURT:  Understood.

10           MR. PRICE:  Your Honor, I don't understand the

11   difference.  Why can't I see them?

12           THE COURT:  It would seem to me -- the other thing

13   I'm concerned about it's going to be projected to the jury, so

14   to that end, I think we should have a copy as a demonstrative

15   exhibit.

16           MS. KOCZAN:  Your Honor, I can give the court this

17   copy after I'm done because I'd like to use it while I'm doing

18   it and I can give it to them.

19           THE COURT:  Why don't we get copies for everybody?

20   Ms. Starr, you can handle that while Mr. Galovich logs.

21   Mr. Colville should have one, Mr. Price should have one and I

22   should have one to follow along and then you'll need one,

23   Mr. Galovich.

24           MS. KOCZAN:  This is the last page but this is not

25   going to be on there so only this.

1            THE COURT:  It's the hospital defendant's closing

2    argument demonstrative.

3            As I told you yesterday, we were working on the

4    memorandum order vis-a-vis my ruling on the corporate

5    negligence issue, and in addition to what I put on the record,

6    I would also add that Dr. Karotkin, although at one point he

7    indicated that -- the question was:  You would agree you can

8    have a standard that differs from yours that can still meet

9    the standard of care?

10           Then he said:  As I noted yesterday, I don't know if

11   that's true.  I guess.  I always thought the standard of care

12   would be what a reasonable person would do in a similar

13   circumstance in a similar hospital.

14           But then he went on to say:  Would you agree that

15   this hospital provides the minimum standard of care?

16           Answer:  Well, again, I would disagree in the sense

17   that they don't advocate for having a pediatrician in

18   attendance at a delivery where there are at least four or five

19   risk factors.

20           Then the question was:  That doesn't mean it doesn't

21   meet the standard of care.  You just disagree and you think a

22   pediatrician should be present.

23           Answer:  Well, it doesn't meet the standard of care

24   that I think I would impose on a hospital delivering patients.

25           Then the question:  But it's what the reasonable

1    doctor would, not just one doctor.  It's across the board,

2    what's agreed to, as a reasonable standard.

3        Answer:  Well, again, I think -- again, I'm not

4    trying to be argumentative.  I'm trying to explain my answer.  I

5    think if you ask the vast majority of pediatricians or

6    neonatologists if a pediatrician should be in attendance where

7    there is a delivery anticipated with meconium-stained fluid,

8    vacuum extraction, delayed descent, some question of

9    abnormalities of the fetal heart rate, I think most of them

10    would agree that a pediatrician should be present at that

11    delivery to evaluate the patient, whether they need to or not.

12        So the court is also going to be relying on that

13    language in our memorandum opinion which, in my estimation,

14    bolsters the court's decision that the issue of the corporate

15    negligence on the policy issue does go to the jury, and the

16    court, you know, finding that those experts, just as the

17    defense experts, were appropriately qualified experts, and

18    that was his opinion in terms of what the standard of care is.

19        And the jury can make a determination whether, number

20    one, that policy was or wasn't reasonable, and number two,

21    whether it was or wasn't followed.

22        In addition, as I said yesterday on the record, the

23    allegations of corporate negligence in the complaint go far

24    beyond the policies.

25        Let the record reflect that Mr. Galovich is now

1    providing copies of the PowerPoint presentation that

2    Ms. Koczan intends to use.  He has retained one for the

3    court's records.  Mr. Galovich, where are we vis-a-vis head

4    count?

5         MS. KOCZAN:  Your Honor, it is not included in my

6    PowerPoint, but I was going to show the first page of this.

7         THE COURT:  Not a problem.

8      (Jury present.)

9         THE COURT:  Morning ladies and gentlemen of the jury.

10   As I told you last evening, we're going to start this morning

11   with closing arguments, and to that end, I have a limiting

12   instruction on closing arguments.

13        You have now heard and seen all the evidence in this

14   case.  The lawyers now have the opportunity to present their

15   closing arguments.  The defendants will argue first.  Then the

16   plaintiffs will present their closing argument.  Closing

17   arguments are designed to present to you the parties' theories

18   about what the evidence has shown and what conclusions may be

19   drawn from the evidence.  Remember, what is said in closing

20   arguments is not evidence.  You have already heard and seen

21   all of the evidence in this case.

22        After the lawyers present their closing arguments,

23   I'll give you my final instructions concerning the law that

24   you must apply to the evidence in reaching your verdict.

25   Although the lawyers may mention points of law in their

1    closing arguments, the law that you must follow in reaching

2    your verdict is the law that I will give you in final

3    instructions.  If there is any difference between what the

4    lawyers say about the law and what I tell you in the final

5    instructions, you must follow my instructions.

6         Now, with that, we'll turn to the defendants.

7    Ms. Koczan?

8         MS. KOCZAN:  Thank you, Your Honor.  Your Honor,

9    counsel, ladies and gentlemen of the jury, we have reached the

10   final phase of this lawsuit and of this trial, and in a few

11   moments, we are all going to be making closing arguments, but

12   before I begin mine, I wanted to thank each and every one of

13   you on behalf of my clients, Dr. Jones and Heritage Valley

14   Beaver and Heritage Valley Pediatrics, for the time that you

15   have spent in the courtroom.

16        We know that this is a major inconvenience for you,

17   and we appreciate you being here, but more importantly, we

18   appreciate the attention that each and every one of you has

19   given to this case.  There has often been long, repetitive

20   testimony.  I can assure you it was not my intention to bore

21   you to tears with repeatedly putting up the same documents,

22   but because I can't ask you if you saw that, if you understood

23   that, I need to make sure that you did, so on behalf of my

24   clients and on behalf of all of the litigants, thank you very

25   much for being here and participating in this most important

1    process.

2         Before we talk about the issues in the case, I want

3    to begin by talking about things that are not issues in the

4    case.  The first nonissue in the case is Kendall's condition

5    at the time of delivery.  Everybody, including the plaintiffs'

6    experts, have said that Kendall, with an Apgar score of eight,

7    was a healthy baby.  I don't think there's any dispute.  Or at

8    least appeared to be a healthy baby at that time.  No dispute

9    about that.  Everyone agrees that that Apgar score was a good

10   score that indicated at that time a healthy baby.

11        The second nonissue, what a pediatrician would have

12   done if one had been called to the delivery room.  I think all

13   the experts agree that if a pediatrician had been called with

14   Kendall having an Apgar score of eight and a completely normal

15   assessment, there would have been nothing to do immediately.

16   There would be no resuscitation that was necessary beyond that

17   that was provided by Nurse Hendershot.  There would be no

18   reason to do anything further, including order antibiotics at

19   that time.  No disagreement as to that.

20        Now, beyond that, there is disagreement and we'll

21   talk about that later.

22        The care provided by Dr. Jones once she arrived at

23   the hospital around 8:00.  There are no criticisms of anything

24   that Dr. Jones did.  Everyone, including plaintiffs' experts,

25   said when she got there at 8:00, she did a great job.  That is

1     not an issue in the case, any of her care, anything she did at

2     that point.

3          The last issue in the case, Kendall's cause of death.

4     Now, there is some issue as to contributing factors, but I

5     believe that everyone agrees that Kendall died of an E. coli

6     sepsis.  That was the cause of her death.

7          So what issues remain in this case that you need to

8     decide when you begin your deliberations?  The first issue is

9     should the nurses, and in this case, it would have been

10    Nurse Hendershot or Nurse Gantz who you didn't hear from, she

11    was one of the other nurses present, should they have called a

12    pediatrician to attend Kendall's delivery or advocated for

13    Dr. Dumpe to call a pediatrician to be present.  That's going

14    to be one of the issues you have to decide.

15         The second issue, if a pediatrician had been called,

16    would there have been an earlier recognition of the E. coli

17    sepsis and, therefore, earlier antibiotic administration?

18    That is the second issue that you are going to have to decide.

19         The next issue, was there any evidence of respiratory

20    distress prior to 7:25 a.m. for which a pediatrician should

21    have been called?

22         And finally, was Dr. Jones called at 7:20 a.m., and

23    if so, whether her arrival at the hospital at 8:00 deviated

24    from the standard of care.

25         There's one additional issue too that is not included

1    in that is whether the hospital's policies were in keeping

2    with the applicable standard of care, so those are the issues

3    that you are going to have to decide when you begin your

4    deliberations.

5         I skipped another one, whether earlier administration

6    of antibiotics would have made a difference in the outcome,

7    given an overwhelming E. coli sepsis.  That is perhaps the

8    most significant of the issues that you are going to have to

9    decide.  Would earlier treatment have made any difference in

10   this case, given the infection that this child had.

11        We talked earlier and the judge is going to give you

12   instructions, but you are going to be asked to decide whether

13   these health care providers were negligent, so it's important

14   to understand what that means.  We talked about this before,

15   that negligence means that the health care provider has a

16   duty, and we don't disagree with that.

17        These health care providers were -- they were in the

18   hospital to care for Kendall and Carissa.  Whether there was a

19   breach of duty, and that testimony came from the experts.  You

20   heard the experts come in and offer opinions as to whether

21   there was compliance with the standard of care or deviation

22   from the standard of care.  That's where that evidence is

23   going to come from.

24        Causation and then harm.  If you put it all together,

25   negligence means a breach of duty that caused harm, so that is

1     what you are going to have to decide.

2          An important thing to keep in mind though, the mere

3     occurrence of an injury or unfortunate result does not prove

4     negligence just because of something unfortunate.  There is no

5     dispute that what happened here was tragic, but just because

6     that happened, it doesn't mean that these health care

7     providers were negligent.

8          And the burden of proof.  The judge will give you

9     instructions, but recall that the burden of proof rests solely

10    with the plaintiff.  The defendants don't have to prove

11    anything.  It isn't their obligation to prove the case.  Think

12    of the scales of justice and the judge will instruct you

13    accordingly.

14         So let's talk a little bit about the expert

15    witnesses, because that's where the testimony is regarding

16    whether there was compliance or deviation from the standard of

17    care.

18         On behalf of the plaintiff, we had Dr. Zamore come in

19    here, and if you remember, he was the very first expert that

20    plaintiffs put on, and he was the obstetrician gynecologist

21    who, if you recall the cross-examination, did a lot of

22    gynecology rather than obstetrics, but he practices at Yale.

23         For the plaintiffs, we have Dr. Shore.  He was from

24    Emory.  He was the pediatric infectious disease expert, and we

25    had Dr. Karotkin, who was the neonatologist from -- I believe

1    it was East Virginia Medical School.

2          On the defense side, this was not my expert but the

3    USA's expert, and that was Dr. Wiesenfeld, and if you recall,

4    he was the obstetric gynecologist who practices at Magee here

5    in Pittsburgh and who has a special interest in maternal

6    infections.

7          We had Dr. Coffin who testified yesterday.  She is

8    the pediatric infectious disease expert from Children's

9    Hospital of Philadelphia, a professor of pediatrics,

10   infectious disease from that institution, Dr. Ringer who was

11   the neonatologist from Dartmouth and finally Dr. Boyd.

12   Plaintiffs didn't bring a pathologist in to talk with you, to

13   offer opinions.  Dr. Boyd was the only pathologist that you

14   heard from, and she told you that unequivocally, this child

15   died from an E. coli infection and that there was not massive

16   meconium, and we'll talk about that a little later.

17         Those are the experts.  You have to determine which

18   of those experts you find to be most credible.  In order to do

19   so, recall their qualifications, recall the manner in which

20   they testified, and you determine who you find to be most

21   credible.  So let's talk about what the evidence was, what the

22   claims are in this case.

23         So the very first claim here is given that the fetal

24   heart tracing, that's the FHT, which intermittently showed a

25   category two tracing, the presence of meconium, the need for a

1    vacuum extraction, the presence of a shoulder dystocia, the

2    delivery room nurses should have called a pediatrician or

3    advocated for the calling of a pediatrician to come to the

4    delivery room.  That's the plaintiffs' claim.  All these

5    things were present.  A pediatrician should have been there,

6    and the nurses should have either called individually or they

7    should have advocated for Dr. Dumpe to do that.

8         Let's talk about the facts.  The fetal heart tracing

9    was reassuring and did not warrant the calling of a

10   pediatrician.  Where did you hear that from?  Dr. Wiesenfeld

11   told you that there was nothing there that was concerning that

12   needed to have a pediatrician in attendance at the time of

13   this delivery.

14        Although it is at the discretion of the obstetrician,

15   the Heritage Valley policy does not indicate that a

16   pediatrician should be present unless there is particulate

17   meconium.  There was no evidence of particulate meconium at

18   any time prior to or during the delivery.  You recall the

19   testimony of Nurse Ash and her notes, thin meconium.  You

20   recall the testimony and notes of Nurse Hendershot, thin

21   meconium.  And then we have Dr. Dumpe's OR report which says

22   nonparticulate meconium.  There was no evidence of particulate

23   meconium here for which a pediatrician needed to be called.

24        That's just what I mentioned.  The American Academy

25   of Pediatrics, the American Heart Association and the ACOG

1    standards do not require a pediatrician to be present when

2    meconium is noted, but instead require a health care provider

3    who is trained in neonatal resuscitation.  Both

4    Nurse Hendershot and Dr. Dumpe were NRP certified.  That is

5    what was required.

6         You heard that testimony from Dr. Wiesenfeld, from

7    Dr. Ringer, from Dr. Dumpe.  These policies comply.  There was

8    nothing in the policy that required a pediatrician to be

9    present during this delivery.

10         The next claim, as we talked about before, the vacuum

11    extraction.  Here, the vacuum extraction was performed as a

12    result of maternal fatigue.  One of the reasons you would have

13    a pediatrician is if you thought there was some injury or

14    problem as a result of the vacuum extraction or that the baby

15    had been deprived of oxygen for some period of time.  There

16    just wasn't that evidence in here.  You didn't hear anything

17    about that, that there was any evidence that there was a

18    problem such that a pediatrician needed to be called for that.

19         We heard repeatedly about the shoulder dystocia, and

20    Mr. Price has repeatedly put up the coding sheet to say, oh,

21    there was shoulder dystocia, but if you look at Dr. Dumpe's

22    note, Dr. Dumpe's note doesn't indicate there was shoulder

23    dystocia.  What the note indicates is that he had a concern

24    for it, and he took measures to prevent it from occurring.

25    There was no shoulder dystocia in this case.  Therefore, there

1    was no reason to have a pediatrician present because of that.

2           The Apgar scores indicated a healthy baby.  All of

3    these health care providers told you that if there was an

4    issue, they would have called a pediatrician.  Why wouldn't

5    they?  That just doesn't make any sense, that if there was

6    something going on, why would they not do that?  The reason

7    they didn't do it here is because this baby had an Apgar

8    score -- five minute Apgar score of eight, which indicates a

9    healthy baby.

10          In addition to that, that initial delivery assessment

11   was completely normal.  There was nothing going on there.

12   There was no reason for a pediatrician to be called in at this

13   point.

14          The next one, there was no need for resuscitation or

15   any other intervention.  The baby didn't need to be

16   resuscitated.  There wasn't anything going on.

17          The next allegation, if a pediatrician had been

18   called, given Kendall's condition at birth and those risk

19   factors which I just went through, fetal heart tracings,

20   vacuum extraction, meconium, the alleged shoulder dystocia,

21   the pediatrician would have initiated interventions which

22   would have or should have included sending Kendall to the

23   nursery for continuous observation, directing the nursing

24   staff to closely monitor her, including frequent checking of

25   pulse oximeters, vital signs, et cetera.  That is the claim.

1          Here are the facts:  All of the physicians agree,

2     including plaintiffs' experts, that had a pediatrician been

3     called, there would have been nothing for the pediatrician to

4     do at that time.  This was a healthy baby.  There was no

5     evidence of respiratory distress.  There was nothing to

6     resuscitate at that point.  There was no issue.

7          Kendall did not require interventions beyond those

8     that had already been provided by the neonatal trained

9     resuscitation nurse.  All agree that the initial assessment

10    revealed that Kendall appeared to be a healthy baby.  Now, we

11    know that wasn't the case, and that became evident later, but

12    at the time of birth, she appeared to be healthy.

13         There was no evidence of any respiratory distress or

14    other symptoms which would have indicated the need for further

15    intervention, including the administration of antibiotics.  I

16    think everyone agreed.  You wouldn't give antibiotics at that

17    time.  There was no reason to do that.

18         And importantly, you heard Dr. Jones testify.  She

19    was asked, well, if you had been called, what would you have

20    done?  And what she told you is she wouldn't have done

21    anything other than to say call me if there are any issues.

22    That's what she would have done.  She would not have directed

23    the baby to be admitted to the nursery because there was no

24    reason.  There was nothing going on at that time that was

25    concerning that required that close observation, pulse

1    oximetry, that type of thing.  There just wasn't anything

2    going on.  She wouldn't have ordered any of that.  She would

3    not have started a sepsis workup because there's no reason to

4    do so.  She would not have prescribed the antibiotics at that

5    time.  You have to have an indication to do that, and at this

6    point in time, there was no indication to do that.

7            Continuous pulse oximetry would not have been

8    indicated or even intermittent pulse oximetry.  You heard

9    Dr. Ringer testify yesterday that isn't standard of care.

10   They don't do that.  When the baby is born and the baby

11   appears healthy, the protocol is to allow the baby to bond

12   with the parents.  It isn't to bring them into the nursery,

13   put them on a continuous pulse ox when there's no reason to do

14   so.  That's the way it works in these institutions.  You don't

15   do that.  There's got to be a reason and there wasn't one

16   here.

17           Given Kendall's condition at birth and the five

18   minute Apgar, again, there was no reason why she should not

19   have been permitted to stay in the delivery room and bond with

20   her parents.

21           Here's the next claim:  During the time that Kendall

22   was in the delivery room with her parents and other family

23   members following her birth and the initial assessment by

24   Nurse Hendershot and the completion of the care by Dr. Dumpe

25   that he provided to Carissa, she was having difficulty

1    breathing, she was grunting, flaring and retracting, crying

2    continuously and was inconsolable, all of which should have

3    warranted intervention.

4            Again, keep in mind that those are the claims by the

5    parents.  That's what they claim was occurring during this

6    time frame.

7            Here are the facts.  Nurse Hendershot, who is a

8    neonatal-resuscitation trained, certified nurse with 30 years

9    of experience was in the room to evaluate Carissa every 15

10   minutes, and during those evaluations, she would have observed

11   Kendall.  This is a nurse who is very experienced.  She was in

12   there.  She saw the baby.

