**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| CARISSA PERONIS, individually and as Administratrix of the Estate of Kendall Peronis, and MATTHEW FRITZIUS, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civ. A. No. 16-cv-01389 |
| UNITED STATES OF AMERICA, VALLEY MEDICAL FACILITIES, INC., t/d/b/a HERITAGE VALLEY PEDIATRICS, VALLEY MEDICAL FACILITIES, INC., t/d/b/a HERITAGE VALLEY BEAVER, and HILARY JONES, M.D., | ) ) ) ) ) ) ) ) | Senior Judge Nora Barry Fischer |
| Defendants. | ) | |

**MEMORANDUM OPINION**

## I.    INTRODUCTION

This medical malpractice action was filed by Plaintiffs Carissa Peronis, individually and

as Administratrix of the Estate of Kendall Peronis, and Matthew Fritzius (collectively "Plaintiffs")

against Defendants United States of America ("United States"); Valley Medical Facilities, Inc.

t/d/b/a Heritage Valley Pediatrics; Valley Medical Facilities, Inc. t/d/b/a Heritage Valley Beaver;

and Hilary Jones, M.D. following the death of Plaintiffs' daughter, Kendall Peronis (hereinafter

"daughter" or "Kendall")[1] just six hours after birth.  An eight-day jury trial was held from August

26, 2019 until September 5, 2019.  (Docket Nos. 203-04).  While the jury ultimately rendered a

verdict for the defense, the verdict against the United States was merely advisory in accordance

---

[1] Although minor children's names are typically redacted per this Court's Local Rules, the parties referred to the deceased minor as "Kendall" throughout this litigation.  *See* LCvR 5.2(D)(1).  For the sake of the continuity of the record, the Court will use "Kendall" throughout this Memorandum Opinion.

with this Court's October 3, 2018 Amended Order.[2]  (Docket Nos. 130; 205).  After the transcript was prepared, Plaintiffs and the United States submitted proposed findings of fact and conclusions of law.  (Docket Nos. 213-23).  Given the perfunctory nature of the conclusions of law filed by the United States, this Court issued a rule to show cause whether or not a legal response was required to the conclusions of law filed by Plaintiffs.  (Docket No. 224).  The United States responded to the rule the following day generally agreeing that Plaintiffs had accurately set forth the applicable Pennsylvania law.  (Docket No. 225).  Weighing the evidence, the Court ordered supplemental briefing as to whether Pennsylvania's two schools of thought doctrine should apply.  (Docket No. 226).  Both Plaintiffs and the United States filed supplemental briefs on December 5, 2019. (Docket Nos. 227-28).  Upon consideration of the trial record, the parties' submissions, and based on the following findings of fact and conclusions of law, judgment will be entered in favor of the United States and against Plaintiffs.

## II.   PROCEDURAL HISTORY

On September 8, 2016, Plaintiffs filed a complaint against the United States, Primary Health Network – Beaver Falls Primary Care, Valley Medical Facilities, Inc. t/d/b/a Heritage Valley Pediatrics, Valley Medical Facilities, Inc. t/d/b/a Heritage Valley Beaver, Kevin Dumpe, M.D., and Hilary Jones, M.D.  (Docket No. 1).  Plaintiffs thereafter voluntarily dismissed Primary Health Network – Beaver Falls Primary Care and Dr. Dumpe.  (Docket Nos. 6, 7).  Two months later, Plaintiff Carissa Peronis filed a second complaint this time against only the United States. (Docket No. 19 ¶ 1 (citing Civ. Act. No. 16-cv-1703)).  In moving to consolidate the actions, Plaintiffs explained that the claims arose under the same set of facts and that the second action was

---

[2] Given that the nongovernmental defendants had an absolute right to a jury trial and that the parties desired that the matter be tried together, this Court ruled that a jury would hear and render a verdict as to all defendants except the United States, upon which it would issue an advisory verdict.  (Docket No. 130); *see* 28 U.S.C. § 2402 (mandating that tort actions against the United States "be tried by the court without a jury").

necessitated by the timing of the denial of the claims, the federal notice of claim issues, and the statute of limitations.  (Docket No. 19 ¶¶ 1, 2).  Hence, the cases were consolidated.  ( Docket No. 23).

Both complaints allege thirty-four ways in which Dr. Dumpe was negligent.  (Docket No. 1; Civ. Act. No. 16-cv-01703, Docket No. 1).  In their Proposed Findings of Fact and Conclusions of Law, Plaintiffs summarize their claims against the United States as follows — that the United States is liable under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346, because Dr. Dumpe "failed to timely and properly recognize fetal compromise; failed to properly follow hospital policies; failed to handle the meconium fluid encountered during labor and delivery; failed to call in a pediatrician to be present at delivery; and failed to have Kendall transferred to the nursery after delivery."  (Docket No. 221 at 4) (citing Docket No. 1 at 13-15).

After the matter was consolidated and the claims were amended,[3] the case proceeded through discovery and while the nongovernmental defendants engaged in motions practice, the Plaintiffs and the United States opted not to do so vis-à-vis the FTCA claim.  (Docket Nos. 43; 86).  When discovery, ADR, and motions practice concluded, the matter was set for trial.  (Docket No. 145).  The Court then entertained the parties' motions in limine, objections to trial exhibit designations, and requests for limiting instructions (Docket Nos. 155-56; 158; 160-61; 163; 168-69; 181; 186; 189), and made rulings on same (Docket Nos. 166-67; 177-78; 180; 187-88; 190, 193).

---

[3] Every count labeled "Carissa Peronis, Administratrix of the Estate of Kendall Peronis, Deceased, and Matthew Fritzius" was amended to read, "Carissa Peronis, Individually and as Administratrix of the Estate of Kendall Peronis, deceased, and Matthew Fritzius."  (Docket No. 43).