13           If she saw anything, would there have been any reason

14   for her not to do something about it?  Why would she not do

15   something about it?  She was just going to ignore it?  That

16   doesn't make any sense.  Carissa was Maria's only patient.  It

17   wasn't like she was running around from patient to patient

18   that night.  That wasn't the situation.  It was just Carissa

19   and Kendall.

20           If Kendall had any of the symptoms which the family

21   claims were present, Nurse Hendershot would have, as she

22   testified, taken Kendall to the nursery for an immediate

23   evaluation.  She would have called a physician.  She would not

24   have allowed Kendall to stay in that room and be passed around

25   from family member to family member.  That would not have

1    occurred.

2         The other thing to keep in mind, there were at least

3    ten family members in that room at that time passing Kendall

4    from family member to family member, and with the exception of

5    Matt allegedly sending Tyler out to report that he was

6    concerned that Kendall was crying or not breathing, no one

7    came out to get a nurse or report their concerns regarding

8    Kendall's condition.  You'll recall, the nurses' station was

9    directly across the hall.  If there's an issue, you walk out

10   in the hall with the baby.  Look at this baby.  Take care of

11   this baby.  That never occurred in this case.

12        When Maria took Kendall to the nursery, she did not

13   observe any symptoms of respiratory distress.  Again, I don't

14   think, again, that there's any dispute that Maria was present

15   and took this baby to the nursery.  I know there's been

16   testimony from Matt that it was he who went there, but all of

17   the nursing staff testified that it was Maria who brought

18   Kendall to the nursery that day.

19        Again, she would have had a chance to observe her.

20   If she had seen any grunting, flaring and retracting,

21   difficulty breathing, why would she not have done something

22   about it?  It doesn't again make any sense.

23        When Barb Hackney admitted Kendall to the nursery,

24   she obtained vital signs which were normal.  She provided eye

25   drops.  She gave an injection.  In order to do that, you've

1    got to be looking at that baby.  She is putting drops in her

2    eyes.  You could see at that point if Kendall were having

3    respiratory issues, and again, why would Barb Hackney ignore

4    those?

5         You may hear, oh it was a change of shift, she was in

6    a hurry.  Barb told you that if for one second she saw any

7    issue with that baby, she would have done something.  She

8    would have done the full assessment.  She would have taken

9    action.  Again, it doesn't make sense.  What?  They all

10   ignored this baby, a baby in distress?  I think you can see

11   from the witnesses who took the stand here how this affected

12   them, how caring and concerned they were.  These nurses would

13   not have done that.

14        The next allegation, Kendall's vital signs and pulse

15   oximeter readings, if they had been taken while in the room

16   with her parents, would have been abnormal and would have led

17   to earlier intervention, including antibiotic administration,

18   which would have given Kendall a chance of survival.  That's

19   the claim.  That was Mr. Price's hypothetical that he was

20   asking the doctor about yesterday, asking you to assume or

21   asking the doctor to assume all these different facts which

22   did not occur.

23        Here are the facts.  Kendall's vital signs were

24   stable at 7:00 a.m.  Therefore, they would have been stable

25   earlier, because when you have an infection like this, they

1    don't get better.  They get worse.  They won't wax and wane.

2    It's a continual deterioration, so to argue that her vital

3    signs would have shown something different earlier, i.e. that

4    they would not have been normal does not make any sense given

5    the way these infections progress.

6        Pulse oximetry again wasn't indicated, and it's not

7    the standard of care.  Did you hear anybody come in here and

8    say the standard of care required the child to have pulse

9    oximetry, and Dr. Ringer told you that is not standard of

10   care.

11       If, as plaintiffs allege, Kendall's vital signs would

12   have been unstable earlier and her pulse ox reduced, Kendall's

13   chance for survival would have been worse and not have led to

14   a better outcome, and I think Dr. Ringer explained that

15   yesterday.  That would have shown even more aggressive

16   infection, further progression of infection, so it would not

17   have made the situation better.  It would have indicated that

18   she was even in worse shape.  So the outcome would not have

19   been better.  It would have been worse.

20       The next allegation, based upon the notes made by

21   Janet Kincade, Dr. Jones was called at 7:20 a.m. but failed to

22   arrive at the hospital until 8:00 a.m.  That's the whole

23   reason that Dr. Jones has been sitting in this courtroom for

24   the past two weeks.  No one claims, as we've talked about,

25   that she did anything wrong here.  The sole claim is if she

1    was called and she didn't come, then she is presumably

2    negligent.

3         Here are the facts.  The nurses who were present and

4    aware of Kendall's condition at 7:20 a.m. were Nurses Barb

5    Hackney and Jamie McCrory.  That was who was there.  Barb

6    testified she didn't call Dr. Jones.  Jamie McCrory testified

7    she didn't call Dr. Jones.  She called Dr. Heiple, the

8    resident, because that was the protocol.  She was to call the

9    resident, and if you recall Dr. Jones saying if I was called,

10   I would have said call the resident.  Have the resident

11   evaluate her.  That's the protocol there.

12        So Barb didn't call.  Jamie didn't call.  Dr. Heiple

13   didn't call Dr. Jones, as he knew she would have been arriving

14   at 8:00 per her routine.  He was also aware that she was on

15   her way because he could see by consulting his iPad that she

16   had already swiped into the parking lot so she was on her way

17   up.  I want to make a couple of comments about Dr. Heiple

18   because I'm sure we're going to hear about this.

19        Dr. Heiple, during his deposition which was taken

20   several years after these events, said that he thought that he

21   got there somewhere around 8:00, but that doesn't make sense

22   in terms of the timing, because we know that Jamie called him

23   somewhere around 7:25 a.m.  His testimony, I was down there

24   pretty quickly thereafter, and Jamie basically said the same

25   thing, so pretty quickly thereafter isn't 8:00.  It might be

1   7:35, 7:40.

2           He also testified that Dr. Jones was there within

3   about 15 minutes of the time that he got there, so if you put

4   that all together, that places him there somewhere around

5   7:40, 7:45.  Dr. Jones was there then at 8:00.

6           So again, the timing makes the most sense that way.

7   Dr. Jones testified that she was not called and that her first

8   knowledge of Kendall was when she arrived in the nursery

9   around 8:00 a.m.

10          And you recall Mr. Price showing you the clip of

11  Jamie explaining that Dr. Jones wasn't happy about the fact

12  that she hadn't been called because she walked in to a

13  situation where there were two babies that needed to be

14  transferred.

15          Nurse Kincade also took the stand and she testified I

16  didn't call Dr. Jones.  Nurse Kincade -- what did happen is

17  that Nurse Kincade asked if the doctor had been called.  She

18  was told that a doctor was called, she said, around 7:20 a.m.

19  She then asked what pediatrician was on call, and she was told

20  it was Dr. Jones.  She then made an assumption that it was

21  Dr. Jones who was called, which we know did not happen.

22  Dr. Jones was not called here.

23          The only way that the nurses or anyone else from

24  Heritage Valley could have reached Dr. Jones was to call

25  either her pager or her cell phone.  She doesn't have a home

phone.  There would have been no other way to reach her.  And
what do we know about that?  The pager records reflect there
were no calls made to Dr. Jones at 7:20 a.m. or any time
thereafter about Kendall.  There simply were no calls.

Her cell phone records reflect that there were no
calls placed to her at 7:20 a.m.  There's been some inquiry
about, well, maybe they called the Heritage Valley pediatric
office and that's how Jones became aware, but as Dr. Jones
told you, if they had called the Heritage Valley Pediatrics
office, Dr. Jones would have been paged.  It would have been
in those pager records, and the pager records show no pages.

I think the evidence abundantly establishes here that
Dr. Jones was not called, that her first knowledge of these
events occurred at 8:00 a.m. and again, there is no criticism
of her in terms of what she did at that time.

The next allegation, since we know Kendall was
infected at the time of birth, had a pediatrician evaluated
her, she would have found abnormalities for which a workup
would have been initiated and earlier treatment rendered which
would have saved her.  That's the claim.

The facts.  This is a virulent, aggressive infection
in newborns.  The way this E. coli works, and you heard
Dr. Ringer talk about that, Dr. Coffin talk about it, is that
the baby initially appears well after delivery, as Kendall did
in this case.  An eight Apgar is a normal Apgar.  Babies,

1    however, can only compensate for a certain amount of time, and

2    in this case, we know that Kendall's body was doing everything

3    it could to fight this infection.

4        We know that because her neutrophil count when those

5    labs were obtained showed that she had basically used up all

6    of those infection-fighting cells.  She was doing -- her body

7    was doing its very best to fight this infection.  However,

8    there comes a point in time where the infection has caused so

9    much tissue damage that the baby just can't fight it anymore,

10   and when that happens, the term that we have used is the baby

11   kind of falls off the cliff.  Everything starts to deteriorate

12   very quickly, and that is exactly what happened in this case.

13       Earlier treatment with antibiotics would not have

14   changed the outcome here and why do we say that?  Why did

15   Dr. Coffin say that?  Because generally, and I think all the

16   doctors agree that the general rule is the earlier you do

17   something, including antibiotics, the better off it's going to

18   be, but that's not the case when the infection has progressed

19   to the point that they are already falling off the cliff.

20       At that point, there isn't anything further that can

21   be done.  Antibiotics are not going to change the course.

22   Antibiotics don't work instantaneously.  They do take some

23   time to work, and when it is so far gone, they don't work, and

24   that's what happened in this case.  And with regard to that,

25   there's simply no evidence that anything was going on here

1    before 7:25 a.m.  When it was noted, the nurses immediately

2    started action.  Jamie McCrory had that baby under the oxy

3    hood.  She was monitoring her.  Dr. Heiple was in there.  He

4    stayed with her.  They were monitoring her.  Dr. Jones was in

5    there.  They were extremely attentive.  They did everything

6    that they could, but this infection is what caused the

7    problem, and it could not have been reversed earlier because

8    the infection didn't manifest itself before 7:25 a.m., and

9    when it did, it was too late.

10          The next claim, had Dr. Heiple called Dr. Jones when

11   he initially evaluated Kendall or placed orders at that time,

12   it would have resulted in earlier intervention.  The facts,

13   Dr. Heiple's actions were appropriate.  When he arrived,

14   Kendall was under that oxy hood.  Her oxygen saturation had

15   come up.  Recall it was originally 81 percent.  She was put in

16   the oxy hood.  She then came up to 94 percent, which is

17   considered to be normal.  That's a decent O2 saturation, and

18   she appeared to him at that time, at least at that moment, to

19   be stable.

20          And you recall that Jamie McCrory testified her note,

21   that note from 7:25, was put together later, and she tried to

22   include as much information as she could all in that note, but

23   her testimony was that initially Kendall wasn't grunting,

24   flaring and retracting.  It wasn't until later when they began

25   to intervene with her that she saw those things, and that

1    would be around the time that Dr. Jones was there, so when

2    Dr. Heiple was there, he didn't see those types of things, so

3    his actions, given the fact that he knew Dr. Jones was going

4    to be there, were totally appropriate.

5              Next claim, earlier administration of antibiotics

6    would have provided Kendall with a chance of survival.  We

7    already talked about that, but the antibiotics were ordered by

8    Dr. Jones verbally sometime between her arrival at 8: -- her

9    arrival and 8:20 a.m. and none of the plaintiffs' experts are

10   critical.  They didn't say she did anything wrong, she didn't

11   timely do anything.  There was no indication to order

12   antibiotics before Dr. Jones ordered them.  That's when

13   symptoms started developing.  She immediately did that.

14             Given the virulent, aggressive infection which had

15   been present since before birth, as evidenced by that

16   neutrophil count of three and Kendall's rapid decline,

17   pulmonary hemorrhage, et cetera, earlier administration of

18   antibiotics would not have changed the outcome in the case.

19             And I think, you know, that all of the experts agree

20   that this infection had been there a while.  There's no

21   question about that.  It had been there.  It was there when

22   she was born.  It didn't manifest itself until later, but it

23   had been there, and it had begun to take its toll, and at

24   7:25, Kendall fell off the cliff.  The infection just

25   overwhelmed her, and she could no longer fight it, and that's

1    when the symptoms occurred.

2         We heard something yesterday about, well, those 7:00

3    a.m. vitals were the same as the 7:25 a.m. vitals, they were

4    both essentially normal.  Therefore, no pulse ox had been done

5    earlier.  What triggered this entire series of events was

6    Jamie McCrory noticing that Kendall was dusky, so there was a

7    change.  There was something different that occurred between

8    7:00 and 7:25.

9         The next claim, the Heritage Valley policy for

10   notification of a pediatrician to attend the delivery does not

11   meet the acceptable standard of care as set forth by the

12   American Academy of Pediatrics, ACOG and the American Heart

13   Association.  That was Dr. Karotkin's claim.

14        If you recall, he testified that in his institution,

15   they require a pediatrician to be present any time there's

16   meconium.  He didn't agree with the Heritage Valley policy and

17   he thought it deviated from the standard of care.

18        The facts, the American Association of -- sorry, the

19   American Academy of Pediatrics, ACOG and the AHA guidelines

20   only require that an individual trained in neonatal

21   resuscitation be present at delivery when meconium is noted.

22   The Heritage Valley policy actually goes above that and

23   requires that or indicates that a pediatrician should be

24   called when particulate meconium is present.

25        So the Heritage Valley policy does not deviate from

1    the standard of care.  You heard that from Dr. Wiesenfeld who

2    is up here at Magee, you heard that from Dr. Ringer, you heard

3    that from Dr. Dumpe.  The policy was in compliance.  There was

4    nothing wrong with the policy.

5         The next allegation, Kendall died as a result of

6    massive meconium aspiration as noted by Dr. Min in his autopsy

7    report, or in the alternative, the massive meconium aspiration

8    contributed to her death and inability to fight the E. coli

9    infection.  That's what we have been debating here.  What

10   effect, if any, did the meconium have, and you heard from

11   Dr. Boyd that clearly there was meconium present.  Dr. Boyd

12   found that when she did her review.  Dr. Min found that when

13   he did his autopsy.  There's no question about that.

14        But the cause of death wasn't massive meconium

15   aspiration.  The cause of death was E. coli sepsis.  Dr. Min

16   said that.  If you remember that portion of the autopsy

17   report, not the three anatomic diagnoses, but the actual cause

18   of death was E. coli sepsis and bronchopneumonia.  That was

19   what caused Kendall's death.

20        We've heard lots of testimony and questions about,

21   well, you know, if you have this meconium, does it impair your

22   ability to fight this infection because you can't exchange

23   gas.  We've heard a lot of testimony to that regard.  We heard

24   testimony or questions, well, this drop in the pH, was that as

25   a result of the meconium, and Dr. Coffin and the others told

31

1      you no, this was the result of the E. coli infection.

2              Dr. Min testified that massive meconium aspiration

3      was a clinical nonpathological finding and the cause of death

4      was E. coli sepsis and bronchopneumonia, and again, he didn't

5      change this report.  It was a clinical diagnosis.  He told you

6      he could not find evidence of massive meconium.  There was

7      meconium there, no question about that.  No one is debating

8      that, but that was not the cause of Kendall's death.

9              In order to accept plaintiffs' version of the events,

10     these hypotheticals that you heard and all the other testimony

11     that you've heard, there are certain things that you have to

12     accept and let's just talk about that.

13             You have to accept that there was particulate

14     meconium present at delivery or before delivery that required

15     a pediatrician to be present here.

16             You have to accept that there was a shoulder

17     dystocia.  We have no evidence of that.

18             You have to accept that there was injury caused by

19     that vacuum extraction for which someone should have been

20     called.

21             You have to accept that Maria Hendershot's Apgar

22     scores were incorrect, that she didn't know how to do them and

23     they weren't done correctly, that this was not a healthy

24     appearing baby at that time.

25             You have to accept that Maria Hendershot's initial

1    neonatal evaluation in the delivery room was not accurate,

2    that the baby wasn't normal at that time.

3         And this one is perhaps the most troubling.  You have

4    to accept that Maria lied about being in the delivery room

5    every 15 minutes from 6:00 a.m. to 7:00 a.m. to evaluate

6    Carissa during which time she observed Kendall.  She would

7    have had to lie.  She documented in the chart that she was in

8    there.  Not only would she have lied, she also would have

9    falsified medical records.  You have to accept that Maria was

10   a liar and she falsified medical records.

11        And if Maria was in the room, then she was

12   incompetent, because she failed to hear the grunting, she

13   failed to observe flaring and retraction.  If Maria was in the

14   room and she observed what the family claims was occurring,

15   the flaring, grunting, then Maria just simply chose to ignore

16   it.  Why would she do that?

17        You also have to accept the testimony from Matt or I

18   think it was actually Kylee who said Tyler was actually sent

19   out to say that the baby was having breathing problems but he

20   got confused or mixed up and told the nurse that she was

21   crying, that Matt brought Kendall to the nursery because of

22   concerns regarding her breathing, and Maria, again, either

23   failed to notice them, she was incompetent or she ignored it.

24        Barb Hackney failed to observe the breathing

25   difficulties including the grunting, flaring and retracting or

1    she ignored them, and you have to accept that Dr. Jones was

2    called at 7:20 but didn't choose to come in until 8:00 a.m.

3    That she was cavalier, oh, I'm not going in.

4           You had a chance to observe these witnesses on the

5    stand.  Do you believe that they lied?  Do you believe that

6    they falsified the medical records?  That's what you have to

7    believe in order to accept plaintiffs' version of this case.

8           While I don't think you will get to damages in the

9    case, if you disagree and you believe that damages are

10   warranted, I just want to make a few comments about that.

11          You heard testimony from Dr. Kenkel who was the

12   economist who came in and gave you a range of damages.  Recall

13   that those -- that range of damages was based upon government

14   statistics, because no one knows what the future would have

15   held for Kendall.  We don't know what she would have done,

16   whether she would have worked, what she would have done, how

17   much she would have made.

18          Those are simply statistics because we don't have a

19   crystal ball, but keep in mind that if you believe damages are

20   awarded, they are meant to compensate.

21          When you go back and you begin your deliberations,

22   you are going to have to assess were these witnesses credible,

23   who do you find to be credible, you know, does the story make

24   sense, and the way you do that is to simply use your good

25   common sense, and that's why you were all chosen to be jurors

1    in this case.