After making their opening statements, the parties jointly moved for the admission of exhibits J1 through J53 into evidence.[4]  (Docket Nos. 204-1; 214 at 36).  Plaintiffs called Doctors Leonard Zamore (expert in obstetrics and gynecology), Steven Shore (expert in pediatrics and pediatric infectious disease), Edward Karotkin (expert in pediatrics and neonatology), James Kenkel (expert in economics and economic calculations), Dumpe, Bradley Heiple, and Tae C. Min.  (Docket Nos. 214-20).  They also called Nurses Maria Hendershot and Jamie McCrory as well as Tyler Janectic, Kylee Fritzius, Matthew Fritzius, and Carissa Peronis.[5]   (*Id.*)   The nongovernmental defendants called Doctors Susan Coffin (expert in pediatric infectious disease), Steven Ringer (expert in neonatal medicine and perinatal medicine), Theonia Boyd (expert in perinatal and pediatric pathology), Jones, and Dumpe as well as Nurses Judith Ash, Janet Kincade, and Barbara Hackney.  (*Id.*)  The United States called Dr. Harold Wiesenfeld (expert in obstetrics and gynecology).  (*Id.*)  Prior to Dr. Wiesenfeld testifying, Plaintiffs made an oral motion in limine, which the Court later denied as moot.[6]  (Docket Nos. 198-99; 218).  At the conclusion of the trial, recognizing that Dr. Zamore was Plaintiffs' only obstetrics and gynecology expert and that he had testified that Dr. Dumpe was not negligent in failing to deliver Kendall sooner, the Court dismissed the portions of Plaintiffs' professional negligence claim relating to the need for an earlier delivery. (Docket No. 208).

## III.    LEGAL STANDARD

In this FTCA medical malpractice action, the Court sits as the trier of fact tasked with resolving factual disputes, weighing the credibility of the evidence and deciding the disputed legal

---

[4] These exhibits consist of medical records, hospital policies, an incident report, witness pictures, illustrations, timelines, and photographs.  (Docket No. 204-1).

[5] Plaintiffs did not call anyone in rebuttal.

[6] Plaintiffs sought to preclude Dr. Wiesenfeld from testifying as to the standard of care for nurses and pediatricians. (Docket No. 218 at 6).  The Court addressed this argument through the course of testimony and no further objections were raised.  As such, the motion was deemed moot.  (*Id.*)

issues between the parties.  *See FTC v. Innovative Designs, Inc.*, Civ. Act. No. 16-1669, 2020 WL 758727, at *1 n.2 (W.D. Pa. Feb. 14, 2020); *EBC, Inc. v. Clark Bldg. Sys., Inc.*, Civ. Act. No. 05-1549, 2008 WL 4922107, at *4 (W.D. Pa. Nov. 13, 2008), *aff'd*, 618 F.3d 253 (3d Cir. 2010) (The "court's task is to weigh the evidence, resolve any conflicts in it, and decide for itself where the preponderance lies. . . .  The Court is also required to assess the credibility of witnesses to determine whether [the movant] has demonstrated a factual and legal right to relief by a preponderance of the evidence") (internal citation and quotation omitted).  The Court's credibility determinations are entitled to significant deference.  *See VICI Racing, LLC v. T-Mobile USA, Inc.*, 763 F.3d 273, 282-83 (3d Cir. 2014) (citing *Travelers Cas. & Sur. Co. v. Ins. Co. of N. Am.*, 609 F.3d 143, 156-57 (3d Cir. 2010)) ("To the extent that the District Court's conclusions rested on credibility determinations, our review is particularly deferential"); *Booker v. United States*, 789 F. App'x 304, 306 (3d Cir. 2019).

With these standards in mind, the Court makes these findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.  FED. R. CIV. P. 52.

## IV.   FINDINGS OF FACT

A.   *Pregnancy to Six Hours After Delivery*

In early 2014, Matthew Fritzius and Carissa Peronis learned that they were expecting their first child.  (J1).  In preparation for their daughter's arrival, Peronis began receiving prenatal care from the doctors and nurses at Primary Health Network, a federally funded clinic.  (*Id.*; Docket No. 214 at 112).  Dr. Dumpe, a board-certified OB/GYN at Primary Health Network, was one of her treating physicians and was her OB/GYN on the day that she went into labor.  (J1; J2; Docket No. 214 at 112, 154).  Dr. Dumpe has been the Director of OB/GYN training at Heritage Valley

Hospital ("Heritage Valley") since 1990.  (Docket No. 214 at 155).  He is trained in neonatal resuscitation.  (*Id.* at 173).

By all accounts, Peronis had a normal pregnancy.  (J2 at 5; Docket No. 214 at 112).  On her due date, October 12, 2014, she was admitted to Heritage Valley after complaining of progressing contractions and vaginal fluid discharge.  (J2 at 5).  Nurse Judith Ash examined Peronis and confirmed that her membranes had ruptured.  (*Id.*; Docket No. 217 at 35-36).  She also determined that Kendall's fetal heart tones were reactive and that Peronis's contractions were two to four minutes apart.  (J2 at 5).  At the time she was admitted, neither Peronis nor Kendall displayed any signs of infection; in fact, neither presented any symptoms of infection throughout the entire labor and delivery.  (Docket Nos. 214 at 169; 218 at 199).  To this end, Peronis did not have a fever, foul smelling amniotic fluid, or an increased heartrate, and Kendall did not have fetal tachycardia.[7]  (Docket No. 214 at 169-70).

At 6:30 p.m., Dr. Dumpe examined Peronis and ruptured her forebag.  (J2 at 138).  Thereafter, he observed the presence of a nonparticulate light green fluid, which he and the corresponding medical records refer to as "thin meconium."  (*Id.* at 138, 146-47, 170; Docket No. 214 at 114, 146-47).  Meconium is a baby's first bowel movement *in utero.*  (Docket Nos. 214 at 55; 217 at 84).

At 3:35 a.m. on October 13, 2014, Dr. Dumpe was notified that Peronis was fully dilated and had progressed to the second stage of labor.  (J2 at 158).  He instructed Peronis to begin pushing.  (*Id.*)  An hour and a half later, Dr. Dumpe was informed by one of the nurses that Kendall's fetal monitoring strips now had Category II tracings.  (*Id.* at 161; Docket No. 214 at 163).  Recognizing that Peronis had become fatigued, that Kendall had intermittent Category II

---

[7] Plaintiffs' expert, Dr . Zamore, likewise did not find any signs or symptoms of infection during the prenatal period or in labor and delivery.  (Docket No. 214 at 82-83).

tracings, and that Kendall was in an arrest of descent, Dr. Dumpe made the decision to implement operative obstetrical procedures to assist the delivery.  (J2 at 3; Docket No. 214 at 164).  First, he applied a vacuum extractor to Kendall's head to aid the descent.  (J2 at 3).  Second, gentle traction was applied over the next six to eight contractions and the vertex or head was delivered atraumatically.  (*Id.*)  Dr. Dumpe testified that he did not summon a pediatrician for the delivery because there was no need for one and hospital policy did not require the presence of one.  (Docket No. 218 at 192).  After performing an episiotomy to allow delivery of the vertex, Dr. Dumpe employed a prophylactic McRoberts Maneuver[8] to help Kendall's shoulders through the birth canal.  (*Id.*; Docket No. 214 at 165-66).