2          This case is clearly tragic.  I don't think anybody

3    feels anything but great sympathy for Carissa and Matt.  The

4    loss of a child is horrific.  You saw these health care

5    providers.  Dr. Jones took the stand and cried.  This was

6    terrible for her.  This was terrible for all of the health

7    care providers.  Terrible for these parents, no one disputes

8    that, and the fact that we are here is not meant to in any way

9    belittle what this family has gone through, but we are here

10   because Maria Hendershot didn't cause this.  Dr. Jones didn't

11   cause this.  Dr. Heiple didn't cause this.  Jamie McCrory,

12   Barb Hackney, they didn't cause this.

13         The cause of Kendall's death was an overwhelming

14   infection.  You heard Carissa testify that she was concerned

15   that she might have done something.  Carissa did nothing.  No

16   person here is responsible for this.  It is an infection.

17   They happen.  This one didn't manifest itself until it was too

18   far along for anything to be done.

19         When you go back and you begin your deliberations

20   after the judge gives you her instructions, she is going to

21   give you a verdict slip, and if we can put that up.  This is

22   the first page of the verdict slip, and this is going to help

23   you to go through your deliberations, because there are

24   certain questions that you are going to have to answer, and

25   the very first question on this, and I'm going to just read it

1    to you, "Do you find the conduct of any of the defendant

2    doctors or other medical providers fell below the applicable

3    standard of care?  In other words, were the defendants

4    negligent," and I would ask that you mark no for Heritage

5    Valley Beaver and no for Dr. Hilary Jones.  Thank you very

6    much.

7           THE COURT:  Thank you, Ms. Koczan.  Ladies and

8    gentlemen of the jury, before we hear our next closing

9    argument, and to give Mr. Colville a couple minutes to set up,

10   if any of you want to stand at this time, just to stretch.

11          Again, ladies and gentlemen, just as you did for

12   Ms. Koczan, I'd like you to give your kind attention to

13   Mr. Colville and recall the limiting instruction I provided

14   you vis-a-vis closing arguments.  Mr. Colville, you can

15   proceed.

16          MR. COLVILLE:  May it please the court, counsel,

17   ladies and gentlemen of the jury?  Let me begin by indicating

18   that the government concurs wholeheartedly with the analysis

19   and the facts that were just described by Ms. Koczan in her

20   opening.

21          When I last talked to you, I mentioned to you what

22   the claims against the United States in this case were.  I

23   indicated there were two claims.  First claim was that

24   plaintiff believed that the delivery of Kendall needed to be

25   accomplished earlier, in this case, because of fetal

1    monitoring strip indicators.

2         The second was that they believed Dr. Dumpe was

3    negligent for not having phoned or having a pediatrician

4    present at the delivery.

5         The first claim has gone away.  It is not before you

6    and you will not be deciding it.  You may recall when I

7    cross-examined Dr. Zamore, one of the first questions I asked

8    him was please tell me exactly when you think the baby should

9    have been delivered earlier based upon the strips, and you may

10   recall that at that point, he said, well, I've changed my

11   mind.  I'm not going through with that.

12        It's inexplicable.  He didn't explain, other than

13   saying I've changed my mind.  The facts hadn't changed.  The

14   same facts applied when he prepared his report.  He indicated

15   that he was -- he intended to prepare an amended report, but

16   he said he reserved the right to, he never did, but I just

17   want -- it's a strange occurrence, and the expert, and it

18   appears plaintiffs themselves have walked away from this

19   claim, so that is not going to be before you.

20        The issue as to whether or not a pediatrician should

21   be present is, and the government's position in this case is

22   it is not supported by the medicine or the facts.  I told you

23   in my opening, our defense in this case is pretty

24   straightforward.

25        The first is meconium wasn't in play here.  It did

1    not cause the death of Kendall.  Neither did the,

2    quote-unquote, "shoulder dystocia" which we argue did not

3    occur, nor did the vacuum extraction, nor did the monitoring

4    strips.

5           As I told you in my opening, these are red herrings.

6    These are shiny little objects that are distracting you from

7    the issue at hand.  In this case, and again part of our

8    defense is, it's the E. coli infection, an insidious disease

9    in this case.  It was insidious because Kendall had this

10   infection in utero.  She had it when she was delivered and

11   born.

12          The infection continued to progress at the same time

13   that people who were there charged with the care of her could

14   see no symptoms.  No symptoms of respiratory distress or

15   infection for them to act upon.  That is the insidiousness of

16   it.  It's a virulent disease that can be deadly, particularly

17   in newborn babies, and yet, even though it progressed, you

18   couldn't tell, you couldn't see it, you couldn't do anything

19   about it.  You wouldn't do anything about it.

20          The other prong of our defense is Dr. Dumpe is

21   competent.  He's experienced.  He knew what he was doing and

22   he did everything that should have been done in this case for

23   Kendall.  He managed the prenatal care of Kendall

24   appropriately.  He managed the labor, the delivery, and when

25   the baby was delivered, this was delivered as a healthy baby.

1          And as you'll see in the document a thousand times,

2    delivery assessment, it is the snapshot summary of the

3    government's defense.  This baby had Apgar scores that were

4    all agreed to be normal.  The evaluation found no

5    abnormalities.  The vitals that were taken at 7:00, once the

6    baby was taken back to the nursery, were normal.  Every expert

7    testified this was a healthy baby.

8          Dr. Dumpe did his job that day.  He delivered a

9    healthy baby.  There were no symptoms for him to follow up on

10   and there was no indications that he should have seen that

11   this E. coli infection was going to progress further, and it

12   had no symptoms, at least on his watch.

13         Dr. Jones testified, and she is the pediatrician in

14   this case.  She is the one who wasn't called.  She wasn't

15   called because the standard of care doesn't require it in this

16   case.  We'll get into that in a little bit, but had Dr. Jones

17   been called in this case by Dr. Dumpe to attend the delivery,

18   Dr. Jones was asked point blank what would you have done.  And

19   her answer was I wouldn't have done anything differently than

20   what was already done.  There was nothing to do.  There were

21   no symptoms.

22         Again, the insidiousness of this infection, it's

23   progressing, but Dr. Jones wouldn't have been able to see it.

24   That's what's documented on the delivery assessment.  That's

25   what tells you it was undetectable.  Dr. Jones wouldn't have

1    worked it up.  She wouldn't have monitored it.  She would have

2    left and said if you see any symptoms, call me, I'll be back,

3    but more importantly, she wouldn't have prescribed antibiotics

4    at that point.

5        That's what plaintiffs claim should have happened.

6    They claim earlier treatment would have resulted in a better

7    outcome.  The problem is, there was no reason to treat.  There

8    were no symptoms to treat.  All the experts, plaintiffs and

9    defendants, testified healthy baby.  All the experts,

10   plaintiffs and defendants, testified because there was a

11   healthy baby, you don't treat with antibiotics.

12       The plaintiffs again, I suggest it's a red herring or

13   distraction from the issue, point to a number of,

14   quote-unquote, "risks":  The meconium, the vacuum extraction,

15   the monitoring strips and the shoulder dystocia.  These are

16   specious contentions and they are not supported by the facts.

17       Let's go through a couple of them.  The shoulder

18   dystocia, Ms. Koczan touched every base on them, and again, I

19   wholeheartedly concur with her analysis on them, but the

20   shoulder dystocia didn't happen period.  It didn't happen.

21   Look at Dr. Dumpe's operative report when you deliberate.  He

22   indicates that he employed the prophylactic McRoberts

23   Maneuver.

24       The McRoberts Maneuver is a maneuver used by

25   obstetricians when there is shoulder dystocia.  Prophylactic

1  means he did something to prevent the shoulder dystocia from

2  happening.  He has testified and Nurse Hendershot who was

3  there testified it did not happen.  And yet, plaintiffs'

4  counsel continues to pose hypotheticals and make assumptions

5  that it did, knowing that the testimony and the records

6  indicate otherwise.

7       It didn't happen.  Not only did it not happen, there

8  weren't any complications that arose from it.  The suggestion

9  is a pediatrician needed to be there because, if this

10  prophylactic McRoberts Maneuver was used, a pediatrician needs

11  to be there to respond to something.  Well, there were no

12  complications that arose from it, because there was no

13  shoulder dystocia.  Start with that.

14       And that is why Dr. Wiesenfeld and Dr. Ringer

15  testified that the standard of care in this case was met.

16  They testified that the standard of care in this situation

17  only required somebody be certified in neonatal resuscitation,

18  and we know that Dr. Dumpe was and we know that

19  Nurse Hendershot was.  Both Dr. Wiesenfeld and Dr. Ringer said

20  the standard of care was met.

21       The fetal heart rate strips, again, this is where

22  Dr. Zamore walks away from that claim.  That is what he based

23  his claim the baby should have been delivered earlier, and I

24  suspect he realized that he had overstepped where he tried to

25  say that the strips were nonreassuring and required an earlier

1    delivery.  They didn't.  Dr. Wiesenfeld indicated there was no

2    need to deliver this baby early.  Dr. Wiesenfeld is an OB-GYN.

3    He's an expert.  He has a subspecialty of reproductive

4    infectious disease.  He is trained to read these strips.  He

5    reads these strips in his work.  He delivers over 100 babies a

6    year and has for the past decade.

7          He reviewed the entire strip and he testified that

8    the strips were reassuring.  He testified there was no

9    reason -- forget about an early delivery, but there was no

10    reason for a pediatrician to have been called at the delivery

11    because of the strips.  He testified the standard of care was

12    met by Dr. Dumpe.  He wouldn't have done anything different

13    than Dr. Dumpe.

14          Dr. Ringer, the other expert, also said the standard

15    of care was met and that a pediatrician was not needed at the

16    delivery based upon the fetal monitoring strips.

17          Plaintiffs' expert Dr. Karotkin, he testified that

18    the strips in his mind needed the pediatrician to be present.

19    Think about Dr. Karotkin though.  There's a couple things.  He

20    testified he didn't read the strips.  He didn't read the

21    strips, and yet he's testified that because of the strips, a

22    pediatrician needed to be there, that Baby Kendall was in

23    jeopardy or was at risk.  He didn't read the strips.  He's not

24    trained in reading the strips.  He doesn't read the strips in

25    his daily work.

1          He agreed when I asked if Dr. Dumpe had more

2     experience in reading the strips than he did.  He said yes.

3     He agreed when I said Dr. Dumpe was more of an expert in

4     reading the strips than him.  He agreed.

5          Like these other risks, the meconium, there was no

6     complication that arose out of these strips.  There was

7     nothing for a pediatrician, if a pediatrician like Dr. Jones

8     had been called to be present, to respond to anything relating

9     to the strips.  The baby was born healthy.

10          Same for the vacuum extraction.  Ms. Koczan

11     appropriately pointed out, one, it's a common procedure.  It

12     was used in this case the very last minute because Carissa had

13     exhausted and it was used to gently pull the baby out with her

14     pushing to assist her.  You may recall this replaced the

15     common use of forceps.  And the plaintiffs argue that this is

16     an operative procedure.  Because it's an operative procedure,

17     the pediatrician should be present.

18          Dr. Ringer, Dr. Wiesenfeld both disagree with it.

19     They both told you the appropriate guidelines do not require

20     that, the pediatricians are not needed, are not required to be

21     present.  Again, all that needs to be there is somebody

22     certified in neonatal resuscitation.  The fear is the baby

23     gets tangled in the umbilical cord, there's asphyxiation, you

24     need somebody to resuscitate the baby, if there was a head

25     injury.  Those types of risks did not present themselves, like

43

1    they didn't in the meconium, in the fetal strips.

2            The standard of care was met.  Dr. Ringer and

3    Dr. Wiesenfeld testified to that.

4            Meconium.  What hasn't been said about meconium in

5    this case?  You probably know more about meconium than you

6    care to know.  So do I, but a couple things we can agree on, I

7    think.  Meconium is common.  This is not particular to Carissa

8    and Kendall.  This happens in 20 percent of the cases.  One

9    out of five have meconium present somewhere in the birth.  It

10   was not caused by Dr. Dumpe.  This happened and it happens

11   mostly in women who take their babies to term, which in this

12   case, it was.

13           The other thing we know, and it is beyond dispute and

14   there's no evidence to contradict it, is the meconium in this

15   case was nonparticulate.  The plaintiffs have provided no

16   evidence, zero, that there was particulate meconium present.

17   It's important, but it sort of isn't, given what

18   Dr. Wiesenfeld testified to, but it's important.  It was

19   important early on when we were talking about the policies,

20   the hospital's policy.

21           In that hospital policy, OBs who are presented with

22   babies who have presented with meconium, like Baby Kendall in

23   this case, are required under the policy to bring a

24   pediatrician in when there is particulate meconium.

25           Now, there wasn't particulate meconium in this case.

1    Dr. Dumpe has the discretion under the policy when it's not

2    particulate to not bring a pediatrician in.  Dr. Wiesenfeld

3    testified the standard of care doesn't require a pediatrician.

4    It only requires a certified neonatal resuscitation personnel.

5    Dr. Dumpe complied with the policy.  He complied with the

6    standard of care.  He was not required to have a pediatrician

7    present, and as Dr. Jones testified, even if she had been

8    present, there was nothing that she was going to do with that

9    meconium.  It had been managed.  It had been observed, noted

10   throughout the labor and dealt with, and it posed no problem

11   or risk that a pediatrician needed to address.

12          The massive aspiration.  There was no massive

13   aspiration.  There was no massive aspiration of meconium, yet

14   plaintiffs' counsel continues to pose questions and throw it

15   out as though it did.  The massive aspiration of meconium,

16   where that came from is in the autopsy report that Dr. Min

17   prepared, and in it, it's one of the three findings.

18          Dr. Min testified at his deposition and he testified

19   here consistent with his deposition that the use of the word

20   massive aspiration of meconium was a mistake.  That's not been

21   challenged by plaintiff as being wrong, as being incorrect,

22   being a lie, but Dr. Min testified he made a mistake.  He

23   should not have used the word massive.  He said during his

24   deposition, he said during his testimony I got that from a

25   review of the clinical record.

1          What that means is he said I went back and looked at

2    the medical records and based upon my review of the medical

3    records, that's where I got it.  He didn't speak to any of the

4    treating -- he didn't speak to Dr. Dumpe, he didn't speak to

5    Nurse Hendershot, both of whom were there and actually saw it.

6    They are the only two that were there and saw it.  They were

7    really the only two that could have said exactly what happened

8    and put it on paper, but anyway, Dr. Min says he wrote

9    massive, he shouldn't have.  He made a mistake.

10         Plaintiffs' counsel knows that and has known it for a

11   long time, and yet assumptions, hypotheticals assuming a

12   massive aspiration of meconium have been asserted.  The truth

13   of the matter is Dr. Min said when he went back and looked

14   back at it, when he went back and looked at the slides, he

15   couldn't tell it was meconium, and Dr. Boyd, a renown

16   pathologist from Boston Children's, she definitively testified

17   that, based upon her review of the slides, same slides that

18   they were all looking at, there was not a massive aspiration

19   of meconium.  It was neutrophils.  It was lymphocytes.  The

20   baby's lungs were being filled with cells that were being

21   produced and expelled by Kendall's body to fight the

22   pneumonia.

23         As Ms. Koczan noted, the neutrophils were down to

24   three.  She was running on empty.  This infection was

25   advanced.  It was subclinical, but it was advanced.  When I

1    say "subclinical," what I mean is it was progressing.  It was

2    building.  It was taking its toll, but it had no symptoms from

3    the outside looking in.  You couldn't tell, but if you had

4    been in there, you could have told them.

5           This meconium is a boogeyman.  Plaintiffs' counsel is

6    using it as a boogeyman almost to the exclusion of actually

7    talking about the E. coli infection, the real cause of the

8    death of Kendall.

9           Wrapping up all these risks, meconium, strips, all of

10   it, none of them had complications.  None of them resulted in

11   anybody having to do anything other than what was done which

12   resulted in the birth of a healthy baby.

13          I want to talk a little bit about the short time

14   Dr. Dumpe spent after the birth in the delivery room.

15   Dr. Dumpe's authored report is a lot like the delivery

16   assessment, and when you deliberate, I would like you to look

17   at it.  It's Exhibit 2 pages 3 and 4.  This is essentially the

18   narrative of what happened during the delivery and it is

19   consistent, wholly consistent with the delivery assessment.

20   It's just as important.

21          There is also a medical record that you'll see at

22   Exhibit 2 page 10.  This is a medical note of the delivery

23   that Dr. Dumpe wrote.  So what happens is, the baby is

24   delivered at 5:20.  Gets the baby out, suctions the little

25   meconium in the mouth, transfers over to the nurses where they

1    attend, clean, suction a little bit more, ultimately swaddle

2    the baby, clean the baby off, hand it off to mom.

3            While all that is happening, Dr. Dumpe is tending to

4    Carissa who had an episiotomy.  He goes back, sutures her up,

5    takes about 20 minutes.  He's there from 5:20 to 5:45.  At

6    5:45, he's gone.  It's probably a little bit before 5:45,

7    because, as you'll see from the medical record that I made

8    reference to, Exhibit 2 page 10, he handwrites a note.  It's

9    just a short little note.  Talks about the Apgar scores.

10   Talks about the vacuum extraction.  It's timed.  The time he

11   wrote the note is 5:45.

12           After he wrote that note, he then goes and dictates

13   the operative report.  As we looked at yesterday, the

14   operative report is timed 5:53.  So Dr. Dumpe is there after

15   delivery from 5:20 at delivery to 5:45.  Then he leaves the

16   room and he's done.

17           I make this point because, like the delivery

18   assessment, an operative report makes no mention whatsoever of

19   any sign or symptom of respiratory distress, any sign or

20   symptom of an infection.  That note was written in realtime,

21   and like the questions Ms. Koczan had about why would they

22   make this up, what motive would Dr. Dumpe have to exclude

23   having seen a sign or a symptom of an infection or respiratory

24   distress at the time?  None.

25           He's dedicated his life to delivering babies, to

1    taking care of babies.  Just like Nurse Hendershot has.  Just

2    like Nurse Hackney, McCrory.  This is what they do.  You see a

3    symptom, you see a sign, you act, and if you don't act, you

4    get somebody that can act, but the point is, those records

5    make no mention of it.