Prior to Kendall's first breath, he aggressively bulb suctioned her mouth and nose.  (J2 at 3; Docket No. 214 at 165-66).  Once Kendall was delivered at 5:20 a.m., he suctioned Kendall's nose and mouth a second time before handing her over to Nurses Katherine Gantz and Hendershot.  (J2 at 3; Docket No. 214 at 152-53, 188, 197, 212, 232-36).  Hendershot was trained in neonatal resuscitation and had worked as a labor and delivery nurse for over thirty years.  (*Id.*)  They deep suctioned Kendall's lungs to remove all of the remaining meconium and administered oxygen.  (Docket No. 214 at 232-36).  Kendall was assessed as having no signs of abnormality.  (*Id.* at 234).  Specifically, she weighed 8 pounds and 7 ounces, and her APGAR[9] scores were 6 at 1 minute and 8 at 5 minutes.  (J2 at 3; J6 at 10).  Because her APGAR scores were so high, Kendall was allowed to remain in the delivery room to bond with her parents for the first two hours of her life.  (Docket No. 214 at 197, 206).  After completing the episiotomy repair, Dr. Dumpe left the room to

---

[8] The McRoberts Maneuver involves raising the mother's legs up in the air to widen her pelvis to give the baby more room to come out.  (Docket No. 214 at 74).  It is often used when a baby's shoulder becomes impacted underneath the mother's pubic symphysis.  (*Id.*)  However, there was no shoulder dystocia here and the maneuver was made prophylactically.  *See infra* note 13.

[9] APGAR scores are used to assess the health of a newborn child.  (Docket No. 215 at 215).  The score involves taking note of the baby's appearance (skin color), pulse, grimace (reflex), activity (muscle tone), and respiration.  (*Id.* at 215-19).  Scores are taken at one minute and five minutes.  (*Id.* at 215).

document the delivery.  (Docket No. 214 at 173).  In his operative report he noted " moderate non-particulate meconium."  (J2 at 3).  It would have been his practice to stop back in the delivery room and congratulate the parents.  (Docket No. 218 at 198).  He concluded his shift and left the hospital prior to Kendall being taken to the nursery.  (Docket No. 214 at 172).

Nurses Hendershot and Gantz observed Kendall until she was taken to the nursery at 7:00 a.m.  (Docket No. 214 at 197-04, 211-14).  Hendershot was also responsible for assessing Peronis and recording her vitals every fifteen minutes, and each time she entered the labor and delivery room, she was able to observe and hear Kendall.  (*Id.* at 197-04, 221; J2 at 166-72).  She never witnessed Kendall flaring, grunting, or retracting.  (Docket No. 214 at 206).  Rather, she heard her crying, which she explained is evidence of a healthy baby girl.  (*Id.* at 203-04).  While Tyler Janectic expressed concern over Kendall's crying and even raised the concern at the nursing station, none of the nurses believed Kendall was anything other than a normal healthy baby.  (Docket No. 215 at 100).

At 7:00 a.m., Nurse Hendershot and Matthew Fritzius took Kendall to the nursery.  (J6 at 60; Docket Nos. 214 at 205-06; 218 at 108).  Neither Nurse Hendershot nor Nurse Hackney, the attending nurse in the nursery, observed anything unusual during the transfer. (Docket Nos. 214 at 203-04, 244; 218 at 106-110).  Kendall was not grunting, flaring, or retracting.  (Docket Nos. 214 at 207; 218 at 110-11).  Nurse Hackney took her vitals, and they were all normal.  (Docket No. 218 at 112).  Kendall's temperature was 99.6ºF; her heart rate was 132 beats per minute (well within the normal range of 120-160 bpm); and she had 44 breaths per minute (also within the normal range of 40-60 breaths per minute).  (*Id.* at 112-13; J6 at 60).

Twenty-five minutes later, Nurse Jamie McCrory, who had replaced Nurse Hackney, noticed that Kendall began to look dusky and saw her grunting, flaring, and retracting.  (Docket

No. 215 at 115, 117-18; J6 at 60-62).  Because her oxygen saturation levels were low, Nurse

McCrory suctioned her airway, placed Kendall on oxygen, and called for a resident.  (Docket No.

215 at 122-23, 127; J6 at 60-62).  The resident on call, Dr. Bradley Heiple, evaluated Kendall and

determined there was no cause for concern as she was responding well to oxygen.  (Docket No.

215 at 167, 179-83).  However, when Dr. Jones,[10]  a pediatrician, arrived for her morning rounds,

she was immediately concerned.  (Docket No. 217 at 124).  Kendall was having difficulty breathing

and on a relatively high amount of oxygen.  (*Id.* at 125).  In fact, she was on 64% oxygen, and

Heritage Valley transfers any baby on more than 40% oxygen because they do not have a neonatal

intensive care unit.  (*Id.* at 124, 158).  Dr. Jones performed a complete workup of Kendall and

contacted West Penn Hospital ("West Penn") for an air transfer.  (J6 at 15; Docket No. 217 at 125-

26, 129).  She ordered a CBC, a chest X-ray, blood cultures, cap gases, an IV, and antibiotics

(ampicillin and gentamicin).[11]  (J6 at 68; Docket No. 217 at 126-27, 132).  Thereafter, Dr. Jones

was in continual contact with Dr. Giovanni Laneri, a neonatologist, at West Penn.  (Docket No.

217 at 129).