6         The same goes -- I'm not here to defend the nurses or

7    any of the people.  After Dr. Dumpe leaves, you know, his role

8    was completed.  The argument is, well, there was grunting and

9    flaring while the family held the baby and there was some

10   concern about it, and for all the reasons Ms. Koczan noted,

11   that story doesn't make sense.

12        I can't explain why that's the story.  I can't.  I'm

13   not going to even try, but as Ms. Koczan said, if you are

14   there for over an hour and you have a baby that you have some

15   concerns about, and they are not getting the attention they

16   want, open the door and walk ten feet and say I think there's

17   something wrong.

18        What else doesn't jibe is the pictures we have is

19   what you would expect.  You have the baby being passed around.

20   It's swaddled.  Smiling.  It's a common experience.

21        Matthew said he walked the baby down to the nursery.

22   Nurse Hendershot has disagreement with that.  Said it's not

23   policy, but where was the conversation with Nurse Hendershot

24   saying, on that walk down, where were you, or here, look at

25   this baby.  It's grunting, it's flaring.  What do you think

1    about this?

2         Does anyone really believe that Nurse Hendershot

3    walked with Matt with the baby grunting and flaring, dropped

4    it off at the nursery and made no comment, no note in any

5    record, report or did nothing in response to a baby grunting

6    for the first time, which is clearly a symptom of respiratory

7    distress, which she would be aware of, which she said she

8    would have noted.

9         Ms. Koczan's question about what you have to believe

10   to believe the story, you've got to believe a lot.  You've got

11   to believe Dr. Dumpe didn't record symptoms he saw or observed

12   or was told about.  You have to believe Nurse Hendershot

13   ignored, didn't document, didn't act, Nurse Hackney,

14   Nurse McCrory, and the documents were created with false

15   information.  It's not believable.  It isn't.

16        You heard from Dr. Wiesenfeld, the expert who

17   testified on behalf of the United States.  Prominent OB-GYN

18   physician from West Penn, and he testified unequivocally that

19   Dr. Dumpe did everything he should have done and he met the

20   standard of care.  He testified earlier delivery was not

21   appropriate nor was it indicated, and the presence of a

22   pediatrician was not indicated or needed here.

23        He testified unequivocally the standard of care does

24   not require a pediatrician under the circumstances presented

25   in this case.  His testimony affirmed my statements that the

1    plaintiffs' emphasis and focus on meconium is misplaced and is

2    misleading.  Dr. Dumpe managed the meconium appropriately.  He

3    managed all facets of this labor and delivery appropriately.

4         Dr. Dumpe met the standard of care.  The plaintiffs'

5    desire in this case to have you focus on meconium or the side

6    issues, rather than the E. coli, I would suggest is a tactic.

7    You shouldn't take the bait.  Meconium was not the cause of

8    the death.  Shoulder dystocia was not the cause.  E. coli was.

9         I have other comments that I was going to tell you,

10   but Ms. Koczan touched all the bases, and the last base she

11   touched is true.  This case is sad.  It's tragic.  It's sad

12   because Kendall died because of an insidious disease.  The

13   whole time people were there that could have helped her but

14   didn't know it.  It didn't show itself.  There weren't

15   symptoms to attack or to fight against.  Her body tried but it

16   couldn't do it.  The infection overwhelmed her.

17        Dr. Dumpe, like the nurses and the staff, played no

18   role in her passing.  He appropriately managed the labor and

19   delivery.  Dr. Kevin Dumpe is an experienced, skilled OB-GYN.

20   He's a good man.  He delivered a healthy baby here, a baby

21   that showed no signs or symptoms that ultimately would take

22   Kendall.

23        If you recognize this reality, your decision with

24   regard to Dr. Dumpe is pretty straightforward.  Ms. Koczan

25   showed you the verdict slip.  The first question asked whether

1    or not you believe the United States, in this case,

2    represented by Dr. Dumpe's actions, was negligent, and I would

3    suggest that the proper answer in this case is no.

4              On behalf of Dr. Dumpe, Mr. O'Connor, myself, I thank

5    you for your time, certainly your patience and the

6    attentiveness which you've given this.  Your service as jurors

7    is very meaningful and we thank you.

8              THE COURT:  Thank you, Mr. Colville, for those

9    arguments on behalf of the United States.  Once again, ladies

10   and gentlemen, if you want to just stretch a little bit, and

11   we'll give Mr. Price a couple of minutes to set up, and we'll

12   hear his closing argument.  Mr. Price, are you ready to

13   proceed?

14             MR. PRICE:  Yes.

15             THE COURT:  Ladies and gentlemen of the jury, we'll

16   now hear the closing argument on behalf of the plaintiffs by

17   Mr. Price.  Once again, give him your kind attention as you've

18   done to prior counsel.  Also once again, recall the

19   instructions I gave to you about closing arguments.

20   Mr. Price, you can proceed.

21             MR. PRICE:  May it please the court, counsel?  5:20

22   a.m., a healthy, healthy baby was born.  In six hours, this

23   baby was dead and yet nobody could do anything.  Nobody did

24   anything.  Why did this baby die in six hours and nobody could

25   do anything?

1           Now, if you'll remember on Monday, last Monday when I

2    gave my opening, I said -- this is the only part I'm going to

3    read.  I said, "Ladies and gentlemen, I think we're going to

4    unseal and discover what happened or didn't happen in the

5    hours leading up to the birth, the six hours of life and in

6    the years after.  I suspect that you will see the inner

7    workings of the health care system and how they cared for, and

8    in instances, didn't care for the lives in the community.

9    Together, we will see how they handled this life in this

10   system."

11           I think, boy, did we see that.  We saw a lot of it,

12   and I'm going to tell you what we saw, because we start out

13   here, this is before anything happened, Carissa and Matt in

14   the laboring room, and they are like any other young couple or

15   any other couple expecting a birth, and they are also like a

16   lot of other people in our health care system.  They're

17   sitting in a bed.  Hospital beds.  Everybody has to go to a

18   hospital.  Everybody has to lay in a bed at some point during

19   their lifetime, and in doing so, in lying in a bed, just like

20   Carissa was with Matt by her side, whenever they want or need

21   medical care, they hope that the system will provide for them

22   as it's supposed to.

23           And you might ask, well, what does the system provide

24   for you in health care?  What do you, as the community, say,

25   hey, look, we have to have standards.  We have to have rules.

1    How do you say, if my grandmother goes into the hospital or I

2    have to take my elderly mother to the hospital or my grandson,

3    what are the rules?  What are the standards that this case can

4    show us that can apply to the community, and what it comes

5    down to is this:  Trust.

6         Matt and Carissa came to this hospital and all they

7    asked for was trust.  They asked the doctors.  They trusted

8    the doctors.  They trusted the health care, and in exchange,

9    the doctors and nurses had to follow the rules.

10        Now, the reason why I pointed out this was that this

11   is in their system.  This is the system that they have to live

12   by.  I talked to everybody about these, and I know you've seen

13   these ad nauseam.  Rule one, rule two and rule three.  I don't

14   have to go over them again, because I know that you know them,

15   but those are the rules that apply in this case, and those are

16   the rules that the doctors must be judged by and the nurses

17   and the hospital, and it's your choice.  I can't tell you what

18   to do or what not to do.

19        You are free to choose to enforce these rules or not.

20   I know there's been argument, but it's your choice.  We can't

21   tell you what to do.  The judge can't tell you what to do.  We

22   can ask, but in the end, it's your choice as to whether or not

23   you think these rules apply or don't apply.

24        Now, how are you going to apply these rules?  Well,

25   I'm going to talk to you in a minute about how these rules

1    apply in this case and what you saw, just so we can go over

2    that, but you are going to apply these rules through the

3    verdict slip.  This is how you make a determination as to

4    whether or not the rules apply.

5         Now, I know that you have been shown it and I'm

6    briefly going to go over it so you can understand a little bit

7    about what your job is going to be.  You are going to be asked

8    four questions.  So the first question is:  Do you believe

9    that any of these parties were negligent?  And you are going

10   to have to answer that question.  Number one, the

11   United States of America for the conduct of Dr. Dumpe.  Second

12   question is Heritage Valley and that's Nurse Hendershot,

13   Dr. Heiple and Nurse McCrory and the third question is

14   Dr. Jones.

15        Now, after that, the next question you are being

16   asked is:  Was the defendant's negligence a factual cause.  I

17   know we'll get to that, and then the third question, the

18   percentage of fault, and the fourth question, the damages.

19        Now I'll be more specific.  We'll go back over that,

20   but that's going to be your task when you go into the jury

21   room to answer these questions.

22        Now, the first question is negligence, and we talked

23   about negligence, and you heard the experts come up here, and

24   I know that you heard Dr. Karotkin talk about it's what a

25   reasonable doctor would do.  I think everybody agreed to that.

1    What's reasonable in this case, and again, they can tell you

2    what's their opinion, but you are the ones who are going to

3    determine what the standard is, what is reasonable care.

4         So safety rule one, if a baby is at risk, a

5    pediatrician must be present.  Why did I come up with that?

6    It's with regard to Dr. Dumpe.

7         Now, why do I say that?  Because it was a complicated

8    delivery and no pediatrician was called.  Is there a dispute

9    about it being a complicated delivery?  Yes.  You heard

10   Mr. Colville just simply say shoulder dystocia didn't happen,

11   didn't happen.  It didn't happen.  But he can't tell you that.

12   You are the one that's going to have to decide that.

13        Fetal strips category plus two, arrest of descent,

14   operative delivery, shoulder dystocia, McRoberts Maneuver,

15   meconium.

16        Why did I come up with this issue of shoulder

17   dystocia?  You kept hearing me ask all the obstetricians that

18   came here and testified even for the defense, and I said to

19   them, in Dr. Dumpe's operative note, it says he used the

20   McRoberts Maneuver.  When do you use the McRoberts Maneuver?

21   They said you use the McRoberts when you have a shoulder

22   dystocia.

23        So was a McRoberts done or not?  Well, there's a

24   billing record for it, and again, this is for you to decide.

25   Now, the importance of this issue is you heard Dr. Ringer

1    testify yesterday, if a shoulder dystocia occurs, pediatrician

2    is present.  Pediatrician is there.  Every shoulder dystocia,

3    a pediatrician is there.  Was there one here?  No.

4         Operative delivery, there was an arrest of descent.

5    You heard Dr. Zamore talk about that, Dr. Shore, and then this

6    issue of meconium.  We're going to talk about that, meconium

7    again.  I know you've heard it but these are the issues.

8         Now, should a pediatrician have been present?  We

9    believe so.  It's going to be your determination whether or

10   not you believe that Dr. Dumpe should have had a pediatrician

11   there, and again, you heard argument that was, well, hey, even

12   Dr. Jones says that if she showed up at 5:20, she would have

13   said everything is fine.

14        Well, that's not the end of it, because Dr. Jones

15   wasn't there.  She doesn't know what the conditions were.  And

16   my point from Dr. Karotkin's testimony, which I developed a

17   little bit more yesterday with Dr. Ringer, I believe it was.

18   Yes, it was Dr. Ringer yesterday.  If this baby had signs of a

19   little bit of respiratory distress and a pediatrician came in,

20   the policy that they keep saying is so great says that it's a

21   pediatrician that has to evaluate the baby.  That means you

22   call a pediatrician up and you say, hey doc, can you come look

23   at this baby.

24        At that point, the pediatrician can say who's there?

25   You say Nurse Hendershot.  The pediatrician can say I trust

her.  Let her do it.  It's fine, but that's the pediatrician's
call.  The policy is call the pediatrician, and no
pediatrician was called here, so we're speculating as to what
Dr. Jones would have done, but our point is is that there was
a reason for a baby to be seen by a pediatrician, because how
do you get 81 percent oxygen at 7:20 without it being worse or
declining throughout birth or after birth.  It had to be lower
in the 90s at 6:00.  It had to be abnormal at 5:45, 6:00.

       And why do I say that?  Because what you heard
Dr. Coffin and Dr. Jones testify.  That when you have meconium
in the lungs, it acts as a bell valve.  Air goes in.  Doesn't
all come out.  What does that happen?  Your body has buildup
of carbon dioxide, so your oxygenation falls.  It's
progressive.  It goes down.  The only way that it got back up
was remember 64 percent oxygen.  They pumped a lot.  So much
more than Dr. Jones ever uses in her own nursery.

       So she was -- she said this is a lot of oxygen for
this kid.  It's the only way to get the oxygen up, so this
baby unfortunately, over those two hours, its oxygenation
level had to be dropping, and a pediatrician would at least
have been there to have seen it, and as Dr. Karotkin said,
here's how easy it is, take some vitals and put a pulse ox on.
Find out what it is.  There is no record in that big binder,
not one record that shows what Kendall's pulse ox was until
7:25.

58

1          Now, Nurse Hendershot, what about the negligence for

2     her?  Well, again, complicated delivery, had a child with

3     meconium.  She noted moist lungs, and again, there was no

4     checkup from 5:30 until 7:00 a.m.  Is that a dispute?  Yes.  I

5     will address it, but there isn't any record of

6     Nurse Hendershot examining Kendall.  It's her word and what

7     she said, and I know that's a factual dispute that you have to

8     determine.  Family's word as compared to the nurse's word.

9          If you simply trust the doctors' words in this case,

10    if you simply trust that every doctor that came here is

11    telling the truth and my clients are lying, I lose, but I'm

12    going to show you there were some -- I'm not going to say

13    lies, but there were a lot of inconsistencies, a lot of things

14    that the defendants themselves said.  So again, these are

15    things that you have to determine.

16         This is our point, pulse ox.  Nurse Hendershot didn't

17    take any pulse ox.  We don't know what it is.  Their excuse,

18    it's better to bond with the baby for two hours.  Now, I know

19    somebody and what price they would pay for a pulse ox for not

20    bonding.  It's not a difficult and it's not an invasive

21    procedure to take a pulse ox, and that's all that had to be

22    done and it would be a different story.

23         Safety rule two, hospital must take all precautions.

24    Again, I'm going to talk about this, but do you think that

25    Nurse Hendershot was in there every 15 minutes?  Do you think

1    that her notes are accurate?  Do you think that her testimony

2    is that she came in and examined Carissa and then examined the

3    baby or at least heard the baby is accurate, or how about

4    Tyler?  Tyler came in here.  I know he's not a medical

5    professional.  This is your job.  Your job is to evaluate the

6    credibility.  The judge will instruct you on this.  She has a

7    whole litany, and she's already told you a little bit about

8    it, but things that you do to judge credibility.

9        Whenever he came up here, he's a young kid.  He's in

10   his 20.s, he doesn't know anything about health care.  He was

11   scared and nervous, just as scared and nervous as any friend

12   of a parent who just had a child, and he had the guts to get

13   up and go outside and try to get a nurse to come in and help.

14       He might have made a mistake as to saying the baby is

15   crying and not that there was more concern, but he tried, and

16   here's what was really -- really got me here.  This whole case

17   has been about the care that the defendants have provided, and

18   the judge will tell you, in this case, they have not made any

19   claim.  They have not brought any claim against Carissa or

20   Matt, and what I mean by that is they had the right to say

21   we're blaming you.  It's your fault.  You should have brought

22   the kid out to the nursery.  You should have done more, but

23   you know what?  They didn't do that until these closing

24   arguments.

25       I just heard both counsel come and blame the parents

1    for not bringing this baby's condition to the nursery staff or

2    to the nurses.  I mean, really?  These two young kids with

3    their first baby trying to do all they can?  They have all

4    their family in there.  They send a friend out to get a nurse

5    who comes to the door and then they get blamed in this case.

6          Now, this is just a picture of a nurses' station, and

7    I tell you it's a nurses' station because it's not the nurses'

8    station at Heritage Valley Beaver because we never got a

9    picture of that nurses' station.  Remember the only pictures

10   we got are inside the room, and we were told that it's right

11   outside the door, and I asked is anybody else going to bring a

12   picture, and we never found out, so I don't know exactly where

13   it is, but I'm using this as an example to say this is what

14   the nurses do.

15         They have to sit at computers and write their

16   electronic medical records, and again, I know that you'll be

17   in there deliberating and I know these binders are very heavy,

18   and I apologize for giving them all to you, but that's we have

19   to do.  You'll see in the medical records the majority of them

20   are electronic, so every nurse has to click on an electronic

21   medical record to put an entry in.  That's the way medical

22   care is these days, so that's where they are.  That's what

23   they are doing, and that's where Nurse Hendershot was whenever

24   they said they looked out the door, she was at the nurses'

25   station.  She came to the door and only poked her head in.

1           Now, Nurse McCrory, Nurse McCrory I think did a good

2    job.  The only issue that we have is what about this time?

3    Dr. Heiple, I know defense characterization of Dr. Heiple is

4    that he wasn't -- he might have been mistaken, but again, I'm

5    not going to go over the timeline again, but why -- did he get

6    there at 7:35?  Did he get there at 8:00?  What was going on?

7           Now, Dr. Heiple, he comes in at 8:00, has a normal

8    assessment, doesn't even call the pediatrician.  He was a

9    young doctor.  This was his third month, I believe, on the

10   pediatric rounding, so I don't think he added anything to this

11   case.  I don't think he helped Kendall in any way, and the

12   only thing that he did was delay the care.  I think that

13   slideshow summed it up.  Nurse McCrory found an abnormal exam.

14   He comes in and finds it normal.  Dr. Jones comes in and finds

15   an abnormal exam.  I think he was unfortunately in over his

16   head, and the problem is is that being in over your head is

17   not an excuse, because this is medical care.  This is doctors.

18          They have to deal with very tough situations, and

19   just because it's your third month on, it doesn't mean that

20   you can simply stand around and wait for help.  Your task, you

21   were called, take care of this child.  We need help, and he

22   just simply said...

23          The earlier you treat something, again, this is

24   another issue too.  Again, I'm relying on your recollection,

25   but this is mine.  Dr. Jones says 8:00.  Orders now.  8:32,

1    Dr. Heiple enters the orders.  9:50 gentamicin comes.  He

2    didn't order it stat.  Even Dr. Coffin was here yesterday and

3    said prescription antibiotics sepsis workup, get it within an

4    hour.  I said what about an hour and 50.  She said that's not

5    acceptable.

6          And that's the thing is that this gentamicin was the

7    only drug that was effective against E. coli, and she didn't

8    get it until an hour and 50 minutes before her death, so yes,

9    it was ineffective.  Would it have been effective at 6:20?

10   6:40?