Dr. Jones next ordered a bolus of normal saline at 9:35 a.m., and five minutes later, because

Kendall's condition was still worsening, she made the decision to intubate.  (*Id.* at 142-43; J6 at 8,

68).  Another five minutes later, she ordered a second bolus of saline.  (J6 at 8).  The West Penn

team arrived at 9:45 a.m., and Dr. Jones began coordinating Kendall's treatment with them.  (J6 at

8; Docket No. 217 at 142-43).  Dr. Jones gave Kendall surfactin but her oxygen saturation levels

continued to remain low.  (*Id.*)  She then gave her nitrous oxide and Versed but Kendall's perfusion

---

[10] Dr. Jones is a board-certified pediatrician and is licensed to practice medicine in both Ohio and Pennsylvania.
(Docket No. 217 at 76).  She graduated from West Virginia University Medical School in 1994.  (*Id.* at 77).  She has
worked for Heritage Valley Pediatrics since 1997, treating pediatric patients both in the office and in the hospital.  (*Id.*
77-79).  She previously served as the Chairman of Pediatrics at Heritage Valley Beaver.  (*Id.* at 83).

[11] The CBC is used to evaluate a person's health and can identify anything from respiratory distress to an infection.
(Docket No. 217 at 99).  It measures the red and white blood cell count, hemoglobin levels, hematocrit,  and platelets.
(*Id.*)

continued to be poor.  (*Id.* at 8-9).  A third saline bolus was administered after which Kendall's heart rate began to suddenly rise and then dropped dramatically.  (*Id.*)  Dr. Jones began chest compressions, and the West Penn team administered epinephrine.  (*Id.*)  Kendall sustained a pulmonary hemorrhage.  (*Id.*)  She was given another round of epinephrine, but her condition worsened.  (*Id.*)  Despite five doses of epinephrine and twenty-five minutes of chest compressions and ventilation, Kendall was not responding; hence, Drs. Jones and Laneri determined it was time to cease resuscitation efforts.  (*Id.* at 9).  Kendall was pronounced dead at 11:40 a.m., approximately six hours after her birth.  (*Id.* at 5).

B.     *Post-Mortem Findings*

Kendall's death certificate lists her cause of death as cardiac arrest due to pulmonary hemorrhage due to pulmonary hypertension due to meconium aspiration.  (J6 at 3).  The autopsy report provides similarly, i.e., she died from E. coli neonatal sepsis and acute bronchopneumonia associated with massive aspiration of meconium.  (*Id.* at 4; J7).

Dr. Min, a board-certified pathologist since 1985, prepared the autopsy report.  (Docket No. 216 at 87-88, 114).  Although he went to medical school in South Korea, in 1968, he came to the United States for an internship at West Penn.  (Docket No. 216 at 113).  He did four years of clinical and anatomical pathology training and an oncology fellowship before becoming a pathologist for Heritage Valley.[12]  (*Id.* at 113-14).  He based the report solely on the medical records within his possession.  (*Id.*  at 87-88, 114).

Dr. Min did not review the death certificate prepared by Dr. Jones prior to doing the autopsy.  (*Id.* at 88).  He could not explain why he listed the cause of death as massive aspiration of meconium when the records he reviewed only reflected an aspiration of meconium.  (*Id.* at 92-

---

[12] Prior to retiring, Dr. Min had his own practice and worked as an independent contractor for Heritage Valley.  (Docket No. 216 at 115).

96).  On further review, he determined there was no basis for the word "massive."  (*Id.* at 106).

Dr. Min was able to determine by the amount of neutrophils filling Kendall's airspaces that her

infection had been going on for at least a day or two.  (*Id.* at 110).  He testified that Kendall's cause

of death was acute respiratory failure due to neonatal E. coli sepsis and acute bronchopneumonia.

(*Id.* at 108).

C.     *Heritage Valley Hospital Policy*

Heritage Valley Hospital Policy 2.21 provides that a baby is deemed to be at "high-risk"

when the mother's "[a]mniotic fluid contain[s] *particulate* meconium."  (J14 at 1) (emphasis

added).  When an obstetrician or Labor and Delivery registered nurse is aware that the delivery of

a high-risk infant is imminent, they are required under Policy 2.21 to contact a pediatrician to be

present during the delivery.  (*Id.*)  Dr. Dumpe testified that he was not required to call a pediatrician

for Kendall's delivery because thin meconium is not particulate meconium.  (J14; Docket Nos.

214 at 158-59, 177-78; 218 at 192).  He explained that per the Policy, it is only where there is thick

particulate meconium that a pediatrician is required to be called.  (Docket No. 214 at 159).  He

also testified that this Policy was formulated with reference to the American Academy of Pediatrics

and American College of Obstetricians and Gynecologists' recommendations and standards and

was formulated in consultation with other hospitals.  (Docket No. 218 at 186-95).

D.     *Fact Witness Credibility Findings*

The kind, color, and consistency of the meconium laced amniotic fluid that was observed

by Dr. Dumpe was the subject of great debate and a demonstrative exhibit.  (Demonstrative 2).

The demonstrative consisted of four bottles: one clear filled with water; one lime green in color

with no particles; one darker green in color with no particles; and one opaque, very dark green

liquid with visible sediment.  (*Id.*; Docket No. 214 at 146-49).  Dr. Dumpe, who had the best

vantage point to observe the color of the meconium throughout the labor and delivery, described the meconium initially as "light, thin, nonparticulate." (Docket No. 214 at 146). But as the labor progressed, according to Dr. Dumpe, the meconium became darker; and at the time of birth, it was "moderate non-particulate meconium." (*Id.* at 139, 146, 148). He described non-particulate meconium as meconium fluid that is without particles that can be seen by the naked eye. (*Id.* at 147). Thus, he testified that only the fourth bottle that contained sediment would be considered particulate meconium. (*Id.* at 148-49).

Nurse Hendershot, who changed Peronis's sanitary pads and was the attending nurse during the delivery described the meconium as thin throughout Peronis's entire labor and contended that the second lime green bottle accurately reflected the color of the meconium. (*Id.* at 189-90). Peronis, however, described the meconium as "greenish dark" mucus that became darker and "lumpier" as her labor progressed. (Docket No. 216 at 208, 212-13). Fritzius recalled that the meconium was a "thick green brown mix" and looked like the color of the thickest greenest liquid pictured in Demonstrative 2. (*Id.* at 147-48). While Nurse McCrory testified that the meconium she suctioned out of Kendall's lungs at 7:20 a.m. in the nursery was "darker", she also testified it was intermixed with other debris. (Docket No. 215 at 128-29, 133). When asked which bottle in Demonstrative 2 best-illustrated the "junk" she suctioned out, she responded none of them but when pressed, stated that the darkest bottle was the closest in color. (*Id.* at 127-28). Dr. Jones described the "junk" as "green-tinged mucus." (Docket No. 217 at 124).