11         Now, Dr. Jones, again, was she called or not?  This

12   is your job to determine the credibility, to determine if

13   these notes are accurate or not.  The other thing to remember

14   is about treating earlier.  Dr. Jones testified she came into

15   a crisis.  Even Dr. Coffin said you don't want to walk into a

16   crisis.  You want to treat it better.  You don't want to end

17   up in the emergency room.  You want to go to your PCP before

18   you end up in the emergency room.  Unfortunately, there was no

19   PCP for Kendall.  It was simply straight in the emergency

20   room.

21         Now, the second question is this issue of causation.

22   This is tough.  It's not an easy question to answer, because

23   you are the jury who has to determine whether or not, if

24   earlier treatment had been given to Kendall, was there a

25   chance that she would have survived?

1          What helps you determine that is some of the expert

2     testimony, and I believe that most, if not all, of the experts

3     said if there was treatment earlier, before 7:20, at 6:20,

4     6:50, there was a chance that the antibiotics could have saved

5     Kendall.  Again, you have to remember your recollection of

6     what Dr. Ringer, what Dr. Coffin said, what Dr. Boyd, all of

7     these doctors said, but I believe, and even my experts, they

8     all agreed earlier treatment of antibiotics for E. coli would

9     have given Kendall a chance.

10          Do we know in absolute certainty what her chances

11    would have been?  No.  Nobody can do that.  The reason is,

12    nobody can go back in time and say, hey, let's do an

13    experiment on babies and give a baby with E. coli at four

14    hours and let's let the next baby get it at eight hours and

15    see what the difference is.  You don't do that.  Once you

16    found an infection, you give antibiotics immediately.

17          I'm getting a little confusing.  You can't go back in

18    time and say with 100 percent certainty the antibiotics would

19    have worked.  The point is, they all said it could have.  A

20    chance to survive could have been there, and that is what the

21    judge is going to read you on the law.  That's what the law is

22    on causation, and that's why I said it's a difficult,

23    difficult issue, but this summarizes it a little bit.

24          I've been accused of running away from E. coli, that

25    E. coli didn't cause her death.  I told you, I thought, and

1    through my questioning, I hoped that I explained that I did,

2    yes, and I know that bronchopneumonia was there too, but it is

3    our theory in the case that the problem was that there was an

4    untreated massive aspiration of meconium.

5        I know they don't want me to say massive, but that's

6    what it was.  That's the official report, a massive aspiration

7    of meconium, and this is the whole issue about air being

8    trapped, unable to be exchanged, unable to fight off an

9    infection.  Those are all of the issues that you are going to

10   have to determine.

11       Was there a lifeline?  Could she have been saved?  If

12   somebody had given her antibiotics earlier, like you followed

13   what Dr. Karotkin said, hey, somebody was there every 15

14   minutes to check vitals and to do a pulse ox and if something

15   was noticed, then let's get a pediatrician in there.

16       Do you believe what the family said, that there was

17   crying, that it was painful, that Kylee noticed what she

18   thought was grunting?  She wanted Matt to get a nurse.  If you

19   believe that was happening, do you believe those would be any

20   early signs of respiratory distress that a pediatrician who

21   would be in the room might pick up on?  If so, a chance, a

22   life preserver wasn't thrown to Kendall, and by the time

23   LifeFlight was called, it was too late.  I know that they did

24   everything they could, but by the time they got there, it was

25   too late.

1           Now, percentages of responsibility, this is the third

2    question, if you find any of these defendants liable, and let

3    me explain.  You can find Dr. Dumpe for the United States

4    liable, that's one; number two would be Heritage Valley

5    Beaver, and Heritage Valley Beaver is actually any of the

6    three.  It doesn't have to be all three.  So for example, you

7    can say Nurse McCrory, she did what she was supposed to do.

8    Dr. Heiple didn't or Nurse Hendershot should have been there

9    and she wasn't.  If you find any one of them fell below the

10   standard of care, then Heritage Valley would be liable, would

11   be negligent, so you don't have to find all three of them

12   negligent to find Heritage Valley negligent.

13          There's also an overriding issue about Heritage

14   Valley, which I'll talk about in a minute about the policies.

15   I know we have had enough about policies, but I do have to

16   talk about it, and the last issue is Dr. Jones.

17          Now, here are the issues and I brought this picture

18   up, because I wanted to explain to you that, unfortunately, I

19   have to get down in the weeds, and what I mean by the weeds is

20   you heard a lot of little issues come up in this case, a lot

21   of little facts, a lot of things in the general scheme might

22   not be a big deal, but they matter for you, and I want to

23   point out these issues to help you determine whether or not

24   you think they would help with some of the decisions on the

25   issues you have.

66

1          Policies, we've gone over them.  The policies were so

2    confusing, Dr. Dumpe had to be called twice to talk about

3    them.  Here is the issue.  If you remember Dr. Karotkin said

4    when there's meconium, pediatrician is called in on the

5    delivery.

6          I believe if you remember Dr. Wiesenfeld's testimony,

7    he said the same thing, meconium, pediatrician.  Now, Heritage

8    Valley Beaver kept arguing that their policies are up and

9    above, way above the standard, but it didn't make sense to me,

10   and again, this is your recollection, but it seems to me that

11   if you are at Magee or wherever, Dr. Karotkin in Virginia

12   practices, St. Mary, if you have any of these meconiums, the

13   pediatrician is there, but if you are at Heritage Beaver, only

14   if you have it on the far left do you get a pediatrician.

15         Now, I think that unfortunately this has been one of

16   the -- I don't want to say silliest, but worthless arguments

17   that we have had.  Why do you or I have to sit here and debate

18   the quality of meconium?  Nurse Hendershot said it was the

19   second bottle from the right.  Dr. Dumpe said it was the third

20   bottle from the right.  Nurse McCrory said it looked like it

21   was something to the fourth bottle.

22         Now, we didn't take any samples of the meconium, so

23   we are here, you are here, we're all here to judge a policy

24   about whether a pediatrician should be called because there's

25   particulate matter in meconium, but wouldn't the better policy

1    simply be, like Dr. Karotkin and Dr. Wiesenfeld said?  You see

2    meconium, call a pediatrician.  We don't have to have this

3    debate.  We wouldn't be having this case.  We wouldn't be

4    talking about particulate matter.  That is a policy that can

5    be changed.  That's what your verdict can do.

6           Your verdict can say, hey, if we had a policy that

7    said meconium, a pediatrician would have been there.  Kendall

8    would have been looked at.  Why are we debating this?  How can

9    you decide that?

10          And they say, oh, I have no evidence whatsoever that

11   it was meconium particulate matter, and I do.  Number one,

12   Jamie said that, whenever she sucked it out of Kendall's

13   throat at 7:20, she said it was all the junk, and she pointed

14   to that bottle and said it was closer to that, and the second

15   is Dr. Min.  He said massive aspiration of meconium and that

16   there was debris in the meconium.

17          Here's another one, let's bond.  It's good to cry.  I

18   don't know.  Is it?  The nurse can come in and she can see the

19   baby.  Remember the specific question though that Ms. Koczan

20   asked.  She said if you looked in the door, could you see the

21   baby on the warmer?  And Nurse Hendershot said yes.

22          Well, after Kendall was taken off the warmer, was she

23   ever put back in the warmer?  No.  She was passed around the

24   room.  There were a whole bunch of friends.  Ten people in the

25   room, and here is what I think really happened.  We'll get

1    down to it.  5:30 to 7:00, a lot of family and friends are

2    coming in.  Nurse Hendershot, she is a very nice,

3    well-qualified nurse.  She had made friends with Carissa and

4    Matt all night.  She was joking around with them.  They have a

5    delivery.  It's a 120 pound woman gives birth to an eight

6    pound seven ounce baby, big baby and a whole bunch of family

7    and friends.  She evaluates.  She thinks the baby is fine.

8         Whole bunch of family and friends come in.  They're

9    enjoying it.  I think, I could be wrong, I think she just

10   said, hey, they are enjoying the baby.  Let's just bond.

11   There's no need for me to come in.  I'll be right outside if

12   they need anything.

13        And I, my personal opinion, I don't think she came

14   in, and I base that on the testimony of the family and the

15   friends.  Nobody saw her come in, and we'll talk about her

16   notes because this is what it is.  In your binder at tab 2

17   from pages 166 through 169, you can see that, and I mean,

18   you'll be able to look at this when you are deliberating, but

19   on those pages, you will see that at 6:00, at the 6:00

20   assessment, Nurse Hendershot clicked on everything that she

21   did for Carissa.  She made 48 clicks under one minute.  They

22   are all timed at 7:32 a.m.  She clicked on Carissa's condition

23   48 different selections and that's what she testified to, that

24   they are drop-down boxes or whatever, and think about that.

25        It's almost one a second, and she is going through an

69

1    electronic medical record and finding things.  If you'll

2    continue on after those pages, you'll see her 6:15, 6:30, 6:45

3    and 7:00 assessments, and you'll see the time, and you'll see

4    what happens, and at the end, it will say at the time it was

5    entered, and you'll see that at 6:15, she had ten entries all

6    done at the same time.

7        Now, is this medical record -- am I accusing her of

8    creating a fraudulent medical record?  What I am saying is

9    that she might have been sitting at her desk at the end of her

10   shift, because her shift was over at 7:30, she just finished a

11   12 hour shift, and had to complete a record.  Is this

12   inaccurate?  You tell me.

13       Has anybody else in this case said that the medical

14   record in this case is inaccurate?  And the answer is yes.

15   Who said that?  Dr. Jones said that.  Dr. Jones said this

16   medical record is inaccurate.  She said there's no way those

17   medical records that says I was notified is accurate.  So how

18   can we trust that Nurse Hendershot was actually in at 6:00?

19   Again, you, as the jury, are going to have to take a look at

20   that evidence and determine whether or not it's an accurate

21   medical record or not.

22       Again, going in the weeds.  Nurse Hendershot, I know,

23   I know I took Kendall.  Barb Hackney says, well, not if we

24   catch them.  Sometimes they bring them down.  We always catch

25   the dads bringing the babies down.  Matt, first time dad,

1    again, light bulb memory or flash bulb memory, I remember

2    dropping her off, kissing her on the head.  Would he have a

3    reason to lie about that?  It was the last time he got to kiss

4    his daughter.  What does his recollection say?  You have to

5    evaluate that.

6            Vitals, again, 7:00 it's great.  Well, we went over

7    the pulse ox.  In the nursery, this is sort of what I'm

8    getting at is there seemed to be, to me, almost a script

9    playing out in this case from the hospital's side.

10           Nurse McCrory gets on the stand and she says I

11   remember that, whenever I saw the first sign of distress in

12   Kendall, it was because she was dusky.  And then they called

13   Nurse Hackney who I deposed, and Nurse Hackney on the stand is

14   asked the question, said is the first thing you saw was that

15   she was dusky or is that the first thing that Nurse McCrory

16   said.  She says I think so.  Question was asked by Ms. Koczan.

17           And then, if you remember, I had to pull out her

18   deposition and say, hey, you told me twice that Nurse McCrory

19   said she is breathing hard.  That's a new finding.  So why

20   would Nurse Hackney come on this stand and not tell what she

21   said in her deposition when she knew that was in her

22   deposition if there wasn't a script about what she was to say?

23           Now, Nurse Kincade, do you remember her?  She is

24   still on vacation.  She got a vacation out of this.  She

25   wasn't called until last Thursday.  She came up from Arizona.

1    She gets put up at the Hampton Inn in Beaver until tomorrow,

2    so she is going to be in town, and she came in here on Tuesday

3    to say I remember exactly why I wrote that note and I remember

4    that I was wrong.  I assumed facts.

5        I said okay.  You were in there for the rest of it.

6    What do you remember about the rest of it?  I only have a

7    vague recollection about this baby that was in crisis.  I'm

8    writing down that x-rays are being taken, the transport.  I

9    just have a vague recollection of that, but other than this

10   specific thing about the doctor being called, I remember that

11   I assumed things.

12       I talked already about the hour and 50 minute delay.

13       Let's talk about Dr. Min.  Here is the most

14   interesting thing about Dr. Min.  Dr. Min -- and think about

15   this in this case.  This is sort of amazing.  Dr. Min is the

16   hospital's pathologist.  Dr. Min had no skin in this game, and

17   he writes a report that says massive aspiration of meconium.

18   The hospital walks away from massive aspiration of meconium to

19   the extent that they go all the way up to Harvard and they

20   hire an expert, Dr. Boyd, to come down here to tell you that

21   Dr. Min, their own pathologist, was wrong.

22       I mean, Dr. Min was my expert.  They said why didn't

23   you -- why didn't Mr. Price bring an expert?  Because I had

24   Dr. Min.  Dr. Min wrote his report and this is what -- we've

25   seen this, and Mr. Colville said he walked away.  He no longer

72

1    believes it's massive aspiration of meconium.

2            Well, remember this.  Dr. Dumpe came down to see him.

3    Why?  Because he had to get rid of massive aspiration of

4    meconium.  But it's still there and their other excuse now is,

5    oh, it's in the clinical record.  You know what the clinical

6    record is.  It's those binders.  You know what you can do?

7    You can go through those binders and look for the word

8    massive.  The only place you are going to find it is in the

9    autopsy report.

10            They keep saying it must have been a clinical

11   finding.  Here's what I'll tell you too.  If the word massive

12   was a "clinical finding," don't you think that they would have

13   hit me right across the chin with it in some medical record?

14   You have seen every medical record ad nauseam brought up by

15   the defense.  They didn't once bring up a medical record that

16   said massive.  The only record that says massive aspiration of

17   meconium is the autopsy.

18            Now, that's enough with the weeds.  The last question

19   that you are going to be answering -- I'm sorry -- asked to

20   answer is about damages and this is about Kendall and about

21   Kendall's estate.  So under the law, you are permitted to

22   award damages to Kendall's estate under two different claims,

23   and you'll see it on the verdict slip.  One is called a

24   survival action and one is called wrongful death.

25            I don't have to get into too much of the particulars,

1    but survival basically means the claims that, if Kendall had

2    survived, would have stayed with her and that's the wage loss.

3    So if Kendall had survived, if this baby had survived, what

4    would she have been able to do in her lifetime, and what we

5    have to do is bring in an expert, and that's Dr. Kenkel, and

6    he simply gave you the most conservative he could.

7          He said if you go to high school these days and you

8    work in your life, you are going to make in your lifetime

9    almost $800,000.  If you go to college, almost 1.7 million.

10   You can determine she may not have done anything or she might

11   have excelled.  The judge will give you an instruction on

12   that, but you are to determine whether or not, if there is any

13   wage loss, what it is.

14         The other part of the claim is called wrongful death,

15   and that is the contributions, the noneconomic loss, and that

16   is for Carissa and Matt, and this is the part of the case

17   where I can't tell you or give you any guidance as to how you

18   are to judge this or what you are to do about determining if

19   there are any damages in this.  It's simply what you think a

20   loss to these people of a child matters and how much, and

21   you've seen these pictures, but this is what it comes down to

22   is does this life in this community with this health care

23   matter, and you are the ones to make that determination.

24         Now, finally, I just want to finish and say I too

25   want to thank you for being here.

1          I always put these slides up at the end because you

2     know, we are here in this courtroom and we have been here for

3     a long time, and there's no windows and we might not know

4     what's going on, but you all are carrying on a great tradition

5     that comes way back from England and continues into America,

6     and I know that we've all seen this movie, and this is going

7     to be you, you are all going to be jurors, but it's very, very

8     important that we handle these cases in this manner.

9          And why do I say "this manner," because this is what

10    I believe in.  This is what Ms. Koczan, Mr. Colville and the

11    judge all believe in.  It's a civil disagreement.

12         Nobody is here -- we don't settle this out in the

13    street.  We settle it before you.  We have empaneled you as a

14    jury to say, hey, look, it's a tough decision.  It's not easy,

15    but this is a civil dispute, and this is what matters to our

16    democracy and this is how we handle things.

17         So I thank you.  I thank you from the bottom of my

18    heart.  I know the court and counsel do too.  It's going to be

19    tough, but this is the question.  Is this acceptable medical

20    care, because you are -- you really are the conscience of the

21    community, and you are going to have to go through the verdict

22    slip and you are going to have to render a decision.

23         And again, I would ask you on behalf of the

24    plaintiffs, on behalf of Matt and Carissa and Kendall, to find

25    for us, but again, you are free to choose your verdict.  Thank

1    you.

2         THE COURT:  Thank you, Mr. Price, for those remarks.

3    Ladies and gentlemen of the jury, at this point, we're going

4    to take our morning break, and as we have done in the past, I

5    would ask that you leave your exhibit binders and notebooks

6    there, and once again, we're almost there, but you still have

7    to hear my final instructions, so to that point, you should

8    still not talk about the case amongst yourselves, and

9    obviously, you are not going to communicate or research about

10   the case.

11        Mr. Galovich is also going to be in with you, because

12   this is the one time that the federal government will buy you

13   a lunch, so to that end, he's going to be talking to you about

14   lunch and your lunch order.  Let's all get back together here

15   on the record at 11:15 and I'll give you my final instructions

16   at that time.  Let's all rise for our jury.

17       (Jury excused.)

18        THE COURT:  We'll start again at 11:15 with the

19   instructions.

20        MS. KOCZAN:  I just have an issue with one of the

21   things that Mr. Price said.  He didn't use the word send a

22   message but essentially that was the import.  Your verdict

23   will, you know, basically tell the hospital, send them a

24   message that this isn't acceptable.  That's not appropriate

25   argument, and I would note that on the record and object to

76

1    that.

2            THE COURT:  Okay.  Any response, Mr. Price, for the

3    record?

4            MR. PRICE:  I believe that my closing was entirely

5    within the bounds of permissible argument.

6            THE COURT:  Mr. Colville, is there anything you want

7    to add to that statement?

8            MR. COLVILLE:  No, Your Honor.

9            THE COURT:  So you've made the objection.  Anything

10   further?  Are you asking for a limiting instruction?  What are

11   you asking for?

12           MS. KOCZAN:  I am, Your Honor.  That's not

13   appropriate argument.

14           THE COURT:  Do you have language for a limiting

15   instruction?

16           MS. KOCZAN:  I do not.  It just happened.

17           THE COURT:  Well, you have 15 minutes to come up with

18   something.

19           MS. KOCZAN:  I will do that.

20           MR. PRICE:  Are we free to go?

21           THE COURT:  Yes.

22       (Recess taken.)