The Court having had the opportunity to observe the demeanors of all of the witnesses, credits the testimony of Drs. Dumpe and Jones as well as that of Nurse Hendershot. The Court also considered their training and experience. To this end, Dr. Dumpe has been an obstetrician for over thirty-seven years, Dr. Jones a pediatrician for over thirty years, and Nurse Hendershot has

been a labor and delivery nurse for over thirty years and has assisted in hundreds if not thousands of labors and deliveries.  (Docket Nos. 214 at 151, 212-13; 217 at 77-79).  Additionally, the Court gives Dr. Dumpe and Nurse Hendershot's recollection more weight as they were in the best position to observe the nature and extent of the meconium attendant to Kendall's delivery.  Finally, the Court recognizes that their testimony was consistent with the contemporaneous hospital records.

E.    *Expert Testimony and Credibility Findings*

At trial, the parties presented competing experts in obstetrics and gynecology to testify as to the applicable standard of care relative to Dr. Dumpe's actions.  Specifically, Plaintiffs presented the expert testimony of Dr. Leonard Zamore, who is board certified in obstetrics and gynecology, and the United States presented the expert testimony of Dr. Harold Wiesenfeld, who is also board certified in obstetrics and gynecology and has a subspecialty in reproductive infectious diseases. (Docket Nos. 214 at 40, 51; 218 at 10).

Dr. Zamore received his Bachelor of Arts from the University of Rochester and his Medical Degree from the State University of New York.  (Docket No. 214 at 40).  He has worked as an Associate Professor at the Yale Medical Group Department of Obstetrics and Gynecology at Yale New Haven Hospital since 2013.  (*Id.* at 41).  Prior to that, he worked in private practice delivering babies, taking care of women, and doing surgery for forty years.  (*Id.*)  In his present capacity, he is responsible for teaching residents and has delivered about one baby per year since he assumed his teaching role.  (*Id.* at 41-46).  He has never practiced medicine in the Commonwealth of Pennsylvania.  (*Id.* at 47, 53).

Dr. Zamore began by explaining that Peronis had a "fairly benign prenatal course" without any complications.  (*Id.* at 53-54).  In fact, he described everything as "normal" going into labor.

(*Id.*)  The first sign that there might be a problem with Kendall, according to Dr. Zamore, was the presence of meconium because it indicated that the baby might be under "some kind of stress." (*Id.* at 55).  Nonetheless, he conceded that "when you see meconium, it doesn't necessarily mean that there's a major issue and you don't need to deliver the baby, [rather] you need to observe the delivery, the labor.  And you need to monitor the baby and the mother with a fetal monitor strip." (*Id.* at 58).

Dr. Zamore opined that a pediatrician should have been present for Kendall's delivery given Dr. Dumpe's use of the vacuum extractor, the presence of shoulder dystocia, the kind and consistency of the meconium, and what he termed "serious Category II tracings."[13]  (*Id.* at 69-73, 78-79).  He also testified that the standard of care in the medical community was that when an operative delivery is used, a pediatrician should be called.  (*Id.* at 69).  Additionally, he asserted that a pediatrician should have been called because meconium was present throughout the labor and Dr. Dumpe could not have known whether or not it contained particulate matter without using a microscope.  (*Id.* at 73, 77).  Thus, he disagreed with Heritage Valley Hospital Policy 2.21 because "you cannot define meconium by looking at it."  (*Id.* at 101).

He stated his belief that the need for a pediatrician was confirmed after Kendall was born because she required bulb suctioning, nasopharynx suctioning, and deep tracheal suctioning.  (*Id.* at 75, 88).  While Dr. Zamore agreed that a nurse certified in resuscitation evaluated Kendall, he deemed that to fall below the applicable standard of care as there are key differences between a nurse and a pediatrician when it comes to evaluating a newborn with potential respiratory distress.

---

[13] Shoulder dystocia can occur during delivery when, after a baby's head is delivered, the baby's shoulder is caught underneath the mother's synthesis pubis.  (Docket No. 214 at 72-73).  Although there is a mention of shoulder dystocia in the bill supplied to Plaintiffs, Dr. Dumpe disputed the presence of shoulder dystocia and testified that the McRoberts Maneuver was conducted prophylactically.  (*Id.* at 180-81).  The Court credits Dr. Dumpe's testimony.

(*Id.* at 104, 109).  He also testified that a pediatrician should have been called after Kendall's parents began complaining that she was struggling to breathe.  (*Id.* at 85).

On cross-examination, he stated that Peronis displayed no signs or symptoms of infection during her prenatal care or during her labor and delivery.  (*Id.* at 82-83).  He further agreed that Kendall's APGAR scores were reflective of a healthy baby and that the vitals taken at the nursery at 7:00 a.m. were normal.  (*Id.* at 90-91).  He testified that but for the parents' contrary statements, Kendall displayed no signs of infection until 7:25 a.m.  (*Id.* at 83, 92).  He agreed with Nurse Hendershot that crying was a sign of a healthy baby.  (*Id.* at 107).  Finally, Dr. Zamore testified that he had changed his opinion concerning whether the tracings necessitated earlier delivery and no longer believed that they did.  (*Id.* at 81).  When asked why he had not documented this change, he responded he had not been asked to do so.  (*Id.*)

The United States' expert Dr. Wiesenfeld practices obstetrics and gynecology at UPMC Magee Women's Hospital.  (Docket No. 218 at 10).  He went to McGill University in Montréal, Canada for medical school and after his residency, came to Pittsburgh for a two-year fellowship.  (*Id.* at 11).  Dr. Wiesenfeld presently serves as a Professor of Obstetrics and Gynecology and Reproductive Sciences as well as an Adjunct Professor in the Department of Medicine at UPMC.  (*Id.* at 12).  He is Vice Chair of Gynecology for OB/GYN, Head of the Infection Control Committee, and Director of Reproductive Infectious Disease.  (*Id.*)  Dr. Wiesenfeld has a small practice and delivers babies two days per month averaging 100-150 babies per year.  (*Id.* at 14-15).  Most of his time is spent teaching medical students, residents, and fellows.  (*Id.* at 12-15).