23           THE COURT:  Ms. Koczan, do you have a proposed

24   limiting instruction for the court?

25           MS. KOCZAN:  I do, Your Honor.  I hope you can read

1    my handwriting.

2              THE COURT:  Have you shared it with Mr. Price?

3              MS. KOCZAN:  No, I haven't.

4              THE COURT:  Why don't you state it out loud so

5    everybody has the benefit of it?

6              MS. KOCZAN:  You have heard argument by Mr. Price

7    that by rendering a verdict against Heritage Valley Beaver

8    that you would, in essence, be sending a message to the

9    hospital that its policy was not appropriate and should be

10   changed.  This is not appropriate argument and you should

11   disregard it.

12             THE COURT:  Mr. Price, any comment?

13             MR. PRICE:  Sure.  I don't believe that I said send a

14   message.  What I said was that in your verdict, you would be

15   saying that the policy was wrong.  I don't think that's the

16   same as punishment, sending a message.  I think that's what

17   their verdict is going to say, whether they think it's right

18   or wrong.

19             THE COURT:  Anything further on this point?

20             MS. KOCZAN:  No, Your Honor.  The limiting

21   instruction does not say that he said -- I'm not accusing him

22   of saying that he sent a message, but in essence, that was

23   what the statement was.

24             THE COURT:  That's the argument that you made.  Over

25   the break, we have had an opportunity to research this

1    interesting issue, and to that end, I call your attention to

2    Larsen, "Navigating the Federal Trial."

3         "Generally this type of argument is not necessarily

4    objectionable unless it is designed to inflame the passions or

5    appeals or the prejudices of the jury.  Problems usually arise

6    when the argument asks the jury to abandon its traditional

7    role as the fact-finder in the case and instead use its

8    verdict to correct some larger societal problem.

9         "In other words, although the jurors are supposed to

10   focus on deciding the essential elements of the charge, claim

11   or defense in the pending case, the objectionable conscience

12   of the community argument diverts their attention instead to a

13   different, broader and irrelevant issue."

14        And here the examples are:  Supporting the war on

15   drugs, helping to reduce gun violence in the community,

16   deterring others from committing criminal acts and the like

17   when reaching their verdict.

18        Now, when you read this section of Larsen, there are

19   a great number of head notes, none of which are Third Circuit.

20        Also, taking a look at Park on "Trial Objections," in

21   their handbook, "Calls for punishment or deterrence in civil

22   cases are appropriate when punitive damages are an issue but

23   not otherwise.  Although civil damages are normally

24   compensatory not punitive, counsel may nevertheless ask the

25   jury which serves as the conscience of the community to send a

1    message to wrong doers and to deter others where punitive

2    damages are an issue," and then it goes on to cite what one

3    litigant asked the jury for, which is not pertinent in this

4    particular case.  And again, a number of case citations, none

5    of which are Third Circuit.

6         Interestingly, in a recent decision, Judge Mariani

7    who I quoted yesterday, in the middle district in a case

8    called Botey versus Green, 2017 Westlaw 2536397, basically

9    says that -- and this, by the way, is in regard to a motion in

10   limine, and their judge there was concerned because he, in his

11   words, discerned in plaintiff's brief some intent to use

12   language such as send a message or to suggest that the jury

13   act as the conscience of the community on the basis that

14   plaintiff views punitive damages as fulfilling a larger

15   societal role.

16        Judge Mariani went on to rule that he would not allow

17   the plaintiff to make any prejudicial appeals to the members

18   of the jury.  In that case, based on the Texas location of the

19   defendants and the Tennessee residence of the defendant, in

20   his words, those statements would be immaterial, parochial and

21   irrelevant, so he made those admonitions and he cautioned

22   counsel not to appeal to regional prejudices, corporate

23   antipathy or other biases.  That's as far as he went.

24        I also take note of a Superior Court decision, and

25   that case is Darlene Nelson versus Airco Welder Supply, et al.

1    It's at 107 A.3d 146 2014.  It was distinguished and given

2    some negative treatment in another case, another asbestos case

3    as it turns out.

4         Once again, these closing arguments were also

5    designed to elicit punitive damages akin to what Judge Mariani

6    was dealing with, and there, there's a quote that the

7    attorney, in making closing, inserted a punitive element into

8    his discussion of damages by stating, "At the end of the day,

9    ladies and gentlemen, you represent the conscience of the

10   community, and I'm asking you to award an amount of money that

11   is so significant and substantial that it will do justice that

12   everyone will know the justice is done, not just the Nelson

13   family but everybody that's in this community.  Do not let

14   this man die in vain."

15        The judge in that case -- the Superior Court in that

16   case found the language to be inflammatory because it

17   allegedly attributed improper motives to the appellants, and

18   to that end, the case was going to be sent down for retrial,

19   and hence, the Superior Court admonished counsel from

20   needlessly inflaming the passions of the jury.

21        So my sense, in reading all of this -- and this is a

22   case where it's all agreed that the damages being sought do

23   not include punitive damages, number one.  Number two, the way

24   it was phrased, the jury is being asked whether this was or

25   wasn't acceptable medical care.  As he was talking about the,

1    "conscience of the community," he had a picture of jurors

2    there, and to that end, I don't think that that particular

3    argument goes as far as some of these other arguments which,

4    in effect, ask to have a message sent, but I do believe, even

5    though I've already instructed the jury on closing arguments,

6    that I should reiterate that instruction.

7         As everybody knows, the demonstratives do not go back

8    with the jury, and they are not going to do that in this

9    particular instance, so your objection is preserved.  The

10   argument is noted.  We'll reinstruct the jury just as a

11   reminder about closing arguments.  Otherwise, I think we're

12   going to be calling too much attention to that particular

13   argument.

14        Mr. Galovich, is everybody back and assembled?

15        THE CLERK:  Yes, Your Honor.

16   (Jury present.)

17        THE COURT:  Thank you, Mr. Galovich.  Again, thank

18   you ladies and gentlemen of the jury.  I know Mr. Galovich has

19   secured your lunch orders, and you are refreshed and renewed,

20   and so now the court is about to provide you my final

21   instructions on this matter.

22        Let me remind you, vis-à-vis the closing arguments,

23   they are designed to present to you the parties' theories

24   about what the evidence has shown and what conclusions may be

25   drawn from the evidence.  What you've heard in closing

1    arguments is not evidence.  You instead have seen and heard

2    all of the evidence.  It will be up to you to ultimately find

3    the facts and then apply this law that I'm going to give you

4    as I will now instruct you.

5            As I've indicated, you have now heard all of the

6    evidence for this case as well as the parties' closing

7    arguments.  It's now my duty to instruct you on the relevant

8    law.  In a few moments, you'll be given the verdict form for

9    this case on which you will answer specific questions.

10           Mr. Galovich, do you have extra copies made of the

11   verdict slip?

12           THE CLERK:  I do not.  Would you like me to print

13   them?

14           THE COURT:  That would be terrific.  Let's hold up

15   and let's do it here.  I apologize.  We should have given you

16   that cue earlier.  What I'm about to do, ladies and gentlemen,

17   is give each one of you one of these verdict slips so you can

18   follow along.

19           Let the record reflect that Mr. Galovich, my deputy,

20   is going to provide each of the jurors with a copy of the

21   verdict slip, and I ask each of you to please take a few

22   minutes to read through this verdict form, because the

23   instructions I'm about to give you will help you answer the

24   questions on the verdict form.  So just take a couple minutes

25   so you read through that verdict form and you'll have that in

1     the back of your mind before I give you the rest of my

2     instructions.

3          (Brief pause.)

4          THE COURT:  It appears that everyone has had a chance

5     to read through the verdict slip so I'm going to continue.

6          When you retire to the jury room to deliberate, you

7     may take with you my instructions and you'll be getting a copy

8     of these instructions once we make sure they are exactly what

9     needs to be said, your notes, of course your notepads and the

10    exhibits that the court has admitted into evidence and which

11    the court permits in the jury room, and as you know, you are

12    going to take those binders back with you, and then in

13    addition, any loose exhibits that have been admitted will also

14    be given to you.

15         Once you are there, you should select one member of

16    the jury as your foreperson.  That person will preside over

17    the deliberations and speak for you here in open court.  Now,

18    you have two main duties as jurors.

19         The first one is, as I told you before, to decide

20    what the facts are from the evidence that you saw and heard

21    here in court.  Deciding what the facts are is your job, not

22    mine, and nothing that I have said or done during the trial is

23    meant to influence your decision about the facts in any way.

24    You should understand that I am absolutely neutral and nothing

25    in the manner in which I deliver these instructions to you is,

84

in any sense, an expression of my opinion about this case.

Your second duty is to take the law that I give you, apply it to the facts and decide if, by a preponderance of the evidence, plaintiffs have established their claims. It is my job to instruct you about the law, and you are bound by the oath that you took at the beginning of this trial to follow the instructions that I give you, even if you personally disagree with them. This includes the instructions that I gave you before and during the trial and these final instructions. All of the instructions are important and you should consider them together as a whole. Do not disregard or give special attention to any one instruction and do not question the wisdom of any rule of law or rule of evidence I state.

In other words, do not substitute your own notion or opinion as to what the law is or ought to be. Perform these duties fairly. Do not let any bias, sympathy or prejudice that you may feel toward one side or the other influence your decision in any way.

Our system of law does not permit jurors to be governed by sympathy, prejudice or public opinion. The parties are entitled to the same fair trial at your hands. All persons stand equal before the law and are to be dealt with as equals in a court of justice.

In this case, one of the defendants is a corporation.

1    The mere fact that one of the parties is a corporation does

2    not mean it is entitled to any less consideration by you.

3           Furthermore, the fact that a governmental entity is

4    involved as a party must not affect your decision in any way.

5    As a reminder, the United States' involvement in this matter

6    is related to Dr. Kevin Dumpe, so when you hear Dr. Dumpe,

7    think United States of America.

8           Both the parties and the public expect that you will

9    carefully and impartially consider all of the evidence in this

10   case, follow the law as stated by the court and reach a just

11   verdict regardless of the consequences.  To this end, I must

12   remind you that Carissa Peronis and Matthew Fritzius, the

13   plaintiffs, have the burden of proving their case by a

14   preponderance of the evidence.

15          As you may recall, that means plaintiffs have to

16   prove, in light of all the evidence, that what they claim is

17   more likely so than not so.

18          To say it differently, if you were to put the

19   evidence favorable to the plaintiffs and the evidence

20   favorable to the defendants on opposite sides of a scale,

21   plaintiffs would have to make the scales tip somewhat on their

22   side.  If plaintiffs fail to meet this burden, the verdict

23   must be for the defendants.

24          Plaintiffs have the burden to prove, number one, that

25   Dr. Dumpe, Dr. Jones, the employees of the hospital defendants

1    and/or the hospital defendants themselves were negligent.

2           Number two, that the negligent conduct of Dr. Dumpe,

3    Dr. Jones, the employees of the hospital defendants and/or the

4    hospital defendants themselves was a factual cause in bringing

5    about harm to Kendall Peronis.

6           And number three, to the extent you find negligence

7    on the part of any of the defendants, the damages caused by

8    such negligence.

9           At this time, let me remind you of the parties'

10   stipulations of fact.  As noted in the court's preliminary

11   instructions and during the trial, the parties in this case

12   agreed or stipulated to these facts and you must accept these

13   facts as true while deliberating the substantive issues in

14   this case even though nothing more may have been said about

15   them during the trial.

16          The following are the stipulations by the parties to

17   this case:  That the medical records of Carissa Peronis and

18   Kendall Peronis are authentic; that at all times relevant to

19   this case, all the nurses and resident doctors or interns were

20   employees of Valley Medical Facilities Incorporated, trading

21   and doing business as Heritage Valley Beaver; that at all

22   times relevant to this case, Dr. Hilary Jones was an employee

23   of Heritage Valley Pediatrics; that there is no claim against

24   Dr. Hilary Jones for her care of Kendall Peronis once she

25   began to administer that care; that there is no claim that the

1    infection Carissa Peronis had while carrying Kendall Peronis

2    had any relation to the E. coli sepsis infection Kendall

3    Peronis developed.  In fact, Dr. Harold Wiesenfeld testified

4    that the bacterial infection was not related in any way to the

5    infection at issue.

6         As I explained in the preliminary instructions, there

7    are two types of evidence that you may use in reaching your

8    verdict:  Direct evidence, which includes something that the

9    witness knows through his own senses or an exhibit where the

10   fact to be proved is its existence or current condition, and

11   circumstantial evidence which is proof of one or more facts

12   from which you can find another fact.

13        You should consider both kinds of evidence that are

14   presented to you.  The law makes no distinction in the weight

15   to be given to either direct or circumstantial evidence.  You

16   are to decide how much weight to give any evidence.  I will

17   now give you an example of the difference between direct and

18   circumstantial evidence.

19        If you would go to bed at night, and as you pull down

20   the shades, you see that it is snowing.  That is direct

21   evidence that it has snowed.

22        On the other hand, if you go to bed at night when

23   nothing is on the ground and you wake up the next morning to

24   see snow on the ground, that is circumstantial evidence that

25   it snowed during the night.

1              Also remember that, unless I instructed you otherwise

2       during the course of this trial, when determining whether any

3       fact has been proved by a preponderance of the evidence, you

4       may consider as evidence, number one, the testimony of the

5       witnesses; number two, documents and other things received as

6       exhibits; number three, any admissions or any facts that are

7       stipulated, that is, formally agreed to by the parties; and

8       number four, any facts that are judicially noticed, that is,

9       facts I say you must accept as true even without other

10      evidence.

11             The following things are not evidence:

12             Number one, statements, arguments and questions of

13      the lawyers for the parties in this case.

14             Number two, charts, summaries, timelines or lists

15      used by the lawyers for the parties in this case when

16      examining a witness or making arguments to you.  These

17      demonstrative exhibits have not been received in evidence and

18      they were shown to you only to explain or illustrate the

19      contents of documents, testimony or other evidence in the

20      case.  As such, they are not proof of any facts.  They are not

21      binding on you in any way.

22             If they do not correctly reflect the facts shown by

23      the evidence in this case, you should disregard any or all of

24      them and determine the facts from the evidence.

25             Number three, objections by lawyers.

1          Number four, any testimony I tell you to disregard.

2          And, number five, anything you may see or hear about

3     this case outside of the courtroom.

4          You must make your decision based only on the

5     evidence that you've seen and heard in the court.  Do not let

6     rumors, suspicions or anything else that you may see or hear

7     outside of the court influence your decision in any way.  You

8     should use your common sense in weighing the evidence.

9     Consider it in light of your everyday experience with people

10    and events and give it whatever weight you believe it

11    deserves.

12         If your experience tells you that certain evidence

13    reasonably leads to a conclusion, you are free to reach that

14    conclusion.

15         As you know, there are rules that control what can be

16    received into evidence by the court.  You should not be

17    influenced by the fact that objections were made during trial.

18    As I just instructed you, objections to questions are not

19    evidence.  Lawyers have an obligation to their clients to make

20    objections when they believe that evidence being offered is

21    improper under the rules of evidence.

22         Likewise, you should not be influenced by the court's

23    rulings on objections.  If an objection was sustained, ignore

24    the question that was asked.  If an objection was overruled,

25    treat the answer like any other.

1    If you are instructed that some item of evidence was

2    received for a limited purpose only, you must follow that

3    instruction.

4    Also, if certain testimony or other evidence is

5    ordered struck from the record, it must be disregarded.  Do

6    not consider any testimony or other evidence that was struck

7    or excluded.  Do not speculate about what a witness might have

8    said or what an exhibit might have shown.

9    You may certainly consider all the exhibits which

10   have been admitted into evidence.  As you may have observed,

11   there are some exhibits which contain redactions.  Redactions

12   are those areas which have been blotted from your view.  These

13   redactions cover protected personal information and/or matters

14   which are not relevant to your deliberations.  Information was

15   redacted because the court determined that it should not play

16   a role in your decision making regarding the case before you.

17   Again, do not speculate about the redacted

18   information.  You are simply to assume that what was redacted

19   was not relevant to your deliberations.  In deciding what the

20   facts are, you will have to review all the evidence.  You will

21   have to decide what testimony you believe and what testimony

22   you did not believe.  In making this determination, you may

23   also consider the exhibits admitted into evidence.

24   During the trial, you have heard testimony from both

25   fact witnesses and expert witnesses.  In general, the opinion

1    of an expert has value only when you accept the facts upon

2    which it is based.  This is true whether the facts are assumed

3    hypothetically by the expert or they come from the expert's

4    personal knowledge, from some other proper source or from some

5    combination of these.

6            With regard to fact witnesses, you should carefully

7    scrutinize the testimony you heard from all the witnesses, the

8    circumstances under which each witness has testified and every

9    matter in evidence which tends to show whether a witness is

10   worthy of belief.

11           In deciding what the facts are, you will have to

12   decide what testimony you believed and what testimony you did

13   not believe.  The number of witnesses offered by one side or

14   the other does not, by itself, determine the weight of the

15   evidence.  It is a factor, but only one of many factors that

16   you should consider.

17           Whether the witnesses appear to be biased or unbiased

18   and whether they are interested or disinterested persons are

19   among the important factors that indicate the reliability of

20   their testimony.  The important thing is the quality of the

21   testimony of each witness.

22           In short, the test is not which side brings the

23   greater number of witnesses or presents the greater quantity

24   of evidence, but which witness or witnesses and which evidence

25   you consider most believable.  Even the testimony of one

1    witness may outweigh that of many if you have reason to

2    believe his or her testimony over the others.

3            On the other hand, where the testimony of the

4    witnesses appears to you to be of the same quality, the weight

5    of numbers could assume particular significance, but again,

6    that is something you must decide.  As you consider the

7    evidence, you may find inconsistencies.  Yet even actual

8    contradictions in the testimony of witnesses do not

9    necessarily mean that any witness has been willfully false in

10   giving his or her testimony.

11           Poor memory is not uncommon.  Sometimes a witness

12   forgets or sometimes he or she remembers incorrectly.  It is

13   also true that two persons witnessing an event may see, hear

14   or remember it differently.  If the testimony of a witness

15   seems inconsistent within itself or if the testimony given by

16   several witnesses conflicts, you should try to reconcile the

17   differences.  If you cannot reconcile the differences, you

18   must then decide which testimony, if any, you believe.