Dr. Wiesenfeld testified that the applicable standard of care did not require a pediatrician to be present for Kendall's delivery.  (*Id.* at 18-20).  He explained that the presence of meconium during delivery was "very common" and that its presence alone does not require a pediatrician to

be summoned. (*Id.* at 21, 31-32). Similarly, he testified that neither the use of a vacuum extractor nor the McRoberts Maneuver required the presence of a pediatrician. (*Id.* at 22-23, 25, 29). Dr. Wiesenfeld further explained that the fetal strips were "very reassuring" and did not present "a sign *of any kind* of concern for resuscitation." (*Id.* at 21-22) (emphasis added). "Reassuring" means that "the baby is doing well and there's nothing that needs to be done acutely to correct any of these findings." (*Id.* at 27). Further, there was nothing in the operative report that led him to believe that a pediatrician needed to be present. (*Id.* at 22). Instead, all that was required when meconium is observed or an operative measure is used is for someone to be present who is certified in newborn resuscitation like Dr. Dumpe or Nurse Hendershot. (*Id.* at 30-32).

Dr. Wiesenfeld testified that Dr. Dumpe met the standard of care and that he would not have done anything differently. (*Id.* at 22, 33-37). Additionally, based on his review of the medical records, Dr. Dumpe could not have foreseen that Kendall had an infection. (*Id.* at 22). Like Dr. Zamore, Dr. Wiesenfeld testified that there was nothing in the record indicating that Kendall had an infection until 7:25 a.m. after Dr. Dumpe had repaired the episiotomy, documented the labor and delivery, checked in on the parents, and left the hospital following his shift. (*Id.* at 60-61, 66, 172-73). To this end, Dr. Wiesenfeld did not see any signs or symptoms of respiratory distress during the labor and delivery. (*Id.* at 22). He described suctioning after birth as "routine." (*Id.* at 23). He further clarified that once a baby is stabilized, the obstetrician's role is over. (*Id.* at 33). He added that it was appropriate for Dr. Dumpe to allow Kendall to stay and bond with her parents in the delivery room given her APGAR scores. (*Id.*)

With regard to Heritage Valley's Policy 2.21, Dr. Wiesenfeld opined that it exceeded the standard of care by requiring a pediatrician to be present when there was visible particulate matter in the meconium. (*Id.* at 45). Under the applicable standard of care, he explained that all that was

required was for someone trained in neonatal resuscitation to be present.  (*Id.* at 45-46).  Thus, regardless of whether particulate matter was present or not, a pediatrician was not required for Kendall's delivery provided that someone certified in neonatal resuscitation was there.  (*Id.* at 54). Finally, Dr. Wiesenfeld testified that he held his opinions to a reasonable degree of medical certainty.  (*Id.* at 38).

This Court credits and gives more weight to the opinions of Dr. Wiesenfeld as to the applicable standard of care having had the opportunity to view his demeanor on the stand and in light of his superior qualifications and experience not only as a treating and teaching OB/GYN but also as an infectious disease specialist, the clearly stated reasons for his opinions, and the fact that his opinions are firmly rooted in the facts as found by this factfinder.  His opinions are also consistent with the nongovernmental defense experts whom this Court found credible.[14]  In making its decision, the Court found Dr. Zamore less credible.  To this end, he changed his mind from the time of his report to the time of his testimony when it came to the issue of whether Kendall should have been delivered earlier.  (Docket No. 214 at 80).  Despite being part of the group that invented fetal tracings, he provided no explanation for the sudden change in his opinion and was particularly evasive on the stand as to his reasons for doing so.  (*Id.* at 58, 80-82).  Thus, the Court will apply the standard of care as stated by Dr. Wiesenfeld.

Turning to the issue of causation, this Court finds the testimony of Drs. Coffin and Boyd not only credible but dispositive.  In thirty years of private trial practice and thirteen years on the

---

[14] Dr. Ringer, an expert in neonatal and perinatal medicine and a Professor of Pediatrics at the Geisinger School of Medicine at Dartmouth and the Chief of Neonatology at the Children's Hospital at Dartmouth, testified that Kendall died from E. coli sepsis.  (*Id.* at 64, 69, 74, 80).  Based upon his review of the medical records and Heritage Valley's policy, Dr. Ringer concluded that Dr. Dumpe was not required to have a pediatrician present at the delivery.  (*Id.* at 76).  And had he called for one, the pediatrician would not have done anything differently.  (*Id.* at 78).  Dr. Ringer also agreed that there was no indication of a problem with Kendall prior to 7:25 a.m.  (*Id.* at 79).  Additionally, he testified that earlier treatment including the administration of antibiotics a couple of hours earlier would not have changed the outcome, given E. coli sepsis.  (*Id.* at 80-81, 98).  *See also* discussion *infra* at pages 17-18.

bench, this Court has never seen a better witness than Dr. Boyd.  She not only has the unique ability to simplify and teach complex areas of medicine but her demeanor during her testimony was undeniably convincing.  She is an expert in perinatal and pediatric pathology.  (Docket No. 218 at 147).  She serves as an Associate Professor of Pathology at Harvard Medical School, works at Boston Children's Hospital, and has performed hundreds of neonatal pediatric autopsies.  (*Id.* at 134, 140).  As such, this Court finds her more qualified to render opinions as to the cause of death in this case than Dr. Min.

She determined that the cause of Kendall's death was neonatal sepsis due to E. coli, which had begun at least a few days prior to delivery.  (*Id.* at 148-49).  She explained that Peronis had an ascending infection, which resulted in bacteria moving up the birth canal and setting up residence in the womb.  (*Id.* at 150).  Dr. Boyd testified that although there was evidence of meconium aspiration on the autopsy slides, it did not cause Kendall's death.  (*Id.*)  In the same vein, she testified that there was no pathological evidence of "massive meconium aspiration" in this case.  (*Id.* at 150-60, 182-84).  She concluded stating, "there is abundant evidence in the neonatal autopsy that the series of events [began] in utero and culminat[ed] in early neonatal death." (*Id.* at 172).