19           If different parts of the testimony of any witness or

20   witnesses appear to be inconsistent, you should try to

21   reconcile the conflicting statements, whether of the same or

22   of different witnesses, and you should do so if it can be done

23   fairly and satisfactorily.  If, however, you decide that there

24   is a genuine and irreconcilable conflict of testimony, it is

25   your function and duty to determine which, if any, of the

93

1    contradictory statements you will believe.

2          As judges of the facts, you as the jurors are the

3    only judges of the credibility of the witnesses and their

4    testimony.  This means that you must judge the truthfulness

5    and accuracy of each witness's testimony and decide whether to

6    believe all, part or none of that witness's testimony.

7          If you decide that a witness has deliberately

8    falsified testimony on a significant point, you should take

9    this into consideration in deciding whether or not to believe

10   the rest of the testimony.  Then, and in that event, you may

11   refuse to believe the rest of the testimony, but you are not

12   required to do so.

13         You are not required to accept testimony even though

14   the testimony is uncontradicted and the witness is not

15   discredited.  For example, you may decide, because of the

16   witness's bearing and demeanor or because of the witness's

17   testimony on other subjects, that such testimony is not

18   believable.  As we touched upon at the beginning of this

19   trial, the following are some of the factors that you may

20   consider when judging credibility and deciding whether or not

21   to believe a witness:

22         Number one, was the witness able to see, hear or know

23   the things about which he or she testified?

24         Number two, how well could the witness remember and

25   describe those things?

1          Number three, was the ability of the witness to see,

2     hear, know, remember or describe those things affected by

3     youth or old age or by any physical, mental or other

4     intellectual deficiency?

5          Number four, did the witness testify in a convincing

6     manner?  How did the witness look, act and speak while

7     testifying?  Was the testimony uncertain, confused,

8     self-contradictory or presented in any kind of evasive manner?

9          Number five, did the witness have any interest in the

10    outcome of the case or any bias, prejudice or any other motive

11    that might have affected the testimony?

12         Number six, how well does the testimony of the

13    witness square with the other evidence in the case, including

14    exhibits and the testimony of other witnesses?  Was it

15    contradicted or supported by the other evidence and testimony?

16         Number seven, does the testimony make sense to you?

17         Number eight, if you believe some part of the

18    testimony of a witness to be inaccurate, consider whether that

19    inaccuracy cast doubt upon the rest of that same witness's

20    testimony.  This may depend on whether the inaccuracy is as to

21    an important matter or a minor detail.

22         Number nine, you should also consider any possible

23    explanation for the inaccuracy.  To that end, did the witness

24    make an honest mistake or simply forget, or was there a

25    deliberate attempt to present false testimony to you?

1          Number ten, if you find that a witness deliberately

2     testified falsely on a material point, that is, on a matter

3     that might affect the outcome of the trial, you may, for that

4     reason alone, choose to disbelieve other parts or all of that

5     same witness's testimony but you are not required to do so.

6     You should consider not only the deliberate falsehood but also

7     any other factors that may bear on the witness's credibility

8     in deciding whether to believe other parts of that witness's

9     testimony.

10          And, number eleven, while you are judging the

11    credibility of each witness, you are likely to be judging the

12    credibility of other witnesses or other evidence in the case.

13    If there is a real irreconcilable conflict, as I advised, it

14    is up to you to decide which, if any, of the conflicting

15    testimony or evidence you believe.

16          As the only judges of credibility and facts in this

17    case, you, the jurors, are responsible to give the testimony

18    of every witness and all the other evidence whatever

19    credibility and weight you think it is entitled to receive.

20          Let me also explain the law does not require any

21    party to call as witnesses all persons who may have been

22    present at any time or place involved in this case or who may

23    appear to have some knowledge of the matters at issue in this

24    trial.  Generally, all witnesses are available to all parties,

25    and no negative inference is to be drawn by you from the fact

1    that certain potential witnesses were not called by either

2    side to testify.

3            To assist juries in deciding cases such as this one

4    involving scientific, technical or other specialized knowledge

5    beyond that possessed by lay persons, the law allows an expert

6    witness with special education and experience to present

7    opinion testimony.  You've heard from the following expert

8    witnesses:  Dr. Leonard Zamore, Dr. Steven Shore, Dr. Edward

9    Karotkin, Dr. James Kenkel, Dr. Theonia Boyd, Dr. Susan

10   Coffin, Dr. Steve Ringer and Dr. Harold Wiesenfeld.

11           An expert witness gives his or her opinion to a

12   reasonable degree of professional certainty based upon the

13   assumption of certain facts.  However, as I previously

14   instructed you, you do not have to accept an expert's opinion

15   just because he or she is considered an expert in his or her

16   field.

17           In evaluating an expert witness's testimony or

18   resolving any conflicting expert witness's testimony, you

19   should consider the following:

20           Number one, the witness's knowledge, skill,

21   experience, training and education.

22           Number two, whether you find the facts the witness

23   relied upon in reaching his or her opinion are accurate.

24           And number three, all of the believability factors

25   I've already given to you as to lay witnesses.

1           To the extent that expert witnesses were asked to

2     assume that certain facts were true and to give an opinion

3     based upon those assumptions, these are called hypothetical

4     questions.  If you find that an important fact assumed in a

5     hypothetical question has not been established by the

6     evidence, you should disregard the expert's opinion given in

7     response to that question.

8           Similarly, if the expert has made it clear that his

9     or her opinion is based on the assumption that an important

10    fact did not exist and you find that it did exist, you should

11    disregard that opinion.

12          Turning to the specific claims in this case,

13    plaintiffs allege claims of professional negligence against

14    the United States, the hospital defendants for their actions

15    and the actions and/or omissions of their employees, including

16    Dr. Hilary Jones.  Given same, I'll now discuss professional

17    negligence and other terms necessary to your evaluation of

18    plaintiffs' claims.

19          Professional negligence consists of a negligent,

20    careless or unskilled performance by a physician of the duties

21    imposed on him or her by the professional relationship with

22    the patient.  It is also negligence when a physician shows a

23    lack of proper care and skill in the performance of the

24    professional act.

25          A physician must have the same knowledge and skill

1    and use the same care normally used in the medical profession.

2    A physician whose conduct falls below this standard of care is

3    negligent.

4            Similarly, a physician who professes to be a

5    specialist in a particular field of medicine must have the

6    same knowledge and skill and use the same care as others in

7    that same medical specialty.  A specialist whose conduct does

8    not meet this professional standard of care is negligent.

9            Under this standard of care, a physician must also

10   keep informed of the contemporary developments in the medical

11   profession or his or her specialty and must use current skills

12   and knowledge.

13           In other words, a physician must have up-to-date

14   medical skills and knowledge, and if he or she fails to keep

15   current or fails to use current knowledge in the medical

16   treatment of the patient, the physician is negligent.

17           A professional medical negligence or medical

18   malpractice case is a civil action for damages and nothing

19   more.  You must decide only the issue of whether plaintiffs

20   have suffered injuries as a result of any or all of the

21   defendants' negligence and are thus entitled to monetary

22   compensation for those injuries.  Your verdict does not

23   involve punishment of the hospital physicians or even

24   criticism of their professional abilities beyond the facts of

25   this case, nor does your verdict involve their reputations,

1    medical practices or rights as a licensed physician and/or

2    hospital.

3    In fact, you should not concern yourselves with any

4    other matters such as social or political issues relating to

5    medicine.  No thought should be given to these irrelevant

6    considerations in reaching your verdict.

7    Plaintiffs also allege claims of corporate negligence

8    against the hospital defendants.  A hospital is directly

9    liable to the patient if it violates a duty that it owes to

10   the patient to ensure the patient's safety and well-being

11   while under the care of the hospital.  The following are the

12   duties that a hospital must fulfill and that it cannot pass on

13   to anyone else:

14   Number one, a duty to use reasonable care in the

15   maintenance of safe and adequate facilities and equipment.

16   Number two, a duty to select and retain only

17   competent physicians and health care personnel.

18   Number three, a duty to oversee all persons who

19   practice nursing within its walls as to patient care.

20   And, number four, a duty to formulate, adopt and

21   enforce adequate rules and policies to ensure quality care for

22   the patients.

23   If you decide that the hospital defendants violated

24   any one of those duties, you must then decide, one, whether

25   the health care institution knew or should have known of the

1    breach of that duty, and two, that the conduct was a factual

2    cause in bringing about the harm or injury.

3         In this case, it is admitted that the defendant

4    Hilary Jones was acting as the agent of the defendant,

5    Heritage Valley Pediatrics, known as the principal, and was

6    engaged in furthering the interests, activities, affairs or

7    business of her principal.

8         A principal is liable for the negligence of its agent

9    occurring while the latter was acting in the course and within

10   the scope of his or her agency.  In this case, it's also

11   admitted that the nurses and resident doctor were, at the time

12   of the occurrence, acting as the employees of the defendant,

13   Heritage Valley Beaver Hospital known as the employer and were

14   engaged in furthering the interests, activities, affairs or

15   business of their employer.

16        An employer is liable for the negligence of its

17   employee occurring while the latter was acting in the course

18   and within the scope of his or her employment.

19        Therefore, if you find defendant Hilary Jones to be

20   liable, you must find Heritage Valley Pediatrics also liable.

21   If, however, you find that she is not liable, then you must

22   find Heritage Valley Pediatrics not liable.

23        Similarly, if you find the nurses and resident doctor

24   to be liable, then you must find Heritage Valley Beaver

25   Hospital also liable.  If, however, you find the nurses and

1    resident doctor not to be liable, then you must find the

2    hospital defendants not liable.

3            You are further instructed that Dr. Dumpe, at all

4    relevant times, was acting as the agent of the United States

5    working as a part of a federally funded clinic.  Thus, if you

6    find Dr. Dumpe liable, then you must find the United States

7    also liable.  If, however, you find Dr. Dumpe was not

8    negligent, then you must find the United States not liable.

9            If you find that any or all of the defendants

10    violated a duty it, he or she owed to the plaintiffs, then you

11    must decide whether that defendant's negligence was a factual

12    cause of the plaintiffs' injuries.  If you so decide, you must

13    decide the amount of damages the plaintiff sustained as a

14    result of the defendant's negligence.

15            Conduct is a factual cause of harm when the harm

16    would not have occurred absent the conduct.  To be a factual

17    cause, the conduct must have been an actual real factor in

18    causing the harm, even if the result is unusual or unexpected.

19    A factual cause cannot be an imaginary or fanciful factor

20    having no connection or only an insignificant connection with

21    the harm.  To be a factual cause, the defendant's conduct need

22    not be the only factual cause.

23            The fact that some other causes concur with the

24    negligence of the defendant in producing an injury does not

25    relieve the defendant from liability as long as that

1   defendant's own negligence is a factual cause of the injury.

2          When a physician or a nurse negligently fails to act

3   or negligently delays in taking indicated diagnostic or

4   therapeutic steps and his or her negligence is a factual cause

5   of injuries to the plaintiffs, that negligent physician or

6   nurse is responsible for the injuries caused.  When a hospital

7   violates a duty to ensure patient safety and well-being while

8   under the care of the hospital, the hospital can be negligent

9   in its own right.

10         Additionally, a hospital can be negligent because of

11  the acts or omissions of its employees.  If you find the

12  hospital to be negligent, you must also consider whether that

13  negligence is a factual cause of the injuries to the

14  plaintiffs.

15         Where the plaintiffs present expert testimony that

16  the failure to act or delay on the part of the physician or

17  nurse has increased the risk of harm to the plaintiffs, this

18  testimony, if found credible, provides a sufficient basis from

19  which you may find that the negligence was a factual cause of

20  the injuries sustained.  If, however, you find that the

21  plaintiffs' injuries would have been sustained even if the

22  hospital, physicians or nurses had not been negligent, then

23  the defendants cannot be said to have been the factual cause

24  of the harm.

25         If you find that there has been any significant

possibility of avoiding injuries and the defendants have destroyed that possibility, they may be liable to the plaintiffs.  That said, there is no presumption or inference of negligence merely because medical care ended in an unfortunate result which might have occurred even though proper care and skill was exercised.

As you likely know, it is rarely possible to demonstrate to an absolute certainty what would have happened under circumstances that any alleged wrongdoer did not allow to occur.  Sometimes a person's negligent conduct combines with another's conduct to cause harm.  When a defendant's negligent conduct combines with the conduct of other persons, the defendant is legally responsible if its, his or her negligent conduct was one of the factual causes of the harm.

In such a case, Dr. Dumpe, Dr. Jones and/or the hospital defendants are fully responsible for the harm suffered by Kendall Peronis, Carissa Peronis and Matthew Fritzius regardless of the extent to which Dr. Dumpe, Dr. Jones and/or the hospital defendants contributed to the harm.

Additionally, sometimes two or more people are negligent but only one person's negligent conduct factually caused the plaintiffs harm and it is uncertain which person caused the harm.  Under such circumstances, each negligent defendant has the burden of proving that he, she or it did not

1    factually cause the plaintiffs' harm.  If you decide that any

2    or all of the defendants were negligent and that the

3    negligence of those parties was a factual cause of the

4    plaintiffs' harm, you must then decide how much each party's

5    negligence contributed to plaintiffs' harm.

6          You've seen the verdict slip.  You've read through

7    the verdict slip.  Looking at that verdict slip, you should

8    state each party's share of the negligence in the form of a

9    percentage.  Together, those percentages must total 100

10   percent.

11         Now, the fact that I am instructing you about damages

12   does not imply any opinion on my part as to whether damages

13   should be awarded.  If you find that the defendants are liable

14   to the plaintiffs, you must then find an amount of money

15   damages you believe will fairly and adequately compensate the

16   plaintiffs for all the physical and financial injury they

17   sustained as a result of the negligence you found.

18         The amount you award today must compensate the

19   plaintiffs completely for damages sustained in the past as

20   well as all damages the plaintiffs will sustain in the future

21   as a consequence of that negligence.

22         When a person dies, the damages they would have been

23   entitled to go to their estate or survivors.  The estate and

24   survivors are just as entitled to these damages as the

25   deceased person would have been had she survived.   The

1    plaintiffs individually and in the case of Carissa Peronis, as

2    the administratrix of the decedent's estate, claim damages

3    under the Pennsylvania Wrongful Death Act and Survival Act.

4         They are entitled to make a claim under both acts,

5    but the damages must not be duplicative.  If your verdict is

6    in favor of the plaintiffs, you must then find the amount of

7    money damages that you believe fairly and adequately

8    compensate them for all the physical injuries and financial

9    damages sustained as a result of the negligence you found.

10        The amount you award today must completely compensate

11   the plaintiffs on behalf of the decedent's estate for all

12   damages sustained in the past as well as all damages you find

13   will be sustained in the future.  As you have seen, the

14   verdict sheet contains a series of questions that will lead

15   you to a proper verdict.  There are places for you to record

16   your verdict as to each item of damages.

17        I'll now describe them.

18        Under The Wrongful Death Act, the damages recoverable

19   by plaintiffs are as follows:

20        First, future loss contributions.  The plaintiffs are

21   entitled to be awarded a sum of money that fairly and

22   adequately compensates them for the value of all sums the

23   decedent would have contributed to the support of her family

24   between today and the end of her life expectancy.  This

25   includes all amounts of money that the decedent would have

1    spent for or given to her family for such items as shelter,
2    food, clothing, medical care, education, entertainment, gifts
3    and recreation during her life expectancy.
4          Second, past and future noneconomic damages.  In
5    addition to the monetary contributions the decedent would have
6    contributed to her family's support, the plaintiffs are
7    entitled to be awarded a sum that will fairly and adequately
8    compensate her family for the monetary value of the services,
9    society and comfort that she would have given to her family
10   had she lived.
11         Under The Survival Act, the damages recoverable by
12   the plaintiffs are as follows:
13         Future loss of earnings.  The plaintiffs are entitled
14   to be awarded the value of the net amount that the decedent
15   would have earned between today and the end of her life
16   expectancy.
17         Again, net earnings for this period are decided as
18   follows:
19         You must first calculate the total amount of the
20   decedent's gross earnings between today and the end of her
21   life expectancy.  From this amount, you must deduct the amount
22   of monetary contributions she would have made to her family
23   during this period which you have already awarded under The
24   Wrongful Death Act.  Your award to the estate for total lost
25   future net earnings thus represents the total net earnings

1    over the decedent's work life expectancy.

2         To decide the decedent's gross earnings between today

3    and the end of her life expectancy, you must decide the total

4    amount the decedent would have earned during her life if the

5    injury and resulting death had not occurred.  In deciding the

6    sum to be awarded for future loss of earnings, you must

7    consider the evidence that has been presented to you

8    concerning the effect of productivity and inflation on the

9    amount of this loss.

10        You should also consider the following:

11        Number one, the decedent's age, educational and work

12   experience, if any.

13        Number two, the decedent's physical condition before

14   the injury and death.

15        Number three, the work that the decedent would have

16   been doing in the future had the injury and death not

17   occurred.

18        Number four, the effect increases in productivity may

19   have on the amount of this loss.

20        Number five, the effect inflation will have on the

21   amount of this loss.

22        And, number six, any other matters in evidence that

23   you find to be relevant to this determination.

24        After you have decided the decedent's loss of future

25   earnings, that sum must be reduced to present value.  To that

end, you should consider and evaluate the expert testimony you have heard concerning reduction to present value based upon a reasonably secure fixed income investment.  The sum of money awarded for future loss of earnings shall be recorded as a single amount.  You are to add each of these items of damage together in proper categories and return your verdict in two lump sum amounts, one under The Wrongful Death Act and the second under The Survival Act.

In order to decide the damages recoverable in this case, you must first decide the number of years the decedent would have lived had she not died as a result of this incident.  According to statistics compiled by the United States Department of Health and Human Services, the average life expectancy of all persons of decedent's age at the time of the incident, sex and race was 81.4 years.  This figure is offered to you only as a guide and you are not bound to accept it if you believe that decedent would have lived longer or less than the average individual in her category.

In reaching this decision, you are to consider decedent's health prior to the accident, her family's manner of living, personal habits and other factors that may have affected the duration of her life.

Now, as I previously indicated and as you know, you have a verdict slip before you, and generally at this stage, I would read that verdict slip aloud, but I saw each and every

1    one of you read the verdict slip, so I'm going to spare you my

2    reading aloud of the verdict slip.