The Court also gave significant weight to the testimony of Dr. Coffin, who is an expert in pediatric infectious disease and works at Children's Hospital in Philadelphia, one of the top pediatric hospitals in the country.  (Docket No. 219 at 9).  She is a Professor of Pediatrics at the University of Pennsylvania School of Medicine but spends 20% of her time in clinical practice. (*Id.* at 9-10, 12).  She likewise testified that Kendall died from an overwhelming infection with E. coli.  (*Id.* at 21-22).  The infection began before birth and grew so rapidly that an earlier

administration of antibiotics would not have made a difference because there was a "tempo of inevitability." (*Id.* at 22-27, 43-44, 57-58).

## V.   CONCLUSIONS OF LAW

This Court has jurisdiction over Plaintiffs' claims under the FTCA. 28 U.S.C. §§ 1346(b). Absent waiver, "sovereign immunity shields the Federal Government and its agencies from suit." *FDIC v. Meyer*, 510 U.S. 471, 475 (1994). The FTCA, however, carved out a "limited waiver" to that sovereign immunity. *Santos ex rel. Beato v. United States*, 559 F.3d 189, 193 (3d Cir. 2009) (citing 28 U.S.C. § 2674). To this end, it "authorizes private tort actions against the United States 'under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.'" *United States v. Olson*, 546 U.S. 43, 44 (2005) (quoting 28 U.S.C. § 1346(b)(1)). There is no dispute that Primary Health Network is a federally funded clinic and that Dr. Dumpe was an employee there. (J1; J2; Docket No. 214 at 112). In addition, because Dr. Dumpe's purported negligent acts or omissions occurred in Pennsylvania, this Court must apply Pennsylvania's substantive law in rendering its determination whether the United States was negligent. *See Olson*, 546 U.S. at 44; *Estate of Whitling ex rel. Whitling v. United States*, 99 F. Supp. 2d 636, 647 (W.D. Pa. 2000).

In Pennsylvania, "[t]o prevail in a medical malpractice action, a plaintiff must 'establish [by a preponderance of the evidence] a duty owed by the physician to the patient, a breach of that duty by the physician, that the breach was the proximate cause of the harm suffered, and the damages suffered were a direct result of the harm.'" *Toogood v. Owen J. Rogal, D.D.S., P.C.*, 824 A.2d 1140, 1145 (Pa. 2003) (citing *Hightower-Warren v. Silk*, 698 A.2d 52, 54 (Pa. 1997)); *see Booker*, 789 F. App'x at 306. In so doing, "[t]he plaintiff must present expert testimony to establish these elements because the medical field is generally beyond the scope of a layperson's

ordinary knowledge." *Booker*, 789 F. App'x at 306 (citing *Toogood*, 824 A.2d at 1145). Consequently, "[t]he applicable duty of care in this case is the standard articulated by a credible expert witness, as established through expert testimony." *Id.* at 307.

"To prevail on a claim of medical negligence, the plaintiff must prove that the defendant's treatment fell below the appropriate standard of care." *Michell v. Shikora*, 209 A.3d 307, 316 (Pa. 2019) (quoting *Brady v. Urbas*, 111 A.3d 1155, 1161-64 (Pa. 2015)). Yet, there is no "presumption or inference of negligence merely because a medical procedure terminated in an unfortunate result which might have occurred despite the exercise of reasonable care." *Id.* (quoting *Toogood*, 824 A.2d at 1150; *Collins v. Hand*, 246 A.2d 378, 401 (Pa. 1968)). "Determining what constitutes the standard of care is complicated, involving considerations of anatomy and medical procedures, and attention to a procedure's risks and benefits. Further, a range of conduct may fall within the standard of care." *Id.* Pennsylvania courts have consistently held that "the standard of care in medical malpractice actions is first and foremost what is reasonable under the circumstances." *Joyce v. Boulevard Physical Therapy & Rehab. Or., P.C.*, 694 A.2d 648, 656 (Pa. Super. Ct. 1997) (citing *Collins*, 246 A.2d at 398).

Plaintiffs allege that Dr. Dumpe breached the standard of care in the following respects: he failed to timely and properly recognize fetal compromise; failed to properly follow hospital policies; failed to handle the meconium fluid encountered during labor and delivery; failed to call in a pediatrician to be present at delivery; and failed to have Kendall transferred to the nursery after delivery. (Docket No. 221 at 4) (citing Docket No. 1 at 13-15). Because Dr. Dumpe is a doctor in the field of obstetrics and gynecology, the only expert opinions that are relevant to the standard of care are those of Drs. Zamore and Wiesenfeld. As explained in the preceding section, this Court gives more weight to the opinion of Dr. Wiesenfeld. To this end, the applicable standard

of care required someone certified in neonatal resuscitation to be present for Kendall's delivery given the presence of Category II tracings, the presence of nonparticulate meconium, and the use of a prophylactic McRoberts Maneuver and vacuum extractor.  (Docket No. 218 at 21-23, 25, 29, 45-54).  Consequently, because the obstetrician, Dr. Dumpe, and the assisting Labor and Delivery Nurse, Nurse Hendershot, were both certified and trained in neonatal resuscitation, the United States cannot be said to have breached the standard of care in failing to call a pediatrician to be present at Kendall's delivery or in failing to respond to the meconium fluid encountered during labor and delivery.

As to Plaintiffs' next argument that Dr. Dumpe failed to follow hospital policy, the Court finds that the credible evidence of record establishes that what Dr. Dumpe witnessed was nonparticulate thin meconium.  (Docket No. 214 at 139-48, 189-90).  Thus, per Policy 2.21, Dr. Dumpe was not required to summon a pediatrician to be present at Kendall's birth.[15]  (J14).  It bears mentioning that Dr. Zamore's position has more to do with his disagreement with the contents of the Policy, as he believes that a pediatrician should always be present when meconium is seen, a standard of care this Court has already rejected.[16]  (Docket No. 214 at 57, 101).