3              But let me tell you this:  In order for you to answer

4    the questions on the jury slip, each juror must agree to the

5    answer.  In other words, your answers to each question must be

6    unanimous.

7              During your deliberations, the court asks that you

8    pay close attention to the instructions on the verdict form

9    and only answer the questions that you are instructed to

10   consider.  Further, nothing said on the verdict form is meant

11   to suggest what your verdict should be.  You alone have the

12   responsibility for deciding the verdict.

13             I will now instruct you on your conduct as jurors

14   during deliberations.  As jurors, you have a duty to consult

15   with one another and to deliberate with the intention of

16   reaching a verdict.  Each of you must decide this case for

17   yourself but only after a full and impartial consideration of

18   all the trial evidence with your fellow jurors.  Listen to

19   each other carefully.

20             In the course of your deliberations, you should feel

21   free to reexamine your own views and to change your opinion

22   based upon the evidence, but you should not give up your

23   honest convictions about the evidence just because of the

24   opinions of your fellow jurors, nor should you change your

25   mind just for the purpose of reaching a verdict.

1    As you were previously instructed and as I repeat,

2    you must perform your duties as jurors fairly.  Do not let any

3    bias, sympathy or prejudice that you may feel toward one side

4    or the other influence your decision in any way.  Remember at

5    all times, you are not partisans.  You are the judges.  Judges

6    of the facts.  Your sole interest is to seek the truth from

7    the evidence in this case.

8    When you retire to the jury room to deliberate, you

9    will take with you your notes and the exhibits that the court

10   has admitted into evidence.  You'll select one member of the

11   jury to act as your foreperson.  That person will preside over

12   deliberations and will speak for you here in open court.  You

13   may also want to select a member to act as secretary to record

14   your votes.  Once you have selected a foreperson and

15   secretary, you may take the verdict form and begin to complete

16   it.

17   When you start deliberating, do not talk to me, my

18   law clerks, the courtroom deputy, the bailiff and alternate

19   bailiff or anyone but each other about the case.  During your

20   deliberations, you must not communicate with or provide any

21   information to anyone by any means about this case.

22   You may not use any electronic device or media such

23   as a cell phone, smartphone or computer of any kind, the

24   Internet, any Internet service or any text or instant

25   messaging service, any Internet chat room, blog, website or

1    social networking service, such as Facebook, Twitter,

2    LinkedIn, Instagram or YouTube to communicate to anyone any

3    information about this case or to conduct any research about

4    the case until I accept your verdict.

5            As you have been told, you may not use these

6    electronic means to investigate or communicate about the case

7    because it's important that you decide this case based solely

8    on the evidence presented in this courtroom.  Information on

9    the Internet or available through social media may be wrong,

10   incomplete or inaccurate.

11           Also, information that you might see on the Internet

12   or on social media has not been admitted into evidence and the

13   parties have not had a chance to discuss it with you.  Hence,

14   you should not seek or obtain such information and it must not

15   influence your decision in this case.

16           If, during your deliberations, you have any questions

17   or messages for me, please write them down on a piece of

18   paper, have the foreperson sign them, and then push the button

19   on the wall in the jury room and give the note to the bailiff

20   or alternate bailiff who will bring it to my attention.  I

21   will then respond as soon as I can, either in writing or by

22   having you return to the courtroom so I can address you

23   orally.

24           Note, I may have to talk to the lawyers about what

25   you have asked so it may take some time to get back to you.  I

1   caution you, however, with regard to any message or any

2   question you might send, you should never write down or tell

3   anyone your numerical division at that time.

4           For example, do not write down or tell anyone that a

5   certain number of jurors is voting one way or another.  Your

6   vote should stay secret until you are finished.  When you have

7   reached agreement as to your verdict, you will fill it in,

8   have your foreperson date the form, and all the jurors will

9   sign the form.  You will then ring for the bailiff.

10          I repeat, you cannot return a verdict until you agree

11  that it is the right verdict.  I will stress that each of you

12  should be in agreement with the verdict which is announced in

13  court.  Once your verdict is announced in open court and

14  officially recorded, it cannot ordinarily be revoked.

15          Unless I direct you otherwise, do not reveal your

16  answers until you are returned to the courtroom to deliver

17  your verdict.  As you know, and you already have a copy of the

18  verdict form which has been prepared for you, you'll take this

19  form to the jury room, and when you've reached unanimous

20  agreement as to your verdict, you'll fill it in, have your

21  foreperson date and sign it, as I indicated, and you'll then

22  return to this courtroom, and your foreperson will provide the

23  verdict to my deputy who in turn will provide it to me.

24  Unless I direct you otherwise, do not reveal your answers on

25  the verdict slip until you are discharged.

1        After you have reached a verdict and you are

2    discharged, you are not required to talk with anyone about

3    this case unless you should choose to do so or I order you to

4    do so.  If you choose to do so, remember do not reveal the

5    votes of other jurors in your deliberations.  Rather, you can

6    provide counsel with your general impressions of the case.

7        Once again, I want to remind you that nothing about

8    my instructions and nothing about the verdict form is intended

9    to suggest or convey in any way or manner what I think your

10   verdict should be.  It is your sole and exclusive duty and

11   responsibility to determine the verdict.  As the court now

12   administers the oath to the bailiff and the alternate bailiff,

13   please recall the bailiffs, as with all court personnel, are

14   forbidden to communicate in any way or any manner with any

15   member of the jury on any subject touching upon the merits of

16   this case.

17       At this time, Mr. Galovich will administer the oath

18   initially to Ms. Starr and then Ms. Starr to Mr. Galovich.

19       (Bailiff sworn.)

20       (Alternate bailiff sworn.)

21       THE COURT:  At this time, I'm going to call counsel

22   to sidebar to see if there are any changes or corrections to

23   the final jury instructions.

24       (At sidebar.)

25       THE COURT:  Now, Mr. Price, are there any additions

1    or corrections to the instructions you would like to put on

2    the record?  Any argument you would like to put on the record

3    at this time?

4              MR. PRICE:  No, Your Honor.

5              THE COURT:  Same question to Ms. Koczan.

6              MS. KOCZAN:  No, Your Honor.

7              THE COURT:  Mr. Colville and Mr. O'Connor?

8              MR. COLVILLE:  No, Your Honor.

9              MR. O'CONNOR:  No, Your Honor.

10             THE COURT:  The only other thing I would say while we

11   are all here at sidebar vis-a-vis the argument we had

12   concerning Mr. Price's closing remarks, relative to

13   instructions, to the extent that they need be given, in

14   addition to what I already said as all would have heard, they

15   were specifically instructed not to concern themselves with

16   any other matters such as social or political issues relating

17   to medicine.  They shouldn't give these irrelevant

18   considerations any thought in reaching their verdict so that

19   was part of this instruction as well.

20             And so to that end, I think what we've done here is

21   adequately covered that issue, but the objection is certainly

22   preserved.

23             I will also say I polled a number of my colleagues on

24   that front, so in any event, in addition to the research that

25   we did over the break.  So if there's nothing further, I'm

1    going to give the jurors their final instructions and then

2    they'll depart.  Mr. Galovich has ordered lunch.  It's due

3    here at 12:30.

4        (In open court.)

5        THE COURT:  My clerk, Ms. Starr, reminds me that as I

6    gave the instruction, I had noted in one place we referenced

7    "it" and I made it he and/or she, which was appropriate, so

8    we're going to make that correction in the written

9    instructions, and once she completes that, then between her

10   and Mr. Galovich, we'll have copies made for each of you.

11       Now, at this point in time, I think you all have your

12   binders and your notebooks and you are going to get to

13   actually take those with you this time.  You'll now be

14   escorted to the jury room.  Ms. Starr and Mr. Galovich will be

15   escorting you as not only deputy but also alternate bailiff

16   and Ms. Starr as bailiff.

17       The reason we do that, if by chance Ms. Starr would

18   become sick or unavailable, then Mr. Galovich becomes the

19   deputy.  Please take with you those notepads, any pencils or

20   pen and also you'll be taking the copy of the verdict slip.

21   Mr. Galovich also has for you the court official verdict slip

22   you'll also take with you.

23       As I noted, Ms. Starr will be in charge of you during

24   your deliberations.  Again, you can't ask her any questions,

25   not even administrative questions.  As I've already stated, if

1    you have any question or message, you are to reduce your

2    question or message to writing, signed by your foreperson.

3    You are to pass the note to the bailiff.  In turn, it will be

4    brought to my attention.

5           Again, I'll respond as quickly and promptly as

6    possible either in writing or by having you return to the

7    courtroom so that the court can address you orally.

8           Once again, I caution you, however, with regard to

9    any message or question that you might send that you should

10   never state or specify your numerical division at that time.

11          On behalf of the parties, their attorneys, all the

12   witnesses that have appeared, this court and all of its

13   personnel, once again I thank each and every one of you for

14   your kind attention through this trial and your willingness to

15   serve as jurors in this case.

16          With that, Mr. Galovich and Ms. Starr will be

17   escorting you.  Please rise for our jurors.

18       (Jury excused.)

19          THE COURT:  Thank you.  While Mr. Galovich and

20   Ms. Starr tend to the jurors, as you witnessed, Ms. Starr will

21   make that one correction, she'll scrub so it doesn't say

22   discussion draft anymore, and Mr. Galovich will print out

23   sufficient copies so each of them have a copy of the

24   instructions, and he'll walk those back, and the next thing

25   I'd like you all to do is take a piece of paper and write down

1    all of your contact information, including cell phone numbers,

2    so that Mr. Galovich and/or Ms. Starr can get ahold of you now

3    that the jury has gone out.

4            Will Precise be taking down all of their equipment at

5    this point?

6            MR. PRICE:  Yes.

7            THE COURT:  So the courtroom is obviously not booked

8    the rest of the afternoon, so you and your team can certainly

9    do what you need to do to dismantle the equipment.  That works

10   for me.  In terms of anything else, is there anything for the

11   record anybody wants to put on the record at this time?

12           MR. PRICE:  No.

13           MS. KOCZAN:  No.

14           THE COURT:  Everybody is shaking their head no.  Does

15   anybody want a copy of the trial transcript at this time?

16           MS. KOCZAN:  No.

17           MR. PRICE:  No.

18           THE COURT:  Not yet.  Enjoy your lunch and if we get

19   a question or concern, we'll let you know.  I have to say, in

20   the past, we have had requests early on for things like

21   markers, new erasers.  We had one instance where the bathroom

22   wasn't working, so those kinds of things, I tend to handle on

23   my own and then let you know about them, but obviously any

24   question of substance, any time they want to have part of the

25   instruction looked at, reread or the like, we'll obviously get

1    your input.  But to my knowledge, everything is in working

2    order back there and we should have sufficient supplies.  Have

3    a good afternoon, everybody.

4        (Recess taken at 12:32 p.m.-4:00 p.m.)

5            THE COURT:  Mr. Galovich has told me the jury has

6    arrived at a verdict.

7            THE CLERK:  Yes, Your Honor.  I'm still waiting for

8    Mr. Price.

9            THE COURT:  Sorry.  I didn't realize he wasn't there.

10           Mr. Price, we have been informed there's a verdict.

11       (Jury present.)

12           THE COURT:  Thank you, ladies and gentlemen of the

13   jury.  The court has been advised through its deputy and the

14   bailiff that you have rendered and reached a verdict.  At this

15   point in time, will you please provide the verdict to

16   Mr. Galovich, my deputy?

17           Thank you.  Mr. Galovich, if you'll please publish

18   the verdict.

19           THE CLERK:  Yes, Your Honor.  Members of the jury

20   empaneled in the case of Carissa Peronis, individually and as

21   administratrix of the estate of Kendall Peronis, and Matthew

22   Fritzius versus United States of America, Valley Medical

23   Facilities, Inc., trading and doing business as Heritage

24   Valley Pediatrics Valley Medical Facilities, Inc., trading and

25   doing business as Heritage Valley Beaver and Hilary Jones,

1    M.D. at civil action No. 16-1389, you say you find:

2           One, "Do you find that the conduct of any of the

3    defendant doctors or other medical providers fell below the

4    applicable standard of medical care?  In other words, were any

5    of the defendants negligent?"

6           Defendant, United States of America:  No.

7           Defendant, Heritage Valley Beaver hospital:  No.

8           Defendant, Hilary Jones:  No.

9           So say you all?

10          (The panel of jurors answer yes.)

11          THE COURT:  Let the record reflect that not only did

12   the jurors indicate by nodding their heads but also speaking

13   yes.  Does anyone want to poll the jury?

14          MR. PRICE:  Yes, please.

15          THE COURT:  Mr. Price has requested the poll.

16   Mr. Galovich, you may proceed.

17          THE CLERK:  Juror number 1, please rise.  Is the

18   verdict as read your verdict?

19          JUROR NO. 1:  Yes.

20          THE CLERK:  Please be seated.  Juror No. 2, please

21   rise.  Is the verdicts as read your verdict?

22          JUROR NO. 2:  Yes.

23          THE CLERK:  Please be seated.  Juror No. 3, please

24   rise.  Is the verdict as read your verdict?

25          JUROR NO. 3:  Yes.

1          THE CLERK:  Juror No. 4, please rise.  Is the verdict

2     as read your verdict?

3          JUROR NO. 4:  Yes.

4          THE CLERK:  Juror No. 5, please rise.  Is the verdict

5     as read your verdict?

6          JUROR NO. 5:  Yes.

7          THE CLERK:  Juror No. 6, please rise.  Is the verdict

8     as read your verdict?

9          JUROR NO. 6:  Yes.

10          THE CLERK:  Juror No. 7, please rise.  Is the verdict

11     as read your verdict?

12          JUROR NO. 7:  Yes.

13          THE CLERK:  Juror No. 8, please rise.  Is the verdict

14     as read your verdict?

15          JUROR NO. 8:  Yes.

16          THE CLERK:  Your Honor, the jury has been polled.

17          THE COURT:  Thank you, Mr. Galovich.  You have the

18     original of the verdict slip to make part of the court record

19     in this case.

20          Once again, ladies and gentlemen of the jury, I

21     appreciate all of the attention that you gave to this case

22     over the last almost two weeks.  The court, as well as the

23     attorneys and the litigants who are here, also appreciate your

24     attention and the duty that you fulfilled in serving as

25     jurors.  As I hope you've seen by your service here, it's a

1    very important function that we are engaged in here both as

2    the court, the attorneys as well as you, the jurors, to

3    ultimately find the facts and reach a verdict in this case.

4         Now, with that, I'm going to permit you all to be

5    escorted by Mr. Galovich and Ms. Starr one more time, and

6    Mr. Galovich will probably have some additional administrative

7    instructions for you concerning your jury service.  So once

8    again, we all appreciate the time, the energy and the

9    sacrifice that you made.  I trust this has been a good

10   experience for each and every one of you.  Once again, let's

11   all rise for our jury.

12       (Jury excused.)

13       THE COURT:  Now, we have received the verdict, but as

14   the government knows, the case is not yet over until the court

15   renders its opinion vis-à-vis Dr. Dumpe and enters a verdict

16   on behalf of Dr. Dumpe and the United States of America.

17       Gentlemen, how would you like to proceed?  Do you

18   want to order the transcript?  Are you going to give me

19   additional briefing?  How are we going to proceed?

20   Mr. Colville?

21       MR. COLVILLE:  Findings of fact and conclusions of

22   law.

23       THE COURT:  That's what I normally do and I normally

24   request preparation of the transcript, and then once the

25   transcript is completed, 30 days to prepare findings of fact

1    and conclusions of law, 30 days to respond, then the court

2    writes.  So the government in this instance will be ordering

3    the transcript or not?

4              MR. COLVILLE:  Yes, we will.

5              THE COURT:  Mr. Price?

6              MR. PRICE:  I would assume, yes.

7              THE COURT:  So the court orders preparation of the

8    transcript and the cost to be borne equally by both Mr. Price

9    and his clients as well as the United States and Mr. Colville.

10             I must say, Ms. Leo has done yeowoman's service.  She

11   is actually to have been rotated to another judge.  I'm not

12   sure if she'll get it out in her usual good form within 30

13   days, but I'm sure she'll make every attempt to do that.

14             So once we have the transcript, as I said, I normally

15   give people 30 days to prepare findings of fact and

16   conclusions of law.  That would come first from you,

17   Mr. Price, as the party with the burden of proof and then from

18   you, Mr. Colville, another 30 days after.  I don't anticipate

19   that you would need argument.  The court already has the rough

20   drafts of your closing arguments here today, so I'll be

21   looking at those and of course when we have the full

22   transcript, they will also be available there.

23             Is there anything else then for the court's attention

24   here today?

25             MR. PRICE:  No.

1    MR. COLVILLE:  No, Your Honor.

2    MS. KOCZAN:  No.

3    THE COURT:  Ms. Leo has indicated that she thinks she

4    can get me the transcript within 30 days, so we should get the

5    transcript by October 7, 2019 and then, Mr. Price, could you

6    have your findings of fact and conclusions of law by November

7    7?

8    MR. PRICE:  Yes.

9    THE COURT:  Does that work for your schedule?

10    MR. PRICE:  Yes.

11    THE COURT:  And then on your end, Mr. Colville, the

12    7th falls on the weekend, so can you have your findings of

13    fact and conclusions of law by December 9?

14    MR. COLVILLE:  Yes.

15    THE COURT:  All right.  Then once again, is there

16    anything else for the court's attention at this time?

17    MR. PRICE:  No.

18    THE COURT:  Thank you all for trying this case.  It

19    was the court's pleasure to preside over same, and I look

20    forward to the further briefing in this case.

21    Mr. Galovich is giving the jurors their instructions

22    in terms of their reimbursement and the like.  Normally I go

23    back and I thank them for their service.  I'll do that in this

24    instance and just keep it to that.  Given the fact that, as we

25    know vis-à-vis Dr. Dumpe, it's an advisory verdict, if that.

124

1     The court still has to make its determinations vis-à-vis

2     Dr. Dumpe and the United States.  Okay.  Thank you all.

3          (At 4:19 p.m., the proceedings were adjourned.)

4

5                    C E R T I F I C A T E

6          I, BARBARA METZ LEO, RMR, CRR, certify that the
      foregoing is a correct transcript from the record of
7     proceedings in the above-entitled case.

8

9     _\s\ Barbara Metz Leo__            ___09/25/2019___
      BARBARA METZ LEO, RMR, CRR            Date of Certification
10    Official Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25