Concerning Plaintiffs' arguments that Kendall should have been transferred to the nursery sooner and that Dr. Dumpe failed to recognize fetal compromise, both experts agree that there was no evidence that Kendall was in distress prior to Dr. Dumpe leaving the delivery room.[17]  (*Id.* at

---

[15] This Court's finding is consistent with that of the jury who opted not to hold the Hospital defendants liable for Nurse Hendershot's failure to request a pediatrician to be present as she too was bound by the same Policy and would have been required to do so were the facts as Plaintiffs suggest.  (Docket No. 205).

[16] Although Dr. Dumpe played a role in formulating the Policy, it is a hospital policy, nonetheless.  (*Id.* at 101).

[17] It bears mentioning that even where there was evidence suggesting respiratory distress in the nursery, the jury did not find the Hospital defendants liable for the actions or inactions of either Nurse McCrory or Dr. Heiple.  (Docket No. 205).

83, 92; 218 at 60-61, 66).  For these reasons, this Court finds that Dr. Dumpe did not breach the

standard of care and the United States is not liable for medical malpractice.[18]

Finally, it is worth noting that Plaintiffs' Brief in Support of Proposed Findings of Fact and

Conclusions of Law largely focuses on the alleged increased risk of harm Kendall sustained as a

result of Dr. Dumpe's purported negligent acts and omissions.  (Docket No. 222).  However, that

doctrine applies to the issue of causation and not to the first two elements of negligence.  *See K.H.*

*ex rel. H.S. v. Kumar*, 122 A.3d 1080, 1104 (Pa. Super. Ct. 2015) (quoting *Hamil v. Bashline*, 392

A.2d 1280, 1288 (Pa. 1978) (stating "[i]n light of our interpretation of [subs]ection 323(a), it

---

[18] In this Court's estimation, to the extent Plaintiffs' claim is based on treatment modalities used by Dr. Dumpe, it also fails under Pennsylvania's "two schools of thought" doctrine.  *See MacDonald v. United States*, 767 F. Supp. 1295 (M.D. Pa. 1991) (applying the "two schools of thought" doctrine in a nonjury setting); *see also Harrington v. United States*, 408 F. Supp. 177 (E.D. Pa. 1976).  "The 'two schools of thought' doctrine serves as a defense to a claim of negligence," *Mitchell v. Shikora*, 209 A.3d 307, 313 n.4 (Pa. 2019), and as such, the burden of proof lies with the defendant, *Jones v. Chidester*, 610 A.2d 964, 969 (Pa. 1992).  *See also Tillery v. Children's Hosp. of Phila.*, 156 A.3d 1233, 1242-43 (Pa. Super. Ct. 2017) (holding "[i]mportantly, the two schools of thought doctrine does not apply to cases in which the issue is a defendant's failure to diagnose") (internal citation and quotation omitted).  Specifically, '[w]here competent medical authority is divided, a physician will not be held responsible if in the exercise of his judgment he followed a course of treatment advocated by a considerable number of recognized and respected professionals in his given area of expertise.'"  *Mitchell*, 209 A.3d at 313 n.4 (quoting *Jones*, 610 A.2d at 969).  Defendant's burden is not onerous.  *Marsteller v. Hanks*, No. 11 MDA 2015, 2015 WL 6551018, at *3 (Pa. Super. Ct. Sept. 17, 2015) (citing *Gala v. Hamilton*, 715 A.2d 1108, 1110-11 (Pa. 1998)).  Such that:

> [t]he proper use of expert witnesses should supply the answers.  Once the expert states the factual reasons to support his claim that there is a considerable number of professionals who agree with the treatment employed by the defendant, there is sufficient evidence to warrant an instruction to the jury on the two "schools of thought."  It then becomes a question for the jury to determine whether they believe that there are two legitimate schools of thought such that the defendant should be insulated from liability.

*Id.* (quoting *Gala*, 715 A.2d at 1110-11) (citation omitted).

Dr. Wiesenfeld testified that the standard in the medical community was to have someone certified in neonatal resuscitation present when there was meconium, a prophylactic McRoberts Maneuver, Category II tracings, and the use of a vacuum extractor.  (Docket No. 218 at 18-20, 30-32).  Dr. Ringer came to a similar conclusion.  (Docket No. 219 at 76).  Additionally, Dr. Wiesenfeld also explained that Heritage Valley Policy 2.21 exceeded the standard of care when it came to the issue of the presence of meconium by requiring a pediatrician to be present when there was particulate matter in the meconium.  (Docket No. 218 at 55-56).  Dr. Dumpe testified that this Policy was formed in consultation with the American Academy of Pediatrics and American College of Obstetricians and Gynecologists' recommendations and standards and in consultation with other hospitals.  (*Id.* at 186-95).  Here, Dr. Dumpe and the person he entrusted Kendall with immediately after her birth, Nurse Hendershot, were both trained in neonatal resuscitation.  (*Id.* at 30-31, 54).  He testified that the treatment Kendall was given was consistent with Hospital policy.  (*Id.* at 218).  Dr. Dumpe met the standard of care.  Therefore, in this Court's estimation, the United States has an additional defense.  *See Mitchell*, 209 A.3d at 313 n.4.

follows that where medical causation is a factor in a case coming within that Section, it is not necessary that the plaintiff introduce medical evidence in addition to that already adduced to prove defendant's conduct increased the risk of harm . . .") (alterations in original).  As the United States stressed at sidebar, Plaintiffs conceded that their expert did not offer causation testimony and as such, they cannot prevail on the causation element of their claim.  (Docket 218 at 37); *see Toogood, 873 A.2d at 1145* (providing "[b]ecause the negligence of a physician encompasses matters not within the ordinary knowledge and experience of laypersons a medical malpractice plaintiff must present expert testimony to establish the applicable standard of care, the deviation from that standard, causation and the extent of the injury").  Given that Plaintiffs did not meet their burden of producing expert opinion on causation coupled with the convincing opinions of Drs. Boyd and Coffin, the Court finds that Dr. Dumpe did not increase the risk of harm to Kendall.  Rather, her tragic death was the result of neonatal sepsis due to E. coli and not the result of any negligence on the part of Dr Dumpe.  For these reasons, judgment will be entered in favor of the United States and against Plaintiffs.

An appropriate Judgment Order will follow.

*/s Nora Barry Fischer*
Nora Barry Fischer
Senior United States District Judge

Dated: April 7, 2020

cc/ecf:  All counsel of record